**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES GARAVAGLIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-CV-1681-CDP |
| | ) | |
| CITY OF ST. LOUIS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**DEFENDANTS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS IN**</u>
<u>**SUPPORT OF THEIR JOINT MOTION FOR SUMMARY JUDGMENT**</u>

COME NOW Defendants the City of St. Louis (the "City") and Darlene Green ("Comptroller Green") and hereby submit the following Statement of Uncontroverted Material Facts in Support of their Joint Motion for Summary Judgment.

**Undisputed Facts Regarding City Comptroller's Office Organization**

1.      Comptroller Darlene Green is an African American woman, who has served as Comptroller for the City of St. Louis ("the City") since 1995.  (**SJ Exhibit 1**, Deposition of James Garavaglia ("Garavaglia Depo."), p. 36, lines 20-23; **SJ Exhibit 9**, Deposition of Darlene Green ("Green Depo."), p. 21, lines 1-6.)

2.      As Comptroller for the City, Comptroller Green is the chief financial officer of the City charged with oversight of the finances of the City and charged with protecting the credit rating of the City.  (**SJ Exhibit 9**, Green Depo. p. 28, lines 12-18.)

3.      Comptroller Green sits on the St. Louis City Board of Estimate and Apportionment ("E&A"), who, along with the Mayor and President of the Board of Aldermen, meets as a Board to approve expenditures on behalf of the City.  (**SJ Exhibit 25**, Deposition of Beverly Fitzsimmons ("Fitzsimmons Depo."), p. 13, lines 21-25, p. 14, lines 1-16.)

4.    Comptroller Green has a Deputy Comptroller who is the second in command under the Comptroller.  (**SJ Exhibit 9**, Green Depo., p. 51, lines 5-25, p. 52, lines 1-25, p. 53, lines 1-25); **SJ Exhibit 25**, Fitzsimmons Depo., p. 14, lines 24-25, p. 15, lines 1-16.)

5.    Comptroller Green, during her tenure, also created a position called Deputy Comptroller, Finance and Development, responsible for certain City public financing issues and other operations within the Office of the Comptroller. (**SJ Exhibit 9**, Green Depo., p. 53, lines 18-25, p. 54, lines 1-11; **SJ Exhibit 25**, Fitzsimmons Depo., p. 15, lines 16-25, p. 16, lines 1-3.)

6.    As Comptroller for the City, only the Comptroller (or her designee) is authorized to sign contracts that bind the City.  (**SJ Exhibit 9**, Green Depo. p. 82, lines 20-25; p. 83, lines 1-10.)

7.    St. Louis City Charter Article XXV, Section 9 provides:

All contracts relating to city affairs shall be in writing, signed and executed in the name of the city. In cases not otherwise provided by law or ordinance**, they shall be made by the comptroller**, and in no case by the board of aldermen or any committee thereof. Contracts not made by the comptroller shall be countersigned by him, and **all contracts shall be filed and registered by number, date and contents with the register**.  (emphasis added)

8.    Other than Comptroller Green, the only person authorized to sign contracts on her behalf was Deputy Comptroller Beverly Fitzsimmons.  (**SJ Exhibit 9**, Green Depo. p. 83, lines 2-25, p. 84, lines 1-10, p. 86, lines 1-20; **SJ Exhibit 25**, Fitzsimmons Depo., p. 23, lines 23-25; p. 24, lines 1-25; p. 25, lines 1-23.)

9.    The types of legally binding contract documents that require a signature of the Comptroller or her designee include lease agreements, financial closing documents, development closing documents, and other agreements.  (**SJ Exhibit 9**, Green Depo. p. 83, lines 2-25, p. 84, lines 1-10, p. 86, lines 1-20.)

10.      As an elected Comptroller for the City, the type of professionalism sought from and demanded of Plaintiff as Deputy Comptroller was important in protecting the integrity of the office of the Comptroller, which obligations included behaving in a professional manner and performing job duties and responsibilities with professionalism and honesty.  (**SJ Exhibit 9**, Green Depo. p. 272, lines 3-20.)

11.      It is very important that Deputies employed by the Comptroller keep the Comptroller fully apprised of what is happening with respect to projects that impact her duties as elected Comptroller of the City because Deputy Comptrollers are the eyes and ears of the Comptroller with respect to the Comptroller Office's dealing with developers, investment bankers, lawyers and others who are working on projects on behalf of the City.  (**SJ Exhibit 9**, Green Depo., p. 271, lines 8-25, p. 272, lines 1-20.)

### Undisputed Facts Regarding Plaintiff's Promotion and Duties and Responsibilities as Deputy Comptroller, Finance and Development

12.      Plaintiff James Garavaglia was employed with the City from April of 1987 until he retired from the City effective October 1, 2019.  (**SJ Exhibit 1**, Garavaglia Depo. p. 12, lines 11-13, p. 351, lines 13-25, p. 352, lines 1-7; **SJ Exhibit 2** [Garavaglia Depo. Ex. 24], page STL1405.)

13.      As Asset Manager for the City of St. Louis, and prior to his promotion to Deputy Comptroller, Plaintiff did not have authority to sign contracts on behalf of the City.  (**SJ Exhibit 1**, Garavaglia Depo. p. 21, lines 19-21.).

14.      The position of Deputy Comptroller, Finance and Development, became available because the person who filled that position, an African American woman named Ivy Pinkston, died.  (**SJ Exhibit 1**, Garavaglia Depo. p. 33, lines 11-20.)

15.      In considering whom to replace Ms. Pinkston in 2016 as Deputy Comptroller, Finance and Development, Comptroller Green extended an offer to an African-American

investment banker named Ron Browning Smith, who at the time was 70 years old. (**SJ Exhibit 9**, Green Depo. p. 114, lines 8-25, p. 115, lines 1-11.)

16. In May of 2016, Comptroller Darlene Green promoted Plaintiff to the position of Deputy Comptroller, Finance and Development. (**SJ Exhibit 1**, Garavaglia Depo. p. 26, lines 6-15; **SJ Exhibit 5**, Deposition of Richard Frank ("Frank Depo."), p. 70, lines 1-25.)

17. When Comptroller Green promoted Plaintiff from Asset Manager to Deputy Comptroller, Finance and Development, Plaintiff was a 65 year old white male, born on September 20, 1952. (**SJ Exhibit 1**, Garavaglia Depo. p. 27, lines 20-23, p. 100, lines 13-15, p. 351-352; **SJ Exhibit 2** [Garavaglia Depo. Exh. 24, page STL1405.)

18. When Plaintiff applied for and was promoted to Deputy Comptroller, Finance and Development, he was ranked number five of six potential candidates for the position. (**SJ Exhibit 1**, Garavaglia Depo. p. 30, lines 24-25, p. 31, lines 1-10.)

19. When Plaintiff was being rated in conjunction with his application for the position of Deputy Comptroller, Finance and Development, Plaintiff was rated as "average" and evaluators pointed out the fact that he lacked knowledge in the finance area. (**SJ Exhibit 1**, Garavaglia Depo. p. 31, lines 11-25, p. 32, lines 1-25, p. 33, lines 1-10.)

20. One evaluator also pointed out that during the interview process, Plaintiff struggled to answer questions related to debt and financing. (**SJ Exhibit 1**, Garavaglia Depo. p. 33, lines 1-10.)

21. Plaintiff acknowledged that debt and financing was an area of weakness where he had the least experience. (**SJ Exhibit 1**, Garavaglia Depo. p. 33, lines 4-10.)

22. When Plaintiff was promoted to Deputy Comptroller, Finance and Development, a white female named Beverly Fitzsimmons born in 1958 served as Deputy Comptroller for the City,

who had been promoted to that position before Plaintiff's promotion.  (**SJ Exhibit 1**, Garavaglia Depo. p. 33, lines 22-25, p. 34, lines 1-12; **SJ Exhibit 25**, Fitzsimmons Depo., p. 8, lines 22-23, p. 12, lines 4-12, p. 114, lines 7-14.)

23.     Part of Plaintiff's responsibility in serving as Deputy Comptroller, Finance and Development was to make sure that important financing documents for transactions involving the City were properly executed by the elected officials, who needed to sign the documents, in a timely fashion.  (**SJ Exhibit 9**, Green Depo. p. 121, lines 17-25, p. 122, lines 1-17, lines 24-25, p. 123, lines 1-21, p. 124, lines 14-25; p. 125, lines 1-21.)

24.     Upon his promotion by Comptroller Green, Plaintiff was eligible to receive only a 5% raise; however, Comptroller Green ultimately recommended and received approval to give Plaintiff a 10% pay raise.  (**SJ Exhibit 1**, Garavaglia Depo. p. 35, lines 6-25, p. 36, lines 1-4; **SJ Exhibit 5**, Frank Depo. p. 66, lines 2-25, p. 67, lines 1-25, p. 68, lines 1-15, p. 69, lines 11-25, p. 70, lines 1-25, p. 71, lines 1-25, p. 72, lines 1-25, p. 73, lines 1-18; **SJ Exhibit 6** [Frank Depo. Ex. 11], STL707-708.)

25.     Based on this promotion and 10% pay raise, Plaintiff was paid more in salary than the Comptroller.  (**SJ Exhibit 1**, Garavaglia Depo. p. 36, lines 2-19.)

26.     In initially offering the job to Plaintiff, Comptroller Green expressed her happiness in a congratulatory call to Plaintiff that Plaintiff would be making a lot more money, would be able to retire and go out ultimately at one of the top jobs in the office, and expressly told Plaintiff that she was "ecstatic" for Plaintiff.  (**SJ Exhibit 9**, Green Depo. p. 142, lines 4-25, p. 143, lines 1-8.)

27.     Plaintiff acknowledged that during this call, Comptroller Green advised him that she was glad he accepted the position and was happy for him regarding this promotion.  (**SJ**

**Exhibit 1**, Garavaglia Depo. p. 66, lines 16-25, p. 67, lines 1-25, p. 68, lines 1-25, p. 69, lines 1-25)

28.     Comptroller Green never thought about replacing Plaintiff as Deputy Comptroller, Finance and Development while he was serving in that position.  (**SJ Exhibit 9**, Green Depo. p. 143, lines 23-25, p. 144, lines 1-2.)

29.     As Deputy Comptroller, Finance and Development, Plaintiff was responsible for telecommunications services provided to the City, including those services provided by AT&T, and was responsible for the Gateway Transportation Center, which had waste management services provided by Waste Management of Missouri, Inc. ("Waste Management").  (**SJ Exhibit 25**, Fitzsimmons Depo., p. 14, lines 17-25, p. 15, lines 1-18; p. 104, lines 10-25, p. 105, lines 1-14.)

30.     Throughout his tenure with the City, Plaintiff understood that, pursuant to the City's Charter, the Comptroller's signature, or a designee authorized in writing, was required on contracts to bind the City.  (**SJ Exhibit 1**, Garavaglia Depo. p. 22, lines 8-25, p. 23, lines 1-12.)

31.     St. Louis City Charter Article XV, Section 3 provides:

"Any officer or employee in the comptroller's office **may be designated** by him to draw warrants upon the treasury with the same effect as if signed by the comptroller, **such designation to be in writing**, **in duplicate, filed with the mayor and in the treasury division**."

32.     Plaintiff understood that the City's contracts would also have to be reviewed by the City Counselor's office to be approved as to form, and approved by E&A:



(**SJ Exhibit 1**, Garavaglia Depo. p. 23, lines 13-17, p. 275, lines 18-25, p. 276, lines 1-25, p. 277, lines 1-21, Garavaglia Depo. p. 279, lines 11-25, p. 280, lines 1-25, p. 281, lines 1-25, p. 282, lines 1-11; **SJ Exhibit 3**, [Garavaglia Depo. Ex. 11], page GRN460-473]); **SJ Exhibit 4**, [Garavaglia Depo. Ex. 12], page GRN465-473]; **SJ Exhibit 25**, Fitzsimmons Depo., p. 130, lines 1-25, p. 131, lines 1-25, p. 132, lines 1-25, p. 133, lines 1-25, p. 134, lines 1=25, p. 135, lines 1-25, p. 136, lines 1-25, p. 137, lines 1-25.; **SJ Exhibit 26**, [Garavaglia Depo. Ex. 20]; **SJ Exhibit 27**, [Garavaglia Depo. Ex. 21].)

33.     In his deposition, Plaintiff reviewed and acknowledged certain written delegations of authority from Comptroller Green to Deputy Comptroller Beverly Fitzsimmons and Judy Armstrong.  (**SJ Exhibit 1,** Garavaglia Depo. p. 277, lines 22-25, p. 278, lines 1-25, p. 279, lines 1-3; **SJ Exhibit 3** [Garavaglia Depo. Ex. 11], pp. GRN000461, page Garavaglia 386; **SJ Exhibit 23**, p. GRN 000456; **Exhibit 25**, Fitzsimmons Depo., p. 123, lines 1-25, p. 124, lines 1-25, p. 125, lines 1-8.)

34.     Plaintiff acknowledged that he has not seen any written document whereby the Comptroller had granted him signature authority on behalf of the Comptroller.  (**SJ Exhibit 1**, Garavaglia Depo. p. 279, lines 4-10.)

35.     As part of his regular duties as Deputy Comptroller, Finance and Development, Plaintiff was obligated to keep Comptroller Green fully apprised of what was transpiring in the areas in which he supervised.  (**SJ Exhibit 1**, Garavaglia Depo. p. 88, lines 10-23.)

36.     Plaintiff acknowledged that it was not uncommon to seek guidance from the Department of Personnel as it relates to potential discipline, the purpose of which was to ensure that proper policies and procedures were being followed.  (**SJ Exhibit 1**, Garavaglia Depo. p. 91, lines 8-25, p. 92, lines 1-11.)

**Undisputed Facts Regarding Plaintiff's Responsibilities Under City Code of Conduct.**

37.     Plaintiff was familiar with the City's Employee Code of Conduct ("Code of Conduct") because he was asked and openly certified annually that he received and reviewed it.  (**SJ Exhibit 1**, Garavaglia Depo. p. 36, lines 24-25, p. 37, lines 1-7, p. 158, lines 1-21; **SJ Exhibit 7** [Garavaglia Depo. Ex. 3], pages Garavaglia 28-34.)

38.     Plaintiff also understood that the Code of Conduct imposed an obligation on him to act with honor, faithfulness, loyalty, fairness, and due diligence in conducting his job responsibilities.  (**SJ Exhibit 1**, Garavaglia Depo. p. 46, lines 22-25, p. 47, lines 1-2.)

39.     Under the Code of Conduct, Plaintiff also recognized that he had an obligation to comply with all applicable laws and regulations, which laws included the City's Charter. (**SJ Exhibit 1**, Garavaglia Depo. p. 47, lines 1-9.)

40.     The Code of Conduct also imposed an obligation on him to meet acceptable standards of performance and to not take actions that were illegal or unethical or that violated any of the City's rules and regulations.  (**SJ Exhibit 1**, Garavaglia Depo. p. 47, lines 7-18, p. 48, lines 1-25.)

41.     Plaintiff was fully aware that under the Code of Conduct, he had an obligation to document every aspect of a transaction fully and completely, and he had an obligation not to make any misleading representations or falsify any record or engage in any false communication of any kind, whether internally or externally.  (**SJ Exhibit 1**, Garavaglia Depo. p. 162, lines 6-25, p. 163, lines 1-16.)

42.     Plaintiff also understood and recognized that all City employees should be completely honest in their dealings with the public, elected officials, appointing authorities, supervisors, and fellow employees, and that lying in any form or omitting any facts would be a violation of that policy, which violations could result in disciplinary action up to and including dismissal.  (**SJ Exhibit 1**, Garavaglia Depo. p. 162, lines 16-25, p. 163, lines 1-25, p. 164, lines 1-9.)

43.     As a senior manager of the City, Plaintiff recognized that he had an obligation to protect the revenue, property, information and assets of the City from any attempt by either

members of the public, contractors, vendors, agents or any employees to gain or preclude them from gaining by deceit, financial, or other benefit at the expense of City's taxpayers.  (**SJ Exhibit 1**, Garavaglia Depo. p. 48, lines 20-25, p. 49, lines 1-4.)

44.    Plaintiff also understood that under the Code of Conduct, he had an obligation to make sure that the transactions in which he was involved were documented fully and completely.  (**SJ Exhibit 1**, Garavaglia Depo. p. 50, lines 12-18; p. 162, lines 20-25, p. 163, lines 1-4.)

45.    As Deputy Comptroller, Finance and Development, Plaintiff also understood that he had an obligation to make sure that the City's books and records reflected all transactions in an accurate and timely manner.  (**SJ Exhibit 1**, Garavaglia Depo. p. 51, lines 4-13.)

46.    Plaintiff also understood that under the Code of Conduct he had an obligation as Deputy Comptroller, Finance and Development, not to make any misleading representations or falsify any records or engage in any false communications of any kind, whether internal or external, including but not limited to, filing any false report, attendance, production, financial, or similar reports or statements.  (**SJ Exhibit 1**, Garavaglia Depo. p. 51, line 25, p. 52, lines 1-25, p. 53, lines 1-25, p. 54, lines 1-18, p. 163, lines 5-16.)

47.    Plaintiff was fully aware that the falsification of official City records could result in immediate termination.  (**SJ Exhibit 1**, Garavaglia Depo. p. 157, lines 21-25, p. 158, lines 1-12, p. 158, lines 18-21.)

**Undisputed Evidence Regarding Plaintiff's History of Mishandling Documents**

48.    After Plaintiff began working in the position of Deputy Comptroller, Plaintiff was promoted to Deputy Comptroller, Finance and Development, the work protocols that had been developed under his predecessor fell apart, and Comptroller Green became aware that Plaintiff was mishandling documentation in performing his duties of that position.  (**SJ Exhibit 9**, Green

Depo. p. 118, lines 5-25, p. 119, lines 1-10, lines 24-25, p. 120, lines 1-25, p. 121, lines 1-8p. 121, lines 2-16.)

49.     In response to Plaintiff's mishandling of documents, Comptroller Green followed up with him by having conferences with him regarding the proper handling, signing and circulating of documents on multiple occasions.  (**SJ Exhibit 9**, Green Depo. p. 126, lines 4-25, p. 127, lines 1-10.)

50.     Comptroller Green followed up with Plaintiff regularly regarding his mishandling of important closing documents by way of verbal reprimands and coaching.  (**SJ Exhibit 9**, Green Depo. p. 129, lines 6-25, p. 130, lines 1-5.)

51.     Based upon the series of events in June 2019 regarding the Muni Court Project documents, which culminated in what both Comptroller Green and Plaintiff determined to be a "chaos", Comptroller Green determined that Plaintiff would not follow her directives.  (**SJ Exhibit 9**, Green Depo. p. 130, lines 20-25, p. 131, lines 1-9; **SJ Exhibit 1**, Garavaglia Depo. p. 214, lines 14-25, p. 215, lines 1-6.)

52.     Sophisticated financial transactions involving the City, specifically including the Muni Court Project, have hard and fast deadlines, and, thus, it is necessary to have a sense of urgency in working to meet these deadlines.  (**SJ Exhibit 9**, Green Depo. p. 131, lines 10-25; p. 132, lines 1-7.)

53.     Despite Plaintiff's dereliction in handling the important closing documents for the Muni Court Project, no deadlines were ultimately missed only because Comptroller Green had processes in place and other staff support to make sure that these documents were properly and timely executed.  (**SJ Exhibit 9**, Green Depo. p. 134, lines 2-11.)

**Undisputed Facts Regarding Municipal Court "Chaos"**

54.     The Municipal Court Project was a multi-million dollar City project which involved redeveloping the Municipal Court building into a hotel and a parking lot, which would have taken a building that was not in use and put it into use such that it would create between 60 – 70 jobs, along with revenues from hotel taxes and sales taxes rather than being unused and boarded up (the "Muni Court Project").  (**SJ Exhibit 9**, Deposition of Darlene Green ("Green Depo."), p. 286, lines 14-25, p. 287, lines 1-4.)

55.     As Deputy Comptroller, Finance and Development, Plaintiff had an obligation to keep Comptroller Green up to date regarding what was transpiring with respect to this important Muni Court Project, and Comptroller Green should have been updated and kept in the loop by Plaintiff on a regular basis regarding what was going on with this important, time-sensitive item. (**SJ Exhibit 1**, Garavaglia Depo., p. 88, lines 10-23, p. 174, lines 17-25, p. 175, lines 1-18; **SJ Exhibit 9**, Green Depo. p. 209, lines 24-25, p. 210, lines 1-25, p. 211, lines 1-20, p. 216, lines 23-25, p. 217, lines 1-25, p. 218, lines 1-25, p. 219, lines 1-20; **SJ Exhibit 7** [Garavaglia Depo. Ex. 3], p. Garavaglia 33 (According to the Code of Conduct, "[w]hen deciding on a course of action, City supervisors frequently rely on the views and opinions of their employees. In such cases, an employee is obliged to give as much information as possible, and his/her own best opinion, to the supervisor before the matter is decided."))

56.     With respect to E&A, "anything that goes on the agenda is approved by the Comptroller. The final agenda is approved by the Comptroller." (**SJ Exhibit 1**, Garavaglia Depo., p. 175, lines 11-13.)

57.     When the Muni Court Project documentation was in the process of being placed on the E&A agenda at the direction of Plaintiff, Plaintiff failed to communicate that fact to the

Comptroller for a number of days despite repeated requests by Deputy Comptroller Beverly Fitzsimmons that he do so. (**SJ Exhibit 1**, Garavaglia Depo. p. 164, lines 10-25, p. 165, lines 1-5, p. 172, lines 22-25, p. 173, lines 1-25, p. 174, lines 1-25, p. 175, lines 1-25, p. 176, lines 1-25, p. 177, lines 1-25, p. 178, lines 1-25, p. 179, lines 1-25, p. 180, lines 1-25, p. 181, lines 1-8, p. 186, lines 24-25, p. 187, lines 1-16; **SJ Exhibit 10** [Garavaglia Depo. Ex. 5], pages Garavagalia 105-109; **SJ Exhibit 25**, Fitzsimmons Depo., p. 55, lines 19-25, p. 56, lines 1-25, p. 57, lines 1-25, p. 58, lines 1-25, p., 59, lines 1-3.)

58.     Plaintiff delayed several days between Friday, June 14, 2019 and Tuesday, June 18, 2019 before advising Comptroller Green that Muni-Court developer Vertical Realty had not obtained the requisite tax clearance, which was needed before placing the Muni Court Project on E&A's June 19, 2019 agenda for approval. (**SJ Exhibit 1**, Garavaglia Depo. pp. 179, lines 11-25, p. 180, lines 1-12, p. 186, lines 24-25, p. 187, lines 1-16; **SJ Exhibit 9**, Green Depo, p. 200, lines 5-25, p. 201, lines 1-6, p. 268, lines 8-25, p. 269, lines 1-25, p. 270, lines 1-25, p. 271, lines 1-7.; **SJ Exhibit 10** [Garavaglia, Depo. Ex. 5].)

59.     Plaintiff represented to Deputy Comptroller Beverly Fitzsimmons that Comptroller Green was okay with having the Muni Court Project documentation placed on the E&A agenda even though he did not so apprise Comptroller Green. (**SJ Exhibit 1**, Garavaglia Depo. p. 178, lines 22-25, p. 179, lines 1-10, p. 180, lines 5-8; **SJ Exhibit 10** [Garavaglia Depo. Ex. 5], pages Garavagalia 105-109; **SJ Exhibit 25**, Fitzsimmons Depo., p. 55, lines 19-25, p. 56, lines 1-25, p. 57, lines 1-25, p. 58, lines 1-25, p., 59, lines 1-3.)

60.     Plaintiff sought to have the Muni Court Project documentation placed on the E&A agenda for approval even though he was fully aware that the prerequisite of having taxes paid in advance of approval by E&A was required, and he failed to apprise the Comptroller for multiple

days that the taxes were outstanding.  (**SJ Exhibit 1**, Garavaglia Depo. p.184, lines 9-25, p. 185, lines 1; 18-25, p. 186, lines 1-17, line 24-25; p. 187, lines 1-25, p. 188, lines 1-9; **SJ Exhibit 10** [Garavaglia Depo. Ex. 5], pages Garavagalia 105-109.)

61.     When Plaintiff finally did discuss the status of the Muni Court project with Comptroller Green on Tuesday, June 18, 2019 before the scheduled E&A meeting, Plaintiff made it appear as if the Mayor's office was pushing to place the matter on the E&A agenda for approval the following day, and he did not advise Comptroller Green that, in fact, he was the person who had made the request to have the Muni Court Project placed on the E&A agenda.  (**SJ Exhibit 9**, Green Depo. p. 201, lines 8-25, p. 202, lines 1-25, p. 203, lines 1-25, p. 204, lines 1-6.)

62.     As it related to Plaintiff's attempt to place the Muni Court Project on the E&A Agenda for the June 19, 2019 E&A meeting, it was Comptroller Green's expectation that Plaintiff would have communicated to her the fact that he had already sought to place this matter on the E&A Agenda even though he implied that the Mayor's office sought to place it on the E&A Agenda.  (**SJ Exhibit 9**, Green Depo., p. 268, lines 8-25, p. 269, lines 1-25, p. 270, lines 1-25, p. 271, lines 1-7.)

63.     At the June 19, 2019 E&A, the Mayor publicly embarrassed Comptroller Green and her staff by reading at the meeting the request made by Plaintiff to have the Muni-Court item placed on the meeting agenda and then withdrawing it because of the unpaid tax issues.  (**SJ Exhibit 1**, Garavaglia Depo. p. 188, lines 17-25, p. 189, lines 1-25, p. 190, lines 1-25, p. 191, lines 1-16.; **SJ Exhibit 10** [Garavaglia Depo. Ex. 5], pages Garavagalia 105-109; **SJ Exhibit 9**, Green Depo., p. 214, lines 23-25, p. 215, lines 1-25, p. 216, lines 1-22; **SJ Exhibit 25**, Fitzsimmons Depo., p. 117, lines 9-25, p. 118, lines 1-25, p. 119, lines 1-25, p. 120, lines 1-25, p. 121, lines 1-10.)

64.     A special meeting had to be called for Monday, June 24, 2019, at which meeting the Muni Court Project documentation was voted for approval by E&A. (**SJ Exhibit 1**, Garavaglia Depo. p. 192, lines 2-16.)

65.     Once E&A approved the Muni Court Project documentation on Monday, June 24, 2019, all of the documentation had to be signed and submitted to the City Register's office by a deadline of 5:00 p.m., Friday, June 28, 2019. (**SJ Exhibit 1**, Garavaglia Depo. p. 192, lines 17-25, p. 193, lines 1-6.)

66.     Even though Plaintiff was responsible for getting the requisite documents properly executed in advance of the Friday, June 28, 2019 deadline, he was scheduled to leave for vacation on Thursday, June 27, 2019, with his last day in the office being Wednesday, June 26, 2019. (**SJ Exhibit 1**, Garavaglia Depo. p. 193, lines 4-25.)

67.     On Wednesday, June 26, 2019, the City's outside counsel Tom Ray sent an email to Chana Morton, Comptroller Green's Executive Assistant, advising that there could be a problem with getting the Muni Court Project documents executed by Friday because Plaintiff had directed that certain documents that needed to be signed by the Comptroller be placed in inter-office mail rather than having the documents couriered. (**SJ Exhibit 1**, Garavaglia Depo. p. 194, lines 24-25, p. 195, lines 1-25, p. 196, lines 1-25, p. 197, lines 1-25, p. 198, lines 1-25, p. 199, lines 1-25, p. 200, lines 1-25, p. 201, lines 1-24.; **SJ Exhibit 11**, Deposition of Chana Morton ("Morton Depo."), p. 86, lines 1-24, p. 114, lines 5-25, p. 115, lines 1-10; **SJ Exhibit 12** [Garavaglia Depo Ex. 6], pages Garavaglia 110, 114.)

68.     In this June 26, 2019 email correspondence to Ms. Morton, Tom Ray pointed out the fact that if the Muni Court Project documents were not timely executed and recorded, "there w[ould] be a default." (**SJ Exhibit 1,** Garavaglia Depo. p. 205, lines 23-25, p. 206, lines 1-25,

p. 207, lines 1-25, p. 208, lines 1-22, p. 220, lines 5-2; **SJ Exhibit 11**, Morton Depo., p. 86, lines 1-24, p. 114, lines 5-25, p. 115, lines 1-10; **SJ Exhibit 12** [Garavaglia Depo Ex. 6], pages Garavaglia 110, 114; **SJ Exhibit 15**, [Plaintiff Deposition Ex. O], pages Garavaglia 110-113.)

69.     Tom Ray's June 26, 2019 email set off alarm bells in the Comptroller's Office regarding the fact that a problem was brewing with respect to the timely execution of the Muni Court Project documents. (**SJ Exhibit 1**, Garavaglia Depo. p. 224, lines 21-25, p. 225, lines 1-25; p. 226, lines 1-7, p. 227, lines 21-25, p. 228, lines 1-17.; **SJ Exhibit 9**, Green Depo. p. 154, lines 2-25, p. 155, lines 1-25, p. 156, lines 1-14, p. 283, lines 22-25, p. 284, lines 1-18; **SJ Exhibit 11**, Morton Depo. p. 86, lines 1-24, p. 114, lines 5-25, p. 115, lines 1-10; **SJ Exhibit 12** [Garavaglia Depo Ex. 6], pages Garavaglia 110, 114; **SJ Exhibit 15**, [Plaintiff Deposition Ex. O], pages Garavaglia 110-113.)

70.     It was Plaintiff's responsibility to make sure that the necessary documentation related to the Muni Court Project was properly executed before going on vacation. (**SJ Exhibit 1**, Garavaglia Depo. p. 202, lines 4-25, p. 203, lines 10-14.)

71.     Plaintiff's decision to send these important Muni Court Project documents through inter-office mail, rather than having them couriered, was the reason the Muni Court Project documents did not arrive in the Comptroller's office prior to Plaintiff leaving for vacation. (**SJ Exhibit 1**, Garavaglia Depo. p. 198, lines 18-22; p. 204, lines 4-25; p. 205, line 1; p. 208, lines 13-22.)

72.     Comptroller Green, as well as her Executive Assistant, Chana Morton, testified that they have never heard of a situation where such important, time sensitive City deal documents were placed in interoffice mail. (**SJ Exhibit 9**, Green Depo. p. 276, lines 22-25, p. 277, lines 1-9; **SJ Exhibit 11**, Morton Depo., p. 58, lines 6-11; p. 117, lines 5-10.)

73.     On Wednesday, June 26, 2019, Plaintiff's last day in the office before he left on vacation, the Comptroller arranged a conference call with Plaintiff, Tom Ray, and others to ascertain where the Muni Court Project documents were and to develop a process to ensure they were properly and timely executed.  (**SJ Exhibit 1**, Garavaglia Depo. p. 205, lines 2-12.; **SJ Exhibit 9**, Green Depo., p. 154, lines 14-25; p. 155, lines 1-25; p. 156, lines 1-14; p. 284, lines 19-25; p. 285, lines 1-14.)

74.     Comptroller Green was not happy with the fact that there was a major deal that was about to close by the end of the business week, and Plaintiff was set to go on vacation even though the whereabouts of the documents were unknown.  (**SJ Exhibit 1**, Garavaglia Depo. p. 205, lines 13-22; **SJ Exhibit 9**, Green Depo. p. 284, lines 1-25; p. 285, lines 1-17.)

75.     Plaintiff testified that he directed that the Muni Court Project documents be routed to him via inter-office mail so that he could review them before leaving for vacation.  (**SJ Exhibit 1**, Garavaglia Depo. p. 197, lines 11-25, p. 198, lines 1-22, p. 201, lines 18-25, p. 202, lines 1-10, p. 209, lines 1-10.)

76.     Plaintiff was responsible for making sure that the Muni Court Project documents were "properly vetted through the normal process" before placing them before the Comptroller.  (**SJ Exhibit 1**, Garavaglia Depo. p. 212, lines 3-25, p. 213, line 1.)

77.     The Muni Court Project documents arrived via inter-office mail in Plaintiff's office on the morning of Thursday, June 27, 2019, while Plaintiff was driving to his vacation destination, and they were not ultimately delivered to the Comptroller's Office until the afternoon of June 27, 2019 without being reviewed by Plaintiff. (**SJ Exhibit 1**, Garavaglia Depo. p. 209, lines 1-25, p. 210, lines 1-2, p. 211, lines 1-5; **SJ Exhibit 11**, Morton Depo. p. 86, lines 1-24, p. 114, lines 5-

25, p. 115, lines 1-10; **Exhibit 12** [Garavaglia Depo Ex. 6], pages Garavaglia 110-114; **SJ Exhibit 15**, [Plaintiff Deposition Ex. O], pages Garavaglia 110-113.)

78.     Plaintiff's assistant, who brought the Muni Court Project documents to the Comptroller's office, advised the Comptroller's executive assistant, Chana Morton, that Plaintiff instructed her to place them only into the hands of the Comptroller and no one else, specifically including the Comptroller's executive assistant.  (**SJ Exhibit 1**, Garavaglia Depo. p. 221, lines 15-25, p. 222, lines 1-25; p. 223, lines 1-25, p. 224, lines 1-7.; **SJ Exhibit 12** (Garavaglia Depo. Exhibit 6), **SJ Exhibit 11**, Morton Depo. p. 117, lines 5-25, p. 118, lines 1-25; p. 119, lines 1-25; p. 120, lines 1-25.)

79.     When the Comptroller's Office received the Muni Court Project documents, several items that were needed in conjunction with these documents were incomplete.  (**SJ Exhibit 1**, Garavaglia Depo. p. 211, lines 6-18; **SJ Exhibit 12** (Garavaglia Depo. Exhibit 6)**;  SJ Exhibit 11,** Morton Depo. p. 117, lines 5-25, p. 118, lines 1-25; p. 119, lines 1-25; p. 120, lines 1-25; **SJ Exhibit 12** [Garavaglia Depo Ex. 6], pages Garavaglia 110-114.)

80.     Plaintiff acknowledged that if he had directed the Muni Court Project documents to be couriered to his office instead of directing them to be sent via inter-office mail prior to leaving for vacation, he would have had an opportunity to review and correct any deficiencies in them before leaving for vacation.  (**SJ Exhibit 1**, Garavaglia Depo. p. 211, lines 6-25; p. 212, lines 1-21.)

81.     Plaintiff admitted that the process of getting these Muni Court Project documentation properly executed was chaotic and unnecessarily so.  (**SJ Exhibit 1**, Garavaglia Depo. p. 214, lines 14-25, p. 215, lines 1-6.)

82. Throughout the chaotic turn of events that unfolded on Thursday, June 27, 2019, neither Comptroller Green nor her executive assistant received any communications from Plaintiff. (**SJ Exhibit 1**, Garavaglia Depo. p. 215, lines 7-25, p. 216, lines 1-16.; **SJ Exhibit 12** [Garavaglia Depo. Exhibit 6]; **SJ Exhibit 11**, Morton Depo. p. 117, lines 5-25, p. 118, lines 1-25; p. 119, lines 1-25; p. 120, lines 1-25.)

83. Because of the chaos in getting the Muni Court Project documents delivered to the Comptroller's Office for execution by the Comptroller, other staff members of the Comptroller's Office were, in Plaintiff's absence, necessarily required to stop doing their work  to make sure that the Muni Court Project documents were processed in time for the June 28 deadline.  (**SJ Exhibit 1**, Garavaglia Depo. p. 216, lines 17-25, p. 217, lines 1-15.; **SJ Exhibit 12** (Garavaglia Depo. Exhibit 6), **SJ Exhibit 11**, Morton Depo. p. 117, lines 5-25, p. 118, lines 1-25; p. 119, lines 1-25; p. 120, lines 1-25.)

84. In documenting the chaotic nature of what transpired with respect to the "handling" of the Muni Court Project documents prior to and upon arrival at the Comptroller's Office, Comptroller Green's Executive Assistant, Chana Morton, noted that the type of lack of communication exhibited by Plaintiff and the confusion caused was happening more and more frequently, and that before Plaintiff took over as Deputy Comptroller, the process had run quite smoothly and collaboratively within the various departments for many years, a fact which Plaintiff does not dispute.  (**SJ Exhibit 1**, Garavaglia Depo. p. 217, lines 16-25, p. 218, lines 1-13.; **SJ Exhibit 12** [Garavaglia Depo Ex. 6], pages Garavaglia 110-114; **SJ Exhibit 11**, Morton Depo. p. 118, lines 1-25, p. 119, lines 1-25, p. 120, lines 1-25, p. 121, lines 1-25, p. 122, lines 1-25, p. 123, lines 1-25, p. 124, lines 1-4; **SJ Exhibit 15**, [Plaintiff Deposition Ex. O], pages Garavaglia 110-113.)

85.     Comptroller Green considered Plaintiff's actions (in not keeping her in the loop, delaying to inform her about what was going on with this important Municipal Court project, and misleading her about his request to place it on the E&A agenda) to be insubordination and lacking in candor.  (**SJ Exhibit 9**, Green Depo. p. 221, lines 16-25, p. 222, lines 1-25, p. 223, lines 1-25, p. 224, lines 1-6.)

86.     Despite what transpired with the handling and delivery of these important Muni Court Project documents via inter-office mail, Plaintiff testified that he does not bear any responsibility for what transpired and denied making any mistakes.  (**SJ Exhibit 1**, Garavaglia Depo. p. 219, lines 14-23.)

87.     Comptroller Green's executive assistant also testified to other incidents that transpired over Plaintiff's time as Deputy Comptroller, Finance and Development, which she regularly pointed out to him relating to Plaintiff submitting documents that were missing signatures and other problems with document handling including a situation where Plaintiff's office misdirected certain Airport closing documents to the Airport rather than to the Comptroller's office.  (**SJ Exhibit 11**, Morton Depo. p. 44, lines 1-25, p. 45, lines 1-25, p. 46, lines 1-25, p. 47, lines 1-25, p. 48, lines 1-11; p. 118, lines 1-25, p. 119, lines 1-25, p. 120, lines 1-25, p. 121, lines 1-25, p. 122, lines 1-25, p. 123, lines 1-25, p. 124, lines 1-4.)

**Undisputed Facts Regarding Plaintiff's Forced Leave, Discovery of Unauthorized Contracts, and Pretermination Review Processes**

88.     In response to Plaintiff's mishandling of the Muni Court Project documents during the week of June 24, 2019, Comptroller Green decided initially to place Plaintiff on forced leave. (**SJ Exhibit 9**, Green Depo. p. 153, lines 20-25, p. 154, lines 1-25, p. 155, lines 1-25, p. 156, lines 1-18.)

89. Comptroller Green's Office contacted Director Frank on Saturday, June 29, 2019, to advise that Comptroller Green had made a determination to place Plaintiff on forced leave, which Director Frank approved orally and then in writing. (**SJ Exhibit 5**, Frank Depo. p. 38, lines 16-25, p. 39, lines 1-25, p. 40, lines 12-25, p. 41, lines 1-25, p. 42, lines 1-5.)

90. On July 2, 2019, Plaintiff received a letter from Comptroller Green, with a copy to Director of Personnel Richard Frank, advising him that he was being placed on forced leave. (**SJ Exhibit 1**, Garavaglia Depo. p. 269, lines 15-25, p. 270, lines 1-3.; **SJ Exhibit 19** [Garavaglia Depo. Ex. 7], page Garavaglia 353.)

91. When Comptroller Green placed Plaintiff on forced leave, she was unsure of what, if any, disciplinary action she would recommend, and she conferred with counsel, the City's Director of Personnel, Richard Frank, and his Deputy Linda Thomas about what disciplinary procedures were available. (**SJ Exhibit 9**, Green Depo. p. 156, lines 19-25, p. 157, lines 1-10, p. 168, lines 24-25, p. 169, lines 1-10, p. 173, lines 3-13.)

92. In placing Plaintiff on forced leave, Comptroller Green intended to send a message to Plaintiff regarding how serious the mishandling of the Muni Court Project documents was, as it related to a very important project that had been in the works for many, many years. (**SJ Exhibit 9**, Green Depo. p. 156, lines 19-25, p. 157, lines 1-25, p. 158, lines 1-6.)

93. When Plaintiff's initial forced leave was instituted, Comptroller Green had not made any decision regarding what, if any, possible discipline she would recommend, and she had no intention, at that time, of recommending that Plaintiff's employment be terminated. (**SJ Exhibit 9**, Green Depo. p. 158, lines 7-25, p. 159, lines 1-25, p. 160, lines 1-7.)

94. Because Plaintiff was a high level and long standing City employee, Comptroller Green wanted to make sure that any decision or possible recommendation for discipline that she

made regarding Plaintiff's mishandling of the Muni Court Project documents would be fair. (**SJ Exhibit 9**, Green Depo. p. 156, lines 19-25, p. 157, lines 1-10, p. 168, lines 24-25, p. 169, lines 1-10, p. 173, lines 3-13.)

95.     Comptroller Green delegated Judy Armstrong, who served as appointing authority as designated by Comptroller Green for personnel matters, to deliver the July 2, 2019 forced leave notice to Plaintiff. (**SJ Exhibit 9**, Green depo. p. 150, lines 24-25, p. 151, lines -1-25, p. 152, lines 1-2.)

96.     Ms. Armstrong delivered notice of the forced leave to Plaintiff in manner consistent with her past practice. (**SJ Exhibit 13**, Deposition of Judy Armstrong ("Armstrong Depo."), pp. 97-100.)

97.     Director Frank approved Comptroller Green's request to place Plaintiff on forced leave by signing off on the request on July 2, 2019. (**SJ Exhibit 5**, Frank Depo. p. 38, lines 12-25, p. 39, lines 1-14, p. 40, lines 12-14, p. 41, lines 9-25,p. 42, lines 1-5.)

98.     Once Plaintiff was placed on forced leave, that began the process for removing him from the workplace and restricting the Plaintiff's access to sensitive financial information. (**SJ Exhibit 5**, Frank Depo. p. 43, lines 11-19.)

99.     After placing Plaintiff on forced leave on July 2, 2019, Comptroller Green directed Judy Armstrong and others to fill in for Plaintiff and to perform certain of his duties while he was on forced leave. (**SJ Exhibit 13**, Armstrong Depo., p. 100, lines 6-24.)

100.    During this time, Ms. Armstrong took over Plaintiff's duties with respect to the Gateway Transportation Center and also worked with a staff attorney, Kelley Anderson, to reconcile certain outstanding invoices from AT&T. (**SJ Exhibit 13**, Armstrong Depo. p. 100, lines 6-24, p. 116, lines 5-24.)

101.     During his deposition, Plaintiff testified that while working as Asset Manager, he did not sign any contracts on behalf of the City.  (**SJ Exhibit 1**, Garavaglia Depo. p. 24, lines 1-10.)

102.     However, in the context of assuming and performing Plaintiff's duties in this regard, Ms. Armstrong discovered various issues relating to Plaintiff's job performance including Plaintiff's improper execution of contracts with AT&T and Waste Management purportedly on behalf of the City which she documented in a memorandum dated August 26, 2019.  (**SJ Exhibit 1**, Garavaglia Depo. p. 229, lines 7-25, p. 230, lines 1-9; **SJ Exhibit 14** [Garavaglia Depo. Ex. 4], pages Garavaglia 42-47, 57-70, 89-91; **SJ Exhibit 13**, Armstrong Depo., p. 110, lines 21-25, p. 116, lines 5-25, p. 117, lines 1-3, p. 118, lines 1-10, p. 119, lines 14-19, p. 134, lines 9-25, p. 135, lines 1-11, p. 144, lines 15-25, p. 145, lines 1-19, p. 146, lines 1-25, p. 147, lines 1-25, p. 148, lines 1-25, p. 149, lines 1-5, p. 173, lines 12-25, p. 174, lines 1-25, p. 175, lines 1-25, p. 176, lines 1-24, p. 182, lines 17-25, p. 183, lines 1-25, p. 184, lines 1-25, p. 185, lines 1-25, p. 186, lines 1-25, p. 187, lines 1-25, p. 188, lines 1-25, p. 189, lines 1-15; **SJ Exhibit 15** [Armstrong Depo. Ex. O], pp. 43-44; **SJ Exhibit 16** [Armstrong Depo. Ex. Y], pp. STL1973-1981; **SJ Exhibit 17** [Armstrong ("Green") Depo Exhibit 1], pp. STL2155-2167.)

103.     Based upon an agreement Plaintiff signed on behalf of the City on January 30, 2009 with AT&T, AT&T took the position that this agreement was binding on the City, and that it was the "Master Agreement" for all subsequent contracts between AT&T and the City.  (**SJ Exhibit 1**, Garavaglia Depo. p. 229, lines 7-25, p. 230, lines 1-9, p. 232, lines 19-25, p. 233, lines 1-19, p. 236, line 25, p. 237, lines 1-18; **SJ Exhibit 14** [Garavaglia Depo. Ex. 4], pp. Garavaglia 42-47; **SJ Exhibit 13**, Armstrong Depo, p. 119, lines 14-19, p. 183, lines 3-25, p. 184, lines 1-25, p. 185, lines 1-25, p. 186, lines 1-25.)

104.    Plaintiff was fully aware and acknowledged that he was not authorized to sign any contract on behalf of the City.  (**SJ Exhibit 1**, Garavaglia Depo. p. 238, lines 19-25, p. 239, lines 1-8.)

105.    Another issue documented by Judy Armstrong was her discovery of a contract signed by Plaintiff on May 22, 2017 with Waste Management relating to trash removal at the Gateway Transportation Center, which purported to extend a pre-existing agreement between the City and Waste Management for an additional 36 months. (**SJ Exhibit 1**, Garavaglia Depo. p. 242, lines 16-25, p. 243, lines 1-3; **SJ Exhibit 14** [Garavaglia Depo. Ex. 4], pages Garavaglia 89-91; **SJ Exhibit 13**, Armstrong Depo. p. 187, lines 1-25; p. 188, lines 1-25; p. 189, lines 1-15; **SJ Exhibit 16** [Armstrong Depo. Ex. Y], pp. STL1973-1981.)

106.    Plaintiff acknowledged that he would not have been authorized to sign the Waste Management contract if in fact it were his signature:

> Q        And you would agree that you didn't have authority to sign this particular contract in May of 2017; correct?
>
> A        I am not authorized to sign contracts.
>
> Q        Okay, so if you did sign it, you would not have been authorized to sign it; correct?
>
> A        I think that's right, yah."

(**SJ Exhibit 1**, Garavaglia Depo. p. 246, lines 5-11.)

107.    When presented with the signed copy of the Waste Management contract, Plaintiff testified that he did not have any idea what the document was and denied that the signature on the document was his.  (**SJ Exhibit 1**, Garavaglia Depo. p. 243, lines 4-25, p. 244, lines 1-25, p. 245, lines 1-23.)

108.    In response to a subpoena duces tecum, Waste Management produced documents containing an email exchange between Plaintiff and representatives of Waste Management whereby Plaintiff acknowledged that he had signed and executed the Waste Management contract:



(**SJ Exhibit 18,** pp. 18-140 through 18-161.)

109.    Comptroller Green testified that Plaintiff's purported execution of the Waste Management Services agreement was in derogation of the established process that required any agreement to be presented to the Comptroller for review after first being reviewed and approved

by the City Counsellor's Office as to form and then presented to E&A for approval. (**SJ Exhibit 9**, Green Depo. p. 235, lines 20-25, p. 236, lines 1-25, p. 237, lines 1-25, p. 238, lines 1-2.)

110.     In addition to the AT&T Master Agreement and the Waste Management contract, Judy Armstrong also discovered that Plaintiff had signed an addendum to the AT&T contract without authorization and three additional AT&T Statements of Work dated October 23, 2018 purporting to obligate the City to pay thousands of dollars for maintenance services. (**SJ Exhibit 1**, Garavaglia Depo. p. 260, lines 22-25, p. 261, lines 3-9; **SJ Exhibit 13**, Armstrong Depo., p. 193, lines 9-25, p. 194, lines 1-25, p. 195, lines 1-25, p. 196, lines 1-25, p. 197, lines 1-25, p. 198, lines 1-25, p. 199, lines 1-25, p. 200, lines 1-4; **SJ Exhibit 17**, [Armstrong ("Green") Depo Exhibit 1], pp. STL2155-2167.)

111.     In the summer of 2019, Ishmael Ikpeama, who worked for the City as an internal auditor, was conducting an internal audit with respect to the Gateway Transportation Center. (**SJ Exhibit 9**, Green Depo. p. 245, lines 7-25, p. 246, lines 1-25, p. 247, lines 1-25, p. 248, lines 1-25, p. 249, lines 1-25, p. 250, lines 1-25, p. 251, lines 1-15.)

112.     Mr. Ikpeama had repeatedly asked Plaintiff to provide information needed to close out his internal audit but, according to Ishmael Ikpeama's internal audit documentation, Plaintiff failed to cooperate. (**SJ Exhibit 9**, Green Depo. p. 245, lines 7-25; p. 246, lines 1-25; p. 247, lines 1-25; p. 248, lines 1-25; p. 249, lines 1-25; p. 250, lines 1-25; p. 251, lines 1-15.)

113.     Comptroller Green considered Plaintiff's failure to cooperate with Mr. Ikpeama's audit in this regard to be unprofessional, given the important function of internal audits in the Comptroller's Office. (**SJ Exhibit 9**, Green Depo. p. 245, lines 7-25, p. 246, lines 1-25, p. 247, lines 1-25, p. 248, lines 1-25, p. 249, lines 1-25, p. 250, lines 1-25, p. 251, lines 1-15.)

114. On July 18, 2019, Comptroller Green submitted a request to withdraw the July 2, 2019 forced leave and reissued a new forced leave request on the same date which was approved by Director Frank on July 18, 2019. (**SJ Exhibit 5**, Frank Depo. p. 47, lines 14-25, p. 48, lines 1-25, p. 49, lines 1-25, p. 50, lines 1-3.)

115. The July 18, 2019 forced leave letter included the additional details that the forced leave was "pending an internal investigation into some serious fiscal improprieties that have come to light." (**SJ Exhibit 1**, Garavaglia Depo. p. 271, lines 1-25, p. 272, lines 1-21.; **SJ Exhibit 20** [Garavaglia Depo. Ex. 8], p. STL 1306.)

116. Comptroller Green extended the period of time for the forced leave pending further investigation and was awaiting a response from state auditors whom she had advised of information that had come to light, after initially placing Plaintiff on forced leave, regarding Plaintiff's apparent unauthorized execution of documents on behalf of the City. (**SJ Exhibit 9**, Green Depo. p. 173, lines 14-25, p. 174, lines 1-25, p. 175, lines 1-25, p. 176, lines 1-5, p. 192, lines 7-25, p. 193, lines 1-6.)

117. On August 28, 2019, Plaintiff received correspondence from Comptroller Green advising him that the forced leave of July 18, 2019 was being withdrawn and that a "pre-termination hearing" was being scheduled to occur on September 12, 2019. (**SJ Exhibit 1**, Garavaglia Depo. p. 273, lines 20-25, p. 274, lines 1-20; **SJ Exhibit 21** [Garavaglia Depo. Ex. 9], pp. STL 1308-1309.)

118. Comptroller Green made the decision to move forward with a pre-termination hearing by way of the notice dated August 28, 2019 to afford Plaintiff an opportunity to explain his actions about what she believed to constitute serious misconduct. (**SJ Exhibit 9**, Green Depo. p. 194; lines 22-25; p. 195, lines 1-24.)

119.     The pre-termination notice listed various reasons for the pre-termination hearing being scheduled, including Plaintiff's signing contracts purportedly on behalf of the City without authorization (**SJ Exhibit 1**, Garavaglia Depo. p. 273, lines 20-25, p. 274, lines 1-20; **SJ Exhibit 21** [Garavaglia Depo. Ex. 9], pp. STL 1308-1309.)

120.     Comptroller Green testified that she placed a high level, older female African American attorney employee on forced leave based on misconduct related issues in April 2016. **SJ Exhibit 9**, Green Depo. p. 75, lines 19-25, p. 76, lines 1-7, p. 78, lines 15-25, p. 79, lines 1-5, p. 91, lines 2-17.)

121.     Director Frank testified that the fact that the Plaintiff improperly signed multiple contracts and contract extensions without legal authorization to do so would be grounds for discipline because it would constitute a serious charge under the Code of Ethics and would be an exception to progressive discipline under Administrative Regulation 117. (**SJ Exhibit 5**, Frank Depo. p. 56, lines 24-25, p. 57, lines 1-25, p. 58, lines 1-17, 24-25, p. 59, lines 1-8.)

122.     The pre-termination hearing would have afforded the Plaintiff the opportunity to respond to the charges, review any evidence against him, and present any evidence he had on his behalf including any mitigating circumstances. (**SJ Exhibit 5**, Frank Depo. p. 59, lines 18-25, p. 60, lines 1-11.)

123.     In addition, Plaintiff would have had the right to have counsel there at the pre-termination hearing to assist him in reviewing the evidence and refuting any charges. (**SJ Exhibit 5**, Frank Depo. p. 61, lines 17-25, p. 62, line 5.)

124.     Director Frank denied that he approved the forced leave request made by Comptroller Green without any supportable basis. (**SJ Exhibit 5**, Frank Depo. p. 62, lines 6-25, p. 63, lines 1-25, p. 64, lines 1-12.)

125.     Director Frank also denied that he conspired with Comptroller Green to discriminate against Plaintiff based on his age, sex, or race, noting "I think we're sort of in the same group there as a white male who is 61 years of age." (**SJ Exhibit 5**, Frank Depo. p. 64, lines 1-25, p. 65, lines 1-25, p. 66, line 1.)

126.     Director Frank denied being a rubber stamp for requests coming from Comptroller Green's office and noted that he has denied various requests made by her Office. (**SJ Exhibit 5**, Frank Depo. p. 75, lines 23-25, p. 76, lines 1-25.)

127.     Plaintiff submitted his election to retire on August 30, 2019, two days after the pre-termination notification was sent to him. (**SJ Exhibit 5**, Frank Depo. p. 81, lines 10-25, p. 82, lines 1-25, p. 83, lines 1-25.)

128.     Director Frank testified that there is a process by which a person can pursue a grievance if he or she believes they have been discriminated against based upon race, age, or sex, and Plaintiff never filed any such grievance. (**SJ Exhibit 5**, Frank Depo. p. 86, lines 21-25, p. 87, lines 1-23.)

**Undisputed Facts Demonstrating No Adverse Employment Action**

129.     When Plaintiff was placed on forced leave, he utilized accrued vacation time, but once his forced leaves were withdrawn by Comptroller Green, the City restored all of the vacation time that Plaintiff had used while he was at home on forced leave.  (**SJ Exhibit 1**, Garavaglia Depo. p. 93, lines 10-19, p. 274, lines 21-25, p. 275, lines 1-17; **SJ Exhibit 8** [Garavaglia Depo Ex. 10, ¶¶7, 10.)

130.     Plaintiff openly acknowledged that the two forced leaves were ultimately rescinded and were ultimately replaced with a pre-termination notice wherein a hearing was set which

allowed him to be represented by counsel and to present an opportunity to address any of the allegations. (**SJ Exhibit 1**, Garavaglia Depo. p. 94, lines 12-25, p. 95, lines 1-14.)

131. From the time frame that Plaintiff was placed on forced leave on July 2, 2019 through the last date of his employment with the City, September 30, 2019, he did not lose any pay or benefits during that time frame. (**SJ Exhibit 1**, Garavaglia Depo. p. 96, lines 12-19.)

132. Director Frank testified that Comptroller Green followed the proper procedure in rescinding the original forced leave and reissuing a new forced leave. (**SJ Exhibit 5**, Frank Depo. p. 51, lines 16-25, p. 52, lines 1-25, p. 53, lines 1-25, p. 54, lines 1-25, p. 55, lines 1-25, p. 56, lines 1-9.)

133. Comptroller Green testified unequivocally that neither Plaintiff's age, race nor sex had anything to do with the steps she took related to the first and second forced leaves or the pre-termination. (**SJ Exhibit 9**, Green Depo. p. 287, lines 5-11.)

134. In determining what candidates to hire for a position, Comptroller Green considers whether or not they are qualified for the job and does not consider their gender, age, or race in making that determination. (**SJ Exhibit 9**, Green Depo. p. 259, lines 22-25, p. 260, lines 1-25, p. 261, lines 1-3., p. 261, lines 16-26.)

**Undisputed Evidence of Repeated Efforts and Admonitions Regarding Plaintiff's Lack of Authority to Sign City Contracts**

135. In August of 2016, Plaintiff had a discussion with outside counsel Tom Ray regarding his authority to sign certain deeds of trust on behalf of the City, and was advised by Tom Ray that he did not have authority to sign such documents absent a written delegation of authority from Comptroller Green. (**SJ Exhibit 1**, Garavaglia Depo. p. 275, lines 18-25, p. 276, lines 1-25, p. 277, lines 1-21; **SJ Exhibit 3** [Garavaglia Depo. Ex. 11], p. GRN000460.)

136.     In obtaining the execution of a lease contract for St. Louis Composting dated December 11, 2014, Plaintiff, as Asset Manager, followed the proper procedure by having the contract approved by the Board of Estimate and Apportionment, having the City Counselor approve it as to form, having Comptroller Green sign on behalf of the City, and having it recorded with the City Register.  (**SJ Exhibit 1**, Garavaglia Depo. p. 279, lines 18-25, p. 280, lines 1-25, p. 281, lines 1-25, p. 282, lines 1-11; **SJ Exhibit 4** [Garavaglia Depo. Ex. 12], pp. GRN 000465-473.)

137.     However, for a subsequent St. Louis Composting leasing contract, Plaintiff attempted to bypass the established procedure for executing and approving contracts that would bind the City, including obtaining approval by the City Counselor's Office as to form, by scratching Comptroller Green's name off a contract document in July 21, 2017, and purporting to sign on behalf of the City.  (Garavaglia depo. p. 282, lines 12-25, p. 283, lines 1-25, p. 284, lines 1-25, p. 285, lines 1-25, p. 286, lines 1-25, p. 287, lines 1-2; **SJ Exhibit 24** [Garavaglia Depo. Ex. 14], pp. GRN 000462-464.)

138.     In conjunction with the St. Louis Composting contract, Plaintiff had advised St. Louis Composting representatives that the contract extension did not require approval by the City Counselor or the signature of the Registrar.  (**SJ Exhibit 1**, Garavaglia Depo. p. 293, lines 2-25, p. 294, lines 1-6; **SJ Exhibit 24** [Garavaglia Depo. Ex. 14], p. GRN 000463.)

139.     When Comptroller Green became aware that Plaintiff had signed contracts purportedly on behalf of the City without authorization, the Comptroller told him not to do it again. (**SJ Exhibit 1**, Garavaglia Depo. p. 54, lines 24-25, p. 55, lines 1-25, p. 56, lines 1-18, p. 287, lines 1-25; **SJ Exhibit 24** [Garavaglia Depo. Ex. 14], pp. GRN 000462-464.)

140. After Comptroller Green became aware of the fact that Plaintiff had attempted to sign the St. Louis Composting contract without authority on her behalf, Comptroller Green sent a memo to him dated July 21, 2017 with the subject line "Unauthorized Signature," whereby she brought to his attention the fact that he was attempting to improperly execute an "Extension of Lease Agreement" on behalf of the City and St. Louis Composting. (**SJ Exhibit 1**, Garavaglia Depo. p. 287, lines 3-25, p. 288, lines 1-25; p. 289, lines 1-25, p. 290, lines 1-25; p. 291, lines 1-5; **SJ Exhibit 24** [Garavaglia Depo. Ex. 14], pp. GRN 000462-464.)

141. When Comptroller Green prepared this July 21, 2017 memorandum admonishing Plaintiff for his attempt to improperly sign on behalf of the City of St. Louis, she was unaware that Plaintiff had purported to sign any other contracts on behalf of the City, but she subsequently discovered, after placing Plaintiff on forced leave, that Plaintiff purported to sign other contracts with AT&T and Waste Management. (**SJ Exhibit 9**, Green Depo. p. 280, lines 9-25, p. 281, lines 1-19.)

142. After Comptroller Green provided the July 21, 2017 memorandum to Plaintiff, Plaintiff never came to her and disclosed to her the fact that he had signed any other contracts for AT&T and for Waste Management purportedly on behalf of the City of Saint Louis. (**SJ Exhibit 9**, Green Depo. p. 279, lines 21-25, p. 280, lines 1-8.)

143. Despite receiving the July 21, 2017 memorandum from Comptroller Green advising him that he was not authorized to sign contracts on behalf of the City, Plaintiff signed three AT&T Statement of Work agreements on October 23, 2018. (**SJ Exhibit 13**, Armstrong Depo., p. 193, lines 19-25, p. 194, lines 1-25, p. 195, lines 1-25, p. 196, lines 1-25, p. 197, lines 1-25, p. 198, lines 1-25, p. 199, 1-25, p. 200, lines 1-4; **SJ Exhibit 17**, [Armstrong ("Green") Depo Exhibit 1], pp. STL2155-2167.)

**Undisputed Evidence Regarding Filling Plaintiff's Position After His Retirement**

144.     Comptroller Green contacted Ron Browning-Smith, a 70 year-old African American male, several times to gauge his interest about working in the position of Deputy Comptroller Finance and Development.  (**SJ Exhibit 9**, Green Depo, p. 274, lines 8-25, p. 275, lines 1-16.)

145.     In January, 2020, LaTaunia Kenner, an African American woman, was promoted to Deputy Comptroller, Finance and Development.  (**SJ Exhibit 9**, Green Depo, p. 255, lines 3-25, p. 256, lines 1-25, p. 257, lines 1-25.)

**Undisputed Evidence Demonstrating No Discrimination or Constructive Discharge**

146.     Plaintiff's contention that he was discriminated against based on his age is based on testimony that after he was advised via a May, 2016 telephone conversation with the Comptroller that he was being promoted to Deputy Comptroller, she advised him that she was glad he accepted the position because it would be a great way for him to round out and complete his career with the City as Deputy because he would be able to go out on top as Deputy in a couple of years.  (**SJ Exhibit 1**, Garavaglia Depo. p. 66, lines 10-25, p. 67, lines 1-25, p. 68, lines 1-25, p. 69, lines 1-9, p. 133, lines 23-25, p. 134, lines 1-25, p.135, lines 1-23.)

147.     When Plaintiff was pressed at his deposition for evidence of discrimination beyond the May, 2016 conversation, Plaintiff testified as follows:

> "Q     All right.  Other than that comment, that phone call with the Comptroller, can you identify any other information that you can provide to us to suggest to you that it was her intention when she hired you to get rid of you in a couple of years?
>
> A     It is my feeling that I was brought in as a placeholder.  I was put in a position because I was a logical best option choice to fill the role for a period of time until such point in time that she was able to promote whom she really wanted in that role.

Q    And whom would that be?

A    It would be someone that was more like the prior Deputy, a young black female.

Q    And what I am trying to get at is evidence.  You say that's your belief, your suspicion, but do you have any evidence that you can share with us, any memos, any discussions with the Comptroller that you can share with us to support that belief?

A    Not at this time, but I possibly could recall something later."

(**SJ Exhibit 1**, Garavaglia Depo. p. 72, lines 4-24.)

*    *    *

Q … Other than your belief, what evidence do you have that that was her intent?

A By the fact that she replaced me with –

Q Right.

A -- a younger black female.

***

Q (By Mr. Norwood) So the fact that she replaced you with an African American female, that's -- in your view, that's your smoking gun; is that right?

A Yeah.

Q Okay. Fair enough.

A That's what she did.

Q That's -- no dispute about that. All right. And -- and that's all you have as it relates to race; correct?

A At this point in time, that's all I can recall.

 (**SJ Exhibit 1**, Garavaglia Depo. p. 131, lines 2-25, p.132, lines 1-9.)

148.    Other than Plaintiff's allegation that he believed Comptroller Green discriminated

against him because he is a white male in his sixties, he acknowledged that neither the Director of

Personnel Richard Frank, who is a white male, Beverly Fitzsimmons, who is a white female, Judy Armstrong, who is an African-American female, nor Chana Morton, who is an African-American female, or Dr. Ishmael Ikpeama, would have discriminated against him because he was a white male in his sixties. (**SJ Exhibit 1**, Garavaglia Depo. p. 74, lines 9-25, p. 75, lines 1-25, p. 76, lines 1-25, p. 77, lines 1-25, p. 78, lines 1-4.)

149. Plaintiff claims that other than Comptroller Green, he is not aware of anyone else in the City who would have discriminated against him. (**SJ Exhibit 1**, Garavaglia Depo. p. 74, lines 4-15.)

150. Other testimony proffered Plaintiff in support of his constructive discharge claim was his general statement and subjective beliefs that a) the work environment "was not good;" b) that he did not feel he shared Comptroller Green's "total and complete confidence and trust"; c) that he did not feel he was part of her "true inner circle of confidants"; d) that Comptroller Green "treated [him] with a certain aloofness"; and e) that "[he] never enjoyed a close working relationship, a good personal relationship, a business professional relationship with ... Ms. Green." (**SJ Exhibit 1**, Garavaglia Depo. p. 82, lines 21-25, p. 83, lines 1-25, p. 84, lines 1-20.)

151. Plaintiff acknowledged that Comptroller Green never told him that he could not work through whatever his planned retirement date would be. (**SJ Exhibit 1**, Garavaglia Depo. p. 108, lines 4-25, p. 109, lines 1-25, p. 110, lines 1-25, p. 111, lines 1-25, p. 112, lines 1-11.)

152. Plaintiff cannot identify anything that Comptroller Green purportedly did to him personally outside of her capacity as Comptroller that caused him any of the harm alleged in his complaint. (**SJ Exhibit 1**, Garavaglia Depo. p. 128, lines 18-25, p. 129, lines 1-8.)

153. During a meeting in the Spring or Summer of 2019, Comptroller Green asked both Deputy Comptroller Fitzsimmons and Plaintiff if they would each commit to continuing to work

for her if and when she decided to run for re-election.  (**SJ Exhibit 9**, Green Depo. p. 144, lines 3-25, p. 145, lines 1-25, p. 146, lines 1-25, p. 147, lines 1-25, p. 148, lines 1-12.; **SJ Exhibit 1**, Garavaglia Depo., p. 100, lines 22-25, p. 101, lines 1-25, p. 102, lines 1-25, 103, lines 1-25, 104, lines 1-3.)

154.    Although Plaintiff alleged in his charge filed with the EEOC that there was a clear pattern and practice of discriminatory treatment of non-black, older, and male employees by the Comptroller, he acknowledged that he has no evidence to support this allegation.  (**SJ Exhibit 1**, Garavaglia Depo. p. 148, lines 1-25, p. 149, lines 1-25, p. 150, lines 1-6.)

155.    Plaintiff does not know if the reason the original forced leave was rescinded and the second forced leave rescinded in favor of a pre-termination proceeding was done based on the advice of counsel provided to Comptroller Green.  (**SJ Exhibit 1**, Garavaglia Depo. p. 151, lines 1-25.)

156.    Plaintiff did not have any sense that the Civil Service Commission would have discriminated against him because he was a white male. (**SJ Exhibit 1**, Garavaglia Depo. p. 95, lines 22-25, p. 96, lines 1-11.)

157.    Plaintiff testified that he could have [had] the chance to work in another department of the City earning a comparable salary had he successfully appealed any disciplinary decision to the Civil Service Commission and that he contemplated that his appeal to the Commission could be successful. (**SJ Exhibit 1**, Garavaglia Depo. p. 16, lines 3-25, p. 17, lines 1-2.)

158.    Comptroller Green wrote the July 21, 2017 memorandum to Plaintiff entitled "Unauthorized Signature" to reiterate to Plaintiff that he did not have authority to sign agreements on behalf of the City and to admonish him in writing because he had erroneously attempted to sign

a contract between the City and St. Louis Composting. (**SJ Exhibit 9**, Green Depo. p. 238, lines 6-25, p. 239, lines 1-25, p. 240, lines 1-25, p. 241, lines 1-11.)

**Undisputed Evidence Regarding Forced Leave and Pre-termination Review Protocol**

159.    Pursuant to Regulation 117, before an individual can be placed on forced leave, it must be approved by the director of personnel and is not considered a disciplinary action in and of itself.. (**SJ Exhibit 9**, Green Depo, p. 79, lines 11-13; **SJ Exhibit 5**, Frank Depo, p. 24, lines 19-25, p. 25, lines 5-16, p. 39, lines 15-25, p. 40, lines 1-14; **SJ Exhibit 9**, Green Depo. p. 74, lines 14-21; **SJ Exhibit 5**, Frank Depo, p. 18, lines 9-25; p. 19, lines 1-8, p. 39, lines 15-25, p. 40, lines 1-14; **SJ Exhibit 7** [Garavaglia Depo. Ex. 3], pages Garavaglia 16-26.)

160.    If an individual is placed on forced leave, the Director of Personnel has to approve the forced leave within 72 hours. (**SJ Exhibit 5**, Frank Depo. p. 24, lines 17-2, p. 25, lines 1-8.)

161.    Director of Personnel Richard Frank, in determining whether to approved forced leave, looked at the totality of the circumstances to determine if the thresholds for forced leaves has been met. (**SJ Exhibit 5**, Frank Depo p. 25, lines 9-25, p. 26, lines 1-7.)

162.    One of the key considerations is whether the individual is a high level employee that has access to sensitive financial information of the City and would therefore constitute a threat to the City. (**SJ Exhibit 5**, Frank Depo p. 25, lines 9-25, p. 26, lines 1-7.)

163.    Director Frank stated that an investigation into serious fiscal improprieties involving a high level employee of the City would justify forced leave because of the magnitude of their decisions, their greater impact on decision making, and their supervisory authority. (**SJ Exhibit 5**, Frank Depo. p. 50, lines 4-25, p. 51, lines 1-4.)

164.     After an individual is placed on forced leave, that individual has a right to an appeal which is taken to the Civil Service Commission.  (**SJ Exhibit 9**, Green Depo. p. 79, lines 14-20; **SJ Exhibit 5**, Frank Depo, p. 22, lines 6-25, p. 23, lines 1-25.)

165.     The forced leave processes outlined by St. Louis City Personnel Administrative Regulation 117 permits an appointing authority, subject to approval by the Director of Personnel, to remove an employee from the workplace who presents a particular danger to themselves, to the community, or to the workplace. (**SJ Exhibit 5**, Frank Depo. p. 18, lines 5-19.)

166.     Forced leave is not considered discipline because an employee may use any accrued vacation or compensatory time for the period of forced leave, and proof of an employee's wrongdoing is not required before placing him on forced leave. (**SJ Exhibit 5**, Frank Depo. p. 18, lines 20-25, p. 19, lines 1-8, p. 32, lines 11-15.)

167.     Forced leave may be necessary where an individual subject to an investigation has access to confidential information, such as a high level individual, and as a result would need to be removed from the workplace pending that investigation. (**SJ Exhibit 5**, Frank Depo. p. 19, lines 9-25, p. 20, lines 1-25, p. 21, lines 1-20.)

168.     When an individual who is placed on forced leave it does not mean that that individual would ultimately be subject to discipline. (**SJ Exhibit 5**, Frank Depo. p. 21, lines 21-25, p. 22, lines 1-5.)

169.     If that individual is placed on forced leave pending an investigation and the investigation is ultimately resolved in the employee's favor, that individual is then permitted to return to work. (**SJ Exhibit 5**, Frank Depo. p. 21, lines 21-25, p. 22, lines 1-5.)

170.     In addition, an individual who is placed on forced leave may file an appeal with the Civil Service Commission, which is what Plaintiff did in challenging the two forced leaves in this case. (**SJ Exhibit 5**, Frank Depo p. 22, lines 6-25, p. 23, lines 1-19.)

171.     When an individual is placed on forced leave, he or she is notified that they should not return to the worksite, and if they are already at the worksite, they would be escorted off the worksite because of the potential imminent threat to the worksite. (**SJ Exhibit 5**, Frank Depo. p. 23, line 20-25, p. 24, lines 1-16.)

172.     The duration of time an individual is placed on forced leave depends on the length of the investigation, which an investigation can take a few days or go as long as a couple of years. (**SJ Exhibit 5**, Frank Depo. p. 26, lines 8-25, p. 27, lines 1-7.)

173.     In circumstances where additional information comes to light during an investigation, a forced leave process may continue for months or years in furtherance of that investigation. (**SJ Exhibit 5**, Frank Depo. p. 27, lines 13-25, p. 28, lines 1-14.)

174.     If an individual is placed on forced leave and the investigation is decided in his or her favor, that individual would then be allowed to return to work and would receive any accrued compensatory time or vacation time utilized as compensation during the period of forced leave. (**SJ Exhibit 5**, Frank Depo. p. 28, lines 15-25, p. 29, lines 1-25, p. 30, lines 1-18.)

175.     If an individual appeals a forced leave and the Civil Service Commission rescinds the forced leave, that individual would then be returned to work and would receive any compensatory time or vacation time utilized during the period of forced leave. (**SJ Exhibit 5**, Frank Depo. p. 29, lines 21-25; p. 30, lines 1-25; p. 31, lines 1-30; p. 32, lines 1-10.)

176.     A pre-termination review is a process whereby an employee is officially put on notice via a letter that the appointing authority is contemplating disciplinary action. (**SJ Exhibit 5**, Frank Depo. p. 33 line 24-35, p. 34, lines 1-10.)

177.     If a pre-termination review is held and ultimately no discipline is issued, that individual would be returned to work as quickly as possible, but if they took any accrued time or vacation time during the period they will enforce leave, they would be repaid the moneys utilized during the period of forced leave. (**SJ Exhibit 5**, Frank Depo. p. 34, lines 21-25, p. 35, lines 1-25, p. 36, lines 1-8.)

178.     If there is a pre-termination review and a determination is made to impose some form of discipline, an employee can appeal that determination to the Civil Service Commission. (**SJ Exhibit 5**, Frank Depo. p. 36, lines 21-25, p. 37, lines 1-25, p. 38, lines 1-11.)

179.     Director Frank is personally aware of situations where: (i) forced leaves were appealed, then rescinded, and the employee returned to work; (ii) no discipline issued following a pre-termination review; and (iii) in the context of an appeal of discipline imposed following a pre-termination review, the Civil Service Commission determined that the discipline was improper and returned the employee to work. **SJ Exhibit 5**, Frank Depo., p. 27, lines 8-25, p. 28, lines 1-25, p. 29, lines 1-25, p. 30, lines 1-25, p. 31, lines 1-25, p. 32, 1-8.)

**Undisputed Evidence Regarding Comptroller's Personnel Rating Practices**

180.     Comptroller Green did not give Plaintiff or any other employees who reported directly to her service ratings other than working test period ratings she believed to be required unless they specifically asked for it.  (**SJ Exhibit 9**, Deposition of Darlene Green ("Green Depo.") p 148, lines 13-25, p. 149, lines 1-22.)

181. Plaintiff never brought to the attention of either Comptroller Green or the Director of Personnel that he did not receive a performance rating. (**SJ Exhibit 1**, Garavaglia Depo. p. 64, lines 4-9, p. 64, lines 10-18.)

182. Other than working test period ratings, Comptroller Green did not perform any ratings for her Executive Assistant Chana Morton, who is an African American female, Beverly Fitzsimmons, who is a white female, Jason Fletcher, who is a white male, or Judy Armstrong, who is an African American female born on September 5, 1957. (**SJ Exhibit 9**, Green Depo. p. 275, lines 17-25, p. 276, lines 1-21; **SJ Exhibit 11**, Morton Depo., p. 30, lines 13-25, p. 114, lines 5-18; **SJ Exhibit 13**, Armstrong Depo., p. 69, lines 5-20, p. 181, lines 7-9, p. 200, lines 5-9.)

183. According to Director Frank, it is common for supervisors in the City not to provide ratings for employees. (**SJ Exhibit 5**, Frank Depo. p. 90, lines 12-25, p. 91, lines 1-21.)

## Other Undisputed Material Facts

184. Comptroller Green wanted Plaintiff to work as long as possible as her Deputy Comptroller given her preference to promote from within. (**SJ Exhibit 9**, Green Depo. p. 140, lines 9-25, p. 141, lines 1-25, p. 142, lines 1-3.)

185. Before Plaintiff's mishandling of the Muni Court Project documents in June 2019, Comptroller Green communicated to Plaintiff more than once that she hoped that he would _not_ retire. (**SJ Exhibit 9**, Green Depo. p. 142, lines 4-10.)

186. In considering who to replace Ms. Pinkston in 2016 as Deputy Comptroller, Finance and Development, Comptroller Green extended an offer to an African-American investment banker named Ron Browning Smith, who at the time was 70 years old. (**SJ Exhibit 9**, Green Depo. p. 114, lines 8-25, p. 115, lines 1-11.)

187. Plaintiff received annual salary increases in June 2017 and June 2018. (**SJ Exhibit 5**, Frank Depo., p. 122, lines 2-25, p. 123, lines 1-6; **SJ Exhibit 22**, [Garavaglia Deposition Exhibit 30, STL 000687, 000689, 000698].)

188. Before he resigned as Deputy Comptroller, Finance and Development, Plaintiff never complained to the Department of Personnel that he believed anyone had discriminated against him on any basis. (**SJ Exhibit 28**, Declaration of Sylvia Donaldson.)

**LEWIS RICE LLC**

By: /s/ *Ronald A. Norwood*
Ronald A. Norwood, #33841
Joy D. McMillen, #42822
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101-1311
314.444.7759 (direct)
314.612.7759 (fax)
rnorwood@lewisrice.com
jmcmillen@lewisrice.com
*Attorneys for Defendant Darlene Green*

**SHEENA HAMILTON,**
**CITY COUNSELOR**

By: /s/ *Sheena Hamilton*
Sheena Hamilton, #62921
City Counselor
1200 Market Street
St. Louis, MO 63103
(314) 622-3361 Telephone
hamiltons@stlouis-mo.gov
*Attorney for Defendant City of St. Louis*

## CERTIFICATE OF SERVICE

I certify that on this 22nd day of April, 2022, a true and correct copy of the foregoing was electronically filed and served on all counsel of record properly registered to receive notice via the Court's CM/ECF system. A Microsoft Word version of this Statement of Uncontroverted Material Facts was also provided via electronic mail.

_/s/     Ronald A. Norwood_