SJ Exhibit 1

## Page 1

```
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MISSOURI
 2                   EASTERN DIVISION
 3   James Garavaglia,    )
                          )
 4      Plaintiff,        )
                          )
 5      v.                ) Case No. 4:20-CV-1681-CDP
                          )
 6   City of St. Louis,   )
     et al.,              )
 7                        )
        Defendants.       )
 8
 9
10
11
12           VIDEO RECORDED DEPOSITION
13                     OF
14               JAMES GARAVAGLIA
15      Taken on behalf of Defendant Darlene Green
                January 21, 2022
16
         Julie Ann Whiting, CCR 830, RPR
17
18
19
20
21
22
23
24
25
```

## Page 2

```
 1                    INDEX
 2   Examination by Mr. Norwood        Page 9
 3
 4
 5               EXHIBIT INDEX
 6   Exhibit 1              Page 127
       (Second Amended Complaint for Employment
 7     Discrimination)
 8   Exhibit 2              Page 147
       (Charge of Discrimination)
 9
10   Exhibit 3              Page 150
       (Letter dated 2/25/2020 with attachments)
11   Exhibit 4              Page 164
       (Memorandum to Paul Schmitz from
12     Comptroller Darlene Green dated 8/27/19
       with attachments)
13
14   Exhibit 5              Page 164
       (Memo to Nancy Kistler from Comptroller
       Darlene Green dated 7/12/19 with
15     attachments)
16   Exhibit 6              Page 190
       (Memorandum from Chana Morton to
17     Nancy Kistler dated 7/12/19 with
       attachments)
18
19   Exhibit 7              Page 269
       (Letters dated 7/2/19, 7/2/19, 7/10/19)
20   Exhibit 8              Page 271
       (Letter dated 7/18/19 with attachments)
21
22   Exhibit 9              Page 273
       (Letters dated 8/28/19, Domestic Return
       Receipt)
23
24   Exhibit 10             Page 274
25     (Declaration of James Garavaglia)
```

## Page 3

```
 1   EXHIBIT INDEX (CONTINUED)
 2   Exhibit 11             Page 276
       (E-mail and Reports of Delegation of
 3     Authority
 4   Exhibit 12             Page 279
       (Memorandum dated 12/11/14 with attachment)
 5
 6   Exhibit 13             Page 285
       (E-mail dated 6/12/17, letter dated 6/2/17)
 7   Exhibit 14             Page 286
       (Memorandum dated 7/21/17 with attachment)
 8
 9   Exhibit 15             Page 295
       (Letter dated 6/14/19)
10   Exhibit 17             Page 298
       (Gateway Transportation Center Revenue
11     Review)
12   Exhibit 18             Page 302
       (E-mails)
13
14   Exhibit 20             Page 325
       (Addendum to Master Agreement)
15   Exhibit 21             Page 326
       (AT&T Statement of Work)
16
17   Exhibit 22             Page 327
       (AT&T Addendum to Comprehensive Service
18     Order Attachment)
19   Exhibit 23             Page 330
       (Tax documents)
20   Exhibit 24             Page 332
       (DROP Statements)
21
22   Exhibit 25             Page 42
       (Letter dated 4/15/88)
23   Exhibit 26             Page 36
       (Employee Code of Conduct)
24
25   Exhibit 27             Page 13
       (James M. Garavaglia Professional Summary)
```

## Page 4

```
 1   EXHIBIT INDEX (CONTINUED)
 2   Exhibit 29             Page 28
       (City of St. Louis Candidate Referral
 3     documents)
 4   Exhibit 30             Page 116
       (Employee Status Forms, letters)
 5
 6
 7     (Whereupon, the exhibits were retained by
       counsel for Defendant Green and are not attached to
 8     the original or copies.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**SJ Exhibit**

**1**

## Page 5

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MISSOURI
 2                 EASTERN DIVISION
 3      James Garavaglia,    )
                             )
 4        Plaintiff,         )
                             )
 5      v.          ) Case No. 4:20-CV-1681-CDP
                             )
 6      City of St. Louis,   )
        et al.,              )
 7                           )
          Defendants.        )
 8
 9
10
11        VIDEO RECORDED DEPOSITION OF JAMES
12      GARAVAGLIA, produced, sworn, and examined on
13      the 21st day of January, 2022, between the
14      hours of 9:43 a.m. and 6:54 p.m., at
15      Lewis Rice, LLC, 600 Washington Avenue,
16      Suite 2500, St. Louis, Missouri, before
17      Julie Ann Whiting, a Certified Court Reporter
18      within and for the State of Missouri and
19      Registered Professional Reporter, in a certain
20      cause now pending In The United States District
21      Court, Eastern District of Missouri, Eastern
22      Division, wherein JAMES GARAVAGLIA is the
23      PLAINTIFF and CITY OF ST. LOUIS, ET AL., are
24      the DEFENDANTS.
25
```

## Page 6

```
 1            A P P E A R A N C E S
 2      APPEARING FOR THE PLAINTIFF:
 3        Uthoff, Graeber, Bobinette & Blanke
          Richard B. Blanke, Esq.
 4        Paul L. Schmitz, Esq.
          906 Olive Street, Suite 300
 5        St. Louis, Missouri 63103
          (314)621-9550
 6        rblanke@ugbblaw.com
          pschmitz@ugbblaw.com
 7
 8      APPEARING FOR THE DEFENDANT
        CITY OF ST. LOUIS:
 9
          City of St. Louis Law Department
10        City Counselor's Office
          Sheena Hamilton, Esq.
11        Room 314, City Hall
          St. Louis, Missouri 63103
12        (314)622-4554
          Hamiltons@stlouis-mo.gov
13
14      APPEARING FOR DEFENDANT DARLENE GREEN:
15        Lewis Rice, LLC
          Ronald A. Norwood, Esq.
16        Joy D. McMillen, Esq.
          600 Washington Avenue, Suite 2500
17        St. Louis, Missouri 63101
          (314)444-7600
18        rnorwood@lewisrice.com
          jmcmillen@lewisrice.com
19
20      ALSO PRESENT VIA TELEPHONE:
21        Darlene Green
22
23
24
25
```

## Page 7

```
 1      THE VIDEOGRAPHER:
 2        Ken Carden, CLVS
          Alaris Litigation Services
 3        711 North 11th Street
          St. Louis, Missouri  63101
 4        (314)644-2191
 5      COURT REPORTER:
 6        Julie Ann Whiting, CCR 830(MO), RPR
          Alaris Litigation Services
 7        711 North 11th Street
          St. Louis, Missouri  63101
 8        (314)644-2191
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 8

```
 1          IT IS HEREBY STIPULATED AND AGREED, by and
 2      between counsel for Plaintiff and counsel for
 3      Defendants, that the Video Recorded Deposition
 4      of JAMES GARAVAGLIA may be taken in shorthand
 5      by Julie Ann Whiting, a Certified Court
 6      Reporter, and afterwards transcribed into
 7      typewriting, and the signature of the witness
 8      is expressly not waived.
 9          (Deposition start time:  9:43 a.m.)
10                  * * * * *
11          THE VIDEOGRAPHER:  We are on the record.
12      Today's date is January 21st, 2022.  The time
13      now is 9:43.  This is the Video Recorded
14      Deposition of James Garavaglia, in the matter
15      of James Garavaglia v. City of St. Louis,
16      et al., Case Number 4:20-CV-1681-CDP, in the
17      United States District Court, Eastern District
18      of Missouri.
19          This deposition is being held at
20      600 Washington.  The reporter's name is
21      Julie Whiting.  My name is Ken Carden.  I'm the
22      legal videographer.
23          Would the attorneys present please
24      introduce themselves and the parties they
25      represent?
```

2 (Pages 5 to 8)

## Page 9

1      MR. BLANKE:  My name is Richard Blanke,
2  B-L-A-N-K-E.  I represent the Plaintiff.
3      MR. SCHMITZ:  Paul Schmitz.  Last name
4  S-C-H-M-I-T-Z.  I also represent the Plaintiff.
5      MR. NORWOOD:  Ronald Norwood.  I represent
6  Defendant Darlene Green.
7      MS. McMILLEN:  Joy McMillen.  I represent
8  Defendant Darlene Green.
9      MS. HAMILTON:  And Sheena Hamilton on
10  behalf of the City of St. Louis.
11      THE VIDEOGRAPHER:  Would the court
12  reporter please swear in the witness.
13      JAMES GARAVAGLIA,
14  of lawful age, being produced, sworn, and examined
15  on behalf of the Defendant Darlene Green, deposes
16  and says:
17          EXAMINATION
18  QUESTIONS BY MR. NORWOOD:
19      Q    Okay.  Good morning, sir.  Would you state
20  and spell your full name for the record, please?
21      A    Sure.  It's James, middle initial M, for
22  Martin.  Last name is G-A-R-A-V-A-G-L-I-A.
23      Q    And how do you pronounce it?
24      A    It's Garavaglia.
25      Q    Garavaglia.  Do you go by James or Jim?

## Page 10

1      A    Jim is fine.
2      Q    Is it okay if I call you Jim?
3      A    Yes, sir.
4      Q    All right.  Great.  Now, Jim, let me start
5  by asking you, have you ever participated in a
6  deposition before?
7      MR. BLANKE:  I just want to make an
8  announcement.  My understanding is that Darlene
9  Green is on the phone.  Is that correct?
10      MR. NORWOOD:  Yes.
11      MR. BLANKE:  For the record.
12      MR. NORWOOD:  She does have that for the
13  record.
14      MR. BLANKE:  Okay.
15      MR. NORWOOD:  Thank you.
16      MR. BLANKE:  Sorry.
17      A    I have participated one other time as a
18  City employee.
19      Q    (By Mr. Norwood)  How long ago was that?
20      A    Probably 20 years ago.
21      Q    All right.  All right.  Are you currently
22  employed?
23      A    I am employed as part-time employee of an
24  LLC owned by my wife.
25      Q    What's the name of that LLC?

## Page 11

1      A    It's called MMJ Consulting, LLC.
2      Q    And what kind of business is that?
3      A    It is primarily associated with
4  telecommunications consulting, and that's kind of
5  what the work is that -- that we are doing right
6  now.
7      Q    Tele -- telecommunications consulting?
8      A    Yes.
9      Q    How long has that business been in
10  operation?
11      A    I believe the business was set up in
12  February of -- no, March of 2020.
13      Q    And were you involved in -- well, strike
14  that.
15      Do you have an ownership interest in this
16  business?
17      A    No.  I'm an employee.
18      Q    A W-2 employee?
19      A    Yes.
20      Q    How long have you been employed with this
21  company?
22      A    Since its inception.
23      Q    What are your duties and responsibilities?
24      A    At this point, it is part-time work
25  whereby I am assisting a client in the

## Page 12

1  telecommunications industry, helping them prospect
2  and helping them find clients where they may
3  participate in requests for proposal primarily in
4  the states of Texas, New Mexico, and Arizona.
5      Q    And who is that client?
6      A    The client's name is called Correct
7  Solutions Group.
8      Q    All right.  Prior to -- well, prior to
9  your current employment, where were you employed?
10      A    By the City of St. Louis.
11      Q    All right.  When did you start as an
12  employee with the City of St. Louis?
13      A    April of 1987.
14      Q    And prior to starting with the City, were
15  you employed?
16      A    Yes, sir.
17      Q    Where were you employed prior to starting
18  with the City?
19      A    I was employed by a company called
20  Chemtech Industries in the chemical industry.
21      Q    All right.  How long were you employed
22  with Chemtech?
23      A    Approximately seven years.
24      Q    What did you do with Chemtech?
25      A    I started as their Budget Director and

3 (Pages 9 to 12)

## Page 13

1  later was promoted a Plant Comptroller.
2      Q   And so seven years, so that would have
3  been -- let me see my math.  That would have been
4  1980-ish?
5      A   Yes, sir.
6      Q   All right.  Prior to 1980, what did you
7  do?
8      A   Prior to 1980, I worked in the electrical
9  equipment industry.  I was a Senior Budget Financial
10 Analyst for a division of GTE Sylvania.
11     Q   I might have a document to help us
12 expedite it a little bit.  I'll give you those.
13 I'll hand you --
14     MR. BLANKE:  Thank you.
15     Q   (By Mr. Norwood)  I'm going to hand you a
16 document that is marked Garavaglia Deposition
17 Exhibit 27 and ask you if you can identify that for
18 us.
19     A   It is my resume, it appears.
20     Q   How -- how -- do you know when you
21 prepared this particular version of your resume,
22 Exhibit 27?
23     A   Obviously it was before I was Deputy
24 Comptroller, so I would have to say it was prior to
25 2016.

## Page 14

1      Q   Okay.  And just looking at the second page
2  of the exhibit, it indicates you have an MBA in
3  Accounting from St. Louis University in May of 1980.
4  Is that accurate?
5      A   Yes, sir.
6      Q   And also a Bachelor of Science in
7  Accounting and Economics from St. Louis University
8  in May of 1974; is that right?
9      A   Yes, sir.
10     Q   All right.  Thank you.  And now, at some
11 point, you ceased your employment with the City of
12 St. Louis; is that correct?
13     A   Yes, sir.
14     Q   When did you cease your employment with
15 the City of St. Louis?
16     A   I'm not sure I understand that.
17     Q   Okay.  Let me rephrase it.  Did you retire
18 from the City of St. Louis?
19     A   Yes.
20     Q   Okay.  What was the effective date of your
21 retirement?
22     A   I believe it was 10/1 of '19.
23     Q   And how was the 10/1/19 date selected?
24 Did you select that date for retirement?
25     A   No.  I believe that once you notify the

## Page 15

1  Department of Personnel, there is a process where
2  they certify your eligibility and then have to --
3  the retirement board has to approve your retirement,
4  and the timing of such of when I submitted my
5  paperwork dictated my actual effective date of
6  retirement would come due.
7      Q   Okay.  And so by way of process, you
8  elected to start the retirement process; is that
9  right?
10     A   I submitted paperwork to retire.
11     Q   Okay.  And why did you retire from the
12 City of St. Louis?
13     A   Basically because what happened to me on
14 July 2nd, 2019 ruined my professional career, ruined
15 my professional reputation.  It greatly affected my
16 life in many ways and my family's life, to be
17 escorted out by an armed marshal and not be told
18 why, given no explanation, be sent home on leave for
19 a period -- period of time where nothing, no -- no
20 knowledge of why, and then to be taken off of leave
21 and then be reinstated on leave, another period of
22 time passes.  We get to another point where you're
23 taken off of leave and you're put on leave again,
24 another period of time passes, and then a pre-term
25 notification comes that a pre-term had been set.

## Page 16

1      And it was only at that time where there
2  was a list of so-called reasons for this to come
3  about.  Basically my life was in shambles.  The
4  physical and emotional effect created by what was
5  done on July the 2nd of 2019 left me with the choice
6  of appealing through the Civil Service Commission.
7  And if I was successful there, I would be placed
8  back into an extremely hostile environment, the work
9  environment.  She didn't want me there.  And I would
10 be placed in an intolerable situation.  And because
11 of that, I had no choice at that particular time
12 except to say, well, maybe, just maybe if I was
13 reinstated, I could have the chance to work in
14 another department, in another area for comparable
15 salary.
16     But by the time -- the period from July to
17 I believe in the end of August when the pre-term
18 notification came to me, I had enough and left.  I
19 had no spirit to go about trying.  I didn't have
20 the -- I just didn't have what it took to go back
21 and work in City government again.  I had no choice
22 at that point.  And it was a difficult decision, but
23 I felt it was the only one I had available to me,
24 and so I felt compelled at that point in time, due
25 to the environment that I would be placed back in

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

1  had I been successful at Civil Service, that I had
2  to put in my papers to retire.
3     Q  Okay.  Fair enough.  All right.  And we're
4  going to talk, obviously, a lot more about all of
5  that, but let me kind of go back a bit and talk
6  about the positions that you've held with the City
7  of St. Louis.  And I guess to facilitate, I'm going
8  to give you back Exhibit 27 and tell us your -- the
9  positions that you've held with the City of
10  St. Louis.
11    A  Well, the positions -- my entire career
12  was spent in the Comptroller's office.  Primarily I
13  started in -- in a -- a role that was assisting the
14  Deputy Comptroller at the time, a variety of things,
15  getting to know how City government worked.
16     At that -- from there, there was a change,
17  in that Comptroller Berra left the office, became
18  the Assessor, and Comptroller Jones came in.  And it
19  was under his administration that he asked me to
20  manage -- and that I had previous experience in
21  management -- to manage a selected group of diverse
22  areas that weren't quite accounting related, but yet
23  needed some day-to-day supervision.
24     And so the position of Asset Manager was
25  created at that time, specifically tailored to the

1  duties that -- that were put together for me there.
2  There are a number of mutually exclusive areas such
3  as telecommunications, such as real estate, such as
4  records retention, such as, you know, working with
5  the Deputy Comptroller at the time and still
6  assisting -- by this point in time, the initial one
7  had left and a different was -- was -- a different
8  one was there.  And so -- and in some instances,
9  doing -- doing specific duties that were accounting
10  related, even.  So that was the initial Asset
11  Management I title.
12     At some point in time, there was a
13  city-wide review of positions and responsibilities
14  and com -- and commensurate salaries that were paid.
15  And in the review, my position is done by an outside
16  firm who I don't recall, but my position was deemed
17  to be reclassified, and so they -- they created the
18  position of Asset Manager II and they left the Asset
19  Manager I position in the Personnel list of titles.
20  And by creating the Asset Manager II title, I didn't
21  gain any more responsibility, but I gained a raise
22  and a different title.
23    Q  Okay.
24    A  And as of this particular document that
25  you've handed me --

1    Q  Exhibit 27?
2    A  Yes.  That's when I was -- at that point,
3  that's where I was in terms of -- title-wise when --
4  when I applied for the position of Deputy
5  Comptroller.
6    Q  Okay.  When did -- well, strike that.
7     At some point, Darlene Green became the
8  Comptroller; correct?
9    A  Uh-huh.
10    Q  And -- and what year -- do you recall what
11  year that would have been?
12    A  '96.
13    Q  '96.  Okay.  And -- and at that point in
14  time when she became Comptroller, who did you report
15  to?
16    A  I was working for Deputy Comptroller Ivy
17  Neyland Pinkston.
18    Q  Okay.  And did Ms. Pinkston report
19  directly to Comptroller Green?
20    A  Yes, sir.
21    Q  All right.  When you were Asset Manager,
22  did individuals report to you?
23    A  Yes.
24    Q  Over that time frame, let's say starting
25  in the '90s -- well, let's go to the '90s, when --

1  when -- when Comptroller Green was elected or
2  selected, how many people reported to you during
3  that time?
4    A  Oh.  I'm not sure that my answer is going
5  to be totally --
6    Q  Well, approximately.  We -- we won't hold
7  you to it.
8    A  I want to say somewhere between 13 and 15.
9    Q  13 and 15.  Okay.  Fair enough.  Now,
10  in -- during that time frame, that group that
11  reported to you that you supervised, was it a
12  diverse group?
13    A  Yes.
14    Q  Okay.  And when you say diverse group,
15  what do you mean?
16    A  I'm not sure I understand it.
17    Q  Okay.  Let's talk about race --
18    A  Oh, okay.
19    Q  -- sex, that sort of thing.  Did you have
20  a diverse group at that time?
21    A  Yes.
22    Q  All right.
23    A  There were men and women, and some were
24  white and some were black.
25    Q  Okay.  Over the course of the time that

Page 21

1    you were there in the Asset Manager role, did the
2    number of people you supervised increase?
3        A   I'm not sure, sir.  I don't know the -- I
4    don't remember the answer to that.
5        Q   Okay.  All right.  Did the group become
6    more or less diverse during that time you were
7    supervising them?
8        A   I don't know that there was a lot of
9    turnover --
10        Q   Okay.
11        A   -- in that time frame, so I would state --
12    say that it probably stayed the same or roughly the
13    same.
14        Q   All right.  During, I guess, your entire
15    tenure at the City of St. Louis in a supervisory
16    role, have there been occasions where you had to
17    discipline personnel?
18        A   Not that I can recall.
19        Q   Okay.  As Asset Manager, did you have
20    authority to sign contracts on behalf of the City?
21        A   No, sir.
22        Q   What was the process, as you understood
23    it, as it related to the execution of contracts on
24    behalf of the City?
25        MR. BLANKE:  Well, let me just object to

Page 22

1    the question because it's unlimited in
2    timeframe, unless that's what your intention
3    is.
4        MR. NORWOOD:  Okay.
5        MR. BLANKE:  So --
6        MR. NORWOOD:  Fair enough.  Let -- let me
7    rephrase the question.
8        Q   (By Mr. Norwood)  During the time you were
9    Asset Manager, did you acquire an understanding as
10    to the process for executing contracts on behalf of
11    the City?
12        A   There was a process that evolved over
13    time.
14        Q   Okay.  Tell us about that process, as you
15    understood it.
16        A   Well, I don't know what it was like until
17    I became Asset Manager, but --
18        Q   Right.
19        A   -- I know that -- that the Comptroller
20    prior to Mr. Jones would sign stacks of documents,
21    and I wasn't involved with it at that point in time.
22        Q   Right.
23        A   Subsequent to that, there became a process
24    that -- whereby they all funneled to a central
25    location and they were then reviewed by an

Page 23

1    accountant or an accounting manager -- not me -- and
2    then they were presented to Mr. Jones or his deputy
3    for signature.
4        Q   Okay.  And did you have an understanding
5    as to why the Comptroller's signature was required
6    on those contracts?
7        A   Yeah, by charter, she's the one that does
8    that.
9        Q   Okay.  And -- and you understood that
10    throughout your tenure there at the City of
11    St. Louis; is that right?
12        A   Yes.
13        Q   Okay.  Did you understand also that City
14    contracts would have to be reviewed by the City
15    Counselor's office?
16        A   They're reviewed by the City Counselor's
17    office as to form, yes.
18        Q   Okay.  And for the record and for lay
19    people who might have occasion to review this
20    testimony, what role does the City Counselor play as
21    it relates to the City of St. Louis?
22        A   My understanding are they are the City's
23    lawyers.
24        Q   The lawyers for the City; is that correct?
25        A   Yes, sir.

Page 24

1        Q   All right.  When you were Asset Manager,
2    did you sign contracts purportedly on behalf of the
3    City?
4        A   No, sir.
5        Q   I'm sorry?
6        A   No, sir.
7        Q   All right.  Never, ever?
8        A   No, sir.  I did not.
9        Q   I'm sorry?
10        A   No, sir.  I did not.
11        Q   All right.  Did you ever communicate to
12    people on your staff that you would sign contracts
13    in recognition of the fact that your signature
14    didn't mean anything?
15        A   No, not that I recall.
16        Q   Not that you recall.  Okay.  When you were
17    Asset Manager, were the areas that you were
18    responsible for overseeing subject to internal
19    audits?
20        A   Sure.  Yes.
21        Q   And -- and for us lay people, as it
22    relates to the City of St. Louis, what is an
23    internal audit?
24        A   Well, the Comptroller's office has a
25    section of CPAs that go out and perform different

ALARIS LITIGATION SERVICES
www.alaris.us      Phone: 1.800.280.3376      Fax: 314.644.1334

## Page 25

1  types of reviews of City departments' operation, be
2  it revenue reviews, be it expense reviews, be it
3  other types of -- I would call them internal control
4  checks, especially, perhaps, checking for internal
5  controls over cash and -- and how operations of a --
6  of a department where cash is handled is being done
7  properly in accordance with generally accepted
8  accounting principles, and they issued reports as to
9  their findings in each case.
10      Q   Okay.  Thank you.  For us lay people,
11  why -- in the City of St. Louis particularly, why is
12  the internal audit function important?
13      A   Well, it's important because it would
14  determine -- it's the first line of defense.  If
15  there was fraud, if there was theft, if there was
16  any kind of impropriety occurring within City
17  departments, we would expect to see that being
18  discovered, uncovered, or some way, somehow found by
19  the types of reviews that I mentioned previously by
20  internal audit.  So it's -- it's very important in
21  that respect.
22      Q   Okay.  And it's important, is it not, to
23  collect revenue that is owed to the City?  Isn't
24  that an important function as well?
25      A   Yes.

## Page 26

1      Q   Now, let's talk about your elevation to
2  Deputy Comptroller.  And that title, just so I'm
3  correct, is Deputy Comptroller of Finance and
4  Development.  Is that the title?
5      A   Yes, sir.
6      Q   All right.  At some point you were
7  promoted as Deputy Comptroller of Finance and
8  Development; is that correct?
9      A   Yes, sir.
10      Q   All right.  And when were you promoted to
11  that position?
12      A   June of 2016.
13      Q   And who promoted you to that position?
14      A   Comptroller Green.
15      Q   Comptroller Darlene Green?
16      A   Yes, sir.
17      Q   All right.  Prior to the time that you
18  were promoted by Comptroller Darlene Green, what
19  kind of relationship did you have with Comptroller
20  Darlene Green?
21      A   I would describe it as arm's length kind
22  of relationship.  I did not work for her directly.
23  She knew me, I knew her, but I -- I worked directly
24  for Ivy, and there was, I would say, limited direct
25  relationship there.

## Page 27

1      Q   Okay.  Tell us about the
2  application/selection process for this new position
3  you were appointed to by Comptroller Green.  What
4  was that process?
5      A   Well, it was a preexisting position.  It
6  was not a new position.
7      Q   Right.
8      A   And the application process is -- was
9  standard, as would be for any civil service position
10  in that you fill out an application, that you can
11  attach a resume if you would -- if you wanted to,
12  and that there would be an evaluation if you met the
13  minimum qualifications by the Personnel department,
14  but prior to you being considered for interview at
15  that point.  So that's -- then you would go before a
16  panel, you would be interviewed, you would be ranked
17  by that panel, and then you would await a second
18  interview with the department that would be hiring
19  for that position.
20      Q   Okay.  And -- and when you were promoted,
21  for the record, you were a white male; is that
22  correct?
23      A   Yes, sir.
24      Q   Okay.  And as part of that selection
25  process, if I'm understanding, how many names are

## Page 28

1  submitted to the Comptroller to consider as it
2  related to the position that you ultimately were
3  promoted to?
4      A   As I understand it, the Personnel
5  Department can certify up to six qualified
6  candidates that have gone through a
7  ranking/screening process.  However, I have
8  interviewed less than that when there were not six
9  qualified candidates.
10      Q   Do you know how many qualified candidates
11  there were that applied for Deputy Comptroller,
12  Finance and Development at the time you applied?
13      A   No, sir, I don't.
14      Q   Have you had occasion to review your
15  personnel file that has been produced in this
16  litigation?
17      A   Briefly yesterday.
18      Q   Okay.  Did you have occasion as part of
19  that brief review to look at documents related to
20  the application process when you applied for the
21  position of Deputy Comptroller Finance and
22  Development?
23      A   I did not, sir.
24      Q   All right.  I'm going to hand you a
25  document marked as Exhibit 29.  And you can hand me

7 (Pages 25 to 28)

## Page 29

1    back the other exhibit just so that you don't get
2    too cluttered.
3           Take a minute, if you could, to review
4    this packet of information. It is not -- this set
5    is not Bates stamped, but I just want to know if you
6    have seen or are familiar with any portions of this
7    packet of information.
8           MR. BLANKE: May I ask, was this produced
9    to us?
10          MR. NORWOOD: It has been produced. It is
11   in production and --
12          MR. BLANKE: Why wouldn't it be Bates
13   stamped?
14          MR. NORWOOD: Well, we have a copy and
15   it's in the City's production.
16          MR. BLANKE: Oh.
17          MR. NORWOOD: So -- I mean, in the
18   Personnel records.
19          MR. BLANKE: I'm sorry. What was the last
20   question on the table here?
21      A   I was just going to ask, can you -- can
22   you restate that question?
23      Q   (By Mr. Norwood) No, I don't have a
24   question, I just wanted you to review the packet
25   first.

## Page 30

1       A   Oh.
2       Q   Have you had an opportunity to review that
3    packet?
4       A   I have glanced through, yes, sir.
5       Q   Okay. Does this appear to be the
6    rating info -- well, strike that.
7           Does this appear to be the evaluation
8    information in conjunction with your application for
9    the position of Deputy Comptroller, Finance and
10   Development?
11      A   It appears to include two pages which are
12   how the preliminary interviews scored my preliminary
13   interview. There --
14      Q   Right.
15      A   Those are in here, yes.
16      Q   All right. And it also ranks the
17   individuals; is that correct?
18      A   It does.
19      Q   All right. Did you receive any
20   communication from Personnel at the time where they
21   advised you where you ranked as it related to this
22   position?
23      A   I'm not certain.
24      Q   All right. According to this document, at
25   least the first page of the document, it looks like

## Page 31

1    the rankings are -- you were listed and ranked as
2    number 5 of 6; is that correct?
3       A   Yes, sir.
4       Q   All right. Do you know why you were
5    ranked 5 out of the 6 candidates for that position
6    at that time?
7       A   I can only refer back to the comments --
8       Q   Okay.
9       A   -- made by the people who conducted the
10   interviews.
11      Q   All right. Well, let's flip to those.
12   And these are unmarked, but for the purpose of the
13   record and part of Exhibit 29, there is a form
14   document, and that form document is entitled Oral
15   Interview Rating Form. Do you see that?
16      A   Yes, sir.
17      Q   All right. And is that what you're
18   talking about in terms of the evaluations?
19      A   Yes, sir.
20      Q   All right. Now, the first form that I
21   see, it looks like it's dated 2/26/16, with a score
22   of 57. Is that the same page you're on?
23      A   Yes, sir.
24      Q   And you were rated, it looks like,
25   average; is that correct?

## Page 32

1       A   Yes, sir.
2       Q   And could you read the comments in that
3    particular evaluation?
4       A   Good work experience and knowledge of -- I
5    think it might say process.
6       Q   Is it players?
7       A   Players. Okay. Players.
8       Q   The players.
9       A   Okay.
10      Q   Okay. Okay. Continue.
11      A   I can't read the first word.
12      Q   Okay.
13      A   Some lack of knowledge of finance area.
14      Q   Okay. So this particular evaluator
15   determined that you lacked some knowledge in the
16   finance area; is that correct?
17      A   Right.
18      Q   All right. And let's go to the next Oral
19   Interview Rating Form, and that score was a 59, and
20   average; is that right?
21      A   Yes.
22      Q   And the rater -- it looks like it's dated
23   2/26/16; is that correct?
24      A   Yes.
25      Q   Okay. And let's read what that particular

8 (Pages 29 to 32)

## Page 33

1 evaluator commented.
2     A  Okay.  It says, Struggled to answer the
3 technical questions related to debt and financing.
4     Q  Okay.  And do you agree with that?  Did
5 you during that process struggle to answer questions
6 related to debt and financing?
7     A  I'm not sure I'd use the word struggle.  I
8 think I'd use the word that I could have done a
9 better job, but this was the area where I had the
10 least experience.
11     Q  Okay.  Fair enough.  Why did the position
12 of Deputy Comptroller of Finance and Development
13 become available?
14     A  The incumbent, the person that I worked
15 for over 20 years, had passed away.
16     Q  And that was Ms. Ivy Pinkston?
17     A  Yes, sir.
18     Q  And Ms. Ivy Pinkston was an African
19 American woman; is that right?
20     A  Yes, sir.
21     Q  Okay.  How many Deputy Comptrollers were
22 there at the time you were promoted by Comptroller
23 Darlene Green to Deputy Comptroller of Finance and
24 Development?
25     A  One.

## Page 34

1     Q  One other one?
2     A  Yes, sir.
3     Q  And who was that one other Deputy
4 Comptroller?
5     A  Beverly Fitzsimmons.
6     Q  All right.  And what race is
7 Beverly Fitzsimmons?
8     A  She's white.
9     Q  All right.  Did she -- strike that.
10     Had she been promoted to Deputy
11 Comptroller prior to your promotion?
12     A  Yes, sir.
13     Q  Do you know approximately when she would
14 have been -- what year, for instance, she would have
15 been promoted to Deputy Comptroller?
16     A  I don't recall.
17     Q  All right.  What was Ms. Fitzsimmons' area
18 of responsibility when you became Deputy Comptroller
19 of Finance and Development?
20     A  I think I would refer to it as accounting
21 services.
22     Q  And for us lay people, as it relates to
23 the City, what does that mean?
24     A  I would say that it would be -- encompass
25 the traditional types of accounting that would be

## Page 35

1 associated with a finance department, meaning paying
2 the bills, collecting the money, that kind of thing.
3     Q  Okay.  Do you know how old Beverly
4 Fitzsimmons is, approximately?
5     A  No, sir, I do not.
6     Q  All right.  When you were promoted to
7 Deputy Comptroller, were you given a raise?
8     A  Yes, sir.
9     Q  How large of a raise?
10     A  In the position that I was in, it was a
11 Grade 19.  The position Asset Manager II, I believe,
12 is a Grade 19 in the Civil Service system.  The
13 position that I assumed in the Civil Service
14 position was a Grade 21.  And so if you were to be
15 promoted, each grade that you would ascend to is a
16 5 percent increase, I believe, in the Department of
17 Personnel policies.
18     Q  Okay.  And so I guess my question was:
19 You -- well, let me -- let me state it this way:
20 You received a promotion from Comptroller Darlene
21 Green; correct?
22     A  Yes, sir.
23     Q  You received a raise when you were
24 promoted that had to be approved by Comptroller
25 Darlene Green; correct?

## Page 36

1     A  Yes, sir.
2     Q  Do you recall if that raise was
3 10 percent?
4     A  I believe it was.
5     Q  All right.  Do you know if at the time you
6 were promoted and given this 10 percent raise,
7 whether or not at that time you were actually making
8 more than the Comptroller?
9     A  I did not know that, no.
10     Q  Okay.  So you don't know one way or the
11 other; is that correct?
12     A  At that time, I did not.
13     Q  Do you know now?
14     A  I do know now.
15     Q  Okay.  And what do you know now as it
16 relates to your salary in comparison to Comptroller
17 Green's salary?
18     A  The salary that I was at was considerably
19 more than the Comptroller made.
20     Q  Okay.  And for the record, Comptroller
21 Darlene Green is an African American woman; is that
22 correct?
23     A  Yes, sir.
24     Q  All right.  Are you familiar with the City
25 of St. Louis Employee Code of Conduct?

## Page 37

1    A   Yes, sir.
2    Q   How is it that you are familiar with the
3   City of St. Louis Employee Code of Conduct?
4    A   I believe the Department of Personnel
5   sends it to us, asks to review it, and then send
6   back a page that we sign that acknowledges that we
7   have done that.
8    Q   Okay.  Let me digress a bit before we go
9   more into the City of St. Louis Employee Code of
10  Conduct.
11       When you became Deputy Comptroller, how
12  many individuals did you supervise?
13    A   Oh.
14    Q   Approximately.
15    A   In excess of 20.
16    Q   All right.  And was that group that you
17  supervised starting in June of 2016 a diverse group
18  of employees?
19    A   I would characterize them as such.
20    Q   Okay.  And why would you characterize that
21  as such?
22    A   Because as in the previous example that we
23  discussed, you said were they black, white, male,
24  female, and I would characterize them that way, yes.
25    Q   All right.  Would you agree that it is

## Page 38

1   important to maintain diversity in the workplace?
2   Would you agree with that statement?
3    A   I believe that it's important to maintain
4   a diversity as long as we meet and -- and have
5   qualified people.  The diversity is -- is important,
6   but you've got to have the right people to do the
7   jobs.  You cannot have people who are not qualified
8   regardless of -- of what ethnic origin they are.
9    Q   Okay.  So in your view, then, diversity
10  for the sake of diversity, that's not a good thing;
11  is that correct?
12    A   No, I didn't say that.
13    Q   Okay.  Well, that's why I'm just trying to
14  understand what you're saying.  What you said, if
15  I'm understanding you correctly, is that diversity
16  is a good thing?  You agree with that?
17    A   Diversity is important.  I understand the
18  concept of -- of needing to reach out and look for
19  people in the application process that could
20  potentially, you know, be good in -- in the role
21  that you have available, but I don't believe that
22  people should be promoted or put in positions that
23  they're not qualified for, again, regardless of
24  their background, be they white, black, or other,
25  you know.

## Page 39

1    Q   Okay.  So I guess I'm trying to get a yes
2   or no.  Is it -- diversity is important?  We can
3   agree with that; is that correct?
4        MR. BLANKE:  Objection.  Asked and
5   answered, but you can answer it again if --
6    A   Yes.
7    Q   (By Mr. Norwood)  All right.  But your
8   caveat is that of course you want qualified
9   diversity?  Is that a fair statement?  Does that
10  fairly summarize what you articulated?
11    A   Qualified candidates, yes.
12    Q   All right.  As it related to the group
13  that you began supervising when you were elevated to
14  Deputy Comptroller, you had a diverse group; is that
15  correct?
16    A   Yes, sir.
17    Q   Did you feel that diverse group was
18  qualified for the positions that they held?
19    A   Well, that calls for me to make a blanket
20  statement.  What I can -- what I can tell you is
21  that to an individual, I don't believe that there
22  was anyone that was grossly lacking in the skills to
23  do the position that they were in.
24    Q   Okay.  Did you rate the people that
25  reported to you?

## Page 40

1    A   I did not rate all of those individuals.
2   In some instances, there was a supervisor that
3   worked with them and -- and supervised the areas in
4   which they were assigned, and I did not rate all
5   twenty-something of those individuals.  I only rated
6   the direct reports.  Although, I was the second
7   rater and sign-off, so I got to see the ratings of
8   all of the people that reported directly or
9   indirectly to me.
10    Q   Okay.  And so the 20 or so folks who were
11  under your supervision, if I'm understanding you,
12  you would have either rated them directly, the
13  direct reports, or you signed off on ratings that
14  were performed by others; is that correct?
15    A   The sign-off is in the form of being the
16  second rater.  In the Civil Service system, there is
17  a primary rater who is the direct supervisor, and
18  then there is a second sign-off by a second rater,
19  and I would -- in cases where the person did not
20  report directly to me, I would have been the second
21  rater.
22    Q   All right.  And so, effectively, you rated
23  everybody, either as a first rater or a second
24  rater; is that correct?
25    A   That was in my table of organization that

Page 41

1  was in my area, yes.
2      Q   All right. Were all of the individuals in
3  your group rated during the time you were Deputy
4  Comptroller, Finance and Development?
5      A   I'm not sure.
6      Q   All right. Is it your understanding that
7  all employees should have been rated in your group
8  that reported to you?
9      A   That's a Department of Personnel
10  requirement, yes.
11      Q   All right. And so if all individuals
12  weren't rated, is that something that you would have
13  called to the attention of the Director of
14  Personnel?
15      A   If they were not rated, I'm not sure that
16  I would have known that. In order for a rating to
17  be completed, the Department of Personnel normally
18  would send the supervisor, approximately six to
19  eight weeks in advance of when their yearly service
20  rating was due, the paperwork and instructions on
21  when and how to perform that service rating for that
22  individual. If the supervisor did not receive that
23  packet or notification, then its potential -- the
24  potential for that service rating to be completed --
25  there's a -- there's a -- there is the potential

Page 42

1  that, you know, it may not have been completed due
2  to the fact that the time frame would have passed
3  without the supervisor realizing that the person was
4  due for a service rating.
5      Q   Okay. Throughout your entire tenure at
6  the City of St. Louis, were you always rated?
7      A   I believe I was --
8      Q   Okay.
9      A   -- until the last three years.
10      Q   Until the last three years. Okay. Let me
11  hand you a document -- I'm sorry to be out of order
12  here, but let me hand you a document that's been
13  marked as Garavaglia Deposition Exhibit 25 and ask
14  you to take a look at that.
15      A   Do you -- do you want it back?
16      Q   Yes. Thank you.
17      A   Okay. Okay.
18      Q   Have you seen that document before?
19      A   It says that I would have received a copy
20  of it in 1988.
21      Q   All right. And for the record, Garavaglia
22  Deposition Exhibit 25 is a letter dated April 15,
23  1988; is that correct?
24      A   Yes.
25      Q   And it's from what is identified as the

Page 43

1  Department of Personnel, Ms. Josephine Profeta,
2  Acting Manager, Personnel Services; is that correct?
3      A   Uh-huh. Yes, sir.
4      Q   All right. And it's cc'd to you, it
5  appears?
6      A   Yes, sir.
7      Q   All right. And the Re: line says
8  Mr. James M. Garavaglia, Special Assistant to the
9  Comptroller, Comptroller's Office; is that correct?
10      A   Yes, sir.
11      Q   And was that your initiation into the City
12  of St. Louis as an employee --
13      A   Yes.
14      Q   -- that position?
15      A   Yes, sir.
16      Q   All right. And it's addressed to
17  Honorable Paul M. Berra, Comptroller, Comptroller's
18  Office; correct?
19      A   Yes, sir.
20      Q   And I'll just read it into the record.
21  Dear Mr. Berra, the Department of Personnel has not
22  received the permanent status rating of Mr. James
23  Garavaglia, Special Assistant to the Comptroller,
24  Comptroller's Office, for the rating period ending
25  March 1, 1988. In accordance with Rule VIII of the

Page 44

1  Rules of the Department of Personnel, quote, Failure
2  by the appointing authority to give such notice to
3  the Director of Personnel within 30 days of
4  termination of the working test period shall have
5  the same force and effect as affirmative action on
6  the part of the appointing authority in granting to
7  the employee permanent status in the position.
8      Since the permanent status rating form of
9  the above-named employee has not been returned
10  within the required period of time stated, it is
11  necessary for us to grant the employee permanent
12  status for the period ending March 1, 1988.
13      Did I read that correctly?
14      A   Yes, sir, you did.
15      Q   All right. And does this represent at
16  least one instance where you were not rated and as a
17  result of not being rated, you effectively were
18  granted permanent status; correct?
19      A   This is not -- this is not the same thing.
20      Q   Well, I didn't ask --
21      A   You asked me if I recalled a time where I
22  had not received a service rating --
23      Q   Okay.
24      A   -- and I said that, no, I did not.
25      Q   Okay.

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334

## Page 45

1     A    What this is referring to is when I was
2    initially hired by the City.  You are in a working
3    test period.
4         Q    Right.
5         A    And what this implies or basically says is
6    that I completed the calendar time period of my
7    working test period and that the appointing
8    authority at the time did not certify to the
9    Department of Personnel that I should be retained or
10   not through the working test period.  In other
11   words, this is about passing or failing the working
12   test period --
13        Q    Right.
14        A    -- not the service record.
15        Q    I understand that.
16        A    That's not the same thing.
17        Q    But in this test period, you are rated --
18   in this case, you would have been rated by the then
19   Comptroller, Mr. Berra; is that correct?
20        A    Most likely by his deputy.
21        Q    All right.  And because there was no
22   rating of any sort for this particular evaluation,
23   you were then determined to have permanent status by
24   rule; is that correct?
25        A    That's correct, but this is not a service

## Page 46

1    rating.
2         Q    I understand.  I understand.  Okay.  All
3    right.  Now, let's go back to the Employee Code of
4    Conduct.  You are familiar with that because
5    annually you're required to sign a form saying I
6    reviewed and understand the Employee Code of
7    Conduct; correct?
8         A    Yes, sir.
9         Q    All right.  And would you agree with me
10   that as a supervisor/employee of the City of
11   St. Louis, you have an obligation to efficiently and
12   effectively direct the activities of your
13   subordinate.  You would agree with that, wouldn't
14   you, sir?
15        A    Generally speaking, yes.
16        Q    All right.  And as Deputy Comptroller
17   Supervisor for the City -- City of St. Louis, you
18   had an obligation to display appropriate, respectful
19   behavior and follow the directions given by your
20   supervisors; correct?
21        A    Yes, sir.
22        Q    All right.  Under that Employee Code of
23   Conduct, you also had an obligation to act with
24   honor, faithfulness, loyalty, fairness, and due
25   diligence in conducting your job responsibilities.

## Page 47

1    You agree with that; right?
2         A    Yes, sir.
3         Q    All right.  And you also had an obligation
4    to comply with all applicable laws and regulations;
5    is that correct?
6         A    Yes, sir.
7         Q    And those laws would include the charter
8    for the City of St. Louis; is that right?
9         A    Yes, sir.
10        Q    You also had an obligation to meet
11   acceptable standards of performance.  You agree with
12   that; right?
13        A    Yes, sir.
14        Q    You had an obligation in your various
15   capacities as a City employee not to take any
16   actions that were illegal or unethical or in
17   violation of the rules and regulations of the City
18   of St. Louis; correct?
19        MR. BLANKE:  Let me just object to the
20   line of questioning on the basis that the Code
21   of Conduct speaks for itself.  If you're asking
22   him whether he knows about those requirements,
23   that's fine.  But you're asking him what's in
24   the Code of Conduct, it seems, and so I object
25   on the basis that the document speaks for

## Page 48

1    itself.
2         Q    (By Mr. Norwood)  Well, subject to that
3    objection, you're familiar with the Code of Conduct.
4    You reviewed it every year and you signed off on it
5    every year; correct?
6         A    Yes, sir.
7         Q    And you had been with the City for some
8    30-odd years.  You were very familiar with that Code
9    of Conduct, weren't you, sir?
10        A    Yes, sir.
11        Q    All right.  So under that Code of Conduct,
12   you understood and recognized that in your role,
13   which was a high role in the City of St. Louis as
14   Deputy Comptroller -- we can agree with that;
15   correct?
16        A    That I was Deputy Comptroller?
17        Q    That it was a high position within the
18   City of St. Louis; correct?
19        A    It's a senior management position.
20        Q    Senior management position.  Okay.  And as
21   a senior manager of the City of St. Louis, you had
22   an obligation to protect the revenue, property,
23   information, and assets of the City from any attempt
24   by either members of the public, contractors,
25   vendors, agents, or any employees to gain or

Page 49

1  preclude them gaining by deceit, financial, or other
2  benefits at the expense of City taxpayers; right?
3  You had to that obligation; is that correct?
4      A   Yes, sir.
5      Q   And let's talk about those -- the City's
6  taxpayers.  When we're talking about City money,
7  we're talking about taxpayer money; right?
8      A   Yes, sir.
9      Q   And that's an important role for the City
10 to properly manage and keep track of financial
11 dealings between the City and the public and
12 vendors; correct?
13     A   Yes, sir.
14     Q   All right.  Under that Code of Conduct,
15 you had an obligation to perform your duties
16 conscientiously, honestly, and in accordance with
17 the best interest of the public; correct?
18     A   Yes, sir.
19     Q   All right.  You also had an obligation to
20 document every aspect of the transaction fully and
21 completely; right?  That was another obligation you
22 had; is that correct?
23         MR. BLANKE:  Let me just object to that
24     line of questioning again on the basis that
25     you're just apparently reading from the Code of

Page 50

1  Conduct without allowing him to refer to it and
2  asking him from memory if this is in the --
3  what I'm objecting to is whether -- your
4  question is ambiguous and unduly vague, because
5  it's not clear as to whether you're asking him
6  is this what's in the Code of Conduct --
7         MR. NORWOOD:  No, I'm not asking that.
8         MR. BLANKE:  -- or is this your opinion
9  that this is an obligation that applies to him?
10        MR. NORWOOD:  I'm not asking him that at
11 all.
12     Q   (By Mr. Norwood)  What I'm asking him,
13 sir, simply, is that -- did you understand that
14 under the Code of Conduct, you had an obligation to
15 make sure that transactions that you were involved
16 in were documented fully and completely?  Wasn't
17 that part of your duties?
18     A   Yes, sir.
19     Q   And that's just -- generally in
20 accounting, isn't it important for financial
21 transactions of any entity to be documented fully
22 and completely?
23     A   I'm not sure about any entity, but the
24 ones that I was involved in, yes.
25     Q   Well, from a public accounting standpoint,

Page 51

1  you -- you -- you -- you have degrees in accounting;
2  correct?
3      A   I do.
4      Q   And you understood as an accountant that
5  it's important to make sure that financial
6  transactions of entities are documented fully and
7  completely.  Can we agree with that?
8      A   Yes, sir.  Yes, sir.
9      Q   All right.  As Deputy Comptroller, you
10 also had an obligation to make sure that the City's
11 books and records reflect, in an accurate and timely
12 manner, all transactions; correct?
13     A   To the best of my ability, yes, sir.
14     Q   Yes.  Accurate and timely.  Those are key
15 points when we're talking about financial revenues
16 of a city with some excess of a billion dollars in
17 revenue; is that correct?
18         MR. BLANKE:  Well, let me object to the
19     compound nature.
20     A   Well, I don't know about -- I don't know
21 the answer.
22         MR. BLANKE:  Hold on a second.  When I
23     object, stop talking.
24         MR. NORWOOD:  I'll withdraw the question.
25     Q   (By Mr. Norwood)  You had an obligation as

Page 52

1  Deputy Comptroller not to make any misleading
2  representations or falsify any records or engage in
3  false communication of any kind, whether internal or
4  external, including, but not limited to or filing
5  any false report, attendance, production, financial,
6  or similar reports and statements?  You had that
7  obligation; is that correct?
8         MR. BLANKE:  Let me object again in that
9     the question is vague and ambiguous as to
10     whether you're asking him if it's his opinion
11     that he had that obligation or whether that's
12     what the Code of Conduct specifically states.
13     Q   (By Mr. Norwood)  What I'm asking you is:
14 Is it your understanding that you had that
15 obligation as the Deputy Comptroller of the City of
16 St. Louis during the time frame you acted as Deputy
17 Comptroller of the City of St. Louis?
18         MR. BLANKE:  So just for clarification,
19     you're asking for his opinion?
20         MR. NORWOOD:  What I'm asking him is do
21     you know whether or not -- I'll rephrase the
22     question.
23     Q   (By Mr. Norwood)  Do you know whether or
24 not under the Code of Conduct, you had that
25 obligation?

13 (Pages 49 to 52)

## Page 53

1    A    I'm not certain I answer -- I understand
2   what we're doing here.  I don't understand that.  I
3   don't understand the question, to be honest with
4   you.
5        Q    All right.  All right.  Let me wrap it up
6   with this question:  Did you understand during the
7   time you were Deputy Comptroller of Finance and
8   Development of the City of St. Louis that you had an
9   obligation to be completely honest in your dealings
10  with the public, elected officials, appointing
11  authorities, supervisors, and fellow employees?  Did
12  you have that understanding?
13       A    Yes, sir.
14       Q    All right.  And you also had an
15  understanding that lying in any form, omitting some
16  facts, or exaggeration undermines the fundamental
17  trust that must exist between employer -- employer
18  and employee and has no place in public service?
19  You would agree with that as well; correct?
20       MR. BLANKE:  Are you -- are you asking him
21   whether he agrees with the policy in the Code
22   of Conduct?
23       Q    (By Mr. Norwood)  What I'm asking him is
24  whether or not you understood under that St. Louis
25  Code of Conduct that you signed every year that you

## Page 54

1   undertook that obligation as the Deputy Comptroller
2   of the City of St. Louis?
3        A    Is it stated in there specifically, what
4   you just read me?
5        Q    And I -- I mean, and we'll review the Code
6   of Conduct.  What I'm trying to figure out is
7   that -- did you understand you had that obligation,
8   that lying in any form -- internal/external -- in
9   the context of a public servant is unacceptable?
10  You understood that, correct?
11       A    I understood the Code of Conduct.  I'm not
12  sure what you asked me is in there.
13       Q    All right.  Aside from whether it's in the
14  Code of Conduct, did you have an understanding at
15  the time you were Deputy Comptroller that lying in
16  any form, internally or externally, by you would be
17  unacceptable?
18       A    Yes, sir.
19       Q    Okay.  I don't know --
20       MR. BLANKE:  Even -- even if the
21   Comptroller asks him to lie.  Correct?  You're
22   saying unqualified no matter what the
23   situation?
24       Q    (By Mr. Norwood)  Let me ask you -- let me
25  ask you the next question.  Do you recall any time

## Page 55

1   before July of 2019 when the Comptroller brought to
2   your attention any instances in which you had
3   attempted to sign contracts on behalf of the City
4   without authorization?
5        A    There was one instance --
6        Q    Okay.
7        A    -- that I was asked about an option in an
8   existing lease.  It wasn't a contract, it was a
9   lease.
10       Q    A lease is a contract; correct?
11       A    Okay, but it's a lease.  It was a lease --
12       Q    A lease contract?
13       A    -- of City property and in the lease,
14  there was a stipulation that upon mutual agreement,
15  that the lessee could ask for the option to be
16  extended beyond the initial lease period.  Upon
17  checking with the City Counselor's office, I was
18  told that that was in the purview of my role to
19  acknowledge -- because if I remember right, in the
20  instance that -- that I can recall, that the lessee
21  had requested us to just acknowledge that they were
22  wanting to exercise the option that was already in
23  the preexisting lease.
24       And so we weren't creating a new lease.
25  We weren't creating a new contractual obligation.

## Page 56

1   It was acknowledging that they had requested to
2   exercise an option that already existed in the lease
3   contract, and so I was told that I could do that.
4        Q    By whom?
5        A    I don't know.  It was someone in the City
6   Counselor's office that I had called.  I'm not going
7   to say specifically that it was Michael Garvin, but
8   at the time we were doing a lot of things and he was
9   handling a lot of things for our office.  It may
10  have been, but, you know, I'm not sure exactly at
11  the time who I spoke with.  But I can tell you that
12  my counterpart took exception to the fact that --
13  and she's not an attorney, she's an accountant.
14  Took exception and basically said you can't do that,
15  and in an e-mail to the Comptroller that -- and to
16  me that, you know, that -- that this should have
17  gone to E&A.  And the Comptroller basically wrote me
18  a letter basically saying don't do it again.
19       Q    And is that the only time you recall any
20  discussion or communication with the Comptroller
21  about you signing contracts purportedly on behalf of
22  the City?  Is that your testimony today, sir?
23       A    I signed an option that was part of an
24  existing contract.
25       Q    Without authorization?

## Page 57

1  A  With and at the direction of an attorney
2  in the City Counselor's office, that it was not a
3  contract -- a new contract, it was exercising an
4  option in the existing contract -- I'm sorry -- in
5  the existing lease that the City had with the
6  lessee.
7  Q  Okay.  Fair enough.  Do you know -- other
8  than the Comptroller, who else in the Comptroller's
9  office would be designated by the Comptroller to
10  sign contracts on her behalf or on behalf of the
11  City?
12  MR. BLANKE:  Objection.  It's unduly vague
13  as to time.
14  MR. NORWOOD:  Well -- fair enough.
15  MR. BLANKE:  Are you talking about all
16  throughout?
17  Q  (By Mr. Norwood)  I'll rephrase the
18  question.
19  During the time you were Deputy
20  Comptroller, did you have an understanding as to who
21  other than the Comptroller she had designated to
22  sign contracts on her behalf or on behalf of the
23  City?
24  A  Yes.
25  Q  Who -- who is that?

## Page 58

1  A  Beverly Fitzsimmons.
2  Q  Anyone else that you're aware of?
3  A  I know that Judy Armstrong had been
4  authorized to sign something.  I'm not sure what
5  kind of documents.
6  Q  Okay.
7  MR. NORWOOD:  Now may be a good time to
8  take a break.  I'm about to dive into maybe
9  some of these documents here, if that's okay,
10  or we can keep going.
11  MR. BLANKE:  It's up to you.
12  MR. NORWOOD:  All right.  Let's take a --
13  MS. McMILLEN:  For the record, where are
14  we on time?
15  THE VIDEOGRAPHER:  This is the
16  videographer.  We're going off the record.  The
17  time now is 10:58.
18  (Off the record at 10:58 a.m.)
19  (On the record at 11:19 a.m.)
20  THE VIDEOGRAPHER:  This is the
21  videographer.  We're back on the record.  The
22  time now is 11:19.
23  Q  (By Mr. Norwood)  Okay.  Do you know who
24  hired Ivy Pinkston?
25  A  Yes.

## Page 59

1  Q  Who?
2  A  Comptroller Jones.
3  Q  Comptroller Virvas Jones?
4  A  Yes, sir.
5  Q  All right.  And what race is -- was
6  former Comptroller Berra?
7  A  He was white.
8  Q  I'm sorry?
9  A  He was white.
10  Q  All right.  Now, let's talk about ratings.
11  What is a rating in the context of St. Louis City
12  government and employees?
13  A  It's an annual review of an employee's
14  performance with the framework of how you
15  characterize and categorize an employee's
16  performance dictated and outlined to a format
17  designed by the Department of Personnel.
18  Q  And those are required to be given
19  annually, you understand?  Is that your
20  understanding?
21  A  Yes, sir.
22  Q  All right.  All -- so just so I'm clear,
23  it's your understanding as a supervisor -- former
24  supervisor with the City of St. Louis, that every
25  supervisor is required to rate every employee on an

## Page 60

1  annual basis; is that correct?
2  A  That is my understanding.
3  Q  All right.  And how did you acquire that
4  understanding?
5  A  I'm not sure that I specific -- I must
6  have read it someplace --
7  Q  All right.
8  A  -- in -- in something that I guess we were
9  given to -- to look at, to read, to acknowledge, and
10  understand.  I'm not sure.
11  Q  All right.  And it's your testimony today
12  that up until the time you started as Deputy
13  Comptroller, for all of those years leading up to
14  that, you would have received an annual rating; is
15  that correct?
16  A  That is my recollection.
17  Q  All right.  And it is also your testimony
18  that the individuals who were direct reports to you
19  during the time you were Deputy Comptroller of
20  Finance and Development, you did annual ratings for
21  those direct reports; is that correct?
22  A  Yes, sir.
23  Q  All right.  Who were those direct reports
24  that you would have done annual ratings for?
25  A  Well, they would have been the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 61

1   telecommunications staff.  It would have been my
2   administrative assistant.  It would have been the
3   supervisor over the Gateway Transportation Center.
4   It would have been -- I can't remember the title of
5   the person, but it -- it's -- it's someone who
6   worked in the Finance and Development area.  There's
7   two people in the Finance and Development area that
8   were direct reports.
9       Q    Okay.  Well, let -- let's talk names.  All
10  right.  You referred to your assistant.  Who is your
11  assistant?
12      A    Sheila Woods.
13      Q    All right.  And you annually rated
14  Sheila Woods every year; is that correct?
15      A    To the best of my recollection, yes, sir.
16      Q    All right.  Who else by name did you
17  annually rate during the time you were Deputy
18  Comptroller?
19      A    I would have rated Robin Jones, who was
20  the supervisor at the Gateway Transportation Center.
21  I would have rated her successor, Sonia Day.  I
22  would have rated Marsha Veal, who worked in real
23  estate.  I would have rated John Diliberto in
24  telecommunications.
25          MR. BLANKE:  I'm sorry.  John who?

Page 62

1           THE WITNESS:  Diliberto,
2   D-I-L-I-B-E-R-T-O.
3       A    I would have rated Marilyn Maxwell in
4   telecommunications.  I would have rated Sheri Cross
5   in telecommunications.
6       Q    What about Ray Gant?
7       A    I would have rated Ray Gant.
8       Q    Okay.  Anybody else?
9       A    I would have rated Ryan Coleman.  I can't
10  remember the other lady's name.
11      Q    Okay.  What is your understanding of what
12  happens if someone is not rated?
13      A    I don't understand the question.
14      Q    Are you -- have you -- well, you weren't
15  rated.  Let's talk about you.  The first year you
16  served as Deputy Comptroller of Finance and
17  Development, you said you weren't rated; is that
18  correct?
19      A    I don't think I was -- that I said that,
20  but I was not rated in any of the three years that I
21  was Deputy.
22      Q    Any of the years you were Deputy, you were
23  not rated?
24      A    Yes, sir.
25      Q    All right.  So let's talk about the first

Page 63

1   year, which would have been -- when would your
2   rating have been -- is it your year of service in
3   the position?  Is that right?
4       A    Yes, sir.
5       Q    So you would have been due for a rating in
6   June of 2017; is that correct?
7       A    Yes, sir.
8       Q    All right.  And you didn't receive a
9   rating?
10      A    Did not.
11      Q    Did you inquire about why not?
12      A    No, I did not.
13      Q    Why not?
14      A    I think the -- probably the -- the reason
15  I did not was the relationship that I had with my
16  boss at the time was not conducive to telling her
17  that she didn't do her job.
18      Q    Okay.  And so you were -- in your view,
19  you understood, according to you, that it was
20  required -- correct -- at that time?
21      A    It was requested by the Department of
22  Personnel.  I'm not sure why it would -- when you
23  say required, I mean, it's not like something was
24  going to happen to me or to the supervisor when it
25  didn't happen, but --

Page 64

1       Q    Okay.  But it didn't happen with you;
2   right?
3       A    It did not.
4       Q    You didn't bring it to the attention of
5   your boss; correct?
6       A    That's correct.
7       Q    You didn't bring it to the attention of
8   the Director of Personnel; correct?
9       A    That's correct.
10      Q    All right.  And the same with respect to
11  2018?  You weren't rated in 2018; correct?
12      A    Correct.
13      Q    And you never brought that to the
14  attention of your boss, Darlene Green; correct?
15      A    That's correct.
16      Q    You never brought it to the attention of
17  Personnel; is that correct?
18      A    That's correct.
19      Q    Do you know if other individuals that
20  Comptroller Green supervised received annual
21  ratings?
22      A    No, sir.  I don't know that.
23      Q    Do you know Chana Morton; is that correct?
24      A    I do.  I do.  I know who she is, yes.
25      Q    And -- and who is she?

## Page 65

1    A   She's the Comptroller's secretary.
2    Q   All right. And was she secretary when you
3  were elevated to Deputy Comptroller?
4    A   I'm not certain that she was in 2016, but
5  I -- I don't know. I -- I'm not sure.
6    Q   Okay. Do you know if she was rated on an
7  annual basis?
8    A   No, sir, I do not.
9    Q   And as you sit here today, during that
10 time frame you were Deputy Comptroller -- you don't
11 know who Comptroller Darlene Green would have rated
12 during that time frame that you were Deputy
13 Comptroller. Is that fair?
14   A   I do not know who she rated. All I know
15 is that she would have rated direct reports.
16   Q   Okay. And those direct reports include
17 white employees; correct?
18   A   Yes.
19   Q   Those direct reports included African
20 American employees; correct?
21   A   Yes.
22   Q   Those direct reports included white male
23 employees; correct?
24   A   Yes.
25   Q   Those direct reports included white female

## Page 66

1  employees; correct?
2    A   Yes.
3    Q   African American female employees;
4  correct?
5    A   Yes.
6    Q   And there is other nationalities; is that
7  correct?
8    A   Yeah, I -- I'm not aware of what their
9  ethnic background would have been.
10   Q   Got it. Fair enough. Now, you in your
11 Complaint -- let's talk about your lawsuit. You
12 allege that you have been discriminated based on
13 your age; is that correct?
14   A   Yes.
15   Q   And why is it -- or strike that.
16       How have you been discriminated based on
17 your age, in your view?
18   A   At the time that I was offered the
19 position, in a conversation with the Comptroller,
20 she said specifically, I'm glad you accepted the
21 position, because this will be a great way for you
22 to round out and complete your career with the City
23 as a Deputy. You'll be able in a couple years to go
24 out on top as a Deputy.
25   Q   Okay.

## Page 67

1    A   And I didn't understand the meaning of her
2  comments at the time, but I believe that her
3  comments were basically telling me that my plans for
4  you are short-term and that I would expect you to
5  leave the office when you reached full Social
6  Security retirement age. She was very specific
7  about -- she said in a couple of years. And I
8  didn't do that.
9    Q   Okay. Let me -- let me -- let's unpack
10 that a bit. Let's get the words down. She said --
11 what did she say exactly, as best you can recall?
12   A   She said that I'm glad you accepted the
13 position. It will give you the opportunity to go
14 out on top in a couple of years and retire as a
15 Deputy Comptroller.
16   Q   So you recall her saying a couple years;
17 right?
18   A   That's right.
19   Q   All right. And you were there a total of
20 how many years?
21   A   Three.
22   Q   Three years. So you interpreted a couple
23 years to mean three years? Is that what you
24 interpreted?
25   A   No. I interpreted a couple years to be a

## Page 68

1  couple, meaning two.
2    Q   All right. So you -- you exceeded the
3  two. You made it to three. Is that your
4  understanding?
5    A   Yes, sir.
6    Q   All right. And -- and she said you can go
7  out on top as Deputy Comptroller; right? I mean,
8  isn't that --
9    A   That's my recollection, yes.
10   Q   All right. And she said she was glad you
11 accepted the position? Isn't that what she told
12 you? She was happy; right?
13   A   Those were her words, yes.
14   Q   Right. I mean, so -- but now looking in
15 hindsight, you are suggesting that when she
16 expressed this happiness for you achieving this top
17 position in City government and she expressed the
18 desire for you to go out on top, that all the while
19 she was intending to terminate you in two years? Is
20 that what you are testifying here to today?
21   A   I'm testifying here today that words are
22 cheap and she could say anything, but the intent
23 was, is that she was implying that she expected me
24 to leave the position in a couple of years.
25   Q   And why do you -- I mean, I'm just trying

17 (Pages 65 to 68)

## Page 69

1  to understand.  You're saying that was her intent.
2  Why --
3      A  That was what I interpreted her comments
4  to mean, not on the day -- I didn't understand them
5  on the day --
6      Q  Right, right.
7      A  -- that they were said.
8      Q  Right.
9      A  But they became more apparent over time.
10      Q  Okay.  So she was happy?
11      A  She said she was happy.
12      Q  All right.  And did you believe she was
13  happy?
14      A  I had no feeling one way or the other.
15  She said the words.  I don't know if she was or not.
16      Q  Well, she hired you; right?
17      A  She hired me, yes.
18      Q  She promoted you; right?
19      A  Yes.
20      Q  Highest position you ever held in the City
21  government; correct?
22      A  Yes.
23      Q  Gave you a 10 percent raise; right?
24      A  Required by Personnel.
25      Q  Right, but she --

## Page 70

1      A  She didn't give me -- she didn't give me
2  the raise.  The raise was mandated by the fact that
3  I was promoted two grades.
4      Q  Did she have to approve the raise?
5      A  Only from the standpoint that she had to
6  have the money to pay for it.
7      Q  All right.  Did she approve subsequent
8  raises outside of that initial 10 percent raise?
9      A  No.
10      Q  I'm sorry?
11      A  No.
12      Q  So you received no raise from twenty --
13      A  I received no merit --
14      Q  Excuse me.  Let me finish.
15      A  No merit increases.
16      Q  Okay.  Did you receive any increases?
17      A  Only the personnel-mandated raise that all
18  employees would get across the board.
19      Q  All right.  Did you -- do you recall
20  anything else -- well, strike that.
21      This discussion that took place where she
22  expressed gladness that you had accepted the
23  position and expressed happiness that you would go
24  out on top, who was present during that discussion?
25      MR. BLANKE:  Let me object to the

## Page 71

1  mischaracterization of his testimony.
2      Q  (By Mr. Norwood)  Subject --
3      MR. BLANKE:  You can -- you can answer.
4      A  It was a phone call.
5      Q  (By Mr. Norwood)  It was a phone call.
6  Okay.  And just you and the Comptroller; is that
7  correct?
8      A  Yes, sir.
9      Q  Do you recall her saying anything else
10  during that discussion?
11      A  Related to my accepting the position?
12      Q  Related to anything.
13      A  Yes.  She asked me if I would work with
14  the City's financial advisor to come up to speed as
15  quick as can be done on understanding and developing
16  a comfort level with public finance, which I agreed
17  to do and I did.
18      Q  And why was that necessary?
19      A  Because that was the area that was the
20  incremental piece of the job that I had not had
21  anything but limited experience assisting the prior
22  Comptroller with.
23      Q  Okay.  And you recognized that weakness at
24  that time; correct?
25      A  I'm sorry, sir?

## Page 72

1      Q  You recognized that weakness on your part
2  at that time?
3      A  Yes.
4      Q  All right.  Other than that comment, that
5  phone call with the Comptroller, can you identify
6  any other information that you can provide to us to
7  suggest to you that it was her intention when she
8  hired you to get rid of you in a couple of years?
9      A  It is my feeling that I was brought in as
10  a placeholder.  I was put in the position because I
11  was a logical best option choice to fulfill the role
12  for a period of time until such point in time that
13  she was able to promote whom she really wanted in
14  that role.
15      Q  And whom would that be?
16      A  It would be someone that was more like the
17  prior Deputy, a younger black female.
18      Q  And what I'm trying to get at is evidence.
19  You say that's your belief, your suspicion.  But do
20  you have any evidence that you can share with us,
21  any memos, any discussions with the Comptroller that
22  you can share with us to support that belief?
23      A  Not at this time, but I possibly could
24  recall something later.
25      Q  Okay.  So not -- as we sit here today,

Page 73

1  January 21st, 2022, other than that comment -- which
2  was a congratulatory call, right?  It was -- would
3  you describe that as a congratulatory call?
4      A   It was an offer call, yes.
5      Q   I'm sorry?
6      A   It was the offer call where she called to
7  offer me the position.
8      Q   Okay.  So she offered you a position.
9          Now, in City government, there's elections
10  every year or every four years or so; is that
11  correct?
12      A   Well, there's aldermanic elections every
13  two years and there are -- depending on which
14  City-wide official you're speaking of, they're
15  for -- they're four-year terms.
16      Q   Okay.  And in the case of the Comptroller,
17  four-year terms; correct?
18      A   Yes, sir.
19      Q   Okay.  And you served at the pleasure of
20  the Comptroller; is that correct?
21      A   I'm not sure I understand what that means.
22      Q   Well, if a new Comptroller had been
23  elected the last election cycle, would you have
24  automatically been entitled to remain Deputy
25  Comptroller of Finance and Development?

Page 74

1      A   Yes.  Deputy Comptroller is a Civil
2  Service position unaffected by a change in the
3  elected official.
4      Q   Okay.  Got it.  And so you also allege
5  that you have been discriminated because you --
6  against because you are a white male; is that
7  correct?
8      A   Yes.
9      Q   All right.  Who in the City can you
10  identify discriminated against you because you are a
11  white male?
12      A   Darlene Green.
13      Q   Anybody else in the City?
14      A   Not that I can think of at this point in
15  time.
16      Q   Okay.  Do you know Mr. Richard Frank?
17      A   Only from being in meetings with him.
18  Like, I'm -- I'm not familiar with him other than in
19  being in meetings with him.
20      Q   Well, you knew he was the Director of
21  Personnel; right?
22      A   Yes, sir.
23      Q   All right.  And he is a white male;
24  correct?
25      A   Yes, sir.

Page 75

1      Q   And did -- do you feel that he has
2  discriminated against you because you are a white
3  male?
4      A   I don't know.
5      Q   All right.  You have alleged in your
6  lawsuit that he was involved in a conspiracy to
7  discriminate against you.  Isn't that correct?
8      A   I'm not sure that I would characterize it
9  as a conspiracy, no.
10      Q   Well, do you know why in your Complaint
11  it's characterized as a conspiracy?
12      A   I would characterize it as complicit with
13  the Comptroller to contrive a way to have me not in
14  the position, yes.
15      Q   And why do you think Mr. Frank would be
16  complicit in a plot to discriminate against you
17  because you are a white man?
18      A   I don't know, sir.
19      Q   So as you sit here today, you don't
20  know -- you -- you believe he was complicit, but you
21  don't know why he would have been complicit?  Is
22  that your testimony?
23      A   That's correct.
24      Q   All right.  What about Beverly
25  Fitzsimmons?  She is a white woman; correct?

Page 76

1      A   Yes, sir.
2      Q   Do you think she has discriminated against
3  you because you are a white male?
4      A   I don't know that.
5      Q   Okay.
6      A   I don't know that.
7      Q   All right.  Do you know Judy Armstrong?
8      A   I do.
9      Q   All right.  She is an African American
10  female; is that correct?
11      A   Yes, sir.
12      Q   And do you believe that she has
13  discriminated against you because you are a white
14  male?
15      A   I don't know that.  I can't say that.  If
16  she did, it could be in a way or in a manner that I
17  am unaware of.
18      Q   Okay.  So as you sit here today, to the
19  best of your knowledge, she did not discriminate
20  against you because you are a white male; correct?
21      A   To the best of my knowledge, that is
22  correct.
23      Q   All right.  What about Chana Morton?  Do
24  you think somehow she has discriminated against you
25  because you are a white male?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 77

1     A  Again, not that I'm aware of.

2     Q  Okay.  Do you know a Dr. Ishmael Ikpeama?

3     A  Yes.

4     Q  All right.  Who is Dr. Ishmael Ikpeama?

5     A  He is a former supervisor in the Internal

6 Audit Division.

7     Q  And he reported to you; correct?

8     A  At -- for -- at a point in time, yes.

9     Q  When you were Deputy Comptroller; correct?

10     A  Not for the entire time.

11     Q  For what period of time did he report you?

12     A  I can't recall the exact dates, but I

13 supervised Internal Audit for a period of time after

14 the remaining supervisor left and before a

15 replacement was hired.

16     Q  Okay.

17     A  And I can't tell you the exact dates.  I

18 don't remember.

19     Q  Okay.  Do you think Dr. Ikpeama would have

20 discriminated against you because you were a white

21 male?

22     A  Not that I am aware of.

23     Q  Do you think any of those individuals I

24 mentioned would have discriminated against you

25 because of your age?

## Page 78

1     A  Is the question do I think they would, or

2 did they?

3     Q  Did they.

4     A  Not that I'm aware of.

5     Q  Not that you're aware of.

6     MR. NORWOOD:  For the record, Peak --

7 Ipema -- Ikpeama is I-K-P-E-A-M-A.  Ishmael.

8     Q  (By Mr. Norwood)  Okay.  And why do you

9 believe that the Comptroller discriminated against

10 you because you are a white male?

11     A  She replaced me with a younger African

12 American female.

13     Q  And the basis for that belief is what?

14     A  That's what happened.

15     Q  Okay.  So the mere fact that an African

16 American woman obtained the position after you

17 vacated it is what leads you to believe that

18 Comptroller Green was discriminating against you

19 based upon the fact that you're a white male.  Is

20 that your testimony?

21     A  Yes, sir.

22     Q  Any other basis other than the simple fact

23 that there was an African American woman hired after

24 you vacated that position?

25     A  I don't understand the question.  What --

## Page 79

1 what are you -- what's the question?

2     MR. NORWOOD:  Could you read that back for

3 me?

4     (The last question was read.)

5     MR. BLANKE:  So you're asking in this

6 question about race and gender alone?  You're

7 not asking about age here, or are you?

8     MR. NORWOOD:  I'm -- let's just go with

9 race and gender for now.

10     A  I'm confused.  I'm sorry.

11     MR. BLANKE:  Okay.

12     Q  (By Mr. Norwood)  All right.  Anything

13 else you can share with us today to support your

14 view that Comptroller Green was -- discriminated

15 against you because you're a white male other than

16 the fact she hired an African American woman

17 after you vacated the position?

18     A  Well, not at this point in time.

19     Q  Not at this point.  Okay.  Fair enough.

20 What about age?  Anything else other than what you

21 talked about, which was the, you know, offer call

22 that you can identify to support your view that she

23 has discriminated against you because of your age?

24     A  Other than what I've already testified to,

25 not at this point in time.

## Page 80

1     Q  Okay.  The incidents involved in this

2 lawsuit, have you discussed those with anyone other

3 than your attorneys?

4     A  I'm not -- the what?  The incidents?

5 What -- what is that -- I'm not understanding what

6 that means.

7     Q  Well, the -- the -- the lawsuit.  Let's

8 talk about that.

9     A  Okay.

10     Q  Have you discussed the details of the

11 lawsuit with anyone other than your attorneys?

12     A  Yes.

13     Q  Who have you discussed it with?

14     A  My wife.

15     Q  Anybody else?

16     A  No.

17     Q  I'm sorry?

18     A  No, sir.

19     Q  All right.  Now, you have alleged that you

20 have been constructively discharged.  Do you

21 understand that?

22     A  Can I ask you to explain it -- what that

23 means?

24     Q  Well, let -- let me -- I'll go ahead with

25 some other question.  So -- so as you sit here

Page 81

1  today, you don't know what that term means; correct?
2  A   Right.
3  Q   All right.  You've talked about early
4  on -- I think I wrote on the first page, you used
5  the term hostile work environment.  What do you mean
6  by that?
7  A   In the context that I spoke of it earlier,
8  what I meant by that is I felt that if I were to be
9  successful and be reinstated through the Civil
10  Service process, that I would be placed in a
11  position where, first of all, my -- my work was not
12  respected, I was not wanted, and the environment
13  that I would be required to work in would be such
14  that I, in my mind, would believe that she would be
15  looking for the next opportunity to put me on forced
16  leave or worse; that it would be an intolerable
17  situation to try and -- you know, as a reasonable
18  person, trying to do the duties of the job and --
19  and trying to do my very best, that I wouldn't have
20  the support and, in fact, a very caustic environment
21  in which I'd be required to work.
22  Q   Okay.  So when you use the term hostile
23  work environment, if I'm understanding your
24  testimony -- I just want to make sure we get this on
25  the record correctly -- you were fearful that if you

Page 82

1  were successful through this disciplinary process
2  and went back to work, you would be in a hostile
3  situation?  Is that a fair characterization?
4  A   I wouldn't be fearful of it, that's would
5  be -- that would be the environment that I would be
6  stepping back into in a position that --
7  Q   How do you know that?
8  A   Well, because she had made her best
9  efforts to put me out of that position, and if I was
10  reinstated in it, I don't believe I would be met
11  with open arms coming back into that position.  I
12  believe that she would do her bed -- dead level best
13  to send me out the door again.
14  Q   And that was your belief about what might
15  have happened had you been reinstated.  Is that a
16  fair assessment?
17  MR. BLANKE:  Well, let me object in that
18  that completely mischaracterizes his prior
19  testimony that that's what he knows.  But
20  subject to that objection, you can answer.
21  Q   (By Mr. Norwood)  Subject to that, you can
22  answer the question.  If I'm understanding what
23  you're saying -- well, let's do it this way:  Prior
24  to your receipt of the communication in July
25  regarding forced leave, were you in a hostile work

Page 83

1  environment, in your view?
2  A   The environment was not good.
3  Q   I'm sorry?
4  A   The environment was not what I would
5  consider a good and positive working relationship.
6  Q   What do you mean by that?
7  A   From the time I was hired, I always felt
8  my relationship and me personally was kept at arm's
9  length from the Comptroller.
10  Q   Okay.
11  A   That I never shared her total and complete
12  confidence and trust, and I never felt like I was
13  part of her true inner circle of confidants and
14  people that she felt comfortable around.  I was
15  never -- she never felt comfortable around me.
16  There was always someone else -- we -- we had -- on
17  one hand I can count the times that we met one on
18  one.  And as much as I tried and as much as I
19  attempted to be the very best and perform at the
20  very highest level, you know, I -- it was very hard
21  to -- for me to -- to have any sense of comfort in
22  her presence.
23  In a group setting, I think that, you
24  know, we both were okay and -- but, you know, praise
25  was hard to come by.  I think that I was tolerated,

Page 84

1  and I think that it was very difficult for me
2  because I enjoyed such a strong close personal
3  working relationship with my former boss, Ivy
4  Pinkston, and to go to one that I was treated with a
5  certain aloofness that allowed me to, you know, feel
6  that, you know, I'm never going to be at that same
7  level that I had with my prior boss.  And it just --
8  I never enjoyed a close working relationship, a good
9  personal relationship, a business professional
10  relationship with -- with -- with Ms. Green.
11  Q   And so you weren't in this inner circle
12  you identified; is that right?
13  A   Yes.
14  Q   And -- and did that cause you concern that
15  you weren't in that inner circle, in your view?
16  A   I'm not sure the term would be concern.
17  Q   What would you use?  What term would you
18  use?
19  A   It was just the facts of the matter that I
20  couldn't do anything about.
21  Q   Okay.  Who was in this inner circle?
22  Let's talk about that inner circle.  You've got --
23  A   Well, surely -- surely her secretary, for
24  one.
25  Q   Okay.

Page 85

1    A   LaTaunia Kenner for two.
2    Q   Okay.
3    A   Judy Armstrong.
4    Q   Okay.
5    A   And I'm not sure who else, but that was --
6    those were the people that she seemed to be most
7    comfortable around.  Perhaps Michele Graham that
8    worked in her office --
9    Q   Right.
10   A   -- on the second floor.
11   Q   Right.  Were those capable and competent
12   employees, in your view?
13   A   I don't know their work.
14   Q   I'm sorry?
15   A   I don't know their work.
16   Q   So you don't know if they were capable or
17   comparable --
18   A   It's not --
19   Q   -- or capable or competent?
20   A   It's -- it's not within my purview to know
21   exactly what their responsibilities were as
22   individual -- each individual that I mentioned, nor
23   do I know specifically if they performed their work
24   well or not.
25   Q   Okay.  Well, let's talk about the

Page 86

1    positions.  Chana Morton.  What -- what was her
2    position as it related to the Comptroller?
3    A   She was Ms. Green's secretary.
4    Q   All right.  Personal secretary; right?
5    A   Yes, sir.
6    Q   All right.  And as the name implies,
7    they're working together quite a bit; correct?
8    A   Right.
9    Q   All right.  And then you mentioned
10   LaTaunia Kenner.  What was her position?
11   A   She held a number of them in the office.
12   Q   All right.  Tell us about those.
13   A   Well, I'm not sure what she did in all of
14   them, but the last few months -- less than a year --
15   that I was there, she actually worked for me in the
16   role of an executive assistant.  I -- I think that
17   her -- I'm not sure what her title was, but she was
18   assigned to me and moved over to 1520 Market office
19   probably a year before I left.
20   Q   Okay.  And you mentioned Judy Armstrong.
21   What was her position?
22   A   I'm not sure of her title, but she worked
23   basically as an assistant to Ms. Green.
24   Q   All right.  And these individuals worked
25   directly with Ms. Green, is your understanding?

Page 87

1    A   Yes.
2    Q   All right.  You didn't work as -- directly
with Ms. Green.  Is that your testimony?
4    A   I did or I didn't?
5    Q   Did not.
6    A   She was my immediate supervisor.
7    Q   I'm sorry?
8    A   She is my -- she was my immediate
9    supervisor.
10   Q   Right.  And did you work closely with her?
11   A   I would not characterize it as such.
12   Q   All right.  How would you characterize it
13   in terms of day-to-day work that you did and your
14   interactions with her?
15   A   I'm not sure that we could characterize my
16   interactions with her day-to-day.
17   Q   All right.
18   A   I would say that my interactions with her
19   90 percent of the time are interactions that I
20   initiated and they were probably more weekly to
21   bi-weekly.
22   Q   Okay.  And when you did intervene --
23   interface with her during those weekly or bi-weekly
24   meetings, were they cordial meetings?
25   A   They were matter-of-fact meetings where I

Page 88

1    was reporting progress or an achievement or needing
2    direction or asking questions and guide -- and
3    requesting guidance.  They were very matter of fact.
4    They were, Okay.
5    Q   Okay.
6    A   They were, Okay.  This is what I did.
7    This is what -- Okay.  That's fine, you know.  We
8    achieved this.  Oh, great.  I need direction on
9    this, I got it, and then that was it.
10   Q   Why were you reporting to her about the
11   matters you were involved in?  Why were you doing
12   that?
13   A   Because as a regular part of my job, I
14   kept her appraised of what was transpiring in the
15   areas in which I supervised.
16   Q   And that was part of your duty, right, to
17   make sure she knew what was happening with respect
18   to the Comptroller's office; correct?
19   A   That's correct.
20   Q   And transactions involving the City that
21   she would ultimately have to sign and approve;
22   correct?
23   A   Yes.
24   Q   All right.
25   A   That's correct.

22 (Pages 85 to 88)

1  Q   Now, as a -- in the context of this
2  disciplinary -- this pre-termination.  Let's talk
3  about the pre-termination.  You received a letter
4  from the Comptroller --
5       MR. NORWOOD:  I'm sorry?
6       MR. BLANKE:  I'm sorry.  I didn't mean to
7  speak.  I spoke outside -- I -- I didn't mean
8  to say anything.  Go ahead.  Sorry.
9       Q   (By Mr. Norwood)  In the context of the
10  pre-termination, you received a letter from
11  Comptroller Green indicating that there would be a
12  hearing set for pre-termination; is that correct?
13      A   I'm not sure who the letter was from.
14      Q   All right.  What is your understanding of
15  the pre-termination process?
16      A   I think, as I understand it, that you can
17  choose or not choose to attend a meeting with your
18  immediate supervisor whereby they would lay out the
19  reasons why you would be terminated before you and
20  you had the opportunity to respond, and then they
21  would tell you that you no longer have a job down
22  the road.  A day or two later, you would get a
23  letter saying, you know, we've decided that you no
24  longer work here.
25      Q   Is it your understanding that the

1  pre-termination process automatically leads to
2  termination if whoever is bringing that process is
3  successful?
4       A   It's my understanding -- because I've
5  never heard of a pre-term where the person wasn't
6  terminated leads me to that conclusion.
7       Q   Okay.  So other than -- how many
8  pre-terminations did you become aware of during your
9  tenure?
10      A   I think I had only participated in one or
11  two.
12      Q   Okay.  Tell us about those one or two that
13  you participated in.
14      A   Well, one was -- actually, I was -- I'm
15  not sure I've -- I've discharged, directly, an
16  employee.  I was there supporting a -- one of the
17  supervisors that reported to me that had to
18  discharge an employee.  In one particular instance
19  when I supervised a municipal garage, we had an
20  employee who had a traffic accident, and when they
21  did the required drop for drug testing, they came up
22  positive.  And since this had been a situation that
23  it had occurred before, there was a positive test
24  once before, that the supervisor, following the
25  Personnel policies, went through the pre-term

1  procedure on that individual.
2       And another individual we had in the
3  records retention area, the supervisor informed me
4  that one of her employees threatened her.  And using
5  Personnel's guidance, that was cause for termination
6  and -- and we -- I was there.  I witnessed a
7  pre-term hearing with that individual.
8       Q   Okay.  You made reference to Personnel's
9  guidance.  What do you mean by that?
10      A   In terms of the actual level of offense,
11  under 117, when the supervisor that worked for me
12  presented the offense to the Department of
13  Personnel, the guidance that they received was
14  reflective of the severity of the infraction,
15  meaning was this a -- a suspension type of offense,
16  was this a -- a written reprimand type of offense,
17  and where it did it fall within the progressive
18  discipline of 117.  In both cases, we were advised
19  that these were dischargeable offenses that were
20  causing us to do a pre-term.
21      Q   And -- and why would you engage Personnel
22  in terms of guidance?  What's the purpose of that?
23      A   To ensure that proper policy was followed,
24  procedures, and that the City would be following its
25  own rules.  I mean, if we didn't follow -- we wanted

1  to make sure that the Comptroller's office and the
2  Department of Personnel were in agreement as to how
3  a situation was to be handled.
4       Q   And -- and so it was common, then, to seek
5  guidance from Personnel as it relates to potential
6  discipline.  Is that -- that's not an uncommon
7  thing; is that correct?
8       A   It's not an uncommon thing.
9       Q   Because that's why Personnel is there;
10  right?  That's the purpose?
11      A   That's one of their purposes.
12      Q   All right.  When did you -- who are those
13  employees?  You identified two employees, the one
14  with the garage incident, the drug incident, and
15  then the second incident.  Who were those employees?
16  Do you recall the names?
17      A   No, sir.
18      Q   Okay.
19      A   This was many years ago.
20      Q   All right.  When did you first engage
21  counsel in this -- as it relates to this matter?
22      A   July 3rd, 2019.
23      Q   And that would have been the day after you
24  received a forced leave notice; is that correct?
25      A   Yes, sir.

Page 93

1      Q    And what's your understanding as to what
2  the purpose of forced leave is?
3      A    I never had any idea.
4      Q    I'm sorry?
5      A    I did not know.  All I was told by the
6  person telling me that I was on forced leave, that I
7  was on paid forced leave, and I don't know why, but
8  I need your keys, your ID badge, and you will be
9  notified at some point in time in the future.
10     Q    Okay.  So you mentioned paid forced leave.
11  You were on paid forced leave; is that right?
12     A    Yes.
13     Q    All right.
14     A    I was using vacation.  That's how I was
15  paid.
16     Q    All right.  And ultimately because of the
17  retraction of those forced leave, you received all
18  of your vacation paid back; is that right?
19     A    I did.
20     Q    All right.  So during the period of time
21  that you were on forced leave, you did not lose any
22  benefits because you were getting paid and you
23  received all of your vacation pay; correct?
24     A    At the time that forced leave was imposed,
25  I was not aware that I would not -- that I would get

Page 94

1  my vacation reinstated.  I believe it was only
2  through the fact that I had retained counsel that
3  that was done.
4      Q    But suffice it to say, it was done, and
5  you got every nickel back.  Can we agree with that?
6      A    Yes.  That's correct.
7      Q    All right.  And you were getting paid;
8  correct?
9      A    Yes, sir.
10     Q    While you were at home; is that right?
11     A    That's correct.
12     Q    And when you brought counsel in, counsel
13  filed certain appeals of the forced leave.  You're
14  aware of that; correct?
15     A    Yes.
16     Q    All right.  And then ultimately, two of
17  the forced leaves were rescinded; is that correct?
18     A    And reinstated.
19     Q    And reinstated; correct?
20     A    Yes.
21     Q    And the -- the last forced leave, which is
22  the second one, was replaced with a pre-termination
23  notice; correct?
24     A    Yes.
25     Q    And a hearing was set on that notice;

Page 95

1  correct?
2      A    Yes.
3      Q    You had counsel to represent you; correct?
4      A    Yes, sir.
5      Q    You had the opportunity to present your
6  case with respect to the allegations; correct?
7      A    Yes.
8      Q    And if you were unsuccessful at that
9  level, you had an opportunity to appeal to the Civil
10  Service Commission; correct?
11     A    If that's the procedure, yes.
12     Q    With very capable attorneys; is that
13  right?
14     A    I had attorneys, yes.
15     Q    Okay.  Do you know how the Civil Service
16  Commission might have ruled on any appeals that you
17  may have taken throughout this entire process?
18     A    No.
19     Q    I'm sorry?
20     A    No, sir.  I -- I -- I don't know how they
21  would have ruled.
22     Q    Did you have some sense that somehow the
23  Civil Service Commission would have discriminated
24  against you because you were a white male?
25     A    The Civil Service Commission is made up of

Page 96

1  mayoral appointees that have -- I mean, I don't -- I
2  don't know who they -- who it would be.  I have no
3  idea who they are.
4      Q    Okay.  Do you have any sense, though, that
5  they would have discriminated against you?
6      A    No, I -- I don't know who they are, so I
7  can't have a sense that they would do anything.  I
8  don't know.  I don't know what they would do other
9  than they would hear the case.  I mean, I -- I have
10  no sense of -- of who they would be, who -- who is
11  even a Commissioner.
12     Q    Fair enough.  From the time frame that you
13  were put on forced leave on July 2nd, 2019 through
14  your last date of service, which was September 30,
15  2019, did you lose any pay or benefits during that
16  time frame?
17     A    No.
18     Q    I'm sorry?
19     A    No.
20     Q    No.  Do you know if the Comptroller's
21  alleged failure to provide you with Civil Service
22  ratings in 2016, 2017, 2018, do you know if that
23  caused you to lose any benefits?
24     A    I'm not sure the two have any bearing on
25  the other.  I don't think one has any bearing on the

24 (Pages 93 to 96)

## Page 97

1  other.
2      Q   Okay.  Well, let me ask it this way:  How
3  were you harmed by the failure of Comptroller Green
4  to give you service ratings in twenty six -- 2017,
5  2018, 2019?
6      A   The harm comes in the fact that you never
7  know where you stand.  You never know how your --
8  how your performance is being viewed, where are the
9  areas that you can do better, where are -- what are
10 the things that you are deficient in or that you may
11 have done exceptionally well.  There -- there was no
12 feedback at all.
13     Q   Okay.  Any financial harm that you can
14 identify for us today?
15     A   Any financial what?  I'm sorry.
16     Q   Financial harm.
17     A   No, they're not -- they're not -- it's an
18 apples and oranges thing.  It's -- the only thing
19 that -- that would tie a financial piece to not
20 getting a service rating is, is if the City in the
21 fiscal years that we were talking about were
22 offering merit raises.  You wouldn't be eligible for
23 a merit increase if you had not gotten a service
24 rating that was above meets standard.
25     Q   Okay.  So if I'm understanding, you're

## Page 98

1  saying you can't identify to us today how you were
2  financially harmed by not receiving service ratings
3  during those years?
4      A   I would have been harmed had I been able
5  and eligible to receive a merit increase, but there
6  were not merit increases in any of those fiscal
7  years.
8      Q   Okay.  So because there were no merit
9  increases, you wouldn't have been harmed by the
10 failure to receive a service rating.  Is that a fair
11 statement?
12     A   But had there been merit increases, I
13 would not have been eligible, because I would not
14 have had a service rating.  And depending on what
15 that service rating was -- and presumably it would
16 have been above the necessary requirement to receive
17 a -- a merit increase, I would have gotten one.
18     Q   Why do you presume that?
19     A   Because my performance would have dictated
20 that.
21     Q   Who would have been providing that
22 evaluation?
23     A   Who I work for.
24     Q   Who is that?
25     A   The Comptroller.

## Page 99

1      Q   Okay.  So the Comptroller who promoted you
2  and hired you and congratulated you, who you believe
3  had designed to discriminate against you because of
4  your race, age, and sex; correct?
5          MR. BLANKE:  Let me object as to an
6  argumentative question.
7          MR. NORWOOD:  I'll withdraw that question.
8      Q   (By Mr. Norwood)  Do you know whether or
9  not the Comptroller provided Beverly Fitzsimmons
10 with service ratings in 2016, 2017, 2018, 2019?
11     A   I do not.
12     Q   In your lawsuit, one of the things you
13 allege -- you allege mental anguish, emotional pain,
14 enjoyment of life.  Have you received any medical
15 treatment for any of those issues that you have
16 suggested?
17     A   You know, problems that you face when
18 something like this happens, the devastating effect
19 that it has on your personal psyche and -- and your
20 physical person is one that I've struggled with.
21 And, you know, I actually was hoping that it -- and,
22 in fact, I was doing better, I felt better.  But,
23 you know, I'm not myself, and I think that
24 potentially I may have to look at having some --
25 some counseling and to do some things that I was

## Page 100

1  hoping would get better, but they're -- they're not.
2          And, you know, as this deposition
3  approached and getting back into reliving and
4  recounting the events that transpired during that
5  period of time, it's kind of set me back a ways, if
6  you will.  And so I believe that that -- that that
7  might be a good option for me, is to -- to seek some
8  treatment in that regard, yes, sir.
9      Q   So as we sit here today, you have not
10 sought out such treatment.  Is that a fair
11 statement?
12     A   I have not as of yet.
13     Q   All right.  At the time you retired, how
14 old were you?
15     A   Let's see.  I was 66.
16     Q   All right.  And when were you planning to
17 retire before the forced leave and things of that
18 sort?
19     A   That question was asked of me probably in
20 March or April of 2019 by the Comptroller in the
21 presence of the other deputy, Beverly Fitzsimmons.
22     Q   Okay.  Let's talk about that meeting.
23 Where -- this was, you say, May of 2019?
24     A   I think it was March or April.
25     Q   March or April of 2019?

## Page 101

1    A    Right, because we were discussing the
2  budget for the upcoming fiscal year.
3    Q    Okay.  And so the participants in that
4  meeting would have been the Comptroller and her two
5  deputies?
6    A    That's correct.
7    Q    And where did this meeting take place?
8    A    In the Comptroller's office.
9    Q    Whereabout?
10    A    What do you mean?
11    Q    In City Hall?
12    A    Yes.  Yes.
13    Q    All right.  Do you recall any meetings
14  with the Comptroller and Ms. Fitzsimmons in your
15  office?
16    A    No.
17    Q    Your offices?
18    A    What does that mean?
19    Q    Well, where were you -- where were you
20  located office-wise?
21    A    1520 Market.
22    Q    1520 Market?
23    A    Yes, sir.
24    Q    Do you recall any meetings with the
25  Comptroller and Ms. Fitzsimmons at 1520 Market?

## Page 102

1    A    Not in this -- not on -- not on this
2  subject matter.  I think we may have had some -- a
3  staff meeting or two there.
4    Q    Okay.  All right.  So let's talk about
5  this March 2019 meeting.  Tell us about that.  What
6  do you recall about that meeting?
7    A    It was designed to have the -- the
8  Comptroller review and sign off on the budget that
9  Bev and I jointly prepared for the office.  And
10  somewhere in the -- in the midst of the
11  conversation, the Comptroller said that -- you know,
12  that she was looking forward and was starting to
13  make plans to run for another term.  And that -- she
14  looked at each of us and said, Can I count on your
15  support?  Will you -- will you be here?  Will you be
16  in these -- will you -- will you be there in these
17  positions?
18          And I said to her that I intended and I --
19  and I could commit to -- that day to working full
20  time through at least the end of her term, which
21  would have been April of 2021, and then I wanted to
22  assess, you know, health-wise and talk to my family
23  and just take it year to year and commit on a
24  year-to-year basis at that point in time.  I had no
25  plans to retire, but I told her that at what -- at

## Page 103

1  certain -- at some point in time, I would like to
2  cut back and go to a part-time employment if that
3  was allowable or possible with the office.
4    Q    Okay.  So she asked you will you be there
5  after the election?  Is that what she was trying to
6  gather, from your interpretation?
7    A    I -- I'm not sure what she was really
8  asking.  I think she was -- she may have been trying
9  to find out if I was going to retire or not.
10    Q    But you don't know as you sit here today?
11    A    I don't know what her motives were, no.
12    Q    All right.  And you had committed to work
13  at least through the next term, if she were to be
14  re-elected?
15    A    I committed to work at least through April
16  of '21, and then I would like to -- I -- I said I
17  would like to evaluate year to year based on health
18  and what -- my family situation, how they were
19  doing, in terms of making -- I wasn't making a
20  four-year commitment, I was making a year-to-year
21  commitment past April of '21, which would put her
22  into the next term that she was hoping to and she
23  was elected to; that I would -- I would be there,
24  you know.  I would make a one-year-at-a-time
25  commitment and potentially, as I said, would like

## Page 104

1  to -- when I did want to give up the full-time
2  status, if there was a way for me to play a role in
3  the office on a part-time basis.
4    Q    Okay.  After you resigned, did anybody
5  tell you you couldn't work with the City on a
6  part-time basis?
7    A    At that point in time -- I was not of the
8  ability to work in any capacity at that point in
9  time.
10    Q    Okay.
11    A    I -- I was just -- I don't know if you
12  want to call it depression.  I just didn't have it
13  in my gut to want to come back in any way, shape, or
14  form at -- at that point in time.
15    Q    Okay.  And so -- but my question, sir,
16  was:  Has anyone from the City told you that you
17  cannot work part time for the City?
18    A    Not that I can recall.
19    Q    All right.  And so as far as you know, as
20  you sit here today, you can still work part time for
21  the City; correct?
22    A    Potentially.
23    Q    Okay.
24        MR. NORWOOD:  I believe our lunch is here.
25  Do we want to take a break until 1:00?

## Page 105

1    MR. BLANKE:  Sounds fine.
2    MR. NORWOOD:  How much time -- where are
3 we in the scheme of things?
4    THE VIDEOGRAPHER:  As in total time?
5    MR. NORWOOD:  Total time, yes.
6    MR. BLANKE:  It's 12:25 now.  When did we
7 take --
8    MS. McMILLEN:  Do you want to go off?
9    MR. BLANKE:  Are we off the record or are
10 we on the record?
11    THE VIDEOGRAPHER:  We're on.
12    MS. McMILLEN:  Let's go off the record.
13    MR. NORWOOD:  Let's go off the record.
14    THE VIDEOGRAPHER:  This is the
15 videographer.  We're going off the record.  The
16 time now is 12:25.
17    (Off the record at 12:25 p.m.)
18    (On the record at 1:11 p.m.)
19    THE VIDEOGRAPHER:  This is the
20 videographer.  We're back on the record.  The
21 time now is 1:11.
22    MR. BLANKE:  Oh, I just thought I'd
23 mention, he did not get a chance to finish his
24 response.  It's up to you what you want --
25 about what happened at that March/April '19

## Page 106

1 meeting.
2    MR. NORWOOD:  Okay.
3    MR. BLANKE:  It was more that he was going
4 to talk about, but I don't know --
5    MR. NORWOOD:  All right.  Are we back on?
6 So counsel, I believe you've indicated off
7 the record that Mr. Garavaglia was -- wanted to
8 finish a response about the March 2019 meeting?
9    MR. BLANKE:  Yeah.  I think he said March
10 or April, I don't know.
11    MR. NORWOOD:  March or April.  Okay.
12    Q    (By Mr. Norwood)  Go ahead, sir, if you
13 have more to add.
14    A    Yeah, I -- I -- what I had said was -- I
15 was asked about how long I intended to work, and I
16 said full time for two years and then we'll take it
17 year by year, and then potentially down the road,
18 who knows.  But when I said that, the Comptroller
19 reacted by -- you know, she pursed her lips and she
20 kind of looked down and then she started making
21 notes.
22    When she asked -- when she looked back up
23 and she asked Bev the same question, Bev said, Well,
24 I've got the years of service that I could retire,
25 but I don't -- I'm shy -- I -- I don't have the age,

## Page 107

1 so I don't have the years that add to the age to get
2 me to 85.  So she said, You got me for not only the
3 next two years, but the entire next term of four
4 years, to which the Comptroller looked at her and
5 nodded approvingly and sort of gave it a bit of a
6 smile.
7    Now, I know working for her long enough to
8 know that what -- when I was saying what I was
9 saying, she didn't like what she heard.  Because she
10 looked down and she kind of made a hmm, pursed her
11 lips, and just started making notes.  However, in
12 contrast to what she heard Bev say, she seemed like
13 that was what she was hoping to hear.
14    Q    Okay.  All right.  Let's unpack that a
15 tad.  So in this meeting, the one where she's asking
16 both of you-all to commit -- well, will you be there
17 in these positions.  I think those were the terms
18 used; right?  That's what she asked you, Will you be
19 there?
20    A    Well, no.  The question was, Will you be
21 able -- I'm going to run, what are your plans, not
22 if we'll be there, but what are your --
23    MR. NORWOOD:  Hold on a second.  Hold on a
24 second.  Do we have -- hold on a second.  Let's
25 make sure.  Hold on a second.

## Page 108

1    Madam Comptroller, we're -- we're getting
2 back on the record.
3    MS. GREEN:  Okay.  Thank you.
4    Q    (By Mr. Norwood)  Okay.  All right.  Let
5 me -- let me re -- let me ask this question again.
6 I want to go back, then, to the statement that she
7 led with.  Let's start with that.  That is -- we're
8 talking about the March or April 2019 meeting where
9 by you, the Comptroller, and Bev Fitzsimmons were in
10 attendance.
11    So how did the -- who called the meeting,
12 first of all?
13    A    I actually think Bev called the meeting,
14 because it was -- we needed to sit down and talk
15 about the budget with the Comptroller.
16    Q    Okay.  So it was a -- is this a normal
17 budget-type meeting, generally speaking, between the
18 two deputies and the Comptroller?  Did you-all
19 typically meet --
20    A    Yeah.
21    Q    -- meet in that fashion?
22    A    Well, we didn't -- we didn't typically.  I
23 think we -- we met maybe a couple of times
24 throughout process, yes.
25    Q    Okay.  And somewhere -- you're talking

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

## Page 109

1  about the budget.  And as best you can recall,
2  exactly what did she say and what did she do?
3      A   She said that she planned on finalizing
4  her plans if she was running again, and she was
5  intending -- she was -- she was pretty sure that she
6  was going to run again and --
7      Q   This would have been -- excuse me.  I
8  don't mean to cut you off.  But this is for the
9  election in 20 --
10     A   '21.
11     Q   -- '21.  Okay.  All right.  Go ahead.
12     A   And that -- she was asking about what were
13  our plans, you know.  What -- what was, you know,
14  our plans going to be, what would we be able to
15  commit to in terms of our -- of our employment.  And
16  I said -- what I -- I think I've said it about four
17  times, but I said I would be certainly -- can I go
18  on?
19     Q   No, no, no.  I mean, I'm sorry.  I don't
20  mean to cut you off.  I'm trying to make sure we get
21  the precise words.  Because I thought -- what I
22  wrote down, it said that you -- she said, Will you
23  continue to be there in these positions after I'm
24  elected in 2021?  Is that --
25     A   Would you -- yes.  Yes.

## Page 110

1      Q   Okay.  All right.  So that's how --
2      A   If I am -- if I run, which I'm leaning
3  toward doing it, if I am elected, would you be in
4  these positions -- would you be available to be in
5  these positions?  And my answer was as I previously
6  testified to.
7      Q   Okay.  And then you said something about
8  lips -- and let's talk about that.
9      A   Well, when I was saying that, knowing her
10  as I do, I know that she was displeased by what I
11  said.  Because she looked down, pursed her lips, and
12  started making notes.  Conversely --
13     Q   Okay.  Let's -- let's stop.  Just -- we're
14  going to get to converse.
15     A   Okay.
16     Q   Okay.  Let's stay with verse, which is in
17  response to you saying I'm planning to stick around,
18  I'm in this through the next term, I might work part
19  time afterwards, she looked down and wrote something
20  down on a piece of paper.  Did you see what she
21  wrote down?
22     A   No, sir --
23     Q   All right.
24     A   -- I did not.
25     Q   All right.  And you said something about

## Page 111

1  her lips.  Tell me about her lips.
2      A   Well, she just -- she pursed her lips.
3  She -- you know, she -- it was like -- she just made
4  a -- her facial expression was that's not what I was
5  hoping to hear.  I'm -- I'm --
6      Q   So you don't know what she meant with
7  whatever facial expression that you believe that
8  you --
9      A   But -- but I know her well enough to
10  know --
11     Q   Let me finish.  Let me finish.
12     A   -- that she didn't like what she heard.
13     Q   Okay.  Let me -- let me finish, just for
14  the court reporter, because she is doing a great
15  job.
16     A   Okay.
17     Q   But when we talk over each other, I don't
18  think she has a special key for that.
19         So let's go back.  You said you know her
20  well enough to know that a pursed lip means what?
21     A   I said that I know her well enough that by
22  her facial expression and the fact that she made the
23  pursed lips and looked down, that she was displeased
24  by what I said.
25     Q   And do you know -- what is it about what

## Page 112

1  you said that displeased her?
2      A   That I wanted to work.  I wanted to keep
3  working.
4      Q   So that's what you believe?  She didn't
5  say that; right?
6      A   That's what I believe, yes.
7      Q   Okay.  She didn't say that; is that
8  correct?
9      A   This is what I believe, yes.
10     Q   She didn't say that; correct?
11     A   She said nothing.
12     Q   Right.  She said nothing.  Non-verbal
13  communications that you interpreted in some negative
14  way; is that correct?
15     A   Yes.
16     Q   All right.  And then you said -- then she
17  turned to Bev, and what did Bev say?
18     A   Bev said that she had the number -- she --
19  she had the -- the number of years of service, but
20  she didn't have the age that would bring her up to
21  the rule of 85, where she could be potentially
22  eligible for full retirement.  And so she said,
23  You've got me.  You've got me through the rest of
24  this term and you've got me the whole next term,
25  because I need to get to the rule and I'm -- you

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 113

1  know, I'll be here.
2      And at that point in time, the Comptroller
3  looked up, looked at her, nodded approvingly, and
4  partially smiled.
5      **Q   And partial -- a partial smile?**
6      A   Yeah.
7      **Q   All right.**
8      A   Meaning that she was glad to hear that, in
9  my opinion.
10     **Q   Okay.  But she didn't say any of that;**
11 **right?**
12     A   She did not.
13     **Q   And you interpreted the partial smile as**
14 **an approval of whatever Bev Simmons (sic) was**
15 **communicating to her; correct?**
16     A   Yes.
17     **Q   Did -- did she take notes when she gave**
18 **that half smile?**
19     A   Did not.
20     **Q   All right.  All right.  And you took the**
21 **fact that she didn't write notes as something**
22 **like -- as what?**
23     A   I didn't take it as anything.  I --
24     **Q   All right.**
25     A   But I can tell you that based on her

## Page 114

1  facial expressions, what I said did not please her.
2  What Bev said did.
3      **Q   All right.  And did you take down her**
4  **writing down, was that -- what did you interpret**
5  **from that?  She's writing down --**
6      A   I --
7      **Q   -- while she's --**
8      A   I didn't -- I didn't take anything from
9  that.
10     **Q   All right.  So just writing; right?**
11     A   I don't know what it was, yes.
12     **Q   All right.  Fair enough.**
13     MR. NORWOOD:  Before we go forward, just
14     for the record, we had talked about Exhibit 29,
15     which were the documents related to his
16     application for Deputy Comptroller, and we had
17     identified the Bates numbers.  So let me do
18     that for you, counsel, so you can isolate those
19     at your leisure.  And those are STL000709
20     through 725.
21     MR. BLANKE:  Thank you.
22     MR. NORWOOD:  You're welcome.
23     **Q   (By Mr. Norwood)  We were talking about**
24 **your direct reports and your annual ratings for**
25 **those direct reports.  Do you recall if you did, as**

## Page 115

1  Deputy Comptroller, annual ratings for Mr. Kelley
2  Anderson?
3      A   Yes.
4      **Q   You do recall?**
5      A   Yes.
6      **Q   And you did those for Kelley?**
7      A   In the time that he worked for me, yes.
8      **Q   All right.  What about LaTaunia Kenner?**
9  **Did she report to you?**
10     A   Yes, but I don't know if it was a time
11 frame -- maybe I did one.  I may have done one.  I'm
12 not sure that I did one for her.  But in the -- for
13 the time that she may have been in -- in -- in my
14 employ, I may have done one.
15     **Q   And Kelley Anderson is African American;**
16 **correct?**
17     A   Yes.
18     **Q   LaTaunia Kenner is African American;**
19 **correct?**
20     A   Yes.
21     **Q   What about Michael Harrington (phonetic)?**
22     A   Yes.
23     **Q   Did you do annual reviews for him as well?**
24     A   He was there possibly -- possibly a year.
25 He may have been there long enough to -- to have a

## Page 116

1  service rating.  I'm not sure.
2      **Q   A service rating.  So -- so for -- you did**
3  **them for Anderson -- service ratings for Anderson,**
4  **Kenner, Harrington, and also Ryan Coleman?**
5      A   Yes.
6      **Q   And all of your direct reports, is your**
7  **testimony, correct, whoever those might have been?**
8      A   Yes.
9      **Q   And you would have been -- you would have**
10 **rated it as a second person on everyone else in your**
11 **group?**
12     A   That was not a direct report, yes.
13     **Q   All right.  Let me hand you what has been**
14 **marked as Garavaglia -- or Garavaglia Deposition**
15 **Exhibit 30, if I could.  Let me hand you a copy.**
16     MR. NORWOOD:  It's not labeled, so you'll
17     have to write that.  This is Exhibit 30.
18     **Q   (By Mr. Norwood)  And -- and for the**
19 **record, these are assorted documents that are Bates**
20 **labeled STL with a number.  So let's start with**
21 **STL000707.  And this is a letter from Comptroller**
22 **Darlene Green to Mr. Richard R. Frank, Director of**
23 **Personnel, dated May 20, 2016.  Do you see that?**
24     A   Yes, sir.
25     **Q   And Comptroller Green starts by saying --**

## Page 117

1  and I'll read it -- quote, Dear Mr. Frank, I would
2  like to respectfully request that the Department of
3  Personnel approve a 10 percent salary increase for
4  Mr. Jim Garavaglia upon his promotion to Deputy
5  Comptroller as of May 13, 2016.
6      Do you see that?
7      A  I do.
8      Q  And it's your understanding that that
9  would have been an automatic 10 percent increase?
10     A  Based on the Civil Service, it -- it's --
11 it's in the -- whenever they do an ordinance -- the
12 Department of Personnel does an ordinance which
13 spells out salary titles and ranges of salary and
14 also the rules that govern promotions, increases,
15 demotions, suspensions, everything that you would
16 need to know regarding and affecting someone's
17 title, grade, or pay.
18     Q  Right.
19     A  I believe in that document, which is a --
20 which is an ordinance that's passed, I don't know,
21 annually by annually, it states in there what would
22 happen if you were to be promoted by one grade, by
23 two grades, but I don't believe in any instance you
24 can be promoted from -- or you can be raised from
25 more than three grades from where you currently are.

## Page 118

1  So it stipulates, I believe, in that ordinance that
2  when you move someone two grades, that they get a
3  10 percent increase.  It's 5 percent per grade.
4      Q  Right.  So in your view, then, she was
5  required to send this letter to give you the
6  10 percent salary increase?  Is that your
7  understanding?
8      A  I'm not sure she was required to, but it
9  may have happened automatically.  Once you put me in
10 the position, it may have happened automatically.
11 I -- I think maybe they -- Personnel requested her
12 to write the letter.  I don't know.
13     Q  All right.  So as you sit here today, do
14 you know if she had not written this letter, whether
15 or not you would have got a 10 percent salary
16 increase?
17     A  I don't know that I wouldn't.
18        COURT REPORTER:  That you wouldn't?
19     A  I don't know that I wouldn't have gotten
20 it anyway.
21        COURT REPORTER:  Thank you.
22     Q  (By Mr. Norwood)  Or would not have gotten
23 it anyway; right?
24     A  No.  I said I'm not sure, because, again,
25 the ordinance that -- that covers Personnel policy

## Page 119

1  regarding pay grades, titles, promotions, demotions,
2  and what happens when you promote someone one grade
3  or two grades, in the ordinance, if she did not --
4  you know, in other words, if -- if I did not get the
5  10 percent raise, she would be technically in
6  violation of an ordinance.
7      Q  That's your understanding?
8      A  That's my understanding.
9      Q  All right.  And so if she had not sent
10 this letter and recommended a 10 percent salary
11 increase -- salary increase, do you know whether or
12 not you would have received that salary increase, is
13 my question?
14     A  I believe I would, by -- by virtue of the
15 fact that Personnel is going to follow their own
16 ordinance.
17     Q  Got it.  All right.  Let's go to the next
18 page, which is a letter dated June 6th, 2016, STL
19 document number STL000708.  It appears to be a
20 letter dated June 6, 2016 from Mr. Frank to
21 Darlene Green.  Have you seen this letter before?
22     A  I don't think so.
23     Q  All right.  Based upon your review of the
24 letter, does it appear that in response to
25 Ms. Green's letter dated May 20, 2016, that he is

## Page 120

1  approving the increase at 10 percent?
2      A  Yeah.  What he's doing is he's referencing
3  the section, I believe, of the ordinance that
4  governs this, that Section 6(1) -- a dash 1.  I
5  believe that's what that is -- in the ordinance
6  that that -- in Section 6 of that ordinance.  I
7  believe that's what he's referencing.
8      Q  So he's approving her request for the
9  10 percent increase that you would have
10 automatically gotten anyway?  Is that your
11 testimony?
12     A  I think that's how it works, yes.
13     Q  All right.  Let's go to the next page,
14 which is STL000698, and ask you if you've seen that
15 document before.
16     A  I probably have this document, because
17 when you receive an increase, there is a copy that
18 goes to the employee.
19     Q  Okay.  And in the middle of -- and this --
20 it has your name on it?  This is from your Personnel
21 file; is that correct?  Is that what you understand?
22     A  Yes.
23     Q  All right.  And it says Reason For Data
24 Change, it says, quote, Promotion to Deputy
25 Comptroller, and then open paren, 10 percent

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 121

1  increase, quote, salary adjustment, unquote, closed
2  paren.  Did I read that correctly?
3      A   Yes, sir.
4      Q   And what's your understanding of salary
5  adjustment, what that means?  Is that what you
6  referred to as an automatic increase?
7      A   I don't know what that term means, sir.
8      Q   All right.  All right.  Let's go to the
9  next page, STL000689.  And this is -- this document
10  is entitled Employee Status Form, as well as the
11  prior document, which was entitled Employee Status
12  Form; is that correct?
13      A   Yes.
14      Q   The prior page?
15      A   Yes.
16      Q   And just for the record, the prior page,
17  STL 698, was -- it looks like it was submitted
18  6/7/16; is that correct?  698.  698.
19      A   I'm looking at -- where -- where do you --
20      Q   Down next to signature, next to Judy
21  Armstrong's signature.
22      A   6/7.  Okay.
23      Q   6/7/16; is that correct?
24      A   Yes.
25      Q   Signed by Judy Armstrong; is that correct?

## Page 122

1      A   Yes.
2      Q   All right.  And then the next page, 689,
3  is dated 6/15/17; correct?
4      A   It is.
5      Q   A year later?
6      A   Yes.
7      Q   Right around your anniversary date;
8  correct?
9      A   Yes.
10      Q   And this one, in the section where it says
11  reason for change, it says merit step increase.  Do
12  you see that?
13      A   I do.
14      Q   And what is a merit step increase?
15      A   The description is incorrect.  A merit
16  increase is based on performance.  A step increase
17  is based on the ordinance increase that all
18  employees would get.  So we're calling it two
19  different -- we're calling it both things.  It's a
20  step increase, is what this is.
21      Q   Okay.  Not a merit increase?
22      A   That's correct.
23      Q   All right.
24      A   The description is wrong.
25      Q   All right.  And then let's go to the next

## Page 123

1  page, which is STL 687, date of submission, 6/20/18.
2  Do you see that?
3      A   I do.
4      Q   This one is signed by Beverly Fitzsimmons,
5  it looks like; is that correct?
6      A   Yes, sir.
7      Q   All right.  And this also says reason for
8  change, merit (step) increase; correct?
9      A   Same description.  Same incorrect
10  description.
11      Q   So --
12      A   Again, there were no merit increases based
13  on performance.  This is strictly an ordinance.
14  It's really a cost of living increase, is what this
15  is, mandated by the ordinance that was passed by the
16  Department of Personnel through the Board of
17  Aldermen.
18      Q   Okay.  And just to close it out, the last
19  page, STL 678, is an Employee Status Form dated
20  9/27/19, signed by Judy Armstrong.  And the reason
21  for data change, it says retired effective 10/1/19;
22  is that correct?
23      A   Yes, sir.
24      Q   And that was because you had retired
25  effective 10/1/19; correct?

## Page 124

1      A   Yes.
2      Q   And it says last day on the payroll, right
3  above that, 9/30/19; is that correct?
4      A   Yes, sir.
5      Q   All right.  All right.  We can put that
6  one to the side for now.  Now, would -- other than
7  your -- the current job you have working with your
8  wife's company, have you sought any other employment
9  after October 1, 2019?
10      A   I have not.
11      Q   And why not?
12      A   I just didn't have the mental and physical
13  wherewithal to go out and look for another job.
14      Q   If you had developed the physical and
15  mental wherewithal to look for another job, do you
16  believe you would have had any problems finding
17  another give job, given your credentials and vast
18  experience?
19      A   It depends on what the job was and what --
20  what field it was in.
21      Q   All right.  So you didn't look for another
22  job, never applied for another job after October 1,
23  2019; correct?
24      A   That's correct.
25      Q   With respect to your -- you -- you've

31 (Pages 121 to 124)

Page 125

1  retained counsel to represent you throughout the
2  administrative proceedings as well as the lawsuit;
3  is that correct?
4      A   Yes.
5      Q   Do you have a formal engagement letter
6  with your counsel?
7      A   Yes.
8      Q   Does that engagement letter provide that
9  you would reimburse counsel on a contingency fee
10  basis?
11      A   No.
12      Q   An hourly basis?
13      A   That's correct.
14      Q   Hourly.  Okay.  And do you have a copy of
15  that agreement that you could provide to us?
16  Because I don't believe we have it.
17      A   I don't know that I --
18      MR. BLANKE:  Do we have one?  I thought
19  we --
20      A   -- have it either.
21      MR. NORWOOD:  Well, on the record, we'd
22  like to make a formal request, because it was
23  included.
24      MR. BLANKE:  I'm not sure we do have one.
25      MR. NORWOOD:  Is that right?

Page 126

1      MR. BLANKE:  Do we?
2      THE WITNESS:  I can't answer that.
3      MR. BLANKE:  I think we ran into the
4  question that there wasn't one.  So I'm not --
5  do you know what an engagement letter is?
6  We'll look again.
7      MR. NORWOOD:  Okay.  Great.
8      MR. BLANKE:  Because if it's hourly, it
9  doesn't have to be in writing, you know.
10      MR. NORWOOD:  Right.  But if -- if you
11  have a written agreement --
12      MR. BLANKE:  Yeah.  Yeah.  Yeah.
13      MR. NORWOOD:  -- you agree to provide it?
14  Thank you, counsel.
15      MR. BLANKE:  Although we may need to
16  redact certain parts of it.  I mean, I know as
17  far as attorney's fees, absolutely.
18      MR. NORWOOD:  Well, we've got to have it
19  before we redact it, so let's see if we have
20  it.  Thank you, counsel.
21      Q   (By Mr. Norwood)  Do you know how long
22  forced leaves or pre-termination proceedings
23  typically take to be resolved in the City?
24      A   I don't know that I've ever had any
25  experience with anyone besides myself being placed

Page 127

1  on forced leave.  Do you believe Mr. Richard Frank
2      Q   Okay.  Do you believe Mr. Richard Frank
3  would be the person to ask that question since he
4  was Director of Personnel?
5      A   Yes.
6      Q   All right.  Do you know why -- as it
7  relates to your pre-termination notice, your two
8  forced leave notices, why Mr. Frank would have
9  signed off on those?
10      A   I have no idea.
11      Q   Okay.  Let me hand you -- let me -- let me
12  do it this way.  It might be easier, perhaps.  Let
13  me give you a binder and let me have you turn to
14  tab 1 of that binder.  And for the record, it --
15  this is a document marked Garavaglia Deposition
16  Exhibit 1.
17          Are you familiar with that document which,
18  for the record, is the Second Amended Complaint for
19  Employment Discrimination filed on your behalf?
20      A   Yes.
21      Q   You are familiar with this document?
22      A   Yes, sir.
23      Q   Did you review it before it was submitted?
24      A   Yes, sir.
25      Q   All right.  And you've talked about some

Page 128

1  of this, so let me kind of go to my literal and
2  figurative highlights.  In paragraph 6 on page 2,
3  you state that, Defendant Green is an African
4  American female.  That's part of it.  And you also
5  say Defendant Green is being sued in her official
6  and individual capacities.
7          Do you see that?
8      A   Yes.
9      Q   What do you believe Ms. Green did in her
10  individual personal capacity as it relates to
11  this -- as it relates to what you claim is unlawful
12  discrimination?
13      MR. BLANKE:  Objection.  I think that
14  calls for a legal conclusion on the part of the
15  witness, who probably doesn't understand the
16  difference between individual and official
17  capacity in the first place.
18      Q   (By Mr. Norwood)  Okay.  Subject to that,
19  do you know what that meant when you allege that you
20  were suing her in her personal capacity?
21      A   I did not.
22      Q   Do you -- can you identify anything that
23  she did to you personally outside of her capacity as
24  Comptroller that caused you the stuff that you claim
25  was caused --

## Page 129

1    MR. BLANKE:  Same --
2    Q  -- by her actions?
3    MR. BLANKE:  Same objection.
4    A  Not at this --
5    MR. BLANKE:  Calls for a legal conclusion.
6  That's the objection.  Go ahead.  I'm sorry.
7    Q  (By Mr. Norwood)  Subject to that.
8    A  Not at this point in time.
9    Q  All right.  Let's look at paragraph 13.
10  You say -- you allege, quote, Defendant Green placed
11  Plaintiff on forced leave with the intent of
12  auditing him in order to obtain and prepare a
13  pre-textual reason to justify Plaintiff's
14  termination and/or with the intent to harass
15  Plaintiff and induce him to retire or resign so that
16  she could replace Plaintiff as Deputy Comptroller
17  with a younger African American female employee.
18    Did I read that correctly?
19    A  Yes, sir.
20    Q  And you -- we had talked about the
21  evidence.  The only evidence you have on that is the
22  fact that Comptroller Green hired a younger African
23  American female; right?
24    A  No.
25    Q  What else do we got?

## Page 130

1    A  As I stated before, the action of placing
2  me on forced leave with no explanation created an
3  environment, a harassing, toxic, hostile environment
4  that is no way that I felt that I could come back
5  into should I be able to be sustained at Civil
6  Service.
7    This was an incredibly difficult time for
8  me, because I had no idea.  32 and a half years of
9  solid performance in Civil Service, come back to
10  work from three days of vacation, and be hit with a
11  complete blindside, being asked to turn in my keys,
12  my ID badge, and to be walked out like the trash in
13  the presence of an armed marshal was devastating and
14  created -- ruined -- as I said before, ruined my
15  professional career, ruined my reputation, and
16  greatly affected me personally to the point where
17  had I -- as I went through this whole thing right up
18  to the pre-term, had I been sustained at Civil
19  Service, I would be placed right back into a
20  terrible work environment that -- just as it says,
21  that this -- I believe that the -- that the forced
22  leave was meant to create the environment that
23  places me on and off, on and off, and then put a
24  pre-term in place to create the environment such
25  that you don't want to come back here even if you --

## Page 131

1  you win at Civil Service.
2    Q  Okay.  And I understand all of that, but
3  my question was:  Other than your belief, what
4  evidence do you have that that was her intent?
5    A  By the fact that she replaced me with --
6    Q  Right.
7    A  -- a younger black female.
8    Q  Right.  And that's -- that's -- that's how
9  I'll start off.  Other than that fact, if she would
10  have replaced you with a white female, would that --
11    A  But she didn't do that.
12    Q  No, no, no.  Listen to my question.  If
13  she had replaced you with a white female, do you
14  believe that that would change your view as to
15  whether or not she intended to discriminate against
16  you because you are a white male?
17    A  But that's not what happened.
18    MR. BLANKE:  Let me -- let me just object.
19  Calls for --
20    MR. NORWOOD:  Well, let me withdraw -- let
21  me withdraw the question.  I'll withdraw the
22  question.  Let's keep it flowing.
23    Q  (By Mr. Norwood)  So the fact that she
24  replaced you with an African American female,
25  that's -- in your view, that's your smoking gun; is

## Page 132

1  that right?
2    A  Yeah.
3    Q  Okay.  Fair enough.
4    A  That's what she did.
5    Q  That's -- no dispute about that.  All
6  right.  And -- and that's all you have as it relates
7  to race; correct?
8    A  At this point in time, that's all I can
9  recall.
10    Q  Okay.  Fair enough.  In paragraph 15, you
11  say, Almost immediately after Defendant Green
12  withdrew her placement of Plaintiff on forced leave,
13  Defendant Green again placed Plaintiff back on
14  forced leave for the same reasons as set forth
15  above.  The Plaintiff then appealed yet again to the
16  Civil Service Commission.
17    Do you know why Ms. Green withdrew the
18  first forced leave?
19    A  Why she withdrew it?
20    Q  Do you know why she withdrew it, yeah.
21    A  Yeah.  Because she had not yet assembled
22  enough information to go to a pre-term and reinstate
23  it.  I think that -- that that's the logical
24  conclusion that she would draw, that she'd put me on
25  forced leave and -- and had a date in the first

## Page 133

1  forced leave --
2  **Q  Right.**
3  A  -- that you -- and at that point, because
4  whatever investigation she decided that she needed
5  to put together, it was not complete or she didn't
6  have enough to go to a pre-term, and so she extended
7  me on another forced leave.
8  **Q  Okay.  Well, why would she have waited**
9  **until she had enough goods on you before she would**
10 **have placed you on forced leave?  Do you have a**
11 **theory on that?**
12 A  I don't know -- I -- I have no idea what
13 happened to me on the 2nd of July.
14 **Q  Okay.**
15 A  I was given no explanation.  I was put out
16 the door with no explanation other than be told,
17 They'll let you know.
18 **Q  And who told you that?**
19 A  Judy Armstrong.
20 **Q  All right.**
21 A  Not the Comptroller.
22 **Q  Right.  Okay.  And so --**
23 A  And you know -- let me just add one more
24 thing.  The 2nd of July is very important, and the
25 reason it's important is it's the beginning of the

## Page 134

1  fiscal year.  I don't think there was any
2  coincidence about the fact this action was taken to
3  coincide with the beginning.  It's out with the old
4  and in with the new.  And I -- I believe that this
5  was a concerted plan to replace me one way or
6  another.  If I didn't retire, I was going to go.  I
7  was put out the door.  There was not the evidential
8  facts to sustain my ultimate demise at the time I
9  was put out the door, and so the extensions kept
10 occurring with this forced leave in order for her to
11 build some kind of potential case that was meant to
12 be substantial enough to sustain the challenge that
13 I may mount at Civil Service.
14      Because the pre-term is a foregone
15 conclusion.  The whole thing was orchestrated and
16 put together to get me out, and there was no time
17 like July 2nd, the beginning of a fiscal year.  And
18 I believe that the -- that the whole process was
19 accelerated by the fact of the meeting that we spoke
20 about just earlier today in -- in that March/April
21 time frame.
22      Once I told her that I was going to
23 continue to work, I wanted to work, and I was going
24 to be there, it didn't fit into her long-range plan
25 to replace me with a black younger female.  That was

## Page 135

1  the ultimate plan, because I had replaced a black,
2  younger female.  And for appearance purposes, she
3  had a problem.  She had two white deputies.  I was
4  the interim solution.
5      I believe that she was pressured in the
6  community that you had a black deputy for
7  20-something years, you promoted a white woman to
8  replace a white man and the other job in accounting
9  services.  Now, that position, I believe, was to be
10 restored to an African American woman, and I was put
11 in the position until such point in time as that
12 person who ultimately got the job was deemed
13 necessarily ready to step up and assume that role
14 and title.
15 **Q  And that is your belief; correct?**
16 A  That is my belief.
17 **Q  All right.**
18 A  That is, in my opinion, exactly how it
19 came down.
20 **Q  All right.  And you don't have any**
21 **evidence to support that belief other than what**
22 **you've already testified to; right?**
23 A  That's correct.
24 **Q  All right.  And so she promoted you for**
25 **the purpose of firing you in two years, three years;**

## Page 136

1  **is that right?**
2  A  No.  That's not correct.
3  **Q  Okay.  Where am I off base?**
4  A  She didn't promote me with -- with the
5  intent of firing me in two or three years.
6  **Q  Okay.**
7  A  She only intended me to be there for a
8  period of time until such point in time that she
9  could put the person that she wanted in the job.
10 **Q  And get rid of you?**
11 A  That's correct.
12 **Q  All right.  And let me try to unpack this**
13 **a little bit more.  She promoted you.  And you**
14 **talked about pressure in the community.**
15      **What is your understanding as to when she**
16 **started getting this pressure?  Well, first of all,**
17 **tell us about this pressure in the community.**
18 A  It is my belief --
19      MR. BLANKE:  Let me object to the
20 question.  It calls for an unduly long
21 narrative response, you know.  Just tell me
22 about something isn't --
23      THE WITNESS:  Okay.
24      MR. BLANKE:  -- isn't specific enough.
25 **Q  (By Mr. Norwood)  All right.  So tell me**

## Page 137

1 about something as it relates to the community and
2 the pressure put on Comptroller Green because she
3 hired you.
4     MR. BLANKE:  Same objection as to the form
5 of the question.  Go ahead, subject to that.
6     A  I believe that people keep score in this
7 town.  People keep score in terms of who is in which
8 positions in what office.  It's political and, you
9 know, you could say it's divisive, but that's --
10 it's the way it works.  And I'm not -- and I don't
11 subscribe to it.  I'm -- I'm not a strong believer
12 in -- in keeping score in that way.
13     But in this particular instance, you have
14 a senior manager's role, a very visible role in
15 public finance and in -- in management of City
16 government that was held by a very prominent African
17 American female for over 20 years.  When you put me
18 in that position and your other deputy is white --
19     Q  (By Mr. Norwood)  Right.
20     A  -- when we were -- when we walked her down
21 the aisle to her inauguration in 2017, a lot of eyes
22 were looking at us and through us.  A lot of people
23 took note of the fact that she had two white
24 deputies, and I think --
25     Q  Who are these people?  Who are these

## Page 138

1 people?  You said a lot of people.  Give me some
2 names.
3     A  I can't tell you that.  I'm just saying
4 people that attended the inauguration.  For the
5 world to see, she had two white deputies.  And I
6 believe as a result of that, she was made aware of
7 the fact that you had this and now you got that.
8     Q  Okay.  But -- so you -- these unidentified
9 eyes are watching you-all walk down the aisle, and
10 as you were walking down the aisle, you were
11 surmising that those eyes were looking on this whole
12 scene with displeasure?  Is that your testimony?
13     A  No.  They were just noting the fact that
14 if you didn't -- if you didn't -- if you weren't
15 aware of the fact that I was in the job, you
16 certainly saw it when we walked in with her.
17     Q  Who is the "they"?  You talked about they.
18     A  I said certainly would see it.
19 Anybody who was there would see it.
20     Q  Okay.  So let's talk about that.  You're
21 talking about African American people in the group?
22     A  There were some, sure.
23     Q  All right.  And are these the eyes you're
24 talking about that were looking --
25     A  No.  I'm talking about anybody who was

## Page 139

1 there.
2     Q  Okay.  White people, black people,
3 everybody there looking with the state --
4     A  I'm talking about the community at large
5 would see that she had two white deputies.
6     Q  Okay.  And they see two white deputies.
7 But you suggested, I believe in your testimony, that
8 somehow they're looking on this scene with
9 displeasure.
10     A  No.  I'm -- I'm -- I'm saying they're
11 looking on the scene with the recollection that it
12 wasn't that way before.
13     Q  Okay.  It wasn't that way before, and
14 therefore what?  I'm trying to follow this.
15     A  That I believe that there needed to be, in
16 her mind, a fixing of that, and I was the person
17 that was going to go.
18     Q  And that would have been, in your mind --
19 your understanding, in your mind, is that, in her
20 mind, as she was walking down the aisle and these
21 eyes were watching you-all, that it was at that
22 point she realized that she needed to get rid of
23 you?
24     A  No, no, no.  What I'm saying is that's an
25 anecdotal example of how people would have been

## Page 140

1 aware of the fact that Ivy was gone, I was there.
2     Q  Well --
3     A  That's just one anecdotal example.  If you
4 read The American or if you -- if you looked in the
5 paper or if you, you know, had any idea of what was
6 going on in City government, you would know that.
7     Q  I would know what?
8     A  That Ivy had died --
9     Q  Right.
10     A  -- and that she had been replaced by a
11 while male.
12     Q  Right.  And so it was known -- commonly
13 known that you had replaced an African American
14 female?
15     A  That's correct.
16     Q  And what I'm trying to figure out is how
17 are you surmising that from her standpoint that she
18 was having a problem with that?  What evidence do
19 you have of that?
20     A  By the mere fact that from the very time I
21 was hired, as we said -- as I testified earlier, the
22 only expected me to be in the position -- I was a
23 placeholder for a period of time.  She said it to
24 me.  And subsequent to that, she asked me about it
25 in the March/April time frame just before this whole

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 141

1  series of events took place.
2  Q  She never said you were a placeholder;
3  right?
4  A  Nope, but it was very much obvious to --
5  to me in looking at the situation after this all
6  unfolded.
7  Q  Okay.  So this is sort of an after the
8  fact, the lightning bolt hit you that from the
9  get-go, she was going to find a way to get rid of
10  you after promoting you and giving you a raise in a
11  couple years; is that right?
12  A  The series of events that I described and
13  I testified to didn't make sense on a
14  mutually-exclusive basis, but once I'm on forced
15  leave and I'm sitting at home with a lot of time on
16  my hands, I was able to put this together in my
17  head.
18  Q  And the public pressure.  Who -- who, I
19  mean, is there any names you can give the Court or
20  the jury about who are these "they" that is putting
21  pressure on the Comptroller to get rid of a white
22  male who was her dep -- deputy?
23  A  I can't at this time, no.
24  Q  Okay.  Do you know if those same eyes and
25  those same public community felt the same way about

## Page 142

1  Bev Simmons, a white --
2  A  I don't know that.
3  Q  -- female deputy?
4  A  I don't know that.
5  Q  You don't know that, but you know that
6  these eyes were on you; correct?
7  A  I didn't say the eyes were on me, I was
8  saying that the eyes were on the fact that
9  Comptroller Green has two white deputies.
10  Q  And you can't identify any of those eyes
11  for us today; is that correct?
12  A  The community at large was able to see
13  that fact, yes.
14  Q  And was the community -- was it the
15  community at large putting pressure on her to do
16  something about it?
17  A  In my opinion, there are -- there are
18  segments of the community -- of the community that
19  were.
20  Q  What segments?
21  A  The African American part of the
22  community.
23  Q  Okay.  So in your view, the pressure was
24  being put on the Comptroller by the African American
25  community to get rid of you in favor of an African

## Page 143

1  American woman.  Is that your testimony?
2  A  Say that again.
3  MR. NORWOOD:  Could you read that back for
4  me?
5  (The last question was read.)
6  A  It is my testimony that there was a sense
7  that the prior Comptroller who had been in the job
8  for 20 years more or less held the position that was
9  I guess designated to be held by someone of color.
10  Q  (By Mr. Norwood)  Okay.  So -- so the
11  black slot?  You're saying this was the black slot?
12  This Deputy Comptroller position was historically
13  the black slot?  Is that your testimony?
14  A  My testimony is that the person prior to
15  me had been in the job over 20 years and they were
16  African American.
17  Q  And therefore that automatically made it
18  the black slot, the African American spot?
19  A  What I think it did was it gave rise to
20  the fact that you replaced a black female with a
21  white male.
22  Q  Okay.  But Ms. Green never said that to
23  you; right?  She never told you that she was --
24  A  Not directly.
25  Q  And she never told you she was under

## Page 144

1  pressure from the African American community, the
2  Hispanic community --
3  A  Not directly.
4  Q  -- the white community -- let me finish.
5  A  Not directly.
6  Q  Not directly.  And the only indirect
7  reference is the reference you've already described;
8  correct?
9  A  I'm not sure what you're referring to.
10  Q  Well, the reference where you said, you
11  know, you'd be around for a couple of years.
12  A  That's -- that is one reference, yes.
13  Q  Okay.  What other references?
14  A  I'm not sure at this point --
15  Q  Okay.
16  A  -- that I can recall at this point.
17  Q  So that's all you can tell us today?
18  A  Today.
19  Q  All right.  And all of this is basically
20  your surmise, based upon your own beliefs, about
21  what you think transpired in this case; correct?
22  A  Yes, sir.
23  Q  All right.  And in paragraph 24, going
24  back to Exhibit 1, you say Defendants' actions were
25  intentional, willful, wanton, malicious, and

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 145

1  outrageous because of their evil motive and reckless
2  indifference in the rights of Plaintiff under the
3  ADA Section 18 -- 1981, Section 1983, Title VII, the
4  MHRA, Missouri Human Rights Act, entitling Plaintiff
5  to punitive damages.
6      Did I read that correctly?
7   A  Yes, sir.
8   Q  All right.  And tell us -- when you say
9  Defendants' actions, you're talking about the City
10  and Ms. Green.  Let's talk about the City's actions
11  separate and apart from Ms. Green.
12      What actions of the City do you believe
13  were intentional, willful, wanton, malicious, and
14  outrageous because of evil motive and reckless
15  indifference?
16   A  Well, by the mere fact that the Department
17  of Personnel supported Ms. Green's actions, that is
18  the City.
19   Q  Okay.  So this would be Mr. Richard Frank?
20   A  Department of Personnel.  I'm not sure if
21  it's Richard Frank and Linda Thomas or Linda Thomas,
22  Richard Frank.  Department of Personnel.  Let's put
23  it that way.
24   Q  All right.  And Linda Thomas, just for the
25  record, is a white female; right?

## Page 146

1   A  Yes.
2   Q  All right.  So you believe that the two of
3  them -- to the extent that they went along with what
4  you suggest was a charade because of their evil
5  motive and willful, wanton, malicious, outrageous
6  conduct?
7   A  Well, the question you asked me is how did
8  the City do this, and my answer was by endorsing
9  and -- and com -- and being com -- in -- in in, I
10  guess, agreement with what the Comptroller was
11  doing.
12   Q  Right.  But I'm trying to -- what I'm
13  trying to drill down on is this intentional,
14  willful, maliciousness.  That -- that's what I'm
15  trying to understand.  Other than what you have
16  described here today, do you have anything else to
17  suggest that the actions of those other players was
18  willful, wanton, malicious, outrageous?  Anything
19  else you can add for this record today?
20   A  Not at this point in time today.
21   Q  Not at this point in time.  All right.
22      And as to Comptroller Green, what is it
23  that you believe was intentional, willful, wanton,
24  malicious, outrageous, with evil motive and reckless
25  indifference?

## Page 147

1   A  I believe that she needed me out -- she
2  needed me to be out of the job and she was taking
3  whatever steps necessary to do that.
4   Q  Got it.
5      MR. BLANKE:  Is this a good time?  I've
6  got to go to the bathroom.
7      MR. NORWOOD:  That's fine.  We'll take a
8  break.
9      THE VIDEOGRAPHER:  This is the
10  videographer.  We're going off the record.  The
11  time now is 2:05.
12      (Off the record at 2:05 p.m.)
13      (On the record at 2:21 p.m.)
14      THE VIDEOGRAPHER:  This is the
15  videographer.  We're back on the record.  The
16  time now is 2:21.
17   Q  (By Mr. Norwood)  Mr. Garavaglia, let's
18  turn to Deposition Exhibit 2, if we could.  What is
19  Deposition Exhibit 2?
20   A  This is my filing of -- of a charge of
21  discrimination before the Missouri Commission on
22  Human Rights.
23   Q  Okay.  And this is -- was your position
24  submitted to the EEOC regarding what you believe
25  transpired with respect to your employment; correct?

## Page 148

1   A  Yes, sir.
2   Q  And other than what you have testified to
3  here today, is there anything else -- well, I'll
4  withdraw that question.
5      Let me look at the last paragraph on
6  page 2 of Exhibit 2.
7   A  Okay.
8   Q  You say, quote, There is a clear pattern
9  and practice of discriminatory treatment of
10  non-black, older, and male employees by the
11  Comptroller.
12      What -- outside of what you already
13  testified to, do you have anything else to offer
14  about this clear pattern and practice of
15  discriminatory treatment of non-black, older, and
16  male employees by the Comptroller?
17   A  I'm not sure I understand what you're --
18  what you want me to tell you.
19   Q  Well, I want for you to tell me the truth;
20  right?  I want you to tell me what you meant when
21  you said to the EEOC, There is a clear pattern and
22  practice of discriminatory treatment of non-black,
23  older, male employees by the Comptroller.
24      What did you mean when you wrote that --
25  when you can communicated that to the federal

1  government?
2      A   I'm speaking about myself.  And you look
3  at the fact that I was hired, I was told -- or I was
4  asked -- you know, I was told how long I was, you
5  know, hopefully going to have a couple years that I
6  could go out on top as a -- as a -- as a deputy.  I
7  was -- I was more or less kept at arm's length.  I
8  wasn't part of her inner circle.  I wasn't, you
9  know, part of the long-term plan, if you will.
10         If you look at the March/April meeting and
11  subsequently what happened, I mean, it's -- it's
12  pretty much -- I was a placeholder.  And I think
13  that, again, you look back on -- on -- on that, and
14  that's pretty much what this is about.
15      Q   But you didn't say that in your statement.
16  You said clear pattern and practice of
17  discriminatory treatment of non-black, older, male
18  employees.
19         So what other Es do you -- can you share
20  with us that have been discriminated against for
21  being non-black, older, white males?
22      A   The context of that sentence -- I'm not
23  sure what I was thinking of at the time.  I'd like
24  to reserve the right to come back and -- and maybe
25  answer that fully.  I can't -- I can't --

1      Q   Okay.
2      A   It's not coming to mind what I was
3  referring to at that point.
4      Q   All right.  So you can't identify for us
5  today any other non-black, older, male employees?
6      A   It's not coming to mind.
7      Q   All right.  Did it come to mind when you
8  submitted this to the EEOC at the time under oath?
9      A   Evidently I -- I could recall it then --
10  I -- I'm just not recalling it.
11      Q   Okay.  Let me direct your attention to
12  Garavaglia Exhibit 3.  And these documents have a
13  Bates stamp that has your name and a number 1 on the
14  first page.  Do you see that?
15      A   Yes.
16      Q   All right.  And then if you turn to the
17  third page, there's a document entitled Respondent's
18  Statement of Position in Response to Charge of
19  Discrimination.
20         Do you see that?
21      A   Yes.
22      Q   Have you seen that document before?
23      A   Yes.  This is the response that was
24  submitted to the EEOC in relation to my charge
25  letter.

1      Q   All right.  Let's turn to page 4 of the
2  document.  It's Garavaglia 6.  In this statement, it
3  says, quote, Based on the advice of counsel, the
4  Comptroller rescinded Complainant's original
5  administrative leave on July 18, 2019 and
6  reinstituted a second administrative leave process
7  that same day, which included the additional new
8  information as to Complainant's fiscal
9  irregularities ascertained as part of the internal
10  audit process.
11         Do you see that?
12      A   Yes.
13      Q   And my question to you:  Do you know if
14  the reason for the recision had to do with advice
15  she received from counsel?
16      MR. BLANKE:  That he received?
17      MR. NORWOOD:  That she received?
18      MR. BLANKE:  She received.
19      A   No.  I -- I just read this at its face
20  value.  I have no idea what -- what that means.
21      Q   (By Mr. Norwood)  So with respect to the
22  statement, though, my question to you is:  Do you
23  know if the reason she did it is because she had
24  advice to suggest that that's what she should do?
25      A   I have no idea why.

1      Q   You have no idea why.  Exactly.  Okay.
2         Do you know if in the context of
3  discipline the Comptroller has initiated termination
4  proceedings against non-male, non-white employees
5  within the Comptroller's office?
6      A   If she initiated -- I'm sorry.
7      MR. BLANKE:  You mean other than him?
8      Q   (By Mr. Norwood)  If -- other than him --
9  other than you, are you aware of whether the
10  Comptroller has also initiated disciplinary
11  proceedings against non-white --
12      MR. BLANKE:  Oh.
13      Q   (By Mr. Norwood) -- individuals in the
14  Comptroller's office?
15      A   Disciplinary proceedings?
16      Q   Yes.
17      A   I'm not sure that I would be privy to that
18  information.
19      Q   So you don't know one way or the other; is
20  that correct?
21      A   I don't know.
22      Q   All right.  Let's turn to further on in
23  that same exhibit, and it would be page --
24  Garavaglia page 15.  Could you take a look at that?
25  It has an Exhibit 1 sticker on it which is an

## Page 153

1    attachment to the Position Statement.
2    A   Okay.
3    Q   Do you see that?
4    A   Yes.
5    Q   And for the record, this document, it says
6    City of St. Louis Department of Personnel
7    Administrative Regulation Number 117.
8        Are you familiar with that regulation?
9    A   It's the discipline policy.  Yes.
10   Q   And are you familiar with that document
11   and policy?
12   A   I'm somewhat familiar.
13   Q   All right.  It starts by saying, quote,
14   All employees are expected to conduct themselves in
15   accordance with department/division policies,
16   Administrative Regulations of the Department of
17   Personnel, Civil Service Rules and Regulations,
18   Ordinances, the Charter of the City of St. Louis,
19   and generally-acceptable work behaviors, including
20   the City's Employment Code of Conduct.
21       Did that -- did I read that correctly?
22   A   Yes.
23   Q   All right.  It says, Employees in
24   supervisory positions should set an example by their
25   own conduct, work habits, and commitment to the City

## Page 154

1    Service.
2        Do you see that?
3    A   Yes.
4    Q   All right.  If you go to the third
5    paragraph, it says, quote, Disciplinary action shall
6    be considered as constructive interventions for the
7    purpose of correcting inappropriate work behavior.
8        Do you see that?
9    A   Yes.
10   Q   It says further, quote, In order to
11   maintain an effective and efficient work force,
12   appointing authorities, managers, and supervisors
13   are obligated to identify any behaviors or actions
14   that prevent an employee from properly performing
15   his or her duties and inform the employee of the
16   behavior and the necessary action required to
17   correct the problem.
18       Do you see that?
19   A   I do.
20   Q   Right?  And it says, Failure by the
21   employee to correct the problems shall result in
22   disciplinary action.
23       Do you see that?
24   A   Yes.
25   Q   Next paragraph, if you look second

## Page 155

1    sentence, it says, quote, The Department of
2    Personnel shall review all proposed discipline to
3    ensure -- ensure that said proposed discipline is
4    appropriate and progressive in nature, excluding
5    those instances that warrant an exception to
6    progressive discipline.
7        Did I read that correctly?
8    A   Yes.
9    Q   And so it's your understanding that
10   whatever is suggested/recommended with respect to
11   discipline has to be approved and signed off on by
12   the Department of Personnel; is that correct?
13   A   Yes.
14   Q   All right.  Next page.  Page Garavaglia 16
15   says, quote, Disciplinary actions include:  A,
16   written reprimand; B, suspension up to 28 calendar
17   days in a 12-month period; C, temporary reduction in
18   pay for a period not to exceed 13 bi-weekly pay
19   periods; D, disciplinary -- disciplinary demotion to
20   a vacant position in a lower pay grade for which the
21   employee is qualified within the
22   division/department; and, E, dismissal.
23       Did you see that?
24       MR. BLANKE:  All right, look.  Objection.
25   You -- you're just asking a whole series of

## Page 156

1    questions.  Do you see that, do you see that,
2    did I read that correctly.  You're just reading
3    Administrative Rule 117 into the record with no
4    question.
5        MR. NORWOOD:  I am.  I --
6        MR. BLANKE:  The document speaks for
7    itself.
8        MR. NORWOOD:  Guilty as charged.
9    Q   (By Mr. Norwood)  Having read that -- did
10   you read that along with me?  Did I read it
11   correctly?
12   A   Yes, sir.
13   Q   And you understand that there are various
14   levels of discipline as it relates to employee
15   misconduct?  You understand that; correct?
16   A   Yep.  I do.
17   Q   And you understood that at the time you
18   were in the process of undergoing discipline at the
19   City of St. Louis; correct?
20   A   I, again, had a general understanding of
21   117, yes.
22   Q   All right.  Let's go to page Garavaglia
23   24, that same document.  There's a section that says
24   Exceptions to Progressive Discipline.
25       Do you see that?

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334

## Page 157

1    A  I do.
2    Q  All right. Let's take a look at that. It
3  says, quote, There are some actions which are so
4  serious that progressive discipline is inappropriate
5  or insufficient and, therefore, immediate --
6  immediate dismissal is warranted.
7      Do you see that?
8    A  Yes.
9      MR. BLANKE: You know, this is your time,
10  you can spend it however you want, but you're
11  wasting your own time, because we've spent like
12  10 or 15 minutes now just reading an
13  administrative regulation into the -- into the
14  record.
15      MR. NORWOOD: Agreed.
16    Q  (By Mr. Norwood) Continuing. Listed
17  below are examples of actions which may be
18  exceptions to progressive discipline.
19      Do you see that?
20    A  I do.
21    Q  All right. Let's flip over a couple of
22  pages to the last page, which is Garavaglia 26. Do
23  you see that?
24    A  Yes.
25    Q  There's a bullet point. It says,

## Page 158

1  Violating any of the provisions of the City's Code
2  of Conduct.
3      Do you see that?
4    A  Yes.
5    Q  And then the next item says, Falsification
6  of time records or other official City records.
7      Do you see that?
8    A  Yes.
9    Q  And so based upon that, you understand,
10  then, that those violations could result in
11  immediate termination; correct?
12    A  Yes.
13    Q  All right. If we continue on in that same
14  stack -- it's Garavaglia 28 -- we have a document
15  that says Employee Code of Conduct.
16      Do you see that?
17    A  Yes.
18    Q  And you were familiar with that because
19  you reviewed it annually and signed off on the fact
20  that you did; correct?
21    A  That's correct.
22    Q  All right. And it starts by saying,
23  quote, We recognize that City employees have a
24  responsibility to various groups: The public,
25  public officials who represent the public, their

## Page 159

1  appointing authorities and supervisors, fellow
2  employees, and representatives of agencies or --
3  and -- of other agencies/organizations.
4      Do you see that?
5    A  Yes.
6    Q  And you understood that as a City
7  employee, you had responsibility to all of those
8  groups in your duties as Deputy Comptroller;
9  correct?
10    A  Yes.
11    Q  And it then says, quote, These unique
12  responsibilities -- let me stop there.
13      You believe that those responsibilities
14  are unique as it relates to City employees as
15  opposed to employees in general?
16    A  That's what it says.
17    Q  Do you believe you had unique
18  responsibilities?
19      MR. BLANKE: Well, let me object in that
20  it's calling for a legal conclusion as to what
21  is meant by this administrative regulation by
22  the word unique --
23      MR. NORWOOD: I didn't ask him about that.
24      MR. BLANKE: -- in the context.
25      MR. NORWOOD: I asked him whether or not

## Page 160

1  he personally believed he had unique
2  responsibilities as Deputy Comptroller.
3      MR. BLANKE: Yeah, but you added in -- in
4  contrast to employers that are not public
5  employees or something like that.
6      MR. NORWOOD: That's right.
7    Q  (By Mr. Norwood) Do you --
8      MR. BLANKE: But that's not in there.
9      MR. NORWOOD: Right, because I'm not in
10  here. I'm in there.
11    Q  (By Mr. Norwood) In there, I'm asking
12  you, as you sit here today, do you believe that you
13  had unique responsibilities as Deputy Comptroller?
14    A  I don't understand this. I don't
15  understand the question.
16    Q  All right.
17    A  What -- what -- what are you trying to ask
18  me?
19    Q  Do you believe that you had unique
20  responsibility? That's what I'm asking.
21    A  You mean unique as in no one else could do
22  that?
23    Q  Unique as in special responsibilities
24  because you're dealing with taxpayer money for a
25  municipality.

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334

Page 161

```
 1    A    No.
 2    Q    All right.
 3    A    Because other people have that same
 4  responsibility that serve in -- in government.
 5    Q    Right.  Other people in government have
 6  that responsibility because --
 7    A    Have the same responsibility, so it
 8  doesn't make my responsibilities unique --
 9    Q    Okay.
10    A    -- if I understand what you asked me.
11    Q    Well -- so you're saying all the
12  government employees have that unique
13  responsibility; correct?
14    A    No, they do not.
15    Q    Okay.  Fair enough.
16    A    There are -- there are levels of -- of
17  responsibility that don't have that.
18    Q    I got it.  Page 29, Garavaglia 29, Work
19  Rules.  It says, quote, This Code of Conduct is
20  intended to supplement the Civil Service Rules of
21  the City of St. Louis, the Administrative
22  Regulations of the Department of Personnel --
23    A    Where are you reading, sir?
24    Q    I'm on Garavaglia --
25    A    29?
```

Page 162

```
 1    Q    -- 29 --
 2    A    Okay.
 3    Q    -- under Work Rules, the last paragraph at
 4  the bottom.
 5    A    Okay.  Got you.
 6    Q    Okay.  It also says, Employees shall be
 7  held accountable for following all established work
 8  rules in addition to the standards of behavior
 9  outlined in this Code of Conduct.
10        Did I read that sentence correctly?
11    A    I see it, yes.
12    Q    And you understood that that was a
13  responsibility that you had as Deputy Comptroller;
14  correct?
15    A    True.  Yes.
16    Q    Okay.  Under Garavaglia 32, which is
17  page 5 of this document, there's a section that says
18  City Funds.  Do you see that?
19    A    Yes.
20    Q    It says, quote, Whenever a City employee
21  is responsible for handling cash and other financial
22  matters, the job of the employee is to document
23  every aspect of the transaction fully and
24  completely.
25        Do you see that?
```

Page 163

```
 1    A    I do.
 2    Q    All right.  You understand that was one of
 3  your responsibilities as well; correct?
 4    A    Yes, sir.
 5    Q    All right.  And then Records and
 6  Communications.  It says, quote -- in the second
 7  paragraph of that section, same page -- Employees
 8  must not make any misleading representations or
 9  falsify any record or engage in any false
10  communication of any kind.  Is that correct?
11    A    That's what it says.
12    Q    Whether internal or external, including,
13  but not limited to making or filing any false
14  reports, attendance, production, financial, or
15  similar reports and statements.  Is that correct?
16    A    Yes, sir.
17    Q    All right.  Let's go to the next page,
18  Garavaglia 33.  Honesty.  City employees should be
19  completely honest in their dealings with the public,
20  elected officials, appointing authorities,
21  supervisors, and fellow employees.
22        Is that a correct reading of that?
23    A    Yes.
24    Q    It says, quote, Lying in any form,
25  omitting some facts, or exaggeration undermines the
```

Page 164

```
 1  fundamental trust that must exist between employer
 2  and employee and has no place in public service.
 3        Did I read that correctly?
 4    A    You did.
 5    Q    Penalties on the same page.  Any violation
 6  of this Code of Conduct will subject the violator to
 7  disciplinary action up to and including dismissal.
 8        Did I read that correctly?
 9    A    Yes, sir.
10    Q    Let's turn to Garavaglia tab 4, Deposition
11  Exhibit 4.  No.  Better yet, let's turn to tab 5,
12  which is Garavaglia Deposition Exhibit 5.
13        Do you see that?
14    A    Number 105?
15    Q    I'm sorry.  Yeah.  Page 105.  Exactly.
16    A    Okay.
17    Q    All right.  Have you seen this document
18  before?
19    A    Yes.
20    Q    It looks like it's a memo from Comptroller
21  Darlene Green to Nancy Kistler, Deputy City
22  Counselor.  Do you see that?
23    A    Yes.
24    Q    In there, it says, quote, At the June 19,
25  2019 E&A meeting, I became aware of an e-mail sent
```

41 (Pages 161 to 164)

## Page 165

1  by Jim Garavaglia to Beverly Fitzsimmons to place an
2  item on the agenda when Mayor Krewson read aloud the
3  e-mail thread.
4      Do you see that?
5      A  I do.
6      Q  And you were at that meeting where that
7  occurred; correct?
8      A  I was.
9      Q  And do you know where the mayor obtained
10  the e-mail that she read aloud at that particular
11  meeting?
12      A  I believe he got that from
13  Bev Fitzsimmons.
14      Q  You believe who got it from Mayor --
15      A  The mayor's office received that Bev
16  Fitzsimmons.
17      Q  Okay.  And she says, This is my first time
18  hearing about the e-mail Jim sent.
19      Do you see that?
20      A  I see it.
21      Q  Do you know if that's accurate?
22      A  It is not.
23      Q  It is not -- okay -- in your view.  It
24  says, This is important, because I didn't realize
25  Jim had initiated the request for an extension of

## Page 166

1  item to be placed on the agenda.  I knew generally
2  that the request for extension was -- for an
3  extension was coming because Jim had mentioned it to
4  me earlier in the month.  However, I was not fully
5  apprised of the situation, including a pending
6  default.
7      Do you see that?
8      A  I do.
9      Q  Do you know if she was apprised of the
10  situation, including the pending default?
11      A  Can I speak to the issue?
12      Q  Absolutely.
13      A  Okay.  I agree with Ms. Green's comment
14  that I became aware of the request coming for an
15  extension from the developer because they were
16  having problems once again with getting their
17  finances in order --
18      Q  Okay.
19      A  -- to move forward with the project.
20      Q  Okay.
21      A  So just as it says here, I advised her
22  that this was coming, it would be on a request to
23  put on the agenda shortly.  On the 14th of June,
24  which was a Friday, I routinely sent the request to
25  Bev Fitzsimmons, who does the agendas for E&A,

## Page 167

1  saying this is tentatively an item that we want to
2  put on.  I spoke to Ms. Green.  At the time I spoke
3  to her, she didn't have any problem with it being on
4  the agenda.
5      Q  When did you speak to Ms. Green?
6      A  Prior to the 14th.
7      Q  Prior to that Friday?  Yes?
8      A  Prior to the 14th.  Some -- sometime, as
9  she states here, earlier in the month, possibly that
10  week.  Since that was a Friday, possibly that week.
11      Q  Okay.
12      A  And I sent the request -- tentative
13  request.  And -- and what that means when I say
14  tentative request is she assembles all of the items
15  to be placed -- Bev -- this is Bev Fitzsimmons.  And
16  then what she does is she then sends them to the
17  president and the mayor's office to see if there's
18  any objections to any of the items.
19      Okay.  So she's doing that.  And in the
20  interim, here comes Monday, and Monday is -- I
21  believe that's the 17th.  Things start changing.
22  The environment is changing regarding this
23  particular request.  And what's happened is -- is
24  that, number one, I became aware -- later confirmed
25  by an e-mail to Bev -- that for whatever reason the

## Page 168

1  president's office was asking us not to put it on
2  the agenda.
3      Q  Okay.
4      A  I'm not aware of why, but -- so I had some
5  concerns about our ability to get this bill -- or to
6  get this item on the agenda and to have it receive
7  at least two votes, since the president's office
8  wasn't on board.
9      Secondly, because the developer in a prior
10  meeting/phone call readily admitted that they owed
11  back taxes, that was a concern, and -- and daily, I
12  was calling.  I didn't have to do a tax clearance
13  request, as this will tell you was a shortcoming on
14  my part.  I didn't have to do that.  I was making
15  phone calls down to the Collector of Revenue's
16  office daily to see if the money had come in.
17      So now I don't know if I've got the votes.
18  I've got a problem with the tax clearance.  And then
19  all during this time period, Bev is calling me and
20  e-mailing me, Have you talked to the Comptroller
21  about this?  Have you got -- have you gotten the
22  approval from the Comptroller?  I've got to put out
23  my agenda.  I've got to go.  I've got to get this
24  done.
25      Q  Right.

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

## Page 169

1    A    And I'm -- I'm saying to her, no, I
2  haven't called her, because I don't have clarity on
3  what we were going to do.  The last thing I'm going
4  to do is place an item on the agenda that I know is
5  not going to get a second or will fail to get the
6  votes necessary to pass.
7    Q    Right.
8    A    I'm not about to place the Comptroller or
9  our office in a position to be embarrassed by the
10  fact that we didn't do our homework and know ahead
11  of time that it was going to be approved at that
12  meeting.
13    Q    Right.
14    A    So I've got concerns.  I've got two
15  concerns, not sure I had enough votes, and the fact
16  that we still had taxes owed on the 17th.
17    Q    Right.
18    A    Later that day on the 17th, a third
19  problem happens, and that is --
20    Q    Now, let me -- let me backtrack.  I just
21  want to make sure you're clear.  So you're saying by
22  the 17th, you understood there was no tax clearance;
23  is that correct?
24    A    I'm calling down there and asking if the
25  taxes are paid.

## Page 170

1    Q    Okay.
2    A    I'm not going through the manual writing
3  up a tax clearance request, because I know the
4  answer by picking up the phone.
5    Q    Right, right, right.
6    A    So by this point in time, we -- on the
7  afternoon, I think --
8    Q    The afternoon of?
9    A    -- of the 17th, which is a Monday --
10    Q    Okay.
11    A    -- somehow or other, the mayor's office
12  knows that we are having -- we're having some
13  hesitancy in making this be a final item agenda
14  item.
15    Q    Right.
16    A    And we -- and I -- I think what happened
17  was because both sides were represented, their
18  attorney, Roger Denny with Spencer Fane, called our
19  attorney, Tom Ray, and basically said I've been
20  talking to the mayor's office, and they're willing
21  to put this on if the Comptroller isn't.  And he let
22  me know that.  And the first thing the next day, Bev
23  is -- is sending me an e-mail, have you got the
24  Comptroller?  I've got to get this out.  Have you
25  talked to her yet?  And now I've got the third

## Page 171

1  problem.  Now the mayor is in the act of wanting to
2  put it on the -- on the agenda.
3    Q    Right.
4    A    I said to her, No, I have not, but I will
5  in my e-mail.  You'll find that somewhere in this
6  chain of e-mails --
7    Q    Right, right, right.
8    A    -- that I said, No, but I will.  I then
9  called the Comptroller and I explained to her that
10  we didn't have -- I wasn't sure about where the
11  president was, but now the mayor's office wants to
12  put it on anyway.  And I said, What do you want me
13  to do?  Do you want me to send them the paper -- the
14  paperwork for -- to put it on the agenda?  And she
15  said, No, send it to me.
16    Q    Right.
17    A    At this point, I want to look at it,
18  because this is -- the Comptroller is telling me,
19  directing me to send this item to her, because I
20  want to take another look at this.  You know, now
21  that -- now that we've gotten to this point, I want
22  to look at this project again.  I've got to ask some
23  questions.  Send it to me.
24        I said, Yes, ma'am.  I did that, called
25  Bev, and said, We're not putting it on.  The

## Page 172

1  Comptroller has asked that the item be sent to her.
2    Q    Okay.
3    A    At that point in time, taxes had not still
4  been paid.
5    Q    Right.
6    A    I still was unaware that we had another
7  vote, but it didn't matter, because the Comptroller
8  the pulled it and said, Send it to me.  It's not
9  going to the mayor's office.  I don't know if she
10  was going to make a decision to put it on in
11  conversation with Bev or not, but I've been stood
12  down.
13    Q    Right.
14    A    And she -- Bev then -- whatever happened
15  between her and the Comptroller I was not party to
16  at that point in time.
17    Q    Okay.
18    A    Now, what happens next --
19    Q    Well, let me stop -- let me stop you
20  there.  We're going to get to the next, but I want
21  to make sure we get this in context.
22        So let's go to Garavaglia page 107, Bates
23  stamped page 107 and 108.  Do you see those pages?
24    A    Where would that be noted?  Oh, I see it.
25  It's -- it's --

## Page 173

1  Q   109.
2  A   Yeah, I see that.
3  Q   All right.  So let's go through the -- the
4  e-mails.  The first one is an e-mail from you dated
5  Friday, June 14 --
6  A   That's --
7  Q   -- 2019?
8  A   That's what I spoke of just a second
9  ago --
10  Q   Right.
11  A   -- where I sent her --
12  Q   Right.
13  A   -- that information.
14  Q   Right.  Okay.  And that's at -- let me
15  finish.
16  A   Yep.  Okay.
17  Q   At 10:53 a.m.; correct?
18  A   Yes.
19  Q   And this is an e-mail from you to Bev, who
20  is responsible for helping to assemble that agenda;
21  correct?
22  A   That's right.  That's right.
23  Q   All right.  And you say, quote, Here's
24  that extension we talked about for E&A.  Thanks.
25  Do you see that?

## Page 174

1  A   Yep.
2  Q   All right.  And then she responded to you
3  at 11:21 a.m. that same day, Friday, June 14, 2019,
4  and she says, You did run this by the Comptroller
5  before we do this; right?  That's what she asked
6  you; right?
7  A   And again --
8  Q   No, no, no.  Let -- let's answer my
9  question.
10  A   All right.
11  Q   Okay?
12  A   Sure.  Go ahead.
13  Q   That's what she responded to you some
14  30 minutes later when you said let's place this item
15  on the agenda; correct?
16  A   On the tentative agenda, yes.
17  Q   Okay.  On the tentative agenda.  All
18  right.  You did run this by the Comptroller before
19  they do this.  That's why she asked you that; right?
20  A   As I stated before, not on the day of the
21  14th.
22  Q   No, no, no, no.
23  A   But prior to this, yes.
24  Q   I'm talking about today.
25  A   That day, no.  And there -- and there's a

## Page 175

1  reason for it.
2  Q   Well, no, no.  We're going to get into the
3  reason for it, but I just want to get what we've
4  got.
5  A   Okay.  As of that point, I -- I -- I
6  answered the question.  Did not.
7  Q   You did not.  Why was she asking
8  whether or not -- why was it important for her to
9  have it run by the Comptroller?  Why is that
10  important?
11  A   Well, because anything that goes on the
12  agenda is approved by the Comptroller.  The final
13  agenda is approved by the Comptroller.
14  Q   It has to be approved by the
15  Comptroller --
16  A   That's right.
17  Q   -- your boss; correct?
18  A   That's right.  That's exactly right.
19  Q   All right.  All right.  And your -- my
20  words, not yours -- terse response is, Did not?
21  A   That's not a terse response.  It's a --
22  it's a reply.
23  Q   Okay.  Did not.  You did not is what you
24  responded to Bev; right?
25  A   You're -- you're adding something that

## Page 176

1  isn't there.
2  Q   All right.  I'm not going to add anything.
3  Did not.  That's there; right?
4  A   Yeah.  I just -- I said no, did not.
5  Q   No, you said, Did not.
6  A   Did not.  I --
7  Q   You didn't say no.
8  A   Yeah, Did not.
9  Q   Did you explain why?
10  A   Yeah, because --
11  Q   No, in the e-mail.
12  A   No.
13  Q   You didn't explain why in the e-mail?
14  A   No.
15  Q   Okay.  All right.  And that was your --
16  A   I was clear I didn't.
17  Q   Your -- well, we just want to make sure
18  the record and the video is clear.
19  A   Yeah.  Okay.
20  Q   We're at 12:04 p.m. on Friday, June 14th.
21  You say, Did not.  And Bev responds some 29 minutes
22  later on that same day, Please run it by her first.
23  I just got off the phone with her, so she is not
24  here, but around.
25  That's what she responded; correct?  Is

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 177

1    that correct?
2        A    That's correct.
3        Q    All right.  And that was on Friday.  Then
4    the next e-mail is on a Monday and -- 9:28 a.m., Bev
5    is sending you an e-mail, First response...what did
6    the Comptroller say?  Is that right?  Did I read
7    that right?
8        A    You did.
9        Q    All right.  And then there's an e-mail
10   from Mary Ries, it looks like.  She is in the -- she
11   is -- her title, it says, Legislative Director for
12   President Lewis Reed, Board of Aldermen; correct?
13       A    Yes.
14       Q    And then it says, At this time, we would
15   prefer not to have this item included on the
16   upcoming agenda.
17       A    This --
18       Q    Do you see that?
19       A    This is a confirmation of what I found and
20   learned verbally through a separate conversation.
21       Q    Okay.
22       A    Yes.  This confirms -- this confirms what
23   I had stated earlier.
24       Q    All right.  It looks like there's an
25   e-mail on the bottom of that on Friday, June 14,

Page 178

1    2019 at 10:59 in response to your e-mail.
2        A    No.  It's not in response to me.
3        Q    Oh, okay.  Well, it says, Would like to
4    add the attached to the agenda.  Another extension
5    for the muni courts development.
6            That's what you were referring to in your
7    e-mail; right?
8        A    Nope.  This is her e-mail to the
9    president's office.
10       Q    No.  I'm saying in your original e-mail,
11   here's the extension we talked about for E&A.
12   Thanks.
13       A    Yes.
14       Q    Are we referencing the same --
15       A    Yes.  That's the document.
16       Q    -- item?
17       A    Yes.
18       Q    The same project?
19       A    I misunderstood you.  Yes.
20       Q    Which is the muni court project?
21       A    Yes.  That's correct.
22       Q    All right.  All right.  Let's go to the
23   next page.  Tuesday, June 18, 2019 at 8:29 a.m.
24   It's an e-mail to you from Beverly Fitzsimmons; is
25   that correct?

Page 179

1        A    Yes.
2        Q    All right.  And she says, Extending on
3    E&A.  Quote, You had told me she was okay with this;
4    right?  Who is the "she"?  She being Comptroller
5    Green; correct?
6        A    I am assuming, yes.
7        Q    She told me she was not.  Did you work
8    this out with her yesterday?  That's what she --
9    Bev asked you; right?
10       A    Right.  Okay.
11       Q    And you responded, same day, 10 minutes
12   later, 8:39 a.m., Tuesday, June 18, 2019 -- and just
13   to put this in context, Tuesday, June 18, 2019, was
14   the day that the agenda had to be finalized and
15   posted in order for any item to be considered at the
16   June 29 E&A meeting; right?
17       A    That's right.  We were getting close to
18   deadline.  That's right.
19       Q    All right.  So we're close to deadline?
20       A    Yes, we are.
21       Q    Running up to the wire; right?  What time
22   usually is that agenda finalized?
23       A    Well, it's got to be pushed and -- and
24   posted 24 hours in advance of the meeting, which is
25   usually 2:00.

Page 180

1        Q    So it's got to be craft, it's got to be
2    reviewed, it's got to be posted by 2:00 that
3    afternoon?
4        A    Yeah.  That's right.
5        Q    All right.  In your response to Bev, you
6    said I didn't talk with her about it, but I will;
7    right?
8        A    That's correct.
9        Q    So we've got Friday, Saturday, Sunday,
10   Monday, you hadn't talked to her about it?
11       A    But I explained and just testified as to
12   why.
13           MR. BLANKE:  But he's not asking about
14   that yet.
15           MR. NORWOOD:  Yeah.  I'm not asking about
16   that.
17           MR. BLANKE:  If he doesn't want to know
18   the answer, then he doesn't get to learn the
19   answers.
20           MR. NORWOOD:  That's right.
21           MR. BLANKE:  So just answer his questions.
22           MR. NORWOOD:  That's right.  That's
23   exactly right.  Thank you, counselor.
24       A    So --
25       Q    (By Mr. Norwood)  So --

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 181

1    A  -- what was the question?
2    Q  -- the question was:  We're at Tuesday,
3  D-day, 8:39 a.m --
4    A  Okay.
5    Q  -- when the agenda is to be posted for
6  this muni court item, and you still hadn't talked to
7  your boss about it; correct?
8    A  At that point, no, I had not.
9    Q  All right.
10   A  But I -- look what I said.  But I will.
11  It's not like I was purposely avoiding.
12   Q  I understand, but --
13     MR. BLANKE:  He doesn't want your
14  explanation.
15   Q  (By Mr. Norwood)  -- over all of those
16  days, why didn't you explain to your boss what was
17  going on?
18     MR. BLANKE:  Are you talking about Darlene
19  Green?
20   Q  (By Mr. Norwood)  Darlene Green.  That was
21  your boss; correct?
22   A  Yeah.  What -- what I --
23     MR. BLANKE:  Now -- now you can answer.
24   Q  (By Mr. Norwood)  Now you can answer.
25   A  What was I -- I could not tell her,

Page 182

1  because I did not have a clarified answer to give
2  her.  Number one, I did not know if we had the
3  votes.  Number two, the taxes were still unpaid.
4  Number three, the mayor -- the -- the mayor's office
5  had received a runaround blindside from their --
6  from the developer's attorney if they would
7  entertain putting it on the agenda rather than the
8  Comptroller's office, because we hesitated because
9  we didn't see -- I didn't see that we had the votes,
10  and I knew, from making daily calls to the Collector
11  of Revenue, that taxes were still outstanding.
12   Q  Okay.
13   A  We weren't going -- we weren't going
14  nowhere.  And, no, I did not have the clarif -- the
15  clarification and the clarity to pick up the phone
16  and call the Comptroller and tell her exactly what
17  we needed to do.
18   Q  Well --
19   A  I didn't have it then.
20   Q  Well, but didn't you have the clarity to
21  know what you didn't know so that you could let your
22  boss what you didn't know -- let her know what you
23  didn't know?
24   A  I would have made no sense to her on the
25  phone because I would have been babbling about three

Page 183

1  different things, all of which would have made no
2  sense to her.  In other words, when I talk to
3  Ms. Green, I want to be concise, precise, and
4  accurate, and I would not have been able to do that
5  because the sand was shifting below our feet with --
6  with what was happening with this item with the
7  developer's attorney going and doing a complete
8  around the corner on us to the mayor's office.  The
9  taxes weren't paid.  And why Lewis Reed didn't even
10  want it on the agenda, I couldn't break through.
11     And the fourth thing is that we now
12  understood or it was rumored that there was a
13  lobbyist that was working both the mayor and the
14  president for their votes to make sure that it was
15  going to get on the agenda and be passed.
16     Normally in a situation like this, I pick
17  up the phone and I can talk to the developer, but
18  this developer chose to be represented, and because
19  of that, we are rep -- we were represented, them by
20  Spencer Fane, us by Armstrong Teasdale.  Therefore,
21  I was advised by our attorney that you cannot speak
22  to them without me being on the line.  Whether
23  that's true or not from a legal point of view,
24  that's what happened.
25     And so we didn't have the ability to have

Page 184

1  realtime conversation, where I could pick up the
2  phone and say, What are you doing?  I had to go
3  through our attorney, who had to get to their
4  attorney or to get to someone else in this equation.
5  So it was very unclear.  And I'm not going to call
6  my boss and give her information that's either not
7  accurate or that is unclear until I knew exactly
8  what was going on.
9    Q  Well, you knew the taxes hadn't been paid.
10  You knew that on Tuesday; right?
11   A  Yeah.
12   Q  You knew that on Friday, didn't you?
13   A  As of that day, yeah, I knew it.
14   Q  Right.  And you -- you -- but you didn't
15  feel the need to pick up the phone to apprise your
16  boss that the taxes --
17   A  I didn't have all the facts.
18   Q  Well, you had that fact; right?
19   A  I didn't have all the facts.  I didn't
20  have what I needed --
21   Q  Well, hold on.  Hold on.  Let's --
22     COURT REPORTER:  Hold on, guys.
23   Q  (By Mr. Norwood)  Stop.  Stop.  Let's
24  stop.  Let's break this down.  I'm talking about one
25  fact.  Let's talk about taxes.  You knew on Friday

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                     Fax: 314.644.1334

## Page 185

1  the taxes weren't paid.  Can we agree with that?
2      A   But that's one -- that's one small thing.
3      Q   No, I understand.  And I'm going to focus
4  on this one small thing --
5      A   Okay.
6      Q   -- and we'll get to the other thing.  You
7  knew on Friday, the 14th, the taxes weren't paid;
8  right?
9      A   But it's being alleged that I didn't know.
10     Q   You knew, though, so --
11     A   But it's being alleged here that I didn't.
12     Q   You knew; right?
13     A   Yes, sir.
14     Q   But you didn't tell your boss on Friday;
15 correct?
16     A   That's correct.  I was working the
17 problem.
18     Q   I got you.  You were working the problem
19 and therefore you didn't feel the need to
20 communicate to your boss that the taxes weren't
21 paid, which meant that the item couldn't go on the
22 agenda; right?
23     A   I was working the problem.
24     Q   The --
25     A   I was -- I was trying to handle the

## Page 186

1  situation.  Okay?
2      Q   You knew that without the taxes being
3  paid, the item couldn't be placed on the E&A agenda.
4  You knew that; correct?
5      A   And I was waiting for a cure call.  I was
6  waiting for the call that they had cured the problem
7  and -- and waiting up to the very end of the time
8  period allowable that they could have come down and
9  paid those taxes.  Had I gotten that green light
10 there, then the next thing I had to worry about
11 was -- was do we have the votes.  When that's
12 cleared, then the next thing we had a problem with
13 is they had done an end around to the mayor's
14 office.
15         MR. NORWOOD:  And I'd like to move to
16     strike all of that, because that's not
17     responsive to my question, sir.
18         MR. BLANKE:  I disagree.
19         MR. NORWOOD:  Let me finish.  My
20     question --
21         MR. BLANKE:  You just don't like the
22     response.
23         MR. NORWOOD:  No.
24     Q   (By Mr. Norwood)  My question is a simple
25 one.  You knew on Friday that there was no tax

## Page 187

1  clearance; correct?
2      A   Yes.
3      Q   You knew on Friday that you didn't tell
4  your boss there was no tax clearance; correct?
5      A   This is asked and answered at least three
6  times now.
7      Q   Correct?
8      A   I'll answer it once (sic) more time.  I
9  did not advise her at of that point in time.
10     Q   At that point in time.  And you didn't
11 advise her on Monday; correct?
12     A   I did not at that point in time, no.
13     Q   All right.  Because you hadn't talked to
14 her; right?
15     A   I was trying to get the problem solved.
16     Q   I understand.
17     A   I was going to give her the complete, full
18 story.  I wasn't going to give her piecemeal
19 information.  She's not -- she -- she's not a
20 favorable -- she doesn't like that.  You want to
21 give her the whole story or don't -- you know, just
22 don't give it to me in pieces.
23     Q   All right.  All right.  So you weren't
24 going to give her any pieces until you had all of
25 the pieces; is that right?

## Page 188

1      A   I wanted to give her a complete, accurate
2  situational report, yes.
3      Q   And at what point in time did you finally
4  get enough pieces assembled so that you could give
5  her a complete and accurate report?
6      A   At the time I called her on Tuesday
7  morning -- and, again, I called her -- I'm watching
8  the clock, too.  I know what the -- what the time
9  limits are.
10     Q   Right.  Right.  Right.
11     A   I gave her a call and basically said we've
12 reached a point of impasse where now the mayor's
13 office is trying to hijack this item.  Do you want
14 me to let them do it?  She said, No.  Send it to me.
15     Q   When you say hijack this item -- what do
16 you mean hijack this item?
17     A   We had placed it on the tentative agenda.
18 When they saw --
19     Q   Well, let me back up.  Who is we?  Who
20 placed it on the agenda?
21     A   The Comptroller's office.  Me.  I gave it
22 to Bev from the developer to place on the tentative
23 agenda on the 14th.
24     Q   Okay.  So the "we" is me, meaning Jim
25 placed the item on the agenda?

47 (Pages 185 to 188)

Page 189

1    A   After speaking with the Comptroller
2  earlier that week and having her concurrence that
3  she was in favor of it and that it was okay.  So to
4  say that I didn't talk to the Comptroller about this
5  item -- I didn't talk to her on the day that the
6  question was asked.  I talked to her earlier that
7  week and she was in favor and said okay.
8    Q   Well, you didn't say that in your e-mail
9  to Bev.  You didn't say Bev, I haven't talked to her
10  today, but I talked to her earlier in the week.  You
11  didn't say that, did you?
12    A   Well, we had phone conversations as well
13  as e-mail, so I may have.  I don't know that.  I
14  don't remember that specifically.  But in addition
15  to the e-mails, she called me, like, every couple of
16  hours.
17       MR. BLANKE:  Who?
18       THE WITNESS:  Bev.
19    Q   (By Mr. Norwood)  Okay.  So Bev called you
20  every couple -- because she said does your boss know
21  what's going on; right?
22    A   And at that point I didn't have something
23  to report to her.
24    Q   Right.  But Bev is concerned -- you know
25  Bev.  You've worked with Bev.  She's concerned that

Page 190

1  she hasn't apprised you-all's respective boss of
2  what's going on with this item.
3    A   She may have been concerned in that
4  regard, but she's more concerned about the fact that
5  her sole locked-in goal is to get out the agenda.
6  That's what she's concerned about.
7    Q   All right.
8    A   All she's -- all she's worried about is
9  making sure the agenda goes out.
10    Q   All right.  Let's go to the next item,
11  Garavaglia Deposition Exhibit 6.  And to put this in
12  context -- ultimately it was not presented and
13  placed on the June 19, 2019 E&A agenda; correct?
14    A   It was not.
15    Q   Right.  It was not.  And the reason it was
16  not was because --
17    A   The Comptroller said, Send it to me, I
18  want to look at it and consider this project and get
19  more details about it.
20    Q   Well, and at the time you talked to her,
21  the taxes hadn't been paid; right?
22    A   At that point in time, no, they hadn't
23  been paid.
24    Q   Right.  So you're not going to place an
25  item on the agenda at 2:00 on the 18th knowing that

Page 191

1  there was no tax clearance?
2    A   Cut-off would have been noon.
3    Q   Well, noon.  I'm sorry.
4    A   Noon on the 18th was the cut-off.  They
5  were not paid at that point.
6    Q   And you would not place an item on the
7  agenda without having that confirmation of tax
8  clearance; correct?
9    A   Yes, sir.
10    Q   Because it would have been a waste of
11  E&A's time and it would have been embarrassing for
12  your office to have that happen; correct?
13    A   And it was --
14    Q   Is that a yes?  Let's start with the
15  correct --
16    A   The answer is yes.
17    Q   Okay.
18    A   But it also puts pressure on the developer
19  to pay the damn bill.
20    Q   Well -- and that's a good thing; right?
21    A   That's -- that's -- that's exactly right.
22    Q   All right.  Now, let's look at, then,
23  Garavaglia Deposition Exhibit 6, which is a memo
24  from Chana Morton dated July 12, 2019 to Nancy
25  Kistler.  Do you see that?

Page 192

1    A   I do.
2    Q   Now, ultimately, it was a special meeting
3  held the following Monday, I believe?
4    A   The 24th, correct.
5    Q   24th.  All right.  And it was at that
6  meeting where it was -- the taxes were finally paid;
7  correct?
8    A   No.  The taxes were actually paid
9  somewhere on the morning of the 19th.
10    Q   All right.  So they had been paid by the
11  24th, is the point?
12    A   That's correct.
13    Q   All right.  So now we've got enough to go
14  forward and have the item approved by E&A, and it
15  was approved by E&A; correct?
16    A   That's correct.
17    Q   All right.  So now was there a deadline in
18  which all of this stuff had to happen --
19    A   The.
20    Q   -- during that week?
21    A   The approval was not necessarily a
22  deadline, but, as we all know, the document --
23  extension document had to be signed and in the
24  register's office by 5 p.m. on Friday, the 28th.
25    Q   All right.  So did you consider that a

48 (Pages 189 to 192)

## Page 193

1  deadline?
2      A   That's what I'm saying.  That is the
3  deadline.
4      Q   All right.  Friday, the 28th, is the
5  deadline; right?
6      A   5 p.m.
7      Q   Right.  And you were going on vacation
8  that week; correct?
9      A   Yes, I was.
10      Q   And when did you -- what was your last day
11  in the office?
12      A   It would have been the 26th.
13      Q   And that would have been a Wednesday?
14      A   That's correct.
15      Q   All right.  So you were on vacation
16  Thursday, Friday.  Where did you go?
17      A   I went to Morgantown, West Virginia for my
18  granddaughter's first birthday.
19      Q   Okay.  And how long were you on vacation?
20      A   I was gone Thursday, Friday, and Monday.
21      Q   All right.  In the meantime, this thing
22  had to be finalized --
23      A   Absolutely.
24      Q   -- by Friday at 5 p.m.; correct?
25      A   That's -- that's right.

## Page 194

1      Q   All right.  Now, this incident report
2  prepared by Chana Morton, have you reviewed this
3  before?
4      A   Yes.
5      Q   Do you have -- do you dispute any of
6  the -- the -- the --
7      A   I dispute most of it, yes.
8      Q   Most of it?  All right.  Let's go through
9  it, then.  It says at 3:28 p.m. -- this is under
10  Wednesday, June 26th, 2019.
11          First of all, did you have a conference
12  call with the Comptroller on Wednesday, June 19,
13  2019?
14      A   Yes.
15      Q   Tell us about that.
16      A   Well, let me -- I will -- I will, but let
17  me tell you --
18      Q   Well, let me -- let me -- let's talk about
19  it, because I'm -- I'm running out of time here.
20  You see, your lawyer is beating on me.  I want to
21  focus on what I want to focus on and he'll have time
22  to talk to you ad nauseam.
23      A   All right.  What's the question, again?
24      Q   Let's talk about the meeting or conference
25  call or discussion on Wednesday, June 26th, 2019.

## Page 195

1          What happened on that day?
2      A   I can't answer it without some -- some
3  context.  I have to give you the context.
4      Q   You were there.
5      A   I understand that, but I have to give you
6  the context as to why the -- why the call was even
7  necessary.
8      Q   Well, let's talk about -- when did the
9  call take place?  Let's start with the basics.
10      A   I'm not sure.
11      Q   Sometime that day?
12      A   Yes, sir.
13      Q   Sometime before you left for vacation?
14      A   That's right.
15      Q   All right.  And who was on the call?
16      A   The Comptroller, myself, Tom Ray, and I
17  believe my administrative assistant, Sheila Woods.
18      Q   Okay.  And what was the purpose of the
19  call?
20      A   The purpose of the call was to make sure
21  that we had a plan in place to expeditiously handle
22  the documents when they arrived from the
23  inter-office mail.
24      Q   Okay.  Well, let's talk about that.  Why
25  were the documents in the inter-office mail?

## Page 196

1      A   Well, that's good -- I'm glad you asked
2  that question.  Because when the -- when E&A passed
3  the item on the 24th, I was expecting to get the
4  final version from the developer through his
5  attorney on the 25th.  At that point in time --
6  well, it didn't -- it didn't happen.  They didn't
7  come.  I called.  It didn't come.  Tom Ray calls,
8  We're working on it.  Okay.
9          They did not come to us.  I was advised --
10  as I think it says somewhere in these documents, I
11  received a call from the mayor's secretary on the
12  morning of the 26th that the developer's attorney,
13  Mr. Denny, instead of following the procedure and
14  protocol which he had followed for the previous four
15  times we did extensions, he brought the documents
16  directly to the mayor's office for the mayor's
17  signature.  That's the second blindside where he
18  went around our office directly to the mayor's
19  office.
20      Q   Okay.
21      A   Okay.  The mayor signs the documents.
22      Q   All right.
23      A   And Sheri goes, What do you want me to do
24  with them?  And I said, Send them to me in the
25  inter-office mail.  I'll get them by the afternoon.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 197

1 And there's a very important reason for that.
2   Q  Okay.
3   A  The reason being is, before I wanted them
4 to present -- be presented to the Comptroller's
5 office and to the Comptroller for signature, I
6 wanted to personally review them and I wanted the
7 City's attorney to personally review the documents,
8 because I'm not going to send anything to the
9 Comptroller that I haven't seen or that our attorney
10 hasn't seen.
11   Q  All right.  But my question to you is:
12 These are important documents; right?
13   A  Yes.
14   Q  We've got a deadline; correct?
15   A  Yes.
16   Q  You're going on vacation; correct?
17   A  Correct.
18   Q  Why are the documents in the inter-office
19 mail?  Why weren't they personally couriered around
20 to get the requisite signatures --
21   A  Because normally --
22   Q  -- let me finish first --
23   A  Okay.  All right.
24   Q  -- to get the requisite signatures?  Why
25 send it through inter-office mail instead of having

## Page 198

1 it couriered around to get it done before you go on
2 vacation?
3   A  Because I wanted to ensure of the accuracy
4 and content of what was being sent around.
5   Q  And you could have done that if it were
6 couriered to you from the mayor's office; correct?
7   A  By putting -- it could have happened that
8 way, but what I had them do is I had them put it in
9 inter-office mail, because normally if you put it in
10 the mail in the morning, I get it in the afternoon
11 run.  I would have had it by 2:00.
12   Q  Generally?
13   A  Generally speaking, yes.
14   Q  But people go to lunch, people take smoke
15 breaks, people don't show up sometimes; right?
16   A  Yes.  That's -- that's -- that's what
17 happened.
18   Q  Okay.  And you made the decision to put it
19 in inter-office mail to you -- correct -- to come to
20 you?  That was your decision?  That was your call;
21 correct?
22   A  It was my decision to do that, yes.
23   Q  All right.  All right.  Let's go back to
24 Chana's memo, where she says at 8:38 p.m.(sic) on
25 Wednesday, June 26th, 2019, I received an e-mail

## Page 199

1 from Tom Ray of Armstrong Teasdale.
2   Was that unusual for Mr. Ray to reach out
3 like this --
4   A  No.
5   Q  -- to Chana --
6   A  No.
7   Q  -- and the Comptroller?
8   A  No, not at all.
9   Q  Not unusual at all?
10   A  No.
11   Q  Okay.  In the e-mail, Please see
12 attachment.  Mr. Ray stated, quote, There might be a
13 problem tomorrow, unquote.  Because Jim received a
14 call from the mayor's office, Sherry Wibbenmeyer,
15 regarding the Municipal Court's 5th amended (sic)
16 documents stating that the documents had been signed
17 by the mayor.
18   Tom Ray, the lawyer -- right?  He's a
19 lawyer -- indicated in his e-mail that instead of
20 asking Sherry to walk the documents to our office
21 for the Comptroller's signature, which is the normal
22 process --
23   A  It is not.
24   Q  Let -- let me finish.  Jim instructed
25 Sherry to send the documents to him via the use of

## Page 200

1 inter-office mail; right?
2   A  That's not the normal process.
3   Q  Okay.  So -- so what was the normal
4 process?
5   A  The normal process would be that the
6 documents would be delivered to me at 1520.  They
7 would be reviewed by me, by our counsel, and then
8 sent to City Counselor's office for approval as to
9 form.
10   Q  How -- how would they be delivered to you
11 in the normal process?
12   A  Usually electronically from the developer
13 or the developer's attorney.
14   Q  All right.  So that's pretty quick.
15 Electronic transmission?
16   A  Yep.
17   Q  What about delivery?  Have you received
18 couriered documents in that fashion?
19   A  Oh, yeah.  Absolutely.
20   Q  All right.  I mean, particularly for
21 important, time-sensitive documents; correct?
22   A  Yeah, that's right.  That's right.
23   Q  All right.  And -- and -- and then the
24 third option is this inter-office mail business,
25 which is pretty slow, generally speaking; right?

50 (Pages 197 to 200)

## Page 201

1     A   No, no.  I -- I --
2     Q   Well, let me say this --
3     A   If you put it in in the morning, you
4   should have it in the afternoon.
5     Q   All right.  It's slower than e-mail;
6   correct?
7     A   These -- evidently these documents were
8   not -- we did not have these documents
9   electronically.  It would have been -- if he would
10  have listened -- if the attorney for the other side
11  would have done what he was requested of, he was
12  supposed to electronically and in hard copy present
13  the documents to me and Tom Ray on the 25th.  He
14  didn't do that.
15    Q   All right.  But in any event, with those
16  options -- you didn't have electronic copy?
17    A   Did not.
18    Q   And you decided to chance it on the normal
19  inter-office mail system; correct?
20    A   It's not a chance.  It's -- it -- normally
21  that's how -- it works fine.
22    Q   All right.  And did it work fine in this
23  instance?
24    A   It did not.  No, it did not.
25    Q   Well, why not?  What happened?

## Page 202

1     A   I don't know.
2     Q   You have no idea?
3     A   I have no idea.
4     Q   Whose responsibility was it to make sure
5   that this all got done before you went on vacation?
6   It was your responsibility; right?  Let's -- can we
7   agree with that?
8     A   Well, it was our document, yes.
9     Q   It was your document and your
10  responsibility, because this was your job; correct?
11        MR. BLANKE:  Well, let me object.  You're
12  just arguing with the witness.
13        MR. NORWOOD:  I --
14        MR. BLANKE:  Everything he answers you
15  disagree with and argue with him.  That's
16  not --
17        MR. NORWOOD:  Well, let me --
18        MR. BLANKE:  That's not cross-examination,
19  that's argument.
20        MR. NORWOOD:  Well, let's make it
21  cross-examination.
22    Q   (By Mr. Norwood)  It was your
23  responsibility, Mr. Garavaglia, isn't that true?
24        MR. BLANKE:  It doesn't matter how soft or
25  loud you are --

## Page 203

1         MR. NORWOOD:  Okay.
2         MR. BLANKE:  -- it matters what you're
3   saying, and you're arguing.
4         MR. NORWOOD:  Thank you, counselor.
5         MR. BLANKE:  You're arguing with him.
6         MR. NORWOOD:  That's a speaking objection.
7   If you have an objection --
8         MR. BLANKE:  Objection, argumentative.
9         MR. NORWOOD:  Thank you.
10    Q   (By Mr. Norwood)  Sir, subject to that
11  argumentative objection, this was your
12  responsibility; correct?
13    A   It's the responsibility of whose item it
14  is, and it was my item, so, yes.
15    Q   Okay.  Okay.
16    A   Okay.  Now --
17    Q   No.  Let me -- no.  Let me -- let me --
18  let me finish, because I'm -- the clock is ticking
19  on me, so I've got to keep moving.
20        MR. BLANKE:  But you're also not allowing
21  him to answer fully.
22        MR. NORWOOD:  I don't have a question for
23  him.  He answered my question.
24        MR. BLANKE:  But he's not answering the
25  question you're asking because you're cutting

## Page 204

1   him off.
2         MR. NORWOOD:  Well, you -- well, you can
3   answer -- have him correct me when I'm wrong.
4     Q   (By Mr. Norwood)  So your decision, your
5   responsibility.  Documents, for whatever reason, got
6   lost in the inter-office mail; right?
7     A   I don't know that they got lost, but they
8   didn't arrive at my destination in a timely manner.
9     Q   Didn't arrive the afternoon you were
10  leaving for vacation?
11    A   No.  They did not arrive until the
12  morning -- oh, I'm not sure that they -- no, I'm not
13  sure -- let's see.  When does she say they arrived?
14    Q   Well, take a look at it.
15    A   I'm not sure that they arrived -- let's
16  see.  Let's go back here and look.
17    Q   Well, let me ask you this:  When you had
18  this conversation with the Comptroller and Tom Ray
19  and the others you identified, did we know at that
20  time the whereabouts of these documents?
21    A   We did not have them yet, no.
22    Q   Okay.  And did we know where they were?
23    A   They were in the inter-office.  That's --
24  that's --
25    Q   Somewhere in the inter-office system?

Page 205

1     A   That's correct.
2     Q   All right.  So let's talk about, then,
3   that conference.  Tell us about that.  What -- who
4   said what and what was going on that day?
5     A   My recollection is not crystal clear on
6   that.  I know that we talked about it.  The
7   Comptroller wanted to know where they were.  I
8   couldn't answer that.  I didn't have them.  They
9   were in the -- in the office mail.  And basically
10  what we did as we set up a process whereby if I was
11  not there when they showed up, what to do and how to
12  go about it.
13    Q   What was that -- well, first of all,
14  where -- was it your impression that the Comptroller
15  was not happy with what was going on with respect to
16  these missing documents?  Was that your impression?
17    A   None of us were.
18    Q   Okay.  She wasn't happy, you weren't
19  happy, we've got a deal that's about to close,
20  you're about to go on this family trip/vacation, and
21  we don't have these critical documents; right?
22    A   That's correct.
23    Q   Tom Ray is concerned.  He's the lawyer.
24  He's got to make sure this deal gets done.  He's
25  concerned; right?

Page 206

1     A   Yep.  That's right.
2     Q   Your boss is concerned because the --
3   we've got -- the deal was approved, we've got a
4   timeline, we've got to get the documents approved by
5   5:00 on Friday; right?
6     A   This is Wednesday.
7     Q   Right.  And this is Wednesday, and you're
8   going on vacation; right?
9     A   I would be on Thursday, yes.
10    Q   Right.  And -- and so everybody on that
11  call was concerned.  That was a five alarm in the
12  sense that we've got to find these documents and get
13  it done.  Is that fair?
14    A   Yes.  And it was a very -- you know, the
15  process would have been as I -- as I explained to
16  you before, when the documents arrive, I would look
17  at them, come -- the -- the attorney, Tom Ray, would
18  look at them.  They would then be taken -- if
19  everything was in good order, they would be taken to
20  the City Counselor's office for approval as to form.
21  But the problem is, there was deficiencies in the
22  documents.
23    Q   Well, we'll talk about that.
24    A   Okay.
25    Q   But first we've got to find them; right?

Page 207

1     A   Right.
2     Q   Right.  So we have deficient --
3     A   But you have to under --
4     Q   Let me finish.  We've got deficient
5   documents working their way through the internal
6   mail system somewhere that we don't know as of the
7   time we're talking about where they are.  We can
8   agree with that; right?
9     A   Yes, sir.
10    Q   All right.  And, ultimately, even when
11  they were discovered and located on the following
12  day, which was Thursday -- that's right?  You were
13  on vacation, so you -- you don't know when they were
14  discovered; is that right?
15    A   It may say so here.
16    Q   Okay.  Take a look.
17        MR. BLANKE:  Go to page 3 of the document.
18    Is that it?
19        THE WITNESS:  Yeah.
20        MR. BLANKE:  At 12:26 -- at 12:50 p.m.?
21        THE WITNESS:  Okay.  No.
22        MR. BLANKE:  No?
23        THE WITNESS:  No.
24    A   They -- the documents themselves -- I'm
25  not -- I'm not positive.  This -- this report

Page 208

1   doesn't tell you -- I don't believe that they
2   arrived on the 26th.  Okay?  So they -- if they
3   really were put in the mail on the 25th, to me, I
4   find it almost incredible -- you could have crawled
5   them from City Hall to 1520 Market in two days.
6     Q   (By Mr. Norwood)  Right.  But as of the
7   time you were on the conference call, they had not
8   crawled there yet.
9     A   No.
10    Q   Correct?
11    A   That's right.  It was -- the end of the
12  day on the 26th, they had not yet arrived.
13    Q   All right.  So end of the day on the 26th,
14  you're checking out for vacation; right?
15    A   Uh-huh.
16    Q   And we still don't know where the
17  documents are?
18    A   That's -- that's what happened, yes.
19    Q   And when did they finally crawl into your
20  office?
21    A   It appears that they -- that they showed
22  up on the morning of the 27th.
23    Q   All right.  And the reason, if I
24  understand you correctly, that they were to come to
25  you is that you wanted to review them; right?

52 (Pages 205 to 208)

Page 209

1    A   Because had they been brought from the
2  mayor's office to the comptroller's office, the
3  deficiencies that I wanted to ensure weren't there,
4  there were.
5    Q   Okay.  But you never got that opportunity,
6  because you were going on vacation when they landed
7  in your office; correct?
8    A   Personally, no.  But we had other -- other
9  parties in place, like Tom Ray, to take the document
10  and make sure that we were okay.
11    Q   Who determined that once they finally
12  landed on Thursday -- did you fly out Wednesday or
13  Thursday for your vacation?
14    A   Thursday morning.
15    Q   Okay.  So you were in the air when all of
16  this was transpiring?  Let's go to Garavaglia page
17  112, starting at 11:09 a.m.  Were you in the air at
18  that time?
19    A   I was in the car, but nonetheless --
20    Q   Oh, you drove?  Okay.  All right.  So you
21  were in the car while all of this was transpiring on
22  Thursday, June the 27th, 2019; correct?
23    A   Yes.
24    Q   All right.
25    A   And -- and Tom was -- Tom Ray was trying

Page 210

1  to quarterback this thing from his office outside of
2  City Hall.
3    Q   Right.  Because you weren't there to
4  quarterback?
5    A   And we were agreed -- that's the agreed
6  upon method that we spoke to about in the conference
7  call on the 26th.
8    Q   Because you weren't there to quarterback
9  it; correct?
10    A   You know that.
11    Q   No.  I'm -- for the record, I mean, I know
12  it, but let's let the public know it.
13    A   Yes.  That's correct.
14    Q   Okay.  All right.  So do you know when the
15  documents finally landed with the Comptroller's
16  office?
17    A   I can only go by this chronology that --
18  that is laid out here.  It says at 11:20 a.m.
19    Q   All right.
20    A   Okay.  Now --
21    Q   Well, let me ask you this:  Let's go to
22  the next page, Garavaglia page 113.  And this is the
23  part of the chronology that Ms. Chana Morton put
24  together.  She says, At 1:25 p.m. when I returned
25  from break, Michele Graham explained that Marsha

Page 211

1  Veal had left some documents with her for the
2  Comptroller's signature.
3        Now, this is 1:25 p.m. the day before when
4  things had to be finalized; correct?
5    A   That's right.
6    Q   All right.  And what it says was, But on
7  examination of the documents, Michele noticed that
8  several items were missing which were needed prior
9  to the Comptroller signing and executing the
10  documents.  Do you see that?
11    A   That's exactly my point as to why they
12  weren't to be delivered directly to the
13  Comptroller's office from the mayor's office.
14    Q   Because they were not in order?
15    A   I didn't know that, but I wanted to ensure
16  that they were in order.
17    Q   Right.  But they were not in order; right?
18    A   That's correct.
19    Q   All right.  And if you had had them
20  couriered to you, you would -- may have had an
21  opportunity to review them before you left on
22  vacation; correct?
23    A   Probably, yeah.
24    Q   Yeah.  Okay.  And we could have noticed
25  those deficiencies earlier and tried to cure them

Page 212

1  earlier; correct?
2    A   Sure, we could have.
3    Q   And you were responsible for making sure
4  that those documents didn't have those deficiencies;
5  correct?
6        MR. BLANKE:  Are you asking if he was
7  solely responsible or partially responsible?
8        MR. NORWOOD:  No.
9    A   No, I'm --
10    Q   (By Mr. Norwood)  You're responsible --
11    A   I'm not solely responsible.
12    Q   I didn't say whether you were solely
13  responsible.  Were you responsible --
14    A   I am responsible for making sure that the
15  document, after it had been properly vetted through
16  the normal process, placed before the Comptroller
17  was accurate, yes.
18    Q   Okay.  That was your responsibility for
19  your boss; correct?
20    A   Had the process been allowed to happen,
21  yes.
22    Q   Right.  And that was your responsibility
23  to your boss and she relied upon you to fulfill that
24  responsibility; correct?
25    A   And it's one that I, in every instance

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 213

1  except this one, managed to accomplish.
2      Q   All right.  When did you find out about
3  problems with the documents?
4      A   When did I find out?
5      Q   Yeah.  In the car while you were on the
6  way or when you arrived?
7      A   Exactly.
8      Q   Who -- who told you?
9      A   I'm not sure.  I think I may have gotten a
10  call from either my person, or it may have been
11  Michele Graham in 212, but it was just what I was
12  afraid of, the deficiencies like the mayor's
13  signature not being notarized, that it hadn't even
14  gone -- that -- that the mayor had signed it, but it
15  had not been through the City Counselor's office.
16  She was -- there was no way she should have signed
17  that document without it at least being approved as
18  to form rather than content, but at least approved
19  as to form by the City Counselor, but she signed it
20  anyway.
21      Along that -- what is Roger Denny doing
22  still bringing signature pages, running around --
23  he's -- he supplied an incomplete document which the
24  mayor signed.  There was four or five different
25  deficiencies, which in a normal course of action, we

## Page 214

1  would have put the brakes on at my office
2  immediately.
3      Q   But you couldn't, because you were gone?
4      A   We couldn't, because it never showed up in
5  the inter-office mail.
6      Q   Right.  And you were gone when it did?
7      A   But --
8      Q   Right?
9      A   But --
10      Q   You agree with that?
11      A   I was gone, but we had made a plan on the
12  phone the evening of the 26th which was not allowed
13  to be placed in motion, as I understand it.
14      Q   All right.  Well, let me -- let me -- let
15  me just cut to the chase on this one so we can move
16  forward.
17      On the last page of Garavaglia 113, it
18  says -- she says, Chana that is -- that's an
19  asterisk.  It says, quote, During this entire
20  chaotic process on Thursday, July 27th.
21      Do you -- you weren't there, but do you
22  dispute the fact that it was a chaotic process on
23  Thursday, July 27th?  Do you dispute that?
24      A   The chaos was premature and unnecessary.
25      Q   But it was chaos, nonetheless?

## Page 215

1      A   Because all these other people tried to
2  run this document and handle the document, and it
3  was a total unnecessary series of events.
4      Q   It was chaotic.  You agree with that;
5  right?
6      A   Yes, it was.
7      Q   All right.  She says, Further, I did not
8  receive any verbal or written communication from
9  James Garavaglia or his assistant, Sheila Woods.
10      Do you dispute that?
11      A   What was she wanting me to communicate
12  with her about?
13      Q   I don't know.  I mean, apparently the
14  chaotic nature of what was happening, I would
15  imagine.
16      A   Well, but the chaotic nature of what was
17  happening was occurring because everybody tried to
18  do something, and there should have been -- you
19  know, the control -- somebody should have taken --
20  Tom Ray had control, and it was taken away from him.
21  And all of a sudden, from her chronology, people are
22  running in all crazy directions trying to figure out
23  what to do and how to get it done.  Had they
24  followed their own internal document signature
25  process -- nobody did that.

## Page 216

1      Q   All right.  But you don't dispute the
2  fact -- you're saying there was no need, but you
3  don't dispute her statement that she didn't receive
4  any verbal communication from either you or your
5  assistant, Sheila Woods?
6      A   That's true.
7      Q   All right.  She goes further and says, I
8  believe they are ultimately responsible for proper
9  execution of these types of emergency documents.
10      Were these emergency documents?
11      A   No.  They were documents that had to be --
12  they weren't -- emergency document means something
13  else in the City's system.
14      Q   All right.  It was an emergency because it
15  had to be done by Friday, the next day; right?
16      A   That's correct.
17      Q   All right.  Instead, many of us had to
18  stop doing our own work for two days to make sure
19  that these muni court documents were processed
20  timely and correctly.
21      Do you dispute that?
22      A   And totally unnecessarily.  If they did
23  that, it's a totally unnecessary waste of their
24  time.
25      Q   It would be a waste of their time, but if

## Page 217

1 they did it, they had to do it to get it done;
2 correct?
3    A    Well, first of all, that's a gross
4 exaggeration.  I can't imagine that they stopped
5 their work for two days --
6    Q    Okay.
7    A    -- waiting for -- for this document to
8 come in.  No.  That --
9    Q    But you don't know --
10   A    I don't agree with that statement.
11   Q    You don't know what happened --
12   A    Right.
13   Q    -- because you weren't there on Thursday;
14 right?
15   A    That's right.
16   Q    All right.  It says further, quote, This
17 type of lack of communication and confusion is
18 unfortunately happening more and more frequently,
19 which is unfortunate, as this process prior to
20 Jim taking over as deputy ran quite smoothly and
21 collaboratively within the department for many
22 years.
23       Now, my question to you --
24   A    As evidenced -- as evidenced by what?
25   Q    (By Mr. Norwood)  My question to you is:

## Page 218

1 Do you know whether or not this process ran quite
2 smoothly and collaboratively within the department
3 for years --
4    A    No.
5    Q    -- listen -- let me finish.
6    A    No, I'm not aware of that.
7    Q    Listen.  Let me finish, please.  You're
8 going to get your chance.
9       Do you know whether, prior to you taking
10 over as deputy, this process ran quite smoothly and
11 collaboratively within the department for many
12 years?  Do you know, yes or no, if that's the truth?
13   A    I do not know that.
14   Q    All right.  Fair enough.
15   A    But I think -- I think that it is a cheap
16 shot, because what she's saying here is not true.
17 This is not true.
18   Q    Got it.
19   A    We -- we did contracts, leases, bond
20 documents, much more -- much more complex nature and
21 never had a problem.  This went off the rails
22 because too many people went into panic and were
23 running around with their heads cut off and didn't
24 follow their own internal procedure for -- for
25 getting this thing signed.

## Page 219

1    Q    And did you --
2    A    Let me -- let me assure you of one other
3 thing.  Do you see what it says here?  By 2:45 on
4 the 27th, the document was finally signed,
5 processed, and sent to the register.  That's a full
6 day and two hours before the deadline.
7    Q    Fair enough.  After --
8    A    Okay.
9    Q    -- people --
10   A    All right.
11   Q    -- had stopped and covered for you while
12 you were on vacation; correct?
13   A    That's not a fair statement.
14   Q    Okay.  Do you bear any responsibility for
15 this -- what happened here?  Do you --
16       MR. BLANKE:  Why don't you ask him if he
17 bears all the responsibility.
18   Q    (By Mr. Norwood)  Well, let's start with
19 any.  Do you bear any responsibility for what
20 transpired here?  Did you make any mistakes here?
21   A    No.
22   Q    Okay.  None at all?
23   A    No.  Not in my mind, no.
24   Q    Okay.  Not in your mind.  And in your
25 view --

## Page 220

1    A    No.
2    Q    -- you did everything you were supposed to
3 do?
4    A    I did.
5    Q    All right.  Fair enough.  Let's look at
6 Garavaglia 114.  This is an e-mail, it looks like,
7 from Tom Ray, Wednesday, June 26, 2019, at 3:28 p.m.
8 to Chana Morton and your assistant, Ms. Woods, and
9 you, among others; correct?
10   A    Yes.
11   Q    And Tom Ray is saying, Chana, this might
12 be a problem tomorrow.
13       Do you know why he's alerting Chana to the
14 fact that this could be a problem?
15   A    Yeah, because we didn't have them.  The
16 documents --
17   Q    All right.
18   A    -- had not yet been received.
19   Q    All right.  And he talked about a default
20 and the documents having to get to the title
21 company; correct?
22   A    Register's office.  And then Roger would
23 take the documents to the title company so they
24 didn't get foreclosed on.
25   Q    Did you ever consider sort of pushing back

Page 221

1  your vacation a day to close this deal out and make
2  sure it got done?
3      A   No.  At -- at the time, I was locked in.
4  I was locked in to commitments out of town, and I
5  believed that -- you know, the whole world isn't
6  going to collapse if I wasn't there to personally
7  walk a document, which is normally handled by
8  administrative staff, through the system.
9      Q   Okay.
10     A   And not only that, we had the conversation
11 and the conference call on the evening of the 28th
12 to ensure that there was a process that was going to
13 be in place to make sure that what happened wasn't
14 going to happen.
15     Q   Did you provide instructions to anyone
16 from your office to take these documents when they
17 finally showed up and only place them in the hands
18 of the Comptroller?
19     A   No.
20     Q   I'm sorry?
21     A   No, sir, I did not.
22     Q   You didn't provide that directive?
23     A   No.  I -- I -- I told a person who you're
24 speaking about, Marsha Veal, that it was -- that,
25 you know, that she had oftentimes -- many times with

Page 222

1  real estate documents, had brought them to the
2  Comptroller's office to Michele Graham and knew very
3  well how the process worked and would be able to
4  ensure that everything was correct and that it would
5  be placed in order and -- in -- in the proper order
6  for the -- Michele to look them over.  And
7  there's -- there's spot checks that she would make
8  and put it in place for the Comptroller to sign.
9         Now, by me -- I told her bring it to the
10 Comptroller's office for the Comptroller to sign.
11 Now, if she took some personal license to say Jim
12 said bring it to the Comptroller and I have to give
13 it to the Comptroller, that was something that --
14 that she took license to do.  I didn't instruct her
15 specifically to bring it to and only give it to the
16 Comptroller as -- as it incorrectly states there.
17     Q   All right.  Well, let's see what it
18 incorrectly states.  It says around -- I'm on
19 page 112 of Exhibit 6, Garavaglia --
20     A   Okay.  We're going backwards, then?
21     Q   We're going backwards.
22     A   All right.  I'm with you.
23     Q   It says at around 12:50 p.m., Marsha
24 finally arrived with the muni court documents.
25         You weren't there, so you don't know if

Page 223

1  that's accurate or not; correct?
2      A   Yes.
3      Q   She -- and the "she" here is Marsha.  Who
4  is Marsha?
5      A   Marsha is a person that works in the real
6  estate section of the Comptroller's office at that
7  time for me.
8      Q   Did she worked for you; correct?
9      A   Yes.  That's correct.
10     Q   And according to what Chana wrote, quote,
11 She -- meaning Marsha -- explained to me that she
12 was instructed to, quote, hand deliver, unquote the
13 documents directly to, quote, the Comptroller only,
14 unquote.  Do you see that?
15     A   That's what it says.
16     Q   All right.  And so was Marsha lying to
17 Chana when she told her that you had instructed her
18 to hand deliver the documents directly to the
19 Comptroller only?
20         MR. BLANKE:  Or was Chana lying in this
21         document?
22     Q   (By Mr. Norwood)  Can you answer my
23     question?
24     A   I have no idea.  All I can tell you is my
25 instructions to Marsha was to bring it to the

Page 224

1  Comptroller's office for the Comptroller to sign.
2      Q   All right.
3      A   What she did from there and what she said,
4  I don't know.
5      Q   And if Marsha said that, she would have
6  been lying on you; is that correct?
7      A   Draw your conclusion.  Yeah, I guess so.
8      Q   I mean, that -- what's your conclusion?
9  She said, according to this, if it's accurate --
10     A   That she misunder -- that she took some
11 license and didn't understand what I told her to do,
12 evidently.
13     Q   Okay.
14         MR. BLANKE:  Why do you think Chana is
15         telling the truth?
16     Q   (By Mr. Norwood)  Okay.  Let's go to --
17 we're going forward again.
18     A   What is it?  I'm sorry.
19     Q   Page Garavaglia 114 --
20     A   Okay.
21     Q   -- that e-mail from Tom Ray.  So Tom is
22 setting off alarm bells about the fact that we've
23 got a problem; correct?
24     A   Yes.  He's saying there might be a
25 problem.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 225

1      Q    There might be.  And there was; right?  He
2   was right.  There was a problem; correct?
3      A    The problem was the documents didn't come
4   through the inter-office mail on time.  Yes.
5      Q    There was a problem; correct?
6      A    That was what the problem was, yes.
7      Q    All right.  And if we go to page 116
8   Garavaglia, there's an e-mail from Ray at --
9   Thursday at 2:13 p.m., where Chana is pointing out
10  to Ray and you and everybody else about the problems
11  with the documents, no cover letter to the
12  Comptroller, mayor's signature is not authorized,
13  there's no document number on the contract.
14      Do you see that?
15     A    Uh-huh.  Yes.
16      Q    So those were deficiencies that you would
17  have caught had you been there; is that correct?
18     A    These are deficiencies that I would have
19  caught had the documents been delivered in a timely
20  manner, yes.
21      Q    Right.  Okay.  Had you delivered the
22  documents to you in a timely manner; correct?
23     A    Had the mayor's office documents gotten to
24  me in a timely manner, yes.
25      Q    You instructed those documents to come in

## Page 226

1   internal mail, so you were delivering the documents
2   to you.  You provided -- you could have told them to
3   have them couriered; right?
4      A    I chose to use the method that was
5   suggested by the secretary in the mayor's office.
6   She said, Do you want me to put them in the
7   inter-office mail, and I said yes.
8      Q    Okay.  But you could have said, listen,
9   I'm going on vacation --
10      MR. BLANKE:  Objection.  This has been
11  asked and answered twice --
12      MR. NORWOOD:  Let -- let -- let me
13  finish --
14      MR. BLANKE:  -- plus -- plus, it's
15  argumentative as well.
16      MR. NORWOOD:  Well, I haven't asked and
17  answered it yet, so let me ask and answer it --
18      MR. BLANKE:  It's the same question.
19      MR. NORWOOD:  -- before you object on
20  asked and answered.
21      Q    (By Mr. Norwood)  You could have provided
22  the instructions, knowing you were going on
23  vacation, to have those couriered to you so that you
24  can complete your review before you left for
25  vacation; correct?

## Page 227

1      MR. BLANKE:  Objection.  Asked and
2   answered and also argumentative.
3      Q    (By Mr. Norwood)  Correct?
4      MR. BLANKE:  Because it could have been
5   lost by courier just as easily.
6      Q    (By Mr. Norwood)  Correct?
7      MR. NORWOOD:  Counselor, I'm going to
8   object to the speaking objections.
9      MR. BLANKE:  You have to speak to make an
10  objection.
11      MR. NORWOOD:  You know that's improper.
12  Well, when you're suggesting that he talk about
13  couriers leaving documents, I think we're over
14  the line.  Subject to that --
15      MR. BLANKE:  Well, you're over the line by
16  arguing with him consistently.
17      MR. NORWOOD:  You can agree and you can
18  make your objection and we can take it up with
19  the Court on the objections, but what we can't
20  do is --
21      MR. BLANKE:  Argue with each other.
22      MR. NORWOOD:  -- signal to the witness
23  what he should be saying.  Right?
24      MR. BLANKE:  Well, go ahead.
25      MR. NORWOOD:  Okay.

## Page 228

1      A    Can you restate your question?
2      Q    (By Mr. Norwood)  The question, simply,
3   is:  You could have avoided some part of this chaos
4   had you said courier those documents to me so I can
5   get them before I go on vacation; correct?
6      MR. BLANKE:  Objection.  Asked and
7   answered.
8      A    I'm not sure that I could have avoided the
9   deficiencies because they were there no matter when
10  I got them.
11      Q    (By Mr. Norwood)  Okay.  Fair enough.
12     A    Deficiencies in the documents existed,
13  which is what my fear was and why I didn't allow
14  them to go directly to the Comptroller from the
15  mayor's office, as claimed in -- in -- you know,
16  Ms. Morton's e-mail that that's what the normal
17  process is.  That's not the normal process.
18      Q    Fair enough.  Let's go to Garavaglia
19  Exhibit 4.  We're going backwards again.  And those
20  documents, for the record, are Bates stamped
21  Garavaglia 39 through 104.  Are you familiar with
22  those documents?
23     A    Through 104?  Let's see.
24      Q    Yes.  Well, that whole set.  That tab.
25  Tab 4, which is --

Page 229

1    A   Generally, I have seen these, yes.
2    Q   All right.  So let's generally take a look
3   at them.  Let's go to page 42.
4    A   Uh-huh.
5    Q   Do you see that page?
6    A   I am (sic).
7    Q   All right.  It's a memo from Judy
8   Armstrong dated August 26th, 2019 to Comptroller
9   Darlene Green -- correct --
10   A   It is.
11   Q   -- re:  Jim Garavaglia's AT&T and Waste
12  Management Investigation.  Do you see that?
13   A   I do.
14   Q   It says, On January 30, 2019,
15  Mr. Garavaglia signed a Master Agreement with AT&T.
16       Do you see that?
17   A   Yes.
18   Q   Is that accurate?  Did you sign a Master
19  Agreement with AT&T?
20   A   I signed --
21       MR. BLANKE:  Let me object -- let me
22  object in that you're reading it probably
23  accidentally.  It says 2009.
24       MR. NORWOOD:  I'm sorry.  Let me repeat it
25  so that the record is clear.

Page 230

1       Thank you, counsel.
2    Q   (By Mr. Norwood)  On January 30, 2009,
3   Mr. Garavaglia signed a Master Agreement with AT&T.
4       Do you see that?
5    A   I do.
6    Q   And that's true; right?  You signed a
7   Master Agreement with AT&T; right?
8    A   I signed a piece of paper with AT&T's name
9   on it, yes.
10   Q   All right.  And what is the piece of paper
11  that you signed with AT&T's name on it?
12   A   Well, I received -- well, first of all,
13  these are only a few of the pages of what made up
14  this -- see, this -- these are only three -- one,
15  two, three pages here.  The -- the rest of it is
16  missing, and that is there are a number of two-sided
17  pieces of paper that was an AT&T listing of all of
18  the tariffed and non-tariffed, regulated and
19  non-regulated services and products for both
20  telecommunications and data that are offered.
21       And what I mean by that is it showed every
22  circuit, every line, every trunk, every piece of
23  potential service software, equipment, hardware,
24  whatever you -- you could think of that you could
25  buy from AT&T.  And next to it was a -- it let us

Page 231

1   know if it was a tariffed item or not, and then
2   there was an extension that showed what the price
3   was.  If it was a tariffed item, there was no room
4   to negotiate except if you bought the product for a
5   longer -- or service for a longer period of time.
6   If it was on the non-regulated side, you go through
7   supply and it was just -- they're offering to
8   provide whatever the good or service or data product
9   was.
10      Having received this, our account exec
11  told us all of our major accounts, in which the City
12  of St. Louis was one, we're asking and requiring all
13  of -- all of you to acknowledge receipt and sign
14  off -- sign this document.  And I go, Hmm.  I've
15  never seen anything like it.
16      At this point in time, I was Asset
17  Manager, not Deputy Comptroller --
18   Q   Right.
19   A   -- and so I brought it to my immediate
20  supervisor, Ivy Neyland Pinkston, and I said they
21  want us to sign this and I don't know what it is.
22  She looked at it.  She's a former Bell employee, by
23  the way.  And she looked at it, and she said, I'll
24  tell you what we need to do, let's -- let's go talk
25  to the City Counselor's office.

Page 232

1       So we made the appointment.  We went down
2   there and spoke to -- he's now retired.  His name
3   was Jim Hartung.  And we -- we explained to him that
4   they presented this to us as a major account.  They
5   want us to sign an acknowledgment receipt of this
6   document, whatever you want to call it.  And he said
7   uh-huh.  And he looked at it and he read it and he
8   said, Okay.  He said if -- if you wanted to purchase
9   anything from Southwestern Bell, you could go on
10  this list and find it and then you could see what it
11  was going to cost you, blah, blah, blah?  And I
12  said, Yeah.  He said, okay.  He said, I don't view
13  this -- regardless of -- of what -- and he read all
14  this, and he said, I don't view this the same way
15  that AT&T does.  For our purposes, I view this as a
16  product catalog or a list of products and services
17  that AT&T is making available to the City of
18  St. Louis.
19   Q   Well -- well, let me stop you there.
20  First of all, we're talking about Garavaglia page
21  44; right?
22   A   Yes, we are.
23   Q   And it says at the top Agreement; right?
24  This is an agreement; right?
25      MR. BLANKE:  Let me object.  It calls for

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334

## Page 233

1     a legal conclusion on the part of the witness.
2     Q   (By Mr. Norwood) Well, it says Agreement.
3 We can agree with that?
4     A   The word Agreement is at the top of the
5 page. That's all I can --
6     Q   Well --
7     A   That's all I can speak to.
8     Q   Well, we can say, too, that the paragraph
9 starts off by saying, This Agreement between
10 customer -- who is the customer?
11     A   The City.
12     Q   All right. And AT&T corporation?
13     A   Uh-huh.
14     Q   Is effective when signed by both parties
15 and continues as long as services are provided under
16 this Agreement.
17       So we see Agreement again; right? You
18 read this Agreement before you signed it; right?
19     A   I did.
20     Q   All right. And it says customer. It says
21 by its authorized representative. Do you see that?
22     A   Yes.
23     Q   Were you an authorized representative to
24 sign on behalf of the City at this time?
25       MR. BLANKE: Let me -- let me just make an

## Page 234

1 objection for the record and ask for your
2 consent that I can make this a continuing
3 objection for all of the questions that follow
4 about it this document.
5       MR. NORWOOD: Yes. Absolutely.
6       MR. BLANKE: It's irrelevant, completely
7 and utterly irrelevant as to what he did as
8 Assess Manager -- Asset Manager, a totally
9 different position, would not constitute
10 grounds to discipline him at all under the
11 City's policies. So it's irrelevant to these
12 proceedings.
13       MR. NORWOOD: Subject to that. Thank you,
14 counsel.
15     Q   (By Mr. Norwood) Were you an authorized
16 representative to sign on behalf of the City when
17 you signed this document?
18     A   Based on the conclusion that the City
19 Counselor's office determined, that this was not a
20 contract, it was not an agreement legally binding
21 for the City to buy, lease, or otherwise procure
22 anything from AT&T, he said the -- Jim Hartung told
23 Ivy and myself that it would be okay, go ahead and
24 sign it. It doesn't bind us to anything.
25       Anything you buy, be on the regulated or

## Page 235

1 on the non-regulated side, would be done on a
2 separate, individual contract by department with a
3 separate -- following the procedures to purchase
4 or -- or lease or procure any of these products
5 totally separate from this agreement. This is
6 nothing more than a catalog of products and services
7 to be provided to the City if you want to buy it
8 from them. He said it is not -- AT&T may consider
9 it one thing, but for our purposes, we're not bound
10 or governed by the rules that AT&T is -- is
11 attempting to impose. Therefore --
12     Q   All right. All right.
13     A   -- it is not a contract. It is not a
14 binding anything, other than a catalog.
15     Q   And that's your opinion?
16     A   That's not my opinion. It's the -- it's
17 what the City Counselor told us when we met with
18 him.
19     Q   Okay. He said that this wasn't a binding
20 agreement, is what you're testifying to?
21     A   It's not a contract. He said it's a
22 catalog.
23     Q   Okay.
24     A   And he then instructed us, he said either
25 one of you can sign it. So we said thank you, we

## Page 236

1 left, we went back to her office, and I said, Well,
2 want to sign it? And she says, You're the guy
3 that's over telecommunications. I don't even know
4 what most of this stuff is --
5     Q   Okay.
6     A   -- which was attached. She said, Go ahead
7 and sign it.
8     Q   So you just signed it?
9     A   I signed it at the direction of the person
10 I worked for at the time.
11     Q   And you signed it because, in your view,
12 it wasn't binding, it was just --
13     A   It wasn't my view, it was the view --
14     Q   -- a waste of ink?
15     A   Nope. It was the -- it was the view of
16 the person who we sought counsel on to determine
17 what this actually was.
18     Q   So it was sign it just to sign it, but it
19 had no legal significance, is what you understood as
20 the information you got; correct?
21       MR. BLANKE: Let me object in that it
22 calls for a legal conclusion as to it didn't
23 have any legal significance.
24       MR. NORWOOD: Fair enough.
25     Q   (By Mr. Norwood) Now, let's go back to

## Page 237

1  page 42. It says AT&T -- I'm -- I'm on the second
2  sentence now on page 42 in the memo from Judy
3  Armstrong dated August 26, 2019. She says, AT&T is
4  utilizing this as a contract with the City of
5  St. Louis; right?
6      A   What?
7      Q   AT&T -- second sentence, first
8  paragraph -- is utilizing this as a contract with
9  the City of St. Louis.
10          Do you see that? In the first -- no, I'm
11  sorry. Not the numbered paragraph, the first
12  beginning paragraph at the top.
13      A   Uh-huh.
14      Q   Do you see that second sentence?
15      A   Yes.
16      Q   All right. AT&T is utilizing this as a
17  contract with the City of St. Louis; correct?
18      A   I see the sentence, yes.
19      Q   All right. And do you know if AT&T was
20  utilizing this as a contract in 2019, August,
21  against the City?
22      A   I never saw this or referred -- had this
23  document referred to from 2009 until I saw it as
24  part of this proceeding. I never saw it or heard of
25  it again.

## Page 238

1      Q   All right. It says, Mr. Garavaglia is not
2  able to sign a contract obligating the City.
3          You agree with that, don't you?
4      A   It's not a contract.
5      Q   Well, aside from this contract, do you
6  agree with the statement that Mr. Garavaglia is not
7  able to sign a contract obligating the City?
8      A   Where are you --
9          MR. BLANKE: Objection. Asked and
10  answered.
11      Q   (By Mr. Norwood) It's the third sentence
12  in the same paragraph we were working with.
13      A   Item number 1?
14      Q   Well, let me --
15      A   I'm on 42. Are you on 42?
16      Q   You're on the top -- we haven't gotten to
17  paragraph numbers yet --
18      A   Oh, okay.
19      Q   -- we just -- we're still working through
20  the first paragraph now.
21          It says in the third sentence,
22  Mr. Garavaglia is not able to sign a contract
23  obligating the City. You agree with that statement?
24      A   And this statement is relating to the
25  prior sentence referring to what she's calling a

## Page 239

1  Master Agreement.
2      Q   Well, okay. Let's push aside the Master
3  Agreement for now. Do you agree with the statement
4  that you were not --
5      A   Yeah. Sure. Absolutely.
6      Q   -- able to sign a contract obligating the
7  City; correct?
8      A   Yes. That's correct.
9      Q   All right. Let's go to the numbered
10  paragraphs. It talks about an outstanding invoice
11  of $902,904.61. Do you see that?
12      A   I do.
13      Q   And you agree that's a whopper? Isn't it
14  a big bill?
15      A   A big number. It's a big number.
16      Q   All right. And that had been outstanding,
17  it looks like, for several years; right?
18      A   Yeah.
19      Q   Okay. And you were responsible for
20  managing these particular bills; correct?
21      A   This one in particular, yes.
22      Q   And you had a stack of these bills in your
23  office on a file cabinet which is I assume where
24  Ms. Judy Armstrong would have found them; correct?
25      A   Does that say that here?

## Page 240

1      Q   Well, did you have them stacked up on a --
2  on your file cabinets in your office, a stack of
3  AT&T bills?
4      A   Over a foot high. Absolutely.
5      Q   All right. So -- all right. So you had
6  them there. So Judy Armstrong, you understand, took
7  over some of your responsibilities when you were
8  placed on forced leave. Is that what you
9  understood?
10      A   Okay. If you say so. I don't know.
11      Q   Do you know that?
12      A   I don't know that.
13      Q   All right. It appears from this memo,
14  though, that she was responsible for trying to
15  figure out what was going on with AT&T; correct?
16      MR. BLANKE: Let me object as to what the
17  memo appears to be. He can only answer
18  questions he knows the answer to.
19      Q   (By Mr. Norwood) Well, do you know?
20      A   What was the question you want me to
21  answer?
22      Q   Do you know what role Judy Armstrong
23  played in covering for you while you were on forced
24  leave?
25      A   I don't know that she played any role.

Page 241

1      Q   All right.  And so from this memo -- well,
2  let -- let's keep going.  Let's talk about -- let's
3  go to page 4.  I'm sorry.  Page 43, page 2 of that
4  document, paragraph number 5.
5      Well, first of all, what happens if a
6  contract is not -- if it's a contract and it's not
7  properly approved by authorized signers of the City?
8  How does that contract get paid?
9      A   It doesn't.
10     Q   Why not?
11     A   Because accounts payable -- it would
12 not -- the -- the document would not have a -- the
13 contract would not have a document number, which
14 means that when you refer to the contract number on
15 a payment through accounts payable, if it's not
16 there, then it doesn't get paid.
17     Q   It doesn't get paid?
18     A   That's right.
19     Q   And do you know it -- if whether in this
20 AT&T Master Agreement, that contract was being --
21 getting paid by the City?
22     MR. BLANKE:  When?
23     Q   (By Mr. Norwood)  At any point.
24     A   What are you -- what -- what contract?
25     Q   The Master Agreement that's referenced in

Page 242

1  this document.
2      A   The one that I was told was a catalog and
3  not a contract?
4      Q   The agreement that you said somebody told
5  you was not an agreement.
6      A   It's not somebody.  It was somebody that
7  was an attorney --
8      Q   Right.
9      A   -- who reviewed it in the City Counselor's
10 office.
11     Q   Right.  That told you --
12     A   It wasn't -- it wasn't somebody in my
13 office.  I didn't make it up.  It was somebody that
14 we -- that we sought out in the City Counselor's
15 office.
16     Q   All right.  Let's talk about paragraph
17 number 5.  It says, Waste Management is a vendor
18 selected to remove trash at the Gateway
19 Transportation Center.  Their original contract was
20 for July 1, 2015 to July 30, 2017 with the City,
21 having the right to extend for three additional
22 one-year periods, for a maximum of five years.
23 James Garavaglia signed an extended agreement for
24 36 months on May 22nd, 2017.
25     Do you see that?

Page 243

1      A   I'm reading it with you.
2      Q   Do you see that?
3      A   I do.
4      Q   And did you sign an extended agreement for
5  an additional 36 months on May 22nd, 2017?
6      A   I don't have any idea what this is.
7      Q   All right.  Well, let's see if we can find
8  it in our stack of stuff.  Let's turn to Garavaglia
9  89.  Yeah.  89.  Are you familiar with that
10 document?
11     A   No, sir.
12     COURT REPORTER:  Did you say yes, sir or
13 no, sir?
14     THE WITNESS:  I said no, sir.
15     COURT REPORTER:  Thank you.
16     Q   (By Mr. Norwood)  Did you sign this
17 document?
18     A   No, sir.  Not that I recall at all, no.
19     Q   Is that your signature?
20     A   I can't say that it is.
21     Q   Okay.  Do you know who would have signed
22 your signature on this document?
23     A   No, I -- I -- I'm not sure who was the
24 actual manager of the Gateway Center at that point
25 in time.  I'm not -- I'm not remembering the dates

Page 244

1  and the -- when -- when Ms. Jones left and Ms. Day
2  actually came in.  I'm -- I'm not sure what the
3  dates were, but there was a -- there was an interim
4  on-site manager and still is at the Gateway Center.
5  This was not an operation that I was directly
6  responsible for.  There was a supervisor that had
7  day-to-day operational responsibility there.
8      Q   Okay.  Let's just -- for the record let's
9  set the lay of the land here.
10     This says Service Agreement, Non-Hazardous
11 Waste Service Summary for Waste Management; correct?
12     A   It does.
13     Q   And it has some terms with a base rate;
14 correct?
15     A   I see that.
16     Q   And it has a signature that says James M.
17 Garavaglia; correct?
18     A   Yes, it does.
19     Q   And it has written James M. Garavaglia.
20 Did you write that?  Is that your writing?
21     A   No.
22     Q   That's not your --
23     A   Not that -- not that I'm aware of, no.
24     Q   It could be your writing, you're just
25 saying you don't know as you sit here today?

Page 245

1     A   I'm saying I don't recall anything about
2  this document or having signed it.
3     Q   Okay.  And I guess my question to you:
4  You -- you write your signature quite often, don't
5  you?
6     A   I did, yeah.
7     Q   All right.  And I'm just trying to get
8  from you, since you're an expert on your own
9  signature -- first of all, is that your handwriting?
10    A   I don't know that it is.
11    Q   Do you know that it's not?  Can you
12 testify under oath that that's not your handwriting?
13    A   I'm not saying that -- that -- I'm not --
14 I don't know what that is.  It could be -- it could
15 be that it's traced.  It could be that somehow or
16 other it's been transferred on it.  I don't -- I
17 don't know.  I do not have any recollection of this
18 particular document.
19    Q   So you're suggesting that somebody forged
20 your signature at the City?
21    A   No.  What I'm suggesting is, is I don't
22 know this document.  I'm not familiar with it, nor
23 am I familiar with my name being on it.
24    Q   All right.  So in any event, it's dated
25 5/22/17; correct?

Page 246

1     A   Yes.
2     Q   And it's dated at a time when you were
3  Deputy Comptroller; correct?
4     A   Yes, I would have been.
5     Q   And you would agree that you didn't have
6  authority to sign this particular contract in May of
7  2017; correct?
8     A   I am not authorized to sign contracts.
9     Q   Okay.  So if you did sign it, you would
10 not have been authorized to sign it; correct?
11    A   I think that's right, yeah.
12    Q   All right.
13        MR. NORWOOD:  Why don't we take a break,
14 if we could.
15        THE VIDEOGRAPHER:  This is the
16 videographer.  We're going off the record.  The
17 time now is 4:02.
18        (Off the record at 4:02 p.m.)
19        (On the record at 4:25 p.m.)
20        THE VIDEOGRAPHER:  This is the
21 videographer.  We're back on the record.  The
22 time now is 4:25.
23    Q   (By Mr. Norwood)  Okay.  Mr. Garavaglia,
24 I'd like to go back to page 89 and this signature of
25 yours that appears on this document.

Page 247

1         Do you see that?
2     A   Yes.
3     Q   We talked about that.  And so I'm just
4  trying to make sure the record is clear before we go
5  on.
6         You're saying you don't know if that's
7  your signature or not; is that correct?
8     A   That is my name and it -- it is not my
9  signature that I'm aware of.  I do not have
10 recollection of having signed this.
11    Q   Okay.  Did you print that?  Does that look
12 like your printing?
13    A   I don't have recollection of this
14 document, sir.
15    Q   No, that wasn't my question.  Does it look
16 like your printing?  Did somebody do a really
17 skillful job of printing your name?
18    A   I printed my name a number of ways.
19 Sometimes I put a line over the J, sometimes I
20 don't.
21    Q   So does that look like one of your
22 versions of your printing?
23    A   I don't know.  It's possible.
24    Q   Okay.  So it's possible that you did sign
25 this?

Page 248

1     A   No, it's -- I didn't say that.
2     Q   Okay.  What are you saying?
3     A   I'm saying that I have no recollection of
4  this document or having anything to do with signing
5  this document.
6     Q   But you could have, is what you're saying?
7     A   No, I didn't say that.
8     Q   Could you have?
9     A   No, I didn't say that.
10    Q   So you couldn't have?
11    A   I'm saying that I have no recollection of
12 this document and I have no recollection of the
13 signature on it.
14    Q   Let's talk about these bills from AT&T,
15 the $900,000 bill.  What was going on with that?  I
16 mean, that's a lot of money; right?
17    A   Which -- which page are you on now, sir?
18    Q   Okay.  We're on page Garavaglia 50.
19    A   Okay.
20    Q   It looks like a Monthly Statement, is what
21 it says -- correct -- from AT&T to the City?
22    A   It is.
23    Q   And how long had this monthly bill been
24 out -- well, let me withdraw that and say this:  The
25 total amount due, it says $992,062.05; correct?

Page 249

1    A    That's what it says.
2    Q    Current charges of 89,157.44; correct?
3    A    Yes.
4    Q    Past due balance, please pay immediately,
5    $902,904.61; correct?
6    A    Yes.
7        MR. BLANKE:  You're just asking if you're
8    correctly reading it?
9        MR. NORWOOD:  I think he understands,
10    because he answered.
11    Q    (By Mr. Norwood)  Right?
12    A    I'm reading it the same way as you're
13    saying it.
14    Q    And that's what it says.  Because we're
15    making a record here, so we're just trying to make
16    sure all of the stuff that we're looking at is on
17    the record.
18        And for the record, the past due amount
19    was $902,904.61 as of the billing date of June 27,
20    2019; correct?
21        MR. BLANKE:  Obj -- objection.  The
22    question is vague and confusing as to whether
23    you're asking him whether it's --
24        COURT REPORTER:  I'm sorry.  I'm sorry.  I
25    lost you.

Page 250

1        MR. BLANKE:  The question is vague and
2    confusing as to whether you're asking him
3    whether or not that's what it says or whether
4    or not that is a true statement that that's the
5    past due amount.  So the question is --
6    Q    (By Mr. Norwood)  Well, is that what it
7    says?  Let's go with that.
8        MR. NORWOOD:  Thank you, counselor.
9    A    That's what it says.
10    Q    (By Mr. Norwood)  All right.  And that's a
11    lot for a past due amount; correct?
12    A    Well, it's all relative.  In reference
13    to -- to what?  If you're -- if you're talking about
14    items that cost a million dollars, it's not.  In
15    this particular instance, it's a big number.
16    Q    Oh, no question about it.  And you were
17    responsible for making sure that this was properly
18    taken care of; correct?
19    A    I was in the process of finalizing that at
20    the time I left employment, yes.
21    Q    How far back did these unpaid bills go?
22    A    Oh, I think you're mischaracterizing what
23    this is.  I mean, I'd like to --
24    Q    Yeah, go ahead.
25    A    -- enlighten you, if I can.

Page 251

1    Q    Go ahead, please.
2    A    Somewhere -- and I'm going to say in the
3    time frame -- and, again, I'm going from memory.
4    Probably sometime around 2015 or so, the City has --
5    this -- what this is, is this is the -- the downtown
6    campus phone bill.  And down here at the very bottom
7    it 622-4005, that is -- the big number that makes
8    this bill up is the downtown City of St. Louis --
9    all the buildings in the downtown complex's phone
10    bill, and all these other little bills are other
11    little stand-alone charges that accompany that for
12    the downtown campus.
13        Now, what this is, this is a contract --
14    or this -- this bill is made up of three separate
15    components.  There is the dial tone component, there
16    is the trunk line component and there is the
17    InterLATA -- Inter -- IntraLATA long distance
18    component.
19        So there's three components to this bill.
20    The bill comes every month, and it's about -- about
21    three and a half to four inches.  Okay?  Probably
22    close to a thousand pages two-sided.  And what this
23    tells you is it gives you every phone number in the
24    downtown campus and it shows you how much that phone
25    line costs.  It breaks out the costs of our long

Page 252

1    distance.  It breaks down the cost of the trunk
2    charges.  And, more importantly, if we were to have
3    any contracted AT&T service for something that
4    wasn't under warranty, it also breaks that out in
5    this bill.
6        Now, this bill, as I said, is a five-year
7    contract that is a -- what's called a custom tariff.
8    And what a custom tariff is, is AT&T goes to the FCC
9    and gets rates for various types of services.  And
10    in this particular instance, these are for,
11    primarily, phone lines, of which there's probably
12    3,500 phone lines in the downtown campus.  And
13    the -- the custom tariff is based on the amount of
14    time you go out on the contract.
15        For example, if the tariff was for one
16    year, you're going to pay a much higher price than
17    if you went out for five years.  And so we always
18    maximize the length of time to give us the lowest
19    possible price on the dial tone component.
20        Now, on or around sometime in 2015, we
21    were without a -- an account exec, because someone
22    had left and the person had been replaced, and there
23    wasn't one in place for probably six months.  And in
24    that time frame, the -- the trunk component -- and
25    trunk lines are what connects the phones to the

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 253

1    central office on Chestnut Street.  The trunk line
2    component for the City went out of contract, which
3    means, again, as part of the custom tariff, that
4    went from a lower price -- because we had the
5    five-year agreement in place -- to a much higher
6    price because we weren't under contract anymore.
7        Q    Well, let me ask you, how did it go out of
8    contract?  Weren't you responsible for making sure
9    that there was continuity between those contracts?
10       A    No.  The Southwestern Bell representative
11   who is in charge of our account was responsible
12   for -- for bringing it to our attention and for
13   bringing us our opportunity to renew the contract
14   with various options.
15       Q    And did that happen?
16       A    No.  We -- we didn't have a -- a person in
17   place.  And so when the price -- when the price of
18   the trunks went up, I called and said, Hey, our bill
19   is out of whack.  And they said, Okay.  And we -- we
20   discovered jointly that it was -- what caused it was
21   this problem with -- with the trunks being out --
22   out of contract.
23            And so someone came down and we decided
24   that we needed to re-up for the longest period of
25   time.  And at that point in time we also did

## Page 254

1    something that we normally do when the contracts
2    come up, and that is we did a busy study.  And the
3    busy study takes those trunk lines and there's a --
4    a guide that AT&T gives us by which we can determine
5    what is an acceptable busy.
6            In other words, when you call and you get
7    an all circuits busy sometimes, that's because
8    everyone is on the phone and you can't get a trunk
9    to make the call to the central office and for your
10   call to go out.
11           So we did a trunk study.  We took out some
12   trunks.  We saved some money, and we put the new
13   agreement in place.  Now, when we put the new
14   agreement in place, for some reason they couldn't
15   get the numbers to work, and so we were generating
16   bills that were incorrect, meaning the amount billed
17   was not reflective of the amount owed.
18           And so they asked us to -- they gave us
19   the number and they said start deducting this amount
20   every month off your bill.  And after a couple of
21   months, I said, no, that's not the way to do things,
22   because it's probably -- it's just not -- not the
23   way we want to do it.  There -- there's no --
24   there's no backup to explain why we just deducted so
25   much money off of our bill.

## Page 255

1        And so they said, Okay.  We'll get this in
2    place.  We'll get it fixed.  Well, by this time,
3    between the amount that was deducted and the amount
4    billed being incorrect, we had run up something
5    around 200,000-or-so dollars of past due that was
6    inappropriately billed because we were out of
7    contract versus at the contract price.
8        Q    Okay.
9        A    So they submitted a proposal to us and
10   said, Here, we're going to credit you $200,000.
11   Well, the past due exceeded 200,000.  By how much, I
12   don't remember.  But it exceeded 200,000.  And so I
13   met with the Comptroller and we -- and I explained
14   to her what happened.  I said, They want to give us
15   a credit for 200,000.  I said, What do you think?
16           And we looked at each other and we both
17   came to the same conclusion.  The credit showed no
18   backup.  There was no detail.  There was no, I
19   guess, reconciliation from our bill to what was
20   shown in the -- in the past due.  And so we only had
21   a certain degree of confidence that that was the
22   right number, and so we rejected at that time the
23   $200,000 credit that they offered.
24       Q    And what about the amount that was owed?
25   There was some money owed; right?

## Page 256

1        A    Well, it's to be determined, because we
2    never did a detailed reconciliation of what was past
3    due.  Now, I want to make a point.
4        Q    Why was there never a detailed
5    reconciliation?
6        A    Because AT&T did not have someone
7    available to provide us with that at that point in
8    time.  Now --
9        Q    So it was AT&T who was -- fault that this
10   thing was --
11       A    AT&T's --
12       Q    -- hanging around?
13       A    AT&T's -- it wasn't so much a fault as it
14   was AT&T did not have someone available to let us
15   have on an extended period of time -- meaning a
16   couple of days -- to work through and do the
17   reconciliation necessary to come up with an accurate
18   number for everybody's purpose.
19       Q    But this went back for some years.  Do you
20   agree with that?
21       A    That -- that was in nineteen -- or
22   twenty -- 2015, I'm thinking.
23       Q    All right.  All the way back to 2015 when
24   you were as Asset Manager?
25       A    Yes.

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334

## Page 257

1  Q  Correct?
2  A  Okay.  So --
3  Q  All right.  Well, let me say this:  Let
4  me -- let me cut to the chase.  Do you know -- by
5  the time this was ultimately resolved, you had
6  been -- you had left the City; is that right?
7  A  Well, when it was -- well, what happened
8  was the timing was of -- of -- of this was such that
9  this -- in the spring of 2019, after going through
10  four or five different people trying to resolve this
11  issue, we finally stumbled across someone who was
12  ready, willing, and able to help us by the name of
13  Mary Harp.
14  Q  Okay.
15  A  And Mary and I sat down -- and you made a
16  reference to that big stack of paper regarding AT&T
17  that was sitting on a file cabinet.
18  Q  Right.
19  A  Well, that was much of the preliminary
20  backup detail work that we had done together to do
21  an accurate spreadsheet that encompassed over four
22  and a half years of month-by-month detail which
23  reconciled what was billed versus what we paid
24  monthly.
25  Q  But four and a half years?  That seems

## Page 258

1  like a long time to me, Mr. Garavaglia.
2  A  Well, I can give you more details as to
3  what happened.
4  Q  Well, no, no, no.  I mean, you agree
5  that's a long time?  Can we agree with that?
6  A  I can also give you more details as to
7  what happened.
8  Q  I'm sure you can give us a lot of details,
9  but why don't you give me the one detail.  That's a
10  long time; right?
11  A  In -- relative to what?
12  Q  Relative to paying bills.
13  A  Well --
14  Q  If you went for four years without paying
15  your bills, or reconciling them anyway, you would
16  think that would be a long time; right?
17  A  No, sir.  You've got the wrong notion.
18  Q  Okay.  Well, let me just ask you this.
19  A  It's not a case -- it's not a case of --
20  of paying bills.  It's a case of the difference
21  between what we paid and what they billed us.
22  Q  Right.  And so -- but even to have this
23  thing hanging out for four years is -- is a problem.
24  Isn't that a problem for any municipal entity to
25  have this thing --

## Page 259

1  A  Well --
2  Q  -- hanging out there for four years?
3  A  -- I -- I can tell you that if we actually
4  owed AT&T close to a million dollars, their regional
5  president would have called the mayor long before
6  any of this.
7  Q  All right.  But suffice it to say, though,
8  was this issue resolved by the time you were placed
9  on forced leave?
10  A  At the time -- at the time I was -- like a
11  couple of weeks before I was escorted out the
12  door --
13  Q  Right.
14  A  -- we had come to a number in the
15  reconciliation that the City's responsible number in
16  all of this was somewhere around 30- to 35,000 --
17  Q  And how --
18  A  -- and -- I'm sorry?
19  Q  How did you document that?  Is there a
20  document --
21  A  We did --
22  Q  -- that we can find?
23  A  We did -- in that stack of stuff that you
24  referred to, there was a yearly detailed
25  spreadsheet, which we never had done before.  When

## Page 260

1  we talked about the $200,000 a few -- a few minutes
2  ago.  When the 200,000 lacked the detail, you know,
3  I went back to her and I said, Let's go back and
4  we're going to do a detailed reconciliation, month
5  by month, year by year.
6  And, remember, the City of St. Louis paid
7  a bill every month.  We never missed a month of
8  vouchering a bill.  The difference was they were
9  generating manual invoices for us which did not
10  affect the billing system which was generating a
11  bill that was $30,000 a month higher than what it
12  should have been.  That bill did not -- the manual
13  bill did not reconcile with the billing system, and
14  so the billing system kept saying, well, you paid
15  seventy, we billed you a hundred.  That 30,000 went
16  to past due, so --
17  Q  All right.  Let me -- let me say this,
18  because we're short on time.
19  So you worked on this with Mary Harp, and
20  if we talk to Mary Harp, she will --
21  A  Absolutely.
22  Q  -- vouch that?  Okay.  Let's go to
23  Garavaglia 57, which is part of Exhibit 4.
24  A  57?
25  Q  Garavaglia 57 -- page 57.  Do you see that

## Page 261

1  page?
2  A  Yes.  I'm looking at it.
3  Q  All right.  At the top it has AT&T
4  letterhead and it has Addendum to Comprehensive
5  Service Order Attachment.  Do you see that?
6  A  I do.
7  Q  All right.  And did you sign this
8  particular document?
9  A  I believe I did.
10  Q  All right.  And did you have authority to
11  sign this particular document?
12  A  Yes.
13  Q  Who -- who told you you had authority to
14  sign this particular document?
15  A  This particular document is an attachment.
16  You say an addendum.  That's the same word as an
17  attachment as to a contract that was put through
18  AT&T through the normal contract process.  What this
19  is is a scope of work.
20  Q  Right.
21  A  This is a scope of work which details that
22  if you're going to spend $50,000 -- and that's what
23  the contract says -- this comes back and gives you
24  the detail of that work.
25  Q  Right.  And my question to you, because it

## Page 262

1  says Agreed:  City of St. Louis on the document;
2  right?
3  A  Okay.  That's what it says.
4  Q  All right.  And it says by James M.
5  Garavaglia; correct?
6  A  It does.
7  Q  Authorized agent or representative;
8  correct?
9  A  Okay.  And that doesn't mean --
10  Q  That's what it says.
11  A  That doesn't mean anything more than I was
12  the head of the telecommunications section for the
13  City.
14  Q  Does that mean you were authorized to sign
15  on behalf of the City?
16  A  I was authorized to sign this type of a --
17  of a document, yes.
18  Q  What --
19  A  This is not a contract.  Well, I don't
20  know.  I -- I ran this by, again, somebody.  I'm not
21  sure if it was Garvin or who it was in the City
22  Counselor's office.  I said, Look, there is an
23  existing contract which is the over -- overview
24  umbrella document that will be in place by which
25  AT&T gets paid.

## Page 263

1  Now, when it comes down to actually doing
2  the work, they are going to give us a detailed scope
3  of work.  And you understand what a scope of work
4  is.  That's what this is.  And, therefore, I was
5  told that it's not a contract.  You can sign it.
6  Q  Did you -- this was at a time when you
7  were Deputy Comptroller; correct?
8  A  That's what it says, yes.
9  Q  Did you discuss this particular document
10  with the Comptroller Green?
11  A  Not that I recall.
12  Q  All right.  So if there was a question
13  about whether or not you could or could not sign
14  contracts --
15  A  This isn't a contract.
16  Q  Well, document.  It's a document; right?
17  A  It's a scope of work.
18  Q  And it has legal obligations; correct?
19  A  Well, I don't know.  I'm not a lawyer.
20  Q  Okay.  So -- but you never asked the
21  Comptroller if you were authorized to sign this
22  contract as an authorized representative of the City
23  of St. Louis; correct?
24  MR. BLANKE:  Objection with the use of the
25  word contract, when he keeps telling you that

## Page 264

1  he doesn't think it was a contract.
2  MR. NORWOOD:  Okay.
3  MR. BLANKE:  So it's argumentative.
4  A  Okay.  I was told it wasn't a contract.
5  MR. NORWOOD:  Well, that's a speaking
6  objection.  I let you get away with it.
7  MR. BLANKE:  It's argumentative.
8  MR. NORWOOD:  I'm sorry?
9  MR. BLANKE:  It's argumentative.
10  MR. NORWOOD:  Okay.  For the record,
11  please, let's not have the speaking objections.
12  Let's move forward, because I'm going to have
13  to --
14  MR. BLANKE:  I think you're allowed to say
15  why it's argumentative.
16  MR. NORWOOD:  No, you can't say that, and
17  you know that.  You state your legal objection
18  and we move on.  You can't go into rambling
19  objections --
20  MR. BLANKE:  There are lines to be drawn.
21  MR. NORWOOD:  You can't -- law -- law
22  school hasn't changed in the last 43 years.
23  MR. BLANKE:  There are lines to be drawn.
24  MR. NORWOOD:  You still can't have
25  rambling, speaking objections.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 265

1     MR. BLANKE:  But things are not as --
2   what's the word?
3     MR. NORWOOD:  Okay.
4     MR. BLANKE:  What's the word?
5     MR. NORWOOD:  I'm just going to have to --
6     MR. BLANKE:  Absolute as you make them.
7     MR. NORWOOD:  -- terminate the deposition
8   if we cannot agree that you're going to make
9   legal objections and I will to continue to ask
10  my questions.  Can we agree to that, counselor?
11    MR. BLANKE:  Yeah.  We can agree to that,
12  yes.
13    MR. NORWOOD:  Okay.  Thank you, counselor.
14    MR. BLANKE:  Let's make that reciprocal,
15  also.
16    Q   (By Mr. Norwood)  All right.  So in your
17  view --
18    A   No, it's not my -- that's not my view.
19    Q   Well, let me say this:  Is this document
20  you signed binding on the City, in your view?
21    A   I can only tell you what I was told by the
22  City Counselor's office that this is not a contract
23  that I was okay to sign.
24    Q   And who told you that?
25    A   I'm thinking it was Garvin.  I don't know

Page 266

1   that.  I don't remember exactly.
2     Q   Why are you thinking it was Garvin?
3     A   Because he's the attorney that we dealt
4   most often with on a number of matters across the
5   board.
6     Q   And did you talk about -- you didn't talk
7   about this with your boss?
8     A   I talked with an attorney.
9     Q   But your -- Garvin is not your boss;
10  right?
11    A   But Garvin is explaining to me if I have
12  the authority to sign it or not.
13    Q   Is Garvin your boss?
14    A   No.
15    Q   Do you report to Garvin?
16    A   No, I do not.
17    Q   Did Garvin hire you?
18    A   No.
19    Q   Did Garvin promote you?
20    A   No.
21    Q   Did Garvin approve your salary increases?
22    A   No.
23    Q   You reported to Comptroller Darlene Green;
24  correct?
25    A   Yes.

Page 267

1     Q   And as we had discussed earlier, you had
2   an obligation to keep her informed about what was
3   happening; correct?
4     A   Yes.  But then again, I also in this job
5   have discretion to decide what to bring to her and
6   what not to.
7     Q   Oh, okay.  Tell us about that.  Where is
8   that in the policy manual?  I -- I missed that.  Is
9   there anything in the Code of Conduct that says you
10  have discretion to not inform your boss about what's
11  going on?
12    A   I didn't say that.  I said that as a
13  senior manager, I'm in that job because I am
14  making -- I -- I'm entrusted with making decisions
15  and have some discretion about what to bring to my
16  boss.  I can't bring her everything that's happening
17  every day.  I'd do nothing but sit there on the
18  phone with her and say, well, what do you think
19  about this, can I do this, can I do that.  That's
20  not what the job is about.
21        She wouldn't need me there, which
22  obviously she decided she didn't -- she wouldn't
23  have needed me there had I had to go to her with
24  everything.  There is a certain amount of discretion
25  that a senior manager has in the job that I have.

Page 268

1     Q   And part of that discretion includes not
2   informing your boss?
3     A   Part of that discretion is finding out
4   from the best means possible what you can do and
5   what you can't do.
6     Q   And -- and you believe that you could sign
7   this contract because -- or this document because it
8   wasn't a contract; right?
9     A   No.  I believed that I was told that I
10  could sign this document.
11    Q   If the Court determines that it was a
12  contract, a binding, legal obligation, that would
13  mean that you signed that binding, legal obligation
14  without authority to do so; correct?
15    MR. BLANKE:  Objection.  It calls for
16  speculation and calls for a legal conclusion.
17    Q   (By Mr. Norwood)  Correct?
18    A   No.  It means that I signed something, and
19  the direction I was given by the City Counselor's
20  office was incorrect, is what it means.
21    Q   Meaning you signed a document that
22  purported to bind the City, but it didn't because
23  you didn't have authority to bind the City; correct?
24    A   No.  It meant that I signed something at
25  the direction of the City Counselor's office, and if

67 (Pages 265 to 268)

## Page 269

1  the City Counselor made a mistake, then it was their
2  mistake and not mine.
3      Q    And therefore because it's not an
4  enforceable contract, so be it; is that right?
5      A    If it's not a contract, then I was
6  authorized to sign it per the City Counselor.
7      Q    And if it is a contract and you did sign
8  it, it's not worth the paper it's written on because
9  you weren't authorized to sign it; correct?
10     A    That would be correct.
11     Q    All right.
12         MR. BLANKE:  Calls for speculation and is
13     a legal conclusion.  Objection.
14         MR. NORWOOD:  It's already been answered.
15     Q    (By Mr. Norwood)  Let's pivot to –
16  quickly to tab number 7.  And it starts -- this is
17  Garavaglia Deposition Exhibit 7, page 352.  This is
18  the letter dated July 2nd, 2019 that was sent to you
19  by Comptroller Darlene Green, a copy to Mr. Richard
20  Frank.
21     A    3 -- 353?  Yes, sir?
22     Q    Yes.  It's the -- tab 7.
23     A    Okay.  Yeah, I've got it.
24     Q    The first page of tab 7.
25     A    I got it.  I got it.

## Page 270

1      Q    And is that the letter you received
2  regarding the first forced leave?
3      A    It appears that it is, yes.
4      Q    All right.  Then the next page.  Have you
5  seen that page before?
6      A    No.
7      Q    It's a letter dated July 2nd, 2019 from
8  Mr. Richard Frank to Ms. -- well, it's a letter from
9  Darlene Green to Mr. Richard Frank dated July 2nd,
10  2019, and up top, it says approved 7/2/19.  Do you
11  know who approved that?
12     A    I don't recognize those initials.
13     Q    Okay.  Do you know if Mr. Frank approved
14  it?
15     A    It could be R.F.  I don't know that I -- I
16  can't read that.
17     Q    Okay.  If we go to the next page, which is
18  page 385, it's a letter dated July 10, 2019 from
19  your counsel to the – Paul Schmitz to the Civil
20  Service Commission of the City of St. Louis;
21  correct?
22     A    It is.
23     Q    And you understand this to be an appeal of
24  the first forced leave; is that right?
25     A    Yes, it looks like it would be that.

## Page 271

1      Q    All right.  All right.  Let's go to tab 8.
2  And this is Depo Exhibit 8.  It is a letter from
3  Comptroller Darlene Green to Mr. Richard Frank
4  indicating that she was withdrawing the forced leave
5  from July the 2nd as of July 18, 2019; correct?
6      A    Yes.
7      Q    All right.  And do you know if that was
8  approved?
9      A    I was notified of such, yes.
10     Q    By Mr. Richard Frank, Director of
11  Personnel; correct?
12     A    I'm not sure who sent that to me.
13     Q    Okay.
14     A    I'm -- I'm going to scan ahead.
15     Q    Okay.
16     A    I'm -- I'm looking at the pages --
17     Q    Yes.
18     A    -- behind that.  And I -- I'm looking for
19  the letter that would have notified me, and I don't
20  necessarily see it.  Is that -- unless it's 1306.
21     Q    All right.  Well, let's go -- let's go to
22  1306.
23     A    Okay.
24     Q    First of all, before 1306, it looks like
25  there's some signatures.  Is that your signature on

## Page 272

1  this card?
2      A    Yes.
3      Q    That's your signature?  Okay.  You
4  recognize your signature?
5      A    Yes.  Yes.
6      Q    Okay.  All right.  Then the next page,
7  July 18, 2019, is a letter to you from Comptroller
8  Darlene Green indicating you're being placed on
9  forced leave effective as of July 18, 2019; correct?
10     A    Yes.
11     Q    And she says, As of today, Thursday,
12  July 18th, 2019, you are being placed on official
13  forced leave of absence pending an internal
14  investigation into some serious financial
15  improprieties that have come to light.
16         Do you see that?
17     A    I do.
18     Q    All right.  And that was what was being
19  communicated to you as to why the forced leave was
20  continuing as of Thursday, July 18, 2019; correct?
21     A    Yes.
22     Q    All right.  The next page -- let's go to
23  the page after that, which is STL 83, which is a
24  letter dated July 23rd, 2019 from your counsel,
25  Mr. Schmitz, to the Civil Service Commission;

68 (Pages 269 to 272)

## Page 273

1  correct?
2  A  Yes.
3  Q  And this is the appeal of the second
4  forced leave; correct?
5  A  Yes.
6  Q  All right.  Let's go to page 9 -- and Depo
7  Exhibit 9, STL 190, a letter from the -- Ashley
8  McClain, Civil Service Commission, advising you that
9  because of the withdrawal, that that forced leave
10  was null and void; correct?
11  A  Yes.
12  Q  And as a result -- last paragraph -- any
13  accrued leave time Mr. Garavaglia used during this
14  period of forced leave from July 18, 2019 through
15  August 28, 2019 shall be restored.
16  Is that what it says?
17  A  It does.
18  Q  And it was restored; correct?
19  A  Yes.
20  Q  All right.  And we go to the next page,
21  192, STL 192, it references a letter dated
22  August 28, 2019 from Comptroller Green to you
23  indicating that she has officially withdrawn the
24  request for forced leave that was issued on
25  July 18th; correct?

## Page 274

1  A  Which page are you on?
2  Q  Page 192.
3  A  Okay.  Yeah.
4  Q  Correct?
5  A  That's to Richard Frank, yes.
6  Q  Right.  You got a copy of that; correct?
7  A  I did.
8  Q  All right.  And then on the next day -- or
9  next page, 1308, that's the notice -- a
10  pre-termination hearing notice; correct?
11  A  Yes.
12  Q  And that sets forth a -- a list of reasons
13  why this process was going forward; correct?
14  A  That's what it says.
15  Q  All right.  And you received this
16  document?
17  A  Yes.  As you can see, there's a receipt
18  that I received it.
19  Q  With your signature?
20  A  That's my signature.
21  Q  All right.  Let's go to tab number 10.
22  And this is a Declaration that you filed in the
23  United States District Court in the lawsuit you have
24  against the City and Comptroller Green; correct?
25  A  Yes.

## Page 275

1  Q  And you've signed this document; correct?
2  A  Yes.
3  Q  And in paragraph 7, you say after the
4  forced leave -- well, let me go back.
5  You say after the forced leave was
6  rescinded, my vacation time that I had used from
7  July 2nd to July 22nd was restored; correct?
8  A  Yes.
9  Q  And that's accurate; correct?
10  A  Yes.
11  Q  And then paragraph 10, you say, After the
12  forced leave was rescinded, my vacation time that I
13  had used from July 23rd, 2019 to August 29, 2019 was
14  again restored on September 20, 2019; correct?
15  A  Yes.
16  Q  And that was true; right?
17  A  It was, yes.
18  Q  All right.  Let's go to tab 11.  Have you
19  seen that document before?
20  A  I'm having trouble reading what it says,
21  but I -- I don't know that I recall having seen it
22  before.
23  Q  Okay.  Well, let me read it for the
24  record.  It's Re: -- well, at the top it says Deeds
25  of Trust; correct?

## Page 276

1  A  Okay.
2  Q  And it's an e-mail dated Thursday,
3  August 11, 2016, 10 -- 10:18 a.m., to Comptroller
4  Green, cc you.  And Mr. Ray says, quote, Darlene,
5  Jim called yesterday and inquired about his
6  executing certain Deeds of Trust processed by
7  Marsha -- Marsha Veal.  As I recall, these are loans
8  of CDA money to homeowners.  As you know, the
9  Charter, Article XV, Section 3, authorizes a
10  designation of a subordinate to affix the
11  Comptroller's signature on warrants.  In order to do
12  so, the designation must be in writing, in
13  duplicate, filed with the mayor and treasury
14  division.
15  You were aware of that in August of
16  2016 -- correct --
17  A  Yes.  That's what it says.
18  Q  -- when you were Asset Manager; correct?
19  A  That's what it says, yes.
20  Q  And you had went to Mr. Ray to try to find
21  out if you could sign off on these documents;
22  correct?
23  A  Just to get some clarity, it looks like I
24  did, yes.
25  Q  And he told you that in order to do

69 (Pages 273 to 276)

Page 277

1  that -- or told you and the Comptroller that it
2  would have to be in accordance with a written
3  authorization; correct?
4      A  Yes.  That's what it looks like.
5      Q  It says, If you authorize Jim to sign
6  these deeds, I would follow your normal procedure of
7  designating him as such; right?  Do you see that?
8      A  I do.
9      Q  And that was the normal procedure.  To be
10  authorized to sign contracts on behalf of the City,
11  there needed to be written authorization; correct?
12     A  Uh-huh.  Yes.
13     Q  You knew that; right?
14     A  It says I did, yes.
15     Q  You knew that in 2016.  You knew that
16  before 2016, didn't you, Mr. Garavaglia?
17     A  Let's put it this way:  I knew it at least
18  by then.  Let's -- let's say that.
19     Q  Okay.  Well, let's say -- did you know it
20  before 2016?
21     A  Probably.
22     Q  Okay.  And let's go to the next page.
23  It's Green 0 -- or GRN000461, and it's a document
24  that says Report of Delegation of Authority.
25         Do you see that?

Page 278

1      A  Yes.
2      Q  Have you seen these types of forms before?
3      A  No.
4      Q  All right.
5      A  Not -- not before we received them
6  yesterday.
7      Q  Okay.  And do you know if this is the
8  official written procedure by way -- or by which the
9  Comptroller would designate in writing who would be
10  authorized to sign on her behalf?
11     A  I don't know that for a fact, but since
12  she signed it, I guess it is.
13     Q  All right.  What about the next -- and it
14  identifies Beverly Fitzsimmons, Deputy Comptroller,
15  as that authorized signer; correct?
16     A  Yes.
17     Q  All right.  Then the next page, there's a
18  Report of Delegation of Authority dated -- well,
19  backing up, the one we just reviewed is dated
20  1/30/17 -- correct -- by the Comptroller?
21     A  Okay.
22     Q  Is that right?
23     A  Okay.  Yes.
24     Q  All right.  And the next one is dated
25  5/20/16, signed by the Comptroller, and it

Page 279

1  designates or delegates to Judy L. Armstrong certain
2  responsibilities; correct?
3      A  It does.
4      Q  All right.  And have you ever seen any
5  similar document that the Comptroller has signed
6  designating you as having authority to sign
7  anything?
8      A  Not anything on this list, no.
9      Q  Anything at all?
10     A  Not that I can recall.
11     Q  Okay.  Let's go to 12, if we could.  Have
12  you seen that document before?
13     A  Let's see.  Well, obviously it's from me,
14  so I guess I have.
15     Q  Okay.  And it says -- the subject is
16  Lease; right?  Do you see that?
17     A  I do.
18     Q  And in this document, this memo that you
19  sent to Comptroller Green when you were Asset
20  Manager on December 11, 2014, you say, quote, The
21  Comptroller's office requests signature approval on
22  a lease between the City of St. Louis and St. Louis
23  Compost; correct?
24     A  That's what it says.
25     Q  All right.  Why were you requesting a

Page 280

1  signature on this lease between St. Louis City
2  Composting from the Comptroller?
3      A  I was following the process, following the
4  normal procedure.
5      Q  The normal procedure for entering into
6  contracts on behalf of the City?
7      A  No, the -- well, the contract, after it's
8  approved by E&A, it goes to the City Counselor.  If
9  you look at the last page, there's a -- there is
10  a -- a series of -- of blanks to be filled in.  The
11  first one is filled in by Patrick Geraty, then it
12  goes to the City Counselor, then there's a tax
13  clearance, and then we send it to the Comptroller
14  with a letter explaining what it is, what the terms
15  are, what the rent is to be paid.  And then after
16  she signs -- oh, and the City E&A approval is on
17  there, as well, the stamp of E&A approval is on
18  there.  And as she signs, Michele Graham gives it a
19  contract number, 67892, yes.
20     Q  All right.  So you're looking at
21  GRN000473; correct?
22     A  That's correct.
23     Q  All right.  It has a lessee, which is
24  St. Louis Compost; correct?
25     A  Yes.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 281

1    Q    And an authorized signature, apparently,
2  from the president; is that right?
3    A    Yes.
4    Q    It has the signature of the lessor, City
5  of St. Louis, signed by Comptroller Darlene Green;
6  correct?
7    A    Yes.
8    Q    It has approved as to legal form by --
9  signed by the City Counselor; correct?
10    A    Yep.
11    Q    It has a contract number, 67892; correct?
12    A    That's correct.
13    Q    It has an approval date from the Board of
14  Estimate and Apportionment; correct?
15    A    Yes.
16    Q    And then it's given to the City registrar
17  to be recorded on the City's books as a contract; is
18  correct?
19    A    That's correct.
20    Q    And even though it's a lease contract, you
21  followed the protocol of making sure that that
22  contract was -- or document was properly executed;
23  correct?
24    A    Yes.
25    Q    And this was a contract; correct?

Page 282

1    A    Yes.
2    Q    All right.  Because it says Lease
3  Agreement; right?  I think that means a contract;
4  right?
5    A    Yes.
6    Q    All right.  And so you knew in September
7  '14 that as it relates to St. Louis Composting, that
8  that contract had to be executed by the Comptroller
9  and signed as to form by the City Counselor;
10  correct?
11    A    Yes.
12    Q    All right.  Now, let's go to -- let's go
13  to tab 14.  Because I believe earlier in your
14  testimony you indicated you were admonished by the
15  Comptroller because you signed a lease contract that
16  you said wasn't a contract; correct?
17    A    Yes.
18    Q    And is this the lease contract that we
19  were talking about that was not a lease contract?
20    A    This is the request for the option that I
21  inquired about through the City Counselor's office
22  and was told that I could in fact sign the request
23  for -- for -- this -- this option, as opposed to
24  having it go through E&A again and be a second
25  contract.  That's correct.

Page 283

1    Q    But this was in 2017.  The original
2  contract was in 2014; right?
3    A    It's a three-year deal, yes.
4    Q    Right.  And so now what we're doing is
5  we're taking that original three-year deal and we're
6  extending it for how many more years, looking at
7  Exhibit 14, tab 14?
8    A    For one additional year per -- per the
9  lease.
10    Q    All right.  So effectively -- well, let's
11  look at page GRN000464.  Do you see that?
12    A    474, sir.
13    Q    I'm sorry.  I'm looking at GRN00464.
14  That's what I'm looking at right now.  Let's look at
15  that.
16    A    Okay.  Let's look at that.
17    Q    And it's under tab 14.  And so you may
18  be -- you may need to -- yeah, the next tab.
19    A    Okay.  Let's see.
20    Q    Tab 14.
21    A    464?
22    Q    4-6 -- 462.
23    A    462.  Okay.
24    Q    All right.  That's the memo -- well,
25  let's -- let's -- before we look at the memo, let's

Page 284

1  go to the -- two pages down, 464.  And there is a --
2  an Extension of Lease Agreement.  Do you see that?
3    A    I do.
4    Q    And that was an extension of the lease
5  agreement that you sent to the Comptroller to have
6  her execute to bind the City; correct?
7    A    No, I sent her the original lease.
8    Q    The original lease you sent her to execute
9  to bind the City; correct?
10    A    That's correct.
11    Q    And then that lease expired; correct?
12    A    That lease was a three-year agreement,
13  yes.
14    Q    And so now we're talking about do we
15  extend that agreement another year; correct?
16    A    Yes.
17    Q    With new terms; correct?
18    A    No.
19    Q    The base rent -- was it the same base
20  rent?
21    A    No.  If you refer to the lease and you go
22  to GRN000474, this lease says under Terms that with
23  proper notice --
24    MR. BLANKE:  Where -- where do you see
25  474?  Where are you?

Page 285

1      THE WITNESS:  At the very bottom on the
2  right-hand corner.
3      Q    (By Mr. Norwood)  Okay.
4      MR. BLANKE:  What tab?
5      THE WITNESS:  I'm sorry.  It's in 12.
6      MR. BLANKE:  Oh.
7      A    Okay.  With proper notice --
8      Q    (By Mr. Norwood)  To whom?  Notice to
9  whom?
10     A    Three months' written notice to the
11 Comptroller, Room 212, 63013, prior to the
12 expiration of the lease agreement or any extension
13 thereof wishes to exercise an option to extend the
14 term for an additional one-year period.
15     Q    So it says the Comptroller, not the Deputy
16 Comptroller; correct?
17     A    At that point in time, as you can see from
18 his -- there's an e-mail that appears, it looks
19 like -- okay.  The -- Mr. Geraty wrote the
20 Comptroller -- this is under tab 13, and we're
21 looking at GRN000475.
22     Q    Uh-huh.  And that was a letter to --
23     A    I think -- what he's saying is I think
24 he's following what the term of the lease is, in
25 that he is notifying the Comptroller that he wishes

Page 286

1  to exercise the option.
2      Q    That's right.  He's notifying --
3      A    Spelled out in the lease.
4      Q    -- the Comptroller; correct?
5      A    Well, that's what it says to do in the
6  lease.
7      Q    Right.  And that's what he did; right?
8  And that was on June 2nd, 2017; correct?
9      A    Yes.
10     Q    All right.  And then if we go to tab 14,
11 GRN00464, there was an Extension of Lease Agreement
12 prepared with a signature for Darlene Green,
13 Comptroller; correct?
14     A    Right.
15     Q    And you scratched that out and hand wrote
16 James M. Garavaglia, Deputy, under where her
17 signature -- or her name was; correct?
18     A    Yes.
19     Q    And you signed James M. Garavaglia;
20 correct?
21     A    I did.
22     Q    Was this a contract, in your view?
23     A    Again, I only did this with advice of
24 counsel.  And I was told, based upon the initial
25 lease, exercising the option under the term and

Page 287

1  guidelines of the initial lease did not constitute a
2  new contract.
3      Q    All right.  Let's look at the first page
4  of Depo Exhibit 4 (sic), GRN000462.  And that's a
5  memo to you, James Garavaglia, Deputy Comptroller,
6  Finance and Development; correct?
7      A    Yes.
8      Q    From Comptroller Darlene Green; correct?
9      A    Yes.
10     Q    Date, July 21, 2017; correct?
11     A    Yes.
12     Q    Re:  Unauthorized signature; correct?
13     A    Yes.
14     Q    And it says, quote, It has come to my
15 attention that you, as Deputy Comptroller of Finance
16 and Development, erroneously attempted to execute a
17 lease agreement extension between the City of
18 St. Louis and St. Louis Composting.  See attached.
19     Did I read that accurately?
20     A    You did.
21     Q    It goes further and says, As you know --
22 and you did know, right -- currently, there are only
23 two authorized signatures for contracts and their
24 extensions.  You knew that; correct?
25     A    Absolutely.

Page 288

1      Q    All right.  As Comptroller, I am
2  authorized and I have authorized Deputy Comptroller
3  Beverly Fitzsimmons.
4      Do you see that?
5      A    Yes.
6      Q    She says, I am puzzled as to how this
7  could have happened.  This is an improper procedure.
8  Please work with Beverly Fitzsimmons so that Michele
9  Graham, Contract Compliance Officer, can process and
10 provide a properly executed extension to the
11 contract.  She cc'd Beverly Fitzsimmons, she cc'd
12 Alan Jankowski.
13     Who is Alan Jankowski?
14     A    He works in Forestry.
15     Q    All right.  Michele Graham.  She is --
16 what was she, contract supervisor?
17     A    Yes.
18     Q    All right.  Brad Hayes, he was in charge
19 of Parks and Recreation; correct?
20     A    That's correct.
21     Q    He's a white male?
22     A    Yep.
23     Q    Okay.  Vanessa Carter.  Who was that?
24     A    She was an accountant that the worked at
25 the Parks Department.

Page 289

1    Q    All right.  Kathy Sullivan, who is she?
2    A    She's a part-time administrative person
3    also working at the Parks Department.
4    Q    All right.  So she said you signed the
5    contract without authority; right?
6    A    Based on what someone who is not an
7    attorney told her.
8    Q    I'm sorry?  Who was -- who told her --
9    well, you just acknowledged that if it was a lease
10   contract, you weren't authorized to sign it;
11   correct?
12   A    And I also testified that I had talked to
13   the City Counselor's office and they -- they
14   determined that after reviewing the contract, that
15   this was the exercising of an option that was part
16   of the initial contract.
17   Q    Okay.  When you got this memo, did you
18   write back -- this is when you were Deputy
19   Comptroller.  Did you write back to Comptroller
20   Green and say, Listen, I talked to the City
21   Counselor and they told me it was okay?  Did you
22   communicate --
23   A    There was a verbal discussion this --
24   regarding this.
25   Q    What did you -- what was the verbal

Page 290

1    discussion?
2    A    I explained that I had -- I had just
3    told you that I had done.
4    Q    You explained that to who?
5    A    To the Comptroller and to Bev.
6    Q    Prior to this time, had you and the
7    Comptroller had any other discussions about
8    unauthorized signature?
9    A    Not that I'm aware of.  Not that I can
10   recall, anyway.  But if you -- if you look at --
11   under tab 13 and you go to GRN000476, the letter
12   that I received was actually generated based on this
13   e-mail saying after speaking to Beverly Fitzsimmons,
14   it is my understanding that this extension will need
15   to be done as an amendment to the original contract.
16   Q    Right.
17   A    Well, Beverly Fitzsimmons is not an
18   attorney.  And when I spoke to the -- an attorney, I
19   was told something totally contrary to this.
20   Q    But does this say anything about you being
21   authorized to sign that contract?
22   A    I didn't sign a contract.
23   Q    Or sign that document?
24   A    I signed -- I signed an option, which I
25   was told I was allowed to do under the terms of the

Page 291

1    original lease contract.
2    Q    Right.  But my point is, this doesn't say
3    you are authorized to do it; right?
4    A    No.  That -- that communication was verbal
5    via telephone.
6    Q    When you talked to the Comptroller about
7    this before -- was it before or after you got the
8    memo?
9    A    After.
10   Q    All right.  And was that a phone call?
11   Was it in person?
12   A    I believe it was in person.
13   Q    All right.  Was anybody else present?
14   A    I believe Bev was there.
15   Q    All right.  So Bev would have been present
16   when she was talking to you about the memo and the
17   unauthorized contract.  What happened -- what was
18   said during that discussion?
19   A    Basically just reiterating what was in the
20   letter.  And I explained what I had done and it --
21   what it came back to is Bev said, Oh.  She said,
22   Well, I'm just trying to make sure that I've got all
23   my bases covered.
24   Q    Who said that?
25   A    Bev.

Page 292

1    Q    Okay.  What did she mean by that, that she
2    had her -- all of her bases covered?
3    A    You'd have to ask her.  I don't know.
4    Q    All right.  What did you interpret that to
5    mean?
6    A    That she wanted to make sure that we were
7    within the guidelines of what we were proper to do,
8    because I think she's always concerned about the
9    potential for this being brought up in an audit.  I
10   think that's what she was referring to.
11   Q    Right.  Right.  And you were concerned
12   about that, too; right?  You would be concerned
13   about that?
14   A    Well, sure I would.
15   Q    Of course.  When we're talking audit,
16   we're talking about the state audit; right?
17   A    Well, we're talking about any ex --
18   external audit.
19   Q    External --
20   A    Our local yearly external audit or perhaps
21   a state audit as well.
22   Q    Right.  Because that's a concern; right?
23   If the -- if the State auditors find issues, that is
24   troubling for the City.  Isn't that correct?
25   A    Any audit exception is something that

## Page 293

1  needs to be addressed, that's correct.
2      Q   Okay.  All right.  So let's go back to
3  Exhibit 14, page 463, which is the second page
4  behind the memo that the Comptroller provided to
5  you.  And this appears to be a letter from Kathy
6  Sullivan, executive assistant for Mr. Greg Hayes; is
7  that correct?  Kathy Sullivan?
8      A   Yeah, she works for Greg.
9      Q   All right.  And it says to -- well, it
10 looks like it was cc'd to Janis Garavaglia.  Who is
11 that?
12     A   No relation.  She married someone with my
13 same last name, but we're not related.
14     Q   Okay.  Had you seen a copy of this letter
15 before?
16     A   I don't think I have.
17     Q   All right.  It's dated July 10, 2017
18 addressed to Mr. Patrick Geraty, President,
19 St. Louis Composting.  It says, Dear Mr. Geraty --
20 G-E-R-A-T-Y -- enclosed please find the
21 fully-executed Extension of Lease Agreement between
22 the City of St. Louis and St. Louis Composting for
23 an additional one year, expiring August 31, 2018.
24         We were advised by Mr. James Garavaglia,
25 Deputy Comptroller, that it was not necessary that

## Page 294

1  the City Counselor approve the extension, nor did it
2  require City -- the signature of the registrar.
3         Do you see that?
4      A   Yep.
5      Q   Did you tell that to Ms. Sullivan?
6      A   If she says I did, I probably did.
7      Q   Okay.
8      A   Again, based on information I received
9  from the City Counselor's office at the time.
10     Q   Got it.  Let's go to -- so you talked a
11 number of times about advice from the City
12 Counselor.  You mentioned a couple names.  You
13 mentioned Mr. Garvin.  You mentioned some others.
14        Who were these City Counselors you're
15 talking to?  We just want to make sure we get that
16 on the record.
17     A   It depends on which instance you're
18 talking about.
19     Q   All right.  Let's go with the instance as
20 it relates to the -- well, let's go to the instance
21 where it relates to the -- well, you didn't sign the
22 Waste Management contract, so let's not talk about
23 that one.  Let's talk about -- well, this one.  This
24 is the one I think you identified that you went to
25 someone in the City Counselor's office --

## Page 295

1      A   I'm surmising that it was Michael Garvin.
2  I -- we had been -- we had been working with him, as
3  I said before, on a number of issues, and he more or
4  less was kind of our go-to person at the time.
5      Q   And -- but as you sit here today, was it
6  Michael Garvin, or someone else?
7      A   I'm going to say that I believe it was,
8  but I -- you know --
9      Q   Who else could it have been?
10     A   Well, that's what I'm saying, we -- in
11 terms of staff attorneys over there, I wouldn't have
12 trusted a staff attorney, I would have wanted to go
13 to an attorney manager or a deputy, and that's where
14 I think I would have called Michael.
15     Q   And -- and who else possibly, if it wasn't
16 Michael?
17     A   See, that's -- that's the part that I -- I
18 can't really say, because I'm not -- I'm not
19 remembering who was in play over there at the time.
20 I mean, Nancy Kistler was around, but she was on the
21 litigation side, so I would not have called her.
22     Q   Okay.  All right.  Let's go to tab 15.
23 What is that document?
24         MR. NORWOOD:  And while he's looking at
25 that document, how much time do we got?

## Page 296

1         MS. McMILLEN:  Can we go off the record?
2         MR. NORWOOD:  Yeah, let's go off the
3  record.
4         THE VIDEOGRAPHER:  This is the
5  videographer.  We're going off the record.  The
6  time now is 5:20.
7         (Off the record at 5:20 p.m.)
8         (At this time, Mr. Blanke exited the
9  deposition.)
10        (On the record at 5:23 p.m.)
11        THE VIDEOGRAPHER:  This is the
12 videographer.  We're back on the record.  The
13 time now is 5:23.
14     Q   (By Mr. Norwood)  Okay.  Mr. Garavaglia,
15 what is Exhibit 15?
16     A   This appears to be the letter that we
17 spoke to previously that I had sent to tentatively
18 place this muni court extension on the agenda for
19 E&A on the 14th of June.
20     Q   Who did you send it to?
21     A   Well, as you can see, it goes to Stephanie
22 Green, who in this case works for Bev and assembles
23 and actually does the work of putting the agenda for
24 E&A together.
25     Q   So did you know -- do you know if this was

74 (Pages 293 to 296)

Page 297

1   actually sent?
2     A   Of course it was.
3     Q   Okay.  Do you know why it's unsigned?
4     A   I don't know why it's unsigned.  This
5   looks like a -- a copy that was printed out of
6   the -- I guess a Word document that was printed out
7   of somebody's database, because they didn't have the
8   signed copy, evidently.
9     Q   Okay.  But just so the record is clear,
10  this communication, June 14, 2019, you say, Please
11  let this serve as my request to place the following
12  item on the next regularly-scheduled meeting of the
13  Board of Estimate and Apportionment to be held on
14  June 19, 2019.
15     So you made the request.  This relates to
16  the muni court project; correct?
17     A   That's right.
18     Q   And you made the request to place it on
19  the agenda on that day; correct?
20     A   Yes.
21     Q   And you copied the mayor, the Comptroller,
22  the President of the Board of Aldermen; correct?
23     A   That's procedure, yes.
24     Q   All right.  Did you typically prepare
25  letters like this to have items placed on the E&A

Page 298

1   agenda?
2     A   I did.
3     Q   You did?
4     A   Yeah.
5     Q   Okay.  Let's go to tab 17.  What is tab
6   17?
7     A   It's an internal audit report, it looks
8   like, for the Gateway Transportation Center.
9     Q   For the record, we're -- this document is
10  marked GRN000628 to GRN000637.  Are you familiar
11  with this document?
12     A   It was sent to me.  I presume I have it,
13  yes.
14     Q   All right.  And it was issued on
15  October 19, 2015; correct?
16     A   Yes.
17     Q   Prepared by the internal audit section of
18  the City of St. Louis?
19     A   Yes.
20     Q   And on the second page, GRN 629, it's
21  signed by Dr. Ishmael Ikpeama; correct?
22     A   Yes.
23     Q   Who was the internal audit supervisor;
24  correct?
25     A   Yes.

Page 299

1     Q   And he reported to you; correct?
2     A   Not at this time.
3     Q   At some point did he report to you?
4     A   Later.
5     Q   When you became Deputy Comptroller?
6     A   For an interim period of time, yes.
7     Q   All right.  And just to cut to the chase,
8   the job -- and you talked about it earlier -- of the
9   internal audit is to make sure the City's books are
10  in order; correct?
11     A   Yes.
12     Q   All right.  And in this case, this audit
13  related to the Gateway Transportation Center revenue
14  review; correct?
15     A   Yes.
16     Q   And as part of this audit that a letter,
17  GRN 629, was sent to you on October 19, 2015 from
18  Dr. Ishmael Ikpeama with respect to the audit
19  findings; correct?
20     A   Yes.
21     Q   All right.  And for us lay people, what
22  are audit findings?
23     A   Well, as you can see, if you flip back a
24  couple of pages, when they do their -- their testing
25  and they do their observations, they -- they follow

Page 300

1   a format.  They follow the audit plan.
2     Q   Right.
3     A   And if they find deviations from what the
4   audit plan says should be the case, it is a finding,
5   and what they'll do then is they'll send the audit
6   finding to the department head or supervisor and ask
7   them for comments, and that's what you have here.
8   You have Ms. Jones' responses to their audit request
9   and findings.
10     Q   Okay.  And findings aren't generally good
11  things?  I mean, they don't find happy stuff?
12     A   Generally what they are is they're
13  pointing out areas of weakness of internal control
14  or places where the internal audits found a method
15  that you can do something better.
16     Q   And that's important for the City to make
17  sure that the City is being fiscally responsible
18  with respect to taxpayer revenue; correct?
19     A   Of course.
20     Q   All right.  And generally speaking, in the
21  internal audit world in the City of St. Louis, were
22  there follow-ups to the findings?
23     A   Generally there is.
24     Q   What was the time frame by which there
25  would normally be a follow-up to audit findings --

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us           Fax: 314.644.1334

## Page 301

1  A  That -- as to --
2  Q  -- internal audit findings?
3  A  Once -- once the audit has been completed
4  and the responses logged, meaning that the responses
5  are in this report and the report is issued -- it
6  depends on the audit manager's audit plan for the
7  year.  They -- and for the budget year, they do an
8  audit plan that corresponds with their staffing and
9  the amount of dollars they have available to do a
10  certain number of different types of reviews.
11  So there's -- you can't cover everything
12  every year, so what you do is you select based on
13  how long it's been since the last time you did
14  something in a department or an agency and you go in
15  and you make your plan saying, uh-huh, it's 2022.  I
16  haven't looked at that particular area since 2018.
17  They will go into my budget this year and I will
18  allocate so many hours of my staff to perform an
19  audit of that area.  So it -- the -- it's -- it's at
20  the discretion of the -- of the manager of the
21  audit and internal audit department as to where he's
22  going to allocate his resources.
23  Q  Was there a follow-up in conjunction with
24  this particular audit, internal audit of the Gateway
25  Transportation Center that was issued on October 19,

## Page 302

1  2015?
2  A  You're asking me if I know if there was
3  one?
4  Q  If you know as you sit here right now if
5  there was a follow-up.
6  A  I don't -- I do not.
7  Q  All right.  Let's go to tab 18.
8  A  Okay.
9  Q  Let's look at the first page which is
10  denominated as GRN000477.  Do you see that document?
11  A  Yes.
12  Q  And this is an e-mail from Dr. Ikpeama,
13  Tuesday, February 20, 2018 at 3:10 p.m.; correct?
14  A  Okay.  Yeah.
15  Q  Is that right?
16  A  Yep.
17  Q  And that's an e-mail to you; is that
18  right?
19  A  Okay.  Yes.
20  Q  And did you respond to this e-mail sent by
21  Dr. Ikpeama?
22  A  I don't recall.  I'm sure that eventually
23  we did.  I don't recall that I did the -- that day
24  or the day after.  Do you have that answer?
25  Q  Well, do you recall responding -- you,

## Page 303

1  meaning Jim, did you respond to Dr. Ikpeama?
2  A  I'm not sure that I did -- that I -- that
3  I do recall.  But I can tell you this, the Gateway
4  Transportation Center has a manager in place that
5  would have been dealing with this one on one
6  directly with Dr. Ikpeama.  Now, why he's sending
7  this to me and bypassing the supervisor, I don't
8  know.
9  Q  All right.  Well, you were the supervisor
10  of the supervisor; correct?
11  A  That's true.
12  Q  All right.  And you had the ultimate
13  responsibility to make sure that your subordinates
14  took care of issues associated with internal audit
15  findings; correct?
16  A  I was her supervisor, yes.
17  Q  And you were responsible for make
18  suring -- making sure that any audit findings that
19  reflective negatively on the processes of the City
20  should be remedied?  That was your responsibility;
21  correct?
22  A  It's my secondary responsibility.  The
23  primary responsibility for correcting audit
24  exceptions lies with the supervisor on-site.
25  Q  And you had responsibility of some nature,

## Page 304

1  you described it as secondary; right?
2  A  That's right.  It's immediately her
3  responsibility to remedy and to respond to the audit
4  exceptions.
5  Q  Who was the supervisor that you're
6  referring to?
7  A  At this point in time, I believe it was
8  Sonia Day.
9  Q  All right.  And she reported to you;
10  correct?
11  A  Yes.  Yes.
12  Q  He says -- and it's directed to you.
13  Dr. Ikpeama, he says, Dear Mr. Garavaglia, I sent to
14  you a follow-up letter dated -- originally it said
15  January 1, 2018.  Somebody scratched it out and
16  wrote February.  Was that you who scratched it out?
17  A  That's not my writing, no, sir.
18  Q  All right.  Either January or
19  February 2018 requesting your response on the
20  Gateway Transportation revenue review report
21  findings and recommendations, Project Number 25-RR08
22  (sic).  The due date was February 9, 2018.  As of
23  today, February 20, 2018, we have not received your
24  response.
25  Do you see that?

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                                          Fax: 314.644.1334

1  A  It was not my response.  It's the response
2  of the Gateway Transportation Center and the direct
3  supervisor's responsibility, yes.
4    Q  Well, he sent something to you and he's
5  saying we haven't received your response.  He's
6  talking to you; right?
7    A  Again, the response should come from the
8  immediate supervisor of that area.
9    Q  Well, did you tell Dr. Ikpeama that?
10   A  I'm not sure.
11   Q  Did you talk to Dr. Ikpeama at all?
12   A  I'm sure I did, since he was right down
13  the hall, but I can't say that I can specifically
14  remember a conversation.
15   Q  All right.  He says, If we do not receive
16  your response by February 26, 2018, we will re-issue
17  the report as repeat findings.  Do we see that?
18   A  I do.
19   Q  Then he says, Thanks for your cooperation;
20  right?
21   A  Okay.
22   Q  Right?
23   A  Yeah.
24   Q  All right.  And is that a good thing for
25  him to have repeat findings two years later?

1  A  Well, normally it's not a good thing, but
2  I can assure you that it's not the first time that's
3  happened --
4    Q  All right.
5    A  -- in any -- in other departments as well.
6    Q  All right.  Well, actually, it's 2015, so
7  we're three years down the road.  And he's following
8  up -- who is responsible for the original follow-up
9  of the original 2015 finding?  Was that your
10  responsibility?
11   A  No.  It would have been the manager in
12  charge.  It would have been Ms. Jones.
13   Q  And Ms. Jones reported to you?
14   A  She did.
15   Q  All right.  So ultimately it was your
16  responsibility, because you supervise Ms. Jones;
17  correct?
18   A  I supervise Ms. Jones, yes.
19   Q  All right.  And when we're talking about
20  curing deficiencies, in this case money owed to the
21  City, isn't it important to get that taken care of
22  as quickly as you can to get that money, that
23  taxpayer money in for the City?
24   A  I think it's important that internal
25  audit -- if they make an exception, an audit

1  exception, that it be properly vetted to ensure that
2  what their conclusion is is correct.
3    Q  Exactly.  But whatever the issue is in an
4  audit finding, isn't it important to work as quickly
5  as possible to get it resolved one way or the other
6  to get the books straight?  Isn't that what
7  accountants do?
8    A  As quickly as possible is the preferred
9  method, yes.
10   Q  I'm sorry?
11   A  As quickly as possible is the preferred
12  method, yes.
13   Q  All right.  And you think three years to
14  try to correct audit findings is quick, in your
15  view?
16   A  No, that's when the follow-up was made.
17  I'm not sure that in the transition between the
18  prior manager and the current manager, that this
19  transcended to -- the next person was even aware of
20  it.
21   Q  Okay.  Well, now, as of February 20, 2018,
22  both you and Ms. Day were aware of it; correct?
23   A  Uh-huh.
24   Q  All right.  And did you have discussions
25  with Ms. Day about getting this taken care of

1  properly?
2    A  Is there anything that speaks to that?
3  I -- I don't recall.  I -- I'm sure I did.
4    Q  But you don't recall as you sit here
5  today; is that right?
6    A  Well, okay.  The next page, it says --
7  speaks to that.
8    Q  Okay.  Let's read the next page.  This is
9  an e-mail from Sonia Day, who reported to you, dated
10  February 28, 2018 at 4:28 p.m.; correct?
11   A  Yes.  It's to Ishmael.
12   Q  And you're copied on it; correct?
13   A  Yes.
14   Q  All right.  And she says, Good afternoon.
15  Jim and I have been in conference regarding this
16  issue.  I have only been in this position since
17  November 2017.  For the prior -- for the -- for
18  about 13 months prior, the position was vacant.  Our
19  plan is to go back to the time of the audit and
20  conduct a comprehensive analysis of the payments
21  made during that period.  We will meet with the
22  lessee to discuss any shortages and a plan to
23  recover any monies due to the City of St. Louis.
24  That's what you and Ms. Day discussed;
25  correct?

## Page 309

1  A  Yes.
2  Q  And you were responsible for making sure
3  that that was taken care of, because you were the
4  supervisor for Ms. Day; right?
5  A  That's right.
6  Q  And you talked to Ms. Day about it --
7  right --
8  A  Well, that's --
9  Q  -- according to this?
10  A  That's what it says, yes.
11  Q  All right.  Then the next page.  We're on,
12  now, February 27, 2018 at 12:41 p.m.  Audit
13  follow-up from Dr. Ikpeama to Sonia.  It says
14  Ms. Day, please see attached, a follow-up report.
15  There is only one finding to respond to.  The letter
16  dated February 1, 2018 explains what you can do.  If
17  you can have -- if you still have any concerns,
18  please call me.  And then it says, Jim has not taken
19  care of this follow-up and request as he told you.
20     Is that true that you told her --
21  A  As he --
22  Q  -- that you told her that you had taken
23  care of the request for a follow-up report?
24  A  I'm not sure what this is referring to.  I
25  don't know what -- what follow-up report he's

## Page 310

1  referring to.
2  Q  Well, it's the follow-up report that we've
3  been talking about for the last few minutes; right?
4  It's the follow-up for the Gateway project; right?
5  That's what we're talking about.  Isn't that right?
6  A  There is a comprehensive report that I
7  completed with Ms. Day that I don't see attached
8  here --
9  Q  Okay.
10  A  -- that basically the finding in the
11  report and my response is that the entire premise
12  under which the revenue review was done is
13  incorrect.
14  Q  Okay.
15  A  I don't see that here.
16  Q  All right.  But what he says -- first of
17  all, what was your relationship with Dr. Ikpeama?
18  Did you have a good relationship with him?
19  A  Very good.
20  Q  All right.  And you and he both worked
21  together?  You were both accountant types --
22  A  Absolutely.
23  Q  -- and that sort of thing?  You-all spoke
24  accountant language --
25  A  Absolutely.

## Page 311

1  Q  -- and all that sort of business; correct?
2  All right.  And he says -- and at the time, you were
3  his boss; right?
4  A  I'm not sure at this point in time.  It
5  may be the case.  I'm not sure.
6  Q  All right.  We're talking February 27,
7  2018.
8  A  It's possible, yeah.
9  Q  All right.
10  A  I don't remember the -- as I said before,
11  I don't remember the exact time frame under which I
12  had internal audit supervision responsibility.
13  Q  And to your knowledge, does Dr. Ikpeama
14  have any ax to grind with you?
15  A  No, none at all.
16  Q  None at all; right?
17  A  No.
18  Q  He says, quote, Jim has taken care of this
19  follow-up report -- oh, I'm sorry.  Jim has not
20  taken care of this follow-up report and requests as
21  he told you.  He has not said a word to me about it.
22  A  Okay.
23  Q  I can work with you to resolve the
24  problem.  Call me if you need help.  Thanks.  So --
25  A  The point --

## Page 312

1  Q  -- he's right down the -- hold on.  He's
2  right down the hall.  You haven't said a word to
3  him.  You haven't responded to him via e-mail.  You
4  had a relationship with him.  You're fellow
5  accountants.
6  A  Uh-huh.
7  Q  Did you tell him that, hey, this is not
8  me, this is Sandra -- Sonia Day, she's going to
9  handle it, or did you communicate any of that to
10  him?
11  A  I believe we did, but yet for some reason
12  he didn't go to Sonia for the information.  But what
13  I'm -- what I'm looking for is my reconciliation
14  report that basically tells the story that internal
15  audit's basic premise for their -- for their revenue
16  review and their contention that there is money to
17  be collected is incorrect.  My -- I -- I have a
18  response out there that is not part of this.
19  Q  Okay.  Fair enough.  Let's go to the next
20  page.  February 28, 2018, 10:51 a.m.  Sonia Day to
21  Dr. Ikpeama, Ms. Day, thanks for your response.  It
22  is very helpful to me.  I can issue the report and
23  just indicate that Gateway Transportation is working
24  to resolve the findings.
25     So he's trying to work with Ms. Day to get

## Page 313

1    this resolved; correct?
2    A   Yep.  And that's fair.
3    Q   All right.  Fair.  However, if it will not
4    take you too long to resolve the problem with the
5    lessee, I can wait.  Once you resolve the problem
6    with the lessee, just send me a copy of what you
7    did, the agreements reached, I will incorporate your
8    response and issue a clean audit report.  Again,
9    thanks for your cooperation.  Correct?
10    A   Uh-huh.
11    Q   Is that a yes?
12    A   Yes.  That's what it says.
13    Q   And what's a clean audit -- a clean
14    report?  When he -- when he's referencing clean
15    report, what does he mean?
16    A   That he finds that any of the, I guess,
17    observations have been addressed.
18    Q   Right.  And so when you say a clean
19    report, that's a good thing.  You want to see a
20    clean report.  Isn't that right?
21    A   That's right.
22    Q   All right.  And let's go to the next page.
23    Now we're into March.  Friday, March 2nd, 2018,
24    11:04 a.m.  E-mail from Sonia Day to Ishmael
25    Ikpeama, cc James Garavaglia.  He says, Good

## Page 314

1    morning.  I have sent an e-mail to the lessee, Arch
2    City Deli, requesting some information that will
3    help to investigate the findings of the audit.  An
4    explanation will be provided based on the
5    cooperation and timeliness of the lessee.  I have
6    given them a deadline of March 16, 2018.  I hope to
7    have a resolution within approximately 30 days;
8    right?
9    A   Okay.
10    Q   Is that right?
11    A   She's doing what she should do, yes.
12    Q   That's right.  Then we go to the next
13    e-mail, where he responds on March 2nd, 2018 at
14    1:33 p.m., Thanks, Ms. Day.  As soon as you get
15    something from them, let me know.
16    Do you see that?
17    A   Uh-huh.
18    Q   Is that a yes?
19    A   Yes.
20    Q   All right.  And then we go to the next
21    page.  And just for the record, this is GRN000043 --
22    I'm sorry -- 483.  This is from Ms. Day to
23    Mr. Ikpeama, cc'd to you.  It says, Good afternoon.
24    March 23rd, 2018, 1:18 p.m., it says, quote, We have
25    reached -- we have received some information.

## Page 315

1    However, we've had to go back and ask for some data
2    that wasn't in the original e-mail.  Information
3    that I'm requesting shall be provided and supportive
4    documents in response to the findings that you
5    originally sent to Mr. Garavaglia, and then it has
6    the project number; correct?
7    A   Okay.
8    Q   Is that right?
9    A   Yeah.
10    Q   All right.  Let's go through the next
11    page.  March 23rd, 2018, 3:11 p.m., Dr. Ikpeama
12    responds to Sonia and says, When can I come over to
13    your office to see what you have?  What of Monday
14    March 26, 2018 at 11 a.m.?
15    He wants to see -- this is what auditors
16    do.  They want to see the proof in the pudding;
17    right?
18    A   Yes.
19    Q   All right.  So he's asking, can I come
20    over and review at least what you've got?  That's
21    what he's doing here; correct?
22    A   Okay.
23    Q   Is that right?
24    A   Yes.
25    Q   All right.  And let's go to the next page.

## Page 316

1    Green 485, e-mail from Sonia Day dated March --
2    e-mail from Sonia Day to Dr. Ikpeama -- and you're a
3    cc -- it says Monday, March 26, 2018, 7:26 a.m.,
4    Good morning.  She says, I am -- I am unable to
5    meet; however, I will forward the information that I
6    am requesting and its supporting documentation to
7    the findings that you originally sent to
8    Mr. Garavaglia as soon as it is available.
9    That's what she's communicating; correct?
10    A   Okay.
11    Q   Is that right?
12    A   Yeah.
13    Q   Did you ever get involved in communicating
14    with Dr. Ikpeama to figure out what was taking so
15    long to get this issue squared away?
16    A   Yeah, I don't know.  We -- our lessee, I
17    guess, was less than forthcoming with the
18    information.  Again, you know, it wasn't for lack of
19    wanting to comply.  It was -- we had trouble getting
20    the information.  And if we had that report -- I
21    actually did a report reconciling the revenue myself
22    and, unfortunately, it proved the premise of the
23    internal audit's report to be totally incorrect.
24    Q   Okay.
25    A   Now, I don't know where that is, but --

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334

## Page 317

1    Q   All right.
2    A   -- it needs to -- it needs to be part of
3 this if this is an issue.
4    Q   All right.  Let's go to GRN -- the next
5 page, GRN000487.
6    A   Okay.
7    Q   And it appears to be a memo from
8 Dr. Ikpeama to the file dated March 28, 2018
9 regarding Gateway Transportation audit; correct?
10   A   Yes.
11   Q   He says, quote, Today I called Sonia Day
12 to see if I can come over to her office and help
13 pull the reports I need to complete my follow-up
14 review.  She was not there.  I left a message to
15 call me back.  She called back.  I thanked her.  I
16 asked her if she had the documents for me.  She told
17 me she spoke with the lady -- no name -- at Arch
18 City Deli this morning.  She still does not have
19 anything for me.  She reminded me that in her e-mail
20 dated March 2nd, 2018, she had asked for 30 days.
21 During this discussion, Ms. Day said, quote, I don't
22 know the problem between you and Jim.  I can't be
23 involved.  Jim is my boss, unquote.
24       Do you know what she meant by that?
25   A   No.  I have no idea.  There was no problem

## Page 318

1 between me and Ishmael.
2    Q   But do you know why Ms. Day would have
3 believed there was a problem between you and
4 Dr. Ikpeama?
5    A   No, but if you read the next sentence,
6 what does it say?
7    Q   He says, I told Ms. Day that there is
8 nothing between Jim and I.
9    A   That's right.
10   Q   I told her that I had sent the letter to
11 Jim on February 2nd, 2018.  He has not responded
12 to -- he has not responded as we speak.  However, I
13 need to complete the follow-up review, because
14 today, March 28, 2018, is the due date for
15 completing the audit; right?
16   A   Okay.
17   Q   That's what --
18   A   That's what he says.
19   Q   -- your --
20   A   That -- that's what he says.  I don't
21 know.
22   Q   Your -- your colleague --
23   A   And I -- I respect --
24   Q   -- who reported -- let me finish.
25   A   And I respect the fact --

## Page 319

1    Q   Let me finish.  Let me finish.  Let me
2 finish.
3    A   Okay.
4    Q   This is what your colleague documented in
5 this file as it relates to this audit that he needs
6 to complete the finding, but you're not helping
7 complete the finding.  That's what he's saying;
8 right?
9    A   All I can tell you is this:  As you can
10 see, efforts -- every effort was made to get the
11 information necessary to complete the proper
12 analysis and response.  There was problems getting
13 that information from the lessee eventually, I
14 recall, because I couldn't believe the analysis that
15 I was able to perform after the fact.  After this
16 stuff here was -- was put out, that the whole basis
17 under which the revenue review finding was made was
18 incorrect.  Now, you know, if you can find -- there
19 is a response and the analysis was done.
20   Q   When did you do all of that?  Was it after
21 this memo?
22   A   After this, yeah --
23   Q   Okay.
24   A   -- when we finally got the information
25 out.  If you can find that, it's -- it's -- it

## Page 320

1 exists somewhere in internal audit.  Because it was
2 never mentioned again after I responded back to
3 internal audit.  The whole matter politely and
4 quietly went away.
5       Now, there was best efforts made on behalf
6 of my employee to get the information necessary.
7 That person is not on par with an internal auditor
8 in terms of knowing accounting.
9    Q   Right.  Right.  Because you and --
10   A   So the -- the analysis -- the analysis
11 when the information was available was always going
12 to be done by me.  Maybe that's why he was coming to
13 me and not her --
14   Q   Right.
15   A   -- but it was her -- it was her primary
16 responsibility, and I believe that she did
17 everything that she could to get the information,
18 which eventually we did get.
19   Q   But the analysis was -- was going to be
20 done by you?  That was doing to be your response;
21 right?
22   A   And it was done.
23   Q   Ultimately, some four years later, three
24 years later?
25   A   No, no, no, no, no, no.

## Page 321

1     Q   Well, the original findings were in '14;
2 correct? Or '15? '15.
3     A   This is -- this is an analysis to comply
4 with this audit.
5     Q   This was the follow-up to the audit;
6 correct?
7     A   Right.
8     Q   Right.
9     A   He was asking for an analysis to be
10 performed. He -- he had a conclusion in his
11 follow-up audit that we needed to verify, and in
12 order for us to respond to it, we needed to get the
13 information that was hard to get.
14     Q   But this is three years after the finding;
15 right?
16     A   It's totally separate. And as you saw in
17 her e-mail, we went from one supervisor and then no
18 one for 13 months, and then the new lady comes in
19 seven months later -- you know, six months later,
20 when he -- or 90 days after he starts wanting to
21 perform this.
22     So to be fair, a supervisor left. The
23 position was vacant for 13 months. She's there four
24 months. He -- he does an audit finding and says,
25 hey, you guys are -- are -- are deficient in this

## Page 322

1 area. Well, if you want to go back and say who
2 should have instituted the proper remedy, it would
3 have been Ms. Jones, and evidently she didn't.
4     Q   And she reported to you?
5     A   Yes, she did.
6     Q   And it was your responsibility to make
7 sure that if somebody -- if there's some gap --
8     A   In the table of organization, she reported
9 to me, yes.
10     Q   All right. And you were her boss and you
11 had the responsibility to make sure the job got
12 done.
13     A   And once --
14     Q   That was your job?
15     A   And once -- and once that responsibility
16 was assigned to her to complete, in good faith, I
17 presume that it had gotten done.
18     Q   And you knew -- well, you knew she was
19 gone for some period of time and the position was
20 vacant; right?
21     A   But it was in the time that she was still
22 gainfully employed for a period of time after that.
23     Q   And you never followed up with her to make
24 sure that these outstanding audit findings are taken
25 care of; is that right?

## Page 323

1     A   I don't remember if I did or I didn't, to
2 be honest.
3     Q   All right. Let's go to the next page,
4 which is GRN 488, which is an e-mail dated
5 Wednesday, April 4, 2018, 4:57 p.m. from Dr. Ikpeama
6 to you and to Sonia Day. And it says Gateway
7 Transportation follow-up review request; right?
8 Correct?
9     A   Yep.
10     Q   It says -- it's addressed to you, Jim -- I
11 mean, Mr. Garavaglia, the internal audit section is
12 making another request from you for some documents
13 in order to complete our follow-up review; right?
14     A   That's what it says.
15     Q   Right. So here we are, we talked
16 February, March. We're in April now, which is some
17 three years after the original audit findings, where
18 he is still trying to get this information from you;
19 correct?
20     A   He's sending it to me because it's still
21 not come in.
22     Q   Well, he knows that she reports to you;
23 correct?
24     A   He does.
25     Q   She knows -- he knows that you are the one

## Page 324

1 who needs to make this happen, which is why he's
2 reaching out to you; right?
3     A   And how would I make it happen any faster
4 than what she could do?
5     Q   Well, I mean, that's the question.
6     A   That's the question.
7     Q   It was your responsibility; right --
8     A   No.
9     Q   -- at the end of the day?
10     A   No.
11     Q   It was Ms. Day's responsibility?
12     A   Yes. It's her primary -- she's the
13 manager of the Gateway Transportation Center. I was
14 going to assist her -- because she is not an
15 accountant -- in performing the follow-up analysis
16 to verify that Mr. Ikpeama was correct, and he was
17 not correct.
18     Q   All right. And so as of this day,
19 April 4, 2018, he ends by saying -- well, let's go
20 back. Let's go to the middle. He says, No. Also,
21 there were two finding in the report dated
22 October 19, 2015. Respond as to the status of these
23 findings. See management's response.
24     Did you respond as to the status of those
25 findings in 2015?

Page 325

1    A  Is it in the record?
2    Q  I don't know.  I mean, do you recall it?
3    A  No.
4    Q  All right.  And it says -- he ends by
5  saying, This project has been delayed for over two
6  months.  Kindly provide these documents and your
7  response to us by April 10, 2018.  If you have any
8  questions, please let me know.  Thank you for your
9  cooperation.
10       Did you ever reach out to Dr. Ikpeama in
11  response to this e-mail?
12    A  I don't know.
13    Q  Okay.  Let's go to tab 20.  Green -- or
14  GRN000489 through -- well, let's stay with 489
15  through 490.  This is an Addendum to a Master
16  Agreement AT&T Equipment Solutions, Voice CPE
17  Support Services; correct?
18    A  Okay.
19    Q  Is that right?
20    A  Yep.
21    Q  And it looks like, if we go to this next
22  page, page 490, it's signed by the Comptroller;
23  correct?
24    A  Yes.
25    Q  And it has a document number; correct?

Page 326

1    A  It does.
2    Q  And go to the next page, 491, approve as
3  to form and signed by the registrar; correct?
4    A  Yep.
5    Q  And that's the process for making sure
6  that contracts that are binding on the City are
7  entered into the system so that they can be properly
8  paid; correct?
9    A  Yes.
10    Q  And so that there is proper evidence of an
11  officially executed contract; correct?
12    A  Uh-huh.
13    Q  If you go to page 498 -- and you actually
14  send a letter to E&A requesting the document to be
15  placed on E&A for approval; right?
16    A  Yep.
17    Q  And that's the process you had described
18  earlier; is that right?
19    A  That's correct.
20    Q  All right.  We'll go to the next page, the
21  AT&T document.  Statement of Work is the name of
22  this document; correct?
23    A  Yes.
24    Q  And this is another document dated -- it's
25  dated -- approved, it looks like, 8/26/16 signed by

Page 327

1  Darlene Green, signed by the City as to form; right?
2    A  Uh-huh.
3    Q  Let's go to 22.  This is an Addendum to a
4  Service Order Contract signed by the Comptroller and
5  the City as to form and the registrar, with a
6  contract number; correct?
7    A  Yes, it is.
8    Q  All right.
9       MR. NORWOOD:  We have a few minutes more.
10  Let's take a break and -- and we're going to
11  wrap it up shorter.  How much time?
12       THE VIDEOGRAPHER:  About 30 minutes.
13       MR. NORWOOD:  I'm sorry?
14       THE VIDEOGRAPHER:  About 30 minutes.
15       MR. NORWOOD:  I can't hear you.
16       THE VIDEOGRAPHER:  About 30 minutes.
17       MR. NORWOOD:  30 minutes.  Okay.  Let's
18  take a quick recess and we're going to wrap
19  this up.
20       THE VIDEOGRAPHER:  This is the
21  videographer.  We're going off the record.  The
22  time now is 5:59.
23       (Off the record at 5:59 p.m.)
24       (On the record at 6:14 p.m.)
25       THE VIDEOGRAPHER:  This is the

Page 328

1  videographer.  We're back on the record.  The
2  time now is 6:14.
3    Q  (By Mr. Norwood)  Okay.  Mr. Garavaglia,
4  we're in the home stretch.  How much have you paid
5  to your attorneys to date?
6    A  I honestly don't know.  How much have I
7  paid them thus far?
8    Q  Ballpark.  Ballpark.
9    A  Oh, a little over 20,000.
10    Q  Okay.  How much is outstanding, do you
11  know?
12    A  No, I -- I actually don't, especially --
13  and I think this month has -- has been a busy month,
14  so I'm not sure.
15    Q  Okay.  Do you know if the Civil Service
16  Commission approved the Comptroller's recommendation
17  for discipline, whatever that turned out to be,
18  would you have lost your retirement benefits?
19    A  Not that I'm aware.
20    Q  All right.  Do you have a financial
21  advisor?
22    A  Yes.
23    Q  Who is your financial advisor?
24    A  I think we use Stifel.  No, not Stifel.
25  We use -- of course if you were to name a few of

Page 329

1  them, I would -- I would be able to tell you.  I'm
2  drawing a blank.  But the answer to your question is
3  yes.
4      Q   All right.  How long have you had that
5  particular financial advisor?
6      A   I think that it helped us plan for our
7  kids' college, so quite some time.
8      Q   All right.  And -- but you can't recall
9  who -- do you got any names of people you've dealt
10  with?
11     A   I -- if it's -- if it's -- if it's
12  necessary that I get that to you, I can get it to
13  you, I just don't have it right now.
14     Q   Now, you talked about being depressed.
15  Have you ever been diagnosed as suffering from
16  depression?
17     A   No.
18     Q   Have you ever been treated for depression?
19     A   No.
20     Q   Ever?
21     A   No.
22     Q   How is your health, generally?
23     A   Well, generally, I -- I believe it's --
24  it's good.  I -- I see a doctor twice a year.  I
25  would consider my general health good.

Page 330

1      Q   Well, let's take a look at deposition
2  Exhibit 23.  And it relates to Garavaglia 581 through, well,
3  documents relating to Garavaglia 581 through, well,
4  628.  Those documents, just to expedite it, it looks
5  like there's some W-2s that you received from the
6  employee retirement system.  Actually, that's a Form
7  1099-R.  And then you've got a W-2 from the City of
8  St. Louis; is that right?
9      A   It looks as if, yes.
10     Q   All right.  Next page, 582, Form SS-1099.
11  That's based upon your receipt of Social Security
12  disability income; is that correct?
13     A   No.  This is not disability.
14     Q   I'm sorry.  What is it for?
15     A   It's actually --
16     Q   Social Security benefit?
17     A   It's a portion of my wife's Social
18  Security that I am able to draw without penalty
19  prior to drawing my full Social Security at age 70.
20     Q   Got it.  Then the next page is a Form
21  1099-R with respect to distribution of pensions.
22  That relates to the distributions you started
23  receiving once you retired from the City; is that
24  right?
25     A   Yes.

Page 331

1      Q   The next page, 589, it looks like, Wage
2  and Tax Statement for 2020; is that right?
3      A   Okay.
4      Q   Is that right?
5      A   589, yes.  Okay.
6      Q   During that 2020, how much in income did
7  you receive from your current employment?
8      A   This particular -- let's see.  Let's look
9  at this.  The portion I received as a result of the
10  work with MMJ Consulting would have been nine
11  months, at $1,000 a month.
12     Q   Okay.  Let's look at 598.  What is that?
13  The document says Profit and Loss From Business, and
14  it identifies Deborah Garavaglia.
15     A   Okay.  Yes.  My -- my wife has a jewelry
16  design business where you can see it's called
17  Absolute Treasures.
18     Q   Okay.  Then if we go down a couple pages,
19  it looks like there's a Profit and Loss Statement
20  for MMJ Consulting.
21     A   Okay.  Yep.
22     Q   Is that right?
23     A   Yes.
24     Q   And how much income did you make with MMJ
25  Consulting for 2020?

Page 332

1      A   Considering that the contract or the --
2  the -- the engagement with our customer I think
3  began in March or April, so I -- as I said just
4  previously, if it started in March, I received
5  10,000.  If it started in April, I would have
6  received 9,000 for the year 2020.
7      Q   Okay.  Let's go to Exhibit 24.  What is
8  Exhibit 24?
9      A   Exhibit 24 is a statement, obviously, of
10  the DROP plan for the beginning -- or -- I'm
11  sorry -- for 2021.
12     Q   All right.  Just for the record,
13  Exhibit 24 is a group exhibit, STL001373 through
14  STL001408, the first page of which, 1373, is the
15  DROP statement you talked about; correct?
16     A   Yes.
17     Q   What is a DROP statement?
18     A   This is a once a year -- I'm sorry -- once
19  a quarter, the City of St. Louis Retirement System
20  sends us an accounting of the balance in our -- in
21  our DROP account.
22     Q   Your retirement account with the employees
23  retirement system?
24     A   No, no.  This is -- this is actually --
25  when you reach the rule of 85 and if you keep

Page 333

1 working, you're allowed to get into the DROP. And
2 what that means is, is that at the time that you
3 enter into the program, which is when you achieve
4 the rule of 85, that you can begin to defer your
5 pension on an account that is set aside for you
6 and for a period of time until you actually retire.
7 And the maximum is five years, and you can
8 accumulate five years of revenue of pension payments
9 into the account.
10      And then if you work two more years, that
11 money is then -- I guess there's treatment whereby
12 you then get your pension revised based on your
13 salary at the end of seven years after you started
14 the DROP. So at the time you retire, however many
15 years you were in it, you then can start drawing
16 that money, and you have an option of taking the
17 money all at once, over 5 years, or over 10 years.
18      Q   What does DROP stand for, do you know?
19      A   I don't.
20      Q   All right. So 1373, 1374, 1375, those are
21 DROP statements you talked about; correct?
22      A   Yes.
23      Q   All right. Let's go to 1376. What is
24 the -- I'm sorry. Yeah, 1376. What is that?
25      A   Let's see.

Page 334

1      Q   Well, just to expedite it, does this
2 relate to your request for -- to retire and begin
3 obtaining pension payments?
4      A   Give me a second. Let me read this,
5 please.
6      Q   Yep. Go right ahead.
7      A   Okay. Yes. This is the calculation of my
8 final pension, what it would be as of the date I
9 retired.
10      Q   Okay. And that payment -- monthly payment
11 allowance is $4,638.20; is that correct?
12      A   Yes.
13      Q   And that's on top of the DROP money you
14 had identified?
15      A   That's correct.
16      Q   All right. Let's go to 1378. What is
17 that?
18      A   I think what we have here is me directing
19 what were to happen with my pension should I pass
20 away before my wife.
21      Q   Okay. The next page, what is that? Well,
22 the next --
23      A   This -- this gives you the options.
24      Q   Okay.
25      A   The next page gives you the options you

Page 335

1 can choose.
2      Q   Okay. 1380, what is that?
3      A   This is the election page where I had to
4 let them -- the City -- know over how long a period
5 I wanted to receive my DROP money.
6      Q   And you chose --
7      A   10 years.
8      Q   -- 10 years at $1,866.21 a month; correct?
9      A   That's correct.
10      Q   All right. And do you -- do you -- are
11 you currently receiving Social Security?
12      A   Just the amount that is the proportionate
13 share allowable of my wife's.
14      Q   Does MMJ Consulting have a website or
15 anything?
16      A   No, it does not.
17      Q   And how many clients does it have?
18      A   We have one paying client and one pro bono
19 client.
20      Q   Any other clients beyond those two?
21      A   No.
22      Q   Who is the pro bono client?
23      A   The law office where my wife works.
24      Q   Which law office is that?
25      A   It's called James Knappenberger, LLP.

Page 336

1 It's in Clayton.
2      Q   How long has she worked for James
3 Knappenberger?
4      A   Over 30 years.
5      Q   All right. Let's go back to 1382 as part
6 of Exhibit 24. What is 1382?
7      A   It looks like my application for pension
8 to the retirement system.
9      Q   Application for Retirement Benefits;
10 correct?
11      A   Yes.
12      Q   All right. You signed that on
13 September 18, 2019; correct?
14      A   Yes.
15      Q   You made the election to obtain those
16 retirement benefits; correct?
17      A   Yes.
18      Q   And on page 1383, it shows that during the
19 period of time from 10/1/17 through 12/23/17, your
20 compensation was 29,640? Is that accurate? Well,
21 for that two-month period, it looks like; right?
22      A   Well, you have to remember that --
23      Q   Three-month period.
24      A   -- in that time frame, from the City, I
25 was probably being paid accrued vacation, I was

Page 337

1    probably being paid a portion of sick leave, so I --
2    I'm not -- they're not wages.  That time frame from
3    10/1, obviously, until 12/23 -- oh, wait.  '17
4    they're not wages.  They're distributions of -- it's
5    probably -- it's not vacation.  It's probably sick
6    leave.  That looks like it's probably sick leave
7    that I elected to receive over a period of time.
8        Q    All right.  Now, what are you claiming as
9    damages in this case, if I might ask?
10       A    I don't understand the question.
11       Q    Well, in this lawsuit, you are suing my
12   client, Comptroller Darlene Green, and the City of
13   St. Louis to recover money; right?
14       A    I see.  Yeah.  The -- you're talking about
15   lost wages?  Because I had testified earlier how
16   long I intended to work.
17       Q    Is that -- yeah.  You have an expert, I
18   believe you retained, that did some calculation?
19       A    That's correct.
20       Q    And you've worked with your expert with
21   respect to those calculations?
22       A    Yes, sir.
23       Q    How long do those calculations show you
24   working based upon what your expert has put
25   together?

Page 338

1        A    I haven't seen those.
2        Q    You have not seen it?
3        A    No, I have not.
4        Q    If it shows you working through age 80, is
5    that a fair thing?  Were you planning to be working
6    through age 80?
7        A    I haven't made that determination.
8        Q    Okay.  So how long are you planning to
9    work?
10       A    I couldn't tell you.  It depends on -- as
11   I said earlier today, it depends on my health and my
12   family's wish to me to continue or not continue.
13       Q    How long can you work and continue to draw
14   your pension?
15       A    My pension?  As long as I'm alive.
16       Q    So is there any restriction on how much
17   you can work in order to continue to draw your
18   pension?
19       A    I don't think so.
20       Q    Okay.  All right.  So lost wages -- what
21   other damages are you seeking other than lost wages?
22       A    I'd like to have my personal reputation
23   restored.
24       Q    Okay.  And -- and how much are you seeking
25   to restore your personal reputation?

Page 339

1        A    I don't know that I've put a number on it.
2        Q    Okay.  All right.  Have you ever sought
3    treatment for any substance or alcohol dependency?
4        A    No, sir.
5        Q    The Missouri Municipal -- the Municipal
6    Finance Corporation Board, what is that?
7        A    That is the entity which the City uses to
8    sell bonds.
9        Q    Okay.  And somewhere in the documents we
10   saw some reference to you losing your position as
11   President of the Municipal Finance Corporation
12   Board; is that correct?
13       A    I was replaced when I was walked out.
14       Q    Okay.  Was it a pre-condition for you to
15   be on that Board being an employee of the City of
16   St. Louis?
17       A    I don't know.  I presume it would be.
18       Q    I'm sorry?
19       A    I don't know that, but I presume that it
20   would be.
21       Q    Well, how were you removed as President,
22   as best you can recall?
23       A    I wasn't there.  I don't know.
24       Q    So --
25       A    I don't know what the process that was --

Page 340

1        Q    Did you receive a communication saying
2    you're no longer President or anything like that?
3        A    Not that I recall.
4        Q    Did you ever show up for any meetings
5    after you were --
6        A    No.
7        Q    -- walked out, as you say?
8        A    (No audible response.)
9        Q    You agree, do you not, that if an
10   individual with access to sensitive financial
11   information is accused of impropriety, that it would
12   be prudent to remove that individual from the work
13   environment until that issue was resolved?  You'll
14   agree to that, wouldn't you?
15            MR. SCHMITZ:  I'd just object.  It calls
16   for speculation.  Go ahead.
17       A    I don't know what you're talking about
18   what is sensitive information -- sensitive financial
19   information.
20       Q    (By Mr. Norwood)  Well, sensitive
21   financial information of the City.  You believe it's
22   prudent to have an employee who is under
23   investigation in the office having access to
24   sensitive financial information of the City?
25       A    Well, again, much of the City's

85 (Pages 337 to 340)

## Page 341

1  information is available on -- on the website.  The
2  budget is out there.  Their annual report is out
3  there.  You can get just about any information you
4  want, including salaries of individuals from public
5  access.
6      Q   But all information isn't public; correct?
7      A   Well, I'm not sure that -- that it is, no.
8      Q   Right.  Because there's certain things in
9  the works that the City wants to keep under wraps
10 until it becomes public; right?
11     A   You mean like development projects --
12     Q   Yes.
13     A   -- or something like that?  Well, those
14 are all subject to attorney/client privilege anyway.
15     Q   Exactly.  And that's sensitive financial
16 information, too, right, what's going on with
17 respect to the City working with its counselor,
18 things of that sort?
19     A   I think that it would be, yes.
20     Q   All right.  So I guess my question --
21 simple question to you is:  Do you think it's
22 prudent to have an individual who is subject to
23 investigation in the job and access -- with access
24 to that information if they're under investigation?
25 Do you think that's prudent?

## Page 342

1      MR. SCHMITZ:  Same objection.
2      A   I think it's -- it's going to be, I guess,
3  bound by was the reason that the person is under
4  investigation contrived or was it real.
5      Q   (By Mr. Norwood)  All right.  Let's assume
6  it was real or believed to be real.  Do you think
7  it's prudent --
8      A   Well, that -- that's two different things,
9  is it believed to be real and it's not, or is it
10 real.
11     Q   Well, until you do your investigation, you
12 don't know if it's real or not; right?
13     A   Well, then, in my case, you shouldn't have
14 put somebody out the door unless you knew for sure
15 what was going on.
16     Q   Okay.  So your standard, then, that an
17 individual subject to investigation, unless you know
18 for sure that they have committed fiscal
19 irregularities, it's okay to have them in the office
20 and access the information?  Is that your testimony?
21     A   All I can tell you is that in my case, I
22 didn't do anything wrong and I was put on leave.
23     Q   I understand that.  But if an individual
24 had done something wrong, is it your view that it's
25 okay for those individuals to remain in the office?

## Page 343

1      A   If you have, you know, verifiable proof
2  that someone has done something that violates any of
3  the things we've talked about today and it's
4  provable and it's not speculation and it's not
5  conjecture and it's not some made-up, bogus
6  nonsense, then, yes, I agree with you.
7      Q   So in your view, all of this is made up,
8  bogus stuff?
9      A   It's untrue and has no shred of truth to
10 it.
11     Q   I'm sorry?
12     A   It's not -- there's not a shred of truth
13 to it, no.
14     Q   And so Judy Armstrong, in her memo, she
15 just made it up; is that right?
16     A   She's wrong.  You've heard me dispute most
17 of what she's put in there.
18     Q   Well, some of it you didn't dispute;
19 right?
20     A   I disputed almost all of it.
21     Q   But some of it you didn't dispute;
22 correct?
23     A   What didn't I dispute?
24     Q   Okay.  What about Ms. Chana -- Ms. Chana
25 Morton?  She had quite a bit of stuff in her

## Page 344

1  detailed memo.  Do you dispute all of that as well?
2      A   Yeah.  Who's -- just because she wrote it,
3  does that mean it's true?
4      Q   It doesn't mean it's true, but if a -- if
5  one of your subordinates provides you with a
6  detailed summary of what she perceived to be
7  problems, would you --
8      A   Well, that detailed summary was contrived
9  after the fact down to the minute of when things
10 came in and when things went out.  It looks -- it
11 looks pretty contrived to me.
12     Q   So you're saying Ms. Chana Morton
13 contrived that official investigative --
14     A   I can -- I could dispute --
15     Q   Let me finish.  Let me finish.
16     You're saying Ms. Chana Morton made up all
17 of that stuff she had in her memo?
18     A   I'm saying that I could argue that -- that
19 a lot of it is -- is incorrect.
20     Q   All right.  But you would -- are you
21 saying she intentionally put incorrect information
22 in that detailed summary?
23     A   I can't say what she did or didn't do, if
24 it was intentional or not, but what I'm saying is, I
25 dispute a lot of the information and believe that

86 (Pages 341 to 344)

Page 345

1    it's incorrect.
2        Q   And the same thing with the Judy Armstrong
3    memo?
4        A   Yes.
5        Q   All right.  Same thing with Dr. Ikpeama?
6        A   Dr. Ikpeama and I aren't in disagreement.
7    He was pressing for information that had not yet
8    been received.
9        Q   But he pointed you out and said Jim hasn't
10   responded.  He's right down the hall.
11       A   I thought we went over this already.
12       Q   I know.  But what we're talking about --
13   my point is this, you don't have any beef with
14   Dr. Ikpeama --
15       A   No.
16       Q   -- but apparently Dr. Ikpeama had issues,
17   because he was beating the drum about needing to get
18   the information to complete about an audit that you
19   agree is a proper thing?
20       A   Dr. Ikpeama was single focused on making
21   sure that he had something in the file that somehow
22   or other covered him in the event that his boss came
23   and said why don't you have this done.
24       Q   Well, you were his boss; right?
25       A   No, not necessarily.  I'm not sure of the

Page 346

1    time frames.
2        Q   All right.  If you were his boss, he would
3    be concerned about you coming to him because you're
4    not coming to him with the information he's trying
5    to get from you; is that right?
6        A   No.  That's double talk.  I wouldn't have
7    been -- I wouldn't have been concerned about that,
8    because he would know that I was in the process of
9    getting the information to do the report that he
10   needed.
11       Q   He was doing his job; is that right?
12       A   He was doing his job in covering his
13   wings, let's put it that way.
14       Q   Well, he was doing his job as an auditor
15   to document what he's required to do as part of a
16   follow-up with an audit finding; correct?
17       A   I presume that -- that he's doing what he
18   thought he needed to.
19       Q   All right.  And if you were his boss at
20   the time, that's pretty, you know, strong for him to
21   challenge his boss --
22       A   But that --
23       Q   Let me finish.  To challenge his boss to
24   get an internal audit done.  That's pretty, you
25   know, strong for someone who has to report to you if

Page 347

1    that were the case at that time; correct?
2        A   Deadlines --
3        MR. SCHMITZ:  I would -- hold on.  I would
4    object that this line of questioning is
5    argumentative and circular.
6        Q   (By Mr. Norwood)  Okay.  Subject to that.
7        A   The deadlines are self-imposed by either
8    him or his audit manager, that nothing -- nothing --
9    you know, the building doesn't fall down if it -- if
10   he doesn't have the information back from me at the
11   time that he says he needs to have it back by.  He
12   doesn't get fired.  He isn't disciplined.  It's a --
13   it's a self-imposed number in his -- in his Rolodex
14   that says I have to have this by then.  I didn't get
15   it.  I better check up.  I better get it.  When am I
16   going to get it?  Well, when the information was
17   provided.  The most important thing for me is to get
18   him an accurate answer --
19       Q   Right.
20       A   -- to satisfy his audit need for an audit
21   response that was accurate and not necessarily
22   timely, but I wanted to make sure it was accurate,
23   and we did that.
24       Q   But he was right down the hall.  Did you
25   talk to him about all of this stuff you just --

Page 348

1        A   I probably saw him every day.
2        Q   Right.  And did you talk to him and say,
3    Listen, I've got her working on it, we're going to
4    get it done, don't worry about it?  Do you recall
5    any conversations like that?
6        A   It doesn't matter what I said, he was
7    going to cover the file.  He was going to cover
8    himself by putting this in the file.
9        Q   But my question to you is, sir:  Did you
10   talk to him about it at all?
11       MR. SCHMITZ:  Objection.  Asked and
12   answered.  Go ahead.
13       A   I'm sure I did.
14       MR. NORWOOD:  Did I get my five-minute
15   warning?
16       THE VIDEOGRAPHER:  Yes.
17       MR. NORWOOD:  How much time do I got?
18   Five minutes.  Okay.  Let's take a two-minute
19   break.
20       Madam Comptroller, why don't you hang on
21   the line for one minute while we just chat for
22   a minute.  Well, let -- we'll call you back.
23       MS. GREEN:  All right.
24       THE VIDEOGRAPHER:  This is the
25   videographer.  We're going off the record.

87 (Pages 345 to 348)

Page 349

1    MR. NORWOOD: Okay.
2    THE VIDEOGRAPHER: The time now is 6:42.
3    (Off the record at 6:42 p.m.)
4    (On the record at 6:48 p.m.)
5    THE VIDEOGRAPHER: This is the
6    videographer. We're back on the record. The
7    time now is 6:48.
8    Q    (By Mr. Norwood) Let me hand you,
9    Mr. Garavaglia, a document that's been marked
10   Deposition Exhibit 31. I don't think we have a 31.
11   MR. NORWOOD: Is that right? I just want
12   to make sure. Maybe our court reporter can
13   tell us.
14   COURT REPORTER: No, we don't.
15   MR. NORWOOD: Okay.
16   COURT REPORTER: Just up to 30.
17   MR. NORWOOD: Thank you.
18   Q    (By Mr. Norwood) Let me hand you what's
19   been marked as Deposition Exhibit 31.
20   MR. NORWOOD: I'm sorry. That's my copy,
21   because I wrote on it. There you go.
22   Q    (By Mr. Norwood) What is that document?
23   A    It's an e-mail from me to the person who
24   is our contact at the retirement system.
25   Q    And what was the purpose of this document,

Page 350

1    an e-mail dated 5/4/2010 at 4:33?
2    A    Hold on a second. I am requesting
3    assistance in order to know the amount of
4    funding required to purchase enough service --
5    MR. SCHMITZ: Just to ask, was this
6    something that was disclosed prior to this in
7    discovery?
8    MR. NORWOOD: I believe it's in the
9    Personnel file.
10   MR. SCHMITZ: I don't -- I don't see the
11   Bates stamp. That's why I'm asking.
12   MR. NORWOOD: Yeah, we'll check on that.
13   A    Oh. At this point, I was lacking some
14   years or -- of service time to -- or age to get to
15   the rule of 85. And there is a provision that
16   allows you to buy in. If you're short a number of
17   years, that you can buy in to the DROP earlier than
18   later.
19   Q    (By Mr. Norwood) Uh-huh.
20   A    What I was doing here was investigating
21   from the standpoint of investments if I could buy
22   into the DROP, have the money in the DROP program be
23   set aside and escrowed earlier than -- than later,
24   and that way it would grow as kind of an extra bank
25   account while I was still working.

Page 351

1    Q    Okay. So were you thinking about
2    retirement in 2010?
3    A    No, no, no, no, no. It was strictly an
4    attempt for me to find ways to increase my potential
5    savings.
6    Q    All right. Other than the City's pension,
7    are you receiving any other pensions?
8    A    No, sir.
9    Q    Are you receiving other income other than
10   what you've identified here today?
11   A    No, sir, nothing other than what you've
12   seen.
13   Q    All right. Let's go to Exhibit 24,
14   page 1403. Have you seen that document before?
15   Well, let's skip through that one. Let's go to
16   STL1405, which is two pages down. And --
17   A    Okay.
18   Q    -- what is that?
19   A    It's my application for retirement.
20   Q    Is that your signature?
21   A    It is.
22   Q    Is that your handwriting?
23   A    Yes.
24   Q    All right. And you say I hereby -- this
25   is a form you submitted to the employee -- Employees

Page 352

1    Retirement System, City of St. Louis, and you say --
2    and you can read the form. You say, I hereby
3    officially apply for normal retirement effective
4    10/1/19. My last day on the payroll was/will be
5    9/30/19, and you sign this request on August 30th,
6    2019; correct?
7    A    Yes.
8    Q    All right. Do you believe that if a
9    Comptroller has reason to believe that there is
10   financial impropriety, that that -- that the
11   Comptroller should take steps to investigate to
12   determine if there is any truth to it?
13   MR. SCHMITZ: Objection. It calls for
14   speculation as to what another party in a job
15   he's never worked in would -- would or wouldn't
16   do.
17   Q    (By Mr. Norwood) Subject to that.
18   A    Could somebody restate that?
19   Q    Well, let's talk about you. When you were
20   Deputy Comptroller, if information came to light to
21   you indicating that someone you supervised was
22   engaged in financial impropriety, would it be
23   prudent for you to investigate to determine if
24   that -- if there was any truth to that?
25   A    Of course.

## Page 353

1      Q   And why do you say of course?

2      A   Because that would be the thing to do --

3  the right thing to do.  However --

4      Q   Did you -- let me ask you this:  Do you

5  feel that you would have had an obligation to do

6  that based upon your position as a Deputy

7  Comptroller if something like that came to light?

8      A   It depends on the nature of the

9  information that gave me rise to believe that

10  something was improper.

11      Q   Okay.  If it came from trusted sources,

12  would that make a difference to you?

13      A   I think there would have to be some

14  level -- hearsay from a trusted source is not

15  certainly sufficient, and certainly not sufficient

16  to put someone on leave.

17      Q   What about signed --

18      MR. SCHMITZ:  I believe we're out of time.

19  He just indicated so --

20      MR. NORWOOD:  Are we done?  All right.

21  Then I will honor, because I will enforce my

22  time as well.

23      So based on that, thank you,

24  Mr. Garavaglia.  We appreciate your time.

25      THE VIDEOGRAPHER:  Do you want him to read

## Page 354

1  and sign?

2      MR. SCHMITZ:  We're going to read.

3      THE VIDEOGRAPHER:  This ends -- this ends

4  the Video Recorded Deposition of James

5  Garavaglia.  We're going off the record.  The

6  time now is 6:54.

7      (Deposition concluded at 6:54 p.m.)

## Page 355

1                CERTIFICATE OF REPORTER

2

3      I, Julie Ann Whiting, Certified Court

4  Reporter within and for the State of Missouri

5  and Registered Professional Reporter, do hereby

6  certify that the witness whose testimony

7  appears in the foregoing deposition was duly

8  placed under oath by me; the testimony of said

9  witness was taken by me to the best of my

10  ability and thereafter reduced to typewriting

11  under my direction; that I am neither counsel

12  for, related to, nor employed by any of the

13  parties to the action in which this deposition

14  was taken, and further that I am not a relative

15  or employee of any attorney or counsel employed

16  by the parties thereto, nor financially or

17  otherwise interested in the outcome of the

18  action.

19

20

21      _____

22      Julie Ann Whiting, CCR 830, RPR

23      State of Missouri

## Page 356

1           ALARIS LITIGATION SERVICES

2  January 26, 2022

3  Uthoff, Graeber, Bobinette & Blanke
      Richard B. Blanke, Esq.

4  906 Olive Street, Suite 300
      St. Louis, Missouri  63101

5

6  IN RE: JAMES GARAVAGLIA v. CITY OF ST. LOUIS, et
      al.

7  Dear Mr. Blanke,

8  Please find enclosed your copies of the deposition of
      JAMES GARAVAGLIA taken on January 21, 2022 in the

9  above-referenced case. Also enclosed is the original
      signature page and errata sheets.

10

11

12  Please have the witness read your copy of the

13  transcript, indicate any changes and/or corrections

14  desired on the errata sheets, and sign the signature

15  page before a notary public.

16

17  Please return the errata sheets and notarized

18  signature page within 30 days to our office at 711 N

19  11th Street, St. Louis, MO 63101 for filing.

20

21  Sincerely,

22

23

24  Julie Ann Whiting

25

## Page 357

1        ERRATA SHEET

Witness Name: JAMES GARAVAGLIA

2    Case Name: JAMES GARAVAGLIA v. CITY OF ST. LOUIS, et al.

3    Date Taken: JANUARY 21, 2022

4

5    Page #_____  Line #_____

6    Should read: _____

7    Reason for change: _____

8

9    Page #_____  Line #_____

10   Should read: _____

11   Reason for change: _____

12

13   Page #_____  Line #_____

14   Should read: _____

15   Reason for change: _____

16

17   Page #_____  Line #_____

18   Should read: _____

19   Reason for change: _____

20

21   Page #_____  Line #_____

22   Should read: _____

23   Reason for change: _____

24

25   Witness Signature: _____

## Page 358

1    STATE OF _____)

2    COUNTY OF _____)

3

4    I, JAMES GARAVAGLIA, do hereby certify:

5        That I have read the foregoing deposition;

6        That I have made such changes in form

7    and/or substance to the within deposition as might

8    be necessary to render the same true and correct;

9        That having made such changes thereon, I

10   hereby subscribe my name to the deposition.

11       I declare under penalty of perjury that the

12   foregoing is true and correct.

13       Executed this _____ day of _____,

14   20____, at _____.

15

16

17

18       _____

19       JAMES GARAVAGLIA

20

21       _____

22       NOTARY PUBLIC

23   My Commission Expires:

24   121372

25

**ALARIS LITIGATION SERVICES**

www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334