SJ Exhibit 5

## RICHARD R. FRANK  3/10/2022

### Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MISSOURI
 3                    EASTERN DIVISION
 4
 5     JAMES GARAVAGLIA,      )
                              )
 6        Plaintiff,    )
                              )
 7     vs.              ) Case No. 4:20-CV-1681-CDP
                              )
 8     CITY OF ST. LOUIS,    )
       et al.,           )
 9                       )
          Defendants.    )
10
11
12
13
14
15
16
17     VIDEO-RECORDED DEPOSITION OF RICHARD R. FRANK
18     TAKEN ON BEHALF OF THE DEFENDANT GREEN
19                  MARCH 10, 2022
20
21
22
23
24
25
```

### Page 2

```
 1              I N D E X
 2              WITNESSES
 3     ALL WITNESSES              PAGE
 4     For Defendant Green
 5       RICHARD R. FRANK
 6         Examination by Mr. Norwood        8
           Examination by Mr. Blanke      96
 7         Re-Examination by Mr. Norwood     230
           Re-Examination by Mr. Blanke     241
 8         Re-Examination by Mr. Norwood     247
 9
10              EXHIBITS
11     NO.        DESCRIPTION        PAGE
12     For Defendant Green:
13     Exhibit 1 Second Amended Complaint
             for Employment Discrimination   62
14
15     Exhibit 2 7/2/19 approval of request
             to place James Garavaglia
16           on forced leave         41
17     Exhibit 3 7/2/19 notice of forced
             leave letter to James
18           Garavaglia          43
19     Exhibit 4 7/18/19 withdraw of
             request of forced leave
20           letter to Richard Frank    46
21     Exhibit 5 7/18/19 request to place
             on leave letter to Richard
22           Frank             48
23     Exhibit 6 7/18/19 approval of request
             to place James Garavaglia on
24           forced leave        49
25
```

### Page 3

```
 1              EXHIBITS
 2     NO.         DESCRIPTION        PAGE
 3     For Defendant Green:
 4     Exhibit 7 7/18/19 notice of forced
             leave letter to James
 5           Garavaglia        51
 6     Exhibit 8 7/17/19 email from Richard
             Frank to Linda Thomas     51
 7
       Exhibit 9 8/28/19 withdraw of
 8           request of forced leave
             letter to Richard Frank   56
 9
       Exhibit 10 8/28/19 letter to James
10           Garavaglia re:
             pre-termination review   83
11
       Exhibit 11 5/20/16 salary increase
12           request letter to Richard
             Frank            66
13
       Exhibit 12 Employee Status Forms      77
14
       Exhibit 13 Employees Retirement
15           System documents    81
16     For Plaintiff:
17     Exhibit O 6/1/16 email from
             Comptroller Darlene Green
18           with attached letters of
             request          142
19
20
21
22     (Exhibits attached to original transcript.)
23
24
25
```

### Page 4

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MISSOURI
 3                    EASTERN DIVISION
 4
 5     JAMES GARAVAGLIA,      )
                              )
 6        Plaintiff,    )
                              )
 7     vs.              ) Case No. 4:20-CV-1681-CDP
                              )
 8     CITY OF ST. LOUIS,    )
       et al.,           )
 9                       )
          Defendants.    )
10
11
12         VIDEO-RECORDED DEPOSITION OF WITNESS,
13     RICHARD R. FRANK, produced, sworn and examined on
14     the 10th day of March, 2022, between the hours of
15     eight o'clock in the forenoon and six o'clock in
16     the afternoon of that day, at the offices of Lewis
17     Rice, 600 Washington Avenue, 25th Floor, St. Louis,
18     Missouri, before Tara Schwake, a Registered
19     Professional Reporter, Certified Realtime Reporter,
20     Certified Shorthand Reporter (IL), Certified Court
21     Reporter (MO), and Notary Public within and for the
22     State of Missouri.
23
24
25
```

1 (Pages 1 to 4)

SJ Exhibit

5

RICHARD R. FRANK  3/10/2022

| | Page 5 |
|---|---|
| 1 | APPEARANCES |
| 2 | |
| 3 | FOR THE PLAINTIFF: |
| 4 | Uthoff Graeber Bobinette & Blanke |
| 5 | 906 Olive Street, Suite 300 |
| 6 | St. Louis, Missouri  63101 |
| 7 | (314) 621-9550 |
| 8 | by:  Mr. Richard B. Blanke |
| 9 | Mr. Paul L. Schmitz |
| 10 | rblanke@ugbblaw.com |
| 11 | pschmitz@ugbblaw.com |
| 12 | |
| 13 | FOR THE DEFENDANT GREEN: |
| 14 | Lewis Rice, LLC |
| 15 | 600 Washington Avenue, Suite 2500 |
| 16 | St. Louis, Missouri  63101 |
| 17 | (314) 444-7600 |
| 18 | by:  Mr. Ronald A. Norwood |
| 19 | Ms. Joy McMillen |
| 20 | rnorwood@lewisrice.com |
| 21 | jmcmillen@lewisrice.com |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 7 |
|---|---|
| 1 | IT IS HEREBY STIPULATED AND AGREED by |
| 2 | and between Counsel for Plaintiff and Counsel for |
| 3 | Defendants that this deposition may be taken by |
| 4 | Tara Schwake, Notary Public and Certified Realtime |
| 5 | Reporter, thereafter transcribed into typewriting, |
| 6 | with the signature of the witness being expressly |
| 7 | reserved. |
| 8 | THE VIDEOGRAPHER:  We are now on the |
| 9 | record.  Today's date is March the 10th, 2022, the |
| 10 | time is approximately 9:47 AM.  This is the |
| 11 | video-recorded deposition of Richard Frank in the |
| 12 | matter of James Garavaglia versus the City of |
| 13 | St. Louis, et al., Case Number 4:20-CV-1681-CDP, in |
| 14 | the United States District Court for the Eastern |
| 15 | District of Missouri. |
| 16 | This deposition is being held at the |
| 17 | law offices of Lewis Rice.  Reporter's name is Tara |
| 18 | Schwake, my name is David Doell and I am the legal |
| 19 | videographer, we're here with Alaris Litigation |
| 20 | Services. |
| 21 | The attorneys attending please |
| 22 | introduce yourselves and the parties you represent? |
| 23 | MR. BLANKE:  Is this working? |
| 24 | Working okay?  Richard Blanke and Paul Schmitz |
| 25 | representing Plaintiff, James Garavaglia. |

| | Page 6 |
|---|---|
| 1 | FOR THE DEFENDANT CITY OF ST. LOUIS: |
| 2 | City of St. Louis, Law Department |
| 3 | City Counselor's Office |
| 4 | 1200 Market Street, Room 314 |
| 5 | St. Louis, Missouri  63103 |
| 6 | (314) 622-4554 |
| 7 | by:  Ms. Sheena Hamilton, City Counselor |
| 8 | hamiltons@stlouis-mo.gov |
| 9 | |
| 10 | COURT REPORTER: |
| 11 | TARA SCHWAKE, CRR, RPR, CCR, CSR |
| 12 | DAVID DOELL, Videographer |
| 13 | Alaris Litigation Services |
| 14 | 711 North 11th Street |
| 15 | St. Louis, Missouri  63101 |
| 16 | (314) 644-2191 |
| 17 | 1-800-280-DEPO |
| 18 | transcripts@alarislitigation.us |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 8 |
|---|---|
| 1 | MS. HAMILTON:  Sheena Hamilton, City |
| 2 | Counselor, representing the City of St. Louis. |
| 3 | MR. NORWOOD:  Ronald Norwood and Joy |
| 4 | McMillen representing the Defendant, Darlene Green. |
| 5 | THE VIDEOGRAPHER:  The court reporter |
| 6 | please swear in the witness and we may proceed. |
| 7 | RICHARD R. FRANK, |
| 8 | of lawful age, having been produced, sworn, and |
| 9 | examined on the part of Defendant Green, testified |
| 10 | as follows: |
| 11 | * * * * * |
| 12 | (Deposition commenced at 9:47 AM) |
| 13 | EXAMINATION |
| 14 | QUESTIONS BY MR. NORWOOD: |
| 15 | Q    Okay, good morning, sir.  As you |
| 16 | know, my name is Ronald Norwood, and I will be |
| 17 | examining you today in this lawsuit.  Would you |
| 18 | state your full name for the record, please? |
| 19 | A    Yes, it's Richard R. Frank, |
| 20 | F-r-a-n-k. |
| 21 | Q    Okay.  And, Mr. Frank, are you |
| 22 | currently employed? |
| 23 | A    No. |
| 24 | Q    All right.  When was the last time |
| 25 | you were employed? |

2 (Pages 5 to 8)

**RICHARD R. FRANK  3/10/2022**

Page 9

1    A    November 30th, 2021.
2    Q    All right.  And where were you
3    employed at that time?
4    A    City of St. Louis.
5    Q    How did it come about that you are no
6    longer employed with the City of St. Louis?
7    A    I retired.
8    Q    And what -- what was the effective
9    date of that retirement?
10   A    The effective date of retirement was
11   1/1/22.
12   Q    Great.  Thank you.  What position
13   did you hold when you retired from the City of
14   St. Louis?
15   A    I was the director of personnel.
16   Q    How long did you work for the City of
17   St. Louis?
18   A    Approximately 17 and a half years.  I
19   started June 1, 2004.
20   Q    Okay.  Well, let's talk about your
21   years of service with the City of St. Louis.  When
22   you started in June of 2004, what position did you
23   hold?
24   A    Director of personnel.
25   Q    All right.  And when you retired,

Page 10

1    what position did you hold?
2    A    Director of personnel.
3    Q    Okay.  And so just for the record,
4    then, during your entire tenure at the City of
5    St. Louis, you served as the director of personnel?
6    A    Yes, sir.
7    Q    All right.  And we're going to talk
8    more about your duties, responsibilities at the
9    City of St. Louis.  Let's talk first about your
10   educational background.
11   A    Okay.
12   Q    If we could.  Where did you go to
13   school?
14   A    Undergraduate, I went to Washington
15   University, and then I have approximately 18 hours
16   of -- of graduate work.
17   Q    Okay.  When did you go to Washington
18   University?
19   A    1979 through 1983.
20   Q    All right.  And did you graduate?
21   A    Yes, I did.
22   Q    And what degree?
23   A    English literature.
24   Q    Okay.  Nice pre-personnel director
25   background, I take it.

Page 11

1    A    I think so.
2    Q    After you graduated from Washington
3    University, what did you do?
4    A    I was appointed to a year-long paid
5    externship in personnel and labor relations for the
6    State of Illinois, Department of Central Management
7    Services, Bureau of Personnel.
8    Q    And what -- what was your job title?
9    A    I started out as a human
10   resource/personnel analyst, and then became a -- a
11   senior analyst.
12   Q    How long did you serve in those
13   positions?
14   A    A total of five years.
15   Q    Okay.  And what did you do next?
16   A    Then I became director of human
17   resources for the St. Louis County court system.
18   Q    During what period of time did you
19   serve as the director of personnel -- I'm sorry --
20   director of human resources for the St. Louis
21   County court system?
22   A    It was from 1989 until 2004.
23   Q    And based upon what you testified to,
24   then, from there you would have transitioned to the
25   director of personnel for the City of St. Louis?

Page 12

1    A    Yes.
2    Q    Great.  All right.  So let's talk
3    about your job position with the City of St. Louis.
4    What were your duties and responsibilities as
5    director of personnel?
6    A    The duties of the director of
7    personnel are defined under Article XVIII of the
8    City Charter, and it is essentially to administer
9    the civil service system.  It's a full service
10   human resource function with all the major
11   functional areas of human resource.
12        I also, pursuant to that ex-officio,
13   was secretary to the Civil Service Commission, also
14   secretary to the Employees Retirement System, and
15   then pursuant to ordinance, later, secretary to the
16   Firefighters Retirement Plan.
17   Q    Okay.  Great.  Let's talk a little
18   bit about, you know, your job as the director of
19   personnel.  Give us a flavor for the types of
20   issues you would handle in that capacity.
21   A    Certainly.  I had section managers
22   who were responsible for benefits.  The City has a
23   very large benefits program that covers about
24   10,000 lives.  I had responsibility for negotiating
25   all benefits for City employees.  We had a

3 (Pages 9 to 12)

RICHARD R. FRANK  3/10/2022

Page 13

1    compensation and classification section which puts
2    together the compensation plan and also deals with
3    compensation issues.
4         We had an employee relations section
5    which is responsible for processing grievances,
6    drug and alcohol program, family medical leave
7    administration, you know, union negotiations on a
8    departmental level.
9         We had a training and organizational
10   development section, which was responsible for, you
11   know, training and organizational interventions at
12   the department level.  We had a personnel services
13   section which administered payroll along with the
14   Comptroller's office and maintained personnel
15   records and files and resolved those kinds of
16   administrative issues.
17        And we then had the pension systems I
18   spoke of, the Employees Retirement System is a
19   multi-employer, IRS qualified plan which includes,
20   for instance, like the Art Museum, Tower Grove
21   Park, the zoo, et cetera, and then the Firefighters
22   Retirement Plan which, you know, covers all
23   employees, specifically those who were affected by
24   the Court of Appeals' decision which validated the
25   Firefighters Retirement Plan effective, I believe,

Page 14

1    retroactive to February 1, 2013.
2         And I believe that's it.
3         Q    Okay.  Who do you report to?
4         A    I have a -- I reported in a --
5         Q    Or who did you report to, I'm sorry.
6         A    Yeah.  That's an interesting
7    question.  The mayor serves as Chief Executive
8    Officer of the City, provided, however, that there
9    are any exception pursuant to Article XVIII.
10        So I had a opinion from prior City
11   Counselor, City -- City Counselor --
12        MS. HAMILTON:  I'm going to ask you
13   not to go into any attorney-client privilege
14   information.
15        THE WITNESS:  Okay.
16        MS. HAMILTON:  Okay.
17        Q    (BY MR. NORWOOD) Yeah, okay.  Well,
18   let me ask it this way.  Did you report to the
19   mayor?
20        A    Not directly.
21        Q    All right.  Did you report to the
22   Comptroller?
23        A    No.
24        Q    Did you report to the Board of
25   Aldermen?

Page 15

1         A    No.
2         Q    Okay.  Was -- well, strike that.
3         You also talked about serving as
4    secretary of the Civil Service Commission.  Tell us
5    about that.  What were your duties and
6    responsibilities as secretary to the Civil Service
7    Commission?
8         A    The secretary to the Civil Service
9    Commission schedules meetings for the Commission,
10   ensures that appropriate minutes are taken, makes
11   sure that the agenda -- agenda items are prepared,
12   makes sure that any appeals are -- are reviewed for
13   timeliness, and then scheduled appropriately,
14   either for the written submission process or the
15   formal evidentiary hearing process.
16        And then additionally, I contracted
17   with six different hearing officers, all of whom
18   were employment attorneys, three of those were
19   former Circuit Court judges to hear disciplinary
20   matters that went before the Commission.
21        Q    Okay, great.  Thank you.  Who is
22   Linda Thomas?
23        A    Linda Thomas was one of my former
24   deputy directors.
25        Q    Okay.  How many deputy directors did

Page 16

1    you have as the director of personnel?
2         A    I had one full-time deputy director,
3    Brian Beckelman, and then two part-time deputy
4    directors who were per performance.
5         Q    And that included Linda Thomas?
6         A    Yes.
7         Q    All right.  And what were the duties
8    and responsibilities of Linda Thomas as deputy
9    director?
10        A    Linda Thomas assisted me in running
11   the day-to-day operations of the City and served as
12   a special resource in particular on the City's ERP
13   project for the last several years, which is the
14   exploration of converting the -- old mainframe
15   system into a new City-wide integrated computer
16   system.
17        Q    Now, when we talk about the City of
18   St. Louis and personnel, let's talk about the time
19   that you -- well, let's talk about when you left.
20   How many employees are there in the City of
21   St. Louis system?
22        A    We had about, I believe, 6,300
23   authorized positions but maybe about 5,100
24   full-time positions that were filled.  In addition
25   to that, there would be varying amounts of per

4 (Pages 13 to 16)

**RICHARD R. FRANK  3/10/2022**

Page 17

1  performance employees and seasonal employees.  We
2  called them hourly workers, or per performance.
3       Q.   Okay.  And those employees, that
4  number 6,300, 5100, does that -- did that
5  include full- and part-time employees?
6       A.   No.  The 6,300 positions were
7  full-time.  That excludes the several hundred per
8  performance employees, and depending on any
9  particular year, we could have 300 to 700 of those
10  per performance employees, especially during the
11  summer months.
12       Q.   And explain to us lay people, when
13  you say per performance employee, what is that?
14       A.   They are employees who work under 17
15  -- approximately 1,700 hours per year.  They have
16  no set schedule per se, and don't receive any
17  benefits except those that would be provided under
18  the ACA Act.
19       Meaning that if it's anticipated they
20  would be working at least 30 hours per week for a
21  six-month period of time, they would get the
22  medical insurance benefits.
23       Q.   Okay.  All right.  Linda Thomas, did
24  she work at the City of St. Louis at the time you
25  retired?

Page 18

1       A.   Yes, she did.
2       Q.   Okay.  Do you know if she's currently
3  employed with the City of St. Louis?
4       A.   No, she retired shortly after I did.
5       Q.   Okay.  All right.  Let's talk about
6  forced leave.  Are you familiar with the process of
7  forced leave in the City of St. Louis?
8       A.   Yes.
9       Q.   Okay.  What is forced leave?
10       A.   Forced leave is defined in Department
11  of Personnel Administrative Regulation 117.  Forced
12  leave can be requested by an appointing authority,
13  to be approved by me, when an employee presents a
14  potential danger to themselves, to the community,
15  to the workplace, et cetera.
16       Q.   The forced leave process I believe
17  you just stated is governed by St. Louis City
18  Regulation 117?
19       A.   Yes.
20       Q.   Is forced leave considered
21  discipline?
22       A.   No.
23       Q.   Why do you say that?
24       A.   It is not considered discipline
25  because an employee may use any accrued

Page 19

1  compensatory time or vacation time for the period
2  of forced leave.  If they elect not to take any
3  accrued leave during the period of forced leave and
4  it is found that discipline or dismissal is not
5  warranted, then they are entitled to back pay for
6  that period of time.
7       So it is not, in the eyes of the
8  Department of Personnel, property deprivation.
9       Q.   Okay.  And one of the reasons you
10  identified as the use of forced leave is when an
11  employee could be a danger to the City.  Is that
12  right?
13       A.   Yes.
14       Q.   And does that danger necessarily mean
15  physical danger or harm?
16       A.   No.
17       Q.   Okay.  What are some other examples
18  of the type of danger to the City that might
19  warrant a forced leave?
20       A.   It could be use of -- misuse of the
21  City computer system for political reasons.  It
22  could be if they have access to confidential
23  information that could be compromised.  It could be
24  also used for investigative purposes.  So an
25  employment authority would ask to place an employee

Page 20

1  on forced leave pending either an investigation or,
2  in many instances, pending a pre-termination
3  review.
4       Q.   Okay.  Why is it important to --
5  well, strike that.
6       So when a person on forced leave,
7  essentially they are removed from the employment
8  site; is that correct?
9       A.   Yes.
10       Q.   Okay.  Why is it important if, for
11  instance, there is an investigation, to remove an
12  employee from the employment site?
13       A.   We want to maintain the integrity of
14  the invest -- investigation process, and that would
15  include the employee not in any way altering or
16  removing records.
17       Similarly, we would not want them
18  discussing the investigation with any co-workers,
19  et cetera.  So.
20       Q.   And -- and -- and so when we talk
21  about sensitive financial information, does that
22  vary based upon the position --
23       A.   Yes.
24       Q.   -- of the particular -- okay, let
25  me --

5 (Pages 17 to 20)

**RICHARD R. FRANK  3/10/2022**

Page 21

1      A    I'm sorry.  I'll let you finish.
2      Q    Just -- just so -- so that, really
3  for our court reporter's benefit because she's
4  trying to take us both down, so it's better to --
5      A    Sorry.
6      Q    -- have the -- sort of you're a
7  tennis player, back and forth volley.
8           So, okay.  So when we talk about
9  sensitive financial information, does that vary
10  based upon the position?
11      A    Yes.
12      Q    All right.  And let's talk about
13  Mr. Garavaglia.  Was he a high level employee?
14  Considered a high level employee at the City of
15  St. Louis?
16      A    Yes.
17      Q    As a high level employee of the City
18  of St. Louis, did he have access to sensitive
19  financial information?
20      A    Yes.
21      Q    All right.  When forced leave is
22  utilized by an appointing authority, does that
23  automatically lead to some form of discipline?
24      A    No.
25      Q    Okay.  Are you aware of situations

Page 22

1  where an individual was placed on forced leave
2  pending an investigation and then ultimately the
3  veil was lifted where that individual was permitted
4  to return to work?
5      A    Yes.
6      Q    Okay.  When an individual is placed
7  on forced leave, are there appeals processes that
8  can be utilized --
9      A    Yes.
10      Q    -- by that -- by that employee?
11      A    Yes.
12      Q    Okay.  And --and as the secretary for
13  the Civil Service Commission, were you involved in
14  those appeals?
15      A    Yes.
16      Q    All right.  Tell us about that
17  process, particularly as it relates to forced
18  leave.  The appeals process as related to forced
19  leave.
20           MR. BLANKE:  Let me just object just
21  to the form of the question calling for an unduly
22  long narrative response.
23      Q    (BY MR. NORWOOD) Okay.  And without
24  having an unduly long narrative response, could you
25  tell us about those processes?

Page 23

1      A    If I received a request to appeal a
2  forced leave, I would call in the administrative
3  assistant to the Civil Service Commission, give it
4  to her, if it were timely, which is within ten days
5  of the notice of forced leave, and then ask him or
6  her to schedule an appeal in front of a hearing
7  officer.
8      Q    Okay.  And in that context, the
9  appeal of a forced leave, do you have an
10  understanding as to what is being looked at by the
11  hearing officer?
12      A    Yes.
13      Q    What is that that would be looked at
14  by a hearing officer in that forced leave appeal
15  context?
16      A    The hearing officer would examine
17  whether or not there appeared to be sufficient
18  justification to place the employee on forced leave
19  and that was not being done for malicious reasons.
20      Q    Okay.  When a person is placed on
21  forced leave, what happens with respect to that
22  individual remaining on the work site?
23      A    If a person is placed on forced
24  leave, they are notified that they should not
25  return to the work site.

Page 24

1      Q    Okay.  What if they are already at
2  the work site?
3      A    If they are currently at the work
4  site, then they would typically be escorted off the
5  work site.
6      Q    And why would they be escorted off
7  the work site?
8      A    Because if they are being placed on
9  forced leave, the appointing authority, in his or
10  her opinion, believes that they present, you know,
11  that imminent type of threat to the work site or
12  themselves or the community.
13      Q    Okay.  So are they escorted off the
14  work site at the time they are notified that
15  they're placed on forced leave?
16      A    Typically, yes.
17      Q    Okay.  How long -- well, before I ask
18  that -- strike that.
19           In a situation where an employee is
20  placed on forced leave, who has to approve that
21  forced leave?
22      A    The appointing authority has the
23  right to place the employee on forced leave, and
24  then they have to receive permission, in writing,
25  from me within 72 hours.

6 (Pages 21 to 24)

RICHARD R. FRANK  3/10/2022

Page 25

1    Q    Okay.  Well, you say "from me,"
2  meaning the director of personnel?
3    A    Director of personnel.  Yes.  No
4  longer me, so.
5    Q    No, that's okay.  But whoever is
6  serving in that role as director of personnel would
7  have to approve the forced leave.  Is that correct?
8    A    Yes.
9    Q    And during the time that you were
10  director of personnel, did you have to approve
11  those forced leaves?
12    A    Yes.
13    Q    Were you considered a rubber stamp of
14  those forced leaves?  I mean, in other words, did
15  you just routinely approve forced leaves?
16    A    No.
17    Q    What, in -- in your practice, and
18  based upon your understanding of your
19  responsibility as director of personnel, what would
20  you do to determine whether or not to approve a
21  forced leave?
22    A    I had to look at the totality of the
23  circumstances to see if that serious threshold were
24  met, that they presented, again, a potential threat
25  to themselves or the City or -- or to, you know,

Page 26

1  the community.
2    Q    And when you say to the City, meaning
3  that if it's a high level employee that has access
4  to sensitive financial information, is that a
5  factor that you would look at to consider whether
6  or not to approve forced leave?
7    A    Yes.
8    Q    When a person is placed on forced
9  leave, how long would that typically last?
10    A    It varies, sir.  It depends on the
11  length of the investigation, or when a
12  pre-disciplinary or pre-termination review, you
13  know, would be set.  If the forced leave is -- if
14  the appointing authority needs more than 30 days to
15  complete the investigation, then they have to
16  receive my approval of the extension.
17    Q    Okay.  And is it common, and
18  particularly in the context of an investigation,
19  for there to be requests for extensions beyond the
20  30 day window you identify?
21    A    Yes.
22    Q    Are you aware of situations -- well,
23  strike that.
24        How long would the typical
25  investigation take?

Page 27

1    A    It could take -- it varies greatly.
2  It could take from a few days, if it were like a
3  blood alcohol test, to sometimes several years if
4  it were a matter that were in the police division,
5  being investigated by the internal affairs division
6  which involve criminal charges.  So it did vary
7  widely.
8    Q    Okay.  Have there -- when you were
9  director of personnel, were there situations,
10  occasions, where a forced leave would be rescinded
11  and then reinstated?
12    A    Yes.
13    Q    Was there anything out of the
14  ordinary about that process while you were director
15  of personnel?
16    A    It's unusual, but it did occur when
17  more information was forthcoming that necessitated
18  another -- a further investigation.
19    Q    Okay.  So if I'm understanding your
20  prior testimony, where, for instance, you said
21  sometimes it could take years, as part of an
22  investigation, as information comes in, does it
23  continue to get extended?
24    A    Yes.
25    Q    Why?

Page 28

1    A    Because again, once you get into an
2  investigation, you can find additional matters of
3  concern.  Additional allegations can surface.
4    Q    Okay.  If additional information
5  comes to light, in your experience as director of
6  personnel, is it prudent to ignore that additional
7  information as it comes in?
8    A    No.
9    Q    Why not?
10    A    Because all of that should be taken
11  into consideration when making the ultimate
12  determination as to whether or not the employee
13  should be set for a pre-disciplinary review or a
14  pre-termination review.
15    Q    Okay.  And you identified situations
16  where there was a forced leave, there was an
17  investigation, and ultimately the individual
18  returned to work.  Is that right?
19    A    Yes.
20    Q    And would that be -- well, strike
21  that.
22        Under what circumstances would, once
23  that process works, would an individual be returned
24  to work?  Give us examples of how that operates.
25    A    We had a situation, for instance,

7 (Pages 25 to 28)

**RICHARD R. FRANK   3/10/2022**

Page 29

1  where an employee was accused of -- of workplace
2  violence, and it was invest -- and so he was placed
3  on forced leave.
4        And then upon further review, he was
5  allowed to return because they did not -- the
6  appointing authority did not believe that the
7  threat was truly physical harm.
8        But then the employee, upon returning
9  to work, made a very viable threat and made
10  physical contact with a supervisor, so he was
11  placed on forced leave again.
12        We've had situations in the police
13  division where the person was placed on forced
14  leave due to a complaint through perhaps the -- a
15  Civilian Oversight Board or through a, you know, a
16  member of the public, and while the particular
17  charge or allegation was found not meritorious, the
18  internal affairs division uncovered other
19  circumstances during its investigation that
20  warranted forced leave again.
21        Q    Okay.  So if I'm understanding you,
22  if there was an investigation and it turns out
23  that, you know, there's not a basis for the next
24  step, which could be discipline, what happens then
25  to that employee?

Page 30

1        A    The person would be returned to work
2  if there was no basis for it.
3        Q    And what about any utilization of --
4  of time?
5        A    Yes, sir.  As I addressed previously,
6  if they elected to take any accrued compensatory
7  time or vacation leave, then they've already been
8  paid, you know, for that time.  And if the period
9  of forced leave were greater than what they had,
10  they would be restored the difference.
11        As an example, if they had only two
12  weeks of time and the forced leave were for three
13  weeks and they were found not to be at fault, they
14  would get the one week time difference.
15        If they elected not to take any time
16  during this period of forced leave for that three
17  weeks, they would get paid for the entire three
18  weeks.
19        Q    Okay.  All right.  Now, what about
20  appeals processes?  Are you aware of situations
21  where an individual was placed on forced leave and
22  appealed and ultimately the forced leave was
23  rescinded?
24        A    Yes.
25        Q    And what happens to the employee in

Page 31

1  that circumstance?
2        A    They are paid for the period that
3  they were off on forced leave.
4        Q    And what about them returning to
5  work?
6        A    They would return to work, you know,
7  upon the expiration -- or the rescission of the
8  forced leave.
9        Q    Okay.  If an individual is ultimately
10  disciplined, and we're going to talk a little bit
11  more about the discipline in that process, are you
12  aware of situations where that disciplined employee
13  appealed that discipline?
14        A    Yes.
15        Q    And if that employee is successful in
16  that appeal, what happens to the employee?
17        A    That depends on the decision of the
18  Civil Service Commission.  They can totally
19  overturn the discipline, in which case the employee
20  is made whole in terms of any lost pay and
21  seniority, et cetera, or the Commission retains the
22  right to reduce the discipline if they feel that
23  there, you know, were -- there were some fault on
24  the part of the employee but that the discipline
25  imposed by the appointing authority was excessive.

Page 32

1        Q    Okay.  So -- so it sounds like the
2  Commission, then, serves as sort of a watchdog to
3  make sure that, if there's discipline of a civil
4  service employee, that it -- it's justified, and,
5  therefore, can effectively remove any discipline
6  and send that employee back to work.  Is that
7  right?
8        A    Yes.
9        Q    And restore any lost benefits?
10        A    Yes.
11        Q    Is it your understanding that an
12  appointing authority needs proof that an individual
13  engaged in misconduct before an individual is
14  placed on forced leave?
15        A    No.
16        Q    You identify forced leave as a way to
17  remove an employee from the workplace while an
18  investigation is going on.  Why is it important to
19  remove an employee from the workplace while the
20  investigation is going on?
21        A    Because --
22        MR. BLANKE:  Objection, asked and
23  answered.
24        MS. HAMILTON:  You can answer.
25        A    Because if the allegations are so

8 (Pages 29 to 32)

Page 33

1    serious, in the director's opinion, to meet that
2    threshold of needing to remove the employee from
3    the workplace, it's important for the safety of the
4    City, of the employee, of the co-workers, that
5    those allegations are thoroughly investigated, you
6    know, be -- and that the person is not, you know,
7    presenting a -- presenting a threat.
8        So we -- we feel that action is -- is
9    necessary.
10       Q    (BY MR. NORWOOD)  Is an individual
11   who is on forced leave, is their access to the
12   City's computer system restricted in any way?
13       A    It is supposed to be restricted, yes.
14       Q    And why is that?
15       A    Because, again, we would not want the
16   person going in and either damaging or altering or
17   removing records.
18       Q    Okay.  And if an individual, in the
19   case of a forced leave, when that forced leave is
20   removed and the individual returns to work, and
21   that -- that access would be reestablished; is that
22   right?
23       A    Yes.
24       Q    Let's talk about pre-termination.
25   What is pre-termination?

Page 34

1        A    Pre-termination is a process whereby
2    an employee is officially put on notice via letter
3    that the City -- the appointing authority
4    specifically is contemplating the need to dismiss
5    them from their job.
6        Q    Okay.
7        A    It's -- it's outlined in
8    Administrative Regulation 117 in -- in terms of how
9    that procedure works and what the necessary
10   elements are.
11       Q    Does -- well, once a pre-termination
12   notice is sent, does that process lead to
13   termination?
14       A    It leads to a pre-termination review,
15   which is not a formal hearing, but it is a review
16   where the employee and his or her representative
17   can review the evidence and also respond to any of
18   the allegations and basically fulfill the elements
19   that are required under Administrative Regulation
20   117.
21       Q    Okay.  And are you aware of
22   situations where that process has occurred and the
23   -- and no discipline was issued?
24       A    Yes.
25       Q    And if that happens, what happens

Page 35

1    with respect to the employee returning to work and
2    restoration of any benefits?
3        A    Again, typically, if a person is
4    placed on -- if they are notified that they are
5    being placed on -- I'm sorry, if they are being set
6    for a pre-termination review, the appointing
7    authority would consult with myself and possibly
8    the law department, and in most cases those people
9    would be placed on forced leave because the
10   employee is put on notice that they may be losing
11   their job.
12       So in most instances the employee
13   would be placed on forced leave and then again that
14   process that we discussed would trigger where they
15   could either elect to take time that they have
16   accrued, or not.
17       Q    And if that happens, though, and it's
18   ultimately determined that, based on those
19   incidents you identified, that there was no basis
20   for discipline, what happens to that employee in
21   terms of returning to work and restoration of
22   benefits?
23       A    Then the employee is returned to work
24   as -- as quickly as possible, and the employee, if,
25   again, if they took any time, if the period of

Page 36

1    forced leave were greater than the amount of time
2    they were on forced leave, they would be paid the
3    difference.
4        If they were not, if they choose not
5    to take any time, they get paid for that -- that
6    period of forced leave and, you know, any seniority
7    or any holidays, you know, they're made whole
8    essentially under -- under our rules.
9        Q    But during the forced leave period of
10   time and during the pre-termination period of time,
11   essentially they are on paid leave.  Is that right?
12       MR. BLANKE:  Objection, leading.
13       Q    (BY MR. NORWOOD)  Well, are they on
14   paid leave in that circumstance?
15       A    It can be either paid or on -- on
16   leave without pay.
17       Q    Okay.  All right.  Once a
18   pre-termination -- is it a pre-termination hearing;
19   is that what it's called?
20       A    We call it a pre-termination review.
21       Q    Okay.  Once a pre-termination review
22   happens, and if there is a determination of a need
23   to impose some form of discipline, can the employee
24   appeal that determination to the Civil Service
25   Commission?

9 (Pages 33 to 36)

**RICHARD R. FRANK  3/10/2022**

Page 37

1    A   Yes.
2    Q   All right.  And if that happens, what
3  happens at the Civil Service Commission level in
4  terms of presentation of evidence, things of that
5  sort?
6    A   What we would do is ensure -- I would
7  ensure my assistant and secretary that the appeal
8  to the Civil Service Commission was timely, meaning
9  within ten days of notification of the results of
10  the pre-termination review.
11       We would then set the hearing in
12  front of one of our hearing officers, and that is
13  the -- the evidentiary hearing process is a full
14  hearing that complies with the rules for a
15  contested hearing.  They can cross-examine
16  witnesses, et cetera.
17    Q   So at that level, the employee could
18  then present evidence to clear his or her name if
19  they feel they have been falsely disciplined; is
20  that right?
21       MR. BLANKE:  Objection, leading.
22    Q   (BY MR. NORWOOD)  Subject to that.
23    A   Yes.
24    Q   Are you aware of situations where
25  that happened?  In other words, there was

Page 38

1  discipline following the pre-termination review,
2  there was an appeal to the Civil Service
3  Commission, and the Civil Service Commission
4  determined that the discipline was improper, and
5  the individual was returned to work?
6    A   Yes.
7    Q   Is it fair to say that this whole
8  Civil Service Commission process is a safeguard to
9  avoid a situation where a civil service employee is
10  wrongfully charged?
11    A   Yes.
12    Q   Okay.  Let's talk about
13  Mr. Garavaglia's forced leave situation.  Did you
14  have any involvement in that forced leave process?
15    A   Yes.
16    Q   Tell us about your involvement in
17  that process as it relates to Mr. Garavaglia.
18       MR. BLANKE:  Objection.  Calls for an
19  unduly long narrative response.
20    Q   (BY MR. NORWOOD)  Subject to that
21  sir, and unless --
22       MS. HAMILTON:  You can answer.
23    A   I received a phone call on a Saturday
24  -- Saturday afternoon from the appointing authority
25  designate -- for the Comptroller, Judy Armstrong,

Page 39

1  advising that the Deputy Comptroller, Garavaglia,
2  was -- they were concerned that he was involved in
3  some serious fiscal issues and was not complying
4  with the Comptroller's office's protocols, and that
5  they were so serious as to warrant a
6  pre-termination review.
7    Q   (BY MR. NORWOOD)  All right.  And
8  that was by way of a phone call?
9    A   Yes, sir.
10    Q   Do you recall when that phone call
11  occurred?
12    A   I don't remember the exact month.  I
13  know it was a Saturday afternoon at approximately
14  1:30 PM.
15    Q   All right.  Is it common for you to
16  receive an oral request for forced leave?
17    A   Yes.
18    Q   And when you receive an oral request
19  for forced leave, do you -- if you agree, does it
20  happen at that point in time, once you have
21  approved it orally?
22    A   It still has to be ratified by me via
23  the 72 hour written notification.  So the
24  appointing authority may call me or, again, like
25  the law department, to discuss a particular matter

Page 40

1  to see if they think this is something that would
2  warrant forced leave, given the nature of the
3  allegations, and then it's the appointing
4  authority's determination as to whether or not to
5  proceed.
6       And they have 72 hours, if they do
7  place the person on forced leave, to get that
8  notice to me so that I can review it and look at it
9  to see if it warrants, in the director's opinion,
10  you know, ratification -- formal -- formal approval
11  of that forced leave request.
12    Q   Okay.  Ultimately, did you approve
13  the forced leave for Mr. Garavaglia?
14    A   Yes.
15    Q   Why did you approve the forced leave
16  request for Mr. Garavaglia?
17       MR. BLANKE:  Well, let me object in
18  that the form of the question is a compound
19  question because he was relieved -- he was placed
20  on forced leave on multiple occasions and the
21  question doesn't relate to any particular equation,
22  so it's -- occasion, so it's overly broad as well.
23       MR. NORWOOD:  Fair objection.
24    Q   (BY MR. NORWOOD)  Why don't we -- you
25  have before you a binder of certain exhibits, and

10 (Pages 37 to 40)

RICHARD R. FRANK  3/10/2022

Page 41

1  why don't we turn to that binder.  And I'm going to
2  direct your attention to tab number 2.  It's
3  actually marked Frank Depo Exhibit 2.  Could you
4  turn to tab 2?
5      A    Are you referring, sir, to the July 2
6  letter?
7      Q    Uh, if --
8      A    Okay.  I have it.
9      Q    If you look at the bottom, it says
10  Frank Depo Exhibit 2.
11      A    I have it.
12      Q    Do you see that?
13      A    Yes, thank you.
14      Q    Okay.  What is Frank Deposition
15  Exhibit 2?
16      A    This is a letter from Comptroller
17  Green to me requesting that I approve formally
18  Mr. Garavaglia's forced leave.
19      Q    Okay.  And there is some writing on
20  that document; is that correct?
21      A    Yes.
22      Q    Whose writing is that?
23      A    That's mine.
24      Q    And could you read what you wrote on
25  -- well, whenever you wrote it?

Page 42

1      A    Yes.  It's "Approved RF 7/2/19."
2      Q    Okay.  And did that mean that you
3  would have approved the forced leave on 7/2/19 for
4  Mr. Garavaglia?
5      A    Yes.
6      Q    Why did you approve this particular
7  forced leave request for Mr. Garavaglia?
8      A    I approved this based on the -- the
9  discussion I had just several days before, I
10  believe this is probably a Monday, but several days
11  before with Judy Armstrong and I believe
12  Comptroller was on the phone line but I did not
13  speak with her, and Beth Seright.
14      Q    Excuse me?
15      A    I believe Beth Seright might have
16  been on the phone, but the person I spoke to only
17  was Judy Armstrong.
18      Q    Okay.  I just want to make she --
19  she's right now.  That last name, who was the other
20  person you identified other than the Comptroller
21  who may have been on?
22      A    Beth Seright.
23      Q    Could you spell that for our court
24  reporter?
25      A    I cannot spell the last name, I

Page 43

1  apologize.
2      MS. HAMILTON:  We'll get it for you.
3      Q    (BY MR. NORWOOD)  Okay.
4      A    Pardon me, I believe, though, it's
5  S-e-w-r-i-g-h-t.
6      Q    Okay.
7      A    I may be wrong.
8      Q    And who is that?
9      A    She's another high level official in
10  the Comptroller's office.
11      Q    Okay.  So once the forced leave was
12  approved, would that then begin the processes you
13  described about removing an individual from the
14  workplace?
15      A    Yes.
16      Q    And restricting that individual's
17  access, in the case of Mr. Garavaglia, access to
18  sensitive financial information?
19      A    Yes.
20      Q    Let's turn to Frank Deposition
21  Exhibit 3.  Which is the next tab.  What is that
22  document?
23      A    This is the letter from Comptroller
24  Green advising the employee, Mr. Garavaglia, that
25  he is being officially placed on forced leave, and

Page 44

1  of his right to use any accumulated time during
2  that period.
3      Q    Okay.  And just for the record, it
4  looks like you were copied on that letter from
5  Comptroller Darlene Green to Mr. Garavaglia;
6  correct?
7      A    Yes.
8      Q    And it looks like Judy Armstrong was
9  also copied on that letter; is that right?
10      A    Yes.
11      Q    And she is, Judy Armstrong that is,
12  is designated as the appointing authority?
13      A    As the appointing authority designee.
14      Q    Okay.  And when you say "appointing
15  authority designee," what does that mean?
16      A    That's a form authorization, a form
17  that's filed with the Department of Personnel that
18  allows the designee to perform certain types of
19  actions.  In the case of Ms. Armstrong, she's
20  authorized to sign off on any and all personnel
21  related matters.
22      Q    On -- as it relates to which
23  department?
24      A    To the Comptroller's office.
25      Q    Okay.  And actually you remind me.

11 (Pages 41 to 44)

RICHARD R. FRANK  3/10/2022

Page 45

1   Let me -- let us, meaning whoever watches this
2   video, reads this transcript, get a sense as to
3   these departments within the City.  How many City
4   departments are there?
5       A    Over thirty major departments.  And
6   then we have cost centers within them with various
7   appointing authorities, but over thirty major
8   departments.
9       Q    Okay.  And one of those departments
10  would be the Comptroller's office?
11      A    Yes.
12      Q    All right.  Would the mayor's office
13  be considered a department?
14      A    No.
15      Q    Okay.
16      A    May I clarify?  Not in terms of
17  personnel related issues.  Because all of the
18  Comptroller's employees, every single one is a
19  civil service employee.  The mayor, her department
20  directors and the mayor's staff are all excepted
21  positions which are not within the civil service
22  system or under my prior authority as director.
23      Q    So certain departments fit within the
24  umbrella of the mayor's office; is that right?
25      A    Only the department heads who are

Page 46

1   appointed directly by her are what they're known as
2   excepted positions.  For instance, the City
3   Counselor, or the director of -- of the health
4   department, et cetera.
5       Q    Okay.  What about the Comptroller's
6   office which you said is a separate department.
7   Does that fit under the mayor's umbrella?
8       A    No.
9       Q    And that is considered a separate arm
10  of the City?
11      A    It's not considered separate.  The
12  Comptroller herself is an elected official but all
13  of her employees are civil service positions and
14  ultimately governed in personnel matters by the
15  Department of Personnel and Civil Service
16  Commission.
17      Q    But the people within her department
18  ultimately would report to her as an elected
19  official?
20      A    Yes, as the appointing authority.
21      Q    As the appointing authority.  Okay.
22  Let's turn to tab number 4, Frank Depo Exhibit 4.
23  What is that document?
24      A    That is a letter from Comptroller
25  Green the next day asking that she would like

Page 47

1   to withdraw her request of forced leave for
2   Mr. Garavaglia.
3       Q    Okay.  I think you said "the next
4   day."  Let's put it in context.  If you go back and
5   look at the prior exhibit, that exhibit and the
6   prior set of exhibits on July 2 --
7       A    Oh, I'm sorry, yeah, I looked at the
8   date wrong.
9       Q    -- July 2, 2019, was the original
10  forced leave.  Is that right?
11      A    Yes.  I misread the -- the date.
12      Q    That's okay.  I just want to make
13  sure the record is clear.
14           So the next document, Frank's
15  Deposition Exhibit 4, for the record, is a letter
16  dated July 18, 2019.  Is that correct?
17      A    Yes.
18      Q    And is that a letter to you from
19  Comptroller Darlene Green?
20      A    Yes, it is.
21      Q    And what is that letter?
22      A    Are you referring, sir, to Exhibit 4
23  again?
24      Q    Exhibit 4, yes.
25      A    Yes, that's a letter from the

Page 48

1   Comptroller advising me that she would like to
2   officially withdraw the request for forced leave
3   for Mr. Garavaglia.
4       Q    All right.  And it looks like
5   Mr. Garavaglia was copied on that document.  Is
6   that right?
7       A    Yes.
8       Q    It looks like Judy Armstrong, as
9   appointing authority, was -- or appointing
10  authority designee was copied on that document;
11  correct?
12      A    Yes.
13      Q    And it also identifies a person,
14  Nancy Kistler, Deputy City Counselor; is that
15  correct?
16      A    Yes.
17      Q    Is it your understanding that Nancy
18  Kistler had involvement as Deputy City Counselor in
19  some of the processes involved in this --
20      A    Yes.
21      Q    -- some of the processes involved in
22  this case as it relates to Mr. Garavaglia?
23      A    Yes, sir.
24      Q    Let's go to Frank Deposition Exhibit
25  5.  And what is Frank Deposition Exhibit 5?

**RICHARD R. FRANK  3/10/2022**

Page 49

1      A      This is a request from Comptroller
2  Green dated July 18, asking that I place
3  Mr. Garavaglia -- or approve Mr. Garavaglia's
4  forced leave for serious fiscal improprieties.
5      Q      Okay.  Did you ultimately approve
6  that request?
7      A   Yes, I did.
8      Q      All right.  Let's turn to the next
9  tab, Frank Depo Exhibit 6.  What is that document?
10      A      This is a copy of my approval of the
11  request for a forced leave for Mr. Garavaglia dated
12  July 18, 2019.
13      Q      Okay.  And there is some writing on
14  that document; is that correct?
15      A   Yes.
16      Q      And whose writing is that?
17      A      That is mine.
18      Q      And for the record, could you read
19  what you wrote on July 18, 2019?
20      A      "Approved RF 7/18/19."
21      Q      All right.  And why did you approve
22  this request for forced leave?
23      A      I approved this request for
24  essentially the same reasons, which were the
25  allegations made by Comptroller that -- and that

Page 50

1  they were -- they were investigating serious fiscal
2  improprieties and some issues of -- related to that
3  from Mr. Garavaglia.
4      Q      Okay.  And would an investigation
5  into serious fiscal improprieties justify a forced
6  leave?
7      A   Yes.
8      Q      For the reasons you've already
9  stated?
10      A   Yes.
11      Q      Does it become more important when
12  you have an individual who is a high level employee
13  of the City?
14      A   Yes.
15      Q   Why?
16      A      Because of the magnitude of their
17  decisions.  They have a greater impact to
18  decision-making, and they also have, typically,
19  involvement in contracts and with vendors and the
20  magnitude of their authority is greater.  So it's
21  amplified.
22      Q      What about their supervisory
23  authority?
24      A      That's certainly another issue, they
25  -- being as high as Mr. Garavaglia was, he had, you

Page 51

1  know, a number of employees, subordinate employees.
2  He was a -- one of the second highest ranking
3  people in the office of the Comptroller who is the
4  Chief Financial Officer for the City, so.
5      Q      Okay.  Let's turn to the next tab,
6  which is tab -- tab 7.  And that appears to be a
7  letter dated July 18, 2019, to Mr. Garavaglia from
8  Comptroller Darlene Green.  Is that correct?
9      A   Yes.
10      Q      And did this reference the forced
11  leave that you approved on July 18, 2019?
12      A   Yes.
13      Q      And were you also copied on this
14  particular communication?
15      A   Yes.
16      Q      All right.  Let's go to the next
17  document, Frank Deposition Exhibit 8, tab 8.  And
18  what is that item?
19      A      I need to read it here first.
20      Q      Yeah, take your time.
21      A      This is a -- an email from Deputy
22  City Counselor -- I'm sorry, deputy director of
23  personnel, Linda Thomas, to myself explaining -- or
24  documenting for me a conversation she had with
25  Comptroller regarding the process for rescinding

Page 52

1  and reinstituting forced leave under the provisions
2  of Administrative Regulation 117.
3      Q      Okay.  And -- and just for the
4  record, let's -- let's read this into the record.
5      The email to you from Linda Thomas --
6  who was your deputy at the time; correct?
7      A   Yes.
8      Q      The email from Linda Thomas to you is
9  dated Wednesday, July 17, 2019, at 2:35 PM.  Is
10  that correct?
11      A   Yes.
12      Q      All right.  And --
13      MS. HAMILTON:  It's 2:33.
14      A   2:33.
15      Q   (BY MR. NORWOOD)  I'm sorry.
16  Actually, it looks like there are two emails; is
17  that right?
18      MS. HAMILTON:  Yes.
19      Q   (BY MR. NORWOOD)  I mean, within the
20  one -- it looks like an email string; is that --
21      A   It is, yeah.  Thank you.
22      Q      Okay.  All right.  So -- so the
23  second, or the top of the string is an email from
24  you to Linda Thomas; is that correct?
25      A   Yes.

13 (Pages 49 to 52)

## RICHARD R. FRANK  3/10/2022

Page 53

1       Q    And that appears to have been -- and
2   that email is dated Wednesday, July 17, 2019, at
3   2:35 PM; is that correct?
4       A    Yes.
5       Q    And that was in response, it appears,
6   to an email that Linda Thomas sent to you on
7   Wednesday, July 17, 2019, at 2:33 PM.  Is that
8   correct?
9       A    Yes.
10       Q    Okay.  And let's read what she wrote
11   to you at 2:33 PM on July 17, 2019.  It says,
12   quote, (Quote as read):
13             Rick, I told the Comptroller to
14             withdraw her request for forced leave
15             on JG.
16             Let me pause there, and do you know
17   who JG was?
18       A    Yes.
19       Q    Who was that?
20       A    Mr. Garavaglia.
21       Q    Okay.  Reading further it says,
22   quote, (Quote as read):
23             All she has to do is for you to
24             withdraw the request and she has to
25             give him a copy and then give back

Page 54

1             any of this time he has used.
2             Do you see that?
3       A    Yes.
4       Q    All right.  And is that your
5   understanding as to what the proper procedure
6   should have been in order --
7       A    Yes.  I'm sorry, didn't mean to --
8       Q    That's okay.
9       A    Pardon me.
10       Q    Is it your understanding that that
11   was the proper procedure to be used with respect to
12   rescinding the original forced leave and
13   reinstituting a new forced leave?
14       A    Yes.
15       Q    Reading further, it says, quote,
16   (Quote as read):
17             Then I told her she could send you a
18             letter requesting forced leave again,
19             give him a copy, and tell him he is
20             being put on forced leave pending an
21             investigation.
22             Is that a fair reading?
23       A    Yes.
24       Q    And is that an accurate description
25   of what the proper procedure would be?

Page 55

1       A    Yes.
2       Q    It goes further, says, quote, (Quote
3   as read):
4             The reason for that first leave would
5             be he has access to a lot of
6             confidential files and computer
7             systems and the investigation would
8             lead to disciplinary action up to, it
9             says, an, a-n, including termination.
10             You see that?
11       A    Yes.
12       Q    And is that --
13             MS. HAMILTON:  And I would just say
14   it says "the forced leave" instead of the first
15   leave.
16             MR. NORWOOD:  Did I say first leave?
17             MS. HAMILTON:  Yes, sir.
18             MR. NORWOOD:  Okay.  Well, let me
19   read it so we get it right in the record.
20       Q    (BY MR. NORWOOD) (Quote as read):
21             The reason for the forced leave would
22             be he has access to a lot of
23             confidential files and computer
24             systems and the investigation would
25             lead to disciplinary action up to an,

Page 56

1             a-n, including termination.
2             Is that a fair reading of what's I
3   -- what's in the communication?
4       A    Yes.
5       Q    And is that consistent with your
6   assessment of the reason why you approved the
7   second forced leave and the first forced leave in
8   the first place?
9       A    Yes.
10       Q    Okay.  Now, let's go to Frank
11   Deposition Exhibit 9.  What is Frank Deposition
12   Exhibit 9?
13       A    This is a letter from Comptroller
14   stating that she would like to officially withdraw
15   her request for forced leave for Mr. Garavaglia.
16       Q    And it's dated August 28, 2019.  Is
17   that correct?
18       A    Yes.
19       Q    And it looks like Mr. Garavaglia,
20   Judy Armstrong, Nancy Kistler were also copied on
21   this letter from Comptroller Darlene Green.  Is
22   that right?
23       A    Yes.
24       Q    All right.  Let's go to the next
25   item, number 10.  And what is this item number 10?

14 (Pages 53 to 56)

## RICHARD R. FRANK  3/10/2022

Page 57

1      A     This is a letter from Comptroller
2  notifying Mr. Garavaglia that he is being set for a
3  pre-termination review.
4      Q     Okay.  And --
5      A     It says "hearing," pardon me, but
6  actually it's a review.
7      Q     Is the -- the nomenclature is review
8  as opposed to hearing; correct?
9      A     Yes.
10     Q     And it's dated August 28, 2019.  Is
11  that correct?
12     A     Yes.
13     Q     Now, it lists a number of bases for
14  the pre-termination review.  And the first one, let
15  me read that into the record because I have a few
16  questions to ask you about that.
17         It says, quote, (Quote as read):
18         You have improperly signed multiple
19         City contracts and contract
20         extensions, including automatic
21         extensions without legal
22         authorization to do so, putting the
23         City at risk, dating back to 2019.
24         Do you see that?
25         MS. HAMILTON:  2009.

Page 58

1      Q     (BY MR. NORWOOD)  I'm sorry, 2009.
2      A     Yes, I see that.
3      Q     Dating back to 2009; correct?
4      A     Yes.
5      Q     Now, if we unpack that, would the
6  improper signing of multiple City contracts and
7  contract extensions, would that be a grounds for
8  discipline?
9      A     Yes.
10     Q     Why?
11     A     That is a very serious charge under
12  both the -- the Code of Ethics and it would be an
13  exception to progressive discipline under
14  Administrative Regulation 117.
15     Q     Okay.  Does it matter that the --
16  that any of the contracts that might be referenced
17  here date back to 2009?
18         MR. BLANKE:  Well, let me object to
19  the form of the question as to whether it matters,
20  that --
21         MR. NORWOOD:  Well, let me say -- let
22  me withdraw that question, let me withdraw that
23  question, and let me ask it another way.
24     Q     (BY MR. NORWOOD)  If an investigation
25  determines past improprieties, are those past

Page 59

1  improprieties to be ignored in the context of that
2  investigation?
3      A     No.
4      Q     Why not?
5      A     Because they're still relevant to the
6  overall performance of the employee, you know, in
7  his or her position and whether or not they, um,
8  you know, are fit for continued service.
9      Q     Okay.  And there are a listing of
10  other charges on that page.  Is that correct?
11     A     Yes.
12     Q     The next page, there is a reference
13  to certain provisions of the City of St. Louis
14  Department of Personnel, Administrative and Joint
15  Regulations, Employee Code of Conduct; you see
16  that?
17     A     Yes.
18     Q     If we look at the next to last
19  paragraph, and I'll read that one into the record,
20  it says, quote, (Quote as read):
21         The purpose of this pre-termination
22         hearing is to allow you the
23         opportunity to respond to the
24         charges, review any evidence against
25         you, present any evidence you have on

Page 60

1         your behalf, including any mitigating
2         circumstances that may be involved.
3         Do you see that?
4      A     Yes.
5      Q     And is that the purpose of that
6  process, this pre-termination review?
7      A     Yes.
8      Q     And in this case, did Mr. Garavaglia
9  have the opportunity to respond to the charges by
10  way of this process?
11     A     Yes.
12     Q     Do you know if he undertook that
13  opportunity?
14     A     I can't recall.
15     Q     Okay.  Do you recall -- well, strike
16  that.
17         Do you know what ultimately happened
18  to Mr. Jim Garavaglia as it relates to his
19  employment with the City of St. Louis?
20     A     My belief is that he retired.
21     Q     All right.  All right.  And -- and
22  we'll -- we have some documents and we'll talk
23  about that in a minute.
24         And so as you sit here today you
25  don't know if in fact he took advantage of the

## RICHARD R. FRANK  3/10/2022

Page 61

```
 1    opportunity to respond to the charges, as you sit
 2    here today?
 3         A    My recollection is I do not remember
 4    seeing a, you know, a summary of a pre-termination
 5    review on Mr. Garavaglia.
 6         Q    Okay.  And as you sit here today, you
 7    don't know if he took advantage of the opportunity
 8    to review any evidence that might be presented
 9    against him as it was delineated in the charges set
10    forth in -- on page 1.
11         A    Yeah, I --
12         MR. BLANKE:  Objection, asked and
13    answered, and leading.
14         MS. HAMILTON:  You can answer.
15         A    I can't say with certainty.  I don't
16    believe so, but I can't say with certainty.
17         Q    (BY MR. NORWOOD)  Okay.  And -- and
18    at the pre-termination review, did Mr. Garavaglia
19    have the right to have counsel there?
20         A    Yes.
21         Q    All right.  Well, and -- and would
22    that have provided him and his counsel with an
23    opportunity to review that evidence and refute any
24    charges?
25         MR. BLANKE:  Objection as to the form
```

Page 62

```
 1    of the question regarding the use of the word
 2    "would" rather than "should," whether it would or
 3    not calls for speculation.
 4         MS. HAMILTON:  You can answer.
 5         A    Yes.
 6         Q    (BY MR. NORWOOD)  All right.  I want
 7    to backtrack a bit, and I hate to jump around, but
 8    let's take a look at tab 1.  And while you're --
 9    and it's marked Frank Deposition Exhibit 1.  And
10    while folks are locating that tab, for the record,
11    that exhibit, Frank Depo Exhibit 1, is a document
12    entitled Second Amended Complaint for Employment
13    Discrimination filed by Mr. James Garavaglia
14    against the City of St. Louis and Darlene Green.
15         Do you see that document?
16         A    Yes, I do.
17         Q    All right.  And let me direct your
18    attention to paragraph -- I'm sorry.  Page 4.  Do
19    you have that page, sir?
20         A    I do.
21         Q    Okay.  And let me read some of the
22    language.  Let's start at paragraph 16.
23         It says, quote, (Quote as read):
24         Defendant Green then withdrew
25         Plaintiff's forced leave yet again
```

Page 63

```
 1         for the same reasons as set forth
 2         above, repeating this conduct for the
 3         third separate occasion,
 4         necessitating Plaintiff multiple --
 5         I'm sorry, Plaintiff filing multiple
 6         appeals to the Civil Service
 7         Commission.
 8         Do you see that?
 9         A    Yes.
10         Q    And then paragraph number 17 says,
11    quote, (Quote as read):
12         The City's director of personnel
13         approved the forced leave each time,
14         knowing that there was no supportable
15         basis for each forced leave decision
16         and/or conspired with Defendant Green
17         to discriminate against Plaintiff as
18         alleged herein.
19         Do you see that?
20         A    I do.
21         Q    All right.  Did you approve -- let's
22    focus on the first forced leave.  July 2, 2019.
23    Did you approve the July 2, 2019, forced leave
24    request with -- without any supportable basis?
25         A    No, I did not.
```

Page 64

```
 1         Q    Did you approve the July 2, 2019,
 2    forced leave request because you were in some
 3    conspiracy with Comptroller Green to discriminate
 4    against Plaintiff?
 5         MR. BLANKE:  Let me object, calls for
 6    legal conclusions on the part of the witness.
 7         MS. HAMILTON:  You can --
 8         Q    (BY MR. NORWOOD)  Well, your
 9    understanding of conspiracy.  Were you huddling up
10    with Comptroller Green in an effort to discriminate
11    against Mr. Garavaglia based on race, sex, age?
12         A    No.
13         MR. BLANKE:  Same objection.
14         MR. NORWOOD:  I'm sorry?
15         MR. BLANKE:  Same objection.
16         MR. NORWOOD:  And I just want to make
17    sure the witness --
18         MR. BLANKE:  He said no.
19         MR. NORWOOD:  Well, I to make sure
20    she got that.
21         THE WITNESS:  I'll slow down.
22         MR. NORWOOD:  You can say what he
23    said, but let's let him say it again.
24         Q    (BY MR. NORWOOD)  Could you answer
25    that one?
```

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

RICHARD R. FRANK  3/10/2022

Page 65

1      A    No.
2      Q    What's your view of that allegation
3   directed to -- against you personally?
4           MR. BLANKE:  Objection as to
5   relevance.
6           MS. HAMILTON:  You can answer.
7      A    I only have -- first I had only one
8   conversation with Comptroller herself, as I said in
9   my original conversation with Judy Armstrong on the
10   Saturday before I approved the forced leave.  I did
11   not speak with Comptroller.  I only spoke to
12   Comptroller once and that was after this matter,
13   you know, had occurred about Mr. Garavaglia.
14           And secondly, in terms of conspiracy
15   to discriminate, I only met Mr. Garavaglia perhaps
16   once.  So I had very, very little knowledge of him
17   other than he was a nice guy.
18      Q    (BY MR. NORWOOD)  Well, and so did
19   you have any reason to conspire against him based
20   on his age or sex or race or anything like that?
21      A    No.  I think we're sort of in the
22   same group there.
23      Q    Got it.  And for the record, what
24   group is that?
25      A    I'm a white male who is 61 years of

Page 66

1   age.
2      Q    Okay.  All right.  Let's go to tab --
3   Exhibit tab 11, Frank Deposition Exhibit 11.  Take
4   your time, if you could, just take a look at the
5   exhibit which, for the record, there are two pages,
6   and it's Bates stamped STL000707 on the first page,
7   and the second page is STL000708, for the record.
8           First of all, what is the first page
9   of Frank Depo Exhibit 11?
10      A    This is a letter from Comptroller
11   Green asking me to give a -- to approve, pursuant
12   to the compensation ordinance, a non-standard
13   increase for Mr. Garavaglia upon his promotion to
14   Deputy Comptroller.
15           The compensation ordinance provides
16   that a person receive a 5 percent normally upon
17   promotion; although, the appointing authority can
18   ask for approval from the director of personnel to
19   grant a higher, non-standard promotional increase
20   in certain circumstances.
21      Q    Okay.  Let's unpack that, if we
22   could.
23           In the normal course, based upon what
24   you understood, him being promoted to deputy
25   Comptroller would have entitled him to a 5 percent

Page 67

1   salary increase from where he was being
2   compensated; is that right?
3      A    Yes.  Or, with the proviso that he
4   would also go to the minimum of the range.  So this
5   was not the case I believe here, but sometimes
6   there is such a large gap between pay ranges that
7   it might automatically result in a 7 percent, et
8   cetera.
9      Q    Right.
10      A    But -- but not -- not in this case to
11   the best of my recollection.
12      Q    Okay.  So he would have been entitled
13   to a 5 percent salary increase; is that right?
14      A    Yes.
15      Q    And because of that, why -- well,
16   strike that.
17           So why would Comptroller Green have
18   to send this to you as it relates to his
19   compensation?
20           MR. BLANKE:  Objection, asked and
21   answered.
22           MS. HAMILTON:  You can answer.
23      A    In our system, the compensation
24   ordinance is the legal document that determines how
25   we pay all of our civil service employees, and even

Page 68

1   excepted employees, and it gives discretion to the
2   director of personnel alone to approve non-standard
3   increases.
4      Q    (BY MR. NORWOOD)  Okay.  And -- and
5   the non-standard, if I'm understanding you, and you
6   correct me if I'm wrong, the non-standard increases
7   would be the increases beyond the document that
8   you've identified; is that correct?
9      A    Yes, sir.
10      Q    All right.  And do you know why
11   Comptroller Green requested a 5 percent salary
12   increase above what he would normally be entitled
13   to?
14      A    My understanding was because he was
15   moving to such a high level --
16           MR. BLANKE:  Objection, it's
17   non-responsive.  The question was whether you know
18   why.
19           THE WITNESS:  Whether I know why?
20           MR. NORWOOD:  Well, and he was
21   answering whether he knew why.
22           MS. HAMILTON:  You can -- you can
23   continue.
24           MR. BLANKE:  I might object to that
25   one.

17 (Pages 65 to 68)

## RICHARD R. FRANK  3/10/2022

Page 69

1      MS. HAMILTON:  He's objecting.  You
2  can continue.
3      A    My understanding was that --
4      MR. BLANKE:  Objection,
5  non-responsive.  He's not us asking what your
6  understanding was.
7      MS. HAMILTON:  Your objection is
8  noted, Counsel.  You can answer.
9      MR. BLANKE:  I understand.  I just
10  wanted to object to it again.
11      A    My understanding from -- from the
12  Comptroller's office was because he was moving to a
13  very high level position.
14      Q    (BY MR. NORWOOD)  Okay.  And do you
15  know if she was required to add another 5 percent?
16      A    No.
17      Q    Do you know why, if Comptroller Green
18  was discriminating against him based on his race or
19  sex or age, why she would recommend a 5 percent
20  increase over and above what he would normally be
21  entitled to?
22      MR. BLANKE:  Objection, not supported
23  by the evidence, and calls for speculation.
24      MS. HAMILTON:  You can answer.
25      A    No.

Page 70

1      Q    (BY MR. NORWOOD)  Let's go to the
2  next page of Frank Deposition Exhibit 11.  What is
3  that?
4      A    This is a letter to Comptroller Green
5  from me saying that based upon her recommendation
6  and in accordance with the compensation ordinance,
7  I am approving her request.
8      Q    Okay.  And just so that my record is
9  -- our record is square, the first letter is dated
10  May 20, 2016, from Darlene Green to you; is that
11  correct?
12      A    Yes.
13      Q    All right.  And is that when he was
14  promoted to Deputy Comptroller?
15      A    Actually, the date I believe, sir,
16  says that his promotional date would be as of
17  May 13, 2016.
18      Q    Okay.  So -- so would that suggest
19  then that he was actually promoted on May 13, 2016?
20      A    Yes.  It would suggest that.
21      Q    All right.  And the request, which
22  would have been made May 20, 2016, would have meant
23  that his effective salary increase would start as
24  of his promotion date.  Is that right?
25      A    Yes.

Page 71

1      Q    All right.  But all of that had to be
2  approved by you.
3      A    Yes.
4      Q    All right.  Let's go to the next page
5  of that Frank Depo Exhibit 11 which is a letter --
6  it appears to be a letter -- well, strike that.
7      What is that page of the exhibit?
8  For the record --
9      (Overtalking - inaudible.)
10      MR. BLANKE:  What page are we on?
11      MR. NORWOOD:  For the record --
12      MR. SCHMITZ:  You said "the next
13  page." What page are you on?
14      MS. HAMILTON:  We're on 11.
15      MR. NORWOOD:  The second page of
16  Exhibit 11 and the Bates stamp page number, for the
17  record, is STL000708.
18      MR. BLANKE:  So you're one back.
19      MS. HAMILTON:  No, you're on the
20  correct page.
21      MR. BLANKE:  Oh, okay, sorry.
22      A    This is my response, sir, to
23  Comptroller Green approving her request for a
24  non-standard 10 -- approximately 10 percent
25  increase for Mr. Garavaglia upon his promotion to

Page 72

1  Deputy Comptroller.
2      Q    (BY MR. NORWOOD)  Okay.  And for the
3  record, the letter is dated June 6, 2016.  Is that
4  correct?
5      A    Yes.
6      Q    Okay.  Let's read the second
7  paragraph of that letter.  And before we do that,
8  it looks like it was CC'd to Terry -- who is that?
9  How do you pronounced that last name?
10      A    Terry Dabrowski.
11      Q    Dabrowski, okay.  And who is Terry
12  Dabrowski?
13      A    She was the manager of the personnel
14  services section of the Department of Personnel.
15  She's since passed away.
16      Q    Okay.  Second paragraph says quote,
17  (Quote as read):
18      Based on your recommendation, please
19      be advised that, in accordance with
20      Section 6(a)(1), I am hereby
21      approving your request.
22      Is that right?
23      A    Yes.
24      Q    And so you did approve the request;
25  right?

18 (Pages 69 to 72)

**RICHARD R. FRANK  3/10/2022**

Page 73

1     A   Yes.
2     Q   All right.  And then it goes further
3  and says, quote, (Quote as read):
4         Therefore, upon Mr. Garavaglia's
5         appointment to the position of Deputy
6         Comptroller, in parens it has
7         (01488-21M-1).
8         What is that number?
9     A   That number refers to his actual
10 position and pay grade, the M meaning that he is a
11 management person, the 1 meaning that he's excluded
12 from overtime provisions of the FLSA.
13    Q   Okay.  And continuing on, it says,
14 (Quote as read):
15        His salary shall be $4,867 biweekly
16        (step 15), approximately 10 percent.
17        Is that correct?
18    A   Yes.
19    Q   What is step 15?  What does that
20 mean?
21    A   There are 30 steps in the current
22 compensation ordinance.  Each step is approximately
23 1.5 percent higher than the next, and so in order
24 to make sure that the payroll office and the
25 Comptroller's office, we set a salary correctly, we

Page 74

1  put in the exact step and pay for their information
2  when we make such approvals.
3     Q   Okay.  Did you have to approve this
4  request?
5     A   Pardon me?
6     Q   Did you have to approve this request?
7     A   No, it's discretionary.
8     Q   Okay.  And why did you approve this
9  request?
10    A   Based upon the recommendation of my
11 classification compensation section, as well as my
12 personal review of his movement to such a high
13 level position, I felt it warranted a non-standard
14 increase.
15    Q   And his supervisor was recommending
16 it.  Was that a factor as well?
17    A   Absolutely.
18    Q   Okay.  Let's go to the next -- well,
19 why don't we take a short break, if we could, if
20 that's okay?
21        THE VIDEOGRAPHER:  Time is 11:12 AM,
22 we are off the record.
23        (Off the record.)
24        THE VIDEOGRAPHER:  The time is 11:41,
25 we are back on the record.

Page 75

1     Q   (BY MR. NORWOOD)  Okay.  Mr. Frank, I
2  believe you indicated that you wanted to clarify
3  the record about the call you had with Judy
4  Armstrong as it related to the first forced leave?
5  You wanted to clarify something on that point?
6     A   Yes, thank you.  Um, I indicated
7  that, um, that -- and I did not speak to the
8  Comptroller directly.  I believe that Judy was the
9  only person that I -- I spoke to other than Chana,
10 who made the connection of -- of the phone for me.
11        So I thought -- I thought that they
12 said Beth was on the line.  I did not speak to her
13 but I'm not sure.  So I just wanted to be clear
14 about that.  I'm sorry.
15    Q   Okay.  Thank you, sir, for clarifying
16 that.
17        Who appointed you to your position as
18 director of personnel for the City of St. Louis?
19    A   Former Mayor Slay, Francis Slay.
20    Q   Okay.  Do you know if -- if Ms. Green
21 had any role in that process?
22    A   No, she did not.
23    Q   Have there been occasions where
24 personnel-related requests have come from the
25 Comptroller's office to your office that you

Page 76

1  denied?
2     A   Yes.
3     Q   What -- what type of -- obviously
4  without specifying the particular personnel, but
5  what kind of requests do you recall --
6     A   They were --
7     Q   -- denying coming from the
8  Comptroller's office?
9     A   I remember requests for non-standard
10 promotional increases.  I remember requests for
11 special performance increases, and I also remember
12 requests for developing new job classes, and I
13 remember requests for reclassifications.  All of
14 which, from time to time, I've denied.
15    Q   And why -- without getting specific,
16 why did you deny those various requests from the
17 Comptroller's office?
18    A   Because those requests did not have
19 merit based on my assessment and the
20 recommendations of my classification and
21 compensation unit.
22    Q   Okay.  So if anyone were to suggest
23 that you were a rubber stamp for the Comptroller's
24 office, would there be any truth to that?
25    A   None.

19 (Pages 73 to 76)

**RICHARD R. FRANK  3/10/2022**

Page 77

```
 1       Q    All right.  Let's turn to Frank Depo
 2   Exhibit 12, if we could?  What is Frank Depo
 3   Exhibit 12?  Well, strike that.
 4           For the record, Frank Deposition
 5   Exhibit 12 consists of multiple pages that are
 6   Bates stamped, the first is STL000698.  The next
 7   one is STL000689.  The next one is STL000687.  And
 8   the next one is STL000678.
 9           So let's start with the first page of
10   Frank Deposition Exhibit 12, which is the
11   STL000698.  What is that document?
12       A    That's the Employee Status Form,
13   and what this documents is the promotion of
14   Mr. Garavaglia to Deputy Comptroller with the
15   increase in salary.
16       Q    Is this 10 percent -- it says "Reason
17   For Data Change," and in parentheses it says "(10
18   percent increase 'salary adjustment')."
19           Do you see that?
20       A    Yes.
21       Q    And that's -- is that salary
22   adjustment the additional 5 percent on what he
23   normally would have been entitled to?
24       A    Yes.
25       Q    All right.  Let's go to the next page
```

Page 78

```
 1   of that exhibit which is STL000689.  And that's a
 2   similar form which is the form, just for the
 3   record, it says Employee Status Form.  Is that the
 4   form we were talking about?
 5       A    Yes.
 6       Q    And this particular Employee Status
 7   Form is for Mr. Garavaglia.  Is that correct?
 8       A    Yes.
 9       Q    And it's dated 6/15/17.  Is that
10   right?
11       A    Yes.
12       Q    And do you know what the purpose of
13   this particular form was for?
14       A    Yes.  This is to process the
15   employee's annual increase.
16       Q    Okay.  And for the record, it says
17   "Reason For Data Change," it says "Merit," and then
18   in parentheses it has "(Step) increase."
19           Do you see that?
20       A    Yes.
21       Q    And what does that mean?
22       A    What that means, we are a merit
23   system, and so employees automatically would get
24   their annual increase, which we call a merit
25   increase, unless their appointing authority submits
```

Page 79

```
 1   a service rating in which the employee is rated as
 2   overall unsuccessful, in which case they, you know,
 3   do not receive that merit increase.
 4       Q    Okay.  But where does the step part
 5   fit into the mix?
 6       A    The step increase just indicates that
 7   it's the normal annual increase.  We have 30 steps
 8   in our system.  Actually there are some more at the
 9   end now because of -- our new pay study, but
10   current compensation ordinance has 30 steps and
11   each step is 1.5 percent.
12           So unless an employee were granted --
13   the appointing authority asked me for a special
14   performance increase and it were granted, it would
15   just be called the step increase, which is 1.5
16   percent.
17       Q    And that's the standard annual
18   increase?
19       A    It's -- it has been standard, except
20   the last few years it was 3 percent.
21       Q    Instead of the 1.5?
22       A    Yes.
23       Q    How long was it 1.5, do you recall?
24       A    Oh, gosh.  Maybe 2016, '17?  I'm not
25   sure.  We negotiated with the unions.  We used to
```

Page 80

```
 1   have open ranges and they weren't working, so we
 2   negotiated 30 steps and each step had about a 1.5
 3   percent in between them except the trades.
 4           The trades, because they had an
 5   expanded range, received a larger one in step 30.
 6   But for all other employees it was about 1.5
 7   percent, excluding police and fire that had
 8   separate, they have a separate type of -- of pay
 9   matrix.
10       Q    Okay.  And then let's go to the next
11   page, which, for the record, is the Employee Status
12   Form and it looks like it was completed 6/20/18?
13       A    Yes, sir.
14       Q    Is that right?
15       A    Yes, sir.
16       Q    And is that for Mr. Garavaglia?
17       A    Yes, sir.
18       Q    And does this reflect a "Merit (Step)
19   increase" as well?
20       A    Yes.
21       Q    That would have been the standard 1.5
22   percent increase?
23       A    Yes, I believe in 2018 it was still.
24       Q    Yep.
25       A    Right.
```

20 (Pages 77 to 80)

RICHARD R. FRANK  3/10/2022

Page 81

```
 1        Q     Let's go to the next page, STL000678.
 2   Do you see that?
 3        A     Yes.
 4        Q     And is that an Employee Status Form
 5   for Mr. Garavaglia?
 6        A     Yes, it is.
 7        Q     And the "Reason For Data Change," it
 8   says "Retired effective 10/1/19."  Is that correct?
 9        A     Yes.
10        Q     All right.  Let's turn to the next
11   document, which is Frank Depo Exhibit 13.  And for
12   the record, it is a group exhibit which appears to
13   have consecutively numbered pages starting with
14   STL001373 through STL001408.
15              I'm going to direct your attention to
16   -- it is five pages in, and the bottom is Bates
17   stamped page STL001377.  Do you have that page in
18   front of you?
19        A     I do.  I do.
20        Q     Okay.  What is that page?
21        A     This is the page that is generated by
22   the Board of Trustees of the Employees Retirement
23   System document and the Award of Pension Allowance.
24        Q     Maybe it'd be better to come back to
25   that page.  Let's skip down to STL001405, if we
```

Page 82

```
 1   could.  Do you have that page in front of you?
 2        A     Not yet.  I'm -- I'm getting there,
 3   sorry.
 4        Q     Yeah, 1405.
 5        A     Is this it?  I -- I think I got it.
 6   Thank you.
 7        Q     Okay.  What is that page?
 8        A     This is the elect -- the form which
 9   is generated by the Employees Retirement office and
10   it elects about -- it's the election of what type
11   of retirement you wish to take.
12        Q     Okay.  And in this case, what does it
13   show?
14        A     It indicates that he was taking
15   normal retirement --
16        Q     "He" who?
17        A     Mr. Garavaglia.
18        Q     Thank you.
19        A     -- effective 10/1/19.
20        Q     And when did Mr. Garavaglia make that
21   request?  In the middle of the document it says
22   "Request made" --
23        A     It's --
24        Q     -- "this 30th day of August --
25        A     "August."
```

Page 83

```
 1        Q     -- "2019"?
 2        A     Yes.
 3        Q     And would that reflect, then, the
 4   date that he elected to take retirement?
 5        A     Yes.
 6        Q     All right.  And for the record,
 7   August 30 of 2019 would have been two days after
 8   the notice of pre-termination; do you recall the
 9   letter dated August 28, 2019 --
10        A     I remember seeing it.  I'd have to go
11   back to the --
12        Q     All right.  Let's go back to that
13   exhibit which is --
14        A     Yes.
15        Q     -- Exhibit --
16        A     10.
17        Q     -- 9 and 10 --
18        A     Yes.
19        Q     -- 10 being the termination notice?
20        A     Yes, I have it, sir.
21        Q     So it looks like two days after the
22   pre-termination notice was, says "Hand-Delivered"
23   to Mr. Garavaglia, he elected to retire.  Is that
24   what it appears, based on these records?
25        A     Yes, it does.
```

Page 84

```
 1        Q     And it -- and a -- and going back to
 2   Exhibit 10, there was a pre-termination -- it says
 3   hearing but we talked about a different term, your
 4   term was review, was set for September 12, 2019, at
 5   9 AM.  Is that right?
 6        A     Yep.
 7        Q     Per Frank Depo Exhibit 10?
 8        A     Yes.
 9        Q     All right.  So, and that was the
10   opportunity for him to present evidence, have his
11   lawyer present, et cetera.  Is that right?
12        A     Yes.
13        Q     All right.  But instead, two days
14   later he submitted retirement papers?
15        A     Yes.
16        Q     Then let's go back to five pages into
17   Exhibit 13, which was the Award of Pension
18   Allowance.  Sorry to have you jumping around.
19        A     Oh, that's okay.  I have it.
20        Q     Okay.  And -- and who -- who submits
21   this document?
22        A     This document is submitted to the
23   Board of Trustees by Denise Droege, or whoever is
24   occupying the position of manager of the Employees
25   Retirement System, who reports directly to the
```

ALARIS LITIGATION SERVICES

www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

RICHARD R. FRANK  3/10/2022

Page 85

1    director of personnel.
2         Q    Okay.  And so is this -- was this
3    particular document, STL0001370 -- 1377 issued --
4    triggered based upon the request to retire by
5    Mr. Garavaglia?
6         A    Yes.
7         Q    All right.  And it talks about the
8    "Date Request Filed" of "August 30, 2019."  Is that
9    right?
10        A    Yes.
11        Q    And it talks about -- well, what else
12   -- what else is included in here?
13        A    It talks about the person's credible
14   years of service.  It talks about the period of
15   service, what their title is, their date of birth,
16   what their, um, I think I said final average
17   compensation, and then it also includes what the
18   anticipated final average -- I'm sorry, the pension
19   allowance is, you know, prior to taxes.
20        Q    Okay.  And let's go to STL0001407,
21   which is second from the back.  That makes it
22   easier to find.
23        A    Okay.  Yeah.
24        Q    Are you there?
25        A    I am, thank you.

Page 86

1         Q    And for the record, it is a document
2    that has a heading, Acknowledgment of Retirement
3    Pension Laws, Rules, Regulations and Policies.
4         Do you see that?
5         A    Yes.
6         Q    What is that?
7         A    This is something that's a notice
8    that is required to be signed by anyone who is
9    applying for retirement through the Employees
10   Retirement System.
11        Q    Okay.  And for this particular
12   document, STL001407, is that signed and
13   acknowledged by Mr. James Garavaglia?
14        A    Yes, it is.
15        Q    And is dated 8/30/19; is that right?
16        A    Yes.  That's correct.
17        Q    And that's him essentially
18   acknowledging the retirement pension laws, rules,
19   regulations, and policies; is that right?
20        A    Yes.
21        Q    Okay.  Is there a process in the
22   City, at least when you were there as director of
23   personnel, is there a process by which a person can
24   pursue a grievance if that person believes he or
25   she has been discriminated against based upon race,

Page 87

1    age, or sex?
2         A    Yes.
3         Q    What is that process?
4         A    It's covered under Administrative
5    Regulation 51, which is -- pardon me.  Pardon me.
6    It's covered by -- I believe it's Administrative
7    Regulation 103 which is the policy against Title
8    VII type of -- of violations, and it instructs the
9    employee that they can either go to their diversity
10   counselor in their own department, or they can go
11   to their appointing authority, or they can come
12   directly to the employee relations section and
13   speak in confidence to, you know, a member of the
14   department personnel staff.
15        Q    Okay.  And that would be a
16   confidential communication; is that right?
17        A    Yes.
18        Q    All right.  Do you know if James
19   Garavaglia ever pursued any claim of discrimination
20   against Comptroller Darlene Green, or anyone else,
21   based upon race, age, or sex discrimination
22   allegations?
23        A    I'm unaware myself of any.
24        Q    Okay.  And while you were there, had
25   you received anything along those lines?

Page 88

1         A    No.
2         Q    If there were such a thing, would you
3    have been made aware of it?
4         A    Possibly.
5         Q    Okay.
6         A    It's -- I would say, you know, the
7    person may just want to come in and explore their
8    options with the employee relations section but not
9    actually pursue something.
10        Q    Okay.
11        A    So in that case I wouldn't have been
12   informed necessarily.
13        Q    Well, what if that person who made
14   the allegation decided to pursue something?  Would
15   that come to your -- to your attention?
16        A    Yes.
17        Q    All right.  And to your knowledge,
18   nothing from Mr. Garavaglia came to your attention
19   related to suggestions of discrimination based upon
20   race, age, or sex.  Is that correct?
21        A    Correct.
22        MS. HAMILTON:  And you're referring
23   to Administrative Regulation 103, the internal
24   process; correct?
25        MR. NORWOOD:  Yes.  In terms of pro

22 (Pages 85 to 88)

RICHARD R. FRANK  3/10/2022

Page 89

1   -- procedures, whatever is set forth in that --
2       A    Correct.
3           MR. NORWOOD:  -- administrative
4   regulation for discrimination allegations.
5       A    You're correct.  I'm not referring to
6   any complaints with MCHR or EEOC.
7       Q    (BY MR. NORWOOD) Okay.  We're
8   talking internal complaints.
9       A    Yes.
10      Q    All right.  And if such a complaint
11  were made, how does that process go?
12      A    That complaint --
13          MR. BLANKE:  Let me object as to
14  relevance, but go ahead.
15          MS. HAMILTON:  You can answer.
16      A    The employee relations section would
17  -- the manager would, either herself or himself or
18  one of the staff members, meet with the person and
19  do a thorough investigation.  And when I say
20  thorough, it is.  It's documented and then it is
21  presented to the director of personnel for his or
22  her personal review and approval of the report, and
23  then the findings are related both back to -- or
24  back to both the appointing authority as well as
25  the employee.

Page 90

1       Q    (BY MR. NORWOOD) And are there any
2   next steps beyond that, assuming there's a finding
3   of discrimination?
4       A    If there's a finding of
5   discrimination, then the employee relations section
6   typically would include suggested remedial steps to
7   ameliorate the situation.
8       Q    And to your knowledge, none of that
9   happened as related to Mr. James Garavaglia; is
10  that correct?
11      A    That's correct.
12      Q    What is an employee rating?
13      A    An employee rating is part of the
14  larger City civil service employee rating process,
15  it's approved by the Civil Service Commission, and
16  it's either an annual rating, which is done on
17  those dates we discussed before, which determines
18  whether or not the employee is eligible for the
19  annual merit slash step increase, or there can be a
20  probationary rating, which is their initial working
21  test period, one that typically occurs after six
22  months, it can be extended by -- with the approval
23  of the director of personnel an additional five
24  months.
25          And then lastly, there might be a

Page 91

1   special interim rating that occurs if a person's
2   performance dramatically increases or decreases
3   during the annual period of time.
4       Q    And who submits those ratings on
5   behalf of an employee?
6       A    The appointing authority.
7       Q    Okay.  Who actually performs the
8   ratings for a particular employee?
9       A    The employee's supervisor typically
10  will do them, but they need to be signed off by the
11  appointing authority --
12      Q    By the appointing --
13      A    -- or -- or the appointing authority
14  designee has the right to do that in many
15  instances.
16      Q    Okay.  Do all supervisors provide
17  ratings for employees?
18      A    No, they do not.
19      Q    Is that fairly common in the City of
20  St. Louis?
21      A    Yes.
22          MR. BLANKE:  I'm sorry, I was going
23  to object as to vagueness, because is what fairly
24  common?  Doing it or not doing it?  You said is it
25  fairly common.

Page 92

1           MR. NORWOOD:  Fair enough.
2       Q    (BY MR. NORWOOD) Is not submitting
3   an employee rating fairly common in the City?
4       A    Oh.  Oh, yes.
5       Q    And I believe you may have touched on
6   this before, so, but if an employee is not rated,
7   does that mean they would automatically receive
8   that step increase you talked about?
9       A    If an employee is not rated, their
10  last rating on record in their file is the one that
11  prevails.  So if it was successful, or highly
12  successful, then yes, they would -- they would
13  still receive that increase.
14      Q    Okay.  Did Mr. James Garavaglia ever
15  come to you and complain to you that he did not
16  receive a rating as Deputy Comptroller?
17      A    No.
18      Q    Did -- and we saw that, from the
19  forms we looked at in '17 and '18, he received that
20  merit step increase those two years, '17 and '18?
21      A    Yes.
22      Q    Now, let's talk about part-time
23  employment as it relates to retirees.  How does
24  that work?  When someone retires, how does one go
25  about working part-time with the City?

23 (Pages 89 to 92)

RICHARD R. FRANK  3/10/2022

Page 93

```
1        A    A person who wants to work part-time
2    with -- with the City, who is retired, you know, is
3    -- is eligible to request reemployment papers.  And
4    many employees do.  And they have to complete those
5    retirement -- or reemployment papers, and they are
6    then sent to the personnel services section of the
7    Department of Personnel, and in the vast majority
8    of instances, you know, those -- those requests are
9    approved, provided, however, that the employee does
10   not have, you know, a -- a work history of
11   documented, you know, repeat disciplinary problems,
12   et cetera.
13       Q    Okay.  In the case of Mr. James
14   Garavaglia, are you aware of him submitting any
15   request to work part-time after his retirement from
16   the City of St. Louis?
17       A    I'm not personally aware, no.
18       Q    Okay.  Do you know if, in the case of
19   Mr. James Garavaglia, whether or not, if he applied
20   for reemployment as a part-time employee following
21   retirement, whether or not he had to work for the
22   Comptroller's office?
23       A    I have no knowledge of that.
24       Q    Okay.  Well, let me ask it this way.
25   Do you know if there were other departments he
```

Page 94

```
1    could have applied to work in other than the
2    Comptroller's office?
3        A    Yes.
4        Q    Okay.  And you talked about some
5    thirty-some-odd departments within the City.
6    Correct?
7        A    Yes.
8        Q    So do you know if Mr. Garavaglia
9    could have applied to work part-time for the City
10   of St. Louis in a department other than the
11   Comptroller's office and actually worked in that
12   department?
13       A    Yes.
14       Q    Okay.  Do you know if there was any
15   prohibition against him doing that today?
16       A    No.
17       Q    Okay.  Well, doing that at the time
18   you retired, you were not aware any of prohibition
19   against him applying and working part-time either
20   at the Comptroller's office or some other
21   department in the City.  Correct?
22       A    No.
23       Q    Correct, meaning you're not aware any
24   of prohibition; is that right?
25       A    No.  I'm not aware of any
```

Page 95

```
1    prohibition.
2        Q    And it's just a matter of filling out
3    an application and submitting that to personnel; is
4    that right?
5        A    That's correct.
6             MR. NORWOOD:  I think I may be done.
7    Let me just take a moment here.
8             Okay.  I think at this moment I am
9    done.  I don't know if other counsel have
10   questions.
11            MR. BLANKE:  Oh, I have lots of
12   questions, but can we eat?
13            MR. NORWOOD:  If the food's here.  I
14   mean, I don't have any control of that.  So you're
15   saying you want to see if we can take a lunch
16   break?
17            MR. BLANKE:  If -- yeah.
18            MR. NORWOOD:  Could you check, Joy,
19   just to -- just to see, and why don't we go off the
20   record for a minute while we --
21            THE VIDEOGRAPHER:  Time is 12:08, we
22   are off the record.
23            (Off the record.)
24            THE VIDEOGRAPHER:  The time is 1:05
25   PM, we are back on the record.
```

Page 96

```
1            EXAMINATION
2    QUESTIONS BY MR. BLANKE:
3        Q    So, Mr. Frank, my name is Richard
4    Blanke, I represent the Plaintiff, Jim Garavaglia.
5    And if you don't understand any questions that I
6    ask you, either because you didn't hear it or
7    because you don't understand it, will you please
8    say that so I can try to rephrase it if I can?
9        A    Yes.
10       Q    Okay.  Since the date your retirement
11   became effective -- which I think was January 1 of
12   2022?
13       A    Yes.
14       Q    -- have you been doing any consulting
15   work for the City, or any other kind of services
16   for the City?
17       A    No.
18       Q    Do you plan to?
19       A    No.
20       Q    Okay.  Um --
21            MR. NORWOOD:  That was three pages --
22            MR. BLANKE:  What's that?
23            MR. NORWOOD:  No, I said that was
24   three pages worth right there.
25            MR. BLANKE:  True.  Don't be too
```

24 (Pages 93 to 96)

**RICHARD R. FRANK  3/10/2022**

Page 97

1    encouraged.
2        Q    (BY MR. BLANKE)  Okay.  Now, you --
3    you indicated on direct examination by Mr. Norwood
4    that once an employee is placed on forced leave,
5    they are usually removed or escorted off the
6    premises of the work site at the time they're
7    notified of the forced leave, I believe is what you
8    said.
9        A    Yes.
10       Q    Okay.  My first question, is that
11   always the case?
12       A    I couldn't testify to always because
13   it could happen and I wouldn't be aware of it.
14       Q    The second question is, you know, my
15   understanding is, is that the appointing authority,
16   or the designee, makes a request to your office
17   that -- for the forced leave, and then you approve
18   it, and that could be a day or two or something
19   like that, and they have some time limit within
20   which to do that; right?
21       A    Yes, 72 hours.
22       Q    So the question is, do they get
23   removed from the premises after the decision is
24   made by the appointing authority to put them on
25   forced leave, or after you approve the decision?

Page 98

1        A    After the appointing authority makes
2    the decision to initially place them on forced
3    leave.
4        Q    And that happens before you approve
5    the decision?
6        A    Yes.
7        Q    Okay.  You said that rescinding or
8    withdrawing a forced leave and then reinstating a
9    forced leave thereafter was unusual, but that you
10   knew that it did occur on certain times --
11       A    Yes.
12       Q    -- or has occurred; correct?
13       A    Yes.
14       Q    Okay.  How unusual?
15       A    I can only recall it happening --
16   happening a handful of times.
17       Q    Okay.  Do you remember those specific
18   occasions?
19       A    One was an occasion in the forestry
20   department, I may have alluded to it, but when an
21   employee originally made a -- a threatening remark
22   and was immediately returned because we didn't
23   think that it felt -- it really met that the -- the
24   threshold for forced leave, but then immediately
25   upon returning, made physical contact.

Page 99

1        There was another example in the
2    police division where a person was charged with --
3    with an alcohol violation when they were driving,
4    and they were -- the forced leave was rescinded and
5    they were allowed to come back to desk duty but
6    then IED uncovered other incidents that occurred
7    during the investigation.  And so the -- they
8    requested forced leave for the employee again.
9        Those are two that come to mind
10   immediately.
11       Q    Okay.  You also testified in direct
12   that -- direct examination that if there are
13   additional allegations unearthed by the
14   investigation, that they should be and usually are
15   considered in the determination as to whether
16   forced leave would continue or be reinstated if it
17   had been withdrawn earlier; correct?
18       A    Yes.
19       Q    Okay.  Is there -- is there any
20   limitations regarding the scope of what these
21   additional allegations would be that would justify
22   reinstatement of a forced leave?  Like the two
23   examples you just gave.
24       I mean, the two examples you just
25   gave were when additional allegations unearthed

Page 100

1    after the forced leave was withdrawn; correct?
2        A    Yes.
3        Q    So, you know, if there were
4    additional allegations unearthed of misconduct or
5    alleged misconduct that occurred nine years earlier
6    or thereabouts, would that justify a reinstatement
7    of forced leave alone?
8        A    It depends on the nature of the
9    violations.
10       Q    Right.
11       A    You know, typically if it were a
12   violation that were something as simple as being 15
13   minutes late to work on an attendance sheet,
14   perhaps not.  But if it was a violation of sexual
15   harassment, yes.  So it really depends on the
16   nature of the prior allegations -- or I mean of the
17   prior incidents which led to additional violations.
18       Q    And what about the length of time,
19   how far back it goes?  Does that factor into it as
20   well, or no?
21       A    It would, again, depending on --
22   there's no hard, fast rule about that, but one
23   would have to exercise discretion depending on the
24   severity of the allegations.
25       Q    Okay.  Now, here, with regard to

25 (Pages 97 to 100)

## RICHARD R. FRANK  3/10/2022

Page 101

```
 1    Mr. Garavaglia, when Comptroller Green withdrew her
 2    first request for forced leave, she asked that
 3    forced leave be reinstated within days; correct?
 4        A    Yes, that's my recollection.
 5        Q    And there was no additional
 6    allegations brought to your attention at that time.
 7            MR. NORWOOD:  Well, let me object
 8    because that assumes facts not in evidence.
 9    Subject to that.
10        A    No, no additional allegations were
11    made known to me.
12        Q    (BY MR. BLANKE)  Right.
13        A    She was --
14        Q    That's all you can say.
15        A    Yeah.
16        Q    And then the second time, it was
17    actually the very same day or the day after that
18    she reinstated the forced leave; is that correct?
19        A    That's correct.
20        Q    And again, there are no additional
21    allegations that came to you that occurred during
22    that time period; is that correct?
23        A    Not to me as director of personnel,
24    no.
25        Q    And why would -- why would it be
```

Page 102

```
 1    necessary to withdraw a forced leave request and
 2    then file another one?  Why couldn't it just be
 3    extended?
 4            MS. HAMILTON:  And I would object
 5    that that calls for speculation, but to the extent
 6    you can answer on behalf of Defendant Green, you
 7    may.
 8            MR. NORWOOD:  And let me also object
 9    because I think it's a compound question, but
10    subject to that.
11            MS. HAMILTON:  And you're asking him
12    what Defendant Green's opinion in this question?
13            MR. BLANKE:  No.  I'm just saying in
14    general.
15        A    I was advised that it was done at the
16    recommendation of Deputy City Counselor Nancy
17    Kistler is --
18        Q    (BY MR. BLANKE)  And that's all --
19    that's -- that's all you know about it?  I mean is
20    that -- my question is this.
21            MS. HAMILTON:  You can answer yes or
22    no.
23        Q    (BY MR. BLANKE)  Is -- is that
24    enough?  Apparently it was enough if -- strike all
25    of that.
```

Page 103

```
 1        Is -- is that how you know about it?
 2        A    I know about it through conversations
 3    with Deputy City Counselor Nancy Kistler who
 4    informed me --
 5            MS. HAMILTON:  Objection --
 6        Q    (BY MR. BLANKE)  That's where you got
 7    to stop.
 8            MS. HAMILTON:  -- I'll stop you and
 9    ask you not to go into a privileged conversation
10    with counsel.
11            THE WITNESS:  Okay.  Thank you.
12        Q    (BY MR. BLANKE)  We'll get into this
13    in a minute but -- in more detail, but just do you
14    recall, before we get into it, that the original
15    forced leave was withdrawn and reinstated a very
16    short time before the hearing was scheduled?
17        A    No, I don't -- I don't recollect
18    that.
19        Q    Do you recall the second time that
20    the forced leave was withdrawn, that it was
21    withdrawn one day -- or several days before the --
22    before the hearing was scheduled?
23            MR. NORWOOD:  Let me object in terms
24    of vague and ambiguous with respect to "the
25    hearing."
```

Page 104

```
 1            MR. BLANKE:  The -- good -- good
 2    objection.  I'll rephrase the question.
 3        Q    (BY MR. BLANKE)  Do you recall when
 4    the second forced leave request was withdrawn, that
 5    that occurred within days of the scheduled hearing
 6    before the Civil Service Commission on the second
 7    forced leave?
 8        A    I know that there was some proximity.
 9    I don't recall the direct amount of time -- or the
10    actual amount of time in terms of days, no.
11        Q    Do you recall even looking at that as
12    a factor in deciding whether to approve it?
13        A    No, because receiving -- or I mean,
14    excuse me.  Rescinding a forced leave request is
15    not discretionary with the director, that's with
16    the appointing authority.
17        Q    That answers a question I haven't
18    asked you yet but was going to.
19        So in terms of reinstating a forced
20    leave request, you've already testified that there
21    was no additional allegations brought to your
22    attention.  So why did you improve it?
23            MR. NORWOOD:  Did you say improve it
24    or approve it?
25            MR. BLANKE:  Approve it.  I'm sorry.
```

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

RICHARD R. FRANK  3/10/2022

Page 105

1      MR. NORWOOD:  Okay.
2      A    The original request for forced leave
3   lacked the specific language that was discussed
4   with me during the conversation with Judy
5   Armstrong, which was the -- just a couple of words
6   about serious financial issues which was presented
7   to me.  And so when it was asked to be rescinded
8   and reinstated, you know, with said language, you
9   know, I approved it.
10      Q    (BY MR. BLANKE)  On that basis alone?
11      A    Yeah -- on the basis of that as well
12   as the original conversation I had with Judy
13   Armstrong.
14      Q    I apologize for taking this out of
15   order but it's the way it came up.  You indicated
16   that if a person is found -- if -- if the forced
17   leave is either withdrawn or the Civil Service
18   Commission overrules it, that if vacation time had
19   not been used during the forced leave, that they
20   would be restored their lost pay.  Is that correct?
21      A    Yes.
22      Q    Okay.  And if I understood you
23   correctly, if the vacation time was used during the
24   forced leave, they would not be restored their
25   vacation time under the circumstance where they

Page 106

1   either -- the forced leave is voluntarily withdrawn
2   by the appointing authority or the Civil Service
3   Commission disapproves it?
4      A    They would not be restored unless the
5   period of forced leave were greater than the time
6   that they had used.  Again, if the forced leave
7   period was, for example, for three weeks and they
8   had elected to use time, accrued time for two
9   weeks, they have been paid for two weeks and -- and
10   there's -- we would not be able to double pay an
11   employee --
12      Q    Right, so my question is --
13      A    -- so it would only be for that one
14   week.
15      Q    But my question is different.
16      A    Then I don't understand.  I'm sorry.
17      Q    My question is whether or not the
18   vacation time would be restored.  Not whether they
19   would be paid twice, but that the vacation time
20   they used, that they didn't have to use if they
21   were never placed on forced leave --
22      A    No.  It would not be restored.
23      Q    Okay.  Why isn't that, in your
24   opinion, a deprivation of a property right?
25

Page 107

1      MR. BLANKE:  Well, let me object --
2      MS. HAMILTON:  Objection, calls for a
3   legal conclusion, and I'm going to direct the
4   witness --
5      MR. BLANKE:  Well, he's --
6      MS. HAMILTON:  -- not to answer.
7      MR. BLANKE:  Well, he's the one
8   that's used those words in his direct examination,
9   that he thought it wasn't a property deprivation.
10      Q    (BY MR. BLANKE)  Isn't that correct?
11      A    I was speaking of property
12   deprivation in terms of loss of income.  Of -- you
13   know, of believing -- relying on -- on income.  And
14   this person would have remained on active status on
15   the payroll during that period of time, having used
16   vacation time or -- or compensatory time.  There's
17   no provision to double pay an employee --
18      Q    I'm not talking about double paying
19   an employee.
20      A    Well, vacation time is, and I don't
21   mean to be argumentative, but vacation time and
22   compensatory time are paid out upon retirement or
23   separation --
24      Q    Oh.
25      A    -- so it does have a monetary value

Page 108

1   and so it would, in an effect, amount to double
2   pay.
3      Q    Well, that's assuming that he hadn't
4   used it before he retired.  Isn't that correct?
5      MS. HAMILTON:  Objection, vague.
6      MR. NORWOOD:  Join.
7      Q    (BY MR. BLANKE)  That's assuming that
8   the vacation time would not have been used before
9   his separation from employment.  If he had used
10   that -- that vacation time, that, you know, isn't
11   restored to him, but if it was restored to him and
12   he had used it, then it would never -- then -- then
13   he -- then he -- he wouldn't be getting that upon
14   separation from employment; correct?
15      MS. HAMILTON:  Objection, vague and
16   confusing and compound.
17      MR. NORWOOD:  And calls for a bunch
18   of speculation.
19      MS. HAMILTON:  To the extent that you
20   understood the question, you may answer.
21      A    The only thing I can say to that is
22   while I understand your position or -- or the
23   argument that an employee, you know, could be
24   disadvantaged by being forced to use vacation or
25   compensatory time in order to remaining in pay

27 (Pages 105 to 108)

## RICHARD R. FRANK  3/10/2022

Page 109

1  status during forced leave, you know, that -- this
2  policy, you know, was written in conjunction with
3  our law department, to whom I defer, and was also
4  found to be lawful by the Court of Appeals.
5      Q    (BY MR. BLANKE) Okay.  So you're
6  just testifying, then, about your understanding of
7  the law.
8      A    Yes.
9      Q    Okay.  You also made a comment that
10  -- maybe I'm not familiar with this, but is it
11  possible for the appointing authority to request a
12  forced leave with pay?
13      A    No.
14      Q    Okay. I misunderstood.  Okay.  All
15  forced leaves are without pay unless they take
16  their vacation time.
17      A    That's correct.
18      Q    Okay.  Now, you said that it was some
19  Saturday at 1:30 prior to the first forced leave
20  request, that you received in writing?
21      A    Correct.
22      Q    That you had a discussion with Judy
23  Armstrong --
24      A    Yes.
25      Q    -- on the phone.  Correct?

Page 110

1      A    Yes, I'm sorry.
2      Q    Okay.  And you thought that perhaps
3  Beth Seright may have been on the phone because
4  somebody told you that might have been the case, or
5  something like that.  Right?
6      A    I believe, yes.  I believe that to be
7  true.
8      Q    Is it possible you misunderstood the
9  name and it was Beverly Fitzsimmons they told you
10  was on the phone?
11      A    I don't recall that.
12      Q    I mean, Beth Seright was an
13  administrative assistant at that time; right?
14      A    Right.
15      Q    And Beverly was -- was the other
16  deputy; correct?
17      A    I -- I don't recall that.  The
18  Comptroller regularly used Chana Morton to connect
19  her phone calls, and so I believe that Chana, to
20  the best of my recollection, Chana was the person
21  who put the call through.  I spoke only with Judy
22  Armstrong but I wasn't clear from Judy if
23  Comptroller were, you know, going to participate on
24  the phone call or not.
25          And I think the suggestion was is

Page 111

1  that she would.  I don't know if she came through
2  or not, she did not speak, but I thought that -- I
3  thought I heard another name, but I'm -- I'm not
4  sure if it was Beth or Beverly or I might be
5  mistaken.
6      Q    Okay.  Fair enough.  Now, you
7  indicated that -- I thought you said that in that
8  conversation with Judy Armstrong, that she informed
9  you -- I'm talking about the phone call.  The oral
10  phone call on a Saturday.  Okay?
11      A    Yes.
12      Q    That she informed you that
13  Mr. Garavaglia was being accused of serious fiscal
14  issues.
15      A    Yes.
16      Q    Can you be more specific than that?
17  What -- what -- did she identify what she was
18  talking about?
19      A    No, she did not.
20      Q    And that was enough for you?
21      A    It was enough because she said that
22  they were serious enough that they were bringing
23  them to the attention of the state auditors.
24      Q    Let me go back, I -- I hate -- sorry
25  about jumping around.

Page 112

1      A    That's okay.
2      Q    But you said that they -- they can --
3  the appointing authority or -- can -- can -- or the
4  department head, can remove somebody when they're
5  placed on forced leave before you approve the
6  forced leave.  Is that correct?
7      A    Yeah.  Yes.
8      Q    How is that -- what's the purpose of
9  your approval?
10      A    The approval is to make sure that
11  there's a short duration of time before the
12  department personnel, as an objective reviewer, can
13  determine whether or not the forced leave were
14  appropriate.  You know, there's weekends, there's
15  holidays, and so there's a 72 period -- or a 72
16  hour time period when they have to get that in to
17  me, you know, in writing, and I conduct my review.
18          So, you know, that's the purpose,
19  but, you know, if you had an employee, for
20  instance, who's got a gun at work, and that's
21  happened --
22      Q    Right.
23      A    -- you have them removed immediately.
24  You're not going to --
25      Q    No.

28 (Pages 109 to 112)

RICHARD R. FRANK  3/10/2022

Page 113

```
1        A    -- wait for Mr. Frank or his
2   designate, you know, to be able to prove that.
3        Q    Now -- now, you've seen occasions
4   where -- or you have had occasions where you have
5   disapproved a requested forced leave, you
6   testified?
7        A    Yes.
8        Q    Okay.  Um, so in such a situation,
9   and I'm not talking about Mr. Garavaglia here but
10  just in general, in -- in such a situation where
11  somebody's removed from the premises prior to your
12  approval of the forced leave, because of the forced
13  leave, and then you disapprove of the forced leave,
14  I guess the appointing authority has to be deemed
15  responsible for that removal; isn't that correct?
16       MR. NORWOOD:  Let me object, because
17  it's vague and ambiguous --
18       Q    (BY MR. BLANKE)  I mean, who's the --
19       MR. NORWOOD:  Let me finish.
20       MR. BLANKE:  Let me withdraw the
21  question.
22       MR. NORWOOD:  I'm sorry?
23       MR. BLANKE:  I will withdraw the
24  question.
25       Q    (BY MR. BLANKE)  In that
```

Page 114

```
1   circumstances, it is the appointing authority who
2   would make the sole -- who would be making the sole
3   decision to remove that employee.  Is that correct?
4        A    The employ --
5        MR. NORWOOD:  Let me object -- let me
6   object because that assumes a bunch of facts that
7   are not in evidence and it also mischaracterizes
8   what he's already testified to.  Subject to that,
9   and subject to counsel's instruction.
10       MS. HAMILTON:  You can answer.
11       A    There -- there's different levels of
12  appointing authorities.  We have department heads,
13  such as Sheena, who report directly to, you know,
14  the Mayor.
15       Q    (BY MR. BLANKE)  Right.
16       A    And then there are also lower levels
17  of appointing authorities or designates.  For
18  instance, you know, maybe like a division person.
19  And so those division -- those division people
20  could be appointing authorities, but might very
21  likely, and I would expect them to consult with
22  their department head before they made a decision
23  about forced leave, if it's possible.
24       But we have a lot of field workers in
25  the City, we have people, you know, collecting
```

Page 115

```
1   trash, we have people who are in the parks, et
2   cetera, where they might not be able to have access
3   to their department director and they need to make
4   an immediate decision in order to avoid a
5   potentially very bad situation.
6        Q    Did Linda Thomas ever tell you that
7   she had multiple conversations with Judy Armstrong
8   about Mr. Garavaglia's forced leaves?
9        A    No.
10       Q    Did she ever tell -- did Linda Thomas
11  ever tell you anything about any discussions she
12  had with Miss Armstrong about the forced leaves?
13       A    Not with Miss Armstrong, no.
14       Q    What about any conversations Linda
15  Thomas had with Comptroller Green --
16       A    Yes.
17       Q    -- about the forced leaves?
18       And how many of those conversations
19  do you recall with -- between you and Miss -- and
20  Miss Thomas?
21       A    Oh, between myself and Miss Thomas?
22       Q    Yeah, about conversations that Miss
23  Thomas had with Defendant Green.
24       A    Perhaps two or three.
25       Q    Okay.  And what -- what do you recall
```

Page 116

```
1   the substance of those communications were about?
2        A    The substance was Linda was always
3   very good about notifying me of any conversation
4   she had with elected officials or Board of Aldermen
5   or appointing authorities with a serious
6   disciplinary matter and she just wanted to inform
7   me that Comptroller had contacted her to ask her
8   for a clarification on forced leave under
9   Administrative Regulation 117.
10       Q    Was that before or after the phone
11  call on -- on Saturday at 1:30?
12       A    After.
13       Q    Was that before or after you approved
14  the first forced leave?
15       A    I orally supported the forced leave
16  on Saturday, and I approved the forced leave on
17  Monday.  So I'm not sure of the exact timing of her
18  conversation, just that she did in fact --
19       Q    So you think it's possible you may
20  have talked to Miss Thomas, before your approval on
21  Monday, about her conversations with Defendant
22  Green?
23       A    I'm not sure.
24       Q    Okay.
25       A    I don't recollect, I'm sorry.
```

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

**RICHARD R. FRANK  3/10/2022**

Page 117

```
 1        Q    Okay.  You don't recall, you don't
 2   recall.
 3            The pre-termination letters.  Letter,
 4   in this case.  Do you approve those?
 5        A    No.
 6        Q    Okay.  So do you even see them before
 7   they go out?
 8        A    No.
 9        Q    Okay.  So you have no role in that.
10        A    No.
11        Q    Okay.  But if, after the
12   pre-termination review is held, and the appointing
13   authority or department head wants to impose
14   disciplinary action against the employee, you have
15   to approve that?
16        A    Myself or my designated --
17        Q    Yeah.
18        A    -- the director of personnel or his
19   or her designee does have to approve that.  I
20   continued throughout my tenure to review personally
21   all police discipline, but that responsibility was
22   delegated to my deputy director, whom I believe at
23   the time, I'm sure, was -- was Kathleen Tanner.
24        Q    I'm jumping around again, for which I
25   sincerely apologize, but.
```

Page 118

```
 1        A    Mm-hmm.
 2        Q    Going back to this idea of unearthing
 3   additional allegations which might justify a
 4   reinstatement of a previously withdrawn forced
 5   leave; okay?  This -- my question is, what if the
 6   allegations that are unearthed in the investigation
 7   were remote -- were -- were in the past, before the
 8   forced leave was ever requested; okay?  Number one.
 9            And number two, the department head
10   knew about them.  That these are not new
11   allegations.  That the department head knew all
12   about it before the investigation.  Would that
13   justify the reinstatement of a forced leave?
14        MR. NORWOOD:  Well, let me object
15   because I think it calls for speculation, improper
16   hypothetical, and a legal conclusion.  Subject to
17   all of that, and subject to counsel.
18        MS. HAMILTON:  I was going to say,
19   object that it's compound.
20        MR. NORWOOD:  I join in that part as
21   well.
22        A    I would say it has to, again, be on a
23   case-by-case basis.  You may have an allegation,
24   for instance, that let's say, as director, somebody
25   alleged that I inappropriately touched them.  And
```

Page 119

```
 1   there's no evidence to corroborate that, nothing to
 2   suggest that, but then that resurfaces eight years
 3   later, and you start -- you're seeing a pattern.
 4            So again, I think you have to look,
 5   as difficult as it can be, you have to look at the
 6   individual circumstances of what the allegation
 7   was, you know, and what the finding was at that
 8   time, and, you know, the recency, and does it
 9   connect with the current allegation, et cetera.
10            So you have to look at it in terms of
11   the totality, and that's what I would advise.  And
12   I think that that's why it's important.
13            I will say that I don't always rely
14   solely on my own judgment either.  I work very
15   closely with, you know, the highest members of our
16   law department as well to make sure that my
17   judgment, carrying the weight that it does, is
18   appropriate.  And that's what I did in this
19   instance.
20        Q    (BY MR. BLANKE)  I -- I thought you
21   said that the -- I don't remember if you said it
22   was an ordinance or the charter, that gives you the
23   discretion to approve or disapprove a forced leave?
24        A    Actually, it's the administrative
25   regulation that gives me --
```

Page 120

```
 1        Q    117?
 2        A    Yes, it does, but there are other --
 3   I would say that there are other things that are
 4   discretionary.  Such as granting Mr. Garavaglia an
 5   increase in salary.  I don't rely just on my own
 6   discretion.  I have the classification and
 7   compensation section review it.
 8            Similarly, if it's an employee
 9   grievance matter, I have service rating appeal
10   boards and grievance boards, et cetera, that make a
11   recommendation to me.
12            So I try and gather as much available
13   information as I can.  You know, we have competent
14   professionals that specialize within that.
15        Q    But these examples you just gave are
16   all people working within your department, within
17   the Department of Personnel.  Correct?
18        A    Yes, but I have legal counsel.  I'm
19   represented by the City Counselor.
20        Q    So how often do you seek legal
21   opinions from your legal counsel, the City
22   Counselor's office --
23        MR. BLANKE:  Well --
24        Q    (BY MR. BLANKE)  -- before you put
25   somebody on forced leave?
```

30 (Pages 117 to 120)

RICHARD R. FRANK  3/10/2022

Page 121

```
 1              MR. NORWOOD:  Well, let me object,
 2    because there's no time reference.
 3              MR. BLANKE:  Well, just in --
 4              MS. HAMILTON:  I'll just object to
 5    the relevance of the question in that it seems to
 6    be skirting on getting into privileged information.
 7              MR. BLANKE:  Well --
 8              MR. NORWOOD:  I join in that
 9    objection.
10              MR. BLANKE:  -- my question stands.
11              THE WITNESS:  May I answer it?
12         Q    (BY MR. BLANKE)  Is it -- let --
13              MS. HAMILTON:  I don't think you need
14    to answer the question.
15         Q    (BY MR. BLANKE)  -- I'll -- I'll just
16    add it, you -- you don't need to, but she doesn't
17    represent you.  Okay?  So it's your choice.
18              MS. HAMILTON:  And why are you saying
19    he doesn't -- I don't represent him?
20              MR. BLANKE:  Well, do you?
21              MS. HAMILTON:  I'm representing the
22    City of St. Louis.  He's --
23              (Overtalking - inaudible.)
24              MR. BLANKE:  Well, he's -- he's not
25    an employee -- he's not an employ -- he's not an
```

Page 122

```
 1    employee of the City of St. Louis.  What are you
 2    talking about?
 3              MS. HAMILTON:  He is a -- you're
 4    asking him here to testify as Director of -- as his
 5    work as the director of personnel; correct?
 6              MR. BLANKE:  No.  We're asking --
 7              MS. HAMILTON:  Every question you've
 8    asked him about has been about his duties as the
 9    director of personnel.  So I'm very confused --
10              MR. BLANKE:  No.  No.  We're asking
11    him about his -- his -- his -- his duties as a
12    former director of personnel.
13              MS. HAMILTON:  Okay.
14              MR. BLANKE:  Not as the director of
15    personnel.  He's not a City employee --
16              (Overtalking - inaudible.)
17              MS. HAMILTON:  -- and I object on
18    behalf of the City of St. Louis --
19              MR. BLANKE:  -- and you do not
20    represent him.  Do you?
21              MS. HAMILTON:  Absolutely.
22              MR. BLANKE:  I mean, you -- so you
23    have a separate re -- you have a separate
24    engagement letter with Mr. Frank?
25              MS. HAMILTON:  No, I don't have a
```

Page 123

```
 1    separate engagement letter with Mr. Frank.  But you
 2    have asked him here to testify as to his duties
 3    when he was director of personnel.
 4              MR. BLANKE:  All right.  Let's cut to
 5    the chase.  Are you instructing him --
 6              MS. HAMILTON:  And he --
 7              MR. BLANKE:  -- not to answer the
 8    question?
 9              MS. HAMILTON:  Yes, about how often
10    you consult your counsel, you do not have to answer
11    that question.
12         Q    (BY MR. BLANKE)  Okay, and I'm asking
13    you to answer the question.  She's telling you that
14    she represents you and you shouldn't answer the
15    question, so what are you going to do?  I mean,
16    it's your choice.
17         A    I feel that my discussions with my
18    legal counsel are privileged.  I'm not an attorney,
19    but I believe --
20         Q    Right.
21         A    -- they're privileged, and I have
22    ongoing consultation and have had ongoing
23    consultation in my role as former director of
24    personnel with upcoming lawsuits.  So I decline.
25         Q    Right, and -- and let's be clear.
```

Page 124

```
 1    I'm not asking you about the substance of any --
 2              MS. HAMILTON:  He was -- just -- just
 3    so that we're clear --
 4         A    I decline.
 5              MS. HAMILTON:  -- he was finishing
 6    his answer and he was going to say that he
 7    declines.
 8              MR. BLANKE:  Oh, I'm sorry.  I'm
 9    sorry.  Oh.
10         A    Yeah.  I decline to answer that.
11         Q    (BY MR. BLANKE)  Okay.  Well, let me
12    -- let me -- you decline to answer the question.  I
13    think you did, though, but let me ask.  To be
14    clear, I'm not asking you about the substance of
15    any communications you had with any lawyer, much
16    less the City Counselor's office.
17              I'm simply asking you whether or not
18    you consulted them at all with regard to your
19    forced leave decisions, and if that -- if so, how
20    common of a practice was that?
21              MS. HAMILTON:  And as to the first
22    question -- you know, because this is a compound
23    one again.  As to the first question of has he
24    ever, I think he's testified to that already, so
25    I'm going to --
```

## RICHARD R. FRANK  3/10/2022

Page 125

```
1              MR. BLANKE:  Right.
2              MS. HAMILTON:  -- object that it's
3      asked and answered.
4              MR. BLANKE:  Right.
5              MS. HAMILTON:  As to the frequency
6      with which he does so, again, I think you're
7      skirting on attorney-client privilege, and I'll
8      instruct the witness not to answer.
9              MR. BLANKE:  So you're now agreeing
10     that he did answer the question that he said he
11     didn't answer.
12             MS. HAMILTON:  No, your question that
13     I objected to was how frequently do you --
14             MR. BLANKE:  Right.
15             MS. HAMILTON:  -- take advice from
16     counsel --
17             MR. BLANKE:  That's the second part.
18             MS. HAMILTON:  -- regarding forced
19     leave.  Yeah.
20             MR. BLANKE:  That's --
21             MS. HAMILTON:  And that's the
22     question I objected to.
23             MR. BLANKE:  Okay.
24             MS. HAMILTON:  I did not object to
25     the first.
```

Page 126

```
1          Q    (BY MR. BLANKE)  So how frequently do
2      you seek City Counselor advice with regard to
3      whether you should approve a forced leave or not?
4              MS. HAMILTON:  Same objection, and
5      same recommendation.
6              MR. NORWOOD:  And let me object in
7      terms of no time reference, because he's no longer
8      director of personnel today.
9          Q    (BY MR. BLANKE)  Well, I had a time
10     reference.  I'm talking about during the time you
11     were the director of personnel.
12             MS. HAMILTON:  Same objection; same
13     instruction.
14         A    I would still say that, yes, I have
15     consulted on -- on matters of forced leave with the
16     City Counselor and I decline to go into any more
17     specifics than that.
18         Q    (BY MR. BLANKE)  Mr. Frank, you -- I
19     don't know if you read it or Mr. Norwood read it to
20     you, that paragraph 17 of the Complaint where --
21     where -- let's see if I can find it.
22             MR. NORWOOD:  Tab 1.
23             MR. BLANKE:  Thank you.
24             MR. NORWOOD:  Page 4.
25         Q    (BY MR. BLANKE)  (Quote as read):
```

Page 127

```
1          The City's -- City's Director of
2          Personnel approved the forced leave
3          each time knowing that there was
4          no --
5              MS. HAMILTON:  Where are you, sir?
6              MR. BLANKE:  This is Paragraph 17 of
7      the Complaint --
8              MR. NORWOOD:  Page --
9              MR. BLANKE:  -- on page 4 of Exhibit
10     1.  Just take a look at that.
11         Q    (BY MR. BLANKE)  Here's my question.
12     When is the first time you learned that that
13     allegation was made?
14         A    At the time that I received a copy of
15     this exhibit.
16         Q    And when was that?
17         A    I don't remember.  I don't remember
18     at the time.  I remember that -- that Mr.
19     Garavaglia retired in the fall of 2019, but I'm not
20     sure of when this wound its way up to court.
21         Q    So this would have been before you
22     found out you were going to be deposed in this
23     case?
24         A    Yes.
25         Q    Okay.  How did you prepare for this
```

Page 128

```
1      deposition?
2          A    The only way that I prepared for this
3      deposition was through two discussions with my --
4      with legal counsel.
5          Q    Did you have any discussions prior to
6      this deposition with Mr. Norwood?
7          A    Yes.
8          Q    What about?
9          A    About this case.
10         Q    What about more specifically?  What
11     about the case?
12         A    Just about preparing for the
13     deposition.
14         Q    Did you go over in detail any of the
15     exhibits used in his direct examination, with him?
16         A    Just -- just a few of them.
17             MS. HAMILTON:  You can answer.
18         A    Just a few of them.  We did not go
19     over this.  We went over, um, we went over the --
20     my discussion in -- with Judy Armstrong, and we
21     discussed the forced leave letters, and we
22     discussed -- we discussed the, yeah.  The -- the
23     general timing of that.
24         Q    (BY MR. BLANKE)  Altogether, do you
25     have any estimate -- can you give me an estimate of
```

32 (Pages 125 to 128)

**RICHARD R. FRANK  3/10/2022**

---

Page 129

1   how much time you spent with Mr. Norwood preparing
2   for this deposition?
3        MR. NORWOOD:  Let me object because
4   you didn't -- well, I'll withdraw the objection.
5        A    An hour the first time, and perhaps
6   an hour and 50 minutes the second time.
7        Q    (BY MR. BLANKE)  Was Darlene Green
8   present?
9        A    No.
10       Q    Have you discussed this matter with
11   -- have you discussed this lawsuit with Comptroller
12   Green since you found out about it?
13       A    This lawsuit, one time.
14       Q    When was that?
15       A    Sometime during 2021.
16       Q    What was that discussion about?
17       A    The discussion was just her concern
18   about the audit findings, what the auditors might
19   -- might find and what they would report about the
20   allegations that she had made against Mr. --
21       Q    Oh, I'm sorry.  So you're talking
22   about before he retired.
23       A    Yes.
24       Q    I'm sorry.  I meant after he retired.
25       A    Oh.  You -- I'm confused.

---

Page 130

1        Q    Let me -- let me ask a different
2   question.
3        A    Yeah, I'm confused, I'm sorry.
4        Q    Yeah, I -- I -- it's my fault.
5        Did you have any discussions with
6   Comptroller Green after you found out about this
7   lawsuit, about the lawsuit?
8        A    I did have one discussion.
9        Q    When was that?
10       A    I don't remember.  It was before I
11   retired.  Sometime during -- I think sometime
12   during 2021.
13       Q    And what -- and what specifically did
14   you discuss with her at that time?
15       A    Her concerns about what the state
16   auditors would report about financial problems, and
17   I believe that she mentioned there were problems
18   with corrections, but that's all.  I didn't go into
19   any great detail.
20       I did read the -- and that was the
21   other document, pardon me, that I did go through
22   with -- with counsel was the pre-termination
23   letter, which I had not seen until after it was
24   delivered to Mr. Garavaglia.
25       Q    Okay.  Did you go into a discussion

---

Page 131

1   about the substance of those allegations in the
2   pre-termination letter?
3        A    Not substance, no.
4        Q    Okay.  Did you ever discuss with
5   Comptroller Green or Judy Armstrong any of the
6   substance of the allegations that ended up in the
7   pre-termination letter?
8        A    No.
9        Q    You indicated that the pay ordinance
10   in the City of St. Louis provides for a 5 percent,
11   what's it called, a step increase?  A merit step
12   increase?
13       A    Yeah, a 5 percent salary adjustment.
14       Q    Per grade?
15       A    Any time there's a promotion or
16   reclassification upward, a person is entitled to a
17   minimum of 5 percent of their current salary.  It's
18   maxed out, however, at 20 percent.
19       Q    Because the grade has a -- a minimum
20   and a maximum, there's -- it's not just a -- an
21   amount.  It's -- it's a -- it's a range of pay.
22   Right?
23       A    That is true, except the last four
24   years, at least, as director, I had removed the top
25   of the range because we knew our salaries were not

---

Page 132

1   competitive.  And until we completed our slowed
2   down City-wide compensation study, slowed down
3   because of COVID, we wanted -- I consulted with,
4   you know, Mayor Jones and also with -- with Mayor
5   Krewson and we had agreed that we thought it best
6   to allow employees to go beyond the top of the pay
7   grades so that they could continue to receive
8   well-deserved increases.
9        Q    Okay.  So -- so the 5 percent is a
10   minimum, and it can be larger than that if -- if
11   the difference between the two grades, you know,
12   one's at the bottom, one's at the top.  Something
13   like that; right?
14       A    That's true, or if it's requested by
15   the appointing authority and I approve it.
16       Q    Right.  But I'm talking about the
17   automatic merit step increase.
18       A    Correct.
19       Q    Yeah.
20       A    For instance, if you had a
21   receptionist who went to administrative assistant,
22   there may be a 10 percent jump between where that
23   person's at and where the start of the new pay
24   range is, so it could result in a higher grade.
25       Q    Okay.  So also if -- if somebody,

---

33 (Pages 129 to 132)

## RICHARD R. FRANK  3/10/2022

<table>
<tr><td colspan="2">Page 133</td><td colspan="2">Page 135</td></tr>
<tr>
<td>

1   let's say, was a -- I'm just going to make
2   something up -- a -- a grade 10.  I don't even know
3   what that means.  But, you know, they were a grade
4   10, and they were being promoted to -- to a grade
5   12, okay, would that be, you know, a minimum 5
6   percent, or a minimum 10 percent step increase?
7      A   Your -- that would be a minimum of 5
8   percent, because the difference between the grades
9   isn't that great.  That would more than likely be a
10   grade 5 -- or excuse me, a promotion of 5 percent,
11   again, unless it were requested by the appointing
12   authority and reviewed by my class and comp
13   division and then approved by me.
14      Q   Yeah, let's stay out of that area.
15   I'm not talking about, what do you call,
16   non-standard pay increases.
17      A   Yeah.
18      Q   I'm talking about the standard step
19   increases.
20      A   The standard, yeah, standard
21   promotional increase is 5 percent.
22      Q   And that doesn't matter how many
23   grades they're being promoted?  If it's resulting
24   from a promotion, it -- it doesn't matter how many
25   grades they're being promoted?

</td>
<td>

</td>
<td>

1   that now --
2      MS. HAMILTON:  Just -- I just was
3   saying, you keep saying "step increase," he keeps
4   saying "salary adjustment."  You keep going back to
5   the wrong phrase.  Um -- you see?
6      Q   (BY MR. BLANKE)  Well, the salary
7   adjustment is -- is called a "Merit (Step)
8   increase," is it not?
9      A   Yes.  That's only because, again,
10   it's a salary adjustment based on a promotion,
11   demotion, can be reduction in pay for disciplinary
12   reasons.
13      Q   Right.
14      A   It -- you know, there are different
15   things that can cause that, so we call -- call it a
16   salary adjustment.
17      Step means that the Department of
18   Personnel is responsible for rounding out that
19   figure to the closest approved amount.  That's why
20   we said in those letters that it -- you know, if
21   they ask for 10 percent, we will put it to the step
22   that's closest to 10 percent.
23      Q   So if I understand you correctly,
24   it's possible to get as much as a 10 percent
25   increase, not as a minimum distribution, but as a

</td>
</tr>
<tr><td colspan="2">Page 134</td><td colspan="2">Page 136</td></tr>
<tr>
<td>

1      A   I think I've already stated that if
2   the -- you get 5 percent, or you go to the minimum
3   of the new range.  So if you had a person who were
4   at a lower level job and then made a big jump,
5   perhaps they had prior experience outside the City
6   and were very qualified, whatever, they -- they
7   would go to the minimum of the new pay range.
8      Q   That much I understand.  But my -- my
9   question is, and maybe you're answering it and I
10   just want to make sure, that if you are being
11   promoted two -- two grades, okay, that it wouldn't
12   be a minimum 10 percent --
13      A   No --
14      Q   -- distribution.
15      (Overtalking - inaudible.)
16      Q   It would still be a minimum 5 percent
17   distribution?
18      A   You're correct.
19      Q   So -- so the amount of the grades has
20   nothing to do -- that's being promoted, has nothing
21   to do with the minimum step distrib -- step
22   increase?
23      A   Correct.  Provided that the grade
24   difference isn't so much.  We've covered that.
25      Q   Right.  Right.  Okay.  So back to

</td>
<td>

</td>
<td>

1   maximum distribution --
2      MS. HAMILTON:  I'm going to object
3   that it --
4      Q   (BY MR. BLANKE)  -- is that -- is
5   that not correct?
6      MS. HAMILTON:  -- mischaracterizes --
7      THE REPORTER:  I'm sorry, say that --
8      MS. HAMILTON:  I would just object
9   that it mischaracterizes his prior testimony
10   regarding the 20 percent.
11      THE WITNESS:  Right.
12      Q   (BY MR. BLANKE)  Explain to me why
13   I'm wrong.
14      A   It's 20 -- it could be 20 percent
15   or --
16      Q   Oh, that's right.
17      A   Just the discretionary one could be
18   20 percent, but it could be more.
19      Q   Yeah, I'm not talking about the
20   discretionary one.
21      A   Okay.
22      Q   I'm talking about the standard --
23      A   Yeah.
24      (Overtalking - inaudible.)
25      A   Well, the standard one, again, could

</td>
</tr>
</table>

34 (Pages 133 to 136)

## RICHARD R. FRANK  3/10/2022

Page 137

1  be more than 20 percent.  It --
2      Q.  Gotcha.
3      A.  Because you have to go to the bottom.
4      Q.  Right.
5      A.  Let's, for instance, you know, if I
6  made $170,000 a year, and I come back to work as,
7  you know, a clerk typist making 35,000, and then I
8  get promoted to an executive assistant 2 that makes
9  75,000 a year, or whatever the minimum that --
10  minimum is, you can see that you can conceivably
11  get a 100 percent increase, or more.  So it really
12  depends on those pay ranges.
13      Q.  Gotcha.  Okay.  You indicated that
14  these merit step increases are annually and -- done
15  annually?  They were at that time back in -- when
16  you were director; right?
17      A.  Yes.
18      Q.  And they are automatic unless the
19  service ratings were unsuccessful in -- in some
20  way.
21      A.  Yes.
22      Q.  Okay.  And you also indicated that if
23  a -- an appointing authority or a department head
24  failed to provide service ratings, you would look
25  at the most recent service rating in order to

Page 138

1  determine whether there was an unsuccessful service
2  rating to disapprove these increases.  These pay
3  increases.  Is that what you said?
4      A.  What I said is that if -- it would
5  default, if they did not conduct the annual service
6  rating and did not get it into the Department of
7  Personnel by the due date, it would default to the
8  last service rating; provided, however, that the
9  last service rating were successful --
10      Q.  Right.
11      A.  -- or highly successful.
12      Q.  Right.
13      A.  If it were unsuccessful, then they
14  have to do a rating.  One has to be submitted.
15  Because --
16      Q.  Okay.
17      A.  -- we would not deprive the employee
18  of their possible service rating based on the --
19  the appointing authority not submitting a service
20  rating in time.
21      Q.  What happens if there was no service
22  rating ever provided?
23      A.  Ever provided?
24      Q.  Then what -- then what do you do?
25      A.  If that -- well, if that never

Page 139

1  happened, they -- the person would have to have
2  some service rating in order to get permanent
3  status.
4      I've talked about the working test
5  period.  In order to gain status as a permanent
6  civil service employee, the appointing authority
7  has to submit, you know, a service rating granting
8  them, you know, permanent status.
9      Although, I guess if they fail to
10  grant -- if they fail to submit the working test
11  period one, they would automatically get status
12  there too.
13      Q.  So you're saying the automatic annual
14  increases are going to be provided, regardless of
15  whether there's any service ratings or not, unless
16  there is a service rating that's unsuccessful; is
17  that right?
18      A.  That's correct.  Unless one were
19  never done in the first place, because then there
20  would be nothing in the file --
21      Q.  Right.
22      A.  -- saying this person were
23  successful.
24      So if you did have that person who
25  gets hired as an attorney 1, let's say, and never

Page 140

1  gets rated, never gets rated at all, you know, they
2  would go through their initial working test period,
3  which would be six months, it wouldn't have been
4  extended if there was no request to do so, and that
5  person would default into permanent status, but
6  they would have no rating to go back to --
7      Q.  So do they get the automatic
8  increases under that circumstance?
9      A.  No, they would not.
10      Q.  They would not.  Okay.
11      A.  No.
12      Q.  Now, what happens if somebody is
13  given service ratings in one position, and then
14  they're promoted, and then after the promotion
15  there's no service ratings?
16      A.  It would still go back to the last
17  service rating done regardless.
18      Q.  Even in the prior --
19      A.  Correct.
20      Q.  -- junior position they were in?
21      A.  Correct.
22      Q.  Okay.  And where is all this written?
23  In -- in the pay ordinance, or -- or where?  Where
24  is it codified?  Where is this -- where do these
25  rules come from?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## RICHARD R. FRANK  3/10/2022

Page 141

```
 1       A    There is a variety of sources.  One
 2   would be the compensation ordinance.
 3       Q    Right.
 4       A    One would also be the administrative
 5   regulations for the Department of Personnel.  And
 6   then also it would be in the service rating manual
 7   which is approved by the Civil Service Commission.
 8       Q    And how often is that updated or
 9   modified?  The manual.
10       A    Not very often.  I believe the last
11   time was when we worked with the police division
12   and integrated, you know, the police division into
13   our system.
14       Q    You -- you said that, you know, all
15   service -- supervisors do not rate their employees
16   and that this is fairly common; right?
17       A    Yes.
18       Q    Does that mean it's not required?  Or
19   it's just commonly not followed?
20       A    It's just commonly not followed.
21       Q    It still is required --
22       MR. NORWOOD:  Well, let me object --
23       Q    (BY MR. BLANKE)  isn't that correct?
24       MR. NORWOOD:  -- because it calls for
25   a legal conclusion, and it also excludes certain
```

Page 142

```
 1   facts.  Subject to that.
 2       MS. HAMILTON:  And I would just
 3   object that it's vague and ambiguous, the question.
 4       Q    (BY MR. BLANKE)  Go ahead.
 5       A    Would you repeat the question?  I'm
 6   sorry.
 7       MR. BLANKE:  Can you read it back?
 8   You don't have to read it back.  I'll just repeat
 9   it.
10       Q    (BY MR. BLANKE)  Are service ratings
11   required by department heads or appointing
12   authorities?
13       A    They are required.
14       Q    By what?
15       A    By the service rating manual.
16       Q    Okay.  Okay.  I've put in front of
17   you Plaintiff's Exhibit O.  And it's a big package.
18   I see you've taken the clip off, that's fine, but
19   try not to get it out of order.
20       A    I'll clip it for you.
21       Q    Okay.
22       A    As long as I can bend it, it'll be
23   all right.
24       Q    Okay.  So if you'll turn to the
25   second page, which purports to be a letter dated
```

Page 143

```
 1   July 2, 2019, to you from Darlene Green.  And one,
 2   two, three, four paragraphs.
 3       MR. NORWOOD:  What page are we on?
 4       MR. BLANKE:  The second page.
 5       MR. NORWOOD:  Okay.
 6       Q    (BY MR. BLANKE)  Correct?
 7       A    Yes.
 8       Q    Okay.  And if you refer to the next
 9   page after that, which is also a letter dated on
10   the same date of July 2, 2019, to you from Darlene
11   Green, those letters are not identical, are they?
12       A    That's correct.
13       Q    Okay.  They both say, however, in the
14   first -- where am I here.  The second one you've
15   already testified, I think it was another exhibit
16   letter, or number --
17       A    Yes.
18       Q    -- is your -- it's got your
19   handwriting on it that approves the forced leave;
20   is that correct?
21       A    Yes.
22       Q    Okay.  And that, that is your
23   handwriting, you said that; right?
24       A    Yes.
25       Q    Yeah.  So why did you approve that
```

Page 144

```
 1   version of the letter instead of the previous
 2   version of the letter?
 3       MR. NORWOOD:  Let me object --
 4       Q    (BY MR. BLANKE)  Or did you receive
 5   both letters?  That's the first question, I guess.
 6       A    No.
 7       Q    You did not.
 8       A    No.
 9       Q    Okay.  So your testimony is you never
10   received page 2 of Exhibit O.  It's not labeled but
11   just the second page.  The one -- the letter
12   identified as the July 2nd letter from -- from
13   Darlene Green to Richard Frank in four paragraphs.
14   You never received that one?
15       A    It's four paragraphs that talks
16   about --
17       Q    Four paragraphs total?
18       A    -- adequately -- (Quote as read):
19           failure to adequately supervise,
20           delegate, or perform his essential
21           duties?
22       Q    Right.
23       A    I -- I don't recollect ever having
24   seen that.
25       Q    Okay.  Now, if you turn to the next
```

**ALARIS LITIGATION SERVICES**

www.alaris.us    Phone: 1.800.280.3376         Fax: 314.644.1334

RICHARD R. FRANK  3/10/2022

Page 145

```
 1   page, this is  -- on the top it says Approval of
 2   Forced Leave, it's an email dated July 2, 2019,
 3   same day, from you to Darlene Green with a copy to
 4   Chana Morton; is that correct?
 5        A   Yes.
 6        Q   And again, you are approving the
 7   request.  Right?
 8        A   Yes.
 9        Q   And you say "pending his
10   pre-termination review."  Is that correct?
11        A   Yes.
12        Q   Where -- where -- where does it say
13   that?  That this is pending -- why did you add that
14   phrase, "pending his pre-termination review"?
15        A   Because during this initial
16   discussion that I had with Ms. Armstrong on
17   Saturday, the Saturday before this date, they
18   indicated that the allegations against
19   Mr. Garavaglia were so serious as to warrant forced
20   leave in their opinion.
21            And I specifically inquired what
22   action, you know, they were seeking, and they
23   explained that they were -- they believed that they
24   would investigate and it may result in a
25   pre-termination review.
```

Page 146

```
 1            And I advised them at that point.
 2        Q   And then if you look at the next two
 3   pages, which are letters from Darlene Green to
 4   Mr. Garavaglia, both dated, again, July 2 of 2019,
 5   did you ever see those before?  To the best of your
 6   recollection?
 7        A   The one on July 2nd.  It's not
 8   numbered, but --
 9        Q   They're all dated July 2nd.
10        A   Yeah, this first one, no.  Again,
11   that's talking about failure to, um, supervise.
12   No, that one I don't recollect having seen.
13        Q   And the next one?
14        A   Yes.  That one I do.  I do recollect
15   seeing.
16        Q   Now, how do you remember that?  Which
17   is which?  How do you know the one you saw and the
18   one you didn't see?
19        A   Because I knew nothing about the
20   specificity of the allegations involving the
21   Municipal Court during my conversation with
22   Ms. Armstrong.
23            The only thing I heard was that she
24   said that there were serious allegations of -- of
25   fiscal improprieties, and she went into no greater
```

Page 147

```
 1   detail than to say that it may have had something
 2   to do with corrections.  That's the only thing I
 3   knew.  So this is --
 4        Q   Now -- now, in this letters to Jim
 5   Garavaglia, also dated July 2nd, Miss Green says
 6   the same thing you said in your approval email.
 7   That (Quote as read):
 8            you are being placed on official
 9            forced leave, pending a
10            pre-termination hearing.
11            They say that.  Right?
12        A   Yes.
13        Q   Both of them do.  Both of these
14   versions of this notice to Mr. Garavaglia of the
15   forced leave say that.  Correct?
16        A   Yes.
17        Q   So do you recall, when you talked to
18   Miss Armstrong on that Saturday, whether she said
19   that this was going to head up -- this was going to
20   end up as a pre-termination hearing, or anything to
21   that effect?
22        A   She indicated that it could, pending
23   the investigation.  That it could end up as a
24   pre-termination hearing, and we discussed what that
25   procedure entailed.
```

Page 148

```
 1        Q   Were you or, to the best of your
 2   knowledge, anyone in your office involved in any
 3   way with what either of these two letters to
 4   Mr. Garavaglia from Defendant Green should or
 5   should not say?
 6        A   I indicated during my conversation
 7   with Ms. Green's office, Judy Armstrong, on
 8   Saturday that they needed to indicate, you know, to
 9   me that he was being placed on forced leave, they
10   were requesting to place him on forced leave, and
11   that they needed to notify him of his right to take
12   any accrued compensatory time, vacation time, and
13   also that, you know, the nature of the allegations
14   were serious.
15        Q   This was on the Saturday
16   conversation?
17        A   Yes.
18        Q   Before you even received a written
19   request?
20        A   Yes.
21        Q   Okay.  But you didn't actually --
22   when did you receive this -- this second letter
23   dated -- that is addressed to James Garavaglia on
24   July 2nd?  When did you receive that one?
25        A   I received that on Tuesday -- I
```

37 (Pages 145 to 148)

**RICHARD R. FRANK  3/10/2022**

| Page 149 | Page 151 |
|---|---|

Page 149

1  believe it was Tuesday, July 3.
2      Q    Now, how do you remember that?
3      A    Because I remember calling Judy
4  Armstrong's and leaving a message that, you know, I
5  would be happy to take a look at the -- the letter,
6  you know, to Mr. Garavaglia to make sure that it
7  was in proper form.  And they indicated that they
8  would send it to me on Monday.
9          But I did not get it Monday.  This
10  letter was hand-delivered to me a day after I
11  expected it and it had already been delivered to
12  Mr. Garavaglia.
13      Q    Now, I also note that, with regard to
14  this first letter addressed to James Garavaglia on
15  July 2nd, it says that you were copied in on it.
16  But that doesn't change your testimony; right?
17      A    No, it does not.
18      Q    Okay.  Do you or anyone in your
19  office normally have any involvement in how the
20  letters to the employee advising of the forced
21  leave should be delivered?  Whether by --
22      A    Delivered?
23      Q    Delivered.  By certified mail or
24  regular mail or hand delivery?  Do you have any
25  input into that?

Page 151

1  are being pre-terminated, don't live at the address
2  where they really do live, or they've moved, or
3  they simply will refuse to accept a Certified
4  letter, and that becomes a problem for us and we
5  want to ensure proper service.
6          So we recommend to the appointing
7  authorities, and I believe the law department, on
8  information and belief, also has -- you know, tells
9  employees --
10          MS. HAMILTON:  And I'm not going to
11  -- I'm going to --
12          THE WITNESS:  Okay.
13          MS. HAMILTON:  -- advise you again
14  not to get into the law department --
15          THE WITNESS:  Okay.
16          MS. HAMILTON:  -- conversations.
17          THE WITNESS:  Okay.
18      A    That's our position.  That that's
19  what we tell employees -- or supervisors --
20      Q    (BY MR. BLANKE)  If you go back to
21  the third -- the third page where your approval
22  handwriting is on the letter to you from Darlene
23  Green where it says "Approved"?
24      A    Yes.
25      Q    Those are your initials; is that

Page 150

1      A    We typically advise employees to send
2  them out, you know, Certified letter, and also, if
3  possible, in person, to ensure service.
4      Q    Did that come up in the -- in the
5  conversation with Judy Armstrong?
6      A    Not to my recollection.
7      Q    Do you know how these letters were
8  delivered --
9      A    No --
10      Q    -- to Jim Garavaglia?
11      A    Do I know how they were delivered?
12      Q    Yes.
13      A    No, I don't.
14      Q    And -- and I'm not sure I understand
15  -- if I understand you correctly, and correct me if
16  I'm mischaracterizing what you just said.  You're
17  saying that they should be delivered by Certified
18  mail?
19      A    We recommend that they go out two
20  ways, you know, either through Certified or
21  Registered mail, and also, if possible,
22  hand-delivered.  Because we don't want the
23  situation to occur where an employee says, "I never
24  got the notice."
25          We have situations where employees

Page 152

1  right?  Is that supposed to be RF or -- I can't
2  tell.
3      A    Yes.
4      Q    Okay.  And then that was July 2nd.
5  You approved this on July 2nd.  Correct?
6      A    Yes.
7      Q    Okay.  So when you approved the
8  forced leave, had you seen the letter to
9  Mr. Garavaglia?  Either one of them?
10      A    No.
11      Q    So your approval of the forced leave
12  is not in any way predicated upon proper notice
13  being given to the employee; is that a fair
14  statement?
15      A    That's fair.
16      Q    Okay.  Now, the hearing on the forced
17  leave, the first forced leave, the one we're
18  talking about here on July 2nd; okay?  The hearing
19  on that before the Civil Service Commission, was
20  initially scheduled for July 23rd.  Is that
21  correct?
22      A    I'd have to check the dates.  I'm --
23  I relied on my --
24      Q    Okay.
25      A    -- employee to schedule that for me.

38 (Pages 149 to 152)

## RICHARD R. FRANK  3/10/2022

Page 153

1      Q     And -- and which employee would that
2    be?
3      A     At the time, I believe it was Ashley
4    McClain.
5      Q     Okay.  Let me direct your attention
6    -- oh, boy.  Let's see.  One, two, three, four,
7    five, six, seven, the eighth page of paragraph O,
8    which looks like this.  You probably recognize
9    that.
10     A     Yeah, is that looks like the --
11            (Overtalking - inaudible.)
12     A     -- Notice of Institution to case?
13            MS. HAMILTON:  Usually the ones
14    before that are (inaudible).
15            MR. BLANKE:  Here.  Counsel?
16            MR. NORWOOD:  Yep.  Got it.
17            THE WITNESS:  I'm slow, I'm sorry.
18    Is it that far in?
19            MS. HAMILTON:  Eighth page.
20            MR. BLANKE:  You may be past eight.
21            MS. HAMILTON:  Yeah.
22            MR. BLANKE:  Well, it looks like
23    this.  Let's make sure we're all on the same page.
24            THE WITNESS:  I know what one looks
25    like, I'm --

Page 154

1            MR. BLANKE:  It says on the top, the
2    first one is a caption, it's on City of St. Louis
3    stationery and it's --
4            MS. HAMILTON:  That's the cover.
5    Right here.  You're -- you're at -- the one that --
6    next one.  That's the cover.
7            THE WITNESS:  "In the Matter of."
8    Got it.  I'm sorry.  Okay.
9      Q     (BY MR. BLANKE)  So, so counsel for
10    the City is directing your attention to an email
11    that precedes what I was talking about, from Ashley
12    McClain?
13     A     Yes.
14     Q     To Nancy Kistler and Paul Schmitz
15    dated July 11; right?
16     A     Yes.
17     Q     Saying (Quote as read):
18            Please see the attached Notice of
19            Hearing.
20            Correct?
21     A     Yes.
22     Q     Okay.  And then after that is the
23    Notice of Hearing; right?  It says Notice of
24    Institution of Case and Hearing.
25     A     Yes.

Page 155

1      Q     We on the same page?
2      A     Yes.
3      Q     Okay.  Does that provide a hearing
4    date?
5      A     Yes.
6      Q     And that's July 23rd; correct?
7      A     Yes.
8      Q     And the parties were advised of that
9    by Ashley McClain, through this notice, on or about
10    July 11th.  Is that correct?
11            MS. HAMILTON:  Objection, foundation.
12     Q     (BY MR. BLANKE)  Well --
13            MS. HAMILTON:  You can answer if you
14    know.
15     Q     (BY MR. BLANKE)  -- the email from
16    before that, the first -- the page right before
17    that with the email that we were talking about?
18     A     Yeah, that's -- the certificate of
19    service does say that.
20     Q     July 11, okay.
21     A     Yeah.
22     Q     What was Ashley McClain?  She was an
23    administrative assistant, but what was her duties?
24     A     She served as the administrative
25    assistant to the Civil Service Commission.

Page 156

1      Q     Okay.  Was she, then, as a secretary
2    to the Commission, was she under you in that
3    regard?
4      A     Yes.
5      Q     Okay.  So you were her supervisor?
6      A     Yes.
7      Q     In that -- in that capacity?
8      A     Yes.
9      Q     Yes.  Okay.  Were you involved in
10    selecting the hearing date in any way?
11     A     No.
12     Q     Turn a couple pages down to the page
13    -- this one does have a Bates stamp.  In the lower
14    right-hand corner it's Bates stamped GARAVAGLIA
15    110.  On the top it's a Memorandum to Nancy Kistler
16    from Chana Martin (sic).  Do you see that?
17     A     I do see it.
18     Q     Okay.  And please go to the end of
19    that, and there is another memorandum that follows
20    that which starts on GARAVAGLIA 105 on the bottom,
21    and this is from Darlene Green to Nancy Kistler.
22    Do you see that?
23     A     Yes.
24     Q     Okay.  Did you see either of these
25    memorandum at any time before you prepared for this

## RICHARD R. FRANK  3/10/2022

Page 157

1  deposition?  I mean when you were a director.  Did
2  you see either of those?  When you were a director.
3  When you were the director of the personnel
4  department.
5      A    I don't recall them, no.
6      Q    You don't recall, or you don't recall
7  seeing them?
8      A    I don't recall seeing them.
9      Q    Okay.
10     A    This -- I'm looking at the first one
11 still.
12     Q    Sure.  Take your time.  So I take it
13 if you don't recall seeing them, you don't know
14 whether you reviewed them or not; right?
15     A    I did not review the first one.
16     Q    Okay.
17     A    I'm looking at the --
18         MS. HAMILTON:  105 at the bottom for
19 the second one.
20     A    I do recall seeing the letter to
21 Nancy Kistler from Comptroller Green dated July 12,
22 2019.  That one I do remember seeing.
23     Q    (BY MR. BLANKE)  And how do you
24 recall that?
25     A    Because it looks familiar.

Page 158

1      Q    Okay.
2      A    The contents look familiar.
3      Q    Do you remember when you may have
4  seen it?
5      A    I can only assume that it was
6  sometime around the date that it was issued.
7      Q    Do you recall any discussions with
8  Comptroller Green or anyone in her office about it?
9      A    No.
10     Q    Okay.  Turn the page again.  This is
11 the page right after the page GARAVAGLIA 106.  So
12 it's right after that second memoranda that you did
13 see.  There's a letter to you, dated July 15, from
14 Darlene Green; correct?
15     A    Yes.
16     Q    And then if you turn the page,
17 there's another letter to you -- I mean then
18 there's a letter to Jim Garavaglia from Darlene
19 Green as well; right?
20     A    Yes.
21     Q    Okay.  And these are both dated
22 July 15; correct?
23     A    Yes.
24     Q    Okay.  The letter from Darlene Green
25 to you dated July 15, 2019, do you know why

Page 159

1  Defendant Green wrote this requesting a forced
2  leave at this time, when Mr. Garavaglia was already
3  on forced leave?
4      A    No.
5      Q    You have no idea?
6      A    No.
7      Q    The reasons given in this letter to
8  Richard -- to you from Darlene Green are the same
9  as the letter that you reviewed on July 2nd.
10 Correct?
11     A    I believe I've already testified that
12 I didn't see that.
13         MR. NORWOOD:  Well, let me --
14     Q    (BY MR. BLANKE)  No, no, no.  I'm
15 talking about the one you did see.
16         MR. NORWOOD:  Well, let me object,
17 because it assumes he did see it.
18     Q    (BY MR. BLANKE)  Okay, well, then
19 maybe I'm mistaken.  You -- you obviously saw --
20     A    No, Counselor.  I already testified
21 that the first of the two --
22     Q    Oh, I said did you hear about them.
23     A    -- on July 2, I did not see that.
24 And I -- I did not.
25     Q    Yeah, I'm -- I'm sorry.  I wanted you

Page 160

1  to compare the letter that you approved -- okay,
2  you obviously saw that one.
3      A    Yes.
4      Q    Okay.  Yeah.  -- with the letter of
5  July 15th that we're looking at now.
6         MR. NORWOOD:  Well, and I'm objecting
7  because that assumes he received that July 15 --
8         MS. HAMILTON:  July 15.
9         MR. NORWOOD:  -- 2019 letter.
10     Q    (BY MR. BLANKE)  Let me add that
11 that's the first question.
12     A    Yeah.
13     Q    Did -- did you?
14     A    I did not receive the July 15th
15 letter, no.
16     Q    And how do you know that?
17     A    Because I've never seen it.  And one
18 of the reasons I know is because I didn't know
19 anything about any issues that were brought up
20 about Muni Court.  Or failure to supervise the
21 employees.  That's not something that was discussed
22 with me.
23     Q    Okay.
24         MS. HAMILTON:  Is this a good time
25 for a break?

40 (Pages 157 to 160)

RICHARD R. FRANK  3/10/2022

## Page 161

1      MR. BLANKE:  If you want one, sure.
2      MS. HAMILTON:  Yeah, I'd love one.
3      MR. BLANKE:  Okay.
4      MS. HAMILTON:  If you don't mind.
5      THE VIDEOGRAPHER:  Time is 2:12 PM,
6  we are off the record.
7      (Off the record.)
8      THE VIDEOGRAPHER:  The time is 2:31,
9  we are back on the record.
10     Q    (BY MR. BLANKE)  Okay.  Where did we
11 leave off.  We were looking at this July 15th
12 letter to Mr. Garavaglia, that you did not remember
13 seeing it, I think?
14     A    Yes.
15     MR. NORWOOD:  Let me object, it
16 mischaracterizes testimony.  He said he didn't see
17 it.
18     MR. BLANKE:  That's what I said.
19     MR. NORWOOD:  No, you said I don't --
20 he didn't remember seeing it, which is different.
21     MR. BLANKE:  Oh, gotcha.  Okay.
22     Q    (BY MR. BLANKE)  Turn the page, there
23 is a Certified Mail return there, but turn the page
24 again to this email from Linda Thomas to you on
25 July 17th at 2:35 PM which begins with the words --

## Page 162

1  well, that's from you to Linda Thomas on July 17th
2  at 2:35, where you're thanking her for the previous
3  email from her to you at 2:33.  Correct?
4      A    Yes.
5      Q    Okay.  Can you please read into the
6  record what she wrote on the email to you at 2:33?
7      A    (Quote as read):
8          Rick, I told the Comptroller to
9          withdraw her request for forced leave
10         on JG.  All she has to do is ask you
11         to withdraw -- ask for you to
12         withdraw the request and she has to
13         give him a copy and then give him
14         back any of his time he has used.
15         Then I told her she could send you a
16         letter requesting force leave --
17         should be forced leave -- force leave
18         again, give him a copy, and tell him
19         he is being put on forced leave
20         pending investigation.  The reason
21         for the forced leave would be he has
22         access to a lot of confidential files
23         and computer systems and the
24         investigation would lead to
25         disciplinary action up to and

## Page 163

1  including termination.
2          Wanted to get this to you while my
3          mind is still fresh on what I said so
4          people don't misquote me, and know
5          you -- and you know what I mean.
6      MR. NORWOOD:  You know who I mean.
7      A    Or who I mean, sorry.
8      Q    (BY MR. BLANKE)  First question I
9  have about this is, did you advise or suggest to
10 Linda Thomas that she instruct Defendant Green to
11 withdraw her initial forced leave request?
12     A    No.
13     Q    Did she -- did you know that she
14 would do that before she did it?
15     A    No.
16     Q    Do you know why she did it?
17     A    After the fact, I believe it was,
18 Linda had told me, again, that she had spoken to --
19 she had received a phone call from Comptroller
20 Green about the procedures for 117 and forced leave
21 because the -- there were, um, a couple of clerical
22 omissions in the initial letter to Mr. Garavaglia
23 about the reason for the forced leave.
24     Q    Did she say what those additional
25 reasons were?

## Page 164

1      A    Yeah, the serious allegations
2  regarding fiscal matters.
3      Q    But did she specify to you what they
4  were?
5      A    No.
6      Q    The last sentence, (Quote as read):
7          Wanted to get this to you while my
8          mind is still fresh on what I said so
9          people don't misquote me, and you
10         know who I mean.
11         What does that mean?
12     MR. NORWOOD:  Well, let me object,
13 calls for speculation on what was in Linda Thomas's
14 mind when she sent that email.
15     MS. HAMILTON:  You can answer.
16     A    I believe she is referring to Nancy
17 Kistler, who is the Deputy City Counselor.
18     Q    (BY MR. BLANKE)  And what's the
19 reason for that?  Why do you believe that?
20     MR. NORWOOD:  Let me object,
21 irrelevant.
22     THE WITNESS:  Oh.  Oh, sorry.
23     MS. HAMILTON:  And what I'll just say
24 is you are welcome to answer, I just -- do not get
25 into any privileged conversations.

41 (Pages 161 to 164)

RICHARD R. FRANK  3/10/2022

---

Page 165

1      A    All right.  It's just that Nancy was
2  -- was assisting Comptroller with the process.
3      Q    (BY MR. BLANKE)  Great.
4      A    And -- and also discussing it with
5  me.
6      Q    Okay.  How confident are you or that
7  -- of that?
8      A    Very confident.
9      Q    Oh, okay.  Now, turn the page again.
10  These three pages, the next three pages, are all
11  dated July 18, 2019.  They all purport to be
12  written by Darlene Green to you; correct?
13      A    Yes.
14      Q    Okay.  What's your under -- take a
15  look at these three, take -- take a moment, and
16  read them over.  And what's if -- what's your
17  understanding of the -- what -- why are there three
18  -- three of these?  What's -- what are the
19  differences, or what's -- do you have an
20  understanding of --
21      A    I do.
22      Q    -- why there are three letters?
23      A    I do.  It all goes back to the
24  original conversation I had with Judy Armstrong
25  that the reason for the forced leave was that there

---

Page 166

1  were allegations of serious fiscal improprieties,
2  and, you know, um, I had suggested that they should
3  include that in the letter of forced leave to
4  Mr. Garavaglia.
5      Q    Now, this is the second letter;
6  right?  Of forced leave?
7      A    Yes.
8      Q    And if you look at the third version,
9  again, it has your handwriting approving it on --
10  on the same day, 7/18/19.
11      MR. NORWOOD:  Let me object to the
12  reference to the "third version."
13      MR. BLANKE:  I'm sorry.  The third
14  letter that we were talking about.  Let's see if
15  there's any identification on this that I can use.
16  Anyway.
17      A    Yes, I have it.
18      Q    (BY MR. BLANKE)  You approved a
19  letter that is addressed to you on July 18 from
20  Darlene Green.  Correct?
21      A    Yes.
22      Q    Is that the only -- the letter that
23  has your approval on it, is that the only one of
24  those versions that you saw?  Or do you know?
25      MR. NORWOOD:  Let me object with

---

Page 167

1  respect to, when you talk about "those versions,"
2  what versions are we talking about?
3      Q    (BY MR. BLANKE)  All right, well, I'm
4  not suggesting they're intended to be the same
5  letter.  I'm just saying there are three letters,
6  all dated July 18, from Darlene Green to Richard
7  Frank.  And my question is --
8      MR. NORWOOD:  Well, let me --
9      Q    (BY MR. BLANKE)  -- do you have an
10  understanding of what those three letters are
11  about?  That's the first question.  You've already
12  answered it, I think; right?
13      My second question is --
14      A    Yes.
15      Q    -- did you see all three of them?
16  You know, at the time -- at or around the time
17  they were written, in July?
18      A    I don't recall seeing, out of those
19  three letters, the second one.  I do recall seeing
20  the one which I initialed.
21      Q    Okay.  The first one is just advising
22  you that she's withdrawing her forced leave
23  request; correct?
24      A    Correct.
25      Q    You don't recall seeing that?

---

Page 168

1      A    Yes.  I said.
2      Q    Okay.  I'm sorry.
3      A    The second one is the one I said I
4  didn't recall seeing.
5      Q    Gotcha.  The second and third letters
6  are -- are -- they might be identical, I don't -- I
7  don't even --
8      A    Pardon me.  I just misspoke then,
9  sir.  I -- I did see -- the second letter is --
10      Q    The second --
11      A    -- that you're referring to is
12  identical to the third.
13      Q    Right.
14      A    Except I -- the third one just
15  contains my initials and approval.
16      Q    Right you are.  Okay.
17      THE VIDEOGRAPHER:  Mr. Frank, could I
18  have you flip your mic to the outside of your lapel
19  as opposed to the inside?
20      THE WITNESS:  Oh, dear.
21      THE VIDEOGRAPHER:  I'm hearing you,
22  but it's mushy.  There you go.
23      THE WITNESS:  Haven't gotten any
24  smarter after age 60, that's for sure.
25      MR. NORWOOD:  Well, don't worry, I do

42 (Pages 165 to 168)

RICHARD R. FRANK  3/10/2022

Page 169

1    that all the time myself.
2        Q     (BY MR. BLANKE)  Now turn the page
3    again.
4        A    Okay.
5        Q    And this is a page where it says
6    "Letter to James Garavaglia" in bold letters at the
7    top?
8        A    Yes.
9        Q    It's an email, purports to be an
10   email of July 18, 2019, from Darlene -- from Chana
11   Martin -- Morton to you.  Is that correct?
12       A    Yes.
13       Q    And it refers to a letter that she
14   claims was hand-delivered to Mr. Garavaglia today,
15   meaning July 18th.  Is that right?
16       A    That's what the memo says, yes.
17       Q    And there is, at the bottom of this
18   email there is a -- an indication that it was an
19   attachment at -- to the -- to the email; right?
20       A    Yes.
21       Q    And then go to the next page, and
22   what do you see there?
23       A    This is the letter notifying
24   Mr. Garavaglia that he's being placed on forced
25   leave pending an internal investigation into some

Page 170

1    improprieties that have come to light, and advising
2    him of his right to use any accumulated leave,
3    vacation, or comp time.
4        Q    And -- and the message here is that
5    it was hand-delivered.  Right?
6        A    Yes.
7        Q    Okay.  And if you'll turn the page
8    again, and now it says "Revised Request Letter" on
9    the top.  Are you on that page?
10       A    Yes.
11       Q    Okay.  Now, this is actually an email
12   stream that we're looking at on this page, appears
13   to be.  At the bottom is an email from Chana Morton
14   to you dated July 18 at 2:50 PM?
15       A    Yes.
16       Q    And it says, (Quote as read):
17            My apologies - please see the
18            attached revised letter.
19            Correct?
20       A    Yes.
21       Q    And then you responded at 2:52 to
22   Chana Morton by writing what?
23       A    (Quote as read):
24            Could you also add the word
25            "serious" and/or "fiscal" before

Page 171

1            "improprieties" to strengthen and
2            clarify (without being too
3            restrictive)?  Thanks.
4        Q    And then above that, there is an
5    email from Chana Morton on behalf of Darlene Green
6    saying, (Quote as read):
7            Please see the attached updated
8            request.
9            Is that right?
10       A    Yes.
11       Q    Were there any oral conversations
12   between you and Chana Morton about all of these
13   letters, or versions?
14       A    I believe there was one conversation
15   -- two conversations that I had with Chana maybe in
16   total.  One was the one on Saturday where she
17   connected the phone call, and then this one was
18   regarding me telling her, you know, that it was
19   important to include what we -- we talked about in
20   the original conversation on that Saturday before
21   July 2nd.  That these were serious allegations of
22   fiscal impropriety.
23       Q    Did you have any conversations with
24   Darlene Green about this matter?
25       A    No.

Page 172

1        Q    Okay.  Then, at 3:24 that afternoon,
2    on the very top, you write Comptroller Green back
3    saying that you're authorizing the second forced
4    leave pending your investigation; correct?
5        A    Yes.
6        Q    Now -- hold on one moment.  If you go
7    back to the letter that you did not see, to James
8    Garavaglia dated July 15th, the Certified letter
9    I'm talking about.
10       A    Yes.  I have it.
11       Q    This letter doesn't contain those
12   added words about "serious" and "fiscal," does it?
13       A    No, it does not.
14       Q    So then the letter dated July 18 to
15   you that you approved does contain those words, the
16   "serious fiscal improprieties."  Correct?
17       A    Yes.
18       Q    So the request to you was updated?
19       A    Yes.
20       Q    Per your instructions.
21       A    Yes.
22       Q    But the letter to Mr. Garavaglia was
23   not.
24            MR. NORWOOD:  Well, let me object --
25            MR. BLANKE:  Let me ask the question

43 (Pages 169 to 172)

## RICHARD R. FRANK  3/10/2022

Page 173

1    first.
2          MR. NORWOOD:  Well, let me object --
3      Q    (BY MR. BLANKE)  Does that seem
4    correct to you?
5          MR. NORWOOD:  Let me object, because
6    you say "the letter to Mr. Garavaglia," and it
7    assumes facts not in evidence.
8          First of all, it's vague and
9    ambiguous as to what letter, and it's -- and so if
10   you --
11         MR. BLANKE:  I can correct that very
12   easily.
13         MR. NORWOOD:  I'm sorry -- well,
14   please.
15         MR. BLANKE:  Okay.
16     Q    (BY MR. BLANKE)  So I'm saying that
17   the letter that we just talked about of July 15th
18   that has a Certified return in back of it --
19         MR. NORWOOD:  Well, let me object to
20   that too --
21         (Overtalking - inaudible.)
22     Q    (BY MR. BLANKE)  -- that was provided
23   to us by --
24         MR. NORWOOD:  Let me object to that,
25   let me object, because this letter -- there's no

Page 174

1    evidence in the record that ties this certification
2    to this letter.
3          MR. BLANKE:  Except that this is how
4    it was presented to us by you guys.
5          MR. NORWOOD:  It -- it -- we don't
6    know that either, because it's not Bates stamped.
7    So we don't know where this document came from as
8    it relates to these --
9          MR. BLANKE:  They do know.
10         MR. NORWOOD:  -- two letters.  Right?
11         MR. BLANKE:  Somebody knows, because
12   you provided it to us.
13         MR. NORWOOD:  Well, but let me say
14   this, Counsel, because I think -- I don't know if
15   it's intentional or inadvertent, but you produced
16   records to us, purportedly what you had in your
17   files.  And your files don't include this letter of
18   July 15, 2019 --
19         MR. BLANKE:  That's right.
20         MR. NORWOOD:  -- which suggest that
21   your client never received it.  And so, so that to
22   the extent that you're suggesting your client did,
23   I think it's improper.
24         MR. BLANKE:  I see.
25         MS. HAMILTON:  Because it's not in

Page 175

1    evidence.
2          MR. NORWOOD:  Well, because it's a
3    mis -- it's a fact that he never got the letter.
4    Because it's not in his file.
5          MR. BLANKE:  Well, let the record
6    reflect that neither the City nor Defendant Green
7    has provided us with a letter, other than this one,
8    that was sent to Mr. Garavaglia.
9          MR. NORWOOD:  That's absolutely
10   false.
11         MS. HAMILTON:  Incorrect.
12         MR. BLANKE:  Oh, really?  Where is
13   it?
14         MR. NORWOOD:  Because the letters
15   that you provided to us --
16         MR. BLANKE:  Yeah.
17         MR. NORWOOD:  -- are from your
18   client's files and from the files that Comptroller
19   Green did provide to counsel at the Civil Service
20   Commission stage.  All of which have your Bates
21   labels on them.
22         MS. HAMILTON:  And every -- I'll just
23   add --
24         MR. BLANKE:  So -- so let me.
25         THE REPORTER:  Wait.

Page 176

1          MS. HAMILTON:  -- I'll just add that
2    the documents that are in this folder of today,
3    Exhibits 2 --
4          MR. BLANKE:  Yeah.
5          MS. HAMILTON:  -- through at least 7,
6    are Bates stamped, have been exchanged in
7    discovery.
8          MR. NORWOOD:  And the only point I'm
9    making, Counsel, is that your client didn't receive
10   the letter because in none of the documents you
11   produced is this letter part of the mix.  And it's
12   not Bates stamped with anybody's Bates stamp.
13         So I think it's improper for you to
14   suggest that there was a letter your client
15   received when you can simply talk to your client
16   right now, so we can get this straight, to figure
17   out whether or not he received it.
18         MS. HAMILTON:  Well -- well, my -- my
19   objection would be that it just is not in evidence;
20   right?  That --
21         MR. BLANKE:  This is not a
22   conference.
23         MS. HAMILTON:  So.
24         MR. BLANKE:  You made -- you've made
25   your objections and I'll withdraw the question, and

44 (Pages 173 to 176)

RICHARD R. FRANK  3/10/2022

Page 177

1   here is my next question.
2       Q     (BY MR. BLANKE)  If you'll look in
3   the Defendant Green's book of exhibits, turn to
4   Exhibit Number 7, please.
5       A     Okay.
6       Q     That purports to be a letter dated
7   July 18 from Darlene Green to James Garavaglia;
8   correct?
9       A     Yes.
10      Q     It says on the letter that it was
11  hand-delivered on the 19th.  Correct?
12      A     Yes.
13      Q     So it says on the letter that it was
14  delivered delay -- the day after the letter was
15  written.  Correct?
16      A     Yes.
17      Q     Which is mysterious, would you not
18  agree?
19          MR. NORWOOD:  Well, let me object, I
20  mean --
21          MS. HAMILTON:  Calls for speculation
22  and is irrelevant.
23      Q     (BY MR. BLANKE)  And it also says on
24  the bottom of the letter --
25          MR. NORWOOD:  Well, hold on a second,

Page 178

1   hold on a second.  Are you -- I mean, was that a
2   question?  We objected.  I mean, are you abandoning
3   your question?
4       Q     (BY MR. BLANKE)  Oh, I thought you
5   answered.  Didn't you answer?
6       A     No, I didn't.  I do not believe it's
7   mysterious.  If you look at the time, you know, I
8   caught what I discussed with Chana to be a clerical
9   error and not capturing the serious allegations
10  which we discussed in the first Saturday, the very
11  beginning, and she corrected it but, you know, we
12  had the Comptroller and, you know, who, we need to
13  sign these things and it was already 3:30 in the
14  afternoon.
15         So I'm not surprised that this would
16  have gotten delivered, hand-delivered, the next
17  day.
18         MR. BLANKE:  No, no, I'm not -- I'm
19  not saying it was mysterious that it would have
20  been hand-delivered the next day.  I'm saying it's
21  mysterious that they're saying it was delivered the
22  next day before it was delivered.
23      A     I'm not --
24      Q     (BY MR. BLANKE)  Never mind.  It's
25  not important.

Page 179

1          MR. NORWOOD:  Yeah.
2          MS. HAMILTON:  Certainly.
3       Q     (BY MR. BLANKE)  The bottom of --
4   of this exhibit says "Letter Revised 7/18/19."
5   Correct?
6       A     Yes.  That's correct.
7       Q     Okay.  Have you seen this?
8       A     This letter?
9       Q     Yes.
10      A     I believe this letter looks similar,
11  I've seen so many letters today.  No.  This one is
12  not one that I -- I saw.
13      Q     Okay.  And how do you know that?
14      A     Because I didn't see the letters, to
15  the best of my recollection, that went to the
16  employee.  As director of personnel, I only saw
17  letters that would come to me asking for the forced
18  leave.
19      Q     Okay.  Do you have any personal
20  knowledge as to whether this -- this Exhibit
21  Number 7 was delivered?  Hand-delivered?
22      A     No, I have no personal knowledge
23  about that.
24      Q     Do you ordinarily review the letters
25  to employees notifying him or her that they've been

Page 180

1   placed on forced leave before you approve it?
2       A     Never.
3       Q     Okay.  This letter, Exhibit 7, says
4   you were copied in on it as well.  Correct?
5       A     Yeah, it does say that I'm copied.
6       Q     But you did not see it.  Is that your
7   testimony?
8       A     I don't recollect it.  This is a
9   letter that my secretary would have kept.
10      Q     And you don't ordinarily see them.
11      A     No, I do not.
12      Q     Is that because you just don't read
13  them, or they're just normally not sent to you?  I
14  mean, how -- how is it that you don't ordinarily
15  see them?
16      A     With all --
17          MR. NORWOOD:  Let me object.  First
18  of all, it's a compound question, I think it's
19  badgering this witness.  But subject to that.
20          MS. HAMILTON:  You can answer.
21      Q     (BY MR. BLANKE)  I certainly don't
22  mean to badger you.  I'm just asking.
23      A     I worked 7:30 in the morning until 7
24  at night, ran two pension systems, was a chief
25  negotiator for twelve unions, approved all police

45 (Pages 177 to 180)

**RICHARD R. FRANK  3/10/2022**

---

Page 181

1  discipline, and up until 2019, reviewed every
2  single piece of discipline in this City.
3      Q    Okay.  So it's a fair --
4      A    And so --
5      MS. HAMILTON:  You can finish.
6      THE WITNESS:  Yeah.
7      MS. HAMILTON:  Carry on.
8      A    And kept extensive records all the
9  way back from 2004 until I left, when we started
10  following our retention rules, and kept files on
11  numerous matters and legal opinions.
12      So I -- I don't mean to be -- it
13  sounds a little defensive --
14      Q    (BY MR. BLANKE)  No, but I mean --
15      A    -- but I just -- there's no way, you
16  know, I was doing -- there's like one person who
17  runs PRS, one person who runs FRS, and in addition
18  to all this, I ran two pension systems that
19  performed really well.
20      Q    So there's no way what?
21      A    There's no possible way that I could
22  keep records of all fitness for duties, or letters
23  to individual employees.  That -- it's just not --
24      Q    Well, yeah, I know, but my -- my
25  question is -- and, you know, look, if you don't

---

Page 182

1  know, you don't know.  I'm not trying to trap you
2  or anything.  I'm just asking --
3      A    Well --
4      Q    -- whether or not you know -- you
5  already had testified that you don't remember --
6      A    Yeah.
7      Q    -- seeing it or reading it, but my
8  question now is simply, do you remember or do you
9  know whether you actually received it in your
10  office?
11      A    It would not have come to my
12  attention.  This type of letter involving
13  employees, like fitness for duties or reports on
14  fitness for duties, or questions that had to do
15  with employees being notified of benefits,
16  regarding the benefits section, if it had to do
17  with forced leave.
18      My secretary, who's retired, Chris
19  Dussault (phonetic), would keep a file of all the
20  forced leave files.  So that's just how the flow of
21  paperwork, you know, anything that I had was a
22  decision point, you know, I would get, and I
23  typically kept a personal copy even though there
24  was one in the computer system, and my secretary
25  usually had one, so.

---

Page 183

1      Q    One more question about all this.
2      A    Mm-hmm.
3      Q    And that is, why did you specifically
4  advise the Comptroller's office to put the words
5  "serious" and "fiscal" into their request?
6      A    I think I've answered that but I'll
7  answer it again.  It's because those were what the
8  original allegations were, as explained to me by
9  Judy Armstrong on that Saturday before, which she
10  said could possibly, if found true, could trigger a
11  pre-termination review.
12      Q    Okay.
13      A    So, you know, that was the consistent
14  thing.
15      Q    And -- and there was nothing in that
16  conversation about Muni Corp; you already testified
17  to that?
18      A    No.
19      Q    What -- um, let's go to the July 23rd
20  letter which, is -- I lost my place.
21      A    I think I --
22      Q    From Paul Schmitz, sitting right next
23  to me here, Mr. Garavaglia's attorney in the Civil
24  Service Commission proceeding, to Ashley McClain.
25      MR. NORWOOD:  Where is that Counsel?

---

Page 184

1      MR. BLANKE:  This is, it says
2  GARAVAGLIA 215 on the bottom right.  Looks like
3  this.
4      MR. NORWOOD:  Let's start with the
5  exhibit number.  This Plaintiff's Exhibit O?
6      MR. BLANKE:  Yes, I'm sorry.
7      MR. NORWOOD:  And somewhere in here
8  there's a --
9      MR. BLANKE:  Well, it's -- it's
10  directly after where we left off with -- with --
11  it's the next page --
12      (Overtalking - inaudible.)
13      MR. BLANKE:  -- after the revised
14  request letter email.
15      A    I think I have it, sir.
16      MR. NORWOOD:  Okay.  July 23.  All
17  right.  I'm there.
18      MR. BLANKE:  Okay.
19      Q    (BY MR. BLANKE)  This letter from
20  Paul to Ashley McClain resulted in another hearing
21  being scheduled; correct?
22      A    Yes.
23      Q    Okay.  And that was, hearing was
24  scheduled for August 29, 2019.  Is that correct?
25      A    I'll check.  That sounds correct.

---

46 (Pages 181 to 184)

RICHARD R. FRANK  3/10/2022

Page 185

1   There should be correspondence from Ashley with the
2   institution of case, and yes.  I've got that
3   exhibit here.  So it was scheduled then for
4   August 29, 2019.
5       Q    Okay.  Okay.  And then if you'll turn
6   to the next page, which is an email from Darlene
7   Green to you dated August 12, 2019, saying attached
8   -- or I'm sorry, it's from Chana Morton saying "See
9   the attached letter from Darlene Green" --
10          MS. HAMILTON:  Where are you?
11      A    I'm --
12          MR. BLANKE:  It's the next page.
13  Well, this letter from Paul Schmitz is, there's two
14  of them, and they're identical, so.
15          MR. NORWOOD:  Okay.  So where are we
16  now?
17          MR. BLANKE:  It's right after that.
18      A    Is this the request for --
19          MR. BLANKE:  Just going in order
20  here.
21      A    -- extension of forced leave?
22          MR. BLANKE:  What's that?
23      A    I'm sorry, sir.  Is this a -- the
24  request for extension of forced leave?  Maybe I'm
25  -- I think I'm in the wrong place.

Page 186

1       Q    (BY MR. BLANKE)  No.  No.
2       A    Okay.
3       Q    Oh, is it letter for extension?  Yes,
4   it is, I'm sorry.  Yeah.  But the -- there's a
5   letter -- before that letter of August 12t, there's
6   an email from Chana Morton saying attached is the
7   letter.
8          MS. HAMILTON:  Are you talking about
9   the email of Monday, August 12, 2019, at 4:45 PM?
10          MR. BLANKE:  Yes.
11      A    Now I've got it.  Thank you.
12          MS. HAMILTON:  Okay.
13      Q    (BY MR. BLANKE)  Okay.  All that is,
14  is just a letter -- an email from Chana Morton
15  saying please find attached the letter from Darlene
16  Green; right?
17      A    Yes.
18      Q    Okay.  And then if you turn the page,
19  there is the letter from Darlene Green to you dated
20  August 12.  Correct?
21      A    Yes.
22      Q    Okay.  And what is this letter?
23      A    This is a letter requesting an
24  extension of the forced leave for Mr. Garavaglia
25  from July 18 for an additional 30 days, and she

Page 187

1   explains it as due to the -- (Quote as read):
2           in light of the ongoing investigation
3           and pending report from the State
4           Auditor's office.
5       Q    Okay.  This would con -- if granted,
6   would continue the forced leave beyond the hearing
7   date; correct?
8       A    Yes, it would.
9       Q    Okay.  And then if you turn the page
10  again, there is an email from you to Defendant
11  Green approving the extension for 30 days from
12  August 18th, instead of the date of her request,
13  which is August 12th.
14          Is that because she requested the
15  effective date to begin on August 18th?
16      A    I'm wondering if it's because the
17  original --
18          MS. HAMILTON:  You can take the time
19  to review the letter.
20          THE WITNESS:  Okay, yeah.
21      A    I -- I believe because the original
22  forced letter -- or approval forced leave letter,
23  she -- she asked for 30 days from July 18, 2019.
24  And 30 days past July 18, 2019, is August 18, 2019.
25  So I was honoring the Comptroller's date of

Page 188

1   request.
2       Q    (BY MR. BLANKE)  Okay.  And then turn
3   the page again.  An email from you to Defendant
4   Green approving the extension -- I've already
5   talked about this, so this is -- this is that
6   approval; right?
7       A    Yes.
8       Q    Okay.  Very good.  And then my
9   question is, is that common practice?
10          MR. NORWOOD:  Is what common
11  practice?
12      Q    (BY MR. BLANKE)  To extend 30 days.
13  You already testified on direct that it happens a
14  lot.
15      A    Oh, yes.
16      Q    Yeah, okay.  Did you discuss this
17  extension with Defendant Green before granting it?
18      A    No.
19      Q    Okay.  With anyone from her office
20  before granting it?
21      A    No.
22      Q    Okay.  Not Judy Armstrong, not Chana
23  Martin -- Morton --
24      A    No.
25      Q    I keep saying Martin.  I apologize.

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

Page 189

1   Do you know whether or not Defendant Green
2   discussed this extension with Linda Thomas?
3        A    I don't have any direct knowledge of
4   that.  It would all be speculative.
5        Q    Now, if I ask you to assume that
6   Defendant Green testified under oath that she
7   discussed this extension with Linda Thomas and with
8   you, would you still disagree with that?
9        A    I disa --
10        MS. HAMILTON:  I'm going to object
11   that it's an improper hypothetical, but subject to
12   that, you can answer to the --
13        (Overtalking - inaudible.)
14        Q    (BY MR. BLANKE)  And she did that, by
15   the way, on page 193, lines 1 through 3, of her
16   deposition.  Go ahead.
17        MS. HAMILTON:  You can answer, sir.
18        A    I don't remember at all discussing
19   specifics of an extension, you know.  Linda, I
20   know, was originally consulted by the Comptroller
21   about the provisions of Administrative Regulation
22   117.
23        My only recollection about the
24   extensions was communication I had with Ashley
25   about trying to get forced leave, the forced leave

Page 190

1   in front of a hearing officer as soon as practical
2   because, you know, it's obviously a important issue
3   for the employee.
4        Q    (BY MR. BLANKE)  Is it your ordinary
5   practice to discuss extensions with the person
6   requesting them before you grant the extension?
7        A    Sometimes.
8        Q    Sometimes yes; sometimes no?
9        A    Sometimes no.
10        Q    Okay.  What -- what would -- well,
11   okay.  Now, why did you grant the extension?
12        A    I granted the extension because of
13   the communication I had received from the
14   Comptroller before that the state auditors, you
15   know, were involved.  I knew that she had planned
16   to have them involved from my original conversation
17   that I go back to on that Saturday, and the state
18   auditors were taking longer, as they often do.
19        Q    So I understand this, I just want to
20   be clear.  Did you discuss the audit with -- with
21   Defendant Green -- I'm sorry, with --
22        A    No.
23        Q    -- Judy Armstrong --
24        A    No.
25        Q    -- on the Saturday afternoon con --

Page 191

1   phone call?
2        A    No.  I think what I testified to here
3   today was I discussed what the allegations were,
4   they were of a --
5        Q    Right.
6        A    -- very serious nature, and also that
7   they -- they -- I said do you think that this is
8   something that could, if crew and true, could
9   reasonably lead to, you know, termination,
10   dismissal, and Judy Armstrong said yes, you know,
11   that the auditors are also very concerned about
12   this.
13        Q    Oh, so she did mention it?
14        A    Yeah, she mentioned the -- their
15   auditors.
16        Q    In that -- in that Saturday
17   conversation?
18        A    Mm-hmm.  I believe so.
19        Q    Is that the first time you learned
20   about an audit?
21        A    Mm-hmm.
22        Q    This is an internal audit?
23        A    Well, not the first time, no.  The
24   City was going through a City-wide audit of all
25   those records.  My department was the very first

Page 192

1   one, you know, and it would take three or four
2   months -- I think it took three or four months to
3   get through just my department.
4        So it was winding its way through the
5   City and the auditors were routinely, you know,
6   going through each of the different departments and
7   were involved.
8        Q    Who were these auditors, do you know?
9        A    Yeah, they were the auditors from
10   Jefferson City who worked, you know, directly for
11   Nicole Galloway.
12        Q    Did you ever find out whether or not
13   this audit of the Comptroller's office was ever
14   completed?
15        A    No, I don't.  I have not read the
16   results.
17        Q    Did you ever find out any results or
18   findings of that audit from any source?
19        A    No.
20        Q    Did you ever see any requests made to
21   the Comptroller's office from the auditors?
22        A    No.
23        Q    Did you see -- did you ever see any
24   documents or recorded statements of anyone in the
25   Comptroller's office made to the auditors?

48 (Pages 189 to 192)

## RICHARD R. FRANK  3/10/2022

Page 193

 1    A    No.
 2    Q    Okay.  So other than just being told
 3 that they were being audited, you don't know --
 4 really know anything about it?  About the audit of
 5 the Comptroller's office?
 6    A    I was told from the Comptroller's
 7 office, and also from my legal counsel.
 8    Q    You were told what?
 9    A    That the auditor -- state auditors
10 were involved.
11    Q    But I mean nothing more than that?
12    A    No.
13    Q    That's my question.  Okay.  So just
14 to be clear, the effect of granting that extension
15 was that the hearing scheduled for August 29, the
16 Civil Service Commission hearing, on the second
17 forced leave request would occur prior to the end
18 of the forced leave; correct?
19         (Overtalking - inaudible.)
20    Q    (BY MR. BLANKE)  Would occur prior to
21 the end of the -- of the second forced leave.  You
22 gave a 30-day extension on August 18 --
23         MR. NORWOOD:  Oh, well, let me -- let
24 me object because it assumes that there was a
25 30-day extension, but subject to that.

Page 194

 1         MR. BLANKE:  What do you mean?  He
 2 testified that he granted the 30-day extension.
 3         MR. NORWOOD:  He testified that he
 4 granted the 30-day extension.  He didn't testify
 5 that the Commission granted the 30-day extension.
 6         MR. BLANKE:  I understand that but
 7 that's not my question.
 8    Q    (BY MR. BLANKE)  My question is just
 9 -- is just whether or not the effect of granting
10 the 30-day extension meant that that 30-day
11 extension wouldn't expire until after the hearing
12 date of August 23rd.  Right?
13         MR. NORWOOD:  Let me object.  After
14 the scheduled hearing date?
15         MR. BLANKE:  The scheduled hearing
16 date.  Right.
17         MR. NORWOOD:  Okay.
18    A    They're two independent types of
19 processes.  You know, the forced leave is granted
20 for the period for which it's granted.
21    Q    (BY MR. BLANKE)  Right.
22    A    You know, we then schedule, you know,
23 at a time when we can get a hearing officer, you
24 know, an evidentiary hearing, with a low threshold,
25 for the meeting --

Page 195

 1    Q    I'm not -- I'm not saying there's
 2 anything improper about it.  I'm just asking
 3 whether or not that's true?
 4    A    I'm just -- and I'm explaining to
 5 you, Counselor, that they're two separate things.
 6    Q    Okay.  So the answer is yes?
 7    A    Could happen at any time.
 8    Q    Right.  So the answer is yes.  Right?
 9 It would --
10         MR. NORWOOD:  Well, and -- and let me
11 just highlight and get your concession --
12         MR. BLANKE:  I think anybody could
13 come --
14         MR. NORWOOD:  -- that you're not
15 suggesting that there's anything improper about it.
16         MR. BLANKE:  That's right.
17         MR. NORWOOD:  I mean, I just want to
18 make sure she got that.
19         MR. BLANKE:  You're right, yeah.
20         MR. NORWOOD:  Is that right, Counsel?
21         MR. BLANKE:  Because as -- that's
22 correct, because as he --
23         MR. NORWOOD:  Okay.
24         MR. BLANKE:  -- just testified, it
25 happens all the time.

Page 196

 1         MR. NORWOOD:  All right.  There we
 2 go.  All right.
 3         MR. BLANKE:  Okay.  So, you know, you
 4 keep reading these motives into my questions and
 5 it's just -- I'm just asking questions.
 6    Q    (BY MR. BLANKE)  Okay.  Look at the
 7 next -- go -- go a couple of pages in to where it
 8 says GARAVAGLIA 374 on the bottom right.  That's
 9 the Bates stamp number.  So it's about three or
10 four pages in and it's called Motion for Continuance.
11    A    I have it.
12    Q    Okay.  And that Motion for
13 Continuance on the second page is signed by Nancy
14 Kistler and dated August 16; is that correct?
15    A    Yes.
16    Q    Okay.  Did you know about this when
17 it was done?  When the motion was filed.
18    A    Yes.
19    Q    Did you know it was going to be filed
20 before it was filed?
21    A    Yes.
22    Q    How?
23    A    Because I was working with Ashley
24 McClain and coming up with a schedule for the
25 forced leave hearing and Ashley explained to me

49 (Pages 193 to 196)

Page 197

```
 1    that, you know -- and she works with the appointed
 2    authorities and the legal counsel to make sure that
 3    there's suitable dates.
 4           So I heard that this was -- you know,
 5    they were in the works in terms of trying to come
 6    up with an amenable date.
 7       Q    Well, we -- you already agreed with
 8    me that the -- the hearing that was scheduled for
 9    August 23rd was scheduled on August the 11th;
10    correct?
11       A    Pardon me?
12       Q    The hearing that was scheduled to
13    take place on August 23rd was actually scheduled on
14    August the 11th; is --
15           MR. SCHMITZ:  You mean 29th?
16       Q    (BY MR. BLANKE)  I'm sorry, I meant
17    to say 29th.
18       A    Oh, okay.
19       Q    It was meant to be -- I'm sorry, I
20    apologize.
21           MR. NORWOOD:  Well, why don't we --
22       Q    (BY MR. BLANKE)  Let's back up.
23           (Overtalking - inaudible.)
24           MR. BLANKE:  I withdraw the whole
25    thing.
```

Page 199

```
 1    communication at this point in the process was
 2    fairly limited to working with Ashley and making
 3    sure that the process is moving forward and the --
 4    and what I remember telling her is, you know, try
 5    and get a date as -- as soon as possible.  We
 6    weren't quite sure how this was all going to turn
 7    out.
 8       Q    (BY MR. BLANKE)  When was the hearing
 9    that was scheduled for August 29th scheduled?  When
10    was that set?  I don't mean when the hearing date
11    was set.  It was set on August the 29th.  But when
12    was that date selected?
13           MS. HAMILTON:  Are you referring to a
14    document in this package of miscellaneous things
15    here?
16           THE WITNESS:  Yeah, I don't --
17           MR. BLANKE:  Yes, but --
18           MS. HAMILTON:  Is there a page that
19    you could point us to with this?
20           MR. BLANKE:  We've already -- this
21    testimony has already occurred.  I don't know why
22    this is so hard.
23           MR. NORWOOD:  We're trying to follow
24    the ball on this.
25           MS. HAMILTON:  This packet and these
```

Page 198

```
 1           (Overtalking - inaudible.)
 2           MR. BLANKE:  I'm withdrawing the
 3    question.
 4       A    Sorry, it's getting late in the day.
 5    Pardon me.
 6       Q    (BY MR. BLANKE)  Me too, and I think,
 7    you know, I -- that's what's going on here.  It's
 8    not that I'm trying to trap you.  It's just because
 9    I confuse myself sometimes.
10           But at any rate, the -- the hearing
11    that was scheduled before the Civil Service
12    Commission on August 29th was set -- was set long
13    before this motion for continuous was filed.
14       A    Correct.
15       Q    Okay.  So my question is, and you may
16    have answered it already correctly, that you knew
17    about the Motion for Continuance prior to the time
18    it was filed.  Correct?
19           MR. NORWOOD:  Well, I think --
20    objection, I think that mischaracterizes testimony.
21           MR. BLANKE:  I don't think so but
22    maybe you're right.  I don't know.  That's why I'm
23    asking again.
24       A    I guess I don't know.  I'm not an
25    attorney, if you call this hearsay, but my
```

Page 200

```
 1    questions.
 2           MR. BLANKE:  No, that's why I'm
 3    asking the question.
 4       Q    (BY MR. BLANKE)  My question is, once
 5    again, for the third time, when was the August 29th
 6    hearing date selected?
 7       A    I would have to have something in
 8    front of me because, again, that's not -- that was
 9    not my job.  I did not set the hearing dates.  I
10    asked my administrative assistant to the Civil
11    Service Commission who has numerous hearing dates,
12    you know, set with all six of our hearing -- or
13    what were six of our hearing officers.
14           So in this case in particular, you
15    know, there -- there was a lot of different things
16    in play so I was not sure, in terms of when it was
17    set and it's not something that normally would be
18    brought to my attention anyway unless I were called
19    as a -- a witness or somehow personally involved.
20       Q    Okay.  Then if you'll turn the page
21    about two or three pages, you'll see an Order from
22    Thomas Frawley.  There are actually two of them.
23    They're both dated on August the 22nd, but I'm
24    talking about the shorter Order which is the second
25    one that appears here that reads, (Quote as read):
```

Page 201

```
 1        Under Administrative Regulation
 2        Number 117, an employee must be --
 3        placed on forced leave may elect to
 4        -- I'm sorry.
 5        Under Administrative Regulation
 6        Number 117, an employee placed on
 7        forced leave may elect to be placed
 8        on vacation leave, but if the forced
 9        leave is disapproved, the employer
10        (sic) will not be restored his
11        vacation leave.
12   A    Right.
13   Q    (Quote as read):
14        Therefore, the Appointing Authority's
15        Motion for Continuance shall be and
16        hereby is denied.
17        And that's dated August 22nd.
18   Correct?
19   A    Yes.
20   Q    Okay.  So as a result of that Order
21   from the hearing officer, the hearing for
22   August 29th was still going to take place?
23   A    Based on this, yes.
24   Q    Yes.  Okay.  Now, if you'll turn the
25   page again, there are -- there is a -- there is
```

Page 202

```
 1   several different memorandums that follow.
 2        The first in order here is a
 3   memorandum to Paul Schmitz from Darlene Green dated
 4   August 27th.  That's a one-page memorandum.  Do you
 5   see that?
 6   A    Yes.
 7   Q    Okay.  And then the second in order
 8   here is an earlier memorandum from the previous day
 9   of August 26 to Judy -- from Judy Armstrong to
10   Darlene Green, and that's two pages long; correct?
11   A    I see that, yes.
12   Q    And then the third is a document
13   dated also on August the 26th from Comptroller
14   Darlene Green but not addressed to anyone in
15   particular.  Correct?
16   A    Yeah.  I see that.
17   Q    Okay.  Did you ever see these?
18   A    No.
19   Q    This the first time you saw them?
20   A    Yes.
21   Q    Okay.  Did you have any discussions
22   with anyone in the Comptroller's office about the
23   request to withdraw the second forced leave before
24   that request was made in writing?
25   A    I don't remember anything in
```

Page 203

```
 1   particular about Mr. Garavaglia's case, any
 2   questions that, if I did answer anything, would
 3   have just been, you know, procedural in nature and
 4   like how do you do this.
 5        I mean, I think that was sort of like
 6   the gist of -- of, according to my conversation
 7   with -- with Linda, which I followed up after I got
 8   the memo and thanked her, I said, you know, what --
 9   what's going on with this, you know, what did you
10   say to the Comptroller, what's going on?
11        And she goes, I actually received a
12   phone call from her.  She wanted to know about the
13   process for forced leave.  Which isn't uncommon.
14   We get a lot of questions about forced leave and
15   how it works, and so it would have just been in
16   general terms about, you know, extension of forced
17   leaves and sometimes they -- the appointing
18   authorities ignore me anyway, so.
19   Q    What do you mean by that?  How do
20   they -- how do they ignore you anyway?
21   A    Well, be prior to the change in
22   October of 2019 -- actually September of 2019, that
23   squarely placed all police division employees under
24   civil service in the department of personnel,
25   administrative regulations under the collective
```

Page 204

```
 1   bargaining agreement and police manual, it was not
 2   necessary for the Police Commissioner to ask
 3   permission to place a commissioned officer on
 4   forced leave.  He had the authority to do it.
 5        And I told them on numerous
 6   occasions, you don't have to send me this and every
 7   month I would get a request for an extension from
 8   people.  So it's just kind of typical that -- not
 9   typical but sometimes in -- with forced leave,
10   people were very careful and they would ask either
11   myself or my secretary, Chris, or Linda, or
12   personnel services, that they were doing forced
13   leave correctly.
14   Q    Okay.  Following these three
15   memoranda that you did not see, okay, is four
16   subpoenas.
17   A    Mm-hmm.
18   Q    Subpoenas Duces Tecum they're called.
19   One's to the Comptroller's Office, another is to
20   the Department of Personnel, and another is to you
21   personally, and another is to Defendant Green
22   personally.
23        How do these get issued?  Well, first
24   of all, as the secretary to the Commission, do you
25   know how they get issued?
```

51 (Pages 201 to 204)

**RICHARD R. FRANK  3/10/2022**

Page 205

1      A     Yeah, I have subpoena power, the
2   Commission does not.  So, you know, I would have to
3   authorize by my signature any, um, you know,
4   Subpoena Duces Tecum or my designee in my absence.
5   I may have erred because I don't know that with
6   forced leave hearings, which have a different
7   standard of -- of proof that Subpoena Duces Tecums
8   are actually issued.
9          But under normal circumstances, you
10  know, I review the subpoena, make sure that
11  they're, you know, properly worded and signed, and
12  every once in a while we'll run into an issue where
13  I -- you know, if it's outside the City of
14  St. Louis, we might have to go to Circuit Court to
15  get them enforced.
16     Q     So were you aware of any motions made
17  by Nancy Kistler to quash any of these subpoenas?
18     A     I may have read it.  I don't recall
19  all of it.
20     Q     Okay.  You -- you signed them,
21  though; right?
22     A     Yes.  I believe I did.
23     Q     So that's your approval that the
24  subpoena is issued; correct?
25     A     Yes.  Which would, if she felt that

Page 206

1   they were improper, overly broad, it's burdensome
2   you know, she then has the responsibility, you
3   know, to file a Motion to Quash.
4          And outside of granting an initial
5   continuance on a hearing, all other motions for an
6   evidentiary hearing need to be ruled on by the
7   hearing officer who is an attorney, so.
8      Q     And that happened in this case,
9   didn't it?
10     A     Yes, it did.
11     Q     Well, let me just go back and --
12     A     And Judge Frawley --
13     Q     And just before that Motion for
14  Continuance that you were looking at earlier is a
15  Motion to Quash Subpoenas?
16     A     Yeah.
17     Q     Made by Nancy Kistler.  And then just
18  to refresh your recollection, I'm just --
19     A     Sorry.
20     Q     -- asking you to glance over that.
21     A     Yeah, this is with Judge Frawley
22  getting back at me and telling me I made an error
23  probably.
24     Q     Well, partially; right?
25     A     Yeah.

Page 207

1      Q     Yeah, so he made an order on August
2   22nd, in addition to his motion -- in addition to
3   denying the continuance, he also ruled on the
4   Motion to Quash the Subpoenas?
5      A     That's correct.
6      Q     And he partially granted them and
7   partially denied the motions; right?
8      A     Yes.
9      Q     Okay.  So some were proper; some were
10  not.  Right?
11     A     Correct.
12     Q     Okay.  So, now, turn the page again
13  after this, after the subpoenas; okay?  And there
14  is a letter from Darlene Green to you dated
15  August 28, 2019.  August 28th is the day, the day,
16  prior to the scheduled evidentiary hearing before
17  the Service -- Civil Service Commission on the
18  second forced leave.  Correct?
19        MS. HAMILTON:  Have you got it?
20     A     I don't think I -- I've got the
21  pre-termination hearing.
22     Q     (BY MR. BLANKE)  You've gone too far.
23        MS. HAMILTON:  August 28.
24     A     I'm up to August 28, isn't it?
25     Q     (BY MR. BLANKE)  Yep.  Back up.  Back

Page 208

1   up.
2      A     Back up?  Okay.
3      Q     Yeah.
4        MS. HAMILTON:  After the subpoenas.
5      Q     (BY MR. BLANKE)  Looks like this.
6      A     Yeah, I'm sorry.
7        MS. HAMILTON:  I'm holding it up to
8   him.
9      Q     (BY MR. BLANKE)  That's okay.
10     A     Right in between the two.  I see it
11  now.  I'm sorry.  Thank you.
12     Q     My first question is an easy one.
13  That that date of August 28, 2019, is the actual --
14  is the day before the scheduled Civil Service
15  Commission hearing of August 29th; right?
16     A     Mm-hmm.  Yes, sir.
17     Q     Okay.  And this letter purports to
18  withdraw her request for forced leave; is that
19  correct?
20     A     Yes.
21     Q     And that would be the second time
22  that she withdrew it?
23     A     Yes.
24     Q     Now, in this letter to you from
25  Defendant Green, she states that she'd like to

52 (Pages 205 to 208)

**RICHARD R. FRANK  3/10/2022**

---

Page 209

1   withdraw the request that she made on July 18,
2   2019.  Do you see that?
3       A   Yes.
4       Q   But she didn't make the request on
5   July 18, 2000 -- on August 18, 2019.  She made it
6   on August 12, 2019.  Correct?
7       A   Yes.  I think --
8       MS. HAMILTON:  I'm -- wait a minute.
9       A   I think that's -- we've already
10  talked about why the extension went to --
11      Q   (BY MR. BLANKE)  Yeah.
12      A   -- August 18 --
13      MS. HAMILTON:  I just think you
14  said --
15      A   -- instead of August 12th.
16      MS. HAMILTON:  -- the wrong dates.
17      THE WITNESS:  Yeah, I know it --
18      MS. HAMILTON:  I'm going to say that
19  again.  I think you got the wrong dates.
20      MR. NORWOOD:  You said July 12th.
21      MR. BLANKE:  I did?  Okay.  I'll say
22  it again.
23      A   August 12th, 2019.
24      Q   (BY MR. BLANKE)  So -- so -- yeah.
25      MS. HAMILTON:  Yeah, let's just do

---

Page 210

1   that one again.
2       MR. BLANKE:  Oh, I see what you mean.
3   Yeah, okay.
4       Q   (BY MR. BLANKE)  Yeah, so she refers
5   to her letter dated July 18th and it was actually
6   July 12th.  Is that correct?  But it was to be
7   effective July 18th.  We've talked about that.
8       A   Yes.
9       Q   Right.  But her letter was actually
10  July 12th?
11      A   Yeah, I -- I agree with you on that.
12      Q   Okay.  Okay.  Now, turn the page yet
13  again, and there's a letter from Ashley McClain to
14  the two attorneys, Nancy Kistler and Paul Schmitz.
15  And what -- what is -- what is Ashley purporting to
16  do here?  What is she advising here?
17      A   She's advising that due to the fact
18  that the Comptroller has requested to withdraw the
19  forced leave, that the -- there's no reason for the
20  hearing.  I mean, the hearing would -- would have
21  been null and void because Mr. Garavaglia would
22  have been made whole by virtue of the fact that the
23  forced request dating all the way back to that date
24  of July 12, I guess it was or whatever, whenever --
25  he -- he would be made whole as of that date.

---

Page 211

1       Q   Now, this letter from Ashley goes to
2   the two attorneys.  My question now is, do you have
3   any reason to believe that Darlene Green knew that
4   this was the case before she made her motion to
5   withdraw her second forced leave request?
6       MR. NORWOOD:  Objection.  Vague and
7   ambiguous.  Knew what -- what was the case?
8       Q   (BY MR. BLANKE)  Do you have any
9   reason to believe that she would have known that by
10  withdrawing her second request for forced leave,
11  that this hearing would have been -- would not have
12  taken place --
13      MS. HAMILTON:  And I would --
14      Q   (BY MR. BLANKE)  -- as a result of
15  that second leave being withdrawn?
16      MS. HAMILTON:  And I would just
17  object to the extent that you might be getting into
18  attorney-client privilege information and instruct
19  the witness, you --
20      MR. BLANKE:  What do you mean?
21      MS. HAMILTON:  -- not to get into any
22  privileged conversations.
23      Q   (BY MR. BLANKE)  Okay.  Other than
24  that.
25      A   Yeah, I really don't have a -- a

---

Page 212

1   response to that.  I mean, I would decline to
2   respond because it was based on, um -- any
3   knowledge I had would be based on my communications
4   with -- with Deputy City Counselor, Nancy Kistler.
5       Q   I think you maybe misunderstand that
6   question.  I'm not asking you anything about the
7   City Counselor's office at all.  I'm asking you
8   whether or not you have any reason to believe that
9   the Comptroller would have known that the effect of
10  withdrawing the forced leave would have resulted in
11  the cancellation of the hearing.
12      MS. HAMILTON:  And I think his answer
13  is that you're asking him to reveal substance of
14  conversations that he had with Nancy Kistler.  Did
15  you hear him?
16      MR. NORWOOD:  She can read it back.
17      Q   (BY MR. BLANKE)  Why -- why would
18  Nancy -- that you had with Nancy Kistler?
19      A   Yes.
20      Q   So you didn't know that yourself,
21  that it would result in the -- in the cancellation
22  of the hearing?
23      MS. HAMILTON:  That wasn't the
24  question.
25      MR. NORWOOD:  That wasn't --

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

**RICHARD R. FRANK  3/10/2022**

Page 213

```
1        A    You weren't asking me.
2        MS. HAMILTON:  That wasn't your
3   question.
4        Q    (BY MR. BLANKE)  Why would you have
5   learned --
6        MS. HAMILTON:  Your question was
7   about --
8        MR. BLANKE:  Oh, I see.  I see.
9        A    The rest of it, pardon me, is
10  speculative.
11       (Overtalking - inaudible.)
12       MR. BLANKE:  So -- so, you know,
13  okay, you know, this is ridiculous.  This
14  attorney-client privilege has no application to
15  this question at all.
16       Q    (BY MR. BLANKE)  If -- if you -- so
17  -- so it's your testimony that -- that you're --
18  you don't want to answer this question because of
19  what Nancy Kistler may have told Darlene Green; is
20  that what --
21       MS. HAMILTON:  And you can --
22       Q    (BY MR. BLANKE)  -- you're saying?
23       MS. HAMILTON:  And you can --
24       Q    (BY MR. BLANKE)  Is -- that right?
25       MS. HAMILTON:  You can read back his
```

Page 214

```
1   answer to the prior question.  Could you read back
2   his answer to the prior question, please?
3        THE REPORTER:  Which question?
4        MS. HAMILTON:  The prior -- the one
5   immediately prior to this.
6        THE REPORTER:  "I'm asking you
7   whether or not you have any reason to believe that
8   the Comptroller would have known that the effect of
9   withdrawing the forced leave would have resulted in
10  the cancellation of the hearing."
11       MS. HAMILTON:  I'm sorry, the answer
12  to the question, sorry.
13       THE REPORTER:  There wasn't an
14  answer.  That's when you all started --
15       MR. NORWOOD:  And then there was an
16  answer that following.
17       THE WITNESS:  May I answer this?
18       MR. NORWOOD:  Well, no, no, no --
19       (Overtalking - inaudible.)
20       THE WITNESS:  -- ordering me not to,
21  I'm confused.
22       MR. BLANKE:  That's the only question
23  I asked.
24       MR. NORWOOD:  Hold on, hold on,
25  let's --
```

Page 215

```
1        THE REPORTER:  I have talk from
2   Ms. Hamilton, Mr. Norwood, that -- but I don't have
3   an answer.
4        MS. HAMILTON:  Maybe he asked the
5   same question twice, but I heard him answer that
6   question.  So.
7        Q    (BY MR. BLANKE)  So can you answer --
8        MR. NORWOOD:  Well, why don't you
9   answer -- ask it again, so we can object again, so
10  we can be confused again, by your question.  But go
11  ahead.
12       MR. BLANKE:  You can read back the
13  question another time.
14       MS. HAMILTON:  Oh, my God.
15       MR. BLANKE:  I don't want to rephrase
16  it.  We'll be talking about three different things.
17       THE REPORTER:  "I'm asking you
18  whether or not you have any reason to believe that
19  the Comptroller would have known that the effect of
20  withdrawing the forced leave would have resulted in
21  the cancellation of the hearing."
22       MS. HAMILTON:  And my objection is
23  that to the extent that the conversation anything
24  that is attorney-client privileged, I would
25  instruct the witness not to answer.  I would also
```

Page 216

```
1   object that it calls for speculation.  Subject to
2   that, you can answer.
3        MR. NORWOOD:  Unless it would breach
4   the attorney-client privilege.
5        A    I think it would breach it because it
6   was a matter that I discussed with the City
7   Counselor, and I routinely discussed --
8        MS. HAMILTON:  And that's --
9        Q    (BY MR. BLANKE)  Let me ask this
10  question.  Did you know before the -- as -- as the
11  secretary to the Commission and the director of the
12  Department of Personnel, when a forced leave
13  request is withdrawn and a Civil Service Commission
14  has already been scheduled for that forced leave,
15  does that have the effect of canceling the hearing?
16       A    Yes, it does.
17       Q    And how did you know that?
18       A    Because that's policy -- I mean
19  that's just procedure.  I mean, there's no --
20       Q    Where does it come from, that
21  procedure?
22       A    The evidentiary hearing process
23  outlines, you know, what would happen and there's
24  no matter at -- at contest anymore.  There -- it's
25  gone.  It's null and void.
```

54 (Pages 213 to 216)

Page 217

1      Q     And that should be apparent to
2  anybody, wouldn't you agree?
3      A    I would agree to that.
4      Q     So would you agree that Darlene
5  Green, being anybody, would have known that, even
6  aside from whatever she may have learned from the
7  Counselor's office?
8          (Overtalking - inaudible.)
9          MS. HAMILTON:  I object that it calls
10 for speculation.
11         THE WITNESS:  Yeah.
12         MR. NORWOOD:  Yes.
13         MS. HAMILTON:  Subject to that, you
14 can answer.
15     A    I would say it's speculative.  I have
16 seen attorneys who have misspelled and -- and
17 misnumbered things.  I have seen plenty of
18 engineers with Master's degrees who can't
19 understand simple provisions.  So it would be
20 speculative.
21         I mean, I've already testified with
22 all due deference to Comptroller Green's financial
23 acumen.  I've already testified she asked about
24 routine procedures of forced leave from Ms. Thomas.
25 This was a complex one, so that's my answer.

Page 218

1      Q     (BY MR. BLANKE)  Let me ask you this.
2  Do you have -- I see that you approved both of the
3  withdrawals of the forced leave that she asked for.
4  Correct?
5          MS. HAMILTON:  I would object that
6  that mischaracterizes --
7      Q     (BY MR. BLANKE)  That's not correct?
8          MS. HAMILTON:  -- the witness's
9  testimony.
10     A    It's not correct because it's a --
11 it's not even like a writ of mandamus kind of
12 issue.  It's -- it's just a formal recognition is
13 all.
14     Q     That was my next question.
15     A    Yeah.
16     Q     You don't have to approve that?
17 That's something --
18     A    No, I don't have to.
19     Q     Right.
20     A    She could rescind it at any time.
21     Q     Right.
22     A    That's -- that's not under my
23 control.
24     Q     So that's something that she did on
25 her own and --

Page 219

1      A    Absolutely.
2      Q     -- and it gets done.  When she says
3  she wants to withdraw it, it's withdrawn,
4  basically?
5      A    Yes.
6      Q     You're just acknowledging the fact.
7      A    Yes.
8      Q     Okay.  And once again, and I
9  apologize if I -- If this was asked already.  I
10 just don't remember the answer if you did.  Did you
11 have any discussions with Defendant Green or anyone
12 in her office about the request to withdraw this
13 forced -- the second forced leave?
14         MR. NORWOOD:  Objection --
15     Q     (BY MR. BLANKE)  Any oral
16 conversations?
17         MR. NORWOOD:  Objection, asked and
18 answered.
19     Q     (BY MR. BLANKE)  Subject to that.
20     A    I -- my recollection is that the two
21 people with whom I had conversations with about the
22 withdrawal of the forced leave were Nancy Kistler
23 and Ashley McClain.
24     Q     That's it?
25     A    That's, yeah, to the best of my

Page 220

1  recollection.
2      Q     Okay.  Do you know whether Linda
3  Thomas or Ashley McClain had any conversations with
4  anyone in the Comptroller's office about their
5  withdrawal of the second forced leave?
6      A    I don't know, sir.
7      Q     Okay.  Let's -- let's go to the black
8  book.  Which has in it the pre-termination letter
9  which is --
10         MR. NORWOOD:  Tab 10.
11         MR. BLANKE:  Thank you.  Tab 10.
12         (Overtalking - inaudible.)
13     Q     (BY MR. BLANKE)  This letter is the
14 pre-termination letter --
15         MR. NORWOOD:  Well, just for -- for
16 the record, we're talking about Frank --
17     Q     (BY MR. BLANKE)  Exhibit 10.
18         MR. NORWOOD:  -- Depo Exhibit 10.
19         MR. BLANKE:  That's correct.
20     A    Thank you.
21     Q     (BY MR. BLANKE)  This letter, on the
22 third page, which is Bates numbered STL001310,
23 shows on the bottom that a copy was sent to you.
24 Correct?
25     A    Yes.

RICHARD R. FRANK  3/10/2022

Page 221

1      Q     Okay.  And did you receive it and
2   read it?
3      A    Yes.
4      Q     Okay.  Do you remember when,
5   approximately?
6      A    I remember it was after it was
7   already delivered to -- or sent, I should say, to
8   -- and dated to Mr. Garavaglia.  I had no input or
9   knowledge of any of the specific contents of it
10  prior to that.
11     Q     Did you discuss all of these charges
12  that are contained in this letter with Defendant
13  Green or anyone in her office?
14     A    No.
15     Q     Do you know whether Ashley -- excuse
16  me.  Do you know whether Linda Thomas ever
17  discussed these charges that are contained in the
18  pre-termination letter with -- with anyone in the
19  Comptroller's office?
20     A    Ms. Thomas, um, explained to me, when
21  she heard that I had a deposition this week, that
22  she only discussed with Comptroller Green the
23  procedures as outlined in Administrative Regulation
24  117 and none of the specifics.
25     Q     How about anyone else in your office?

Page 222

1   Did anybody else in your office, to the best of
2   your knowledge, discuss the contents of the
3   allegation -- the charges against Mr. Garavaglia
4   that are contained in Exhibit Number 10?
5      A    None to my knowledge, and I have
6   every confidence and belief that my former
7   administrative assistant, Ashley McClain, would not
8   have discussed them.  She had impeccable sense of
9   integrity and propriety and a long history of legal
10  background, so I -- I -- I have no reason to
11  believe she would have discussed any specifics
12  about this.  And --
13     Q     Why -- why -- do you -- that sort of
14  suggests to me that you think it would have been
15  improper for her to do that.  Is -- is that what
16  you're saying?
17     A    Be -- I would say that because we
18  don't get into -- it's not our job to be the
19  adjudicator --
20     Q     Okay.
21     A    -- you know, of an appeal to the
22  Commission.  She's there to assist the -- the
23  judicial officer -- I'm sorry, the quasi-judicial
24  officer, the hearing officer, in terms of trans --
25  you know, taking the tape, transcribing it,

Page 223

1   scheduling it, et cetera.
2           And so, you know, that kind of
3   cross-communication, other than just discussion of
4   policies and procedures, would -- would be outside
5   of something we would get involved with.
6      Q     What -- what about Linda Thomas?
7   Would it have been improper for her to discuss
8   these allegations?
9           MR. NORWOOD:  Well, let me -- let me
10  object on the term "improper" because it's vague
11  and ambiguous and could call for a legal
12  conclusion.
13     Q     (BY MR. BLANKE)  Well, improper for
14  any reason because I -- I'm just picking that up
15  from what you said in your answer that you thought
16  that it would have -- maybe you were just referring
17  to Ashley McClain.
18     A    I was referring to Ashley McClain and
19  myself as secretary, I wear different hats.  Admin
20     Q     Right.
21     A    So while I might review a
22  pre-termination packet to make sure that it
23  complies with Admin Reg 117 fully and the tenets of
24  due process, you know, I'm not looking to see if
25  they've proved up the charges or et cetera.  That's

Page 224

1   my role as director of personnel.
2           As secretary, I'm just making sure
3   that other kinds of things, you know, under the
4   Commissions purview are proper, et cetera, and
5   that's Ashley's role.
6           Linda Thomas, you know, would have
7   been, you know, capable of speaking to, you know,
8   any employee about -- or I'm sorry, any appointing
9   authority about, you know, disciplinary issues, but
10  I think I've already stated that, based on a recent
11  conversation I had with Miss Thomas, she explained
12  to me that the only conversation she had in this
13  whole business was answering the Comptroller's
14  initial questions about Administrative Regulation
15  117, and she really had no interest in getting
16  involved with it, quite frankly.
17     Q     Okay.  How does that scheduled
18  hearing of 29th, how does it actually get canceled?
19  Is it just -- does it automatically get canceled?
20  Or does the Commission cancel it?  Or does Ashley
21  cancel it?
22     A    Not the Commission.  Ashley would
23  cancel it.
24     Q     She cancels it herself?
25     A    Yes.  And she would do that, sir, in

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

RICHARD R. FRANK  3/10/2022

Page 225

 1    conjunction with the -- the hearing officer.  She
 2    would notify the hearing officer, first, of course,
 3    as a courtesy, and then immediately the parties so
 4    we don't have people showing up.
 5         Q    Did you ever have any discussions
 6    about approving Defendant Green's requests for
 7    forced leave, or her request to withdraw the forced
 8    leaves, with anyone outside of the Comptroller's
 9    office?  Or the Department of Personnel?  Anyone
10    outside of these two departments.  Your department
11    or the Comptroller's office.  Anyone else?
12         A    Yes.  Nancy Kistler.
13         Q    Anyone else?
14         A    No.
15         Q    Did you ever receive any pressure of
16    any kind from anybody, in or out of the City, to
17    approve the forced leaves?
18         A    No.
19         MR. BLANKE:  Okay.  I need to take a
20    five-minute break.  We might be done, but I just
21    want to take a five -- a -- just a five-minute
22    break.
23         MR. NORWOOD:  Fair enough.
24         THE VIDEOGRAPHER:  Time is 3:38 PM,
25    we are off the record.

Page 226

 1         (Off the record.)
 2         THE VIDEOGRAPHER:  The time is 3:56
 3    PM, we are back on the record.
 4         Q    (BY MR. BLANKE)  So, Mr. Frank, in
 5    your conversations with Defendant Green, I think
 6    you said in 2021 after the lawsuit was filed, I
 7    think?
 8         A    Mm-hmm.  Yes.
 9         Q    And it was about Garavaglia's forced
10    leaves, I take it?  The conversation?
11         MR. NORWOOD:  Well, let me object
12    because that mischaracterizes his testimony.
13         Q    (BY MR. BLANKE)  Okay.  What was it
14    about?
15         A    The conversation was actually about
16    concerns about the state audit.
17         Q    And what -- what specifically were
18    her concerns?
19         A    Just that there was going to be
20    negative findings about the Comptroller's office's
21    result of things that occurred in the office, so.
22         Q    Did she give you the impression that
23    the audit was still ongoing?  The audit of the
24    Comptroller's office?
25         A    It was kind of ambiguous.  I -- I

Page 227

 1    wasn't sure if it was completed and they just
 2    hadn't issued it yet, or if, you know, they were
 3    still looking into it.  I mean, this has been
 4    months ago, so.
 5         Q    And -- and you wouldn't have any
 6    personal knowledge as to whether -- which of those
 7    two things it might be?
 8         A    No, I would not.
 9         Q    Do you remember anything else?
10    Anything more specific.  About the audit.
11         A    No, not about the audit at all.  I
12    remember mine.  I was really happy with that, but
13    other than that, no.
14         Q    Well, do you have anything -- was
15    there anything else specifically that you recall
16    that was discussed besides what you just said?
17         A    No, I think that just the other thing
18    I, and just in an abundance of transparency, I
19    never had a conversation about the -- the case or
20    the allegations or anything, but the only other
21    person I talked to was Chana when she would say the
22    Comptroller's on the phone, you know.
23         Q    Well --
24         A    That -- that's it.
25         Q    Sticking with this conversation with

Page 228

 1    Green, though, in 2021, did you -- did she discuss
 2    anything with you specifically with regard to
 3    she was worried about with regard to the audit?
 4         A    No.  As a matter of fact, just to
 5    amplify on that, I didn't even know that -- that
 6    municipal courts were involved.  I stated I thought
 7    it was something to do with corrections, but --
 8         Q    What does that mean?
 9         A    Pardon?
10         Q    What do you mean, corrections?  What
11    does that mean?
12         A    The correctional division, I thought
13    there might have been some concerns about the
14    correctional division, but --
15         Q    She said that, or you just thought
16    that?
17         A    No, I -- I might have thought that --
18    I might have been mistaken because I was also
19    called -- called as an expert witness in some -- by
20    a different firm about some issues with
21    corrections, so it just may -- may have -- may have
22    been, you know, my memory.
23         I thought that during the initial
24    conversation, though, that Judy Armstrong had --
25    had mentioned that as a particular department but

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334

### RICHARD R. FRANK  3/10/2022

Page 229

```
 1    I'm not sure.  We did not discuss any of the
 2    specifics other than the gravity of what the
 3    allegations were.
 4         Q     I'm lost as to why the -- what does
 5    Department of Corrections have to do with
 6    anything?  Would --
 7         A     I'm not sure that it does.  I just
 8    said I thought that Judy Armstrong started, you
 9    know, a discussion that there were perhaps problems
10    with something to do in corrections.  In -- in
11    terms of -- of, um, you know, the funds or
12    contracts or whatever.  We didn't get into specific
13    details about it.
14         Q     Okay.
15         A     But I don't remember ever having
16    heard anything.
17         Q     Would this have related to anything
18    that had to do with -- with Mr. Garavaglia?
19         A     Yeah, it was -- it would have been in
20    connection with the original conversation that I
21    had with Judy Armstrong that was set up by Chana
22    Morton that Saturday.  But I'm -- I'm not sure it
23    was corrections or not.  I -- I might have been
24    mistaken with that.
25         Q     Did you take any notes of that -- of
```

Page 230

```
 1    either of those conversations?
 2         A     No, no, no, be -- no, I did not.  I
 3    had asked them again pur -- and reminded them that
 4    pursuant to the administrative regulation, that
 5    they needed to follow up with me within the 72
 6    hours and, you know, to request that and --
 7         Q     To the best of your knowledge, when
 8    you were talking to Miss Green in 2021 -- first of
 9    all, that was a phone call, or on -- or in person?
10         A     No, I haven't seen Miss Green for
11    some time.  It was a phone call.  She called me
12    maybe at like 5:30, 6 o'clock at night.
13         Q     Do -- do you know whether there was
14    anyone else on the phone, on that phone
15    conversation?
16         A     No, there would not have been because
17    this was from her private number.
18         Q     Okay.  And -- anything else?
19         MR. BLANKE:  That'll be it for now.
20              RE-EXAMINATION
21    QUESTIONS BY MR. NORWOOD:
22         Q     Okay.  Let me try to wind things down
23    quickly.  Do you know -- well.  Throughout the
24    correspondence and communication and your
25    understanding, this was a -- an investigation that
```

Page 231

```
 1    was ongoing during this period of time.  Is that
 2    your understanding?
 3         A     Yes.
 4         Q     All right.  And at the time you had
 5    your discussion with Judy Armstrong that you
 6    identified on this Saturday before the
 7    pre-termination notice -- so we're talking about
 8    the Saturday before July 2nd; right?
 9         A     Yes.
10         MR. BLANKE:  You said -- you said
11    "pre-termination."
12         MR. NORWOOD:  I'm sorry --
13         (Overtalking - inaudible.)
14         MR. NORWOOD:  -- let me withdraw.
15         (Overtalking - inaudible.)
16         Q     (BY MR. NORWOOD)  The forced leave.
17         A     Yes.
18         Q     The first forced leave.
19         A     Yeah.
20         Q     Okay.  July 2, 2019, was the first
21    forced leave notification and communication and
22    approval by you; correct?  July 2nd --
23         A     Right.
24         Q     -- 2019; right?
25         A     Yeah, and I don't have my calendar.
```

Page 232

```
 1    I believe that would be a Monday.  It was a Monday.
 2         Q     Whether it was a Monday or a
 3    Tuesday --
 4         A     It was --
 5         Q     -- the Saturday before that is when
 6    you would have had the conversation.
 7         A     Yes.  That, I recall.
 8         Q     All right.  And do you know what
 9    additional information was unearthed between the
10    time you had the discussion with them the Saturday
11    before the first forced leave and the time when the
12    pre-termination notice was actually issued in
13    August?
14         A     In August?  No.
15         Q     I mean, so in other words, you don't
16    know what was being unearthed during this
17    investigative process; is that a fair statement?
18         A     Very fair.
19         Q     All right.  And is it common for
20    appointing authorities to provide you with that
21    kind of detail in order to get you to approve or
22    sign off on a forced leave?
23         A     No, they generally just talk to me
24    about what type of general behavior, like bullying,
25    harassment, refusal -- I mean refusal to test for
```

58 (Pages 229 to 232)

**RICHARD R. FRANK  3/10/2022**

Page 233

1    drugs, alcohol, drug alcohol failure.
2          As a matter of fact those are even
3    delegated to my employee relations manager.  So
4    they typically just will give me an outline that
5    there was serious harassment at work, or
6    falsification of records, things like that.
7          Q    But not the details about the
8    specifics, allegations, or anything of that sort?
9          A    No.  The details are required in the
10   pre-disciplinary review notice or the
11   pre-termination hearing -- or not hearing,
12   pre-termination review notice.  That's when, under
13   our rules and under our perception of -- of due
14   process, that you need to give the person ample
15   time to review and -- and really list through those
16   specifics.
17         Q    Okay.  Do you know if the
18   Comptroller's office prepared different drafts of
19   communications before they were either sent out
20   to you or before they may have been sent out to
21   Mr. Garavaglia?  Do you know that?
22         A    I had no personal knowledge of that
23   until when I saw the different letters today.
24         Q    Okay.  So -- so that's something you
25   wouldn't have been privy to in terms of --

Page 234

1          A    No.
2          Q    -- what was happening internally in
3    her office regarding draft communications; correct?
4          A    No.  Sometimes some appointing
5    authorities will, rarely, but sometimes they might
6    give me a draft letter to review, but usually they
7    do not.
8          Q    Okay.
9          A    Usually do not.
10         Q    And you've testified that it was your
11   understanding the Comptroller's office was working
12   with the City Counselor's office through Miss
13   Kistler in this process; correct?
14         A    Yes.
15              MR. BLANKE:  Let me just object, I
16   still don't think that in redirect you can lead the
17   witness, so leading.
18         Q    (BY MR. NORWOOD)  Well, do you know
19   whether or not the Comptroller was working with
20   Assistant City Counselor Nancy Kistler as it
21   relates to this matter?
22              MS. HAMILTON:  Deputy.
23         A    Yes.  Deputy City Counselor Nancy
24   Kistler.
25         Q    (BY MR. NORWOOD)  Okay, I'm sorry,

Page 235

1    Deputy City Counselor.
2          A    Yeah.
3          Q    Thank you.
4          And so it was your understanding that
5    she was working with counsel to -- as part of this
6    process?
7          A    Yes.
8          Q    All right.  Based upon your
9    interactions with the Comptroller's office, was it
10   your impression that they were trying to make sure
11   that this thing was done correctly in accordance
12   with the procedures in your office and the
13   administrative regulations?
14         A    Yes, sir, I -- I believe so because
15   that's why they called me on a Saturday afternoon
16   and still waiting -- until waiting for Monday
17   morning.
18         Q    Okay.  I want to get some clarity on
19   the question of the forced leave and your approval.
20   If a request for forced leave comes to you and you
21   don't approve it, can the appointing authority make
22   it happen on their own without your approval?
23         A    No, it's discretionary.
24         Q    With you?
25         A    Yes.  With me.

Page 236

1          Q    So you're -- you're -- if you, in
2    this case, decided that the forced leave was
3    improper and you disapproved it, that would have
4    been the end of it; correct?
5          A    Yes.
6          Q    All right.  And that's by the
7    regulation?
8          A    Yes.
9              MR. BLANKE:  Objection, leading.
10   Try.
11         Q    (BY MR. NORWOOD)  All right.  Is it
12   by the regulation?
13         A    It is by the regulation.
14         Q    And the regulation we're talking
15   about is Administrative Regulation 117 --
16         A    Yes.
17         Q    -- is that right?
18         A    That is correct.
19         Q    All right.  And -- and just so I'm
20   clear and the record's clear, is it -- do different
21   appointing authorities reach out to you in your
22   office in order to get clarity on procedures as it
23   relates to forced leave, pre-termination; is that
24   common?
25         A    They did it frequently.

59 (Pages 233 to 236)

Page 237

```
 1        Q    Okay.  And you talked about forced
 2   leave being one of those things that is tricky?
 3        A    Yes.
 4        Q    All right.  And so in that context,
 5   were you getting a lot of requests?
 6        A    Yes.
 7        Q    For clarity?
 8        A    Yes.
 9        Q    Okay.  Let's go to -- this is the
10   packet that we received from counsel --
11        A    Thank you.
12        Q    (BY MR. NORWOOD)  -- the non-indexed
13   batch --
14             (Overtalking - inaudible.)
15        Q    (BY MR. NORWOOD)  -- of documents.
16        MR. BLANKE:  Do you have --
17        Q    (BY MR. NORWOOD)  And so --
18        MR. BLANKE:  This may be yours.
19        Q    (BY MR. NORWOOD)  -- if we could look
20   at page 215, it's GARAVAGLIA 215?
21        A    I just opened to it.  Pardon me.
22   It's funny after I didn't find anything all
23   afternoon.
24        Q    But you're right there.  All right.
25        A    Pardon me.  Okay.
```

Page 238

```
 1        Q    All right.  You must be ready to go.
 2   July 23, 2019, that is the letter from Mr. Paul
 3   Schmitz to the Civil Service Commis -- Miss McClain
 4   at the Civil Service Commission; correct?
 5        A    Yes.
 6        Q    And in that letter, if we go to the
 7   second line, it says, quote, (Quote as read):
 8             As a new notice was issued on
 9             July 18, 2019, this letter serves as
10             timely notice of his request to
11             appeal this second placement of
12             forced leave effective July 18, 2019,
13             by the Appointing Authority, Darlene
14             Green, the Comptroller, City of
15             St. Louis.
16             Do you see that?
17        A    Yes.
18        Q    So that -- does that suggest to you
19   that at least as of July 23, 2019, Mr. Garavaglia
20   and Mr. Paul -- Paul Schmitz had received
21   notification of this July 18, 2019, forced leave
22   letter?
23        A    Yes.
24        Q    All right.  And I just want to make
25   sure we get clear on the record, and I think it's
```

Page 239

```
 1   already clear on multiple records, but if you look
 2   at the August 28, 2019, letter from Ashley McClain
 3   to Mr. Schmitz and to Miss Kistler, I think we read
 4   through some of that, but I want to focus on the
 5   next to last paragraph.
 6        MR. BLANKE:  Where -- where are you
 7   now?
 8        MR. NORWOOD:  August 26, (sic), 2019,
 9   letter from Ashley McClain to Mr. Schmitz and Miss
10   Kistler.
11        MR. BLANKE:  Okay.
12        MR. NORWOOD:  You talked about it.
13        MR. BLANKE:  Okay.
14        Q    (BY MR. NORWOOD)  Do you have it?
15        A    Yes, I do.
16        MR. NORWOOD:  Do you have it?
17        MR. BLANKE:  Not yet, but I will.  Go
18   ahead.
19        MR. NORWOOD:  Do you have it?
20        MR. BLANKE:  I'm familiar with it,
21   but go ahead.
22        MR. NORWOOD:  Okay.
23        Q    (BY MR. NORWOOD)  All right.  The
24   last sentence says -- and this was after it was
25   approved to officially withdraw the request for
```

Page 240

```
 1   forced leave dated July 18, 2019.  After that, as
 2   part of that communication from Miss McClain, the
 3   third paragraph says, quote, (Quote as read):
 4             Any accrued leave time Mr. Garavaglia
 5             used during this period of forced
 6             leave from July 18, 2019, through
 7             August 28, 2019, shall be restored.
 8             Do you see that?
 9        A    Yes.
10        Q    And is it your understanding that in
11   fact that did occur?
12        A    Yes.  That would -- that would occur
13   because a copy of this would have gone to my
14   executive secretary who would take it to personnel
15   services who would physically make sure that was
16   done.
17        Q    Okay.  And so effectively, it's like
18   it didn't happen?
19        A    Pro forma, yeah, yeah.
20        Q    Right.  And then Mr. Garavaglia was
21   getting paid during this particular time?
22        A    Yes.
23        Q    Okay.
24        MR. NORWOOD:  All right.  I have no
25   further questions at this time.
```

60 (Pages 237 to 240)

## RICHARD R. FRANK  3/10/2022

Page 241

1          MR. BLANKE:  Um, are you going to ask
2    any questions?
3          MS. HAMILTON:  No.
4          MR. BLANKE:  Okay.  Hold -- hold on
5    one second.
6          (Off the record.)
7          MR. BLANKE:  Okay, I do have a
8    question.
9                RE-EXAMINATION
10   QUESTIONS BY MR. BLANKE:
11        Q    You saw Judge Frawley's Order that
12   says that if a Civil Service Commission overruled
13   the forced leave, any vacation time that he took
14   would not be restored; correct?
15        A    That's correct.
16        Q    The rule is different when the
17   request is withdrawn?
18        A    If the request is withdrawn, then
19   it's as if the employee were never on forced leave
20   and they would be paid for any time they were
21   taking except for the fact that their vacation
22   would not be restored if they took that vacation
23   time.
24        Q    So -- so then this is not correct.
25   This letter from Miss McClain.  This sentence that

Page 242

1    Mr. Norwood just read.  McClain says "Any accrued
2    leave time."  Not paid -- paid -- not paid -- not
3    payments but (Quote as read):
4               Any accrued leave time that
5               Mr. Garavaglia used during this
6               period of forced leave shall be
7               restored.
8          That's not correct, then, is it --
9          MR. NORWOOD:  Well --
10        Q    (BY MR. NORWOOD)  -- or is it?
11        MR. NORWOOD:  -- let me object that
12   assumes facts that are inconsistent with your
13   client's affidavit.  But subject to that.
14        A    What Ms. McClain is saying is that
15   any that he used should be restored, you know, if
16   he chose to use it, you know, so -- so that's --
17   that's the point, is that Ms. McClain, since there
18   was no forced leave hearing, you know, wouldn't
19   necessarily know whether or not, you know, the
20   person had chosen to take accrued vacation and
21   compensatory leave or not, just as like I wouldn't.
22        That's not something that we would
23   normally know until some kind of hearing and
24   resolution, you know, were -- were reached.
25        Q    (BY MR. BLANKE)  Is the rule

Page 243

1    different between -- if the civil service -- about
2    restoring vacation time, is the rule different
3    about restoring vacation time when the Civil
4    Service Commission overrules the forced leave
5    versus when the Comptroller withdraws the forced
6    leave?
7          A    No.  The rule can't be different
8    because it's not only contained in my
9    administrative regulation, but it's also contained
10   in, you know, our compensation ordinance, which is
11   adopted into law by the Civil Service Commission,
12   the Board of Aldermen, and the mayor.
13        Q    Okay.  So I am completely flummoxed,
14   and it's probably my fault, but Miss McClain is
15   saying in this letter of August 28, and I quote,
16   (Quote as read):
17               Any accrued leave time Mr. Garavaglia
18               used during this period of forced
19               leave from July 18, 2019, through
20               August 28, 2019, shall be restored.
21               Did I read that correctly?
22        A    No, actually, that's -- that's a good
23   -- a good catch and, again, this is a -- tricky
24   thing, but a rescission is if it never happened.
25   So I mean that would be correct.  And my opinion as

Page 244

1    former director is if you rescind it and you used
2    any -- any time, but that might call for a legal --
3          MR. NORWOOD:  Yeah, let's not --
4          A    -- rendering, I -- that's a little
5    over my head right now.
6          MR. NORWOOD:  All right.  Great.
7          Q    (BY MR. BLANKE)  Well, then, I won't
8    ask for what your opinion is on the merits of that
9    question --
10        A    Yeah.
11        Q    -- but so is it now your testimony
12   that you don't know whether what she's saying is
13   correct or not?
14        A    Yeah, in the case of -- I -- I don't
15   know for certain if the -- because what -- what I
16   am aware of are the parameters of the -- the
17   Administrative Reg 117, which states that, again,
18   if you use the time to stay in paid -- paid status
19   when you're in forced leave, you know, and then --
20   then you're paid, you know, that's it.
21        But, you know, a rescission of a
22   forced leave isn't entirely different.  In that
23   case, you know, if you used your time, that time
24   would be restored, and we've done that in the past.
25        So I believe Miss McClain's correct

61 (Pages 241 to 244)

**RICHARD R. FRANK  3/10/2022**

<table>
<tr><td>

Page 245

1  but I would defer, you know, to our law department
2  for a final reading on that.
3       Q    Just one more thing.  And switching
4  back from McClain back to Judge Frawley, he clearly
5  says in his Order of August 22, 2019, (Quote as
6  read):
7            but if the forced leave is
8            disapproved, the employee will not
9            be restored his vacation leave.
10           Correct?  That's his finding; right?
11  His ruling.  Correct?
12       MS. HAMILTON:  I would --
13       MR. NORWOOD:  Let me object --
14       MS. HAMILTON:  I will just object
15  that it's been asked and answered, the document
16  speaks for itself.  Subject to that, you can
17  answer.
18       A    If the forced leave is disapproved
19  and the employee were out for two or three days, I
20  would order that that person have their vacation
21  and compensatory time restored.  Because that --
22       Q    (BY MR. BLANKE)  Contrary -- contrary
23  to Judge Frawley's ruling?
24       A    No, that's really what he's -- or I
25  guess I'm saying what -- what Ashley McClain said

</td><td>

Page 247

1  QUESTIONS BY MR. NORWOOD:
2       Q    Do you know if, in this case,
3  Mr. Garavaglia submitted an affidavit to the court
4  swearing under oath that he got all of that back?
5  The accrued time and vacation time he may have
6  taken?  Do you know if --
7       A    I don't know.
8       MR. NORWOOD:  All right.  I have no
9  further questions.
10       MR. BLANKE:  Okay.  That's all folks.
11  You want to talk to him about signature?
12       THE WITNESS:  All right.  Thank you.
13       MS. HAMILTON:  Yeah, we'll read and
14  sign.
15       THE VIDEOGRAPHER:  Time is 4:19, we
16  are off the record.  This concludes our deposition
17  of Richard Frank.
18       THE REPORTER:  Mr. Norwood, do you
19  like an e-tran?
20       MR. NORWOOD:  Yep.
21       THE REPORTER:  Exhibits, or does
22  everybody --
23       MR. NORWOOD:  Let me do this.  To
24  make it easier for you, I'm going to give you those
25  exhibits.  How about that?

</td></tr>
<tr><td>

Page 246

1  is correct, I think Judge Frawley misread
2  Administrative Regulation 117 in terms of forced
3  leave.
4       Q    Okay.  That explains it.
5       A    Yeah, it does.  And pardon me, but
6  I've also had judges grant relief when -- when it
7  didn't exist.  Very --
8       Q    Sure.
9       A    -- prominent judges, so.
10       Q    But at least I understand what you're
11  saying now.
12       A    I understand.  Thank you very much
13  for the conflict there, but...
14       MR. BLANKE:  Did you get all that?
15       THE VIDEOGRAPHER:  I got all that.
16       MR. BLANKE:  Thank God.
17       THE WITNESS:  I'm sorry.
18       MR. BLANKE:  Okay.
19       THE WITNESS:  These hearing officers
20  don't ask me before they issue their orders.
21       MR. BLANKE:  Okay.  I don't have
22  anything further.
23       MR. NORWOOD:  I just have one.  Maybe
24  two.
25            RE-EXAMINATION

</td><td>

Page 248

1       THE REPORTER:  Thank you.
2       MS. HAMILTON:  I'll take an E-tran
3  with the exhibits.
4       MR. BLANKE:  E-tran is fine and I
5  don't need the exhibits.  And a word index, please,
6  also.
7            (Wherein, the taking of the instant
8  deposition ceased at 4:19 PM)
9            (Deposition to be read and signed by
10  the witness.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

</td></tr>
</table>

62 (Pages 245 to 248)

## RICHARD R. FRANK  3/10/2022

### Page 249

```
1              CERTIFICATE OF REPORTER
2
3         I, TARA SCHWAKE, a Registered
4    Professional Reporter and Notary Public within and
5    for the State of Missouri, do hereby certify that
6    the witness whose testimony appears in the
7    foregoing deposition was duly sworn by me; that the
8    testimony of said witness was taken by me to the
9    best of my ability and thereafter reduced to
10   typewriting under my direction; that I am neither
11   counsel for, related to, nor employed by any of the
12   parties to the action in which this deposition was
13   taken, and further that I am not a relative or
14   employee of any attorney or counsel employed by the
15   parties thereto, nor financially or otherwise
16   interested in the outcome of the action.
17
18
19         _____
20         Notary Public in and for
21         The State of Missouri
22
23
24
25
```

### Page 250

```
1              ALARIS LITIGATION SERVICES
2
3    March 16, 2022
4
5    Ms. Sheena Hamilton, City Counselor
     City of St. Louis, Law Department
     City Counselor's Office
6    1200 Market Street, Room 314
     St. Louis, Missouri  63103
7
     IN RE: JAMES GARAVAGLIA v. CITY OF ST. LOUIS, et
8    al.
9    Dear Ms. Hamilton:
10   Please find enclosed your copies of the deposition of
     RICHARD R. FRANK taken on March 10, 2022 in the
11   above-referenced case. Also enclosed is the original
     signature page and errata sheets.
12
     Please have the witness read your copy of the
13   transcript, indicate any changes and/or corrections
     desired on the errata sheets, and sign the signature
14   page before a notary public.
15
16   Please return the errata sheets and notarized
17   signature page within 30 days to our office at 711 N
18   11th Street, St. Louis, MO 63101 for filing.
19
20   Sincerely,
21
22
23   TARA SCHWAKE
24
25   Enclosures
```

### Page 251

```
1                 ERRATA SHEET
     Witness Name: RICHARD R. FRANK
2    Case Name: JAMES GARAVAGLIA v. CITY OF ST. LOUIS, et
     al.
3    Date Taken: MARCH 10, 2022
4
5    Page #_____   Line #_____
6    Should read: _____
7    Reason for change: _____
8
9    Page #_____   Line #_____
10   Should read: _____
11   Reason for change: _____
12
13   Page #_____   Line #_____
14   Should read: _____
15   Reason for change: _____
16
17   Page #_____   Line #_____
18   Should read: _____
19   Reason for change: _____
20
21   Page #_____   Line #_____
22   Should read: _____
23   Reason for change: _____
24
25   Witness Signature: _____
```

### Page 252

```
1    STATE OF _____)
2
3    COUNTY OF _____)
4
5    I, RICHARD R. FRANK, do hereby certify:
6         That I have read the foregoing deposition;
7         That I have made such changes in form
8    and/or substance to the within deposition as might
9    be necessary to render the same true and correct;
10        That having made such changes thereon, I
11   hereby subscribe my name to the deposition.
12        I declare under penalty of perjury that the
13   foregoing is true and correct.
14        Executed this _____ day of _____,
15   20____, at _____.
16
17
18
19        _____
20        RICHARD R. FRANK
21
22        _____
23        NOTARY PUBLIC
24   My Commission Expires:
25
```

63 (Pages 249 to 252)