Page 94

1    A.  I did not.
2    Q.  Did anyone else in your office that you're
3 aware of?
4    A.  I'm unaware of that.
5       MR. SCHMITZ:  All right.  I want to -- I'm
6 going to move to another exhibit, Exhibit J.
7          (Whereupon Exhibit J was marked
8           for identification.)
9    Q.  (By Mr. Schmitz)  Do you see this document?
10   A.  Yes.
11   Q.  Have you seen the cover sheet, the letter
12 before?
13   A.  I'm unaware if I have or have not.
14   Q.  All right.  Are you aware that in 2018
15 another version of these rules was issued?
16   A.  I may have.
17   Q.  All right.  As far as this document, did
18 you participate in any of the changes --
19   A.  No.
20   Q.  -- that were made to it?  No.
21       Were you consulted in any way on
22 those changes?
23   A.  I'm not sure.
24   Q.  If you could go back to the first page,
25 second paragraph.  As you can see, this memorandum

Page 95

1 was written by Judy Armstrong.  In the second
2 paragraph, it talks about there's a need for an
3 update on the guidelines.  Is that coming from you
4 or was that a determination made by Ms. Armstrong?
5    A.  I did not write this.
6    Q.  Is she speaking on your behalf, or did you
7 direct her to do this or did she do this on her own?
8    A.  I did not direct her to write this.
9    Q.  All right.  If you read the second full
10 sentence where it says:  Some of the most recent
11 concerns echoed by managers involve employee's
12 lateness to work, loud conversations, excessive
13 socializing in and around work areas.
14       Are these issues that you were aware
15 of were taking place around this time frame,
16 November 8, 2018?
17   A.  I was told by employees prior to 2018 and
18 from time to time that there would be issues
19 regarding work ethic within the office.
20   Q.  All right.  I'm going to jump forward a
21 little bit.  So I'm not going to reference that
22 exhibit anymore.
23       As far as the positions in your
24 office, can you describe just briefly how those
25 positions are posted when there's a job opening?

Page 96

1    A.  They're posted by the Department Of
2 Personnel when there's a job opening.
3    Q.  Okay.  To what extent do you participate
4 in the process?
5    A.  Sometimes none.  And at other times, I
6 would give approval to post it.  The majority of
7 times I'm not asked to give approval to post jobs.
8    Q.  Okay.  Do you interview the candidates?
9    A.  No, not unless they are directly reporting
10 to me or if a manager would like for me to interview
11 the candidate or I ask the manager to allow me to
12 interview the candidate.
13   Q.  Under what circumstances would you ask the
14 manager to allow you to interview the candidate?
15   A.  If I felt the manager needed my
16 assistance.
17   Q.  In what way, like they were a new manager
18 or --
19   A.  If they were a new manager, or if they
20 gave me a reason to believe that they would like my
21 assistance in most areas of their job.
22   Q.  Do you know if there's a recruitment
23 process for candidates either through your office or
24 the Department of Personnel?
25   A.  From time to time, there is as I

Page 97

1 understand it an opportunity for a recruitment
2 process through the Office of Personnel.
3    Q.  Is that something that you could request
4 to be done?
5    A.  From time to time, my deputy comptroller
6 has done that.
7    Q.  Is that something that you've asked them
8 to do or do they do that on their own?
9    A.  Sometimes.  The majority of the time, it
10 has been the request of the deputy comptroller with
11 making sure that I have knowledge of the request --
12   Q.  Okay.
13   A.  -- to the personnel office.
14   Q.  Do you know what those recruitment efforts
15 would entail?
16   A.  It would entail using organizations that
17 were widely known to help in the recruitment of
18 certain professional positions.
19   Q.  What do you know about the civil service
20 position hiring system?  Do you understand how
21 candidates are selected for interview?
22   A.  No.
23   Q.  Okay.  Do you know anything about
24 positions -- some positions having a score base
25 system?

25 (Pages 94 - 97)

1    A.  Yes.
2    Q.  Okay.  How does that work?
3    A.  I know a little about it.  I don't know
4  the system in its entirety.  What I know about it is
5  generally speaking that a City employee who already
6  has a job with the City would score higher than any
7  other applicant based on the fact that they were a
8  City employee.
9    Q.  Do you know what other factors could
10  affect the score?
11    A.  Experience in the job would affect the
12  score.  If there was no experience, even though if
13  you're a City employee, you still get points for
14  being a City employee with or without experience in
15  the job.  So in the experience that I have seen over
16  the years that I've worked as many years, the
17  majority of city employees end up at the top of the
18  list when they apply for a job.
19    Q.  So you mentioned that you have
20  participated in interviews.  In terms of those who
21  interview and then the selection that's made, who
22  makes that decision?  Does that vary?
23    A.  It varies.
24    Q.  Okay.  Who would make that decision for
25  front line nonmanagement or supervisory employees?

1    A.  It varies.
2    Q.  Would it be the manager that's going to be
3  supervising them or is there somebody that's
4  generally designated to do that in the office?
5    A.  It varies.
6    Q.  So how does it vary?
7    A.  Sometimes it varies by function of the
8  particular job function.  And sometime it would be
9  the supervisor of that particular individual
10  position that would make that determination.  But if
11  that particular individual was not considered a high
12  enough level of management, they would not make that
13  final decision.  It would be that supervisor of the
14  person who the -- individual who's going to be hired
15  would report to.  It would not be that individual
16  who they would report to.
17        Specifically or specific examples
18  would have to do with -- I guess I'm restating it.
19  It really has to do with the function.  And
20  sometimes it also has to do with whether or not the
21  individual was new or not.  And those factor into
22  who would make the final decision.
23    Q.  Do you have to give final approval to it
24  or are they allowed to do that on their own?
25    A.  I don't have to give final decision in all

1  cases of hiring.
2    Q.  What decisions would you give the final
3  approval?
4    A.  It depends on the position.  Those direct
5  reports to me, I would of course have the final
6  decision.  And -- and I think that's about all that
7  I would have final decision in terms of hiring.  And
8  that has been my practice.  I think that other
9  offices have other practices or can have other
10  practices.  But that has been my practice in my
11  office.
12    Q.  Okay.  What positions direct report to you
13  within your office?
14    A.  It varies.  But currently, the direct
15  reports are my administrative assistant, my deputy
16  comptroller, deputy comptroller for Finance &
17  Development, the staff support officer, the public
18  information officer, and I believe currently the
19  contract compliance officer, but I'm not sure.  At
20  one point, there was a direct report to me.  But I
21  believe in the last several months, that may have
22  changed.
23    Q.  So who's the current deputy comptroller
24  right now?
25    A.  Beverly Fitzsimmons.

1    Q.  Okay.  How old is Bev?
2    A.  How old is she?
3    Q.  Uh-huh.
4    A.  I don't know her age.  Approximately over
5  50, possibly over 60.  I do not know for sure.
6    Q.  Okay.  What is her race?
7    A.  White.
8    Q.  Okay.  And who is the deputy comptroller
9  for Finance & Development?
10    A.  LaTaunia Kenner.
11    Q.  All right.  How old is she?
12    A.  Approximately over 50.
13    Q.  What race is she?
14    A.  Black.
15    Q.  And you mentioned a staff support officer.
16  Is there somebody that's currently in that position
17  or is there more than one?
18    A.  There's two.
19    Q.  Okay.  And who are they?
20    A.  Jason Fletcher and Judy Armstrong.
21    Q.  Do they both have the same title of staff
22  support officer?
23    A.  Yes.
24    Q.  Okay.  Jason Fletcher, how old is he?
25    A.  Approximately over 30 or approximately

26 (Pages 98 - 101)

1 over 40.
2    Q.   Okay.  And his race?
3    A.   White.
4    Q.   And how about Judy Armstrong, her age and
5 race?
6    A.   Approximately over 50, black.
7    Q.   All right.  You mentioned a public
8 information officer.  Is there somebody in that
9 position?
10    A.   Yes.
11    Q.   Okay.  Who is that?
12    A.   Tyson Pruitt.
13    Q.   Okay.  Can you tell me his age, please,
14 and his race?
15    A.   Approximately over 30 or 40, white.
16    Q.   All right.  And the contract compliance
17 officer, who is that?
18    A.   Michelle Graham.
19    Q.   Okay.  How old is she?
20    A.   Approximately over 50.
21    Q.   And her race?
22    A.   Black.
23    Q.   Did you approve the hiring of all of these
24 people or some of them?
25    A.   I believe all except Michelle Graham.  Is

1 that four people?
2    Q.   Okay.
3    A.   I believe.
4    Q.   Who picked Michelle Graham?
5    A.   She was there when I came.
6    Q.   Okay.  You appointed Bev?
7    A.   Actually I did to her current position.
8    Q.   Okay.
9    A.   She was there when I came, too.  She was
10 promoted.
11    Q.   How many administrative assistants do you
12 have?
13    A.   One.
14    Q.   And who is that?
15    A.   Chana Morton, like Morton Salt.
16    Q.   How old is Ms. Morton?
17    A.   50-something.  50.  Over 50.
18    Q.   Okay.  What is her race?
19    A.   Black.
20    Q.   Okay.  Is there anyone else that you have
21 directly hired or approved the hiring of in your
22 office currently other than the people you just
23 named?
24    A.   Yes.  Secretary of E&A, I believe --
25 actually no.  I don't remember if I selected her.

1 So I'm not sure.  I may have been involved, and I
2 may not have been involved.  But what I do know
3 about that position is that she was No. 1 on the
4 list.  And whether I selected her or if Beverly
5 selected her, I don't know.  But she was No. 1.
6    Q.   Who is that?
7    A.   Her name is Stephanie Green.
8    Q.   Stephanie Green, okay.
9    A.   But she does not report directly to me.
10    Q.   All right.  Ms. Green, how old is she?
11    A.   40-something, 50-something maybe.
12    Q.   What is her race?
13    A.   Black.
14    Q.   All right.  Is that it then?  Is there
15 anyone else that you would have -- during, you know,
16 your time as --
17    A.   The whole time?
18    Q.   Well, no.  Currently now, but as the
19 comptroller that you've --
20    A.   Not that I'm aware of.
21    Q.   All right.  I want to talk a little bit
22 about Jim.  Okay?  You obviously know
23 Jim Garavaglia?
24    A.   Yes.
25    Q.   Okay.  He started in your office as an

1 asset manager; is that correct?
2    A.   No.
3    Q.   How did he start in your office?
4    A.   I don't know.  He was there when I came to
5 the comptroller's office.  When I became the
6 comptroller, Jim was already employed in the Office
7 of the Comptroller prior to my becoming the
8 comptroller of the City in 1995.
9    Q.   So you said no as far as where -- I didn't
10 say he started with you.  I just meant the office
11 you were in.  But what position, if you know, did he
12 start in?
13    A.   I don't know.
14    Q.   All right.  Do you know what position he
15 was when you became comptroller?
16    A.   I don't know.
17    Q.   Okay.  Do you know what position he was in
18 before he was promoted to deputy comptroller?
19    A.   Yes.
20    Q.   Okay.  What was that?
21    A.   Asset Manager II.
22    Q.   Okay.  Did you interact with him when he
23 was in that position?
24    A.   Which position?
25    Q.   Asset Manager II?

27 (Pages 102 - 105)

1   A.   Yes.
2   Q.   Okay.  About how often would you say you
3   interacted with him?
4   A.   I would say frequently.  But that's
5   relative.
6   Q.   How often, like multiple times a day?
7   A.   At least a few times a month.
8   Q.   All right.  Were you ever involved in his
9   supervision when he was at Asset Manager II?
10  A.   No.
11  Q.   What type -- what was the nature of your
12  interactions with him in general?
13  A.   Generally, my interaction had to do with
14  projects that the Office of the Comptroller was
15  involved in regarding City assets, City property,
16  City operations that fell under the jurisdiction of
17  the Office of the Comptroller.  And from time to
18  time issues regarding the office of -- in the area
19  of accounting operations, financial operations that
20  would spill over into an asset manager for whatever
21  reason.
22  Q.   Based on your interactions with him, did
23  you ever consider him for any promotional
24  considerations?
25  A.   Based on my interaction with Jim, I found

1   him to be a person that could be promotable while he
2   was in the job of asset manager.
3   Q.   Okay.  Did you have any particular
4   positions in mind that he might be promotable to?
5   A.   I did not.
6   Q.   Okay.  Did you ever evaluate his
7   performance directly when he was an asset manager?
8   A.   Not that I'm aware of.
9   Q.   All right.  Do you recall reviewing or
10  signing off on any of his evaluations of performance
11  that were written by someone else?
12  A.   It's possible, but I don't remember.
13  Q.   Do you have any recollection of doing --
14  contributing in any way to his evaluations?
15  A.   The evaluations offer a second rater.  I
16  could have been asked to be a second rater.  But at
17  this time, I don't remember.  I just do not recall
18  if, in fact, that I did ever sign off.  I have
19  second rated employees during my tenure as the
20  comptroller.  And I'm just not sure if Jim was one
21  of them.
22  Q.   Have you ever had any ratings where you
23  made suggestions or contributions but didn't act as
24  a second rater?
25  A.   It's possible, but I can't remember.  I

1   just do not recall at this time.
2   Q.   Okay.  Do you know -- this again relates
3   to him being an asset manager or Asset Manager II --
4   if you ever were involved in sending him to any
5   additional training or outside education?  And I
6   mean by that, you directly.
7   A.   Directly in terms of training for Jim in
8   particular, I don't recall.  However, for the office
9   as a whole, I directly sent employees for training
10  when possible and when we had the finances to do so.
11  Q.   Do you do that at a macro level like the
12  whole office, I want you guys to go to this
13  training, or do you do it sometimes specific to the
14  employee if you feel there's a need?
15  A.   I've done both.
16  Q.   So you have referred specific individuals
17  to specific trainings?
18  A.   Yes.
19  Q.   As far as the deputy comptroller of
20  finance, I think you've mentioned Ivy Pinkston was
21  in that role.
22  A.   Yes.
23  Q.   Did you appoint her to that role?
24  A.   There's no easy answer for that.  So I'll
25  describe.  Ivy created the position in order to

1   express the level of job duties that she had
2   undertaken in the office.  And as that job was
3   created, her -- she sought, that is, my approval as
4   to who would be reporting to her.  And it included
5   the asset manager.
6   Q.   Okay.
7   A.   Along with other employees that filled out
8   the area.
9   Q.   All right.  And I know she passed or at
10  least that's my understanding.  Did that happen
11  while she was in the position?
12  A.   Yes.
13  Q.   So that's how the position became
14  available again?
15  A.   She created the position.
16  Q.   I mean after she originally took the
17  position, she remained in it until she passed; is
18  that correct?
19  A.   Correct.
20  Q.   At which point there was a vacancy that
21  you sought to fill?
22  A.   I took my time to seek to fill it.  And
23  eventually I did seek to -- I asked that it be
24  posted to fill.
25  Q.   How long did you take before you asked for

1  it to be posted?
2      A.  A few months.
3      Q.  Did you consider not filling the position
4  at all?
5      A.  Yes.
6      Q.  Okay.  What was the -- what would be the
7  reasons why you were considering that?
8      A.  The candidate for the position was, I
9  felt, that was in the office was not there at the
10  time.
11      Q.  Okay.  On what -- do you mean like
12  qualifications?
13      A.  Yes.  Qualifications.
14      Q.  When you were using this time to make the
15  determination, did you consult with anybody else?
16      A.  Consult how?
17      Q.  Ask for their advice, ask for their
18  opinion, seek --
19      A.  What do you mean?  Please be more clear.
20  You mean --
21      Q.  I'm being general for a reason.  Did you
22  talk to anyone else to seek their advice?  For
23  example, did you talk to any other elected officials
24  about --
25      A.  On whether or not to fill the position or

1  were there other candidates?  Advice for --
2      Q.  To fill the position, is my question.
3      A.  I did not seek advice whether or not to
4  fill the position.
5      Q.  Okay.  How about did you seek their advice
6  on who you would be looking at to fill the position?
7      A.  I did not.  But what I did do was talk to
8  outside professionals in the finance industry,
9  because I was called by them to ask me, knowing that
10  the position was open, whether or not I would
11  consider people who were in their industry.  I was
12  given names of people throughout the United States
13  that could fill the job.
14      Q.  Those people --
15      A.  Which is common in the industry of
16  finance.
17      Q.  And these people reached out to you or you
18  sought --
19      A.  They reached out to me from investment
20  bankers, bond attorneys throughout the United
21  States, both white and black, male and female from
22  the east coast to the west coast.
23      Q.  Did you -- I'm not sure if you answered
24  this question specific to what I asked.  I know you
25  mentioned that.  Did you ever seek advice on

1  possible candidates from anyone that's a St. Louis
2  City elected official?
3      A.  No.
4      Q.  Did you talk to anybody in the community
5  that's like a community leader and seek advice from
6  them?
7      A.  Absolutely not, no.
8      Q.  How about other elected officials state
9  level or --
10      A.  No.
11      Q.  Nobody?
12      A.  No.  No.
13      Q.  All right.  How about other department
14  heads, reporting authorities within the City of
15  St. Louis?
16      A.  No.
17      Q.  Anyone else that worked in a financial
18  capacity for the City of St. Louis but not within
19  your office, such as like the airport or other --
20      A.  Let me see.  Did I do that?  I don't
21  believe so.  I don't recall.  Unless I was trying to
22  hire from a different department.  But I don't
23  believe I did.  Unless I was trying to hire
24  specific, but I'm pretty sure I did not.  But I
25  don't recall.

1      Q.  All right.  Do you recall participating in
2  the interview process with the candidates for that
3  position?
4      A.  Not at the early stage, but at the later
5  stage.
6      Q.  Okay.  In reference to Jim, do you know
7  who interviewed him for the position?
8      A.  No.  I do not recall.
9      Q.  Okay.  If I asked you, if Judy Armstrong
10  did it, would that refresh your recollection at all?
11      A.  No.
12      Q.  No.
13      A.  Because the Office of Personnel recruits
14  the people who they would like to interview,
15  candidates and/or the office that is requesting the
16  actual hire would determine who goes.
17      Q.  Did they consult with you before --
18      A.  No.  I mean, that's not common.  Totally
19  not common.
20      Q.  Well, I understand it's not common.  What
21  about for this particular position, did they seek
22  your --
23      A.  No.
24      Q.  All right.  So to what extent did you
25  participate in the ultimate selection of Jim for

1 that position?
2     A.   Could you be more clear?
3     Q.   Well, I want you to say whatever is
4 responsive to the question.  So you know he was
5 ultimately picked as the replacement deputy
6 comptroller of Finance & Development, correct?
7     A.   Correct.
8     Q.   So what was your involvement, if any, in
9 making that selection?
10     A.   I reviewed the list of six people.  And I
11 remember interviewing the people, each of the
12 people.  And there was one individual who was in the
13 finance industry at the time that I was interested
14 in who I had actually spoken with prior to --
15 actually spoken to and was among the people who were
16 actively, I guess, looking at the position from the
17 financing.  In other words, an investment banker was
18 on that list.
19     Q.   Okay.
20     A.   Investment banker was on that list.  And
21 that investment banker was very interested in the
22 job.
23     Q.   Do you recall who that individual was?
24     A.   Ron Browning Smith.
25     Q.   You said Ron Browning Smith?

1     A.   Yes.
2     Q.   Okay.  And what happened with that?  Did
3 he -- you did not hire him obviously.  So --
4     A.   He was offered the job.
5     Q.   Okay.  Did he decline?
6     A.   Yes.
7     Q.   Do you know approximately how old he is?
8     A.   Over 70.  At the time, he was 70.
9     Q.   Can you tell me, do you recall what race
10 he is?
11     A.   Black.
12     Q.   All right.  So after he declined the job,
13 what did you do next?
14     A.   I reviewed other candidates and reviewed
15 my options.  And eventually made a determination
16 that I believe was in the best interest of the -- of
17 the Office of the Comptroller to talk with Jim about
18 considering accepting the job with making some
19 changes.
20     Q.   What changes are those?
21     A.   The job that in its current form and as it
22 was advertised would be changed to have less duties
23 than would be there for the finance functions.  And
24 the reason for that was since he was an asset
25 manager, that he would also maintain his duties as

1 asset manager.  And I needed to know if he was
2 accepting of that type of arrangement prior to
3 accepting the position.
4     Q.   Okay.  So the duties of the asset manager
5 were not one that Ivy Pinkston --
6     A.   That is correct.
7     Q.   All right.
8     A.   My reason for that was because Ivy
9 Pinkston did not ever have Jim involved in the
10 business of Finance & Development while she was
11 deputy comptroller.  I was very observant of that.
12 I understood that Jim did not have the skills
13 required to be in the position, even though he had
14 worked under her as asset manager.
15          He had never interacted with bankers,
16 investment bankers, and the attorneys that were bond
17 attorneys, and those professionals that worked in
18 the area while Ivy Pinkston was the deputy
19 comptroller for Finance & Development.  Jim was not
20 assigned in that area at all.
21          I was observant of that, because she
22 did come down with an illness.  I was observant of
23 who she would put in charge of certain areas that
24 she was -- had charge over.  Candace Gorden, Ryan
25 Coleman, Eunetter Steele, became those individuals

1 that I as the comptroller rely on for all of the
2 business of Finance & Development while Ivy Pinkston
3 was the deputy comptroller --
4     Q.   Okay.
5     A.   -- of Finance & Development.  Jim was
6 fully in his role and very active as the asset
7 manager and all the duties that was under him.  But
8 none of them crossed over into the Finance &
9 Development area.
10     Q.   So when he became the deputy comptroller,
11 did those people continue to perform those duties?
12     A.   Candace Gorden retired.  She was the top
13 person under -- the top assistant under Ivy
14 Pinkston.  And she retired.
15     Q.   So who performed those duties after that?
16     A.   Eunetter Steele was --
17     Q.   Before you jump to that, I want to make
18 sure we don't get too confused.  Candace --
19     A.   Retired.
20     Q.   -- she retired, who took on those duties?
21     A.   I did.
22     Q.   So that was not something that fell under
23 Jim?
24     A.   It did not.
25     Q.   All right.  And then you were mentioning

30 (Pages 114 - 117)

1 somebody else?

2    A. Ryan Coleman.

3    Q. I think you said Eunetter?

4    A. Eunetter Steele.

5    Q. Did she remain in her position --

6    A. Yes.

7    Q. -- after Jim got promoted?

8      Okay. Who did she report to?

9    A. I do not recall, because I don't know if

10 Jim would -- accepted her as an employee or if she

11 reported to someone else. I do not recall that.

12 She was the direct assistant -- administrative

13 assistant to Ivy Pinkston.

14      What I know for sure is that the

15 protocols that was established for that

16 progress for Finance & Development was no longer

17 followed. Eunetter Steele had developed the work

18 protocol with the leadership of Ivy Pinkston. After

19 Jim took the position, those protocols fell apart.

20    Q. Can you elaborate on that?

21    A. Eunetter Steele remained in her position

22 after the passing of Ivy Pinkston, and made herself

23 available to assist, to train, and help in any way

24 whatsoever for the new deputy comptroller for

25 development, which was Jim Garavaglia. I was told

1 and observed that those protocols were not followed.

2 Those were instructions of my office from me, the

3 comptroller, to have those well-oiled procedures and

4 policies to be continued. And they were not

5 followed.

6    Q. Who told you that?

7    A. I observed --

8    Q. I know you said that. Who told you that.

9 You said somebody told you?

10    A. I didn't say that. I said I observed.

11    Q. You said I was told -- could you read the

12 record back just to be clear?

13      THE COURT REPORTER: Answer: Eunetter

14    Steele remained in her position after the

15    passing of Ivy Pinkston, and made herself

16    available to assist, to train, and help in any

17    way whatsoever for the new deputy comptroller

18    for development, which was Jim Garavaglia. I

19    was told and observed that those protocols were

20    not followed. Those were instructions of my

21    office from me, the comptroller, to have those

22    well-oiled procedures and policies to be

23    continued. And they were not followed.

24    A. I was told by Eunetter Steele and by my

25 assistant, Chana Morton.

1    Q. (By Mr. Schmitz) Was that something that

2 Chana Morton -- it was part of her job expectation?

3    A. Absolutely.

4    Q. Okay. So just to be clear, your

5 administrative assistant, one of her job roles is to

6 observe the practices of the deputy comptroller and

7 the deputy comptroller for Finance & Development?

8    A. One of her roles is to make sure that the

9 comptroller's instructions that she is well aware of

10 and understands is adhered to when it comes to

11 receiving documentation on behalf of me, the

12 comptroller. She understood the well-oiled system

13 because it existed from the beginning of the

14 creation of the position itself.

15      It was not rocket science. We were

16 handling and managing very important financial

17 documents that had not, before the position,

18 occurred as regularly as it was occurring during my

19 administration.

20    Q. When did you become aware of this? You

21 said you observed it and you were told by two

22 individuals.

23    A. Mishaps occurred.

24    Q. No. My question is when.

25    A. Mishaps occurred when Jim Garavaglia, when

1 he was --

2    Q. When did you become aware of it?

3    A. I became aware immediately upon Jim

4 Garavaglia's handling of documentation that was

5 Finance & Development that was mishandled. In other

6 words, the handling of the documents was no longer

7 the same as had been before he took the position.

8 So that was an immediate.

9    Q. Okay. So --

10    A. It was immediate. And I -- not only was I

11 observing it, but I asked a question about it

12 because I needed to know who and why. It was that

13 important to know. I did not want to jump to a

14 conclusion and say that it was somebody when it was

15 not. But I needed to know. So the observation was

16 immediate.

17    Q. Okay. So what steps did you take in

18 response?

19    A. I asked questions.

20    Q. To whom?

21    A. Eunetter Steele, Chana Morton, Jim

22 Garavaglia.

23    Q. And then what?

24    A. I was given answers.

25    Q. And then what?

31 (Pages 118 - 121)

1    A.   And then I had to observe the next go
2  around to see if there were corrections made based
3  on instructions that I had given after having the
4  discussions about the process and how the process
5  should go.  And this is a process about making sure
6  that there's a circulation of the documents which
7  was efficient and in order to make sure that we are
8  meeting deadlines.
9         Whenever there's a financing, there's
10  deadlines that are in place.  Elected officials are
11  not always going to be at their desk, the major, the
12  comptroller, the treasurer and other signers of
13  public officials that were supposed to sign the
14  documents, were not necessarily going to all be in
15  one place during the time the documents were
16  approaching for signature.  And the deadlines were
17  in stone; not the individuals.
18    Q.   Okay.  Before we talk about the process at
19  length --
20    A.   You're cutting me off, sir.  I would like
21  to finish and it won't take long.  And it's very
22  important.
23    Q.   Go ahead.
24    A.   Like I said, the deadline was in stone,
25  but not the individuals.  So what was in place was

1  for the secretaries of -- and assistants, the
2  assistants for each elected official and other
3  officials who were going to sign the documents to
4  find out where those individuals would be and to
5  inform them that there were some important documents
6  that were going to be coming within a certain time
7  period or window.  And then they would arrange among
8  themselves when to get the documents to those
9  individuals so that the deadlines which were very
10  important could be met without question.
11         Over a couple of decades, that worked
12  perfect.  Then all of a sudden, I observed a
13  dismantling of that system, a well-oiled system that
14  seemed to just stop working.  And while Eunetter
15  Steele was still present, I couldn't understand.  So
16  maybe there's something that I'm not understanding.
17  So I kept going back, giving the instruction, to
18  make sure you follow direction.  And then those
19  directions were not followed by Jim.
20    Q.   And you've documented this?
21    A.   I did.
22    Q.   Over the course of his time as the deputy
23  comptroller?
24    A.   Yes.
25    Q.   Okay.  Where is that documentation?

1    A.   The documentation would be in the form of
2  a narrative given to an attorney which I believe you
3  also have the narrative.
4    Q.   Was it -- okay.  You are referring to
5  documentation in July of 2019?
6    A.   It follows --
7    Q.   Was there any documentation prior to that?
8    A.   I believe so.  But I can't recall
9  specifically at this time.  But I believe so.
10    Q.   Okay.  How long was Jim the deputy
11  comptroller?
12    A.   From, I believe, June -- May or June of
13  2016, until he retired in 2019.
14    Q.   So in those three years before he was
15  placed on forced leave, what was done in response to
16  what you just articulated you observed and were also
17  told by two different individuals?
18    A.   Well, let me give you an example.  I got a
19  call from Joyce Opinsky, who's a banker with Stern
20  Brothers, the morning of a closing of a financing.
21  She was alarmed.  It was in the morning.  I was on
22  the way to a doctor's appointment.  Joyce Opinsky
23  said: If you don't mind, Comptroller, I need your
24  signature.
25         I was in shock.  I said:  Joyce.

1         She says:  Comptroller, whatever you
2  do, I need your signature by noon.
3         I said:  But Jim -- and I remembered
4  this so well because her office was in Clayton and I
5  was driving to my doctor's appointment at the time.
6  I said:  Joyce, no worries.  I'll swing by your
7  office.
8         I'll come down the elevator.  I'll
9  meet you in the lobby.
10         I went to Stern Brothers.  I signed
11  the document.  And Joyce and I spoke about how this
12  is happening, how this is happening, and how this
13  had to happen.
14         She says:  I don't care about what
15  you guys got to do.  In order to sell these bonds, I
16  need your signature.  Thank you so much.
17         I went to my doctor's appointment.  I
18  didn't hear from Jim that day.  But what I heard
19  from others in the office is that Jim was surprised
20  that the document was signed.  That was the first
21  time I observed that I'm aware --
22    Q.   Did you speak to Jim about this?
23    A.   I did not.  Jim did not call me.  He's my
24  subordinate.
25    Q.   Did you seek to talk to him about it?

1    A.  I probably was more concerned with my
2  health on that day that I had just come from the
3  doctor.
4    Q.  Did you follow up?
5    A.  I did not follow up until later on in the
6  weeks.  Because certainly there were other documents
7  that were circulating.  And, yes, I pulled Jim into
8  the office for a conference and a consultation on
9  matters that had to do with signing documents and
10  circulating them.  I did that multiple times.
11    Not only was it Jim and his
12  secretary, it was also Jim's secretary and Eunetter
13  in my office to have consultation on circulation of
14  the documents and the understanding of such in terms
15  of the importance of how you get the documents
16  circulated properly to let the elected officials
17  know that you'll meet them at a certain time and
18  place to sign documents, instead of having an
19  investment banker to call you while you're on the
20  way to the doctor.
21    Q.  So when was this?
22    A.  This was early on in Jim's tenure as
23  deputy comptroller.  He began June of -- or June of
24  2016.  So it was either the 2016 or 2017 year.  It
25  was early.  It was early enough to alarm me that I

1  had to have a call from an investment banker to ask
2  for my signature instead of my subordinate who was
3  Jim Garavaglia, who should have called me or my
4  assistant to find out where I would be to sign a
5  document so it could be in time for the closing.
6    That's millions of dollars of City
7  taxpayer's dollars that we're talking about here.
8  And I had given strict instructions on how, that
9  these procedures for signature should happen.  And
10  Jim did not follow them.
11    Q.  Where are these procedures?  What document
12  are they contained in?
13    A.  These procedures come from the comptroller
14  verbally.
15    Q.  Did you ever memorialize any of these
16  strict detailed instructions?
17    A.  Yes.  Eunetter Steele did that.
18    Q.  Where are they?
19    A.  I don't -- there was a fold -- there's a
20  thick book in the Office of the Comptroller which
21  was shared with Jim's secretary, from Eunetter
22  Steele to Jim's secretary.  And it happened in my
23  office.  I was sitting right there.  I said:
24  Sheila, are you going to do this work here that
25  it -- it says this is how you circulate these.  Are

1  you going to do this?
2    At the time Sheila cried.
3    Q.  So where's this document is what I asked.
4    A.  It's in the City of St. Louis
5  comptroller's office, and it would be in 1520
6  Market.
7    Q.  Does it have a title?
8    A.  I'm telling you where it is.  You're
9  asking me.  So if you allow me to tell you the rest.
10    Q.  Go ahead.  You want to answer the question
11  fully.  You say I'm not giving you a chance.
12    A.  The document is in the City of St. Louis
13  Comptroller's office at 1520 Market.
14    Q.  You said that already.  Is there anything
15  else you want to add to that?
16    A.  No.
17    Q.  Okay.  So does it have a title?  Is it
18  labeled in some conspicuous way?
19    A.  I don't know.  I didn't prepare it myself.
20    Q.  But you reviewed it?
21    A.  Yes.
22    Q.  Okay.  And this was put together and your
23  testimony is that it was made available to Jim.  It
24  was explained to Jim that it had to be followed.  Is
25  that what your testimony is?

1    A.  My testimony is the document was made
2  available by Eunetter Steele to help and assist in
3  any way she could, Jim Garavaglia, the secretary to
4  Jim Garavaglia, any assistant to Jim Garavaglia to
5  get the job done.  That's my testimony.
6    Q.  Okay.  So this document was created.  You
7  were aware of it.  You are saying that Jim was
8  provided with it.  Was expected to follow it but
9  didn't right out of the gate and continuously
10  throughout his employment.  Did you not follow up
11  with him?  Did you not take any type of disciplinary
12  action?
13    A.  I followed up with him, yes, and I
14  followed up with him regularly.
15    Q.  In what way?
16    A.  I gave Jim verbal reprimands regularly.
17    Q.  Did you ever put that in an e-mail?
18  Anything related to this issue and his noncompliance
19  with your expectation get memorialized in writing?
20    A.  I'm not sure.
21    Q.  So you're unaware if it did or didn't?
22    A.  I an unsure that I memorialized it in
23  writing on this particular issue, I am unsure.  But
24  I'm very sure that I gave direct instructions to Jim
25  on how to circulate documents.  And I'm very sure

1 that he did not ever follow those instructions as I
2 had given them to him. And it was very troubling to
3 me that he couldn't do that, because I did take the
4 time and the steps to continuously speak to him and
5 also monitor and also speak to other professionals.
6 Q. Then there were witnesses to all these
7 conversations?
8 A. There was not direct witnesses to when I
9 spoke to Jim. But there are people that I spoke to
10 about the problem.
11 Q. Okay. Who would those be?
12 A. Well, I spoke to -- one of the persons
13 that I spoke to was the financial advisor. I
14 mentioned very casually that I was experiencing an
15 issue. And her response was very short. And I
16 decided that I needed to be more vigilant in my
17 observation so that I would not miss or misinterpret
18 or misunderstand whether there was a
19 misunderstanding on Jim's part or his staff.
20 Q. Okay. And what determinations did you
21 make?
22 A. I determined that after I had given Jim
23 Garavaglia a directive and direct instructions, that
24 not only did he not follow them, was that he was not
25 going to follow them, is what I determined.

1 Q. When did you make this determination?
2 A. I made that determination after the fiasco
3 that happened with the documents with the real
4 estate closing of Vertical Realty. I knew then with
5 that fiasco that Jim was never going to follow the
6 directive and protocol and procedure to circulate
7 the documents in a professional manner, in a proper
8 manner, so that they could be signed and a deadline
9 could be met properly.
10 Q. All right. So describe this process to
11 me. What -- give me the detailed description of
12 exactly what should have been done and what should
13 be done in each one of these cases?
14 A. We have financial closings that involve
15 investment bankers. But you also have financial
16 closings or extensions or development deals. You
17 have all of those kinds of dealings. Each of those
18 kinds of deals, you have different protocols. But
19 the bottom line is you have different persons who
20 need to be available to sign the documents. And the
21 job is to act in a sense of urgency to meet the
22 deadlines on behalf of those who are developers, who
23 are expecting that their project shall be closed on
24 time. And on behalf of the City of St. Louis who's
25 the issuer of the bonds in most cases.

1 City of St. Louis Airport is an
2 example. Water department, another example.
3 Parking division, another example when it comes to
4 issuing bonds and expecting to adhere to deadlines
5 and meeting those deadlines. Because again, those
6 are hard deadlines. The people who have to sign the
7 documents are not.
8 Q. How many of those deadlines were missed
9 during Jim's tenure?
10 A. During Jim's tenure, the deadlines were --
11 that were there for each of those were not all met
12 because of Jim. Because Jim --
13 Q. Is this documented?
14 A. Yes, it is.
15 Q. So there's sales that --
16 A. Yes, it is. For example, Vertical Real
17 Estate's closing, that deadline was met without Jim.
18 Q. So it was met?
19 A. It was met because I'm observing and I
20 took a special role to observe once I found out that
21 Jim was not handling the documents properly.
22 Q. So my question was, how many deadlines
23 were not met?
24 A. I heard your question. And I gave you an
25 answer.

1 Q. Well, you said --
2 A. And my answer is that --
3 THE COURT REPORTER: One at a time,
4 please.
5 MR. NORWOOD: She was answering and you
6 keep talking over her.
7 MR. SCHMITZ: Well, no. Her answer --
8 MR. NORWOOD: No. You are cutting her
9 off.
10 MR. SCHMITZ: Every single time.
11 MR. NORWOOD: And you should know better.
12 MR. BLANKE: Not much.
13 (Whereupon there was an
14 off-the-record discussion.)
15 MR. SCHMITZ: We're good.
16 Q. (By Mr. Schmitz) I'm going to ask politely
17 that your answers are responsive to the questions.
18 That's the reason I keep repeating it. And if I'm
19 asking the question again, it's because your answer
20 is not responsive to my question.
21 MR. NORWOOD: And I'm objecting as being
22 argumentative. She is answering your question.
23 And when you don't like the answer, you cut her
24 off and that's what's causing the confusion.
25 MR. SCHMITZ: Your objection is noted. I

1    don't agree with you, but it's on the record.
2    Q. (By Mr. Schmitz) Now, how many times were
3  deadlines not met? One? Two? Five?
4    A. There were no deadlines not met, but it
5  was because of the Comptroller, Darlene Green, who
6  is sitting here answering these questions to you and
7  the staff of the comptroller put in place a
8  procedure and a process to make sure deadlines are
9  met. It is our job to do the right thing in the
10  Office of the Comptroller to protect the integrity
11  of the office, is what we were doing.
12    Q. Well, I mean you're laying all the blame
13  at the feet of Jim. So my question is, how many of
14  these bonds were effected negatively and you've
15  answered my questions. Now, how many bond sales
16  were successfully completed during Jim's time as
17  comptroller? Did you look at that?
18    A. Is that a question?
19    Q. It is, yes.
20    A. Did I look at it?
21    Q. Do you know the answer?
22    A. Do I know the answer to what?
23    Q. Do you know the answer?
24    A. The answer to whether I looked at
25  something or the answer to how many bond deals

1  closed while Jim was the deputy comptroller for
2  Finance & Development?
3    Q. If you know the answer, please tell me.
4    A. Is that a question?
5    MR. SCHMITZ: Counsel, she's deliberately
6  arguing with me when it's very clear to me what
7  I'm asking.
8    MR. NORWOOD: She's not arguing.
9    MR. SCHMITZ: I'm going to respectfully
10  request on the record that you instruct your
11  client to simply answer the question as asked.
12    MR. NORWOOD: She's not arguing with you.
13  She's trying to get clarity on what you're
14  asking and you're not providing clarity.
15    MR. SCHMITZ: I asked repeatably do you
16  know the answer and what is it.
17    MS. HAMILTON: That's not a clear
18  question. The reason that she's trying to
19  clarify the question is because every question
20  you present is compound. So she's asking if
21  you want her to answer the first part or the
22  second part. Just because it's clear to you,
23  does not mean it's not clear for the witness.
24  And you're becoming argumentative when you're
25  inserting various speaking testimony --

1    MR. SCHMITZ: This has now taken on the
2  role of a speaking objection which we have --
3    MS. HAMILTON: -- being inserted in your
4  question.
5    MR. NORWOOD: Why don't we do this --
6    MR. SCHMITZ: You guys are doing exactly
7  the same thing that you said was wildly
8  inappropriate during the last deposition that
9  was taken of my client. I'm going to ask that
10  we can all proceed --
11    MR. NORWOOD: Let's take a break.
12    MR. SCHMITZ: Can I finish before you
13  interrupt me?
14    MR. NORWOOD: You can finish.
15    MR. SCHMITZ: Thank you. First of all,
16  I'm not going to take a break until I get an
17  answer to the question. Second, I'm going to
18  ask you both to not make speaking objections.
19  You can make your points and that's that. I
20  made a request and you can decline to do that
21  or not.
22    That being said, that's my request on the
23  record that your client not cut me off, that
24  your client answer the questions as asked, and
25  when I ask for the question to be answered,

1  that you don't interrupt when it's not being
2  answered.
3    MR. NORWOOD: Are you done?
4    MR. SCHMITZ: Go ahead.
5    MR. NORWOOD: Okay. In response to that,
6  we are more than willing to allow the witness
7  to finish her answer, if you allow her to
8  finish the answer. We're more than willing to
9  have her answer a question that's clearly put
10  out before her. And we have -- just like you
11  would with your witness, if she doesn't
12  understand the question, she is probing to find
13  out what you are asking. The questions are
14  confusing. They're compound. And every time
15  she starts answering and you don't like it, you
16  cut her off.
17    You're being belligerent to her. You're
18  badgering her. And we're not going to tolerate
19  it. Okay? So what I would suggest is we take
20  a break. We take a breath. We come back and
21  we proceed in an orderly fashion that we're
22  supposed to, which is to allow the witness to
23  answer the question or have the witness try to
24  clarify the question so she can give you a
25  complete answer.

35 (Pages 134 - 137)

1    MR. SCHMITZ: I have no problem clarifying
2 the questions.
3    MR. NORWOOD: There we go.
4    MR. SCHMITZ: That's not my issue. That
5 was never my objection. That wasn't even part
6 of my request.
7    MR. NORWOOD: It's part of mine.
8    MR. SCHMITZ: I asked if you would
9 politely ask your client to not interrupt me
10 either. That's not only been my request. You
11 didn't respond to that part. Let me revisit my
12 question again.
13    Are we still on the record?
14    THE COURT REPORTER: Yes.
15    Q. (By Mr. Schmitz) How many successful bond
16 contract issues were executed during Jim's tenure?
17    A. I don't know the number.
18    Q. Do you know approximately?
19    A. I would say successful bond issues, I
20 recall a 2016 bond issue. I recall a 2018 bond
21 issue. Both of those were general obligation bond
22 issues. There would have been possibly some
23 refinancings. And I'm not sure if there was one or
24 two refinancings. So roughly anywhere between five
25 and eight possibly.

1    MR. SCHMITZ: You guys want to take a
2 break?
3    MR. NORWOOD: Yeah. Take a break.
4        (Whereupon there was a short
5        break, 2:02 p.m. to 2:24 p.m.)
6    Q. (By Mr. Schmitz) So I want to talk about
7 after Jim was hired when he first started in that
8 position as the deputy comptroller for Finance &
9 Development. Do you recall having any initial
10 meetings with him?
11    A. Yes.
12    Q. Okay. What did you discuss at those
13 meetings?
14    A. There was, I guess, more than one meeting.
15 There was -- I would say more than one topic,
16 several topics. One would have been about the job
17 expectations.
18    Q. Okay.
19    A. Then there would have been other times
20 where there was meetings on other subjects having to
21 do with work. There were many meetings because
22 there was lots of work, lots of topics, areas of
23 concern that we were working on at the time. There
24 were meetings where there was Jim and just myself.
25 There was meetings where there were multiple people

1 and Jim was present along with other members of the
2 staff. There were just multiple meetings.
3    Q. Okay.
4    A. It was pretty common.
5    Q. So I'm going to go back near the very
6 beginning. Do you ever recall talking to him about
7 his future in that job?
8    A. Yes.
9    Q. Did you talk to him about how long he
10 intended to work?
11    A. I wanted him to stay there as long as
12 possible. That's my MO, modus of operandi. If I'm
13 working, I want you to be working. I want you
14 working with me. I want you working alongside me.
15 I want you to be a partner in the job of working in
16 the Office of the Comptroller.
17    I am very well-known to have been a
18 person that promotes from within. And am very
19 hopeful that the people who work for me want to work
20 for me forever. Because I like to train, help
21 educate, I want to see people do well. I want to
22 see people that work for me to do well. And I've
23 shown it in my practice. When I promote you, I have
24 elevated you to a place of responsibility along with
25 more salary. Not only to help you but help your

1 family.
2    Because you have chosen to work in
3 the Office of the Comptroller, I believe in giving a
4 benefit for that. I believe that is something that
5 will help the individual employee enjoy the job even
6 that much more. So that they would want to continue
7 on working for the Office of the Comptroller.
8    Because there was a lot of times that
9 employees didn't get raises. But if they got a
10 promotion, then a raise came with that. That I
11 would hope that that would cause them to want to
12 have a loyalty to the Office of the Comptroller and
13 to work in the Office of the Comptroller. Because
14 the Office of the Comptroller in the City of
15 St. Louis was an office that I felt, I guess -- we
16 did a lot of good for the community. I really
17 believe that.
18    We were complimented a lot in terms
19 of how we served the public, especially during times
20 when the public would call, ask for services. And
21 instead of us saying, sorry, you got the wrong
22 office, we'd say wait one moment. We will direct
23 you to the people that you need to talk to. And we
24 were happy to have that reputation. And I was happy
25 to have an employee that would want to stay with the

36 (Pages 138 - 141)

1 Office of the Comptroller. That had experience and
2 that had worked in the community, that had family
3 ties in the community. It was very important.
4     Q.  Did you ever talk to him about retirement
5 in the beginning?
6     A.  I talked to him about retirement hoping
7 that he would not retire, is what I would most
8 definitely have said to him as well as employees
9 that worked for me. I hope you wouldn't retire
10 because we need you, want you, in the job.
11     Q.  Do you -- did you talk to him by phone or
12 in person when you --
13     A.  In person.
14     Q.  No. When you offered him the job?
15     A.  I'm not sure if it was by phone or in
16 person when I offered him the job. I don't know. I
17 just can't recall right now.
18     Q.  Do you recall ever asking him if he was or
19 stating to him that he would be going out on top?
20     A.  Well, in the most complimentary way I did.
21 I was so happy that he was now making a lot more
22 money than he would have been making had he not been
23 promoted to the job. So that being the top job in
24 the office, I was ecstatic for him. And I expressed
25 that to him.

1           Because now instead of having an
2 Asset Manager II salary to retire on whenever he
3 chose to do that, he would retire at the top
4 position that he could have in the Office of the
5 Comptroller. And by God, I was wanting to
6 congratulate him on that. Because I was happy about
7 it. And I would hope that he would be happy about
8 it.
9     Q.  Do you know if anybody else was a witness
10 to that conversation?
11     A.  I'm not sure.
12     Q.  Okay. You don't recall?
13     A.  No, I don't recall.
14     Q.  And did you ever think about if Jim
15 retired or was no longer in that position, who his
16 replacement might be?
17     A.  Yes. I did think about that.
18     Q.  Okay. Did you have any thoughts or plans?
19     A.  Well, I thought about it in terms of the
20 asset manager portion of it, is that what you're
21 asking, or are you asking about the deputy
22 comptroller?
23     Q.  Well, I'm asking if you ever thought about
24 who might replace him.
25     A.  While he was in the position?

1     Q.  Yes.
2     A.  No.
3     Q.  I know we talked about after he was in the
4 position, you guys met. And I'm not going to repeat
5 and get into that again. But I do want to ask about
6 a meeting that may have been around March or April
7 of 2019 between you and Bev Fitzsimmons. I don't
8 know if that's enough information to help you to
9 know if that meeting happened or not or if you
10 recall. But I'll ask that now.
11           Do you recall based on that
12 information, a meeting in or around March,
13 April '19 regarding your running for reelection?
14     A.  No, I do not recall.
15     Q.  Okay. Do you recall any specifics of any
16 conversation you had with Jim where you may have
17 asked him if he intended to retire and when?
18     A.  In the same year or could you --
19     Q.  During any point.
20     A.  I would have had a conversation with Jim
21 and my other deputy comptroller as to whether they
22 would be in my office working for me as long as I
23 was the comptroller. That would have been the
24 conversation that I would have and have had in the
25 past with deputy comptrollers of the comptroller

1 since I had the job. Because every four years, I
2 would not know whether I had a job.
3           But I did know that as a civil
4 servant, the employees that work for me, they would
5 have a job. So I wanted to know if they were still
6 wanting to be there working for me in the Office of
7 the Comptroller. So that would have been the
8 question that I would have had.
9     Q.  So you used the words "would have." Do
10 you have any specific recollection of any particular
11 meetings where you recall having that actual
12 conversation?
13     A.  I would have made the statement similar to
14 or in the context of hope -- that I would hope that
15 they were not going to retire if I'm planning to run
16 for reelection. Running for reelection never
17 guaranteed whether I was going to be elected or not.
18 And a high-level employee would be in jeopardy when
19 or if I was not elected. I was clear about that.
20           I was very protective of my
21 employees. So I didn't want to put any jeopardy in
22 their way if I plan to just not run for reelection.
23 So I'm saying it was like kind of a team, a work
24 team, if you will.
25     Q.  Do you recall actually having that

37 (Pages 142 - 145)

1  conversation, though, specifically?
2     A.  With Beverly and with Jim at some point.
3  I met with them both --
4     Q.  So you did --
5     A.  -- to let them know.  This was June 11,
6  2019 in the 1520 building, the same day that there
7  was a special E&A meeting scheduled.  And I asked
8  for a meeting with Beverly and I asked Jim to join
9  me on that day.  To instead of going to the E&A
10 meeting, which was June 11, 2019, I would be absent
11 and I asked that my staff be absent.  And in lieu of
12 going to the E&A meeting, we would meet and just
13 talk.  And that was June 11, 2019.  And we talked
14 about several issues.
15       One of the first ones was whether or
16 not any of us had heard from the airport or the
17 airlines regarding the issue of the airline or
18 airport financing.  Because that was the issue that
19 the mayor wanted the special meeting about, to vote.
20 And the airlines -- I had understood as I was going
21 into that meeting, I just heard that the airlines
22 had threatened to come or show up if there was such
23 a meeting to be held.
24       So I thought it would be best to be
25 outside of city hall and nowhere near just in case

1  there were some issues of press.  Later after that
2  meeting, we learned that the airlines had sent the
3  mayor a letter at noon on that day letting her
4  specifically what she needed to do with regard to
5  that airport financing and what their purpose was.
6  They said they prefer the comptroller's financing to
7  whatever she was proposing.  And that if there was
8  such a vote that would go awry of that, that she
9  would hear from them.  And that letter came from the
10 American Airline and Southwest Airline.
11       So that day was a very memorable day
12 because of that issue.  And I know who I was with.
13 I was with those -- and as a matter of fact, the
14 meeting was at 2:00 at the same time the scheduled
15 E&A meeting was.
16    Q.  And did this meeting include discussions
17 about their future plans?
18    A.  It included conversations about whether or
19 not -- in addition to the conversation, which a
20 large part of the conversation had to do with the
21 airport, and the other part had to do with whether
22 or not they were wanting to be in the comptroller's
23 office, that was what that was about.  And I
24 remember asking if they had any concerns.  Do you
25 have any concerns?

1        I remember asking about Jim's
2  secretary Sheila, because there had been some
3  problems which was discussed about the circulation
4  of documents, which I was led to believe she was the
5  problem with that.  So I made a point to ask him
6  face-to-face about Sheila, was she okay, was she
7  going to be okay following the instructions.  I made
8  the point to talk about whatever it is that they had
9  asked me.  That Beverly had asked.  She was present.
10 You know, the three of us was present in the
11 conference room.  I believe we stayed for an hour or
12 less in the meeting.
13    Q.  Okay.  Did you ever give Jim any service
14 ratings?
15    A.  I did not, except for when I had to by --
16 I believe to his working test period.
17    Q.  Okay.  Any particular reason why not?
18    A.  Because I don't give ratings generally to
19 any of my employees.
20    Q.  You say generally, is --
21    A.  Generally unless they ask for it and force
22 me.
23    Q.  Did you give ratings to Bev?
24    A.  For her working test period, I believe I
25 did.

1     Q.  How about since then?
2     A.  I don't believe I did.
3     Q.  I'm not going to go through each of them
4  in turn, but we talked about other employees that
5  report directly to you.  Would you be the one
6  responsible for doing the ratings if someone were to
7  do a rating?
8     A.  Yes.
9     Q.  Do you know whether you've done ratings
10 for any of those individuals?
11    A.  I do not believe I've done them.
12    Q.  And why don't you do them unless the
13 employee asks for it?
14    A.  It is not one of the work -- for work.
15 It's not one of the favorite things for me to do.
16    Q.  Is it your understanding that it's
17 optional, or do you know if it's something policy
18 requires?
19    A.  It's my understanding employees would
20 receive their maximum merit raises with or without
21 the rating.  And they also would be considered
22 satisfactory across the board without a rating.
23    Q.  There are two types of raises, though,
24 correct?
25    A.  I'm not sure what you mean.

1    Q.   Well, there's merit based raises based on
2  your performance and raises based on a particular
3  classification, right, that are based on percentage
4  either City wide or specific to a classification?
5  Is that not correct?
6    A.   For years we've only had the one.  Since
7  2009, we've had the one type of the raise which was
8  the merit increase.
9    Q.   How would an employee get a merit based
10  increase without a rating, one that was based on
11  performance?
12    A.   The personnel regulations require that
13  absent of an annual review, would be considered the
14  same as an annual review given in a successful or
15  above successful rating.
16    Q.   Do you know what regulation that's from?
17    A.   I do not.
18    Q.   Do you know if it's an administrative
19  regulation or if it comes from an ordinance or --
20    A.   I do know it's a personnel regulation.
21    Q.   So like an internal regulation with that
22  department?
23    A.   I'm not sure.
24    Q.   Okay.  Before I talk about the events in
25  June of 2019 that we've already touched on, I want

1  to fast-forward a little bit just to July 2 itself
2  and talk about the actual forced leave notice.  Do
3  you know who gave that to Jim?
4    A.   I believe it was Judy Armstrong.
5    Q.   Okay.
6    A.   But I'm not sure.
7    Q.   Did you participate in it?
8    A.   I did not.
9    Q.   And how come you did not participate?
10    A.   I delegated the actual delivery.
11    Q.   And what was your reason for delegating
12  it?
13    A.   I delegated the delivery of forced leave,
14  is my reason.  I do delegate that activity.
15    Q.   Okay.  What's the reason you delegate
16  them?
17    A.   Pardon me?
18    Q.   Excuse me.  What is the reason you
19  delegate that particular duty?
20    A.   The reason that I delegate the delivery of
21  a forced leave letter is because the forced leave
22  letter is prepared by me with the instructions or
23  approval of the personnel director.  And after
24  having consultation and said approval from the
25  director, then the action of carrying out of

1  delivery, I have chosen to delegate that part of the
2  forced leave as a matter of practice.
3    Q.   Do you know the circumstances of what
4  happened to Jim after he was presented with the
5  forced leave at all; are you familiar with that?
6    A.   I do not know directly, only by what I was
7  told.  And I do believe I was told that a successful
8  delivery of the letter occurred.
9    Q.   Okay.  Do you know anything about him
10  being escorted out of the building?
11    A.   I believe there was more than one employee
12  that met with -- that met together to meet Jim at
13  the time of the delivery of that information.
14    Q.   Who were the other employees?
15    A.   I think it was -- I believe I was told it
16  was Kelly Anderson.  And I don't know who the other
17  employee would have been from the 1520 --
18    Q.   Do you know -- sorry.  Go ahead and
19  finish.
20    A.   From 1520 Market.
21    Q.   Do you know anything about Cindy Marshall
22  being present?
23    A.   That may have been the other employee.
24  But I don't know personally if that was true.
25    Q.   Okay.  Do you know -- Well, let me strike

1  that.
2         If you know, whose decision was it to
3  have him immediately escorted off the premises
4  without even an opportunity to get his personal
5  items?
6    A.   I don't know if that was a decision made
7  that was -- I don't know or not.  But what I know is
8  that Judy Armstrong is the appointing authority for
9  personnel.  And that she had the authority to set a
10  process in place for managing all personnel actions.
11    Q.   Were you aware this was going to happen
12  when he was presented with this forced leave?
13    A.   I was aware that he would be presented
14  with the information.  I was aware of that, yes.
15    Q.   Okay.  What about being escorted out, not
16  being allowed to take personal items, that sort of
17  thing?
18    A.   I don't know if I was aware at the time, I
19  don't know.
20    Q.   Why did you decide to place him on forced
21  leave instead of a pretermination notice?
22    A.   I had a couple of weeks of disturbing
23  incidents.  One being at the E&A meeting.  The
24  second being the second week, the Wednesday before
25  the Vertical Realty documents needed to be signed,

1 which was that Friday they needed to be signed, but
2 on that Wednesday, I got an e-mail from Tom Ray,
3 outside attorney who warned our office that there
4 would be trouble he believed, because he learned
5 that Jim Garavaglia had put the documents in the
6 interoffice mail.
7       So in that e-mail, I discerned that
8 the attorney was trying to protect the integrity of
9 the office with a warning about the documents. And
10 so I took steps. I was reminded of what had
11 happened the week before. And I said, okay, here we
12 are. Week two, let's get a plan together so that we
13 can have a smooth landing.
14       And so I took it upon myself to ask
15 my secretary to set up a conference call. Tom Ray,
16 I said, place him on the conference call with the
17 secretary of the mayor, which was Sherry
18 Wibbenmeyer, myself, my secretary, and
19 Jim Garavaglia. Those five people on the call.
20    Q.  What date was this?
21    A.  This was Wednesday, June 26. And it was
22 roughly around 4:00, a little after 4:00. We had
23 been given -- the e-mail had been received after
24 2:00 from Tom Ray, outside counsel, warning my
25 office about pending trouble because documents had

1 been placed in interoffice mail. In that e-mail,
2 Tom Ray stated that Jim should not have asked
3 Sherry, the secretary, to place the documents in the
4 interoffice mail.
5    Q.  Is Tom Ray familiar with the circulation
6 process for the City?
7    A.  He's extremely familiar with them. He's
8 worked over 30 years plus on finances and anything
9 and everything to do with the Office of the
10 Comptroller. He was a former City counselor. And
11 his job was to be counsel to the Office of the
12 Comptroller. And subsequent to that, he joined the
13 law firm of Armstrong Teasdale and continued to work
14 on financial matters for the Office of the
15 Comptroller.
16       So he was familiar with the
17 operations that had been put in place by Eunetter
18 Steele about circulating documents. And he had the
19 acute understanding that the secretaries had to make
20 sure that their bosses were in a place to sign the
21 documents. As a matter of fact, that e-mail was
22 sent to Chana Morton because of his acute knowledge
23 of how the circulation process worked.
24       Of course he would sound the alarm
25 when he found out that the documents had been placed

1 in interoffice mail, because he probably never heard
2 of such. And he stated in that e-mail that Jim
3 should have never put those documents in the
4 interoffice mail. These were important real estate
5 documents. As a matter of fact, they were down the
6 hall at the mayor's office. And the format that Tom
7 Ray was used to, one or the other secretary would
8 walk the documents down. If Sherry was busy, then
9 my secretary would walk down the hall and get the
10 documents and have them ready for review.
11       So that's the common practice that
12 Tom Ray was used to. And he also stated those very
13 words in his e-mail. He said: Sherry should have
14 walked the documents down.
15       So in answer to your question, why
16 did I consider a forced leave instead of immediate
17 disciplinary action, is because I needed to think
18 about what the disciplinary action should look like.
19    Q.  What do you mean by that, you needed to
20 see what the disciplinary action would look like?
21    A.  I wasn't clear. Jim was a valued employee
22 I had. Jim had many years in the Office of the
23 Comptroller. I said, no way I'm going to fire this
24 dude. I said, I'm going to look at this. I'm going
25 to see what we need to do here. So I called up and

1 had a discussion with the Director of Personnel and
2 explained the problem that I had, and gave him in
3 detail. And he told me, he said: Well, Jim's a
4 high level employee of yours. We have forced leave
5 to deal with employees like that. Then you can make
6 your decision.
7       I said: Well, you know, you're
8 right. So I chose to look at forced leave that
9 would give me at least ten to 14 days to make a
10 decision that was fair to Jim.
11    Q.  Did you want --
12    A.  I wanted to make a fair -- if you want me
13 to finish, I will.
14    Q.  Go ahead.
15    A.  I wanted to make a fair decision.
16 Something that was fair to Jim. I didn't want to
17 make a decision that was hasty. I wanted time to
18 think, because these were serious matters. I wanted
19 to know Jim understood how serious this was. This
20 is City money. This is a project that we had been
21 working tirelessly on for many, many years. And we
22 finally got it to a place where these guys were
23 going to get this hotel built. And we've got one
24 more extension. Everybody was hanging on, letting
25 me get this one more extension.

40 (Pages 154 - 157)

1          This was a project that started out
2   of our office, out of the Office of the Comptroller.
3   So I was very familiar with it and had been familiar
4   with it for years.  And I was very supportive of it.
5   I wanted it to be successful.  I wanted Jim to be
6   successful.
7          Q.   Did you make the forced leave decision on
8   July 1?
9          A.   I made that forced leave decision on -- on
10  the 28th, on that Friday.
11         Q.   When did you decide that you were going to
12  be seeking termination?
13         A.   I never decided that I was going to be
14  seeking termination.
15         Q.   Can you look at what's marked Plaintiff's
16  Exhibit O?
17         A.   Yes, I have it.
18              (Whereupon Exhibit O was marked
19               for identification.)
20         Q.   (By Mr. Schmitz)  If you could turn to the
21  fifth page within that packet, it's dated July 2,
22  2019.  And it's addressed to Mr. Richard Frank from
23  you.
24         A.   It's July 2?
25         Q.   July 2, 2019, yes.  This would be the

1   fifth document in this packet.
2          A.   To Richard Frank from me?
3          Q.   Yes.  Hold on.  I might be counting wrong.
4          A.   Yeah.  I'm on three pages.  This is five
5   right here.
6          MR. NORWOOD:  No.  He --
7          THE WITNESS:  He said five.
8          MR. NORWOOD:  Are you talking about the
9      third page?
10         Q.   (By Mr. Schmitz)  Hold on.  Let me get it
11  right.  Sorry.  Yes, the letter to Jim -- we'll go
12  with the letter to Jim.
13         A.   That's the one on the fifth page.
14         Q.   Right.  Addressed to him from you dated
15  July 2.
16         A.   Yes.
17         Q.   Okay.  Can you just read the first
18  sentence of that paragraph?
19         A.   As of Monday, July 2, 2019, you are being
20  placed on an official forced leave pending a
21  pretermination hearing.
22         Q.   Okay.  So you would agree that a
23  pretermination hearing was already presented as
24  early as July 2?
25         A.   That was the process.  That's what it was

1   titled, a pretermination hearing.  It was not meant
2   to be a termination, otherwise it would have stated
3   such.  I was aware that I had options to discipline
4   instead of forced leave.  I chose forced leave
5   instead of discipline.  I wanted to make sure that
6   the discipline that I chose was appropriate for the
7   employee.
8          Q.   Can you circle back to the second and
9   third pages of this exhibit?
10         A.   Yes.
11         Q.   You see there's two different letters to
12  Richard Frank both dated July 2?
13         A.   Yes.
14         Q.   Okay.  Can you tell me why there was two
15  separate letters sent to him?
16         A.   Yes.  The first one and the second one.
17  The first one I'm seeing is the one that had more
18  detail describing actions taken by Jim Garavaglia.
19  The second one does not describe those actions.  I
20  was advised by counsel to be more clear, that Jim
21  did not -- would not know why he was being put on
22  forced leave.
23         MS. HAMILTON:  I'm going to object to --
24      that those conversations are attorney-client
25      privilege.

1          Do not get into what counsel told you.  If
2   you want to say on the advice of counsel, fine.
3   But what counsel said is attorney-client
4   privilege.
5          And I'm going to assert the
6   attorney-client privilege on behalf of the City
7   of St. Louis and direct the witness not to
8   answer any questions in that regard or offer
9   any testimony in that regard.
10         MR. BLANKE:  Is this a privilege that
11      belongs to Ms. Green?
12         MS. HAMILTON:  It belongs to the City of
13      St. Louis.
14         MR. NORWOOD:  I'll join in that objection.
15         MR. BLANKE:  As to her privilege?
16         MR. NORWOOD:  I'm joining in the City's
17      objection to --
18         MR. BLANKE:  I'm asking, what is the
19      objection?  Is it an objection to whose
20      attorney-client privilege?
21         MR. SCHMITZ:  Are you objecting to my
22      question?
23         MS. HAMILTON:  Would you like to read back
24      what I said?
25         MR. SCHMITZ:  I would like for it to be

1  clear.
2      MR. BLANKE: Wait. Ms. Hamilton, I know
3  you were super clear. You said it was the
4  City's objection.
5      I'm asking Mr. Norwood, you said you
6  joined in the objection. I'm asking as to your
7  objection, is that an objection of
8  attorney-client privilege for Ms. Green?
9      MR. NORWOOD: I agree with the City
10 counselor that any communication with counsel
11 would be privileged, and she should not be
12 required to answer those questions. And I'm
13 agreeing -- since I'm representing her
14 personally, I'm agreeing as her lawyer to
15 follow the admonition to not answer questions
16 regarding any discussions with counsel.
17     MS. HAMILTON: Or offer any testimony in
18 that regard.
19     MR. NORWOOD: Or inadvertently offering
20 testimony in that regard, right. It's the
21 City's privilege and only the City can waive
22 the privilege.
23     MR. SCHMITZ: And that was my question.
24     MR. BLANKE: I'm sorry.
25     MR. SCHMITZ: No. My only question was,

1  was the objection to my question or the answer
2  that was given?
3      MR. NORWOOD: For the record, it doesn't
4  matter because to the extent that the witness
5  might inadvertently talk about discussions with
6  counsel, I think the proper objection is to
7  object at that time beforehand and instruct the
8  witness not to answer any further.
9      MR. SCHMITZ: I don't think it's not
10 relevant. I'm just trying to clarify for the
11 record what the objection was to in particular.
12     MS. HAMILTON: Would you like her to read
13 it back?
14     MR. SCHMITZ: No. I was asking you what
15 your objection was to. That's all.
16     MS. HAMILTON: Do you want to read back my
17 objection, Madam Court Reporter?
18     THE COURT REPORTER: I'm going to object
19 to -- that those conversations are
20 attorney-client privilege.
21     Do not get into what counsel told you. If
22 you want to say on the advice of counsel, fine.
23 But what counsel said is attorney-client
24 privilege.
25     And I'm going to assert the

1  attorney-client privilege on behalf of the City
2  of St. Louis and direct the witness not to
3  answer any questions in that regard or offer
4  any testimony in that regard.
5      MR. BLANKE: Just for the record, I want
6  to say that I think it's a mystery to me how
7  the City attorney can direct a person that's
8  not her client to not answer questions. But
9  you're doing the same thing, but you're also
10 saying it's a City objection.
11     MR. NORWOOD: It's an issue what is
12 attorney-client privilege, right?
13     MR. BLANKE: Whose privilege?
14     MR. NORWOOD: She is here in her personal
15 capacity. She is also taking actions in her
16 official capacity. So technically she has two
17 attorneys here to the extent that she's here
18 and to the extent that she's answering -- wait
19 a minute. To the extent she's answering
20 questions that relate to her official duties
21 that would be subject to a privilege that
22 belongs to the City, she has every right to
23 object and instruct her not to answer.
24     And to the extent her instruction not to
25 answer isn't sufficient, my instruction would

1  be. So we both are instructing her not to
2  answer. But you can -- whichever one, you can
3  take hers or mine or both.
4      MR. BLANKE: But the Court has sustained
5  your motion to dismiss any claim based on
6  official capacity. And the only claims that
7  remain against her at this point are in her
8  personal capacity.
9      MS. HAMILTON: And there are claims
10 against the City of St. Louis.
11     MR. NORWOOD: But there are claims against
12 the City of St. Louis. And all of the actions
13 we're talking about have nothing to do with
14 personal capacity.
15     MR. BLANKE: Let's move on. I understand.
16     Q. (By Mr. Schmitz) So I asked you to read
17 from Page 5. And if you turn to the next page, you
18 see there's also a second letter addressed to Jim
19 Garavaglia dated July 2 from you. Do you see that?
20     A. Yes.
21     Q. And those letters differ in some respect?
22     A. One has more clarity in terms of actions
23 that were taken by Jim.
24     Q. Do you know why those two -- there are two
25 different letters?

42 (Pages 162 - 165)

1    A.   Yes.
2    Q.   Okay.  Subject to your counsel's prior
3 objection, can you -- will you answer as to why you
4 were --
5        MR. NORWOOD:  With the admonition that to
6    the extent that the answer requires her to
7    reveal discussions with counsel.
8        MR. SCHMITZ:  Hence why I said subject to
9    that objection.  I don't know what the answer
10   is.
11       MR. NORWOOD:  I'm just trying to make sure
12   the witness understands that.  She shouldn't
13   talk about specifics as to discussions with
14   counsel, is all.
15       So subject to that, to the extent you can
16   answer, feel free to do so.
17   A.   On advice to give clarity.
18   Q.   (By Mr. Schmitz)  All right.  Do you know
19 which letter was sent?
20   A.   I had a record of that.  But right now at
21 this point, I'm unclear.
22   Q.   Do you know what record that is if
23 you're --
24   A.   It would have been the postal record for
25 the receipt.

1        MS. HAMILTON:  I don't mean to interrupt
2    here, but I did try to make it clear in the
3    City's production, I'm not sure if it was,
4    which one actually went.
5        MR. SCHMITZ:  I'm not disputing what was
6    sent.  I'm merely asking her if she has a
7    recollection as to which one was sent.
8    Q.   (By Mr. Schmitz)  Are you referring to
9 certified mail when you say you have a record?
10   A.   I believe there was delivery by certified
11 mail on an occasion, and then there may have been a
12 delivery by courier on an occasion.
13   Q.   And you believe that was done to your
14 knowledge and understanding, that was done in
15 addition to him being handed the forced leave
16 document by Judy Armstrong?
17   A.   I believe.
18   Q.   Okay.
19   A.   But I'm not sure.
20   Q.   Do you know if he was handed the same
21 letter by Ms. Armstrong that was mailed to him?
22   A.   I do not know.
23   Q.   All right.  If you could skip forward a
24 few pages -- it looks like two pages.  It's an
25 e-mail addressed to me by Ashley McClain.  Do you

1 know who Ashley McClain is?
2    A.   With the Civil Service Commission.
3    Q.   Were you aware that a civil service
4 hearing had been scheduled as of July 11?
5    A.   Based on the appeal that was filed.
6    Q.   Well, did you receive notice, this same
7 notice -- and I'm going to ask you to just turn the
8 page to this Notice of Institution of Case and
9 Hearing.  Did you receive a copy of that from the
10 Commission?
11   A.   Not personally, no.
12   Q.   Okay.  But were you made aware of it,
13 then, at some point?
14   A.   Yeah.
15   Q.   So you were aware it was scheduled for
16 July 23?
17   A.   I don't recall if I was aware at the time.
18   Q.   All right.  Related to his forced leave
19 and making your decision, after he was placed on
20 forced leave on July 2, what did you do to assist
21 you in making that determination?  I can repeat the
22 question.
23   A.   Please do.
24   Q.   So relative to you making the decision as
25 what to do after he was placed on forced leave, Jim,

1 I mean, what actions or steps did you take to help
2 you in making that decision?
3    A.   One of the things, that I spoke with
4 counsel.
5    Q.   Okay.  Did you do anything else?  No need
6 to talk about what counsel said.  We're going to not
7 talk about that.
8    A.   I probably spoke once again to either
9 Linda Thomas or the Director of Personnel.  Those
10 would have been the steps.
11   Q.   Okay.  If you skip forward a few more
12 pages, you'll see a memorandum with Nancy Kistler,
13 with the City counselor's office, Ms. Morton, your
14 secretary, dated July 12, 2019.
15   A.   Yes.
16   Q.   Are you familiar with this?
17   A.   Yes.
18   Q.   Okay.  Who requested that she prepare
19 this?
20   A.   Counsel.
21   Q.   All right.  All right.  Can you
22 fast-forward, then, past those two documents to a
23 memorandum from you to Richard Frank dated July 15,
24 2019.  Do you see that?
25   A.   Is it dated July 15?

43 (Pages 166 - 169)

1    Q.   Yes.  2019.
2         MR. NORWOOD:  You're saying a memo?
3         MR. SCHMITZ:  Well, it doesn't use the
4    word "memorandum," but a letter, memo.
5    Q.   (By Mr. Schmitz)  Do you see that?
6    A.   Yes.
7    Q.   Wherein you asked that he be placed on
8    forced leave effective July 15, 2019?
9    A.   Yes.
10   Q.   Why did you request a forced leave on this
11   date?
12        MR. NORWOOD:  Let me object.  It assumes
13   facts not in evidence.
14        Subject to that, you can answer.
15   Q.   (By Mr. Schmitz)  Well, all I'm asking is
16   the document states:  I am respectfully requesting
17   you place Mr. James Garavaglia, a deputy comptroller
18   of Finance & Development, on official forced leave
19   effective Monday, July 15.
20        Do you see that?
21   A.   Yes.
22   Q.   And it's addressed to Richard Frank on
23   July 15?
24   A.   Yes.
25   Q.   So were you requesting that he place him

1    on forced leave on July 15?
2    A.   Yes.
3    Q.   So again, my question was, why were you
4    asking that he be placed on forced leave on July 15,
5    2019?
6    A.   Because it had to do with an
7    investigation.
8    Q.   Okay.  Was he not already on forced leave
9    at that time?
10   A.   Yes.
11   Q.   Okay.  Your reasons that you provide in
12   this letter, if you refer back to your request on
13   July 2, 2019, it does not appear to be different in
14   any other way other than the dates.  So were you
15   requesting forced leave for a different reason?
16   A.   I would have had advice of counsel in the
17   letters.  So I would not be as clear today as to the
18   advice given regarding the letters.
19   Q.   All right.  Notwithstanding advice of
20   counsel and what that may or may not have been, is
21   it your understanding you would need to request
22   forced leave again for an employee that was already
23   on forced leave?
24   A.   Yes.  Forced leave for my understanding
25   was limited to, I believe, 14 days.  July 15 would

1    have began a new forced leave from my understanding.
2    Q.   Were you asking for an extension?
3    A.   I was asking for forced leave.
4    Q.   Did you believe it had already expired at
5    that time?
6    A.   What the letter indicates is that I was
7    asking for forced leave.
8    Q.   Well, I may have misunderstood your prior
9    response then.  Did you ask for forced leave a
10   second time because you believed the previous forced
11   leave that had been granted had already expired?
12   A.   Well, I'm going to defer again to advice
13   of counsel in the short period of time, July 2 to
14   July 15, then July 10, when I believe there was an
15   appeal filed by your office during those short few
16   days.  Many things was happening.  And the result of
17   it is the second letter.
18   Q.   All right.  If you could go forward to an
19   e-mail on Wednesday, July 17, 2019.  It's from Linda
20   Thomas to Richard Frank.  Have you ever seen this
21   e-mail before?
22   A.   Yes.
23   Q.   Well, it's originally from Rick to Linda
24   and then Linda responded, but.
25        MR. NORWOOD:  I mean, just for the record,

1    I think it's the other way around.
2         MR. SCHMITZ:  You're right.  Strike that.
3    Q.   (By Mr. Schmitz)  So it's from Linda Thomas
4    addressed to Rick.  And it says:  I told the
5    comptroller to withdraw her request for forced leave
6    on J.G.
7         Do you have any recollection of Linda
8    Thomas telling you to withdraw your request for
9    forced leave?
10   A.   As I stated before, I was in consultation
11   with Linda Thomas and the Director of Personnel
12   along with counsel during those periods of time
13   seeking direction.
14   Q.   Right.  So I don't want you to answer
15   anything that involves counsel's advice or direction
16   or the content of those conversations, but this is
17   an e-mail where Linda Thomas is making a
18   representation to Richard Frank about something she
19   asked you.
20        So I'm asking you in that limited
21   capacity, do you recall her telling you to withdraw
22   her -- your request, excuse me, for forced leave?
23   A.   I recall seeking direction and Linda
24   giving me direction.  The auditor -- state auditors
25   were in the Office of the Comptroller performing an

1 audit. And I recall speaking to Linda about it.
2      The auditors had called within days
3 of Jim being placed on forced leave. The state
4 auditor specifically told me that she had read the
5 paper and learned that Jim was on forced leave. And
6 that she recognized he was a high-level employee.
7 And specifically she asked, do I have anything to
8 worry about -- or do we have anything to worry
9 about? And at the time, I told her no, because I
10 didn't believe she did. That was within the 14
11 days.
12      After learning that there were
13 documents that were official City documents that
14 were contracts and they were signed by Jim
15 Garavaglia, within a few days later, I called that
16 auditor back. And I said, I know you're in the
17 office auditing and you are auditing contracts. We
18 have learned that there's a reason for you to be
19 concerned.
20      They asked me to send them the
21 documents. And I did so. I sent the auditors the
22 documents that had been signed by Jim Garavaglia.
23 And they told me that they would get back to me.
24 Asked what they would do. And they said they would
25 let me know.

1      So this would have been in a few
2 days. And then I discussed all of this with Linda
3 Thomas as to what to do since this is coming to
4 the time we're going to have a hearing and all of
5 this. She let me know there's nothing wrong with
6 expending an investigation now that you heard from
7 the auditors, now that they're involved. She said
8 those things in this e-mail, giving me instructions
9 on what I needed to do.
10      Q.  Did the auditor ever present you with a
11 report?
12      A.  The auditors didn't get back to me in a
13 timely manner. And I did take it upon myself to
14 call to find out if, in fact, there was going to be
15 an audit performed. And I finally got an answer
16 from the auditors that they were not going to audit
17 the documents that I sent, because they had a
18 specific scope of work that they were interested in
19 completing, which was fiscal year 2018. And those
20 documents are outside of their scope of work. And
21 they said they would not be giving me any audit
22 report on that. And that answer came from them in,
23 I believe, August.
24      Q.  Did they ever subsequently do an audit on
25 2019?

1      A.  I never followed up. As the comptroller
2 of the City, it was my responsibility to follow up
3 if, in fact, I wanted them to take further steps to
4 specifically audit the records surrounding those
5 documents that were signed by Jim Garavaglia.
6      Q.  Okay.  So you didn't ask -- just so I'm
7 clear on your answer, you didn't ask and they did
8 not do it; is that correct?
9      A.  That is correct.
10      Q.  Thank you.  If you could turn the page
11 from that, you see there's a letter to Mr. Frank
12 again dated July 18.
13      A.  Yes.
14      Q.  Okay.  And again you're requesting he be
15 placed on forced leave?
16      A.  Yes.
17      Q.  Did you then withdraw your original
18 request for forced leave as recommended by Linda
19 Thomas?
20      A.  I believe that is the letter dated July 18
21 to Richard Frank stating as such.
22      Q.  Well, I see that you're requesting it.
23 Just so I'm clear, had you already withdrawn your
24 prior requests dated July 2, had you actually
25 withdrawn that request before you issued --

1      MR. NORWOOD:  Let me object.  You're
2 talking about July 18.  And there are two
3 July 18 letters.  It looks like she's looking
4 at one and you may be looking at the other.  So
5 let's just make sure the record's clear as to
6 which July 18, 2019 letter we're talking about.
7      MR. SCHMITZ:  Well, it looks like it's the
8 same letter, but the second page has
9 handwritten "approved" on it.
10      MR. NORWOOD:  No, no.
11      MS. HAMILTON:  There are three July 18,
12 2019 letters.
13      MR. NORWOOD:  There's a withdrawal letter
14 dated July 18, 2019 that she's looking at now.
15      MR. SCHMITZ:  I wasn't asking her about
16 that in particular yet.  I was asking if she
17 recalls withdrawing it.
18      A.  Yes.
19      Q.  (By Mr. Schmitz) Okay.  Now, back to that
20 July 18.  So you had withdrawn it or you wrote that
21 letter requesting to withdraw it before you
22 requested he be placed on forced leave again?
23      A.  Yes.
24      Q.  Do you know how that second letter was
25 delivered to the one addressed to Jim notifying that

45 (Pages 174 - 177)

1 he's being placed on forced leave as of July 18,
2 2019?
3     A.  No.  At this time, I don't recall.
4     Q.  Okay.  If you could turn the page to an
5 e-mail, it appears to have come from your -- I might
6 be wrong about this.  But it appears to come from
7 your e-mail address, but has Ms. Morton's signature.
8 It says "on behalf."  So I'm assuming she -- well, I
9 shouldn't assume.  Did she use your e-mail address
10 to send that?
11    A.  Is this dated --
12    Q.  July 18.
13    A.  -- July 18, 3:24?
14    Q.  Yeah.  It just says 2:25, not 3:24.  It's
15 an e-mail --
16        MR. NORWOOD:  I think -- yeah, I think
17 we're looking at the same one.  He's talking
18 about --
19    A.  3:24.  This is 2:52, not 25.
20    Q.  (By Mr. Schmitz) So it's titled Letter to
21 James Garavaglia.
22    A.  I don't have that.  I got revised request
23 letter.
24    Q.  It should be right after the July 18
25 letter that has "approved" handwritten on it.

1        MR. NORWOOD:  I see.  There are two
2 July 18 e-mails.
3        THE WITNESS:  Oh, I have it now.
4        MR. NORWOOD:  So we just want to make
5 sure.  This e-mail and then there's the e-mail
6 a couple pages down.  So which one should she
7 be looking at?
8        MR. SCHMITZ:  Not the one that's 3:24 or
9 that's responding to 2:52.
10       MR. NORWOOD:  He's talking about this one.
11   Q.  (By Mr. Schmitz) It just says:  Dear
12 Mr. Frank, please see attached copy of the letter
13 hand delivered today.
14   A.  Yes, I see that.
15   Q.  I'm just asking, does that refresh any
16 memory, that use of the term "hand delivered," what
17 does that mean, if you know?
18   A.  I would believe it was couriered today.
19   Q.  Okay.  Now, I'm going to fast-forward to
20 the e-mail that you thought I was talking about.
21 The one that's the same date, but 3:24.  And go down
22 the page at 2:52 -- or 2:50.  Excuse me.
23       MR. BLANKE:  Is this a time, 2:50 p.m.?
24       MR. SCHMITZ:  Yes.
25   Q.  (By Mr. Schmitz) On July 18, it looks like

1 Ms. Morton on behalf of you, using your e-mail
2 address, wrote:  Dear Mr. Frank, my apologies.
3 Please see attached revised letter.
4        Do you know why approximately 25
5 minutes after Mr. Frank was informed that a letter
6 had been hand delivered, she then sent a revised
7 letter?
8     A.  From what I'm reading here, it states from
9 Richard Frank that he wrote:  Thank you.
10       And he wrote:  Could you also add
11 words "serious" and/or "fiscal" before improprieties
12 to strengthen and clarify.
13    Q.  Right.  I believe, unless I'm wrong,
14 that's in response to what Ms. Morton wrote prior to
15 that.  Because what she wrote is time stamped 2:50.
16    A.  And two minutes later, he writes --
17    Q.  And I'm going to get to that.  My question
18 was not -- I don't want to confuse the issue.  My
19 question was, do you know why Chana sent a revised
20 letter 25 minutes later before he responded two
21 minutes later?  Because it appears there was a
22 letter delivered that was sent and then there's no
23 subsequent e-mail response that was provided to us
24 from Richard Frank, but yet Chana, 25 minutes later,
25 sent a revised letter.  Do you know why there was a

1 revised letter sent?
2     A.  I do not.
3     Q.  Okay.  Do you recall an e-mail or a phone
4 conversation with Rick or Linda requesting a revised
5 letter?
6     A.  I do not.
7     Q.  Okay.  Do you know if that revised
8 letter -- if you go to the page before that, do you
9 know if the page before that is the letter that --
10 the revised letter that Ms. Morton sent 25 minutes
11 later?
12       It's just one page before the e-mail
13 we were just talking about, or the e-mail chain.
14 It's also dated July 18.
15    A.  From what I'm looking at, I can't be sure.
16    Q.  All right.  It doesn't contain the word
17 "serious" or "fiscal;" is that correct, from your
18 reading --
19    A.  Correct.
20    Q.  -- before impropriety?
21       Okay.  Then if you go back to the
22 e-mail chain on the next page, Please see the
23 attached updated request from Chana -- is it Chana
24 or Shauna?  I'm sorry.
25    A.  Chana.

46 (Pages 178 - 181)

1    Q.  Chana.  My apologies.  From Chana Morton,
2  with an updated request.  We haven't received a copy
3  of that updated request.  So I don't have that to
4  show you, but.
5        MR. NORWOOD:  Well, what did you say now?
6  I'm sorry.
7        MR. SCHMITZ:  We don't have a copy of the
8  updated request if there is one.
9        MR. NORWOOD:  Wait a minute.
10        MR. SCHMITZ:  I don't know that there even
11  is one.
12        MR. NORWOOD:  That's what I'm trying to
13  figure out.  Because are we talking about the
14  letter to your client, or are we talking about
15  the letter to Frank?  That's what I'm trying to
16  make sure we're on the same page.  That may be
17  where the confusion lies.
18        MR. SCHMITZ:  I don't know.  All it says
19  is attached updated request.  The witness may
20  be the only one that can answer that question.
21  And I don't know that she can.
22        MR. NORWOOD:  But if you look at the
23  e-mail that follows that, I think that adds
24  some clarity.
25        MR. SCHMITZ:  Right.  She wrote attached

1  updated request.  I don't know if that means
2  request.  That's part of what my questions are
3  going to be.  For forced leave or if that means
4  a revised letter that included the word
5  "serious" or "fiscal."  So that's my question.
6    Q.  (By Mr. Schmitz)  Do you know, was there
7  ever another letter prepared that added the word
8  "serious" and/or "fiscal" before improprieties?
9        MR. NORWOOD:  Objection.  I don't know.
10  When you're saying another letter, to whom; to
11  Frank or to your client?  That's what I'm
12  saying we need to get clear on what we're
13  talking about.
14        MR. SCHMITZ:  I don't think I can ask that
15  question the way that you're asking it without
16  the witness first answering.  Because she
17  doesn't know if the prior letter, this one --
18  she doesn't know if that's the letter that's
19  being referenced here.  If it is, then
20  obviously it would be a letter to Jim.  If not,
21  then I'm asking if she knows that too.
22        THE WITNESS:  He's asking --
23        MR. SCHMITZ:  Maybe I can break this down.
24        MR. NORWOOD:  Let me make it easier for
25  you.  That language appears in a letter to

1  Frank, July 18, 2019.  That's why I'm saying,
2  there's a letter to your client and a letter to
3  Frank.  So I think it's unfair to ask this
4  witness a question about a communication that
5  was transmitted by her assistant to the
6  Director of Personnel who it looks like had to
7  weigh in on this thing.
8        MR. SCHMITZ:  It's possible she doesn't
9  know.  So let's start there.
10        MR. NORWOOD:  Okay.  Let's do that.
11    Q.  (By Mr. Schmitz)  I mean, do you know when
12  Richard Frank is responding, can you add the word
13  "serious" or "fiscal," do you know if he's referring
14  to the request for forced leave or do you know if
15  he's referring to the letter --
16    A.  It appears --
17    Q.  -- the notice of forced leave?
18    A.  It appears that he might be referring to
19  the letter, but I don't know as I sit here and read
20  the letter.  I see the word "improprieties."  Before
21  that word, it says "some."  I could look at the
22  e-mail that Richard Frank wrote and make an
23  assumption that he was referencing the letter.
24    Q.  I'm not asking you to do that.  I'm not
25  asking you to speculate.  I'm asking if you have any

1  actual knowledge.
2    A.  My knowledge at this moment in time, I do
3  not recall.
4    Q.  All right.  Last question related to this
5  e-mail where Richard Frank writes:  Thank you,
6  Honorable Comptroller Green.  Please be advised that
7  effective immediately, I'm authorizing
8  Mr. Garavaglia to be placed --
9        THE COURT REPORTER:  Slower, please.
10    Q.  (By Mr. Schmitz)  I am authorizing
11  Mr. Garavaglia to be placed on forced leave pending
12  your investigation.
13        So was it at this point that he
14  authorized Jim being placed on forced leave for a
15  second time?
16    A.  I see the second letter.  You said you
17  didn't have it.  It's right here.  It says serious
18  fiscal improprieties, July 18th to Richard Frank.
19  So those words are added to the letter that you said
20  you didn't have.
21    Q.  I didn't say I didn't have that.  I said I
22  didn't have a letter to Jim with those words in it,
23  so.
24    A.  That may not have been what Richard Frank
25  asked for.

47 (Pages 182 - 185)

1    Q.   Exactly.  That was my question.
2    A.   But he has it.  Richard Frank has this
3 letter of what he asked for.  Serious fiscal
4 impropriety, that's what's in the e-mail from
5 Richard Frank.
6    Q.   Again I wasn't asking you to speculate.
7    A.   But I'm not speculating now.  I'm reading
8 here.  I have two letters from Jim Garavaglia and
9 one to Richard Frank.  The one to Richard Frank is
10 specifically here.  And instead of it saying some
11 impropriety, it says some serious fiscal
12 improprieties, which is obvious that was written
13 after Mr. Richard Frank asked for Chana to write it.
14 And in both cases, I'm signing it.  And these are my
15 original signatures.
16    Q.   All right.  So are you saying that having
17 read that, it refreshes your recollection that that
18 was what Richard Frank was referring to is the
19 letter to him requesting --
20    A.   What I'm saying, it looks clear to me as I
21 read it today.  But if you're asking me to recall
22 three years ago specifically, I cannot do that.  But
23 I can look here today in front of my eyes and read
24 where Richard Frank is asking for two words to be
25 added to a letter that would be sent to him.  And I

1 can see clearly that that letter was prepared by my
2 assistant and signed by me and sent to Richard
3 Frank.
4    Q.   Going back to the top portion of this
5 e-mail.  Okay?  I read it into the record already.
6 So I'm going to address it again briefly in that was
7 this the point in which the Director of Personnel
8 authorized Jim's placement on forced leave for a
9 second time?
10    A.   Is it stated in the e-mail?  Is that your
11 question?  Is it stated?
12    Q.   I'm asking you if that's when that
13 happened.
14    A.   You're asking me about what somebody else
15 did?  I want to be clear to understand your question
16 so I can answer it properly.
17    Q.   If you don't know, that's fine.  My
18 question is, is that your understanding?
19    A.   My understanding is that we received the
20 e-mail from Richard Frank, that he did authorize the
21 forced leave.  So we did receive the authorization,
22 is what my understanding is.
23    Q.   All right.  If you go back to the
24 letter -- sorry -- the e-mail that I addressed
25 earlier, again that is the one at 2:25 p.m.  So

1 59 minutes before Rick Frank sent that out.  Was the
2 letter then hand delivered to Jim an hour before it
3 was approved by Richard Frank?
4    A.   E-mail says:  Mr. Frank, please see the
5 attached copy of the letter delivered today to
6 Mr. Garavaglia.
7         And that's the e-mail you're asking
8 me to answer.  And it appears that this e-mail is
9 stating that a letter was delivered to
10 Mr. Garavaglia.  So I would believe.  Of course, I'm
11 not recalling, because I can't recall and was not
12 privy to the delivery personally.  In other words, I
13 did not deliver it personally.  But I can by this
14 e-mail have an understanding today.  But that's not
15 your question, though.
16    Q.   I think that's a fair answer.
17         And what was delivered, would you
18 agree, is the notice to Jim that he was being placed
19 on forced leave for a second time?
20    A.   I would have the understanding it would be
21 the letter that was addressed to Jim Garavaglia.
22    Q.   Right.  But that provides notice he's
23 being placed on forced leave?
24    A.   And addressed to him as well.
25    Q.   Okay.  Other than counsel -- I want to

1 make clear, I don't want you to answer that portion
2 of it -- did you have a discussion with anyone else
3 besides Linda Thomas and/or Richard Frank related to
4 this process?
5    A.   No.
6    Q.   No.  All right.  I want to go back briefly
7 and then we can move on to -- I need to find it.  So
8 just be patient with me, please -- an e-mail on
9 Wednesday, July 17.  We've already discussed it
10 briefly.
11         MS. HAMILTON:  Where are you?  I'm sorry.
12         MR. SCHMITZ:  The e-mail that we discussed
13 earlier from Linda Thomas to Rick Frank.
14         MS. HAMILTON:  Okay.
15         MR. SCHMITZ:  Wednesday, July 17, 2019 at
16 2:35 p.m.
17         (By Mr. Schmitz)  I think these should have
18 had Bates stamps on them, but it's looking like they
19 got cut off.  So I apologize for that, because that
20 would make it easier.
21         MS. HAMILTON:  Well, let's make sure
22 everybody's there.  It's right after the
23 certified mail slip.
24         MR. SCHMITZ:  Yeah.  It looks like a
25 photocopy of a green card, certified mail green

1     card. It's the page directly after that.
2        MR. NORWOOD: Okay. I'm there. Are you
3    there? Everybody's there.
4     Q. (By Mr. Schmitz) So my question to you
5    simply is, factually, do you have knowledge about
6    the last sentence which states to Rick: Wanted to
7    get this to you while my mind is still fresh in what
8    I said, so people don't misquote me. And you know
9    who I mean.
10       Do you know personally who she's
11   referring to?
12     A. No.
13     Q. No. Okay. Was that discussed at any
14   point with either Linda or Rick?
15     A. No.
16     Q. Okay. All right. I'm going to go forward
17   again. I'm going to jump to August 12, 2019.
18   First, there's an e-mail that says James Garavaglia,
19   a 30-day extension. And then the next page after
20   that has a letter dated August 12, 2019 from you
21   addressed to Richard Frank.
22       Do you see what I'm talking about?
23     A. Yes.
24     Q. Okay. The attached -- the next page of
25   that letter is the letter that was attached to that

1   e-mail on August 12?
2     A. Yes.
3     Q. All right. And --
4       MR. NORWOOD: Just for the record, at
5   least this one has a Bates stamp, I think we're
6   talking about Garavaglia 344. Is that what
7   we're talking about?
8       MR. SCHMITZ: Yeah, 344. The page before,
9   the e-mail does not.
10      MR. BLANKE: I think they all had Bates
11   stamped, but they got cut off.
12      MR. SCHMITZ: The ones that had the City
13   ones were probably a little bit lower and got
14   cut off in the copying.
15      MS. HAMILTON: It's hard to be sure about
16   what's here, the way that these are labeled.
17      MR. SCHMITZ: That's why I think we're
18   trying to be pretty clear for the record. This
19   is marked Garavaglia 344.
20      MS. HAMILTON: I don't think it's clear.
21     Q. (By Mr. Schmitz) Do you see where I'm
22   talking about, the letter?
23     A. Yes. I said yes.
24     Q. Okay.
25     A. Oh, no. I said yes.

1     Q. I just wanted to make sure that was still
2   the case after your attorney asked that question,
3   so.
4       So you were asking now for a 30-day
5   extension?
6     A. Yes.
7     Q. All right. Why did you ask this at this
8   time?
9     A. I asked for this extension and additional
10   time, because I had not heard from the auditor.
11     Q. All right. And why did you not seek or
12   issue -- Strike that.
13      Why did you not issue a notice of
14   pretermination at this time?
15     A. I asked for this extension, because I had
16   not heard from the auditor. And I had preference --
17   or preferred that I hear a response from the
18   auditor.
19     Q. Did you believe at this point in time that
20   you had a sufficient basis to request termination?
21     A. Well, that wasn't my concern. My concern
22   was to have a complete picture of the situation that
23   we had and have a complete picture of my problem.
24   And I thought that with the auditor's input, I would
25   have more clarity and I would have more information.

1   So I wanted to have the auditor's input. And so I
2   did discuss this with Linda Thomas and Richard
3   Frank. And then this extension was requested. And
4   it was later rejected. But it was requested because
5   I wanted the information. And I had not heard back
6   from the state auditors.
7     Q. Had you made your decision as to whether
8   or not you were going to seek termination?
9     A. No. I had not made a decision.
10     Q. All right. I'm going to fast-forward
11   to -- let me find it. It's near the end. It's a
12   letter dated August 28, 2019 from you to Richard
13   Frank.
14      MR. NORWOOD: Towards the back. A little
15   bit further.
16     A. To Mr. Garavaglia?
17     Q. (By Mr. Schmitz) No, no. This is to you
18   from Director Frank.
19     A. Director Frank? One page over. No. The
20   other way.
21     Q. Okay. Do you have it?
22     A. Yes. I have the letter.
23     Q. Do you know or can you tell me why you
24   wrote this letter? Why did you withdraw your
25   request for forced leave on August 28, 2019?