1   A.   That I was preparing for the hearing, a
2  pretermination hearing.  This letter was to request
3  the withdrawal of forced leave in preparation for
4  setting a hearing date.
5   Q.   Okay.  Were you aware there had been a
6  Civil Service Commission hearing scheduled for the
7  following day, August 28, 2019, regarding his forced
8  leave, Jim's?
9   A.   No, I'm not sure I was aware.  I don't
10 recall being aware of that.
11  Q.   Were you aware a motion had been filed in
12 advance of that hearing seeking a motion for
13 continuance --
14  A.   Yes.
15  Q.   -- on the 16th of August seeking to
16 continue the Civil Service Commission hearing date?
17  A.   I believe I may have been advised by
18 counsel.
19  Q.   Were you aware that the hearing officer
20 had denied a request for continuance?
21  A.   I believe I was advised by counsel.
22  Q.   When you did make the decision to
23 terminate Jim?  Was it on August 28?
24  A.   I made the decision to have a
25 pretermination hearing.  And I made the decision to

1  have the hearing prior to putting the letter
2  together.
3   Q.   And why did you make that decision on that
4  date?
5   A.   A pretermination hearing would afford me
6  the opportunity to hear from Mr. Garavaglia and to
7  hear from his point of view as he would explain to
8  me his actions, his misconduct, the reasons why he
9  was dishonest with me on several occasions.
10      And then of course after the hearing,
11 I would have two weeks, according to civil service
12 rules, to render a kind of discipline that would be
13 appropriate after hearing from him.  That it would
14 have been unfair to only have one side of the story
15 inserted into a decision for discipline.  And I did
16 not choose to make a one-sided decision for
17 discipline.
18      Mr. Garavaglia had served the City
19 for more than 30 years.  And as his supervisor, I
20 recognized and honored the time spent on the job.
21 And so pretermination hearings afford not only the
22 employee but the supervisor to have a sit-down in a
23 formal manner to get an understanding as to what
24 happened from both sides point of view.
25  Q.   Did you not believe that that opportunity

1  would have also presented itself at a Civil Service
2  Commission hearing?
3   A.   What I believe is that a hearing, whether
4  it be a civil service hearing, which I never denied,
5  or had any actions, those civil service hearings --
6  and I want to answer completely, because I believe
7  you're speaking about the civil service hearing that
8  you asked for, that you made him appear for as his
9  attorney.
10  Q.   Yes.  The one specifically --
11  A.   I was not against that.  I was ready to
12 go.  I was ready to sit down with whoever made it.
13 But I'm not counsel.  So I'm not able to discuss
14 with you matters that counsel understand.  I
15 understood civil service rules for my understanding
16 of a pretermination hearing.
17      I am not aware when counsel from the
18 City would have necessarily advised or not about a
19 civil service hearing that didn't come to fruition.
20 Had there been one, I would have been there.  There
21 obviously was not one there.  In other words, I
22 wasn't advising counsel.  Counsel was advising me.
23  Q.   So are you -- were you aware that
24 withdrawing the request for forced leave would
25 operate to end the appeal?

1   A.   I had no idea.
2   Q.   You don't know?
3   A.   I believe I understand that you believe
4  that I have knowledge or privy to knowledge that I
5  don't have.
6   Q.   I'm not telling you what I believe.  I'm
7  just asking you a question.
8   A.   Then I'm telling you that I don't know
9  about whether you believe or I believe that there
10 would have been or not been a hearing but for the
11 letter.  I don't know that.
12      What I know is the letter came.  I
13 wrote the letter.  And I made a decision to have a
14 pretermination hearing.  But I don't know if there
15 was consultation from counsel to me about a civil
16 service hearing.  I do not recall if there was a
17 back and forth there any way whatsoever.
18      And I would not have stopped or
19 caused counsel to stop a hearing of any kind to hear
20 the other side of Jim Garavaglia, because that was
21 necessary.  I was trying to get there with my
22 pretermination hearing.
23      Counsel at the time was working with
24 counsel.  And that would have been your office as
25 counsel and the Office of City Counselor at the

1 time. And there may not have been perfect
2 coordination of efforts on behalf of my office and
3 the office and your office.
4     Q.   Are you saying that because you have
5 factual knowledge of that or are you speculating?
6     A.   I'm saying that because I saw a lot of
7 papers flying back and forth. And I was
8 unknowledgeable of what all was going on at the time
9 except for the fact that I wanted to sit down and
10 have a hearing. And I thought it was very urgent
11 and important to do so.
12     MR. SCHMITZ:  Want to take a break?
13     MR. NORWOOD:  Yeah.
14     (Whereupon there was a short
15     break, 3:57 p.m. to 4:21 p.m.)
16     MR. NORWOOD:  The witness had a
17 clarification on one of the questions. So if
18 you want to clarify regarding your discussions
19 with folks about the forced leave. I mean, who
20 you would have communicated with.
21     A.   Oh, yeah, that's right. You had asked the
22 question regarding whether I communicated with
23 anyone else besides counsel. And I --
24     Q.   (By Mr. Schmitz)  Just so I'm clear, which
25 time or in reference to what?

1     A.   In reference to letters and e-mails
2 regarding forced leave. And there was a question
3 you asked regarding communication with anybody, that
4 I would have had communication with anyone regarding
5 the forced leave, withdrawals for forced leave,
6 anything at all. And I said in my answer, Linda
7 Thomas and the Personnel Director. And I may have
8 also discussed with Judy Armstrong, who is the
9 appointing authority for personnel.
10     Q.   Is that all you wanted to clarify then?
11     A.   Yes. Because I would have needed to add
12 her as someone that would have been in discussion.
13     Q.   Thank you for supplementing it.
14     MR. SCHMITZ:  Did you pass P over there
15 already?
16     MR. NORWOOD:  Yeah.
17     (Whereupon Exhibit P was marked
18     for identification.)
19     MR. NORWOOD:  We're done with those.
20     MR. SCHMITZ:  I don't know if I'm going to
21 circle back or not, but we're done for the
22 moment.
23     Q.   (By Mr. Schmitz)  All right. So now I'm on
24 P. It starts with an e-mail chain entitled Muni
25 Court Building. Do you see that?

1     A.   Yes.
2     Q.   Do you recognize this e-mail chain that's
3 on this first page?
4     A.   Yes.
5     Q.   Okay. Do you know what this e-mail chain
6 is discussing or what it relates to?
7     A.   Yes.
8     Q.   Okay. Can you tell me?
9     A.   On this first page, this e-mail chain is
10 Beverly Fitzsimmons corresponding with Jim
11 Garavaglia as to whether or not he has told me about
12 the extension for the real estate project. Beverly
13 is admonishing Jim Garavaglia, because she is
14 stating to him that he had told her that I was okay
15 with it. As she states, You had told me she was
16 okay with it. Is what I'm reading here that Beverly
17 Fitzsimmons is saying to Jim in an e-mail.
18     Then she's telling him that she --
19 and the "she" is referring to myself -- she told me
20 that she was not. Did you work this out with her
21 yesterday?
22     And then Jim is replying to her:  I
23 did not talk with her about it, but I will.
24     And then Beverly is responding:
25 Please do it soon, because Stephanie is trying to

1 finish the agenda.
2     And the agenda she's referring to is
3 E&A. This was the Tuesday before E&A. This would
4 have been at 8:40 in the morning when this
5 conversation ended.
6     Q.   When was E&A?
7     A.   Wednesday, the next day.
8     Q.   Okay. Did you discuss this with Jim on
9 that date?
10     A.   On Tuesday?
11     Q.   Yes.
12     A.   I believe Jim called me on the day after
13 he had this discussion with Bev.
14     Q.   So the day of the E&A?
15     A.   He called me on the Tuesday after he
16 discussed on that same Tuesday morning after Bev
17 asked him to discuss with me. And he did say that
18 he would. And then he called me.
19     Q.   All right. And what did he tell you
20 during that phone call?
21     A.   I don't recall the exact conversation but
22 it was something to the effect that the mayor's
23 office wanted to put documents for the extension on
24 E&A. And I thought that was really odd and strange
25 since the project was the project from the

51 (Pages 198 - 201)

1 comptroller's office of which Jim was the leader of
2 the project from its inception even when he was the
3 asset manager.
4 So I was listening to Jim at this
5 point to hear what else he was going to say after
6 saying that to me. I was like hm-hm, that was kind
7 of like not what I would hear when he finally called
8 me the day before E&A. Oh, Comptroller, the mayor's
9 office is going to put this on as an item. Do you
10 want me to send them the documents?
11 Another strange thing out of the
12 ordinary, send them the items. Jim, I think you
13 already sent them the items, is what I already knew
14 as a fact. That's when you had pre E&A, which is a
15 week earlier. The Wednesday before the Wednesday
16 meeting, you discuss with people what you want to
17 add to the agenda. And by that Tuesday before,
18 Beverly had already informed me that this item was
19 being added or attempted to be added by Jim.
20 So that's why she was having the back
21 and forth with Jim, because I needed to hear from
22 Jim because Jim was in charge; not Beverly. This is
23 a direct example of how two deputies must coordinate
24 and communicate together in order -- as a team.
25 This is team comptroller's office. And we're in

1 charge of this particular project. And so both
2 deputies needs to have an understanding that this is
3 a go or it's not. And Jim was the No. 1 person with
4 that knowledge.
5 Beverly could not usurp his knowledge
6 in any way, shape or form as the Muni Court project,
7 because she was working with the attorneys on both
8 sides. That would be Tom Ray representing the City
9 and that would be the Spencer Fane attorneys
10 representing the developers. Jim was all in the
11 mix. And he was supposed to inform me as the
12 comptroller, as well as any other person in the
13 comptroller's office, that had anything to do with
14 helping this project come along.
15 Q. Did you ask -- did you ask him why he had
16 waited that long to talk to you?
17 A. I listened to Jim on the call, on the
18 Tuesday morning call where he called me and told me.
19 He is telling me the mayor's office wants to put
20 this on the agenda. Comptroller, show us in the
21 document. I was stunned. I believe, but not sure,
22 that I may have said to him something to do with the
23 taxes. But I don't know if I said that, because
24 that was what was on my mind.
25 That was what I was unclear as to

1 whether there had been tax clearance. I don't know
2 if Beverly knew. What I did know is that the
3 conversation with Beverly and myself was we're not
4 sure what's going on with the project. And I
5 couldn't -- she couldn't tell me. I said, I don't
6 know, because I haven't heard from Jim.
7 Q. Did you ask him?
8 A. I didn't ask Jim to do anything except
9 when he asked me, shall I send the documents to the
10 mayor? I said, send the documents to me. Now --
11 Q. When did you talk to Bev before that?
12 A. I talked to Bev probably right before she
13 talked to Jim. Because I told her that I hadn't
14 heard from Jim. She asked me had I heard from Jim.
15 No, I haven't heard from him.
16 Q. Did you follow up with Jim to ask him
17 those questions?
18 A. Jim called me.
19 Q. Right. I know. But before that.
20 A. Beverly asked me -- and I'm trying to
21 answer, because you asked me did I follow up with
22 Jim. And I think you asked me after I talked to
23 Beverly.
24 Q. Correct. Before he reached out to you?
25 A. No.

1 Q. Okay. Did you attempt to?
2 A. Not at 9:30 in the morning, not at 8:00 in
3 the morning, no, I did not. This is before E&A.
4 Most likely I -- it is my practice to be discussing
5 the agenda with the E&A secretary as to what we
6 already have ready for her to assemble, which is the
7 same conversation that Beverly's having with Jim.
8 She's telling him, hurry up,
9 Stephanie wants to get the agenda out. Stephanie,
10 as is practice, is talking to the comptroller about
11 the agenda. We have these items, Comptroller,
12 checkmark, checkmark, on the agenda. There's at
13 least the first three items that are from the
14 comptroller. We want to make sure we have all of it
15 in order.
16 Beverly is the pre-E&A person as
17 designated. Each person that is an E&A person has a
18 designee. Beverly is my designee. Tom Shepherd is
19 the designee for the president of the board. And at
20 the time, Tom Waelterman was the designee for the
21 mayor. Those three designees had met a week earlier
22 on a Wednesday or a Thursday sometimes to discuss
23 all these items for the agenda. Other items can
24 come and have come on the Friday or the Monday
25 before E&A.

1    Q.   And did some items get removed as well?
2    A.   We're talking about the agenda?
3    Q.   Uh-huh.
4    A.   You're saying removed.  So I'm confused as
5  to do you mean removed from the process or removed
6  from the agenda?
7    Q.   The preliminary agenda.
8    A.   That is the --
9    Q.   Just so I'm clear, I'm not trying to
10  interrupt you, but I want to understand what you're
11  saying.  So you said they meet a week before.
12  There's a pre-agenda item list generated.  Then you
13  said sometimes additional items are added in the
14  week between that meeting and the actual E&A
15  meeting.  So you asked -- or you said I added.  And
16  I said, are items also removed sometimes during that
17  week period?
18    A.   Now, those would be discussions with the
19  pre-E&A members.  For those items that are brought
20  to the table and in terms of staying or going, you
21  could use the term "removal" for the ones that are
22  going away and not staying as an agenda item.
23    Q.   Okay.
24    A.   I guess you're trying to make a conclusion
25  that I'm not there for, if that makes sense.

1    Q.   No.  I'm not trying to make any
2  conclusions.
3    A.   You asked me what do the E&A people do,
4  and I'm giving you my best answer as to what they
5  do.  They are considering the items.  Some of them
6  will be E&A items.  Some of them you won't see as an
7  E&A item.  So is it fair to say that they were
8  removed?
9    Q.   Well, you characterized it --
10    A.   They were considered.  And whether or not
11  they were removed, that's --
12    Q.   You used the word "added."  So I used the
13  word "removed."
14    A.   You sure did.
15    Q.   You corrected that, and that's fine.  I
16  think I understand what you're saying.
17    A.   Thank you.
18    Q.   I understand it's not something you
19  directly have a hand in, but I believe you are at
20  least familiar with the process since you were
21  talking about it at length.
22    A.   And I really wasn't finish.  If you would
23  like me to finish, I will, but if not.
24    Q.   Sure.  Continue.
25    A.   I did say that there are items added in

1  the Friday and the Monday.  Not a week, but in those
2  two days before.  Because there's only one week
3  before the pre-E&A.  Not two weeks; one.  I became
4  aware from Beverly that Jim was wanting to add the
5  Muni Court.  But I hasn't heard from him myself
6  personally.  So I was not aware personally.  Because
7  I had not heard from him on the Wednesday or the
8  Thursday or the Friday or the Saturday or the
9  Sunday.
10        THE COURT REPORTER:  Slow down a little
11    bit.
12    A.   I heard from him on the Tuesday, but he
13  didn't tell me on the Tuesday that he was adding the
14  item.  Even when he sent an e-mail after the fact,
15  he did not tell me.
16    Q.   (By Mr. Schmitz)  When you say you learned
17  he wanted to add it, how did you learn that?
18    A.   I learned it from Beverly.  The ones that
19  I would expected to learn it from.
20    Q.   Did you ask him if that was something he
21  wanted added?
22    A.   So here's what I did:  I communicated with
23  the pre-E&A person, okay, that's Beverly, to find
24  out about all of the items of pre-E&A.  Jim has
25  spoken to me earlier in the month of June about the

1  item.  And that's the Muni Court item.  Jim had told
2  me earlier in the month, the first week in June,
3  about the item and the extension that he thought was
4  coming.  He said, Comptroller, I don't think it's
5  going to go.
6        From that first week, I didn't hear
7  anymore from Jim about the item.  Now, that's
8  important, because the item was time sensitive.  Jim
9  is deputy director -- deputy comptroller for Finance
10  & Development in charge of this project, not the
11  mayor's office, not SLDC.  The comptroller's office
12  under the direction of Jim Garavaglia, who's worked
13  consistently with this item.
14    Q.   What information do you know about --
15    A.   And as I complete my -- before you start,
16  I heard from Jim on the Tuesday before E&A which was
17  the second time I heard from him about the item.  So
18  I'm done with my response.  I heard from him the
19  first week of June.  And the second time I heard
20  from him was the day before E&A.  In the meantime, I
21  was hearing from Beverly about the item.
22    Q.   Okay.  Are you done?
23    A.   Yes.
24    Q.   All right.  Do you have any knowledge that
25  things change quickly in those final days before the

1 E&A meeting?

2    A. Absolutely. And that is why I should have
3 been updated and kept in the loop by Jim about the
4 item on a regular basis. On a day-to-day basis,
5 sometimes hourly, sometimes every minute, because
6 this was a time sensitive item. So Jim had
7 information about the item and whether it had to do
8 with the taxes, whether it had to do with a default.
9 The comptroller should have been updated about that,
10 but I was not.

11    Q. What basis do you have to believe that he
12 had concrete information to give you?

13    A. The basis is having looked at these
14 e-mails, in particular the ones from Beverly who is
15 insisting that he speak with me, because I'm telling
16 her from the knowledge that I had earlier because
17 Jim had already told me, hey, I don't think it's
18 going to go. So what does Beverly know? She
19 doesn't have the knowledge that Jim knows. I know
20 that as the comptroller, because I know what he has
21 put into the project. She hasn't.

22    So if he knows that this is something
23 that should go, then why don't I know as the
24 comptroller of the City of St. Louis. I should be
25 well-apprised of the activities of this particular

1 project. And that should have come from Jim
2 Garavaglia, because it couldn't come from Beverly.
3 Had she had knowledge of it, I believe she would
4 have told me about the deal and whether it should
5 go. But her answers to me were only, Comptroller, I
6 don't know, I don't know, I don't know.

7    So I said, Well, I'll hear from him.
8 I'll hear from him. Because in that month, we had
9 the closing of the refinancing of the airport deal,
10 which was highly volatile. We also had this deal,
11 which I thought was not volatile at all, because we
12 had been working on it so diligently for so long.
13 Tom Ray, who was the outside professional attorney,
14 was very diligent in handling anything and
15 everything that had to do with this deal.

16    As I look back and see e-mails from
17 Tom Ray regarding this deal, he's the one that
18 helped protect the integrity of the office when it
19 came to making sure this deal came to fruition when
20 Jim did not.

21    Q. What do you know about the other attorney,
22 not Tom Ray, the developer's attorney?

23    A. Denny?

24    Q. Right. Requesting to the mayor's office
25 that the item be added to the agenda?

1    A. I don't know anything about that. I don't
2 know that Denny requested to the mayor's office that
3 it be requested, because I do know that Denny knows
4 that Jim Garavaglia controls the project. So if
5 Denny was asking the mayor's office, then there
6 would have probably been a problem that Denny
7 suspected that was in my office.

8    Q. Why would Denny ask for the mayor's office
9 to put it on the agenda if there was a problem?

10    A. I don't know why Denny asked the mayor's
11 office or would ask the mayor's office. Because I
12 do know that Denny would have full knowledge that
13 Jim Garavaglia was in charge of the project. I do
14 know that.

15    And I do see e-mails throughout, you
16 know, having gotten to this point in this lawsuit,
17 e-mails dating back throughout the month of June.
18 Correspondence between Denny and Tom and Jim. Denny
19 and Tom and Jim and not the mayor. All the way
20 through pre-E&A and up to pre-E&A and beyond E&A
21 after the approval. Those e-mails did not include
22 the mayor's office. That's what I know. That's why
23 I have knowledge about it.

24    So I would not know why or have any
25 knowledge or have ever read anything that made a

1 statement suggesting that Denny would have asked the
2 mayor to put the item on the agenda. I do not have
3 knowledge of that.

4    Q. Do you know why the mayor put the item on
5 the agenda or even wanted to?

6    A. I'm unaware that the mayor put the item on
7 the agenda. What I am aware of is that there was an
8 attempt by the mayor's office to add an item by
9 posting an item from the mayor's office onto the
10 comptroller's website about an additional item.

11    Q. Do you know why they did that?

12    A. I don't know why she did that. But I'm
13 aware that it happened. And that when it happened,
14 the person in charge of the website for the
15 comptroller took steps to remind the mayor that this
16 was -- mayor's office, that the website was the
17 comptroller's website.

18    Q. Okay. But that was something that the
19 mayor's office initiated, correct?

20    A. I'm not sure who initiated it. But I am
21 aware that there was an attempt.

22    Q. Well, how do you know about the web
23 developer's response? Who told you that?

24    A. Web developer, I never spoke about a web
25 developer. I spoke about the person in charge of my

1 website and the comptroller's office.
2    Q. What's that person's title?
3    A. That's Tyson Pruitt, who is the public
4 information officer, in the Office of the
5 Comptroller, reports to the comptroller. He became
6 aware of a posting. Then he made me aware of that
7 posting. Then he told me that he was going to take
8 care of it.
9    Q. Okay. Did he tell you where that came
10 from?
11    A. He told me it came from the office of the
12 mayor.
13    Q. Okay. And how did he know that?
14    A. Because he is the computer communications
15 person, and I believe he made inquiries, proper
16 inquiries, to determine where the posting came from.
17    Q. Okay. But you don't know who those
18 inquiries were to?
19    A. I did not ask him who he inquired. I
20 would believe he would have to check with web
21 people, web communications type IT people. So that
22 they could identify who made postings.
23    Q. Did you ever talk to Bev about all of this
24 after the fact, after the E&A meeting had taken
25 place?

1    A. I did.
2    Q. What did she tell you of that meeting?
3    A. After the meeting had taken place, and I
4 spoke to her the next day, because I had never
5 heard a mayor -- any mayor read e-mails of -- of an
6 employee of other E&A member's office. I was
7 stunned. Bev told me she was stunned. And we were
8 both embarrassed. We spoke on the phone about that.
9    I said: Bev, talk to me about this
10 e-mail that we didn't see or I didn't know about.
11    She said: Oh, yeah. There's an
12 e-mail thread among pre-E&A.
13    I said: Oh. What about it?
14    And she explained. In her
15 explanation, she made me to understand that when
16 there's pre-E&A items come to the table of E&A and
17 then there are e-mail discussions back and forth as
18 to what's presented and what the other offices think
19 about it and they take time to comment.
20    And so I asked her to send them to
21 me. I said, send them to me so I can see what
22 you're talking about. When I saw the e-mails, I did
23 see where discussions had been between the E&A
24 members, and in particular I'm talking about this
25 item, the president of the board had decided that he

1 did not want to hear the item.
2    The item was sent from Jim, I believe
3 it was the Friday, the 14th, to the pre -- to
4 Beverly, who is my pre-E&A person, and asking her to
5 add it. And then she immediately sent it to the
6 other members, Tom Shepherd and -- which represents
7 the president of the board, Tom Waelterman, who
8 represents the mayor, for consideration. Her words
9 were something like, here's this extension again.
10 That was the Friday or Monday. The president of the
11 board's office responded, we don't think we want to
12 see this item at this time.
13    The mayor's office from Tom
14 Waelterman, I don't believe there was a response.
15 And that is how I learned or at least part of how I
16 learned how the mayor got the e-mails that she read,
17 because automatically they would have come to the
18 mayor's office and president of the board's office,
19 because Beverly sent the item that Jim had requested
20 be placed on the agenda.
21    And so that's how I learned about the
22 e-mail that the mayor did.
23    Q. And it's your contention that you believe
24 the item was not going to be on the agenda at that
25 time?

1    A. I wasn't sure about that, because I hadn't
2 heard from Jim. And that's very sincere. I didn't
3 know. I even told Beverly prior to the meeting, I
4 was like, Beverly, I don't know. I haven't heard
5 from Jim. I don't know what's going on. And I
6 needed to hear from Jim. I needed to be in the
7 loop. I needed to be updated about the item,
8 because I was hearing that there were problems. In
9 fact, Jim had said earlier in the month, I don't
10 think it's going to go.
11    So those words were still with me in
12 the month of June. This is the month of June. We
13 haven't even gotten to the middle of June. The
14 first, second week of June, I had traveled to
15 Chicago I recall. I had to talk about financing of
16 municipal jails. We had financed a jail 20 years
17 earlier. I was asked to speak about that. So I
18 know in the first week of June, that kind of thing I
19 was doing, among the other big ticket item which was
20 the airport refinance of which the mayor was asking
21 for lots of explanations and answering questions.
22    So I had a lot on my plate in terms
23 of what I was working on in addition to this
24 particular Muni Court item. This was a big item.
25 That those things were big. And this was between, I

1 guess, the first week in August. And I guess you
2 get to the third week, which is the third Tuesday --
3 I mean the third Wednesday, which is when the E&A
4 meeting occurred.
5      But prior to the regular E&A, the
6 mayor called for an E&A meeting on June 11, which we
7 previously talked about. So I prepared for that
8 meeting. And then chose not to go because of the
9 airline situation of which the airlines was
10 displeased with the mayor having stated that she
11 would have a special meeting to vote on the
12 refinancing. They were very displeased. So that
13 was also in play in that time period.
14      And as I was sitting with Jim on that
15 day, Jim never discussed with me any updates that he
16 would have had about the Muni Court project. He had
17 all the opportunity in the world. He had my full
18 attention on June 11 to talk to me about the Muni
19 project whether or not they had paid their taxes,
20 whether or not he thought the deal was going to go,
21 whether or not he wanted to put it on E&A. He did
22 not ask me. That was June 11.
23      And I'll finish so that you can
24 start.
25      Q.  You're saying he talked to you earlier in

1 the month. And now you're saying way back on
2 June 11, he had an opportunity to talk to you.
3      A.  I said earlier in the month --
4      Q.  What date was that?
5      A.  That would have been the first week in
6 June.
7      Q.  Why do you think that he had new
8 information to give you as of June 11?
9      A.  I am saying that if he had information on
10 that date, I was available.
11      Q.  Okay. But you don't know if he did or did
12 not?
13      A.  I stated I did not know anything. What I
14 do know is he didn't talk to me about it. I'm not
15 aware that he had information or that he did not
16 have information. I am aware that I was available
17 and made myself available. We were face-to-face.
18 And I'm aware that nothing from Jim about the Muni
19 Court project was talked to about on that day while
20 we were in a meeting.
21      Q.  Were you unavailable at other times in
22 that month?
23      A.  I was in Chicago at a conference that I
24 just spoke to you about. That would have been the
25 first week -- between the first and second week of

1 the month of June. And there were other times where
2 I did not hear from Jim by phone, by text, or by
3 face regarding this project. We were in discussions
4 about other items like the airport refinancing that
5 I can recall.
6      Q.  You had mentioned that you talked to Bev
7 about this before talking to Jim. But you also said
8 Jim was the person that should have firsthand
9 knowledge. So why did you talk to Bev instead of
10 Jim?
11      A.  Because Bev is the E&A person who is
12 charged with making sure the items go on the E&A
13 agenda and Jim is not. Jim would have been the one
14 who provided the item to Beverly. And once she got
15 the item, right, wrong or indifferent, it would have
16 gone on the E&A, if the E&A members all approved --
17 pre-E&A all approved, it would go on E&A.
18      It was up to Jim to make sure that
19 she was in discussions with his supervisor, which is
20 me, the comptroller, about the item to make sure
21 that it was A-OK to go on the agenda. Because I am,
22 as well as he and those he had talked to about the
23 item, the developer, Tom Ray and others, I would be
24 in the loop to know that this deal was A-OK and
25 ready to go.

1      Q.  So this miscommunication here, which you
2 still got your answers the day before E&A as we've
3 testified, what policies does that violate in your
4 opinion?
5      MS. HAMILTON:  I would object that that
6 mischaracterizes the witness' testimony.
7      But to the extent you want to answer the
8 question, you can answer.
9      MR. NORWOOD:  I join in that objection and
10 also think it might call for a legal
11 conclusion, but subject to that.
12      A.  Well, as I understand the question, I
13 never told you that there was any violation. And I
14 never told you there was a miscommunication. I
15 never said that. You're injecting that now.
16      Q.  (By Mr. Schmitz) Do you consider it a
17 violation?
18      A.  And I never told you I consider it a
19 violation. What I consider is insubordination for
20 an employee of mine who had direct instructions to
21 keep me in the loop as the deputy comptroller for
22 Finance & Development, and I was not kept in the
23 loop.
24      In addition, on the Tuesday, I
25 believe there was -- I was spoken to with

1 misinformation. That's different from
2 miscommunication. I was directly communicated with,
3 with dishonesty. I was told a lie on that phone.
4 Q. You said you believe. So why do you
5 believe that?
6 A. Because his words were: The mayor wants
7 to add the item to the agenda. Do you want me to
8 send the documents to the mayor's office? I had to
9 consider what I knew to be true versus what he was
10 saying to me on the phone. They didn't connect.
11 Q. What did you know to be true?
12 A. What I knew to be true from Beverly was
13 that Jim was adding the item. He's telling me that
14 the mayor's adding the item. So I didn't know who
15 to believe. Remember, this is at 9:00 something in
16 morning.
17 Q. So you're saying --
18 A. Later on in the day -- I'm answering the
19 question as fully as I can, because it does sound
20 strange here. But these are the facts.
21      I heard from Beverly. Then I heard
22 from Jim. Then I heard from Tyson Pruitt who's
23 telling me the mayor's posting. So now what Jim is
24 saying at 9:00, I'm hearing from Tyson later in the
25 day, that there's this posting.

1 Q. Well, that tends to suggest that it's
2 true, does it not?
3 A. It suggests in the moment that I'm hearing
4 from Jim, and he's not telling me anything at all
5 about him adding the project, he's telling me about
6 the mayor. I hadn't heard from him about his
7 activities. He's my employee. I need to hear your
8 activities. I don't want you to tell me about
9 somebody else that's not in our office. You're on
10 our team. What are you doing with regard to this
11 project? Like I had heard in all the months in the
12 past.
13      Every single time prior to this time,
14 Jim had updated me properly. And I had proper
15 information when this item -- this, as a matter of
16 fact, is probably the third extension. The other
17 two extensions, I had no problems hearing from Jim
18 about why this project should go on the E&A or not.
19 Beverly never informed me about whether the project
20 should go on the agenda or not. It was always Jim.
21      As a matter of fact, if you look at
22 the agendas, you will see that it's coming from
23 deputy director -- I mean deputy comptroller for
24 development, Finance & Development. That's who
25 places it on the agenda. And those discussions then

1 have to be had between the supervisor, which is me,
2 Comptroller Green, and deputy comptroller, which is
3 Jim, had been had. First time it was put on the
4 agenda. Second time it was put on the agenda for
5 this. And this third time, I don't know what
6 happened.
7 Q. Again, the claim that the mayor -- you're
8 saying that that was a lie, that the mayor wanted to
9 put -- I'm not hearing any evidence. Whether Jim
10 wanted to add it or not, how is that evidence that
11 the mayor's office didn't also want to add the item?
12 A. It's evidence because -- or what I heard
13 in the early hour was contrary to what I knew at the
14 early hour. Notwithstanding all of what Jim knew.
15 Q. What did you know about the mayor's office
16 adding it to the agenda at that early hour?
17 A. What Jim told me.
18 Q. Okay. Did you have anything that
19 suggested that that was false?
20 A. Yes, I did.
21 Q. And what is that?
22 A. The knowledge from Beverly.
23 Q. So Beverly had direct knowledge that the
24 mayor's office did not want to add it to the agenda?
25 A. What she had was the knowledge that Jim

1 wanted to add it.
2 Q. Right. So Jim --
3 A. In other words --
4 Q. Hold on. My question is: How is that
5 evidence? Whether or not Jim wanted to add it, how
6 does that mean that the mayor's office subsequently
7 did not want to add it?
8 A. It didn't.
9 Q. You testified earlier that all three may
10 want to add items to the agenda and agree. So I
11 don't understand how that is evidence that the
12 mayor's office did not independently want to add it.
13 A. I never said that they didn't.
14 Q. You said that was a lie.
15 A. I said that I was told that. And it was
16 contrary to what I knew. And that's a fact. I'm
17 restating the fact. At the early hour, I knew from
18 Beverly that Jim was adding it. That's what I knew.
19 I also knew that Jim was telling me at that hour
20 that the mayor was adding it. Those two didn't
21 match.
22 Q. How do you know that --
23 A. So now that I know that they didn't
24 match --
25 Q. How do you know that Beverly's information

1 was up to date? How do you know at the time you
2 spoke to Beverly, the situation hadn't changed --
3     A. Because the --
4     Q. Hold on. Let me finish my question.
5         How do you know at the time Beverly
6 talked to you, the situation hadn't changed such
7 that Jim had decided he was not sure if it should be
8 added or not at that point because things had
9 happened quickly?
10     A. What I knew was, and I'll restate, I knew
11 what Beverly told me and I knew what Jim told me.
12 And they weren't congruent. They didn't match.
13     Q. And Beverly's statements are
14 unimpeachable?
15     A. I can't say whether one or the other in
16 that hour was -- they didn't match. And for me to
17 understand that documents should go to the mayor's
18 office as Jim was asking me to do, I said send them
19 to me. And I was real clear about that.
20     Q. One last thing you said and then I'll move
21 on. You said you did not want to hear from him,
22 anything about anyone from an office outside of your
23 own?
24     A. Well, here's what it is.
25     Q. Let me finish my question.

1     A. Sure. I didn't know that was the
2 question.
3     Q. Okay. I did not -- excuse me. Are you
4 stating, a simple yes or no, whether or not you
5 expected Jim to withhold that information then
6 because it did not come from inside your office?
7     A. That's a confusing question that you just
8 asked me. If you would be more plain, please, I
9 would appreciate it.
10     Q. You stated during your testimony, I don't
11 want to hear about anything from an office that's
12 not this office. So that's my question. Was it
13 your expectation, then, that Jim not bring to your
14 attention information that he received from outside
15 the office?
16     MR. NORWOOD: Well, let me object because
17 that mischaracterizes her testimony.
18         But subject to that, you can answer the
19 question.
20     A. I am real clear on my expectation from my
21 employee, and that is to be updated on a regular
22 basis and kept in the loop about projects at hand.
23     Q. (By Mr. Schmitz) I'm asking --
24     A. That is a simple --
25     MR. NORWOOD: Objection.

1     A. -- if I'm allowed to characterize my
2 answer as you characterize your question.
3     MR. SCHMITZ: This is not my question.
4     MR. NORWOOD: Let me object. She is
5 answering your question and you're cutting her
6 off. And you've been doing it repeatedly. I
7 mean, can she finish the response before you
8 interject?
9     MR. SCHMITZ: Let me be clear. My
10 question in no way called for anything related
11 to what her expectations are as a whole for
12 reporting. My question was very narrow, very
13 specific.
14     Q. (By Mr. Schmitz) And that is, do you or
15 did you not expect Jim to tell you about information
16 he finds out about an office outside of the
17 comptroller? That's it, yes or no.
18     MR. NORWOOD: It's not a yes or no
19 question. Let me object. You just used the
20 word "expectation." And when she used the word
21 "expectation," you're saying you're not asking
22 about expectations.
23     MR. SCHMITZ: I'm not asking her about
24 expectations different than those expectations.
25 I'm not. Those questions have been asked and

1 answered. We're going to be here with
2 five-to-seven-minute responses that go way off
3 topic.
4     MR. NORWOOD: She's not going way off
5 topic. You don't like the responses, is what
6 it amounts to.
7     MR. SCHMITZ: I can tell you the responses
8 are not responsive.
9     MR. NORWOOD: If you want to move to have
10 it stricken after she answers, that's one
11 thing.
12     MR. BLANKE: What if she takes 45
13 minutes --
14     MR. NORWOOD: Let me finish. Now you're
15 interrupting me. Can I make my record? Thank
16 you.
17         You're not allowed to just chop the
18 witness off in the middle of her response when
19 she's answering your question as best she can
20 answer it.
21     MR. BLANKE: But if her answer is
22 nonresponsive --
23     MR. NORWOOD: Then you move to strike it
24 as nonresponsive.
25     MR. BLANKE: But if she wants to continue

58 (Pages 226 - 229)

1  speaking for 45 minutes, we have to sit here
2  and listen to that? Is that what you're --
3      MR. NORWOOD: She's not speaking for 45
4  minutes.
5      MR. BLANKE: Is that what you're saying,
6  though? We cannot stop her for nonresponsive
7  answers?
8      MR. NORWOOD: What I'm suggesting is that
9  there is a procedure and a process. He may not
10  like the answer. He may not believe it's
11  responsive. But he can't simply cut her off
12  before she finishes her answer.
13      MR. BLANKE: Yes, he can.
14      MR. NORWOOD: And the record will show
15  whether or not it's responsive.
16      MR. SCHMITZ: You've made your speaking
17  objection, which has now lasted an extended
18  period of time.
19      MR. NORWOOD: Yes. Because I've sat here
20  and been patient, but this is ridiculous.
21      MR. SCHMITZ: Okay. And again, what did
22  you say the last time about speaking
23  objections, yet you continue to violate that
24  rule over and --
25      MR. NORWOOD: Your speaking objections was

1  counseling the witness on what to say. I am
2  protecting this witness from being badgered
3  because you are cutting her off in the middle
4  of a question [sic].
5      MR. SCHMITZ: We're not going to argue on
6  the record. Are you done?
7      MR. NORWOOD: For now, yes.
8      Q. (By Mr. Schmitz) Can you answer that with
9  a simple yes or no?
10      A. I cannot.
11      Q. Okay.
12          (Whereupon Exhibit Q was marked
13          for identification.)
14      Q. (By Mr. Schmitz) Are you familiar with
15  this document?
16      A. I've become familiar with the document
17  during this process.
18      Q. Just for the record, I'm referring to
19  what's been marked Plaintiff's Exhibit Q. What's
20  the date on this?
21      MR. NORWOOD: You mean on the first page
22  of this?
23      MR. SCHMITZ: Yes.
24      THE WITNESS: Is that a question for me?
25      Q. (By Mr. Schmitz) Uh-huh.

1      A. I see 1/30/09.
2      Q. Okay. When you've seen this document, and
3  I'm referring strictly to the first four pages of
4  this exhibit, which are Bates stamped Garavaglia 44
5  through 47, are these the only four pages you've
6  seen that were a part of this document?
7      A. I've seen all of these pages.
8      Q. I know. I'm asking you to stop at the
9  fourth page. Again Garavaglia 44 through 47.
10      A. I have seen the four pages.
11      Q. All right. And as you can see, they say
12  Page 1 of 4 through 4 of 4. Have you seen any
13  additional items attached to this particular
14  agreement?
15      A. I'm unaware of that.
16      Q. All right. Have you ever seen any
17  documents that are connected with this document that
18  list out various AT&T communications products?
19      A. I am unaware of that.
20      Q. If you could turn to what's Bates stamped
21  Garavaglia 57. Are you familiar with this document?
22      A. I have seen this document through this
23  process.
24      Q. What is your understanding as to what this
25  document is?

1      A. It is an AT&T agreement.
2      Q. And what makes you think that it's an
3  agreement?
4      A. The words before the signature says
5  agreed, A-G-R-E-E-D. Agreed -- City of St. Louis,
6  agreed AT&T.
7      Q. Do you see above that where it -- below
8  the box where it says, this statement of work, and
9  in parentheses, SOW?
10      A. I see that.
11      Q. All right. Does it remain your
12  understanding that this is an agreement rather than
13  statement of work?
14      A. Are you asking me to make a conclusion
15  about the documents from AT&T?
16      Q. If you have personal knowledge.
17      A. I'm just answering your question.
18      MR. NORWOOD: Let her answer, please.
19      A. I answered it based on what I understand.
20  That's my understanding. I understand that this is
21  an agreement.
22      Q. (By Mr. Schmitz) What do you know about
23  the outstanding money that was being requested by
24  AT&T? You can see some of those documents in here
25  on what's Bates stamped Garavaglia 48, 49 and 50.

59 (Pages 230 - 233)

1    A.  I've seen these documents through this
2  process.
3    Q.  Okay.  Do you know if this issue was
4  resolved?
5    A.  Specifically I can't speak to these
6  specific statements as to the resolution.
7    Q.  Just to clarify, are you saying you don't
8  recall at this time when you say you can't speak?
9    A.  Specifically to your question?
10    Q.  Well, you said I can't speak to.  So I'm
11  clarifying what you mean by that.
12    A.  I can't say if these particular issues
13  were resolved as they are here in front of me, as I
14  see them in front of me.  I do know there were
15  resolutions that happened between the City and AT&T.
16  I'm aware of that.  But I can't make a clearcut
17  statement as to whether the fees are the issue.
18    Q.  Do you have any recollection of any
19  conversation with Jim about a proposed settlement of
20  $200,000 to resolve the issue?
21    A.  I don't recall.  I do know I have an
22  e-mail regarding -- I've seen an e-mail regarding
23  that.
24    Q.  Do you recall what the e-mail said?
25    A.  It talked about a resolution.

1    Q.  Do you know who sent you the e-mail?
2    A.  I don't know if anyone sent it to me.  I
3  have a recollection of seeing it recently throughout
4  this process.  And when I say I'm not sure if anyone
5  sent it, it may have been someone brought it and put
6  it on my desk or something.  I don't know.
7    Q.  Do you know who the e-mails were from?
8    A.  I believe there was an e-mail that was
9  between Jim Garavaglia and Kelly Anderson.
10    Q.  All right.  Do you remember any of the
11  contents of that e-mail?
12    A.  The contents of that e-mail had to do with
13  meeting to present the -- or to review and then
14  present the item to me.
15        (Whereupon Exhibit R was marked
16        for identification.)
17    Q.  (By Mr. Schmitz)  All right.  Do you have
18  this exhibit?  Do you recognize this document?
19    A.  Yes.  Through this process, yes.
20    Q.  All right.  And what is this document to
21  your understanding?
22    A.  This is a Waste Management service
23  agreement between the City of St. Louis and Waste
24  Management --
25    Q.  Okay.

1    A.  -- signed by Jim Garavaglia.
2    Q.  You say it's signed by Jim.  Are you
3  basing that on what you're looking at?
4    A.  Yes.
5    Q.  Do you have any direct knowledge that he
6  signed this?
7    A.  I wasn't present for his signing it, no.
8    Q.  Do you have a process for a document like
9  this for how it should be reviewed and then
10  presented to you for signature?
11    A.  Yes.
12    Q.  Okay.  And what is that process?
13    A.  Contracts, agreements are presented for
14  review to the comptroller after they've been
15  reviewed by the City counselor's office normally.
16  They would approve as to form.  And they would then
17  initiate a new process where they're further
18  reviewed in the comptroller's office by the staff
19  support person, Jason Fletcher, before they're
20  presented to be approved for signature.
21    Q.  Okay.
22    A.  That's just part of the process.  There's
23  other approval processes that require adding to E&A
24  for approval, which the presenting to the City
25  counselor as to form may or may not have occurred

1  prior to it being approved by the E&A.
2    Q.  Are all contracts brought to E&A or just
3  some?
4    A.  There is the majority of contracts that
5  would be brought to E&A for approval.  That would be
6  for professional items.  And there's a list of
7  agreements.  But the majority and most people, most
8  departments, would have their agreements sent for
9  approval by E&A.  There is ordinance authority for
10  some requirements for documents to be brought before
11  E&A for approval.
12    Q.  Okay.  Are there any -- you said a list.
13  Are there any agreements, contracts, that would not
14  be that you would sign without the E&A part of the
15  process?
16    A.  There's possible -- there's a possibility
17  there may be some that would not need to come before
18  E&A.  For example, there would be those emergencies
19  that would come directly to the comptroller, because
20  they would be emergency.  There are also times where
21  even emergency contracts or extensions would go
22  before E&A.  But there are times when emergency
23  wouldn't allow it to go to E&A first.
24    Q.  Would that be the only exception then?
25    A.  That is the one that I'm most aware of.

60 (Pages 234 - 237)

1 And there would be others that a counselor or lawyer
2 would know that I would not know perhaps.
3    Q.   All right.
4          (Whereupon Exhibit S was marked
5           for identification.)
6    Q.   (By Mr. Schmitz) So I have what's marked
7 Plaintiff's Exhibit S, which the first page is a
8 letter stating it's from you to Jim dated July 21,
9 2017.  Do you see that page?
10   A.   Yes.
11   Q.   All right.  Do you recall writing this
12 letter?
13   A.   Yes.
14   Q.   Okay.  Why did you write the letter?
15   A.   I wrote the letter to inform Jim that he
16 did not have and he was not authorized to sign
17 agreements on behalf of the City of St. Louis as
18 deputy comptroller for Finance & Development.  The
19 signature that he signed on an agreement with the
20 composting company were erroneous.  They were
21 extensions between the City of St. Louis and the
22 St. Louis composting company.  And it was a reminder
23 to Jim, because I had verbally told him one year
24 earlier that I recall when he asked if he has
25 signature authority, and I verbally told him he did

1 not.
2          And I recall that so clearly because
3 Tom Ray called me right after I had the discussion
4 with Jim about signature authority.  And at the
5 time, I thought since he was brand-new on the job,
6 that he maybe thought this came with the new job.  I
7 explained that it did not.  I explained Beverly
8 Fitzsimmons, who was the deputy comptroller, was the
9 only designated one besides myself that had the
10 authority to sign agreements on behalf of the City,
11 binding the City.  And that he did not have that
12 authority.
13         So when I saw this signature wherein
14 Jim Garavaglia was crossing out my name and title on
15 a contract extension and replacing it with his name
16 and title and signing it in an attempt to inform the
17 contractor, as well as the Department where the
18 contractor was contracting with which was the
19 Forestry Department, that there was a new procedure
20 wherein his signature was good.
21         I had to inform Jim that he was
22 incorrect.  And that I stated in this e-mail, as you
23 can see, I'm puzzled as to how this could happen.
24 This is an improper procedure.  And I asked Jim to
25 please work with Beverly Fitzsimmons so that

1 Michelle Graham, who was in contract compliance
2 office, can process and provide a properly executed
3 extension.  Because what he had provided was not
4 properly executed.  And it would be putting the City
5 and the contractor at risk.
6    Q.   Did you ever have a discussion with Jim
7 about any opinions related by the City counselor's
8 office related to this?
9    A.   No.  Jim did not contact me after he went
10 to the City counselor's office seeking their advice.
11 Had he contacted me, then we could have had that
12 discussion.  But I was unaware that he was seeking
13 advice outside of the advice I had given him
14 directly as his supervisor.  Jim did not follow my
15 advice.
16         But I was fortunate that when he did
17 seek the advice of Tom Ray who was outside counsel,
18 Tom Ray e-mailed me to let me know that Jim asked
19 him about signing documents.  And that reminded me
20 that I had a verbal with Jim about signing
21 documents.  And Tom Ray then e-mailed me that
22 subsequent to my discussion with Jim that he asked
23 whether he had signatures authority obviously.  And
24 Tom Ray told him that he would contact me.
25         As a matter of fact, Jim is copied on

1 Tom Ray's e-mail.  So that Tom Ray is letting Jim
2 know he is checking with the supervisor, which is
3 me, which is basically what Jim should have done.
4 In the cases where Jim sought other counsel, those
5 counselors did not e-mail me.  So I was not aware
6 and could not have ever been aware that Jim sought
7 advice to sign documents when his direct supervisor
8 had given him a direct order not to sign the
9 documents, which I did verbally as well as in
10 writing as you can see that's in this memorandum
11 today.
12   Q.   Did you do anything other than verbally
13 and in writing bring this to his attention?
14   A.   I did not.
15   Q.   Do you have any knowledge of this issue
16 with an unauthorized signature as you listed in the
17 title that occurred after July 21, 2017?
18   A.   I believe I -- I don't recall if the AT&T
19 invoice was 2017.  And I believe there may have been
20 another AT&T subsequent to that.  But I'm not sure.
21 There was multiple AT&T documents signed by Jim that
22 had multiple dates.  So I'm not sure if the
23 July 2017 was the last one, if that's what your
24 question is, if that's the last one or if there were

1 others.
2    Q.  I'm asking if you know of anything that
3 occurred after that date, yes.
4    A.  I don't know.
5    Q.  Okay.  And if you want, you can look at
6 Exhibit Q to refresh your recollection because we
7 talked about this already.  I did ask you about the
8 date on the first page.  But we can turn to what's
9 Bates stamped Garavaglia 57, because we talked about
10 this document as well.
11    A.  This is dated 3/17/17, the AT&T document
12 that was signed by Jim.
13    Q.  Right.  Do you know of any additional
14 documents other than these?
15    A.  This -- not past these dates that I'm
16 aware of, except I do believe I've seen others.  But
17 I'm not certain.
18    Q.  Well, when did you see others?
19    A.  I thought I saw a document dated July -- I
20 mean I'm not sure of the date or the month, but I
21 thought I saw a document dated in 2018.  And it was
22 an AT&T document, but I could be incorrect.
23    Q.  Was that listed in the pretermination
24 notice?
25    A.  I don't know.  It should have been with

1 all the documents because there was a lot of
2 documents.  And I think it was called a master
3 agreement and it came from AT&T.
4    Q.  Master agreement.
5    A.  Do you remember a master agreement coming
6 from AT&T from Mary Harp?
7    Q.  If you look at the front of Exhibit Q, the
8 master agreement you're referring to, is that what
9 you're talking about?
10    A.  Okay.  That's what this says, master
11 agreement for '14 and '09.  Oh, no.  This is an
12 attention to.  That's not the name of the agreement.
13    Q.  Well, certainly it's referring to an
14 agreement that predates this agreement.
15    A.  Yes.
16    Q.  Okay.
17    A.  But the document I'm talking about had
18 master agreement across the top.  It was sent by
19 Mary Harp.
20    Q.  If you could go back.  I think you should
21 still have Exhibit O over there.  And then it's
22 Bates stamped Garavaglia 42.  It's a memorandum from
23 Judy Armstrong to you dated August 26, 2019.
24    A.  I have 41.  You said 42.
25    Q.  Yes.

1    MR. NORWOOD:  Let me give you mine.
2    THE WITNESS:  That would be good.  I have
3 it.
4    Q.  (By Mr. Schmitz)  If you read the first
5 paragraph, on January 30 --
6    MR. BLANKE:  Wait.  She's still not on the
7 right page.
8    MR. NORWOOD:  Go to the next page.
9    Q.  (By Mr. Schmitz)  Got it.  So I'm reading
10 from the first paragraph, first sentence:  On
11 January 30, 2009 [sic], Mr. Garavaglia signed a
12 master agreement with AT&T.
13       Then it goes on in the paragraphs to
14 discuss July 10, 2019, Mary Harp -- I assume she's
15 an AT&T representative -- sent a master agreement to
16 us, which was signed by James.
17       But she's referring to the master
18 agreement of January 30, 2009 [sic].  So is that
19 what you -- is that what your belief that something
20 came after that is coming from?
21    A.  I'm unclear, but I do see this and it may
22 be.  But I'm unclear.
23    Q.  All right.  I'm going to move on.
24       (Whereupon Exhibit T was marked
25       for identification.)

1    Q.  (By Mr. Schmitz)  I'm going to draw your
2 attention to what's now marked Plaintiff's Exhibit
3 T.  Do you recognize this document?
4    A.  Yes.
5    Q.  Okay.  What is this?
6    A.  It's internal audit document.
7    Q.  All right.  Do you see what's Bates
8 stamped, third page, GRN 000627?
9    A.  Yes.
10    Q.  All right.  That's a letter or a memo that
11 was written by Ishmael Ikpeama.  Do you know that
12 individual?
13    A.  Yes.
14    Q.  And who is he?
15    A.  He's an employee of the comptroller's
16 office.  I believe he's retired.
17    Q.  All right.  So was he an employee at the
18 time that this was written?
19    A.  Yes.
20    Q.  All right.  And did his position which is
21 listed here as internal audit supervisor fall under
22 the supervision of the deputy comptroller of Finance
23 & Development?
24    A.  Yes.  At that time.
25    Q.  All right.  Have you seen these documents

1 in this exhibit?

2    A.  During this process, I have.

3    Q.  All right. Are you aware of any e-mails

4 between Dr. Ikpeama and Jim and Sonia?

5    A.  During this process, I became aware of

6 some.

7    Q.  Would you say it's a responsibility of the

8 deputy comptroller for Finance & Development to

9 ensure that the findings of this audit are accurate?

10    A.  No.

11    Q.  Do you believe that getting this done

12 timely according to the timeline set out by

13 Dr. Ikpeama supercedes the need to get the

14 information accurate?

15    A.  You mean putting out a report versus --

16    Q.  Let me ask it differently. What is more

17 important -- Jim, as the supervisor for Dr. Ikpeama,

18 what is more important that he follow Dr. Ikpeama's

19 self-created deadline or that Jim ensures that the

20 information is accurate?

21    MR. NORWOOD: Let me object. I think

22    that's a loaded question and assumes a lot of

23    facts that are not in evidence.

24    And subject to that, though, you can

25    answer the question.

1    THE WITNESS: I really don't understand.

2 It sounds like you're asking me who's more

3 important.

4    Q.  (By Mr. Schmitz) No, I'm not asking you

5 who's more important at all.

6    A.  You're saying that Ishmael didn't have any

7 processes and procedures to follow. You just said

8 self-imposed. So you took me away when you said

9 that. Because I thought it was apparent to me that

10 you are characterizing the two. So please help me

11 understand what you really want to know.

12    Q.  Where does his deadline come from?

13    A.  His processes and procedures and his

14 supervisor. He would have had someone supervising

15 him. And in his profession as a CPA and an auditor,

16 internal audit, he would have understood his

17 processes and procedures and how long he should have to do a review

18 like this.

19    Q.  And that comes from his supervisor?

20    A.  Yes.

21    Q.  Okay. And who did that supervisor --

22    A.  That would have been whoever at the time

23 was -- that would have been -- it would not have

24 been Jim Garavaglia in terms of deadlines, if that's

25 what you're asking. Jim did not -- was not and is

1 not an auditor in the office. He's a temporary --

2 had temporary oversight of the department but not

3 the function. And that's a distinction. This is an

4 audit function. That Jim could not tell them how to

5 do their independent jobs.

6    These were professionals, and

7 licensed professionals to add to that. These are

8 licensed professionals who could lose their license

9 if they were to do things outside of the accountancy

10 and audit and the audit rules. So there are audit

11 rules that govern their job.

12    Q.  What rules are those?

13    A.  The audit rules that govern the auditor's

14 jobs are spelled out for auditors. I'm not an

15 auditor. So there are rules for auditors like there

16 are rules for lawyers and accountants. So their

17 rules would have dictated what they would have had

18 to do with regard to this review in terms of setting

19 the processes in place to audit.

20    Q.  Do you believe -- I'm not trying to

21 characterize your testimony in any way. I'm asking

22 this as a clarifying question about these audit

23 rules, as you refer to, are binding on him for an

24 internal audit done by the comptroller's office on

25 behalf of the comptroller's office, you know, and

1 those are inflexible dates?

2    A.  You mean for Ishmael?

3    Q.  Uh-huh.

4    A.  I absolutely do. Because they are

5 reviewed independently by other audit offices

6 similar to the audit office that exists in the

7 Office of the Comptroller. For example, the audit

8 office in the County of St. Charles independently

9 comes in and audits. And they have a process where

10 they audit in order to keep all of the internal

11 audit offices that exist up to standard. And

12 they're very serious about their work. That's what

13 I know about that.

14    Q.  Okay. And what if the audit has errors in

15 it? How is that corrected?

16    A.  The auditors would correct that and

17 reissue.

18    Q.  Okay. So again, I'm not asking about

19 independent auditor rules. I'm talking about your

20 rules as the comptroller for the comptroller's

21 office. What is your expectation about getting the

22 information accurate during an audit?

23    A.  My expectation is that Ishmael and any of

24 the internal audit employees would perform in a

25 professional manner and adhere to the professional

63 (Pages 246 - 249)

1 standards of their profession. But I also would
2 expect my employee Jim Garavaglia as the deputy
3 comptroller to adhere to the professional standards
4 of the operations of the comptroller's office. It's
5 an expectation that I believe I would -- it's a
6 reasonable expectation that they would be able to
7 perform their jobs in a professional manner.
8 Q. Okay. But that's -- I'm not sure the
9 question about professional manner came up. But
10 those auditor rules do not apply to Jim, correct?
11 A. That is correct.
12 Q. All right. And are there independent
13 separate policies within your office that inform
14 even a deputy comptroller, that they are subject to
15 those auditor rules in terms of their supervision of
16 somebody conducting an audit?
17 A. The auditors are subject to the rules.
18 Those who they audit, which would have been in this
19 case, Jim Garavaglia. As the supervisor at the time
20 of the audit, he was supervising Gateway
21 Transportation. He would have been asked by Ishmael
22 to respond. That's what he's after, a response.
23 Q. Okay. So my question was, are there any
24 rules that exist within your office directing -- or
25 policies, procedures, directing deputy comptrollers

1 on the need to follow the auditor's rules --
2 A. Okay.
3 Q. -- as it pertains to the supervision? So
4 I know they're not subject directly to the rules.
5 But as it pertains to the supervision of an auditor
6 conducting an audit?
7 A. As I understand your question, that gets
8 back to me saying my expectation for the rules in my
9 office from the comptroller's standpoint is that the
10 behavior of the deputy comptroller for Finance &
11 Development would be to perform in a professional
12 manner. That means timeliness. That means honesty.
13 That means being able to act in a sense of urgency
14 when those things call for that. That's -- and
15 perform the job, his job, in a professional manner.
16 Q. Would that also be --
17 A. So that would be to simply respond.
18 Q. Would that include accuracy?
19 A. From his position, of course.
20 Q. Okay. Due diligence?
21 A. Due diligence, of course. Because the
22 request from the internal auditor is for a response.
23 The internal auditor is not said to be always
24 accurate. That's why you ask for the auditee's
25 response. Because if, in fact, the auditee finds an

1 error, it's up to the auditee to tell the auditor
2 they are incorrect. Then the auditee can remove the
3 findings. That's how that would work.
4 Q. Right. So consistent with that, it's
5 important for the person supplying that request and
6 information to ensure that information is accurate,
7 wouldn't you agree, rather than just pass along what
8 they think they know?
9 A. You misunderstand what you're asking me.
10 And I say that sincerely.
11 Q. I misunderstand what I'm -- okay. Well,
12 I'm still asking the questions.
13 A. Yes. I'm very direct in stating to you if
14 that auditor has a finding, correct or incorrect, it
15 is up -- if they ask a question, they're asking
16 directly to the person that they said, we found
17 this. And that would have been to Jim. Jim says,
18 no, you're incorrect. He has that right. They ask
19 for a response. And that auditor can be found to be
20 wrong if the person, Jim Garavaglia, did tell
21 Ishmael, Ishmael, you're incorrect, here's the
22 accurate. Ishmael then per his rules would say
23 thank you. We shall remove this finding. We were
24 wrong. That's how auditors work. They're either
25 right or wrong.

1 Q. Okay. I understand that. My question was
2 never about the auditor, though.
3 A. But that's what you're asking for, for
4 accuracy, right?
5 Q. No. I said in Jim's position.
6 A. Right, but you said accuracy.
7 Q. That was professionalism. You brought up
8 professionalism and timeliness and named off a few
9 other things. And I asked you, does that also
10 include accuracy and due diligence?
11 A. It's in regard to the behavior. The
12 professionalism and --
13 Q. I understand what you were saying.
14 MR. NORWOOD: Let her finish.
15 Q. (By Mr. Schmitz) Because you said it and
16 repeated it. I'm asking if it also includes those
17 other things.
18 A. Accuracy, of course, in any situation is
19 acceptable. In order to answer your question, I
20 have to answer it that way, because I'm unclear as
21 to if you're asking me if I want Jim to be accurate.
22 And I guess my response would be professional
23 behavior, of course, I would want anyone to be
24 accurate including Jim. If that's what the question
25 is.

1   Q.   Okay.  It was, yeah.  Then my follow-up
2   question is, due diligence in ensuring accuracy is
3   also professional?
4       A.   Doing due diligence and ensuring your
5   accuracy is professional and acceptable, yes.
6       Q.   Okay.  You mentioned that Jim has the
7   right to disagree with a finding?
8       A.   Yes.
9       Q.   Okay.  But you would not want him to
10  disagree with a finding without a firm foundation as
11  the basis for his disagreement, right?
12      A.   I would want anybody to be right or wrong
13  and to say as such.
14      Q.   Okay.  So it's very important that he
15  knows whether or not he's right or wrong before
16  he --
17      A.   And he should communicate that to the
18  auditor, so the auditor can close out a book and
19  move on to something else.  That means you're acting
20  in a timely and professional manner in response to
21  the question you asked.
22      Q.   Right.  But my question wasn't about the
23  timeliness or lack of communication.  I never
24  posited that that occurred.  I simply asked you a
25  question about whether or not that's a crucial

1   expectation.
2       A.   I think you're correct.
3       Q.   All right.  All right.  I'm going to jump
4   forward and just ask you questions about Jim's
5   replacement after he was no longer the deputy
6   comptroller for Finance & Development.  Okay?  What
7   candidates did you look at during your search?
8       A.   I believe two candidates applied.
9       Q.   Did you expect more than two candidates to
10  apply?
11      A.   I didn't know what to expect.  I didn't
12  have any expectations.
13      Q.   If you have two candidates, is there a
14  process that allows you to go back and request the
15  job be reposted so that you have more candidates or
16  are you stuck with those two?
17      A.   I'm not real sure.  That does depend on
18  the timing.  So I'm not real sure in that space
19  whether I could have gone back and asked for more.
20  It's possible.
21      Q.   All right.  When did you make the decision
22  as to who would be his successor?
23      A.   After the position was awarded to the
24  person that replaced him, which was LaTaunia Kenner
25  and that would have been after -- I believe she

1   served as interim before she actually entered into
2   the position formally by the personnel process, is
3   what I'm recalling.
4       Q.   Whose decision was it to make her the
5   interim?
6       A.   I made that decision to make her interim
7   after thinking about it.  And actually she did say
8   that she thought she could do the job.  She
9   approached me and said, I think I can do this if you
10  will please consider me.
11      Q.   Okay.  Did you -- so we talked about way
12  back -- I know it's been a long day -- some of the
13  recruitment efforts that could have taken place
14  mostly by Department of Personnel, but you also
15  mentioned you had a lot of outside people calling in
16  basically soliciting themselves in the position in
17  that fashion.  Did that happen?
18      A.   I didn't say they were soliciting.  I said
19  they were calling in about the position.  They were
20  actually referring people that I should pick up the
21  phone and call.
22      Q.   Understood.  Did that happen this time?
23      A.   No.
24      Q.   All right.  Do you know why?
25      A.   I really don't.  I don't know why.

1       Q.   Did you make any efforts to locate anybody
2   so that you had the person who ultimately got the
3   position who came to you before becoming interim and
4   she obviously applied.  Did you know the other
5   candidate?  Were they a City employee?
6       A.   I believe the other candidate was a City
7   employee, but I don't recall.  But I believe they
8   were.
9       Q.   Okay.  Did you do anything other than just
10  take the list that was provided before starting your
11  interviews or considering candidates?
12      A.   I did consider Ron Browning Smith, but I
13  don't recall if I actually called him.  The main
14  reason that I would even consider him was because he
15  was local and he lived in the City.  Most of the
16  other people who were local did not live in the
17  City.
18      Q.   Is that a requirement?
19      A.   To be a City employee, it is a requirement
20  to live in the City.
21      Q.   I didn't know if there were exceptions to
22  that that related to that job or not.
23      A.   No.
24      Q.   Did you consult anybody else to see if
25  there would be interested candidates that could be

65 (Pages 254 - 257)

1 recruited?
2    A.  I looked at Kelly Anderson, because he was
3 an attorney.  But I didn't think he would fit.  And
4 he didn't express any interest.  LaTaunia Kenner
5 expressed an interest and reminded me that she had a
6 master's in finance.  And that she wanted to take a
7 crack at doing the job.  I did talk to Joyce Opinsky
8 and asked her to move to the City.  And she said no.
9    Q.  Do you recall if the other candidate was
10 male or female, the one that wasn't selected?
11    A.  I believe it was a female.
12    Q.  Okay.  Do you remember that person's age?
13    A.  I do not.
14    Q.  If there was a male and female candidate
15 that you were considering and all things were equal,
16 do you feel like it would be okay to select a
17 candidate based on their gender at that point?
18        MR. NORWOOD:  Let me object.  I think
19    that's an improper hypothetical and calls for
20    speculation.
21        Subject to that, you can answer if you
22    can.
23        THE WITNESS:  I don't really -- I didn't
24    hear your question, because I was thinking
25    about had I spoken to other people.  And I

1 recall I had spoken to Lyda Krewson about a
2 year earlier about a deputy comptroller job.
3 She turned me down.  I was just thinking that
4 when you asked the question.  This was before
5 she became the mayor.
6    Q.  (By Mr. Schmitz)  Okay.  Well, this would
7 have been back when Jim was --
8    A.  This was before Jim.
9    Q.  Yeah.  I was specifically asking about
10 this go around.
11    A.  I understand, but I was still thinking.  I
12 was trying to make sure that I wouldn't leave
13 anybody out that I had considered for the position.
14 And Lyda Krewson was considered, because I asked her
15 directly.  We both sat at the airport commission
16 meeting.  There was one meeting.  And she looked at
17 me like I would get a look like -- I forget what she
18 told me.  But she told me -- oh, you said, I have a
19 job.  That's what she said.
20        MR. SCHMITZ:  Can you repeat that last
21    question?
22        THE COURT REPORTER:  Question:  If there
23    was a male and female candidate that you were
24    considering and all things were equal, do you
25    feel like it would be okay to select a

1 candidate based on their gender at that point?
2    A.  I guess I don't look at gender in terms of
3 positions when I'm wanting to hire.  I never have
4 and I never will.  The gender has nothing to do with
5 the work qualifications for a job.  And so I would
6 say absolutely not.
7    Q.  (By Mr. Schmitz)  Have you ever considered
8 age before when considering somebody for a position?
9    A.  Absolutely not.  I never considered age,
10 gender, race.  Age, gender, race.  What's the other
11 thing?  Color, sex.  I don't consider those kinds of
12 things when I am looking for qualified professionals
13 to take a job in the Office of the Comptroller,
14 because those things are not important.  What is
15 important is the qualified individual willing and
16 able to take the job.  And they will come with the
17 qualifications to do the job.  And they live in the
18 City of St. Louis.
19    Q.  Do you consider factors related to age?
20 And this is specific to age, not the other items
21 that you mentioned.
22    A.  I never consider age.
23    Q.  If I could finish my question.  I was
24 going to ask something specific.
25        Not age.  You already answered that

1 question.  But likelihood of how long that
2 individual is going to work or --
3    A.  Absolutely not.  No.
4    Q.  Do you consider whether or not you think
5 that person's likely to stick around or move on to
6 another job?
7    A.  No, not at all.  If they're accepting a
8 position and the circumstance which has been
9 explained to them, living in the City of St. Louis,
10 that has been the most question when a person has
11 qualified, would come and accept the job.  If they
12 don't live in the City of St. Louis.  And I believe
13 the City of St. Louis gives you six months to move.
14 So of course I would have wanted to have the
15 employee in the position longer than six months.
16    Q.  Do you think that you have any right or
17 authority to consider any of those factors at all
18 before, age, gender, race, any of those factors at
19 all?
20    A.  I do not consider any of those factors at
21 all, whether I have the right or not.  Because that
22 is not in my character to do so and is not in the
23 best interest of hiring practices for myself or for
24 the City of St. Louis.  It's just not in the best
25 interest to be considering those factors.  (Pages

1   Q.  Okay.  As far as my question, do you
2  believe that you have that right, though?  Do you
3  believe you have some discretion to seek diversity
4  as a priority in your office?
5   A.  I don't consider it, period.
6   Q.  I understand that.  You've answered that.
7   A.  And I gotcha.  And I did answer it.  Even
8  if I had the right and believed that I had the
9  right, I don't consider it.
10   Q.  I'm just asking --
11     MR. NORWOOD:  Let me object.  Hold on,
12  Ms. Green.  You can't cut her off when she's
13  answering your question.  You've been doing it
14  repeatedly.
15     MR. SCHMITZ:  Ron, I've asked the question
16  three times.
17     MR. NORWOOD:  She's answered it three
18  times.  Every time she begins to explain, you
19  cut her off.  And that's improper.  So I'm
20  objecting.
21     MR. SCHMITZ:  You can make your objection.
22     MR. NORWOOD:  Let me also object on the
23  grounds it's been asked and answered.  She
24  answered it.  And it calls for speculation.
25  And it's irrelevant.

1     Subject to all of that, you can answer
2  again until he cuts you off.  Then I'll object
3  again.
4     MR. SCHMITZ:  Despite your need to engage
5  in hyperbole.
6   Q.  (By Mr. Schmitz)  I'm asking, do you think
7  you have the right or not?  I understand very well
8  that you say you would not do that regardless.
9   A.  I don't know.
10   Q.  Thank you.
11     MR. NORWOOD:  Why don't we take a break.
12  We need to get a time check.
13     (Whereupon there was a short
14     break, 5:55 p.m. to 6:03 p.m.)
15     (Whereupon Exhibit V was marked
16     for identification.)
17   Q.  (By Mr. Schmitz)  I'm going to draw your
18  attention to what's marked Plaintiff's Exhibit V.
19  Are you familiar with this document?
20   A.  Yes.
21   Q.  Okay.  What is it?
22   A.  Personnel listing or candidates for this
23  particular position.
24   Q.  And the second individual, was that the
25  other individual that you considered for this

1  position?
2   A.  Yes.
3   Q.  All right.  Did that person get an
4  interview?
5   A.  I'm not sure.
6   Q.  All right.  So you don't recall
7  interviewing them?
8   A.  I don't recall.
9   Q.  Okay.  To your knowledge, is this the only
10  candidate referral document that was issued?
11   A.  I believe so.
12   Q.  And I know you answered this to some
13  extent.  I just want to clarify my understanding.
14  To your knowledge, these are the only two people
15  that applied for the position?
16   A.  That's what I believe.
17   Q.  Is there a circumstance where somebody
18  could have applied but never made this list?
19   A.  Yes.
20   Q.  What is that?
21   A.  Personnel would have screened them out.
22   Q.  And then you would not know about it?
23   A.  I would not know about it.
24   Q.  All right.  What's your understanding of
25  what the term "affirmative action" means in the

1  employment context?
2   A.  Generally speaking?
3     MS. HAMILTON:  Objection, calls for a
4  legal conclusion.
5     MR. NORWOOD:  I join in that objection.
6   A.  Yeah.  I would say that's a legal
7  question.  It's a highly legal question.  I mean,
8  it's very -- I haven't thought about it.  I
9  haven't -- okay.  My understanding of affirmative
10  action, I haven't thought about.  So I would not be
11  able to give you a good answer in terms of my belief
12  and what I think about it.  I think about diversity.
13  Diversity is important to all organizations, is what
14  I think.
15   Q.  (By Mr. Schmitz)  Okay.  Do you understand
16  it to mean anything other than just diversity?  Not
17  from a legal standpoint.  Just to be clear, just
18  your personal understanding.
19     MR. NORWOOD:  Same objection.
20     MS. HAMILTON:  Moving back to a legal
21  term.  So I have the same objection.
22     MR. NORWOOD:  I join.
23     Subject to that, you can answer if you can
24  again.
25   A.  I believe that my understanding is all

1 about diversity in the workplace, in the schools,
2 and in the world. That's what affirmative action
3 would be about.
4     Q. (By Mr. Schmitz) Are you permitted to do
5 anything to promote that?
6     MS. HAMILTON: Objection, calls for a
7 legal conclusion.
8     A. I'm not HR.
9     MR. NORWOOD: I join in that objection.
10 And calls for speculation and it's irrelevant.
11     Subject to that, you can answer.
12     A. I guess as I started to answer, I'm not in
13 HR and I haven't really considered it.
14     Q. (By Mr. Schmitz) Did you ever discuss his
15 retirement with him? I know you said you had
16 conversations about how long he was going to stay in
17 the position, but did you ever discuss his
18 retirement specifically?
19     A. No, I did not.
20     Q. Okay. Did you ever discuss his possible
21 retirement with anyone else?
22     A. No, I did not.
23     Q. Is there an age in which you believe
24 somebody who's in the role of deputy comptroller
25 would have difficulty performing the functions of

1 the position?
2     A. No, I do not.
3     Q. Okay. Were you aware of retirement papers
4 being submitted in 2019 by Jim?
5     A. I became aware when I was told.
6     Q. Okay. When was that?
7     A. I'm not sure, but it may have been
8 counsel. But I'm not sure.
9     Q. Okay. Did you have a particular view on
10 that?
11     A. I was surprised.
12     Q. Were you in favor of it?
13     A. I was surprised.
14     Q. Okay. What were you surprised about?
15     A. Well, because I thought the hearing was
16 important especially having had the lawyers involved
17 so early. I just thought there would be a hearing.
18     Q. Is there anything you could have done to
19 prevent it?
20     A. To prevent it?
21     Q. Yeah. Is there anything you could have
22 done to prevent his retirement before the
23 pretermination hearing?
24     MR. NORWOOD: Let me object, because I
25 think it calls for speculation and some

1 hypotheticals, but subject to that.
2     A. I don't know.
3     MR. SCHMITZ: I think that's all I have.
4     MR. NORWOOD: Okay. I've got some
5 follow-ups. Let me dive right in.
6     [EXAMINATION]
7 QUESTIONS BY MR. NORWOOD:
8     Q. Counsel made a point about the fact that
9 when you talked to Jim that Tuesday before the E&A
10 meeting, that Jim made a reference to the mayor
11 wanting to place the item on the agenda. Do you
12 recall that?
13     A. Yes.
14     Q. Was it your expectation that he would have
15 communicated to you that he had already made a
16 request for that to be placed on the agenda?
17     A. I did, as well as I was very hopeful that
18 I would get a full update on the project from Jim.
19 I was stunned that I did not get a full update about
20 the particulars of the project, whether or not taxes
21 were paid, if that was an issue, whether it was
22 going to be in default, anything like that. I was
23 stunned about what I heard instead of what I was
24 expecting to hear.
25     Q. So just so we're clear on the record, it

1 wasn't that the mayor was placing the item on the
2 agenda. It was the fact that he hasn't communicated
3 to you that he made that request to place it on the
4 agenda on your behalf?
5     A. On my behalf. And he could have told me
6 the reasons for the request and the reasons why we
7 need to go ahead and put this on the agenda and on
8 and on and on. And I would have supported Jim.
9 Because in times past, I would have supported him if
10 he had particular -- and I have to say I heard from
11 his deposition that he was knowledgeable and in
12 contact with the collector of revenue about the
13 taxes, but I didn't know about that until the
14 deposition.
15     Had I known about that with the
16 deposition, Jim and I could have had a more
17 intelligent conversation with information that he
18 knew. I had no knowledge of his interactions with
19 the collector of revenue and attempting to get the
20 taxes and all of that. Had I known that, that could
21 have been an item put on the agenda from the
22 comptroller's office as he had requested. But
23 because I was kept out of the loop by Jim and made
24 to not have that knowledge, I couldn't work to help
25 Jim to support him to get the item on the agenda.

1       So the fact that the mayor was
2 putting it on the agenda was not only confusing, but
3 as I said earlier, I had two different comments.
4 One made by Beverly and one made by him.  In that
5 split moment, I said, Jim, send the documents to me.
6 Then I had to do all the work at that time.  Then I
7 learned later there was an attempt to put the
8 documents on.
9       But the matter at 9:00 in the morning
10 that Jim had full control of could have been --
11 could have stopped not only the mayor but also his
12 first request if he had fully apprised me and told
13 me why he thought the item should go on the agenda.
14 Then I would have said, have you told Beverly this,
15 or are we all going to be on Team Comptroller to get
16 this item on the agenda?
17       I was not afforded that because the
18 behavior that I got from Jim was unbecoming of a
19 professional at his level to misinform me.  I was
20 misinformed on that call.  And I can't express that
21 enough, because I should have been well informed
22 instead of misinformed.  You gave me all the
23 information so I can make an intelligent decision.
24 But he didn't do that.  That's why we're here today,
25 I guess.

1       If he had done that and done his job
2 in a professional manner, which I'm pretty sure that
3 I had a reasonable expectation of having him be
4 professional and doing his job at the level and
5 having a sense of urgency to make sure I'm apprised
6 of this issue so this item can move forward.  I
7 didn't get that from Jim on that day.
8   Q.  Okay.  Let's talk generally about why is
9 it important for your deputies to keep you -- you
10 referred to -- the term you used was in the loop.
11 Why is it important for your deputies to keep you in
12 the loop of what's happening with respect to
13 projects that impact your elected duties as the
14 comptroller?
15   A.  It's always important to keep me in the
16 loop as a deputy comptroller, because the deputy
17 comptrollers represent me to the public.  The deputy
18 comptrollers are my eyes and ears to those who are
19 developers, investment bankers, lawyers, and others
20 who are working projects.  They're speaking on
21 behalf of the comptroller in most cases.
22       And in some cases, the deputy
23 comptrollers can misrepresent.  And I believe in
24 this case, Jim misrepresented on my behalf.  It
25 appears from the e-mail trail, that it was told to

1 Jim in some manner that I was not in favor of the
2 project.  And that never existed whatsoever.
3   Q.  Okay.  You also used the term "integrity"
4 of the office.  Could you explain a little bit more
5 about why that's important from the standpoint of
6 your elected duties as the comptroller?
7   A.  The integrity of the Office of the
8 Comptroller is really important to protect.  And you
9 protect it by behaving in a professional manner and
10 performing your job duties with honesty.  You
11 perform your job duties with professionalism.  And a
12 high level of sensitivity exists, because you're
13 talking about financial documents.
14       And so we want to have the integrity
15 of the Office of the Comptroller protected in the
16 manner with your behavior.  Your work behavior is
17 going to show in your manner of conduct that should
18 show that you're honest and that you have a sense of
19 professionalism that is deserving of being in the
20 Office of the Comptroller.
21   Q.  Now, has your office since you have been
22 in charge as the comptroller received awards for the
23 work that you have done in terms of keeping the
24 fiscal responsibilities, performance, and integrity
25 of the City?  What awards did you receive?

1   A.  Well, annually we're fortunate to receive
2 the annual award for putting out the comprehensive
3 financial report.  And we've received that for a
4 number of years from the organization of GFOA.  The
5 Governmental Financial Officer's Association would
6 give us that award.
7       Additionally, our former deputy
8 comptroller, Ivy Pinkston, I was explaining earlier,
9 was invited by Harvard to give a course when the
10 City of St. Louis was one of the first ten cities to
11 be put on -- put their bond activity on the
12 computer.  We call it Fly St. Louis.  At the time
13 when other cities were racing to get that done, the
14 City of St. Louis got that done.  And that was a
15 very fine testament as to the work in that area.
16   Q.  Okay.  Now, I just want to focus in on
17 when the vacancy occurred with Jim's retirement, I
18 believe you testified that you reached out to Joyce
19 Opinsky?
20   A.  Yes, I did.
21   Q.  And why did you reach out to Joyce
22 Opinsky?
23   A.  Well, to see if she was ready to join the
24 office, to come back to the City and work in that
25 job.  She would have been very good for that job.

1 She had previously worked with the City in the
2 Office of Budget Director. She knows how the City
3 operates. She understands the need and how the job
4 of deputy comptroller for Finance & Development
5 should go.
6    Q. And what race is Joyce Opinsky?
7    A. She's white.
8    Q. Okay. You mentioned Ron Browning Smith a
9 couple of times. I think you mentioned that you had
10 reached out to him at the suggestion of other folks
11 when the position was vacated because of the
12 untimely death of Jim's predecessor. You reached
13 out to Ron Browning Smith; is that right?
14    A. I did. And Ron Browning Smith was very
15 sincere and went so far as to take me up on the
16 offer by sitting down with Eunetter Steele to go
17 over the job expectations that he would have. And
18 then he evaluated whether or not he should take the
19 job. And he decided not to. He told me because he
20 makes too much money.
21    Q. And where was Ron Browning Smith at the
22 time you reached out to him? Where was he working
23 at the time?
24    A. He worked at an investment banking firm
25 that he still works at today, but he lives in the

1 City of St. Louis.
2    Q. And how old was he at the time when you
3 reached out to him in 2016?
4    A. I believe he was 70.
5    Q. Okay. And then when the vacancy came open
6 again with Jim's retirement, I believe you testified
7 that you reached out to him again.
8    A. I believe I did. And he turned me down
9 again.
10    Q. Just for the record, he is an African
11 American male; is that right?
12    A. Yes.
13    Q. And when you reached out to him the second
14 time, if he was 70 when you reached out to him in
15 2016, he would have been 73 at the time?
16    A. Yes.
17    Q. Okay. Now, let's talk about these
18 ratings. Now, you testified that generally unless
19 it's required or it's strongly requested, you
20 wouldn't do a rating; is that a fair summary?
21    A. That's correct.
22    Q. All right. And, for instance, have you
23 done ratings for Chana, your assistant?
24    A. Not unless it was required. Only the
25 required ratings.

1    Q. Just for the record, Chana is an African
2 American -- Chana Morton is an African American
3 female; is that correct?
4    A. Yes.
5    Q. And what about you mentioned Bev
6 Fitzsimmons, your deputy; did you do ratings for
7 her?
8    A. No.
9    Q. Except --
10    A. Except for required ratings.
11    Q. And she is -- just for the record, what is
12 her race?
13    A. She's white.
14    Q. What about Tyson Pruitt, did you do
15 ratings for him?
16    A. No.
17    Q. And what is his race?
18    A. Except for the ones required.
19    Q. Okay. And what is his race, for the
20 record?
21    A. He's white.
22    Q. Okay. Have you ever in all of your years
23 as deputy comptroller -- as comptroller for the City
24 of St. Louis, have you ever heard of a situation
25 where important time sensitive deal documents were

1 placed in interoffice mail?
2    A. Not ever in my whole 27 years as
3 comptroller of the City of St. Louis have I ever
4 heard of time sensitive documents being placed in
5 interoffice mail, not ever. And also I have to add
6 to that neither has Tom Ray, who obviously knew that
7 he needed to alert the Office of the Comptroller
8 that this was happening at the time for these types
9 of time sensitive documents.
10    Q. Okay. Now, you were shown Exhibit S,
11 which is a memo you prepared to Jim regarding his
12 attempt to have a St. Louis composting contract
13 executed by Jim. Do you recall that discussion?
14    A. Yes.
15    Q. Okay. As you testified this wasn't the
16 first time you had discussions with Jim about
17 signature authority; is that correct?
18    A. That is correct.
19    Q. All right. In fact, you identified a
20 situation that was at least a year prior where he
21 apparently went around you and went to Tom Ray to
22 get some advice about signing?
23    A. After I had verbally admonished him about
24 signing. And I said admonish. It could be the same
25 to inform or counsel. To let him know Beverly

70 (Pages 274 - 277)

1 Fitzsimmons was the only other designated signer
2 besides the comptroller. So I thought he understood
3 that. Then here comes a year later, where not only
4 is he attempting to sign this document, but he's
5 giving false information to the other employee at
6 the City, the Forestry Department who knows the
7 rules regarding signature, and had expressed that to
8 the vendor, saying they have to get the
9 comptroller's signature. There's a process.
10        Jim tells them the process didn't
11 exist, which is false. The process does exist. And
12 it was in effect. So I asked him in this memo, once
13 again it's an admonishment and it's also a form of
14 counseling, and letting him know I'm calling you on
15 the carpet, but I'm also calling you on the carpet
16 with the audience of City employees and the Forestry
17 Department along with the vendors. So the vendor
18 would not be blindsided by the false information
19 that they had received.
20   Q. Okay. In Exhibit S, which is the July 21,
21 2017 memo to Jim regarding unauthorized signature,
22 you say in there -- and I'm just going to read it
23 into the record, the second sentence says, quote:
24 As you know, currently there are only two authorized
25 signatures for contracts and their extensions.

1        You wrote that to him, right?
2   A. Yes, I did.
3   Q. And when you said as you know, was that
4 based upon the fact that you had had these
5 discussions with him before?
6   A. I had previous discussions with him. So I
7 knew that he knew.
8   Q. Did he ever come to you and say, no, I
9 didn't know?
10   A. He never did.
11   Q. And you go further and say: As
12 comptroller, I am authorized and I have also
13 authorized Deputy Comptroller, Beverly Fitzsimmons.
14 Right?
15   A. Yes.
16   Q. All right. And you had told him that
17 before, correct?
18   A. Correct.
19   Q. Years before?
20   A. Correct.
21   Q. All right. When he received this memo,
22 after he received this memo, after July 21, 2017,
23 did Jim ever come to you and say, oh, by the way, I
24 have already signed off on contracts for AT&T and
25 for Waste Management? Did he ever do that?

1   A. He never did.
2   Q. Would it be your expectation that he would
3 come to you and tell you that?
4   A. I would have expected that Jim would have
5 performed with the professional behavior and come to
6 me to tell me that he had signed other documents
7 after he had received this memo from me, but he did
8 not.
9   Q. Okay. At the time you wrote this memo,
10 did you know he had signed off on these other
11 contracts?
12   A. I did not know that until he -- I did not
13 know at the time at all. I did not know until a
14 year or two years later.
15   Q. How did you find out about the fact that
16 there were these contracts out there and that he had
17 signed purportedly on behalf of the city?
18   A. Once Jim decided to retire, other
19 employees took time to perform his duties. And as
20 they were doing their regular duties, performing
21 their regular duties, they submitted a form. They
22 submitted a voucher for payment for Waste Management
23 and it was rejected. And it was rejected because
24 there was no current contract on file.
25       And so there couldn't be, because

1 they hadn't been being paid. So then the Waste
2 Management company was contacted and they
3 immediately sent us a contract that had been signed
4 by Jim. It was a three-year extension that was
5 signed by Jim. And so we submitted it or at least I
6 was told that Judy Armstrong, not knowing any
7 better, submitted to the contract administrator who
8 knew better. She said this can't be. This is not
9 legitimate.
10   Q. Okay.
11   A. So then she moved to take steps to get a
12 legitimate three-month or four-month extension so
13 that the Waste Management people could continue to
14 be paid.
15   Q. And this discovery happened during the
16 time he was on forced leave; is that right?
17   A. Yes. And this was within a few days. He
18 was on forced leave as of July the 2nd. This
19 discovery happened within less than seven days.
20   Q. Okay. Let me show you -- I want to go to
21 Exhibit O. There was a reference to some letters
22 dated July 15, 2019. So let's go to those.
23       Do you know if those letters were
24 actually submitted to Mr. Frank and to
25 Mr. Garavaglia on July 15, 2019?

1    A.  I don't believe they were.  I'm glad
2  you're asking me this.  Again, these look like they
3  were letters that were in preparation.  The ones
4  that were dated July 15 were in preparation for the
5  letters that would be submitted on July 18.  So
6  these were prepared, but not delivered.
7    Q.  Were they draft letters in your view?
8    A.  They were draft letters.  They had my
9  original signature.
10    Q.  Okay.  Were the actual letters that went
11  out as related to the second forced leave sent on
12  July 18, 2019 to Mr. Frank --
13    A.  Yes.
14    Q.  Let me finish.
15       -- to Mr. Frank and to
16  Mr. Garavaglia?
17    A.  Yes.
18    Q.  All right.  And just for the record,
19  there's a July 18, 2019 letter that was actually
20  written to Mr. Frank that has approved 7/18/19; is
21  that correct?
22    A.  Yes.
23    Q.  And do you know who wrote that on there?
24    A.  I don't know.
25    Q.  Do you know if that's Mr. Frank's

1  approval?
2    A.  It probably is Mr. Frank's approval.
3    Q.  Okay.  Let me close it out.  Do you know
4  if Judy Armstrong as the appointing authority would
5  have also consulted with Director of Personnel and
6  Linda Thomas in conjunction with the forced leave in
7  this case?
8    A.  Yes.
9    Q.  Okay.  Now, these deals that ultimately
10  were completed on time, were they completed on time
11  because there were guardrails in place in terms of
12  professionals, outside professionals, like Opinsky
13  and Tom Ray to make sure that they stayed on track?
14    A.  Absolutely.  That is correct.  Those
15  professionals, lawyers, bond lawyers, as well as
16  investment bankers were very aware of the timeline
17  and schedules.  And they were there to help to make
18  sure that these deals got done properly.  Even Tom
19  Ray would chime in, step in to make sure deals got
20  done without any delay.  That's how they got done
21  without delay.
22    Q.  When you found out about Tom Ray reaching
23  out to Chana to alert her of the problem with the
24  timing on getting these documents executed, did that
25  jump out at you as being unusual?

1    A.  It was alarming to say the least.  That he
2  had to take the time.  Because in his e-mail, he's
3  also copying Jim.  But he's directed it to the
4  secretary of the comptroller letting us be alerted
5  that we're going to have a problem, because Jim is
6  basically not handling his job in a professional
7  manner to get the documents circulated in a timely
8  manner so there's a closing.
9       He lets us know there's a closing.
10  He lets us know documents are in interoffice mail,
11  which is a mistake.  He says to call him on the next
12  day so he can be of help.  Instead of calling him on
13  the next day, I chose to call him on the same day,
14  along with Jim, along with Sherry Wibbenmeyer in the
15  mayor's office, my secretary and myself, the five of
16  us was on that call.  And I asked him did he have a
17  plan for getting the documents executed in a timely
18  manner.
19    Q.  And he was going to be on vacation the
20  very following day; is that right?
21    A.  That is correct.  And that is why I chose
22  to call him that day, because I didn't know if I
23  would be able to get in touch with him the next day.
24  So if he had told me he had a plan in place to take
25  care of the execution, then I would have been secure

1  in that.  He did say that his secretary, Sheila,
2  would be delivering the documents to my office the
3  next morning.
4       That was after I asked him, could
5  he -- I asked him where were the documents at that
6  moment.  He told me they were in the mail.  My
7  question was a leading question.  And the leading
8  question was in an attempt to see if Jim was going
9  to offer to go get the documents out of the mail.
10  And he did not.
11    Q.  Are we talking about interoffice mail?
12    A.  I'm talking about interoffice mail before
13  the close of business at the City of St. Louis on
14  the day before he was going on vacation.
15    Q.  Okay.
16    A.  Jim showed no urgency to have the
17  documents ready for my signature in a timely manner.
18  But he did in his deposition talk about that the
19  documents needed review.  So when I heard the
20  deposition, I didn't understand how he was going to
21  be reviewing the documents that came out of the mail
22  on the day that he was driving out of town.  Those
23  things didn't register.
24    Q.  All right.
25    A.  He said that in his deposition.  He was

72 (Pages 282 - 285)

1 going out of town on that call before the close of
2 business. Before he left, those documents -- he
3 made no attempt to take them out of the mail for a
4 review that he talked about at his deposition.
5     Q. Okay. We talked about the Muni Court
6 project.
7       MR. BLANKE: Let me interrupt you for a
8   second. I want to object just for the record.
9   I think we're over the seven hours now in
10   total.
11       MR. NORWOOD: You have a seven-hour limit.
12   I can use any of my seven hours. I am going to
13   wrap it up.
14     Q. (By Mr. Norwood) But my question to you
15 is -- let's talk about the Muni Court project. What
16 is that? How many millions of dollars is involved
17 and what project are we talking about when you say
18 the Muni Court project?
19     A. We're talking about a project where the
20 developers were going to redevelop the Muni Court
21 into a hotel. And then that hotel would have also
22 be redeveloped into a parking lot. And that would
23 have took a building that is not in use right now
24 and pull it into full effect and use and would not
25 only create jobs, they were expecting there would be

1 anywhere between 60 to 70 jobs created, along with
2 the revenues from the hotel taxes and sales taxes
3 for that particular location right now, which is
4 right now an unused building and boarded up.
5     Q. Okay. Let me close with this. And I'll
6 ask you point blank. Did Mr. Garavaglia's age,
7 race, or sex have anything to do with the steps you
8 took as it related to the first, the second forced
9 leave or pretermination?
10     A. Absolutely not, no. Absolutely not. Not
11 at all.
12       MR. NORWOOD: All right. I have no
13   further questions.
14       MR. BLANKE: Do you have anything else?
15       MR. SCHMITZ: No.
16       MR. NORWOOD: We'll read.
17       (Whereupon signature was
18       reserved.)
19       (Off the record at 6:36 p.m.)
20
21
22
23
24
25

1       CERTIFICATE OF REPORTER
2     I, Sheryl A. Pautler, RPR, Certified Court
3 Reporter (MO), Certified Shorthand Reporter
4 (IL), do hereby certify that the witness whose
5 testimony appears in the foregoing deposition
6 was duly sworn by me; the testimony of said
7 witness was taken by me to the best of my
8 ability and thereafter reduced to typewriting
9 under my direction; that I am neither counsel
10 for, related to, nor employed by any of the
11 parties to the action in which this deposition
12 was taken, and further that I am not a relative
13 or employee of any attorney or counsel employed
14 by the parties thereto, nor financially or
15 otherwise interested in the outcome of the
16 action.
17
18
19         _Sheryl Pautler_
20       Certified Court Reporter (MO)
21       Certified Shorthand Reporter (IL)
22
23
24
25

```
1          Veritext Legal Solutions
              1100 Superior Ave
2                Suite 1820
             Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
    March 4, 2022
5
    To: MR. NORWOOD
6
    Case Name: James Garavaglia v. City Of St. Louis, Et Al.
7
    Veritext Reference Number: 5083764
8
    Witness: Darlene Green     Deposition Date: 2/17/2022
9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript. Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change. Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA
```

```
1          DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 5083764
3   CASE NAME: James Garavaglia v. City Of St. Louis, Et Al.
    DATE OF DEPOSITION: 2/17/2022
4   WITNESS' NAME: Darlene Green
5   In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7   I have made no changes to the testimony
    as transcribed by the court reporter.
8
    _____
9   Date           Darlene Green
10  Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
    They have read the transcript;
13  They signed the foregoing Sworn
       Statement; and
14  Their execution of this Statement is of
       their free act and deed.
15
    I have affixed my name and official seal
16  this _____ day of_____, 20____.
17
    _____
18       Notary Public
19
    _____
    Commission Expiration Date
20
21
22
23
24
25
```

```
1          DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 5083764
3   CASE NAME: James Garavaglia v. City Of St. Louis, Et Al.
    DATE OF DEPOSITION: 2/17/2022
4   WITNESS' NAME: Darlene Green
5   In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7   I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9   I request that these changes be entered
    as part of the record of my testimony.
10
    I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13
    _____
    Date           Darlene Green
14
    Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17  They have read the transcript;
    They have listed all of their corrections
18      in the appended Errata Sheet;
    They signed the foregoing Sworn
19      Statement; and
    Their execution of this Statement is of
20      their free act and deed.
21  I have affixed my name and official seal
22  this _____ day of_____, 20____.
23
    _____
    Notary Public
24
    _____
25  Commission Expiration Date
```

```
1       ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS MIDWEST
2       ASSIGNMENT NO: 5083764
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
    _____
20  Date           Darlene Green
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
       Notary Public
24
    _____
25  Commission Expiration Date
```

Veritext Legal Solutions