# SJ Exhibit 11

```
 1             UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF MISSOURI
 3                    EASTERN DIVISION
 4
 5   JAMES GARAVAGLIA,           )
                                 )
 6          Plaintiff,           )
                                 )
 7   vs.                         )   Case No. 4:20-cv-01681-CDP
                                 )
 8   CITY OF ST. LOUIS,          )
     et al.,                     )
 9                               )
            Defendants.          )
10
11
12
13
14
15            DEPOSITION OF CHANA MORTON
16         TAKEN ON BEHALF OF THE PLAINTIFF
17                  APRIL 7, 2022
18
19
20
21
22
23
24                                           SJ Exhibit
25                                              11
```

Page 29

1  signed that either?
2  A  I did sign it.
3  Q  You did sign it?
4  A  Mm-hmm.
5  Q  But you don't believe you've read it?
6  A  No.
7  Q  The last page, which refers to all
8  these Work Rules, do you know -- do you recall ever
9  signing this?
10  A  Yes.
11  Q  Okay.  All right.  But your testimony
12  is that you hadn't read it but you have signed this
13  -- the Acknowledgment page?
14  A  Yes.
15  Q  Anybody ever talk to you about these
16  rules?
17  A  The cross-training, yes.  Talked to
18  Judy.
19  Q  So there -- was the training on all
20  of these rules?  Did they discuss them?
21  A  I'm sorry, say it again?
22  Q  At that training, the cross-training,
23  did they discuss all these rules?
24  MS. HAMILTON:  I would object that
25  that mischaracterizes the witness's testimony.

Page 30

1  She's saying she had a conversation about the
2  cross-training policy, not that there was an actual
3  training.
4  Q  (BY MR. SCHMITZ)  Have you been to
5  any training on these rules?
6  A  No.
7  Q  You had a discussion about them, you
8  said, with Judy Armstrong?
9  A  Yes.
10  Q  Did you -- did she -- did you discuss
11  each and every one of the rules?
12  A  No.  Just the cross-training.
13  Q  Have you ever had a service rating?
14  A  Ever?
15  Q  Well, yeah, I should -- should
16  rephrase that.  Since you got to the Comptroller's
17  office as the executive secretary, or assistant to
18  the Comptroller.
19  A  Yes.
20  Q  Okay.  Do you recall how many times
21  you've had one?
22  A  Twice.
23  Q  Twice.  Do you remember what years?
24  A  2011 -- no, it would have to be 2012.
25  And maybe 2013.

Page 31

1  Q  Okay.  And not since?
2  A  No.
3  Q  Do you know why you haven't had one?
4  A  No.
5  MS. HAMILTON:  And I will, just for
6  the record, object to foundation.  And that it
7  calls for speculation.
8  Q  (BY MR. SCHMITZ)  So I want to talk
9  to you a little bit about Jim.  You came in 2011;
10  is that right?  Just to clarify, I know you've
11  testified, I just want to make sure I'm right.  And
12  Jim was an asset manager at that time?
13  A  Yes.
14  Q  Did you interact with him when he was
15  an asset manager?
16  A  Not much.
17  Q  Not much?  Okay.  Do you recall if
18  you had any interactions with him while he was an
19  asset manager?
20  A  I'm sure I did.
21  Q  Do you recall what that would have --
22  A  I don't recall.
23  Q  All right.  Did you have any
24  involvement in his work or his duties when he was
25  an asset manager?

Page 32

1  A  No.
2  Q  Okay.  Do you recall when he was
3  promoted to Deputy Comptroller for finance and
4  development?
5  A  Yes.
6  Q  And did your interactions with him
7  increase at that time?
8  A  Yes.
9  Q  What were your interactions with him,
10  typically?  After his promotion?
11  A  If he had questions or needed to --
12  information, I would help him.  If it was something
13  that I knew about.  Sometimes items would come in
14  for the Comptroller that the Deputy Comptroller
15  would handle, so I would give those to him.
16  Q  Can you give us some examples of
17  that?
18  A  Since he was still doing some of the
19  asset, so any time documents or -- we'd get mail
20  regarding leases or things that the City owned, I
21  would refer that to Jim.  Or if there were phone
22  calls about assets, or something that the City
23  owned, I would refer that to Jim.
24  Q  Okay.  Do you know, did a lot of -- I
25  want to make sure I phrase this right, so if you

Page 41

1 procedure that you created?
2   A   Eunetter Steele probably.
3   Q   And who is Eunetter Steele?
4   A   She was Ivy Pinkston's assistant.  Or
5 executive secretary.
6   Q   And after Miss Ivy Pinkston left, did
7 Miss Steele, did she remain with the Comptroller's
8 office?
9   A   Yes.
10  Q   Do you know in what capacity?
11  A   She was still the executive
12 secretary.
13  Q   Who did she report to?
14  A   To Ivy -- I guess they all reported
15 to the Comptroller directly.
16  Q   Did she have the same classification
17 as you?
18  A   No.
19  Q   So she was an executive secretary but
20 she reported -- did she perform any of the same
21 duties as you did?
22  A   For the Comptroller?  No.
23  Q   No.  Do you know what she did after
24 she was the executive secretary to Ivy Pinkston?
25  A   She still did the bond documents,

Page 42

1 probably still did payroll for that section.  I
2 don't know what else she did.
3   Q   Was she ever part of -- so when the
4 bond documents got to your desk, that was when it
5 was ready for the Comptroller's signature, subject
6 to your review; is that correct?
7   A   No.  I wouldn't -- well --
8   Q   Subject -- does it sometimes come to
9 your desk without it --
10  A   Subject to my review, yes.
11  Q   All right.  So did Miss Steele, after
12 Jim became Deputy Comptroller, was she part of the
13 process of handling those documents and making sure
14 they were in order before they got to you?
15  A   No.  Jim replaced her with his own
16 assistant.
17  Q   What did Miss Steele do after that?
18  A   She went to work for Judy Armstrong.
19  Q   Okay.  Do you know what she did
20 there?
21  A   They did personnel issue
22 requisitions.  I don't know what all she did.
23  Q   So she wasn't involved in the bond
24 documents at that point?
25  A   No.  I don't think so.

Page 43

1   Q   Did Miss Steele have any involvement
2 in these protocols that Miss Ivy Pinkston taught
3 you when you first came on board?
4       MS. HAMILTON:  Objection, calls for
5 speculation.  Subject to that, you can answer.
6       MR. NORWOOD:  And I was going to join
7 in the speculation objection.
8   Q   (BY MR. SCHMITZ)  Just to clarify, if
9 you know.  If you have actual knowledge.
10  A   I don't know.
11  Q   Okay.  Did you ever talk to Miss
12 Steele about these procedures for the bond
13 documents?
14      MR. NORWOOD:  Objection, asked and
15 answered.
16      MS. HAMILTON:  You can answer.
17  A   Yes.
18  Q   (BY MR. SCHMITZ)  Okay.  Do you
19 recall any of those conversations?
20  A   I don't recall specific
21 conversations.  She -- she was one of the people
22 who trained me.
23  Q   Okay.  So it wasn't just Miss Ivy
24 Pinkston that --
25  A   Correct.

Page 44

1   Q   Who else trained you besides those
2 two?
3   A   The Comptroller.
4   Q   At any point did you ever speak to
5 the Comptroller about these procedures, or what you
6 were taught, and then Jim not following the
7 procedures?
8   A   Yes.
9   Q   When was that?
10  A   I don't recall a date.
11  Q   Do you recall what year?
12  A   It would have to be 2016.
13  Q   Was that the only time that you
14 talked to her?
15  A   No.
16  Q   Okay.  Do you recall other times?
17  A   It was continuous.
18  Q   What things were you telling the
19 Comptroller?
20  A   Items were missing, he wasn't
21 following what had been done with the documents for
22 years.
23  Q   Was this something that you discussed
24 with Jim at any point, or did you just inform the
25 Comptroller?

### Page 45

1  A  I know I discussed with both Jim and
2  Sheila.
3  Q  Sheila being who?
4  A  Jim's assistant.
5  Q  What's her last name?
6  A  I forgot her last name. Oh, my gosh.
7  Q  That's okay. Did you have to
8  communicate with her frequently when Jim was Deputy
9  Comptroller?
10  A  Not every day. Only when we were
11  doing bond deals.
12  Q  Do you know whether or not she was
13  the one who prepared those documents and got them
14  in order?
15  A  It was very confusing. I was never
16  sure.
17  Q  So you mentioned things not being in
18  order or missing signatures. Anything else?
19  A  There was a time where the documents
20  ended up out at the airport.
21  Q  Do you remember what -- what year it
22  was, or when?
23  A  I don't remember the year.
24  Q  Do you remember what type of bond
25  issue it was?

### Page 46

1  A  No.
2  Q  Do you recall if you spoke to Sheila
3  or to Jim about it?
4  A  I spoke with Sheila about it.
5  Q  Do you recall what happened or what
6  was said?
7  A  I just let her know that the airport
8  called me, the contract officer out there, and was
9  confused about some other documents that were --
10  that she received. And I asked her to read it to
11  me and I realized they were bond documents, and I
12  asked her to send them to me.
13  And I know the contract person
14  mentioned that they were in a folder, but the
15  folder wasn't marked. So I talked to Sheila, and I
16  said if these are bond documents, um, when you put
17  them in a folder, you should mark who -- you know,
18  what they are, who you are, so that they'll know if
19  they go out there by accident, or something should
20  happen, people will know.
21  Q  Did you ever speak to Jim about it,
22  or just to Sheila?
23  A  Just to Sheila.
24  Q  Did you ever discuss these issues
25  with Miss Steele? Or was it always either the

### Page 47

1  Comptroller or Jim or Sheila?
2  A  Well, Eunetter was doing something
3  different, so it was always the Comptroller,
4  Sheila, or Jim.
5  Q  Anybody else besides those people?
6  A  Probably talked to Michele Graham.
7  Q  Okay. What was her role?
8  A  She's in our office and she's the
9  contract supervisor.
10  Q  Who does she report to?
11  A  At that time, I'm not sure. I think
12  she reported to the deputy, Bev Fitzsimmons.
13  Q  Okay. Did you believe it was your
14  responsibility to speak to either Jim or Sheila or
15  the Comptroller about whether or not these
16  documents were in order?
17  A  Yes.
18  Q  Did you believe that because you were
19  told that directly from the Comptroller?
20  A  No.
21  Q  Okay. Why did you believe that?
22  A  Because we're responsible -- I felt
23  responsible for the documents. To make sure --
24  Q  Can you -- I'm sorry, I didn't mean
25  to cut you off. I'm sorry.

### Page 48

1  A  No, go ahead.
2  Q  I was just going to ask what you
3  meant by that, felt responsible. Why?
4  A  Because receiving the documents is
5  part of my responsibility.
6  Q  Well, but it goes beyond that a
7  little bit; right? You're not just receiving them
8  and then waiting for the Comptroller to hand it to
9  her. You're involved in making sure they're
10  correct. Is that right?
11  A  Yes.
12  Q  Okay. You were never told directly
13  to do that. Is that right?
14  MS. HAMILTON: Is there a question?
15  Q  (BY MR. SCHMITZ) Is that right?
16  MS. HAMILTON: I would just object
17  that it mischaracterizes her prior testimony
18  regarding her training. Subject to that, you can
19  answer. Sorry.
20  A  When I spoke with Eunetter Steele and
21  Ivy, it was part of our discussion.
22  Q  (BY MR. SCHMITZ) Okay.
23  A  And part of the training, I will say.
24  Q  So let me be clear because I want to
25  make sure we get your testimony correct. Were you

12 (Pages 45 to 48)

Page 57

 1  yes.
 2     Q   How about after that?
 3     A   Not in the beginning.  I'd say
 4  periodically afterwards, yes.  Not in the
 5  beginning.
 6     Q   Okay.  If you turn the page, it's
 7  still under paragraph 9, it mentions Rochelle
 8  Pruitt.  Are you familiar with her?
 9     A   Yes.
10     Q   Okay.  What's her -- what is her
11  title?
12     A   At that time she worked in the
13  Mayor's office.  I don't know her title.
14     Q   Okay.  Did she typically take the
15  documents directly to you as is listed -- written
16  in here?
17     A   Yes.
18     Q   Okay.  And then you took the
19  documents to the Register?
20     A   Yes.
21     Q   And this was all part of what you
22  were taught by Miss Steele?
23     A   Yes.
24     Q   In your training, was it ever talked
25  about, the movement and documents and how that

Page 58

 1  should be done?  How they should be -- is from one
 2  building to another, how that should be taken?
 3     A   From one building to another?
 4     Q   Right.
 5     A   No.
 6     Q   Okay.  Are you familiar with the
 7  interoffice mail?
 8     A   Yes.
 9     Q   Okay.  Were bond documents ever
10  passed along through interoffice mail?
11     A   No.
12     Q   How was it done?
13     A   Usually it gets to the City
14  Counselor's office.  I'm not sure what they did to
15  get it to the City Counselor's office.  But I know
16  that Joan Jennings would walk it to the Mayor's
17  office, and either Rochelle or Sherry Wibbenmeyer
18  would walk the documents to me.
19     Q   There were two different offices
20  within the Comptroller's office; right?  The
21  physical locations?
22     A   Yes.
23     Q   And was there a person that delivered
24  documents between those two offices?
25     A   Bond documents?

Page 59

 1     Q   Yes.
 2     A   I don't know how Eunetter got the
 3  bond documents to the City Counselor's office.
 4     Q   Well, not the City Counselor's
 5  office, but from one office to the other.  Like to
 6  where the Comptroller -- like to where your office;
 7  for example.
 8     A   We have garage attendants, we have a
 9  garage that the Comptroller is over, but we have
10  attendants there, and they pick up documents and
11  take them back and forth.
12     Q   Are these City employees?
13     A   Yes.
14     Q   Is it one particular person?  Or --
15     A   No.  I think maybe they have four
16  people?  Maybe five?
17     Q   Are they employees of the
18  Comptroller's office?
19     A   Yes.
20     Q   Do you know what their titles are?
21     A   I believe garage attendants.
22     Q   In your review of this document, did
23  you see anything about those garage attendants?
24     A   No.
25     Q   But you would agree you read about

Page 60

 1  other procedures about transferring documents, you
 2  know, between the Mayor's office and the City
 3  Counselor's office, that involved specific
 4  individuals; right?
 5     A   Yes.  And the Treasurer's office.
 6  They have a courier.
 7     Q   Do you know who that is?
 8     A   Tony.
 9     Q   Did you see Tony's name in here?
10     A   I thought I did.  I don't know what
11  page it's on but I did see it this week.  But the
12  Treasurer's courier.  You could call him and he'll
13  courier it.
14     Q   But none of these individuals are
15  located on site at the office where Jim was working
16  at; right?  Where the Deputy Comptroller is
17  stationed?
18     A   They're not located even at City
19  Hall.  Oh, there is something on number 10 where it
20  talks about "the Municipal Garage courier," they
21  "courier to the Treasurer."
22         So they did use the couriers.  And
23  then sometimes the Treasurer's courier will bring
24  them back.
25     Q   This is the Treasurer's courier?

Page 85

1  attendant to hand-deliver it.
2      Q   And then did you receive confirmation
3  that it had been delivered?
4      A   He signed the card.
5      Q   Okay.  And you said a card.  What
6  card would that be?
7      A   The card we attached, like a
8  Certified letter.
9      Q   Is it different than the USPS
10 Certified Mail receipt, the green card?  This was
11 something your office uses or --
12     A   No.  No.  It's not different.  I just
13 used that card.
14     Q   Used that card, but he --
15     A   Signed, mm-hmm.
16     Q   All right.  I'm going to circle back
17 to this exhibit but I'm just going to ask you some
18 questions not related to it.
19         So you talked -- you testified that
20 you and -- the Comptroller informed you that
21 Friday, I believe it was June the 28th, that the
22 events of the prior two days was related to his
23 placement on forced leave; is that correct?  Do I
24 have that right?
25     A   Yes.

Page 86

1      Q   So did you witness any of the events
2  that transpired on those two days?
3      A   Yes.
4      Q   Okay.  Do you know what -- what the
5  issue was?
6      A   I know there was a bond closing that
7  was happening that Friday, and I know prior to
8  that, it had gone to E&A and there was a lot of
9  confusion with that, and so it finally passed
10 through E&A and so we were waiting on these
11 documents.
12         And I received an email from Tom Ray
13 telling me that Jim had the documents, you know,
14 was circulating the documents and that the
15 documents were in the Mayor's office, and that Jim
16 asked the Mayor's secretary to put the documents
17 into the interoffice mail, once the Mayor has
18 already signed it.
19         And Tom Ray knew that that was not
20 the normal procedure, and that normally the Mayor's
21 office would walk the documents to the Comptroller.
22 Especially with the closing being so close.
23         And so I was made aware that the
24 documents were not heading to our office.
25     Q   Do you know what date that email was

Page 87

1  sent to you?
2      A   Was that June 26?
3      Q   Do you know anything about Bev
4  Fitzsimmons sending any information to the Mayor's
5  office?  Were you a part of that at all?
6      A   No.  No.
7      Q   Did you ever have any verbal
8  conversations with Tom Ray, or were they all by
9  email?
10     A   Email.  All by email.
11     Q   Do you know who Roger Denny is?
12     A   No.
13     Q   Do you recall if you've ever
14 communicated with an attorney at Spencer Fane
15 related to this issue?
16     A   Yes.  He was emailing me.
17     Q   Okay.  Did that refresh your
18 recollection that it was --
19     A   Yes.  Yeah.
20     Q   Okay.
21     A   But that's not the norm.  Normal way.
22 But...
23     Q   What is the normal way?
24     A   That an outside counsel would contact
25 me about documents.

Page 88

1      Q   Okay.  And did you bring that to the
2  attention of the Comptroller, that outside counsel
3  was communicating with you?
4      A   I don't recall.  I probably did.
5      Q   Do you know why he communicated with
6  you?  And I'm speaking to Roger -- about Roger
7  Denny.
8          MS. HAMILTON:  I'm going to object
9  that it calls for speculation.  But subject to
10 that, you can answer if you know.
11     A   No, I -- I'm not sure why he did.
12     Q   (BY MR. SCHMITZ)  Okay.  So we have a
13 -- documents.  This is part of what we just got
14 today so we do not have copies or an exhibit.  I'll
15 mark it as Exhibit X just so we can --
16         MS. HAMILTON:  The number?
17         MR. SCHMITZ:  It starts with 2120 and
18 they're in order.  Looks like it goes all the way
19 to 2139.  I think a lot of it's repetitive.  I have
20 obviously had a very short opportunity to review
21 it.
22         MS. HAMILTON:  2120 to 49 you said?
23         MR. BLANKE:  39.
24         MR. SCHMITZ:  2139, yes.  And for the
25 record, we'll just mark it as Exhibit X.

## Page 113

1 promotion into that position?
2    A   Yes.
3    Q   Okay. Did you interact with her on a
4 regular basis? Or --
5    A   No.
6    Q   Okay. What was your relationship
7 with her prior to her promotion?
8    A   I don't understand.
9    Q   I mean did you -- you worked
10 together; right?
11    A   A little bit.
12    Q   A little?
13    A   Yeah.
14    Q   I mean, did you have a good working
15 relationship to the extent that you worked
16 together?
17    A   Sometimes.
18    Q   Sometimes, okay. Do you recall what
19 her position was before she got promoted?
20    A   Not exactly, no.
21    MR. SCHMITZ: I'm going to ask for a
22 short break again.
23    MS. McMILLEN: Time, for the record?
24    THE REPORTER: 12:43.
25    (Off the record.)

## Page 114

1    MR. SCHMITZ: We are finished. For
2 now.
3    EXAMINATION
4 QUESTIONS BY MR. NORWOOD:
5    Q   Okay. I have a few. I want to talk
6 about, you touched on this, but with respect to
7 your ratings, I think you had indicated that maybe
8 in 2011 and 2012, you received ratings from the
9 Comptroller; is that right?
10    A   Yes.
11    Q   And thereafter, you had not received
12 any ratings?
13    A   I have not received any more ratings.
14    Q   From the Comptroller?
15    A   Correct.
16    Q   And just for the record, you are an
17 African American female; is that right?
18    A   Yes.
19    Q   That email you received from Tom Ray
20 that we talked about, I believe it was Wednesday,
21 June the 26th of 2019. Is that right?
22    A   Yes.
23    Q   Was that unusual for you to get an
24 email like that?
25    A   Yes.

## Page 115

1    Q   Why?
2    A   Tom Ray knows how we circulate
3 documents. He was basically giving me a red alert
4 that this was -- this was unusual.
5    Q   Okay. And Mr. Garavaglia was copied
6 on that email?
7    A   Yes.
8    Q   As part of that red alert that you
9 identified. Is that right?
10    A   Yes.
11    Q   Were you -- you had talked about or
12 touched on a meeting that took place on July 2 of
13 2019 that occurred in the Comptroller's office with
14 Mr. Garavaglia?
15    A   Yes.
16    Q   Let's talk a little bit more about
17 that. What time of day was that meeting?
18    A   I called Jim at 7 AM that morning and
19 asked him to come to the office instead of going to
20 his office. To come to the Comptroller's office.
21 So he got there at 7:30, around 7:30, and that's
22 when he was presented the letter in the conference
23 room.
24    Q   Okay. And the letter we're talking
25 about is the letter that was dated July 2, 2019?

## Page 116

1    A   That's correct.
2    Q   Regarding the forced leave?
3    A   Yes.
4    Q   And who was there at that meeting?
5    A   There was Judy Armstrong, Jason
6 Fletcher, Kelly Anderson, and Larry, one of the
7 marshals.
8    Q   And Mr. Garavaglia?
9    A   And Mr. Garavaglia.
10    Q   And, now, did you sit in on the
11 actual meeting itself?
12    A   No.
13    Q   All right. How long did that meeting
14 last?
15    A   Not very long. Maybe eight to ten
16 minutes.
17    Q   Were other people in the office
18 that --
19    A   No.
20    Q   Why was that?
21    A   It was before work hours, official
22 work hours.
23    Q   Okay. So all of this transpired with
24 respect to delivery of the letter, and the meeting
25 you say lasted about ten minutes?

Page 117

1   A   Yes. Maybe less than that.
2   Q   And -- and this was before working
3   hours had started. Is that right?
4   A   That's correct.
5   Q   I think you touched on this, but have
6   you ever heard of, since you have been associated
7   with the Comptroller's office, a situation where
8   important documents like this would be sent in
9   interoffice mail?
10  A   Never.
11  Q   Do you know why Jim Garavaglia would
12  have sent them in interoffice mail --
13      MR. SCHMITZ: Objection, calls for
14  speculation.
15      MR. NORWOOD: Well, let me get it
16  out.
17  Q   (BY MR. NORWOOD) Do you know why,
18  given the fact that Mr. Garavaglia was going to be
19  on vacation the following day, he would have
20  instructed the Mayor's secretary to put those
21  important documents in interoffice mail?
22      MR. SCHMITZ: Again, objection, calls
23  for speculation.
24  Q   (BY MR. NORWOOD) If you know.
25  A   I don't know.

Page 118

1   Q   Let me -- if you could turn to
2   Exhibit O? Do you have that in front of you?
3   A   Yes.
4   Q   And I'm going to direct your
5   attention to what they have repaginated as page 12,
6   which is the memo that you prepared for Miss Nancy
7   Kistler dated July 12, 2019. Do you see that?
8   A   Yes.
9   Q   Let me turn to the last paragraph of
10  that letter, which is on page 4, and there is an
11  asterisk. Do you see that?
12      MR. BLANKE: Did you say page 4? Oh,
13  at the top.
14      MR. NORWOOD: Well, it's page 15 of
15  the repaginated but it's page 4 of the memo that
16  you wrote.
17  Q   (BY MR. NORWOOD) Are you there?
18  Page --
19  A   Yes.
20  Q   Exhibit O, redesignated as page 15.
21  It's page 4 of your memo. Is that right?
22  A   Yes.
23  Q   All right. Now, you have an asterisk
24  there, and a couple of sentences following that
25  asterisk; is that correct?

Page 119

1   A   Yes.
2   Q   I want to just read that. It says,
3   (Quote as read):
4       During this entire chaotic process on
5       Thursday, July 27, I did not receive
6       any verbal or written communication
7       from James Garavaglia or his
8       assistant, Sheila Woods.
9       Why did you write that there?
10  A   Because that was unusual, for me to
11  get communication from outside people and the
12  Comptroller's own deputy did not follow up or call
13  to see how things were going. I didn't hear
14  anything from either one of them.
15  Q   Okay. You go further and you say,
16  (Quote as read):
17      I believe they are ultimately
18      responsible for the proper execution
19      of these types of emergency
20      documents.
21      Why did you write that?
22  A   Because I felt that they are
23  ultimately responsible. They are responsible, but
24  now we became responsible for the documents.
25  Q   And I think you talked about that

Page 120

1   earlier where essentially you had to drop the work
2   you would normally do to make sure that these
3   important documents were executed before the
4   deadline.
5   A   That's correct.
6   Q   And then you go further, you say,
7   (Quote as read):
8       Instead, many of us had to stop doing
9       our own work for two days to make
10      sure that these Muni Court documents
11      were processed timely and correctly.
12      Is that accurate?
13  A   That's correct.
14  Q   All right. And then it says, (Quote
15  as read):
16      This type of lack of communication
17      and confusion is, unfortunately,
18      happening more and more frequently,
19      which is unfortunate as this process
20      prior to Jim taking over as deputy
21      ran quite smoothly and
22      collaboratively within the
23      departments for many years.
24      Is that accurate?
25  A   That's correct.

Page 121

1  Q   And when you talked about the
2  pre-James Garavaglia process working smoothly and
3  cooperatively for many years, tell us about that.
4    A    All of us assistants worked together,
5  we worked together with Ivy, we worked together
6  with Eunetter, we always knew where the documents
7  were, we always knew the documents were coming
8  days, even weeks before the documents came.
9         And the assistants, we always emailed
10  each other, who has the documents?  You have it,
11  okay, Chana, I'm bringing it to you, I got it.
12  Eunetter, I have the documents, I put it down, you
13  know, I brought them to the register's office.  It
14  was constant communication and it was just smooth.
15  Everyone knew what they were supposed to do.
16    Q    And why is that important with
17  respect to dealing with the Mayor, the president of
18  the Board of Aldermen, the Comptroller, why that
19  was important for that collaboration to take place
20  to know where people were so that documents could
21  be properly executed?
22         MR. SCHMITZ:  Objection, it calls for
23  speculation.
24    Q    (BY MR. NORWOOD)  If you know.
25    A    Because these are financial

Page 122

1  documents.  Normally these are financial documents.
2  It's very important, there's always deadlines, but
3  more importantly, the elected officials, they have
4  their own meetings and schedules and just to
5  collaborate all the schedules, you know, all the
6  secretaries, all of us will work together, well,
7  she's here, okay, we'll give it to her and make
8  sure she has it, and it's just important, regarding
9  their schedules, to get these financial documents
10  done correctly and without any bumps.
11    Q    And after Jim became Deputy
12  Comptroller, finance and development, did that
13  process change?
14    A    Yes.  So we never knew when the
15  documents were coming.  And like I said before, a
16  lot of times Sheila wouldn't put it in a marked
17  envelope, or she wouldn't communicate with us and
18  she would always say, well, Jim said to do this,
19  Jim said.  So we tried to work together with her to
20  get her into the fold of how we usually do things
21  but it never happened.
22    Q    Okay.  All right.  And I believe you
23  testified that you had discussions with Jim about
24  issues as they were developing over the -- after he
25  became Deputy Comptroller; is that correct?

Page 123

1    A    Yes.  That's correct.
2    Q    All right.  And why did you have
3  discussions with Jim about problems with those
4  documents?
5    A    Because items were missing, or we
6  didn't know where the documents were.  Sheila
7  wouldn't know where the documents were.  At one
8  point Jim was trying to walk the documents around,
9  which is not something -- because he doesn't know
10  their schedules, he doesn't know if the Mayor's
11  there, he doesn't know if the Comptroller, you
12  know, and so we tried to get him into our system.
13  He just never did conform.  Never.
14    Q    Okay.  And you had those discussions
15  with Sheila as well?
16    A    Yes.
17    Q    And what was her response?
18    A    She would cry.  She would cry.
19    Q    She would cry in response to your
20  suggesting that there be more collaboration with
21  these documents to make sure they were properly
22  executed?
23    A    Yes.  Because she would say, well,
24  Jim is telling me this, and you're telling me that,
25  and so she was just kinda in the middle so she

Page 124

1  would cry.
2    Q    All right.  Okay.  And did that
3  happen fairly often?
4    A    Yes.
5    Q    Let me hand you what had been
6  previously marked as Garavaglia Deposition Exhibit
7  14.  And I think you cleared this up but I just
8  want to make sure we get this cleared up squarely
9  for the record.
10         MR. BLANKE:  What is this?
11         MR. NORWOOD:  This is Garavaglia
12  Exhibit 14.
13         MR. BLANKE:  Sorry, Ron, I didn't
14  know you had these.
15    Q    (BY MR. NORWOOD)  You had, in
16  response to counsel's question, you had identified
17  Waste Management, an issue with a Waste Management
18  contract for which you prepared a document for the
19  Comptroller to sign.
20         Do you recall that?
21    A    Yes.
22    Q    All right.  And then I believe you
23  clarified that, and when he talked about St. Louis
24  Composting, that refreshed your recollection that
25  in fact what you were talking about was the