SJ Exhibit 13

```
 1              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF MISSOURI
 2                    EASTERN DIVISION

 3    James Garavaglia,        )
                               )
 4       Plaintiff,            )
                               )
 5    v.                       ) Case No. 4:20-cv-01681-CDP
                               )
 6    City of St. Louis,       )
      et al.,                  )
 7                             )
         Defendants.           )
 8

 9

10

11

12            DEPOSITION OF JUDY ARMSTRONG

13

14          Taken on behalf of the Plaintiff
                    April 12, 2022
15
             Julie Ann Whiting, CCR 830, RPR
16
```

**SJ Exhibit 13**

Page 69

1   A   That is correct.
2   Q   Okay. Have you ever received a service
3   rating from Comptroller Green?
4   A   No, I have not.
5   Q   Have you ever received a service rating
6   from anybody in the Comptroller's office, is what I
7   should have asked you.
8   A   I did.
9   Q   And this was in -- is this before or after
10  you became Executive Assistant?
11  A   Before.
12  Q   So as Executive Assistant II and as Fiscal
13  Operations Support Manager, you were never rated?
14  A   No.
15  Q   What about as Executive Assistant I?
16  A   No.
17  Q   You were only rated as Special Assistant?
18  A   Yes.
19  Q   Do you know why that is?
20  A   No, I don't.
21  Q   Back to this question about -- let me make
22  a more specific question here.
23      Did you ever discuss with Mr. Garavaglia
24  his intentions to retire at any time?
25  A   No, I did not.

Page 70

1   Q   Did you ever hear any such discussions
2   between the Comptroller Green and Jim Garavaglia
3   about his intention to retire?
4   A   No.
5   Q   Or anything dealing with how long he would
6   stay on as Deputy Comptroller?
7   A   No.
8   Q   Were you ever told about any such
9   discussions by anyone?
10  A   No.
11  Q   Okay. Did you ever discuss his retirement
12  or his performance with Chana Morton before he
13  retired?
14  A   No.
15  Q   Now, after Mr. Garavaglia was promoted to
16  Deputy Comptroller, he replaced Eunetter Steele as
17  his assistant; is that correct?
18  A   When you -- no. That's not correct.
19  Q   In what way is that not correct?
20  A   Because she was never his assistant.
21  Q   Well, that's what I meant. I meant that,
22  you know --
23  A   But you said he replaced her. He couldn't
24  replace her if she wasn't his assistant.
25  Q   He hired a -- he designated another person

Page 71

1   to be his assistant from the get-go?
2   A   That's correct.
3   Q   Correct?
4   A   That's correct.
5   Q   And then -- and then you hired her as --
6   or she became your assistant?
7   A   Correct.
8   Q   Why is that?
9   A   Because I still needed an assistant.
10  Q   But why her? She was doing a totally
11  different job, wasn't she?
12  A   But she was still a secretary, so that's
13  what I needed.
14  Q   Okay. So why did you choose her of all
15  the --
16  A   I thought she was a good one for the job.
17  Q   How did you know that?
18  A   I knew her. I've seen her work before. I
19  knew what type of work she did.
20  Q   Now, you said you did not see
21  Jim Garavaglia's work before, but you saw her work
22  before?
23  A   Uh-huh.
24  Q   She was -- so when he was Asset Manager,
25  did you see his work as Asset Manager? No, because

Page 72

1   she was -- she was a Special Assistant to his
2   predecessor as Deputy Comptroller; is that right?
3       MR. NORWOOD: Well, let me object.
4       MS. HAMILTON: Yeah.
5   Q   (By Mr. Blanke) Let me ask you this: Was
6   Eunetter Steele, to the best of your knowledge, ever
7   Jim Garavaglia's assistant?
8   A   No.
9   Q   No? Okay. Do you know if he had an
10  assistant or a secretary as Asset Manager?
11  A   Yes.
12  Q   And who was that?
13  A   Sheila Woods.
14  Q   Did you deal with Sheila Woods when he --
15  when Jim Garavaglia was Asset Manager?
16  A   No.
17  Q   Did you ever have any discussions -- well,
18  strike that.
19      Did you ever state to Comptroller Green
20  that documents regarding public finance matters were
21  not being handled property -- properly, that the
22  signature process had problems, you know, or things
23  of that nature?
24      MS. HAMILTON: I'm going to object to the
25  vagueness of that.

18 (Pages 69 to 72)

Page 97

1 is that a fair statement?
2     MS. HAMILTON: I'm going to object to the
3 foundation of the question, that the question
4 lacks foundation. But subject to that, you can
5 answer.
6   A  I don't who he -- who he's talking about.
7   Q  (By Mr. Blanke) What happened when you
8 gave him the notice? Where was it, first of all?
9 Where did you hand it to him?
10   A  Who are you talking about?
11   Q  Jim Garavaglia. I'm sorry. When you
12 delivered the forced leave notice to Jim Garavaglia
13 by hand --
14   A  Uh-huh.
15   Q  -- where was that?
16   A  In the Comptroller's conference room.
17   Q  And who all was there?
18   A  Myself, Kelley Anderson, Jason Fletcher,
19 and Larry -- I forget his last name -- from the City
20 marshals.
21   Q  Anyone else you recall?
22   A  No, that's all that was in there.
23   Q  Was Comptroller Green there?
24   A  No.
25   Q  Was Chana Morton there?

Page 98

1   A  No.
2   Q  Was Bev Fitzsimmons there?
3   A  No.
4   Q  Okay. Do you know why the people who were
5 there were there?
6   A  Those were the ones that the Comptroller
7 asked to be there.
8   Q  Did -- did the Comptroller ask them to be
9 there through you? Did you deliver -- did you tell
10 them to be there or did somebody else?
11   A  I honestly don't remember.
12   Q  So when you got there, all of these people
13 were already there? Were you the last one to
14 arrive, or how did that go?
15   A  I don't know.
16   Q  Do you remember? Do you remember what
17 happened during that meeting?
18   A  Yes.
19   Q  What? What happened?
20   A  We -- I handed Jim the letter, he read it,
21 I told him he was being on forced leave and I needed
22 to collect his badge and keys.
23   Q  Did you say that in front of these other
24 folks?
25   A  Yes.

Page 99

1   Q  Do you think they heard you?
2   A  Yes.
3   Q  What did he say?
4   A  He asked what was wrong, why was this, or
5 something to that effect, and I told him I didn't
6 have any other information than what was in the
7 letter.
8   Q  Okay. What else happened? Anything?
9   A  That was it.
10   Q  By the way, what date was this? Do you
11 have any --
12   A  July 2nd.
13   Q  This was July 2nd. Okay. And then what
14 happened after you told him that?
15   A  He left out and Larry left out with him.
16   Q  Did anyone ask him to leave?
17   A  No.
18   Q  What was the marshal doing there?
19   A  It's just -- was a standard protocol.
20 With something like this, you never know what's
21 going to happen, so --
22   Q  Did anyone ask the marshal to escort him
23 out?
24   A  No.
25   Q  Did the marshal escort him out?

Page 100

1   A  They walked out together. I can say that.
2   Q  Do you remember telling Jim Garavaglia
3 that they would let him know about what would happen
4 in the future, his status, what it would be?
5   A  No, I don't remember that.
6   Q  Who determined -- if you know, who
7 determined how Mr. Garavaglia's duties would be
8 handled in his absence?
9   A  Comptroller Green.
10   Q  How do you know that?
11   A  Well, she was the one that communicated to
12 me.
13   Q  So did you communicate that to
14 Jim Garavaglia what she had told you?
15   A  No.
16   Q  Okay. What did she tell you?
17   A  Excuse me?
18   Q  What did she tell you about how his duties
19 would be handled in his absence?
20   A  The real estate and telecommunications
21 were going to be done by Kelly Anderson, LaTaunia
22 Kenner was going to do all of the bond deals, and
23 then I was going to do the Gateway Transportation
24 Center.
25   Q  Okay. Anything else?

25 (Pages 97 to 100)

Page 109

1  31 and 32. Here we have another e-mail and letter
2  to Richard Frank from Darlene Green, copying you in
3  on both, about requesting a 30-day extension. Did
4  you know about that before it was done?
5    A   Yes.
6    Q   How?
7    A   Comptroller Green told me.
8    Q   What did she tell you about it?
9    A   That she was going to extend the forced
10 leave.
11   Q   And why? Did she tell you why?
12   A   I don't think we got into the why.
13   Q   Look specifically at page 32 where
14 Darlene Green informs Mr. Frank that she was asking
15 for an extension of 30 days. And then the second
16 sentence of the first paragraph is, We are
17 requesting this extension in light of the ongoing
18 investigation and pending report it from the State
19 Auditor's office.
20         When you received this letter, a copy of
21 this letter, did you know what they were talking
22 about with regard to this State Auditor?
23   A   I did not.
24   Q   Did you ask?
25   A   I did not.

Page 110

1    Q   The reference to the ongoing
2  investigation -- was that an investigation you were
3  conducting?
4    A   No, it's not.
5    Q   Who was conducting it, if you know?
6    A   According to this, the State Auditors.
7    Q   Okay. It goes on to say that the
8  continued restriction of Mr. Garavaglia's access to
9  all the offices, files, e-mails, and such continue.
10        Did you know about that aspect of the
11 forced leave, that he was barred from the premises,
12 from any contact with any of the files or e-mails
13 or -- did you know about that?
14   A   I did know that.
15   Q   And were you consulted by Darlene Green as
16 to whether or not that would be asked for, or was
17 that -- whose idea was that, do you know?
18   A   I do not.
19   Q   Did she talk to you about it?
20   A   No, she did not.
21   Q   Please direct your attention to pages 43
22 and 44. What is this? What is that?
23   A   Results of some things that were -- needed
24 to be brought to her attention regarding AT&T and
25 Waste Management.

Page 111

1    Q   Okay. You authored it? This is yours,
2  right?
3    A   Yes, it is.
4    Q   Okay. Before I get into that, let's come
5  back. This -- if you'll direct your attention to
6  pages 53 through the end. This is a series of
7  different versions of the pre-termination letter.
8  You indicated that you couldn't recall whether you
9  had anything to do with this, but these are actually
10 signed by you -- isn't that correct -- as the
11 Appointing Authority?
12        MS. HAMILTON: I'm going to object on the
13   basis of foundation. Subject to that, you can
14   answer.
15   Q   (By Mr. Blanke) Well, as a matter of
16 fact, none of them are -- none of these copies are
17 signed, actually?
18   A   I was going to say, he said they're signed
19 by me, but there's no signature on here.
20   Q   Do you recall drafting these letters or
21 having something to do with the drafting of these
22 letters?
23   A   I may have. Right now, I do not recall
24 it. I do draft letters for pre-term hearings.
25   Q   So it notes in here that the State

Page 112

1  Auditors were brought in as a part of the
2  investigation. You said -- you said you had --
3        MS. HAMILTON: Where are you referring to
4    when you say in here, just for clarity for the
5    record?
6    A   Yeah, where at? What -- what document are
7  you on? What page?
8    Q   (By Mr. Blanke) Well, I assumed they were
9  the same, but they may not be. I'm looking at
10 page -- let's see. Page. It's item number 7 on
11 page 53.
12        MS. HAMILTON: Okay.
13   A   Okay.
14   Q   (By Mr. Blanke) It appears to be item
15 number 7.
16   A   Uh-huh.
17   Q   No, it changed. Let's see. Yeah, I think
18 it's in there. I think it's number 7. So, you
19 know, you already --
20        MS. HAMILTON: So you're on page 53, item
21   number 7? Is that correct?
22        MR. BLANKE: Right.
23        MS. HAMILTON: For clarity of the record.
24        MR. BLANKE: Yes.
25        MS. HAMILTON: Okay.

28 (Pages 109 to 112)

Page 113

1  Q  (By Mr. Blanke)  It's also page 55, item
2  number 7.  It's also page 58, item number 7.  It's
3  all the same.
4  A  Okay.
5      MR. NORWOOD:  These unsigned versions of
6  the letters is what you're referring to?
7      MR. BLANKE:  Right, the versions that were
8  supplied to us by Defendants.  That's correct.
9      MR. NORWOOD:  The unsigned versions that
10 were supplied to you by Defendants?
11     MR. BLANKE:  That's correct.
12     MR. NORWOOD:  Okay.
13 Q  (By Mr. Blanke)  So you indicated that you
14 didn't have anything to do with that, but did you
15 have any knowledge as to who was involved in the
16 decision to bring in the State Auditors to
17 investigate Mr. Garavaglia?
18 A  I do not.
19 Q  Or what the scope of their work was?
20 A  No, I do not.
21 Q  And you had no communications with any of
22 them?
23 A  No.
24 Q  Did you ever see the results of their
25 audit?

Page 114

1  A  I did not.
2  Q  Okay.  One more thing before I go back to
3  your memo.  If you'll turn to page 45 of Exhibit O.
4  A  Uh-huh.
5  Q  Pages 45 and 46.
6  A  Uh-huh.
7  Q  This appears to be a signed memorandum
8  written by Darlene Green dated August 26th about the
9  hearing and investigation of Jim Garavaglia.
10     Have you ever seen this before?
11 A  I do not recall seeing this before.
12 Q  My question was going to be whether you
13 know who it was sent to, because it doesn't say.  Do
14 you know anything about this, like who it was sent
15 to?
16 A  I do not.
17 Q  So I take it if I ask you if you ever
18 discussed it with her, what's in this memorandum --
19 A  No.
20 Q  -- you wouldn't know that either; right?
21 A  No, I would not.
22     MR. BLANKE:  Okay.  Let's take a break.
23 Can we take a break?  As a matter of fact, it's
24 12:05.  Maybe this would be a good time to take
25 a lunch break.

Page 115

1      MR. NORWOOD:  That's fine with me.
2      MS. HAMILTON:  Yeah.
3      MR. BLANKE:  Maybe that's not the right --
4  what do you have, 12 --
5      COURT REPORTER:  12:06.
6      (Off the record at 12:06 p.m.)
7      (On the record at 1:11 p.m.)
8  Q  (By Mr. Blanke)  Did you ever have any
9  conversations with Bev Fitzsimmons about the muni
10 court issue?
11 A  No.
12 Q  Were you aware of the fact that she sent
13 an e-mail chain to the mayor's office, an e-mail
14 chain within the department?
15 A  No.
16 Q  Did you ever communicate with Tom Ray
17 about the muni court issue?
18 A  No.
19 Q  Were you aware of the e-mails between
20 Chana Morton and Tom Ray?
21 A  No.
22 Q  Did you have any knowledge about the
23 attorney for the developer attempting to get an item
24 on the agenda with the mayor's office?
25 A  No.

Page 116

1  Q  You don't know anything about it.  Okay.
2  You have no personal knowledge about any of this
3  stuff?
4  A  No.
5  Q  Okay.  Back to Exhibit O, which I think is
6  still before you, I think.  Okay.  Page 43.  This is
7  your memorandum to Comptroller Green dated
8  August 26th of 2019.  First of all, let's go to the
9  bottom of that, which is the next page on page 44.
10 There is a c -- a copy sent to Kelley Anderson,
11 Esquire, a special assistant to the Comptroller.
12     Why was Kelley Anderson copied in?  Is
13 that just your normal practice?
14 A  Because he was working with me on AT&T
15 stuff.
16 Q  How was he working with you?
17 A  We were both trying to get those accounts
18 reconciled and he was -- at that time, he was
19 over -- actually being the one that was over AT&T.
20 Q  When you were working together on this,
21 were either of you higher than the other or have
22 primary duties, or were you co-equals with regard to
23 that investigation?
24 A  We were co-equal.
25 Q  Why did you write this particular

Page 117

1 memorandum to Darlene Green?
2   A  It was bringing her up to date on what was
3 going on, on some things that we had discovered.
4   Q  Okay. Did you have communications with
5 Darlene Green before writing this memorandum where
6 she actually knew about a bunch of this stuff before
7 actually getting this memo? In other words, were
8 you just memorializing what you had already
9 discussed with her, a lot of it, or was it really
10 new information for her?
11   A  No, we had -- I had mentioned some things
12 to her, but she asked for everything to be put in
13 writing.
14   Q  Okay. Well, you know, I guess I'm asking
15 for a generalization. But, you know, was she aware
16 of most of it, hardly any of it?
17   A  I can't -- I don't remember now.
18   Q  Okay.
19   A  She just asked me to put things in
20 writing.
21   Q  Did anybody -- did Kelley Anderson help
22 you prepare this memo, or is he just another
23 recipient?
24   A  He's another recipient.
25   Q  Okay. So did anybody help you prepare

Page 118

1 this memo?
2   A  No.
3   Q  On the very -- Roman numeral I on page 43,
4 it refers to an attachment. You said AT&T considers
5 this agreement -- what you call the Master Agreement
6 that was signed by James Garavaglia, you said AT&T
7 considers this agreement to be a contract between
8 AT&T and the City, and then you say see attached.
9 What was attached? Was it the contract itself?
10   A  The Master Agreement.
11   Q  The Master Agreement. And when you say
12 AT&T considers this to be a contract, were you of
13 the -- were you aware of the fact that they had told
14 Mr. James Garavaglia that it was not a contract?
15   A  No, I wasn't.
16     MR. NORWOOD: Well, let me object.
17     MS. HAMILTON: Yeah, I'm going to object
18   that it assumes a fact that's not in evidence,
19   but subject to that.
20     MR. NORWOOD: Well, let me object, too,
21   because it calls for a legal conclusion on the
22   part of AT&T as well, assuming that's the
23   "they" you're talking about.
24     MR. BLANKE: She said no, so it's sort of
25   a moot point at this point.

Page 119

1   Q  (By Mr. Blanke) Were you aware of anyone
2 telling Mr. Garavaglia that it was not a contract?
3   A  No.
4   Q  And did you talk to the AT&T in person --
5 excuse me.
6     Did you talk to the AT&T person who said
7 this, that it was a contract?
8     MS. HAMILTON: I'm going to object that --
9   oh, you're talking about did she -- her
10   reference? Excuse me.
11     MR. BLANKE: Yeah. Yeah.
12     MS. HAMILTON: I'll withdraw the
13   objection.
14   Q  (By Mr. Blanke) Did you, Judy Armstrong,
15 talk to any AT&T person who told you that AT&T
16 considered this to be a contract?
17   A  Yes.
18   Q  Who?
19   A  Mary Harp.
20   Q  Okay. And when was that, do you remember?
21   A  I don't remember.
22   Q  Did this -- now, I think you told me
23 before -- correct me if I'm wrong -- that your
24 entire investigation of this matter began after
25 Jim Garavaglia was put on forced leave?

Page 120

1   A  That is correct.
2   Q  In number 3, you say, Greg Hayes contacted
3 Mr. Garavaglia and was told not to pay the bill
4 until it was corrected.
5     Did Greg Hayes tell you that?
6   A  Yes, he did.
7   Q  Okay. And when was that?
8   A  I don't have any dates or anything.
9   Q  It would have been sometime between the
10 time he was first placed on forced leave --
11   A  In the time of us doing this --
12   Q  -- and the time this was written?
13   A  That's right.
14   Q  Did he tell you who told him not to pay
15 it? Did Mr. Hayes tell you that it was
16 Mr. Garavaglia who told him not to pay?
17   A  Yes, he did.
18   Q  You said they should have been paying
19 something on the invoice while the particulars were
20 being worked out. Was that your opinion or someone
21 else's?
22   A  That was my opinion.
23   Q  Why was that your opinion?
24   A  Because they were using the service.
25   Q  What if they were grossly overcharging,

Page 133

1   A  This is dealing with NICE inContact.
2   Q  Okay. Can you pick up Exhibit Y again?
3   Turn to page 1870.
4   A  Uh-huh.
5   Q  Do you recognize this?
6   A  Yes.
7   Q  What is it?
8   A  Just a report that I gave to the
9   Comptroller on some issues that I had found.
10  Q  Okay. And do you know when you gave it to
11  the Comptroller?
12  A  I do not.
13  Q  Do you know when --
14      MS. HAMILTON: If you show her the cover
15  e-mail, the prior page, it may refresh the
16  witness' recollection.
17  Q  (By Mr. Blanke) Did you send this to her
18  secretary, Chana Martin -- Morton on July 11th of
19  2019?
20  A  I would say yes. That's what's on here.
21  Q  And by doing that, I assume that's -- how
22  come you didn't just send it directly to
23  Darlene Green?
24  A  I don't know.
25  Q  And that's the reason I asked in the very

Page 134

1   beginning, whether you dealt directly with
2   Darlene Green or you had to go through Chana. I
3   mean, you didn't have to send it to Chana; right?
4   You could have sent it to Darlene Green; correct?
5   A  I could have.
6   Q  Okay. So items from James Garavaglia's
7   office.
8   A  Uh-huh.
9   Q  Why are you sending this? What's the
10  reason for it? What's the reason?
11  A  Well, first of all, it's also showing
12  things that were not done that needed to be done.
13  It shows the service dates and it shows invoices
14  that were not paid. All this had to be rectified.
15  It also points out the past due with the Parks
16  Department, what was going on there. It has the
17  past due from the -- AT&T. And it also shows the
18  contract for Waste Management and the issue that we
19  have with that.
20  Q  Well, why are you reporting to her about
21  all this stuff?
22  A  Because this is all -- it's all her office
23  and she needed to know what was going on.
24  Q  Well, were you asked to investigate all
25  these different matters?

Page 135

1   A  I was -- it's a difference in
2   investigating and a difference in going in and doing
3   things to see that nothing slips through the cracks.
4   Q  Did Darlene Green ask you to go into his
5   office and see that nothing seeps through the
6   cracks?
7   A  She asked that we continue to have -- that
8   the work continues to get done.
9   Q  So she didn't specifically ask you to do
10  this?
11  A  No, she did not.
12  Q  What did she do after she received it?
13  A  I don't know.
14  Q  I meant to say what did she tell you after
15  she received it, if anything?
16  A  I can't -- I can't say that she -- I don't
17  really remember what she told me.
18  Q  Was there more than this, or is -- did you
19  make more reports like this, or is this the only
20  one?
21  A  Make more reports in terms of --
22  Q  In terms of the items from his office.
23  Was this the first or the second or the third one of
24  these that you did?
25  A  No. I believe it was the only one like

Page 136

1   this. I think some of these items were mentioned in
2   some other documents, but it was the only one
3   spreadsheet I did like this.
4   Q  In what other documents would it be
5   mentioned in?
6   A  Some of the same things that's on here
7   were in some of the other documents you brought up.
8   Q  E-mails?
9   A  Yes.
10  Q  Okay. Did you learn after going through
11  all of this stuff with AT&T in particular that any
12  amounts allegedly due had already been compromised
13  before you started looking into it? By compromised,
14  I mean settled for a lesser sum than what was given.
15  A  No.
16  Q  Did you learn that there had been
17  negotiations to do that?
18  A  No.
19  Q  On the right-hand column, you refer to
20  some reductions of late fees and other compromises.
21  I'm not sure I understand -- I mean, it may have --
22  this may have been cut off, but it says late fees
23  waived. Reduced amount to something, and I don't
24  think it's $3.00.
25  A  Uh-huh.

34 (Pages 133 to 136)

Page 141

1  suggest. Is this the final information about the
2  final settlement, or is this more of an interim
3  report of some kind?
4      A   For the Parks Department, it was the final
5  one.
6      Q   Okay.
7      A   For the Comptroller's office, it was not
8  the final one.
9      Q   Now, we know this is before July 11th of
10 2019, right, because that's when the e-mail was sent
11 on the page before, 1869?
12     A   Uh-huh.
13     Q   So with reference to the Parks budget, it
14 had already been finalized by this date? Is that
15 what you're saying?
16     A   That is correct.
17     Q   But what had not yet been finalized, which
18 you think was toward the end of the year, what --
19 what --
20     A   The AT&T, Comptroller's office. We're
21 looking at two different events here.
22     Q   Right.
23     A   And the one at the Parks Department, I
24 actually had to meet with them that first week in
25 July. I don't know the date. That was the first

Page 142

1  thing I had to do. So we were able to get that one
2  done by this time.
3      Q   Okay.
4      A   Now, this second one with the
5  Comptroller's office took a little longer.
6      Q   So this was an interim report as far as
7  that goes; right?
8      A   Right.
9      Q   Yeah. So do you have a final report that
10 shows what it was compromised to and how it was
11 settled?
12     A   I don't have it here.
13         MS. HAMILTON: I think you might actually
14 have it here.
15         MR. BLANKE: Oh, okay. Do we? You think
16 you supplied it to us? And this all comes from
17 what you supplied last week?
18         MS. HAMILTON: It does.
19         MR. BLANKE: That's where it is?
20         MS. HAMILTON: Well, I'm going to let you
21 handle your deposition and depose the witness
22 that you Noticed --
23         MR. BLANKE: Okay.
24         MS. HAMILTON: -- with the documents that
25 you put together.

Page 143

1      Q   (By Mr. Blanke) Let me ask you this: I'm
2  not going to ask you what you shared with your
3  attorneys or anything else. Do you still have the
4  documents that -- I mean, I hear you saying it. If
5  you're correct, you're correct. But do you still
6  have --
7          MS. HAMILTON: Would you like to take some
8  time to review the exhibit -- the exhibit that
9  you have in front of you?
10         THE WITNESS: All of this?
11         MS. HAMILTON: I'm not sure why it's like
12 this, but would you like to take some time to
13 review this?
14         MR. BLANKE: Well, it's only because I
15 don't -- we don't see it in here, you know.
16 It's possible we're overlooking it.
17     Q   (By Mr. Blanke) Yeah, I'd like you to do
18 that also. But what you're looking for in
19 particular is something that memorializes what the
20 final settlement with AT&T was, not with the Parks
21 Department, but with the Comptroller's office. This
22 is it. It's a lot bigger. We'll get into that
23 later, unless you want to find it. If it's in
24 there, that's fine. You don't have to keep doing
25 that.

Page 144

1          Let me ask you this, Ms. Armstrong: Can
2  you describe what that one looked like, I mean, the
3  final documents? What should we be looking for?
4  What form is it in?
5      A   It says Settlement and Agreement with
6  AT&T, is how it's --
7      Q   Is it, you know, a narrative memorandum of
8  some kind or is it a chart like this one, do you
9  remember?
10     A   No, it's not a chart.
11     Q   Okay. Do you remember the title of it?
12     A   Settlement Agreement.
13     Q   All right. We'll look more carefully.
14 Let me move on.
15         Once again, what do you know about Waste
16 Management documents that Comptroller Green alleged
17 that Jim signed?
18     A   You have the document right here in this
19 packet where it has his signature on it for
20 renewing. The contract came back -- the encumbrance
21 came back showing that this was an expired contract.
22         MS. HAMILTON: And you are in Exhibit Y,
23 is that right?
24         THE WITNESS: Uh-huh.
25         MS. HAMILTON: And on what page are you

36 (Pages 141 to 144)

Page 145

1   referring?
2        THE WITNESS:  1980.
3        Q   (By Mr. Blanke)  So page 1980 is a
4   document that Jim signed that he shouldn't have
5   signed?
6        A   That's correct.
7        Q   Okay.  And Comptroller Green brought that
8   to your attention?
9        A   No.  I brought it to her attention.
10       Q   Oh, you brought it to her attention?
11       A   Yes.
12       Q   Okay.  When you brought it to her
13  attention, did you say look at -- here's a
14  signature, he shouldn't have signed this, or did you
15  just -- what did you say to her when you brought it
16  to her attention?
17       A   I had to ask for an emergency extension so
18  I could get them paid for picking up trash at the
19  Gateway Transportation Center.
20       Q   What processes, if any, are in place to
21  review existing contracts/agreements to ensure that
22  they are properly executed?
23           MS. HAMILTON:  And I would object that it
24       calls for speculation.  Subject to that, you
25       can answer if you know.

Page 146

1        A   And I do not know what process is in
2   place.
3        Q   (By Mr. Blanke)  Did you determine on your
4   own before talking to Comptroller Green that this
5   was an invalid signature, an unauthorized signature
6   on page 1980 of Exhibit Y?
7        A   When you say did I determine on my own
8   that it was --
9        Q   Yes.
10       A   Yes, I did.
11       Q   How?
12       A   Because had it been a valid signature and
13  had it been -- went through the proper channel, it
14  would have had a document number on it and accounts
15  payable would not have contacted me to say that the
16  contract with Waste Management was expired.
17       Q   Didn't Waste Management think this was a
18  valid contract?
19       A   Yes, they did.
20       Q   Okay.  So how did they find out that it
21  wasn't?
22       A   I contacted them.
23       Q   How did you know that it wasn't?
24           MS. HAMILTON:  I'm going to object that
25       the question is asked and answered, but subject

Page 147

1        to that, you can respond.
2        A   I just said that.
3        Q   (By Mr. Blanke)  What?
4        A   That I knew it was not valid, because I
5   was told that it was not -- that we did not have a
6   contract and they could not pay.
7        Q   Who told you that?
8        A   Accounts Payable.
9        Q   Who in Accounts Payable?  That's what I
10  was asking.  Who in Accounts Payable?
11           MS. HAMILTON:  That was not what you were
12       asking, but carry on.
13           MR. BLANKE:  That's what I meant to be
14       asking.
15       Q   (By Mr. Blanke)  Go ahead.  Do you
16  remember?
17       A   I don't remember.  I was trying to, but I
18  don't want to say who did it and they didn't do it.
19       Q   So what I was asking was, you know, how it
20  is you came to believe that this was not a proper
21  signature by James Garavaglia, and you're telling me
22  now, if I understand you correctly, Accounts Payable
23  told you that.
24       A   Accounts Payable didn't see this.  Okay?
25  They did not have a contract.  The contract they had

Page 148

1   with Waste Management had expired, so they could not
2   pay.
3        Q   Why did Accounts Payable not see this?
4        A   It didn't go through the proper channel.
5   They wouldn't get it.
6        Q   Where would it go?
7        A   It would go through the contract
8   compliance officer, who would then stamp a document
9   number on here that says Comptroller's Office
10  document number such-and-such.
11       Q   Where did you get this document from when
12  you first found it?
13       A   I actually got this -- Waste Management
14  e-mailed this to me to show me that they did have a
15  contract with us.
16       Q   Now it's making sense.  Okay.  I
17  understand.  And then you didn't see anything
18  stamped on it so, what, you contacted contract
19  compliance to find out why is there nothing stamped
20  on it?
21       A   No.
22       Q   What did you do next?
23       A   After I received this and I see that
24  James Garavaglia had signed it, I already know that
25  it didn't go through the proper channel, and I also

Page 149

1  know that he cannot sign to obligate the City for
2  any payments. So based upon that, I had to send a
3  letter to E&A to get an emergency in place so they
4  could get paid until we could get a new contract in
5  place.
6     Q   Is this, 1980, an extension of a prior
7  contract? Does it purport to be? I mean, I know
8  it --
9     A   It appears to be.
10    Q   Are you aware of any City policy expressed
11 either in an ordinance or by charter or any other
12 rule that says that existing contracts cannot be
13 extended by anyone besides the Comptroller?
14    A   No.
15    Q   While Jim was -- while Mr. Garavaglia was
16 on forced leave --
17    A   Uh-huh.
18    Q   -- did you submit any contracts or other
19 documents other than this to the contract
20 administrator that was rejected?
21       MS. HAMILTON: And I'm going to object to
22    the vagueness of the question. But subject to
23    that, you can answer.
24       MR. BLANKE: I didn't hear you.
25       MS. HAMILTON: Vague.

Page 150

1        MR. BLANKE: Vagueness.
2     A   No.
3     Q   (By Mr. Blanke) Who was the contract
4  administrator during the last half of 2019?
5     A   Our contract -- I don't know. When you
6  say contract administrator, are you referring to the
7  contract compliance officer?
8     Q   Yes. I'm sorry. Yes.
9     A   Michele Graham.
10    Q   Michele Graham. The invoices from Waste
11 Management that came in after May of 2017 were paid,
12 were they not?
13    A   Yes, they were.
14    Q   Who was paying it if it was not properly
15 signed?
16    A   It was still being paid through the
17 accounts payable.
18    Q   Do you have an understanding as to why
19 they would have done that?
20       MS. HAMILTON: I'm going to object that it
21    calls for speculation. Subject to that, you
22    can answer if you know.
23    A   I did ask that question, and when I asked
24 that question, I was told that when we submit our
25 encumbrances, they don't always look back to verify

Page 151

1  the contract is in place. But when I submitted the
2  encumbrance in July of 2019 and they went to check
3  the contract, that's when they told me the contract
4  was expired.
5        So, yes, they were paid when they should
6  not have been, but it was never checked. And as
7  long as long the -- and that money had been
8  encumbered, so it was in there, so that's why it was
9  being paid.
10    Q   (By Mr. Blanke) And you were told by that
11 Michele Graham, or by somebody else?
12    A   No, Michele Graham wouldn't have anything
13 to do with that.
14    Q   This is Accounts Payable?
15    A   This is in Accounts Payable, and they're
16 the ones that set up the encumbrance.
17    Q   And who told you that in Accounts Payable?
18    A   I want to say -- well, no, I don't want to
19 accuse anybody.
20    Q   I'm sorry?
21       MS. HAMILTON: You don't want to
22    speculate?
23       THE WITNESS: Yeah, I don't want to
24    speculate as to who told me that.
25    Q   (By Mr. Blanke) Who was the head of

Page 152

1  Accounts Payable at that time? Was there a director
2  or supervisor or something of Accounts Payable?
3     A   Of course there is. I know Bev
4  Fitzsimmons is the ultimate head, but she -- I don't
5  remember who her manager was at that time either,
6  because she's changed --
7     Q   Who was that name?
8     A   Bev Fitzsimmons was the Deputy Comptroller
9  over that section --
10    Q   Right.
11    A   -- but I don't remember who the manager
12 was at that time.
13    Q   Was it Bev Fitzsimmons or the --
14    A   No, it wasn't Bev. It would have been
15 whoever -- someone in that section that I spoke
16 with.
17       MR. BLANKE: Do you have any exhibit
18    stickers?
19       (Discussion off the record.)
20       (Plaintiff's Exhibit Z was marked for
21    identification.)
22       MR. BLANKE: This is my only copy, so if
23    you want to make copies, you can feel free to
24    do it, or we can do it afterwards. It's up to
25    you.

## Page 173

1  Q  -- let me finish -- before he was placed
2  on forced leave?
3  A  Yes.
4  Q  All right. And it's fair to say that some
5  of those folks would have been folks that worked
6  under him; is that right?
7  A  Yes.
8  Q  And were some of those folks people who
9  were assigned some of his duties and
10  responsibilities when he was placed on forced leave?
11  A  Yes.
12  Q  Okay. You talked about you and Kelley
13  being assigned to handle some of the
14  telecommunications issues.
15  A  Uh-huh.
16  Q  Is that right?
17  A  Yes. That's correct.
18  Q  Okay. Let's go to -- that same packet.
19  Let's go to 1977. What is 1977? It looks like
20  there's a couple of e-mails. Let's start at the
21  bottom. What is that bottom e-mail, the one dated
22  Tuesday July 23rd, 2019 at 2:05 p.m.?
23  A  This is the e-mail that I had originally
24  sent to Waste Management to say that I did not have
25  a valid contract with them, and then this is the one

## Page 174

1  where he responded back and said he attached a copy
2  of the current Service Agreement on file that runs
3  through June of 2020, so -- which is why they
4  thought that they had a valid contract.
5  Q  Okay. And then you sent an e-mail, it
6  looks like, on July 23rd, 2019 to Michele Graham and
7  Comptroller Green; is that right?
8  A  That's correct.
9  Q  And you say, quote, Please see attached
10  document where Waste Management believes they have
11  an extension through June 2020. The price is the
12  same as the original contract. Please advise if we
13  need to submit the extension and send it through the
14  proper signature process after getting tax and
15  license clearance.
16     Do you see that?
17  A  Yes.
18  Q  Is tax and license clearance a
19  prerequisite to entering into contracts with
20  vendors?
21  A  Yes.
22  Q  Why is that, do you know?
23  A  That's so that we're not going into a
24  contract with somebody that owes the City.
25  Q  Okay. Let's skip down, then, to

## Page 175

1  page 1980. And that is a contract that is signed by
2  Mr. James Garavaglia dated 5/22/17. Is that what
3  you saw when you received that document?
4  A  Yes.
5  Q  Okay. When you received that document,
6  was there any question in your mind that that was
7  Mr. Garavaglia's signature?
8  A  No, it wasn't.
9  Q  Okay. You talked about the process as it
10  relates to this particular contract as to how you
11  discover a problem with the Waste Management
12  contract. Could you explain to us how that came
13  about?
14  A  Sure. I submitted the encumbrance for the
15  year, which would go from July 1 through June 30,
16  and this was July 1 of 2019 through June 30 of 2020
17  of how much it would cost for Waste Management to
18  pick up trash at the Gateway Transportation Center.
19  When I submitted that -- I submitted to our
20  accountant in -- each of the departments in the City
21  have -- accountants are divided up for certain
22  departments, and to the accountant that represents
23  the Comptroller's office I submitted this -- excuse
24  me -- it represents the Gateway Transportation
25  Center. And they submitted it to their accounting

## Page 176

1  coordinator, who contacted me to say that the
2  contract -- the PO contract number that I submitted
3  for this encumbrance, the contract had expired.
4  Q  Okay. And by way of processes, when a
5  contract is validly executed by the City, is it
6  entered into a system of the City's?
7  A  Yes, it is.
8  Q  And is it entered into that system by
9  contract number?
10  A  Yes.
11  Q  All right. And to your knowledge, did
12  anyone have a copy of this document, 1980, in the
13  system when you were making your inquiries about
14  this contract?
15  A  No, there was not one.
16  Q  There was not a contract?
17  A  In the -- in the City's system.
18  Q  In the City's system?
19  A  That's correct.
20  Q  Were you aware or made aware that
21  Mr. Garavaglia had this particular contract faxed to
22  him to be executed in May of 2017? Were you made
23  aware of that?
24  A  I was not made as to how he received it.
25  Q  Okay. All right. So let's go to -- let

Page 181

1   A   Yes.
2   Q   Okay. And so the letters he showed you
3   that had your signature -- or that had a signature
4   line for you, to the best of your knowledge, did you
5   ever sign such a letter?
6   A   No.
7   Q   Okay. Now, for the record, you're an
8   African American female; is that correct?
9   A   Yes.
10  Q   And you had testified earlier that you
11  didn't recall receiving a rating from Comptroller
12  Green for a number of years; is that right?
13  A   Yes.
14  Q   All right. All right. You also talked
15  about -- or counsel asked you about inter-office
16  mail. Do you recall that?
17  A   Yes.
18  Q   All right. Do you recall ever forwarding
19  time-sensitive documents through inter-office mail?
20  A   No.
21  Q   Why not?
22  A   Well, if it's time sensitive, then
23  generally I'm going to call the -- if I don't
24  deliver it myself, I'm going to call the garage and
25  ask them to pick it up and take it where it needs to

Page 182

1   go.
2   Q   Okay. And so there were occasions where
3   you would deliver it yourself?
4   A   Yes.
5   Q   Why?
6   A   I may be going that way or something, so
7   it just depends.
8   Q   All right. Or you would call the garage
9   couriers to make sure it got there --
10  A   Ask them to come pick it up and tell them
11  that this needed to go right away, and sometimes
12  they may have to wait on a signature and then take
13  it someplace else, so it just depends.
14  Q   Okay. Do you have Exhibit O in front of
15  you?
16  A   Yes.
17  Q   Okay. Let's turn to what they've marked
18  as page 43 -- Armstrong Depo Exhibit O, page 43.
19  A   Page.
20  Q   And is that a copy of the memo that you
21  prepared?
22  A   Yes.
23  Q   And let's take a look at that memo. That
24  memo is one that you prepared on August 26th, 2019
25  and submitted to Comptroller Darlene Green; is that

Page 183

1   right?
2   A   That's correct.
3   Q   And you say in the first paragraph on
4   January 30, 2009, Mr. Garavaglia signed a Master
5   Agreement with AT&T. Do you see that?
6   A   Yes.
7   Q   And tell us again how you found out about
8   this Master Agreement that was signed by
9   Mr. Garavaglia.
10  A   When Mary Harp would send a contract from
11  AT&T that needed to be signed, she would always say
12  this is being sent against the Master Agreement.
13  Q   All right.
14  A   And I asked her, Well, what's the Master
15  Agreement? So, anyway, she sent me a copy of the
16  Master Agreement.
17  Q   Okay. Was that Master Agreement one that
18  the City had in its system?
19  A   No, it was not.
20  Q   Was that Master Agreement -- did it have a
21  contract number associated with it?
22  A   No, it did not.
23  Q   Do you know if that Master Agreement was
24  approved by the City Counselor's office as to form?
25  A   No, it was not.

Page 184

1   Q   Do you know if that Master Agreement was
2   signed by Comptroller Darlene Green?
3   A   It was not.
4   Q   Who signed that Master Agreement?
5   A   James Garavaglia.
6   Q   All right. And you go further in your
7   memo of August 26th, 2019 and you say, quote, AT&T
8   is utilizing this as a contract with the City of
9   St. Louis. Do you see that?
10  A   Yes.
11  Q   And then you write further, you say
12  Mr. Garavaglia is not able to sign a contract
13  obligation for the City. Do you see that?
14  A   Yes.
15  Q   And is that your understanding of the
16  custom and practice for the time that you have
17  served in your current capacity and various
18  capacities, that the Comptroller and Bev Fitzsimmons
19  are the authorized signers for those types of
20  contracts?
21  A   That is correct.
22  Q   All right. And then we go to -- you have
23  some numbered paragraphs. Let's go to paragraph
24  number 1. You say on July 10, 2019, Mary Harp, the
25  City's AT&T representative, sent a Master Agreement

46 (Pages 181 to 184)

Page 185

1  to us which was signed by James Garavaglia. AT&T
2  considers this agreement to be a contract between
3  AT&T and the City; is that right?
4    A  Yes.
5    Q  Is that the first awareness that you
6  became aware of this Master Agreement?
7    A  That is correct.
8    Q  Okay. And that -- and as you've
9  testified, it wasn't in the City's system as an
10  agreement; is that right?
11   A  Right.
12   Q  All right. Then you go to number 2. You
13  refer to account number 314879-30066005, as an
14  invoice for June 27, 2019. It has a past due amount
15  of $902,904.61. Do you see that?
16   A  Yes.
17   Q  And why did that cause you concern?
18   A  Because it was actually a very large past
19  due amount.
20   Q  Okay. And who was responsible for
21  handling the AT&T accounts?
22   A  Mr. Garavaglia.
23   Q  All right. It says, This past due amount
24  has been escalating for several years. You say on
25  May -- on the May 27, 2018 invoice, the past due

Page 186

1  amount was $465,066.15. Do you see that?
2    A  Yes.
3    Q  And was that for the Parks Department?
4    A  No. We're still talking -- this is the
5  one in the Comptroller's office here.
6    Q  Okay. So this is all part of the
7  Comptroller's office?
8    A  That's correct.
9    Q  And do you know why these -- this billing
10  was hanging out there for years and years and years
11  with the City?
12   A  The only thing that I can tell you as far
13  as my knowledge of this -- and that's in working
14  with the representatives with AT&T -- is that none
15  of the invoices had been fully paid every month, so
16  the only partial payments have been made.
17   Q  Okay. And were you made aware by AT&T
18  that the City had been placed on some delinquent
19  list of some sort?
20   A  It was placed on credit hold.
21   Q  Tell us about that.
22   A  There was some contracts that were in
23  place that was going to lower some service, and
24  because we were on credit hold, that could not
25  happen, and then --

Page 187

1    MS. HAMILTON: Lower the price?
2    A  It was going to lower the price if we got
3  those contracts signed. But when we were placed on
4  credit hold, AT&T's system would not allow us to go
5  forward with the contract until we came off of
6  credit hold.
7    Q  (By Mr. Norwood) So credit hold, H-O-L-D,
8  is what you're saying?
9    A  Yes.
10   Q  All right. And then you referred to the
11  NICE in kind situation. You've testified about
12  that. Who was responsible for making sure that the
13  NICE in kind contract was properly --
14   A  And it's NICE inContact.
15   Q  I'm sorry. NICE inContact contract. Who
16  was responsible for making sure that the NICE
17  inContact contract was properly handled and entered
18  into the system of the City's? Whose responsibility
19  would that have been?
20   A  That was still filed under Jim Garavaglia.
21  James Garavaglia.
22   Q  Okay. And then we refer to the Waste
23  Management contract. We've talked about that. And
24  in there, you point out the fact that this
25  contract -- that Waste Management believed it had a

Page 188

1  contract that was good until 2020; is that right?
2    A  Yes.
3    Q  And you point out the fact that
4  Mr. Garavaglia would not be authorized to sign this
5  type of contract; is that right?
6    A  Yes.
7    Q  And that's based upon your understanding
8  of who has the authority to sign such contracts
9  binding the City; correct?
10   A  Yes.
11   Q  And then that last bullet point under
12  number 5, you say, It states in the Waste Management
13  contract that Mr. Garavaglia signed, quote, it shall
14  automatically renew thereafter for additional terms
15  of 36 months renewal terms unless terminated as set
16  forth herein. Do you see that?
17   A  Uh-huh.
18   Q  Is that a yes?
19   A  I'm sorry. Yes.
20   Q  And you say, The City is not authorized to
21  automatically renew contracts past five years. They
22  must go out for bid again. Do you see that?
23   A  Yes.
24   Q  All right. And what do you mean by that?
25   A  With the City, contract -- like, the Waste

47 (Pages 185 to 188)

Page 189

1  Management contract was -- the original contract was
2  for two years, from 2015 to 2017, with the option of
3  three one-year renewals. So had those one-year
4  renews had been done, then this contract would have
5  still been good. But because the renewals were
6  never done in the proper way, it was not a valid
7  contract anymore.
8      So in that greeting -- in that Waste
9  Management, when they sent me their thing, it had in
10 there that it would automatically renew an
11 additional 36 months unless it was terminated.
12     Q   Okay.
13     A   And that would put us past the five years,
14 even, if it automatically renewed if we didn't do
15 something different.
16     Q   Okay. Then we go to bullet point number
17 6. And you talked about this with counsel. And
18 there's a reference here where it says -- if you go
19 down to about the fifth or sixth line, in quotes, it
20 says, His response to her -- meaning Jim's response
21 to her, her being the person in Equipment Services?
22     A   Yes. And I'm trying to -- as I said to
23 the other attorney, I remember this, but I can't
24 remember who it was that I was actually speaking to,
25 and I'm shocked that I didn't put that in here.

Page 190

1      Q   Okay.
2      A   So --
3      Q   Let's go to -- do you have Exhibit Q in
4  front of you?
5      A   Yes.
6      Q   All right. And let's turn to -- it is a
7  Bates stamped page. It looks like 96. Garavaglia
8  96. Can you turn to that down here on the bottom?
9      A   Uh-huh. Okay.
10     Q   Do you see that?
11     A   Yes.
12     Q   All right. And this appears to be an
13 e-mail exchange between Mr. Garavaglia and a Karen
14 Travers. Do you see that?
15     A   Yes.
16     Q   All right. In your memo, you wrote, His
17 response to her was, quote, we don't do that. Don't
18 need to do their jobs. Let them figure it out.
19     Do you see that?
20     A   Okay. Uh-huh.
21     MR. BLANKE: But you misread it, by the
22 way.
23     Q   (By Mr. Norwood) I'm sorry. Let me start
24 over. Quote, We don't know that. Don't need to do
25 their jobs. Let them figure it out, unquote.

Page 191

1      Do you see that?
2      A   I do.
3      Q   All right. And there's a reference to
4  May 27, 2015 in your memo. Does that correspond
5  with the e-mail dated Wednesday, May 27th, 2015?
6      A   Yes, it does.
7      Q   All right. And in fact, what
8  Mr. Garavaglia wrote to Karen Travers was, quote, We
9  don't know that. Don't need to do their jobs. Let
10 them figure it out.
11     Do you see that?
12     A   Right.
13     Q   And do you -- does that refresh your
14 recollection --
15     A   It does.
16     Q   -- on where you may have gotten -- let me
17 finish.
18     Does that refresh your recollection of
19 where you may have gotten that language that you
20 included in your e-mail -- I mean your memo?
21     A   Yes, it does.
22     Q   All right. Now, I believe you testified
23 that you essentially stumbled on to these issues
24 regarding AT&T, Waste Management, this issue about
25 how he instructed them not to tell them how to do

Page 192

1  their job, that you basically ran across that as you
2  were performing the duties that were assigned to you
3  to fill in for Mr. Garavaglia; is that right?
4      A   That is correct.
5      Q   All right. And at some point, then, you
6  documented that in the form of your memo; is that
7  right?
8      A   Yes.
9      Q   And do you know if what you documented,
10 along with other items, formed the basis for the
11 pre-termination notice that was sent to
12 Mr. Garavaglia on August 28, 2019?
13     A   I can't say that I know that.
14     Q   Okay. Well, let's do it -- let's
15 short-circuit it. If you can go back to Exhibit 9
16 that I handed to you. Take a look at that,
17 page 1308.
18 Okay. Are you there, 1308?
19     A   Yes.
20     Q   Garavaglia Deposition Exhibit 9.
21     A   Yes.
22     Q   And one of the -- the first item on the
23 list of charges under the pre-termination notice, it
24 says, one, you have improperly signed multiple City
25 contracts and contract extensions, including

Page 193

1  automatic extensions without legal authorization to
2  do so, putting the City at risk dating back to 2009.
3      Do you see that?
4   A  Yes.
5   Q  And do you know if that's based upon the
6  information that you provided in the memo you
7  supplied to the Comptroller?
8   A  Yes, it is.
9      MR. NORWOOD:  I need a sticker.  Let's
10  mark this -- let's make it Green Exhibit 1.
11      MR. BLANKE:  Is this new?  Have we seen
12  this before, ever?
13      MR. NORWOOD:  It's been produced.
14      MR. BLANKE:  No, I mean, you haven't used
15  it as an exhibit yet?
16      MR. NORWOOD:  Not yet.
17      (Green Exhibit 1 was marked for
18  identification.)
19   Q  (By Mr. Norwood)  All right.  Now, the
20  first page of Green Exhibit 1 is Bates stamped
21  STL002155, and it goes through to STL002167; is that
22  correct?
23   A  Yes.
24   Q  All right.  And in the cover page -- the
25  first couple of pages looks like there's some e-mail

Page 194

1  communications; is that correct?
2   A  Yes.
3   Q  And at some point that e-mail
4  communication was directed to you; is that right?
5  If you look at the top of page 1, Marilyn Maxwell.
6   A  Oh, okay.  Yes.
7   Q  All right.  It looks like she forwarded
8  this to you on Tuesday, September 17, 2019, at
9  8:11 a.m.; is that correct?
10   A  Yes.
11   Q  And it references SOW 18-19 Parks
12  Department, SOW 18-19, Fire Department, SOW
13  2018-2019 Streets Department.  Is that right?
14   A  Yes.
15   Q  All right.  And if we skip down to page
16  2159.  Do you see that?
17   A  Yes.
18   Q  All right.  Does that appear to be a
19  document -- statement or document executed by
20  Mr. James Garavaglia?
21   A  Yes.
22      MR. BLANKE:  Let me object to possibly --
23  well, it looks like it calls for a legal
24  conclusion as to what this is.  Go ahead.
25      MS. HAMILTON:  He said document.

Page 195

1   Q  (By Mr. Norwood)  Well, at the top of it,
2  it says Statement of Work; is that right?
3   A  Yes.
4   Q  All right.  And it has a signature that
5  appears to be Mr. Garavaglia's signature; is that
6  right?
7   A  Yes.
8   Q  And that document is dated 10/23/18 --
9  October 23rd, 2018; is that correct?
10   A  Uh-huh.  Yes.  I'm sorry.
11   Q  All right.  And does this document appear
12  to obligate the City to pay money?
13   A  Yes, it does.
14   Q  Where does it show an obligation to pay
15  money?
16   A  On the next page it tells you what that
17  annual price is, 11,374.42.
18   Q  And that is per page STL002160?
19   A  Yes.
20   Q  All right.  And it has a term of -- what
21  is the term?
22   A  The term is for one year, from
23  September 11th, 2018 to September 10th, 2019.
24   Q  Okay.  Do you know if this document was in
25  the system with a contract number of the City?

Page 196

1   A  No.  It does not have one on here, so, no,
2  it's not.
3   Q  Okay.  Let's go to STL002162.  Do you see
4  that?
5   A  Yes.
6   Q  Well, no, let me go back to 2159 before I
7  move on.
8      At the top of that under Statement of
9  Work, it says City of St. Louis Fire Department; is
10  that right?
11   A  Yes.
12   Q  And what type of contract is this?  What
13  kind of service, do you know?
14   A  It's a Maintenance Agreement.  It's the
15  yearly maintenance for the Fire Department for their
16  telephones.
17   Q  Okay.  And then when we go to 2162, that's
18  a Statement of Work.  It says City of St. Louis
19  Parks Department; is that right?
20   A  Correct.
21   Q  And is that for maintenance service
22  related to the Parks Department?
23   A  Yes, it is.
24   Q  All right.  And who signed -- who
25  purported to sign that on behalf of the City of

Page 197

1 St. Louis?
2    A   James Garavaglia.
3    Q   All right. And the date of that one is
4 October 23rd, 2018 as well; is that right?
5    A   Yes.
6    Q   And does this Parks Department Maintenance
7 Contract purport to obligate the City to pay money?
8       MR. BLANKE: Let me object in that this is
9    not a Maintenance Contract and you're asking
10   her to give a legal conclusion as to that
11   improper assumption.
12   Q   (By Mr. Norwood) Well, let's look at the
13 top of the document where it says Statement of Work,
14 City of St. Louis, Parks Department, CS1000
15 Maintenance. That's what it says; right?
16   A   Yes.
17   Q   All right. And then on the next page.
18 Does this document purport to obligate the City to
19 pay money?
20      MR. BLANKE: Objection. Calls for a legal
21   conclusion.
22   A   Yes, it does.
23   Q   (By Mr. Norwood) I'm sorry. You answered
24 the question? You said --
25      MS. HAMILTON: She did.

Page 198

1    A   Yes.
2    Q   (By Mr. Norwood) Okay. And is there a
3 section that says annual price? Do you see that?
4    A   Yes.
5    Q   And what's that annual price?
6    A   $8,864.09.
7    Q   You may want to read that again. It's
8 8,000 --
9    A   $584.09. Excuse me.
10   Q   Okay. Thank you. And that purports to
11 obligate the City for that amount for a one-year
12 term from 9/11/18 to 9/10/19; is that correct?
13   A   That is correct.
14   Q   All right. So let's -- let's go to the
15 next document.
16      MS. HAMILTON: What page? What page?
17      MR. NORWOOD: I'm getting lost in the fog.
18   Q   (By Mr. Norwood) 2165. Let's go to that
19 one. Do you see that?
20   A   Yes.
21   Q   And that document is entitled Statement of
22 Worth, City of St. Louis, Streets Department,
23 C91000, Maintenance; is that correct?
24   A   Yes.
25   Q   All right. And does this document --

Page 199

1 well, strike that.
2       Who purported to sign this document on
3 behalf of the City?
4    A   James Garavaglia.
5    Q   And the date of that one is also
6 October 23rd, 2018; is that correct?
7    A   Yes, it is.
8    Q   All right. And does this document purport
9 to bind the City to pay money to AT&T for this
10 Statement of Work?
11      MR. BLANKE: Objection. It calls --
12   A   Yes, it does.
13      MR. BLANKE: You're not giving me time to
14   object after the question.
15      MR. NORWOOD: Go ahead.
16      MR. BLANKE: Objection. It calls for a
17   legal conclusion.
18   Q   (By Mr. Norwood) Okay. Is there a
19 section on this document that has annual price?
20   A   Yes.
21   Q   And what is that annual price on this
22 particular document?
23   A   $9,184.69.
24   Q   Is that money that AT&T is paying to the
25 City of St. Louis?

Page 200

1    A   No.
2    Q   What does it purport to be?
3    A   That's what the Street Department will pay
4 to AT&T for that maintenance agreement.
5    Q   Okay. For the record, could you give
6 us -- I think you've already done it, but just in
7 case, your date of birth and age for the record?
8    A   Yes. September the 5th, 1957, and I am 64
9 years old.
10   Q   Okay. Thank you. And this meeting you
11 had with Mr. Garavaglia where you presented him with
12 the July 2nd, 2019 forced leave letter, where
13 exactly were you when that occurred?
14   A   In the conference room in Comptroller
15 Green's office.
16   Q   And who was actually present in the room?
17   A   Kelly Anderson, Jason Fletcher, myself,
18 and Larry from the City marshals.
19   Q   And I believe you testified earlier that
20 having Larry there, that's a pretty much par -- or
21 standard procedure with respect to individuals who
22 are being provided with this type of notification?
23   A   That is correct.
24      MR. NORWOOD: Okay. I have no further
25   questions at this time.