SJ Exhibit 25

## Page 1

```
 1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MISSOURI
 2               EASTERN DIVISION
 3    James Garavaglia,    )
                           )
 4        Plaintiff,       )
                           )
 5    v.                   ) Case No. 4:20-CV-1681-CDP
                           )
 6    City of St. Louis,   )
      et al.,              )
 7                         )
          Defendants.      )
 8
 9
10
11
12        DEPOSITION OF BEVERLY FITZSIMMONS
13
14        Taken on behalf of the Plaintiff
               April 19, 2022
15
          Julie Ann Whiting, CCR 830, RPR
16
17
18
19
20
21
22
23
24
25
```

## Page 2

```
 1                    INDEX
 2    Examination by Mr. Schmitz      Page 6
 3    Examination by Mr. Norwood      Page 102
 4    Further Examination by Ms. Schmitz   Page 139
 5    Further Examination by Mr. Norwood   Page 144
 6
 7               EXHIBIT INDEX
 8    Plaintiff's Exhibit P       Page 54
          (E-mail string)
 9
      Plaintiff's Exhibit Q       Page 91
10        (AT&T documents)
11    Plaintiff's Exhibit R       Page 96
          (Waste Management Service Agreement)
12
      Plaintiff's Exhibit U       Page 74
13        (Letter dated 2/25/20)
14    Plaintiff's Exhibit Y       Page 66
          (E-mail chain with attachments)
15
      Plaintiff's Exhibit Z       Page 63
16        (E-mail string)
17    Plaintiff's Exhibit AA      Page 80
          (Letter dated 8/28/19)
18
      Plaintiff's Exhibit BB      Page 100
19        (Memorandum dated 12/12/2019)
20    Garavaglia Exhibit 11       Page 123
          (E-mail and Reports of Delegation of
21        Authority
22    Garavaglia Exhibit 12       Page 128
          (Memorandum dated 12/11/14 with attachment)
23
      Garavaglia Exhibit 14       Page 125
24        (Memorandum dated 7/21/17 with attachment)
25
```

## Page 3

```
 1       EXHIBIT INDEX (CONTINUED)
 2    Garavaglia Exhibit 20        Page 130
          (Addendum to Master Agreement)
 3
      Garavaglia Exhibit 21        Page 132
 4        (AT&T Statement of Work)
 5    Garavaglia Exhibit 22        Page 135
          (AT&T Addendum to Comprehensive Service
 6        Order Attachment)
 7
 8    (Whereupon, the exhibits were attached to the
      original and copies.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MISSOURI
 2               EASTERN DIVISION
 3    James Garavaglia,    )
                           )
 4        Plaintiff,       )
                           )
 5    v.                   ) Case No. 4:20-CV-1681-CDP
                           )
 6    City of St. Louis,   )
      et al.,              )
 7                         )
          Defendants.      )
 8
 9
10
11
12        DEPOSITION OF BEVERLY FITZSIMMONS,
13    produced, sworn, and examined on the 19th day
14    of April, 2022, between the hours of 9:44 a.m.
15    and 1:27 p.m., at Lewis Rice, LLC, 12925 North
16    Outer 40, Suite 102, St. Louis, Missouri,
17    before Julie Ann Whiting, a Certified Court
18    Reporter within and for the State of Missouri
19    and Registered Professional Reporter, in a
20    certain cause now pending in The United States
21    District Court, Eastern District of Missouri,
22    Eastern Division, wherein JAMES GARAVAGLIA is
23    the PLAINTIFF and CITY OF ST. LOUIS, et al.,
24    are the DEFENDANTS.
25
```

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax:

SJ Exhibit
25

Page 5

```
 1          A P P E A R A N C E S
 2   APPEARING FOR THE PLAINTIFF:
 3   Uthoff Graeber Bobinette & Blanke
     Richard B. Blanke, Esq.
 4   Paul L. Schmitz, Esq.
     906 Olive Street, Suite 300
 5   St. Louis, Missouri  63101
     (314)621-9550
 6   rblanke@ugbblaw.com
     pschmitz@ugbblaw.com
 7
 8   APPEARING FOR DEFENDANT
     CITY OF ST. LOUIS:
 9
     City of St. Louis Law Department
10   City Counselor's Office
     Sheena Hamilton, Esq.
11   1200 Market Street, Room 314
     St. Louis, Missouri  63103
12   (314)622-4554
     Hamiltons@stlouis-mo.gov
13
14   APPEARING FOR DEFENDANT DARLENE GREEN:
15   Lewis Rice, LLC
     Ronald A. Norwood, Esq.
16   Joy D. McMillen, Esq.
     600 Washington Avenue, Suite 2500
17   St. Louis, Missouri  63101
     (314)444-7600
18   rnorwood@lewisrice.com
     jmcmillen@lewisrice.com
19
20   ALSO PRESENT:
21   James Garavaglia
22   COURT REPORTER:
23   Julie Ann Whiting, CCR 830(MO), RPR
     Alaris Litigation Services
24   711 North 11th Street
     St. Louis, Missouri  63101
25   (314)644-2191
```

Page 6

```
 1        IT IS HEREBY STIPULATED AND AGREED, by and
 2   between counsel for Plaintiff and counsel for
 3   Defendants, that the Deposition of
 4   BEVERLY FITZSIMMONS may be taken in shorthand
 5   by Julie Ann Whiting, a Certified Court
 6   Reporter, and afterwards transcribed into
 7   typewriting, and the signature of the witness
 8   is expressly not waived.
 9        (Deposition start time:  9:44 a.m.)
10            * * * * *
11            BEVERLY FITZSIMMONS,
12   of lawful age, being produced, sworn, and examined
13   on behalf of the Plaintiff, deposes and says:
14            EXAMINATION
15   QUESTIONS BY MR. SCHMITZ:
16        Q   Good morning.  I'm Paul Schmitz.  I'm
17   going to be doing most of the questions today.
18   Counsel might have some, too.  I don't know yet, but
19   we'll see.
20        So I'm just going to start with some
21   introduction questions.  If you could state and
22   spell your name for the record.
23        A   My name is Beverly Fitzsimmons,
24   B-E-V-E-R-L-Y, Fitzsimmons, F-I-T-Z-S-I-M-M-O-N-S.
25        Q   Have you ever had your deposition taken
```

Page 7

```
 1   before?
 2        A   Yes.
 3        Q   You have?  Okay.  So I'll try to be quick
 4   with that part.  But if you don't understand
 5   something I say or it's not clear, feel free to ask
 6   me to clarify or to speak up or whatever.  That
 7   won't be a problem.  And just -- all answers have to
 8   be verbal.  I'm sure you know this.  A nod or a --
 9   she can't put that into the transcript.
10        All right.  Did you prepare for this
11   deposition at all --
12        A   Yes.
13        Q   -- before today?  Okay.  Did you review
14   documents beforehand?
15        A   Yes.
16        Q   Do you recall what documents you reviewed?
17        A   It was a memo.  I don't remember what we
18   looked at.  There was a memo regarding some
19   contracts, and I did look at the memo that I have
20   stipulating that I should be the signator with the
21   Comptroller.
22        Q   Got you.
23        A   And I do not remember what other ones I
24   looked at, if I did.  Those were the main two that
25   come to mind.
```

Page 8

```
 1        Q   All right.  Thank you.  What is your
 2   current residence?
 3        A   Current residence address-wise?
 4        Q   Yes.
 5        A   6565 Pernod, St. Louis, Missouri.  In the
 6   city.
 7        Q   What's the zip code?
 8        A   63139.
 9        Q   Okay.  Thank you.  All right.  I'm going
10   to ask you a few questions just about your
11   educational background.  How far did you go in
12   school?
13        A   I graduated from college with a
14   Bachelor's.
15        Q   Okay.  And where did you go to college?
16        A   Southeast Missouri State.
17        Q   What year did you graduate?
18        A   1980.
19        Q   Okay.  What was your degree?
20        A   Business Administration, with a major in
21   Accounting and Management.
22        Q   What's your date of birth?
23        A   August 21st, 1958.
24        Q   Okay.  Thank you.  All right.  I just want
25   to talk a little bit about your work experience.  So
```

2 (Pages 5 to 8)

Page 9

1  if you graduated in 1980, I'm not really concerned
2  with jobs prior to your obtaining your degree.  But
3  what was the first job you got out of college?
4       A    City of St. Louis.
5       Q    City of St. Louis?
6       A    That's the only job I've had.
7       Q    Okay.  So you've worked entirely for the
8  City of St. Louis?
9       A    Yes.
10      Q    Okay.  Did you start in 1980?
11      A    Yes, I did.
12      Q    Okay.  What job did you start in?
13      A    Account -- an Accountant I in the Federal
14  Grants section of the Comptrollor's office.
15      Q    Okay.  And how long did you remain in that
16  position?
17      A    I left the Federal Grants section about
18  18 months later.
19      Q    Did you have the same position when you
20  left?
21      A    I was still an Accountant I, but I swung
22  over to the financial reporting section at City Hall
23  in the Comptroller's office.
24      Q    Okay.  And how long were you an
25  Accountant I?

Page 10

1       A    I do not remember that.
2       Q    Okay.  Were you ever promoted from that
3  position or did you do a lateral change?
4       A    No.  I constantly was promoted.
5       Q    Okay.  Do you remember what you were
6  promoted to?
7       A    I was promoted to an Accountant II --
8       Q    Okay.
9       A    -- and then Accountant III.  Do you want
10  me to keep going?
11      Q    Well, I was going to ask you about dates.
12  Hold on one second.
13      A    I don't know dates --
14      Q    You don't know dates?
15      A    -- I can tell you that right now.  I
16  could -- I mean, I remember when I became a
17  Manager II, but that's just -- I related it to
18  children.
19      Q    Okay.  So you were Accountant II and then
20  Accountant III?
21      A    Uh-huh.
22      Q    You don't recall the dates?
23      A    Nope.
24      Q    What were you promoted to after that?
25      A    Accounting Manager I.

Page 11

1       Q    Accounting Manager I?
2       A    Uh-huh.
3       Q    Okay.  And do you remember the date of
4  that?
5       A    No.
6       Q    Okay.  Do you know how long, like,
7  years-wise you might have remained in that position?
8       A    Probably about seven years, maybe, six
9  years.
10      Q    Okay.  Did you receive a promotion again
11  after that?
12      A    Yes, I did.  I was an Accounting
13  Manager II.  I got that around 1994.
14      Q    Okay.  Do you remember how long you
15  remained in that position?
16      A    Until I became the fiscal manager, which I
17  got promoted probably around 2012.  Not exact dates.
18      Q    Okay.  So you were -- you were an
19  Accounting Manager II from about '94 to 2012?  For a
20  long time?
21      A    Uh-huh.
22      Q    Okay.  Was this all with the --
23           MR. NORWOOD:  Excuse me.  You have to
24      answer verbally.
25      A    Yes.  I'm sorry.  Yes.

Page 12

1       Q    (By Mr. Schmitz)  Was this all in the
2  Comptroller's office?
3       A    Always in the Comptroller's office, yes.
4       Q    Always.  Okay.  All right.  How long were
5  you a fiscal manager?
6       A    Estimating, about three years.
7       Q    All right.  And then were you promoted
8  again?
9       A    Yes.
10      Q    And what were you promoted to?
11      A    Deputy Comptroller.
12      Q    This would have been around 2015?
13      A    Yes.
14      Q    Okay.  Did you replace somebody that had
15  been in that position?
16      A    Yes.
17      Q    Okay.  Who did you replace?
18      A    John Zakibe.
19      Q    Can you spell that name?
20      A    Z-A-K-I-B-E.
21      Q    Okay.  Who did you report to other than
22  the Comptroller -- so directly -- when you were a
23  fiscal manager?
24      A    John Zakibe.
25      Q    Have you held any secondary jobs at all,

1  or has it always just been one job with the
2  Comptroller?
3     A   Just one.
4     Q   Okay.  Just one.  Okay.  Do you -- are you
5  a member of any professional positions or
6  committees?  So not other jobs, but anything outside
7  of the Comptroller's office with the City or
8  elsewhere?
9     A   No.
10    Q   No?
11    A   I mean, I don't think -- does church
12  count?  I don't know.
13    Q   I mean, it does count.
14    A   Oh, okay.  I'm on the finance committee at
15  St. Joan of Arc.
16    Q   Okay.  I have kids that go to South City
17  Catholic.
18    A   Do you?
19    Q   Yeah, I do.  I've got --
20    A   So does my grandson.
21    Q   Small world, yeah.  All right.  Tell me a
22  little bit about your understanding of the position
23  of Comptroller and what the Comptroller's duties are
24  before I talk about Deputy Comptroller.
25    A   The comptroller is basically the CFO of

1  the City.  They -- she is over all of the financial
2  side of the City.
3     Q   Okay.  What are some -- just broadly.  You
4  don't have to get into the details.  Just broadly,
5  what are some of the duties of that office or
6  position?
7     A   Of the office would probably be easier to
8  answer.  She is -- well, the position, she is a
9  member of the Board of Estimate and Apportionment,
10  which is the top three that meet to make decisions
11  for the City.  She -- we pay the bills of the City.
12  We do the financing for the City, manage the real
13  estate of the City, you know, any type of
14  accounting, whether it be in redevelopment area or
15  accounts payable, financial reporting of the City,
16  Internal Audit section.
17    Q   Okay.  So the position of Deputy
18  Comptroller -- and I know that there are --
19  technically there's a Deputy Comptroller and the
20  Deputy Comptroller of Finance and Development, so
21  I'm going to talk specifically about your position
22  only --
23    A   Uh-huh.
24    Q   -- when I ask these questions.  What is --
25  what does the Deputy Comptroller do?  What is that

1  position?
2     A   My position is over the accounting side of
3  the office.  Technically it's the second in command
4  underneath the Comptroller's office.  My charge is
5  to do, like I said, all the finance -- financial
6  reporting, the accounts payable, the redevelopment
7  calculation -- I mean, the group that is underneath
8  me, probably the only ones that are not are like
9  real estate, telecommunications, the financing side
10  of it, which is issuing bonds and debt, that type of
11  thing.  Internal Audit is not underneath me, but
12  pretty much -- pretty much everything else is.  And
13  GTC is not is not underneath me.  The outside
14  offices that kind of stem from the Comptroller's
15  office, municipal garage, records retention, not
16  underneath me.
17    Q   What is GTC?
18    A   Gateway Transportation Center.
19    Q   All right.  And you kind of already
20  touched on this, some of the differences between
21  what is and is not underneath you.  So are there
22  other differences between the two positions of
23  Deputy Comptroller and Deputy Comptroller of Finance
24  and Development?
25    A   Yes.  I mean, technically my position by

1  charter is established and I am the -- the
2  Comptroller has assigned me to do signator on
3  contracts also.
4     Q   And I'll touch on that a little bit in
5  more detail.  But is that -- just to follow up on
6  what you just said, is that something that you
7  understand is a discretionary decision by the
8  Comptroller to assign that signatory authority to
9  you, or is that something that's automatically only
10  assigned in that office to the person who occupies
11  the position of Deputy Comptroller?
12    A   I do not know that for a fact.  I know in
13  my history it's always just been -- I mean, if I --
14  if I just look at the history of the office, it's
15  always just been the Deputy Comptroller that had the
16  authority to sign as well as -- with the
17  Comptroller's direction.
18    Q   Thank you.  What are some of the positions
19  that directly report to you?
20    A   I have a financial operations support
21  manager that is also over -- and she is over federal
22  grants and financial reporting and over the new
23  accounting system we just initiated.  And then I
24  have a fiscal -- fiscal manager, who is over
25  accounts payable, and redevelopment section.  I'm

## Page 17

1   over payroll, general ledger section.  I think
2   that's all.
3       Q    Is there a manager -- like a payroll
4   manager, then, position?
5       A    Yes.
6       Q    How would you describe your
7   relationship -- working relationship with
8   Comptroller Green?
9       A    Strictly professional.
10      Q    How often would you say that you
11  communicate with her?
12      A    Maybe, I don't know, two, three times a
13  month, maybe, depending what's going on.
14      Q    Do you work in the same office, or are you
15  at the office on Market?
16      A    No, I'm in City Hall.
17      Q    City Hall.  Okay.
18      A    Not in the same office, but I'm in
19  City Hall.
20      Q    Okay.  How do you usually communicate with
21  the Comptroller?
22      A    Three ways.  E-mail, text, and phone call.
23      Q    Which of those would you say you use most
24  often?
25      A    Probably text.

## Page 18

1       Q    Does Comptroller Green ever talk -- seek
2   your advice or input on office protocols, rules?
3       A    Yes.
4       Q    Okay.  Can you give me an example of some
5   of the things that you and her would talk about
6   related to that?
7       A    If someone requested emergency contract,
8   we'll discuss why it would be an emergency if it
9   qualifies under the charter to accept the contract.
10  We'll discuss, you know, changes in personnel,
11  things like that.
12      Q    When you say office personnel, do you
13  discuss with her the work performance of different
14  employees?
15      A    Sometimes.
16      Q    Do you -- what he -- which -- what
17  employees would you talk to her about?
18      A    Usually I am talking to her about
19  employees that I want to initiate a Section 7, which
20  is an increase from -- in their pay, is usually what
21  I do, or how -- how to -- the other option would be
22  we talk about what's the best way to construct the
23  office going forward, because we've had so many
24  changes in the past year.
25      Q    Okay.  How about disciplinary matters?

## Page 19

1       A    I do not talk to her about disciplinary
2   matters.
3       Q    Okay.
4       A    There's someone else that handles that.
5       Q    So if you have a disciplinary issue for
6   somebody that is underneath your position --
7       A    I usually go to -- Judy Armstrong is
8   the -- you know, I don't know if Appointing
9   Authority is the right term, but she handles
10  personnel issues.
11      Q    Okay.
12      A    If it got to that point, I could take it
13  to the Comptroller, but usually I work it out, and
14  then Judy kind of is that middleman between.
15      Q    Okay.
16      A    So, no, I don't usually go directly to
17  her.
18      Q    So when you talk to her about wanting to
19  get an increase in pay, do you talk to the
20  Comptroller about that employee's work performance?
21      A    Yes.
22      Q    Okay.  What if an employee's work
23  performance is not performing, it needs improvement,
24  would you talk to the Comptroller about that?
25      A    Probably not.  I'd probably handle it

## Page 20

1   myself.
2       Q    Okay.  What about if it's an employee that
3   doesn't report to you and it relates to what you
4   believe to be substandard work performance?
5       A    I do not get involved with that.
6       Q    Okay.  Would you -- if you observed
7   something, would you talk to that person's manager
8   or supervisor, or would you just not get involved?
9       MR. NORWOOD:  Let me object.
10      MS. HAMILTON:  I'm going to object that
11  the line of question poses improper
12  hypotheticals.  Subject to that, if you
13  understand, you can answer.
14      MR. NORWOOD:  And I'll join in that
15  objection and also object on -- when you say
16  talk about these issues, it's vague and
17  ambiguous.  But subject to that.
18      Q    (By Mr. Schmitz)  Do you need me to
19  clarify?
20      A    I do, because I don't know -- no -- yes, I
21  do need clarification.
22      Q    Okay.  So if you were to observe the
23  performance of an employee that was not someone who
24  reported to you, my question was -- because you had
25  testified that you usually would not get involved.

## Page 21

1  Would you even report it to that person's
2  supervisor, or would you simply --
3      A   It would depend on what it is.
4      Q   Okay.  Has the Comptroller ever asked you
5  about how different employees are performing?
6      A   I do not recall it.
7      Q   Okay.  So in addition to all the duties
8  that are assigned to you as Deputy Comptroller, do
9  you ever perform directly any of the duties of the
10  Comptroller?
11      A   Other than signing contracts, no, I can't
12  think of any.
13      Q   Do you recall when you were hired to your
14  current position -- so Deputy Comptroller -- do you
15  recall who interviewed you for that?
16      A   The Comptroller.
17      Q   Okay.
18      A   I don't remember if there was anybody else
19  in the room or if it was just me.
20      Q   And is it your understanding that the
21  Comptroller is the one who selected you for that
22  position?
23      A   Yes.
24      Q   Okay.  When you were promoted to Deputy
25  Comptroller, did you ever receive any training for

## Page 22

1  the position?
2      A   I was provisional in the very beginning,
3  so John Zakibe, in his exit strategy, trained me.
4      Q   Okay.  And what are some of the things
5  that he did to train you?
6      A   He would just have me sit in on -- on
7  meetings, or he would have me sit in on -- he would
8  show me -- you know, one of the duties he had
9  brought with him was the City's insurance and things
10  like that.  So at the time, it was PFPC, which is
11  the Public Facilities Protection Corporation,
12  existed, and it was -- he would explain that.  So it
13  was just kind of going through the duties he
14  specifically had himself.  I had been in the
15  Comptroller's office so long, it was -- I probably
16  knew most of what was going on.
17      Q   Okay.
18      A   And I always -- I always reported -- well,
19  not always, but I mostly reported to the -- to the
20  deputies -- the past two deputies directly, so --
21      Q   Did you ever have any formal training?
22  Did you have, like, any classes or certifications
23  you had to get after you were promoted to Deputy
24  Comptroller?
25      A   No.

## Page 23

1      Q   Did the Comptroller herself ever train
2  you?
3      A   Direct training, no.  I could ask her
4  questions of how something went and she would
5  explain something to me.  But formal training with
6  her, no.
7      Q   Thank you.  After you got promoted to
8  Deputy Comptroller, did you ever receive a service
9  rating?
10      A   I don't remember that.
11      Q   You don't recall if you've had -- just to
12  be clear on that -- ever had a service rating?
13      A   As Deputy Comptroller?
14      Q   Yes.
15      A   I do not recall.
16      Q   Okay.  Did you get them before you were
17  promoted to Deputy Comptroller?
18      A   Yes, but maybe not consistently.  Yes.
19      Q   Do you recall about how often, I should
20  say?  How frequently?
21      A   Probably, if I had to guess, 80 percent of
22  the time.
23      Q   So you've already testified a little bit
24  about signing contracts.  I just want to follow up
25  with that.  And who does have the authority to sign

## Page 24

1  a contract within the Comptroller's office?
2      A   Ms. Green, as Comptroller, and myself.
3  She has given me the exclusive right to do that.
4      Q   All right.  And how did she do that?
5      A   There was a memo that was sent out that
6  said that -- I do not remember who the memo was to.
7  I don't know if it was the Register or the mayor
8  saying that I -- you know, she -- per the charter,
9  she had given me the authority to sign.
10      Q   And do you know where that authority comes
11  from?
12      A   She referenced it in the -- from the
13  charter, so I'm going to assume the charter.
14      Q   Okay.  Have you read that provision in the
15  charter?
16      A   No.
17      Q   Okay.  Have you signed contracts?
18      A   Yes.
19      Q   Okay.  How often would you say you sign
20  contracts?
21      A   On a weekly basis.
22      Q   Do you sign most of the contracts for the
23  office?
24      A   Over half.
25      Q   Do you sign specific types of contracts

Page 25

1  and then the Comptroller signs different ones?
2      A   We -- in the past couple years -- and
3  maybe it's more with the pandemic and things -- we
4  kind of broke it out into two areas.  And I have
5  my -- who is now my fiscal operations manager
6  reviews the contracts for federal grants and I sign
7  those.  She has her fiscal operation manager review
8  other contracts other than federal grants, and she
9  usually signs those.  If she is unavailable to sign
10  those, then I'll go downstairs and sign those for
11  her.  She'll let me know if she needs assistance.
12  So I sign federal grants, she signs other, but
13  sometimes she'll say, Hey, will you run down and
14  sign those contracts for me.
15      Q   So for the ones that you sign, do you
16  always get her approval ahead of time, or do you
17  kind of --
18      A   No, I have authority.
19      Q   Okay.  So you -- it's your discretion
20  whether or not it should be signed?
21      A   Yes.
22      Q   Okay.  And you referenced maybe the
23  pandemic.  This has been in recent years.  So how
24  about from pre-pandemic, say 2017 to 2019, how was
25  it handled?

Page 26

1      A   Most of the time I think I signed
2  everything, but if she was in the office and was
3  available, you know, she wasn't in a meeting or
4  something, she -- and she saw contracts there
5  waiting to be signed, she would go sign them, too.
6  So there was no real pattern there.
7      Q   All right.  How about other documents
8  related to contracts but are not legally binding?
9  Have you -- do you sign those?
10      A   I will say that I do not know what is
11  legally binding in your -- in your view, so I'm
12  going to preference my answer with that.  I can tell
13  you what else I sign.  I'll sign, like, demo
14  permits.  I'll sign release of deeds, things like
15  that.  I do not sign financings, like if we borrow
16  money, that type of thing.  I -- she signs all
17  those, you know.  So those type of documents I do
18  not sign.
19      Q   So you asked -- you testified that you
20  didn't know what constitutes a legally binding
21  contract.  Do you have to make that determination in
22  your position as to what is and is not legally
23  binding?
24      A   I was unclear on what you meant by legally
25  binding.

Page 27

1      Q   Right, right.  So that's my follow-up
2  question.  Do you have to make that determination in
3  your position as to whether or not the document
4  you're signing is -- any particular document is
5  legally binding?
6      A   I would assume that anything with the
7  Comptroller's office signature would be legally
8  binding, but I was not willing to testify to that.
9      Q   Okay.  Do you ever have to determine
10  whether something you sign is a contract or
11  something else?
12      A   It's pretty evident, in my eyes.
13      Q   Do you ever -- is it ever not evident?  Is
14  there ever a document that you're unsure about?
15      A   If it's a contract?
16      Q   Well, or whether or not it does constitute
17  a contract.  I'm asking, do you make that
18  determination yourself based on what you're seeing
19  in front of you, or do you have to look at other
20  resources to --
21      A   I'm not clear on what you're --
22      Q   Let me rephrase it.
23      A   I'm not clear on your question.
24      Q   Okay.  If you have a document in front of
25  you and you say it's pretty clear that it's a

Page 28

1  contract, if it's not clear that it's a contract,
2  what do you do?
3          MS. HAMILTON:  And I'm going to object
4  that the question was asked and answered.  She
5  said that she does -- it's pretty clear she
6  doesn't have such documents.  But subject to
7  that, you can answer.
8          MR. NORWOOD:  Join.
9          MS. McMILLEN:  Improper hypothetical.
10          MR. NORWOOD:  Join.
11          MS. HAMILTON:  You can answer.
12      A   I have contracts that I sign.  I have,
13  like, permits, demo permits and maybe electrical --
14  electricians' licenses I sign.  I have lien waivers
15  I -- I mean, I remove liens from property, like if
16  they had a CDA loan, that type of thing.  Those are
17  the things I sign.  Legally, that's what I sign.
18  Okay.
19      Q   (By Mr. Schmitz)  Do you ever try to
20  determine what it is that the City is -- how the
21  City is being bound, what the terms are?
22          MS. HAMILTON:  I'm going to object that it
23  calls for a legal conclusion.  Subject to that,
24  you can answer.
25      A   Repeat the question, please?

## Page 29

1     MR. SCHMITZ:  Can you read it back?
2     COURT REPORTER:  Sure.
3     (The last question was read.)
4     A   Of course I do.
5     Q   (By Mr. Schmitz)  Okay.  Do you always
6  make that determination on your own, or do you ever
7  seek outside assistance?
8     A   The contract has gone through various
9  stages.  I'm the -- almost the end stage.  The
10  Register is the final stage, but I'm almost.  So if
11  I have a question, yes, I will call a department and
12  find out what's going on or question it, but
13  otherwise, I don't always take -- second guess the
14  department who is saying they need this contract
15  unless it's pretty evident that it's, you know,
16  not -- I don't want to say legit, but not, you know,
17  kosher.
18     Q   Okay.  Do you ever contact the City
19  Counselor's office for guidance?
20     A   Yes.  I have in the past.
21     Q   Okay.  How about related to contracts
22  or --
23     A   Yes.
24     Q   Okay.  And what are the reasons that you
25  would typically contact them?

## Page 30

1     MS. HAMILTON:  I'm going to object that it
2  calls for attorney/client privileged
3  information and instruct the witness not to
4  answer.
5     Q   (By Mr. Schmitz)  Are you refusing to
6  answer that question?
7     A   According to my lawyer.
8     Q   Okay.  Are you familiar with a document
9  related to City Composting from 2017 --
10     MS. HAMILTON:  And I would just -- sorry.
11  Go ahead.  I didn't know if you were finished
12  with your question.
13     MR. SCHMITZ:  I'm not.
14     Q   (By Mr. Schmitz)  So this would have been
15  a document in 2017 that was allegedly signed by
16  Mr. Garavaglia related to St. Louis Composting.  I
17  can give you more documents to look at it if you're
18  not familiar.
19     MS. HAMILTON:  And I would just object to
20  foundation.  Subject to that, if you know what
21  he's talking about, you can answer.
22     A   I was shown this document in -- I don't
23  know what you call it -- when I met with my lawyer.
24  And I did not remember it, to tell you the truth,
25  but my name was on as cc'd, so obviously I did see

## Page 31

1  it.
2     Q   (By Mr. Schmitz)  Okay.
3     A   But it was five years ago.
4     MR. NORWOOD:  And just for your benefit, I
5  did -- we did have that marked as 14 in
6  Mr. Garavaglia's deposition, so if you want to
7  refer to it, we can use this copy, or if you've
8  got a copy, we can do it that way.  Either way.
9     MR. SCHMITZ:  Yeah.  I don't -- I don't
10  know what you have in 14, like, as far as the
11  specific pages.
12     MR. NORWOOD:  We've got all the exhibits.
13     MR. SCHMITZ:  They may not be the same.
14     MR. NORWOOD:  Well, take a look at it.
15     MR. SCHMITZ:  I haven't even made an
16  exhibit --
17     MR. NORWOOD:  Because I'm going to
18  reference mine, so you can take a look at what
19  I'm going to reference.
20     MR. SCHMITZ:  I haven't made an exhibit
21  letter for that yet.
22     MR. NORWOOD:  Well, take a look at it.
23     MR. SCHMITZ:  I'm not going to use that
24  just yet.
25     MR. NORWOOD:  Well, you can hold on to

## Page 32

1  that copy, because I will.
2     MR. SCHMITZ:  Okay.  Sounds good.
3     Q   (By Mr. Schmitz)  Do you have any
4  recollection of any times that Jim signed something
5  that appeared to be a contract?
6     MS. HAMILTON:  Objection.  Calls for a
7  legal conclusion.
8     Q   (By Mr. Schmitz)  Subject to that.
9     MR. NORWOOD:  I'll join.
10     MS. HAMILTON:  I assumed you would join,
11  but it was delayed.  Subject to that, you can
12  answer, even though it's not relevant.
13     A   I can think of one other time.
14     Q   (By Mr. Schmitz)  Okay.  And what was
15  that?
16     A   An AT&T contract I remember him signing.
17     Q   How did you find out about that?
18     A   I don't know.  I was shown it by -- I
19  don't know.  I don't remember who I was shown it by.
20     Q   Okay.  Do you remember when you found out
21  about it?
22     A   No.  I do not know the exact date.  I know
23  it was in the instance when we were trying to unwind
24  the AT&T contracts, kind of -- you know, we were at
25  a state where contracts weren't being issued, and so

## Page 33

1  we were looking at that.  So we were looking at
2  different contracts that -- that the City had with
3  AT&T.
4      Q   Do you recall if this was before or after
5  Jim left the office?
6      A   It was after, I believe.  I'm going to
7  retract that.  I don't remember.  I'll be honest
8  with you.  I know we've done a lot of work on AT&T
9  contracts since, but --
10     Q   Okay.  All right.  I'm going to shift
11 gears a little bit here.  I want to ask you if you
12 recall -- this would have been when Jim was still
13 Deputy Comptroller for Finance and Development, and
14 it would have been in 2009 -- or '19, not '9.
15 Excuse me.
16         Do you recall meeting with the Comptroller
17 and Jim to discuss the budget for the next fiscal
18 year?
19     A   I do not know what specifically you are
20 talking about.  We -- we met many times and I'm sure
21 we've talked about budget many times.
22     Q   Okay.
23     A   I'm not clear on what you're asking.
24     Q   Well, I'm just asking if you recall budget
25 meetings -- just the three of you -- in early 2019.

## Page 34

1      A   I -- I can't tell you a date.
2      Q   Okay.
3      A   I can't -- I mean, we've met before on
4  that subject.
5      Q   Do you recall a meeting in 2019 with you
6  and Jim and the Comptroller where the Comptroller
7  mentioned -- or asked -- excuse me -- about yours
8  and Jim's plans for the future leading up to her
9  running for her next term?
10     A   Yes.
11     Q   Okay.  Do you remember approximately what
12 date that meeting was?
13     A   I'm going to say maybe -- I'm assuming
14 June, maybe.  It could be May.  I don't know that
15 for a fact.
16     Q   Okay.  Do you recall what was discussed at
17 this meeting?
18     A   I cannot give you details.  I can tell you
19 an overview of what I felt like the meeting was
20 about.
21     Q   Just what you can recall.
22     A   Okay.  I remember meeting -- I'm assuming
23 this is the meeting that we had at 1520 Market.  I'm
24 assuming that.  Okay?  So that's the one I'm
25 thinking of.  That she -- we met on a pretty regular

## Page 35

1  basis back then, and so we met with her.  And my
2  feeling coming out of that meeting was that she was
3  not really too happy with us, that she felt like she
4  wanted to know, you know, if she -- when she ran
5  again or whatever, that were we going to be by her
6  side and have her back, basically, is the feeling I
7  got.  I cannot -- I do not say that those were the
8  exact words or anything.
9      Q   Do you recall why you felt that way?
10     A   Specifically, no.  I think it was more a
11 feeling of she wanted to make sure her deputies were
12 on the same page as her.
13     Q   Do you recall what you said at that
14 meeting?
15     A   No, I do not specifically.
16     Q   Okay.  Do you recall anything that Jim
17 said at that meeting?
18     A   I know Jim said that he was -- and I'm
19 paraphrasing -- okay -- just that, yes, he would --
20 he was on her team, basically.
21     Q   Do you recall anything about any questions
22 or discussions about retirement either for you or
23 for Jim?
24     A   Specifically, no.
25     Q   Do you recall if that was discussed at

## Page 36

1  all, not specifics, but --
2      A   I don't -- I truly do not remember.
3      Q   Okay.  Do you recall her ever asking how
4  long either of you intended to continue working in
5  your positions?
6          MR. NORWOOD:  Well, let me object, because
7  it's a compound question when you say either of
8  you.  Subject to that.
9          MS. HAMILTON:  You can answer.
10     A   Was the word retirement ever used?  I
11 don't remember.  We -- in the past in other
12 meetings, I mean, it was kind of like we're -- I
13 don't think it was like when are you going to leave
14 or, you know, what are your plans, I think she just
15 needed to know how her office was going to run.
16 That was my take on it.
17     Q   (By Mr. Schmitz)  Okay.  I don't want to
18 assume your answer, so I'll just ask again.  Does
19 that mean that you do recall some discussion at this
20 meeting about how long either you or Jim --
21     A   I don't remember specifically that.
22     Q   Okay.  Do you recall any other topics
23 unrelated to retirement?
24     A   I -- after the -- my --
25     Q   I understand.

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 37

1    A    I -- my memory of it is top level.  I
2  don't have any details of that meeting at all.
3    Q    All right.  Did you and Jim ever discuss
4  his retirement or his -- his leaving the office?
5    A    I think -- you know, because we had a very
6  friendly relationship, and I think we still do.  But
7  I mean, I -- I think we probably said what our plans
8  were for the future.  I know he had planned on
9  staying, you know, through her next term, and mine
10  was, you know, hopefully I was out by the time I was
11  65, you know, so --
12    Q    Did you and the Comptroller ever discuss
13  Jim's retirement separately --
14    A    No.
15    Q    -- outside of Jim's presence?
16    A    No.
17    Q    Okay.  How frequently are your
18  interactions with Chana Morton?
19    A    I talk to Chana quite often.
20    Q    Has Chana ever discussed with you -- and
21  this would have been relative to twenty -- anything
22  about big changes after the change of fiscal year in
23  2019?
24    A    I do not remember that.
25    Q    Do you know of any big changes that were

## Page 38

1  coming?
2    A    No.  I was not privy to anything.
3    Q    You don't know of any significant changes
4  that were made to the budget for fiscal 2019, I
5  guess it would be twenty --
6    A    No.
7    Q    No?
8    A    Huh-uh.
9    Q    You testified that you had, I think you
10  said, a friendly relationship with Jim.
11    A    Uh-huh.
12    Q    How often --
13    MS. HAMILTON:  You've got to say yes or
14  no.
15    A    Yes.  I'm sorry.
16    Q    (By Mr. Schmitz)  How often did you
17  interact with Jim when he was there?
18    A    There was -- there was no timing on it.
19  You know, it depended what was going on.  If we had
20  to talk about something, we talked about it, if we
21  didn't.  We were in two different
22  buildings and we had two different jobs.
23    Q    If you -- if you guys had an issue --
24  well, let me strike that.
25    Was it customary for you and Jim when you

## Page 39

1  were both in the Deputy Comptroller position to try
2  to work things out between each other before you
3  would bring it to the Comptroller, or would you
4  bring that to the Comptroller's attention?
5    MS. HAMILTON:  I'm going to object to the
6  phraseology when you were both Deputy
7  Comptroller as unsupported by and contrary to
8  the testimony that the witness has given based
9  on their different jobs.  Subject to that, you
10  can answer.
11    MR. NORWOOD:  I'll join and also agree
12  that they had different positions, as well as
13  different jobs.  And it's a compound, vague,
14  and ambiguous question.  Subject to all that.
15    MS. HAMILTON:  You can answer.
16    A    Will you repeat it?
17    MR. SCHMITZ:  Can you read the question
18  back?  Thank you.
19    (The last question was read.)
20    A    If we had something we needed to work on,
21  of course we would join together and work on it and
22  take it to the Comptroller.  I mean, I feel that's
23  what she wanted.  I don't think we were, you know,
24  in -- you know, we weren't two silos.  It's an
25  office.  It's a combined office.  If there was

## Page 40

1  something Jim needed and I needed to discuss with
2  him or vice versa, you know, we worked together.
3    Q    (By Mr. Schmitz)  Did you ever have any
4  issues working with Jim to get what you needed?
5    A    No.
6    Q    Did you guys ever work together on
7  projects, or were they mostly like you had your
8  duties and they were underneath you and he
9  had separate things?
10    A    Well, I think -- I think you can say that
11  they crossed over, you know.  I don't think that
12  it's -- you know, if he was working on the
13  short-term debt, he needed my help or my people's
14  help to get the financial statements he needed.  So
15  it's -- you know, even though I say we're two
16  different jobs because the classification of what he
17  was doing versus what my responsibilities are -- and
18  they intertwine through finances.
19    Q    Okay.  So you did have to collaborate with
20  him and his people --
21    A    Yes.
22    Q    -- quite a bit?  Okay.  Did you ever
23  discuss his work performance with the Comptroller
24  without him present?
25    A    Not that I recall.  Can I add to that,

10 (Pages 37 to 40)

## Page 41

1   please?
2       Q   Uh-huh.
3           MS. HAMILTON:  Yes.
4       A   When we interviewed -- Jim was
5   interviewing for Deputy of Finance.  I was involved
6   in that, and I would -- I did discuss Jim at that
7   point.
8       Q   (By Mr. Schmitz)  Okay.
9       A   That would count.
10      Q   And how were you involved in that?
11      A   I sat in on the interviews.
12      Q   Did you work with Jim when he was, like,
13  an Asset Manager?
14      A   Yes.
15      Q   Okay.  Did he ever report directly to you?
16      A   Never.
17      Q   How was your working relationship when he
18  was an Asset Manager?
19      A   It was fine.
20      Q   After you interviewed Jim, did you have
21  any input on who was selected to that position?
22      A   I would say yes.
23      Q   Okay.  What was that input?
24      A   I recommended that she hire him.  It was
25  still her total decision, but I recommended him.

## Page 42

1       Q   Okay.  When Jim became the Deputy
2   Comptroller for Finance and Development, did you --
3   do you know anything about who was his
4   administrative assistant?
5       A   I'm trying to think back who.  I'm
6   assuming Sheila Woods.  I don't remember if there
7   was somebody before her.  I don't remember that.
8       Q   Okay.  Did you know Sheila?
9       A   Distantly, yes.  I didn't know her
10  personally.
11      Q   When you were -- during your
12  communications with Jim, did you ever communicate
13  with Sheila to communicate something to Jim, or was
14  it generally you guys?
15      A   I have no idea.
16      Q   You don't recall?  Do you -- are you
17  familiar with Eunetter Steele?
18      A   Yes.
19      Q   Okay.  Who is she?
20      A   She was -- she was an assistant in the
21  office also.  I think she was Executive Secretary,
22  is her title.  She was the Executive Secretary to
23  his predecessor, who was Ivy Pinkston.
24      Q   Do you know anything about Jim's decision
25  to have Sheila Woods as his administrative assistant

## Page 43

1   rather than to retain Eunetter Steel?
2       A   Office gossip.  That's all I know.
3       Q   Did anyone ever talk to you personally
4   about it?
5       A   About the decision, no.
6       Q   Did you ever discuss it with Jim?
7       A   I do not recall doing that.
8       Q   What was the -- you mentioned office --
9   excuse me -- office gossip.  I mean, what were some
10  of the things that you did hear?
11          MR. NORWOOD:  Well, let me object to the
12      extent that we're putting office gossip in the
13      record, which would be hearsay and office
14      gossip, which --
15          MS. HAMILTON:  I would just object to
16      relevance.  But subject to that, you can answer
17      if you know.
18          MR. NORWOOD:  Join in that.
19      A   And I think that, you know, it's
20  just I heard that they didn't want to work together.
21  And that was -- and who told me, I have no idea.
22          MR. SCHMITZ:  I'm going to shift gears
23      again.  I don't need a break, but if anybody
24      else does, this is probably a good time.
25          MS. HAMILTON:  Would you like a break?

## Page 44

1           THE WITNESS:  I would love some water,
2       yeah.
3           MS. HAMILTON:  Yeah, let's take a break.
4           MR. SCHMITZ:  All right.
5           MS. HAMILTON:  A real quick one.
6           (Off the record at 10:35 a.m.)
7           (On the record at 10:50 a.m.)
8       Q   (By Mr. Schmitz)  One last question, and
9   then I'll move on.
10          You testified that you had recommended
11  Jim's promotion to Deputy Comptroller for Finance
12  and Development to the Comptroller.  Did you do that
13  in writing or did you do that verbally?
14      A   No, verbally.
15      Q   Verbally.  Okay.  All right.  I want to
16  talk about June of 2019 and the municipal courts
17  bond issue.  Is that something you're familiar with?
18      A   Somewhat.
19      Q   Okay.  Do you recall receiving information
20  from Mr. Garavaglia to place the municipal courts
21  extension project on the preliminary E&A agenda?
22      A   Yes.
23      Q   Okay.  Do you remember when that was?
24      A   I guess it was right before that E&A.  I
25  guess in June.

## Page 45

1    Q   Do you remember the exact date?

2    A   No, I do not.

3    Q   Okay.  Had you discussed that with the

4  Comptroller at all before?

5    A   No.

6    Q   Okay.  Were you aware if Jim and the

7  Comptroller had discussed it prior to that?

8    MS. HAMILTON:  And I'm going to object

9    that the question is vague in terms of it.  But

10    subject to that, if you know what it is

11    referring to, you can answer.

12    MR. NORWOOD:  And I'll join in that

13    objection and object on the grounds it's vague

14    and ambiguous.

15    A   I'm trying to remember your question

16  again.  I'm sorry.

17    Q   (By Mr. Schmitz)  Sure.  I can state it

18  again.  Placing that muni courts extension on the

19  preliminary E&A agenda, do you know if Jim and the

20  Comptroller had discussed that prior to him sending

21  that to you?

22    A   First of all, I didn't think -- I don't

23  remember it -- and I'm not saying I'm correct, but I

24  do not remember it being on the pre-E&A.  I think it

25  was on the -- after pre-E&A, because it was a

## Page 46

1  last-minute add, I believe, if I remember correctly.

2  And I remember asking Jim if he had talked to the

3  Comptroller about it, and he had not at that point.

4    Q   When you asked him that, had you heard

5  anything about that?

6    A   Did I know about the deal?  Is that what

7  you're asking?

8    Q   Not exactly.  Well, I guess you can answer

9  that first, yeah.  Did you know about the deal?

10    A   Yes, because it had been going on for a

11  while.

12    Q   Okay.  Did you know about the possibility

13  of it being on the E&A agenda prior to him sending

14  you that e-mail --

15    A   No.

16    Q   -- that you just referenced?  No.  Okay.

17  And I'll get into those documents in a little bit,

18  so we can see if that refreshes any of your

19  recollection on these things, but for now I'm just

20  going to ask you to tell me what you know based on

21  what you recall.

22    Did you and Jim coordinate on getting

23  items on to the E&A agenda in the past before this?

24    A   I'm sure we did.

25    Q   Was that something that happened

## Page 47

1  regularly?

2    A   The only time I am actually involved in

3  adding them would be at the last minute.  Most of

4  the time it would be -- the additions would be

5  approved through the Comptroller and sent directly

6  to the E&A secretary.  I'm usually not involved in

7  the actual initial one.  It's after it becomes

8  pre-E&A discussion where they need to be add-ons is

9  kind of where I step in there.

10    Q   Okay.  And you're saying now.  Just to be

11  clear, was that also true in 2019?

12    A   As far as I remember.

13    Q   Okay.  And maybe you could just describe

14  the process as you're familiar with it as to how

15  items get on that.  You kind of touched on it there,

16  but how do items typically get on the E&A agenda?

17  Like, who specifically is involved in that process?

18    A   Normally, it is -- the mayor's office

19  usually puts on their items.  It really kind of just

20  depends on what it is.  So if it's a transfer,

21  usually the budget division gets involved.  If it is

22  a department underneath the mayor's office, they

23  usually approve it.  If it's something with our

24  office, we're supposed to run it through the

25  Comptroller first.  And then we -- you know, I do

## Page 48

1  send things directly to the secretary of E&A.

2    If it's something major, it goes to the

3  Comptroller's office.  If it's that I am requesting

4  to destroy vouchers that have been scanned, I don't

5  send that type of stuff to her.  It's more meaty

6  things, I guess you would call them, that you -- or

7  policies or something like that that would go to the

8  Comptroller first normally.

9    So -- and then you send it to the

10  secretary of E&A.  She then prepares a pre -- what

11  we call a pre-E&A packet, and the pre-E&A meets.

12  Usually we try to meet the Thursday before the

13  actual E&A meeting, discuss everything that's on the

14  agenda.  If anybody has any issues, you can bring in

15  things to add at that point and discuss them.  After

16  pre-E&A, there are additions to the E&A, and that's

17  kind of, you know, up until usually maybe that

18  Monday before a Wednesday E&A, you can add to it.

19  That's -- that was a big issue in the prior

20  administration of timing of doing that, but --

21    Q   What -- what days are E&A meetings usually

22  on?

23    A   Normally on a Wednesday.  Usually the

24  third Wednesday of the month is the normal.

25    Q   Okay.  Tell me what -- just from your

## Page 49

1 recollection, after -- you referenced an e-mail that
2 Jim sent.  So after he sent you that e-mail and you
3 responded to him, what happened next?
4     A   I do not remember if it was an e-mail he
5 sent or if he called me.  I don't remember that.  I
6 know he asked me to put this thing on the agenda.
7 Okay?
8     Q   Uh-huh.
9     A   And I did it right away, is -- which was
10 my problem.  So I sent it -- when I say I added it,
11 I sent it to the other pre-E&A members and say, hey,
12 we're going to add this.
13     Q   Okay.
14     A   And then as soon as I hit that button, I
15 was like, oh, wait.  Does the Comptroller know about
16 this?  So I wrote back to Jim and said, Hey, had you
17 discussed this with the Comptroller before we put it
18 on?
19     Q   Okay.  And you said that's my problem.
20 What did you mean by that?
21     A   That means I should have asked that
22 question before I hit the button, you know, and --
23 you know.
24     Q   Okay.  And do you recall what he said?
25     A   He said he would.

## Page 50

1     Q   Okay.  Do you have any recollection of
2 what happened after that?
3     A   If I follow the e-mails I've seen -- I'm
4 just recalling -- it's that I would ask and he said
5 he still needed to talk to her.  And at some point
6 it looked like -- reading the e-mails recently --
7 that discussed it with the Comptroller -- I do not
8 have recollection of it memory-wise -- that she
9 was -- didn't want it to be on or that she -- he
10 hadn't talked to her yet.  It wasn't that she didn't
11 want it to be on at that point, it was that he
12 hadn't talked to her as of that time.
13     Q   Okay.  You do recall that, having talked
14 to her?
15     A   I -- just by the e-mail.  I don't --
16     Q   Okay.  Do you have any --
17     A   I don't have a good memory.
18     Q   And that's fair.  And I'm not -- just to
19 be clear, I don't want you to speculate --
20     A   Right.
21     Q   -- so I'm just asking you what you can
22 recall.  And I will go to those e-mails, but I want
23 to, you know, help see if it refreshes your
24 recollection.  But some of the things I want to ask
25 you about aren't e-mails, so I -- did you talk to

## Page 51

1 her directly after sending the item to the E&A
2 agenda?  Did you talk to her?
3     A   No, I -- no, I did not call her
4 immediately, no.
5     Q   Okay.  Do you know when you talked to her?
6     A   No, I do not.
7     Q   Okay.  And is it your testimony you don't
8 remember when you did talk to her what you talked
9 about?
10     A   I don't remember either, probably.
11     Q   Okay.  Do you remember any conversations
12 you had with the Comptroller after the E&A meeting?
13     A   No, I don't.
14     Q   Do you recall any discussions that you had
15 with Jim after you became aware he wanted it added
16 and before the actual E&A meeting?  Did you guys
17 talk on the phone or in person?
18     A   I don't recall that.
19     Q   You don't recall.  Before I jump into
20 those e-mails and documents, is there a pre-E&A
21 committee that met?  And this would have been in
22 2019 before the pandemic.  So I'm not asking about
23 what happens now, but --
24     A   The pre-E&A is usually made up of a
25 representative of the President of the Board of

## Page 52

1 Aldermen, and it would be his assistant -- his next
2 in command, which is Tom Shepard.  The mayor's
3 office at that time, it was Todd Waelterman, budget
4 director, Paul Payne, myself, and then the
5 Comptroller had asked Jim to start joining us for
6 pre-E&A, so we actually had two.
7     Q   Okay.  And when you -- do you recall
8 having met -- did you meet -- well, let me strike
9 that.
10         How did you guys meet before the E&A
11 meetings?
12     A   Prior to the pandemic, we would always
13 meet in Todd Waelterman's office or in the mayor's
14 conference room.  Most of the time in Todd's office.
15     Q   Okay.  Do you recall a pre-E&A meeting
16 taking place in June 2019?
17     A   We met before every E&A.
18     Q   Do you recall that one specifically?
19     A   No, I do not.
20     Q   Did you ever discuss with anyone, with
21 President Reed or his staff about adding this item,
22 the agenda -- the muni court issue item to the
23 agenda?
24     A   Did I discuss it with them?  No.
25     Q   Okay.

13 (Pages 49 to 52)

## Page 53

1    A   Not that I recall.
2    Q   Do you have any recollection of either
3  President Reed or one of his staff not wanting that
4  item to be on the agenda?
5    A   Reviewing that e-mail, Mary was on there
6  as -- as saying that he didn't want it on there.
7    Q   How about the mayor's office?  Do you know
8  why the mayor's office wanted that item to be on the
9  agenda at the last minute?
10   A   I -- I don't -- no, I don't know.
11   Q   Okay.
12   A   And I don't know if they wanted it or if
13  they just were okay with it when we said we were
14  adding it, if there was a method to that.
15   Q   Did you ever follow up with anyone either
16  with the mayor's office or with the pre-E&A
17  committee?
18       (Discussion off the record.)
19   Q   (By Mr. Schmitz)  Let me start over.
20  After you found out from Jim that he wanted the item
21  added and then after you spoke to him and he said
22  the Comptroller did not know, did you ever follow up
23  with anyone with the mayor's office or with the
24  pre-E&A committee about having asked for that item
25  to be added?

## Page 54

1    A   I don't remember.
2        (Discussion off the record.)
3        MR. SCHMITZ:  Okay.  Do you-all have -- I
4  know Rick sent out an e-mail yesterday --
5  copies of Exhibit P?
6        MR. BLANKE:  No, I don't.
7        MR. SCHMITZ:  We've used this before.
8        MR. BLANKE:  No, I don't think we have.
9        MR. SCHMITZ:  Did you bring all those
10  copies?
11       MR. BLANKE:  P.  I'm giving out copies.
12  Here's one for the witness.
13       MR. NORWOOD:  This is for the witness?
14       MR. BLANKE:  Yeah.
15       MR. NORWOOD:  And this is for us?
16       MR. BLANKE:  Yeah.
17       MR. NORWOOD:  Okay.
18   Q   (By Mr. Schmitz)  All right.  So we've
19  been talking about some e-mails.  I just want you to
20  look at this first page here.
21       MS. HAMILTON:  And you can look at the
22  entire packet, if you want, prior to answering
23  the questions.
24       MR. BLANKE:  These are on double sides, by
25  the way.  They should be.

## Page 55

1    Q   (By Mr. Schmitz)  Okay.  Just let me know
2  when you're ready.
3    A   Sorry.  I'm confused by where it starts.
4  Okay.
5        MS. HAMILTON:  Yeah.
6    Q   (By Mr. Schmitz)  Yeah, let's start with
7  page --
8    A   I mean, because June 5th is in the back
9  and then the -- so we're kind of backwards.
10       MS. HAMILTON:  You can take a look at it.
11       THE WITNESS:  You can take a look at it.
12       MS. HAMILTON:  You can just take your
13  time.
14   Q   (By Mr. Schmitz)  Right.  When you've had
15  a chance to look through it, then I'll start
16  referencing specific pages.
17   A   Okay.
18   Q   All right.  So I'm going to start with --
19  I know it's a little hard to read, but down at the
20  bottom of the pages are some Bates stamps that say
21  Garavaglia --
22   A   Okay.
23   Q   -- and then a number.  So about four pages
24  in, and it's going to be on -- since they're
25  double-sided, so four of the double-sided pages.  At

## Page 56

1  the bottom, it says Garavaglia 157.  It should be an
2  e-mail.
3    A   Oh, okay.  Got you.
4    Q   All right.  So at the top, the e-mail is
5  marked Friday, June 14th, 2019 at 10:53 a.m.  Is
6  this the e-mail that you were referring to earlier
7  in the testimony about Jim sending that to you?
8    A   Yeah.
9    Q   Okay.  So he states, Here's that extension
10  we talked about for E&A.
11       Do you recall talking to him about that
12  extension prior to him sending this e-mail?
13   A   I don't remember that, no.
14   Q   Okay.  What was your understanding when he
15  sent this as to what he was asking?
16   A   To add this extension for the developer on
17  E&A.
18   Q   Okay.  Now, after he sent that and you
19  responded below at 11:21 a.m., just to clarify your
20  earlier testimony, had you sent the e-mail to add
21  that -- the muni court --
22   A   I sent it to the other pre-E&A members,
23  right.
24   Q   All right.  And then you sent this
25  response, You did run this by the Comptroller before

Page 57

1  we do this?
2      A  Right.
3      Q  Okay.  He said, Did not, and then he --
4  then you said, Please run it by her first.  Is that
5  correct?
6      A  Right.
7      Q  Okay.  All right.  And then it looks like
8  on Monday, June 17th, 2019, you sent a follow-up
9  e-mail to Jim.  It says, First response.  What did
10  the Comptroller say?
11          What did you mean by that?
12      A  I do not know.
13      Q  You don't know?  Okay.
14      A  I have no idea what first response meant.
15      Q  Down below it looks like maybe you
16  forwarded a message below as well -- correct me if
17  I'm wrong -- from Mary Ries?
18      A  Oh, maybe that's what first response
19  means, is that this was the --
20          MR. NORWOOD:  Are we on a different page
21      now?
22          MR. SCHMITZ:  We are, yeah.  It goes over
23      on to 158.
24          MR. NORWOOD:  All right.  Just making sure
25      the record is clear.

Page 58

1      A  The response from the -- that's from the
2  Board of Aldermen saying that she did not want to
3  put it on.
4      Q  (By Mr. Schmitz)  Okay.
5      A  Or they did not.
6      Q  Does that refresh what you might have
7  meant by first -- your recollection as to what you
8  meant?
9      A  That's probably the first person that
10  responded to me, yeah.
11      Q  Got you.  And then below that where it
12  says Friday, June 14th, was that the e-mail that you
13  had sent asking --
14      A  That was -- that works with the -- between
15  the first and the second one, it looks like.
16      Q  Right.  So that was the e-mail you sent
17  after Jim sent you the original e-mail?
18      A  Right.
19      Q  Okay.  And if you turn to the very first
20  page in the packet Bates stamped Garavaglia 154, it
21  looks like on Tuesday, you sent an e-mail that said
22  extending on E&A.  You had told me she was okay with
23  this.  She told me she was not.  Did you work this
24  out with her yesterday?
25          Do you recall sending that?

Page 59

1      A  Yes.
2      Q  Okay.  And he responded I did not -- or I
3  didn't talk with her about it, but I will.
4          Did you speak to her prior to Tuesday,
5  June 18th, 2019 at 8:29 a.m.?
6      A  I believe I did.
7      Q  Okay.  Do you recall when that was?
8      A  I'm trying to make sure I have the right
9  memory together, but I believe Friday night she had
10  called me.  I was on my way to dinner and she had
11  called and was like -- and I'm, like, well, I sent
12  you an e-mail about this type of deal.  So I -- I'm
13  thinking it's the same thing.  I probably -- since
14  I'm unclear, I probably shouldn't have brought it
15  up.  But there was a time where she called me and
16  said -- to discuss something, and I'm thinking it
17  was this, but I'm not a hundred percent sure.
18      Q  Do you recall whether or not it was -- you
19  know, the date is correct?  Do you recall what the
20  substance of that conversation was as it relates to
21  the E&A, you know --
22      A  It was something that she -- she wasn't
23  wanting it on the E&A agenda and questioned it, but,
24  you know what, I'm not sure that it's before or
25  after this, to tell you the truth.

Page 60

1      Q  Okay.  Do you have any recollection as to
2  why you asked Jim this question on that Tuesday
3  morning?
4      A  Well, I had -- oh, on this Tuesday?  Well,
5  we were -- you have to have the agenda posted
6  24 hours in advance of the meeting.
7      Q  Right.
8      A  And we were still trying to get a final
9  agenda out, but yet, you know, I hadn't heard what
10  the decision was, if he had talked to her.
11      Q  Okay.  All right.  So the last e-mail here
12  it says, Please do it soon, because Stephanie is
13  trying to finish agenda.
14          Do you recall what happened after that?
15      A  No.  I'm assuming it was put on the
16  agenda.  I do not know.
17      Q  Okay.  Do you know what happened at the
18  E&A meeting?
19      A  I remember Ms. Green saying that she
20  didn't want it on -- I think she said that she
21  didn't want it on anymore because they owed taxes on
22  the -- and she wasn't willing to give them another
23  extension until they paid their taxes.  I believe
24  that's what happened at this one.  They all kind of
25  run together after so long.

Page 61

1      Q    Okay.  Do you recall her saying anything
2  about Jim and what had transpired that led to this
3  late -- you know, these late e-mails between you and
4  Jim?  Did she --
5      A    To me or at E&A?
6      Q    To you.
7      A    No, I -- I can't tell you what the
8  response was.
9      Q    Okay.  Did you attend the E&A meeting?
10     A    Yes.
11     Q    You did?  Okay.  Do you recall how this
12 item came up at the meeting?
13     A    I believe it was -- you know, normally
14 they'll read the whole agenda and then they'll say,
15 okay, we're going to vote on 1, 2, 3, 5, you know,
16 whatever, and they pulled this out separately to
17 have a discussion with it and she had brought up the
18 fact that these people --
19         MR. NORWOOD:  She?  I'm sorry.  She?
20     A    She being the Comptroller --
21         MR. NORWOOD:  Okay.
22     A    -- okay -- brought up the fact that this
23 company -- and I'm not sure how it was structured,
24 because I was not involved in this technically at
25 all.  They -- in some way they had the title on

Page 62

1  it -- that they actually owed taxes on it and they
2  had not paid.  I was unfamiliar with that before she
3  said that.
4      Q    (By Mr. Schmitz)  And when you said they
5  pulled this out separately to have the discussion,
6  who is they?
7      A    They being one of the board members of
8  E&A, and I'm assuming that would have been her, but
9  that's an assumption on my part.
10     Q    Okay.  So you don't recall that?
11     A    I do not recall who.
12     Q    All right.  So you testified you didn't --
13 until the actual E&A meeting, you didn't have any
14 knowledge of any issues related to taxes not being
15 paid?
16     A    I don't recall.
17     Q    Okay.  Do you know who Tom Ray is?
18     A    Yes.
19     Q    Okay.  Did you ever communicate with
20 Tom Ray about the municipal courts issue and the
21 item being added to the agenda at all?
22     A    I do not think I did.
23     Q    Okay.  Are you familiar with the developer
24 for -- I'm sorry -- the attorney for the developer
25 going to the mayor's office and asking that the item

Page 63

1  be placed on the agenda?
2      A    I have no knowledge of that.
3      Q    Okay.  All right.  I want to --
4          MR. SCHMITZ:  Rick, can you pass out
5  Exhibit Z?
6          MR. BLANKE:  Okay.
7          MR. SCHMITZ:  Thank you.
8          MS. HAMILTON:  Feel free to take a look at
9  it.
10     Q    (By Mr. Schmitz)  Just let me know when
11 you're ready and I can start asking questions.
12         MS. HAMILTON:  Okay.  I think we're ready.
13     Q    (By Mr. Schmitz)  Okay.  If you could turn
14 to what's Bates stamped -- it's the second page in
15 this packet, STL001793.  Take your time reviewing it
16 and then --
17         MR. NORWOOD:  Which page?
18         MS. HAMILTON:  1793.
19         MR. NORWOOD:  1793.
20     Q    (By Mr. Schmitz)  Are you familiar with
21 this letter?
22     A    Specifically would I have remembered it,
23 no.  But I'm familiar with the letter, yes.
24     Q    How are you familiar with the letter?
25     A    Well, this is what he would have sent to

Page 64

1  add to E&A.
2      Q    Okay.  And you see the date at the top is
3  June 14?
4      A    Right.
5      Q    Okay.  So is it safe to say that because
6  your name is cc'd down at the bottom, that you would
7  have been aware this may be on the E&A agenda as
8  early as June 14?
9      A    Well, June 14th is when he asked me to add
10 it, which would have been after pre-E&A.  Because
11 pre-E&A, if it was on normal time, would have been
12 the day before that.  So this is when I sent it out
13 to the other pre-E&A saying I'm going to add
14 something.
15     Q    Okay.  Was this attached to the e-mail he
16 sent you, do you recall?
17     A    I do not know.  I assume.
18     Q    If you go to the next page, 1794.  Are
19 these documents familiar?
20     A    Specifically, no.  I mean --
21     Q    Okay.  It actually goes 1794 all the way
22 to, it looks like --
23     A    Yes.
24         MR. BLANKE:  Forever.
25         MS. HAMILTON:  1812.

16 (Pages 61 to 64)

Page 65

1    Q    (By Mr. Schmitz)  It goes on for a while?
2        MR. SCHMITZ:  What did you say?
3        MS. HAMILTON:  1811.
4        MR. SCHMITZ:  Okay.
5    Q    (By Mr. Schmitz)  Did you ever review
6    those documents?
7    A    No.  Before I put them on E&A?  No.
8    Q    Okay.  How about since then?
9    A    No.
10   Q    Could you turn to what's marked -- same
11   exhibit -- 1833 at the bottom?  Do you have that
12   page?
13   A    Uh-huh.
14   Q    Okay.  So if you look down towards the
15   bottom of the page, does this look like an e-mail
16   chain that was between you and -- the same e-mail
17   chain we've been discussing between you and Jim?
18   A    Yes.
19   Q    Okay.  And then above that, not the very
20   top of the page, but just below that, on Friday,
21   June 14th, 2019 at 1:02 p.m., it says from you to
22   Chana Morton.  Do you see that one?
23   A    Right.
24   Q    So was this you forwarding it to the
25   secretary for the Comptroller letting her know that

Page 66

1    this had been forwarded and added to pre-E&A?
2    A    Right.
3    Q    Okay.  Do you know if that was then shared
4    with the Comptroller that day?
5        MS. HAMILTON:  I'm going to object that it
6    calls for speculation.  Subject to that, you
7    can answer.
8    A    I do not know.
9        MR. SCHMITZ:  Okay.  Rick, can you --
10   Exhibit Y.  I don't know how many copies we
11   have of that.
12       MR. BLANKE:  Exhibit Y is something you
13   guys all should have, so here's something for
14   the witness.  We used this last time.  It was
15   in Chana Morton's deposition or Judy
16   Armstrong's deposition.  I'm sorry.
17       And just for the record, this was in the
18   City's most recent production of documents.
19   Q    (By Mr. Schmitz)  Feel free to review the
20   whole document, but I'm only going to ask you about
21   three pages.
22   A    Okay, good, because it's, like, really
23   thick.
24   Q    I'm only going to ask you about three
25   pages.

Page 67

1    A    Okay.  Let's just do that.
2    Q    Okay.  So those pages are going to be 1903
3    to 1905, if you want to review those quickly and
4    then I'll ask you questions about it.
5        MR. NORWOOD:  1903 to 1905?
6        MR. SCHMITZ:  Yeah, those three pages.
7    Q    (By Mr. Schmitz)  I'm going to start with
8    1903, so whenever you're ready.
9        MR. NORWOOD:  1903?
10       MR. SCHMITZ:  Uh-huh.
11   A    Okay.
12   Q    (By Mr. Schmitz)  On page 1903, it looks
13   like it's an e-mail that was sent out by
14   Comptroller Green on Wednesday, June 19th at
15   11:05 a.m.  Do you see that at the top?
16   A    Uh-huh.
17       MR. NORWOOD:  Is that a yes?
18   A    Yes.  I'm sorry.  Yes.
19       MR. NORWOOD:  That's okay.
20       MS. HAMILTON:  Did you say it looks like
21   it was sent out by Comptroller Green?
22       MR. SCHMITZ:  Yeah.  It says from at the
23   very top.
24   A    But it was from the --
25       MR. BLANKE:  But indeed.

Page 68

1        MS. HAMILTON:  Yeah, but indeed.
2        MS. McMILLEN:  Is there a question
3    pending?
4        MR. SCHMITZ:  I don't think so.  I just
5    asked if she saw that at the top, and she said
6    yes, so if there's some confusion about that, I
7    can certainly clarify it.
8        MS. HAMILTON:  I would just -- are you
9    saying that was from Comptroller Green or from
10   her e-mail address at the top when you --
11       MR. SCHMITZ:  It's from her e-mail address
12   on behalf of, right, so --
13       MR. NORWOOD:  Well, and are you asking her
14   to clarify what she was meaning when she just
15   made the comment in reaction to your question?
16       MS. HAMILTON:  Just for the record,
17   counsel, do you want to clarify the question?
18   Q    (By Mr. Schmitz)  I'm simply asking who
19   the e-mail was from at the top of the page,
20   according to that.
21   A    The "from" says Darlene Green.
22   Q    Okay.  Do you recall receiving this
23   e-mail?
24   A    Do I specifically recall it?  I recall it.
25   I don't recall receiving -- you know what I'm

## Page 69

1  saying?
2      Q   You recall the e-mail, though?  Okay.
3      A   I mean, I remember the instance of what
4  was happening.
5      Q   And as you can see at the bottom, it
6  states Chana Morton on behalf of Darlene Green?
7      A   Right.
8      Q   Okay.  Was that typical for her to send
9  out e-mails?
10     A   Yes.
11     Q   Specifically what my question is, is on
12 behalf of the Comptroller from the Comptroller's
13 e-mail address?
14     A   Yes.
15     Q   All right.  All right.  If you would turn
16 your page to 1904.  I know you've had an opportunity
17 to review this.  Are you familiar with this
18 document?
19     A   It jogged my memory, yes.
20     Q   Okay.  Do you recall ever discussing this
21 with the Comptroller before she sent this out?
22     A   I do not know.
23     Q   Okay.  Are you familiar with what she is
24 writing in the first paragraph?  Do you have any
25 recollection of this occurring in --

## Page 70

1      A   Yes.
2      Q   Okay.  And what -- are you familiar with
3  all of it, or just portions of that first paragraph?
4      A   I just know that the mayor's office posted
5  an agenda in which -- normally you'd always go
6  through the Secretary of the Board of E&A.  It's one
7  of these -- one of the questions that's kind of
8  always raised is, is that the Secretary to the Board
9  of E&A reports to the Comptroller, but at the same
10 time, she works for all three.  So it's one of those
11 where you have two many bosses.  And so they went
12 ahead and posted something that Ms. Green -- without
13 going through the secretary, is what it was.
14     Q   Okay.  Would that have been something that
15 you would have been included -- or let me strike
16 that.
17         Is that something that you should have
18 been included in before it was posted to the agenda?
19     A   I don't know that this was posted to the
20 agenda.
21     Q   Okay.
22     A   You know, I'm reading it as just a letter.
23     Q   Oh, I'm not talking about this letter.
24 Sorry.
25     A   Okay.

## Page 71

1      Q   The item in the agenda, yeah.
2      A   Okay.
3      Q   So let me -- it says -- let me go to the
4  second sentence in the first paragraph.  The
5  addendum was posted physically in City Hall and to
6  the Comptroller's website without notifying the
7  Comptroller's staff.
8          Who -- let me just strike the previous
9  question and ask this:  Who should have been
10 notified in the Comptroller's office?
11     A   The secretary to E&A.
12     Q   Okay.  And who is that -- or who was that
13 at this time?
14     A   I believe it was Stephanie Green --
15     Q   Okay.
16     A   -- but I -- I'll be honest with you,
17 time-wise, I think so.
18     Q   All right.  Should you also have been
19 notified in your position, or just Stephanie?
20     A   Normally they would include everybody.  I
21 mean, it's usually pretty inclusive.
22     Q   Would you say that this was unusual for
23 the mayor's office to have done this?
24     A   Yes.
25     Q   Okay.  Prior to this happening, do you

## Page 72

1  have any recollection of either the mayor's office
2  or the President of the Board of Aldermen's office
3  having posted something without following these
4  procedures?
5      A   I don't ever remember this happening other
6  than this time.
7      Q   Okay.  All right.  I want to jump forward
8  a little bit after E&A.  Did you have any
9  involvement in the signature process of the
10 documents related to the muni court issue after the
11 E&A meeting?
12     A   No.
13     Q   No?
14     A   Not that I can remember.
15     Q   Okay.  Did you ever hear about there being
16 any difficulties in getting signatures that took
17 place?
18     A   I don't know anything about it.
19     Q   Don't know anything about it?
20     A   Huh-uh.
21     Q   Okay.  How did you first become aware that
22 Jim was being placed on forced leave?
23     A   Todd Waelterman called me on the phone,
24 the mayor's office.
25     Q   Do you remember what date that was?

LEXITAS LEGAL
www.lexitaslegal.com          Phone: 1.800.280.3376          Fax: 314.644.1334

Page 73

1      A   No.  It was right after it happened,
2  because he had called me and said, Hey, did you
3  know?  And I'm like, What?  So he had run in to Jim
4  out in the parking lot, he said.
5      Q   So you did not know that this was
6  something that was going to happen before it
7  happened?
8      A   I did not.
9      Q   Okay.  Do you recall after the E&A meeting
10  talking to the Comptroller about Jim and what had
11  happened with the E&A?
12     A   I don't recall that.
13     Q   Okay.  So after you found out, did you
14  ever discuss Jim's forced leave with the
15  Comptroller?
16     A   No.
17     Q   Never?
18     A   Never.
19     Q   Okay.  Did you ever discuss it with
20  Judy Armstrong?
21     A   No.  I stayed out of it totally.
22     Q   Did anyone ever ask you what had happened
23  in the days leading up to the E&A meeting as part of
24  an investigation?
25     A   Not that I recall.

Page 74

1      MR. SCHMITZ:  Okay.  Do you have
2  Exhibit U?
3      MR. BLANKE:  I'm sorry?
4      MR. SCHMITZ:  U.
5      (Discussion off the record.)
6      Q   (By Mr. Schmitz)  Take time to review the
7  document and then I'll ask you some questions about
8  it.
9      MR. BLANKE:  Paul, don't lose that copy,
10  because that may be our only copy now.
11     MR. SCHMITZ:  Okay.
12     MS. HAMILTON:  Okay.  We're ready.
13     Q   (By Mr. Schmitz)  Have you ever seen any
14  of these documents before?
15     A   No, I have not.
16     Q   No?  Okay.  If you could turn to -- it's
17  page 2 of what's titled Respondent's Statement of
18  Position in Response to Charge of Discrimination.
19  And at the very bottom, it's Bates stamped
20  Garavaglia 4.
21     A   Uh-huh.
22     Q   Okay.  I'm going to reference the first
23  full paragraph where it says, 1, failing to keep
24  Comptroller Green fully informed about problems that
25  developed with documentation for the muni court

Page 75

1  project which would have caused the matter to be
2  prematurely placed on the E&A agenda.
3      Is that something you ever discussed with
4  the Comptroller or anyone else?
5      A   No.
6      Q   If you go a little bit forward to 3.
7      MR. BLANKE:  Page 3?
8      MR. SCHMITZ:  No, no, no.  Same paragraph
9  marked 3.
10     Q   (By Mr. Schmitz)  I read 1.  It says
11  creating through these document deficiencies the
12  need for a second E&A meeting, all while withholding
13  information from the Comptroller regarding numerous
14  deficiencies in the documentation.
15     I'm going to ask you two questions and not
16  a compound question.  So first related to that, do
17  you recall there being a second E&A meeting related
18  to this?
19     A   I truly did not.
20     Q   You did not?  Okay.  Do you have any
21  knowledge of Jim withholding information from the
22  Comptroller regarding deficiencies in the
23  documentation?
24     A   No.
25     Q   Okay.  Can you skip forward to number 7,

Page 76

1  same paragraph?  Do you have any knowledge of Jim
2  falsely communicating to the office of the mayor and
3  the office of the President of the St. Louis City
4  Board of Aldermen that Comptroller Green did not
5  want to proceed with the muni court project, when in
6  fact she was in favor of the project?
7      A   I have no knowledge.
8      Q   Okay.  Do you recall ever telling the
9  Comptroller that you believed Jim was responsible
10  for any of the issues that arose leading up to the
11  E&A meeting?
12     A   I've never discussed it with -- I mean,
13  that he didn't talk -- he didn't contact her about
14  it.  She questioned me and I said, well, you know,
15  that he was supposed to talk to you about it, and
16  she's like, Why did you put it on?  He was supposed
17  to talk to you about it.  That was it.  That was all
18  that was --
19     Q   That was all that was discussed?
20     A   Uh-huh.
21     Q   Okay.
22     MR. NORWOOD:  Was that a yes?
23     A   Yes.  Sorry.
24     Q   (By Mr. Schmitz)  Do you recall any
25  conversations with you, the Comptroller, and Jim all

Page 77

1  at the same time related to placing the muni courts
2  issue on the E&A agenda?
3      A   I do not recall that.
4      Q   Okay.  Did you ever have any conversations
5  with anyone with the Department of Personnel related
6  to Jim being placed on forced leave?
7      A   No.
8      Q   How about before -- well, this would have
9  been true both before and after he was placed on
10 forced leave?
11     A   With Personnel?
12     Q   Personnel.
13     A   Not -- not an official -- no, I don't
14 think I did.  I don't recall it.  I mean, sometimes
15 I talked to people off to the side, but I don't
16 recall ever officially asking any questions about
17 it.
18     Q   Do you recall anything at all, like,
19 unofficial with anybody that was with the Department
20 of Personnel, even informally?
21     A   No.  No, I don't.
22     Q   You said Todd Waelterman had called you.
23 What did he say when he called you about him -- Jim
24 being placed on forced leave?
25     A   He just said that he had run in to Jim and

Page 78

1  did I know that they placed him on leave, and I did
2  not.  I was shocked about it.
3      Q   Did you talk to anyone in the
4  Comptroller's office about --
5      A   No.
6      Q   Okay.  Did anyone come to you within the
7  Comptroller's office and say, hey, Jim is on forced
8  leave?
9      A   No.
10     Q   Okay.  Did you have to assume any of his
11 duties while he was out on forced leave?
12     A   No.
13     Q   Okay.  How about Jim being placed on a
14 second forced leave, do you know anything about
15 that?
16     A   I didn't even know that until I read it.
17     Q   Okay.
18     A   I had no idea.
19     Q   When did you read that?
20     A   Just right now on this thing.
21     Q   Just right now?  Okay.
22         MS. HAMILTON:  Exhibit U is what you're
23     referring to?
24     A   Yes.  I'm sorry.  Yes.  Exhibit U.  I had
25 no idea.

Page 79

1      Q   (By Mr. Schmitz)  Okay.  So no one has
2  ever discussed that with you?
3      A   Never.
4      Q   Okay.  Do you know anything about a
5  pre-termination notice being issued to him?
6      A   No, I do not.
7      Q   Okay.  So we talked way earlier on in the
8  depo about AT&A documents and AT&T contracts, so I'm
9  going to -- I'm going to touch on that a little bit.
10 Correct me if I'm wrong.  I believe you testified
11 that you were familiar with him possibly signing an
12 AT&T document?
13     A   Yes.
14     Q   Okay.  Do you have any knowledge about him
15 signing an AT&T document as it relates to him being
16 placed on forced leave?
17     A   No.
18     Q   No.  Okay.  Were you aware that he had
19 been placed on forced leave, at least in part at
20 some point, because of issues related to signing
21 AT&T documents?
22     A   No.  I don't recall that.
23     Q   Okay.
24         MR. SCHMITZ:  Do you have Exhibit AA?
25     Thanks.

Page 80

1      Q   (By Mr. Schmitz)  If you could review
2  these briefly and then I will ask you questions.
3         MR. BLANKE:  I apologize for not stapling
4      this.  I thought I had.  It's paper clipped.
5      A   Okay.
6      Q   (By Mr. Schmitz)  Okay.  Having reviewed
7  all of these, is this familiar to you?
8      A   Parts of it I remember and parts -- I
9  guess I did.  My name is on it.
10     Q   I'm going to start from the first page,
11 which is marked STL001876 --
12     A   Okay.
13     Q   -- at the bottom.  So this is dated
14 February 7th, 2019 at 1:27 p.m.  It looks like an
15 e-mail from you to Jim; is that correct?
16     A   It looks like it.
17     Q   Okay.  Do you recall sending this e-mail?
18     A   Nope.
19     Q   Okay.  Do you know, just having read it,
20 what this e-mail was about?
21     A   It seems -- and I get this periodically,
22 where a company will call me asking, you know --
23 that we have delinquent bills, you know.  So it
24 looks like I got a call from AT&T saying our bills
25 were delinquent, I assume.

## Page 81

1    Q   Do you know anything about bills being
2   delinquent during this time period before this
3   e-mail?
4    A   I don't recall.
5    Q   Okay.  If you could turn -- I think we'll
6   go through the next two pages sort of working
7   backwards.  It kind of -- page 2053 looks like it's
8   the very end of an e-mail signature, so really I'll
9   be working off of 2052.  It looks like your
10  signature.  Are you familiar with this e-mail chain?
11   A   I do not recall it.
12   Q   Okay.  Do you know, having read it, what
13  this would be about?
14   A   That we owed bills to AT&T.
15   Q   Do you know how -- and you may not know
16  this, but if you recall how Jim -- it looks like he
17  responded to you from the e-mail that you wrote --
18  well, it looks like -- below that, it looks like
19  D. Cox.  I'm not sure.  Who is D. Cox?
20   A   I don't even remember that name, to tell
21  you the truth.
22   Q   You don't?  Okay?
23   A   Maybe -- you said the first name, but I
24  don't remember who it is.
25   Q   All right.  If you could see in the middle

## Page 82

1   of the page, it's --
2    A   Right.  Now I see it --
3    Q   Right.  Right.
4    A   -- but when I saw that, I was like I don't
5   even remember who that is.
6    Q   Okay.  It was his office assistant.
7    A   Right.
8    Q   So presumably somebody -- but then it
9   says, of course, Darlene Green at the top.  So
10  presumably this person had access to her e-mail?
11   A   Right.
12   Q   Okay.  And then it looks like Jim
13  responded to you related to this.  Do you know how
14  he got it?
15   A   Are we talking about the "I got it" at the
16  top?
17   Q   Yes.
18   A   Okay.  To me, if I follow this, it's that
19  I was like, Hey, I got this voice mail and they're
20  saying we have overdue bills, and he was, like,
21  saying I'll take care of that, figure it out.
22   Q   Do you know if you forwarded him that or
23  do you know if you had a conversation with him?
24   A   No, I have no idea.
25   Q   Okay.

## Page 83

1    A   And that was an assumption on my part,
2   too.
3    Q   Okay.
4    MS. HAMILTON:  And I would just --
5   counsel, for the record, the document right
6   under Jim's signature shows Bev forwarding it
7   to him, but --
8    MR. SCHMITZ:  I don't think it says it's
9   forwarded to him.  We can -- we could assume
10  that, but it doesn't say who it was forwarded
11  to, for the record.
12   MS. HAMILTON:  He responds to it, so --
13   Q   (By Mr. Schmitz)  If you could turn to
14  2055 first, and then I'm going to reference back to
15  2054, the e-mail at the bottom from Lauren S.
16  Trager.
17   A   Uh-huh.
18   Q   That looks like it's part of the same
19  e-mail chain.  Do you -- have you seen that e-mail
20  before from LaurenTrager@kmov.com to Tyson Pruitt?
21   A   I don't recall seeing it.  We get a lot of
22  these, so --
23   Q   Okay.  Do you have any recollection of a
24  bill received by SLATE -- and I'm reading now from
25  her e-mail to Tyson Pruitt -- for 52,000 from AT&T?

## Page 84

1   Are you familiar with anything relating to a bill
2   owed to AT&T by SLATE?
3    A   I do not remember that.
4    Q   Okay.  Above that, it looks like Tyson
5   forwarded that to both you and --
6    A   Right.
7    Q   -- Jim.  Do you know if you --
8    MS. HAMILTON:  Now we can tell it was
9   forwarded.
10   MR. NORWOOD:  I'm sorry?
11   MS. HAMILTON:  I withdraw that.  It was
12  argumentative.
13   MR. BLANKE:  Thank you for your candor.
14   Q   (By Mr. Schmitz)  All right.  Do you know
15  if you got involved in this?  Do you recall that?
16   A   I do not remember.
17   Q   Okay.  Who typically handled the AT&T
18  bills?  Was that something that both -- was handled
19  by you and Jim, or was that --
20   A   No, Jim's section.
21   Q   Jim's section?
22   A   Uh-huh.
23   Q   Okay.  If you know -- and I'm not asking
24  you to speculate -- do you know why Tyson would have
25  forwarded that to both of you?

## Page 85

1    A   He does that when he's not sure who can
2  answer the question.
3    Q   Okay.  All right.  If you go to 2056.  I'm
4  not going to spend a lot of time on this since
5  you've answered all the questions from the previous
6  part of this e-mail chain.  But it looks like there
7  was a response from Tyson.  Just reading that, does
8  that refresh any recollection about the AT&T bill
9  and SLATE as to what happened, or do you still not
10  recall?
11    A   I don't recall this specific instance.  I
12  know we were struggling with AT&T according to how
13  they were crediting our bills.
14    Q   Okay.  Can you talk a little bit more
15  about what you do know?  What was that struggle, as
16  best as you can recall?
17    A   Well, it seemed like -- because it seemed
18  like we were always in a delinquent mode, and I
19  think one of the things that we were looking at
20  was -- at the time Jim was trying to unwind --
21  like, you know, if we were paying these bills, where
22  were they being credited to and figuring out why
23  there was delinquencies in these instances.
24    Q   Do you know if that was a difficult
25  process?

## Page 86

1    A   AT&T is very complicated.
2    Q   Was there some concern that AT&T was
3  possibly overcharging?
4    A   I think --
5        MS. HAMILTON:  I would just object that
6     it's vague because you have not identified who
7     might in fact have been concerned.  But subject
8     to that, you can answer.
9    A   Yeah, I -- you know, I don't -- I mean, I
10  guess you always have that concern, but I don't
11  remember if it has anything --
12    Q   (By Mr. Schmitz)  Do you know how it
13  was -- or if -- excuse me.  Strike that.
14        Do you know if it was ever resolved, this
15  bill -- these bills?
16    A   I do not.  Oh, these specific ones?  I
17  have no idea.
18    Q   How about any of the bills for overdue
19  payment?
20    A   I think there's an ongoing concern with
21  AT&T bills.
22    Q   Okay.  Would you say that's true even now?
23    A   Yes.
24    Q   Okay.  Do you know what that concern --
25  ongoing concern is?

## Page 87

1    A   If they're billing us correctly.
2    Q   Okay.  Is that something that's still
3  handled by the Deputy Comptroller for Finance and
4  Development?
5    A   No.  I believe Judy Armstrong is in charge
6  of telecommunications at this time.  I believe.
7    Q   Okay.  Is that something that --
8    A   But Judy may report to LaTaunia, but I'm
9  not sure about that, the changes.
10    Q   Is that something you're involved in
11  yourself now?
12    A   I have tried to help out, but I'm not
13  technically involved in it.
14    Q   Okay.  How have you tried to help out?
15    A   I designed an Excel spreadsheet for a
16  worker to try to do two years' worth of review of
17  how the bills pay out.  It didn't work out well.
18    Q   Could you turn to page 2058?  It's the
19  last page in this exhibit.
20    A   Uh-huh.
21    Q   Are you familiar with this e-mail?
22    A   Absolutely.
23    Q   Okay.  Can you tell me a little bit more
24  about what you were asking as far as AT&T bills
25  in -- is it pars division?

## Page 88

1    A   The park -- yeah, I don't spell --
2    Q   The park?
3    A   I don't type well.
4    Q   Sure.
5    A   Yeah, the Parks Division called me at the
6  end of the fiscal year saying that they had these
7  very delinquent bills, and I'm like, well, why are
8  they so delinquent.  And they said that -- they had
9  told me that Jim told them not to pay them until he
10  figured out what the issue was with the bills, which
11  then I had to figure out how to get them paid, so --
12    Q   Was that the first time you became aware
13  of --
14    A   The Parks ones?  Yes.
15    Q   -- delinquent bills at Parks?
16    A   Yes.
17    Q   Okay.  Do you know why they called you?
18    A   Because at the end of the year, I'm the
19  one trying to figure out how to get the bills paid.
20    Q   Okay.  Do you know if there was any -- so
21  Jim looks like he responded, They went out of
22  contract and stopped paying bills.  It's a total
23  mess.  We finally have someone at AT&T working on
24  it, but it won't be resolved for a while.
25        Do you know if there was any follow-up to

## Page 89

1  that?
2      MR. NORWOOD: I'm sorry. Which page are
3  you reading from?
4      MR. SCHMITZ: The same page at the top,
5  2058.
6      MR. NORWOOD: Okay.
7      A   A follow-up meaning did he figure out what
8  the bills -- what was wrong with the bills?
9      Q   (By Mr. Schmitz) Well --
10     A   Clarify your question, please.
11     Q   Yeah, did -- was there any follow-up with
12 you after that? Did you follow up with him or did
13 he supplement that response?
14     A   No. As far as this, I mean, I made sure
15 that Parks got their bills paid, but I didn't follow
16 up with him according to this specific issue.
17     Q   Did you follow up with anybody else after
18 this date on this specific issue?
19     A   No, because it would have been
20 telecommunications that was handling this issue.
21     Q   Okay. Was that under his position at that
22 time?
23     A   Yes.
24     Q   Okay. And do you recall that he was
25 placed on forced leave essentially the following

## Page 90

1  Tuesday after this e-mail was sent?
2      A   Do I recall? Just from reading the
3  e-mails, it said July 2nd, so --
4      Q   Okay.
5      A   That he was placed on leave.
6      Q   Okay.
7      A   I remember it was the beginning of July.
8  That's all I remember.
9      Q   Do you know how -- what happened after he
10 was placed on forced leave related to the Parks
11 issue and the AT&T bill?
12     A   Do I know how the AT&T bills played out,
13 or -- please clarify.
14     Q   Yeah. Do you know what happened after
15 this related to what you were asking here at the
16 bottom? So was this resolved and, if so, how?
17     A   I believe that, you know, since they were
18 out of contract, that the contract was worked on and
19 figured out. We did pay the payments the following
20 fiscal year.
21     Q   Okay.
22     MR. SCHMITZ: Do you have Exhibit Q, Rick?
23     MR. BLANKE: Sorry?
24     MR. SCHMITZ: Q.
25     MR. BLANKE: This should be one that you

## Page 91

1  guys have. Here's one for the witness.
2  Exhibit Q.
3      MR. NORWOOD: Yeah, it looks familiar.
4  The one signed by James Garavaglia? Is that
5  the one you're talking about?
6      MR. BLANKE: The one that you say was
7  signed by James Garavaglia.
8      MR. NORWOOD: Okay. That one. Yeah, we
9  have that one.
10     Q   (By Mr. Schmitz) If you want to take time
11 to review that document, please do. Just let me
12 know when you're ready. Are you ready?
13     A   Uh-huh.
14     Q   Okay. Are you familiar with this document
15 or any parts of this exhibit?
16     A   Not these specifically.
17     Q   Okay. Well, let's start with the first
18 page. It's Bates stamped Garavaglia 44. How about
19 this particular page? Have you seen this before?
20     A   Not that I recall.
21     Q   Okay. All right. You testified earlier
22 that you had some awareness of an AT&T document that
23 was signed by Jim. Do you recall what that document
24 was?
25     A   It was similar to -- looked like this, but

## Page 92

1  I don't remember specifically which one it was.
2      Q   Okay. Let me --
3      A   I mean, it was this -- it kind of looks
4  more like an agreement than an actual contract.
5      Q   Why do you say that?
6      A   Well, not -- the one I remember was much
7  shorter than this, it was like a one-pager and it --
8  you know, usually contracts are much more detailed.
9      Q   Can you go forward to what's Bates stamped
10 Garavaglia 57?
11     A   Okay.
12     Q   Are you familiar with this page?
13     A   Not this specific one, no.
14     Q   Okay. Have you seen it before?
15     A   Not this particular one.
16     Q   Okay. Just looking at it, can you tell me
17 what this is, this document?
18     MS. HAMILTON: And to the extent you're
19 seeking a legal conclusion, I'll object that it
20 calls for a legal conclusion. But subject to
21 that, you can answer.
22     A   No, I have no idea what -- what it does.
23     Q   (By Mr. Schmitz) Based on your previous
24 testimony that you usually can tell whether
25 something is a contract or not, can you tell me what

## Page 93

1  you believe this document to be, looking at it?
2      MS. HAMILTON:  And I'll again object that
3  it calls for a legal conclusion.  Subject to
4  that, you can answer.
5      MR. NORWOOD:  I'll join.
6      A  This is an agreement with AT&T, which
7  would constitute a contract in my eyes, but, you
8  know, it's a little bit different, and I -- I can't
9  explain that.
10     Q  (By Mr. Schmitz)  Have you ever reviewed a
11 document that was referred to as a Statement of
12 Work?
13     A  Not that I recall.
14     Q  Okay.  How about -- you scanned through
15 the rest of this exhibit.  Is anything in here
16 familiar to you or something you've seen before?
17     A  Just paging through, nothing specific is
18 hitting me in the face.
19     Q  All right.  If you turn to where it begins
20 on page Garavaglia 48, the Bates stamp at the
21 bottom.
22     MR. NORWOOD:  Which page?
23     MR. SCHMITZ:  48.
24     MR. NORWOOD:  Thank you.
25     MR. SCHMITZ:  Uh-huh.

## Page 94

1      Q  (By Mr. Schmitz)  Just page -- look at
2  that, and then page through pages 48, 49, and 50.
3      Have you seen any of these documents?
4      MS. HAMILTON:  Objection.  Asked and
5  answered.  You can answer.
6      A  I can't guarantee these specific ones, no.
7      Q  (By Mr. Schmitz)  Okay.  Are you familiar
8  with these particular invoices and what they relate
9  to?
10     A  These types of invoices, but not these
11 invoices.
12     Q  Not these?  Okay.  So you don't know what
13 specifically, what department?
14     A  No.
15     Q  Okay.  Were you ever involved in getting
16 these particular bills resolved in any way?
17     A  No.
18     Q  Okay.
19     MS. HAMILTON:  Do you guys need a break?
20     MR. BLANKE:  I think we're getting close.
21     MS. HAMILTON:  Okay.  Great.
22     MR. SCHMITZ:  If you guys want a break,
23 that's fine.
24     MR. NORWOOD:  Are we getting close?
25     MS. HAMILTON:  No, it just seems like

## Page 95

1  there might be a need for a break.  But if not,
2  then carry on, please.
3      MR. NORWOOD:  Are we getting close?
4      MR. SCHMITZ:  I will defer to them,
5  because I'm not necessarily in need of one.
6      MR. NORWOOD:  Are we getting close?  I
7  guess we're trying to figure out -- a natural
8  break would be when you finish up and I start.
9  But how far --
10     MR. SCHMITZ:  I think so.  But, again,
11 there's a few more sections and it totally
12 relates to how much knowledge she has.
13     MS. HAMILTON:  Okay.  Just carry on,
14 please.
15     MR. NORWOOD:  Carry on.
16     Q  (By Mr. Schmitz)  Did you ever communicate
17 with Mary Harp with AT&T?
18     A  Not directly --
19     Q  Not directly?  Okay.
20     A  -- that I can recall.
21     Q  Do you know anything about the inContact
22 contract separate from the AT&T billing?
23     A  It doesn't sound familiar.
24     Q  Okay.  So you've mentioned that you knew
25 about an AT&T document being signed.  How about

## Page 96

1  Waste Management?  Have you ever --
2      A  I didn't recall it until I did see it.
3      Q  Okay.  So you have seen it?
4      A  Yes.
5      Q  When did you see it?
6      A  When I was talking to my lawyer.
7      Q  Okay.  Having seen it, before I go to it,
8  do you -- did that refresh your recollection?
9      A  No.
10     Q  Do you have any knowledge of what
11 happened?
12     A  I still didn't remember it.
13     Q  You don't?
14     A  It just had my name on the memo.
15     MR. SCHMITZ:  Okay.  Can you give me R and
16 S?
17     (Mr. Schmitz conferring with co-counsel.)
18     MR. BLANKE:  Yeah.  There's R and S.
19     Q  (By Mr. Schmitz)  I'm just going to refer
20 to Exhibit R.  If you could take the time to review
21 it and then let me know when you're ready.
22     A  Okay.
23     MR. SCHMITZ:  Actually, just R.  I don't
24 need S.
25     Q  (By Mr. Schmitz)  Are you familiar with

## Page 97

1     this document on page -- the first page, Garavaglia
2     89?
3     A  No.
4     Q  No?
5     A  No.
6     Q  Okay.  Have you seen this before?
7     A  No.
8     Q  No.  Just looking at it, do you know what
9     it is?
10     A  It looks like a Service Agreement.
11     Q  Is this something that you would have
12     signed?
13     A  I don't know.  I've never -- I've never
14     seen one before, so I don't know.
15     Q  Okay.  You mentioned that when you -- in
16     the beginning of your testimony, you talked about
17     the various duties of the Comptroller's office, one
18     of which was, you mentioned, doing audits.  Are you
19     familiar with internal audits that are done by your
20     office?
21     A  It's not my section, but it's part of the
22     Comptroller's office.
23     Q  Okay.  So you are at least familiar that
24     they take place?
25     A  They do, yes.

## Page 98

1     Q  All right.  Do you know who Dr. Ishmael
2     Ikpeama is?
3     A  Yes.
4     Q  If I'm pronouncing that correctly.
5     I don't know either.  Yes.
6     Q  All right.  Is he somebody that works in
7     the Comptroller's office?
8     A  He's retired.  He's no longer there.
9     Q  Okay.  Do you know anything about an
10     internal audit that he conducted related to the
11     Gateway Transportation Center?
12     A  I am not familiar.
13     Q  Not at all?  Okay.  Do you have any
14     knowledge about Jim's relationship with
15     Dr. Ikpeama --
16     A  No.
17     Q  -- at any point?
18     A  No.
19     Q  Okay.  All right.  I want to talk about
20     after Jim left and the process to hire the next
21     Deputy Comptroller of Finance and Development.
22     A  Uh-huh.
23     Q  What was your involvement with that
24     process, if any?
25     A  I sat in on the interviews when -- it goes

## Page 99

1     through regular Civil Service rules and procedures.
2     So it, you know, gets posted and that type of thing.
3     Actually, I believe they were posted separately, the
4     Deputy Comptroller and Deputy Comptroller for
5     Finance and Development.  And so I sat -- I had
6     already been hired, so I sat in on the second Deputy
7     Comptroller, you know, for Finance and Development.
8     Q  Okay.  Did you sit in on all the
9     interviews?
10     A  Uh-huh.
11     Q  Do you recall how many there were?
12     A  Yes.
13     MR. NORWOOD:  I'm sorry.  Is that yes?
14     A  Yes.  I'm sorry.  Yes.  I believe there
15     were, like, maybe three or four, maybe.
16     MS. HAMILTON:  I think you guys might be
17     on different timelines.  Are you talking about
18     Jim's hiring or his replacement?
19     MR. SCHMITZ:  His replacement.
20     A  Oh, okay.  I am definitely on a different
21     timeline.
22     Q  (By Mr. Schmitz)  Okay.
23     A  No.  I did not have anything to do with
24     the second one -- with Jim's replacement.  No, I did
25     not.  I'm sorry.

## Page 100

1     THE WITNESS:  Thank you.
2     MS. HAMILTON:  Yeah.
3     THE WITNESS:  I was totally off.
4     MR. SCHMITZ:  I do not have an exhibit
5     marked for this, so do you guys want to make
6     copies --
7     MR. NORWOOD:  I'll make a copy.
8     MR. SCHMITZ:  -- of everything?  I'm just
9     going to refer to it briefly.
10     MR. NORWOOD:  Okay.  Brief is good.
11     MS. HAMILTON:  Do we want to go off the
12     record?
13     MR. SCHMITZ:  Yeah.  Let's go off the
14     record.
15     (Off the record at 12:18 p.m.)
16     (On the record at 12:21 p.m.)
17     (Plaintiff's Exhibit BB was marked for
18     identification.)
19     Q  (By Mr. Schmitz)  I'm just going to talk
20     about the first page, 1928.
21     A  I guess I did interview her.
22     Q  That's what I was going to ask you.
23     A  I don't remember it, but I guess I did,
24     yeah.
25     Q  Yeah, it looks like -- it doesn't identify

## Page 101

1   who was interviewed.  Is that --
2      A   I was on the -- it looks like I was on the
3   panel for the --
4      Q   Meaning you would have interviewed
5   everyone --
6      A   Right.
7      Q   -- that was a candidate?
8      A   Right.  And -- yes.
9      Q   All right.  But you don't have any
10  recollection of having --
11     A   I do this a lot.  No, I don't remember.
12     Q   Okay.  Do you recall if you made a
13  recommendation to the Comptroller?
14     A   No.  I would not have done that.
15        MR. SCHMITZ:  Okay.  I think it's a good
16  time to take a break now.  I believe I'm done,
17  but of course we're going to chat about that
18  briefly.  I know you wanted to come back and
19  start.  I would like to leave a window for us
20  to add any few things I might have forgotten.
21        MS. HAMILTON:  All right.
22        MR. SCHMITZ:  But other than that, I'll be
23  turning it over to you.
24        MR. NORWOOD:  Great.  Great.  Wonderful.
25  Super.

## Page 102

1        (Off the record at 12:22 p.m.)
2        (On the record at 12:30 p.m.)
3        MR. SCHMITZ:  We don't have any more
4   questions at this point.  So the floor is
5   yours.
6        MR. NORWOOD:  Thank you.
7           EXAMINATION
8   QUESTIONS BY MR. NORWOOD:
9      Q   Okay.  Let us go in reverse, if we could.
10  I'm going to direct your attention to Plaintiff's
11  Exhibit AA.  Do you have that in front of you?
12     A   Yes, I do.
13     Q   Okay.  And just on the first page of AA
14  Bates stamped STL001876, just so we can read that
15  into the record, you wrote an e-mail on
16  February 2nd, 2019 to James Garavaglia; is that
17  right?
18     A   Yes, it is.
19     Q   All right.  And in the voice mail, you --
20  well, your subject is AT&T call; right?
21     A   Right.
22     Q   And it says, quote, voice mail from AT&T
23  regarding account number 150226618.  Do you see
24  that?
25     A   Yes.

## Page 103

1      Q   And you talked about the complexities of
2   AT&T.  There were multiple account numbers.  Isn't
3   that --
4      A   Absolutely.
5      Q   All right.  And this is one of many
6   accounts?
7      A   Yes.
8      Q   All right.  And you say tried calling
9   number, and then you have a phone number for AT&T --
10  is that right --
11     A   Yes.
12     Q   -- back, and I could -- and all I could
13  get was overdue bill...and since I didn't know pin
14  number, no more information.  Maybe you can match up
15  the account number and figure out the call.
16        Do you see that?
17     A   Yes.
18     Q   Now, this was in February -- early
19  February of 2019.  Do you recall what his response
20  was to that?
21     A   No --
22     Q   Okay.
23     A   -- except for reading it on the paper.
24     Q   Okay.  And why did you try to call them?
25     A   Somebody called me.

## Page 104

1      Q   Okay.  And apparently you needed some pin
2   number which you didn't have?
3      A   Right.  Other departments sometimes pay
4   their own bills, and I wouldn't have known who it
5   is.
6      Q   Right.
7      A   And since the Comptroller's name is on the
8   bottom of the check, people call our office for
9   information when the department needs to answer.
10     Q   Okay.  Okay.  And then let's go to the
11  next page, STL002052, of Plaintiff's Exhibit AA.
12  And we talked about this e-mail exchange between you
13  and Jim regarding one of the unpaid AT&T bills; is
14  that right?
15     A   Right.
16     Q   Okay.  And however Jim got it, the e-mail
17  trail, he responded to you, it looks like, on
18  February 26th, 2019 at 4:45 p.m. saying I got it.
19  Right?
20     A   Right.  This looks like it was like a --
21  if people go through the cen web, it's like a
22  centralized place that sends it, so it looks like
23  they sent the request to them, and then somebody
24  sent it to me saying hey -- 311 is our room number.
25     Q   Okay.

## Page 105

1    A    So this is something 311 would handle.
2    And then Jim said he'll take care of it.
3        Q    Well, he stated, I've got it.
4        A    Well, yeah.
5        Q    Right?
6        A    Yes.
7        Q    And you interpreted that to mean he would
8    take care of it; right?
9        A    Yes.
10        Q    And the reason he was taking care of it,
11    because this was in his bailiwick in terms of his
12    authority as Deputy Comptroller of Finance and
13    Development?
14        A    Yes.
15        Q    All right.  Now, if we flip through the
16    page in Exhibit AA -- Plaintiff's Exhibit AA,
17    STL002054, there's some references to some bills for
18    SLATE.  What is SLATE?
19        A    St. Louis Agency on Training and --
20        MS. HAMILTON:  Employment.
21        A    -- Employment.
22        Q    (By Mr. Norwood)  Okay.
23        A    I had to think of E.
24        Q    Is that a City agency?
25        A    Yes.

## Page 106

1        Q    All right.  And this references a SLATE
2    bill for $52,000; right?
3        A    Uh-huh.  Yes, it does.
4        Q    All right.  And then there's a reference
5    to a late payment of $700; is that right?
6        A    Yes.
7        Q    In any of these pages that you reviewed,
8    did it make reference to any bills outstanding in
9    excess of a million dollars to AT&T?
10        A    No.
11        Q    And then we skip down to the last page.
12    You wrote an e-mail dated June 26, twenty -- I'm
13    sorry.  Dated June 28, 2019 at 4:09 p.m., and you
14    reference a bill.
15        MS. HAMILTON:  Well --
16        MR. NORWOOD:  I'm sorry?
17        MS. HAMILTON:  Her e-mail is at 4:30.
18        A    Mine is at 4:30.  His was at 4:09.
19        Q    (By Mr. Norwood)  Okay.  Let me start
20    over.  We're looking at STL002458.
21        MR. BLANKE:  2058.
22        MR. NORWOOD:  I thought that's what I --
23        MR. BLANKE:  You said 2-4.  You said 2458.
24        Q    (By Mr. Norwood)  STL002058 is the page
25    number and the e-mail is from Jim to you; is that

## Page 107

1    right?
2        A    It looks like it.
3        Q    All right.  And you sent an e-mail in
4    response on that same day, Friday, June 28, 2019; is
5    that right?
6        A    It looks like it, yes.
7        Q    All right.  Well, let's start with your
8    e-mail Friday, June 28, 2019 at 4:30 p.m.  You
9    write, quote, What's going on with AT&T bills and --
10    you were saying Parks Division; right?
11        A    Correct.
12        Q    It says, Looks like -- looks like didn't
13    pay this year, and last year ranged between 5K and
14    8K; is that right?
15        A    Right.
16        Q    5,000 and 8,000; is that right?
17        A    Yes.
18        Q    All right.  Anything in there that
19    references billing that could -- for outstanding
20    bills from AT&T in excess of a million, five?
21        A    No.
22        Q    All right.  And if you go to -- I believe
23    it is Exhibit Q.  And I'm going to direct your
24    attention to Garavaglia page 48 and 49.  Do you have
25    those pages?

## Page 108

1        A    Yes.
2        MS. HAMILTON:  48 and 49.
3        A    Yes.
4        Q    (By Mr. Norwood)  And 48, it looks like an
5    outstanding AT&T bill of $567,158; is that right?
6        A    That's what it looks like.
7        Q    All right.  When is the first time you
8    became aware of a bill outstanding to AT&T in that
9    amount?
10        MR. SCHMITZ:  I would just object that
11    it's inconsistent with the witness' prior
12    testimony that she was unfamiliar with these
13    documents and these outstanding amounts.
14    Subject to that.
15        Q    (By Mr. Norwood)  Right.  So you can
16    answer the question.  When is the first time you
17    became aware of a bill outstanding in this amount?
18        A    When I would see the bills, I would only
19    look at the current pieces, because it was
20    something that the telecommunications section was
21    trying to work out.
22        Q    Right.
23        A    And so it was -- you know, they were going
24    back and, you know, talking to AT&T about the way
25    they billed us and that type of thing.  So, you

LEXITAS LEGAL
www.lexitaslegal.com        Phone: 1.800.280.3376        Fax: 314.644.1334

## Page 109

1  know, I really didn't look at those that hard.
2      Q   Right.  So when is the first time, then,
3  you became aware of a bill of that amount
4  outstanding owed by the City to AT&T, according to
5  AT&T?
6      A   I don't know.  I mean --
7      Q   Was it before today?
8      A   Well, I knew we always had delinquents,
9  but I never -- I don't recall that amount.
10      Q   Okay.  And let's go to the next page,
11  Garavaglia 49.  And that appears to be a bill for
12  $96,202.04; is that correct?
13      A   Yes, it is.
14      Q   And when is the first time you became
15  aware of that amount?
16      A   I never am -- you know, made -- I don't
17  know.
18      Q   Okay.  Do you know when the Comptroller
19  found out about those amounts being outstanding?
20      A   No, I do not.
21      Q   All right.  Okay.  And then we go to the
22  next page, Garavaglia 50.  And just take a moment to
23  review that.  It looks like this is the following
24  month's AT&T bill; is that right?
25      A   I'm sorry.  The question?

## Page 110

1      Q   Yeah.  This next page, 50, this appears to
2  be -- and compare the previous page 49 with 50.
3  Does this appear to be the next month's bill from
4  AT&T for this particular account?
5      A   Yes, but it doesn't -- oh, okay.  Yes.
6      Q   And apparently amounts have been added on
7  to that; is that right?
8      A   And taken off, right.
9      Q   Okay.  Added on, taken off.  And the total
10  amount due as of this bill, which is -- the billing
11  date is June 27, 2019; is that right?
12      A   Yes.
13      Q   And that amount that appears to be
14  outstanding, according to AT&T, is $992,062.05;
15  correct?
16      A   That is what it reads, yes.
17      Q   All right.  Now, I think you had talked
18  about being involved in unwinding AT&T contracts.
19  Could you elaborate on what you meant by that?
20      A   I think the City didn't have a clear
21  understanding of what all contracts were actually
22  out there and which ones were expired and which ones
23  weren't and that type of thing.  So --
24      Q   Well, let me back up and stop you -- pause
25  you for one moment.  When you say the City wasn't

## Page 111

1  aware, what do you mean?
2      A   Well, the Comptroller's office or, in
3  general, our office.
4      Q   Okay.
5      A   Okay.  We -- there was no -- we felt like
6  we did not have a handle on what contracts were
7  outstanding, what were signed up, what was still
8  delinquent that they're charging us more for,
9  because we had many departments calling and
10  complaining that their bills were increasing so much
11  because they were out of contract.
12      Q   Okay.  When you say we, who is the we?
13      A   Oh, I'm sorry.  Judy Anthony is actually
14  in charge of this.
15      Q   Judy --
16      A   Judy -- I'm sorry -- Armstrong.  Wrong
17  Judy.
18      Q   Okay.  All right.  But when did you become
19  involved with trying to sort through and unwind and
20  figure out all of these expired AT&T contracts?
21      A   I never was super deep until I started
22  trying to figure out ways -- Judy really worked with
23  AT&T herself, right.
24      Q   And that -- just for the record, that was
25  after Jim was no longer there?

## Page 112

1      A   Right, right, right.
2      Q   All right.
3      A   Judy took it on after that.
4      Q   All right.  And you became aware, if I'm
5  understanding you, that there was situations where
6  the contracts were in disarray because they had
7  expired?
8      A   Right.
9      Q   Some of them weren't in the system?
10      A   Right.
11      Q   And why is that a problem?
12      A   Well, they were charging us more because
13  of it.  So the cost of the services had gone up
14  dramatically.
15      Q   Well, let me -- that was a bad question.
16  Why was the fact that contracts are not in
17  the system -- why would that be a problem?
18      A   Well, we track contracts by document
19  number.
20      Q   Okay.
21      A   AT&T bills are not -- in the legacy system
22  were not encumbered, though.  So it's not --
23  normally when you get a contract, you'll encumber it
24  in most contracts.  But in this instance -- AT&T
25  contracts technically -- they had their own line

LEXITAS LEGAL
www.lexitaslegal.com        Phone: 1.800.280.3376        Fax: 314.644.1334

## Page 113

1　item specific to a telephone bill, so they're not
2　encumbered.
3　　　Q　Okay.  And we'll talk a little bit more
4　about that.  Now, I believe you testified that you
5　and Jim were friends --
6　　　A　Uh-huh.
7　　　Q　-- when he was at the City in his
8　position --
9　　　A　Sure.
10　　　Q　-- as Deputy comptroller of Finance and
11　Development.
12　　　A　Yes.
13　　　Q　How long have you and Jim been friends as
14　of 2019 -- June of 2019?  How long had you-all been
15　friends?
16　　　A　Oh.  Well, we've worked together.  I mean,
17　friends -- we didn't hang out together.
18　　　Q　Okay.
19　　　A　Friends as -- work friends.
20　　　Q　Okay.  Work friends.
21　　　A　Since he started.  He started probably
22　30-something years ago.
23　　　Q　Okay.
24　　　A　So, I mean, he sat in the same office with
25　me when he started back in --

## Page 114

1　　　Q　Okay.  So 30-something years you-all were
2　work friends?
3　　　A　At least, yes.
4　　　Q　And you stated, I believe, that you and he
5　are still friends, as far as you know?
6　　　A　Sure.  We -- yeah.  Uh-huh.
7　　　Q　Okay.  All right.  Let's talk about --
8　well, for the record -- this sounds strange -- but
9　what is your race?
10　　　A　White.
11　　　Q　Okay.
12　　　A　Caucasian.
13　　　Q　Okay.  White female, Caucasian?
14　　　A　Right.
15　　　Q　Okay.  And this is just for the record.
16　　　A　Sure.  I understand.
17　　　Q　Let's talk about Internal Audit.  What is
18　Internal Audit?
19　　　A　Internal Audit is a section of the
20　Comptroller's office that goes out and audits
21　different departments.  It's supposed to be an
22　independent piece of the office so that they can
23　make -- draw their own conclusions.
24　　　Q　Why independent?
25　　　A　So that nobody can, you know, oversee and,

## Page 115

1　you know, cause their decisions or their
2　observations to be skewed.
3　　　Q　Okay.  And why is it important, at least
4　from your role as Deputy Comptroller, to have
5　completed, timely internal audits?
6　　　A　Just to make sure things run efficiently.
7　　　Q　What do you mean?
8　　　A　Well, I mean, Internal Audit makes sure
9　that the processes being done are up to par.
10　　　Q　And making sure the books are accurate for
11　the City that is reported to the public and to
12　provide information to outside auditors; is that
13　right?
14　　　　MR. SCHMITZ:  I would just object to that.
15　　　A　No.  I think you're talking two different
16　audits.
17　　　　MR. SCHMITZ:  Hold on.  I've got to object
18　for the record before you answer.  Let me just
19　object to the testimonial nature.
20　　　Q　(By Mr. Norwood)  Let me withdraw the
21　question and ask you this:  Does the internal audit
22　function provide data and numbers that are utilized
23　to put together audit information for the City?
24　　　A　No.
25　　　Q　Okay.  So what is the purpose of an

## Page 116

1　internal audit if it's not to provide overall
2　financial information for the City?
3　　　A　Internal Audit looks more at procedures
4　and makes sure -- you know, they -- they're in
5　charge of the fraud hotline.  They make sure that
6　procedures are in place, internal controls are in
7　place, that type of thing.  They're not a financial
8　audit-type group.  That's -- we hire an external
9　auditor on an annual basis.  They audit the City.
10　　　Q　Okay.  But if you're looking at a specific
11　vendor, for instance, and information, dollars
12　information reported, does that ultimately wind up
13　in those numbers that are provided to the external
14　auditors if it relates to numbers, dollars?
15　　　A　In a way, I guess.
16　　　Q　Yeah.
17　　　A　I mean, they're all the same numbers
18　basically, you know.  I don't use anything that the
19　Internal Audit does in my financial statements.
20　　　Q　Okay.  Got it.  Is it important for you in
21　your position to keep the Comptroller advised of
22　what's going on and what you're doing?
23　　　　MR. SCHMITZ:  I would just object that it
24　calls for speculation.
25　　　　MS. HAMILTON:  You can answer.

LEXITAS LEGAL
www.lexitaslegal.com　　　　Phone: 1.800.280.3376　　　　Fax: 314.644.1334

Page 117

1    A   Yes.  I should -- yes.
2    Q   (By Mr. Norwood)  Why?
3    A   Well, she's the boss.
4    Q   And you're the Deputy.  Is that part of
5  your duties and responsibility, to make sure that
6  the Comptroller -- the elected Comptroller knows
7  what's happening in the Comptroller's office?
8    A   Yes.
9    Q   All right.  And you mentioned or
10  referenced the meeting -- E&A meeting.  I believe it
11  was June 19, 2019 -- is that right -- the third
12  Wednesday of June?
13    A   If that's the third Wednesday, yeah.
14    Q   All right.
15    A   I couldn't tell you a specific date.
16    Q   All right.  When we look at the e-mails,
17  we'll put that in context.  But at that particular
18  meeting, was that a strange meeting?
19    A   It was controversial.
20    Q   Why was it controversial?
21    A   Well, the good kind of E&A meetings are
22  where everybody says I vote aye and you are done in
23  five minutes, you know.
24    Q   Okay.
25    A   So if there's a lot of back and forth,

Page 118

1  then it becomes, you know --
2    Q   Well, this particular meeting, the mayor
3  read off some communications regarding the placement
4  of the -- well, let me -- let me withdraw that
5  question and start over.
6        These -- this meeting that we're talking
7  about -- and we refer to it as the muni court
8  project.  Are these documents we're talking about
9  related to that particular project?
10    A   Yes.
11    Q   Okay.  And the documentation itself, could
12  you describe for us if you can what those documents
13  related to as it related to that muni court project?
14    A   I can give you a high overview.
15    Q   Yes.
16    A   I do not know the documents specifically.
17    Q   Yes.  Yes, your overview.
18    A   But it was basically giving the -- I
19  believe it was giving the developer an extension of
20  time to get his financing together.
21    Q   Okay.  All right.  And this was a
22  development project -- a big development project for
23  the --
24    A   Right.  Very much so.
25    Q   Let me finish.  This was a big -- that's

Page 119

1  okay.  We're getting anxious.  We're almost done.
2        This was a big development project for the
3  City; right?
4    A   Yes.
5    Q   Millions of dollars involved?
6    A   Yes.
7    Q   Okay.  And at this meeting, E&A meeting --
8  and for the record, that is the meeting where the
9  mayor, the Comptroller, the President of the Board
10  of Aldermen meet to make decisions regarding
11  expenditure or finances for the City; is that right?
12    A   Yes.
13    Q   All right.  And at this particular
14  meeting, the one that you talked about, the mayor
15  read communications at that meeting; right?
16    A   If you ask me what day that happened, I
17  probably could not say, but there was a meeting
18  where she read off an e-mail stream of Jim and I's,
19  yes.
20    Q   And was that embarrassing?
21    A   Yes.
22    Q   Why?
23    A   Well, I've just never heard a mayor do
24  that before.  Kind of -- she was trying to embarrass
25  the Comptroller, and so --

Page 120

1    Q   And what she was using to embarrass the
2  Comptroller was the fact that it looked like the
3  Comptroller's office had placed an item on the
4  agenda and was pulled off the agenda; right?
5    A   Right.  Right.
6    Q   And that's embarrassing; right?
7    A   Right.
8    Q   And this is a public meeting that's being
9  recorded for the public to see; is that right?
10    A   That's correct.
11    Q   Did you feel --
12    A   I don't know if back then it was recorded.
13  I'm sorry.
14    Q   Okay.
15    A   Was it?  I don't know.
16    Q   Well, you don't know, but it's a public
17  meeting, public --
18    A   Right.  No, it's a public meeting, but in
19  those days I think it was recorded, but I don't know
20  that it was --
21    Q   Okay.  But the public can get the
22  recording --
23    A   Right, right.
24    Q   -- if it's recorded and the public can get
25  the minutes; right?

## Page 121

1      A   Right.
2      Q   All right.  And you were embarrassed;
3  right?
4      A   I was.
5      Q   Why?  Why were you embarrassed?
6      A   Well, I was probably more worried, because
7  the Comptroller -- I expected her to be very angry
8  at us, you know.
9      Q   Because of the embarrassing factor?
10      A   Right.
11      Q   All right.  And this item went on the
12  agenda, and the reason it was taken off the agenda
13  is -- what you testified is because the taxes
14  weren't paid; right?
15      A   I am unclear and I do not remember if
16  it -- it was taken -- it was on the agenda and
17  manually tried to be taken off the agenda at that
18  meeting, though.  I'm making sure I'm understanding
19  your question.
20      Q   Okay.  So you -- so it was officially on
21  the agenda even though the taxes weren't paid?
22      A   Right.
23      Q   All right.  And would you consider that a
24  no-no?  Well, let me ask it this way.
25      A   I don't know how to answer that.

## Page 122

1      Q   Do you understand the fact that there has
2  to be tax clearances before an item is approved by
3  E&A?
4      A   Right.  But in developers -- I was unclear
5  if that was a procedure that was part of that
6  activity.
7      Q   Okay.
8      A   I know -- I used to be directly involved
9  with the redevelopment section -- okay -- and we
10  would -- before we would let anybody get their
11  actual money -- they could have the TIF, but before,
12  we would make sure they had paid their taxes.  But I
13  did not know if that was part of the regular
14  procedure for this type of development or not.
15      Q   What was -- what were the -- what is a tax
16  clearance?
17      A   A tax clearance just states that the
18  company involved has paid all their earnings and has
19  all of their licenses in place.
20      Q   Okay.  And why is that important?
21      A   Well, because we want to make sure the
22  City is getting their money.
23      Q   Okay.  Fair enough.  And not have to be
24  behind the taxing authorities?
25      A   Right.  Right.

## Page 123

1      Q   Okay.  Let me hand you -- and this will be
2  quick.  It looks thick, but it will be quick.  Let
3  me start by handing you -- let me hand you what has
4  been previously marked as Garavaglia Deposition
5  Exhibit 11.  And I'm going to direct your --
6  Garavaglia Deposition 11.  I'm going to direct your
7  attention to page GRN000461.  Do you see that?
8      A   Uh-huh.
9      Q   Is that a yes?
10      A   Yes.
11      Q   Okay.  What is that document?
12      A   Something I signed.
13      Q   Take a moment to review it.
14      A   Department of Personnel Delegation of
15  Authority.  It's Darlene giving me authority to sign
16  on any personnel matters.  So I can sign time sheets
17  and payroll rolls and status forms, things like
18  that.
19      Q   And there's a references to Article VIII
20  of the City charter on this document.
21      A   Yes.
22      Q   Was that what you were kind of trying to
23  at least describe, as best you could, about what was
24  happening when she gave you signature authority?
25      A   I do not know if that's the same article.

## Page 124

1  I'm assuming.
2      Q   Okay.  But you understood from your
3  conversation with her that she was delegating
4  authority --
5      A   Right.
6      Q   -- to you pursuant to the charter so that
7  you could execute documents on her behalf?
8      A   Yes.
9      Q   All right.  And when you -- well, strike
10  that.
11         And you recall a memo where it was
12  transmitted to various individuals in the City,
13  higher level officials regarding that signature
14  authority --
15      A   Yes.
16      Q   -- that you were -- let me finish -- that
17  you were given; correct?
18      A   Yes.
19      Q   Okay.  All right.  And you understood that
20  that was necessary in order for you to sign those
21  contracts on behalf of the Comptroller?
22      A   Yes.
23         MR. SCHMITZ:  Objection as to the
24  reference to the word contracts, when this
25  document and the witness has testified this

## Page 125

1 relates only to personnel actions and
2 documents.
3    Q    (By Mr. Norwood)  Well, you understood
4 that you were given broader authority by way of a
5 separate delegation to sign all contracts on behalf
6 of the Comptroller?
7    A    Yes.  There was a letter that was
8 prepared.
9    Q    Okay.  Fair enough.  Let me hand you
10 what's been marked as -- previously marked as
11 Garavaglia Deposition Exhibit 14.  And we've touched
12 on that.  I want to talk a little bit more about it
13 before we move on.  And you were copied on this memo
14 from Comptroller Darlene Green dated July 21, 2017;
15 right?
16    A    I was.
17    Q    And the reference is unauthorized
18 signature; is that right?
19    A    Yes.
20    Q    All right.  And in the memo, it talks
21 about the fact that Jim was attempting to execute a
22 lease agreement between the City of St. Louis and
23 St. Louis Composting; is that correct?
24    A    Yes.
25    Q    All right.  Now, if we flip down, this is

## Page 126

1 Bates stamped page GRN000462.  And then let's flip
2 down to GRN000464, and it says Extension of Lease
3 Agreement.  Do you see that?
4    A    Yes.
5    Q    And there's a signature line for Darlene
6 Green, Comptroller.  Do you see that?
7    A    Yes.
8    Q    And it appears that someone named James M.
9 Garavaglia scratched out Darlene Green and put James
10 M. Garavaglia; is that correct?
11    MR. SCHMITZ:  I would object that, you
12 know, it assumes facts not in evidence.
13    MR. NORWOOD:  Well, he testified that he
14 scratched out the signature and put his name on
15 there, and that is in the record.
16    MR. SCHMITZ:  I don't believe that's
17 correct.  But anyway, just for the record, I'm
18 just objecting to the testimonial nature of the
19 question.
20    Q    (By Mr. Norwood)  Okay.  In your position
21 as Deputy Comptroller, have you ever scratched
22 Comptroller Darlene Green's name and signed your own
23 name to those contracts?
24    A    When I sign on contracts, I sign Darlene's
25 name and put my initials after it.

## Page 127

1    Q    Okay.  All right.
2    MR. SCHMITZ:  And just for the record, I
3 would object to the question referring to this
4 as a contract, when that calls for a legal
5 conclusion.
6    Q    (By Mr. Norwood)  Well, it's a Lease
7 Agreement Extension, is what it says; right?
8    A    Correct.
9    Q    And in your mind, that would be a
10 contract; right?
11    MR. SCHMITZ:  Again, I would object to the
12 extent that that calls for a legal conclusion.
13    A    Yes.  I signed these agreements with --
14    Q    (By Mr. Norwood)  You sign these contracts
15 all the time?
16    A    Similar to contracts, right.
17    Q    Yeah.  Okay.  And just for the record,
18 then, this lease extension purports to obligate the
19 City to pay $19,200 in advanced monthly installments
20 of 1,600 -- correct -- section 2?
21    A    Yes.
22    Q    All right.
23    MR. SCHMITZ:  I would also object for the
24 record in that this extension refers back to
25 section 2 of a document that's not included in

## Page 128

1 this exhibit.
2    MR. NORWOOD:  Okay.  We're about to go to
3 that one.
4    Q    (By Mr. Norwood)  But just for the record,
5 this relates to St. Louis Composting; is that right?
6    A    Yes.  That's what it says.
7    Q    Okay.  All right.  Now, let me hand you
8 what's been marked as -- previously marked as
9 Garavaglia Deposition Exhibit 12.
10    MS. HAMILTON:  Thank you.
11    Q    (By Mr. Norwood)  Okay.  This document --
12 take a look at it.  Have you ever seen this before?
13    A    I have no recollection.
14    Q    Okay.  And for the record, it's Bates
15 stamped GRN000465 through GRN000463.  And it's -- if
16 you go to 466, it says Lease Agreement; right?
17    A    Yes.
18    Q    And the Lease Agreement appears to be a
19 Lease Agreement between the City of St. Louis, a
20 municipal corporation, and St. Louis Composting;
21 right?
22    A    Yes.
23    Q    All right.  And let's go to the last two
24 pages of the document.  Well, let's go to the last
25 page of the document.

## Page 129

1      Now, this document -- you talked about a
2  process, and I think you talked about when these
3  contracts come to you, they've gone through a
4  process already; is that right?
5      A   Yes.
6      Q   All right.  Those documents, when they
7  come to you, they've already been approved as to
8  form by the City Counselor's office; right?
9      A   Yes.
10     Q   And those documents, when they come to
11 you, have already been signed by the vendor; right?
12     A   Yes.
13     Q   And have they been assigned a contract
14 number at that point?
15     A   After the Comptroller's signature.
16     Q   After the Comptroller's signature.  On
17 this one, it has a signature of Darlene Green,
18 Comptroller; correct?
19     A   That's correct.
20     Q   All right.  And it has a signature
21 approved as to legal form by the City Counselor;
22 right?
23     A   Yes.
24     Q   And then there's an approved 8/20/14,
25 Board of Estimate and Apportionment; right?

## Page 130

1      A   Yes.
2      Q   And is it your understanding that these
3  contracts also have to be approved at E&A?
4      A   Yes.
5      Q   All right.  And then it has a contract
6  number, it appears, issued by the Register; is that
7  right?
8      A   No.  The contract number -- the document
9  number is this 67 --
10     Q   67892.  What is that?
11     A   That is a document number from the
12 Comptroller's office to be able to track contracts.
13     Q   And then ultimately it goes to the City
14 registrar?
15     A   That's correct.
16     Q   And why does it go to -- I said registrar.
17 Register.  Why does it go to the City Register?
18     A   She is the keeper of contracts, so if you
19 need a copy of a contract, you go to her because
20 it's fully executed.
21     Q   Okay.  All right.  Let me hand you what's
22 been marked as -- previously marked as Garavaglia
23 Deposition Exhibit 20.  And for the record, this is
24 Bates stamped GRN00046 -- I'm sorry.  GRN000489
25 through GRN000498; is that right?

## Page 131

1      A   Yes.
2      Q   All right.  And if we go to the -- and
3  this says Addendum to Master Agreement.  Do you see
4  that at the top?
5      A   Of the first page?
6      Q   Yes.
7      A   Yes.
8      Q   And this is the Master Agreement, it looks
9  like, to an AT&T Equipment Solutions, Voice CPE
10 Support Services.  Right?
11     A   Yes.  That's what it says.
12     Q   All right.  And if we go to the next page,
13 it appears to be signed by the Comptroller; correct?
14     A   Yes.
15     Q   And it has a document number; right?
16     A   Yes.
17     Q   And that's on page 490.  And if you go to
18 491, it's approved as to form by the City Counselor;
19 is that right?
20     A   Yes.
21     Q   And it's also signed by the Register; is
22 that right?
23     A   Yes.
24     Q   And is that the process that you
25 understood was to be followed with respect to the

## Page 132

1  execution of contracts on behalf of the City?
2      A   Yes.
3      Q   Let me hand you what's been marked as
4  Garavaglia Deposition Exhibit 21.  And for the
5  record, Garavaglia Deposition Exhibit 21 is
6  identified as GRN000540 through GRN000545; is that
7  correct?
8      A   Yes.
9      Q   All right.  And this looks like an AT&T
10 document; right?
11     A   Yes.
12     Q   And at the top it says Statement of Work,
13 City of St. Louis, Streets -- I'm sorry.  City of
14 St. Louis, Streets Department, CS1000 Maintenance;
15 right?
16     A   Yes.
17     Q   Do you know what kind of contract this is
18 as it relates to services from AT&T?
19     A   No.
20     Q   All right.  But it appears to be signed by
21 the customer, City of St. Louis.  Who signed that?
22     A   Darlene Green.
23     Q   All right.  And also signed by AT&T; is
24 that right?
25     A   Yes.

## Page 133

1    Q    And then there's a stamp that says
2  approved 8/23/16 Board of Estimate and
3  Apportionment; right?
4    A    Yes.
5    Q    It has a Comptroller office and document
6  number; is that right?
7    A    Yes.
8    Q    On the next page, GRN000541, it has City
9  of St. Louis, approved by the City Counselor as to
10 form; right?
11   A    Correct.
12   Q    And signed by the Register by way of the
13 Deputy; right?
14   A    Yes.
15   Q    And do you know why this Statement of Work
16 was executed in that fashion?
17   A    No.  No.
18   Q    All right.  Let's go to the last page of
19 the document, which is GRN000545.  Do you see that?
20   A    Yes.
21   Q    And this appears to be a letter signed by
22 someone named James M. Garavaglia dated August 5,
23 2016; correct?
24   A    Correct.
25   Q    And it's directed to the Honorable Board

## Page 134

1  of Estimate and Apportionment; correct?
2    A    Yes.
3    Q    And it's directed to Yudora Watson.  Do
4  you know who she is?
5    A    She was the secretary to E&A at that time.
6    Q    All right.  And let's read into the record
7  what Mr. Garavaglia wrote on August 5, 2016 after he
8  was Deputy Comptroller.  Right?  He signed it as
9  Deputy Comptroller Finance and Development; correct?
10   A    Correct.
11   Q    And you're copied on that; correct?
12   A    Yes, I am.
13   Q    And it says, Dear Ms. Watson, the
14 Comptroller's office requests E&A approval of a
15 contract between the City of St. Louis and AT&T for
16 maintenance services at the Street Department, 1900
17 Hampton Avenue.  This agreement is for one year at a
18 cost of $9,184.69.  Funding for this account can be
19 found in FY -- that's fiscal year -- is that
20 right --
21   A    Yes.
22   Q    -- '16 through '17 budget and account
23 number, and then it lists an account number.
24        Do you see that?
25   A    Yes.

## Page 135

1    Q    And it says, We appreciate your attention
2  and consideration in this matter.
3        Do you see that?
4    A    Yes.
5    Q    All right.  And is that your understanding
6  of what the process is/was for Jim to follow with
7  respect to the execution of this Statement of Work
8  document that he identified as a contract between
9  the City and AT&T?
10   A    Yes.
11   Q    Okay.  Let me hand you what's been
12 previously marked as Garavaglia Deposition Exhibit
13 22.  And it looks like Addendum to Comprehensive
14 Service Order Attachment.  It appears to be signed
15 by Darlene Green; is that correct?
16   A    Yes.
17   Q    And for the record, this is GRN000546
18 through GRN000561.  It appears to be signed by
19 Darlene Green; correct?
20   A    Yes.
21   Q    It has a Comptroller document number, it
22 looks like?
23   A    Yes.
24   Q    And then on the next page, GRN000547, it's
25 approved as to form by the City Counselor; right?

## Page 136

1    A    Yes.
2    Q    It has a -- the Register Deputy signing on
3  behalf of the Register; correct?
4    A    That's correct.
5    Q    And it is approved on 4/19/17 by the Board
6  of Estimate and Apportionment; right?
7    A    Yes.
8    Q    Okay.
9        MS. HAMILTON:  Are you going to go to the
10 last page of that?
11       MR. NORWOOD:  I'm sorry?
12   Q    (By Mr. Norwood)  Yeah, let's go to the
13 last page of that document.  And that appears to be
14 a letter from -- well, document number GRN000561
15 dated March -- a letter from Mr. James Garavaglia,
16 Deputy Comptroller, Finance and Development, dated
17 March 17, 2017; is that correct?
18   A    Yes, it is.
19   Q    All right.  And, again, it's a letter to
20 the Honorable Board of Estimate and Apportionments;
21 Correct?
22   A    Yes.
23   Q    And it's to Ms. Watson; correct?
24   A    Yes.
25   Q    And it says, Dear Ms. Watson, the

Page 137

1    Comptroller's office requests E&A approval of a
2    contract between the City of St. Louis and AT&T.
3    This contract will replace existing call center
4    equipment and various City departments due to
5    discontinued product by AT&T.  The monthly
6    reoccurring cost as well as the one-time
7    installation cost will be shared by City Courts,
8    Citizen Service Bureau, and Human Services.  The
9    reoccurring costs will vary monthly due to the
10   billing cycle cut-off date.  The one-time cost will
11   be as follows.  It lists different account numbers
12   and a total of $21,050.  Correct?
13       A   Yes.
14       Q   And it says we appreciate your attention
15   and consideration of this matter.
16           Do you see that?
17       A   Yes.
18       Q   And, in fact, that has a stamp for the
19   Board of Estimate and Apportionment saying approved
20   4/19/17; is that right?
21       A   That's correct.
22       Q   And that's your understanding of what the
23   correct procedure is to sign contracts, be it AT&T
24   or other vendors, to bind the City; right?
25       A   Yes.

Page 138

1        Q   Okay.  Do you recall -- and I'm not asking
2    you to get into the communications, because that
3    would be privileged.  But do you recall having any
4    discussion with Nancy Kistler about the matter
5    involving Jim Garavaglia?
6        A   No.
7        Q   Okay.
8        A   I don't remember that.
9        Q   All right.  Do you know what role, if any,
10   Ms. Kistler had in the issues associated with
11   Mr. Garavaglia?
12           MS. HAMILTON:  I'm going to object that
13       her involvement or role is attorney/client
14       privileged and instruct the witness not to
15       answer.
16       Q   (By Mr. Norwood)  Okay.  Well, let me
17   rephrase that.
18           Were you made aware by anybody other than
19   the City Counselor about the City Counselor's role
20   as it relates to Mr. Jim Garavaglia and the matters
21   that are the subject of this lawsuit?
22           MS. HAMILTON:  And I'll just instruct
23       the --
24       A   No.
25           MS. HAMILTON:  Oh, you said no?  Okay.

Page 139

1        A   No.  I'm sorry.
2            MR. NORWOOD:  Okay.  I have no further
3    questions at this time.
4            MR. BLANKE:  Just give us one minute.
5    Literally one minute.
6            MR. NORWOOD:  All right.
7            (Off the record at 1:15 p.m.)
8            (On the record at 1:17 p.m.)
9                EXAMINATION
10   FURTHER QUESTIONS BY MR. SCHMITZ:
11       Q   I want to go back just -- I want to go
12   back in reverse order of what he was talking about,
13   just so it's a little bit more fresh in your mind
14   here.  If you could go back to what was marked
15   Garavaglia depo Exhibit 14.  And turn to the last
16   page, which is Bates stamped GRN000464.
17           Do these go to the City Counselor's office
18   to be approved as to legal form before they come to
19   the Comptroller's office for signature?
20       A   Yes.
21       Q   Do you know why it was not?
22       A   No, I do not.
23       Q   Okay.  Should it have been sent to the
24   City Counselor's office and signed before it was
25   ever sent over to be signed?

Page 140

1        A   Yes.
2        Q   Okay.  Would documents to be signed that
3    aren't contracts be sent to the City Counselor's
4    office to be approved to form?
5        A   Not necessarily.
6        Q   Are there any documents that are sent to
7    the City Counselor's office to be approved as to
8    form other than contracts?
9            MS. HAMILTON:  And I would object that
10       that calls for speculation since she does not
11       work for the City Counselor and never has.
12       Subject to that, to the extent that you know.
13       A   Yeah, I would be -- I would be unaware.
14       Q   (By Mr. Schmitz)  Just to be clear as to
15   your office and as to your knowledge specifically,
16   not -- not other departments.
17       A   Are there -- please repeat.
18       Q   Are there documents from the Comptroller's
19   office that are not contracts that are still sent to
20   the City Counselor's office to be reviewed as to
21   form that you're aware of?
22       A   Well, I'm not sure as to -- as to form.
23   Financings would be sent over there and lien
24   releases are signed by them before they come to us.
25       Q   And why are those sent?

## Page 141

1    A  That's --
2    MS. HAMILTON:  Objection.  Calls for
3  speculation.  Subject to that, you can answer.
4    **Q  (By Mr. Schmitz)  If you know.**
5    A  That's -- their name is on it.  That's
6  what I know.
7    Q  Okay.  You don't know any -- otherwise you
8  don't have any specific knowledge as to what that
9  office does with those documents that you just
10  mentioned?
11    A  Review them, I assume.
12    Q  Okay.  Well, don't assume.  If you don't
13  know, just say that.
14    A  Okay.  No, I don't know what the City
15  Counselor's office does.
16    Q  I'm trying to be clear.  Okay.  If you
17  could go back to Exhibit Q.  You were asked a little
18  bit about what was marked Garavaglia pages 48 and
19  49, these monthly statements from AT&T.
20    A  Yes.
21    Q  The question was asked saying when did you
22  see these.  Had you seen -- have you seen these
23  specific statements before today?
24    A  I cannot verify that.
25    Q  Okay.  So you don't know if you've ever

## Page 142

1  seen them until you have been asked about them
2  today?
3    A  Yes.
4    Q  All right.  I want you to go to what's
5  marked Garavaglia 50.  Have you seen this particular
6  statement before today?
7    A  I cannot say.
8    Q  Okay.  So have you ever seen on a
9  statement -- monthly statement from AT&T a
10  handwritten note under total current charges?
11    A  Yes.
12    Q  Okay.  And what is that?  Why would
13  somebody write that?
14    A  The telecommunications section sends out
15  notice to departments how much they owe on their
16  bill and then they receive checks made out to AT&T
17  and they mail those checks with the balance.  So the
18  66 is the balance of what the Comptroller's office
19  would pay.  The 22 is various other departments that
20  would pay that are -- I don't know who, because I've
21  never seen those actual checks.  I think they're
22  attached, but I've never --
23    Q  Okay.  Do you know why pages 48 and 49
24  would not have those handwritten numbers?
25    A  There's only one of the bills that

## Page 143

1  actually is handled this way, and I do not know what
2  the difference of the bills are.  We have bills for
3  land lines, we have bills for long distance, we have
4  bills for various things.  I do not know -- I
5  couldn't spout off all of them.  But I do not know
6  what's the difference in that one.
7    Q  All right.  You were asked if the
8  municipal court issue was taken off the agenda -- or
9  was still on the agenda -- excuse me -- at the time
10  of the E&A meeting.  Are you certain that that's
11  correct?  Because you said yes in your testimony,
12  but --
13    A  I -- I do not know for a fact if it was
14  read as an agenda item at that meeting, I thought it
15  was, and then taken off by the committee members.  I
16  do not remember that, but I thought that's where she
17  brought up the fact that they owed taxes.  And then
18  they were given -- they paid their taxes right away.
19    Q  Do you know with certainty whether the
20  municipal court issue was an item on the agenda at
21  the time of the meeting, or not?
22    A  No.  I do not know for a fact.
23    MR. SCHMITZ:  I don't have any further
24  questions.
25    MR. NORWOOD:  Just a couple follow-ups.

## Page 144

1              EXAMINATION
2  FURTHER QUESTIONS BY MR. NORWOOD:
3    Q  At that meeting counsel just referenced,
4  if I recall your earlier testimony, the mayor read
5  the communication whereby the request was made to
6  place the item on the agenda by the Comptroller's
7  office; right?
8    A  Right.
9    Q  All right.  And do you recall if in fact
10  it was voted on at that particular meeting?
11    A  100 percent, no.  I believe it was taken
12  off until the taxes could get paid.
13    Q  Okay.  And then there was a special
14  meeting the following Monday.  Do you recall that?
15    A  I could not say a hundred percent.
16    Q  That's okay.  It's okay.  It's in the
17  record.  That's fine.
18    You talked about earlier someone advising
19  you that Jim had told them not to pay the AT&T bill.
20  Do you recall that testimony?
21    A  Yes.
22    Q  Tell us more about that.
23    A  The Parks Department, when I questioned
24  why -- I go through at the end of the year and I try
25  to see where there's available funds, and I noticed

LEXITAS LEGAL
www.lexitaslegal.com    Phone: 1.800.280.3376    Fax: 314.644.1334

## Page 145

1    they had not paid their telephone bill at all.  And
2    when I asked them, they said that they felt like
3    they were being overcharged, and so Jim told them
4    just not to pay it.
5        Q    Okay.
6        A    That was what they told me.
7        Q    Okay.  Let's go to Garavaglia Deposition
8    Exhibit 14 again.  Do you have that in front of you?
9        A    I've got them all messed up.  Okay.  Yes.
10       Q    Okay.  And if you go to the second page of
11   the document, which is GRN 000463.  Do you see that?
12       A    Yes.
13       Q    And this is a letter from Kathy Sullivan,
14   Executive Assistant, to -- is that the Executive
15   Assistant to Mr. Greg Hayes, Parks Director?
16       A    Yes, she was.
17       Q    All right.  And this is to St. Louis
18   Composting -- a letter to St. Louis Composting dated
19   July 10, 2017.  Do you see that?
20       A    Yes.
21       Q    And I'm just going to read the second
22   paragraph, because we're trying to wrap things up.
23   And we covered it with Mr. Garavaglia.
24            It says, quote, We were advised by
25   Mr. James Garavaglia, Deputy Comptroller, that it

## Page 146

1    was not necessary that the City Counselor -- well,
2    I'm sorry.  Wrong -- yeah.  We were advised by
3    Mr. James Garavaglia that it was not necessary that
4    the City Counselor approve the extension, nor did it
5    require the signature of the Register.
6            Do you see that?
7        A    Yes.
8        Q    All right.  And is that the first time you
9    were made aware of that fact?
10       A    Yeah.
11       Q    All right.
12            MR. SCHMITZ:  I would just object to the
13   characterization of that fact as --
14       Q    (By Mr. Norwood)  Well, that fact that
15   there was a reference from the Parks Department that
16   they were advised by Mr. Garavaglia that this thing
17   didn't have to go to the City Counselor and didn't
18   have to be -- require the signature of the Register.
19            MR. SCHMITZ:  Again, I would just object
20   on the record that there's not an established
21   fact.  That's just what's being stated here.
22       Q    (By Mr. Norwood)  Okay.  Well, if that was
23   communicated, your understanding is that would not
24   be accurate from what you've testified to before
25   about the process; right?

## Page 147

1        A    Yes.
2            MR. SCHMITZ:  I would just object to the
3    hypothetical nature of the question.
4        Q    (By Mr. Norwood)  Okay.  Subject to that.
5        A    Yes.
6        Q    That would be a violation of the process
7    as you've understood it for your 30-plus years with
8    the City?
9        A    Yes.
10           MR. NORWOOD:  Okay.  I have no further
11   questions.
12           MR. BLANKE:  Okay.  We're good.
13           COURT REPORTER:  Signature?
14           MS. HAMILTON:  We'll read.
15           (Deposition concluded at 1:27 p.m.)
16
17
18
19
20
21
22
23
24
25

## Page 148

1            CERTIFICATE OF REPORTER
2
3        I, Julie Ann Whiting, Certified Court
4    Reporter within and for the State of Missouri
5    and Registered Professional Reporter, do hereby
6    certify that the witness whose testimony
7    appears in the foregoing deposition was duly
8    placed under oath by me; the testimony of said
9    witness was taken by me to the best of my
10   ability and thereafter reduced to typewriting
11   under my direction; that I am neither counsel
12   for, related to, nor employed by any of the
13   parties to the action in which this deposition
14   was taken, and further that I am not a relative
15   or employee of any attorney or counsel employed
16   by the parties thereto, nor financially or
17   otherwise interested in the outcome of the
18   action.
19
20
21   _____
22   Julie Ann Whiting, CCR 830, RPR
23   State of Missouri
24
25

## Page 149

```
 1              LEXITAS LEGAL
 2
 3      April 21, 2022
 4
        Sheena Hamilton, Esq.
 5      City of St. Louis Law Department
        City Counselor's Office
 6      1200 Market Street, Room 314
        St. Louis, Missouri  63103
 7
        IN RE: JAMES GARAVAGLIA v. CITY OF ST. LOUIS, et
 8      al.
 9      Dear Ms. Hamilton:
10      Please find enclosed your copies of the deposition of
        BEVERLY FITZSIMMONS taken on April 19, 2022 in the
11      above-referenced case. Also enclosed is the original
        signature page and errata sheets.
12
        Please have the witness read your copy of the
13      transcript, indicate any changes and/or corrections
        desired on the errata sheets, and sign the signature
14      page before a notary public.
15
16      Please return the errata sheets and notarized
17      signature page within 30 days to our office at 711 N
18      11th Street, St. Louis, MO 63101 for filing.
19
20      Sincerely,
21
22
23      Julie Ann Whiting
24
25      Enclosures
```

## Page 150

```
 1              ERRATA SHEET
        Witness Name: BEVERLY FITZSIMMONS
 2      Case Name: JAMES GARAVAGLIA v. CITY OF ST. LOUIS, et
        al.
 3      Date Taken: APRIL 19, 2022
 4
 5      Page #_____  Line #_____
 6      Should read: _____
 7      Reason for change: _____
 8
 9      Page #_____  Line #_____
10      Should read: _____
11      Reason for change: _____
12
13      Page #_____  Line #_____
14      Should read: _____
15      Reason for change: _____
16
17      Page #_____  Line #_____
18      Should read: _____
19      Reason for change: _____
20
21      Page #_____  Line #_____
22      Should read: _____
23      Reason for change: _____
24
25      Witness Signature: _____
```

## Page 151

```
 1      STATE OF _____)
 2
 3      COUNTY OF _____)
 4
 5      I, BEVERLY FITZSIMMONS, do hereby certify:
 6          That I have read the foregoing deposition;
 7          That I have made such changes in form
 8      and/or substance to the within deposition as might
 9      be necessary to render the same true and correct;
10          That having made such changes thereon, I
11      hereby subscribe my name to the deposition.
12          I declare under penalty of perjury that the
13      foregoing is true and correct.
14          Executed this _____ day of _____,
15      20____, at _____.
16
17
18
19      _____
20      BEVERLY FITZSIMMONS
21
22      _____
23      NOTARY PUBLIC
24      My Commission Expires:
25
```