# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JAMES GARAVAGLIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-CV-1681-CDP |
| | ) | |
| CITY OF ST. LOUIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO STATEMENT OF MATERIAL FACTS
## IN OPPOSITION TO THE SUMMARY JUDGMENT MOTION
## OF DEFENDANTS

Comes now plaintiff, James Garavaglia, by and through his counsel, and hereby submits, in opposition to the motion for summary judgment filed by defendants, the following responses to defendants' Statement of Uncontroverted Material Facts ("SUMF").

**I.** **The Numbered Paragraphs Of Defendants' SUMF Which Are Disputed By Plaintiff Are Set Forth *In Haec Verba* Below, Together With Plaintiffs' Responses Thereto**:[1]

4.      Comptroller Green has a Deputy Comptroller who is the second in command under the Comptroller.  (SJ Exhibit 9, Green Depo., p. 51, lines 5-25, p. 52, lines 1-25, p. 53, lines 1-25); SJ Exhibit 25, Fitzsimmons Depo., p. 14, lines 24-25, p. 15, lines 1-16.).

Plaintiffs deny that the position of Deputy Comptroller established by the City Charter and the second established position of Deputy Comptroller for finance and development are unequal in either classification grade, responsibility, or authority. Defendants misrepresent the chain of command related to the deputy

---

[1]  Pursuant to Local Rule 4.01(E), plaintiff's Response sets forth each relevant fact as to which plaintiff contends a genuine issue exists, together with specific citations to the record, where available, upon which plaintiff relies. In Part I of this Response, plaintiff also includes the paragraph number from defendants' Statement of Uncontroverted Material Facts of all facts which are disputed by plaintiff.

comptroller positions.

<u>The following evidence of record shows the existence of a genuine dispute:</u>

--See Plaintiff's Ex. OO (STL001740-1745).

5. Comptroller Green, during her tenure, also created a position called Deputy Comptroller, Finance and Development, responsible for certain City public financing issues and other operations within the Office of the Comptroller. (**SJ Exhibit 9**, Green Depo., p. 53, lines 18-25, p. 54, lines 1-11; **SJ Exhibit 25**, Fitzsimmons Depo., p. 15, lines 16-25, p. 16, lines 1-3.)

Plaintiffs deny that the Comptroller Green created the position of Deputy Comptroller for Finance and Development in any capacity. This position was submitted by the previous Comptroller for approval by the Department of Personnel and was ultimately added to the City's approved positions and job classifications in 1995. The previous Comptroller, Virvus Jones, also appointed plaintiff's predecessor, Ivy Neylund-Pinkston, to the position of Deputy Comptroller of Finance and Development, not Defendant Green. Defendant Green's claim that she created the position of Deputy Comptroller of Finance and Development is demonstrably false as is her claim that the position was intended to be subordinate to the position of Deputy Comptroller, as she did not create the position of Deputy Comptroller for Finance and Development.

<u>The following evidence of record demonstrates the existence of a genuine dispute on the following material facts:</u>

-- See Ex. HH, Defendant Green Depo. p. 57, line 1 to p. 60 line 25.
See Plaintiff's Ex. OO (STL001740-1745) which demonstrates that Defendant Green's testimony was false.

9. The types of legally binding contract documents that require a signature of the Comptroller or her designee include lease agreements, financial closing documents, development closing documents, and other agreements. (SJ Exhibit 9, Green Depo. p. 83, lines 2 25, p. 84, lines 1 10, p. 86, lines 1 20.).

The evidence cited by defendants does not establish the absence of a genuine dispute. These are self-serving declarations by defendants, and constitute legal conclusions, not facts. Further, as Deputy Comptroller for Finance and Development, plaintiff was authorized by Defendant Green to sign numerous documents, including but not limited to all bond issue closing documents, bond issue refinancing documents, and documents acknowledging legally binding agreements that have already been signed by the Comptroller.

<u>The following evidence of record shows the existence of a genuine dispute</u> of these alleged facts:

-- See Ex. KK, Declaration of James Garavaglia, ¶9

10.     As an elected Comptroller for the City, the type of professionalism sought from and demanded of Plaintiff as Deputy Comptroller was important in protecting the integrity of the office of the Comptroller, which obligations included behaving in a professional manner and performing job duties and responsibilities with professionalism and honesty.  (SJ Exhibit 9, Green Depo. p. 272, lines 3-20.)

The evidence cited by defendants does not establish the absence of a genuine dispute for this alleged fact, and is merely opinion evidence.  Plaintiff's "professionalism", which is undefined, is not otherwise mentioned by defendants as a part of their pretext to attempt to justify their discriminatory conduct towards plaintiff, and is not otherwise mentioned in defendants' motion for summary judgment, statement of material facts ("SOMF"), or their memorandum in support of their motion for summary judgment.   To the extent that defendants claim Defendant Green "demanded" a particular type of professionalism from plaintiff, this is undeniably a disputed fact.  Defendant Green never spoke of, counseled, demanded, or otherwise explained any "standard of professionalism" to plaintiff at any point during his tenure with the City of St. Louis, and never expressed any dissatisfaction with plaintiff's professionalism or stated that he had ever behaved in a manner that was "unprofessional".

<u>The following evidence of record shows the existence of a genuine dispute</u>:

-- See Ex. KK, Declaration of James Garavaglia, ¶10.

11. It is very important that Deputies employed by the Comptroller keep the Comptroller fully apprised of what is happening with respect to projects that impact her duties as elected Comptroller of the City because Deputy Comptrollers are the eyes and ears of the Comptroller with respect to the Comptroller Office's dealing with developers, investment bankers, lawyers and others who are working on projects on behalf of the City. (**SJ Exhibit 9**, Green Depo., p. 271, lines 8-25, p. 272, lines 1-20.)

The evidence cited by defendants does not establish the absence of a genuine dispute for this alleged fact, and is merely opinion evidence. Defendant Green's testimony is irrelevant and assumes facts not in evidence, in that the assertion that plaintiff somehow failed to keep Defendant Green in the loop is unsupportable and is refuted by the evidence in the record. Further, the phrase "eyes and ears of the Comptroller" is undefined, and defendants cite to no other evidence that this is a mandatory job obligation of plaintiff as Deputy Comptroller, and defendants cite to no evidence that plaintiff was aware this was a mandatory job obligation. Evidence in the record shows that per Comptroller Green's own expectations, decisions made by deputy comptrollers regarding when to keep Defendant Green up to date is subjective and up to the discretion of the Deputy Comptrollers. Further, Defendant Green actually expected her deputy comptrollers not to inform her of information until they have all the facts, and expressed this to plaintiff.

The following evidence of record shows the existence of a genuine dispute:

--See Ex. GG, Garavaglia depo, p. 267, lines 7-25.

17. When Comptroller Green promoted Plaintiff from Asset Manager to Deputy Comptroller, Finance and Development, Plaintiff was a 65 year old white male, born on September 20, 1952. (SJ Exhibit 1, Garavaglia Depo. p. 27, lines 20-23, p. 100, lines 13-15, p. 351-352; SJ Exhibit 2 [Garavaglia Depo. Exh. 24, page STL1405.).

Defendants' citation does not establish the absence of a genuine dispute for this alleged fact, and includes a plainly erroneous claim of an undisputed fact. Plaintiff was age 63, not 65 at the time of his promotion. A person born on

September 20, 1952 would be sixty-three years of age as of May, 2016, not sixty-five.

The following evidence of record shows the existence of a genuine dispute:

--*See* Exhibits GG, Garavaglia Depo. p. 27, lines 20-23, p. 100, lines 13-15, p. 351-352; Ex. KK, Declaration of James Garavaglia, ¶7.


18.     When Plaintiff applied for and was promoted to Deputy Comptroller, Finance and Development, he was ranked number five of six potential candidates for the position.  (SJ Exhibit 1, Garavaglia Depo. p. 30, lines 24-25, p. 31, lines 1-10.)

The citation to plaintiff's deposition testimony does not establish the absence of a genuine dispute for this alleged fact.  Plaintiff never testified that he knew where he was actually ranked, no independent evidence was cited to by defendants in this statement of uncontroverted material fact, and plaintiff cannot and did not testify as to the authenticity of an internal St. Louis City Department of Personnel document.

 The following evidence of record shows the existence of a genuine dispute:

--See Plaintiff's Exhibit GG , Garavaglia Depo. p. 30: 19-31:10.


19.     When Plaintiff was being rated in conjunction with his application for the position of Deputy Comptroller, Finance and Development, Plaintiff was rated as "average" and evaluators pointed out the fact that he lacked knowledge in the finance area.  (SJ Exhibit 1, Garavaglia Depo. p. 31, lines 11-25, p. 32, lines 1-25, p. 33, lines 1-10.)

The citation to plaintiff's deposition testimony does not establish the absence of a genuine dispute for this alleged fact.  Plaintiff never testified that he had actual knowledge he was rated as average or that he lacked knowledge in the finance area, he simply confirmed what an unknown documents presented to him had written, no independent evidence was cited to by defendants in these statements of uncontroverted material facts, and plaintiff cannot and did not testify as to the authenticity of an internal St. Louis City Department of Personnel document.

 The following evidence of record shows the existence of a genuine dispute:

--See Exhibit GG, Garavaglia Depo. p. 31, lines 11-25, p. 32, lines 1-25, p. 33, lines 1-

10.)

20.     One evaluator also pointed out that during the interview process, Plaintiff struggled to answer questions related to debt and financing.  (SJ Exhibit 1, Garavaglia Depo. p. 33, lines 1-10.)

The citation to plaintiff's deposition testimony does not establish the absence of a genuine dispute for this alleged fact.  Plaintiff never testified that he had actual knowledge that an evaluator had pointed out plaintiff struggled to answer questions related to debt or financing, he simply confirmed what an unknown documents presented to him had written.  Further, plaintiff disputed that he struggled with debt or financing, he simply testified that this was the area in which he had the least experience.  No independent evidence was cited to by defendants in this statement of uncontroverted material facts, and plaintiff cannot and did not testify as to the authenticity of an internal St. Louis City Department of Personnel document.

The following evidence of record shows the existence of a genuine dispute:

--*See* Exhibit GG, Garavaglia Depo. p. 33, lines 1-10; Ex. KK, Declaration of James Garavaglia, ¶5.


21.     Plaintiff acknowledged that debt and financing was an area of weakness where he had the least experience.  (SJ Exhibit 1, Garavaglia Depo. p. 33, lines 4-10.)

The citation to plaintiff's deposition testimony does not establish the absence of a genuine dispute for this alleged fact.  Further, the testimony defendants cite to does not include any acknowledgement by plaintiff that debt and financing was "an area of weakness".  Defendants mischaracterize plaintiff's cited testimony in this statement of uncontroverted material fact and cite to no additional evidence.
.
-- *See*, Exhibit GG, Garavaglia Depo. p. 33, lines 4-10; Ex. KK, Declaration of James Garavaglia, ¶5.


23.     Part of Plaintiff's responsibility in serving as Deputy Comptroller, Finance and Development was to make sure that important financing documents for transactions involving the City were properly executed by the elected officials, who needed to sign the documents, in a timely fashion.  (SJ Exhibit 9, Green Depo. p. 121, lines 17 25, p. 122, lines 1 17, lines 24 25, p. 123, lines 1 21, p. 124, lines 14 25; p. 125, lines 1 21.)

Defendants' citations do not establish the absence of a genuine dispute for the alleged fact that Plaintiff was responsible for directing the process of document signing. Rather, there were separate staff and administrative personnel that were directly involved in and responsible for the coordination of handling and executing documents in a timely manner.

-- See Ex. KK, Declaration of James Garavaglia, ¶¶9, 10.
-- See Ex. GG, Garavaglia Depo. Pg. 218, lines 19-21.


24.     Upon his promotion by Comptroller Green, Plaintiff was eligible to receive only a 5% raise; however, Comptroller Green ultimately recommended and received approval to give Plaintiff a 10% pay raise. (SJ Exhibit 1, Garavaglia Depo. p. 35, lines 6-25, p. 36, lines 1-4; SJ Exhibit 5, Frank Depo. p. 66, lines 2-25, p. 67, lines 1-25, p. 68, lines 1-15, p. 69, lines 11-25, p. 70, lines 1-25, p. 71, lines 1-25, p. 72, lines 1-25, p. 73, lines 1-18; SJ Exhibit 6 [Frank Depo. Ex. 11], STL707-708.)


Defendants' citations do not establish the absence of a genuine dispute for this alleged fact. Upon his promotion by Defendant Green, plaintiff was eligible for up to 20% raise with the approval of the Director of Personnel when such action is needed to attract experienced, qualified candidates for a position. The assertion that plaintiff was eligible to only receive a 5% raise is factually erroneous.

-- See Ex. KK, Declaration of James Garavaglia, ¶ 6;
-- *See* Exhibit GG , Garavaglia Depo. p. 116, lines 13 to p. 120 line 12. -- See also Plaintiffs' Exhibit UU (City of St. Louis Ordinance #69949, Section 6 (pg. 62 of 168).


25.     Based on this promotion and 10% pay raise, Plaintiff was paid more in salary than the Comptroller. (SJ Exhibit 1, Garavaglia Depo. p. 36, lines 2-19.)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact and is immaterial. Defendant testified he did not know if he was making more than the Comptroller when asked by counsel for Defendant Green, and only repeated he "knew that" based upon the assertion by Defendant Green's counsel that it was factually true. Defendants cite to no actual evidence of this statement of uncontroverted material fact. It is also immaterial, as the position of Comptroller as an elected official is capped by City ordinance and cannot increase without an amendment to the law; thus, the Comptroller was not

eligible for a raise and the classification of deputy comptroller was subject to automatic raises. Further, it does not constitute evidence that demonstrates she did not actually promote plaintiff with the intention for him to be a placeholder who would retire shortly thereafter so she could replace him with her preferred choice, a younger African American female, after she had time to properly train and prepare her preferred candidate for the position.

*See* Exhibit GG, Garavaglia Depo. p. 33, lines 1-10.
*See* also Ex. KK, Declaration of James Garavaglia, ¶6.

26.     In initially offering the job to Plaintiff, Comptroller Green expressed her

happiness in a congratulatory call to Plaintiff that Plaintiff would be making a lot more

money, would be able to retire and go out ultimately at one of the top jobs in the office,

and expressly told Plaintiff that she was "ecstatic" for Plaintiff. (SJ Exhibit 9, Green

Depo. p. 142, lines 4-25, p. 143, lines 1-8.)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact and are immaterial. Defendant Green's tone and demeanor was not ecstatic nor did it convey happiness to plaintiff when she offered the position to him. Further, the evidence cited by Defendants is self-serving and it does not constitute evidence that demonstrates she did not actually promote plaintiff with the intention for him to be a placeholder who would retire shortly thereafter so she could replace him with her preferred choice, a younger African American female, after she had time to properly train and prepare her preferred candidate for the position.

-- See Ex. KK,  Declaration of James Garavaglia, ¶7.
-- See Ex. GG, Garavaglia Depo. p. 66 line 18 to p. 69 line 11; pg. 73 lines 1-7.

27.     Plaintiff acknowledged that during this call, Comptroller Green advised him that

she was glad he accepted the position and was happy for him regarding this promotion.

(SJ Exhibit 1, Garavaglia Depo. p. 66, lines 16-25, p. 67, lines 1-25, p. 68, lines 1-25, p.

69, lines 1-25)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact and are immaterial. Defendant Green's tone and demeanor was not ecstatic nor did it convey happiness to plaintiff when she offered the position to him. Plaintiff specifically testified that Defendant Green stated that plaintiff would be able to go out on top in a couple of years and that he understood Defendant Green to mean that her plans for him were short-term and that she expected him to retire when plaintiff reached social-security retirement age. In addition, plaintiff never testified that Defendant Green stated she was happy for plaintiff regarding his promotion. Rather, plaintiff was responding to the previous question by Defendant's counsel asking if Defendant Green stated she was glad plaintiff accepted the position. Plaintiff was clear in his testimony that Defendant Green conveyed her expectation that plaintiff retire in a couple of years after his promotion.

The following evidence of record shows the existence of a genuine dispute:

-- See Ex. KK, Declaration of James Garavaglia, ¶7.
-- *See,* Exhibit GG, Garavaglia Depo. p. 66, lines 16-25, p. 67, lines 1-25, p. 68, lines 1-25, p. 69, lines 1-25)


28.     Comptroller Green never thought about replacing Plaintiff as Deputy Comptroller, Finance and Development while he was serving in that position. (SJ Exhibit 9, Green Depo. p. 143, lines 23-25, p. 144, lines 1-2.)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact, are immaterial, and are contracted by the evidence in the record. Defendants' only cite to Defendant Green's self-serving testimony as evidence in support of this alleged incontrovertible material fact. However, Defendant Green was also actively socializing and grooming the person who became plaintiff's replacement after his termination.

The following evidence of record shows the existence of a genuine dispute:

-- See Ex. KK, Declaration of James Garavaglia, ¶11, 12.
-- *See,* Exhibit GG, Garavaglia Depo. p. 83, line 11 to p. 85, line 1.


35.     As part of his regular duties as Deputy Comptroller, Finance and Development, Plaintiff was obligated to keep Comptroller Green fully apprised of what was transpiring in the areas in which he supervised. (SJ Exhibit 1, Garavaglia Depo. p. 88, lines 10-23.)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact. The daily decisions made by the deputy comptrollers were intended to be discretionary, and it would be impossible to keep Defendant Green fully informed as that would take up all of the working time for both plaintiff and Defendant Green. Further, the evidence cited to does not constitute probative evidence of the alleged incontrovertible material fact and mischaracterizes plaintiff's testimony. Plaintiff never testified he kept Defendant Green "fully" apprised of what was transpiring in the office.

The following evidence of record shows the existence of a genuine dispute on the issue of defendants control and influence over the infringing websites and search results:

-- *See,* Ex. GG., Garavaglia Depo. p. 87, line 2 to p. 88, line 25; and p 265, line 23 to p. 268, line 5.


46.     Plaintiff also understood that under the Code of Conduct he had an obligation as Deputy Comptroller, Finance and Development, not to make any misleading representations or falsify any records or engage in any false communications of any kind, whether internal or external, including but not limited to, filing any false report, attendance, production, financial, or similar reports or statements. (SJ Exhibit 1, Garavaglia Depo. p. 51, line 25, p. 52, lines 1-25, p. 53, lines 1-25, p. 54, lines 1-18, p. 163, lines 5-16.)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact and is immaterial and irrelevant. There is no evidence that plaintiff ever made any misleading representations, falsified any records, or engaged in any false communications of any kind. Defendant's citations to defendant's counsel reading the Code of Conduct into the record at plaintiff's deposition and then plaintiff acknowledging that this information is in the code of conduct does not evidence that this alleged incontrovertible material fact is relevant or material.


47.     Plaintiff was fully aware that the falsification of official City records could result in immediate termination. (**SJ Exhibit 1**, Garavaglia Depo. p. 157, lines 21-25, p. 158, lines 1-12, p. 158, lines 18-21.)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact and is immaterial and irrelevant. There is no evidence that plaintiff ever made any misleading representations, falsified any records, or engaged in any false communications of any kind. Defendant's citations to defendant's counsel reading the Code of Conduct into the record at plaintiff's deposition and then plaintiff acknowledging that this information is in the code of conduct does not evidence that this alleged incontrovertible material fact is relevant or material. .

48.     After Plaintiff began working in the position of Deputy Comptroller, Plaintiff was

promoted to Deputy Comptroller, Finance and Development, the work protocols that had

been developed under his predecessor fell apart, and Comptroller Green became aware

that Plaintiff was mishandling documentation in performing his duties of that position.

(SJ Exhibit 9, Green Depo. p. 118, lines 5 25, p. 119, lines 1 10, lines 24 25, p. 120, lines

1 25, p. 121, lines 1 8p. 121, lines 2 16.)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact. Defendants cite to no evidence that any transactions, closings, purchase agreements, or other business dealings were delayed in any manner or otherwise adversely affected in any way by plaintiff's performance or some alleged failure to maintain or follow protocols. Further, Defendants cite to no evidence that plaintiff mishandled any documents in the performance of his duties other than Defendant Green's self-serving and subjective opinion testimony. I addition, defendants wholly fail to explain or identify what is meant by the term "falling apart", or fail to explain how this self-serving testimony is either relevant or material.

The following evidence of record shows the existence of a genuine dispute as to whether plaintiff mishandled documents or that "work protocols fell apart":

-- *See,* Ex. GG, Garavaglia Depo. p. 218, line 19 to p.219, line 6; and p 265, line 23 to p 268, line 5.
-- *See,* Ex. KK, Declaration of James Garavaglia, ¶¶ 9, 10.

49.     In response to Plaintiff's mishandling of documents, Comptroller Green followed

up with him by having conferences with him regarding the proper handling, signing and

circulating of documents on multiple occasions.  (SJ Exhibit 9, Green Depo. p. 126, lines

4 25, p. 127, lines 1 10.)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact.  Defendants cite to no evidence that Defendant Green ever followed up with plaintiff in any manner to discuss the "proper handling, signing, and circulation of documents, and she has no specific recollection of ever documenting this or the "dismantling of the system" she blamed Plaintiff for until she wrote the memorandum in July, 2019 after she was in the process of constructively terminating plaintiff.  In addition, as alluded to in Defendant Green's testimony, plaintiff had a conversation with Defendant Green, Eunetter Steele, of Sheila Woods wherein, in the presence of plaintiff, Defendant Green admonished Ms. Woods and Ms. Steele for failing to work out a personal dispute that lead to issues with document handling as a result of their inability to communicate properly.  At no time did Defendant Green ever have a conference with plaintiff about his proper handling of documents or discuss directly with plaintiff that process of circulating documents was not being followed by plaintiff. Defendant Green only addressed her comments and directives to Ms. Steele and Ms. Woods during this June, 2016 meeting.

<u>The following evidence of record shows the existence of a genuine dispute as to whether Defendant Green ever followed up with plaintiff on the proper handling of documents:</u>

*See,* Ex. HH, Green Depo. p. 122, line 24 to p.124, line 9 and p. 126, line 4 to p. 127, line 10.
-- See Ex. KK, Declaration of James Garavaglia, ¶10.


50.     Comptroller Green followed up with Plaintiff regularly regarding his mishandling

of important closing documents by way of verbal reprimands and coaching.  (SJ Exhibit

9, Green Depo. p. 129, lines 6-25, p. 130, lines 1-5.)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact.  Defendant Green never followed up with plaintiff at any time related to his mishandling of documents, and never gave plaintiff any verbal reprimands or coaching on any issues related to the handling of documents.  Defendant Green also has no recollection of ever documenting any of these alleged verbal reprimands or coaching nor were there ever witnesses to these alleged "follow-ups".

-- *See,* Ex. HH, Defendant Green Depo. p. 129, line 17 to p.130, line 10.
-- *See*, Ex. KK, Declaration of James Garavaglia, ¶10.

51.     Based upon the series of events in June 2019 regarding the Muni Court Project

documents, which culminated in what both Comptroller Green and Plaintiff determined

to be a "chaos", Comptroller Green determined that Plaintiff would not follow her

directives.  (SJ Exhibit 9, Green Depo. p. 130, lines 20-25, p. 131, lines 1-9; SJ Exhibit 1,

Garavaglia Depo. p. 214, lines 14-25, p. 215, lines 1-6.).

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact and this alleged fact is immaterial.  This alleged statement of an uncontroverted material fact Paragraph 37 is not a statement of fact but rather is hyperbolic and constitutes nothing more than speculation and the self-serving opinion of Defendant Green.  Further, while plaintiff did ultimately agree that the process was chaotic, he explained in his testimony that this alleged chaos was unnecessary and was the result of multiple people, other than plaintiff, trying to take control of a process they lacked experience with and failing to follow their own document signature process.

The following evidence of record shows the existence of a genuine for this alleged fact:

-- *See,* Ex. GG. Garavaglia Depo. p. 214, lines 11-13; p. 215, lines 1-3; p. 215, lines 16 to 25; p. 218, lines 19-25; pg. 219, lines 1-6.


52.     Sophisticated financial transactions involving the City, specifically including the

Muni Court Project, have hard and fast deadlines, and, thus, it is necessary to have a

sense of urgency in working to meet these deadlines.  (SJ Exhibit 9, Green Depo. p. 131,

lines 10-25; p. 132, lines 1 7.)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact and this alleged fact is immaterial.  There is no evidence cited by Defendants that any deadlines were met, or were even in danger of not being met, nor is there any evidence that plaintiff did not act with a "sense of urgency".

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- *See,* Ex. GG, Garavaglia Depo. p. 218, lines 19-25; pg. 219, lines 1-6.

53. Despite Plaintiff's dereliction in handling the important closing documents for the Muni Court Project, no deadlines were ultimately missed only because Comptroller Green had processes in place and other staff support to make sure that these documents were properly and timely executed. (SJ Exhibit 9, Green Depo. p. 134, lines 2-11.)

Defendants' citations do not establish the absence of a genuine dispute for the alleged implied fact that plaintiff was derelict in his handling of important closing documents or that it was Comptroller Green and her processes that resulted in the timely execution of the documents. This alleged statement of an uncontroverted material fact is not a statement of fact but rather is rhetorical and constitutes nothing more than the self-serving opinion of Defendant Green. Further, Defendant Green's claim that no deadlines were missed because of her own processes and support staff is also wholly self-serving, is unsupported by any other evidence, constitutes a mischaracterization of what actually transpired, and is demonstrably false based upon other evidence.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. KK, Declaration of James Garavaglia, ¶¶9, 10.
-- *See,* Ex. GG, Garavaglia Depo. P. 195, line 16 to p. 196, line 19; p. 196 line 23 to p 197, line 10; p. 198 lines 3-11; p. 200, lines 5-9; p. 201, lines 7-21; p. 205, lines 5-12; p. 206, lines 14-21; p. 215, lines 16 to 25; p. 218, lines 19-25; pg. 219, line 1- p. 220, line 4, all of which support that on June 26, 2019 plaintiff discovered the documents had been brought to the mayor's office for signature rather than to him first, which was not the proper protocol, plaintiff followed the proper protocol and directed that the documents be brought to him because he wanted to review the documents for accuracy and completeness prior to taking them to Defendant Green which is both customary and expected by Defendant Green, that a delay arose only when the inter-office mail courier failed to deliver documents timely in that same day, that plaintiff participated in a phone call to determine how to ensure that the documents would be delivered with plenty of time for signatures, that plaintiff even offered to hand deliver the documents directly to Defendant Green's house the evening and she declined, and that plaintiff even participated in phone calls the following day to help ensure the proper delivery of the documents despite being on vacation and in a car traveling.

54. The Municipal Court Project was a multi-million dollar City project which involved redeveloping the Municipal Court building into a hotel and a parking lot, which

would have taken a building that was not in use and put it into use such that it would create between 60 – 70 jobs, along with revenues from hotel taxes and sales taxes rather than being unused and boarded up (the "Muni Court Project"). (SJ Exhibit 9, Deposition of Darlene Green ("Green Depo."), p. 286, lines 14-25, p. 287, lines 1-4.)

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact and is immaterial. Defendants cite to no other evidence of this claim other than Defendant Green's self-serving statements. Further, this alleged uncontroverted material fact is not relevant and is nothing more than an attempt by Defendants to retrospectively artificially inflate the importance of this project in order to make it appear as if this pretext was serious misconduct by plaintiff. The evidence shows that the municipal court project was not even the actual basis Defendants placed plaintiff on forced leave.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

-- See Ex. KK, Declaration of James Garavaglia, ¶18.
-- See Ex. FF, Richard Frank deposition, p. 49, line 23 to p. 50, line 3; p. 146, line 16 to p. 147, line 3; p. 227, line 25 to p. 228, line 7).

55.     As Deputy Comptroller, Finance and Development, Plaintiff had an obligation to keep Comptroller Green up to date regarding what was transpiring with respect to this important Muni Court Project, and Comptroller Green should have been updated and kept in the loop by Plaintiff on a regular basis regarding what was going on with this important, time-sensitive item. (SJ Exhibit 1, Garavaglia Depo., p. 88, lines 10-23, p. 174, lines 17-25, p. 175, lines 1-18; SJ Exhibit 9, Green Depo. p. 209, lines 24-25, p. 210, lines 1-25, p. 211, lines 1-20, p. 216, lines 23-25, p. 217, lines 1-25, p. 218, lines 1-25, p. 219, lines 1-20; SJ Exhibit 7 [Garavaglia Depo. Ex. 3], p. Garavaglia 33 (According to the Code of Conduct, "[w]hen deciding on a course of action, City supervisors frequently

rely on the views and opinions of their employees. In such cases, an employee is obliged to give as much information as possible, and his/her own best opinion, to the supervisor before the matter is decided."))

Defendants' citations do not establish the absence of a genuine dispute for these alleged facts, are immaterial, and are misleading. Defendants cite to the City of St. Louis Code of Conduct as supporting evidence, which is irrelevant. Defendants deliberately ignore that the evidence shows this matter was not yet decided, either by plaintiff or Defendant Green, that plaintiff was actively working on getting as much information as possible so he could keep the Comptroller fully informed, and that he did in fact speak to Defendant Green who ultimately decided to keep the item off the agenda. Plaintiff did in fact keep the Comptroller fully informed as he learned new information, and it was Defendant Green who falsely accused plaintiff of lying to her about what had transpired.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. KK, Declaration of James Garavaglia, ¶¶ 17-20.
-- See Ex. GG, Garavaglia deposition, p. 165, line 25 to p. 166, line 6; p. 166, lines 1-6 13-17, and 21-25; p. 167 line 1 to p. 172, line 12, p. 181, line 24 to p. 184, line 8.
-- See also Plaintiff's Exhibit O, Plaintiff's Exhibit CC (This email from Tom Ray, the attorney for the City to Roger Denny, the attorney for the developer, shows that it was the actions of Defendant Green and Beverly Fitzsimmons that lead to the late confusion which caused plaintiff to have to scramble to determine what went wrong and lead to Roger Denny going directly to the mayor's office with Beverly Fitzsimmons's email requesting that the item be added to the E&A agenda. This email references a rift between Defendant Green and the mayor over a dispute involving airport bond refunding, another important project that was set to close that same week, as the reasons for delay, causing the developer and, by extension, the municipal courts project, to be "collaterally damaged". The email also indicates that Beverly Fitzsimmons won't add the muni courts item to the agenda because the Comptroller hasn't approved it and that Defendant Green balked when asked to provide needed information to the mayor because of the ongoing rift between Defendant Green and Mayor Lyda Krewson. As the E&A meeting approached, Roger Denny went straight to the mayor's office to try and get the item added. Prior to this, Plaintiff was unaware of all of this and was actively trying to find out what was happening and was preparing to update Defendant Green once he had that information).

56.    With respect to E&A, "anything that goes on the agenda is approved by the Comptroller. The final agenda is approved by the Comptroller."  (SJ Exhibit 1, Garavaglia Depo., p. 175, lines 11-13.)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact, is immaterial, and is misleading.  The final agenda must be approved by the Comptroller, but items are to be submitted to Beverly Fitzsimmons for placement on the preliminary E&A agenda.  The final agenda is prepared for Defendant Green for her approval and is often not finalized until the last day for submission, twenty-four hours before the E&A meeting.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. KK, Declaration of James Garavaglia, ¶17.
-- See Ex. EE, Beverly Fitzsimmons deposition, p. 47, line 18 to p. 48, line 20.


57.    When the Muni Court Project documentation was in the process of being placed on the E&A agenda at the direction of Plaintiff, Plaintiff failed to communicate that fact to the Comptroller for a number of days despite repeated requests by Deputy Comptroller Beverly Fitzsimmons that he do so.  (SJ Exhibit 1, Garavaglia Depo. p. 164, lines 10-25, p. 165, lines 1-5, p. 172, lines 22-25, p. 173, lines 1-25, p. 174, lines 1-25, p. 175, lines 1-25, p. 176, lines 1-25, p. 177, lines 1-25, p. 178, lines 1-25, p. 179, lines 1-25, p. 180, lines 1-25, p. 181, lines 1-8, p. 186, lines 24-25, p. 187, lines 1-16; SJ Exhibit 10 [Garavaglia Depo. Ex. 5], pages Garavagalia 105-109; SJ Exhibit 25, Fitzsimmons Depo., p. 55, lines 19-25, p. 56, lines 1-25, p. 57, lines 1-25, p. 58, lines 1-25, p., 59, lines 1-3.)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact, is immaterial, and is misleading.  Plaintiff did not fail to communicate anything to the Comptroller in a timely fashion.  Plaintiff lacked the information as to what was changing and made extensive efforts to find out so he could properly inform Defendant Green and advise her as to whether or not the item should be placed on the final agenda.   Beverly Fitzsimmons was not involved in this

process and would have no knowledge that plaintiff was in the process of getting updated information, and plaintiff was under no obligation to inform her of this, as the time to make the decision to place the item on the final agenda had not yet come, and plaintiff did speak to Defendant Green before that deadline. Defendant Green expected her deputy comptrollers to give her the whole story, not check in repeatedly to give her pieces of information that do not adequately explain the situation.  Further, Defendant Green told plaintiff not to put the item on the agenda and to send everything he had to her, which he did.  This was all the result of the developer's attorney going to the mayor and asking that the item be placed on the agenda by the mayor because of the Comptroller's unwillingness to provide requested information to that attorney or to instruct Beverly Fitzsimmons herself to place the item on the agenda.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

-- See Ex. GG, Garavaglia deposition, p. 165, line 25 to p. 166, line 6; p. 166, lines 1-6 13-17, and 21-25; p. 167 line 1 to p. 172, line 12, p. 181, line 24 to p. 184, line 8; p. 182, line 20 to p. 184, line 8; and p. 187, lines 17-22.
-- See, Plaintiff's Exhibit CC (This email from Tom Ray, the attorney for the City to Roger Denny, the attorney for the developer, shows that it was the actions of Defendant Green and Beverly Fitzsimmons that lead to the late confusion which caused plaintiff to have to scramble to determine what went wrong and lead to Roger Denny going directly to the mayor's office with Beverly Fitzsimmons's email requesting that the item be added to the E&A agenda. This email references a rift between Defendant Green and the mayor over a dispute involving airport bond refunding, another important project that was set to close that same week, as the reasons for delay, causing the developer and, by extension, the municipal courts project, to be "collaterally damaged".  The email also indicates that Beverly Fitzsimmons won't add the muni courts item to the agenda because the Comptroller hasn't approved it and that Defendant Green balked when asked to provide needed information to the mayor because of the ongoing rift between Defendant Green and Mayor Lyda Krewson.  As the E&A meeting approached, Roger Denny went straight to the mayor's office to try and get the item added.  Prior to this, Plaintiff was unaware of all of this and was actively trying to find out what was happening and was preparing to update Defendant Green once he had that information).

58.     Plaintiff delayed several days between Friday, June 14, 2019 and Tuesday, June 18, 2019 before advising Comptroller Green that Muni-Court developer Vertical Realty had not obtained the requisite tax clearance, which was needed before placing the Muni Court Project on E&A's June 19, 2019 agenda for approval.  (SJ Exhibit 1, Garavaglia Depo. pp. 179, lines 11-25, p. 180, lines 1-12, p. 186, lines 24-25, p. 187, lines 1-16; SJ

Exhibit 9, Green Depo, p. 200, lines 5-25, p. 201, lines 1-6, p. 268, lines 8-25, p. 269, lines 1-25, p. 270, lines 1-25, p. 271, lines 1-7.; SJ Exhibit 10 [Garavaglia, Depo. Ex. 5].)

Defendants' citations do not establish the absence of a genuine dispute for these alleged facts, are immaterial, and are misleading.  Plaintiff did not delay in telling Defendant Green that the developer did not have the requisite tax clearance. Instead, plaintiff sought to confirm if the tax clearance had not yet been obtained and also sought to determine what else had transpired to cause additional impediments to placing the item on the final E&A agenda. Plaintiff lacked the information as to what was changing and made extensive efforts to find out so he could properly inform Defendant Green and advise her as to whether or not the item should be placed on the final agenda.  Defendant Green expected her deputy comptrollers to give her the whole story, not check in repeatedly to give her pieces of information that do not adequately explain the situation.  Further, Defendant Green told plaintiff not to put the item on the agenda and to send everything he had to her, which he did, including the tax clearance.  Further, the developer actually paid the taxes on June 19, 2019 and was able to successfully obtain the tax clearance prior to the E&A meeting.   Had plaintiff advised Defendant Green that the taxes were not paid, that would have been premature information and Defendant Green made the decision not to add the item herself.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. GG, Garavaglia deposition, p. 165, line 25 to p. 166, line 6; p. 166, lines 1-6 13-17, and 21-25; p. 167 line 1 to p. 172, line 12, p. 181, line 24 to p. 184, line 8; p. 182, line 20 to p. 184, line 8; p. 187, lines 17-22, and p. 192, lines 5-9.
-- See also Plaintiff's Exhibit O, Plaintiff's Exhibit CC (This email from Tom Ray, the attorney for the City to Roger Denny, the attorney for the developer, shows that it was the actions of Defendant Green and Beverly Fitzsimmons that lead to the late confusion which caused plaintiff to have to scramble to determine what went wrong and lead to Roger Denny going directly to the mayor's office with Beverly Fitzsimmons's email requesting that the item be added to the E&A agenda.  This email references a rift between Defendant Green and the mayor over a dispute involving airport bond refunding, another important project that was set to close that same week, as the reasons for delay, causing the developer and, by extension, the municipal courts project, to be "collaterally damaged".  The email also indicates that Beverly Fitzsimmons won't add the muni courts item to the agenda because the Comptroller hasn't approved it and that Defendant Green balked when asked to provide needed information to the mayor because of the ongoing rift between Defendant Green and Mayor Lyda Krewson.   As the E&A meeting approached, Roger Denny went straight to the mayor's office to try and get the item added.  Prior to this, Plaintiff was unaware of all of this and was actively trying to find out what was happening and was preparing to update Defendant Green once he had that information).

59.     Plaintiff represented to Deputy Comptroller Beverly Fitzsimmons that Comptroller Green was okay with having the Muni Court Project documentation placed on the E&A agenda even though he did not so apprise Comptroller Green.  (SJ Exhibit 1, Garavaglia Depo. p. 178, lines 22-25, p. 179, lines 1-10, p. 180, lines 5-8; SJ Exhibit 10 [Garavaglia Depo. Ex. 5], pages Garavaglia 105-109; SJ Exhibit 25, Fitzsimmons Depo., p. 55, lines 19-25, p. 56, lines 1-25, p. 57, lines 1-25, p. 58, lines 1-25, p., 59, lines 1-3.)

The evidence cited here by defendants does not establish the absence of a genuine dispute, and the evidence cited actually demonstrates that this claim is factually false.  Plaintiff originally discussed the municipal courts project with Defendant Green during a telephone call in June 2019 (prior to June 14, 2019) and Defendant Green was made aware that it may be an item on the E&A agenda.  Plaintiff then sent Beverly Fitzsmmons an email stating "Here's that extension we talked about for E&A".  Fitzsimmons then asked plaintiff if he had spoken to the Comptroller and plaintiff stated he had **not**.  None of the cited testimony or documents evidence that plaintiff misrepresented anything to Fitzsimmons; rather, the evidence demonstrates he did not.  In addition, plaintiff did apprise Defendant Green about the possibility of the Municipal Court project being on the agenda.

The following evidence of record shows the existence of a genuine dispute for these alleged facts:

-- See Ex. GG, Garavaglia deposition, p. 166 line 21 to 167, line 10; p. 187, line 17 to p. 88, line 2.
-- See Ex. KK, Declaration of James Garavaglia, ¶17.


60.     Plaintiff sought to have the Muni Court Project documentation placed on the E&A agenda for approval even though he was fully aware that the prerequisite of having taxes paid in advance of approval by E&A was required, and he failed to apprise the Comptroller for multiple days that the taxes were outstanding.  (SJ Exhibit 1, Garavaglia Depo. p.184, lines 9-25, p. 185, lines 1; 18-25, p. 186, lines 1-17, line 24-25; p. 187, lines

1-25, p. 188, lines 1-9; SJ Exhibit 10 [Garavaglia Depo. Ex. 5], pages Garavaglia 105-109.)

The evidence cited here by defendants does not establish the absence of a genuine dispute. Plaintiff only sought to have the muni court project placed on the tentative E&A agenda, not the final one, and at that time there was still ample opportunity for the developer to pay the back taxes. Further, plaintiff was unaware that the taxes had not yet been paid when he proposed that the item be added to the preliminary agenda, but checked multiple times per day after the item had been submitted to the preliminary agenda to see if the taxes had in fact been paid after he was made aware they had not yet been paid. Plaintiff never recommended or sought to have this item added to the final E&A agenda without verification that taxes had not been paid.

The following evidence of record shows the existence of a genuine dispute on these alleged facts:

-- See Ex. GG, Garavaglia deposition, p. 168, lines 9-24; p. 169 line 20 to 170, line 4; p. 171, lines 9-15; p. 181, line 25 to p. 182, line 11; p. 185, line 6 to p. 186, line 14.

61.     When Plaintiff finally did discuss the status of the Muni Court project with Comptroller Green on Tuesday, June 18, 2019 before the scheduled E&A meeting, Plaintiff made it appear as if the Mayor's office was pushing to place the matter on the E&A agenda for approval the following day, and he did not advise Comptroller Green that, in fact, he was the person who had made the request to have the Muni Court Project placed on the E&A agenda. (SJ Exhibit 9, Green Depo. p. 201, lines 8-25, p. 202, lines 1-25, p. 203, lines 1-25, p. 204, lines 1-6.)

The evidence cited here by defendants does not establish the absence of a genuine dispute and is a false and misleading characterization of the circumstances that actually occurred based upon the evidence, including the evidence cited by Defendants. Plaintiff had already apprised Defendant Green previously that the item may be added to the E&A agenda and Defendant Green expressed she was in favor of this. On June 18, 2019, Plaintiff truthfully reported to Defendant Green that the mayor's office was pushing to have the item placed on the E&A agenda. Plaintiff lacked the information as to why the mayor's office suddenly wanted the item placed on the agenda and made extensive efforts to find out so he could properly inform Defendant Green and advise her as to

21

whether or not the municipal court issue should be placed on the final agenda by Defendant Green. Once plaintiff accurately and truthfully informed Defendant Green that the taxes were unpaid, that the President of the Board of Alderman suddenly changed his mind and wanted the item removed from the agenda, and that the mayor was seeking to have the item added to the agenda, Defendant Green decided not to add the item herself and asked plaintiff to send her all of the information. Defendants alleged facts are misleading in that they fail to distinguish between plaintiff's original request to place the item on the tentative E&A agenda, which was made prior to plaintiff being aware about unpaid taxes or the mayor's office seeking to have them item added themselves, or the changes occurring with the President of the Board of Alderman. The evidence cited by Defendants constitutes nothing more than pure speculation by Defendant Green, is evidence she knew about the item being added to the agenda and later lied so she could blame plaintiff, and is evidence Defendant Green intended to scapegoat plaintiff regardless of what the facts actually were.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. GG, Garavaglia deposition, p. 165, line 25 to p. 166, line 6; p. 166, lines 1-6 13-17, and 21-25; p. 167 line 1 to p. 172, line 12, p. 181, line 24 to p. 184, line 8; p. 187, lines 17-22; and p. 192, lines 5-9.

-- See also Plaintiff's Exhibit O, Plaintiff's Exhibit CC (This email from Tom Ray, the attorney for the City to Roger Denny, the attorney for the developer, shows that it was the actions of Defendant Green and Beverly Fitzsimmons that lead to the late confusion which caused plaintiff to have to scramble to determine what went wrong and lead to Roger Denny going directly to the mayor's office with Beverly Fitzsimmons's email requesting that the item be added to the E&A agenda. This email references a rift between Defendant Green and the mayor over a dispute involving airport bond refunding, another important project that was set to close that same week, as the reasons for delay, causing the developer and, by extension, the municipal courts project, to be "collaterally damaged". The email also indicates that Beverly Fitzsimmons won't add the muni courts item to the agenda because the Comptroller hasn't approved it and that Defendant Green balked when asked to provide needed information to the mayor because of the ongoing rift between Defendant Green and Mayor Lyda Krewson. As the E&A meeting approached, Roger Denny went straight to the mayor's office to try and get the item added. Prior to this, Plaintiff was unaware of all of this and was actively trying to find out what was happening and was preparing to update Defendant Green once he had that information).

62. As it related to Plaintiff's attempt to place the Muni Court Project on the E&A Agenda for the June 19, 2019 E&A meeting, it was Comptroller Green's expectation that Plaintiff would have communicated to her the fact that he had already sought to place this matter on the E&A Agenda even though he implied that the Mayor's office sought to place it on the E&A Agenda. (SJ Exhibit 9, Green Depo., p. 268, lines 8-25, p. 269, lines 1-25, p. 270, lines 1-25, p. 271, lines 1-7.)

The evidence cited here by defendants does not establish the absence of a genuine dispute and is a false and misleading characterization of the circumstances that actually occurred based upon the evidence, including the evidence cited by Defendants. Plaintiff had already apprised Defendant Green previously that the item may be added to the E&A agenda and Defendant Green expressed she was in favor of this. On June 18, 2019, Plaintiff truthfully reported to Defendant Green that the mayor's office was pushing to have the item placed on the E&A agenda. Plaintiff lacked the information as to why the mayor's office suddenly wanted the item placed on the agenda and made extensive efforts to find out so he could properly inform Defendant Green and advise her as to whether or not the municipal court issue should be placed on the final agenda by Defendant Green. Once plaintiff accurately and truthfully informed Defendant Green that the taxes were unpaid, that the President of the Board of Alderman suddenly changed his mind and wanted the item removed from the agenda, and that the mayor was seeking to have the item added to the agenda, Defendant Green decided not to add the item herself and asked plaintiff to send her all of the information. Defendants alleged facts are misleading in that they fail to distinguish between plaintiff's original request to place the item on the tentative E&A agenda, which was made prior to plaintiff being aware about unpaid taxes or the mayor's office seeking to have them item added themselves, or the changes occurring with the President of the Board of Alderman. The evidence cited by Defendants constitutes nothing more than pure speculation by Defendant Green, is evidence she knew about the item being added to the agenda and later lied so she could blame plaintiff, and is evidence Defendant Green intended to scapegoat plaintiff regardless of what the facts actually were.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

-- See Ex. GG, Garavaglia deposition, p. 165, line 25 to p. 166, line 6; p. 166, lines 1-6 13-17, and 21-25; p. 167 line 1 to p. 172, line 12, p. 181, line 24 to p. 184, line 8; p. 187, lines 17-22; p. 188, lines 1-2; p. 189, lines 1-7; and p. 192, lines 5-9.

-- See also Plaintiff's Exhibit O, Plaintiff's Exhibit CC (This email from Tom Ray, the attorney for the City to Roger Denny, the attorney for the developer, shows that it was the actions of Defendant Green and Beverly Fitzsimmons that lead to the late confusion which caused plaintiff to have to scramble to determine what went wrong and lead to Roger Denny going directly to the mayor's office with Beverly Fitzsimmons's email requesting that the item be added to the E&A agenda. This email references a rift between Defendant Green and the mayor over a dispute involving airport bond refunding, another important project that was set to close that same week, as the reasons for delay, causing the developer and, by extension, the municipal courts project, to be "collaterally damaged". The email also indicates that Beverly Fitzsimmons won't add the muni courts item to the agenda because the Comptroller hasn't approved it and that Defendant Green balked when asked to provide needed information to the mayor because of the ongoing rift between Defendant Green and Mayor Lyda Krewson. As the E&A meeting approached, Roger Denny went straight to the mayor's office to try and get the item added. Prior to this, Plaintiff was unaware of all of this and was actively trying to find out what was happening and was preparing to update Defendant Green once he had that information).

63.     At the June 19, 2019 E&A, the Mayor publicly embarrassed Comptroller Green and her staff by reading at the meeting the request made by Plaintiff to have the Muni-Court item placed on the meeting agenda and then withdrawing it because of the unpaid tax issues.  (SJ Exhibit 1, Garavaglia Depo. p. 188, lines 17-25, p. 189, lines 1-25, p. 190, lines 1-25, p. 191, lines 1-16.; SJ Exhibit 10 [Garavaglia Depo. Ex. 5], pages Garavagalia 105-109; SJ Exhibit 9, Green Depo., p. 214, lines 23-25, p. 215, lines 1-25, p. 216, lines 1-22; SJ Exhibit 25, Fitzsimmons Depo., p. 117, lines 9-25, p. 118, lines 1-25, p. 119, lines 1-25, p. 120, lines 1-25, p. 121, lines 1-10.)

The evidence cited here by defendants does not establish the absence of a genuine dispute, is immaterial, and is irrelevant.  Nothing that plaintiff did lead to this occurrence.  It was Beverly Fitzsimmons who sent the email to the mayor's office asking for the item to be added before she confirmed that the Comptroller had approved it, and did so well in advance of the due date for the final agenda. Further, plaintiff only sought to have the muni court project placed on the tentative E&A agenda, not the final one, which should have been clear to Fitzsimmons given that the request was made over four days before the final agenda was due.  Most importantly, the mayor's actions were the direct result of the Comptroller first admonishing the mayor's office for not placing the item on the agenda without using the proper E&A agenda protocols.  Plaintiff is not

responsible for the independent actions of Defendant Green.

-- See Ex. EE, Beverly Fitzsimmons deposition, p. 49, lines 4-23.
-- See also plaintiff's Ex. WW (This is a video recording of the June 19, 2019 E&A meeting wherein the Comptroller admonishes the mayor for not following protocols which resulted in the mayor reading out the email sent by Beverly Fitzsimmons that was sent to the other pre-E&A members).

66.     Even though Plaintiff was responsible for getting the requisite documents properly executed in advance of the Friday, June 28, 2019 deadline, he was scheduled to leave for vacation on Thursday, June 27, 2019, with his last day in the office being Wednesday, June 26, 2019.  (SJ Exhibit 1, Garavaglia Depo. p. 193, lines 4-25).

<u>Defendants' citations do not establish the absence of a genuine dispute for this alleged fact,</u> which suggests (wrongly) that plaintiff was solely responsible for getting the documents executed.  Further, defendants only cite to plaintiff's own testimony as evidence in support of this.  Plaintiff's administrative assistant, the Comptroller's administrative assistant, and both outside counsel for the City and the developer were fully versed and prepared to properly execute the documents. Defendants also neglect to mention that Defendant Green was aware of and approved plaintiff's vacation despite his involvement in the execution of these documents.

-- See Ex. GG, Garavaglia deposition, p. 195, lines 15-23.


67.     On Wednesday, June 26, 2019, the City's outside counsel Tom Ray sent an email to Chana Morton, Comptroller Green's Executive Assistant, advising that there could be a problem with getting the Muni Court Project documents executed by Friday because Plaintiff had directed that certain documents that needed to be signed by the Comptroller be placed in inter-office mail rather than having the documents couriered.  (SJ Exhibit 1, Garavaglia Depo. p. 194, lines 24-25, p. 195, lines 1-25, p. 196, lines 1-25, p. 197, lines 1-25, p. 198, lines 1-25, p. 199, lines 1-25, p. 200, lines 1-25, p. 201, lines 1-24.; SJ Exhibit 11, Deposition of Chana Morton ("Morton Depo."), p. 86, lines 1-24, p. 114,

lines 5-25, p. 115, lines 1-10; SJ Exhibit 12 [Garavaglia Depo Ex. 6], pages Garavaglia

110, 114).

The evidence cited here by defendants does not establish the absence of a
genuine dispute, and there is a genuine dispute as to Tom Ray's meaning when
he stated there may be a problem.  Tom Ray was aware that counsel for the
developer had ignored the proper process for the handling and delivery of
documents and had instead taken the documents directly to the mayor's office for
signature, which interrupted the streamlined process for the processing of
documents, and was addressing that this was the problem.  Defendants provide
no testimony or evidence from Tom Ray but instead simply cite evidence that
speculates on the meaning of this email.  Defendants chose to interpret Tom
Ray's meaning in this manner because of Defendant Green's underlying
discriminatory intent.

-- *See*, Ex. GG, Garavaglia deposition, p. 167, line 12 to 169, line 12.
-- *See,* Exhibit X (STL002125- STL002128)

68.     In this June 26, 2019 email correspondence to Ms. Morton, Tom Ray pointed out

the fact that if the Muni Court Project documents were not timely executed and recorded,

"there w[ould] be a default."  (SJ Exhibit 1, Garavaglia Depo. p. 205, lines 23-25, p. 206,

lines 1-25, p. 207, lines 1-25, p. 208, lines 1-22, p. 220, lines 5-2; SJ Exhibit 11, Morton

Depo., p. 86, lines 1-24, p. 114, lines 5-25, p. 115, lines 1-10; SJ Exhibit 12 [Garavaglia

Depo Ex. 6], pages Garavaglia 110, 114; SJ Exhibit 15, [Plaintiff Deposition Ex. O],

pages Garavaglia 110-113).

The evidence cited here by defendants does not establish the absence of a
genuine dispute, and there is a genuine dispute as to Tom Ray's meaning when
he mentioned that there would be a default, and he never assigned any blame to
plaintiff.  Tom Ray was aware that counsel for the developer had ignored the
proper process for the handling and delivery of documents and had instead taken
the documents directly to the mayor's office for signature, which interrupted the
streamlined process for the processing of documents, and he wanted to make
sure all parties were aware of the deadline.  No default actually occurred, and the
documents were properly executed well in advance, due in part of plaintiff's
efforts.  Defendants provide no testimony or evidence from Tom Ray regarding
his meaning and intent but instead simply cite evidence that speculates on the

meaning of this email. Defendants chose to interpret Tom Ray's meaning in this manner because of Defendant Green's underlying discriminatory intent.

--*See,* Ex. G, Garavaglia deposition, p. 167, line 12 to 169, line 12; and p. 219- lines 2-6.

--See, Exhibit X (STL002125- STL002128)

69.     Tom Ray's June 26, 2019 email set off alarm bells in the Comptroller's Office regarding the fact that a problem was brewing with respect to the timely execution of the Muni Court Project documents.  (SJ Exhibit 1, Garavaglia Depo. p. 224, lines 21-25, p. 225, lines 1-25; p. 226, lines 1-7, p. 227, lines 21-25, p. 228, lines 1-17.; SJ Exhibit 9, Green Depo. p. 154, lines 2-25, p. 155, lines 1-25, p. 156, lines 1-14, p. 283, lines 22-25, p. 284, lines 1-18; SJ Exhibit 11, Morton Depo. p. 86, lines 1-24, p. 114, lines 5-25, p. 115, lines 1-10; SJ Exhibit 12 [Garavaglia Depo Ex. 6], pages Garavaglia 110, 114; SJ Exhibit 15, [Plaintiff Deposition Ex. O], pages Garavaglia 110-113).

<u>The evidence cited here by defendants does not establish the absence of a genuine dispute, and this alleged fact constitutes nothing more than hyperbole.</u> Further, it was Defendant Green's decision to wrongly assign blame for plaintiff using the normal inter-office courier process.  A plain reading of Ray's email shows that it was nothing more than a cautionary notice that there were issues that could potentially delay the execution of the documents.  Any "alarm bells" that went off would be an exaggeration and totally unnecessary, and are unsupported by other evidence.  Chana Morton, who claimed she took copious notes after she received this email, wrote nothing of urgency, other than that the documents had not been received by 4:40 p.m. (See Ex. NN), which was entirely the fault of the inter-offer couriers, not plaintiff.  Several weeks later, Morton then wrote a detailed narrative assigning all of the blame to plaintiff.

-- *See,* Ex. GG. Garavaglia deposition, p. 219, lines 2-6; p. 221, lines 3-14.
-- *See,* Exhibits O (pgs. 12-14), Ex. X (STL002125- STL002128); Ex. NN.

70.     It was Plaintiff's responsibility to make sure that the necessary documentation related to the Muni Court Project was properly executed before going on vacation.  (SJ Exhibit 1, Garavaglia Depo. p. 202, lines 4-25, p. 203, lines 10-14.)

<u>The evidence cited here by defendants does not establish the absence of a genuine dispute.</u>  The proper procedure to successfully execute the documents related to municipal court was already in place, as the documents were to originally be sent to plaintiff and his administrative assistant.  However, counsel for the developer submitted the documents to the mayor's office first and did not provide electronic copies for review, which was outside of the normal practice.  Many parties were responsible for the execution of these documents, not just plaintiff.  Defendants only cite to plaintiff's testimony, which does not establish that it was plaintiff's sole responsibility.  Further, the alleged fact that it had to be executed before plaintiff went on vacation is factually false.  Defendant Green was aware of and approved plaintiff's vacation despite his involvement in the execution of these documents, and, when plaintiff offered to locate and hand deliver the documents to Defendant Green's home she declined knowing he would be leaving in the morning for vacation.

-- *See,* Ex. GG, Garavaglia deposition, p. 205, lines 5-12; p. 214, lines 11-13; p. 221, lines 3-14.
-- *See,* Exhibits O, X (STL002125- STL002128)
-- *See,* Ex. KK, Declaration of James Garavaglia, ¶19.


71.     Plaintiff's decision to send these important Muni Court Project documents

through inter-office mail, rather than having them couriered, was the reason the Muni

Court Project documents did not arrive in the Comptroller's office prior to Plaintiff

leaving for vacation.  (SJ Exhibit 1, Garavaglia Depo. p. 198, lines 18-22; p. 204, lines 4-

25; p. 205, line 1; p. 208, lines 13-22).

<u>The evidence cited here by defendants does not establish the absence of a genuine dispute, and there is a genuine dispute as to what actually caused the delay.</u>  This alleged fact also completely mischaracterizes what occurred, and improperly assigns blame to plaintiff for using a delivery system that is supposed to be same day delivery.  This alleged fact constitutes opinion evidence as to who is at fault, and is evidence that Defendant Green chose to blame plaintiff as a result of her discretionary intent.  Also, defendants only cite to plaintiff's testimony in support of them claim, and plaintiff never testified that his decision to have the documents couriered by inter-office mail was the reason for the delay.

-- *See,* Ex. GG, Garavaglia deposition, p. 195, line 18 to p. 196, line 19.
-- *See,* Ex. KK, Declaration of James Garavaglia, ¶20.

72. Comptroller Green, as well as her Executive Assistant, Chana Morton, testified that they have never heard of a situation where such important, time sensitive City deal documents were placed in interoffice mail. (SJ Exhibit 9, Green Depo. p. 276, lines 22-25, p. 277, lines 1-9; SJ Exhibit 11, Morton Depo., p. 58, lines 6-11; p. 117, lines 5-10).

<u>The evidence cited here by defendants does not establish the absence of a genuine dispute, and is totally immaterial</u>. This testimony represents nothing more than Defendant Green's intent to create pretext to support some justifiable reason for discriminating against plaintiff and wrongfully discharging him. Defendants also attempt to allege that plaintiff was solely responsible for the handling and execution of these documents and claim this was an unusually important and unique case. Defendant Green and Morton also never testified that they ever were responsible for handling the transfer of documents between offices, and that was never their responsibility; thus, their collective knowledge about the proper transfer of documents is irrelevant. The reason for the continued delay on June 27, 2019 was multiple people who were involved failed to follow the agreed upon procedure for that day to properly get and deliver the documents.

-- *See,* Ex. KK, Declaration of James Garavaglia, ¶20.
-- *See,* Ex. GG, Garavaglia deposition, p. 214, line 21 to p. 215, line 4; p. 215, lines 16-25.

73. On Wednesday, June 26, 2019, Plaintiff's last day in the office before he left on vacation, the Comptroller arranged a conference call with Plaintiff, Tom Ray, and others to ascertain where the Muni Court Project documents were and to develop a process to ensure they were properly and timely executed. (SJ Exhibit 1, Garavaglia Depo. p. 205, lines 2-12.; SJ Exhibit 9, Green Depo., p. 154, lines 14-25; p. 155, lines 1-25; p. 156, lines 1-14; p. 284, lines 19-25; p. 285, lines 1-14).

The evidence cited here by defendants does not establish the absence of a genuine dispute, in that there was a process developed in consultation with plaintiff and others, but that process was not followed by others on July 27, 2019, resulting in additional delays.

-- *See,* Ex. GG, Garavaglia deposition, p. 205, lines 5-12.

-- *See,* Ex. KK, Declaration of James Garavaglia, ¶19..

74.      Comptroller Green was not happy with the fact that there was a major deal that was about to close by the end of the business week, and Plaintiff was set to go on vacation even though the whereabouts of the documents were unknown.  (SJ Exhibit 1, Garavaglia Depo. p. 205, lines 13-22; SJ Exhibit 9, Green Depo. p. 284, lines 1-25; p. 285, lines 1-17.)).

Defendants' citation does not establish the absence of a genuine dispute for this alleged fact, the citation to the testimony of Defendant Green is not credible, and is disputed by the evidence. Defendant Green was aware of and approved plaintiff's vacation despite his involvement in the execution of these documents, and, when plaintiff offered to locate and hand deliver the documents to Defendant Green's home she declined knowing he would be leaving in the morning for vacation.  Her subsequent claim that she was unhappy is self-serving and evidences her discriminatory intent.  The documents were also delivered that following day, with the help of plaintiff, despite the fact that he had already left for vacation and was in a vehicle.

The following evidence of record shows the existence of a genuine dispute:

-- *See,* Ex. GG, Garavaglia Depo. P. 195, line 16 to p. 196, line 19; p. 196 line23 to p 197, line 10; p. 198 lines 3-11; p. 200, lines 5-9; p. 201, lines 7-21; p. 205, lines 5-12; p. 206, lines 14-21; p. 214, lines 11-13, p. 215, lines 16 to 25; p. 218, lines 19-25; pg. 219, line 1- p. 220, line 4; and p. 221, lines 3-14, all of which support that on June 26, 2019 plaintiff discovered the documents had been brought to the mayor's office for signature rather than to him first, which was not the proper protocol,  plaintiff followed the proper protocol and directed that the documents be brought to him because he wanted to review the documents for accuracy and completeness prior to taking them to Defendant Green which is both customary and expected by Defendant Green, that a delay arose only when the inter-office mail courier failed to deliver documents timely in that same day, that plaintiff participated in a phone call to determine how to ensure that the documents would be delivered with plenty of time for signatures, that plaintiff even offered to hand deliver the documents directly to Defendant Green's house the evening and she declined, and that plaintiff even participated in phone calls on June 27, 2019 to help ensure the proper delivery of the documents despite being on vacation and in a car traveling.

77.      The Muni Court Project documents arrived via inter-office mail in Plaintiff's office on the morning of Thursday, June 27, 2019, while Plaintiff was driving to

his vacation destination, and they were not ultimately delivered to the Comptroller's Office until the afternoon of June 27, 2019 without being reviewed by Plaintiff. (SJ Exhibit 1, Garavaglia Depo. p. 209, lines 1-25, p. 210, lines 1-2, p. 211, lines 1-5; SJ Exhibit 11, Morton Depo. p. 86, lines 1-24, p. 114, lines 5-25, p. 115, lines 1-10; Exhibit 12 [Garavaglia Depo Ex. 6], pages Garavaglia 110-114; SJ Exhibit 15, [Plaintiff Deposition Ex. O], pages Garavaglia 110-113.)

This alleged fact mischaracterizes what transpired and ignores material facts. Plaintiff properly attempted to have the documents routed to him the morning of June 26, 2019 so he could review them and ensure there were not errors after they had already been improperly delivered by the developer's counsel to the mayor's office. This was the usual protocol. The documents should have been sent directly to plaintiff for review, both hard copies and electronic copies. Plaintiff would review the documents as well, making sure that all exhibits and signature pages were properly attached (which they were not). Upon approval from outside counsel, the total document package would then be sent to the City Counselor's Office for approval as to form. Had the documents not yet been signed by the Mayor, they would then be sent to the Mayor's Office for her signature, and they would then be sent to the Comptroller's Office for the Comptroller's signature. After the Comptroller signs, the documents would then be sent to the Register's Office to have the City Seal affixed, making it an official City document. Plaintiff wanted the documents sent to him to ensure they were containing what had been previously discussed in a previous draft. Plaintiff did not want documents going to the Comptroller's office for signature that had not been reviewed by outside counsel and Plaintiff, as well as the City Counselor's Office. However, they were not properly delivered by the inter-office courier that same day. Plaintiff participated in the phone call with Defendant Green and others to create a solution to have the documents brought over in the morning. It was the failure to follow the process that resulted in the delay, as well as the failure of others to follow the agreed upon protocol with defendant Green that was determined during the June 26, 2019 conference call.

 The following evidence of record shows the existence of a genuine dispute:

-- *See,* Ex. GG, Garavaglia Depo. P. 195, line 16 to p. 196, line 19; p. 196 line 23 to p 197, line 10; p. 198 lines 3-11; p. 200, lines 5-9; p. 201, lines 7-21; p. 205, lines 5-12; p. 206, lines 14-21; p. 214, lines 11-13, p. 215, lines 16 to 25; p. 218, lines 19-25; pg. 219, line 1- p. 220, line 4; and p. 221, lines 3-14, all of which support that on June 26, 2019 plaintiff discovered the documents had been brought to the mayor's office for signature rather than to him first, which was not the proper protocol, plaintiff followed the proper protocol and directed that the documents be brought to him because he wanted to review

the documents for accuracy and completeness prior to taking them to Defendant Green which is both customary and expected by Defendant Green, that a delay arose only when the inter-office mail courier failed to deliver documents timely in that same day, that plaintiff participated in a phone call to determine how to ensure that the documents would be delivered with plenty of time for signatures, that plaintiff even offered to hand deliver the documents directly to Defendant Green's house the evening and she declined, and that plaintiff even participated in phone calls on June 27, 2019 to help ensure the proper delivery of the documents despite being on vacation and in a car traveling.

-- See also Ex. KK, Declaration of James Garavaglia.

78.     Plaintiff's assistant, who brought the Muni Court Project documents to the Comptroller's office, advised the Comptroller's executive assistant, Chana Morton, that Plaintiff instructed her to place them only into the hands of the Comptroller and no one else, specifically including the Comptroller's executive assistant.     (SJ Exhibit 1, Garavaglia Depo. p. 221, lines 15-25, p. 222, lines 1-25; p. 223, lines 1-25, p. 224, lines 1-7.; SJ Exhibit 12 (Garavaglia Depo. Exhibit 6), SJ Exhibit 11, Morton Depo. p. 117, lines 5-25, p. 118, lines 1-25; p. 119, lines 1-25; p. 120, lines 1-25).

Defendants' citation does not establish the absence of a genuine dispute for this alleged fact and is disputed by the testimony of plaintiff, who was the only actual witness with direct knowledge to testify on this alleged fact.  Defendants only cite to hearsay evidence which in not probative evidence in support of this alleged facts.  This alleged fact is also immaterial, as they documents were properly executed on time.  This alleged fact constitutes nothing more than evidence of Defendant Green's discriminatory intent in that she attempts to ascribe blame to plaintiff for the independent actions of another, and never discussed with plaintiff if he actually made this request.

The following evidence of record shows the existence of a genuine dispute:

-- *See* Ex. GG, Garavaglia Depo. P. 222, lines 9-16; p. 223 line 24 to p. 224, line 4.

79.     When the Comptroller's Office received the Muni Court Project documents, several items that were needed in conjunction with these documents were incomplete. (SJ Exhibit 1, Garavaglia Depo. p. 211, lines 6-18; SJ Exhibit 12 (Garavaglia Depo.

Exhibit 6); SJ Exhibit 11, Morton Depo. p. 117, lines 5-25, p. 118, lines 1-25; p. 119, lines 1-25; p. 120, lines 1-25; SJ Exhibit 12 [Garavaglia Depo Ex. 6], pages Garavaglia 110-114.)

Defendants' citation does not establish the absence of a genuine dispute for this alleged fact to the extent that it implies plaintiff was responsible for the incompleteness of the document package and, to the extent that it does not, this alleged fact is irrelevant and immaterial.

The following evidence of record shows the existence of a genuine dispute:

-- *See* Ex. GG, Garavaglia Depo. p. 213, line 2 to p. 214, line 2; p. 214, lines 11-13, p. 215, lines 16 to 25; p. 218, lines 19-25; pg. 219, line 1- p. 220, line 4; and p. 221, lines 3-14.

80.     Plaintiff acknowledged that if he had directed the Muni Court Project documents to be couriered to his office instead of directing them to be sent via inter-office mail prior to leaving for vacation, he would have had an opportunity to review and correct any deficiencies in them before leaving for vacation. (SJ Exhibit 1, Garavaglia Depo. p. 211, lines 6-25; p. 212, lines 1-21).

Defendants' citation does not establish the absence of a genuine dispute for this alleged fact and is immaterial. Plaintiff had the documents sent by interoffice mail, which is a courier system that should have brought the documents over to him that same day. The testimony cited by defendant included a hypothetical question regarding the unusual use of a private professional courier, which was not something done in the normal course of business, including documents of this kind. Defendant is attempting to assign blame to plaintiff for using a process that is designed to deliver documents in the same day. Defendants do not dispute this with any evidence. Rather, Defendant Green is seeking to blame plaintiff for using the normal process because someone else involved in the inter-0office mail process failed to perform his or her duties.

The following evidence of record shows the existence of a genuine dispute:

-- See Ex. GG, Garavaglia Depo. P. 222, lines 11-16
-- See KK, Declaration of James Garavaglia, ¶20.

81.     Plaintiff admitted that the process of getting these Muni Court Project documentation properly executed was chaotic and unnecessarily so.  (SJ Exhibit 1, Garavaglia Depo. p. 214, lines 14-25, p. 215, lines 1-6.)

Defendants' citations do not establish the absence of a genuine dispute for this alleged fact to the extent that it implies plaintiff is at all responsible for any of the deficiencies in the execution of these documents, and defendants fail to cite to any evidence supporting any alleged fact that plaintiff was deficient in his performance in any way.

<u>The following evidence of record shows the existence of a genuine dispute</u>:

-- See Ex. GG, Garavaglia Depo. P. 214, lines 11-13, p. 214, line 24; p. 215, lines 1-3.
-- See KK, Declaration of James Garavaglia, ¶19.


82.     Throughout the chaotic turn of events that unfolded on Thursday, June 27, 2019, neither Comptroller Green nor her executive assistant received any communications from Plaintiff.  (SJ Exhibit 1, Garavaglia Depo. p. 215, lines 7-25, p. 216, lines 1-16.; SJ Exhibit 12 [Garavaglia Depo. Exhibit 6]; SJ Exhibit 11, Morton Depo. p. 117, lines 5-25, p. 118, lines 1-25; p. 119, lines 1-25; p. 120, lines 1-25).

The evidence cited here does not establish the absence of a genuine dispute and is irrelevant and immaterial.  Plaintiff communicated with other individuals with the Comptroller's office in an attempt to assist with the execution of the documents.  Further, neither Defendant Green nor Chana Morton ever attempted to communicate with plaintiff on June 27, 2019 or sought his assistance or involvement in any way, and both Morton and Defendant Green were aware plaintiff was on vacation.  Importantly, Defendant Green never attempted to communicate with plaintiff either on June 26, 2019 or June 27, 2019 in any way, other than the conference call she and plaintiff both participated in, and Defendant Green never voiced any displeasure or issue with plaintiff's performance or the fact that plaintiff was going on vacation.  Defendant Green also declined his offer to deliver the documents the evening of June 26, 2019 to Defendant Green's home.

-- See Ex. GG, Garavaglia Depo. P. 215 lines 1-3, p. 215, lines 16-25.
-- See KK, Declaration of James Garavaglia, ¶19.

-- See also Ex. O, (pg. 13).

83.     Because of the chaos in getting the Muni Court Project documents delivered to

the Comptroller's Office for execution by the Comptroller, other staff members of the

Comptroller's Office were, in Plaintiff's absence, necessarily required to stop doing their

work to make sure that the Muni Court Project documents were processed in time for the

June 28 deadline.  (SJ Exhibit 1, Garavaglia Depo. p. 216, lines 17-25, p. 217, lines 1-15.;

SJ Exhibit 12 (Garavaglia Depo. Exhibit 6), SJ Exhibit 11, Morton Depo. p. 117, lines 5-

25, p. 118, lines 1-25; p. 119, lines 1-25; p. 120, lines 1-25).

The evidence cited here does not establish the absence of a genuine dispute and
is irrelevant and immaterial.  Any chaos or unnecessary actions that occurred
were solely the responsibility of the staff the Comptroller directed to be involved
on her end, particularly her administrative assistant, Chana Morton.   The
documents were properly circulated, reviewed, corrected, and executed a full day
before the deadline, and there was never any risk whatsoever of execution
because plaintiff used inter-office mail or went on vacation. This alleged fact is
nothing more than evidence of Defendant Green's attempt to create pretext to
justify terminating plaintiff for discriminatory reasons.   The cited testimony of
Morton also represents a blatant exaggeration of the facts, and there is
absolutely no supporting evidence that many employees "stopped working for
two days" just to make sure documents that were delayed in delivery arrived.
Nor is the deficiencies in those documents something plaintiff is responsible for,
so any time spent correcting those deficiencies is immaterial and irrelevant to
plaintiff and these alleged pretextual reasons for his termination.

-- See Ex. GG, Garavaglia Depo. P. 216 lines 17-25, p. 217, lines 1-5.
-- See KK, Declaration of James Garavaglia, ¶19.
-- See also Ex. SS, which shows that outside counsel for the developer was regularly
attempting to steer the process, which was outside of plaintiff's control and create more
work for Comptroller office staff.
-- See also Ex. O, (pgs. 13-1484.

84.     In documenting the chaotic nature of what transpired with respect to the

"handling" of the Muni Court Project documents prior to and upon arrival at the

Comptroller's Office, Comptroller Green's Executive Assistant, Chana Morton, noted

that the type of lack of communication exhibited by Plaintiff and the confusion caused

was happening more and more frequently, and that before Plaintiff took over as Deputy

Comptroller, the process had run quite smoothly and collaboratively within the various

departments for many years, a fact which Plaintiff does not dispute. (SJ Exhibit 1,

Garavaglia Depo. p. 217, lines 16-25, p. 218, lines 1-13.; SJ Exhibit 12 [Garavaglia Depo

Ex. 6], pages Garavaglia 110-114; SJ Exhibit 11, Morton Depo. p. 118, lines 1-25, p. 119,

lines 1-25, p. 120, lines 1-25, p. 121, lines 1-25, p. 122, lines 1-25, p. 123, lines 1-25, p.

124, lines 1-4; SJ Exhibit 15, [Plaintiff Deposition Ex. O], pages Garavaglia 110-113).


The evidence cited herein does not establish the absence of a genuine dispute
and is contradicted by other evidence in the record.  Chana Morton testified that
that she made handwritten notes on her notepad to document the events that
had transpired, and she used those notes to help prepare the memorandum she
sent to City Counselor Nancy Kistler.  However, these handwritten notes actually
contain none of the detailed information she wrote in the memorandum, which
was not prepared until fifteen (15) days later, and well after plaintiff had been
placed on forced leave.  Further, the testimony of Morton constitutes nothing
more than her opinion, as she was not involved plaintiff's performance of his
duties in any way.  Further, the alleged fact that plaintiff did and does not dispute
that document handling ran "smoothly and collaboratively" before he became
deputy comptroller is plainly false and wholly unsupported by plaintiff's testimony
cited by defendants.  Plaintiff clearly and unequivocally stated he did **not** know
that the process ran smoothly and collaboratively prior to his tenure and, when
he attempted to explain that it did not in fact run smoothly at all, counsel for
defendants repeatedly interrupted him.  Further plaintiff clearly disputed the
allegations of Chana Morton, called it a "cheap shot", and denied any of it was
true.

-- See Ex. GG, Garavaglia Depo. P. 216 lines 17-25, p. 217, lines 1-5.
-- See KK, Declaration of James Garavaglia, ¶¶9, 10..
-- See also Ex. O, (pgs. 13-14).

85.     Comptroller Green considered Plaintiff's actions (in not keeping her in the loop,

delaying to inform her about what was going on with this important Municipal Court

project, and misleading her about his request to place it on the E&A agenda) to be

insubordination and lacking in candor.  (SJ Exhibit 9, Green Depo. p. 221, lines 16-25, p.

222, lines 1-25, p. 223, lines 1-25, p. 224, lines 1-6.)

The evidence cited herein does not establish the absence of a genuine dispute, is contradicted by other evidence in the record, and only cites to the self-serving opinion testimony of Defendant Green. Further, Defendant Green's allegation that plaintiff mislead her about his intent to place the item on the E&A agenda (preliminary or final: defendants fail to make clear which they are even referring to in this alleged fact). Moreover, Defendant Green was already aware that plaintiff had asked Beverly Fitzsimmons to place the item on the preliminary agenda because she spoke to Fitzsimmons before plaintiff called her. Plaintiff's actions were all designed to protect and serve the interests of Defendant Green and the Comptroller's office once he discovered the developer still owed back taxes, the item potentially lacked a second vote because of a last minute change from the office of the President of the Board of Alderman regarding keeping the item on the agenda, or that the Mayor was working behind the scenes to get the item on the agenda (which was outside of the normal process) in order to embarrass the Comptroller at the meeting. Plaintiff was attempting to protect Defendant Green in this matter by gathering all of the facts for her so he could properly advise her without setting her up for any surprises. A crucial fact is that Beverly Fitzsimmons had already sent the request to the pre E&A committee, something plaintiff did not know about and something he did not expect her to do. Most importantly, Defendant Green told plaintiff not to put the item on the agenda and to send everything he had to her, which he did. This was all the result of the developer's attorney going to the mayor and asking that the item be placed on the agenda by the mayor because of the Comptroller's unwillingness to provide requested information to that attorney or to instruct Beverly Fitzsimmons herself to place the item on the agenda. Defendant Green was aware of all of this. There is no evidence that plaintiff engaged in any insubordination, and everything plaintiff told Defendant Green was factually true. It was Defendant Green that withheld the information from plaintiff that she was interfering with the item getting on the E&A agenda timely because of her refusal to send documents to the attorney for the developer at the mayor's request, and plaintiff got approval from Defendant Green to place the item on the pre E&A agenda, despite Green's knowledge that the attorney for the developer still needed documents for the mayor ahead of the E&A meeting.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. GG, Garavaglia deposition, p. 165, line 25 to p. 166, line 6; p. 166, lines 1-6 13-17, and 21-25; p. 167 line 1 to p. 172, line 12, p. 181, line 24 to p. 184, line 8; p. 182, line 20 to p. 184, line 8; and p. 187, lines 17-25; and p. 194, lines 1-7.

-- See also Plaintiff's Exhibit O (Garavaglia 105-106), Plaintiff's Exhibit CC (This email from Tom Ray, the attorney for the City to Roger Denny, the attorney for the developer, shows that it was the actions of Defendant Green and Beverly Fitzsimmons that lead to the late confusion which caused plaintiff to have to scramble to determine what went wrong and lead to Roger Denny going directly to the mayor's office with Beverly

Fitzsimons's email requesting that the item be added to the E&A agenda. This email references a rift between Defendant Green and the mayor as the reasons for delay, causing the developer and, by extension, the municipal courts project, to be "collaterally damaged". The email also indicates that Beverly Fitzsimmons won't add the item to the agenda because the Comptroller hasn't approved it and that Defendant Green balked when asked to provide needed information to the mayor because of the ongoing rift between Defendant Green and Mayor Lyda Krewson. As the E&A meeting approached, Roger Denny went straight to the mayor's office to try and get the item added. Plaintiff was unaware of all of this and was actively trying to find out what was happening and was preparing to inform Defendant Green once he had that information. However, Defendant Green knew all along that she had been withholding information from the attorney for the Developer because it was the mayor that had requested it, and this caused the delay in why the item was added to the agenda.)

87. Comptroller Green's executive assistant also testified to other incidents that transpired over Plaintiff's time as Deputy Comptroller, Finance and Development, which she regularly pointed out to him relating to Plaintiff submitting documents that were missing signatures and other problems with document handling including a situation where Plaintiff's office misdirected certain Airport closing documents to the Airport rather than to the Comptroller's office. (SJ Exhibit 11, Morton Depo. p. 44, lines 1-25, p. 45, lines 1-25, p. 46, lines 1-25, p. 47, lines 1-25, p. 48, lines 1-11; p. 118, lines 1-25, p. 119, lines 1-25, p. 120, lines 1-25, p. 121, lines 1-25, p. 122, lines 1-25, p. 123, lines 1-25, p. 124, lines 1-4.).

The evidence cited herein does not establish the absence of a genuine dispute and is irrelevant and immaterial. Chana Morton never pointed out any documents to plaintiff that were missing signatures or informed plaintiff that there were ever problems regarding the routing of any documents, and defendants provide no documentary evidence that Morton ever apprised or discussed any of this, despite Morton's testimony that she takes notes. Plaintiff also has no knowledge if Morton ever discussed any of these issues with his administrative assistant, and in the event that occurred, plaintiff was never made aware of this by either Morton or his administrative assistant. Further, the allegation by Morton that plaintiff's office misdirected airport closing documents is factually false.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

-- See Ex. GG, Garavaglia Depo. p. 217 line 16 to p. 219, line 6; p. 343 line 24 to p. 345, line 1.
-- See Ex. II, Chana Morton deposition, p. 97, line 20 to p. 98, line 16.
-- See KK, Declaration of James Garavaglia, ¶9, 10.

88.    In response to Plaintiff's mishandling of the Muni Court Project documents during the week of June 24, 2019, Comptroller Green decided initially to place Plaintiff on forced leave. (SJ Exhibit 9, Green Depo. p. 153, lines 20-25, p. 154, lines 1-25, p. 155, lines 1-25, p. 156, lines 1-18.)

<u>The evidence cited herein does not establish the absence of a genuine dispute and is contradicted by other evidence in the record.</u>  Plaintiff was not placed on forced leave because of any alleged "mishandling" of the municipal court documents. Defendant Green fabricated that testimony. On Saturday June 29, 2019, Judy Armstrong had a phone call with Director of Personnel Richard Frank to discuss placing plaintiff on forced leave. Armstrong told Richard Frank that Defendant Green was alleging that they were investigating "serious fiscal improprieties" that needed to be brought to the attention of the state auditors and that they believed would result in a pre-termination review. **Defendant Green claimed that the serious fiscal improprieties were only later uncovered after plaintiff had already been placed on forced leave**.  Richard Frank was never informed of any allegations related to the municipal court issue or the mishandling of documents.  Defendant Green testified that she only became aware of these issues after plaintiff was already placed on forced leave, and she also claimed in her memorandum dated August 26, 2019 that the original investigation began **after** plaintiff was placed on forced leave for insubordination and subterfuge by misrepresenting facts and mishandling documents (allegations ascribed to the municipal court issue) and only then did the investigation "uncover" that plaintiff had allegedly signed contracts without authorization and that there were past due an unpaid city wide telecommunication bills (both of which Defendant Green already knew about long before plaintiff was placed on forced leave). This indisputably evidences that Defendant Green planned to engage in a pretextual sham to place plaintiff on forced leave so she could then "uncover" these alleged fiscal improprieties she already knew about and had told the director and deputy director about before plaintiff was placed on forced leave and any "investigation" could possibly uncover this for the first time.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

-- See Ex. FF, Richard Frank deposition, p. 38 line 23 to p. 39, line 6; p. 111, lines 6-23; p. 145, lines 12-25;  p. 146, line 16 to p. 147, line 3; p. 171, lines 14-22; p. 183, lines 3-18; p. 190, line 10 to p. 192, line 11.
--See Ex. JJ, Linda Thomas deposition, p. 25, line 24 to p. 26, line 23; p. 32, line 22 to p. 34, line 23.
--See Ex. HH, Defendant Darlene Green deposition, p. 168, line 18 to 169, line 10; p. 180, lines 8-12.

91.     When Comptroller Green placed Plaintiff on forced leave, she was unsure of what, if any, disciplinary action she would recommend, and she conferred with counsel, the City's Director of Personnel, Richard Frank, and his Deputy Linda Thomas about what disciplinary procedures were available.  (SJ Exhibit 9, Green Depo. p. 156, lines 19-25, p. 157, lines 1-10, p. 168, lines 24-25, p. 169, lines 1-10, p. 173, lines 3-13.)

The evidence cited herein does not establish the absence of a genuine dispute and is contradicted by other evidence in the record.  Comptroller Green instructed Judy Armstrong to speak with Richard Frank on Saturday June 29, 2019, and during that phone call, Judy Armstrong represented on behalf of the Comptroller that the forced leave request was for the purpose of investigating "serious fiscal improprieties" that needed to be brought to the attention of the state auditors and that warrant a pre-termination review.  There is a clear dispute in that Defendant Green was already planning for plaintiff's termination and the forced leave was an effort to conduct an "investigation" to purportedly uncover other potentially serious allegations of policy violations.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

-- See Ex. FF, Richard Frank deposition p. 38 line 23 to p. 39, line 6; p. 111, lines 6-23; p. 145, lines 12-25;   p. 146, line 16 to p. 147, line 3; p. 171, lines 14-22; p. 183, lines 3-18; p. 190, line 10 to p. 192, line 11.

92.     In placing Plaintiff on forced leave, Comptroller Green intended to send a message to Plaintiff regarding how serious the mishandling of the Muni Court Project documents was, as it related to a very important project that had been in the works for

many, many years.  (SJ Exhibit 9, Green Depo. p. 156, lines 19-25, p. 157, lines 1-25, p.

158, lines 1-6.).

The evidence cited herein does not establish the absence of a genuine dispute, lacks credibility, is contradicted by other evidence in the record. Defendant Green never spoke to plaintiff about the processing of the municipal court project documents and was not even present when plaintiff was handed the original forced leave notice.  The original forced leave notice also never mentioned the basis for the forced leave or the handling of documents related to the forced leave.   Nothing in the record, other than Defendant Green's self-serving testimony, support this alleged fact.

-- See Ex. KK, Declaration of James Garavaglia, ¶10.


93.      When Plaintiff's initial forced leave was instituted, Comptroller Green had not

made any decision regarding what, if any, possible discipline she would recommend, and

she had no intention, at that time, of recommending that Plaintiff's employment be

terminated.  (SJ Exhibit 9, Green Depo. p. 158, lines 7-25, p. 159, lines 1-25, p. 160, lines

1-7.)

The evidence cited herein does not establish the absence of a genuine dispute and is contradicted by other evidence in the record.   Comptroller Green instructed Judy Armstrong to speak with Richard Frank on Saturday June 29, 2019, and during that phone call, Judy Armstrong represented on behalf of the Comptroller that the forced leave request was for the purpose of investigating "serious fiscal improprieties" that needed to be brought to the attention of the state auditors and that warrant a pre-termination review.  There is a clear dispute in that Defendant Green was already planning for plaintiff's termination and the forced leave was an effort to conduct an "investigation" to purportedly uncover other potentially serious allegations of policy violations.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. FF, Richard Frank deposition p. 38 line 23 to p. 39, line 6; p. 111, lines 6-23; p. 145, lines 12-25;   p. 146, line 16 to p. 147, line 3; p. 171, lines 14-22; p. 183, lines 3-18; p. 190, line 10 to p. 192, line 11.

94.     Because Plaintiff was a high level and long standing City employee, Comptroller

Green wanted to make sure that any decision or possible recommendation for discipline

that she made regarding Plaintiff's mishandling of the Muni Court Project documents

would be fair.  (SJ Exhibit 9, Green Depo. p. 156, lines 19-25, p. 157, lines 1-10, p. 168,

lines 24-25, p. 169, lines 1-10, p. 173, lines 3-13.)

The evidence cited herein does not establish the absence of a genuine dispute, is supported only by the self-serving testimony of Defendant Green, and is contradicted by other evidence in the record.  Comptroller Green instructed Judy Armstrong to speak with Richard Frank on Saturday June 29, 2019, and during that phone call, Judy Armstrong represented on behalf of the Comptroller that the forced leave request was for the purpose of investigating "serious fiscal improprieties" that needed to be brought to the attention of the state auditors and that warrant a pre-termination review.  There is a clear dispute in that Defendant Green was already planning for plaintiff's termination and the forced leave was an effort to conduct an "investigation" to purportedly uncover other potentially serious allegations of policy violations.  Further, Defendant Green never made an effort to speak with plaintiff regarding any of these issues to understand anything from his perspective, to get clarification from plaintiff as to what had actually occurred, or even inform plaintiff that she had concerns about his performance, honesty, loyalty, or anything else related to his employment as Deputy Comptroller for Finance and Development.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. FF, Richard Frank deposition p. 38 line 23 to p. 39, line 6; p. 111, lines 6-23; p. 145, lines 12-25;   p. 146, line 16 to p. 147, line 3; p. 171, lines 14-22; p. 183, lines 3-18; p. 190, line 10 to p. 192, line 11.
-- See Ex. KK, Declaration of James Garavaglia, ¶19.


102.    However, in the context of assuming and performing Plaintiff's duties in this

regard, Ms. Armstrong discovered various issues relating to Plaintiff's job performance

including Plaintiff's improper execution of contracts with AT&T and Waste Management

purportedly on behalf of the City which she documented in a memorandum dated August

26, 2019.  (SJ Exhibit 1, Garavaglia Depo. p. 229, lines 7-25, p. 230, lines 1-9; SJ Exhibit

14 [Garavaglia Depo. Ex. 4], pages Garavaglia 42-47, 57-70, 89-91; SJ Exhibit 13, Armstrong Depo., p. 110, lines 21-25, p. 116, lines 5-25, p. 117, lines 1-3, p. 118, lines 1-10, p. 119, lines 14-19, p. 134, lines 9-25, p. 135, lines 1-11, p. 144, lines 15-25, p. 145, lines 1-19, p. 146, lines 1-25, p. 147, lines 1-25, p. 148, lines 1-25, p. 149, lines 1-5, p. 173, lines 12-25, p. 174, lines 1-25, p. 175, lines 1-25, p. 176, lines 1-24, p. 182, lines 17-25, p. 183, lines 1-25, p. 184, lines 1-25, p. 185, lines 1-25, p. 186, lines 1-25, p. 187, lines 1-25, p. 188, lines 1-25, p. 189, lines 1-15; SJ Exhibit 15 [Armstrong Depo. Ex. O], pp. 43-44; SJ Exhibit 16 [Armstrong Depo. Ex. Y], pp. STL1973-1981; SJ Exhibit 17 [Armstrong ("Green") Depo Exhibit 1], pp. STL2155-2167.)

The evidence cited herein does not establish the absence of a genuine dispute and is contradicted by other evidence in the record. Defendants attempt to present a legal conclusion as an alleged fact, i.e. that plaintiff signed "contracts" on behalf of the city, and base this on testimonial evidence from Judy Armstrong and plaintiff. Plaintiff denied that he signed contracts and stated he signed documents only on the advice of counsel in the City Counselor's office.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

-- See Ex. GG, Garavaglia Depo. p. 230 line 10 to p. 232 line 18; p. 234 line 15 to p. 236, line 17; p. 242, line 16 to p. 244, line 7; and p. 245 lines 11-18.

103.    Based upon an agreement Plaintiff signed on behalf of the City on January 30, 2009 with AT&T, AT&T took the position that this agreement was binding on the City, and that it was the "Master Agreement" for all subsequent contracts between AT&T and the City. (SJ Exhibit 1, Garavaglia Depo. p. 229, lines 7-25, p. 230, lines 1-9, p. 232, lines 19-25, p. 233, lines 1-19, p. 236, line 25, p. 237, lines 1-18; SJ Exhibit 14 [Garavaglia Depo. Ex. 4], pp. Garavaglia 42-47; SJ Exhibit 13, Armstrong Depo, p. 119, lines 14-19, p. 183, lines 3-25, p. 184, lines 1-25, p. 185, lines 1-25, p. 186, lines 1-25.)

The evidence cited herein does not establish the absence of a genuine dispute, is irrelevant and immaterial, is supported by hearsay, is misleading in its intent to show that plaintiff improperly signed contracts, and is contradicted by other evidence in the record. In support of this alleged fact, Defendants cite only to testimony of plaintiff and Judy Armstrong, and provide no testimony from an authorized representative of AT&T, including Mary Harp who is referenced in the testimony of Judy Armstrong. Further, the document presented by Defendants [Garavaglia Depo Ex. 4) is not the complete document. Plaintiff has repeatedly demanded the full and complete document; however, defendants have never disclosed a full copy. In addition, plaintiff only signed this document at the direction of his boss, the Deputy Comptroller for Finance and Development, Ivy Pinkston, and after being so advised by Jim Hartung, an attorney with the City Counselor's office that this was not a contract but was simply a catalog of telecommunication products.

-- See Ex. GG, Garavaglia Depo. p. 230 line 10 to p. 232 line 18; p. 234 line 15 to p. 236.
-- See also Plaintiff's Ex. Q (Garavaglia 44-48, which is not the complete documents but is all that Defendants ever produced).

105.    Another issue documented by Judy Armstrong was her discovery of a contract signed by Plaintiff on May 22, 2017 with Waste Management relating to trash removal at the Gateway Transportation Center, which purported to extend a pre-existing agreement between the City and Waste Management for an additional 36 months. (SJ Exhibit 1, Garavaglia Depo. p. 242, lines 16-25, p. 243, lines 1-3; SJ Exhibit 14 [Garavaglia Depo. Ex. 4], pages Garavaglia 89-91; SJ Exhibit 13, Armstrong Depo. p. 187, lines 1-25; p. 188, lines 1-25; p. 189, lines 1-15; SJ Exhibit 16 [Armstrong Depo. Ex. Y], pp. STL1973-1981.)

The evidence cited herein does not establish the absence of a genuine dispute and is contradicted by other evidence in the record. Defendants attempt to present a legal conclusion as an alleged fact, i.e. that plaintiff signed this alleged "contract" on behalf of the city, and base this on testimonial evidence from Judy Armstrong and plaintiff. Plaintiff denied that he signed this contract and stated he signed documents only on the advice of counsel in the City Counselor's office.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. GG, Garavaglia Depo. p. 243, lines 7-11; p. 243, lines 16-20; p. 244, lines 16-

23; and p. 245, lines 1-23.

106.    Plaintiff acknowledged that he would not have been authorized to sign the Waste

Management contract if in fact it were his signature:

Q       And you would agree that you didn't have authority to sign this particular

contract in May of 2017; correct?

A       I am not authorized to sign contracts.

Q       Okay, so if you did sign it, you would not have been authorized to sign it; correct?

A       I think that's right, yah."

(SJ Exhibit 1, Garavaglia Depo. p. 246, lines 5-11.)

The evidence cited herein does not establish the absence of a genuine dispute.
Defendants attempt to present a legal conclusion as an alleged fact, i.e. that
plaintiff signed this alleged "contract" on behalf of the city, and base this on
testimonial evidence from plaintiff, who cannot testify as to whether or not the
document in question is or is not legally binding on the city or constitutes a
"contract".     Plaintiff even simply agreed he "thinks" that is right, but as his
testimony shows, he doesn't actually know that answer.

108.    In response to a subpoena duces tecum, Waste Management produced documents

containing an email exchange between Plaintiff and representatives of Waste

Management whereby Plaintiff acknowledged that he had signed and executed the Waste

Management contract:  (SJ Exhibit 18, pp. 18-140 through 18-161.)

The evidence cited herein does not establish the absence of a genuine dispute.
Defendants attempt to present a legal conclusion as an alleged fact, i.e. that
plaintiff signed this alleged "contract" on behalf of the city.  This email exchange
does not evidence that the document referenced in the email is the same
document defendants claim plaintiff signed that they argue is a contract, and it
does not evidence that this is, in fact, a legally binding contract.

110.    In addition to the AT&T Master Agreement and the Waste Management contract,

Judy Armstrong also discovered that Plaintiff had signed an addendum to the AT&T

45

contract without authorization and three additional AT&T Statements of Work dated October 23, 2018 purporting to obligate the City to pay thousands of dollars for maintenance services. (SJ Exhibit 1, Garavaglia Depo. p. 260, lines 22-25, p. 261, lines 3-9; SJ Exhibit 13, Armstrong Depo., p. 193, lines 9-25, p. 194, lines 1-25, p. 195, lines 1-25, p. 196, lines 1-25, p. 197, lines 1-25, p. 198, lines 1-25, p. 199, lines 1-25, p. 200, lines 1-4; SJ Exhibit 17, [Armstrong ("Green") Depo Exhibit 1], pp. STL2155-2167.)

The evidence cited herein does not establish the absence of a genuine dispute. Defendants attempt to present a legal conclusion as an alleged fact, i.e. that plaintiff signed these alleged "contracts" on behalf of the city. However, defendants do correctly state that the documents were "statements of work" which are, by definition, statements of work to be done that the parties have already contractually agreed to. These documents acknowledge and accept, on behalf of the telecommunications section of the Comptroller's office, that telecommunications was acknowledging that this statement of work and the services included within were to be performed under an already existing contract. In addition, at the time plaintiff signed these documents, plaintiff had already consulted with an attorney in the City Counselor's office and had been avised these documents were not contracts.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. GG, Garavaglia Depo. p. 261, line 10 to 263, line 19; p. 265, line 16 to p. 266, line 12; p. 268, lines 6-10; p. 268, line 21 to 269, line 6.

112.     Mr. Ikpeama had repeatedly asked Plaintiff to provide information needed to close out his internal audit but, according to Ishmael Ikpeama's internal audit documentation, Plaintiff failed to cooperate. (SJ Exhibit 9, Green Depo. p. 245, lines 7-25; p. 246, lines 1-25; p. 247, lines 1-25; p. 248, lines 1-25; p. 249, lines 1-25; p. 250, lines 1-25; p. 251, lines 1-15.).

The evidence cited herein does not establish the absence of a genuine dispute, mischaracterizes the evidence, and is irrelevant and immaterial. Defendants only cite to hearsay evidence in support of this alleged fact. Further, this unsupported

alleged fact is also irrelevant in that plaintiff did not fail to cooperate with his subordinate, Dr. Ikpeama, in any way.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

-- See Ex. GG, Garavaglia Depo. p. 302, line 25 to 303, line 8; p. 303, line 17 to p. 305, line 8; p. 312, 7-18; p. 316, line 13 to p. 324, line 17.

113.     Comptroller Green considered Plaintiff's failure to cooperate with Mr. Ikpeama's audit in this regard to be unprofessional, given the important function of internal audits in the Comptroller's Office.  (SJ Exhibit 9, Green Depo. p. 245, lines 7-25, p. 246, lines 1-25, p. 247, lines 1-25, p. 248, lines 1-25, p. 249, lines 1-25, p. 250, lines 1-25, p. 251, lines 1-15.)

The evidence cited herein does not establish the absence of a genuine dispute, mischaracterizes the evidence, and is irrelevant and immaterial, in that it assumes facts not shown by the evidence, as there was no failure to cooperate with Dr. Ikpeama by plaintiff. Plaintiff was not the individual responsible for providing the needed information for the audit, that was the manager in charge of the Gateway Transportation Center.  Further, that manager was involved in obtaining needed data for Dr. Ikpeama that was not made available in time to meet Dr. Ikpeama's self-created schedule for the audit.  Crucially, plaintiff discovered numerous deficiencies with Dr. Ikpeama's audit findings, which prevented the City from taking improper action.  Further, Defendant Green never vocalized or addressed this issue in any manner with plaintiff; rather, she only determined it to be "unprofessional" as a part of her investigation she initiated after placing plaintiff on forced leave in order to add more pretextual reasons for her plan to terminate plaintiff.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

-- See Ex. GG, Garavaglia Depo. P. 319, line 9 to p. 322, line 17; p. 324, lines 11-17.
-- See KK, Declaration of James Garavaglia, ¶25.

116.     Comptroller Green extended the period of time for the forced leave pending further investigation and was awaiting a response from state auditors whom she had

advised of information that had come to light, after initially placing Plaintiff on forced leave, regarding Plaintiff's apparent unauthorized execution of documents on behalf of the City. (SJ Exhibit 9, Green Depo. p. 173, lines 14-25, p. 174, lines 1-25, p. 175, lines 1-25, p. 176, lines 1-5, p. 192, lines 7-25, p. 193, lines 1-6.)

The evidence cited herein does not establish the absence of a genuine dispute, and is irrelevant and immaterial. Defendant Green requested that the State Auditors investigate plaintiff, but no evidence of any fiscal improprieties was ever found, nor were any instances of unauthorized execution of documents.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. GG, Garavaglia Depo. P. 319, line 9 to p. 322, line 17; p. 324, lines 11-17.
--See also Ex. Y (STL002172-002185).


118.    Comptroller Green made the decision to move forward with a pre-termination hearing by way of the notice dated August 28, 2019 to afford Plaintiff an opportunity to explain his actions about what she believed to constitute serious misconduct. (SJ Exhibit 9, Green Depo. p. 194; lines 22-25; p. 195, lines 1 24.)

The evidence cited herein does not establish the absence of a genuine dispute. Defendant Green only scheduled a pre-termination hearing on August 28, 2019 after she withdrew the second forced leave (also on August 28, 2019) because a Civil Service Commission Hearing had been scheduled for August 29, 2019. The City attempted to have the hearing date postponed via a motion for continuance with the Civil Service Commission, but that motion was denied on August 22, 2019. Subsequently, Defendant Green waited until the day before the hearing to again withdraw the forced leave, which resulted in the appeal of the forced leave to be dismissed and the CSC hearing cancelled. Further, Defendant Green had no intention of giving plaintiff an opportunity to explain his actions, in fact, she never even spoke to him after she made the decision to place him on forced leave or at any time during the investigation of plaintiff. Defendant Green was required to offer a pre-termination hearing under Administrative Regulation 117 and had no choice.

--See Plaintiff's Depo Ex. O (pgs 38-39, Depo pgs. 38-39; Depo pg 41; Depo pgs. 51-54).

120.     Comptroller Green testified that she placed a high level, older female African

American attorney employee on forced leave based on misconduct related issues in April

2016.  SJ Exhibit 9, Green Depo. p. 75, lines 19-25, p. 76, lines 1-7, p. 78, lines 15-25, p.

79, lines 1-5, p. 91, lines 2-17.)

The evidence cited herein is both irrelevant and immaterial.  The alleged fact that
Defendant Green once disciplined an African-American female for misconduct is
not evidence she did not discriminate against plaintiff in this case.

121.     Director Frank testified that the fact that the Plaintiff improperly signed multiple

contracts and contract extensions without legal authorization to do so would be grounds

for discipline because it would constitute a serious charge under the Code of Ethics and

would be an exception to progressive discipline under Administrative Regulation 117. (SJ

Exhibit 5, Frank Depo. p. 56, lines 24-25, p. 57, lines 1-25, p. 58, lines 1-17, 24-25, p. 59,

lines 1-8.)

The evidence cited herein is both irrelevant and immaterial.  Director Frank also
testified that neither he nor Linda Thomas had any actual knowledge that plaintiff
signed multiple contracts without authorization and he did not review any
evidence before he approved Defendant Green's request for forced leave.
Director Frank based his decision entirely on Judy Armstrong's representation
that plaintiff had engaged in serious fiscal improprieties.

The following evidence of record shows the existence of a genuine dispute for
this alleged fact:

--See Ex. FF, Deposition of Richard Frank, p. 145 line 15 to p. 147,, line 3; p. 182 line 11
to p. 183, line 18; p. 190, line 12 to p. 192, line 9; p. 223, line 6 to p. 224, line 16; p. 227,
lines 17-22; p. 232 line 19 to p. 233, line 16.

124.    Director Frank denied that he approved the forced leave request made by

Comptroller Green without any supportable basis. (SJ Exhibit 5, Frank Depo. p. 62, lines

6-25, p. 63, lines 1-25, p. 64, lines 1-12.)

The evidence cited herein is both irrelevant and immaterial and the testimony cited constitutes a legal conclusion.  Director Frank also testified that neither he nor Linda Thomas had any actual knowledge that plaintiff signed multiple contracts without authorization and he did not review any evidence before he approved Defendant Green's request for forced leave.  Director Frank based his decision entirely on Judy Armstrong's representation that plaintiff had engaged in serious fiscal improprieties.  Thus, he has no actual knowledge that there was or was not an actual supportable basis for placing plaintiff on forced leave because he was relying on the veracity of claims by Judy Armstrong and Defendant Green.  Further, any determination that there was in fact a supportable basis for placing plaintiff on forced leave is a legal conclusion, is not probative evidence, and is nothing more than Frank's opinion.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

--See Ex. FF, deposition of Richard Frank, p. 145 line 15 to p. 147,, line 3; p. 182 line 11 to p. 183, line 18; p. 190, line 12 to p. 192, line 9; p. 223, line 6 to p. 224, line 16; p. 227, lines 17-22; p. 232 line 19 to p. 233, line 16.

128.    Director Frank testified that there is a process by which a person can pursue a

grievance if he or she believes they have been discriminated against based upon race, age,

or sex, and Plaintiff never filed any such grievance. (SJ Exhibit 5, Frank Depo. p. 86,

lines 21-25, p. 87, lines 1-23.)

The evidence cited herein does not establish the absence of a genuine dispute, is irrelevant and immaterial, and this alleged fact is misleading in that it falsely suggests plaintiff should have filed a grievance.  Plaintiff was not fully aware of the discrimination of Defendant Green or that she would actually take adverse employment actions against him in order to replace him with a younger African-American female until *after* plaintiff was placed on forced leave.  Plaintiff then immediately filed an appeal with the Civil Service Commission, seeking to challenge the alleged basis for why he was placed on forced leave, and Defendants took several steps involving repeatedly withdrawing and reinstating the forced leave, extending the forced leave, and ultimately issuing a pre-termination letter, all to avoid this evidentiary hearing.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

--See Plaintiff's Depo Ex. O (. 7-11; 22-24; 29-30; Dep32-34; 38-39, 41; 47-54).

-- See Ex. KK, Declaration of James Garavaglia, ¶27.

133.    Comptroller Green testified unequivocally that neither Plaintiff's age, race nor sex had anything to do with the steps she took related to the first and second forced leaves or the pre-termination.  (SJ Exhibit 9, Green Depo. p. 287, lines 5-11.)

The evidence cited herein does not establish the absence of a genuine dispute is constitutes nothing more than a self-serving statement by Defendant Green. There is a genuine factual dispute regarding the ultimate question in this case, and plaintiff's claim that the steps taken by Defendant Green in placing plaintiff or forced leave several times, extending the forced leave, and issuing a pre-termination letter are all directly the result of her preference to replace plaintiff with a younger African-American female is all supported by evidence of this discrimination.

--See additional material facts as to which plaintiff contends a genuine issue exists, contained herein below, for citations to evidence regarding Defendant Green's promotion of plaintiff to be a "placeholder" in the deputy comptroller for finance and development position until her preferred permanent replacement, a younger African-American female, could replace plaintiff, as well as Defendants' unlawful termination of plaintiff after plaintiff chose not to retire when Comptroller Green wanted him to.

134.    In determining what candidates to hire for a position, Comptroller Green considers whether or not they are qualified for the job and does not consider their gender, age, or race in making that determination.  (SJ Exhibit 9, Green Depo. p. 259, lines 22-25, p. 260, lines 1-25, p. 261, lines 1-3., p. 261, lines 16-26.)

The evidence cited herein does not establish the absence of a genuine dispute is constitutes nothing more than a self-serving statement by Defendant Green. There is a genuine factual dispute regarding the ultimate question in this case.

--See additional material facts as to which plaintiff contends a genuine issue exists, contained herein below, for citations to evidence regarding Defendant Green's promotion of plaintiff to be a "placeholder" in the deputy comptroller for finance and development

position until her preferred permanent replacement, a younger African-American female, could replace plaintiff, as well as Defendants' unlawful termination of plaintiff after plaintiff chose not to retire when Comptroller Green wanted him to.

135.    In August of 2016, Plaintiff had a discussion with outside counsel Tom Ray regarding his authority to sign certain deeds of trust on behalf of the City, and was advised by Tom Ray that he did not have authority to sign such documents absent a written delegation of authority from Comptroller Green.  (SJ Exhibit 1, Garavaglia Depo. p. 275, lines 18-25, p. 276, lines 1-25, p. 277, lines 1-21; SJ Exhibit 3 [Garavaglia Depo. Ex. 11], p. GRN000460.)

The evidence cited herein does not establish the absence of a genuine dispute for this alleged fact.  This item refers to a conversation Plaintiff had with outside counsel, Tom Ray. It had been brought to the Plaintiff's attention by Marcia Veale, the real estate clerk, that there were hundreds of documents a year in the form of deeds of trust, deeds of release, and subordinations dealing with CDA loans made to individual home owners which had to follow the same laborious path that any other document the Comptroller was required to sign. Ms. Veale suggested that I look into if there was a way, since she was located in the same building as I was, that I would be allowed to sign deeds of trust, deeds of release, and subordinations only as they relate to CDA block grant loans to individual home owners. In that way she could more expeditiously move documents and better help citizens who were trying to sell or refinance their properties. Plaintiff then conveyed the substance of that inquiry to Tom Ray.  Mr. Ray explained to me the method by which he would have the authority to sign those documents, and after further consideration, the idea was abandoned by the Plaintiff.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

-- See Ex. GG, Garavaglia Depo. P. 319, line 9 to p. 322, line 17; p. 324, lines 11-17.

137.    However, for a subsequent St. Louis Composting leasing contract, Plaintiff attempted to bypass the established procedure for executing and approving contracts that would bind the City, including obtaining approval by the City Counselor's Office as to

form, by scratching Comptroller Green's name off a contract document in July 21, 2017, and purporting to sign on behalf of the City. (Garavaglia depo. p. 282, lines 12-25, p. 283, lines 1-25, p. 284, lines 1-25, p. 285, lines 1-25, p. 286, lines 1-25, p. 287, lines 1-2; SJ Exhibit 24 [Garavaglia Depo. Ex. 14], pp. GRN 000462-464.)

The evidence cited herein does not establish the absence of a genuine dispute for this alleged fact and constitutes a legal conclusion. At no time did plaintiff bypass the established procedure for executing and approving contracts for a composting leasing contact. Defendants erroneously allege that the document in question is in fact a contract, and that assertion constitutes a legal question, not a factual one and thus the testimony of plaintiff does not establish that this document is or is not a contact as a matter of law. The cited document is a lease extension notice for an option to extend an already existing contract. Upon receiving this document, plaintiff sought advice from the City Counselor's office and was advised that this document did not require any action to leave the terms and conditions of the lease in place and to extend it. However, St. Louis Composting, for their records and for their auditors' scrutiny asked if they could have a City signed acceptance of receipt of the lease extension. The City Counselor's office advised plaintiff that he was authorized to sign such an extension because it was not a new lease, but just an acknowledgement that the City was aware that St. Louis Composting was exercising their option to extend the lease.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. GG, Garavaglia Depo. P. 282, lineS 18-25; p. 286, lines 23-25, p. 289, lines 12-16, p. 290 line 9 to 291, line 1.
--See also Plaintiff's Exhibit S.


138.    In conjunction with the St. Louis Composting contract, Plaintiff had advised St. Louis Composting representatives that the contract extension did not require approval by the City Counselor or the signature of the Registrar. (SJ Exhibit 1, Garavaglia Depo. p. 293, lines 2-25, p. 294, lines 1-6; SJ Exhibit 24 [Garavaglia Depo. Ex. 14], p. GRN 000463.)

The evidence cited herein does not establish the absence of a genuine dispute for this alleged fact and constitutes a legal conclusion. At no time did plaintiff

bypass the established procedure for executing and approving contracts for a composting leasing contact. Defendants erroneously allege that the document in question is in fact a contract, and that assertion constitutes a legal question, not a factual one and thus the testimony of plaintiff does not establish that this document is or is not a contact as a matter of law. The cited document is a lease extension notice for an option to extend an already existing contract. Upon receiving this document, plaintiff sought advice from the City Counselor's office and was advised that this document did not require any action to leave the terms and conditions of the lease in place and to extend it. However, St. Louis Composting, for their records and for their auditors' scrutiny asked if they could have a City signed acceptance of receipt of the lease extension. The City Counselor's office advised plaintiff that he was authorized to sign such an extension because it was not a new lease, but just an acknowledgement that the City was aware that St. Louis Composting was exercising their option to extend the lease. Further, the cited testimony from plaintiff does not establish the absence of a guanine dispute regarding the alleged fact that plaintiff represented this to Kathy Sullivan, the executive assistant with St. Louis composting, as he did not recall doing so or ever seeing this letter. In addition, the cited document (GRN000463) is hearsay evidence without a recognized exception.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

-- See Ex. GG, Garavaglia Depo. p. 293, line 2 to p. 294, line 9.
--See also Plaintiff's Exhibit S

139. When Comptroller Green became aware that Plaintiff had signed contracts purportedly on behalf of the City without authorization, the Comptroller told him not to do it again. (SJ Exhibit 1, Garavaglia Depo. p. 54, lines 24-25, p. 55, lines 1-25, p. 56, lines 1-18, p. 287, lines 1-25; SJ Exhibit 24 [Garavaglia Depo. Ex. 14], pp. GRN 000462-464.)

The evidence cited herein does not establish the absence of a genuine dispute for this alleged fact and constitutes a legal conclusion. At no time did plaintiff bypass the established procedure for executing and approving contracts for a composting leasing contact. Defendants erroneously allege that the document in question is in fact a contract, and that assertion constitutes a legal question, not a factual one and thus the testimony of plaintiff does not establish that this document is or is not a contact as a matter of law. The cited document is a lease extension notice for an option to extend an already existing contract. Upon receiving this document, plaintiff sought advice from the City Counselor's office

and was advised that this document did not require any action to leave the terms and conditions of the lease in place and to extend it. However, St. Louis Composting, for their records and for their auditors' scrutiny asked if they could have a City signed acceptance of receipt of the lease extension. The City Counselor's office advised plaintiff that he was authorized to sign such an extension because it was not a new lease, but just an acknowledgement that the City was aware that St. Louis Composting was exercising their option to extend the lease. The Comptroller spoke to plaintiff before plaintiff had a chance to explain to Defendant Green that he had consulted with the City Counselor's office and had been advised he could sign this document since it was not a binding agreement.

These cited documents also evidence that Defendant Green was aware as early as 2017 that plaintiff had signed documents that she believed were contracts (even if they were not as a matter of law) and that Defendant Green believed the appropriate response was to simply send a letter instructing him not to sign contracts in the future.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. GG, Garavaglia Depo. p. 289, line 1 to p. 291, line 25.
--See also Plaintiff's Exhibit S.


140.    After Comptroller Green became aware of the fact that Plaintiff had attempted to sign the St. Louis Composting contract without authority on her behalf, Comptroller Green sent a memo to him dated July 21, 2017 with the subject line "Unauthorized Signature," whereby she brought to his attention the fact that he was attempting to improperly execute an "Extension of Lease Agreement" on behalf of the City and St. Louis Composting. (SJ Exhibit 1, Garavaglia Depo. p. 287, lines 3-25, p. 288, lines 1-25; p. 289, lines 1-25, p. 290, lines 1-25; p. 291, lines 1-5; SJ Exhibit 24 [Garavaglia Depo. Ex. 14], pp. GRN 000462-464.)

The evidence cited herein does not establish the absence of a genuine dispute for this alleged fact and constitutes a legal conclusion. At no time did plaintiff bypass the established procedure for executing and approving contracts for a composting leasing contact. Defendants erroneously allege that the document in question is in fact a contract, and that assertion constitutes a legal question, not

a factual one and thus the testimony of plaintiff does not establish that this document is or is not a contact as a matter of law. The cited document is a lease extension notice for an option to extend an already existing contract. Upon receiving this document, plaintiff sought advice from the City Counselor's office and was advised that this document did not require any action to leave the terms and conditions of the lease in place and to extend it. However, St. Louis Composting, for their records and for their auditors' scrutiny asked if they could have a City signed acceptance of receipt of the lease extension. The City Counselor's office advised plaintiff that he was authorized to sign such an extension because it was not a new lease, but just an acknowledgement that the City was aware that St. Louis Composting was exercising their option to extend the lease. The Comptroller sent the letter to plaintiff before plaintiff had a chance to explain to Defendant Green that he had consulted with the City Counselor's office and had been advised he could sign this document since it was not a binding agreement.

These cited documents also evidence that Defendant Green was aware as early as 2017 that plaintiff had signed documents that she believed were contracts (even if they were not as a matter of law) and that Defendant Green believed the appropriate response was to simply send a letter instructing him not to sign contracts in the future.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

-- See Ex. GG, Garavaglia Depo. p. 289, line 1 to p. 291, line 25.
--See also Plaintiff's Exhibit S.

141.    When Comptroller Green prepared this July 21, 2017 memorandum admonishing

Plaintiff for his attempt to improperly sign on behalf of the City of St. Louis, she was

unaware that Plaintiff had purported to sign any other contracts on behalf of the City, but

she subsequently discovered, after placing Plaintiff on forced leave, that Plaintiff

purported to sign other contracts with AT&T and Waste Management. (SJ Exhibit 9,

Green Depo. p. 280, lines 9-25, p. 281, lines 1-19.)

The evidence cited herein does not establish the absence of a genuine dispute and is contradicted by other evidence in the record. Defendant Green was not unaware that plaintiff had purported to sign any other alleged contracts on behalf of the City, and she did not only discover documents that allegedly lead her to believe that he had **after** she placed him on forced leave. On Saturday June 29,

2019, Judy Armstrong had a phone call with Director of Personnel Richard Frank to discuss placing plaintiff on forced leave. Armstrong told Richard Frank that Defendant Green was alleging that they were investigating "serious fiscal improprieties" that needed to be brought to the attention of the state auditors and that they believed would result in a pre-termination review. **Defendant Green claimed that the serious fiscal improprieties were only later uncovered after plaintiff had already been placed on forced leave**. Richard Frank was never informed of any allegations related to the municipal court issue or the mishandling of documents but instead was only told about the "serious fiscal improprieties" that were later revealed to be the alleged unauthorized signing of contracts as well as the allegation that plaintiff had failed to take care of large outstanding telecommunications invoices. Defendant Green falsely testified that she only became aware of these issues after plaintiff was already placed on forced leave, and she also claimed in her memorandum dated August 26, 2019 that the original investigation began **after** plaintiff was placed on forced leave for insubordination and subterfuge by misrepresenting facts and mishandling documents (allegations ascribed to the municipal court issue) and only then did the investigation "uncover" that plaintiff had allegedly signed contracts without authorization and that there were past due an unpaid city wide telecommunication bills (both of which Defendant Green already knew about long before plaintiff was placed on forced leave). This indisputably evidences that Defendant Green planned to engage in a pretextual sham to place plaintiff on forced leave so she could then "uncover" these alleged fiscal improprieties she already knew about (including this alleged St. Louis Composting document) and had told the director and deputy director about before plaintiff was placed on forced leave and any "investigation" could possibly uncover this for the first time.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:


-- See Ex. FF, Richard Frank deposition, p. 38 line 23 to p. 39, line 6; p. 111, lines 6-23; p. 145, lines 12-25;   p. 146, line 16 to p. 147, line 3; p. 171, lines 14-22; p. 183, lines 3-18; p. 190, line 10 to p. 192, line 11.
--See Ex. JJ, Linda Thomas deposition, p. 25, line 24 to p. 26, line 23; p. 32, line 22 to p. 34, line 23.
--See Ex. HH, Darlene Green deposition, p. 168, line 18 to 169, line 10; p. 180, lines 8-12.
--See Ex. GG, Garavaglia deposition, p. 230, line 10 to p. 232, line 18; p. 234, line 15 p. 236, line 17; p. 242, line 16 to p. 244, line 7; p. 245, lines 11-18.
--See also Plaintiff's Exhibit O (Pg 23; 44-45)


142.    After Comptroller Green provided the July 21, 2017 memorandum to Plaintiff,

Plaintiff never came to her and disclosed to her the fact that he had signed any other

contracts for AT&T and for Waste Management purportedly on behalf of the City of

Saint Louis. (SJ Exhibit 9, Green Depo. p. 279, lines 21-25, p. 280, lines 1-8.)

The evidence cited herein does not establish the absence of a genuine dispute and is contradicted by other evidence in the record. Plaintiff has maintained throughout his testimony that he has never signed any contracts on behalf of the city, that the documents in question are either not contracts and were only signed on the advice of counsel and/or his supervisor, or were never signed by plaintiff. Thus, plaintiff could not disclose something to Defendant Green that did not occur. Furthermore, before she ever placed plaintiff on forced leave, Defendant Green was aware of the existence of all of these documents she later claimed were contracts and that plaintiff had signed them.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

--See Ex. GG, Garavaglia deposition, p. 230, line 10 to p. 232, line 18; p. 234, line 15 p. 236, line 17; p. 242, line 16 to p. 244, line 7; p. 245, lines 11-18.


143. Despite receiving the July 21, 2017 memorandum from Comptroller Green

advising him that he was not authorized to sign contracts on behalf of the City, Plaintiff

signed three AT&T Statement of Work agreements on October 23, 2018. (SJ Exhibit 13,

Armstrong Depo., p. 193, lines 19-25, p. 194, lines 1-25, p. 195, lines 1-25, p. 196, lines

1-25, p. 197, lines 1-25, p. 198, lines 1-25, p. 199, 1-25, p. 200, lines 1-4; SJ Exhibit 17,

[Armstrong ("Green") Depo Exhibit 1], pp. STL2155-2167.)

The evidence cited herein does not establish the absence of a genuine dispute and is contradicted by other evidence in the record. Further, Defendants attempt to characterize a "statement of work" as a contract evidences Defendants' ongoing efforts to target plaintiff with anything they believe can support their pretext to obfuscate defendant's actual reason for terminating plaintiff. "Statements of work" are, by definition, *documents which identify work to be done that the parties have already contractually agreed to*. These statements of work simply acknowledge and accept, on behalf of the telecommunications section of the Comptroller's office, that telecommunications was acknowledging that this statement of work and the services included within were to be performed under an already existing contract. In addition, at the time plaintiff signed these documents, plaintiff had already consulted with an attorney in the City Counselor's office and had been advised these documents were statements or work, not contracts. At no time did plaintiff ever sign any documents that could

reasonably be determined to be contracts after receiving the July 21, 2017 memorandum from Defendant Green, and defendants cite to no evidence that plaintiff was either unauthorized to sign a statement of work or that Defendant Green had ever instructed plaintiff to not sign a statement of work. Further, the testimony of Judy Armstrong as cited by Defendants constitutes a legal conclusion and has no probative value.

Notably, this particular document is not referenced in any of the forced leave requests, the pre-termination letter, or any of the other memorandums prepared during the so called "investigation" into plaintiff after he was first put on forced leave. Defendants only produced these work statements and declared they were contracts after it was clear that Defendant Green knew plaintiff had signed the Composting option notice (Plaintiff's Ex. S) and had decide no formal or serious discipline was needed *at that time*. It was only when Defendant Green realized plaintiff did not intend to retire did this "issue" suddenly become a "serious fiscal impropriety" such that plaintiff apparently needed to be placed on forced leave and ultimately terminated.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

--See Plaintiff's Depo Ex. O (pgs. 7-11; 22-24; 29-30; 32-34; 38-39, 41; 47-54).
--See Ex. GG, Garavaglia deposition, p. 261, lines 15 to p. 253, line 8; p. 263, lines 12-17; p. 265, lines 16-23.
-- See Ex. KK, Declaration of James Garavaglia, ¶23.


146. Plaintiff's contention that he was discriminated against based on his age is based on testimony that after he was advised via a May, 2016 telephone conversation with the Comptroller that he was being promoted to Deputy Comptroller, she advised him that she was glad he accepted the position because it would be a great way for him to round out and complete his career with the City as Deputy because he would be able to go out on top as Deputy in a couple of years. (SJ Exhibit 1, Garavaglia Depo. p. 66, lines 10-25, p. 67, lines 1-25, p. 68, lines 1-25, p. 69, lines 1-9, p. 133, lines 23-25, p. 134, lines 1-25, p.135, lines 1-23.)

The evidence cited herein does not establish the absence of a genuine dispute and is contradicted by other evidence in the record. The evidence that plaintiff was discriminated on the basis of age is not limited to the May, 2016 telephone

call wherein Defendant Green stated her intent that plaintiff retire in a couple of years. However, the fact that Defendant Green did make this statement is an uncontroverted material fact. Defendant Green clearly stipulated that she expected plaintiff to retire in a couple of years and that the position would not be his long term.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

--See Ex. GG, Garavaglia deposition, p. 66, line 16 to p. 69, line 15.
--See Ex. HH, Deposition of Defendant Green, p. 142, line 6 to p. 143, line 8.
--See Ex. KK, Declaration of James Garavaglia, ¶7.


147. When Plaintiff was pressed at his deposition for evidence of discrimination beyond the May, 2016 conversation, Plaintiff testified as follows:
"Q      All right. Other than that comment, that phone call with the Comptroller, can you identify any other information that you can provide to us to suggest to you that it was her intention when she hired you to get rid of you in a couple of years?
A      It is my feeling that I was brought in as a placeholder. I was put in a position because I was a logical best option choice to fill the role for a period of time until such point in time that she was able to promote whom she really wanted in that role.
Q      And whom would that be?
A      It would be someone that was more like the prior Deputy, a young black female.
Q      And what I am trying to get at is evidence. You say that's your belief, your suspicion, but do you have any evidence that you can share with us, any memos, any discussions with the Comptroller that you can share with us to support that belief?
A      Not at this time, but I possibly could recall something later."
(SJ Exhibit 1, Garavaglia Depo. p. 72, lines 4-24.)
*      *      *
Q … Other than your belief, what evidence do you have that that was her intent?
A By the fact that she replaced me with –
Q Right.
A -- a younger black female.
***
Q (By Mr. Norwood) So the fact that she replaced you with an African American female, that's -- in your view, that's your smoking gun; is that right?
A Yeah.
Q Okay. Fair enough.
A That's what she did.
Q That's -- no dispute about that. All right. And -- and that's all you have as it relates to race; correct?
A At this point in time, that's all I can recall.

The evidence cited herein does not establish the absence of a genuine dispute for the alleged fact that this is the only evidence that defendants discriminated against plaintiff based upon age, race, or gender and is irrelevant and immaterial. Plaintiff cannot testify to what constitutes a legal question (the ultimate legal question in this case) and his testimony about what evidence is probative and/or material cannot be considered a fact. The totality of the evidence in the record is what determines whether defendants discriminated against plaintiff and terminated plaintiff because of his age, race, and gender. This cited testimony and alleged fact is not material and has no bearing on this matter. Further, plaintiff also testified in his deposition that he was replaced by a younger African-American female that Defendant Green was grooming for the position of Deputy Comptroller for Finance and Development, and that in March or April of 2019 Comptroller Green again pressed plaintiff about his future plans and retirement as was disappointed when plaintiff stated he planned to stay on through the remainder of Green's term. Defendant Green also testified that this meeting occurred, but stated it was in June 11, 2019. It was also in late June, 2019 that the Comptroller took steps to have plaintiff placed on forced leave. Plaintiff also testified Comptroller Green kept him at arm's length and refused to make him a part of her inner circle of confidants, despite his being at the deputy comptroller level.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

--See Ex. GG, Garavaglia deposition, p. 140, line 16 to p. 141, line 17; p. 146, line 22 to p. 14, line 3; p. 149 lines 2-14.
--See Ex. HH, deposition of Defendant Green, p. 144, line 15 to p. 148, line 12.


148.    Other than Plaintiff's allegation that he believed Comptroller Green discriminated against him because he is a white male in his sixties, he acknowledged that neither the Director of Personnel Richard Frank, who is a white male, Beverly Fitzsimmons, who is a white female, Judy Armstrong, who is an African-American female, nor Chana Morton, who is an African-American female, or Dr. Ishmael Ikpeama, would have discriminated against him because he was a white male in his sixties. (SJ Exhibit 1, Garavaglia Depo. p. 74, lines 9-25, p. 75, lines 1-25, p. 76, lines 1-25, p. 77, lines 1-25, p. 78, lines 1-4.)

The evidence cited herein does not establish the absence of a genuine dispute for the alleged fact and wholly mischaracterizes plaintiff's testimony. Plaintiff clearly testified that he "did not know", when asked if these individuals

discriminated against him and the testimony defendants cite to unequivocally show this. Plaintiff never "acknowledged" any of these individuals "would have" discriminated against him. The question called for speculation, and plaintiff clearly did not answer in the way defendants purport he did in this alleged fact.

149.    Plaintiff claims that other than Comptroller Green, he is not aware of anyone else in the City who would have discriminated against him. (SJ Exhibit 1, Garavaglia Depo. p. 74, lines 4-15.)

The evidence cited herein does not establish the absence of a genuine dispute for the alleged fact and misstates plaintiff's testimony. Plaintiff testified that he could not think of others who did discriminate, and clarified that he did not have factual knowledge, but that others could have discriminated against him "in a manner he was unaware of.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

--See Ex. GG, Garavaglia deposition, p. 76, lines 15-17.

152.    Plaintiff cannot identify anything that Comptroller Green purportedly did to him personally outside of her capacity as Comptroller that caused him any of the harm alleged in his complaint. (SJ Exhibit 1, Garavaglia Depo. p. 128, lines 18-25, p. 129, lines 1-8.)

The facts cited herein are immaterial and irrelevant, and misstate the law as it relates to personal/individual capacity.

153.    During a meeting in the Spring or Summer of 2019, Comptroller Green asked both Deputy Comptroller Fitzsimmons and Plaintiff if they would each commit to continuing to work for her if and when she decided to run for re-election. (SJ Exhibit 9, Green Depo. p. 144, lines 3-25, p. 145, lines 1-25, p. 146, lines 1-25, p. 147, lines 1-25, p. 148, lines 1-12.; SJ Exhibit 1, Garavaglia Depo., p. 100, lines 22-25, p. 101, lines 1-25, p. 102, lines 1-25, 103, lines 1-25, 104, lines 1-3.)

The evidence cited herein does not establish the absence of a genuine dispute for the alleged fact and misstates plaintiff's testimony. Plaintiff testified that Defendant Green asked if both he and Beverly Fitzsimmons "will you be here"? Plaintiff did not testify that she asked plaintiff to commit to work longer. In response, Plaintiff told the Comptroller that he would continue to work full-time through June of 2021, and that depending on family considerations and health, he wanted to work full-time on a year-by-year basis, at some point cutting back to half time in a role to be determined within the office. Plaintiff further testified that the Comptroller was displeased with this response and Bev Fitzsimmons also testified that the Comptroller was not to happy with them

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

--See Ex. GG, Garavaglia deposition, p. 102, line 4 to p.04, line 3; p. 106, line 12 to p. 107, line 13.
--See Ex. EE, Deposition of Beverly Fitzsimmons, p. 34, line 5 to p. 35, line 8.
--See Ex. KK, Declaration of James Garavaglia, ¶13.


154.    Although Plaintiff alleged in his charge filed with the EEOC that there was a clear

pattern and practice of discriminatory treatment of non-black, older, and male employees

by the Comptroller, he acknowledged that he has no evidence to support this allegation.

(SJ Exhibit 1, Garavaglia Depo. p. 148, lines 1-25, p. 149, lines 1-25, p. 150, lines 1-6.)

The evidence cited herein does not establish the absence of a genuine dispute for the alleged fact and misstates plaintiff's cited testimony. Plaintiff testified he could not recall, at the time of the deposition, if he had evidence to support that allegation. He never acknowledged he had no evidence. Importantly, there were no other older, non-black, male employees in senior positions within the Comptroller's office at the time plaintiff was terminated by defendants.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

--See Ex. GG, Garavaglia deposition, p. 149, line 19 to p. 150, line 10.
--See Ex. KK, Declaration of James Garavaglia


155.    Plaintiff does not know if the reason the original forced leave was rescinded and

the second forced leave rescinded in favor of a pre-termination proceeding was done

based on the advice of counsel provided to Comptroller Green.  (SJ Exhibit 1, Garavaglia Depo. p. 151, lines 1-25.)

The facts cited herein are immaterial and irrelevant to the extent that it is intended to create the inference that defendant Green did not rescind the forced leaves on separate occasions in order to avoid having a civil service commission hearing on those forced leaves.  The timing of Comptroller Green's rescinding the forced leaves coincided with the scheduled Civil Service Commission hearing dates and when given a chance to explain, defendant Green claimed it was at the direction of Linda Thomas, and Linda Thomas and Judy Armstrong refused to answer on the basis of attorney-client privilege.  Richard Frank also refused to answer, but did testify that the effect of recinding a forced leave is that it has the effect of cancelling the hearing.  Thus, there is a clear dispute as to defendant' motives regarding the forced leaves.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

--See Ex. DD, Deposition of Judy Armstrong, p. 79, lines 1 to p. 80, line 2.
--See Ex. HH, Deposition of Darlene Green, p. 176, line 17 to p. 177, line 23.
--See Ex. JJ, Deposition of Linda Thomas, p. 49, line 1 to p. 51, line 25.
--See Ex. FF, Deposition of Richard Frank, p. 211, line 1 to p. 217, line 25.


156. Plaintiff did not have any sense that the Civil Service Commission would have discriminated against him because he was a white male. (SJ Exhibit 1, Garavaglia Depo. p. 95, lines 22-25, p. 96, lines 1-11.)


The evidence cited herein does not establish the absence of a genuine dispute for the alleged fact and misstates plaintiff's cited testimony.  Defendant testified he does not know the Commissioners and does not know what they would do.

<u>The following evidence of record shows the existence of a genuine dispute for this alleged fact:</u>

--See Ex. GG, Garavaglia deposition, p. 96, lines 6-11.

157.   Plaintiff testified that he could have [had] the chance to work in another department of the City earning a comparable salary had he successfully appealed any disciplinary decision to the Civil Service Commission and that he contemplated that his appeal to the Commission could be successful. (SJ Exhibit 1, Garavaglia Depo. p. 16, lines 3-25, p. 17, lines 1-2.)

The evidence cited herein does not establish the absence of a genuine dispute for the alleged fact and misstates plaintiff's cited testimony.  Plaintiff was describing the detrimental effect the discriminatory actions of defendants had on his well-being and the damage to his reputation that inhibited his ability to get another job within the city because of Defendant Green's false and pretextual allegations.


158.   Comptroller Green wrote the July 21, 2017 memorandum to Plaintiff entitled "Unauthorized Signature" to reiterate to Plaintiff that he did not have authority to sign agreements on behalf of the City and to admonish him in writing because he had erroneously attempted to sign a contract between the City and St. Louis Composting.  (SJ Exhibit 9, Green Depo. p. 238, lines 6-25, p. 239, lines 1-25, p. 240, lines 1-25, p. 241, lines 1-11.)

The evidence cited herein does not establish the absence of a genuine dispute for the alleged fact and constitutes only self-serving testimony from Defendant Green.  Further, this testimony evidences that Defendant Green was aware as early as 2017 that plaintiff had signed documents that she believed were contracts (even if they were not as a matter of law) and that Defendant Green believed the only appropriate response was to simply send a letter instructing him not to sign contracts in the future.

166.   Forced leave is not considered discipline because an employee may use any accrued vacation or compensatory time for the period of forced leave, and proof of an

employee's wrongdoing is not required before placing him on forced leave. (SJ Exhibit 5, Frank Depo. p. 18, lines 20-25, p. 19, lines 1-8, p. 32, lines 11-15.)

The evidence cited herein does not establish the absence of a genuine dispute for the alleged fact. Employees may use vacation or compensatory time while on unpaid leave, but in the event that the forced leave is overturned by the Civil Service Commission, that forced leave is not restored.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

--See Plaintiff's Exhibit F (City of St. Louis Administrative Regulation 117, Section VI Forced Leave, Paragraph 2).

170.    In addition, an individual who is placed on forced leave may file an appeal with the Civil Service Commission, which is what Plaintiff did in challenging the two forced leaves in this case. (SJ Exhibit 5, Frank Depo p. 22, lines 6-25, p. 23, lines 1-19.)

The evidence cited herein does not establish the absence of a genuine dispute for the alleged fact. Defendants are correct in that an individual on forced leave has a right to file an appeal with the Civil Service Commission. However, plaintiff never had an opportunity to exercise that right because defendants subverted that process by repeatedly withdrawing the forced leaves, leading the cancellation of the forced leave appeal hearing.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

--See Plaintiff's Depo Ex. O (7-11; 22-24; 29-30; 32-34; 38-39, 41; 47-54)

177.    If a pre-termination review is held and ultimately no discipline is issued, that individual would be returned to work as quickly as possible, but if they took any accrued time or vacation time during the period they will enforce leave, they would be repaid the moneys utilized during the period of forced leave. (SJ Exhibit 5, Frank Depo. p. 34, lines 21-25, p. 35, lines 1-25, p. 36, lines 1-8.)

The evidence cited herein does not establish the absence of a genuine dispute for the alleged fact. Employees may use vacation or compensatory time while on unpaid leave, but in the event that the forced leave is overturned by the Civil Service Commission, that forced leave is not restored.

The following evidence of record shows the existence of a genuine dispute for this alleged fact:

--See Plaintiff's Exhibit F (City of St. Louis Administrative Regulation 117, Section VI Forced Leave, Paragraph 4).

179.    Director Frank is personally aware of situations where: (i) forced leaves were appealed, then rescinded, and the employee returned to work; (ii) no discipline issued following a pre-termination review; and (iii) in the context of an appeal of discipline imposed following a pre-termination review, the Civil Service Commission determined that the discipline was improper and returned the employee to work. SJ Exhibit 5, Frank Depo., p. 27, lines 8-25, p. 28, lines 1-25, p. 29, lines 1-25, p. 30, lines 1-25, p. 31, lines 1-25, p. 32, 1-8.)

This alleged fact is both irrelevant and immaterial to the allegations in this case.

181.    Plaintiff never brought to the attention of either Comptroller Green or the Director of Personnel that he did not receive a performance rating.  (SJ Exhibit 1, Garavaglia Depo. p. 64, lines 4-9, p. 64, lines 10-18.)

This alleged fact is both irrelevant and immaterial to the allegations in this case. The responsibility for Defendant Green to complete service ratings for her employees is hers alone.

--See Ex. FF, Deposition of Richard Frank, p. 91, lines 4-15.

184.    Comptroller Green wanted Plaintiff to work as long as possible as her Deputy

Comptroller given her preference to promote from within.  (SJ Exhibit 9, Green Depo. p.

140, lines 9-25, p. 141, lines 1-25, p. 142, lines 1-3.).

The evidence cited herein does not establish the absence of a genuine dispute
for the alleged fact and constitutes only self-serving testimony from Defendant
Green and is unsupported by the evidence in the record and Defendant Green's
decision to terminate plaintiff.


185.    Before Plaintiff's mishandling of the Muni Court Project documents in June 2019,

Comptroller Green communicated to Plaintiff more than once that she hoped that he

would not retire.  (SJ Exhibit 9, Green Depo. p. 142, lines 4-10.)

The evidence cited herein does not establish the absence of a genuine dispute
for the alleged fact and is contradicted by other evidence.

The following evidence of record shows the existence of a genuine dispute for
this alleged fact:

--See Ex. KK, Declaration of Plaintiff James Garavaglia.


## II. Additional Material Facts as to Which Plaintiff Contends A Genuine Issue Exists

1. Following the death of Ivy Pinkston, Defendant Green did not want to promote
   plaintiff to the position of Deputy Comptroller for Finance and Development, and she
   did not consider plaintiff qualified for the position.  (Ex. HH, Depo of Defendant
   Green, p. 115, line 14 to p. 117, line 9).

2. Defendant Green preferred an African-American candidate from outside of the office,
   Ron Browning Smith, who was 70 years old at the time.  (Ex. HH, Depo of Defendant
   Green, p. 114, line 10 to p. 115, line 11).

3. Based on the age of the two candidates that were considered and the statement made
   by Defendant Green to plaintiff after she promoted plaintiff that he would retire on
   top in a couple of years, it is clear Defendant Green was looking for an older
   candidate that was near or at retirement age as a placeholder until her preferred
   candidate, a younger African-American female named LaTaunia Kenner, would be
   sufficiently trained and experienced to take over the position of Deputy Comptroller

of Finance and Development. Ex. HH, Depo of Defendant Green, p. 114, line 10 to p. 115, line 11; p. 115, line 14 to p. 117, line 9; p. 142, line 18 to p. 143, line 8; Ex. GG, Garavaglia Depo. p. 33, lines 1-10; p, 66, line 18 to p. 67, line 18; See also Ex. KK, Declaration of James Garavaglia).

4. Defendant Green testified that she always tried to promote from within first; however, she first attempted to hire someone from outside the office before she decided to promote plaintiff. (Ex. HH, Depo of Defendant Green, p. 114, line 10 to p. 115, line 11; p. 140, lines 11-18).

5. Lataunia Kenner, plaintiff's eventual replacement, did not apply for and was unqualified for the role of Deputy Comptroller in 2016 when plaintiff was first promoted, and was one of only two candidates considered at the time she was promoted in 2020. (Ex. GG, Garavaglia Depo. p. 86, lines 9-19; See also Ex. KK, Declaration of James Garavaglia; Ex. V).

6. After plaintiff was promoted, Defendant Green did not train plaintiff, coach plaintiff, give feedback related to performance to plaintiff (positive or negative), or complete service ratings for plaintiff during the entire time he was Deputy Comptroller for Finance and Development. (Ex. GG, Garavaglia Depo. p. 83, line 4 to p. 84, line 10; 87, line 10 to p. 88, line 15; p. 97, lines 6-12; Ex. HH, Depo of Defendant Green, p. 148, lines 13-16; See also Ex. KK, Declaration of James Garavaglia).

7. Defendant Green had an "inner circle" of close confidants, all younger African-American females, that she socialized with outside of the office, took trips with, and relied on to assist her in running the office, and all participated in some form in plaintiff's termination. (Ex. GG, Garavaglia Depo. p. 83, line 11 to p. 85, line 8; p. 87, line 10 to p. 88, line 15; p. 97, lines 6-12; Ex. DD, Deposition of Judy Armstrong, p. 157, line 5 to p. 159, line 12; p. 170, line 5 to p. 171, line 3; Ex. RR (showing that plaintiff's duties were delegated to Eunetter Steele by Judy Armstrong); See also Ex. KK, Declaration of James Garavaglia).

8. These individuals include plaintiff's replacement, LaTaunia Kenner, Defendant Green's executive secretary, Chana Morton, Defendant Green's Executive Assistant, Chana Morton, Secretary Eunetter Steele, and Contract Administrator Michele Graham. (Ex. GG, Garavaglia Depo. p. 83, line 11 to p. 87, line 1; See also Ex. KK, Declaration of James Garavaglia).

9. Following plaintiff's termination and their participation in the investigation of plaintiff's forced leave and pre-termination process, Chana Morton was promoted from Executive Secretary to the Comptroller to Executive Assistant to the Comptroller and Judy Armstrong was promoted from Executive Assistant to the Comptroller to Fiscal Operations Support Manager. (Ex. DD, Deposition of Judy Armstrong, p. 19, lines 18-23; Ex. II, Deposition of Chana Morton, p. 14, lines 13-17; p. 15, lines 3-4).

10. Despite all being in lower level positions than plaintiff, Defendant used these confidants to surreptitiously securitize and spy on plaintiff and plaintiff's work and secretly report their observations back to Defendant Green. Defendant Green then relied entirely on those same individuals when explaining her pretextual reasons in support for why she placed plaintiff on forced leave and ultimately constructively terminated him. (Ex. HH, Depo of Defendant Green, p. 118, line14 to p. 120, line 19; See also Ex. KK, Declaration of James Garavaglia).

11. Sometime between March and June, 2019, Defendant Green met with plaintiff and Deputy Comptroller Beverly Fitzsimmons and discussed their intentions to stay on or retire, and after plaintiff responded he intended to stay in his position, Defendant Green was displeased. (Ex. GG, Garavaglia Depo., p. 102, line 4 to p.04, line 3; p. 106, line 12 to p. 107, line 13; Ex. EE, deposition of Beverly Fitzsimmons, p. 34, line 5 to p. 35, line 8.)

12. Immediately thereafter, in June, 2019, Defendant Green began taking steps to remove plaintiff from his position as Deputy Comptroller for Finance and Development by placing him on forced leave, and, on July 2, 2019, he was escorted out of his office and out of City Hall by a City Marshal without any knowledge of why he was being placed on forced leave (Plaintiff's Ex. O, pgs. 1-4; Ex. GG, Garavaglia Depo., p. 11, lines 7-25; p. 13- line 1 to p. 131, line 1).

13. July 2 is an important date because it was the beginning of the new fiscal year, and fit with the Comptroller's plan of having plaintiff replaced with Kenner as Deputy Comptroller for Finance and Development. (Plaintiff's Ex. O, pgs. 1-4; Garavaglia Depo., p. 133, line 23 to p. 135, line 14).

14. Defendant Green initially used allegations of "fiscal improprieties" such as claims that plaintiff signed unauthorized contracts or that there was unpaid and ignored overdue telecommunications bills, on Saturday June 28, 2019 when the Director of Personnel was told Defendant Green wanted to put plaintiff on forced leave on that basis. (Ex. FF, deposition of Richard Frank, p. 38 line 23 to p. 39, line 6; p. 111, lines 6-23; p. 145, lines 12-25; p. 146, line 16 to p. 147, line 3; p. 171, lines 14-22; p. 183, lines 3-18; p. 190, line 10 to p. 192, line 11; p. 227, line 25 to p. 228, line 7; Ex. JJ, Linda Thomas deposition, p. 25, line 24 to p. 26, line 23; p. 32, line 22 to p. 34, line 23. Ex. HH, Defendant Darlene Green deposition, p. 168, line 18 to 169, line 10; p. 180, lines 8-12)

15. Later, on July 12, with the assistance of Judy Armstrong, Defendant Green changed the initial reason for placing plaintiff on forced leave in an attempt to make it seem like the allegations surrounding the municipal court issue were the initial basis, and falsely alleged that after an investigation, and only after plaintiff was already on forced leave, it was newly discovered that plaintiff had signed unauthorized contracts and had improperly allowed telecommunications bills to remain unpaid. (Ex. HH, Defendant Darlene Green deposition, p. 168, line 18 to 169, line 10; p. 180, lines 8-12; Ex. O, ps. 16-17, 43-44)

16. Defendant Green had been aware of the outstanding telecommunications invoices the previous year, she refused an offer of settlement from AT&T at an amount that was less then what she later settled at, and she was aware plaintiff had been working diligently to resolve the outstanding invoice issue. (Ex. GG, Garavaglia Depo., p. 253, line 16 to p. 256 line 25; Ex. LL, Ex. MM, Ex. VV; See also Ex. KK, Declaration of James Garavaglia).

17. Once plaintiff was on forced leave Defendant Green attempted to conduct an "investigation" looking for additional pretext to support termination of plaintiff, and even attempted to bring in the State Auditor with the hope they would find additional pretext; however, the State Auditor did not find any evidence of any fiscal improprieties on the part of plaintiff. (Plaintiff's Ex. Y; Plaintiff's Ex. O, pgs. 32, 40-41, 53-54

## EXHIBITS SUBMITTED BY PLAINTIFF

Exhibit F – Administrative Reg. 117
Exhibit O – Dept of Personnel & Civil Service Commission Docs
Exhibit Q – AT&T Docs
Exhibit S – St. Louis Composting Docs
Exhibit V – Candidate Referral Form
Exhibit X – Morton/Ray Emails
Exhibit Y – Missouri State Audit
Exhibit CC – Emails re Muni Court Ext Docs
Exhibit DD – Armstrong Deposition Transcript
Exhibit EE—Fitzsimmons Deposition Transcript
Exhibit FF – Frank Deposition Transcript
Exhibit GG – Garavaglia Deposition Transcript
Exhibit HH –Green Deposition Transcript
Exhibit II – Morton Deposition Transcript
Exhibit JJ – Thomas Deposition Transcript
Exhibit KK – Declaration of Jim Garavaglia
Exhibit LL – AT&T Emails re Adjustment
Exhibit MM – AT&T Spreadsheet
Exhibit NN – Morton Notes
Exhibit OO – Exchange between Duffe & Jones
Exhibit RR – Email from Armstrong
Exhibit SS – Morton Emails, 6-26-19 & 6-27-19
Exhibit UU – Ordinance 69949
Exhibit VV – Email from Garavaglia re: AT&T
Exhibit WW – You Tube Video Links

UTHOFF, GRAEBER, BOBINETTE & BLANKE

By:   /s/  Richard B. Blanke
         Richard B. Blanke, #28675MO
         Paul Schmitz, #66885MO
         906 Olive Street, Suite 300
         St. Louis, MO 63101
         Tel.: (314) 621-9550
         Fax: (314) 621-2697
         E-Mail:   rblanke@ugbblaw.com and
                     pschmitz@ugbblaw.com
         *Attorneys for Plaintiff*

### CERTIFICATE OF SERVICE

Comes now the undersigned and hereby certifies that the foregoing Memorandum was delivered on this 24th day of June 2022, by service through the Court's CM-ECF filing system.

         /s/   Richard B. Blanke, Atty.