```
 1              UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF MISSOURI
 2                   EASTERN DIVISION

 3  James Garavaglia,        )
                             )
 4      Plaintiff,           )
                             )
 5  v.                       ) Case No. 4:20-cv-01681-CDP
                             )
 6  City of St. Louis,       )
    et al.,                  )
 7                           )
        Defendants.          )
 8

 9

10

11

12          DEPOSITION OF JUDY ARMSTRONG

13

14       Taken on behalf of the Plaintiff
                 April 12, 2022
15
         Julie Ann Whiting, CCR 830, RPR
16

17

18

19

20

21

22

23

24

25
```

PLAINTIFF'S
EXHIBIT
**DD**

```
 1        Q     Do you have any estimate as to when you
 2   became Executive Assistant II?
 3        A     I do not.
 4        Q     No idea when?
 5        A     I don't.
 6        Q     Was it -- do you know was it before or
 7   after 2010?
 8        A     I don't know.  I don't want to speculate.
 9        Q     What did you -- what else did you do as an
10   Executive Assistant II?
11        A     I still did a lot of the same things I did
12   as a I in terms of special meetings and serving on
13   committees and --
14        Q     Did you have a supervisory role over
15   anyone else except for the folks in the parking
16   garage?
17        A     Not at that time.
18        Q     Were you promoted again?
19        A     Yes.
20        Q     To what position?
21        A     To the Fiscal Operations Support Manager.
22        Q     And when did that occur?
23        A     That occurred in 2019.
24        Q     Okay.  So now we have an end date for your
25   Executive Assistant II role; right?
```

```
 1        A    I can't tell you when.

 2        Q    Was it in the last two years?  Or I'll say

 3   the last three years.  How about that?

 4        A    I don't remember when it was.

 5        Q    Who was responsible for the municipal

 6   garage and the records retention before you?

 7        A    Jim Garavaglia.

 8        Q    And that would be in his position as

 9   Deputy Comptroller of Finance; right?

10        A    No.  As Asset Manager.

11        Q    As Asset Manager.  It goes all the way

12   back to there.  Okay.  And when he became Deputy

13   Comptroller, did he continue with that role, or is

14   that when you took over?  These two things I'm

15   talking about, records retention and municipal

16   garage.

17        A    I can't give you any -- I don't remember.

18   I don't remember when it changed.

19        Q    Okay.  Do you know why it changed?

20        A    I do not.

21        Q    Man, this is a lot of paper.  The poor

22   trees.

23             Okay.  I've handed you two exhibits again,

24   Plaintiff's Exhibits I and J.  I is fairly easy to

25   determine what it is.  J, not so much.  J starts
```

1    with a letter from you to whoever and then on the

2    third page of J, the Table of Contents.  If you'll

3    look at the cover page of Exhibit I, it's dated

4    1999, the original date updated and reissued

5    February of 2010.  And then if you look at the front

6    page of Exhibit J on your letter, that is your

7    letter, right, November 8th, 2018?

8        A    Yes, sir.

9        Q    Okay.  That's dated 2018.  Would you say

10   it's a fair characterization that Exhibit J replaced

11   Exhibit I as the Comptroller's Office Work Rules?

12       A    Yes.

13       Q    Okay.  Did you have anything to do with

14   the preparation of Exhibit I?

15       A    I did not.

16       Q    Do you know who did?

17       A    I don't know for sure.

18       Q    Okay.  Do you have any reason to believe

19   who did -- who was involved in it?

20            MS. HAMILTON:  And I'm going to object

21       that the question calls for speculation.

22       Subject to that, you can answer.

23       Q    (By Mr. Blanke)  Let me -- let me withdraw

24   the question and ask it another way.

25            You know, you say you didn't know for sure

 1      Q    The reference to the ongoing
 2  investigation -- was that an investigation you were
 3  conducting?
 4      A    No, it's not.
 5      Q    Who was conducting it, if you know?
 6      A    According to this, the State Auditors.
 7      Q    Okay.  It goes on to say that the
 8  continued restriction of Mr. Garavaglia's access to
 9  all the offices, files, e-mails, and such continue.
10           Did you know about that aspect of the
11  forced leave, that he was barred from the premises,
12  from any contact with any of the files or e-mails
13  or -- did you know about that?
14      A    I did know that.
15      Q    And were you consulted by Darlene Green as
16  to whether or not that would be asked for, or was
17  that -- whose idea was that, do you know?
18      A    I do not.
19      Q    Did she talk to you about it?
20      A    No, she did not.
21      Q    Please direct your attention to pages 43
22  and 44.  What is this?  What is that?
23      A    Results of some things that were -- needed
24  to be brought to her attention regarding AT&T and
25  Waste Management.

 1      Q    You don't know anything about it.  Okay.

 2  You have no personal knowledge about any of this

 3  stuff?

 4      A    No.

 5      Q    Okay.  Back to Exhibit O, which I think is

 6  still before you, I think.  Okay.  Page 43.  This is

 7  your memorandum to Comptroller Green dated

 8  August 26th of 2019.  First of all, let's go to the

 9  bottom of that, which is the next page on page 44.

10  There is a c -- a copy sent to Kelley Anderson,

11  Esquire, a special assistant to the Comptroller.

12          Why was Kelley Anderson copied in?  Is

13  that just your normal practice?

14      A    Because he was working with me on AT&T

15  stuff.

16      Q    How was he working with you?

17      A    We were both trying to get those accounts

18  reconciled and he was -- at that time, he was

19  over -- actually being the one that was over AT&T.

20      Q    When you were working together on this,

21  were either of you higher than the other or have

22  primary duties, or were you co-equals with regard to

23  that investigation?

24      A    We were co-equal.

25      Q    Why did you write this particular

1    memorandum to Darlene Green?

2         A     It was bringing her up to date on what was

3    going on, on some things that we had discovered.

4         Q     Okay.  Did you have communications with

5    Darlene Green before writing this memorandum where

6    she actually knew about a bunch of this stuff before

7    actually getting this memo?  In other words, were

8    you just memorializing what you had already

9    discussed with her, a lot of it, or was it really

10   new information for her?

11        A     No, we had -- I had mentioned some things

12   to her, but she asked for everything to be put in

13   writing.

14        Q     Okay.  Well, you know, I guess I'm asking

15   for a generalization.  But, you know, was she aware

16   of most of it, hardly any of it?

17        A     I can't -- I don't remember now.

18        Q     Okay.

19        A     She just asked me to put things in

20   writing.

21        Q     Did anybody -- did Kelley Anderson help

22   you prepare this memo, or is he just another

23   recipient?

24        A     He's another recipient.

25        Q     Okay.  So did anybody help you prepare

 1   this memo?

 2        A    No.

 3        Q    On the very -- Roman numeral I on page 43,

 4   it refers to an attachment.  You said AT&T considers

 5   this agreement -- what you call the Master Agreement

 6   that was signed by James Garavaglia, you said AT&T

 7   considers this agreement to be a contract between

 8   AT&T and the City, and then you say see attached.

 9   What was attached?  Was it the contract itself?

10        A    The Master Agreement.

11        Q    The Master Agreement.  And when you say

12   AT&T considers this to be a contract, were you of

13   the -- were you aware of the fact that they had told

14   Mr. James Garavaglia that it was not a contract?

15        A    No, I wasn't.

16             MR. NORWOOD:  Well, let me object.

17             MS. HAMILTON:  Yeah, I'm going to object

18        that it assumes a fact that's not in evidence,

19        but subject to that.

20             MR. NORWOOD:  Well, let me object, too,

21        because it calls for a legal conclusion on the

22        part of AT&T as well, assuming that's the

23        "they" you're talking about.

24             MR. BLANKE:  She said no, so it's sort of

25        a moot point at this point.

```
 1        Q    (By Mr. Blanke)  Were you aware of anyone
 2   telling Mr. Garavaglia that it was not a contract?
 3        A    No.
 4        Q    And did you talk to the AT&T in person --
 5   excuse me.
 6             Did you talk to the AT&T person who said
 7   this, that it was a contract?
 8             MS. HAMILTON:  I'm going to object that --
 9             oh, you're talking about did she -- her
10             reference?  Excuse me.
11             MR. BLANKE:  Yeah.  Yeah.
12             MS. HAMILTON:  I'll withdraw the
13             objection.
14        Q    (By Mr. Blanke)  Did you, Judy Armstrong,
15   talk to any AT&T person who told you that AT&T
16   considered this to be a contract?
17        A    Yes.
18        Q    Who?
19        A    Mary Harp.
20        Q    Okay.  And when was that, do you remember?
21        A    I don't remember.
22        Q    Did this -- now, I think you told me
23   before -- correct me if I'm wrong -- that your
24   entire investigation of this matter began after
25   Jim Garavaglia was put on forced leave?
```

1    beginning, whether you dealt directly with

2    Darlene Green or you had to go through Chana.  I

3    mean, you didn't have to send it to Chana; right?

4    You could have sent it to Darlene Green; correct?

5         A    I could have.

6         Q    Okay.  So items from James Garavaglia's

7    office.

8         A    Uh-huh.

9         Q    Why are you sending this?  What's the

10   reason for it?  What's the reason?

11        A    Well, first of all, it's also showing

12   things that were not done that needed to be done.

13   It shows the service dates and it shows invoices

14   that were not paid.  All this had to be rectified.

15   It also points out the past due with the Parks

16   Department, what was going on there.  It has the

17   past due from the -- AT&T.  And it also shows the

18   contract for Waste Management and the issue that we

19   have with that.

20        Q    Well, why are you reporting to her about

21   all this stuff?

22        A    Because this is all -- it's all her office

23   and she needed to know what was going on.

24        Q    Well, were you asked to investigate all

25   these different matters?

1      A     I was -- it's a difference in

2  investigating and a difference in going in and doing

3  things to see that nothing slips through the cracks.

4      **Q     Did Darlene Green ask you to go into his**

5  **office and see that nothing seeps through the**

6  **cracks?**

7      A     She asked that we continue to have -- that

8  the work continues to get done.

9      **Q     So she didn't specifically ask you to do**

10  **this?**

11      A     No, she did not.

12      **Q     What did she do after she received it?**

13      A     I don't know.

14      **Q     I meant to say what did she tell you after**

15  **she received it, if anything?**

16      A     I can't -- I can't say that she -- I don't

17  really remember what she told me.

18      **Q     Was there more than this, or is -- did you**

19  **make more reports like this, or is this the only**

20  **one?**

21      A     Make more reports in terms of --

22      **Q     In terms of the items from his office.**

23  **Was this the first or the second or the third one of**

24  **these that you did?**

25      A     No.  I believe it was the only one like

1          Let me ask you this, Ms. Armstrong:  Can

2   you describe what that one looked like, I mean, the

3   final documents?  What should we be looking for?

4   What form is it in?

5        A    It says Settlement and Agreement with

6   AT&T, is how it's --

7        Q    Is it, you know, a narrative memorandum of

8   some kind or is it a chart like this one, do you

9   remember?

10       A    No, it's not a chart.

11       Q    Okay.  Do you remember the title of it?

12       A    Settlement Agreement.

13       Q    All right.  We'll look more carefully.

14   Let me move on.

15          Once again, what do you know about Waste

16   Management documents that Comptroller Green alleged

17   that Jim signed?

18       A    You have the document right here in this

19   packet where it has his signature on it for

20   renewing.  The contract came back -- the encumbrance

21   came back showing that this was an expired contract.

22          MS. HAMILTON:  And you are in Exhibit Y,

23       is that right?

24          THE WITNESS:  Uh-huh.

25          MS. HAMILTON:  And on what page are you

 1      A     And I do not know what process is in

 2   place.

 3      **Q     (By Mr. Blanke)  Did you determine on your**

 4   **own before talking to Comptroller Green that this**

 5   **was an invalid signature, an unauthorized signature**

 6   **on page 1980 of Exhibit Y?**

 7      A     When you say did I determine on my own

 8   that it was --

 9      **Q     Yes.**

10      A     Yes, I did.

11      **Q     How?**

12      A     Because had it been a valid signature and

13   had it been -- went through the proper channel, it

14   would have had a document number on it and accounts

15   payable would not have contacted me to say that the

16   contract with Waste Management was expired.

17      **Q     Didn't Waste Management think this was a**

18   **valid contract?**

19      A     Yes, they did.

20      **Q     Okay.  So how did they find out that it**

21   **wasn't?**

22      A     I contacted them.

23      **Q     How did you know that it wasn't?**

24           MS. HAMILTON:  I'm going to object that

25           the question is asked and answered, but subject

1          to that, you can respond.

2          A    I just said that.

3          **Q    (By Mr. Blanke)  What?**

4          A    That I knew it was not valid, because I

5     was told that it was not -- that we did not have a

6     contract and they could not pay.

7          **Q    Who told you that?**

8          A    Accounts Payable.

9          **Q    Who in Accounts Payable?  That's what I**

10    **was asking.  Who in Accounts Payable?**

11              MS. HAMILTON:  That was not what you were

12         asking, but carry on.

13              MR. BLANKE:  That's what I meant to be

14         asking.

15         **Q    (By Mr. Blanke)  Go ahead.  Do you**

16    **remember?**

17         A    I don't remember.  I was trying to, but I

18    don't want to say who did it and they didn't do it.

19         **Q    So what I was asking was, you know, how it**

20    **is you came to believe that this was not a proper**

21    **signature by James Garavaglia, and you're telling me**

22    **now, if I understand you correctly, Accounts Payable**

23    **told you that.**

24         A    Accounts Payable didn't see this.  Okay?

25    They did not have a contract.  The contract they had

1   with Waste Management had expired, so they could not

2   pay.

3       **Q    Why did Accounts Payable not see this?**

4       A    It didn't go through the proper channel.

5   They wouldn't get it.

6       **Q    Where would it go?**

7       A    It would go through the contract

8   compliance officer, who would then stamp a document

9   number on here that says Comptroller's Office

10  document number such-and-such.

11      **Q    Where did you get this document from when**

12  **you first found it?**

13      A    I actually got this -- Waste Management

14  e-mailed this to me to show me that they did have a

15  contract with us.

16      **Q    Now it's making sense.  Okay.  I**

17  **understand.  And then you didn't see anything**

18  **stamped on it so, what, you contacted contract**

19  **compliance to find out why is there nothing stamped**

20  **on it?**

21      A    No.

22      **Q    What did you do next?**

23      A    After I received this and I see that

24  James Garavaglia had signed it, I already know that

25  it didn't go through the proper channel, and I also

1    know that he cannot sign to obligate the City for
2    any payments.  So based upon that, I had to send a
3    letter to E&A to get an emergency in place so they
4    could get paid until we could get a new contract in
5    place.
6         **Q    Is this, 1980, an extension of a prior**
7    **contract?  Does it purport to be?  I mean, I know**
8    **it --**
9         A    It appears to be.
10        **Q    Are you aware of any City policy expressed**
11   **either in an ordinance or by charter or any other**
12   **rule that says that existing contracts cannot be**
13   **extended by anyone besides the Comptroller?**
14        A    No.
15        **Q    While Jim was -- while Mr. Garavaglia was**
16   **on forced leave --**
17        A    Uh-huh.
18        **Q    -- did you submit any contracts or other**
19   **documents other than this to the contract**
20   **administrator that was rejected?**
21             MS. HAMILTON:  And I'm going to object to
22        the vagueness of the question.  But subject to
23        that, you can answer.
24             MR. BLANKE:  I didn't hear you.
25             MS. HAMILTON:  Vague.

1        testimony with regard to Appointing Authority.

2        Q    (By Mr. Blanke)  I'm going to shift gears

3    with you here.  Okay?

4        A    Uh-huh.

5        Q    You indicated that while you didn't

6    associate socially much, if at all, with Comptroller

7    Green -- have you ever associated individually or as

8    a group with Comptroller Green, Ms. Morton, or

9    Ms. Kenner for a business or business meeting kind

10   of function outside of the office?

11       A    Yes.

12       Q    How often?

13       A    Not on a regular, but, I mean --

14       Q    Like, what kind of events were these?

15       A    It could be a luncheon.  It could be a

16   dinner that she got tickets for or something and

17   different events throughout the city that she

18   supports and stuff.  She may have tables purchased

19   that she offered tickets to the staff.

20       Q    Have you ever traveled out of town

21   individually or as a group with Comptroller Green,

22   Ms. Morton, or Ms. Kenner for a business purpose or

23   meeting?

24       A    No.

25       Q    Never went to Chicago?

```
 1      A    Yes.
 2      Q    Well, that's out of town.
 3      A    I didn't go for a business meeting.
 4      Q    Oh, what did you go for?
 5      A    I went to see the -- Hamilton.
 6      Q    Hamilton?
 7      A    Yes.
 8      Q    The stage play?
 9      A    Yes.
10      Q    With who?
11      A    Ms. Green was there for an event and she
12   went, too, but I didn't go with her for that
13   business meeting.  I went up there later to see that
14   production.
15      Q    And who did you go with to see the
16   production?
17      A    Chana.
18      Q    Chana and Comptroller Green?
19      A    Comptroller Green was already there.
20   Chana and I went together.
21      Q    Oh, okay.  That's a social event; right?
22   Was that business related?
23      A    I said -- no, I said sometimes.
24      Q    No, I know.  I'm not trying to catch you.
25      A    Okay.  So --
```

1     Q    I'm just being clear.  Anything else like
2  that that comes to mind like that kind of a social
3  event besides Hamilton that you can think of?  No?
4  Are you still thinking?
5     A    I don't know what you're referring to.
6     Q    Well, I don't either, I'm just asking.
7     A    Okay.  So --
8     Q    I'm just asking if there were.
9     A    There probably was --
10    Q    Okay.
11    A    -- but nothing that's sticking out right
12  now.
13    Q    Okay.  All right.  You indicated earlier,
14  I believe, that you really -- well, let me ask you
15  this question:  I don't want to characterize your
16  prior testimony.  You don't know -- do you know
17  anything at all about the internal audit conducted
18  by Dr. Ishmael Ikpeama related to the Gateway
19  Transportation Center?
20    A    I do not.
21    Q    Do you have any knowledge about the
22  relationship between Dr. Ikpeama and Mr. Garavaglia
23  during the time of the audit?
24    A    No, I do not.
25    Q    When you -- did you sign the pre-term

1  approve or anything, but --

2     **Q     When you're talking about the work rules,**

3  **that is Exhibit J; correct?**

4     A     That's correct, the ones that I did.

5     **Q     Okay.  You earlier gave some testimony**

6  **about social events and tables that the Comptroller**

7  **will sponsor.**

8     A     Yes.

9     **Q     Can you give us some examples of those?**

10     A     Comptroller would purchase tables for the

11  Salute to Excellence and --

12     **Q     By the St. Louis American?**

13     A     By the St. Louis American, the Salute to

14  Excellence In Education -- because they do

15  several -- but the one in education.  And depending

16  on how many tables she ended up having --

17     **Q     What are some other examples?**

18     A     Some other examples is she purchased a

19  table for trivia night that was held at -- I want to

20  say it was Channel 9.  Channel 9 had a trivia night

21  and it was at the Sheldon, and she offered

22  several --

23     **Q     Any other examples?**

24     A     All That Jazz with the Herbert Hoover Boys

25  and Girls Club.

1      Q     Okay.

2      A     Matthews-Dickey Boys' & Girls' Club, they

3   would have a luncheon for their event.

4      Q     Okay.  And how did the Comptroller go

5   about filling those tables?

6      A     She always asked her managers and super --

7   or had me to ask her managers and supervisors first

8   if they would like to attend, and those that did

9   would get two tickets for them -- would get two

10  tickets, them and their spouse.  And then whatever

11  tickets were left, I would send an e-mail out to the

12  whole staff and whoever responded first would get to

13  go.

14     Q     Okay.  And did Mr. Garavaglia ever attend

15  any of those events, to the best of your knowledge?

16     A     Yes.

17     Q     Multiple events?

18     A     Yes.

19           MS. HAMILTON:  Nothing further.

20                       EXAMINATION

21  QUESTIONS BY MR. NORWOOD:

22     Q     Okay.  I have a few follow-up.  Let's

23  start with Plaintiff's Exhibit Y.  And if you have

24  that in front of you, let's go to the page we just

25  looked at with Plaintiff's counsel, STL001950.

1      Q     -- let me finish -- before he was placed

2  on forced leave?

3      A     Yes.

4      Q     All right.  And it's fair to say that some

5  of those folks would have been folks that worked

6  under him; is that right?

7      A     Yes.

8      Q     And were some of those folks people who

9  were assigned some of his duties and

10 responsibilities when he was placed on forced leave?

11     A     Yes.

12     Q     Okay.  You talked about you and Kelley

13 being assigned to handle some of the

14 telecommunications issues.

15     A     Uh-huh.

16     Q     Is that right?

17     A     Yes.  That's correct.

18     Q     Okay.  Let's go to -- that same packet.

19 Let's go to 1977.  What is 1977?  It looks like

20 there's a couple of e-mails.  Let's start at the

21 bottom.  What is that bottom e-mail, the one dated

22 Tuesday July 23rd, 2019 at 2:05 p.m.?

23     A     This is the e-mail that I had originally

24 sent to Waste Management to say that I did not have

25 a valid contract with them, and then this is the one

1   where he responded back and said he attached a copy

2   of the current Service Agreement on file that runs

3   through June of 2020, so -- which is why they

4   thought that they had a valid contract.

5       Q    Okay.  And then you sent an e-mail, it

6   looks like, on July 23rd, 2019 to Michele Graham and

7   Comptroller Green; is that right?

8       A    That's correct.

9       Q    And you say, quote, Please see attached

10  document where Waste Management believes they have

11  an extension through June 2020.  The price is the

12  same as the original contract.  Please advise if we

13  need to submit the extension and send it through the

14  proper signature process after getting tax and

15  license clearance.

16          Do you see that?

17      A    Yes.

18      Q    Is tax and license clearance a

19  prerequisite to entering into contracts with

20  vendors?

21      A    Yes.

22      Q    Why is that, do you know?

23      A    That's so that we're not going into a

24  contract with somebody that owes the City.

25      Q    Okay.  Let's skip down, then, to

1    page 1980.  And that is a contract that is signed by

2    Mr. James Garavaglia dated 5/22/17.  Is that what

3    you saw when you received that document?

4        A    Yes.

5        Q    Okay.  When you received that document,

6    was there any question in your mind that that was

7    Mr. Garavaglia's signature?

8        A    No, it wasn't.

9        Q    Okay.  You talked about the process as it

10   relates to this particular contract as to how you

11   discover a problem with the Waste Management

12   contract.  Could you explain to us how that came

13   about?

14       A    Sure.  I submitted the encumbrance for the

15   year, which would go from July 1 through June 30,

16   and this was July 1 of 2019 through June 30 of 2020

17   of how much it would cost for Waste Management to

18   pick up trash at the Gateway Transportation Center.

19   When I submitted that -- I submitted to our

20   accountant in -- each of the departments in the City

21   have -- accountants are divided up for certain

22   departments, and to the accountant that represents

23   the Comptroller's office I submitted this -- excuse

24   me -- it represents the Gateway Transportation

25   Center.  And they submitted it to their accounting

1    coordinator, who contacted me to say that the

2    contract -- the PO contract number that I submitted

3    for this encumbrance, the contract had expired.

4         **Q    Okay.  And by way of processes, when a**

5    **contract is validly executed by the City, is it**

6    **entered into a system of the City's?**

7         A    Yes, it is.

8         **Q    And is it entered into that system by**

9    **contract number?**

10        A    Yes.

11        **Q    All right.  And to your knowledge, did**

12   **anyone have a copy of this document, 1980, in the**

13   **system when you were making your inquiries about**

14   **this contract?**

15        A    No, there was not one.

16        **Q    There was not a contract?**

17        A    In the -- in the City's system.

18        **Q    In the City's system?**

19        A    That's correct.

20        **Q    Were you aware or made aware that**

21   **Mr. Garavaglia had this particular contract faxed to**

22   **him to be executed in May of 2017?  Were you made**

23   **aware of that?**

24        A    I was not made as to how he received it.

25        **Q    Okay.  All right.  So let's go to -- let**

 1   go.

 2       Q    Okay.  And so there were occasions where

 3   you would deliver it yourself?

 4       A    Yes.

 5       Q    Why?

 6       A    I may be going that way or something, so

 7   it just depends.

 8       Q    All right.  Or you would call the garage

 9   couriers to make sure it got there --

10       A    Ask them to come pick it up and tell them

11   that this needed to go right away, and sometimes

12   they may have to wait on a signature and then take

13   it someplace else, so it just depends.

14       Q    Okay.  Do you have Exhibit O in front of

15   you?

16       A    Yes.

17       Q    Okay.  Let's turn to what they've marked

18   as page 43 -- Armstrong Depo Exhibit O, page 43.

19       A    Page.

20       Q    And is that a copy of the memo that you

21   prepared?

22       A    Yes.

23       Q    And let's take a look at that memo.  That

24   memo is one that you prepared on August 26th, 2019

25   and submitted to Comptroller Darlene Green; is that

1    right?

2        A    That's correct.

3        Q    And you say in the first paragraph on

4    January 30, 2009, Mr. Garavaglia signed a Master

5    Agreement with AT&T.  Do you see that?

6        A    Yes.

7        Q    And tell us again how you found out about

8    this Master Agreement that was signed by

9    Mr. Garavaglia.

10       A    When Mary Harp would send a contract from

11   AT&T that needed to be signed, she would always say

12   this is being sent against the Master Agreement.

13       Q    All right.

14       A    And I asked her, Well, what's the Master

15   Agreement?  So, anyway, she sent me a copy of the

16   Master Agreement.

17       Q    Okay.  Was that Master Agreement one that

18   the City had in its system?

19       A    No, it was not.

20       Q    Was that Master Agreement -- did it have a

21   contract number associated with it?

22       A    No, it did not.

23       Q    Do you know if that Master Agreement was

24   approved by the City Counselor's office as to form?

25       A    No, it was not.

1          Q    Do you know if that Master Agreement was

2    signed by Comptroller Darlene Green?

3          A    It was not.

4          Q    Who signed that Master Agreement?

5          A    James Garavaglia.

6          Q    All right.  And you go further in your

7    memo of August 26th, 2019 and you say, quote, AT&T

8    is utilizing this as a contract with the City of

9    St. Louis.  Do you see that?

10         A    Yes.

11         Q    And then you write further, you say

12   Mr. Garavaglia is not able to sign a contract

13   obligation for the City.  Do you see that?

14         A    Yes.

15         Q    And is that your understanding of the

16   custom and practice for the time that you have

17   served in your current capacity and various

18   capacities, that the Comptroller and Bev Fitzsimmons

19   are the authorized signers for those types of

20   contracts?

21         A    That is correct.

22         Q    All right.  And then we go to -- you have

23   some numbered paragraphs.  Let's go to paragraph

24   number 1.  You say on July 10, 2019, Mary Harp, the

25   City's AT&T representative, sent a Master Agreement

1    to us which was signed by James Garavaglia.  AT&T

2    considers this agreement to be a contract between

3    AT&T and the City; is that right?

4         A    Yes.

5         Q    Is that the first awareness that you

6    became aware of this Master Agreement?

7         A    That is correct.

8         Q    Okay.  And that -- and as you've

9    testified, it wasn't in the City's system as an

10   agreement; is that right?

11        A    Right.

12        Q    All right.  Then you go to number 2.  You

13   refer to account number 314879-30066005, as an

14   invoice for June 27, 2019.  It has a past due amount

15   of $902,904.61.  Do you see that?

16        A    Yes.

17        Q    And why did that cause you concern?

18        A    Because it was actually a very large past

19   due amount.

20        Q    Okay.  And who was responsible for

21   handling the AT&T accounts?

22        A    Mr. Garavaglia.

23        Q    All right.  It says, This past due amount

24   has been escalating for several years.  You say on

25   May -- on the May 27, 2018 invoice, the past due

1    amount was $465,066.15.  Do you see that?

2        A    Yes.

3        Q    And was that for the Parks Department?

4        A    No.  We're still talking -- this is the

5    one in the Comptroller's office here.

6        Q    Okay.  So this is all part of the

7    Comptroller's office?

8        A    That's correct.

9        Q    And do you know why these -- this billing

10   was hanging out there for years and years and years

11   with the City?

12       A    The only thing that I can tell you as far

13   as my knowledge of this -- and that's in working

14   with the representatives with AT&T -- is that none

15   of the invoices had been fully paid every month, so

16   the only partial payments have been made.

17       Q    Okay.  And were you made aware by AT&T

18   that the City had been placed on some delinquent

19   list of some sort?

20       A    It was placed on credit hold.

21       Q    Tell us about that.

22       A    There was some contracts that were in

23   place that was going to lower some service, and

24   because we were on credit hold, that could not

25   happen, and then --

 1          MS. HAMILTON:  Lower the price?

 2      A    It was going to lower the price if we got

 3  those contracts signed.  But when we were placed on

 4  credit hold, AT&T's system would not allow us to go

 5  forward with the contract until we came off of

 6  credit hold.

 7      **Q    (By Mr. Norwood)  So credit hold, H-O-L-D,**

 8  **is what you're saying?**

 9      A    Yes.

10      **Q    All right.  And then you referred to the**

11  **NICE in kind situation.  You've testified about**

12  **that.  Who was responsible for making sure that the**

13  **NICE in kind contract was properly --**

14      A    And it's NICE inContact.

15      **Q    I'm sorry.  NICE inContact contract.  Who**

16  **was responsible for making sure that the NICE**

17  **inContact contract was properly handled and entered**

18  **into the system of the City's?  Whose responsibility**

19  **would that have been?**

20      A    That was still filed under Jim Garavaglia.

21  James Garavaglia.

22      **Q    Okay.  And then we refer to the Waste**

23  **Management contract.  We've talked about that.  And**

24  **in there, you point out the fact that this**

25  **contract -- that Waste Management believed it had a**

1    contract that was good until 2020; is that right?

2         A    Yes.

3         Q    And you point out the fact that

4    Mr. Garavaglia would not be authorized to sign this

5    type of contract; is that right?

6         A    Yes.

7         Q    And that's based upon your understanding

8    of who has the authority to sign such contracts

9    binding the City; correct?

10        A    Yes.

11        Q    And then that last bullet point under

12   number 5, you say, It states in the Waste Management

13   contract that Mr. Garavaglia signed, quote, it shall

14   automatically renew thereafter for additional terms

15   of 36 months renewal terms unless terminated as set

16   forth herein.  Do you see that?

17        A    Uh-huh.

18        Q    Is that a yes?

19        A    I'm sorry.  Yes.

20        Q    And you say, The City is not authorized to

21   automatically renew contracts past five years.  They

22   must go out for bid again.  Do you see that?

23        A    Yes.

24        Q    All right.  And what do you mean by that?

25        A    With the City, contract -- like, the Waste

1   Management contract was -- the original contract was

2   for two years, from 2015 to 2017, with the option of

3   three one-year renewals.  So had those one-year

4   renews had been done, then this contract would have

5   still been good.  But because the renewals were

6   never done in the proper way, it was not a valid

7   contract anymore.

8           So in that greeting -- in that Waste

9   Management, when they sent me their thing, it had in

10  there that it would automatically renew an

11  additional 36 months unless it was terminated.

12      Q    Okay.

13      A    And that would put us past the five years,

14  even, if it automatically renewed if we didn't do

15  something different.

16      Q    Okay.  Then we go to bullet point number

17  6.  And you talked about this with counsel.  And

18  there's a reference here where it says -- if you go

19  down to about the fifth or sixth line, in quotes, it

20  says, His response to her -- meaning Jim's response

21  to her, her being the person in Equipment Services?

22      A    Yes.  And I'm trying to -- as I said to

23  the other attorney, I remember this, but I can't

24  remember who it was that I was actually speaking to,

25  and I'm shocked that I didn't put that in here.

1    **automatic extensions without legal authorization to**

2    **do so, putting the City at risk dating back to 2009.**

3    **Do you see that?**

4    A   Yes.

5    **Q   And do you know if that's based upon the**

6    **information that you provided in the memo you**

7    **supplied to the Comptroller?**

8    A   Yes, it is.

9    MR. NORWOOD:  I need a sticker.  Let's

10    mark this -- let's make it Green Exhibit 1.

11    MR. BLANKE:  Is this new?  Have we seen

12    this before, ever?

13    MR. NORWOOD:  It's been produced.

14    MR. BLANKE:  No, I mean, you haven't used

15    it as an exhibit yet?

16    MR. NORWOOD:  Not yet.

17    (Green Exhibit 1 was marked for

18    identification.)

19    **Q  (By Mr. Norwood)  All right.  Now, the**

20    **first page of Green Exhibit 1 is Bates stamped**

21    **STL002155, and it goes through to STL002167; is that**

22    **correct?**

23    A   Yes.

24    **Q   All right.  And in the cover page -- the**

25    **first couple of pages looks like there's some e-mail**

 1    communications; is that correct?

 2        A    Yes.

 3        Q    And at some point that e-mail

 4    communication was directed to you; is that right?

 5    If you look at the top of page 1, Marilyn Maxwell.

 6        A    Oh, okay.  Yes.

 7        Q    All right.  It looks like she forwarded

 8    this to you on Tuesday, September 17, 2019, at

 9    8:11 a.m.; is that correct?

10        A    Yes.

11        Q    And it references SOW 18-19 Parks

12    Department, SOW 18-19, Fire Department, SOW

13    2018-2019 Streets Department.  Is that right?

14        A    Yes.

15        Q    All right.  And if we skip down to page

16    2159.  Do you see that?

17        A    Yes.

18        Q    All right.  Does that appear to be a

19    document -- statement or document executed by

20    Mr. James Garavaglia?

21        A    Yes.

22            MR. BLANKE:  Let me object to possibly --

23        well, it looks like it calls for a legal

24        conclusion as to what this is.  Go ahead.

25            MS. HAMILTON:  He said document.

 1      Q    (By Mr. Norwood)  Well, at the top of it,
 2  it says Statement of Work; is that right?
 3      A    Yes.
 4      Q    All right.  And it has a signature that
 5  appears to be Mr. Garavaglia's signature; is that
 6  right?
 7      A    Yes.
 8      Q    And that document is dated 10/23/18 --
 9  October 23rd, 2018; is that correct?
10      A    Uh-huh.  Yes.  I'm sorry.
11      Q    All right.  And does this document appear
12  to obligate the City to pay money?
13      A    Yes, it does.
14      Q    Where does it show an obligation to pay
15  money?
16      A    On the next page it tells you what that
17  annual price is, 11,374.42.
18      Q    And that is per page STL002160?
19      A    Yes.
20      Q    All right.  And it has a term of -- what
21  is the term?
22      A    The term is for one year, from
23  September 11th, 2018 to September 10th, 2019.
24      Q    Okay.  Do you know if this document was in
25  the system with a contract number of the City?

 1      A    No.  It does not have one on here, so, no,

 2  it's not.

 3      Q    Okay.  Let's go to STL002162.  Do you see

 4  that?

 5      A    Yes.

 6      Q    Well, no, let me go back to 2159 before I

 7  move on.

 8           At the top of that under Statement of

 9  Work, it says City of St. Louis Fire Department; is

10  that right?

11      A    Yes.

12      Q    And what type of contract is this?  What

13  kind of service, do you know?

14      A    It's a Maintenance Agreement.  It's the

15  yearly maintenance for the Fire Department for their

16  telephones.

17      Q    Okay.  And then when we go to 2162, that's

18  a Statement of Work.  It says City of St. Louis

19  Parks Department; is that right?

20      A    Correct.

21      Q    And is that for maintenance service

22  related to the Parks Department?

23      A    Yes, it is.

24      Q    All right.  And who signed -- who

25  purported to sign that on behalf of the City of

 1    St. Louis?

 2        A    James Garavaglia.

 3        Q    All right.  And the date of that one is

 4    October 23rd, 2018 as well; is that right?

 5        A    Yes.

 6        Q    And does this Parks Department Maintenance

 7    Contract purport to obligate the City to pay money?

 8            MR. BLANKE:  Let me object in that this is

 9        not a Maintenance Contract and you're asking

10        her to give a legal conclusion as to that

11        improper assumption.

12        Q    (By Mr. Norwood)  Well, let's look at the

13    top of the document where it says Statement of Work,

14    City of St. Louis, Parks Department, CS1000

15    Maintenance.  That's what it says; right?

16        A    Yes.

17        Q    All right.  And then on the next page.

18    Does this document purport to obligate the City to

19    pay money?

20            MR. BLANKE:  Objection.  Calls for a legal

21        conclusion.

22        A    Yes, it does.

23        Q    (By Mr. Norwood)  I'm sorry.  You answered

24    the question?  You said --

25            MS. HAMILTON:  She did.

```
 1       A    Yes.
 2       Q    (By Mr. Norwood)  Okay.  And is there a
 3  section that says annual price?  Do you see that?
 4       A    Yes.
 5       Q    And what's that annual price?
 6       A    $8,864.09.
 7       Q    You may want to read that again.  It's
 8  8,000 --
 9       A    $584.09.  Excuse me.
10       Q    Okay.  Thank you.  And that purports to
11  obligate the City for that amount for a one-year
12  term from 9/11/18 to 9/10/19; is that correct?
13       A    That is correct.
14       Q    All right.  So let's -- let's go to the
15  next document.
16            MS. HAMILTON:  What page?  What page?
17            MR. NORWOOD:  I'm getting lost in the fog.
18       Q    (By Mr. Norwood)  2165.  Let's go to that
19  one.  Do you see that?
20       A    Yes.
21       Q    And that document is entitled Statement of
22  Worth, City of St. Louis, Streets Department,
23  C91000, Maintenance; is that correct?
24       A    Yes.
25       Q    All right.  And does this document --
```

1    well, strike that.

2           Who purported to sign this document on

3    behalf of the City?

4        A    James Garavaglia.

5        Q    And the date of that one is also

6    October 23rd, 2018; is that correct?

7        A    Yes, it is.

8        Q    All right.  And does this document purport

9    to bind the City to pay money to AT&T for this

10   Statement of Work?

11          MR. BLANKE:  Objection.  It calls --

12       A    Yes, it does.

13          MR. BLANKE:  You're not giving me time to

14       object after the question.

15          MR. NORWOOD:  Go ahead.

16          MR. BLANKE:  Objection.  It calls for a

17       legal conclusion.

18       Q    (By Mr. Norwood)  Okay.  Is there a

19   section on this document that has annual price?

20       A    Yes.

21       Q    And what is that annual price on this

22   particular document?

23       A    $9,184.69.

24       Q    Is that money that AT&T is paying to the

25   City of St. Louis?

 1      A    No.

 2      Q    **What does it purport to be?**

 3      A    That's what the Street Department will pay

 4  to AT&T for that maintenance agreement.

 5      Q    **Okay.  For the record, could you give**

 6  **us -- I think you've already done it, but just in**

 7  **case, your date of birth and age for the record?**

 8      A    Yes.  September the 5th, 1957, and I am 64

 9  years old.

10      Q    **Okay.  Thank you.  And this meeting you**

11  **had with Mr. Garavaglia where you presented him with**

12  **the July 2nd, 2019 forced leave letter, where**

13  **exactly were you when that occurred?**

14      A    In the conference room in Comptroller

15  Green's office.

16      Q    **And who was actually present in the room?**

17      A    Kelly Anderson, Jason Fletcher, myself,

18  and Larry from the City marshals.

19      Q    **And I believe you testified earlier that**

20  **having Larry there, that's a pretty much par -- or**

21  **standard procedure with respect to individuals who**

22  **are being provided with this type of notification?**

23      A    That is correct.

24           MR. NORWOOD:  Okay.  I have no further

25           questions at this time.