```
1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF MISSOURI
2                      EASTERN DIVISION

3    James Garavaglia,         )
                               )
4        Plaintiff,            )
                               )
5    v.                        ) Case No. 4:20-CV-1681-CDP
                               )
6    City of St. Louis,        )
     et al.,                   )
7                              )
         Defendants.           )
8

9

10

11

12            DEPOSITION OF BEVERLY FITZSIMMONS

13

14           Taken on behalf of the Plaintiff
                      April 19, 2022
15
             Julie Ann Whiting, CCR 830, RPR
16

17

18

19

20

21

22

23

24

25
```

**PLAINTIFF'S EXHIBIT EE**

1 the City.  They -- she is over all of the financial
2 side of the City.
3     Q    Okay.  What are some -- just broadly.  You
4 don't have to get into the details.  Just broadly,
5 what are some of the duties of that office or
6 position?
7     A    Of the office would probably be easier to
8 answer.  She is -- well, the position, she is a
9 member of the Board of Estimate and Apportionment,
10 which is the top three that meet to make decisions
11 for the City.  She -- we pay the bills of the City.
12 We do the financing for the City, manage the real
13 estate of the City, you know, any type of
14 accounting, whether it be in redevelopment area or
15 accounts payable, financial reporting of the City,
16 Internal Audit section.
17     Q    Okay.  So the position of Deputy
18 Comptroller -- and I know that there are --
19 technically there's a Deputy Comptroller and the
20 Deputy Comptroller of Finance and Development, so
21 I'm going to talk specifically about your position
22 only --
23     A    Uh-huh.
24     Q    -- when I ask these questions.  What is --
25 what does the Deputy Comptroller do?  What is that

1  position?
2      A    My position is over the accounting side of
3  the office.  Technically it's the second in command
4  underneath the Comptroller's office.  My charge is
5  to do, like I said, all the finance -- financial
6  reporting, the accounts payable, the redevelopment
7  calculation -- I mean, the group that is underneath
8  me, probably the only ones that are not are like
9  real estate, telecommunications, the financing side
10 of it, which is issuing bonds and debt, that type of
11 thing.  Internal Audit is not underneath me, but
12 pretty much -- pretty much everything else is.  And
13 GTC is not is not underneath me.  The outside
14 offices that kind of stem from the Comptroller's
15 office, municipal garage, records retention, not
16 underneath me.
17     Q    What is GTC?
18     A    Gateway Transportation Center.
19     Q    All right.  And you kind of already
20 touched on this, some of the differences between
21 what is and is not underneath you.  So are there
22 other differences between the two positions of
23 Deputy Comptroller and Deputy Comptroller of Finance
24 and Development?
25     A    Yes.  I mean, technically my position by

1   charter is established and I am the -- the
2   Comptroller has assigned me to do signator on
3   contracts also.
4       Q    And I'll touch on that a little bit in
5   more detail.  But is that -- just to follow up on
6   what you just said, is that something that you
7   understand is a discretionary decision by the
8   Comptroller to assign that signatory authority to
9   you, or is that something that's automatically only
10  assigned in that office to the person who occupies
11  the position of Deputy Comptroller?
12      A    I do not know that for a fact.  I know in
13  my history it's always just been -- I mean, if I --
14  if I just look at the history of the office, it's
15  always just been the Deputy Comptroller that had the
16  authority to sign as well as -- with the
17  Comptroller's direction.
18      Q    Thank you.  What are some of the positions
19  that directly report to you?
20      A    I have a financial operations support
21  manager that is also over -- and she is over federal
22  grants and financial reporting and over the new
23  accounting system we just initiated.  And then I
24  have a fiscal -- fiscal manager, who is over
25  accounts payable, and redevelopment section.  I'm

```
 1        A    I -- I can't tell you a date.
 2        Q    Okay.
 3        A    I can't -- I mean, we've met before on
 4   that subject.
 5        Q    Do you recall a meeting in 2019 with you
 6   and Jim and the Comptroller where the Comptroller
 7   mentioned -- or asked -- excuse me -- about yours
 8   and Jim's plans for the future leading up to her
 9   running for her next term?
10        A    Yes.
11        Q    Okay.  Do you remember approximately what
12   date that meeting was?
13        A    I'm going to say maybe -- I'm assuming
14   June, maybe.  It could be May.  I don't know that
15   for a fact.
16        Q    Okay.  Do you recall what was discussed at
17   this meeting?
18        A    I cannot give you details.  I can tell you
19   an overview of what I felt like the meeting was
20   about.
21        Q    Just what you can recall.
22        A    Okay.  I remember meeting -- I'm assuming
23   this is the meeting that we had at 1520 Market.  I'm
24   assuming that.  Okay?  So that's the one I'm
25   thinking of.  That she -- we met on a pretty regular
```

1 basis back then, and so we met with her.  And my
2 feeling coming out of that meeting was that she was
3 not really too happy with us, that she felt like she
4 wanted to know, you know, if she -- when she ran
5 again or whatever, that were we going to be by her
6 side and have her back, basically, is the feeling I
7 got.  I cannot -- I do not say that those were the
8 exact words or anything.
9     Q    **Do you recall why you felt that way?**
10     A    Specifically, no.  I think it was more a
11 feeling of she wanted to make sure her deputies were
12 on the same page as her.
13     Q    **Do you recall what you said at that**
14 **meeting?**
15     A    No, I do not specifically.
16     Q    **Okay.  Do you recall anything that Jim**
17 **said at that meeting?**
18     A    I know Jim said that he was -- and I'm
19 paraphrasing -- okay -- just that, yes, he would --
20 he was on her team, basically.
21     Q    **Do you recall anything about any questions**
22 **or discussions about retirement either for you or**
23 **for Jim?**
24     A    Specifically, no.
25     Q    **Do you recall if that was discussed at**

1    regularly?
2       A    The only time I am actually involved in
3    adding them would be at the last minute.  Most of
4    the time it would be -- the additions would be
5    approved through the Comptroller and sent directly
6    to the E&A secretary.  I'm usually not involved in
7    the actual initial one.  It's after it becomes
8    pre-E&A discussion where they need to be add-ons is
9    kind of where I step in there.
10      Q    Okay.  And you're saying now.  Just to be
11   clear, was that also true in 2019?
12      A    As far as I remember.
13      Q    Okay.  And maybe you could just describe
14   the process as you're familiar with it as to how
15   items get on that.  You kind of touched on it there,
16   but how do items typically get on the E&A agenda?
17   Like, who specifically is involved in that process?
18      A    Normally, it is -- the mayor's office
19   usually puts on their items.  It really kind of just
20   depends on what it is.  So if it's a transfer,
21   usually the budget division gets involved.  If it is
22   a department underneath the mayor's office, they
23   usually approve it.  If it's something with our
24   office, we're supposed to run it through the
25   Comptroller first.  And then we -- you know, I do

1  send things directly to the secretary of E&A.
2           If it's something major, it goes to the
3  Comptroller's office.  If it's that I am requesting
4  to destroy vouchers that have been scanned, I don't
5  send that type of stuff to her.  It's more meaty
6  things, I guess you would call them, that you -- or
7  policies or something like that that would go to the
8  Comptroller first normally.
9           So -- and then you send it to the
10 secretary of E&A.  She then prepares a pre -- what
11 we call a pre-E&A packet, and the pre-E&A meets.
12 Usually we try to meet the Thursday before the
13 actual E&A meeting, discuss everything that's on the
14 agenda.  If anybody has any issues, you can bring in
15 things to add at that point and discuss them.  After
16 pre-E&A, there are additions to the E&A, and that's
17 kind of, you know, up until usually maybe that
18 Monday before a Wednesday E&A, you can add to it.
19 That's -- that was a big issue in the prior
20 administration of timing of doing that, but --
21      **Q    What -- what days are E&A meetings usually**
22 **on?**
23      A    Normally on a Wednesday.  Usually the
24 third Wednesday of the month is the normal.
25      **Q    Okay.  Tell me what -- just from your**

1  recollection, after -- you referenced an e-mail that
2  Jim sent.  So after he sent you that e-mail and you
3  responded to him, what happened next?
4      A   I do not remember if it was an e-mail he
5  sent or if he called me.  I don't remember that.  I
6  know he asked me to put this thing on the agenda.
7  Okay?
8      Q   Uh-huh.
9      A   And I did it right away, is -- which was
10 my problem.  So I sent it -- when I say I added it,
11 I send it to the other pre-E&A members and say, hey,
12 we're going to add this.
13     Q   Okay.
14     A   And then as soon as I hit that button, I
15 was like, oh, wait.  Does the Comptroller know about
16 this?  So I wrote back to Jim and said, Hey, had you
17 discussed this with the Comptroller before we put it
18 on?
19     Q   Okay.  And you said that's my problem.
20 What did you mean by that?
21     A   That means I should have asked that
22 question before I hit the button, you know, and --
23 you know.
24     Q   Okay.  And do you recall what he said?
25     A   He said he would.

1       Q    (By Mr. Schmitz)  Okay.  Just let me know
2  when you're ready.
3       A    Sorry.  I'm confused by where it starts.
4  Okay.
5            MS. HAMILTON:  Yeah.
6       Q    (By Mr. Schmitz)  Yeah, let's start with
7  page --
8       A    I mean, because June 5th is in the back
9  and then the -- so we're kind of backwards.
10           MS. HAMILTON:  You can take a look at it.
11           THE WITNESS:  Okay.
12           MS. HAMILTON:  You can just take your
13      time.
14      Q    (By Mr. Schmitz)  Right.  When you've had
15 a chance to look through it, then I'll start
16 referencing specific pages.
17      A    Okay.
18      Q    All right.  So I'm going to start with --
19 I know it's a little hard to read, but down at the
20 bottom of the pages are some Bates stamps that say
21 Garavaglia --
22      A    Okay.
23      Q    -- and then a number.  So about four pages
24 in, and it's going to be on -- since they're
25 double-sided, so four of the double-sided pages.  At

1  the bottom, it says Garavaglia 157.  It should be an
2  e-mail.
3       A    Oh, okay.  Got you.
4       Q    All right.  So at the top, the e-mail is
5  marked Friday, June 14th, 2019 at 10:53 a.m.  Is
6  this the e-mail that you were referring to earlier
7  in the testimony about Jim sending that to you?
8       A    Yeah.
9       Q    Okay.  So he states, Here's that extension
10 we talked about for E&A.
11           Do you recall talking to him about that
12 extension prior to him sending this e-mail?
13      A    I don't remember that, no.
14      Q    Okay.  What was your understanding when he
15 sent this as to what he was asking?
16      A    To add this extension for the developer on
17 E&A.
18      Q    Okay.  Now, after he sent that and you
19 responded below at 11:21 a.m., just to clarify your
20 earlier testimony, had you sent the e-mail to add
21 that -- the muni court --
22      A    I sent it to the other pre-E&A members,
23 right.
24      Q    All right.  And then you sent this
25 response, You did run this by the Comptroller before

```
 1   we do this?
 2        A    Right.
 3        Q    Okay.  He said, Did not, and then he --
 4   then you said, Please run it by her first.  Is that
 5   correct?
 6        A    Right.
 7        Q    Okay.  All right.  And then it looks like
 8   on Monday, June 17th, 2019, you sent a follow-up
 9   e-mail to Jim.  It says, First response.  What did
10   the Comptroller say?
11             What did you mean by that?
12        A    I do not know.
13        Q    You don't know?  Okay.
14        A    I have no idea what first response meant.
15        Q    Down below it looks like maybe you
16   forwarded a message below as well -- correct me if
17   I'm wrong -- from Mary Ries?
18        A    Oh, maybe that's what first response
19   means, is that this was the --
20            MR. NORWOOD:  Are we on a different page
21      now?
22            MR. SCHMITZ:  We are, yeah.  It goes over
23      on to 158.
24            MR. NORWOOD:  All right.  Just making sure
25      the record is clear.
```

 1    A    The response from the -- that's from the
 2 Board of Aldermen saying that she did not want to
 3 put it on.
 4    Q    (By Mr. Schmitz)  Okay.
 5    A    Or they did not.
 6    Q    Does that refresh what you might have
 7 meant by first -- your recollection as to what you
 8 meant?
 9    A    That's probably the first person that
10 responded to me, yeah.
11    Q    Got you.  And then below that where it
12 says Friday, June 14th, was that the e-mail that you
13 had sent asking --
14    A    That was -- that works with the -- between
15 the first and the second one, it looks like.
16    Q    Right.  So that was the e-mail you sent
17 after Jim sent you the original e-mail?
18    A    Right.
19    Q    Okay.  And if you turn to the very first
20 page in the packet Bates stamped Garavaglia 154, it
21 looks like on Tuesday, you sent an e-mail that said
22 extending on E&A.  You had told me she was okay with
23 this.  She told me she was not.  Did you work this
24 out with her yesterday?
25         Do you recall sending that?

1      A     Yes.
2      Q     Okay.  And he responded I did not -- or I
3   didn't talk with her about it, but I will.
4            Did you speak to her prior to Tuesday,
5   June 18th, 2019 at 8:29 a.m.?
6      A     I believe I did.
7      Q     Okay.  Do you recall when that was?
8      A     I'm trying to make sure I have the right
9   memory together, but I believe Friday night she had
10  called me.  I was on my way to dinner and she had
11  called and was like -- and I'm, like, well, I sent
12  you an e-mail about this type of deal.  So I -- I'm
13  thinking it's the same thing.  I probably -- since
14  I'm unclear, I probably shouldn't have brought it
15  up.  But there was a time where she called me and
16  said -- to discuss something, and I'm thinking it
17  was this, but I'm not a hundred percent sure.
18     Q     Do you recall whether or not it was -- you
19  know, the date is correct?  Do you recall what the
20  substance of that conversation was as it relates to
21  the E&A, you know --
22     A     It was something that she -- she wasn't
23  wanting on the E&A agenda and questioned it, but,
24  you know what, I'm not sure that it's before or
25  after this, to tell you the truth.

1     A    Yes.  I should -- yes.

2     **Q**    **(By Mr. Norwood)  Why?**

3     A    Well, she's the boss.

4     **Q**    **And you're the Deputy.  Is that part of**

5 **your duties and responsibility, to make sure that**

6 **the Comptroller -- the elected Comptroller knows**

7 **what's happening in the Comptroller's office?**

8     A    Yes.

9     **Q**    **All right.  And you mentioned or**

10 **referenced the meeting -- E&A meeting.  I believe it**

11 **was June 19, 2019 -- is that right -- the third**

12 **Wednesday of June?**

13    A    If that's the third Wednesday, yeah.

14    **Q**    **All right.**

15    A    I couldn't tell you a specific date.

16    **Q**    **All right.  When we look at the e-mails,**

17 **we'll put that in context.  But at that particular**

18 **meeting, was that a strange meeting?**

19    A    It was controversial.

20    **Q**    **Why was it controversial?**

21    A    Well, the good kind of E&A meetings are

22 where everybody says I vote aye and you are done in

23 five minutes, you know.

24    **Q**    **Okay.**

25    A    So if there's a lot of back and forth,

 1  then it becomes, you know --
 2      Q    Well, this particular meeting, the mayor
 3  read off some communications regarding the placement
 4  of the -- well, let me -- let me withdraw that
 5  question and start over.
 6           These -- this meeting that we're talking
 7  about -- and we refer to it as the muni court
 8  project.  Are these documents we're talking about
 9  related to that particular project?
10      A    Yes.
11      Q    Okay.  And the documentation itself, could
12  you describe for us if you can what those documents
13  related to as it related to that muni court project?
14      A    I can give you a high overview.
15      Q    Yes.
16      A    I do not know the documents specifically.
17      Q    Yes.  Yes, your overview.
18      A    But it was basically giving the -- I
19  believe it was giving the developer an extension of
20  time to get his financing together.
21      Q    Okay.  All right.  And this was a
22  development project -- a big development project for
23  the --
24      A    Right.  Very much so.
25      Q    Let me finish.  This was a big -- that's

```
 1   okay.  We're getting anxious.  We're almost done.
 2            This was a big development project for the
 3   City; right?
 4        A    Yes.
 5        Q    Millions of dollars involved?
 6        A    Yes.
 7        Q    Okay.  And at this meeting, E&A meeting --
 8   and for the record, that is the meeting where the
 9   mayor, the Comptroller, the President of the Board
10   of Aldermen meet to make decisions regarding
11   expenditure or finances for the City; is that right?
12        A    Yes.
13        Q    All right.  And at this particular
14   meeting, the one that you talked about, the mayor
15   read communications at that meeting; right?
16        A    If you ask me what day that happened, I
17   probably could not say, but there was a meeting
18   where she read off an e-mail stream of Jim and I's,
19   yes.
20        Q    And was that embarrassing?
21        A    Yes.
22        Q    Why?
23        A    Well, I've just never heard a mayor do
24   that before.  Kind of -- she was trying to embarrass
25   the Comptroller, and so --
```

1    Q    And what she was using to embarrass the
2  Comptroller was the fact that it looked like the
3  Comptroller's office had placed an item on the
4  agenda and was pulled off the agenda; right?
5       A    Right.  Right.
6       Q    And that's embarrassing; right?
7       A    Right.
8       Q    And this is a public meeting that's being
9  recorded for the public to see; is that right?
10      A    That's correct.
11      Q    Did you feel --
12      A    I don't know if back then it was recorded.
13  I'm sorry.
14      Q    Okay.
15      A    Was it?  I don't know.
16      Q    Well, you don't know, but it's a public
17  meeting, public --
18      A    Right.  No, it's a public meeting, but in
19  those days I think it was recorded, but I don't know
20  that it was --
21      Q    Okay.  But the public can get the
22  recording --
23      A    Right, right.
24      Q    -- if it's recorded and the public can get
25  the minutes; right?

1	A	Right.
2	Q	All right.  And you were embarrassed;
3	right?
4	A	I was.
5	Q	Why?  Why were you embarrassed?
6	A	Well, I was probably more worried, because
7	the Comptroller -- I expected her to be very angry
8	at us, you know.
9	Q	Because of the embarrassing factor?
10	A	Right.
11	Q	All right.  And this item went on the
12	agenda, and the reason it was taken off the agenda
13	is -- what you testified is because the taxes
14	weren't paid; right?
15	A	I am unclear and I do not remember if
16	it -- it was taken -- it was on the agenda and
17	manually tried to be taken off the agenda at that
18	meeting, though.  I'm making sure I'm understanding
19	your question.
20	Q	Okay.  So you -- so it was officially on
21	the agenda even though the taxes weren't paid?
22	A	Right.
23	Q	All right.  And would you consider that a
24	no-no?  Well, let me ask it this way.
25	A	I don't know how to answer that.