1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF MISSOURI

3                           EASTERN DIVISION

4

5      JAMES GARAVAGLIA,          )
                                  )
6            Plaintiff,           )
                                  )
7      vs.                        )   Case No. 4:20-CV-1681-CDP
                                  )
8      CITY OF ST. LOUIS,         )
       et al.,                    )
9                                 )
             Defendants.          )

10

11

12

13

14

15

16

17        VIDEO-RECORDED DEPOSITION OF RICHARD R. FRANK

18           TAKEN ON BEHALF OF THE DEFENDANT GREEN

19                        MARCH 10, 2022

20

21

22

23

24

25

PLAINTIFF'S
EXHIBIT

FF

 1          A      Yes, she did.

 2          Q      **Okay.  Do you know if she's currently**

 3   **employed with the City of St. Louis?**

 4          A      No, she retired shortly after I did.

 5          Q      **Okay.  All right.  Let's talk about**

 6   **forced leave.  Are you familiar with the process of**

 7   **forced leave in the City of St. Louis?**

 8          A      Yes.

 9          Q      **Okay.  What is forced leave?**

10          A      Forced leave is defined in Department

11   of Personnel Administrative Regulation 117.  Forced

12   leave can be requested by an appointing authority,

13   to be approved by me, when an employee presents a

14   potential danger to themselves, to the community,

15   to the workplace, et cetera.

16          Q      **The forced leave process I believe**

17   **you just stated is governed by St. Louis City**

18   **Regulation 117?**

19          A      Yes.

20          Q      **Is forced leave considered**

21   **discipline?**

22          A      No.

23          Q      **Why do you say that?**

24          A      It is not considered discipline

25   because an employee may use any accrued

1    compensatory time or vacation time for the period

2    of forced leave.  If they elect not to take any

3    accrued leave during the period of forced leave and

4    it is found that discipline or dismissal is not

5    warranted, then they are entitled to back pay for

6    that period of time.

7              So it is not, in the eyes of the

8    Department of Personnel, property deprivation.

9         **Q    Okay.  And one of the reasons you**

10   **identified as the use of forced leave is when an**

11   **employee could be a danger to the City.  Is that**

12   **right?**

13        A    Yes.

14        **Q    And does that danger necessarily mean**

15   **physical danger or harm?**

16        A    No.

17        **Q    Okay.  What are some other examples**

18   **of the type of danger to the City that might**

19   **warrant a forced leave?**

20        A    It could be use of -- misuse of the

21   City computer system for political reasons.  It

22   could be if they have access to confidential

23   information that could be compromised.  It could be

24   also used for investigative purposes.  So an

25   employment authority would ask to place an employee

1   where an individual was placed on forced leave

2   pending an investigation and then ultimately the

3   veil was lifted where that individual was permitted

4   to return to work?

5        A    Yes.

6        Q    Okay.  When an individual is placed

7   on forced leave, are there appeals processes that

8   can be utilized --

9        A    Yes.

10       Q    -- by that -- by that employee?

11       A    Yes.

12       Q    Okay.  And --and as the secretary for

13  the Civil Service Commission, were you involved in

14  those appeals?

15       A    Yes.

16       Q    All right.  Tell us about that

17  process, particularly as it relates to forced

18  leave.  The appeals process as related to forced

19  leave.

20            MR. BLANKE:  Let me just object just

21  to the form of the question calling for an unduly

22  long narrative response.

23       Q    (BY MR. NORWOOD)  Okay.  And without

24  having an unduly long narrative response, could you

25  tell us about those processes?

```
 1        A      If I received a request to appeal a
 2   forced leave, I would call in the administrative
 3   assistant to the Civil Service Commission, give it
 4   to her, if it were timely, which is within ten days
 5   of the notice of forced leave, and then ask him or
 6   her to schedule an appeal in front of a hearing
 7   officer.
 8        Q      Okay.  And in that context, the
 9   appeal of a forced leave, do you have an
10   understanding as to what is being looked at by the
11   hearing officer?
12        A      Yes.
13        Q      What is that that would be looked at
14   by a hearing officer in that forced leave appeal
15   context?
16        A      The hearing officer would examine
17   whether or not there appeared to be sufficient
18   justification to place the employee on forced leave
19   and that was not being done for malicious reasons.
20        Q      Okay.  When a person is placed on
21   forced leave, what happens with respect to that
22   individual remaining on the work site?
23        A      If a person is placed on forced
24   leave, they are notified that they should not
25   return to the work site.
```

1          A      It could take -- it varies greatly.

2     It could take from a few days, if it were like a

3     blood alcohol test, to sometimes several years if

4     it were a matter that were in the police division,

5     being investigated by the internal affairs division

6     which involve criminal charges.  So it did vary

7     widely.

8          **Q      Okay.  Have there -- when you were**

9     **director of personnel, were there situations,**

10    **occasions, where a forced leave would be rescinded**

11    **and then reinstated?**

12         A      Yes.

13         **Q      Was there anything out of the**

14    **ordinary about that process while you were director**

15    **of personnel?**

16         A      It's unusual, but it did occur when

17    more information was forthcoming that necessitated

18    another -- a further investigation.

19         **Q      Okay.  So if I'm understanding your**

20    **prior testimony, where, for instance, you said**

21    **sometimes it could take years, as part of an**

22    **investigation, as information comes in, does it**

23    **continue to get extended?**

24         A      Yes.

25         **Q      Why?**

1          A     Because again, once you get into an

2     investigation, you can find additional matters of

3     concern.  Additional allegations can surface.

4          **Q     Okay.  If additional information**

5     **comes to light, in your experience as director of**

6     **personnel, is it prudent to ignore that additional**

7     **information as it comes in?**

8          A     No.

9          **Q     Why not?**

10          A     Because all of that should be taken

11     into consideration when making the ultimate

12     determination as to whether or not the employee

13     should be set for a pre-disciplinary review or a

14     pre-termination review.

15          **Q     Okay.  And you identified situations**

16     **where there was a forced leave, there was an**

17     **investigation, and ultimately the individual**

18     **returned to work.  Is that right?**

19          A     Yes.

20          **Q     And would that be -- well, strike**

21     **that.**

22               **Under what circumstances would, once**

23     **that process works, would an individual be returned**

24     **to work?  Give us examples of how that operates.**

25          A     We had a situation, for instance,

1  where an employee was accused of -- of workplace

2  violence, and it was invest -- and so he was placed

3  on forced leave.

4          And then upon further review, he was

5  allowed to return because they did not -- the

6  appointing authority did not believe that the

7  threat was truly physical harm.

8          But then the employee, upon returning

9  to work, made a very viable threat and made

10  physical contact with a supervisor, so he was

11  placed on forced leave again.

12          We've had situations in the police

13  division where the person was placed on forced

14  leave due to a complaint through perhaps the -- a

15  Civilian Oversight Board or through a, you know, a

16  member of the public, and while the particular

17  charge or allegation was found not meritorious, the

18  internal affairs division uncovered other

19  circumstances during its investigation that

20  warranted forced leave again.

21      **Q    Okay.  So if I'm understanding you,**

22  **if there was an investigation and it turns out**

23  **that, you know, there's not a basis for the next**

24  **step, which could be discipline, what happens then**

25  **to that employee?**

```
 1          A      The person would be returned to work
 2    if there was no basis for it.
 3          Q      And what about any utilization of --
 4    of time?
 5          A      Yes, sir.  As I addressed previously,
 6    if they elected to take any accrued compensatory
 7    time or vacation leave, then they've already been
 8    paid, you know, for that time.  And if the period
 9    of forced leave were greater than what they had,
10    they would be restored the difference.
11                 As an example, if they had only two
12    weeks of time and the forced leave were for three
13    weeks and they were found not to be at fault, they
14    would get the one week time difference.
15                 If they elected not to take any time
16    during this period of forced leave for that three
17    weeks, they would get paid for the entire three
18    weeks.
19          Q      Okay.  All right.  Now, what about
20    appeals processes?  Are you aware of situations
21    where an individual was placed on forced leave and
22    appealed and ultimately the forced leave was
23    rescinded?
24          A      Yes.
25          Q      And what happens to the employee in
```

1    that circumstance?

2         A     They are paid for the period that

3    they were off on forced leave.

4         **Q     And what about them returning to**

5    **work?**

6         A     They would return to work, you know,

7    upon the expiration -- or the rescission of the

8    forced leave.

9         **Q     Okay.  If an individual is ultimately**

10   **disciplined, and we're going to talk a little bit**

11   **more about the discipline in that process, are you**

12   **aware of situations where that disciplined employee**

13   **appealed that discipline?**

14        A     Yes.

15        **Q     And if that employee is successful in**

16   **that appeal, what happens to the employee?**

17        A     That depends on the decision of the

18   Civil Service Commission.  They can totally

19   overturn the discipline, in which case the employee

20   is made whole in terms of any lost pay and

21   seniority, et cetera, or the Commission retains the

22   right to reduce the discipline if they feel that

23   there, you know, were -- there were some fault on

24   the part of the employee but that the discipline

25   imposed by the appointing authority was excessive.

1         Q     Okay.  So -- so it sounds like the
2    Commission, then, serves as sort of a watchdog to
3    make sure that, if there's discipline of a civil
4    service employee, that it -- it's justified, and,
5    therefore, can effectively remove any discipline
6    and send that employee back to work.  Is that
7    right?
8         A     Yes.
9         Q     And restore any lost benefits?
10        A     Yes.
11        Q     Is it your understanding that an
12   appointing authority needs proof that an individual
13   engaged in misconduct before an individual is
14   placed on forced leave?
15        A     No.
16        Q     You identify forced leave as a way to
17   remove an employee from the workplace while an
18   investigation is going on.  Why is it important to
19   remove an employee from the workplace while the
20   investigation is going on?
21        A     Because --
22              MR. BLANKE:  Objection, asked and
23   answered.
24              MS. HAMILTON:  You can answer.
25        A     Because if the allegations are so

 1      A      Pre-termination is a process whereby

 2   an employee is officially put on notice via letter

 3   that the City -- the appointing authority

 4   specifically is contemplating the need to dismiss

 5   them from their job.

 6      **Q      Okay.**

 7      A      It's -- it's outlined in

 8   Administrative Regulation 117 in -- in terms of how

 9   that procedure works and what the necessary

10   elements are.

11      **Q      Does -- well, once a pre-termination**

12   **notice is sent, does that process lead to**

13   **termination?**

14      A      It leads to a pre-termination review,

15   which is not a formal hearing, but it is a review

16   where the employee and his or her representative

17   can review the evidence and also respond to any of

18   the allegations and basically fulfill the elements

19   that are required under Administrative Regulation

20   117.

21      **Q      Okay.  And are you aware of**

22   **situations where that process has occurred and the**

23   **-- and no discipline was issued?**

24      A      Yes.

25      **Q      And if that happens, what happens**

1    **with respect to the employee returning to work and**

2    **restoration of any benefits?**

3          A      Again, typically, if a person is

4    placed on -- if they are notified that they are

5    being placed on -- I'm sorry, if they are being set

6    for a pre-termination review, the appointing

7    authority would consult with myself and possibly

8    the law department, and in most cases those people

9    would be placed on forced leave because the

10   employee is put on notice that they may be losing

11   their job.

12          So in most instances the employee

13   would be placed on forced leave and then again that

14   process that we discussed would trigger where they

15   could either elect to take time that they have

16   accrued, or not.

17          **Q      And if that happens, though, and it's**

18   **ultimately determined that, based on those**

19   **incidents you identified, that there was no basis**

20   **for discipline, what happens to that employee in**

21   **terms of returning to work and restoration of**

22   **benefits?**

23          A      Then the employee is returned to work

24   as -- as quickly as possible, and the employee, if,

25   again, if they took any time, if the period of

1    forced leave were greater than the amount of time

2    they were on forced leave, they would be paid the

3    difference.

4            If they were not, if they choose not

5    to take any time, they get paid for that -- that

6    period of forced leave and, you know, any seniority

7    or any holidays, you know, they're made whole

8    essentially under -- under our rules.

9        **Q      But during the forced leave period of**

10   **time and during the pre-termination period of time,**

11   **essentially they are on paid leave.  Is that right?**

12           MR. BLANKE:  Objection, leading.

13       **Q      (BY MR. NORWOOD)  Well, are they on**

14   **paid leave in that circumstance?**

15       A      It can be either paid or on -- on

16   leave without pay.

17       **Q      Okay.  All right.  Once a**

18   **pre-termination -- is it a pre-termination hearing;**

19   **is that what it's called?**

20       A      We call it a pre-termination review.

21       **Q      Okay.  Once a pre-termination review**

22   **happens, and if there is a determination of a need**

23   **to impose some form of discipline, can the employee**

24   **appeal that determination to the Civil Service**

25   **Commission?**

1      discipline following the pre-termination review,

2      there was an appeal to the Civil Service

3      Commission, and the Civil Service Commission

4      determined that the discipline was improper, and

5      the individual was returned to work?

6           A     Yes.

7           Q     Is it fair to say that this whole

8      Civil Service Commission process is a safeguard to

9      avoid a situation where a civil service employee is

10     wrongfully charged?

11          A     Yes.

12          Q     Okay.  Let's talk about

13     Mr. Garavaglia's forced leave situation.  Did you

14     have any involvement in that forced leave process?

15          A     Yes.

16          Q     Tell us about your involvement in

17     that process as it relates to Mr. Garavaglia.

18               MR. BLANKE:  Objection.  Calls for an

19     unduly long narrative response.

20          Q     (BY MR. NORWOOD)  Subject to that

21     sir, and unless --

22               MS. HAMILTON:  You can answer.

23          A     I received a phone call on a Saturday

24     -- Saturday afternoon from the appointing authority

25     designate -- for the Comptroller, Judy Armstrong,

1    advising that the Deputy Comptroller, Garavaglia,

2    was -- they were concerned that he was involved in

3    some serious fiscal issues and was not complying

4    with the Comptroller's office's protocols, and that

5    they were so serious as to warrant a

6    pre-termination review.

7         Q    (BY MR. NORWOOD)  All right.  And

8    that was by way of a phone call?

9         A    Yes, sir.

10        Q    Do you recall when that phone call

11   occurred?

12        A    I don't remember the exact month.  I

13   know it was a Saturday afternoon at approximately

14   1:30 PM.

15        Q    All right.  Is it common for you to

16   receive an oral request for forced leave?

17        A    Yes.

18        Q    And when you receive an oral request

19   for forced leave, do you -- if you agree, does it

20   happen at that point in time, once you have

21   approved it orally?

22        A    It still has to be ratified by me via

23   the 72 hour written notification.  So the

24   appointing authority may call me or, again, like

25   the law department, to discuss a particular matter

```
 1          A     This is a request from Comptroller
 2   Green dated July 18, asking that I place
 3   Mr. Garavaglia -- or approve Mr. Garavaglia's
 4   forced leave for serious fiscal improprieties.
 5          Q     Okay.  Did you ultimately approve
 6   that request?
 7          A     Yes, I did.
 8          Q     All right.  Let's turn to the next
 9   tab, Frank Depo Exhibit 6.  What is that document?
10          A     This is a copy of my approval of the
11   request for a forced leave for Mr. Garavaglia dated
12   July 18, 2019.
13          Q     Okay.  And there is some writing on
14   that document; is that correct?
15          A     Yes.
16          Q     And whose writing is that?
17          A     That is mine.
18          Q     And for the record, could you read
19   what you wrote on July 18, 2019?
20          A     "Approved RF 7/18/19."
21          Q     All right.  And why did you approve
22   this request for forced leave?
23          A     I approved this request for
24   essentially the same reasons, which were the
25   allegations made by Comptroller that -- and that
```

1    they were -- they were investigating serious fiscal

2    improprieties and some issues of -- related to that

3    from Mr. Garavaglia.

4         **Q     Okay.  And would an investigation**

5    **into serious fiscal improprieties justify a forced**

6    **leave?**

7         A     Yes.

8         **Q     For the reasons you've already**

9    **stated?**

10        A     Yes.

11        **Q     Does it become more important when**

12   **you have an individual who is a high level employee**

13   **of the City?**

14        A     Yes.

15        **Q     Why?**

16        A     Because of the magnitude of their

17   decisions.  They have a greater impact to

18   decision-making, and they also have, typically,

19   involvement in contracts and with vendors and the

20   magnitude of their authority is greater.  So it's

21   amplified.

22        **Q     What about their supervisory**

23   **authority?**

24        A     That's certainly another issue, they

25   -- being as high as Mr. Garavaglia was, he had, you

1              a-n, including termination.

2              Is that a fair reading of what's I

3    -- what's in the communication?

4         A    Yes.

5         Q    And is that consistent with your

6    assessment of the reason why you approved the

7    second forced leave and the first forced leave in

8    the first place?

9         A    Yes.

10        Q    Okay.  Now, let's go to Frank

11   Deposition Exhibit 9.  What is Frank Deposition

12   Exhibit 9?

13        A    This is a letter from Comptroller

14   stating that she would like to officially withdraw

15   her request for forced leave for Mr. Garavaglia.

16        Q    And it's dated August 28, 2019.  Is

17   that correct?

18        A    Yes.

19        Q    And it looks like Mr. Garavaglia,

20   Judy Armstrong, Nancy Kistler were also copied on

21   this letter from Comptroller Darlene Green.  Is

22   that right?

23        A    Yes.

24        Q    All right.  Let's go to the next

25   item, number 10.  And what is this item number 10?

1          A     This is a letter from Comptroller

2     notifying Mr. Garavaglia that he is being set for a

3     pre-termination review.

4          Q     Okay.  And --

5          A     It says "hearing," pardon me, but

6     actually it's a review.

7          Q     Is the -- the nomenclature is review

8     as opposed to hearing; correct?

9          A     Yes.

10          Q     And it's dated August 28, 2019.  Is

11     that correct?

12          A     Yes.

13          Q     Now, it lists a number of bases for

14     the pre-termination review.  And the first one, let

15     me read that into the record because I have a few

16     questions to ask you about that.

17                    It says, quote, (Quote as read):

18                    You have improperly signed multiple

19                    City contracts and contract

20                    extensions, including automatic

21                    extensions without legal

22                    authorization to do so, putting the

23                    City at risk, dating back to 2019.

24                    Do you see that?

25                    MS. HAMILTON:  2009.

 1          Q       (BY MR. NORWOOD)  I'm sorry, 2009.

 2          A       Yes, I see that.

 3          Q       Dating back to 2009; correct?

 4          A       Yes.

 5          Q       Now, if we unpack that, would the

 6      improper signing of multiple City contracts and

 7      contract extensions, would that be a grounds for

 8      discipline?

 9          A       Yes.

10          Q       Why?

11          A       That is a very serious charge under

12      both the -- the Code of Ethics and it would be an

13      exception to progressive discipline under

14      Administrative Regulation 117.

15          Q       Okay.  Does it matter that the --

16      that any of the contracts that might be referenced

17      here date back to 2009?

18                  MR. BLANKE:  Well, let me object to

19      the form of the question as to whether it matters,

20      that --

21                  MR. NORWOOD:  Well, let me say -- let

22      me withdraw that question, let me withdraw that

23      question, and let me ask it another way.

24          Q       (BY MR. NORWOOD)  If an investigation

25      determines past improprieties, are those past

1    improprieties to be ignored in the context of that

2    investigation?

3          A     No.

4          Q     Why not?

5          A     Because they're still relevant to the

6    overall performance of the employee, you know, in

7    his or her position and whether or not they, um,

8    you know, are fit for continued service.

9          Q     Okay.  And there are a listing of

10   other charges on that page.  Is that correct?

11         A     Yes.

12         Q     The next page, there is a reference

13   to certain provisions of the City of St. Louis

14   Department of Personnel, Administrative and Joint

15   Regulations, Employee Code of Conduct; you see

16   that?

17         A     Yes.

18         Q     If we look at the next to last

19   paragraph, and I'll read that one into the record,

20   it says, quote, (Quote as read):

21                    The purpose of this pre-termination

22                    hearing is to allow you the

23                    opportunity to respond to the

24                    charges, review any evidence against

25                    you, present any evidence you have on

1  of the question regarding the use of the word
2  "would" rather than "should," whether it would or
3  not calls for speculation.
4          MS. HAMILTON:  You can answer.
5      A    Yes.
6      **Q    (BY MR. NORWOOD)  All right.  I want**
7  **to backtrack a bit, and I hate to jump around, but**
8  **let's take a look at tab 1.  And while you're --**
9  **and it's marked Frank Deposition Exhibit 1.  And**
10 **while folks are locating that tab, for the record,**
11 **that exhibit, Frank Depo Exhibit 1, is a document**
12 **entitled Second Amended Complaint for Employment**
13 **Discrimination filed by Mr. James Garavaglia**
14 **against the City of St. Louis and Darlene Green.**
15         **Do you see that document?**
16     A    Yes, I do.
17     **Q    All right.  And let me direct your**
18 **attention to paragraph -- I'm sorry.  Page 4.  Do**
19 **you have that page, sir?**
20     A    I do.
21     **Q    Okay.  And let me read some of the**
22 **language.  Let's start at paragraph 16.**
23         **It says, quote, (Quote as read):**
24         **Defendant Green then withdrew**
25         **Plaintiff's forced leave yet again**

```
 1                    for the same reasons as set forth
 2                    above, repeating this conduct for the
 3                    third separate occasion,
 4                    necessitating Plaintiff multiple --
 5                    I'm sorry, Plaintiff filing multiple
 6                    appeals to the Civil Service
 7                    Commission.
 8                    Do you see that?
 9         A     Yes.
10         Q     And then paragraph number 17 says,
11    quote, (Quote as read):
12                    The City's director of personnel
13                    approved the forced leave each time,
14                    knowing that there was no supportable
15                    basis for each forced leave decision
16                    and/or conspired with Defendant Green
17                    to discriminate against Plaintiff as
18                    alleged herein.
19                    Do you see that?
20         A     I do.
21         Q     All right.  Did you approve -- let's
22    focus on the first forced leave.  July 2, 2019.
23    Did you approve the July 2, 2019, forced leave
24    request with -- without any supportable basis?
25         A     No, I did not.
```

```
 1        Q     Did you approve the July 2, 2019,
 2   forced leave request because you were in some
 3   conspiracy with Comptroller Green to discriminate
 4   against Plaintiff?
 5             MR. BLANKE:  Let me object, calls for
 6   legal conclusions on the part of the witness.
 7             MS. HAMILTON:  You can --
 8        Q     (BY MR. NORWOOD)  Well, your
 9   understanding of conspiracy.  Were you huddling up
10   with Comptroller Green in an effort to discriminate
11   against Mr. Garavaglia based on race, sex, age?
12        A     No.
13             MR. BLANKE:  Same objection.
14             MR. NORWOOD:  I'm sorry?
15             MR. BLANKE:  Same objection.
16             MR. NORWOOD:  And I just want to make
17   sure the witness --
18             MR. BLANKE:  He said no.
19             MR. NORWOOD:  Well, I to make sure
20   she got that.
21             THE WITNESS:  I'll slow down.
22             MR. NORWOOD:  You can say what he
23   said, but let's let him say it again.
24        Q     (BY MR. NORWOOD)  Could you answer
25   that one?
```

```
 1        A     No.
 2        Q     What's your view of that allegation
 3   directed to -- against you personally?
 4              MR. BLANKE:  Objection as to
 5   relevance.
 6              MS. HAMILTON:  You can answer.
 7        A     I only have -- first I had only one
 8   conversation with Comptroller herself, as I said in
 9   my original conversation with Judy Armstrong on the
10   Saturday before I approved the forced leave.  I did
11   not speak with Comptroller.  I only spoke to
12   Comptroller once and that was after this matter,
13   you know, had occurred about Mr. Garavaglia.
14              And secondly, in terms of conspiracy
15   to discriminate, I only met Mr. Garavaglia perhaps
16   once.  So I had very, very little knowledge of him
17   other than he was a nice guy.
18        Q     (BY MR. NORWOOD)  Well, and so did
19   you have any reason to conspire against him based
20   on his age or sex or race or anything like that?
21        A     No.  I think we're sort of in the
22   same group there.
23        Q     Got it.  And for the record, what
24   group is that?
25        A     I'm a white male who is 61 years of
```

 1   age.

 2        **Q     Okay.  All right.  Let's go to tab --**

 3   **Exhibit tab 11, Frank Deposition Exhibit 11.  Take**

 4   **your time, if you could, just take a look at the**

 5   **exhibit which, for the record, there are two pages,**

 6   **and it's Bates stamped STL000707 on the first page,**

 7   **and the second page is STL000708, for the record.**

 8              **First of all, what is the first page**

 9   **of Frank Depo Exhibit 11?**

10        A     This is a letter from Comptroller

11   Green asking me to give a -- to approve, pursuant

12   to the compensation ordinance, a non-standard

13   increase for Mr. Garavaglia upon his promotion to

14   Deputy Comptroller.

15              The compensation ordinance provides

16   that a person receive a 5 percent normally upon

17   promotion; although, the appointing authority can

18   ask for approval from the director of personnel to

19   grant a higher, non-standard promotional increase

20   in certain circumstances.

21        **Q     Okay.  Let's unpack that, if we**

22   **could.**

23              **In the normal course, based upon what**

24   **you understood, him being promoted to deputy**

25   **Comptroller would have entitled him to a 5 percent**

1    **salary increase from where he was being**

2    **compensated; is that right?**

3          A     Yes.  Or, with the proviso that he

4    would also go to the minimum of the range.  So this

5    was not the case I believe here, but sometimes

6    there is such a large gap between pay ranges that

7    it might automatically result in a 7 percent, et

8    cetera.

9          **Q     Right.**

10         A     But -- but not -- not in this case to

11   the best of my recollection.

12         **Q     Okay.  So he would have been entitled**

13   **to a 5 percent salary increase; is that right?**

14         A     Yes.

15         **Q     And because of that, why -- well,**

16   **strike that.**

17                **So why would Comptroller Green have**

18   **to send this to you as it relates to his**

19   **compensation?**

20                MR. BLANKE:  Objection, asked and

21   answered.

22                MS. HAMILTON:  You can answer.

23         A     In our system, the compensation

24   ordinance is the legal document that determines how

25   we pay all of our civil service employees, and even

1    excepted employees, and it gives discretion to the

2    director of personnel alone to approve non-standard

3    increases.

4         **Q    (BY MR. NORWOOD)  Okay.  And -- and**

5    **the non-standard, if I'm understanding you, and you**

6    **correct me if I'm wrong, the non-standard increases**

7    **would be the increases beyond the document that**

8    **you've identified; is that correct?**

9         A    Yes, sir.

10        **Q    All right.  And do you know why**

11   **Comptroller Green requested a 5 percent salary**

12   **increase above what he would normally be entitled**

13   **to?**

14        A    My understanding was because he was

15   moving to such a high level --

16             MR. BLANKE:  Objection, it's

17   non-responsive.  The question was whether you know

18   why.

19             THE WITNESS:  Whether I know why?

20             MR. NORWOOD:  Well, and he was

21   answering whether he knew why.

22             MS. HAMILTON:  You can -- you can

23   continue.

24             MR. BLANKE:  I might object to that

25   one.

```
 1              MS. HAMILTON:  He's objecting.  You
 2    can continue.
 3         A     My understanding was that --
 4              MR. BLANKE:  Objection,
 5    non-responsive.  He's not us asking what your
 6    understanding was.
 7              MS. HAMILTON:  Your objection is
 8    noted, Counsel.  You can answer.
 9              MR. BLANKE:  I understand.  I just
10    wanted to object to it again.
11         A     My understanding from -- from the
12    Comptroller's office was because he was moving to a
13    very high level position.
14         Q     (BY MR. NORWOOD)  Okay.  And do you
15    know if she was required to add another 5 percent?
16         A     No.
17         Q     Do you know why, if Comptroller Green
18    was discriminating against him based on his race or
19    sex or age, why she would recommend a 5 percent
20    increase over and above what he would normally be
21    entitled to?
22              MR. BLANKE:  Objection, not supported
23    by the evidence, and calls for speculation.
24              MS. HAMILTON:  You can answer.
25         A     No.
```

 1          Q     (BY MR. NORWOOD)  Let's go to the
 2    next page of Frank Deposition Exhibit 11.  What is
 3    that?
 4          A     This is a letter to Comptroller Green
 5    from me saying that based upon her recommendation
 6    and in accordance with the compensation ordinance,
 7    I am approving her request.
 8          Q     Okay.  And just so that my record is
 9    -- our record is square, the first letter is dated
10    May 20, 2016, from Darlene Green to you; is that
11    correct?
12          A     Yes.
13          Q     All right.  And is that when he was
14    promoted to Deputy Comptroller?
15          A     Actually, the date I believe, sir,
16    says that his promotional date would be as of
17    May 13, 2016.
18          Q     Okay.  So -- so would that suggest
19    then that he was actually promoted on May 13, 2016?
20          A     Yes.  It would suggest that.
21          Q     All right.  And the request, which
22    would have been made May 20, 2016, would have meant
23    that his effective salary increase would start as
24    of his promotion date.  Is that right?
25          A     Yes.

```
 1          Q      All right.  But all of that had to be

 2    approved by you.

 3          A      Yes.

 4          Q      All right.  Let's go to the next page

 5    of that Frank Depo Exhibit 11 which is a letter --

 6    it appears to be a letter -- well, strike that.

 7                 What is that page of the exhibit?

 8    For the record --

 9                 (Overtalking - inaudible.)

10                 MR. BLANKE:  What page are we on?

11                 MR. NORWOOD:  For the record --

12                 MR. SCHMITZ:  You said "the next

13    page."  What page are you on?

14                 MS. HAMILTON:  We're on 11.

15                 MR. NORWOOD:  The second page of

16    Exhibit 11 and the Bates stamp page number, for the

17    record, is STL000708.

18                 MR. BLANKE:  So you're one back.

19                 MS. HAMILTON:  No, you're on the

20    correct page.

21                 MR. BLANKE:  Oh, okay, sorry.

22          A      This is my response, sir, to

23    Comptroller Green approving her request for a

24    non-standard 10 -- approximately 10 percent

25    increase for Mr. Garavaglia upon his promotion to
```

1    Deputy Comptroller.

2         Q    (BY MR. NORWOOD)  Okay.  And for the

3    record, the letter is dated June 6, 2016.  Is that

4    correct?

5         A    Yes.

6         Q    Okay.  Let's read the second

7    paragraph of that letter.  And before we do that,

8    it looks like it was CC'd to Terry -- who is that?

9    How do you pronounced that last name?

10        A    Terry Dabrowski.

11        Q    Dabrowski, okay.  And who is Terry

12   Dabrowski?

13        A    She was the manager of the personnel

14   services section of the Department of Personnel.

15   She's since passed away.

16        Q    Okay.  Second paragraph says quote,

17   (Quote as read):

18             Based on your recommendation, please

19             be advised that, in accordance with

20             Section 6(a)(1), I am hereby

21             approving your request.

22             Is that right?

23        A    Yes.

24        Q    And so you did approve the request;

25   right?

1          A     Yes.

2          Q     All right.  And then it goes further

3     and says, quote, (Quote as read):

4                Therefore, upon Mr. Garavaglia's

5                appointment to the position of Deputy

6                Comptroller, in parens it has

7                (01488-21M-1).

8                What is that number?

9          A     That number refers to his actual

10    position and pay grade, the M meaning that he is a

11    management person, the 1 meaning that he's excluded

12    from overtime provisions of the FLSA.

13         Q     Okay.  And continuing on, it says,

14    (Quote as read):

15                His salary shall be $4,867 biweekly

16                (step 15), approximately 10 percent.

17                Is that correct?

18         A     Yes.

19         Q     What is step 15?  What does that

20    mean?

21         A     There are 30 steps in the current

22    compensation ordinance.  Each step is approximately

23    1.5 percent higher than the next, and so in order

24    to make sure that the payroll office and the

25    Comptroller's office, we set a salary correctly, we

```
 1          Q      And for the record, it is a document
 2    that has a heading, Acknowledgment of Retirement
 3    Pension Laws, Rules, Regulations and Policies.
 4                 Do you see that?
 5          A      Yes.
 6          Q      What is that?
 7          A      This is something that's a notice
 8    that is required to be signed by anyone who is
 9    applying for retirement through the Employees
10    Retirement System.
11          Q      Okay.  And for this particular
12    document, STL001407, is that signed and
13    acknowledged by Mr. James Garavaglia?
14          A      Yes, it is.
15          Q      And is dated 8/30/19; is that right?
16          A      Yes.  That's correct.
17          Q      And that's him essentially
18    acknowledging the retirement pension laws, rules,
19    regulations, and policies; is that right?
20          A      Yes.
21          Q      Okay.  Is there a process in the
22    City, at least when you were there as director of
23    personnel, is there a process by which a person can
24    pursue a grievance if that person believes he or
25    she has been discriminated against based upon race,
```

1    age, or sex?

2          A     Yes.

3          Q     **What is that process?**

4          A     It's covered under Administrative

5    Regulation 51, which is -- pardon me.  Pardon me.

6    It's covered by -- I believe it's Administrative

7    Regulation 103 which is the policy against Title

8    VII type of -- of violations, and it instructs the

9    employee that they can either go to their diversity

10   counselor in their own department, or they can go

11   to their appointing authority, or they can come

12   directly to the employee relations section and

13   speak in confidence to, you know, a member of the

14   department personnel staff.

15         Q     **Okay.  And that would be a**

16   **confidential communication; is that right?**

17         A     Yes.

18         Q     **All right.  Do you know if James**

19   **Garavaglia ever pursued any claim of discrimination**

20   **against Comptroller Darlene Green, or anyone else,**

21   **based upon race, age, or sex discrimination**

22   **allegations?**

23         A     I'm unaware myself of any.

24         Q     **Okay.  And while you were there, had**

25   **you received anything along those lines?**

1   that she would.  I don't know if she came through

2   or not, she did not speak, but I thought that -- I

3   thought I heard another name, but I'm -- I'm not

4   sure if it was Beth or Beverly or I might be

5   mistaken.

6          Q     Okay.  Fair enough.  Now, you

7   indicated that -- I thought you said that in that

8   conversation with Judy Armstrong, that she informed

9   you -- I'm talking about the phone call.  The oral

10  phone call on a Saturday.  Okay?

11         A     Yes.

12         Q     That she informed you that

13  Mr. Garavaglia was being accused of serious fiscal

14  issues.

15         A     Yes.

16         Q     Can you be more specific than that?

17  What -- what -- did she identify what she was

18  talking about?

19         A     No, she did not.

20         Q     And that was enough for you?

21         A     It was enough because she said that

22  they were serious enough that they were bringing

23  them to the attention of the state auditors.

24         Q     Let me go back, I -- I hate -- sorry

25  about jumping around.

1    page, this is  -- on the top it says Approval of

2    Forced Leave, it's an email dated July 2, 2019,

3    same day, from you to Darlene Green with a copy to

4    Chana Morton; is that correct?

5         A    Yes.

6         Q    And again, you are approving the

7    request.  Right?

8         A    Yes.

9         Q    And you say "pending his

10   pre-termination review."  Is that correct?

11        A    Yes.

12        Q    Where -- where -- where does it say

13   that?  That this is pending -- why did you add that

14   phrase, "pending his pre-termination review"?

15        A    Because during this initial

16   discussion that I had with Ms. Armstrong on

17   Saturday, the Saturday before this date, they

18   indicated that the allegations against

19   Mr. Garavaglia were so serious as to warrant forced

20   leave in their opinion.

21             And I specifically inquired what

22   action, you know, they were seeking, and they

23   explained that they were -- they believed that they

24   would investigate and it may result in a

25   pre-termination review.

```
 1                    And I advised them at that point.
 2          Q       And then if you look at the next two
 3   pages, which are letters from Darlene Green to
 4   Mr. Garavaglia, both dated, again, July 2 of 2019,
 5   did you ever see those before?  To the best of your
 6   recollection?
 7          A       The one on July 2nd.  It's not
 8   numbered, but --
 9          Q       They're all dated July 2nd.
10          A       Yeah, this first one, no.  Again,
11   that's talking about failure to, um, supervise.
12   No, that one I don't recollect having seen.
13          Q       And the next one?
14          A       Yes.  That one I do.  I do recollect
15   seeing.
16          Q       Now, how do you remember that?  Which
17   is which?  How do you know the one you saw and the
18   one you didn't see?
19          A       Because I knew nothing about the
20   specificity of the allegations involving the
21   Municipal Court during my conversation with
22   Ms. Armstrong.
23                  The only thing I heard was that she
24   said that there were serious allegations of -- of
25   fiscal improprieties, and she went into no greater
```

1  detail than to say that it may have had something

2  to do with corrections.  That's the only thing I

3  knew.  So this is --

4      **Q    Now -- now, in this letters to Jim**

5  **Garavaglia, also dated July 2nd, Miss Green says**

6  **the same thing you said in your approval email.**

7  **That (Quote as read):**

8                  **you are being placed on official**

9                  **forced leave, pending a**

10                 **pre-termination hearing.**

11                 **They say that.  Right?**

12     A     Yes.

13     **Q     Both of them do.  Both of these**

14  **versions of this notice to Mr. Garavaglia of the**

15  **forced leave say that.  Correct?**

16     A     Yes.

17     **Q     So do you recall, when you talked to**

18  **Miss Armstrong on that Saturday, whether she said**

19  **that this was going to head up -- this was going to**

20  **end up as a pre-termination hearing, or anything to**

21  **that effect?**

22     A     She indicated that it could, pending

23  the investigation.  That it could end up as a

24  pre-termination hearing, and we discussed what that

25  procedure entailed.

1                "improprieties" to strengthen and
2                clarify (without being too
3                restrictive)?  Thanks.
4        **Q     And then above that, there is an**
5  **email from Chana Morton on behalf of Darlene Green**
6  **saying, (Quote as read):**
7                **Please see the attached updated**
8                **request.**
9                **Is that right?**
10       A     Yes.
11       **Q     Were there any oral conversations**
12 **between you and Chana Morton about all of these**
13 **letters, or versions?**
14       A     I believe there was one conversation
15 -- two conversations that I had with Chana maybe in
16 total.  One was the one on Saturday where she
17 connected the phone call, and then this one was
18 regarding me telling her, you know, that it was
19 important to include what we -- we talked about in
20 the original conversation on that Saturday before
21 July 2nd.  That these were serious allegations of
22 fiscal impropriety.
23       **Q     Did you have any conversations with**
24 **Darlene Green about this matter?**
25       A     No.

1    know, you don't know.  I'm not trying to trap you

2    or anything.  I'm just asking --

3           A     Well --

4           Q     -- whether or not you know -- you

5    already had testified that you don't remember --

6           A     Yeah.

7           Q     -- seeing it or reading it, but my

8    question now is simply, do you remember or do you

9    know whether you actually received it in your

10   office?

11          A     It would not have come to my

12   attention.  This type of letter involving

13   employees, like fitness for duties or reports on

14   fitness for duties, or questions that had to do

15   with employees being notified of benefits,

16   regarding the benefits section, if it had to do

17   with forced leave.

18                My secretary, who's retired, Chris

19   Dussault (phonetic), would keep a file of all the

20   forced leave files.  So that's just how the flow of

21   paperwork, you know, anything that I had was a

22   decision point, you know, I would get, and I

23   typically kept a personal copy even though there

24   was one in the computer system, and my secretary

25   usually had one, so.

 1          Q       One more question about all this.

 2          A       Mm-hmm.

 3          Q       And that is, why did you specifically

 4    advise the Comptroller's office to put the words

 5    "serious" and "fiscal" into their request?

 6          A       I think I've answered that but I'll

 7    answer it again.  It's because those were what the

 8    original allegations were, as explained to me by

 9    Judy Armstrong on that Saturday before, which she

10    said could possibly, if found true, could trigger a

11    pre-termination review.

12          Q       Okay.

13          A       So, you know, that was the consistent

14    thing.

15          Q       And -- and there was nothing in that

16    conversation about Muni Corp; you already testified

17    to that?

18          A       No.

19          Q       What -- um, let's go to the July 23rd

20    letter which, is -- I lost my place.

21          A       I think I --

22          Q       From Paul Schmitz, sitting right next

23    to me here, Mr. Garavaglia's attorney in the Civil

24    Service Commission proceeding, to Ashley McClain.

25                  MR. NORWOOD:  Where is that Counsel?

1    in front of a hearing officer as soon as practical

2    because, you know, it's obviously a important issue

3    for the employee.

4        **Q    (BY MR. BLANKE)  Is it your ordinary**

5    **practice to discuss extensions with the person**

6    **requesting them before you grant the extension?**

7        A    Sometimes.

8        **Q    Sometimes yes; sometimes no?**

9        A    Sometimes no.

10       **Q    Okay.  What -- what would -- well,**

11   **okay.  Now, why did you grant the extension?**

12       A    I granted the extension because of

13   the communication I had received from the

14   Comptroller before that the state auditors, you

15   know, were involved.  I knew that she had planned

16   to have them involved from my original conversation

17   that I go back to on that Saturday, and the state

18   auditors were taking longer, as they often do.

19       **Q    So I understand this, I just want to**

20   **be clear.  Did you discuss the audit with -- with**

21   **Defendant Green -- I'm sorry, with --**

22       A    No.

23       **Q    -- Judy Armstrong --**

24       A    No.

25       **Q    -- on the Saturday afternoon con --**

1    **phone call?**

2         A     No.  I think what I testified to here

3    today was I discussed what the allegations were,

4    they were of a --

5         **Q     Right.**

6         A     -- very serious nature, and also that

7    they -- they -- I said do you think that this is

8    something that could, if crew and true, could

9    reasonably lead to, you know, termination,

10   dismissal, and Judy Armstrong said yes, you know,

11   that the auditors are also very concerned about

12   this.

13        **Q     Oh, so she did mention it?**

14        A     Yeah, she mentioned the -- their

15   auditors.

16        **Q     In that -- in that Saturday**

17   **conversation?**

18        A     Mm-hmm.  I believe so.

19        **Q     Is that the first time you learned**

20   **about an audit?**

21        A     Mm-hmm.

22        **Q     This is an internal audit?**

23        A     Well, not the first time, no.  The

24   City was going through a City-wide audit of all

25   those records.  My department was the very first

1    one, you know, and it would take three or four

2    months -- I think it took three or four months to

3    get through just my department.

4            So it was winding its way through the

5    City and the auditors were routinely, you know,

6    going through each of the different departments and

7    were involved.

8        **Q      Who were these auditors, do you know?**

9        A      Yeah, they were the auditors from

10   Jefferson City who worked, you know, directly for

11   Nicole Galloway.

12       **Q      Did you ever find out whether or not**

13   **this audit of the Comptroller's office was ever**

14   **completed?**

15       A      No, I don't.  I have not read the

16   results.

17       **Q      Did you ever find out any results or**

18   **findings of that audit from any source?**

19       A      No.

20       **Q      Did you ever see any requests made to**

21   **the Comptroller's office from the auditors?**

22       A      No.

23       **Q      Did you see -- did you ever see any**

24   **documents or recorded statements of anyone in the**

25   **Comptroller's office made to the auditors?**

1  scheduling it, et cetera.

2          And so, you know, that kind of

3  cross-communication, other than just discussion of

4  policies and procedures, would -- would be outside

5  of something we would get involved with.

6          **Q      What -- what about Linda Thomas?**

7  **Would it have been improper for her to discuss**

8  **these allegations?**

9          MR. NORWOOD:  Well, let me -- let me

10  object on the term "improper" because it's vague

11  and ambiguous and could call for a legal

12  conclusion.

13          **Q     (BY MR. BLANKE)  Well, improper for**

14  **any reason because I -- I'm just picking that up**

15  **from what you said in your answer that you thought**

16  **that it would have -- maybe you were just referring**

17  **to Ashley McClain.**

18          A     I was referring to Ashley McClain and

19  myself as secretary, I wear different hats.  Admin

20          **Q      Right.**

21          A     So while I might review a

22  pre-termination packet to make sure that it

23  complies with Admin Reg 117 fully and the tenets of

24  due process, you know, I'm not looking to see if

25  they've proved up the charges or et cetera.  That's

1    my role as director of personnel.

2            As secretary, I'm just making sure

3    that other kinds of things, you know, under the

4    Commissions purview are proper, et cetera, and

5    that's Ashley's role.

6            Linda Thomas, you know, would have

7    been, you know, capable of speaking to, you know,

8    any employee about -- or I'm sorry, any appointing

9    authority about, you know, disciplinary issues, but

10   I think I've already stated that, based on a recent

11   conversation I had with Miss Thomas, she explained

12   to me that the only conversation she had in this

13   whole business was answering the Comptroller's

14   initial questions about Administrative Regulation

15   117, and she really had no interest in getting

16   involved with it, quite frankly.

17       **Q    Okay.  How does that scheduled**

18   **hearing of 29th, how does it actually get canceled?**

19   **Is it just -- does it automatically get canceled?**

20   **Or does the Commission cancel it?  Or does Ashley**

21   **cancel it?**

22       A    Not the Commission.  Ashley would

23   cancel it.

24       **Q    She cancels it herself?**

25       A    Yes.  And she would do that, sir, in

1    wasn't sure if it was completed and they just

2    hadn't issued it yet, or if, you know, they were

3    still looking into it.  I mean, this has been

4    months ago, so.

5         **Q     And -- and you wouldn't have any**

6    **personal knowledge as to whether -- which of those**

7    **two things it might be?**

8         A     No, I would not.

9         **Q     Do you remember anything else?**

10   **Anything more specific.  About the audit.**

11        A     No, not about the audit at all.  I

12   remember mine.  I was really happy with that, but

13   other than that, no.

14        **Q     Well, do you have anything -- was**

15   **there anything else specifically that you recall**

16   **that was discussed besides what you just said?**

17        A     No, I think that just the other thing

18   I, and just in an abundance of transparency, I

19   never had a conversation about the -- the case or

20   the allegations or anything, but the only other

21   person I talked to was Chana when she would say the

22   Comptroller's on the phone, you know.

23        **Q     Well --**

24        A     That -- that's it.

25        **Q     Sticking with this conversation with**

1    **Green, though, in 2021, did you -- did she discuss**

2    **anything with you specifically with regard to what**

3    **she was worried about with regard to the audit?**

4         A    No.  As a matter of fact, just to

5    amplify on that, I didn't even know that -- that

6    municipal courts was involved.  I stated I thought

7    it was something to do with corrections, but --

8         **Q    What does that mean?**

9         A    Pardon?

10        **Q    What do you mean, corrections?  What**

11   **does that mean?**

12        A    The correctional division, I thought

13   there might have been some concerns about the

14   correctional division, but --

15        **Q    She said that, or you just thought**

16   **that?**

17        A    No, I -- I might have thought that --

18   I might have been mistaken because I was also

19   called -- called as an expert witness in some -- by

20   a different firm about some issues with

21   corrections, so it just may -- may have -- may have

22   been, you know, my memory.

23             I thought that during the initial

24   conversation, though, that Judy Armstrong had --

25   had mentioned that as a particular department but

1    I believe that would be a Monday.  It was a Monday.

2        **Q       Whether it was a Monday or a**

3    **Tuesday --**

4        A    It was --

5        **Q       -- the Saturday before that is when**

6    **you would have had the conversation.**

7        A    Yes.  That, I recall.

8        **Q       All right.  And do you know what**

9    **additional information was unearthed between the**

10   **time you had the discussion with them the Saturday**

11   **before the first forced leave and the time when the**

12   **pre-termination notice was actually issued in**

13   **August?**

14       A    In August?  No.

15       **Q       I mean, so in other words, you don't**

16   **know what was being unearthed during this**

17   **investigative process; is that a fair statement?**

18       A    Very fair.

19       **Q       All right.  And is it common for**

20   **appointing authorities to provide you with that**

21   **kind of detail in order to get you to approve or**

22   **sign off on a forced leave?**

23       A    No, they generally just talk to me

24   about what type of general behavior, like bullying,

25   harassment, refusal -- I mean refusal to test for

1    drugs, alcohol, drug alcohol failure.

2             As a matter of fact those are even

3    delegated to my employee relations manager.  So

4    they typically just will give me an outline that

5    there was serious harassment at work, or

6    falsification of records, things like that.

7         **Q     But not the details about the**

8    **specifics, allegations, or anything of that sort?**

9         A     No.  The details are required in the

10   pre-disciplinary review notice or the

11   pre-termination hearing -- or not hearing,

12   pre-termination review notice.  That's when, under

13   our rules and under our perception of -- of due

14   process, that you need to give the person ample

15   time to review and -- and really list through those

16   specifics.

17        **Q     Okay.  Do you know if the**

18   **Comptroller's office prepared different drafts of**

19   **communications before they were either sent out**

20   **to you or before they may have been sent out to**

21   **Mr. Garavaglia?  Do you know that?**

22        A     I had no personal knowledge of that

23   until when I saw the different letters today.

24        **Q     Okay.  So -- so that's something you**

25   **wouldn't have been privy to in terms of --**