```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
 2                    EASTERN DIVISION

 3   James Garavaglia,        )
                              )
 4      Plaintiff,            )
                              )
 5   v.                       ) Case No. 4:20-CV-1681-CDP
                              )
 6   City of St. Louis,       )
     et al.,                  )
 7                            )
        Defendants.           )

 8

 9

10

11

12            VIDEO RECORDED DEPOSITION

13                       OF

14                 JAMES GARAVAGLIA

15      Taken on behalf of Defendant Darlene Green
                    January 21, 2022
16
              Julie Ann Whiting, CCR 830, RPR
17

18

19

20

21

22

23

24

25
```

PLAINTIFF'S
EXHIBIT

GG

1           And it was only at that time where there
2    was a list of so-called reasons for this to come
3    about.  Basically my life was in shambles.  The
4    physical and emotional effect created by what was
5    done on July the 2nd of 2019 left me with the choice
6    of appealing through the Civil Service Commission.
7    And if I was successful there, I would be placed
8    back into an extremely hostile environment, the work
9    environment.  She didn't want me there.  And I would
10   be placed in an intolerable situation.  And because
11   of that, I had no choice at that particular time
12   except to say, well, maybe, just maybe if I was
13   reinstated, I could have the chance to work in
14   another department, in another area for comparable
15   salary.
16           But by the time -- the period from July to
17   I believe in the end of August when the pre-term
18   notification came to me, I had enough and left.  I
19   had no spirit to go about trying.  I didn't have
20   the -- I just didn't have what it took to go back
21   and work in City government again.  I had no choice
22   at that point.  And it was a difficult decision, but
23   I felt it was the only one I had available to me,
24   and so I felt compelled at that point in time, due
25   to the environment that I would be placed back in

1    had I been successful at Civil Service, that I had

2    to put in my papers to retire.

3        **Q    Okay.  Fair enough.  All right.  And we're**

4    **going to talk, obviously, a lot more about all of**

5    **that, but let me kind of go back a bit and talk**

6    **about the positions that you've held with the City**

7    **of St. Louis.  And I guess to facilitate, I'm going**

8    **to give you back Exhibit 27 and tell us your -- the**

9    **positions that you've held with the City of**

10   **St. Louis.**

11       A    Well, the positions -- my entire career

12   was spent in the Comptroller's office.  Primarily I

13   started in -- in a -- a role that was assisting the

14   Deputy Comptroller at the time, a variety of things,

15   getting to know how City government worked.

16           At that -- from there, there was a change,

17   in that Comptroller Berra left the office, became

18   the Assessor, and Comptroller Jones came in.  And it

19   was under his administration that he asked me to

20   manage -- and that I had previous experience in

21   management -- to manage a selected group of diverse

22   areas that weren't quite accounting related, but yet

23   needed some day-to-day supervision.

24           And so the position of Asset Manager was

25   created at that time, specifically tailored to the

1        Q    Okay.  Tell us about the

2   application/selection process for this new position

3   you were appointed to by Comptroller Green.  What

4   was that process?

5        A    Well, it was a preexisting position.  It

6   was not a new position.

7        Q    Right.

8        A    And the application process is -- was

9   standard, as would be for any civil service position

10  in that you fill out an application, that you can

11  attach a resume if you would -- if you wanted to,

12  and that there would be an evaluation if you met the

13  minimum qualifications by the Personnel department,

14  but prior to you being considered for interview at

15  that point.  So that's -- then you would go before a

16  panel, you would be interviewed, you would be ranked

17  by that panel, and then you would await a second

18  interview with the department that would be hiring

19  for that position.

20       Q    Okay.  And -- and when you were promoted,

21  for the record, you were a white male; is that

22  correct?

23       A    Yes, sir.

24       Q    Okay.  And as part of that selection

25  process, if I'm understanding, how many names are

1      A    Oh.

2      Q    **Have you had an opportunity to review that**

3  **packet?**

4      A    I have glanced through, yes, sir.

5      Q    **Okay.  Does this appear to be the**

6  **rating info -- well, strike that.**

7           **Does this appear to be the evaluation**

8  **information in conjunction with your application for**

9  **the position of Deputy Comptroller, Finance and**

10  **Development?**

11     A    It appears to include two pages which are

12  how the preliminary interviews scored my preliminary

13  interview.  There --

14     Q    **Right.**

15     A    Those are in here, yes.

16     Q    **All right.  And it also ranks the**

17  **individuals; is that correct?**

18     A    It does.

19     Q    **All right.  Did you receive any**

20  **communication from Personnel at the time where they**

21  **advised you where you ranked as it related to this**

22  **position?**

23     A    I'm not certain.

24     Q    **All right.  According to this document, at**

25  **least the first page of the document, it looks like**

1    the rankings are -- you were listed and ranked as

2    number 5 of 6; is that correct?

3         A    Yes, sir.

4         Q    All right.  Do you know why you were

5    ranked 5 out of the 6 candidates for that position

6    at that time?

7         A    I can only refer back to the comments --

8         Q    Okay.

9         A    -- made by the people who conducted the

10   interviews.

11        Q    All right.  Well, let's flip to those.

12   And these are unmarked, but for the purpose of the

13   record and part of Exhibit 29, there is a form

14   document, and that form document is entitled Oral

15   Interview Rating Form.  Do you see that?

16        A    Yes, sir.

17        Q    All right.  And is that what you're

18   talking about in terms of the evaluations?

19        A    Yes, sir.

20        Q    All right.  Now, the first form that I

21   see, it looks like it's dated 2/26/16, with a score

22   of 57.  Is that the same page you're on?

23        A    Yes, sir.

24        Q    And you were rated, it looks like,

25   average; is that correct?

1    A    Yes, sir.

2    **Q    And could you read the comments in that**

3    **particular evaluation?**

4    A    Good work experience and knowledge of -- I

5    think it might say process.

6    **Q    Is it players?**

7    A    Players.  Okay.  Players.

8    **Q    The players.**

9    A    Okay.

10    **Q    Okay.  Okay.  Continue.**

11    A    I can't read the first word.

12    **Q    Okay.**

13    A    Some lack of knowledge of finance area.

14    **Q    Okay.  So this particular evaluator**

15    **determined that you lacked some knowledge in the**

16    **finance area; is that correct?**

17    A    Right.

18    **Q    All right.  And let's go to the next Oral**

19    **Interview Rating Form, and that score was a 59, and**

20    **average; is that right?**

21    A    Yes.

22    **Q    And the rater -- it looks like it's dated**

23    **2/26/16; is that correct?**

24    A    Yes.

25    **Q    Okay.  And let's read what that particular**

1    evaluator commented.

2        A    Okay.  It says, Struggled to answer the

3    technical questions related to debt and financing.

4        Q    Okay.  And do you agree with that?  Did

5    you during that process struggle to answer questions

6    related to debt and financing?

7        A    I'm not sure I'd use the word struggle.  I

8    think I'd use the word that I could have done a

9    better job, but this was the area where I had the

10   least experience.

11       Q    Okay.  Fair enough.  Why did the position

12   of Deputy Comptroller of Finance and Development

13   become available?

14       A    The incumbent, the person that I worked

15   for for over 20 years, had passed away.

16       Q    And that was Ms. Ivy Pinkston?

17       A    Yes, sir.

18       Q    And Ms. Ivy Pinkston was an African

19   American woman; is that right?

20       A    Yes, sir.

21       Q    Okay.  How many Deputy Comptrollers were

22   there at the time you were promoted by Comptroller

23   Darlene Green to Deputy Comptroller of Finance and

24   Development?

25       A    One.

1    associated with a finance department, meaning paying
2    the bills, collecting the money, that kind of thing.
3         Q    Okay.  Do you know how old Beverly
4    Fitzsimmons is, approximately?
5         A    No, sir, I do not.
6         Q    All right.  When you were promoted to
7    Deputy Comptroller, were you given a raise?
8         A    Yes, sir.
9         Q    How large of a raise?
10        A    In the position that I was in, it was a
11   Grade 19.  The position Asset Manager II, I believe,
12   is a Grade 19 in the Civil Service system.  The
13   position that I assumed in the Civil Service
14   position was a Grade 21.  And so if you were to be
15   promoted, each grade that you would ascend to is a
16   5 percent increase, I believe, in the Department of
17   Personnel policies.
18        Q    Okay.  And so I guess my question was:
19   You -- well, let me -- let me state it this way:
20   You received a promotion from Comptroller Darlene
21   Green; correct?
22        A    Yes, sir.
23        Q    You received a raise when you were
24   promoted that had to be approved by Comptroller
25   Darlene Green; correct?

 1       A     Yes, sir.

 2       Q     **Do you recall if that raise was**

 3    **10 percent?**

 4       A     I believe it was.

 5       Q     **All right.  Do you know if at the time you**

 6    **were promoted and given this 10 percent raise,**

 7    **whether or not at that time you were actually making**

 8    **more than the Comptroller?**

 9       A     I did not know that, no.

10       Q     **Okay.  So you don't know one way or the**

11    **other; is that correct?**

12       A     At that time, I did not.

13       Q     **Do you know now?**

14       A     I do know now.

15       Q     **Okay.  And what do you know now as it**

16    **relates to your salary in comparison to Comptroller**

17    **Green's salary?**

18       A     The salary that I was at was considerably

19    more than the Comptroller made.

20       Q     **Okay.  And for the record, Comptroller**

21    **Darlene Green is an African American woman; is that**

22    **correct?**

23       A     Yes, sir.

24       Q     **All right.  Are you familiar with the City**

25    **of St. Louis Employee Code of Conduct?**

1   that, you know, it may not have been completed due

2   to the fact that the time frame would have passed

3   without the supervisor realizing that the person was

4   due for a service rating.

5        Q    Okay.  Throughout your entire tenure at

6   the City of St. Louis, were you always rated?

7        A    I believe I was --

8        Q    Okay.

9        A    -- until the last three years.

10       Q    Until the last three years.  Okay.  Let me

11  hand you a document -- I'm sorry to be out of order

12  here, but let me hand you a document that's been

13  marked as Garavaglia Deposition Exhibit 25 and ask

14  you to take a look at that.

15       A    Do you -- do you want it back?

16       Q    Yes.  Thank you.

17       A    Okay.  Okay.

18       Q    Have you seen that document before?

19       A    It says that I would have received a copy

20  of it in 1988.

21       Q    All right.  And for the record, Garavaglia

22  Deposition Exhibit 25 is a letter dated April 15,

23  1988; is that correct?

24       A    Yes.

25       Q    And it's from what is identified as the

1    Department of Personnel, Ms. Josephine Profeta,

2    Acting Manager, Personnel Services; is that correct?

3        A    Uh-huh.  Yes, sir.

4        Q    All right.  And it's cc'd to you, it

5    appears?

6        A    Yes, sir.

7        Q    All right.  And the Re: line says

8    Mr. James M. Garavaglia, Special Assistant to the

9    Comptroller, Comptroller's Office; is that correct?

10       A    Yes, sir.

11       Q    And was that your initiation into the City

12   of St. Louis as an employee --

13       A    Yes.

14       Q    -- that position?

15       A    Yes, sir.

16       Q    All right.  And it's addressed to

17   Honorable Paul M. Berra, Comptroller, Comptroller's

18   Office; correct?

19       A    Yes, sir.

20       Q    And I'll just read it into the record.

21   Dear Mr. Berra, the Department of Personnel has not

22   received the permanent status rating of Mr. James

23   Garavaglia, Special Assistant to the Comptroller,

24   Comptroller's Office, for the rating period ending

25   March 1, 1988.  In accordance with Rule VIII of the

1    Rules of the Department of Personnel, quote, Failure

2    by the appointing authority to give such notice to

3    the Director of Personnel within 30 days of

4    termination of the working test period shall have

5    the same force and effect as affirmative action on

6    the part of the appointing authority in granting to

7    the employee permanent status in the position.

8            Since the permanent status rating form of

9    the above-named employee has not been returned

10   within the required period of time stated, it is

11   necessary for us to grant the employee permanent

12   status for the period ending March 1, 1988.

13           Did I read that correctly?

14   A    Yes, sir, you did.

15   Q    All right.  And does this represent at

16   least one instance where you were not rated and as a

17   result of not being rated, you effectively were

18   granted permanent status; correct?

19   A    This is not -- this is not the same thing.

20   Q    Well, I didn't ask --

21   A    You asked me if I recalled a time where I

22   had not received a service rating --

23   Q    Okay.

24   A    -- and I said that, no, I did not.

25   Q    Okay.

1     A     What this is referring to is when I was

2  initially hired by the City.  You are in a working

3  test period.

4        **Q     Right.**

5     A     And what this implies or basically says is

6  that I completed the calendar time period of my

7  working test period and that the appointing

8  authority at the time did not certify to the

9  Department of Personnel that I should be retained or

10  not through the working test period.  In other

11  words, this is about passing or failing the working

12  test period --

13        **Q     Right.**

14     A     -- not the service record.

15        **Q     I understand that.**

16     A     That's not the same thing.

17        **Q     But in this test period, you are rated --**

18  **in this case, you would have been rated by the then**

19  **Comptroller, Mr. Berra; is that correct?**

20     A     Most likely by his deputy.

21        **Q     All right.  And because there was no**

22  **rating of any sort for this particular evaluation,**

23  **you were then determined to have permanent status by**

24  **rule; is that correct?**

25     A     That's correct, but this is not a service

1    rating.

2        Q    I understand.  I understand.  Okay.  All

3    right.  Now, let's go back to the Employee Code of

4    Conduct.  You are familiar with that because

5    annually you're required to sign a form saying I

6    reviewed and understand the Employee Code of

7    Conduct; correct?

8        A    Yes, sir.

9        Q    All right.  And would you agree with me

10   that as a supervisor/employee of the City of

11   St. Louis, you have an obligation to efficiently and

12   effectively direct the activities of your

13   subordinate.  You would agree with that, wouldn't

14   you, sir?

15       A    Generally speaking, yes.

16       Q    All right.  And as Deputy Comptroller

17   Supervisor for the City -- City of St. Louis, you

18   had an obligation to display appropriate, respectful

19   behavior and follow the directions given by your

20   supervisors; correct?

21       A    Yes, sir.

22       Q    All right.  Under that Employee Code of

23   Conduct, you also had an obligation to act with

24   honor, faithfulness, loyalty, fairness, and due

25   diligence in conducting your job responsibilities.

1    You agree with that; right?

2        A    Yes, sir.

3        Q    All right.  And you also had an obligation

4    to comply with all applicable laws and regulations;

5    is that correct?

6        A    Yes, sir.

7        Q    And those laws would include the charter

8    for the City of St. Louis; is that right?

9        A    Yes, sir.

10       Q    You also had an obligation to meet

11   acceptable standards of performance.  You agree with

12   that; right?

13       A    Yes, sir.

14       Q    You had an obligation in your various

15   capacities as a City employee not to take any

16   actions that were illegal or unethical or in

17   violation of the rules and regulations of the City

18   of St. Louis; correct?

19            MR. BLANKE:  Let me just object to the

20        line of questioning on the basis that the Code

21        of Conduct speaks for itself.  If you're asking

22        him whether he knows about those requirements,

23        that's fine.  But you're asking him what's in

24        the Code of Conduct, it seems, and so I object

25        on the basis that the document speaks for

1    you -- you -- you -- you have degrees in accounting;

2    correct?

3         A    I do.

4         Q    And you understood as an accountant that

5    it's important to make sure that financial

6    transactions of entities are documented fully and

7    completely.  Can we agree with that?

8         A    Yes, sir.  Yes, sir.

9         Q    All right.  As Deputy Comptroller, you

10   also had an obligation to make sure that the City's

11   books and records reflect, in an accurate and timely

12   manner, all transactions; correct?

13        A    To the best of my ability, yes, sir.

14        Q    Yes.  Accurate and timely.  Those are key

15   points when we're talking about financial revenues

16   of a city with some excess of a billion dollars in

17   revenue; is that correct?

18             MR. BLANKE:  Well, let me object to the

19        compound nature.

20        A    Well, I don't know about -- I don't know

21   the answer.

22             MR. BLANKE:  Hold on a second.  When I

23        object, stop talking.

24             MR. NORWOOD:  I'll withdraw the question.

25        Q    (By Mr. Norwood)  You had an obligation as

1    **Deputy Comptroller not to make any misleading**

2    **representations or falsify any records or engage in**

3    **false communication of any kind, whether internal or**

4    **external, including, but not limited to or filing**

5    **any false report, attendance, production, financial,**

6    **or similar reports and statements?  You had that**

7    **obligation; is that correct?**

8            MR. BLANKE:  Let me object again in that

9        the question is vague and ambiguous as to

10       whether you're asking him if it's his opinion

11       that he had that obligation or whether that's

12       what the Code of Conduct specifically states.

13   **Q    (By Mr. Norwood)  What I'm asking you is:**

14   **Is it your understanding that you had that**

15   **obligation as the Deputy Comptroller of the City of**

16   **St. Louis during the time frame you acted as Deputy**

17   **Comptroller of the City of St. Louis?**

18           MR. BLANKE:  So just for clarification,

19       you're asking for his opinion?

20           MR. NORWOOD:  What I'm asking him is do

21       you know whether or not -- I'll rephrase the

22       question.

23   **Q    (By Mr. Norwood)  Do you know whether or**

24   **not under the Code of Conduct, you had that**

25   **obligation?**

1      A      I'm not certain I answer -- I understand
2  what we're doing here.  I don't understand that.  I
3  don't understand the question, to be honest with
4  you.
5      **Q      All right.  All right.  Let me wrap it up**
6  **with this question:  Did you understand during the**
7  **time you were Deputy Comptroller of Finance and**
8  **Development of the City of St. Louis that you had an**
9  **obligation to be completely honest in your dealings**
10  **with the public, elected officials, appointing**
11  **authorities, supervisors, and fellow employees?  Did**
12  **you have that understanding?**
13      A      Yes, sir.
14      **Q      All right.  And you also had an**
15  **understanding that lying in any form, omitting some**
16  **facts, or exaggeration undermines the fundamental**
17  **trust that must exist between employer -- employer**
18  **and employee and has no place in public service?**
19  **You would agree with that as well; correct?**
20            MR. BLANKE:  Are you -- are you asking him
21            whether he agrees with the policy in the Code
22            of Conduct?
23      **Q      (By Mr. Norwood)  What I'm asking him is**
24  **whether or not you understood under that St. Louis**
25  **Code of Conduct that you signed every year that you**

1   undertook that obligation as the Deputy Comptroller

2   of the City of St. Louis?

3        A    Is it stated in there specifically, what

4   you just read me?

5        Q    And I -- I mean, and we'll review the Code

6   of Conduct.  What I'm trying to figure out is

7   that -- did you understand you had that obligation,

8   that lying in any form -- internal/external -- in

9   the context of a public servant is unacceptable?

10  You understood that, correct?

11       A    I understood the Code of Conduct.  I'm not

12  sure what you asked me is in there.

13       Q    All right.  Aside from whether it's in the

14  Code of Conduct, did you have an understanding at

15  the time you were Deputy Comptroller that lying in

16  any form, internally or externally, by you would be

17  unacceptable?

18       A    Yes, sir.

19       Q    Okay.  I don't know --

20            MR. BLANKE:  Even -- even if the

21       Comptroller asks him to lie.  Correct?  You're

22       saying unqualified no matter what the

23       situation?

24       Q    (By Mr. Norwood)  Let me ask you -- let me

25  ask you the next question.  Do you recall any time

1    A    With and at the direction of an attorney

2    in the City Counselor's office, that it was not a

3    contract -- a new contract, it was exercising an

4    option in the existing contract -- I'm sorry -- in

5    the existing lease that the City had with the

6    lessee.

7    Q    Okay.  Fair enough.  Do you know -- other

8    than the Comptroller, who else in the Comptroller's

9    office would be designated by the Comptroller to

10   sign contracts on her behalf or on behalf of the

11   City?

12           MR. BLANKE:  Objection.  It's unduly vague

13        as to time.

14           MR. NORWOOD:  Well -- fair enough.

15           MR. BLANKE:  Are you talking about  all

16        throughout?

17   Q    (By Mr. Norwood)  I'll rephrase the

18   question.

19           During the time you were Deputy

20   Comptroller, did you have an understanding as to who

21   other than the Comptroller she had designated to

22   sign contracts on her behalf or on behalf of the

23   City?

24   A    Yes.

25   Q    Who -- who is that?

1       A     Beverly Fitzsimmons.

2       **Q     Anyone else that you're aware of?**

3       A     I know that Judy Armstrong had been

4    authorized to sign something.  I'm not sure what

5    kind of documents.

6       **Q     Okay.**

7             MR. NORWOOD:  Now may be a good time to

8             take a break.  I'm about to dive into maybe

9             some of these documents here, if that's okay,

10            or we can keep going.

11            MR. BLANKE:  It's up to you.

12            MR. NORWOOD:  All right.  Let's take a --

13            MS. McMILLEN:  For the record, where are

14            we on time?

15            THE VIDEOGRAPHER:  This is the

16            videographer.  We're going off the record.  The

17            time now is 10:58.

18            (Off the record at 10:58 a.m.)

19            (On the record at 11:19 a.m.)

20            THE VIDEOGRAPHER:  This is the

21            videographer.  We're back on the record.  The

22            time now is 11:19.

23      **Q     (By Mr. Norwood)  Okay.  Do you know who**

24    **hired Ivy Pinkston?**

25      A     Yes.

1     **Q**    **Who?**

2     A    Comptroller Jones.

3     **Q**    **Comptroller Virvas Jones?**

4     A    Yes, sir.

5     **Q**    **All right.  And what race is -- or was**

6    **former Comptroller Berra?**

7     A    He was white.

8     **Q**    **I'm sorry?**

9     A    He was white.

10    **Q**    **All right.  Now, let's talk about ratings.**

11  **What is a rating in the context of St. Louis City**

12  **government and employees?**

13    A   It's an annual review of an employee's

14  performance with the framework of how you

15  characterize and categorize an employee's

16  performance dictated and outlined to a format

17  designed by the Department of Personnel.

18    **Q**    **And those are required to be given**

19  **annually, you understand?  Is that your**

20  **understanding?**

21    A    Yes, sir.

22    **Q**    **All right.  All -- so just so I'm clear,**

23  **it's your understanding as a supervisor -- former**

24  **supervisor with the City of St. Louis, that every**

25  **supervisor is required to rate every employee on an**

1    annual basis; is that correct?

2        A    That is my understanding.

3        Q    All right.  And how did you acquire that

4    understanding?

5        A    I'm not sure that I specific -- I must

6    have read it someplace --

7        Q    All right.

8        A    -- in -- in something that I guess we were

9    given to -- to look at, to read, to acknowledge, and

10   understand.  I'm not sure.

11       Q    All right.  And it's your testimony today

12   that up until the time you started as Deputy

13   Comptroller, for all of those years leading up to

14   that, you would have received an annual rating; is

15   that correct?

16       A    That is my recollection.

17       Q    All right.  And it is also your testimony

18   that the individuals who were direct reports to you

19   during the time you were Deputy Comptroller of

20   Finance and Development, you did annual ratings for

21   those direct reports; is that correct?

22       A    Yes, sir.

23       Q    All right.  Who were those direct reports

24   that you would have done annual ratings for?

25       A    Well, they would have been the

1  telecommunications staff.  It would have been my

2  administrative assistant.  It would have been the

3  supervisor over the Gateway Transportation Center.

4  It would have been -- I can't remember the title of

5  the person, but it -- it's -- it's someone who

6  worked in the Finance and Development area.  There's

7  two people in the Finance and Development area that

8  were direct reports.

9      Q    Okay.  Well, let -- let's talk names.  All

10  right.  You referred to your assistant.  Who is your

11  assistant?

12      A    Sheila Woods.

13      Q    All right.  And you annually rated

14  Sheila Woods every year; is that correct?

15      A    To the best of my recollection, yes, sir.

16      Q    All right.  Who else by name did you

17  annually rate during the time you were Deputy

18  Comptroller?

19      A    I would have rated Robin Jones, who was

20  the supervisor at the Gateway Transportation Center.

21  I would have rated her successor, Sonia Day.  I

22  would have rated Marsha Veal, who worked in real

23  estate.  I would have rated John Diliberto in

24  telecommunications.

25          MR. BLANKE:  I'm sorry.  John who?

 1          THE WITNESS:  Diliberto,

 2     D-I-L-I-B-E-R-T-O.

 3     A    I would have rated Marilyn Maxwell in

 4     telecommunications.  I would have rated Sheri Cross

 5     in telecommunications.

 6     **Q    What about Ray Gant?**

 7     A    I would have rated Ray Gant.

 8     **Q    Okay.  Anybody else?**

 9     A    I would have rated Ryan Coleman.  I can't

10     remember the other lady's name.

11     **Q    Okay.  What is your understanding of what**

12     **happens if someone is not rated?**

13     A    I don't understand the question.

14     **Q    Are you -- have you -- well, you weren't**

15     **rated.  Let's talk about you.  The first year you**

16     **served as Deputy Comptroller of Finance and**

17     **Development, you said you weren't rated; is that**

18     **correct?**

19     A    I don't think I was -- that I said that,

20     but I was not rated in any of the three years that I

21     was Deputy.

22     **Q    Any of the years you were Deputy, you were**

23     **not rated?**

24     A    Yes, sir.

25     **Q    All right.  So let's talk about the first**

1    year, which would have been -- when would your

2    rating have been -- is it your year of service in

3    the position?  Is that right?

4         A    Yes, sir.

5         Q    So you would have been due for a rating in

6    June of 2017; is that correct?

7         A    Yes, sir.

8         Q    All right.  And you didn't receive a

9    rating?

10        A    Did not.

11        Q    Did you inquire about why not?

12        A    No, I did not.

13        Q    Why not?

14        A    I think the -- probably the -- the reason

15   I did not was the relationship that I had with my

16   boss at the time was not conducive to telling her

17   that she didn't do her job.

18        Q    Okay.  And so you were -- in your view,

19   you understood, according to you, that it was

20   required -- correct -- at that time?

21        A    It was requested by the Department of

22   Personnel.  I'm not sure why it would -- when you

23   say required, I mean, it's not like something was

24   going to happen to me or to the supervisor when it

25   didn't happen, but --

```
 1        Q    Okay.  But it didn't happen with you;
 2   right?
 3        A    It did not.
 4        Q    You didn't bring it to the attention of
 5   your boss; correct?
 6        A    That's correct.
 7        Q    You didn't bring it to the attention of
 8   the Director of Personnel; correct?
 9        A    That's correct.
10        Q    All right.  And the same with respect to
11   2018?  You weren't rated in 2018; correct?
12        A    Correct.
13        Q    And you never brought that to the
14   attention of your boss, Darlene Green; correct?
15        A    That's correct.
16        Q    You never brought it to the attention of
17   Personnel; is that correct?
18        A    That's correct.
19        Q    Do you know if other individuals that
20   Comptroller Green supervised received annual
21   ratings?
22        A    No, sir.  I don't know that.
23        Q    Do you know Chana Morton; is that correct?
24        A    I do.  I do.  I know who she is, yes.
25        Q    And -- and who is she?
```

1      A    She's the Comptroller's secretary.

2      Q    All right.  And was she secretary when you

3  were elevated to Deputy Comptroller?

4      A    I'm not certain that she was in 2016, but

5  I -- I don't know.  I -- I'm not sure.

6      Q    Okay.  Do you know if she was rated on an

7  annual basis?

8      A    No, sir, I do not.

9      Q    And as you sit here today, during that

10  time frame you were Deputy Comptroller -- you don't

11  know who Comptroller Darlene Green would have rated

12  during that time frame that you were Deputy

13  Comptroller.  Is that fair?

14      A    I do not know who she rated.  All I know

15  is that she would have rated direct reports.

16      Q    Okay.  And those direct reports include

17  white employees; correct?

18      A    Yes.

19      Q    Those direct reports included African

20  American employees; correct?

21      A    Yes.

22      Q    Those direct reports included white male

23  employees; correct?

24      A    Yes.

25      Q    Those direct reports included white female

1    employees; correct?

2        A    Yes.

3        Q    **African American female employees;**

4    **correct?**

5        A    Yes.

6        Q    **And there is other nationalities; is that**

7    **correct?**

8        A    Yeah, I -- I'm not aware of what their

9    ethnic background would have been.

10       Q    **Got it.  Fair enough.  Now, you in your**

11   **Complaint -- let's talk about your lawsuit.  You**

12   **allege that you have been discriminated based on**

13   **your age; is that correct?**

14       A    Yes.

15       Q    **And why is it -- or strike that.**

16            **How have you been discriminated based on**

17   **your age, in your view?**

18       A    At the time that I was offered the

19   position, in a conversation with the Comptroller,

20   she said specifically, I'm glad you accepted the

21   position, because this will be a great way for you

22   to round out and complete your career with the City

23   as a Deputy.  You'll be able in a couple years to go

24   out on top as a Deputy.

25       Q    **Okay.**

 1      A    And I didn't understand the meaning of her

 2   comments at the time, but I believe that her

 3   comments were basically telling me that my plans for

 4   you are short-term and that I would expect you to

 5   leave the office when you reached full Social

 6   Security retirement age.  She was very specific

 7   about -- she said in a couple of years.  And I

 8   didn't do that.

 9      Q    Okay.  Let me -- let me -- let's unpack

10   that a bit.  Let's get the words down.  She said --

11   what did she say exactly, as best you can recall?

12      A    She said that I'm glad you accepted the

13   position.  It will give you the opportunity to go

14   out on top in a couple of years and retire as a

15   Deputy Comptroller.

16      Q    So you recall her saying a couple years;

17   right?

18      A    That's right.

19      Q    All right.  And you were there a total of

20   how many years?

21      A    Three.

22      Q    Three years.  So you interpreted a couple

23   years to mean three years?  Is that what you

24   interpreted?

25      A    No.  I interpreted a couple years to be a

1    couple, meaning two.

2        Q    All right.  So you -- you exceeded the

3    two.  You made it to three.  Is that your

4    understanding?

5        A    Yes, sir.

6        Q    All right.  And -- and she said you can go

7    out on top as Deputy Comptroller; right?  I mean,

8    isn't that --

9        A    That's my recollection, yes.

10       Q    All right.  And she said she was glad you

11   accepted the position?  Isn't that what she told

12   you?  She was happy; right?

13       A    Those were her words, yes.

14       Q    Right.  I mean, so -- but now looking in

15   hindsight, you are suggesting that when she

16   expressed this happiness for you achieving this top

17   position in City government and she expressed the

18   desire for you to go out on top, that all the while

19   she was intending to terminate you in two years?  Is

20   that what you are testifying here to today?

21       A    I'm testifying here today that words are

22   cheap and she could say anything, but the intent

23   was, is that she was implying that she expected me

24   to leave the position in a couple of years.

25       Q    And why do you -- I mean, I'm just trying

1    to understand.  You're saying that was her intent.

2    Why --

3         A    That was what I interpreted her comments

4    to mean, not on the day -- I didn't understand them

5    on the day --

6         Q    Right, right.

7         A    -- that they were said.

8         Q    Right.

9         A    But they became more apparent over time.

10        Q    Okay.  So she was happy?

11        A    She said she was happy.

12        Q    All right.  And did you believe she was

13   happy?

14        A    I had no feeling one way or the other.

15   She said the words.  I don't know if she was or not.

16        Q    Well, she hired you; right?

17        A    She hired me, yes.

18        Q    She promoted you; right?

19        A    Yes.

20        Q    Highest position you ever held in the City

21   government; correct?

22        A    Yes.

23        Q    Gave you a 10 percent raise; right?

24        A    Required by Personnel.

25        Q    Right, but she --

1      A    She didn't give me -- she didn't give me

2   the raise.  The raise was mandated by the fact that

3   I was promoted two grades.

4      **Q    Did she have to approve the raise?**

5      A    Only from the standpoint that she had to

6   have the money to pay for it.

7      **Q    All right.  Did she approve subsequent**

8   **raises outside of that initial 10 percent raise?**

9      A    No.

10     **Q    I'm sorry?**

11     A    No.

12     **Q    So you received no raise from twenty --**

13     A    I received no merit --

14     **Q    Excuse me.  Let me finish.**

15     A    No merit increases.

16     **Q    Okay.  Did you receive any increases?**

17     A    Only the personnel-mandated raise that all

18   employees would get across the board.

19     **Q    All right.  Did you -- do you recall**

20  **anything else -- well, strike that.**

21          **This discussion that took place where she**

22  **expressed gladness that you had accepted the**

23  **position and expressed happiness that you would go**

24  **out on top, who was present during that discussion?**

25          MR. BLANKE:  Let me object to the

1     Q     You recognized that weakness on your part

2  at that time?

3     A     Yes.

4     Q     All right.  Other than that comment, that

5  phone call with the Comptroller, can you identify

6  any other information that you can provide to us to

7  suggest to you that it was her intention when she

8  hired you to get rid of you in a couple of years?

9     A     It is my feeling that I was brought in as

10  a placeholder.  I was put in the position because I

11  was a logical best option choice to fulfill the role

12  for a period of time until such point in time that

13  she was able to promote whom she really wanted in

14  that role.

15     Q     And whom would that be?

16     A     It would be someone that was more like the

17  prior Deputy, a younger black female.

18     Q     And what I'm trying to get at is evidence.

19  You say that's your belief, your suspicion.  But do

20  you have any evidence that you can share with us,

21  any memos, any discussions with the Comptroller that

22  you can share with us to support that belief?

23     A     Not at this time, but I possibly could

24  recall something later.

25     Q     Okay.  So not -- as we sit here today,

1     January 21st, 2022, other than that comment -- which

2     was a congratulatory call, right?  It was -- would

3     you describe that as a congratulatory call?

4          A     It was an offer call, yes.

5          Q     I'm sorry?

6          A     It was the offer call where she called to

7     offer me the position.

8          Q     Okay.  So she offered you a position.

9                Now, in City government, there's elections

10    every year or every four years or so; is that

11    correct?

12         A     Well, there's aldermanic elections every

13    two years and there are -- depending on which

14    City-wide official you're speaking of, they're

15    for -- they're four-year terms.

16         Q     Okay.  And in the case of the Comptroller,

17    four-year terms; correct?

18         A     Yes, sir.

19         Q     Okay.  And you served at the pleasure of

20    the Comptroller; is that correct?

21         A     I'm not sure I understand what that means.

22         Q     Well, if a new Comptroller had been

23    elected the last election cycle, would you have

24    automatically been entitled to remain Deputy

25    Comptroller of Finance and Development?

1      A    Yes.  Deputy Comptroller is a Civil
2  Service position unaffected by a change in the
3  elected official.
4      Q    Okay.  Got it.  And so you also allege
5  that you have been discriminated because you --
6  against because you are a white male; is that
7  correct?
8      A    Yes.
9      Q    All right.  Who in the City can you
10  identify discriminated against you because you are a
11  white male?
12      A    Darlene Green.
13      Q    Anybody else in the City?
14      A    Not that I can think of at this point in
15  time.
16      Q    Okay.  Do you know Mr. Richard Frank?
17      A    Only from being in meetings with him.
18  Like, I'm -- I'm not familiar with him other than in
19  being in meetings with him.
20      Q    Well, you knew he was the Director of
21  Personnel; right?
22      A    Yes, sir.
23      Q    All right.  And he is a white male;
24  correct?
25      A    Yes, sir.

1      Q     And did -- do you feel that he has

2   discriminated against you because you are a white

3   male?

4      A     I don't know.

5      Q     All right.  You have alleged in your

6   lawsuit that he was involved in a conspiracy to

7   discriminate against you.  Isn't that correct?

8      A     I'm not sure that I would characterize it

9   as a conspiracy, no.

10     Q     Well, do you know why in your Complaint

11  it's characterized as a conspiracy?

12     A     I would characterize it as complicit with

13  the Comptroller to contrive a way to have me not in

14  the position, yes.

15     Q     And why do you think Mr. Frank would be

16  complicit in a plot to discriminate against you

17  because you are a white man?

18     A     I don't know, sir.

19     Q     So as you sit here today, you don't

20  know -- you -- you believe he was complicit, but you

21  don't know why he would have been complicit?  Is

22  that your testimony?

23     A     That's correct.

24     Q     All right.  What about Beverly

25  Fitzsimmons?  She is a white woman; correct?

1      A    Yes, sir.

2      Q    Do you think she has discriminated against

3  you because you are a white male?

4      A    I don't know that.

5      Q    Okay.

6      A    I don't know that.

7      Q    All right.  Do you know Judy Armstrong?

8      A    I do.

9      Q    All right.  She is an African American

10  female; is that correct?

11      A    Yes, sir.

12      Q    And do you believe that she has

13  discriminated against you because you are a white

14  male?

15      A    I don't know that.  I can't say that.  If

16  she did, it could be in a way or in a manner that I

17  am unaware of.

18      Q    Okay.  So as you sit here today, to the

19  best of your knowledge, she did not discriminate

20  against you because you are a white male; correct?

21      A    To the best of my knowledge, that is

22  correct.

23      Q    All right.  What about Chana Morton?  Do

24  you think somehow she has discriminated against you

25  because you are a white male?

1      A      Again, not that I'm aware of.

2      **Q      Okay.  Do you know a Dr. Ishmael Ikpeama?**

3      A      Yes.

4      **Q      All right.  Who is Dr. Ishmael Ikpeama?**

5      A      He is a former supervisor in the Internal

6  Audit Division.

7      **Q      And he reported to you; correct?**

8      A      At -- for -- at a point in time, yes.

9      **Q      When you were Deputy Comptroller; correct?**

10      A      Not for the entire time.

11      **Q      For what period of time did he report you?**

12      A      I can't recall the exact dates, but I

13  supervised Internal Audit for a period of time after

14  the remaining supervisor left and before a

15  replacement was hired.

16      **Q      Okay.**

17      A      And I can't tell you the exact dates.  I

18  don't remember.

19      **Q      Okay.  Do you think Dr. Ikpeama would have**

20  **discriminated against you because you were a white**

21  **male?**

22      A      Not that I am aware of.

23      **Q      Do you think any of those individuals I**

24  **mentioned would have discriminated against you**

25  **because of your age?**

```
 1        A    Is the question do I think they would, or
 2   did they?
 3        Q    Did they.
 4        A    Not that I'm aware of.
 5        Q    Not that you're aware of.
 6             MR. NORWOOD:  For the record, Peak --
 7        Ipema -- Ikpeama is I-K-P-E-A-M-A.  Ishmael.
 8        Q    (By Mr. Norwood)  Okay.  And why do you
 9   believe that the Comptroller discriminated against
10   you because you are a white male?
11        A    She replaced me with a younger African
12   American female.
13        Q    And the basis for that belief is what?
14        A    That's what happened.
15        Q    Okay.  So the mere fact that an African
16   American woman obtained the position after you
17   vacated it is what leads you to believe that
18   Comptroller Green was discriminating against you
19   based upon the fact that you're a white male.  Is
20   that your testimony?
21        A    Yes, sir.
22        Q    Any other basis other than the simple fact
23   that there was an African American woman hired after
24   you vacated that position?
25        A    I don't understand the question.  What --
```

1    **environment, in your view?**

2        A    The environment was not good.

3        **Q    I'm sorry?**

4        A    The environment was not what I would

5    consider a good and positive working relationship.

6        **Q    What do you mean by that?**

7        A    From the time I was hired, I always felt

8    my relationship and me personally was kept at arm's

9    length from the Comptroller.

10       **Q    Okay.**

11       A    That I never shared her total and complete

12   confidence and trust, and I never felt like I was

13   part of her true inner circle of confidants and

14   people that she felt comfortable around.  I was

15   never -- she never felt comfortable around me.

16   There was always someone else -- we -- we had -- on

17   one hand I can count the times that we met one on

18   one.  And as much as I tried and as much as I

19   attempted to be the very best and perform at the

20   very highest level, you know, I -- it was very hard

21   to -- for me to -- to have any sense of comfort in

22   her presence.

23            In a group setting, I think that, you

24   know, we both were okay and -- but, you know, praise

25   was hard to come by.  I think that I was tolerated,

1    and I think that it was very difficult for me

2    because I enjoyed such a strong close personal

3    working relationship with my former boss, Ivy

4    Pinkston, and to go to one that I was treated with a

5    certain aloofness that allowed me to, you know, feel

6    that, you know, I'm never going to be at that same

7    level that I had with my prior boss.  And it just --

8    I never enjoyed a close working relationship, a good

9    personal relationship, a business professional

10   relationship with -- with -- with Ms. Green.

11        **Q    And so you weren't in this inner circle**

12   **you identified; is that right?**

13        A    Yes.

14        **Q    And -- and did that cause you concern that**

15   **you weren't in that inner circle, in your view?**

16        A    I'm not sure the term would be concern.

17        **Q    What would you use?  What term would you**

18   **use?**

19        A    It was just the facts of the matter that I

20   couldn't do anything about.

21        **Q    Okay.  Who was in this inner circle?**

22   **Let's talk about that inner circle.  You've got --**

23        A    Well, surely -- surely her secretary, for

24   one.

25        **Q    Okay.**

1      A     LaTaunia Kenner for two.

2      **Q     Okay.**

3      A     Judy Armstrong.

4      **Q     Okay.**

5      A     And I'm not sure who else, but that was --

6    those were the people that she seemed to be most

7    comfortable around.  Perhaps Michele Graham that

8    worked in her office --

9      **Q     Right.**

10     A     -- on the second floor.

11     **Q     Right.  Were those capable and competent**

12   **employees, in your view?**

13     A     I don't know their work.

14     **Q     I'm sorry?**

15     A     I don't know their work.

16     **Q     So you don't know if they were capable or**

17   **comparable --**

18     A     It's not --

19     **Q     -- or capable or competent?**

20     A     It's -- it's not within my purview to know

21   exactly what their responsibilities were as

22   individual -- each individual that I mentioned, nor

23   do I know specifically if they performed their work

24   well or not.

25     **Q     Okay.  Well, let's talk about the**

1    positions.  Chana Morton.  What -- what was her

2    position as it related to the Comptroller?

3         A    She was Ms. Green's secretary.

4         Q    All right.  Personal secretary; right?

5         A    Yes, sir.

6         Q    All right.  And as the name implies,

7    they're working together quite a bit; correct?

8         A    Right.

9         Q    All right.  And then you mentioned

10   LaTaunia Kenner.  What was her position?

11        A    She held a number of them in the office.

12        Q    All right.  Tell us about those.

13        A    Well, I'm not sure what she did in all of

14   them, but the last few months -- less than a year --

15   that I was there, she actually worked for me in the

16   role of an executive assistant.  I -- I think that

17   her -- I'm not sure what her title was, but she was

18   assigned to me and moved over to 1520 Market office

19   probably a year before I left.

20        Q    Okay.  And you mentioned Judy Armstrong.

21   What was her position?

22        A    I'm not sure of her title, but she worked

23   basically as an assistant to Ms. Green.

24        Q    All right.  And these individuals worked

25   directly with Ms. Green, is your understanding?

1      A    Yes.

2      Q    All right.  You didn't work as -- directly

3   with Ms. Green.  Is that your testimony?

4      A    I did or I didn't?

5      Q    Did not.

6      A    She was my immediate supervisor.

7      Q    I'm sorry?

8      A    She is my -- she was my immediate

9   supervisor.

10     Q    Right.  And did you work closely with her?

11     A    I would not characterize it as such.

12     Q    All right.  How would you characterize it

13  in terms of day-to-day work that you did and your

14  interactions with her?

15     A    I'm not sure that we could characterize my

16  interactions with her day-to-day.

17     Q    All right.

18     A    I would say that my interactions with her

19  90 percent of the time are interactions that I

20  initiated and they were probably more weekly to

21  bi-weekly.

22     Q    Okay.  And when you did intervene --

23  interface with her during those weekly or bi-weekly

24  meetings, were they cordial meetings?

25     A    They were matter-of-fact meetings where I

1    was reporting progress or an achievement or needing
2    direction or asking questions and guide -- and
3    requesting guidance.  They were very matter of fact.
4    They were, Okay.
5         Q    **Okay.**
6         A    They were, Okay.  This is what I did.
7    This is what -- Okay.  That's fine, you know.  We
8    achieved this.  Oh, great.  I need direction on
9    this, I got it, and then that was it.
10        Q    **Why were you reporting to her about the**
11   **matters you were involved in?  Why were you doing**
12   **that?**
13        A    Because as a regular part of my job, I
14   kept her appraised of what was transpiring in the
15   areas in which I supervised.
16        Q    **And that was part of your duty, right, to**
17   **make sure she knew what was happening with respect**
18   **to the Comptroller's office; correct?**
19        A    That's correct.
20        Q    **And transactions involving the City that**
21   **she would ultimately have to sign and approve;**
22   **correct?**
23        A    Yes.
24        Q    **All right.**
25        A    That's correct.

1        Q    Now, as a -- in the context of this
2   disciplinary -- this pre-termination.  Let's talk
3   about the pre-termination.  You received a letter
4   from the Comptroller --
5            MR. NORWOOD:  I'm sorry?
6            MR. BLANKE:  I'm sorry.  I didn't mean to
7        speak.  I spoke outside -- I -- I didn't mean
8        to say anything.  Go ahead.  Sorry.
9        Q    (By Mr. Norwood)  In the context of the
10   pre-termination, you received a letter from
11   Comptroller Green indicating that there would be a
12   hearing set for pre-termination; is that correct?
13       A    I'm not sure who the letter was from.
14       Q    All right.  What is your understanding of
15   the pre-termination process?
16       A    I think, as I understand it, that you can
17   choose or not choose to attend a meeting with your
18   immediate supervisor whereby they would lay out the
19   reasons why you would be terminated before you and
20   you had the opportunity to respond, and then they
21   would tell you that you no longer have a job down
22   the road.  A day or two later, you would get a
23   letter saying, you know, we've decided that you no
24   longer work here.
25       Q    Is it your understanding that the

1   pre-termination process automatically leads to

2   termination if whoever is bringing that process is

3   successful?

4        A    It's my understanding -- because I've

5   never heard of a pre-term where the person wasn't

6   terminated leads me to that conclusion.

7        Q    Okay.  So other than -- how many

8   pre-terminations did you become aware of during your

9   tenure?

10       A    I think I had only participated in one or

11  two.

12       Q    Okay.  Tell us about those one or two that

13  you participated in.

14       A    Well, one was -- actually, I was -- I'm

15  not sure I've -- I've discharged, directly, an

16  employee.  I was there supporting a -- one of the

17  supervisors that reported to me that had to

18  discharge an employee.  In one particular instance

19  when I supervised a municipal garage, we had an

20  employee who had a traffic accident, and when they

21  did the required drop for drug testing, they came up

22  positive.  And since this had been a situation that

23  it had occurred before, there was a positive test

24  once before, that the supervisor, following the

25  Personnel policies, went through the pre-term

1    procedure on that individual.

2           And another individual we had in the

3    records retention area, the supervisor informed me

4    that one of her employees threatened her.  And using

5    Personnel's guidance, that was cause for termination

6    and -- and we -- I was there.  I witnessed a

7    pre-term hearing with that individual.

8        **Q    Okay.  You made reference to Personnel's**

9    **guidance.  What do you mean by that?**

10       A    In terms of the actual level of offense,

11   under 117, when the supervisor that worked for me

12   presented the offense to the Department of

13   Personnel, the guidance that they received was

14   reflective of the severity of the infraction,

15   meaning was this a -- a suspension type of offense,

16   was this a -- a written reprimand type of offense,

17   and where it did it fall within the progressive

18   discipline of 117.  In both cases, we were advised

19   that these were dischargeable offenses that were

20   causing us to do a pre-term.

21       **Q    And -- and why would you engage Personnel**

22   **in terms of guidance?  What's the purpose of that?**

23       A    To ensure that proper policy was followed,

24   procedures, and that the City would be following its

25   own rules.  I mean, if we didn't follow -- we wanted

1    my vacation reinstated.  I believe it was only

2    through the fact that I had retained counsel that

3    that was done.

4         **Q    But suffice it to say, it was done, and**

5    **you got every nickel back.  Can we agree with that?**

6         A    Yes.  That's correct.

7         **Q    All right.  And you were getting paid;**

8    **correct?**

9         A    Yes, sir.

10        **Q    While you were at home; is that right?**

11        A    That's correct.

12        **Q    And when you brought counsel in, counsel**

13   **filed certain appeals of the forced leave.  You're**

14   **aware of that; correct?**

15        A    Yes.

16        **Q    All right.  And then ultimately, two of**

17   **the forced leaves were rescinded; is that correct?**

18        A    And reinstated.

19        **Q    And reinstated; correct?**

20        A    Yes.

21        **Q    And the -- the last forced leave, which is**

22   **the second one, was replaced with a pre-termination**

23   **notice; correct?**

24        A    Yes.

25        **Q    And a hearing was set on that notice;**

 1    correct?

 2         A    Yes.

 3         Q    **You had counsel to represent you; correct?**

 4         A    Yes, sir.

 5         Q    **You had the opportunity to present your**

 6    **case with respect to the allegations; correct?**

 7         A    Yes.

 8         Q    **And if you were unsuccessful at that**

 9    **level, you had an opportunity to appeal to the Civil**

10    **Service Commission; correct?**

11         A    If that's the procedure, yes.

12         Q    **With very capable attorneys; is that**

13    **right?**

14         A    I had attorneys, yes.

15         Q    **Okay.  Do you know how the Civil Service**

16    **Commission might have ruled on any appeals that you**

17    **may have taken throughout this entire process?**

18         A    No.

19         Q    **I'm sorry?**

20         A    No, sir.  I -- I -- I don't know how they

21    would have ruled.

22         Q    **Did you have some sense that somehow the**

23    **Civil Service Commission would have discriminated**

24    **against you because you were a white male?**

25         A    The Civil Service Commission is made up of

1  mayoral appointees that have -- I mean, I don't -- I

2  don't know who they -- who it would be.  I have no

3  idea who they are.

4      Q    Okay.  Do you have any sense, though, that

5  they would have discriminated against you?

6      A    No, I -- I don't know who they are, so I

7  can't have a sense that they would do anything.  I

8  don't know.  I don't know what they would do other

9  than they would hear the case.  I mean, I -- I have

10  no sense of -- of who they would be, who -- who is

11  even a Commissioner.

12      Q    Fair enough.  From the time frame that you

13  were put on forced leave on July 2nd, 2019 through

14  your last date of service, which was September 30,

15  2019, did you lose any pay or benefits during that

16  time frame?

17      A    No.

18      Q    I'm sorry?

19      A    No.

20      Q    No.  Do you know if the Comptroller's

21  alleged failure to provide you with Civil Service

22  ratings in 2016, 2017, 2018, do you know if that

23  caused you to lose any benefits?

24      A    I'm not sure the two have any bearing on

25  the other.  I don't think one has any bearing on the

1    other.

2        **Q    Okay.  Well, let me ask it this way:  How**

3    **were you harmed by the failure of Comptroller Green**

4    **to give you service ratings in twenty six -- 2017,**

5    **2018, 2019?**

6        A    The harm comes in the fact that you never

7    know where you stand.  You never know how your --

8    how your performance is being viewed, where are the

9    areas that you can do better, where are -- what are

10   the things that you are deficient in or that you may

11   have done exceptionally well.  There -- there was no

12   feedback at all.

13       **Q    Okay.  Any financial harm that you can**

14   **identify for us today?**

15       A    Any financial what?  I'm sorry.

16       **Q    Financial harm.**

17       A    No, they're not -- they're not -- it's an

18   apples and oranges thing.  It's -- the only thing

19   that -- that would tie a financial piece to not

20   getting a service rating is, is if the City in the

21   fiscal years that we were talking about were

22   offering merit raises.  You wouldn't be eligible for

23   a merit increase if you had not gotten a service

24   rating that was above meets standard.

25       **Q    Okay.  So if I'm understanding, you're**

1  hoping would get better, but they're -- they're not.

2          And, you know, as this deposition

3  approached and getting back into reliving and

4  recounting the events that transpired during that

5  period of time, it's kind of set me back a ways, if

6  you will.  And so I believe that that -- that that

7  might be a good option for me, is to -- to seek some

8  treatment in that regard, yes, sir.

9      **Q    So as we sit here today, you have not**

10  **sought out such treatment.  Is that a fair**

11  **statement?**

12      A    I have not as of yet.

13      **Q    All right.  At the time you retired, how**

14  **old were you?**

15      A    Let's see.  I was 66.

16      **Q    All right.  And when were you planning to**

17  **retire before the forced leave and things of that**

18  **sort?**

19      A    That question was asked of me probably in

20  March or April of 2019 by the Comptroller in the

21  presence of the other deputy, Beverly Fitzsimmons.

22      **Q    Okay.  Let's talk about that meeting.**

23  **Where -- this was, you say, May of 2019?**

24      A    I think it was March or April.

25      **Q    March or April of 2019?**

1      A      Not in this -- not on -- not on this

2   subject matter.  I think we may have had some -- a

3   staff meeting or two there.

4      **Q      Okay.  All right.  So let's talk about**

5   **this March 2019 meeting.  Tell us about that.  What**

6   **do you recall about that meeting?**

7      A      It was designed to have the -- the

8   Comptroller review and sign off on the budget that

9   Bev and I jointly prepared for the office.  And

10   somewhere in the -- in the midst of the

11   conversation, the Comptroller said that -- you know,

12   that she was looking forward and was starting to

13   make plans to run for another term.  And that -- she

14   looked at each of us and said, Can I count on your

15   support?  Will you -- will you be here?  Will you be

16   in these -- will you -- will you be there in these

17   positions?

18           And I said to her that I intended and I --

19   and I could commit to -- that day to working full

20   time through at least the end of her term, which

21   would have been April of 2021, and then I wanted to

22   assess, you know, health-wise and talk to my family

23   and just take it year to year and commit on a

24   year-to-year basis at that point in time.  I had no

25   plans to retire, but I told her that at what -- at

1  certain -- at some point in time, I would like to

2  cut back and go to a part-time employment if that

3  was allowable or possible with the office.

4      Q    Okay.  So she asked you will you be there

5  after the election?  Is that what she was trying to

6  gather, from your interpretation?

7      A    I -- I'm not sure what she was really

8  asking.  I think she was -- she may have been trying

9  to find out if I was going to retire or not.

10     Q    But you don't know as you sit here today?

11     A    I don't know what her motives were, no.

12     Q    All right.  And you had committed to work

13  at least through the next term, if she were to be

14  re-elected?

15     A    I committed to work at least through April

16  of '21, and then I would like to -- I -- I said I

17  would like to evaluate year to year based on health

18  and what -- my family situation, how they were

19  doing, in terms of making -- I wasn't making a

20  four-year commitment, I was making a year-to-year

21  commitment past April of '21, which would put her

22  into the next term that she was hoping to and she

23  was elected to; that I would -- I would be there,

24  you know.  I would make a one-year-at-a-time

25  commitment and potentially, as I said, would like

1    to -- when I did want to give up the full-time

2    status, if there was a way for me to play a role in

3    the office on a part-time basis.

4         **Q    Okay.  After you resigned, did anybody**

5    **tell you you couldn't work with the City on a**

6    **part-time basis?**

7         A    At that point in time -- I was not of the

8    ability to work in any capacity at that point in

9    time.

10        **Q    Okay.**

11        A    I -- I was just -- I don't know if you

12   want to call it depression.  I just didn't have it

13   in my gut to want to come back in any way, shape, or

14   form at -- at that point in time.

15        **Q    Okay.  And so -- but my question, sir,**

16   **was:  Has anyone from the City told you that you**

17   **cannot work part time for the City?**

18        A    Not that I can recall.

19        **Q    All right.  And so as far as you know, as**

20   **you sit here today, you can still work part time for**

21   **the City; correct?**

22        A    Potentially.

23        **Q    Okay.**

24             MR. NORWOOD:  I believe our lunch is here.

25        Do we want to take a break until 1:00?

1          MR. BLANKE:  Sounds fine.

2          MR. NORWOOD:  How much time -- where are

3     we in the scheme of things?

4          THE VIDEOGRAPHER:  As in total time?

5          MR. NORWOOD:  Total time, yes.

6          MR. BLANKE:  It's 12:25 now.  When did we

7     take --

8          MS. McMILLEN:  Do you want to go off?

9          MR. BLANKE:  Are we off the record or are

10    we on the record?

11         THE VIDEOGRAPHER:  We're on.

12         MS. McMILLEN:  Let's go off the record.

13         MR. NORWOOD:  Let's go off the record.

14         THE VIDEOGRAPHER:  This is the

15    videographer.  We're going off the record.  The

16    time now is 12:25.

17         (Off the record at 12:25 p.m.)

18         (On the record at 1:11 p.m.)

19         THE VIDEOGRAPHER:  This is the

20    videographer.  We're back on the record.  The

21    time now is 1:11.

22         MR. BLANKE:  Oh, I just thought I'd

23    mention, he did not get a chance to finish his

24    response.  It's up to you what you want --

25    about what happened at that March/April '19

1      meeting.

2           MR. NORWOOD:  Okay.

3           MR. BLANKE:  It was more that he was going

4      to talk about, but I don't know --

5           MR. NORWOOD:  All right.  Are we back on?

6           So counsel, I believe you've indicated off

7      the record that Mr. Garavaglia was -- wanted to

8      finish a response about the March 2019 meeting?

9           MR. BLANKE:  Yeah.  I think he said March

10     or April, I don't know.

11          MR. NORWOOD:  March or April.  Okay.

12     **Q     (By Mr. Norwood)  Go ahead, sir, if you**

13  **have more to add.**

14     A     Yeah, I -- I -- what I had said was -- I

15  was asked about how long I intended to work, and I

16  said full time for two years and then we'll take it

17  year by year, and then potentially down the road,

18  who knows.  But when I said that, the Comptroller

19  reacted by -- you know, she pursed her lips and she

20  kind of looked down and then she started making

21  notes.

22          When she asked -- when she looked back up

23  and she asked Bev the same question, Bev said, Well,

24  I've got the years of service that I could retire,

25  but I don't -- I'm shy -- I -- I don't have the age,

1  so I don't have the years that add to the age to get
2  me to 85.  So she said, You got me for not only the
3  next two years, but the entire next term of four
4  years, to which the Comptroller looked at her and
5  nodded approvingly and sort of gave it a bit of a
6  smile.
7        Now, I know working for her long enough to
8  know that what -- when I was saying what I was
9  saying, she didn't like what she heard.  Because she
10  looked down and she kind of made a hmm, pursed her
11  lips, and just started making notes.  However, in
12  contrast to what she heard Bev say, she seemed like
13  that was what she was hoping to hear.
14      **Q    Okay.  All right.  Let's unpack that a**
15  **tad.  So in this meeting, the one where she's asking**
16  **both of you-all to commit -- well, will you be there**
17  **in these positions.  I think those were the terms**
18  **used; right?  That's what she asked you, Will you be**
19  **there?**
20      A    Well, no.  The question was, Will you be
21  able -- I'm going to run, what are your plans, not
22  if we'll be there, but what are your --
23        MR. NORWOOD:  Hold on a second.  Hold on a
24        second.  Do we have -- hold on a second.  Let's
25        make sure.  Hold on a second.

1        Madam Comptroller, we're -- we're getting

2     back on the record.

3        MS. GREEN:  Okay.  Thank you.

4     **Q    (By Mr. Norwood)  Okay.  All right.  Let**

5  **me -- let me re -- let me ask this question again.**

6  **I want to go back, then, to the statement that she**

7  **led with.  Let's start with that.  That is -- we're**

8  **talking about the March or April 2019 meeting where**

9  **by you, the Comptroller, and Bev Fitzsimmons were in**

10  **attendance.**

11        **So how did the -- who called the meeting,**

12  **first of all?**

13     A    I actually think Bev called the meeting,

14  because it was -- we needed to sit down and talk

15  about the budget with the Comptroller.

16     **Q    Okay.  So it was a -- is this a normal**

17  **budget-type meeting, generally speaking, between the**

18  **two deputies and the Comptroller?  Did you-all**

19  **typically meet --**

20     A    Yeah.

21     **Q    -- meet in that fashion?**

22     A    Well, we didn't -- we didn't typically.  I

23  think we -- we met maybe a couple of times

24  throughout process, yes.

25     **Q    Okay.  And somewhere -- you're talking**

1    about the budget.  And as best you can recall,

2    exactly what did she say and what did she do?

3         A    She said that she planned on finalizing

4    her plans if she was running again, and she was

5    intending -- she was -- she was pretty sure that she

6    was going to run again and --

7         Q    This would have been -- excuse me.  I

8    don't mean to cut you off.  But this is for the

9    election in 20 --

10        A    '21.

11        Q    -- '21.  Okay.  All right.  Go ahead.

12        A    And that -- she was asking about what were

13   our plans, you know.  What -- what was, you know,

14   our plans going to be, what would we be able to

15   commit to in terms of our -- of our employment.  And

16   I said -- what I -- I think I've said it about four

17   times, but I said I would be certainly -- can I go

18   on?

19        Q    No, no, no.  I mean, I'm sorry.  I don't

20   mean to cut you off.  I'm trying to make sure we get

21   the precise words.  Because I thought -- what I

22   wrote down, it said that you -- she said, Will you

23   continue to be there in these positions after I'm

24   elected in 2021?  Is that --

25        A    Would you -- yes.  Yes.

1      Q    Okay.  All right.  So that's how --

2      A    If I am -- if I run, which I'm leaning

3  toward doing it, if I am elected, would you be in

4  these positions -- would you be available to be in

5  these positions?  And my answer was as I previously

6  testified to.

7      Q    Okay.  And then you said something about

8  lips -- and let's talk about that.

9      A    Well, when I was saying that, knowing her

10  as I do, I know that she was displeased by what I

11  said.  Because she looked down, pursed her lips, and

12  started making notes.  Conversely --

13      Q    Okay.  Let's -- let's stop.  Just -- we're

14  going to get to converse.

15      A    Okay.

16      Q    Okay.  Let's stay with verse, which is in

17  response to you saying I'm planning to stick around,

18  I'm in this through the next term, I might work part

19  time afterwards, she looked down and wrote something

20  down on a piece of paper.  Did you see what she

21  wrote down?

22      A    No, sir --

23      Q    All right.

24      A    -- I did not.

25      Q    All right.  And you said something about

1    her lips.  Tell me about her lips.

2         A    Well, she just -- she pursed her lips.

3    She -- you know, she -- it was like -- she just made

4    a -- her facial expression was that's not what I was

5    hoping to hear.  I'm -- I'm --

6         Q    So you don't know what she meant with

7    whatever facial expression that you believe that

8    you --

9         A    But -- but I know her well enough to

10   know --

11        Q    Let me finish.  Let me finish.

12        A    -- that she didn't like what she heard.

13        Q    Okay.  Let me -- let me finish, just for

14   the court reporter, because she is doing a great

15   job.

16        A    Okay.

17        Q    But when we talk over each other, I don't

18   think she has a special key for that.

19             So let's go back.  You said you know her

20   well enough to know that a pursed lip means what?

21        A    I said that I know her well enough that by

22   her facial expression and the fact that she made the

23   pursed lips and looked down, that she was displeased

24   by what I said.

25        Q    And do you know -- what is it about what

1    you said that displeased her?

2       A     That I wanted to work.  I wanted to keep

3    working.

4       Q     So that's what you believe?  She didn't

5    say that; right?

6       A     That's what I believe, yes.

7       Q     Okay.  She didn't say that; is that

8    correct?

9       A     This is what I believe, yes.

10      Q     She didn't say that; correct?

11      A     She said nothing.

12      Q     Right.  She said nothing.  Non-verbal

13   communications that you interpreted in some negative

14   way; is that correct?

15      A     Yes.

16      Q     All right.  And then you said -- then she

17   turned to Bev, and what did Bev say?

18      A     Bev said that she had the number -- she --

19   she had the -- the number of years of service, but

20   she didn't have the age that would bring her up to

21   the rule of 85, where she could be potentially

22   eligible for full retirement.  And so she said,

23   You've got me.  You've got me through the rest of

24   this term and you've got me the whole next term,

25   because I need to get to the rule and I'm -- you

1    know, I'll be here.

2           And at that point in time, the Comptroller

3    looked up, looked at her, nodded approvingly, and

4    partially smiled.

5           **Q     And partial -- a partial smile?**

6           A     Yeah.

7           **Q     All right.**

8           A     Meaning that she was glad to hear that, in

9    my opinion.

10          **Q     Okay.  But she didn't say any of that;**

11   **right?**

12          A     She did not.

13          **Q     And you interpreted the partial smile as**

14   **an approval of whatever Bev Simmons (sic) was**

15   **communicating to her; correct?**

16          A     Yes.

17          **Q     Did -- did she take notes when she gave**

18   **that half smile?**

19          A     Did not.

20          **Q     All right.  All right.  And you took the**

21   **fact that she didn't write notes as something**

22   **like -- as what?**

23          A     I didn't take it as anything.  I --

24          **Q     All right.**

25          A     But I can tell you that based on her

1    facial expressions, what I said did not please her.

2    What Bev said did.

3        **Q    All right.  And did you take down her**

4    **writing down, was that -- what did you interpret**

5    **from that?  She's writing down --**

6        A    I --

7        **Q    -- while she's --**

8        A    I didn't -- I didn't take anything from

9    that.

10       **Q    All right.  So just writing; right?**

11       A    I don't know what it was, yes.

12       **Q    All right.  Fair enough.**

13           MR. NORWOOD:  Before we go forward, just

14           for the record, we had talked about Exhibit 29,

15           which were the documents related to his

16           application for Deputy Comptroller, and we had

17           identified the Bates numbers.  So let me do

18           that for you, counsel, so you can isolate those

19           at your leisure.  And those are STL000709

20           through 725.

21           MR. BLANKE:  Thank you.

22           MR. NORWOOD:  You're welcome.

23       **Q    (By Mr. Norwood)  We were talking about**

24   **your direct reports and your annual ratings for**

25   **those direct reports.  Do you recall if you did, as**

1   service rating.  I'm not sure.

2       Q    A service rating.  So -- so for -- you did

3   them for Anderson -- service ratings for Anderson,

4   Kenner, Harrington, and also Ryan Coleman?

5       A    Yes.

6       Q    And all of your direct reports, is your

7   testimony, correct, whoever those might have been?

8       A    Yes.

9       Q    And you would have been -- you would have

10  rated it as a second person on everyone else in your

11  group?

12      A    That was not a direct report, yes.

13      Q    All right.  Let me hand you what has been

14  marked as Garavaglia -- or Garavaglia Deposition

15  Exhibit 30, if I could.  Let me hand you a copy.

16          MR. NORWOOD:  It's not labeled, so you'll

17      have to write that.  This is Exhibit 30.

18      Q    (By Mr. Norwood)  And -- and for the

19  record, these are assorted documents that are Bates

20  labeled STL with a number.  So let's start with

21  STL000707.  And this is a letter from Comptroller

22  Darlene Green to Mr. Richard R. Frank, Director of

23  Personnel, dated May 20, 2016.  Do you see that?

24      A    Yes, sir.

25      Q    And Comptroller Green starts by saying --

1    **and I'll read it -- quote, Dear Mr. Frank, I would**

2    **like to respectfully request that the Department of**

3    **Personnel approve a 10 percent salary increase for**

4    **Mr. Jim Garavaglia upon his promotion to Deputy**

5    **Comptroller as of May 13, 2016.**

6            **Do you see that?**

7    A    I do.

8    **Q    And it's your understanding that that**

9    **would have been an automatic 10 percent increase?**

10    A    Based on the Civil Service, it -- it's --

11    it's in the -- whenever they do an ordinance -- the

12    Department of Personnel does an ordinance which

13    spells out salary titles and ranges of salary and

14    also the rules that govern promotions, increases,

15    demotions, suspensions, everything that you would

16    need to know regarding and affecting someone's

17    title, grade, or pay.

18    **Q    Right.**

19    A    I believe in that document, which is a --

20    which is an ordinance that's passed, I don't know,

21    annually by annually, it states in there what would

22    happen if you were to be promoted by one grade, by

23    two grades, but I don't believe in any instance you

24    can be promoted from -- or you can be raised from

25    more than three grades from where you currently are.

1    So it stipulates, I believe, in that ordinance that

2    when you move someone two grades, that they get a

3    10 percent increase.  It's 5 percent per grade.

4        **Q    Right.  So in your view, then, she was**

5    **required to send this letter to give you the**

6    **10 percent salary increase?  Is that your**

7    **understanding?**

8        A    I'm not sure she was required to, but it

9    may have happened automatically.  Once you put me in

10   the position, it may have happened automatically.

11   I -- I think maybe they -- Personnel requested her

12   to write the letter.  I don't know.

13       **Q    All right.  So as you sit here today, do**

14   **you know if she had not written this letter, whether**

15   **or not you would have got a 10 percent salary**

16   **increase?**

17       A    I don't know that I wouldn't.

18            COURT REPORTER:  That you wouldn't?

19       A    I don't know that I wouldn't have gotten

20   it anyway.

21            COURT REPORTER:  Thank you.

22       **Q    (By Mr. Norwood)  Or would not have gotten**

23   **it anyway; right?**

24       A    No.  I said I'm not sure, because, again,

25   the ordinance that -- that covers Personnel policy

1    regarding pay grades, titles, promotions, demotions,

2    and what happens when you promote someone one grade

3    or two grades, in the ordinance, if she did not --

4    you know, in other words, if -- if I did not get the

5    10 percent raise, she would be technically in

6    violation of an ordinance.

7        Q    **That's your understanding?**

8        A    That's my understanding.

9        Q    **All right.  And so if she had not sent**

10    **this letter and recommended a 10 percent salary**

11    **increase -- salary increase, do you know whether or**

12    **not you would have received that salary increase, is**

13    **my question?**

14        A    I believe I would, by -- by virtue of the

15    fact that Personnel is going to follow their own

16    ordinance.

17        Q    **Got it.  All right.  Let's go to the next**

18    **page, which is a letter dated June 6th, 2016, STL**

19    **document number STL000708.  It appears to be a**

20    **letter dated June 6, 2016 from Mr. Frank to**

21    **Darlene Green.  Have you seen this letter before?**

22        A    I don't think so.

23        Q    **All right.  Based upon your review of the**

24    **letter, does it appear that in response to**

25    **Ms. Green's letter dated May 20, 2016, that he is**

1  approving the increase at 10 percent?

2      A    Yeah.  What he's doing is he's referencing

3  the section, I believe, of the ordinance that

4  governs this, that Section 6(1) -- a dash 1.  I

5  believe that's what that is in -- in the ordinance

6  that that -- in Section 6 of that ordinance.  I

7  believe that's what he's referencing.

8      Q    So he's approving her request for the

9  10 percent increase that you would have

10  automatically gotten anyway?  Is that your

11  testimony?

12      A    I think that's how it works, yes.

13      Q    All right.  Let's go to the next page,

14  which is STL000698, and ask you if you've seen that

15  document before.

16      A    I probably have this document, because

17  when you receive an increase, there is a copy that

18  goes to the employee.

19      Q    Okay.  And in the middle of -- and this --

20  it has your name on it?  This is from your Personnel

21  file; is that correct?  Is that what you understand?

22      A    Yes.

23      Q    All right.  And it says Reason For Data

24  Change, it says, quote, Promotion to Deputy

25  Comptroller, and then open paren, 10 percent

 1    of this, so let me kind of go to my literal and

 2    figurative highlights.  In paragraph 6 on page 2,

 3    you state that, Defendant Green is an African

 4    American female.  That's part of it.  And you also

 5    say Defendant Green is being sued in her official

 6    and individual capacities.

 7         Do you see that?

 8    A    Yes.

 9    Q    What do you believe Ms. Green did in her

10    individual personal capacity as it relates to

11    this -- as it relates to what you claim is unlawful

12    discrimination?

13         MR. BLANKE:  Objection.  I think that

14         calls for a legal conclusion on the part of the

15         witness, who probably doesn't understand the

16         difference between individual and official

17         capacity in the first place.

18    Q    (By Mr. Norwood)  Okay.  Subject to that,

19    do you know what that meant when you allege that you

20    were suing her in her personal capacity?

21    A    I did not.

22    Q    Do you -- can you identify anything that

23    she did to you personally outside of her capacity as

24    Comptroller that caused you the stuff that you claim

25    was caused --

1          MR. BLANKE:  Same --

2     **Q     -- by her actions?**

3          MR. BLANKE:  Same objection.

4     A    Not at this --

5          MR. BLANKE:  Calls for a legal conclusion.

6     That's the objection.  Go ahead.  I'm sorry.

7     **Q    (By Mr. Norwood)  Subject to that.**

8     A    Not at this point in time.

9     **Q    All right.  Let's look at paragraph 13.**

10    **You say -- you allege, quote, Defendant Green placed**

11    **Plaintiff on forced leave with the intent of**

12    **auditing him in order to obtain and prepare a**

13    **pre-textual reason to justify Plaintiff's**

14    **termination and/or with the intent to harass**

15    **Plaintiff and induce him to retire or resign so that**

16    **she could replace Plaintiff as Deputy Comptroller**

17    **with a younger African American female employee.**

18         **Did I read that correctly?**

19    A    Yes, sir.

20    **Q    And you -- we had talked about the**

21    **evidence.  The only evidence you have on that is the**

22    **fact that Comptroller Green hired a younger African**

23    **American female; right?**

24    A    No.

25    **Q    What else do we got?**

 1   forced leave --

 2        Q    Right.

 3        A    -- that you -- and at that point, because

 4   whatever investigation she decided that she needed

 5   to put together, it was not complete or she didn't

 6   have enough to go to a pre-term, and so she extended

 7   me on another forced leave.

 8        Q    Okay.  Well, why would she have waited

 9   until she had enough goods on you before she would

10   have placed you on forced leave?  Do you have a

11   theory on that?

12        A    I don't know -- I -- I have no idea what

13   happened to me on the 2nd of July.

14        Q    Okay.

15        A    I was given no explanation.  I was put out

16   the door with no explanation other than be told,

17   They'll let you know.

18        Q    And who told you that?

19        A    Judy Armstrong.

20        Q    All right.

21        A    Not the Comptroller.

22        Q    Right.  Okay.  And so --

23        A    And you know -- let me just add one more

24   thing.  The 2nd of July is very important, and the

25   reason it's important is it's the beginning of the

1  fiscal year.  I don't think there was any

2  coincidence about the fact this action was taken to

3  coincide with the beginning.  It's out with the old

4  and in with the new.  And I -- I believe that this

5  was a concerted plan to replace me one way or

6  another.  If I didn't retire, I was going to go.  I

7  was put out the door.  There was not the evidential

8  facts to sustain my ultimate demise at the time I

9  was put out the door, and so the extensions kept

10  occurring with this forced leave in order for her to

11  build some kind of potential case that was meant to

12  be substantial enough to sustain the challenge that

13  I may mount at Civil Service.

14          Because the pre-term is a foregone

15  conclusion.  The whole thing was orchestrated and

16  put together to get me out, and there was no time

17  like July 2nd, the beginning of a fiscal year.  And

18  I believe that the -- that the whole process was

19  accelerated by the fact of the meeting that we spoke

20  about just earlier today in -- in that March/April

21  time frame.

22          Once I told her that I was going to

23  continue to work, I wanted to work, and I was going

24  to be there, it didn't fit into her long-range plan

25  to replace me with a black younger female.  That was

1  the ultimate plan, because I had replaced a black,

2  younger female.  And for appearance purposes, she

3  had a problem.  She had two white deputies.  I was

4  the interim solution.

5          I believe that she was pressured in the

6  community that you had a black deputy for

7  20-something years, you promoted a white woman to

8  replace a white man and the other job in accounting

9  services.  Now, that position, I believe, was to be

10 restored to an African American woman, and I was put

11 in the position until such point in time as that

12 person who ultimately got the job was deemed

13 necessarily ready to step up and assume that role

14 and title.

15     Q    And that is your belief; correct?

16     A    That is my belief.

17     Q    All right.

18     A    That is, in my opinion, exactly how it

19 came down.

20     Q    All right.  And you don't have any

21 evidence to support that belief other than what

22 you've already testified to; right?

23     A    That's correct.

24     Q    All right.  And so she promoted you for

25 the purpose of firing you in two years, three years;

1   aware of the fact that Ivy was gone, I was there.

2        Q    Well --

3        A    That's just one anecdotal example.  If you

4   read The American or if you -- if you looked in the

5   paper or if you, you know, had any idea of what was

6   going on in City government, you would know that.

7        Q    I would know what?

8        A    That Ivy had died --

9        Q    Right.

10       A    -- and that she had been replaced by a

11   while male.

12       Q    Right.  And so it was known -- commonly

13   known that you had replaced an African American

14   female?

15       A    That's correct.

16       Q    And what I'm trying to figure out is how

17   are you surmising that from her standpoint that she

18   was having a problem with that?  What evidence do

19   you have of that?

20       A    By the mere fact that from the very time I

21   was hired, as we said -- as I testified earlier, she

22   only expected me to be in the position -- I was a

23   placeholder for a period of time.  She said it to

24   me.  And subsequent to that, she asked me about it

25   in the March/April time frame just before this whole

1    series of events took place.

2        Q    She never said you were a placeholder;

3    right?

4        A    Nope, but it was very much obvious to --

5    to me in looking at the situation after this all

6    unfolded.

7        Q    Okay.  So this is sort of an after the

8    fact, the lightning bolt hit you that from the

9    get-go, she was going to find a way to get rid of

10    you after promoting you and giving you a raise in a

11    couple years; is that right?

12        A    The series of events that I described and

13    I testified to didn't make sense on a

14    mutually-exclusive basis, but once I'm on forced

15    leave and I'm sitting at home with a lot of time on

16    my hands, I was able to put this together in my

17    head.

18        Q    And the public pressure.  Who -- who, I

19    mean, is there any names you can give the Court or

20    the jury about who are these "they" that is putting

21    pressure on the Comptroller to get rid of a white

22    male who was her dep -- deputy?

23        A    I can't at this time, no.

24        Q    Okay.  Do you know if those same eyes and

25    those same public community felt the same way about

```
 1      A    Yes.
 2      Q    All right.  So you believe that the two of
 3 them -- to the extent that they went along with what
 4 you suggest was a charade because of their evil
 5 motive and willful, wanton, malicious, outrageous
 6 conduct?
 7      A    Well, the question you asked me is how did
 8 the City do this, and my answer was by endorsing
 9 and -- and com -- and being com -- in -- in, I
10 guess, agreement with what the Comptroller was
11 doing.
12      Q    Right.  But I'm trying to -- what I'm
13 trying to drill down on is this intentional,
14 willful, maliciousness.  That -- that's what I'm
15 trying to understand.  Other than what you have
16 described here today, do you have anything else to
17 suggest that the actions of those other players was
18 willful, wanton, malicious, outrageous?  Anything
19 else you can add for this record today?
20      A    Not at this point in time today.
21      Q    Not at this point in time.  All right.
22           And as to Comptroller Green, what is it
23 that you believe was intentional, willful, wanton,
24 malicious, outrageous, with evil motive and reckless
25 indifference?
```

1    A    I believe that she needed me out -- she
2  needed me to be out of the job and she was taking
3  whatever steps necessary to do that.
4        **Q    Got it.**
5        MR. BLANKE:  Is this a good time?  I've
6        got to go to the bathroom.
7        MR. NORWOOD:  That's fine.  We'll take a
8        break.
9        THE VIDEOGRAPHER:  This is the
10       videographer.  We're going off the record.  The
11       time now is 2:05.
12           (Off the record at 2:05 p.m.)
13           (On the record at 2:21 p.m.)
14       THE VIDEOGRAPHER:  This is the
15       videographer.  We're back on the record.  The
16       time now is 2:21.
17       **Q    (By Mr. Norwood)  Mr. Garavaglia, let's
18  turn to Deposition Exhibit 2, if we could.  What is
19  Deposition Exhibit 2?**
20       A    This is my filing of -- of a charge of
21  discrimination before the Missouri Commission on
22  Human Rights.
23       **Q    Okay.  And this is -- was your position
24  submitted to the EEOC regarding what you believe
25  transpired with respect to your employment; correct?**

 1      A     Yes, sir.

 2      Q     And other than what you have testified to

 3 here today, is there anything else -- well, I'll

 4 withdraw that question.

 5            Let me look at the last paragraph on

 6 page 2 of Exhibit 2.

 7      A     Okay.

 8      Q     You say, quote, There is a clear pattern

 9 and practice of discriminatory treatment of

10 non-black, older, and male employees by the

11 Comptroller.

12            What -- outside of what you already

13 testified to, do you have anything else to offer

14 about this clear pattern and practice of

15 discriminatory treatment of non-black, older, and

16 male employees by the Comptroller?

17      A     I'm not sure I understand what you're --

18 what you want me to tell you.

19      Q     Well, I want for you to tell me the truth;

20 right?  I want you to tell me what you meant when

21 you said to the EEOC, There is a clear pattern and

22 practice of discriminatory treatment of non-black,

23 older, male employees by the Comptroller.

24            What did you mean when you wrote that --

25 when you can communicated that to the federal

 1    **government?**

 2         A    I'm speaking about myself.  And you look

 3    at the fact that I was hired, I was told -- or I was

 4    asked -- you know, I was told how long I was, you

 5    know, hopefully going to have a couple years that I

 6    could go out on top as a -- as a -- as a deputy.  I

 7    was -- I was more or less kept at arm's length.  I

 8    wasn't part of her inner circle.  I wasn't, you

 9    know, part of the long-term plan, if you will.

10              If you look at the March/April meeting and

11    subsequently what happened, I mean, it's -- it's

12    pretty much -- I was a placeholder.  And I think

13    that, again, you look back on -- on -- on that, and

14    that's pretty much what this is about.

15         **Q    But you didn't say that in your statement.**

16    **You said clear pattern and practice of**

17    **discriminatory treatment of non-black, older, male**

18    **employees.**

19              **So what other Es do you -- can you share**

20    **with us that have been discriminated against for**

21    **being non-black, older, white males?**

22         A    The context of that sentence -- I'm not

23    sure what I was thinking of at the time.  I'd like

24    to reserve the right to come back and -- and maybe

25    answer that fully.  I can't -- I can't --

1      Q    Okay.

2      A    It's not coming to mind what I was

3  referring to at that point.

4      Q    All right.  So you can't identify for us

5  today any other non-black, older, male employees?

6      A    It's not coming to mind.

7      Q    All right.  Did it come to mind when you

8  submitted this to the EEOC at the time under oath?

9      A    Evidently I -- I could recall it then --

10  I -- I'm just not recalling it.

11      Q    Okay.  Let me direct your attention to

12  Garavaglia Exhibit 3.  And these documents have a

13  Bates stamp that has your name and a number 1 on the

14  first page.  Do you see that?

15      A    Yes.

16      Q    All right.  And then if you turn to the

17  third page, there's a document entitled Respondent's

18  Statement of Position in Response to Charge of

19  Discrimination.

20           Do you see that?

21      A    Yes.

22      Q    Have you seen that document before?

23      A    Yes.  This is the response that was

24  submitted to the EEOC in relation to my charge

25  letter.

1      Q    All right.  Let's turn to page 4 of the
2  document.  It's Garavaglia 6.  In this statement, it
3  says, quote, Based on the advice of counsel, the
4  Comptroller rescinded Complainant's original
5  administrative leave on July 18, 2019 and
6  reinstituted a second administrative leave process
7  that same day, which included the additional new
8  information as to Complainant's fiscal
9  irregularities ascertained as part of the internal
10  audit process.
11           Do you see that?
12      A    Yes.
13      Q    And my question to you:  Do you know if
14  the reason for the recision had to do with advice
15  she received from counsel?
16           MR. BLANKE:  That he received?
17           MR. NORWOOD:  That she received.
18           MR. BLANKE:  She received.
19      A    No.  I -- I just read this at its face
20  value.  I have no idea what -- what that means.
21      Q    (By Mr. Norwood)  So with respect to the
22  statement, though, my question to you is:  Do you
23  know if the reason she did it is because she had
24  advice to suggest that that's what she should do?
25      A    I have no idea why.

1     A    I do.

2     Q    All right.  Let's take a look at that.  It

3    says, quote, There are some actions which are so

4    serious that progressive discipline is inappropriate

5    or insufficient and, therefore, immediate --

6    immediate dismissal is warranted.

7         Do you see that?

8     A    Yes.

9         MR. BLANKE:  You know, this is your time,

10        you can spend it however you want, but you're

11        wasting your own time, because we've spent like

12        10 or 15 minutes now just reading an

13        administrative regulation into the -- into the

14        record.

15        MR. NORWOOD:  Agreed.

16    Q    (By Mr. Norwood)  Continuing.  Listed

17    below are examples of actions which may be

18    exceptions to progressive discipline.

19        Do you see that?

20     A    I do.

21     Q    All right.  Let's flip over a couple of

22    pages to the last page, which is Garavaglia 26.  Do

23    you see that?

24     A    Yes.

25     Q    There's a bullet point.  It says,

1    Violating any of the provisions of the City's Code

2    of Conduct.

3              Do you see that?

4        A    Yes.

5        Q    And then the next item says, Falsification

6    of time records or other official City records.

7              Do you see that?

8        A    Yes.

9        Q    And so based upon that, you understand,

10   then, that those violations could result in

11   immediate termination; correct?

12       A    Yes.

13       Q    All right.  If we continue on in that same

14   stack -- it's Garavaglia 28 -- we have a document

15   that says Employee Code of Conduct.

16             Do you see that?

17       A    Yes.

18       Q    And you were familiar with that because

19   you reviewed it annually and signed off on the fact

20   that you did; correct?

21       A    That's correct.

22       Q    All right.  And it starts by saying,

23   quote, We recognize that City employees have a

24   responsibility to various groups:  The public,

25   public officials who represent the public, their

1        A    I do.

2        Q    All right.  You understand that was one of

3   your responsibilities as well; correct?

4        A    Yes, sir.

5        Q    All right.  And then Records and

6   Communications.  It says, quote -- in the second

7   paragraph of that section, same page -- Employees

8   must not make any misleading representations or

9   falsify any record or engage in any false

10  communication of any kind.  Is that correct?

11       A    That's what it says.

12       Q    Whether internal or external, including,

13  but not limited to making or filing any false

14  reports, attendance, production, financial, or

15  similar reports and statements.  Is that correct?

16       A    Yes, sir.

17       Q    All right.  Let's go to the next page,

18  Garavaglia 33.  Honesty.  City employees should be

19  completely honest in their dealings with the public,

20  elected officials, appointing authorities,

21  supervisors, and fellow employees.

22            Is that a correct reading of that?

23       A    Yes.

24       Q    It says, quote, Lying in any form,

25  omitting some facts, or exaggeration undermines the

1    fundamental trust that must exist between employer

2    and employee and has no place in public service.

3            Did I read that correctly?

4      A    You did.

5      Q    Penalties on the same page.  Any violation

6    of this Code of Conduct will subject the violator to

7    disciplinary action up to and including dismissal.

8            Did I read that correctly?

9      A    Yes, sir.

10     Q    Let's turn to Garavaglia tab 4, Deposition

11   Exhibit 4.  No.  Better yet, let's turn to tab 5,

12   which is Garavaglia Deposition Exhibit 5.

13           Do you see that?

14     A    Number 105?

15     Q    I'm sorry.  Yeah.  Page 105.  Exactly.

16     A    Okay.

17     Q    All right.  Have you seen this document

18   before?

19     A    Yes.

20     Q    It looks like it's a memo from Comptroller

21   Darlene Green to Nancy Kistler, Deputy City

22   Counselor.  Do you see that?

23     A    Yes.

24     Q    In there, it says, quote, At the June 19,

25   2019 E&A meeting, I became aware of an e-mail sent

 1    by Jim Garavaglia to Beverly Fitzsimmons to place an
 2    item on the agenda when Mayor Krewson read aloud the
 3    e-mail thread.
 4              Do you see that?
 5         A    I do.
 6         Q    And you were at that meeting where that
 7    occurred; correct?
 8         A    I was.
 9         Q    And do you know where the mayor obtained
10    the e-mail that she read aloud at that particular
11    meeting?
12         A    I believe he got that from
13    Bev Fitzsimmons.
14         Q    You believe who got it from Mayor --
15         A    The mayor's office received that Bev
16    Fitzsimmons.
17         Q    Okay.  And she says, This is my first time
18    hearing about the e-mail Jim sent.
19              Do you see that?
20         A    I see it.
21         Q    Do you know if that's accurate?
22         A    It is not.
23         Q    It is not -- okay -- in your view.  It
24    says, This is important, because I didn't realize
25    Jim had initiated the request for an extension of

1      item to be placed on the agenda.  I knew generally

2      that the request for extension was -- for an

3      extension was coming because Jim had mentioned it to

4      me earlier in the month.  However, I was not fully

5      apprised of the situation, including a pending

6      default.

7             Do you see that?

8      A     I do.

9      Q     Do you know if she was apprised of the

10     situation, including the pending default?

11     A     Can I speak to the issue?

12     Q     Absolutely.

13     A     Okay.  I agree with Ms. Green's comment

14     that I became aware of the request coming for an

15     extension from the developer because they were

16     having problems once again with getting their

17     finances in order --

18     Q     Okay.

19     A     -- to move forward with the project.

20     Q     Okay.

21     A     So just as it says here, I advised her

22     that this was coming, it would be on a request to

23     put on the agenda shortly.  On the 14th of June,

24     which was a Friday, I routinely sent the request to

25     Bev Fitzsimmons, who does the agendas for E&A,

1   saying this is tentatively an item that we want to

2   put on.  I spoke to Ms. Green.  At the time I spoke

3   to her, she didn't have any problem with it being on

4   the agenda.

5        Q    **When did you speak to Ms. Green?**

6        A    Prior to the 14th.

7        Q    **Prior to that Friday?  Yes?**

8        A    Prior to the 14th.  Some -- sometime, as

9   she states here, earlier in the month, possibly that

10  week.  Since that was a Friday, possibly that week.

11       Q    **Okay.**

12       A    And I sent the request -- tentative

13  request.  And -- and what that means when I say

14  tentative request is she assembles all of the items

15  to be placed -- Bev -- this is Bev Fitzsimmons.  And

16  then what she does is she then sends them to the

17  president and the mayor's office to see if there's

18  any objections to any of the items.

19            Okay.  So she's doing that.  And in the

20  interim, here comes Monday, and Monday is -- I

21  believe that's the 17th.  Things start changing.

22  The environment is changing regarding this

23  particular request.  And what's happened is -- is

24  that, number one, I became aware -- later confirmed

25  by an e-mail to Bev -- that for whatever reason the

1  president's office was asking us not to put it on

2  the agenda.

3      **Q      Okay.**

4      A     I'm not aware of why, but -- so I had some

5  concerns about our ability to get this bill -- or to

6  get this item on the agenda and to have it receive

7  at least two votes, since the president's office

8  wasn't on board.

9           Secondly, because the developer in a prior

10  meeting/phone call readily admitted that they owed

11  back taxes, that was a concern, and -- and daily, I

12  was calling.  I didn't have to do a tax clearance

13  request, as this will tell you was a shortcoming on

14  my part.  I didn't have to do that.  I was making

15  phone calls down to the Collector of Revenue's

16  office daily to see if the money had come in.

17           So now I don't know if I've got the votes.

18  I've got a problem with the tax clearance.  And then

19  all during this time period, Bev is calling me and

20  e-mailing me, Have you talked to the Comptroller

21  about this?  Have you got -- have you gotten the

22  approval from the Comptroller?  I've got to put out

23  my agenda.  I've got to go.  I've got to get this

24  done.

25      **Q      Right.**

1     A    And I'm -- I'm saying to her, no, I

2  haven't called her, because I don't have clarity on

3  what we were going to do.  The last thing I'm going

4  to do is place an item on the agenda that I know is

5  not going to get a second or will fail to get the

6  votes necessary to pass.

7         **Q    Right.**

8     A    I'm not about to place the Comptroller or

9  our office in a position to be embarrassed by the

10  fact that we didn't do our homework and know ahead

11  of time that it was going to be approved at that

12  meeting.

13         **Q    Right.**

14     A    So I've got concerns.  I've got two

15  concerns, not sure I had enough votes, and the fact

16  that we still had taxes owed on the 17th.

17         **Q    Right.**

18     A    Later that day on the 17th, a third

19  problem happens, and that is --

20         **Q    Now, let me -- let me backtrack.  I just**

21  **want to make sure you're clear.  So you're saying by**

22  **the 17th, you understood there was no tax clearance;**

23  **is that correct?**

24     A    I'm calling down there and asking if the

25  taxes are paid.

1       **Q      Okay.**

2       A      I'm not going through the manual writing

3   up a tax clearance request, because I know the

4   answer by picking up the phone.

5       **Q      Right, right, right.**

6       A      So by this point in time, we -- on the

7   afternoon, I think --

8       **Q      The afternoon of?**

9       A      -- of the 17th, which is a Monday --

10      **Q      Okay.**

11      A      -- somehow or other, the mayor's office

12  knows that we are having -- we're having some

13  hesitancy in making this be a final item agenda

14  item.

15      **Q      Right.**

16      A      And we -- and I -- I think what happened

17  was because both sides were represented, their

18  attorney, Roger Denny with Spencer Fane, called our

19  attorney, Tom Ray, and basically said I've been

20  talking to the mayor's office, and they're willing

21  to put this on if the Comptroller isn't.  And he let

22  me know that.  And the first thing the next day, Bev

23  is -- is sending me an e-mail, have you got the

24  Comptroller?  I've got to get this out.  Have you

25  talked to her yet?  And now I've got the third

1    problem.  Now the mayor is in the act of wanting to

2    put it on the -- on the agenda.

3        **Q    Right.**

4        A    I said to her, No, I have not, but I will

5    in my e-mail.  You'll find that somewhere in this

6    chain of e-mails --

7        **Q    Right, right, right.**

8        A    -- that I said, No, but I will.  I then

9    called the Comptroller and I explained to her that

10   we didn't have -- I wasn't sure about where the

11   president was, but now the mayor's office wants to

12   put it on anyway.  And I said, What do you want me

13   to do?  Do you want me to send them the paper -- the

14   paperwork for -- to put it on the agenda?  And she

15   said, No, send it to me.

16       **Q    Right.**

17       A    At this point, I want to look at it,

18   because this is -- the Comptroller is telling me,

19   directing me to send this item to her, because I

20   want to take another look at this.  You know, now

21   that -- now that we've gotten to this point, I want

22   to look at this project again.  I've got to ask some

23   questions.  Send it to me.

24            I said, Yes, ma'am.  I did that, called

25   Bev, and said, We're not putting it on.  The

1   Comptroller has asked that the item be sent to her.

2      Q    Okay.

3      A    At that point in time, taxes had not still

4   been paid.

5      Q    Right.

6      A    I still was unaware that we had another

7   vote, but it didn't matter, because the Comptroller

8   the pulled it and said, Send it to me.  It's not

9   going to the mayor's office.  I don't know if she

10  was going to make a decision to put it on in

11  conversation with Bev or not, but I've been stood

12  down.

13     Q    Right.

14     A    And she -- Bev then -- whatever happened

15  between her and the Comptroller I was not party to

16  at that point in time.

17     Q    Okay.

18     A    Now, what happens next --

19     Q    Well, let me stop -- let me stop you

20  there.  We're going to get to the next, but I want

21  to make sure we get this in context.

22          So let's go to Garavaglia page 107, Bates

23  stamped page 107 and 108.  Do you see those pages?

24     A    Where would that be noted?  Oh, I see it.

25  It's -- it's --

1    Q    109.

2    A    Yeah, I see that.

3    Q    All right.  So let's go through the -- the

4    e-mails.  The first one is an e-mail from you dated

5    Friday, June 14 --

6    A    That's --

7    Q    -- 2019?

8    A    That's what I spoke of just a second

9    ago --

10    Q    Right.

11    A    -- where I sent her --

12    Q    Right.

13    A    -- that information.

14    Q    Right.  Okay.  And that's at -- let me

15    finish.

16    A    Yep.  Okay.

17    Q    At 10:53 a.m.; correct?

18    A    Yes.

19    Q    And this is an e-mail from you to Bev, who

20    is responsible for helping to assemble that agenda;

21    correct?

22    A    That's right.  That's right.

23    Q    All right.  And you say, quote, Here's

24    that extension we talked about for E&A.  Thanks.

25         Do you see that?

```
 1        A    Yep.
 2        Q    All right.  And then she responded to you
 3   at 11:21 a.m. that same day, Friday, June 14, 2019,
 4   and she says, You did run this by the Comptroller
 5   before we do this; right?  That's what she asked
 6   you; right?
 7        A    And again --
 8        Q    No, no, no.  Let -- let's answer my
 9   question.
10        A    All right.
11        Q    Okay?
12        A    Sure.  Go ahead.
13        Q    That's what she responded to you some
14   30 minutes later when you said let's place this item
15   on the agenda; correct?
16        A    On the tentative agenda, yes.
17        Q    Okay.  On the tentative agenda.  All
18   right.  You did run this by the Comptroller before
19   they do this.  That's why she asked you that; right?
20        A    As I stated before, not on the day of the
21   14th.
22        Q    No, no, no, no.
23        A    But prior to this, yes.
24        Q    I'm talking about today.
25        A    That day, no.  And there -- and there's a
```

 1   reason for it.

 2       Q    Well, no, no.  We're going to get into the

 3   reason for it, but I just want to get what we've

 4   got.

 5       A    Okay.  As of that point, I -- I -- I

 6   answered the question.  Did not.

 7       Q    You did not.  Why was she asking

 8   whether or not -- why was it important for her to

 9   have it run by the Comptroller?  Why is that

10   important?

11       A    Well, because anything that goes on the

12   agenda is approved by the Comptroller.  The final

13   agenda is approved by the Comptroller.

14       Q    It has to be approved by the

15   Comptroller --

16       A    That's right.

17       Q    -- your boss; correct?

18       A    That's right.  That's exactly right.

19       Q    All right.  All right.  And your -- my

20   words, not yours -- terse response is, Did not?

21       A    That's not a terse response.  It's a --

22   it's a reply.

23       Q    Okay.  Did not.  You did not is what you

24   responded to Bev; right?

25       A    You're -- you're adding something that

1    isn't there.

2         Q    All right.  I'm not going to add anything.

3              Did not.  That's there; right?

4         A    Yeah.  I just -- I said no, did not.

5         Q    No, you said, Did not.

6         A    Did not.  I --

7         Q    You didn't say no.

8         A    Yeah, Did not.

9         Q    Did you explain why?

10        A    Yeah, because --

11        Q    No, in the e-mail.

12        A    No.

13        Q    You didn't explain why in the e-mail?

14        A    No.

15        Q    Okay.  All right.  And that was your --

16        A    I was clear I didn't.

17        Q    Your -- well, we just want to make sure

18   the record and the video is clear.

19        A    Yeah.  Okay.

20        Q    We're at 12:04 p.m. on Friday, June 14th.

21   You say, Did not.  And Bev responds some 29 minutes

22   later on that same day, Please run it by her first.

23   I just got off the phone with her, so she is not

24   here, but around.

25              That's what she responded; correct?  Is

1   that correct?

2        A    That's correct.

3        Q    All right.  And that was on Friday.  Then

4   the next e-mail is on a Monday and -- 9:28 a.m., Bev

5   is sending you an e-mail, First response...what did

6   the Comptroller say?  Is that right?  Did I read

7   that right?

8        A    You did.

9        Q    All right.  And then there's an e-mail

10  from Mary Ries, it looks like.  She is in the -- she

11  is -- her title, it says, Legislative Director for

12  President Lewis Reed, Board of Aldermen; correct?

13       A    Yes.

14       Q    And then it says, At this time, we would

15  prefer not to have this item included on the

16  upcoming agenda.

17       A    This --

18       Q    Do you see that?

19       A    This is a confirmation of what I found and

20  learned verbally through a separate conversation.

21       Q    Okay.

22       A    Yes.  This confirms -- this confirms what

23  I had stated earlier.

24       Q    All right.  It looks like there's an

25  e-mail on the bottom of that on Friday, June 14,

1    **2019 at 10:59 in response to your e-mail.**

2         A    No.  It's not in response to me.

3         **Q    Oh, okay.  Well, it says, Would like to**

4    **add the attached to the agenda.  Another extension**

5    **for the muni courts development.**

6              **That's what you were referring to in your**

7    **e-mail; right?**

8         A    Nope.  This is her e-mail to the

9    president's office.

10        **Q    No.  I'm saying in your original e-mail,**

11   **here's the extension we talked about for E&A.**

12   **Thanks.**

13        A    Yes.

14        **Q    Are we referencing the same --**

15        A    Yes.  That's the document.

16        **Q    -- item?**

17        A    Yes.

18        **Q    The same project?**

19        A    I misunderstood you.  Yes.

20        **Q    Which is the muni court project?**

21        A    Yes.  That's correct.

22        **Q    All right.  All right.  Let's go to the**

23   **next page.  Tuesday, June 18, 2019 at 8:29 a.m.**

24   **It's an e-mail to you from Beverly Fitzsimmons; is**

25   **that correct?**

1      A      Yes.

2      Q      All right.  And she says, Extending on

3   E&A.  Quote, You had told me she was okay with this;

4   right?  Who is the "she"?  She being Comptroller

5   Green; correct?

6      A      I am assuming, yes.

7      Q      She told me she was not.  Did you work

8   this out with her yesterday?  That's what she --

9   Bev asked you; right?

10     A      Right.  Okay.

11     Q      And you responded, same day, 10 minutes

12   later, 8:39 a.m., Tuesday, June 18, 2019 -- and just

13   to put this in context, Tuesday, June 18, 2019, was

14   the day that the agenda had to be finalized and

15   posted in order for any item to be considered at the

16   June 29 E&A meeting; right?

17     A      That's right.  We were getting close to

18   deadline.  That's right.

19     Q      All right.  So we're close to deadline?

20     A      Yes, we are.

21     Q      Running up to the wire; right?  What time

22   usually is that agenda finalized?

23     A      Well, it's got to be pushed and -- and

24   posted 24 hours in advance of the meeting, which is

25   usually 2:00.

     1          Q     So it's got to be craft, it's got to be
     2     reviewed, it's got to be posted by 2:00 that
     3     afternoon?
     4          A     Yeah.  That's right.
     5          Q     All right.  In your response to Bev, you
     6     said I didn't talk with her about it, but I will;
     7     right?
     8          A     That's correct.
     9          Q     So we've got Friday, Saturday, Sunday,
    10     Monday, you hadn't talked to her about it?
    11          A     But I explained and just testified as to
    12     why.
    13               MR. BLANKE:  But he's not asking about
    14          that yet.
    15               MR. NORWOOD:  Yeah.  I'm not asking about
    16          that.
    17               MR. BLANKE:  If he doesn't want to know
    18          the answer, then he doesn't get to learn the
    19          answers.
    20               MR. NORWOOD:  That's right.
    21               MR. BLANKE:  So just answer his questions.
    22               MR. NORWOOD:  That's right.  That's
    23          exactly right.  Thank you, counselor.
    24          A     So --
    25          Q     (By Mr. Norwood)  So --

1        A     -- what was the question?

2        **Q     -- the question was:  We're at Tuesday,**

3   **D-day, 8:39 a.m --**

4        A     Okay.

5        **Q     -- when the agenda is to be posted for**

6   **this muni court item, and you still hadn't talked to**

7   **your boss about it; correct?**

8        A     At that point, no, I had not.

9        **Q     All right.**

10        A     But I -- look what I said.  But I will.

11   It's not like I was purposely avoiding.

12        **Q     I understand, but --**

13             MR. BLANKE:  He doesn't want your

14        explanation.

15        **Q     (By Mr. Norwood)  -- over all of those**

16   **days, why didn't you explain to your boss what was**

17   **going on?**

18             MR. BLANKE:  Are you talking about Darlene

19        Green?

20        **Q     (By Mr. Norwood)  Darlene Green.  That was**

21   **your boss; correct?**

22        A     Yeah.  What -- what I --

23             MR. BLANKE:  Now -- now you can answer.

24        **Q     (By Mr. Norwood)  Now you can answer.**

25        A     What was I -- I could not tell her,

1   because I did not have a clarified answer to give

2   her.  Number one, I did not know if we had the

3   votes.  Number two, the taxes were still unpaid.

4   Number three, the mayor -- the -- the mayor's office

5   had received a runaround blindside from their --

6   from the developer's attorney if they would

7   entertain putting it on the agenda rather than the

8   Comptroller's office, because we hesitated because

9   we didn't see -- I didn't see that we had the votes,

10  and I knew, from making daily calls to the Collector

11  of Revenue, that taxes were still outstanding.

12      **Q      Okay.**

13      A      We weren't going -- we weren't going

14  nowhere.  And, no, I did not have the clarif -- the

15  clarification and the clarity to pick up the phone

16  and call the Comptroller and tell her exactly what

17  we needed to do.

18      **Q      Well --**

19      A      I didn't have it then.

20      **Q      Well, but didn't you have the clarity to**

21  **know what you didn't know so that you could let your**

22  **boss what you didn't know -- let her know what you**

23  **didn't know?**

24      A      I would have made no sense to her on the

25  phone because I would have been babbling about three

1  different things, all of which would have made no

2  sense to her.  In other words, when I talk to

3  Ms. Green, I want to be concise, precise, and

4  accurate, and I would not have been able to do that

5  because the sand was shifting below our feet with --

6  with what was happening with this item with the

7  developer's attorney going and doing a complete

8  around the corner on us to the mayor's office.  The

9  taxes weren't paid.  And why Lewis Reed didn't even

10  want it on the agenda, I couldn't break through.

11        And the fourth thing is that we now

12  understood or it was rumored that there was a

13  lobbyist that was working both the mayor and the

14  president for their votes to make sure that it was

15  going to get on the agenda and be passed.

16        Normally in a situation like this, I pick

17  up the phone and I can talk to the developer, but

18  this developer chose to be represented, and because

19  of that, we are rep -- we were represented, them by

20  Spencer Fane, us by Armstrong Teasdale.  Therefore,

21  I was advised by our attorney that you cannot speak

22  to them without me being on the line.  Whether

23  that's true or not from a legal point of view,

24  that's what happened.

25        And so we didn't have the ability to have

1    realtime conversation, where I could pick up the

2    phone and say, What are you doing?  I had to go

3    through our attorney, who had to get to their

4    attorney or to get to someone else in this equation.

5    So it was very unclear.  And I'm not going to call

6    my boss and give her information that's either not

7    accurate or that is unclear until I knew exactly

8    what was going on.

9          Q    Well, you knew the taxes hadn't been paid.

10   You knew that on Tuesday; right?

11         A    Yeah.

12         Q    You knew that on Friday, didn't you?

13         A    As of that day, yeah, I knew it.

14         Q    Right.  And you -- you -- but you didn't

15   feel the need to pick up the phone to apprise your

16   boss that the taxes --

17         A    I didn't have all the facts.

18         Q    Well, you had that fact; right?

19         A    I didn't have all the facts.  I didn't

20   have what I needed --

21         Q    Well, hold on.  Hold on.  Let's --

22              COURT REPORTER:  Hold on, guys.

23         Q    (By Mr. Norwood)  Stop.  Stop.  Let's

24   stop.  Let's break this down.  I'm talking about one

25   fact.  Let's talk about taxes.  You knew on Friday

1    the taxes weren't paid.  Can we agree with that?

2         A    But that's one -- that's one small thing.

3         Q    No, I understand.  And I'm going to focus

4    on this one small thing --

5         A    Okay.

6         Q    -- and we'll get to the other thing.  You

7    knew on Friday, the 14th, the taxes weren't paid;

8    right?

9         A    But it's being alleged that I didn't know.

10        Q    You knew, though, so --

11        A    But it's being alleged here that I didn't.

12        Q    You knew; right?

13        A    Yes, sir.

14        Q    But you didn't tell your boss on Friday;

15   correct?

16        A    That's correct.  I was working the

17   problem.

18        Q    I got you.  You were working the problem

19   and therefore you didn't feel the need to

20   communicate to your boss that the taxes weren't

21   paid, which meant that the item couldn't go on the

22   agenda; right?

23        A    I was working the problem.

24        Q    The --

25        A    I was -- I was trying to handle the

 1   situation.  Okay?

 2       **Q     You knew that without the taxes being**

 3   **paid, the item couldn't be placed on the E&A agenda.**

 4   **You knew that; correct?**

 5       A     And I was waiting for a cure call.  I was

 6   waiting for the call that they had cured the problem

 7   and -- and waiting up to the very end of the time

 8   period allowable that they could have come down and

 9   paid those taxes.  Had I gotten that green light

10   there, then the next thing I had to worry about

11   was -- was do we have the votes.  When that's

12   cleared, then the next thing we had a problem with

13   is they had done an end around to the mayor's

14   office.

15            MR. NORWOOD:  And I'd like to move to

16        strike all of that, because that's not

17        responsive to my question, sir.

18            MR. BLANKE:  I disagree.

19            MR. NORWOOD:  Let me finish.  My

20        question --

21            MR. BLANKE:  You just don't like the

22        response.

23            MR. NORWOOD:  No.

24       **Q     (By Mr. Norwood)  My question is a simple**

25   **one.  You knew on Friday that there was no tax**

1  clearance; correct?

2      A    Yes.

3      **Q    You knew on Friday that you didn't tell**

4  **your boss there was no tax clearance; correct?**

5      A    This is asked and answered at least three

6  times now.

7      **Q    Correct?**

8      A    I'll answer it once (sic) more time.  I

9  did not advise her at of that point in time.

10     **Q    At that point in time.  And you didn't**

11  **advise her on Monday; correct?**

12     A    I did not at that point in time, no.

13     **Q    All right.  Because you hadn't talked to**

14  **her; right?**

15     A    I was trying to get the problem solved.

16     **Q    I understand.**

17     A    I was going to give her the complete, full

18  story.  I wasn't going to give her piecemeal

19  information.  She's not -- she -- she's not a

20  favorable -- she doesn't like that.  You want to

21  give her the whole story or don't -- you know, just

22  don't give it to me in pieces.

23     **Q    All right.  All right.  So you weren't**

24  **going to give her any pieces until you had all of**

25  **the pieces; is that right?**

1      A    I wanted to give her a complete, accurate
2  situational report, yes.
3      **Q    And at what point in time did you finally**
4  **get enough pieces assembled so that you could give**
5  **her a complete and accurate report?**
6      A    At the time I called her on Tuesday
7  morning -- and, again, I called her -- I'm watching
8  the clock, too.  I know what the -- what the time
9  limits are.
10     **Q    Right.  Right.  Right.**
11     A    I gave her a call and basically said we've
12  reached a point of impasse where now the mayor's
13  office is trying to hijack this item.  Do you want
14  me to let them do it?  She said, No.  Send it to me.
15     **Q    When you say hijack this item -- what do**
16  **you mean hijack this item?**
17     A    We had placed it on the tentative agenda.
18  When they saw --
19     **Q    Well, let me back up.  Who is we?  Who**
20  **placed it on the agenda?**
21     A    The Comptroller's office.  Me.  I gave it
22  to Bev from the developer to place on the tentative
23  agenda on the 14th.
24     **Q    Okay.  So the "we" is me, meaning Jim**
25  **placed the item on the agenda?**

1      A     After speaking with the Comptroller

2   earlier that week and having her concurrence that

3   she was in favor of it and that it was okay.  So to

4   say that I didn't talk to the Comptroller about this

5   item -- I didn't talk to her on the day that the

6   question was asked.  I talked to her earlier that

7   week and she was in favor and said okay.

8      **Q     Well, you didn't say that in your e-mail**

9   **to Bev.  You didn't say Bev, I haven't talked to her**

10  **today, but I talked to her earlier in the week.  You**

11  **didn't say that, did you?**

12     A     Well, we had phone conversations as well

13  as e-mail, so I may have.  I don't know that.  I

14  don't remember that specifically.  But in addition

15  to the e-mails, she called me, like, every couple of

16  hours.

17          MR. BLANKE:  Who?

18          THE WITNESS:  Bev.

19     **Q     (By Mr. Norwood)  Okay.  So Bev called you**

20  **every couple -- because she said does your boss know**

21  **what's going on; right?**

22     A     And at that point I didn't have something

23  to report to her.

24     **Q     Right.  But Bev is concerned -- you know**

25  **Bev.  You've worked with Bev.  She's concerned that**

1   she hasn't apprised you-all's respective boss of

2   what's going on with this item.

3        A    She may have been concerned in that

4   regard, but she's more concerned about the fact that

5   her sole locked-in goal is to get out the agenda.

6   That's what she's concerned about.

7        Q    All right.

8        A    All she's -- all she's worried about is

9   making sure the agenda goes out.

10       Q    All right.  Let's go to the next item,

11  Garavaglia Deposition Exhibit 6.  And to put this in

12  context -- ultimately it was not presented and

13  placed on the June 19, 2019 E&A agenda; correct?

14       A    It was not.

15       Q    Right.  It was not.  And the reason it was

16  not was because --

17       A    The Comptroller said, Send it to me, I

18  want to look at it and consider this project and get

19  more details about it.

20       Q    Well, and at the time you talked to her,

21  the taxes hadn't been paid; right?

22       A    At that point in time, no, they hadn't

23  been paid.

24       Q    Right.  So you're not going to place an

25  item on the agenda at 2:00 on the 18th knowing that

1    there was no tax clearance?

2         A    Cut-off would have been noon.

3         Q    **Well, noon.  I'm sorry.**

4         A    Noon on the 18th was the cut-off.  They

5    were not paid at that point.

6         Q    **And you would not place an item on the**

7    **agenda without having that confirmation of tax**

8    **clearance; correct?**

9         A    Yes, sir.

10        Q    **Because it would have been a waste of**

11   **E&A's time and it would have been embarrassing for**

12   **your office to have that happen; correct?**

13        A    And it was --

14        Q    **Is that a yes?  Let's start with the**

15   **correct --**

16        A    The answer is yes.

17        Q    **Okay.**

18        A    But it also puts pressure on the developer

19   to pay the damn bill.

20        Q    **Well -- and that's a good thing; right?**

21        A    That's -- that's -- that's exactly right.

22        Q    **All right.  Now, let's look at, then,**

23   **Garavaglia Deposition Exhibit 6, which is a memo**

24   **from Chana Morton dated July 12, 2019 to Nancy**

25   **Kistler.  Do you see that?**

 1      A    I do.

 2      Q    Now, ultimately, it was a special meeting

 3   held the following Monday, I believe?

 4      A    The 24th, correct.

 5      Q    24th.  All right.  And it was at that

 6   meeting where it was -- the taxes were finally paid;

 7   correct?

 8      A    No.  The taxes were actually paid

 9   somewhere on the morning of the 19th.

10      Q    All right.  So they had been paid by the

11   24th, is the point?

12      A    That's correct.

13      Q    All right.  So now we've got enough to go

14   forward and have the item approved by E&A, and it

15   was approved by E&A; correct?

16      A    That's correct.

17      Q    All right.  So now was there a deadline in

18   which all of this stuff had to happen --

19      A    The.

20      Q    -- during that week?

21      A    The approval was not necessarily a

22   deadline, but, as we all know, the document --

23   extension document had to be signed and in the

24   register's office by 5 p.m. on Friday, the 28th.

25      Q    All right.  So did you consider that a

1    deadline?

2    A    That's what I'm saying.  That is the

3    deadline.

4    **Q    All right.  Friday, the 28th, is the**

5    **deadline; right?**

6    A    5 p.m.

7    **Q    Right.  And you were going on vacation**

8    **that week; correct?**

9    A    Yes, I was.

10   **Q    And when did you -- what was your last day**

11   **in the office?**

12   A    It would have been the 26th.

13   **Q    And that would have been a Wednesday?**

14   A    That's correct.

15   **Q    All right.  So you were on vacation**

16   **Thursday, Friday.  Where did you go?**

17   A    I went to Morgantown, West Virginia for my

18   granddaughter's first birthday.

19   **Q    Okay.  And how long were you on vacation?**

20   A    I was gone Thursday, Friday, and Monday.

21   **Q    All right.  In the meantime, this thing**

22   **had to be finalized --**

23   A    Absolutely.

24   **Q    -- by Friday at 5 p.m.; correct?**

25   A    That's -- that's right.

1      Q    All right.  Now, this incident report

2  prepared by Chana Morton, have you reviewed this

3  before?

4      A    Yes.

5      Q    Do you have -- do you dispute any of

6  the -- the -- the --

7      A    I dispute most of it, yes.

8      Q    Most of it?  All right.  Let's go through

9  it, then.  It says at 3:28 p.m. -- this is under

10 Wednesday, June 26th, 2019.

11          First of all, did you have a conference

12 call with the Comptroller on Wednesday, June 19,

13 2019?

14     A    Yes.

15     Q    Tell us about that.

16     A    Well, let me -- I will -- I will, but let

17 me tell you --

18     Q    Well, let me -- let me -- let's talk about

19 it, because I'm -- I'm running out of time here.

20 You see, your lawyer is beating on me.  I want to

21 focus on what I want to focus on and he'll have time

22 to talk to you ad nauseam.

23     A    All right.  What's the question, again?

24     Q    Let's talk about the meeting or conference

25 call or discussion on Wednesday, June 26th, 2019.

1          What happened on that day?

2     A    I can't answer it without some -- some

3 context.  I have to give you the context.

4     Q    You were there.

5     A    I understand that, but I have to give you

6 the context as to why the -- why the call was even

7 necessary.

8     Q    Well, let's talk about -- when did the

9 call take place?  Let's start with the basics.

10    A    I'm not sure.

11    Q    Sometime that day?

12    A    Yes, sir.

13    Q    Sometime before you left for vacation?

14    A    That's right.

15    Q    All right.  And who was on the call?

16    A    The Comptroller, myself, Tom Ray, and I

17 believe my administrative assistant, Sheila Woods.

18    Q    Okay.  And what was the purpose of the

19 call?

20    A    The purpose of the call was to make sure

21 that we had a plan in place to expeditiously handle

22 the documents when they arrived from the

23 inter-office mail.

24    Q    Okay.  Well, let's talk about that.  Why

25 were the documents in the inter-office mail?

1      A    Well, that's good -- I'm glad you asked

2    that question.  Because when the -- when E&A passed

3    the item on the 24th, I was expecting to get the

4    final version from the developer through his

5    attorney on the 25th.  At that point in time --

6    well, it didn't -- it didn't happen.  They didn't

7    come.  I called.  It didn't come.  Tom Ray calls,

8    We're working on it.  Okay.

9            They did not come to us.  I was advised --

10   as I think it says somewhere in these documents, I

11   received a call from the mayor's secretary on the

12   morning of the 26th that the developer's attorney,

13   Mr. Denny, instead of following the procedure and

14   protocol which he had followed for the previous four

15   times we did extensions, he brought the documents

16   directly to the mayor's office for the mayor's

17   signature.  That's the second blindside where he

18   went around our office directly to the mayor's

19   office.

20       **Q    Okay.**

21       A    Okay.  The mayor signs the documents.

22       **Q    All right.**

23       A    And Sheri goes, What do you want me to do

24   with them?  And I said, Send them to me in the

25   inter-office mail.  I'll get them by the afternoon.

1    And there's a very important reason for that.

2        Q    Okay.

3        A    The reason being is, before I wanted them

4    to present -- be presented to the Comptroller's

5    office and to the Comptroller for signature, I

6    wanted to personally review them and I wanted the

7    City's attorney to personally review the documents,

8    because I'm not going to send anything to the

9    Comptroller that I haven't seen or that our attorney

10   hasn't seen.

11       Q    All right.  But my question to you is:

12   These are important documents; right?

13       A    Yes.

14       Q    We've got a deadline; correct?

15       A    Yes.

16       Q    You're going on vacation; correct?

17       A    Correct.

18       Q    Why are the documents in the inter-office

19   mail?  Why weren't they personally couriered around

20   to get the requisite signatures --

21       A    Because normally --

22       Q    -- let me finish first --

23       A    Okay.  All right.

24       Q    -- to get the requisite signatures?  Why

25   send it through inter-office mail instead of having

1    it couriered around to get it done before you go on

2    vacation?

3        A    Because I wanted to ensure of the accuracy

4    and content of what was being sent around.

5        Q    And you could have done that if it were

6    couriered to you from the mayor's office; correct?

7        A    By putting -- it could have happened that

8    way, but what I had them do is I had them put it in

9    inter-office mail, because normally if you put it in

10    the mail in the morning, I get it in the afternoon

11    run.  I would have had it by 2:00.

12        Q    Generally?

13        A    Generally speaking, yes.

14        Q    But people go to lunch, people take smoke

15    breaks, people don't show up sometimes; right?

16        A    Yes.  That's -- that's -- that's what

17    happened.

18        Q    Okay.  And you made the decision to put it

19    in inter-office mail to you -- correct -- to come to

20    you?  That was your decision?  That was your call;

21    correct?

22        A    It was my decision to do that, yes.

23        Q    All right.  All right.  Let's go back to

24    Chana's memo, where she says at 8:38 p.m.(sic) on

25    Wednesday, June 26th, 2019, I received an e-mail

1     from Tom Ray of Armstrong Teasdale.

2              Was that unusual for Mr. Ray to reach out

3     like this --

4        A    No.

5        Q    -- to Chana --

6        A    No.

7        Q    -- and the Comptroller?

8        A    No, not at all.

9        Q    Not unusual at all?

10       A    No.

11       Q    Okay.  In the e-mail, Please see

12    attachment.  Mr. Ray stated, quote, There might be a

13    problem tomorrow, unquote.  Because Jim received a

14    call from the mayor's office, Sherry Wibbenmeyer,

15    regarding the Municipal Court's 5th amended (sic)

16    documents stating that the documents had been signed

17    by the mayor.

18              Tom Ray, the lawyer -- right?  He's a

19    lawyer -- indicated in his e-mail that instead of

20    asking Sherry to walk the documents to our office

21    for the Comptroller's signature, which is the normal

22    process --

23       A    It is not.

24       Q    Let -- let me finish.  Jim instructed

25    Sherry to send the documents to him via the use of

1  inter-office mail; right?

2      A    That's not the normal process.

3      **Q    Okay.  So -- so what was the normal**

4  **process?**

5      A    The normal process would be that the

6  documents would be delivered to me at 1520.  They

7  would be reviewed by me, by our counsel, and then

8  sent to City Counselor's office for approval as to

9  form.

10     **Q    How -- how would they be delivered to you**

11 **in the normal process?**

12     A    Usually electronically from the developer

13 or the developer's attorney.

14     **Q    All right.  So that's pretty quick.**

15 **Electronic transmission?**

16     A    Yep.

17     **Q    What about delivery?  Have you received**

18 **couriered documents in that fashion?**

19     A    Oh, yeah.  Absolutely.

20     **Q    All right.  I mean, particularly for**

21 **important, time-sensitive documents; correct?**

22     A    Yeah, that's right.  That's right.

23     **Q    All right.  And -- and -- and then the**

24 **third option is this inter-office mail business,**

25 **which is pretty slow, generally speaking; right?**

1      A    No, no.  I -- I --

2      **Q    Well, let me say this --**

3      A    If you put it in in the morning, you

4  should have it in the afternoon.

5      **Q    All right.  It's slower than e-mail;**

6  **correct?**

7      A    These -- evidently these documents were

8  not -- we did not have these documents

9  electronically.  It would have been -- if he would

10 have listened -- if the attorney for the other side

11 would have done what he was requested of, he was

12 supposed to electronically and in hard copy present

13 the documents to me and Tom Ray on the 25th.  He

14 didn't do that.

15     **Q    All right.  But in any event, with those**

16 **options -- you didn't have electronic copy?**

17     A    Did not.

18     **Q    And you decided to chance it on the normal**

19 **inter-office mail system; correct?**

20     A    It's not a chance.  It's -- it -- normally

21 that's how -- it works fine.

22     **Q    All right.  And did it work fine in this**

23 **instance?**

24     A    It did not.  No, it did not.

25     **Q    Well, why not?  What happened?**

1      A     I don't know.

2      **Q     You have no idea?**

3      A     I have no idea.

4      **Q     Whose responsibility was it to make sure**

5   **that this all got done before you went on vacation?**

6   **It was your responsibility; right?  Let's -- can we**

7   **agree with that?**

8      A     Well, it was our document, yes.

9      **Q     It was your document and your**

10  **responsibility, because this was your job; correct?**

11          MR. BLANKE:  Well, let me object.  You're

12      just arguing with the witness.

13          MR. NORWOOD:  I --

14          MR. BLANKE:  Everything he answers you

15      disagree with and argue with him.  That's

16      not --

17          MR. NORWOOD:  Well, let me --

18          MR. BLANKE:  That's not cross-examination,

19      that's argument.

20          MR. NORWOOD:  Well, let's make it

21      cross-examination.

22      **Q     (By Mr. Norwood)  It was your**

23  **responsibility, Mr. Garavaglia, isn't that true?**

24          MR. BLANKE:  It doesn't matter how soft or

25      loud you are --

1          MR. NORWOOD:  Okay.

2          MR. BLANKE:  -- it matters what you're

3     saying, and you're arguing.

4          MR. NORWOOD:  Thank you, counselor.

5          MR. BLANKE:  You're arguing with him.

6          MR. NORWOOD:  That's a speaking objection.

7     If you have an objection --

8          MR. BLANKE:  Objection, argumentative.

9          MR. NORWOOD:  Thank you.

10     **Q    (By Mr. Norwood)  Sir, subject to that**

11     **argumentative objection, this was your**

12     **responsibility; correct?**

13     A    It's the responsibility of whose item it

14     is, and it was my item, so, yes.

15     **Q    Okay.  Okay.**

16     A    Okay.  Now --

17     **Q    No.  Let me -- no.  Let me -- let me --**

18     **let me finish, because I'm -- the clock is ticking**

19     **on me, so I've got to keep moving.**

20          MR. BLANKE:  But you're also not allowing

21     him to answer fully.

22          MR. NORWOOD:  I don't have a question for

23     him.  He answered my question.

24          MR. BLANKE:  But he's not answering the

25     question you're asking because you're cutting

1      him off.

2           MR. NORWOOD:  Well, you -- well, you can

3      answer -- have him correct me when I'm wrong.

4      **Q    (By Mr. Norwood)  So your decision, your**

5      **responsibility.  Documents, for whatever reason, got**

6      **lost in the inter-office mail; right?**

7      A    I don't know that they got lost, but they

8      didn't arrive at my destination in a timely manner.

9      **Q    Didn't arrive the afternoon you were**

10     **leaving for vacation?**

11     A    No.  They did not arrive until the

12     morning -- oh, I'm not sure that they -- no, I'm not

13     sure -- let's see.  When does she say they arrived?

14     **Q    Well, take a look at it.**

15     A    I'm not sure that they arrived -- let's

16     see.  Let's go back here and look.

17     **Q    Well, let me ask you this:  When you had**

18     **this conversation with the Comptroller and Tom Ray**

19     **and the others you identified, did we know at that**

20     **time the whereabouts of these documents?**

21     A    We did not have them yet, no.

22     **Q    Okay.  And did we know where they were?**

23     A    They were in the inter-office.  That's --

24     that's --

25     **Q    Somewhere in the inter-office system?**

1      A    That's correct.

2      Q    All right.  So let's talk about, then,

3  that conference.  Tell us about that.  What -- who

4  said what and what was going on that day?

5      A    My recollection is not crystal clear on

6  that.  I know that we talked about it.  The

7  Comptroller wanted to know where they were.  I

8  couldn't answer that.  I didn't have them.  They

9  were in the -- in the office mail.  And basically

10 what we did was we set up a process whereby if I was

11 not there when they showed up, what to do and how to

12 go about it.

13     Q    What was that -- well, first of all,

14 where -- was it your impression that the Comptroller

15 was not happy with what was going on with respect to

16 these missing documents?  Was that your impression?

17     A    None of us were.

18     Q    Okay.  She wasn't happy, you weren't

19 happy, we've got a deal that's about to close,

20 you're about to go on this family trip/vacation, and

21 we don't have these critical documents; right?

22     A    That's correct.

23     Q    Tom Ray is concerned.  He's the lawyer.

24 He's got to make sure this deal gets done.  He's

25 concerned; right?

1     A    Yep.  That's right.

2     Q    **Your boss is concerned because the --**

3  **we've got -- the deal was approved, we've got a**

4  **timeline, we've got to get the documents approved by**

5  **5:00 on Friday; right?**

6     A    This is Wednesday.

7     Q    **Right.  And this is Wednesday, and you're**

8  **going on vacation; right?**

9     A    I would be on Thursday, yes.

10    Q    **Right.  And -- and so everybody on that**

11 **call was concerned.  That was a five alarm in the**

12 **sense that we've got to find these documents and get**

13 **it done.  Is that fair?**

14    A    Yes.  And it was a very -- you know, the

15 process would have been as I -- as I explained to

16 you before, when the documents arrive, I would look

17 at them, come -- the -- the attorney, Tom Ray, would

18 look at them.  They would then be taken -- if

19 everything was in good order, they would be taken to

20 the City Counselor's office for approval as to form.

21 But the problem is, there was deficiencies in the

22 documents.

23    Q    **Well, we'll talk about that.**

24    A    Okay.

25    Q    **But first we've got to find them; right?**

 1      A    Right.

 2      Q    **Right.  So we have deficient --**

 3      A    But you have to under --

 4      Q    **Let me finish.  We've got deficient**

 5  **documents working their way through the internal**

 6  **mail system somewhere that we don't know as of the**

 7  **time we're talking about where they are.  We can**

 8  **agree with that; right?**

 9      A    Yes, sir.

10      Q    **All right.  And, ultimately, even when**

11  **they were discovered and located on the following**

12  **day, which was Thursday -- that's right?  You were**

13  **on vacation, so you -- you don't know when they were**

14  **discovered; is that right?**

15      A    It may say so here.

16      Q    **Okay.  Take a look.**

17           MR. BLANKE:  Go to page 3 of the document.

18      Is that it?

19           THE WITNESS:  Yeah.

20           MR. BLANKE:  At 12:26 -- at 12:50 p.m.?

21           THE WITNESS:  Okay.  No.

22           MR. BLANKE:  No?

23           THE WITNESS:  No.

24      A    They -- the documents themselves -- I'm

25  not -- I'm not positive.  This -- this report

1    doesn't tell you -- I don't believe that they

2    arrived on the 26th.  Okay?  So they -- if they

3    really were put in the mail on the 25th, to me, I

4    find it almost incredible -- you could have crawled

5    them from City Hall to 1520 Market in two days.

6         **Q    (By Mr. Norwood)  Right.  But as of the**

7    **time you were on the conference call, they had not**

8    **crawled there yet.**

9         A    No.

10        **Q    Correct?**

11        A    That's right.  It was -- the end of the

12   day on the 26th, they had not yet arrived.

13        **Q    All right.  So end of the day on the 26th,**

14   **you're checking out for vacation; right?**

15        A    Uh-huh.

16        **Q    And we still don't know where the**

17   **documents are?**

18        A    That's -- that's what happened, yes.

19        **Q    And when did they finally crawl into your**

20   **office?**

21        A    It appears that they -- that they showed

22   up on the morning of the 27th.

23        **Q    All right.  And the reason, if I**

24   **understand you correctly, that they were to come to**

25   **you is that you wanted to review them; right?**

 1     A    Because had they been brought from the
 2  mayor's office to the comptroller's office, the
 3  deficiencies that I wanted to ensure weren't there,
 4  there were.
 5     **Q    Okay.  But you never got that opportunity,**
 6  **because you were going on vacation when they landed**
 7  **in your office; correct?**
 8     A    Personally, no.  But we had other -- other
 9  parties in place, like Tom Ray, to take the document
10  and make sure that we were okay.
11     **Q    Who determined that once they finally**
12  **landed on Thursday -- did you fly out Wednesday or**
13  **Thursday for your vacation?**
14     A    Thursday morning.
15     **Q    Okay.  So you were in the air when all of**
16  **this was transpiring?  Let's go to Garavaglia page**
17  **112, starting at 11:09 a.m.  Were you in the air at**
18  **that time?**
19     A    I was in the car, but nonetheless --
20     **Q    Oh, you drove?  Okay.  All right.  So you**
21  **were in the car while all of this was transpiring on**
22  **Thursday, June the 27th, 2019; correct?**
23     A    Yes.
24     **Q    All right.**
25     A    And -- and Tom was -- Tom Ray was trying

1    to quarterback this thing from his office outside of

2    City Hall.

3        Q    Right.  Because you weren't there to

4    quarterback?

5        A    And we were agreed -- that's the agreed

6    upon method that we spoke to about in the conference

7    call on the 26th.

8        Q    Because you weren't there to quarterback

9    it; correct?

10       A    You know that.

11       Q    No.  I'm -- for the record, I mean, I know

12   it, but let's let the public know it.

13       A    Yes.  That's correct.

14       Q    Okay.  All right.  So do you know when the

15   documents finally landed with the Comptroller's

16   office?

17       A    I can only go by this chronology that --

18   that is laid out here.  It says at 11:20 a.m.

19       Q    All right.

20       A    Okay.  Now --

21       Q    Well, let me ask you this:  Let's go to

22   the next page, Garavaglia page 113.  And this is the

23   part of the chronology that Ms. Chana Morton put

24   together.  She says, At 1:25 p.m. when I returned

25   from break, Michele Graham explained that Marsha

1    **Veal had left some documents with her for the**

2    **Comptroller's signature.**

3           **Now, this is 1:25 p.m. the day before when**

4    **things had to be finalized; correct?**

5    A   That's right.

6    **Q   All right.  And what it says was, But on**

7    **examination of the documents, Michele noticed that**

8    **several items were missing which were needed prior**

9    **to the Comptroller signing and executing the**

10   **documents.  Do you see that?**

11   A   That's exactly my point as to why they

12   weren't to be delivered directly to the

13   Comptroller's office from the mayor's office.

14   **Q   Because they were not in order?**

15   A   I didn't know that, but I wanted to ensure

16   that they were in order.

17   **Q   Right.  But they were not in order; right?**

18   A   That's correct.

19   **Q   All right.  And if you had had them**

20   **couriered to you, you would -- may have had an**

21   **opportunity to review them before you left on**

22   **vacation; correct?**

23   A   Probably, yeah.

24   **Q   Yeah.  Okay.  And we could have noticed**

25   **those deficiencies earlier and tried to cure them**

1    earlier; correct?

2        A    Sure, we could have.

3        **Q    And you were responsible for making sure**

4    **that those documents didn't have those deficiencies;**

5    **correct?**

6            MR. BLANKE:  Are you asking if he was

7        solely responsible or partially responsible?

8            MR. NORWOOD:  No.

9        A    No, I'm --

10       **Q    (By Mr. Norwood)  You're responsible --**

11       A    I'm not solely responsible.

12       **Q    I didn't say whether you were solely**

13   **responsible.  Were you responsible --**

14       A    I am responsible for making sure that the

15   document, after it had been properly vetted through

16   the normal process, placed before the Comptroller

17   was accurate, yes.

18       **Q    Okay.  That was your responsibility for**

19   **your boss; correct?**

20       A    Had the process been allowed to happen,

21   yes.

22       **Q    Right.  And that was your responsibility**

23   **to your boss and she relied upon you to fulfill that**

24   **responsibility; correct?**

25       A    And it's one that I, in every instance

1    except this one, managed to accomplish.

2        **Q    All right.  When did you find out about**

3    **problems with the documents?**

4        A    When did I find out?

5        **Q    Yeah.  In the car while you were on the**

6    **way or when you arrived?**

7        A    Exactly.

8        **Q    Who -- who told you?**

9        A    I'm not sure.  I think I may have gotten a

10   call from either my person, or it may have been

11   Michele Graham in 212, but it was just what I was

12   afraid of, the deficiencies like the mayor's

13   signature not being notarized, that it hadn't even

14   gone -- that -- that the mayor had signed it, but it

15   had not been through the City Counselor's office.

16   She was -- there was no way she should have signed

17   that document without it at least being approved as

18   to form rather than content, but at least approved

19   as to form by the City Counselor, but she signed it

20   anyway.

21            Along that -- what is Roger Denny doing

22   still bringing signature pages, running around --

23   he's -- he supplied an incomplete document which the

24   mayor signed.  There was four or five different

25   deficiencies, which in a normal course of action, we

1    would have put the brakes on at my office

2    immediately.

3        Q    But you couldn't, because you were gone?

4        A    We couldn't, because it never showed up in

5    the inter-office mail.

6        Q    Right.  And you were gone when it did?

7        A    But --

8        Q    Right?

9        A    But --

10       Q    You agree with that?

11       A    I was gone, but we had made a plan on the

12   phone the evening of the 26th which was not allowed

13   to be placed in motion, as I understand it.

14       Q    All right.  Well, let me -- let me -- let

15   me just cut to the chase on this one so we can move

16   forward.

17            On the last page of Garavaglia 113, it

18   says -- she says, Chana that is -- that's an

19   asterisk.  It says, quote, During this entire

20   chaotic process on Thursday, July 27th.

21            Do you -- you weren't there, but do you

22   dispute the fact that it was a chaotic process on

23   Thursday, July 27th?  Do you dispute that?

24       A    The chaos was premature and unnecessary.

25       Q    But it was chaos, nonetheless?

1      A    Because all these other people tried to

2 run this document and handle the document, and it

3 was a total unnecessary series of events.

4      **Q    It was chaotic.  You agree with that;**

5 **right?**

6      A    Yes, it was.

7      **Q    All right.  She says, Further, I did not**

8 **receive any verbal or written communication from**

9 **James Garavaglia or his assistant, Sheila Woods.**

10          **Do you dispute that?**

11     A    What was she wanting me to communicate

12 with her about?

13     **Q    I don't know.  I mean, apparently the**

14 **chaotic nature of what was happening, I would**

15 **imagine.**

16     A    Well, but the chaotic nature of what was

17 happening was occurring because everybody tried to

18 do something, and there should have been -- you

19 know, the control -- somebody should have taken --

20 Tom Ray had control, and it was taken away from him.

21 And all of a sudden, from her chronology, people are

22 running in all crazy directions trying to figure out

23 what to do and how to get it done.  Had they

24 followed their own internal document signature

25 process -- nobody did that.

1      Q    All right.  But you don't dispute the
2   fact -- you're saying there was no need, but you
3   don't dispute her statement that she didn't receive
4   any verbal communication from either you or your
5   assistant, Sheila Woods?
6      A    That's true.
7      Q    All right.  She goes further and says, I
8   believe they are ultimately responsible for proper
9   execution of these types of emergency documents.
10          Were these emergency documents?
11     A    No.  They were documents that had to be --
12  they weren't -- emergency document means something
13  else in the City's system.
14     Q    All right.  It was an emergency because it
15  had to be done by Friday, the next day; right?
16     A    That's correct.
17     Q    All right.  Instead, many of us had to
18  stop doing our own work for two days to make sure
19  that these muni court documents were processed
20  timely and correctly.
21          Do you dispute that?
22     A    And totally unnecessarily.  If they did
23  that, it's a totally unnecessary waste of their
24  time.
25     Q    It would be a waste of their time, but if

1  **they did it, they had to do it to get it done;**

2  **correct?**

3      A    Well, first of all, that's a gross

4  exaggeration.  I can't imagine that they stopped

5  their work for two days --

6      **Q    Okay.**

7      A    -- waiting for -- for this document to

8  come in.  No.  That --

9      **Q    But you don't know --**

10     A    I don't agree with that statement.

11     **Q    You don't know what happened --**

12     A    Right.

13     **Q    -- because you weren't there on Thursday;**

14 **right?**

15     A    That's right.

16     **Q    All right.  It says further, quote, This**

17 **type of lack of communication and confusion is**

18 **unfortunately happening more and more frequently,**

19 **which is unfortunate, as this process prior to**

20 **Jim taking over as deputy ran quite smoothly and**

21 **collaboratively within the department for many**

22 **years.**

23          **Now, my question to you --**

24     A    As evidenced -- as evidenced by what?

25     **Q    (By Mr. Norwood)  My question to you is:**

1    **Do you know whether or not this process ran quite**

2    **smoothly and collaboratively within the department**

3    **for years --**

4        A    No.

5        **Q    -- listen -- let me finish.**

6        A    No, I'm not aware of that.

7        **Q    Listen.  Let me finish, please.  You're**

8    **going to get your chance.**

9             **Do you know whether, prior to you taking**

10   **over as deputy, this process ran quite smoothly and**

11   **collaboratively within the department for many**

12   **years?  Do you know, yes or no, if that's the truth?**

13       A    I do not know that.

14       **Q    All right.  Fair enough.**

15       A    But I think -- I think that it is a cheap

16   shot, because what she's saying here is not true.

17   This is not true.

18       **Q    Got it.**

19       A    We -- we did contracts, leases, bond

20   documents, much more -- much more complex nature and

21   never had a problem.  This went off the rails

22   because too many people went into panic and were

23   running around with their heads cut off and didn't

24   follow their own internal procedure for -- for

25   getting this thing signed.

1      Q    And did you --

2      A    Let me -- let me assure you of one other

3  thing.  Do you see what it says here?  By 2:45 on

4  the 27th, the document was finally signed,

5  processed, and sent to the register.  That's a full

6  day and two hours before the deadline.

7      Q    Fair enough.  After --

8      A    Okay.

9      Q    -- people --

10     A    All right.

11     Q    -- had stopped and covered for you while

12  you were on vacation; correct?

13     A    That's not a fair statement.

14     Q    Okay.  Do you bear any responsibility for

15  this -- what happened here?  Do you --

16         MR. BLANKE:  Why don't you ask him if he

17     bears all the responsibility.

18     Q    (By Mr. Norwood)  Well, let's start with

19  any.  Do you bear any responsibility for what

20  transpired here?  Did you make any mistakes here?

21     A    No.

22     Q    Okay.  None at all?

23     A    No.  Not in my mind, no.

24     Q    Okay.  Not in your mind.  And in your

25  view --

1    A    No.

2    Q    -- you did everything you were supposed to

3  do?

4    A    I did.

5    Q    All right.  Fair enough.  Let's look at

6  Garavaglia 114.  This is an e-mail, it looks like,

7  from Tom Ray, Wednesday, June 26, 2019, at 3:28 p.m.

8  to Chana Morton and your assistant, Ms. Woods, and

9  you, among others; correct?

10   A    Yes.

11   Q    And Tom Ray is saying, Chana, this might

12 be a problem tomorrow.

13        Do you know why he's alerting Chana to the

14 fact that this could be a problem?

15   A    Yeah, because we didn't have them.  The

16 documents --

17   Q    All right.

18   A    -- had not yet been received.

19   Q    All right.  And he talked about a default

20 and the documents having to get to the title

21 company; correct?

22   A    Register's office.  And then Roger would

23 take the documents to the title company so they

24 didn't get foreclosed on.

25   Q    Did you ever consider sort of pushing back

1    **your vacation a day to close this deal out and make**

2    **sure it got done?**

3         A    No.  At -- at the time, I was locked in.

4    I was locked in to commitments out of town, and I

5    believed that -- you know, the whole world isn't

6    going to collapse if I wasn't there to personally

7    walk a document, which is normally handled by

8    administrative staff, through the system.

9         Q    **Okay.**

10        A    And not only that, we had the conversation

11   and the conference call on the evening of the 28th

12   to ensure that there was a process that was going to

13   be in place to make sure that what happened wasn't

14   going to happen.

15        Q    **Did you provide instructions to anyone**

16   **from your office to take these documents when they**

17   **finally showed up and only place them in the hands**

18   **of the Comptroller?**

19        A    No.

20        Q    **I'm sorry?**

21        A    No, sir, I did not.

22        Q    **You didn't provide that directive?**

23        A    No.  I -- I -- I told a person who you're

24   speaking about, Marsha Veal, that it was -- that,

25   you know, that she had oftentimes -- many times with

1  real estate documents, had brought them to the

2  Comptroller's office to Michele Graham and knew very

3  well how the process worked and would be able to

4  ensure that everything was correct and that it would

5  be placed in order and -- in -- in the proper order

6  for the -- Michele to look them over.  And

7  there's -- there's spot checks that she would make

8  and put it in place for the Comptroller to sign.

9          Now, by me -- I told her bring it to the

10  Comptroller's office for the Comptroller to sign.

11  Now, if she took some personal license to say Jim

12  said bring it to the Comptroller and I have to give

13  it to the Comptroller, that was something that --

14  that she took license to do.  I didn't instruct her

15  specifically to bring it to and only give it to the

16  Comptroller as -- as it incorrectly states there.

17      Q    All right.  Well, let's see what it

18  incorrectly states.  It says around -- I'm on

19  page 112 of Exhibit 6, Garavaglia --

20      A    Okay.  We're going backwards, then?

21      Q    We're going backwards.

22      A    All right.  I'm with you.

23      Q    It says at around 12:50 p.m., Marsha

24  finally arrived with the muni court documents.

25          You weren't there, so you don't know if

1    that's accurate or not; correct?

2        A    Yes.

3        Q    She -- and the "she" here is Marsha.  Who

4    is Marsha?

5        A    Marsha is a person that works in the real

6    estate section of the Comptroller's office at that

7    time for me.

8        Q    Did she worked for you; correct?

9        A    Yes.  That's correct.

10       Q    And according to what Chana wrote, quote,

11   She -- meaning Marsha -- explained to me that she

12   was instructed to, quote, hand deliver, unquote the

13   documents directly to, quote, the Comptroller only,

14   unquote.  Do you see that?

15       A    That's what it says.

16       Q    All right.  And so was Marsha lying to

17   Chana when she told her that you had instructed her

18   to hand deliver the documents directly to the

19   Comptroller only?

20           MR. BLANKE:  Or was Chana lying in this

21       document?

22       Q    (By Mr. Norwood)  Can you answer my

23   question?

24       A    I have no idea.  All I can tell you is my

25   instructions to Marsha was to bring it to the

1    Comptroller's office for the Comptroller to sign.

2        **Q      All right.**

3        A      What she did from there and what she said,

4    I don't know.

5        **Q      And if Marsha said that, she would have**

6    **been lying on you; is that correct?**

7        A      Draw your conclusion.  Yeah, I guess so.

8        **Q      I mean, that -- what's your conclusion?**

9    **She said, according to this, if it's accurate --**

10       A      That she misunder -- that she took some

11   license and didn't understand what I told her to do,

12   evidently.

13       **Q      Okay.**

14           MR. BLANKE:  Why do you think Chana is

15           telling the truth?

16       **Q      (By Mr. Norwood)  Okay.  Let's go to --**

17   **we're going forward again.**

18       A      What is it?  I'm sorry.

19       **Q      Page Garavaglia 114 --**

20       A      Okay.

21       **Q      -- that e-mail from Tom Ray.  So Tom is**

22   **setting off alarm bells about the fact that we've**

23   **got a problem; correct?**

24       A      Yes.  He's saying there might be a

25   problem.

1   **internal mail, so you were delivering the documents**

2   **to you.  You provided -- you could have told them to**

3   **have them couriered; right?**

4       A    I chose to use the method that was

5   suggested by the secretary in the mayor's office.

6   She said, Do you want me to put them in the

7   inter-office mail, and I said yes.

8       **Q    Okay.  But you could have said, listen,**

9   **I'm going on vacation --**

10      MR. BLANKE:  Objection.  This has been

11      asked and answered twice --

12      MR. NORWOOD:  Let -- let -- let me

13      finish --

14      MR. BLANKE:  -- plus -- plus, it's

15      argumentative as well.

16      MR. NORWOOD:  Well, I haven't asked and

17      answered it yet, so let me ask and answer it --

18      MR. BLANKE:  It's the same question.

19      MR. NORWOOD:  -- before you object on

20      asked and answered.

21      **Q    (By Mr. Norwood)  You could have provided**

22  **the instructions, knowing you were going on**

23  **vacation, to have those couriered to you so that you**

24  **can complete your review before you left for**

25  **vacation; correct?**

1       MR. BLANKE:  Objection.  Asked and
2       answered and also argumentative.
3       **Q    (By Mr. Norwood)  Correct?**
4       MR. BLANKE:  Because it could have been
5       lost by courier just as easily.
6       **Q    (By Mr. Norwood)  Correct?**
7       MR. NORWOOD:  Counselor, I'm going to
8       object to the speaking objections.
9       MR. BLANKE:  You have to speak to make an
10      objection.
11      MR. NORWOOD:  You know that's improper.
12      Well, when you're suggesting that he talk about
13      couriers leaving documents, I think we're over
14      the line.  Subject to that --
15      MR. BLANKE:  Well, you're over the line by
16      arguing with him consistently.
17      MR. NORWOOD:  You can agree and you can
18      make your objection and we can take it up with
19      the Court on the objections, but what we can't
20      do is to --
21      MR. BLANKE:  Argue with each other.
22      MR. NORWOOD:  -- signal to the witness
23      what he should be saying.  Right?
24      MR. BLANKE:  Well, go ahead.
25      MR. NORWOOD:  Okay.

1          A     Can you restate your question?

2          Q     **(By Mr. Norwood)  The question, simply,**

3    **is:  You could have avoided some part of this chaos**

4    **had you said courier those documents to me so I can**

5    **get them before I go on vacation; correct?**

6          MR. BLANKE:  Objection.  Asked and

7          answered.

8          A     I'm not sure that I could have avoided the

9    deficiencies because they were there no matter when

10   I got them.

11         Q     **(By Mr. Norwood)  Okay.  Fair enough.**

12         A     Deficiencies in the documents existed,

13   which is what my fear was and why I didn't allow

14   them to go directly to the Comptroller from the

15   mayor's office, as claimed in -- in -- you know,

16   Ms. Morton's e-mail that that's what the normal

17   process is.  That's not the normal process.

18         Q     **Fair enough.  Let's go to Garavaglia**

19   **Exhibit 4.  We're going backwards again.  And those**

20   **documents, for the record, are Bates stamped**

21   **Garavaglia 39 through 104.  Are you familiar with**

22   **those documents?**

23         A     Through 104?  Let's see.

24         Q     **Yes.  Well, that whole set.  That tab.**

25   **Tab 4, which is --**

1      A     Generally, I have seen these, yes.

2      **Q     All right.  So let's generally take a look**

3   **at them.  Let's go to page 42.**

4      A     Uh-huh.

5      **Q     Do you see that page?**

6      A     I am (sic).

7      **Q     All right.  It's a memo from Judy**

8   **Armstrong dated August 26th, 2019 to Comptroller**

9   **Darlene Green -- correct --**

10      A     It is.

11      **Q     -- re:  Jim Garavaglia's AT&T and Waste**

12   **Management Investigation.  Do you see that?**

13      A     I do.

14      **Q     It says, On January 30, 2019,**

15   **Mr. Garavaglia signed a Master Agreement with AT&T.**

16          **Do you see that?**

17      A     Yes.

18      **Q     Is that accurate?  Did you sign a Master**

19   **Agreement with AT&T?**

20      A     I signed --

21          MR. BLANKE:  Let me object -- let me

22      object in that you're reading it probably

23      accidentally.  It says 2009.

24          MR. NORWOOD:  I'm sorry.  Let me repeat it

25      so that the record is clear.

1              Thank you, counsel.

2       **Q     (By Mr. Norwood)  On January 30, 2009,**

3  **Mr. Garavaglia signed a Master Agreement with AT&T.**

4              **Do you see that?**

5       A     I do.

6       **Q     And that's true; right?  You signed a**

7  **Master Agreement with AT&T; right?**

8       A     I signed a piece of paper with AT&T's name

9  on it, yes.

10      **Q     All right.  And what is the piece of paper**

11 **that you signed with AT&T's name on it?**

12      A     Well, I received -- well, first of all,

13 these are only a few of the pages of what made up

14 this -- see, this -- these are only three -- one,

15 two, three pages here.  The -- the rest of it is

16 missing, and that is there are a number of two-sided

17 pieces of paper that was an AT&T listing of all of

18 the tariffed and non-tariffed, regulated and

19 non-regulated services and products for both

20 telecommunications and data that are offered.

21              And what I mean by that is it showed every

22 circuit, every line, every trunk, every piece of

23 potential service software, equipment, hardware,

24 whatever you -- you could think of that you could

25 buy from AT&T.  And next to it was a -- it let us

1 know if it was a tariffed item or not, and then

2 there was an extension that showed what the price

3 was. If it was a tariffed item, there was no room

4 to negotiate except if you bought the product for a

5 longer -- or service for a longer period of time.

6 If it was on the non-regulated side, you go through

7 supply and it was just -- they're offering to

8 provide whatever the good or service or data product

9 was.

10        Having received this, our account exec

11 told us all of our major accounts, in which the City

12 of St. Louis was one, we're asking and requiring all

13 of -- all of you to acknowledge receipt and sign

14 off -- sign this document. And I go, Hmm. I've

15 never seen anything like it.

16        At this point in time, I was Asset

17 Manager, not Deputy Comptroller --

18    **Q    Right.**

19    A    -- and so I brought it to my immediate

20 supervisor, Ivy Neyland Pinkston, and I said they

21 want us to sign this and I don't know what it is.

22 She looked at it. She's a former Bell employee, by

23 the way. And she looked at it, and she said, I'll

24 tell you what we need to do, let's -- let's go talk

25 to the City Counselor's office.

1        So we made the appointment.  We went down

2    there and spoke to -- he's now retired.  His name

3    was Jim Hartung.  And we -- we explained to him that

4    they presented this to us as a major account.  They

5    want us to sign an acknowledgment receipt of this

6    document, whatever you want to call it.  And he said

7    uh-huh.  And he looked at it and he read it and he

8    said, Okay.  He said if -- if you wanted to purchase

9    anything from Southwestern Bell, you could go on

10   this list and find it and then you could see what it

11   was going to cost you, blah, blah, blah?  And I

12   said, Yeah.  He said, okay.  He said, I don't view

13   this -- regardless of -- of what -- and he read all

14   this, and he said, I don't view this the same way

15   that AT&T does.  For our purposes, I view this as a

16   product catalog or a list of products and services

17   that AT&T is making available to the City of

18   St. Louis.

19        Q    Well -- well, let me stop you there.

20   First of all, we're talking about Garavaglia page

21   44; right?

22        A    Yes, we are.

23        Q    And it says at the top Agreement; right?

24   This is an agreement; right?

25             MR. BLANKE:  Let me object.  It calls for

1       a legal conclusion on the part of the witness.

2       Q     (By Mr. Norwood)  Well, it says Agreement.

3  We can agree with that?

4       A     The word Agreement is at the top of the

5  page.  That's all I can --

6       Q     Well --

7       A     That's all I can speak to.

8       Q     Well, we can say, too, that the paragraph

9  starts off by saying, This Agreement between

10  customer -- who is the customer?

11       A     The City.

12       Q     All right.  And AT&T corporation?

13       A     Uh-huh.

14       Q     Is effective when signed by both parties

15  and continues as long as services are provided under

16  this Agreement.

17             So we see Agreement again; right?  You

18  read this Agreement before you signed it; right?

19       A     I did.

20       Q     All right.  And it says customer.  It says

21  by its authorized representative.  Do you see that?

22       A     Yes.

23       Q     Were you an authorized representative to

24  sign on behalf of the City at this time?

25             MR. BLANKE:  Let me -- let me just make an

1    objection for the record and ask for your

2    consent that I can make this a continuing

3    objection for all of the questions that follow

4    about it this document.

5         MR. NORWOOD:  Yes.  Absolutely.

6         MR. BLANKE:  It's irrelevant, completely

7    and utterly irrelevant as to what he did as

8    Assess Manager -- Asset Manager, a totally

9    different position, would not constitute

10   grounds to discipline him at all under the

11   City's policies.  So it's irrelevant to these

12   proceedings.

13        MR. NORWOOD:  Subject to that.  Thank you,

14   counsel.

15   **Q    (By Mr. Norwood)  Were you an authorized**

16   **representative to sign on behalf of the City when**

17   **you signed this document?**

18        A    Based on the conclusion that the City

19   Counselor's office determined, that this was not a

20   contract, it was not an agreement legally binding

21   for the City to buy, lease, or otherwise procure

22   anything from AT&T, he said the -- Jim Hartung told

23   Ivy and myself that it would be okay, go ahead and

24   sign it.  It doesn't bind us to anything.

25             Anything you buy, be on the regulated or

1    on the non-regulated side, would be done on a

2    separate, individual contract by department with a

3    separate -- following the procedures to purchase

4    or -- or lease or procure any of these products

5    totally separate from this agreement.  This is

6    nothing more than a catalog of products and services

7    to be provided to the City if you want to buy it

8    from them.  He said it is not -- AT&T may consider

9    it one thing, but for our purposes, we're not bound

10   or governed by the rules that AT&T is -- is

11   attempting to impose.  Therefore --

12       Q    **All right.  All right.**

13       A    -- it is not a contract.  It is not a

14   binding anything, other than a catalog.

15       Q    **And that's your opinion?**

16       A    That's not my opinion.  It's the -- it's

17   what the City Counselor told us when we met with

18   him.

19       Q    **Okay.  He said that this wasn't a binding**

20   **agreement, is what you're testifying to?**

21       A    It's not a contract.  He said it's a

22   catalog.

23       Q    **Okay.**

24       A    And he then instructed us, he said either

25   one of you can sign it.  So we said thank you, we

1  left, we went back to her office, and I said, Well,

2  want to sign it?  And she says, You're the guy

3  that's over telecommunications.  I don't even know

4  what most of this stuff is --

5      **Q    Okay.**

6      A    -- which was attached.  She said, Go ahead

7  and sign it.

8      **Q    So you just signed it?**

9      A    I signed it at the direction of the person

10 I worked for at the time.

11     **Q    And you signed it because, in your view,**

12 **it wasn't binding, it was just --**

13     A    It wasn't my view, it was the view --

14     **Q    -- a waste of ink?**

15     A    Nope.  It was the -- it was the view of

16 the person who we sought counsel on to determine

17 what this actually was.

18     **Q    So it was sign it just to sign it, but it**

19 **had no legal significance, is what you understood as**

20 **the information you got; correct?**

21         MR. BLANKE:  Let me object in that it

22     calls for a legal conclusion as to it didn't

23     have any legal significance.

24         MR. NORWOOD:  Fair enough.

25     **Q    (By Mr. Norwood)  Now, let's go back to**

1    page 42.  It says AT&T -- I'm -- I'm on the second

2    sentence now on page 42 in the memo from Judy

3    Armstrong dated August 26, 2019.  She says, AT&T is

4    utilizing this as a contract with the City of

5    St. Louis; right?

6         A    What?

7         Q    AT&T -- second sentence, first

8    paragraph -- is utilizing this as a contract with

9    the City of St. Louis.

10             Do you see that?  In the first -- no, I'm

11   sorry.  Not the numbered paragraph, the first

12   beginning paragraph at the top.

13        A    Uh-huh.

14        Q    Do you see that second sentence?

15        A    Yes.

16        Q    All right.  AT&T is utilizing this as a

17   contract with the City of St. Louis; correct?

18        A    I see the sentence, yes.

19        Q    All right.  And do you know if AT&T was

20   utilizing this as a contract in 2019, August,

21   against the City?

22        A    I never saw this or referred -- had this

23   document referred to from 2009 until I saw it as

24   part of this proceeding.  I never saw it or heard of

25   it again.

1    this document.

2         A    The one that I was told was a catalog and

3    not a contract?

4         **Q    The agreement that you said somebody told**

5    **you was not an agreement.**

6         A    It's not somebody.  It was somebody that

7    was an attorney --

8         **Q    Right.**

9         A    -- who reviewed it in the City Counselor's

10   office.

11        **Q    Right.  That told you --**

12        A    It wasn't -- it wasn't somebody in my

13   office.  I didn't make it up.  It was somebody that

14   we -- that we sought out in the City Counselor's

15   office.

16        **Q    All right.  Let's talk about paragraph**

17   **number 5.  It says, Waste Management is a vendor**

18   **selected to remove trash at the Gateway**

19   **Transportation Center.  Their original contract was**

20   **for July 1, 2015 to July 30, 2017 with the City,**

21   **having the right to extend for three additional**

22   **one-year periods, for a maximum of five years.**

23   **James Garavaglia signed an extended agreement for**

24   **36 months on May 22nd, 2017.**

25                **Do you see that?**

1     A     I'm reading it with you.

2     **Q     Do you see that?**

3     A     I do.

4     **Q     And did you sign an extended agreement for**

5  **an additional 36 months on May 22nd, 2017?**

6     A     I don't have any idea what this is.

7     **Q     All right.  Well, let's see if we can find**

8  **it in our stack of stuff.  Let's turn to Garavaglia**

9  **89.  Yeah.  89.  Are you familiar with that**

10 **document?**

11    A     No, sir.

12          COURT REPORTER:  Did you say yes, sir or

13    no, sir?

14          THE WITNESS:  I said no, sir.

15          COURT REPORTER:  Thank you.

16    **Q     (By Mr. Norwood)  Did you sign this**

17 **document?**

18    A     No, sir.  Not that I recall at all, no.

19    **Q     Is that your signature?**

20    A     I can't say that it is.

21    **Q     Okay.  Do you know who would have signed**

22 **your signature on this document?**

23    A     No, I -- I -- I'm not sure who was the

24 actual manager of the Gateway Center at that point

25 in time.  I'm not -- I'm not remembering the dates

1   and the -- when -- when Ms. Jones left and Ms. Day

2   actually came in.  I'm -- I'm not sure what the

3   dates were, but there was a -- there was an interim

4   on-site manager and still is at the Gateway Center.

5   This was not an operation that I was directly

6   responsible for.  There was a supervisor that had

7   day-to-day operational responsibility there.

8        Q    Okay.  Let's just -- for the record let's

9   set the lay of the land here.

10            This says Service Agreement, Non-Hazardous

11   Waste Service Summary for Waste Management; correct?

12       A    It does.

13       Q    And it has some terms with a base rate;

14   correct?

15       A    I see that.

16       Q    And it has a signature that says James M.

17   Garavaglia; correct?

18       A    Yes, it does.

19       Q    And it has written James M. Garavaglia.

20   Did you write that?  Is that your writing?

21       A    No.

22       Q    That's not your --

23       A    Not that -- not that I'm aware of, no.

24       Q    It could be your writing, you're just

25   saying you don't know as you sit here today?

1     A     I'm saying I don't recall anything about
2  this document or having signed it.
3     **Q     Okay.  And I guess my question to you:**
4  **You -- you write your signature quite often, don't**
5  **you?**
6     A     I did, yeah.
7     **Q     All right.  And I'm just trying to get**
8  **from you, since you're an expert on your own**
9  **signature -- first of all, is that your handwriting?**
10    A     I don't know that it is.
11    **Q     Do you know that it's not?  Can you**
12 **testify under oath that that's not your handwriting?**
13    A     I'm not saying that -- that -- I'm not --
14 I don't know what that is.  It could be -- it could
15 be that it's traced.  It could be that somehow or
16 other it's been transferred on it.  I don't -- I
17 don't know.  I do not have any recollection of this
18 particular document.
19    **Q     So you're suggesting that somebody forged**
20 **your signature at the City?**
21    A     No.  What I'm suggesting is, is I don't
22 know this document.  I'm not familiar with it, nor
23 am I familiar with my name being on it.
24    **Q     All right.  So in any event, it's dated**
25 **5/22/17; correct?**

1   central office on Chestnut Street.  The trunk line

2   component for the City went out of contract, which

3   means, again, as part of the custom tariff, that

4   went from a lower price -- because we had the

5   five-year agreement in place -- to a much higher

6   price because we weren't under contract anymore.

7       **Q    Well, let me ask you, how did it go out of**

8   **contract?  Weren't you responsible for making sure**

9   **that there was continuity between those contracts?**

10      A    No.  The Southwestern Bell representative

11  who is in charge of our account was responsible

12  for -- for bringing it to our attention and for

13  bringing us our opportunity to renew the contract

14  with various options.

15      **Q    And did that happen?**

16      A    No.  We -- we didn't have a -- a person in

17  place.  And so when the price -- when the price of

18  the trunks went up, I called and said, Hey, our bill

19  is out of whack.  And they said, Okay.  And we -- we

20  discovered jointly that it was -- what caused it was

21  this problem with -- with the trunks being out --

22  out of contract.

23          And so someone came down and we decided

24  that we needed to re-up for the longest period of

25  time.  And at that point in time we also did

1   something that we normally do when the contracts

2   come up, and that is we did a busy study.  And the

3   busy study takes those trunk lines and there's a --

4   a guide that AT&T gives us by which we can determine

5   what is an acceptable busy.

6               In other words, when you call and you get

7   an all circuits busy sometimes, that's because

8   everyone is on the phone and you can't get a trunk

9   to make the call to the central office and for your

10  call to go out.

11              So we did a trunk study.  We took out some

12  trunks.  We saved some money, and we put the new

13  agreement in place.  Now, when we put the new

14  agreement in place, for some reason they couldn't

15  get the numbers to work, and so we were generating

16  bills that were incorrect, meaning the amount billed

17  was not reflective of the amount owed.

18              And so they asked us to -- they gave us

19  the number and they said start deducting this amount

20  every month off your bill.  And after a couple of

21  months, I said, no, that's not the way to do things,

22  because it's probably -- it's just not -- not the

23  way we want to do it.  There -- there's no --

24  there's no backup to explain why we just deducted so

25  much money off of our bill.

1          And so they said, Okay.  We'll get this in

2     place.  We'll get it fixed.  Well, by this time,

3     between the amount that was deducted and the amount

4     billed being incorrect, we had run up something

5     around 200,000-or-so dollars of past due that was

6     inappropriately billed because we were out of

7     contract versus at the contract price.

8          Q     Okay.

9          A     So they submitted a proposal to us and

10    said, Here, we're going to credit you $200,000.

11    Well, the past due exceeded 200,000.  By how much, I

12    don't remember.  But it exceeded 200,000.  And so I

13    met with the Comptroller and we -- and I explained

14    to her what happened.  I said, They want to give us

15    a credit for 200,000.  I said, What do you think?

16         And we looked at each other and we both

17    came to the same conclusion.  The credit showed no

18    backup.  There was no detail.  There was no, I

19    guess, reconciliation from our bill to what was

20    shown in the -- in the past due.  And so we only had

21    a certain degree of confidence that that was the

22    right number, and so we rejected at that time the

23    $200,000 credit that they offered.

24         Q     And what about the amount that was owed?

25    There was some money owed; right?

1      A    Well, it's to be determined, because we
2    never did a detailed reconciliation of what was past
3    due.  Now, I want to make a point.
4         **Q    Why was there never a detailed**
5    **reconciliation?**
6         A    Because AT&T did not have someone
7    available to provide us with that at that point in
8    time.  Now --
9         **Q    So it was AT&T who was -- fault that this**
10   **thing was --**
11        A    AT&T's --
12        **Q    -- hanging around?**
13        A    AT&T's -- it wasn't so much a fault as it
14   was AT&T did not have someone available to let us
15   have on an extended period of time -- meaning a
16   couple of days -- to work through and do the
17   reconciliation necessary to come up with an accurate
18   number for everybody's purpose.
19        **Q    But this went back for some years.  Do you**
20   **agree with that?**
21        A    That -- that was in nineteen -- or
22   twenty -- 2015, I'm thinking.
23        **Q    All right.  All the way back to 2015 when**
24   **you were as Asset Manager?**
25        A    Yes.

1    we talked about the $200,000 a few -- a few minutes

2    ago.  When the 200,000 lacked the detail, you know,

3    I went back to her and I said, Let's go back and

4    we're going to do a detailed reconciliation, month

5    by month, year by year.

6              And, remember, the City of St. Louis paid

7    a bill every month.  We never missed a month of

8    vouchering a bill.  The difference was they were

9    generating manual invoices for us which did not

10   affect the billing system which was generating a

11   bill that was $30,000 a month higher than what it

12   should have been.  That bill did not -- the manual

13   bill did not reconcile with the billing system, and

14   so the billing system kept saying, well, you paid

15   seventy, we billed you a hundred.  That 30,000 went

16   to past due, so --

17        **Q    All right.  Let me -- let me say this,**

18   **because we're short on time.**

19             **So you worked on this with Mary Harp, and**

20   **if we talk to Mary Harp, she will --**

21        A    Absolutely.

22        **Q    -- vouch that?  Okay.  Let's go to**

23   **Garavaglia 57, which is part of Exhibit 4.**

24        A    57?

25        **Q    Garavaglia 57 -- page 57.  Do you see that**

 1  **page?**

 2      A    Yes.  I'm looking at it.

 3      **Q    All right.  At the top it has AT&T**

 4  **letterhead and it has Addendum to Comprehensive**

 5  **Service Order Attachment.  Do you see that?**

 6      A    I do.

 7      **Q    All right.  And did you sign this**

 8  **particular document?**

 9      A    I believe I did.

10      **Q    All right.  And did you have authority to**

11  **sign this particular document?**

12      A    Yes.

13      **Q    Who -- who told you you had authority to**

14  **sign this particular document?**

15      A    This particular document is an attachment.

16  You say an addendum.  That's the same word as an

17  attachment as to a contract that was put through

18  AT&T through the normal contract process.  What this

19  is is a scope of work.

20      **Q    Right.**

21      A    This is a scope of work which details that

22  if you're going to spend $50,000 -- and that's what

23  the contract says -- this comes back and gives you

24  the detail of that work.

25      **Q    Right.  And my question to you, because it**

1    says Agreed:  City of St. Louis on the document;

2    right?

3         A    Okay.  That's what it says.

4         Q    All right.  And it says by James M.

5    Garavaglia; correct?

6         A    It does.

7         Q    Authorized agent or representative;

8    correct?

9         A    Okay.  And that doesn't mean --

10        Q    That's what it says.

11        A    That doesn't mean anything more than I was

12   the head of the telecommunications section for the

13   City.

14        Q    Does that mean you were authorized to sign

15   on behalf of the City?

16        A    I was authorized to sign this type of a --

17   of a document, yes.

18        Q    What --

19        A    This is not a contract.  Well, I don't

20   know.  I -- I ran this by, again, somebody.  I'm not

21   sure if it was Garvin or who it was in the City

22   Counselor's office.  I said, Look, there is an

23   existing contract which is the over -- overview

24   umbrella document that will be in place by which

25   AT&T gets paid.

1          Now, when it comes down to actually doing

2     the work, they are going to give us a detailed scope

3     of work.  And you understand what a scope of work

4     is.  That's what this is.  And, therefore, I was

5     told that it's not a contract.  You can sign it.

6          **Q     Did you -- this was at a time when you**

7     **were Deputy Comptroller; correct?**

8          A     That's what it says, yes.

9          **Q     Did you discuss this particular document**

10    **with the Comptroller Green?**

11         A     Not that I recall.

12         **Q     All right.  So if there was a question**

13    **about whether or not you could or could not sign**

14    **contracts --**

15         A     This isn't a contract.

16         **Q     Well, document.  It's a document; right?**

17         A     It's a scope of work.

18         **Q     And it has legal obligations; correct?**

19         A     Well, I don't know.  I'm not a lawyer.

20         **Q     Okay.  So -- but you never asked the**

21    **Comptroller if you were authorized to sign this**

22    **contract as an authorized representative of the City**

23    **of St. Louis; correct?**

24              MR. BLANKE:  Objection with the use of the

25         word contract, when he keeps telling you that

1          MR. BLANKE:  But things are not as --
2      what's the word?
3          MR. NORWOOD:  Okay.
4          MR. BLANKE:  What's the word?
5          MR. NORWOOD:  I'm just going to have to --
6          MR. BLANKE:  Absolute as you make them.
7          MR. NORWOOD:  -- terminate the deposition
8      if we cannot agree that you're going to make
9      legal objections and I will to continue to ask
10     my questions.  Can we agree to that, counselor?
11         MR. BLANKE:  Yeah.  We can agree to that,
12     yes.
13         MR. NORWOOD:  Okay.  Thank you, counselor.
14         MR. BLANKE:  Let's make that reciprocal,
15     also.
16     **Q    (By Mr. Norwood)  All right.  So in your**
17 **view --**
18     A    No, it's not my -- that's not my view.
19     **Q    Well, let me say this:  Is this document**
20 **you signed binding on the City, in your view?**
21     A    I can only tell you what I was told by the
22 City Counselor's office that this is not a contract
23 that I was okay to sign.
24     **Q    And who told you that?**
25     A    I'm thinking it was Garvin.  I don't know

 1   that.  I don't remember exactly.

 2        **Q    Why are you thinking it was Garvin?**

 3        A    Because he's the attorney that we dealt

 4   most often with on a number of matters across the

 5   board.

 6        **Q    And did you talk about -- you didn't talk**

 7   **about this with your boss?**

 8        A    I talked with an attorney.

 9        **Q    But your -- Garvin is not your boss;**

10   **right?**

11        A    But Garvin is explaining to me if I have

12   the authority to sign it or not.

13        **Q    Is Garvin your boss?**

14        A    No.

15        **Q    Do you report to Garvin?**

16        A    No, I do not.

17        **Q    Did Garvin hire you?**

18        A    No.

19        **Q    Did Garvin promote you?**

20        A    No.

21        **Q    Did Garvin approve your salary increases?**

22        A    No.

23        **Q    You reported to Comptroller Darlene Green;**

24   **correct?**

25        A    Yes.

1      Q    And as we had discussed earlier, you had

2   an obligation to keep her informed about what was

3   happening; correct?

4      A    Yes.  But then again, I also in this job

5   have discretion to decide what to bring to her and

6   what not to.

7      Q    Oh, okay.  Tell us about that.  Where is

8   that in the policy manual?  I -- I missed that.  Is

9   there anything in the Code of Conduct that says you

10   have discretion to not inform your boss about what's

11   going on?

12      A    I didn't say that.  I said that as a

13   senior manager, I'm in that job because I am

14   making -- I -- I'm entrusted with making decisions

15   and have some discretion about what to bring to my

16   boss.  I can't bring her everything that's happening

17   every day.  I'd do nothing but sit there on the

18   phone with her and say, well, what do you think

19   about this, can I do this, can I do that.  That's

20   not what the job is about.

21           She wouldn't need me there, which

22   obviously she decided she didn't -- she wouldn't

23   have needed me there had I had to go to her with

24   everything.  There is a certain amount of discretion

25   that a senior manager has in the job that I have.

1      Q    And part of that discretion includes not
2    informing your boss?
3      A    Part of that discretion is finding out
4    from the best means possible what you can do and
5    what you can't do.
6      Q    And -- and you believe that you could sign
7    this contract because -- or this document because it
8    wasn't a contract; right?
9      A    No.  I believed that I was told that I
10    could sign this document.
11      Q    If the Court determines that it was a
12    contract, a binding, legal obligation, that would
13    mean that you signed that binding, legal obligation
14    without authority to do so; correct?
15           MR. BLANKE:  Objection.  It calls for
16        speculation and calls for a legal conclusion.
17      Q    (By Mr. Norwood)  Correct?
18      A    No.  It means that I signed something, and
19    the direction I was given by the City Counselor's
20    office was incorrect, is what it means.
21      Q    Meaning you signed a document that
22    purported to bind the City, but it didn't because
23    you didn't have authority to bind the City; correct?
24      A    No.  It meant that I signed something at
25    the direction of the City Counselor's office, and if

1    the City Counselor made a mistake, then it was their

2    mistake and not mine.

3         **Q     And therefore because it's not an**

4    **enforceable contract, so be it; is that right?**

5         A     If it's not a contract, then I was

6    authorized to sign it per the City Counselor.

7         **Q     And if it is a contract and you did sign**

8    **it, it's not worth the paper it's written on because**

9    **you weren't authorized to sign it; correct?**

10         A     That would be correct.

11         **Q     All right.**

12              MR. BLANKE:  Calls for speculation and is

13         a legal conclusion.  Objection.

14              MR. NORWOOD:  It's already been answered.

15         **Q     (By Mr. Norwood)  Let's pivot to --**

16    **quickly to tab number 7.  And it starts -- this is**

17    **Garavaglia Deposition Exhibit 7, page 352.  This is**

18    **the letter dated July 2nd, 2019 that was sent to you**

19    **by Comptroller Darlene Green, a copy to Mr. Richard**

20    **Frank.**

21         A     3 -- 353?  Yes, sir?

22         **Q     Yes.  It's the -- tab 7.**

23         A     Okay.  Yeah, I've got it.

24         **Q     The first page of tab 7.**

25         A     I got it.  I got it.

 1      Q    And you've signed this document; correct?

 2      A    Yes.

 3      Q    And in paragraph 7, you say after the

 4   forced leave -- well, let me go back.

 5           You say after the forced leave was

 6   rescinded, my vacation time that I had used from

 7   July 2nd to July 22nd was restored; correct?

 8      A    Yes.

 9      Q    And that's accurate; correct?

10      A    Yes.

11      Q    And then paragraph 10, you say, After the

12   forced leave was rescinded, my vacation time that I

13   had used from July 23rd, 2019 to August 29, 2019 was

14   again restored on September 20, 2019; correct?

15      A    Yes.

16      Q    And that was true; right?

17      A    It was, yes.

18      Q    All right.  Let's go to tab 11.  Have you

19   seen that document before?

20      A    I'm having trouble reading what it says,

21   but I -- I don't know that I recall having seen it

22   before.

23      Q    Okay.  Well, let me read it for the

24   record.  It's Re: -- well, at the top it says Deeds

25   of Trust; correct?

1      A    Okay.

2      Q    And it's an e-mail dated Thursday,

3  August 11, 2016, 10 -- 10:18 a.m., to Comptroller

4  Green, cc you.  And Mr. Ray says, quote, Darlene,

5  Jim called yesterday and inquired about his

6  executing certain Deeds of Trust processed by

7  Marsha -- Marsha Veal.  As I recall, these are loans

8  of CDA money to homeowners.  As you know, the

9  Charter, Article XV, Section 3, authorizes a

10  designation of a subordinate to affix the

11  Comptroller's signature on warrants.  In order to do

12  so, the designation must be in writing, in

13  duplicate, filed with the mayor and treasury

14  division.

15           You were aware of that in August of

16  2016 -- correct --

17      A    Yes.  That's what it says.

18      Q    -- when you were Asset Manager; correct?

19      A    That's what it says, yes.

20      Q    And you had went to Mr. Ray to try to find

21  out if you could sign off on these documents;

22  correct?

23      A    Just to get some clarity, it looks like I

24  did, yes.

25      Q    And he told you that in order to do

1    that -- or told you and the Comptroller that it
2    would have to be in accordance with a written
3    authorization; correct?
4         A    Yes.  That's what it looks like.
5         Q    It says, If you authorize Jim to sign
6    these deeds, I would follow your normal procedure of
7    designating him as such; right?  Do you see that?
8         A    I do.
9         Q    And that was the normal procedure.  To be
10   authorized to sign contracts on behalf of the City,
11   there needed to be written authorization; correct?
12        A    Uh-huh.  Yes.
13        Q    You knew that; right?
14        A    It says I did, yes.
15        Q    You knew that in 2016.  You knew that
16   before 2016, didn't you, Mr. Garavaglia?
17        A    Let's put it this way:  I knew it at least
18   by then.  Let's -- let's say that.
19        Q    Okay.  Well, let's say -- did you know it
20   before 2016?
21        A    Probably.
22        Q    Okay.  And let's go to the next page.
23   It's Green 0 -- or GRN000461, and it's a document
24   that says Report of Delegation of Authority.
25               Do you see that?

```
 1      A    Yes.
 2      Q    All right.  Because it says Lease
 3  Agreement; right?  I think that means a contract;
 4  right?
 5      A    Yes.
 6      Q    All right.  And so you knew in September
 7  '14 that as it relates to St. Louis Composting, that
 8  that contract had to be executed by the Comptroller
 9  and signed as to form by the City Counselor;
10  correct?
11      A    Yes.
12      Q    All right.  Now, let's go to -- let's go
13  to tab 14.  Because I believe earlier in your
14  testimony you indicated you were admonished by the
15  Comptroller because you signed a lease contract that
16  you said wasn't a contract; correct?
17      A    Yes.
18      Q    And is this the lease contract that we
19  were talking about that was not a lease contract?
20      A    This is the request for the option that I
21  inquired about through the City Counselor's office
22  and was told that I could in fact sign the request
23  for -- for -- this -- this option, as opposed to
24  having it go through E&A again and be a second
25  contract.  That's correct.
```

1    to exercise the option.

2         Q    That's right.  He's notifying --

3         A    Spelled out in the lease.

4         Q    -- the Comptroller; correct?

5         A    Well, that's what it says to do in the

6    lease.

7         Q    Right.  And that's what he did; right?

8    And that was on June 2nd, 2017; correct?

9         A    Yes.

10        Q    All right.  And then if we go to tab 14,

11   GRN00464, there was an Extension of Lease Agreement

12   prepared with a signature for Darlene Green,

13   Comptroller; correct?

14        A    Right.

15        Q    And you scratched that out and hand wrote

16   James M. Garavaglia, Deputy, under where her

17   signature -- or her name was; correct?

18        A    Yes.

19        Q    And you signed James M. Garavaglia;

20   correct?

21        A    I did.

22        Q    Was this a contract, in your view?

23        A    Again, I only did this with advice of

24   counsel.  And I was told, based upon the initial

25   lease, exercising the option under the term and

1  guidelines of the initial lease did not constitute a

2  new contract.

3      Q    All right.  Let's look at the first page

4  of Depo Exhibit 4 (sic), GRN000462.  And that's a

5  memo to you, James Garavaglia, Deputy Comptroller,

6  Finance and Development; correct?

7      A    Yes.

8      Q    From Comptroller Darlene Green; correct?

9      A    Yes.

10     Q    Date, July 21, 2017; correct?

11     A    Yes.

12     Q    Re:  Unauthorized signature; correct?

13     A    Yes.

14     Q    And it says, quote, It has come to my

15  attention that you, as Deputy Comptroller of Finance

16  and Development, erroneously attempted to execute a

17  lease agreement extension between the City of

18  St. Louis and St. Louis Composting.  See attached.

19          Did I read that accurately?

20     A    You did.

21     Q    It goes further and says, As you know --

22  and you did know, right -- currently, there are only

23  two authorized signatures for contracts and their

24  extensions.  You knew that; correct?

25     A    Absolutely.

1      Q    All right.  As Comptroller, I am
2  authorized and I have authorized Deputy Comptroller
3  Beverly Fitzsimmons.
4           Do you see that?
5      A    Yes.
6      Q    She says, I am puzzled as to how this
7  could have happened.  This is an improper procedure.
8  Please work with Beverly Fitzsimmons so that Michele
9  Graham, Contract Compliance Officer, can process and
10 provide a properly executed extension to the
11 contract.  She cc'd Beverly Fitzsimmons, she cc'd
12 Alan Jankowski.
13          Who is Alan Jankowski?
14     A    He works in Forestry.
15     Q    All right.  Michele Graham.  She is --
16 what was she, contract supervisor?
17     A    Yes.
18     Q    All right.  Brad Hayes, he was in charge
19 of Parks and Recreation; correct?
20     A    That's correct.
21     Q    He's a white male?
22     A    Yep.
23     Q    Okay.  Vanessa Carter.  Who was that?
24     A    She was an accountant that the worked at
25 the Parks Department.

1    Q    All right.  Kathy Sullivan, who is she?

2    A    She's a part-time administrative person

3    also working at the Parks Department.

4    Q    All right.  So she said you signed the

5    contract without authority; right?

6    A    Based on what someone who is not an

7    attorney told her.

8    Q    I'm sorry?  Who was -- who told her --

9    well, you just acknowledged that if it was a lease

10    contract, you weren't authorized to sign it;

11    correct?

12    A    And I also testified that I had talked to

13    the City Counselor's office and they -- they

14    determined that after reviewing the contract, that

15    this was the exercising of an option that was part

16    of the initial contract.

17    Q    Okay.  When you got this memo, did you

18    write back -- this is when you were Deputy

19    Comptroller.  Did you write back to Comptroller

20    Green and say, Listen, I talked to the City

21    Counselor and they told me it was okay?  Did you

22    communicate --

23    A    There was a verbal discussion this --

24    regarding this.

25    Q    What did you -- what was the verbal

1    discussion?

2         A    I explained that I had -- what I had just

3    told you that I had done.

4         Q    You explained that to who?

5         A    To the Comptroller and to Bev.

6         Q    Prior to this time, had you and the

7    Comptroller had any other discussions about

8    unauthorized signature?

9         A    Not that I'm aware of.  Not that I can

10   recall, anyway.  But if you -- if you look at --

11   under tab 13 and you go to GRN000476, the letter

12   that I received was actually generated based on this

13   e-mail saying after speaking to Beverly Fitzsimmons,

14   it is my understanding that this extension will need

15   to be done as an amendment to the original contract.

16        Q    Right.

17        A    Well, Beverly Fitzsimmons is not an

18   attorney.  And when I spoke to the -- an attorney, I

19   was told something totally contrary to this.

20        Q    But does this say anything about you being

21   authorized to sign that contract?

22        A    I didn't sign a contract.

23        Q    Or sign that document?

24        A    I signed -- I signed an option, which I

25   was told I was allowed to do under the terms of the

1    original lease contract.

2        Q    Right.  But my point is, this doesn't say

3    you are authorized to do it; right?

4        A    No.  That -- that communication was verbal

5    via telephone.

6        Q    When you talked to the Comptroller about

7    this before -- was it before or after you got the

8    memo?

9        A    After.

10       Q    All right.  And was that a phone call?

11   Was it in person?

12       A    I believe it was in person.

13       Q    All right.  Was anybody else present?

14       A    I believe Bev was there.

15       Q    All right.  So Bev would have been present

16   when she was talking to you about the memo and the

17   unauthorized contract.  What happened -- what was

18   said during that discussion?

19       A    Basically just reiterating what was in the

20   letter.  And I explained what I had done and it --

21   what it came back to is Bev said, Oh.  She said,

22   Well, I'm just trying to make sure that I've got all

23   my bases covered.

24       Q    Who said that?

25       A    Bev.

1    needs to be addressed, that's correct.

2        Q    Okay.  All right.  So let's go back to

3    Exhibit 14, page 463, which is the second page

4    behind the memo that the Comptroller provided to

5    you.  And this appears to be a letter from Kathy

6    Sullivan, executive assistant for Mr. Greg Hayes; is

7    that correct?  Kathy Sullivan?

8        A    Yeah, she works for Greg.

9        Q    All right.  And it says to -- well, it

10   looks like it was cc'd to Janis Garavaglia.  Who is

11   that?

12       A    No relation.  She married someone with my

13   same last name, but we're not related.

14       Q    Okay.  Had you seen a copy of this letter

15   before?

16       A    I don't think I have.

17       Q    All right.  It's dated July 10, 2017

18   addressed to Mr. Patrick Geraty, President,

19   St. Louis Composting.  It says, Dear Mr. Geraty --

20   G-E-R-A-T-Y -- enclosed please find the

21   fully-executed Extension of Lease Agreement between

22   the City of St. Louis and St. Louis Composting for

23   an additional one year, expiring August 31, 2018.

24            We were advised by Mr. James Garavaglia,

25   Deputy Comptroller, that it was not necessary that

1   the City Counselor approve the extension, nor did it

2   require City -- the signature of the registrar.

3           Do you see that?

4   A    Yep.

5   Q    Did you tell that to Ms. Sullivan?

6   A    If she says I did, I probably did.

7   Q    Okay.

8   A    Again, based on information I received

9   from the City Counselor's office at the time.

10  Q    Got it.  Let's go to -- so you talked a

11  number of times about advice from the City

12  Counselor.  You mentioned a couple names.  You

13  mentioned Mr. Garvin.  You mentioned some others.

14          Who were these City Counselors you're

15  talking to?  We just want to make sure we get that

16  on the record.

17  A    It depends on which instance you're

18  talking about.

19  Q    All right.  Let's go with the instance as

20  it relates to the -- well, let's go to the instance

21  where it relates to the -- well, you didn't sign the

22  Waste Management contract, so let's not talk about

23  that one.  Let's talk about -- well, this one.  This

24  is the one I think you identified that you went to

25  someone in the City Counselor's office --

 1    2015?

 2         A    You're asking me if I know if there was

 3    one?

 4         Q    **If you know as you sit here right now if**

 5    **there was a follow-up.**

 6         A    I don't -- I do not.

 7         Q    **All right.  Let's go to tab 18.**

 8         A    Okay.

 9         Q    **Let's look at the first page which is**

10    **denominated as GRN000477.  Do you see that document?**

11         A    Yes.

12         Q    **And this is an e-mail from Dr. Ikpeama,**

13    **Tuesday, February 20, 2018 at 3:10 p.m.; correct?**

14         A    Okay.  Yeah.

15         Q    **Is that right?**

16         A    Yep.

17         Q    **And that's an e-mail to you; is that**

18    **right?**

19         A    Okay.  Yes.

20         Q    **And did you respond to this e-mail sent by**

21    **Dr. Ikpeama?**

22         A    I don't recall.  I'm sure that eventually

23    we did.  I don't recall that I did the -- that day

24    or the day after.  Do you have that answer?

25         Q    **Well, do you recall responding -- you,**

1    meaning Jim, did you respond to Dr. Ikpeama?

2        A    I'm not sure that I did -- that I -- that

3    I do recall.  But I can tell you this, the Gateway

4    Transportation Center has a manager in place that

5    would have been dealing with this one on one

6    directly with Dr. Ikpeama.  Now, why he's sending

7    this to me and bypassing the supervisor, I don't

8    know.

9        Q    All right.  Well, you were the supervisor

10    of the supervisor; correct?

11        A    That's true.

12        Q    All right.  And you had the ultimate

13    responsibility to make sure that your subordinates

14    took care of issues associated with internal audit

15    findings; correct?

16        A    I was her supervisor, yes.

17        Q    And you were responsible for make

18    suring -- making sure that any audit findings that

19    reflective negatively on the processes of the City

20    should be remedied?  That was your responsibility;

21    correct?

22        A    It's my secondary responsibility.  The

23    primary responsibility for correcting audit

24    exceptions lies with the supervisor on-site.

25        Q    And you had responsibility of some nature,

1    you described it as secondary; right?

2        A    That's right.  It's immediately her

3    responsibility to remedy and to respond to the audit

4    exceptions.

5        Q    Who was the supervisor that you're

6    referring to?

7        A    At this point in time, I believe it was

8    Sonia Day.

9        Q    All right.  And she reported to you;

10   correct?

11       A    Yes.  Yes.

12       Q    He says -- and it's directed to you.

13   Dr. Ikpeama, he says, Dear Mr. Garavaglia, I sent to

14   you a follow-up letter dated -- originally it said

15   January 1, 2018.  Somebody scratched it out and

16   wrote February.  Was that you who scratched it out?

17       A    That's not my writing, no, sir.

18       Q    All right.  Either January or

19   February 2018 requesting your response on the

20   Gateway Transportation revenue review report

21   findings and recommendations, Project Number 25-RR08

22   (sic).  The due date was February 9, 2018.  As of

23   today, February 20, 2018, we have not received your

24   response.

25            Do you see that?

```
 1        A     It was not my response.  It's the response
 2    of the Gateway Transportation Center and the direct
 3    supervisor's responsibility, yes.
 4        Q     Well, he sent something to you and he's
 5    saying we haven't received your response.  He's
 6    talking to you; right?
 7        A     Again, the response should come from the
 8    immediate supervisor of that area.
 9        Q     Well, did you tell Dr. Ikpeama that?
10        A     I'm not sure.
11        Q     Did you talk to Dr. Ikpeama at all?
12        A     I'm sure I did, since he was right down
13    the hall, but I can't say that I can specifically
14    remember a conversation.
15        Q     All right.  He says, If we do not receive
16    your response by February 26, 2018, we will re-issue
17    the report as repeat findings.  Do you see that?
18        A     I do.
19        Q     Then he says, Thanks for your cooperation;
20    right?
21        A     Okay.
22        Q     Right?
23        A     Yeah.
24        Q     All right.  And is that a good thing for
25    him to have repeat findings two years later?
```

1     Q    -- he's right down the -- hold on.  He's

2   right down the hall.  You haven't said a word to

3   him.  You haven't responded to him via e-mail.  You

4   had a relationship with him.  You're fellow

5   accountants.

6     A    Uh-huh.

7     Q    Did you tell him that, hey, this is not

8   me, this is Sandra -- Sonia Day, she's going to

9   handle it, or did you communicate any of that to

10  him?

11    A    I believe we did, but yet for some reason

12  he didn't go to Sonia for the information.  But what

13  I'm -- what I'm looking for is my reconciliation

14  report that basically tells the story that internal

15  audit's basic premise for their -- for their revenue

16  review and their contention that there is money to

17  be collected is incorrect.  My -- I -- I have a

18  response out there that is not part of this.

19    Q    Okay.  Fair enough.  Let's go to the next

20  page.  February 28, 2018, 10:51 a.m.  Sonia Day to

21  Dr. Ikpeama, Ms. Day, thanks for your response.  It

22  is very helpful to me.  I can issue the report and

23  just indicate that Gateway Transportation is working

24  to resolve the findings.

25              So he's trying to work with Ms. Day to get

1    Green 485, e-mail from Sonia Day dated March --

2    e-mail from Sonia Day to Dr. Ikpeama -- and you're a

3    cc -- it says Monday, March 26, 2018, 7:26 a.m.,

4    Good morning.  She says, I am -- I am unable to

5    meet; however, I will forward the information that I

6    am requesting and its supporting documentation to

7    the findings that you originally sent to

8    Mr. Garavaglia as soon as it is available.

9            That's what she's communicating; correct?

10    A     Okay.

11    Q     Is that right?

12    A     Yeah.

13    Q     Did you ever get involved in communicating

14   with Dr. Ikpeama to figure out what was taking so

15   long to get this issue squared away?

16    A     Yeah, I don't know.  We -- our lessee, I

17   guess, was less than forthcoming with the

18   information.  Again, you know, it wasn't for lack of

19   wanting to comply.  It was -- we had trouble getting

20   the information.  And if we had that report -- I

21   actually did a report reconciling the revenue myself

22   and, unfortunately, it proved the premise of the

23   internal audit's report to be totally incorrect.

24    Q     Okay.

25    A     Now, I don't know where that is, but --

 1      Q    Let me finish.  Let me finish.  Let me
 2  finish.
 3      A    Okay.
 4      Q    **This is what your colleague documented in**
 5  **this file as it relates to this audit that he needs**
 6  **to complete the finding, but you're not helping**
 7  **complete the finding.  That's what he's saying;**
 8  **right?**
 9      A    All I can tell you is this:  As you can
10  see, efforts -- every effort was made to get the
11  information necessary to complete the proper
12  analysis and response.  There was problems getting
13  that information from the lessee eventually, I
14  recall, because I couldn't believe the analysis that
15  I was able to perform after the fact.  After this
16  stuff here was -- was put out, that the whole basis
17  under which the revenue review finding was made was
18  incorrect.  Now, you know, if you can find -- there
19  is a response and the analysis was done.
20      Q    **When did you do all of that?  Was it after**
21  **this memo?**
22      A    After this, yeah --
23      Q    **Okay.**
24      A    -- when we finally got the information
25  out.  If you can find that, it's -- it's -- it

1  exists somewhere in internal audit.  Because it was

2  never mentioned again after I responded back to

3  internal audit.  The whole matter politely and

4  quietly went away.

5          Now, there was best efforts made on behalf

6  of my employee to get the information necessary.

7  That person is not on par with an internal auditor

8  in terms of knowing accounting.

9      **Q    Right.  Right.  Because you and --**

10     A    So the -- the analysis -- the analysis

11 when the information was available was always going

12 to be done by me.  Maybe that's why he was coming to

13 me and not her --

14     **Q    Right.**

15     A    -- but it was her -- it was her primary

16 responsibility, and I believe that she did

17 everything that she could to get the information,

18 which eventually we did get.

19     **Q    But the analysis was -- was going to be**

20 **done by you?  That was doing to be your response;**

21 **right?**

22     A    And it was done.

23     **Q    Ultimately, some four years later, three**

24 **years later?**

25     A    No, no, no, no, no, no.

 1       **Q    Well, the original findings were in '14;**
 2  **correct?  Or '15?  '15.**
 3       A    This is -- this is an analysis to comply
 4  with this audit.
 5       **Q    This was the follow-up to the audit;**
 6  **correct?**
 7       A    Right.
 8       **Q    Right.**
 9       A    He was asking for an analysis to be
10  performed.  He -- he had a conclusion in his
11  follow-up audit that we needed to verify, and in
12  order for us to respond to it, we needed to get the
13  information that was hard to get.
14       **Q    But this is three years after the finding;**
15  **right?**
16       A    It's totally separate.  And as you saw in
17  her e-mail, we went from one supervisor and then no
18  one for 13 months, and then the new lady comes in
19  seven months later -- you know, six months later,
20  when he -- or 90 days after he starts wanting to
21  perform this.
22            So to be fair, a supervisor left.  The
23  position was vacant for 13 months.  She's there four
24  months.  He -- he does an audit finding and says,
25  hey, you guys are -- are -- are deficient in this

1    area.  Well, if you want to go back and say who

2    should have instituted the proper remedy, it would

3    have been Ms. Jones, and evidently she didn't.

4        **Q    And she reported to you?**

5        A    Yes, she did.

6        **Q    And it was your responsibility to make**

7    **sure that if somebody -- if there's some gap --**

8        A    In the table of organization, she reported

9    to me, yes.

10       **Q    All right.  And you were her boss and you**

11   **had the responsibility to make sure the job got**

12   **done.**

13       A    And once --

14       **Q    That was your job?**

15       A    And once -- and once that responsibility

16   was assigned to her to complete, in good faith, I

17   presume that it had gotten done.

18       **Q    And you knew -- well, you knew she was**

19   **gone for some period of time and the position was**

20   **vacant; right?**

21       A    But it was in the time that she was still

22   gainfully employed for a period of time after that.

23       **Q    And you never followed up with her to make**

24   **sure that these outstanding audit findings are taken**

25   **care of; is that right?**

1    who needs to make this happen, which is why he's

2    reaching out to you; right?

3        A    And how would I make it happen any faster

4    than what she could do?

5        Q    Well, I mean, that's the question.

6        A    That's the question.

7        Q    It was your responsibility; right --

8        A    No.

9        Q    -- at the end of the day?

10       A    No.

11       Q    It was Ms. Day's responsibility?

12       A    Yes.  It's her primary -- she's the

13   manager of the Gateway Transportation Center.  I was

14   going to assist her -- because she is not an

15   accountant -- in performing the follow-up analysis

16   to verify that Mr. Ikpeama was correct, and he was

17   not correct.

18       Q    All right.  And so as of this day,

19   April 4, 2018, he ends by saying -- well, let's go

20   back.  Let's go to the middle.  He says, No.  Also,

21   there were two finding in the report dated

22   October 19, 2015.  Respond as to the status of these

23   findings.  See management's response.

24            Did you respond as to the status of those

25   findings in 2015?

```
 1        A    If you have, you know, verifiable proof
 2    that someone has done something that violates any of
 3    the things we've talked about today and it's
 4    provable and it's not speculation and it's not
 5    conjecture and it's not some made-up, bogus
 6    nonsense, then, yes, I agree with you.
 7        Q    So in your view, all of this is made up,
 8    bogus stuff?
 9        A    It's untrue and has no shred of truth to
10    it.
11        Q    I'm sorry?
12        A    It's not -- there's not a shred of truth
13    to it, no.
14        Q    And so Judy Armstrong, in her memo, she
15    just made it up; is that right?
16        A    She's wrong.  You've heard me dispute most
17    of what she's put in there.
18        Q    Well, some of it you didn't dispute;
19    right?
20        A    I disputed almost all of it.
21        Q    But some of it you didn't dispute;
22    correct?
23        A    What didn't I dispute?
24        Q    Okay.  What about Ms. Chana -- Ms. Chana
25    Morton?  She had quite a bit of stuff in her
```

1    detailed memo.  Do you dispute all of that as well?

2         A    Yeah.  Who's -- just because she wrote it,

3    does that mean it's true?

4         Q    It doesn't mean it's true, but if a -- if

5    one of your subordinates provides you with a

6    detailed summary of what she perceived to be

7    problems, would you --

8         A    Well, that detailed summary was contrived

9    after the fact down to the minute of when things

10   came in and when things went out.  It looks -- it

11   looks pretty contrived to me.

12        Q    So you're saying Ms. Chana Morton

13   contrived that official investigative --

14        A    I can -- I could dispute --

15        Q    Let me finish.  Let me finish.

16             You're saying Ms. Chana Morton made up all

17   of that stuff she had in her memo?

18        A    I'm saying that I could argue that -- that

19   a lot of it is -- is incorrect.

20        Q    All right.  But you would -- are you

21   saying she intentionally put incorrect information

22   in that detailed summary?

23        A    I can't say what she did or didn't do, if

24   it was intentional or not, but what I'm saying is, I

25   dispute a lot of the information and believe that

 1      Q    Okay.  So were you thinking about
 2  retirement in 2010?
 3      A    No, no, no, no, no.  It was strictly an
 4  attempt for me to find ways to increase my potential
 5  savings.
 6      Q    All right.  Other than the City's pension,
 7  are you receiving any other pensions?
 8      A    No, sir.
 9      Q    Are you receiving other income other than
10  what you've identified here today?
11      A    No, sir, nothing other than what you've
12  seen.
13      Q    All right.  Let's go to Exhibit 24,
14  page 1403.  Have you seen that document before?
15  Well, let's skip through that one.  Let's go to
16  STL1405, which is two pages down.  And --
17      A    Okay.
18      Q    -- what is that?
19      A    It's my application for retirement.
20      Q    Is that your signature?
21      A    It is.
22      Q    Is that your handwriting?
23      A    Yes.
24      Q    All right.  And you say I hereby -- this
25  is a form you submitted to the employee -- Employees

1    Retirement System, City of St. Louis, and you say --

2    and you can read the form.  You say, I hereby

3    officially apply for normal retirement effective

4    10/1/19.  My last day on the payroll was/will be

5    9/30/19, and you sign this request on August 30th,

6    2019; correct?

7        A    Yes.

8        Q    All right.  Do you believe that if a

9    Comptroller has reason to believe that there is

10   financial impropriety, that that -- that the

11   Comptroller should take steps to investigate to

12   determine if there is any truth to it?

13            MR. SCHMITZ:  Objection.  It calls for

14        speculation as to what another party in a job

15        he's never worked in would -- would or wouldn't

16        do.

17       Q    (By Mr. Norwood)  Subject to that.

18       A    Could somebody restate that?

19       Q    Well, let's talk about you.  When you were

20   Deputy Comptroller, if information came to light to

21   you indicating that someone you supervised was

22   engaged in financial impropriety, would it be

23   prudent for you to investigate to determine if

24   that -- if there was any truth to that?

25       A    Of course.