Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF MISSOURI

3                    EASTERN DIVISION

4

5      JAMES GARAVAGLIA,                    )

6                                           )

7         Plaintiff,                        )

8                                           ) Cause No.

9      vs.                                  ) 4:20-CV-1681-

10                                          ) CDP

11     CITY OF ST. LOUIS, et al.,           )

12                                          )

13        Defendants.                       )

14

15              DEPOSITION OF DARLENE GREEN

16            Taken on behalf of the Plaintiff

17                  February 17, 2022

18

19              Sheryl A. Pautler, RPR,

20

21            MO-CCR 871, IL-CSR 084-004585

22

23         (The proceedings began at 9:42 a.m.)

24                                    **PLAINTIFF'S EXHIBIT**
                                      **HH**

25

1    Is this document for the organization structure

2    under a second deputy comptroller position?

3        A.    This document -- this page is for the

4    deputy comptroller.

5        Q.    Are -- there is -- as of 2019, there was

6    multiple deputy comptrollers; is that correct?

7        A.    There was one deputy comptroller and then

8    there was a deputy comptroller for the Finance &

9    Development.

10       Q.    All right.  So are you saying --

11       A.    What I'm saying -- I'm being very clear

12   and succinct here.

13       Q.    Okay.

14       A.    And I'm being that way because of what

15   you're -- to answer your question correctly.  There

16   was one deputy comptroller.  And then there was a

17   deputy comptroller for Finance & Development.

18       Q.    Okay.  Were those two positions equal

19   level positions, the ones you just named?

20       A.    Not in the same manner as I believe you're

21   asking.  If you can be clear, then I'll be clearer

22   with you.  Can you -- because there is function and

23   there is personnel title and class.  They were equal

24   in personnel title and class, unequal in function.

25       Q.    Unequal in function of terms of the level

Page 52

1  they're at or in terms of their duties?

2      A.   In terms of not only their duties but in

3  terms of the charter responsibilities.

4      Q.   Okay.  Did either deputy comptroller or to

5  be more clear the deputy comptroller versus the

6  deputy comptroller of Finance & Development ever

7  report to the other in any manner?  And I mean in an

8  organizational structure, supervisory, subordinate

9  type role.

10      A.   Both deputy comptrollers report to the

11  comptroller.

12      Q.   All right.  Directly, correct?  There's

13  not any -- anything in between your position and

14  their position?

15      A.   Correct.

16      Q.   All right.

17      A.   But there is a status difference in terms

18  of function in my office.

19      Q.   Okay.  What do you mean by that?

20      A.   Per the charter.

21      Q.   What is the difference?

22      A.   The charter states that there shall be one

23  deputy comptroller.

24      Q.   Okay.

25      A.   And that position on this Page 289 is that

Page 53

1   deputy comptroller per charter.

2        Q.   Understood.  So what's the -- how does

3   that impact their status in an organizational chart

4   as far as being on the same level?  And I mean as

5   far as supervisor support.  Does it at all?

6        A.   Could you be more clear?

7        Q.   Well, I mean, you've answered that they

8   have a different level.  And I'm trying to get at

9   what you mean by that.  Do you mean that in terms of

10  their duties and roles or what the charter defines

11  it or do you mean it specifically as in one is some

12  way subordinate to the other?

13       A.   One is in some way subordinate to the

14  other.

15       Q.   Okay.  And what way is that?

16       A.   Charter responsibility, charter

17  definition, charter function.

18       Q.   To your understanding, does the charter

19  define the deputy comptroller of Finance &

20  Development as subordinate to the deputy

21  comptroller?

22            MR. NORWOOD:  Let me object, because I

23        think it may call for a legal interpretation of

24        the charter.  And it calls for a legal opinion

25        on the part of this lay witness.

1           But subject to that objection to the
2      extent you can try to answer, please feel free
3      to try to do so.
4      A.   The deputy comptroller for Finance &
5  Development did not exist prior to my becoming the
6  comptroller.  The deputy comptroller as defined by
7  charter existed.  The charter states that there
8  shall be additional deputies as added.  This was an
9  added deputy with a specific role, not to replace or
10  usurp the charter's deputy comptroller as required
11  by the charter.
12      Q.   (By Mr. Schmitz)  Okay.  In your job as the
13  comptroller, are you responsible for interpreting
14  the charter in any way?
15      A.   I believe I need to have a clear
16  understanding of the charter in order -- as it
17  relates to my job in order to carry out my job well.
18      Q.   Do you believe you have a clear
19  understanding?
20      A.   I absolutely do.
21      Q.   All right.  So based on that clear
22  understanding, in what way is the position of deputy
23  comptroller of Finance & Development subordinate
24  based on the language of the charter?
25      A.   It is --

1            It's subordinate in the way it was

2    defined by the comptroller at the time and the

3    comptroller at the time was me.  The position was

4    created under my direction expressly for the duties

5    that would be subordinate duties of the deputy

6    comptroller of the office.

7        Q.   Is this something that's been put into

8    writing what you just said at any point?

9        A.   It was, a description of the position was

10   put in writing.

11       Q.   Okay.  Does that description include what

12   you just said, that it was intended to be a position

13   that was subordinate to the duties of the deputy

14   comptroller as listed in the charter?

15       A.   Over the years when both positions

16   existed, the question has come up by deputy

17   comptroller at the time and deputy comptroller for

18   Finance & Development, and it became a question

19   asked and answered and understood.

20       Q.   So my question was, the job description

21   you referred to, was what you just said included in

22   any of those documents?

23       A.   In terms of it being a subordinate

24   position?

25       Q.   Correct.

Page 58

1        A.    I don't recall.

2        Q.    All right.  Do you recall any document

3    where that would be expressly stated?

4        A.    I do.

5        Q.    Okay.  Can you tell me what those are?

6        A.    It would have been in a memo.  And it

7    would have been between -- let's see -- the deputy

8    comptroller -- it would have been in the early

9    2000s.  Deputy Comptroller Bozzo and Deputy

10   Comptroller for Finance, Ivy Pinkston, at the time.

11   There was a big question as to the responsibility,

12   the level.  And it was very clear and made clear

13   that Deputy Comptroller Bozzo had the superior

14   position.

15              The question came because the staff

16   questioned.  The staff needed to be clear as to who

17   to listen to in all phases of the office.  And it

18   was the bottom line that Deputy Comptroller Bozzo

19   was at the helm.  And that was made clear.

20       Q.    In this memo?

21       A.    That I recall.

22       Q.    All right.  Did you write the memo?

23       A.    I did not.

24       Q.    Do you know who wrote the memo?

25       A.    I do not.

Page 59

1      Q.    Were there any additional memos written

2   subsequent to that?

3      A.    Not that I recall.

4      Q.    Would you say, then, that the deputy

5   comptroller of Finance & Development actually takes

6   direction from the deputy comptroller?

7      A.    At times.

8      Q.    Okay.  What times would those be?

9      A.    Because the office is a finance -- it's

10  generally -- I said finance.  But I mean it is

11  largely an accounting office, the deputy comptroller

12  for Finance & Development does not cross over into

13  the duties of the accounting services.  But must

14  coordinate their activities in order that they may

15  work together well in order to produce the work

16  product that's necessary in order for them to

17  operate their jobs.

18            That is critical, that they have an

19  understanding of the functions and positions of each

20  other's jobs so that they wouldn't get crossways

21  with whose responsibility it is in terms of the

22  different work activities that come through our

23  office.  That's very critical.

24            As the comptroller, I also have to

25  have a very clear understanding of the functions of

1  the two deputies.  Chiefly because they are the same

2  class.  Chiefly because it appears that they shall

3  operate at the same level and have the same

4  authority.  And they do not.

5          That is expressly impart -- I have

6  over the years been very clear and expressed to the

7  best of my ability as controller, the importance of

8  the separation of the duties of the two.  As well as

9  the importance of the two deputies working together.

10  Extremely important.

11          We have had times where they would

12  bump heads.  But in the end, and for the best

13  interest of the City, for the best interest of the

14  office, they must work together.

15      Q.   Are there -- so they have distinct

16  functions, is what you're saying?

17      A.   They have distinct functions.

18      Q.   Does the deputy comptroller take direction

19  from the deputy comptroller of Finance & Development

20  when it comes to issues directly under the purview

21  of the deputy comptroller of Finance & Development?

22      A.   In some cases.

23      Q.   So there are times, depending on what the

24  issue is, where both would take direction from the

25  other; is that your expectation?

1      Q.    So my question, just to repeat it, and you

2   answered with one of them:  Are there any other

3   actions that you as the appointing authority as it

4   relates to discipline need approval from the

5   director or the Department of Personnel?

6           MR. NORWOOD:  Let me object.  It calls for

7           a legal conclusion with respect to the

8           interpretation of Reg 117.

9           Subject to that, you can answer to the

10          extent that you can.

11     A.    I'm not aware of any other area of this

12   regulation where I would need approval from the

13   Director of Personnel.

14     Q.    (By Mr. Schmitz)  All right.  These pages

15   don't have Bates stamps.  So I'm just going to ask

16   you to go to Section VI, where it's marked forced

17   leave.  If you can let me know when you have that.

18     A.    I have it.

19     Q.    All right.  Thank you.  Have you ever

20   placed anyone on forced leave or sought approval

21   from the Director of Personnel to place somebody on

22   forced leave?

23     A.    Yes.

24     Q.    Okay.  Have you done it more than once?

25     A.    Yes.

Page 76

1      Q.   If you know, can you tell me approximately

2  how many times that you've participated in this

3  process?

4      A.   Two.

5      Q.   All right.  Can you tell me who those

6  individuals are?

7      A.   Yes.

8          MR. NORWOOD:  Let me object to the extent

9          that we're talking about personnel matters that

10         involve nonparties in this case.  I don't

11         believe that -- well, actually I'm going to

12         differ to the City counselor on the position

13         about discussing the names of individuals who

14         are not parties to this case, and discipline

15         related to those individuals.

16         MR. BLANKE:  Let me just point out for the

17         record that there is a protective order in

18         place which deals with this very thing in

19         depositions.  Where we want to make something

20         subject to that protective order, there's a

21         procedure to do so.

22         MS. HAMILTON:  He's not yet asked for the

23         names.  That's why I didn't say anything yet.

24         MR. NORWOOD:  I think he just did.

25         MR. SCHMITZ:  I did.

Page 78

1          MR. BLANKE:  That's my understanding.

2          MS. HAMILTON:  Either way.

3          MR. NORWOOD:  So then can we have an

4     agreement on the record, then, what we'll do is

5     when we get the deposition transcript, we will

6     designate the pages as confidential?

7          MR. BLANKE:  Absolutely.

8          MR. NORWOOD:  So the record is clear on

9     what portions of that will be confidential.

10          MR. BLANKE:  That's fine.

11          MR. NORWOOD:  Subject to all of that,

12     Madam Comptroller, to the extent you can answer

13     that question, feel free to do so.

14     A.   You want the name?

15     Q.   (By Mr. Schmitz)  Well, you identified two

16 people.  So those two --

17     A.   Yes.

18     Q.   -- subject to those objections.

19     A.   Well, the first person was an African

20 American female named Elaine Spearman.

21          MR. BLANKE:  I'm sorry.  Elaine?

22          THE WITNESS:  Elain Spearman.

23          And the second one was Jim Garavaglia.

24     Q.   (By Mr. Schmitz)  Do you know approximately

25 the time frame for Elaine Spearman subject to the

Page 79

1   same objections?

2         A.   April 20, 2016.

3         Q.   All right.  Are you familiar with the

4   steps that need to be taken, then, in order to have

5   some -- an employee placed on forced leave?

6         A.   Yes.

7         Q.   All right.  And just to be clear, where do

8   those -- the procedure and the steps for that come

9   from?

10        A.   From Regulation 117.

11        Q.   All right.  You already testified that the

12  Director of Personnel must approve that, correct?

13        A.   Yes.

14        Q.   Do you know anything about what that

15  employee's rights are after they've been placed on

16  forced leave?

17        A.   I believe there's a right to appeal.

18        Q.   All right.  And where does that appeal go?

19  Who do they appeal to, the employee?

20        A.   Civil Service Commission, I believe.

21        Q.   All right.  You have G ready.  Thanks.

22             MR. BLANKE:  Sorry.

23             MR. NORWOOD:  That's all right.

24             MR. BLANKE:  Your table is way too big for

25        me.

Page 83

1          A.    Yes.

2          Q.    Okay.  What other documents would bind the

3    City to your knowledge?  I'm not asking for a legal

4    conclusion.  I'm asking based on your role as

5    comptroller.

6          A.    Lease agreements, financial closing

7    documents, development closing documents.  Those

8    documents that are directing the comptroller to sign

9    that have directed the comptroller to sign per

10   ordinance.

11         Q.    Do you make those determinations yourself

12   or do you ever seek help in making that

13   determination?

14         A.    The documents that I have to sign that

15   are, I will call, everyday documents such as

16   contracts and leases are very clear as to the

17   signature from the comptroller.  It's very clear to

18   me in terms of not having to seek a recommendation.

19   It's also clear by the majority of the offices and

20   department -- and particular department heads of the

21   entire City of St. Louis as to the authority and the

22   understanding of the authority -- signature

23   authority in the City.

24         Q.    And so just to reiterate my question, have

25   you ever had to seek counsel --

Page 84

1     A.   Yes, that would have been the second part

2  of my question -- I mean my answer.  You asked a

3  compound question.  And so I gave you the everyday

4  situations for the contracts and leases where that

5  is widely understood, not only by myself, as well as

6  99 percent of all directors and all departments of

7  the City.  That the signature authority lies with

8  the comptroller.  In addition to that, when we have

9  development documents.  Other types of financial

10 documents --

11      MS. HAMILTON:  Madam Comptroller, to the

12      extent that you have sought legal advice, you

13      have answered that there are circumstances that

14      you do.  Otherwise, I will object that the

15      advice and the circumstances under which you

16      sought that advice are attorney-client

17      privileged on behalf of the City of St. Louis.

18      And as you are aware --

19      MR. SCHMITZ:  Well, I'm not asking about

20      the circumstances, and I don't plan to.  So

21      I'm -- especially not particular circumstances.

22      Any questions I'm asking are general in nature.

23      Not anything that relates to any specific

24      instance at this point.

25      MS. HAMILTON:  Even any general type of

Page 86

1          THE WITNESS:  Exactly.

2          MR. SCHMITZ:  I'm not characterizing it in

3      any way.  I'm asking it as a question.  I'm not

4      stating it as what she just said.  So I'd like

5      the witness to clarify that rather than you.

6          MR. NORWOOD:  I'm not clarifying.  I'm

7      making an objection for the record.

8          THE WITNESS:  So you want me to clarify

9      what I've sought and what I haven't sought?

10         Q.  (By Mr. Schmitz)  No.  I'll ask it in a

11   different way.  In other words, leases and contracts

12   are those -- you said that's generally understood as

13   something that needed to be signed by the

14   comptroller only; is that your testimony?

15         A.   As per charter, responsibility of the

16   comptroller, I understand that those documents that

17   include leases, contracts that bind the City, I sign

18   and without -- and generally without seeking

19   additional advice.  And that is because the charter

20   provides.

21         Q.   Okay.  So just so that I'm not

22   misunderstanding.  Generally speaking you made that

23   determination yourself?

24         A.   Well, in my position as comptroller, and I

25   want to be real clear that this is a job.  This is

Page 91

1   supervisors.

2       Q.   All right.  Do you know who was

3   responsible for preparing and generating these

4   rules?

5       A.   Yes.

6       Q.   All right.  Who?

7       A.   Elaine Spearman.

8       Q.   Did she do that with your assistance?

9       A.   No.

10      Q.   How did she know what rules to have for

11  the Office of the Comptroller?

12      A.   As an employee and an attorney in the

13  Office of the Comptroller gaining -- I believe she

14  would have gained the knowledge of the personnel

15  rules and would put this together to adhere to those

16  rules that would be personnel rules when this

17  document was prepared.

18      Q.   Do you know when this document was

19  prepared?

20      A.   It says 1999.

21      Q.   It does.  And then do you see what it says

22  on the front page below that?

23      A.   Yes.

24      Q.   What does it say?

25      A.   Updated and reissued February 2010.

Page 114

1    that position?

2         A.    Could you be more clear?

3         Q.    Well, I want you to say whatever is

4    responsive to the question.  So you know he was

5    ultimately picked as the replacement deputy

6    comptroller of Finance & Development, correct?

7         A.    Correct.

8         Q.    So what was your involvement, if any, in

9    making that selection?

10        A.    I reviewed the list of six people.  And I

11   remember interviewing the people, each of the

12   people.  And there was one individual who was in the

13   finance industry at the time that I was interested

14   in who I had actually spoken with prior to --

15   actually spoken to and was among the people who were

16   actively, I guess, looking at the position from the

17   financing.  In other words, an investment banker was

18   on that list.

19        Q.    Okay.

20        A.    Investment banker was on that list.  And

21   that investment banker was very interested in the

22   job.

23        Q.    Do you recall who that individual was?

24        A.    Ron Browning Smith.

25        Q.    You said Ron Browning Smith?

Page 115

1      A.   Yes.

2      Q.   Okay.  And what happened with that?  Did

3  he -- you did not hire him obviously.  So --

4      A.   He was offered the job.

5      Q.   Okay.  Did he decline?

6      A.   Yes.

7      Q.   Do you know approximately how old he is?

8      A.   Over 70.  At the time, he was 70.

9      Q.   Can you tell me, do you recall what race

10  he is?

11      A.   Black.

12      Q.   All right.  So after he declined the job,

13  what did you do next?

14      A.   I reviewed other candidates and reviewed

15  my options.  And eventually made a determination

16  that I believe was in the best interest of the -- of

17  the Office of the Comptroller to talk with Jim about

18  considering accepting the job with making some

19  changes.

20      Q.   What changes are those?

21      A.   The job that in its current form and as it

22  was advertised would be changed to have less duties

23  than would be there for the finance functions.  And

24  the reason for that was since he was an asset

25  manager, that he would also maintain his duties as

Page 116

1   asset manager.  And I needed to know if he was

2   accepting of that type of arrangement prior to

3   accepting the position.

4        Q.    Okay.  So the duties of the asset manager

5   were not one that Ivy Pinkston --

6        A.    That is correct.

7        Q.    All right.

8        A.    My reason for that was because Ivy

9   Pinkston did not ever have Jim involved in the

10  business of Finance & Development while she was

11  deputy comptroller.  I was very observant of that.

12  I understood that Jim did not have the skills

13  required to be in the position, even though he had

14  worked under her as asset manager.

15            He had never interacted with bankers,

16  investment bankers, and the attorneys that were bond

17  attorneys, and those professionals that worked in

18  the area while Ivy Pinkston was the deputy

19  comptroller for Finance & Development.  Jim was not

20  assigned in that area at all.

21            I was observant of that, because she

22  did come down with an illness.  I was observant of

23  who she would put in charge of certain areas that

24  she was -- had charge over.  Candace Gorden, Ryan

25  Coleman, Eunetter Steele, became those individuals

Page 117

1    that I as the comptroller rely on for all of the

2    business of Finance & Development while Ivy Pinkston

3    was the deputy comptroller --

4         Q.   Okay.

5         A.   -- of Finance & Development.  Jim was

6    fully in his role and very active as the asset

7    manager and all the duties that was under him.  But

8    none of them crossed over into the Finance &

9    Development area.

10        Q.   So when he became the deputy comptroller,

11   did those people continue to perform those duties?

12        A.   Candace Gorden retired.  She was the top

13   person under -- the top assistant under Ivy

14   Pinkston.  And she retired.

15        Q.   So who performed those duties after that?

16        A.   Eunetter Steele was --

17        Q.   Before you jump to that, I want to make

18   sure we don't get too confused.  Candace --

19        A.   Retired.

20        Q.   -- she retired, who took on those duties?

21        A.   I did.

22        Q.   So that was not something that fell under

23   Jim?

24        A.   It did not.

25        Q.   All right.  And then you were mentioning

Page 118

1   somebody else?

2        A.    Ryan Coleman.

3        Q.    I think you said Eunetter?

4        A.    Eunetter Steele.

5        Q.    Did she remain in her position --

6        A.    Yes.

7        Q.    -- after Jim got promoted?

8              Okay.  Who did she report to?

9        A.    I do not recall, because I don't know if

10   Jim would -- accepted her as an employee or if she

11   reported to someone else.  I do not recall that.

12   She was the direct assistant -- administrative

13   assistant to Ivy Pinkston.

14              What I know for sure is that the

15   protocols that was established for that work

16   progress for Finance & Development was no longer

17   followed.  Eunetter Steele had developed the work

18   protocol with the leadership of Ivy Pinkston.  After

19   Jim took the position, those protocols fell apart.

20        Q.    Can you elaborate on that?

21        A.    Eunetter Steele remained in her position

22   after the passing of Ivy Pinkston, and made herself

23   available to assist, to train, and help in any way

24   whatsoever for the new deputy comptroller for

25   development, which was Jim Garavaglia.  I was told

Page 119

1  and observed that those protocols were not followed.

2  Those were instructions of my office from me, the

3  comptroller, to have those well-oiled procedures and

4  policies to be continued.  And they were not

5  followed.

6        Q.   Who told you that?

7        A.   I observed --

8        Q.   I know you said that.  Who told you that.

9  You said somebody told you?

10        A.   I didn't say that.  I said I observed.

11        Q.   You said I was told -- could you read the

12  record back just to be clear?

13            THE COURT REPORTER:  Answer:  Eunetter

14        Steele remained in her position after the

15        passing of Ivy Pinkston, and made herself

16        available to assist, to train, and help in any

17        way whatsoever for the new deputy comptroller

18        for development, which was Jim Garavaglia.  I

19        was told and observed that those protocols were

20        not followed.  Those were instructions of my

21        office from me, the comptroller, to have those

22        well-oiled procedures and policies to be

23        continued.  And they were not followed.

24        A.   I was told by Eunetter Steele and by my

25  assistant, Chana Morton.

Page 120

1      Q.    (By Mr. Schmitz)  Was that something that

2   Chana Morton -- it was part of her job expectation?

3      A.    Absolutely.

4      Q.    Okay.  So just to be clear, your

5   administrative assistant, one of her job roles is to

6   observe the practices of the deputy comptroller and

7   the deputy comptroller for Finance & Development?

8      A.    One of her roles is to make sure that the

9   comptroller's instructions that she is well aware of

10   and understands is adhered to when it comes to

11   receiving documentation on behalf of me, the

12   comptroller.  She understood the well-oiled system

13   because it existed from the beginning of the

14   creation of the position itself.

15              It was not rocket science.  We were

16   handling and managing very important financial

17   documents that had not, before the position,

18   occurred as regularly as it was occurring during my

19   administration.

20      Q.    When did you become aware of this?  You

21   said you observed it and you were told by two

22   individuals.

23      A.    Mishaps occurred.

24      Q.    No.  My question is when.

25      A.    Mishaps occurred when Jim Garavaglia, when

Page 121

1    he was --
2         Q.    When did you become aware of it?
3         A.    I became aware immediately upon Jim
4    Garavaglia's handling of documentation that was
5    Finance & Development that was mishandled.  In other
6    words, the handling of the documents was no longer
7    the same as had been before he took the position.
8    So that was an immediate.
9         Q.    Okay.  So --
10        A.    It was immediate.  And I -- not only was I
11   observing it, but I asked a question about it
12   because I needed to know who and why.  It was that
13   important to know.  I did not want to jump to a
14   conclusion and say that it was somebody when it was
15   not.  But I needed to know.  So the observation was
16   immediate.
17        Q.    Okay.  So what steps did you take in
18   response?
19        A.    I asked questions.
20        Q.    To whom?
21        A.    Eunetter Steele, Chana Morton, Jim
22   Garavaglia.
23        Q.    And then what?
24        A.    I was given answers.
25        Q.    And then what?

Page 122

1        A.   And then I had to observe the next go

2   around to see if there were corrections made based

3   on instructions that I had given after having the

4   discussions about the process and how the process

5   should go.  And this is a process about making sure

6   that there's a circulation of the documents which

7   was efficient and in order to make sure that we are

8   meeting deadlines.

9             Whenever there's a financing, there's

10  deadlines that are in place.  Elected officials are

11  not always going to be at their desk, the major, the

12  comptroller, the treasurer and other signers of

13  public officials that were supposed to sign the

14  documents, were not necessarily going to all be in

15  one place during the time the documents were

16  approaching for signature.  And the deadlines were

17  in stone; not the individuals.

18       Q.   Okay.  Before we talk about the process at

19  length --

20       A.   You're cutting me off, sir.  I would like

21  to finish and it won't take long.  And it's very

22  important.

23       Q.   Go ahead.

24       A.   Like I said, the deadline was in stone,

25  but not the individuals.  So what was in place was

Page 123

1   for the secretaries of -- and assistants, the

2   assistants for each elected official and other

3   officials who were going to sign the documents to

4   find out where those individuals would be and to

5   inform them that there were some important documents

6   that were going to be coming within a certain time

7   period or window.  And then they would arrange among

8   themselves when to get the documents to those

9   individuals so that the deadlines which were very

10  important could be met without question.

11              Over a couple of decades, that worked

12  perfect.  Then all of a sudden, I observed a

13  dismantling of that system, a well-oiled system that

14  seemed to just stop working.  And while Eunetter

15  Steele was still present, I couldn't understand.  So

16  maybe there's something that I'm not understanding.

17  So I kept going back, giving the instruction, to

18  make sure you follow direction.  And then those

19  directions were not followed by Jim.

20      Q.   And you've documented this?

21      A.   I did.

22      Q.   Over the course of his time as the deputy

23  comptroller?

24      A.   Yes.

25      Q.   Okay.  Where is that documentation?

1      A.   The documentation would be in the form of

2   a narrative given to an attorney which I believe you

3   also have the narrative.

4      Q.   Was it -- okay.  You are referring to

5   documentation in July of 2019?

6      A.   It follows --

7      Q.   Was there any documentation prior to that?

8      A.   I believe so.  But I can't recall

9   specifically at this time.  But I believe so.

10      Q.   Okay.  How long was Jim the deputy

11   comptroller?

12      A.   From, I believe, June -- May or June of

13   2016, until he retired in 2019.

14      Q.   So in those three years before he was

15   placed on forced leave, what was done in response to

16   what you just articulated you observed and were also

17   told by two different individuals?

18      A.   Well, let me give you an example.  I got a

19   call from Joyce Opinsky, who's a banker with Stern

20   Brothers, the morning of a closing of a financing.

21   She was alarmed.  It was in the morning.  I was on

22   the way to a doctor's appointment.  Joyce Opinsky

23   said:  If you don't mind, Comptroller, I need your

24   signature.

25              I was in shock.  I said:  Joyce.

Page 125

1              She says:  Comptroller, whatever you

2       do, I need your signature by noon.

3              I said:  But Jim -- and I remembered

4       this so well because her office was in Clayton and I

5       was driving to my doctor's appointment at the time.

6       I said:  Joyce, no worries.  I'll swing by your

7       office.

8              I'll come down the elevator.  I'll

9       meet you in the lobby.

10              I went to Stern Brothers.  I signed

11       the document.  And Joyce and I spoke about how this

12       is happening, how this is happening, and how this

13       had to happen.

14              She says:  I don't care about what

15       you guys got to do.  In order to sell these bonds, I

16       need your signature.  Thank you so much.

17              I went to my doctor's appointment.  I

18       didn't hear from Jim that day.  But what I heard

19       from others in the office is that Jim was surprised

20       that the document was signed.  That was the first

21       time I observed that I'm aware --

22       Q.   Did you speak to Jim about this?

23       A.   I did not.  Jim did not call me.  He's my

24       subordinate.

25       Q.   Did you seek to talk to him about it?

1    A.    I probably was more concerned with my

2  health on that day that I had just come from the

3  doctor.

4    Q.    Did you follow up?

5    A.    I did not follow up until later on in the

6  weeks.  Because certainly there were other documents

7  that were circulating.  And, yes, I pulled Jim into

8  the office for a conference and a consultation on

9  matters that had to do with signing documents and

10  circulating them.  I did that multiple times.

11            Not only was it Jim and his

12  secretary, it was also Jim's secretary and Eunetter

13  in my office to have consultation on circulation of

14  the documents and the understanding of such in terms

15  of the importance of how you get the documents

16  circulated properly to let the elected officials

17  know that you'll meet them at a certain time and

18  place to sign documents, instead of having an

19  investment banker to call you while you're on the

20  way to the doctor.

21    Q.    So when was this?

22    A.    This was early on in Jim's tenure as

23  deputy comptroller.  He began June of -- or June of

24  2016.  So it was either the 2016 or 2017 year.  It

25  was early.  It was early enough to alarm me that I

Page 127

1    had to have a call from an investment banker to ask

2    for my signature instead of my subordinate who was

3    Jim Garavaglia, who should have called me or my

4    assistant to find out where I would be to sign a

5    document so it could be in time for the closing.

6              That's millions of dollars of City

7    taxpayer's dollars that we're talking about here.

8    And I had given strict instructions on how, that

9    these procedures for signature should happen.  And

10   Jim did not follow them.

11        Q.   Where are these procedures?  What document

12   are they contained in?

13        A.   These procedures come from the comptroller

14   verbally.

15        Q.   Did you ever memorialize any of these

16   strict detailed instructions?

17        A.   Yes.  Eunetter Steele did that.

18        Q.   Where are they?

19        A.   I don't -- there was a fold -- there's a

20   thick book in the Office of the Comptroller which

21   was shared with Jim's secretary, from Eunetter

22   Steele to Jim's secretary.  And it happened in my

23   office.  I was sitting right there.  I said:

24   Sheila, are you going to do this work here that

25   it -- it says this is how you circulate these.  Are

1      A.   My testimony is the document was made

2    available by Eunetter Steele to help and assist in

3    any way she could, Jim Garavaglia, the secretary to

4    Jim Garavaglia, any assistant to Jim Garavaglia to

5    get the job done.  That's my testimony.

6      Q.   Okay.  So this document was created.  You

7    were aware of it.  You are saying that Jim was

8    provided with it.  Was expected to follow it but

9    didn't right out of the gate and continuously

10   throughout his employment.  Did you not follow up

11   with him?  Did you not take any type of disciplinary

12   action?

13     A.   I followed up with him, yes, and I

14   followed up with him regularly.

15     Q.   In what way?

16     A.   I gave Jim verbal reprimands regularly.

17     Q.   Did you ever put that in an e-mail?

18   Anything related to this issue and his noncompliance

19   with your expectation get memorialized in writing?

20     A.   I'm not sure.

21     Q.   So you're unaware if it did or didn't?

22     A.   I an unsure that I memorialized it in

23   writing on this particular issue, I am unsure.  But

24   I'm very sure that I gave direct instructions to Jim

25   on how to circulate documents.  And I'm very sure

1  that he did not ever follow those instructions as I

2  had given them to him.  And it was very troubling to

3  me that he couldn't do that, because I did take the

4  time and the steps to continuously speak to him and

5  also monitor and also speak to other professionals.

6          Q.    Then there were witnesses to all these

7  conversations?

8          A.    There was not direct witnesses to when I

9  spoke to Jim.  But there are people that I spoke to

10 about the problem.

11         Q.    Okay.  Who would those be?

12         A.    Well, I spoke to -- one of the persons

13 that I spoke to was the financial advisor.  I

14 mentioned very casually that I was experiencing an

15 issue.  And her response was very short.  And I

16 decided that I needed to be more vigilant in my

17 observation so that I would not miss or misinterpret

18 or misunderstand whether there was a

19 misunderstanding on Jim's part or his staff.

20         Q.    Okay.  And what determinations did you

21 make?

22         A.    I determined that after I had given Jim

23 Garavaglia a directive and direct instructions, that

24 not only did he not follow them, was that he was not

25 going to follow them, is what I determined.

Page 131

1      Q.    When did you make this determination?

2      A.    I made that determination after the fiasco

3  that happened with the documents with the real

4  estate closing of Vertical Realty.  I knew then with

5  that fiasco that Jim was never going to follow the

6  directive and protocol and procedure to circulate

7  the documents in a professional manner, in a proper

8  manner, so that they could be signed and a deadline

9  could be met properly.

10     Q.    All right.  So describe this process to

11 me.  What -- give me the detailed description of

12 exactly what should have been done and what should

13 be done in each one of these cases?

14     A.    We have financial closings that involve

15 investment bankers.  But you also have financial

16 closings or extensions or development deals.  You

17 have all of those kinds of dealings.  Each of those

18 kinds of deals, you have different protocols.  But

19 the bottom line is you have different persons who

20 need to be available to sign the documents.  And the

21 job is to act in a sense of urgency to meet the

22 deadlines on behalf of those who are developers, who

23 are expecting that their project shall be closed on

24 time.  And on behalf of the City of St. Louis who's

25 the issuer of the bonds in most cases.

Page 132

1           City of St. Louis Airport is an

2    example.  Water department, another example.

3    Parking division, another example when it comes to

4    issuing bonds and expecting to adhere to deadlines

5    and meeting those deadlines.  Because again, those

6    are hard deadlines.  The people who have to sign the

7    documents are not.

8        Q.   How many of those deadlines were missed

9    during Jim's tenure?

10       A.   During Jim's tenure, the deadlines were --

11   that were there for each of those were not all met

12   because of Jim.  Because Jim --

13       Q.   Is this documented?

14       A.   Yes, it is.

15       Q.   So there's sales that --

16       A.   Yes, it is.  For example, Vertical Real

17   Estate's closing, that deadline was met without Jim.

18       Q.   So it was met?

19       A.    It was met because I'm observing and I

20   took a special role to observe once I found out that

21   Jim was not handling the documents properly.

22       Q.   So my question was, how many deadlines

23   were not met?

24       A.    I heard your question.  And I gave you an

25   answer.

Page 134

1      don't agree with you, but it's on the record.

2      Q.   (By Mr. Schmitz)  Now, how many times were

3  deadlines not met?  One?  Two?  Five?

4      A.   There were no deadlines not met, but it

5  was because of the Comptroller, Darlene Green, who

6  is sitting here answering these questions to you and

7  the staff of the comptroller put in place a

8  procedure and a process to make sure deadlines are

9  met.  It is our job to do the right thing in the

10  Office of the Comptroller to protect the integrity

11  of the office, is what we were doing.

12      Q.   Well, I mean you're laying all the blame

13  at the feet of Jim.  So my question is, how many of

14  these bonds were effected negatively and you've

15  answered my questions.  Now, how many bond sales

16  were successfully completed during Jim's time as

17  comptroller?  Did you look at that?

18      A.   Is that a question?

19      Q.   It is, yes.

20      A.   Did I look at it?

21      Q.   Do you know the answer?

22      A.   Do I know the answer to what?

23      Q.   Do you know the answer?

24      A.   The answer to whether I looked at

25  something or the answer to how many bond deals

Page 140

1    and Jim was present along with other members of the

2    staff.  There were just multiple meetings.

3         Q.   Okay.

4         A.   It was pretty common.

5         Q.   So I'm going to go back near the very

6    beginning.  Do you ever recall talking to him about

7    his future in that job?

8         A.   Yes.

9         Q.   Did you talk to him about how long he

10   intended to work?

11        A.   I wanted him to stay there as long as

12   possible.  That's my MO, modus of operandi.  If I'm

13   working, I want you to be working.  I want you

14   working with me.  I want you working alongside me.

15   I want you to be a partner in the job of working in

16   the Office of the Comptroller.

17             I am very well-known to have been a

18   person that promotes from within.  And am very

19   hopeful that the people who work for me want to work

20   for me forever.  Because I like to train, help

21   educate, I want to see people do well.  I want to

22   see people that work for me to do well.  And I've

23   shown it in my practice.  When I promote you, I have

24   elevated you to a place of responsibility along with

25   more salary.  Not only to help you but help your

Page 141

1   family.

2                Because you have chosen to work in

3   the Office of the Comptroller, I believe in giving a

4   benefit for that.  I believe that is something that

5   will help the individual employee enjoy the job even

6   that much more.  So that they would want to continue

7   on working for the Office of the Comptroller.

8                Because there was a lot of times that

9   employees didn't get raises.  But if they got a

10  promotion, then a raise came with that.  That I

11  would hope that that would cause them to want to

12  have a loyalty to the Office of the Comptroller and

13  to work in the Office of the Comptroller.  Because

14  the Office of the Comptroller in the City of

15  St. Louis was an office that I felt, I guess -- we

16  did a lot of good for the community.  I really

17  believe that.

18               We were complimented a lot in terms

19  of how we served the public, especially during times

20  when the public would call, ask for services.  And

21  instead of us saying, sorry, you got the wrong

22  office, we'd say wait one moment.  We will direct

23  you to the people that you need to talk to.  And we

24  were happy to have that reputation.  And I was happy

25  to have an employee that would want to stay with the

1    Office of the Comptroller.  That had experience and

2    that had worked in the community, that had family

3    ties in the community.  It was very important.

4        Q.   Did you ever talk to him about retirement

5    in the beginning?

6        A.   I talked to him about retirement hoping

7    that he would not retire, is what I would most

8    definitely have said to him as well as employees

9    that worked for me.  I hope you wouldn't retire

10   because we need you, want you, in the job.

11       Q.   Do you -- did you talk to him by phone or

12   in person when you --

13       A.   In person.

14       Q.   No.  When you offered him the job?

15       A.   I'm not sure if it was by phone or in

16   person when I offered him the job.  I don't know.  I

17   just can't recall right now.

18       Q.   Do you recall ever asking him if he was or

19   stating to him that he would be going out on top?

20       A.   Well, in the most complimentary way I did.

21   I was so happy that he was now making a lot more

22   money than he would have been making had he not been

23   promoted to the job.  So that being the top job in

24   the office, I was ecstatic for him.  And I expressed

25   that to him.

1           Because now instead of having an

2  Asset Manager II salary to retire on whenever he

3  chose to do that, he would retire at the top

4  position that he could have in the Office of the

5  Comptroller.  And by God, I was wanting to

6  congratulate him on that.  Because I was happy about

7  it.  And I would hope that he would be happy about

8  it.

9       Q.   Do you know if anybody else was a witness

10  to that conversation?

11      A.   I'm not sure.

12      Q.   Okay.  You don't recall?

13      A.   No, I don't recall.

14      Q.   And did you ever think about if Jim

15  retired or was no longer in that position, who his

16  replacement might be?

17      A.   Yes.  I did think about that.

18      Q.   Okay.  Did you have any thoughts or plans?

19      A.   Well, I thought about it in terms of the

20  asset manager portion of it, is that what you're

21  asking, or are you asking about the deputy

22  comptroller?

23      Q.   Well, I'm asking if you ever thought about

24  who might replace him.

25      A.   While he was in the position?

Page 144

1      Q.   Yes.

2      A.   No.

3      Q.   I know we talked about after he was in the

4  position, you guys met.  And I'm not going to repeat

5  and get into that again.  But I do want to ask about

6  a meeting that may have been around March or April

7  of 2019 between you and Bev Fitzsimmons.  I don't

8  know if that's enough information to help you to

9  know if that meeting happened or not or if you

10  recall.  But I'll ask that now.

11           Do you recall based on that

12  information, a meeting in or around March,

13  April '19 regarding your running for reelection?

14      A.   No, I do not recall.

15      Q.   Okay.  Do you recall any specifics of any

16  conversation you had with Jim where you may have

17  asked him if he intended to retire and when?

18      A.   In the same year or could you --

19      Q.   During any point.

20      A.   I would have had a conversation with Jim

21  and my other deputy comptroller as to whether they

22  would be in my office working for me as long as I

23  was the comptroller.  That would have been the

24  conversation that I would have and have had in the

25  past with deputy comptrollers of the comptroller

Page 145

1   since I had the job.  Because every four years, I

2   would not know whether I had a job.

3                But I did know that as a civil

4   servant, the employees that work for me, they would

5   have a job.  So I wanted to know if they were still

6   wanting to be there working for me in the Office of

7   the Comptroller.  So that would have been the

8   question that I would have had.

9        Q.   So you used the words "would have."  Do

10  you have any specific recollection of any particular

11  meetings where you recall having that actual

12  conversation?

13       A.   I would have made the statement similar to

14  or in the context of hope -- that I would hope that

15  they were not going to retire if I'm planning to run

16  for reelection.  Running for reelection never

17  guaranteed whether I was going to be elected or not.

18  And a high-level employee would be in jeopardy when

19  or if I was not elected.  I was clear about that.

20               I was very protective of my

21  employees.  So I didn't want to put any jeopardy in

22  their way if I plan to just not run for reelection.

23  So I'm saying it was like kind of a team, a work

24  team, if you will.

25       Q.   Do you recall actually having that

Page 146

1    conversation, though, specifically?

2          A.    With Beverly and with Jim at some point.

3    I met with them both --

4          Q.    So you did --

5          A.    -- to let them know.  This was June 11,

6    2019 in the 1520 building, the same day that there

7    was a special E&A meeting scheduled.  And I asked

8    for a meeting with Beverly and I asked Jim to join

9    me on that day.  To instead of going to the E&A

10   meeting, which was June 11, 2019, I would be absent

11   and I asked that my staff be absent.  And in lieu of

12   going to the E&A meeting, we would meet and just

13   talk.  And that was June 11, 2019.  And we talked

14   about several issues.

15                One of the first ones was whether or

16   not any of us had heard from the airport or the

17   airlines regarding the issue of the airline or

18   airport financing.  Because that was the issue that

19   the mayor wanted the special meeting about, to vote.

20   And the airlines -- I had understood as I was going

21   into that meeting, I just heard that the airlines

22   had threatened to come or show up if there was such

23   a meeting to be held.

24                So I thought it would be best to be

25   outside of city hall and nowhere near just in case

1    there were some issues of press.  Later after that

2    meeting, we learned that the airlines had sent the

3    mayor a letter at noon on that day letting her

4    specifically what she needed to do with regard to

5    that airport financing and what their purpose was.

6    They said they prefer the comptroller's financing to

7    whatever she was proposing.  And that if there was

8    such a vote that would go awry of that, that she

9    would hear from them.  And that letter came from the

10   American Airline and Southwest Airline.

11           So that day was a very memorable day

12   because of that issue.  And I know who I was with.

13   I was with those -- and as a matter of fact, the

14   meeting was at 2:00 at the same time the scheduled

15   E&A meeting was.

16       Q.   And did this meeting include discussions

17   about their future plans?

18       A.   It included conversations about whether or

19   not -- in addition to the conversation, which a

20   large part of the conversation had to do with the

21   airport, and the other part had to do with whether

22   or not they were wanting to be in the comptroller's

23   office, that was what that was about.  And I

24   remember asking if they had any concerns.  Do you

25   have any concerns?

Page 148

1          I remember asking about Jim's
2   secretary Sheila, because there had been some
3   problems which was discussed about the circulation
4   of documents, which I was led to believe she was the
5   problem with that.  So I made a point to ask him
6   face-to-face about Sheila, was she okay, was she
7   going to be okay following the instructions.  I made
8   the point to talk about whatever it is that they had
9   asked me.  That Beverly had asked.  She was present.
10  You know, the three of us was present in the
11  conference room.  I believe we stayed for an hour or
12  less in the meeting.
13          Q.   Okay.  Did you ever give Jim any service
14  ratings?
15          A.   I did not, except for when I had to by --
16  I believe to his working test period.
17          Q.   Okay.  Any particular reason why not?
18          A.   Because I don't give ratings generally to
19  any of my employees.
20          Q.   You say generally, is --
21          A.   Generally unless they ask for it and force
22  me.
23          Q.   Did you give ratings to Bev?
24          A.   For her working test period, I believe I
25  did.

Page 153

1    that.

2                   If you know, whose decision was it to

3    have him immediately escorted off the premises

4    without even an opportunity to get his personal

5    items?

6        A.   I don't know if that was a decision made

7    that was -- I don't know or not.  But what I know is

8    that Judy Armstrong is the appointing authority for

9    personnel.  And that she had the authority to set a

10   process in place for managing all personnel actions.

11       Q.   Were you aware this was going to happen

12   when he was presented with this forced leave?

13       A.   I was aware that he would be presented

14   with the information.  I was aware of that, yes.

15       Q.   Okay.  What about being escorted out, not

16   being allowed to take personal items, that sort of

17   thing?

18       A.   I don't know if I was aware at the time, I

19   don't know.

20       Q.   Why did you decide to place him on forced

21   leave instead of issue a pretermination notice?

22       A.   I had a couple of weeks of disturbing

23   incidents.  One being at the E&A meeting.  The

24   second being the second week, the Wednesday before

25   the Vertical Realty documents needed to be signed,

Page 154

1   which was that Friday they needed to be signed, but

2   on that Wednesday, I got an e-mail from Tom Ray,

3   outside attorney who warned our office that there

4   would be trouble he believed, because he learned

5   that Jim Garavaglia had put the documents in the

6   interoffice mail.

7            So in that e-mail, I discerned that

8   the attorney was trying to protect the integrity of

9   the office with a warning about the documents.  And

10  so I took steps.  I was reminded of what had

11  happened the week before.  And I said, okay, here we

12  are.  Week two, let's get a plan together so that we

13  can have a smooth landing.

14           And so I took it upon myself to ask

15  my secretary to set up a conference call.  Tom Ray,

16  I said, place him on the conference call with the

17  secretary of the mayor, which was Sherry

18  Wibbenmeyer, myself, my secretary, and

19  Jim Garavaglia.  Those five people on the call.

20       Q.   What date was this?

21       A.   This was Wednesday, June 26.  And it was

22  roughly around 4:00, a little after 4:00.  We had

23  been given -- the e-mail had been received after

24  2:00 from Tom Ray, outside counsel, warning my

25  office about pending trouble because documents had

 1   been placed in interoffice mail.  In that e-mail,

 2   Tom Ray stated that Jim should not have asked

 3   Sherry, the secretary, to place the documents in the

 4   interoffice mail.

 5        Q.   Is Tom Ray familiar with the circulation

 6   process for the City?

 7        A.   He's extremely familiar with them.  He's

 8   worked over 30 years plus on finances and anything

 9   and everything to do with the Office of the

10   Comptroller.  He was a former City counselor.  And

11   his job was to be counsel to the Office of the

12   Comptroller.  And subsequent to that, he joined the

13   law firm of Armstrong Teasdale and continued to work

14   on financial matters for the Office of the

15   Comptroller.

16             So he was familiar with the

17   operations that had been put in place by Eunetter

18   Steele about circulating documents.  And he had the

19   acute understanding that the secretaries had to make

20   sure that their bosses were in a place to sign the

21   documents.  As a matter of fact, that e-mail was

22   sent to Chana Morton because of his acute knowledge

23   of how the circulation process worked.

24             Of course he would sound the alarm

25   when he found out that the documents had been placed

Page 156

1    in interoffice mail, because he probably never heard

2    of such.  And he stated in that e-mail that Jim

3    should have never put those documents in the

4    interoffice mail.  These were important real estate

5    documents.  As a matter of fact, they were down the

6    hall at the mayor's office.  And the format that Tom

7    Ray was used to, one or the other secretary would

8    walk the documents down.  If Sherry was busy, then

9    my secretary would walk down the hall and get the

10   documents and have them ready for review.

11            So that's the common practice that

12   Tom Ray was used to.  And he also stated those very

13   words in his e-mail.  He said:  Sherry should have

14   walked the documents down.

15            So in answer to your question, why

16   did I consider a forced leave instead of immediate

17   disciplinary action, is because I needed to think

18   about what the disciplinary action should look like.

19   Q.   What do you mean by that, you needed to

20   see what the disciplinary action would look like?

21   A.   I wasn't clear.  Jim was a valued employee

22   I had.  Jim had many years in the Office of the

23   Comptroller.  I said, no way I'm going to fire this

24   dude.  I said, I'm going to look at this.  I'm going

25   to see what we need to do here.  So I called up and

Page 157

1   had a discussion with the Director of Personnel and

2   explained the problem that I had, and gave him in

3   detail.  And he told me, he said:  Well, Jim's a

4   high level employee of yours.  We have forced leave

5   to deal with employees like that.  Then you can make

6   your decision.

7                    I said:  Well, you know, you're

8   right.  So I chose to look at forced leave that

9   would give me at least ten to 14 days to make a

10  decision that was fair to Jim.

11       Q.   Did you want --

12       A.   I wanted to make a fair -- if you want me

13  to finish, I will.

14       Q.   Go ahead.

15       A.   I wanted to make a fair decision.

16  Something that was fair to Jim.  I didn't want to

17  make a decision that was hasty.  I wanted time to

18  think, because these were serious matters.  I wanted

19  to know Jim understood how serious this was.  This

20  is City money.  This is a project that we had been

21  working tirelessly on for many, many years.  And we

22  finally got it to a place where these guys were

23  going to get this hotel built.  And we've got one

24  more extension.  Everybody was hanging on, letting

25  me get this one more extension.

Page 158

1              This was a project that started out
2    of our office, out of the Office of the Comptroller.
3    So I was very familiar with it and had been familiar
4    with it for years.  And I was very supportive of it.
5    I wanted it to be successful.  I wanted Jim to be
6    successful.
7         Q.   Did you make the forced leave decision on
8    July 1?
9         A.   I made that forced leave decision on -- on
10   the 28th, on that Friday.
11        Q.   When did you decide that you were going to
12   be seeking termination?
13        A.   I never decided that I was going to be
14   seeking termination.
15        Q.   Can you look at what's marked Plaintiff's
16   Exhibit O?
17        A.   Yes, I have it.
18                  (Whereupon Exhibit O was marked
19                   for identification.)
20        Q.  (By Mr. Schmitz)  If you could turn to the
21   fifth page within that packet, it's dated July 2,
22   2019.  And it's addressed to Mr. Richard Frank from
23   you.
24        A.   It's July 2?
25        Q.   July 2, 2019, yes.  This would be the

1    fifth document in this packet.

2          A.    To Richard Frank from me?

3          Q.    Yes.  Hold on.  I might be counting wrong.

4          A.    Yeah.  I'm on three pages.  This is five

5    right here.

6                MR. NORWOOD:  No.  He --

7                THE WITNESS:  He said five.

8                MR. NORWOOD:  Are you talking about the

9          third page?

10         Q.  (By Mr. Schmitz)  Hold on.  Let me get it

11   right.  Sorry.  Yes, the letter to Jim -- we'll go

12   with the letter to Jim.

13         A.    That's the one on the fifth page.

14         Q.    Right.  Addressed to him from you dated

15   July 2.

16         A.    Yes.

17         Q.    Okay.  Can you just read the first

18   sentence of that paragraph?

19         A.    As of Monday, July 2, 2019, you are being

20   placed on an official forced leave pending a

21   pretermination hearing.

22         Q.    Okay.  So you would agree that a

23   pretermination hearing was already presented as

24   early as July 2?

25         A.    That was the process.  That's what it was

Page 160

1    titled, a pretermination hearing.  It was not meant

2    to be a termination, otherwise it would have stated

3    such.  I was aware that I had options to discipline

4    instead of forced leave.  I chose forced leave

5    instead of discipline.  I wanted to make sure that

6    the discipline that I chose was appropriate for the

7    employee.

8         Q.   Can you circle back to the second and

9    third pages of this exhibit?

10        A.   Yes.

11        Q.   You see there's two different letters to

12   Richard Frank both dated July 2?

13        A.   Yes.

14        Q.   Okay.  Can you tell me why there was two

15   separate letters sent to him?

16        A.   Yes.  The first one and the second one.

17   The first one I'm seeing is the one that had more

18   detail describing actions taken by Jim Garavaglia.

19   The second one does not describe those actions.  I

20   was advised by counsel to be more clear, that Jim

21   did not -- would not know why he was being put on

22   forced leave.

23             MS. HAMILTON:  I'm going to object to --

24        that those conversations are attorney-client

25        privilege.

Page 168

1   know who Ashley McClain is?

2        A.    With the Civil Service Commission.

3        Q.    Were you aware that a civil service

4   hearing had been scheduled as of July 11?

5        A.    Based on the appeal that was filed.

6        Q.    Well, did you receive notice, this same

7   notice -- and I'm going to ask you to just turn the

8   page to this Notice of Institution of Case and

9   Hearing.  Did you receive a copy of that from the

10  Commission?

11       A.    Not personally, no.

12       Q.    Okay.  But were you made aware of it,

13  then, at some point?

14       A.    Yeah.

15       Q.    So you were aware it was scheduled for

16  July 23?

17       A.    I don't recall if I was aware at the time.

18       Q.    All right.  Related to his forced leave

19  and making your decision, after he was placed on

20  forced leave on July 2, what did you do to assist

21  you in making that determination?  I can repeat the

22  question.

23       A.    Please do.

24       Q.    So relative to you making the decision as

25  what to do after he was placed on forced leave, Jim,

Page 169

1   I mean, what actions or steps did you take to help

2   you in making that decision?

3        A.   One of the things, that I spoke with

4   counsel.

5        Q.   Okay.  Did you do anything else?  No need

6   to talk about what counsel said.  We're going to not

7   talk about that.

8        A.   I probably spoke once again to either

9   Linda Thomas or the Director of Personnel.  Those

10  would have been the steps.

11       Q.   Okay.  If you skip forward a few more

12  pages, you'll see a memorandum with Nancy Kistler,

13  with the City counselor's office, Ms. Morton, your

14  secretary, dated July 12, 2019.

15       A.   Yes.

16       Q.   Are you familiar with this?

17       A.   Yes.

18       Q.   Okay.  Who requested that she prepare

19  this?

20       A.   Counsel.

21       Q.   All right.  All right.  Can you

22  fast-forward, then, past those two documents to a

23  memorandum from you to Richard Frank dated July 15,

24  2019.  Do you see that?

25       A.   Is it dated July 15?

Page 173

1         I think it's the other way around.

2              MR. SCHMITZ:  You're right.  Strike that.

3         Q.  (By Mr. Schmitz)  So it's from Linda Thomas

4    addressed to Rick.  And it says:  I told the

5    comptroller to withdraw her request for forced leave

6    on J.G.

7              Do you have any recollection of Linda

8    Thomas telling you to withdraw your request for

9    forced leave?

10        A.   As I stated before, I was in consultation

11   with Linda Thomas and the Director of Personnel

12   along with counsel during those periods of time

13   seeking direction.

14        Q.   Right.  So I don't want you to answer

15   anything that involves counsel's advice or direction

16   or the content of those conversations, but this is

17   an e-mail where Linda Thomas is making a

18   representation to Richard Frank about something she

19   asked you.

20              So I'm asking you in that limited

21   capacity, do you recall her telling you to withdraw

22   her -- your request, excuse me, for forced leave?

23        A.   I recall seeking direction and Linda

24   giving me direction.  The auditor -- state auditors

25   were in the Office of the Comptroller performing an

1   audit.  And I recall speaking to Linda about that.

2                    The auditors had called within days

3   of Jim being placed on forced leave.  The state

4   auditor specifically told me that she had read the

5   paper and learned that Jim was on forced leave.  And

6   that she recognized he was a high-level employee.

7   And specifically she asked, do I have anything to

8   worry about -- or do we have anything to worry

9   about?  And at the time, I told her no, because I

10  didn't believe she did.  That was within the 14

11  days.

12                   After learning that there were

13  documents that were official City documents that

14  were contracts and they were signed by Jim

15  Garavaglia, within a few days later, I called that

16  auditor back.  And I said, I know you're in the

17  office auditing and you are auditing contracts.  We

18  have learned that there's a reason for you to be

19  concerned.

20                   They asked me to send them the

21  documents.  And I did so.  I sent the auditors the

22  documents that had been signed by Jim Garavaglia.

23  And they told me that they would get back to me.

24  Asked what they would do.  And they said they would

25  let me know.

1           So this would have been in a few
2   days.  And then I discussed all of this with Linda
3   Thomas as to what to do now since this is coming to
4   the time we're going to have a hearing and all of
5   this.  She let me know there's nothing wrong with
6   expending an investigation now that you heard from
7   the auditors, now that they're involved.  She said
8   those things in this e-mail, giving me instructions
9   on what I needed to do.
10      Q.   Did the auditor ever present you with a
11  report?
12      A.   The auditors didn't get back to me in a
13  timely manner.  And I did take it upon myself to
14  call to find out if, in fact, there was going to be
15  an audit performed.  And I finally got an answer
16  from the auditors that they were not going to audit
17  the documents that I sent, because they had a
18  specific scope of work that they were interested in
19  completing, which was fiscal year 2018.  And those
20  documents are outside of their scope of work.  And
21  they said they would not be giving me any audit
22  report on that.  And that answer came from them in,
23  I believe, August.
24      Q.   Did they ever subsequently do an audit on
25  2019?

Page 176

1          A.    I never followed up.  As the comptroller

2     of the City, it was my responsibility to follow up

3     if, in fact, I wanted them to take further steps to

4     specifically audit the records surrounding those

5     documents that were signed by Jim Garavaglia.

6          Q.    Okay.  So you didn't ask -- just so I'm

7     clear on your answer, you didn't ask and they did

8     not do it; is that correct?

9          A.    That is correct.

10          Q.    Thank you.  If you could turn the page

11     from that, you see there's a letter to Mr. Frank

12     again dated July 18.

13          A.    Yes.

14          Q.    Okay.  And again you're requesting he be

15     placed on forced leave?

16          A.    Yes.

17          Q.    Did you then withdraw your original

18     request for forced leave as recommended by Linda

19     Thomas?

20          A.    I believe that is the letter dated July 18

21     to Richard Frank stating as such.

22          Q.    Well, I see that you're requesting it.

23     Just so I'm clear, had you already withdrawn your

24     prior requests dated July 2, had you actually

25     withdrawn that request before you issued --

Page 180

1  Ms. Morton on behalf of you, using your e-mail

2  address, wrote:  Dear Mr. Frank, my apologies.

3  Please see attached revised letter.

4           Do you know why approximately 25

5  minutes after Mr. Frank was informed that a letter

6  had been hand delivered, she then sent a revised

7  letter?

8      A.   From what I'm reading here, it states from

9  Richard Frank that he wrote:  Thank you.

10          And he wrote:  Could you also add

11  words "serious" and/or "fiscal" before improprieties

12  to strengthen and clarify.

13     Q.   Right.  I believe, unless I'm wrong,

14  that's in response to what Ms. Morton wrote prior to

15  that.  Because what she wrote is time stamped 2:50.

16     A.   And two minutes later, he writes --

17     Q.   And I'm going to get to that.  My question

18  was not -- I don't want to confuse the issue.  My

19  question was, do you know why Chana sent a revised

20  letter 25 minutes later before he responded two

21  minutes later?  Because it appears there was a

22  letter delivered that was sent and then there's no

23  subsequent e-mail response that was provided to us

24  from Richard Frank, but yet Chana, 25 minutes later,

25  sent a revised letter.  Do you know why there was a

Page 192

1      Q.   I just wanted to make sure that was still

2   the case after your attorney asked that question,

3   so.

4                So you were asking now for a 30-day

5   extension?

6      A.   Yes.

7      Q.   All right.  Why did you ask this at this

8   time?

9      A.   I asked for this extension and additional

10   time, because I had not heard from the auditor.

11      Q.   All right.  And why did you not seek or

12   issue -- Strike that.

13                Why did you not issue a notice of

14   pretermination at this time?

15      A.   I asked for this extension, because I had

16   not heard from the auditor.  And I had preference --

17   or preferred that I hear a response from the

18   auditor.

19      Q.   Did you believe at this point in time that

20   you had a sufficient basis to request termination?

21      A.   Well, that wasn't my concern.  My concern

22   was to have a complete picture of the situation that

23   we had and have a complete picture of my problem.

24   And I thought that with the auditor's input, I would

25   have more clarity and I would have more information.

1    So I wanted to have the auditor's input.  And so I

2    did discuss this with Linda Thomas and Richard

3    Frank.  And then this extension was requested.  And

4    it was later rejected.  But it was requested because

5    I wanted the information.  And I had not heard back

6    from the state auditors.

7         Q.   Had you made your decision as to whether

8    or not you were going to seek termination?

9         A.   No.  I had not made a decision.

10        Q.   All right.  I'm going to fast-forward

11   to -- let me find it.  It's near the end.  It's a

12   letter dated August 28, 2019 from you to Richard

13   Frank.

14             MR. NORWOOD:  Towards the back.  A little

15        bit further.

16        A.   To Mr. Garavaglia?

17        Q.   (By Mr. Schmitz)  No, no.  This is to you

18   from Director Frank.

19        A.   Director Frank?  One page over.  No.  The

20   other way.

21        Q.   Okay.  Do you have it?

22        A.   Yes.  I have the letter.

23        Q.   Do you know or can you tell me why you

24   wrote this letter?  Why did you withdraw your

25   request for forced leave on August 28, 2019?

Page 194

1        A.    That I was preparing for the hearing, a

2    pretermination hearing.  This letter was to request

3    the withdrawal of forced leave in preparation for

4    setting a hearing date.

5        Q.    Okay.  Were you aware there had been a

6    Civil Service Commission hearing scheduled for the

7    following day, August 28, 2019, regarding his forced

8    leave, Jim's?

9        A.    No, I'm not sure I was aware.  I don't

10   recall being aware of that.

11       Q.    Were you aware a motion had been filed in

12   advance of that hearing seeking a motion for

13   continuance --

14       A.    Yes.

15       Q.    -- on the 16th of August seeking to

16   continue the Civil Service Commission hearing date?

17       A.    I believe I may have been advised by

18   counsel.

19       Q.    Were you aware that the hearing officer

20   had denied a request for continuance?

21       A.    I believe I was advised by counsel.

22       Q.    When you did make the decision to

23   terminate Jim?  Was it on August 28?

24       A.    I made the decision to have a

25   pretermination hearing.  And I made the decision to

Page 195

1    have the hearing prior to putting the letter

2    together.

3        Q.    And why did you make that decision on that

4    date?

5        A.    A pretermination hearing would afford me

6    the opportunity to hear from Mr. Garavaglia and to

7    hear from his point of view as he would explain to

8    me his actions, his misconduct, the reasons why he

9    was dishonest with me on several occasions.

10              And then of course after the hearing,

11   I would have two weeks, according to civil service

12   rules, to render a kind of discipline that would be

13   appropriate after hearing from him.  That it would

14   have been unfair to only have one side of the story

15   inserted into a decision for discipline.  And I did

16   not choose to make a one-sided decision for

17   discipline.

18              Mr. Garavaglia had served the City

19   for more than 30 years.  And as his supervisor, I

20   recognized and honored the time spent on the job.

21   And so pretermination hearings afford not only the

22   employee but the supervisor to have a sit-down in a

23   formal manner to get an understanding as to what

24   happened from both sides point of view.

25       Q.    Did you not believe that that opportunity

Page 200

1          A.    Yes.

2          Q.    Do you recognize this e-mail chain that's

3     on this first page?

4          A.    Yes.

5          Q.    Okay.  Do you know what this e-mail chain

6     is discussing or what it relates to?

7          A.    Yes.

8          Q.    Okay.  Can you tell me?

9          A.    On this first page, this e-mail chain is

10    Beverly Fitzsimmons corresponding with Jim

11    Garavaglia as to whether or not he has told me about

12    the extension for the real estate project.  Beverly

13    is admonishing Jim Garavaglia, because she is

14    stating to him that he had told her that I was okay

15    with it.  As she states, You had told me she was

16    okay with it.  Is what I'm reading here that Beverly

17    Fitzsimmons is saying to Jim in an e-mail.

18              Then she's telling him that she --

19    and the "she" is referring to myself -- she told me

20    that she was not.  Did you work this out with her

21    yesterday?

22              And then Jim is replying to her:  I

23    did not talk with her about it, but I will.

24              And then Beverly is responding:

25    Please do it soon, because Stephanie is trying to

Page 201

1   finish the agenda.

2                And the agenda she's referring to is

3   E&A.  This was the Tuesday before E&A.  This would

4   have been at 8:40 in the morning when this

5   conversation ended.

6        Q.   When was E&A?

7        A.   Wednesday, the next day.

8        Q.   Okay.  Did you discuss this with Jim on

9   that date?

10       A.   On Tuesday?

11       Q.   Yes.

12       A.   I believe Jim called me on the day after

13  he had this discussion with Bev.

14       Q.   So the day of the E&A?

15       A.   He called me on the Tuesday after he

16  discussed on that same Tuesday morning after Bev

17  asked him to discuss with me.  And he did say that

18  he would.  And then he called me.

19       Q.   All right.  And what did he tell you

20  during that phone call?

21       A.   I don't recall the exact conversation but

22  it was something to the effect that the mayor's

23  office wanted to put documents for the extension on

24  E&A.  And I thought that was really odd and strange

25  since the project was the project from the

Page 202

1    comptroller's office of which Jim was the leader of
2    the project from its inception even when he was the
3    asset manager.
4                So I was listening to Jim at this
5    point to hear what else he was going to say after
6    saying that to me.  I was like hm-hm, that was kind
7    of like not what I would hear when he finally called
8    me the day before E&A.  Oh, Comptroller, the mayor's
9    office is going to put this on as an item.  Do you
10   want me to send them the documents?
11               Another strange thing out of the
12   ordinary, send them the items.  Jim, I think you
13   already sent them the items, is what I already knew
14   as a fact.  That's when you had pre E&A, which is a
15   week earlier.  The Wednesday before the Wednesday
16   meeting, you discuss with people what you want to
17   add to the agenda.  And by that Tuesday before,
18   Beverly had already informed me that this item was
19   being added or attempted to be added by Jim.
20               So that's why she was having the back
21   and forth with Jim, because I needed to hear from
22   Jim because Jim was in charge; not Beverly.  This is
23   a direct example of how two deputies must coordinate
24   and communicate together in order -- as a team.
25   This is team comptroller's office.  And we're in

Page 203

1    charge of this particular project.  And so both

2    deputies needs to have an understanding that this is

3    a go or it's not.  And Jim was the No. 1 person with

4    that knowledge.

5              Beverly could not usurp his knowledge

6    in any way, shape or form as the Muni Court project,

7    because she was working with the attorneys on both

8    sides.  That would be Tom Ray representing the City

9    and that would be the Spencer Fane attorneys

10   representing the developers.  Jim was all in the

11   mix.  And he was supposed to inform me as the

12   comptroller, as well as any other person in the

13   comptroller's office, that had anything to do with

14   helping this project come along.

15        Q.   Did you ask -- did you ask him why he had

16   waited that long to talk to you?

17        A.   I listened to Jim on the call, on the

18   Tuesday morning call where he called me and told me.

19   He is telling me the mayor's office wants to put

20   this on the agenda.  Comptroller, show us in the

21   document.  I was stunned.  I believe, but not sure,

22   that I may have said to him something to do with the

23   taxes.  But I don't know if I said that, because

24   that was what was on my mind.

25              That was what I was unclear as to

1   whether there had been tax clearance.  I don't know

2   if Beverly knew.  What I did know is that the

3   conversation with Beverly and myself was we're not

4   sure what's going on with the project.  And I

5   couldn't -- she couldn't tell me.  I said, I don't

6   know, because I haven't heard from Jim.

7        Q.   Did you ask him?

8        A.   I didn't ask Jim to do anything except

9   when he asked me, shall I send the documents to the

10  mayor?  I said, send the documents to me.  Now --

11       Q.   When did you talk to Bev before that?

12       A.   I talked to Bev probably right before she

13  talked to Jim.  Because I told her that I hadn't

14  heard from Jim.  She asked me had I heard from Jim.

15  No, I haven't heard from him.

16       Q.   Did you follow up with Jim to ask him

17  those questions?

18       A.   Jim called me.

19       Q.   Right.  I know.  But before that.

20       A.   Beverly asked me -- and I'm trying to

21  answer, because you asked me did I follow up with

22  Jim.  And I think you asked me after I talked to

23  Beverly.

24       Q.   Correct.  Before he reached out to you?

25       A.   No.

1    item.  And that's the Muni Court item.  Jim had told

2    me earlier in the month, the first week in June,

3    about the item and the extension that he thought was

4    coming.  He said, Comptroller, I don't think it's

5    going to go.

6                From that first week, I didn't hear

7    anymore from Jim about the item.  Now, that's

8    important, because the item was time sensitive.  Jim

9    is deputy director -- deputy comptroller for Finance

10   & Development in charge of this project, not the

11   mayor's office, not SLDC.  The comptroller's office

12   under the direction of Jim Garavaglia, who's worked

13   consistently with this item.

14       Q.   What information do you know about --

15       A.   And as I complete my -- before you start,

16   I heard from Jim on the Tuesday before E&A which was

17   the second time I heard from him about the item.  So

18   I'm done with my response.  I heard from him the

19   first week of June.  And the second time I heard

20   from him was the day before E&A.  In the meantime, I

21   was hearing from Beverly about the item.

22       Q.   Okay.  Are you done?

23       A.   Yes.

24       Q.   All right.  Do you have any knowledge that

25   things change quickly in those final days before the

Page 210

1    E&A meeting?

2         A.    Absolutely.  And that is why I should have

3    been updated and kept in the loop by Jim about the

4    item on a regular basis.  On a day-to-day basis,

5    sometimes hourly, sometimes every minute, because

6    this was a time sensitive item.  So Jim had

7    information about the item and whether it had to do

8    with the taxes, whether it had to do with a default.

9    The comptroller should have been updated about that,

10   but I was not.

11        Q.    What basis do you have to believe that he

12   had concrete information to give you?

13        A.    The basis is having looked at these

14   e-mails, in particular the ones from Beverly who is

15   insisting that he speak with me, because I'm telling

16   her from the knowledge that I had earlier because

17   Jim had already told me, hey, I don't think it's

18   going to go.  So what does Beverly know?  She

19   doesn't have the knowledge that Jim knows.  I know

20   that as the comptroller, because I know what he has

21   put into the project.  She hasn't.

22              So if he knows that this is something

23   that should go, then why don't I know as the

24   comptroller of the City of St. Louis.  I should be

25   well-apprised of the activities of this particular

Page 211

1   project.  And that should have come from Jim

2   Garavaglia, because it couldn't come from Beverly.

3   Had she had knowledge of it, I believe she would

4   have told me about the deal and whether it should

5   go.  But her answers to me were only, Comptroller, I

6   don't know, I don't know, I don't know.

7                   So I said, Well, I'll hear from him.

8   I'll hear from him.  Because in that month, we had

9   the closing of the refinancing of the airport deal,

10  which was highly volatile.  We also had this deal,

11  which I thought was not volatile at all, because we

12  had been working on it so diligently for so long.

13  Tom Ray, who was the outside professional attorney,

14  was very diligent in handling anything and

15  everything that had to do with this deal.

16                  As I look back and see e-mails from

17  Tom Ray regarding this deal, he's the one that

18  helped protect the integrity of the office when it

19  came to making sure this deal came to fruition when

20  Jim did not.

21      Q.   What do you know about the other attorney,

22  not Tom Ray, the developer's attorney?

23      A.   Denny?

24      Q.   Right.  Requesting to the mayor's office

25  that the item be added to the agenda?

1    website and the comptroller's office.

2         Q.    What's that person's title?

3         A.    That's Tyson Pruitt, who is the public

4    information officer, in the Office of the

5    Comptroller, reports to the comptroller.  He became

6    aware of a posting.  Then he made me aware of that

7    posting.  Then he told me that he was going to take

8    care of it.

9         Q.    Okay.  Did he tell you where that came

10   from?

11        A.    He told me it came from the office of the

12   mayor.

13        Q.    Okay.  And how did he know that?

14        A.    Because he is the computer communications

15   person, and I believe he made inquiries, proper

16   inquiries, to determine where the posting came from.

17        Q.    Okay.  But you don't know who those

18   inquiries were to?

19        A.    I did not ask him who he inquired.  I

20   would believe he would have to check with web

21   people, web communications type IT people.  So that

22   they could identify who made postings.

23        Q.    Did you ever talk to Bev about all of this

24   after the fact, after the E&A meeting had taken

25   place?

Page 215

1       A.    I did.

2       Q.    What did she tell you of that meeting?

3       A.    After the meeting had taken place, she --

4   I spoke to her the next day, because I had never

5   heard a mayor -- any mayor read e-mails of -- of an

6   employee of other E&A member's office.  I was

7   stunned.  Bev told me she was stunned.  And we were

8   both embarrassed.  We spoke on the phone about that.

9             I said:  Bev, talk to me about this

10  e-mail that we didn't see or I didn't know about.

11            She said:  Oh, yeah.  There's an

12  e-mail thread among pre-E&A.

13            I said:  Oh.  What about it?

14            And she explained.  In her

15  explanation, she made me to understand that when

16  there's pre-E&A items come to the table of E&A and

17  then there are e-mail discussions back and forth as

18  to what's presented and what the other offices think

19  about it and they take time to comment.

20            And so I asked her to send them to

21  me.  I said, send them to me so I can see what

22  you're talking about.  When I saw the e-mails, I did

23  see where discussions had been between the E&A

24  members, and in particular I'm talking about this

25  item, the president of the board had decided that he

Page 216

1    did not want to hear the item.

2                    The item was sent from Jim, I believe

3    it was the Friday, the 14th, to the pre -- to

4    Beverly, who is my pre-E&A person, and asking her to

5    add it.  And then she immediately sent it to the

6    other members, Tom Shepherd and -- which represents

7    the president of the board, Tom Waelterman, who

8    represents the mayor, for consideration.  Her words

9    were something like, here's this extension again.

10   That was the Friday or Monday.  The president of the

11   board's office responded, we don't think we want to

12   see this item at this time.

13                   The mayor's office from Tom

14   Waelterman, I don't believe there was a response.

15   And that is how I learned or at least part of how I

16   learned how the mayor got the e-mails that she read,

17   because automatically they would have come to the

18   mayor's office and president of the board's office,

19   because Beverly sent the item that Jim had requested

20   be placed on the agenda.

21                   And so that's how I learned about the

22   e-mail that the mayor did.

23       Q.   And it's your contention that you believe

24   the item was not going to be on the agenda at that

25   time?

Page 217

1      A.   I wasn't sure about that, because I hadn't

2  heard from Jim.  And that's very sincere.  I didn't

3  know.  I even told Beverly prior to the meeting, I

4  was like, Beverly, I don't know.  I haven't heard

5  from Jim.  I don't know what's going on.  And I

6  needed to hear from Jim.  I needed to be in the

7  loop.  I needed to be updated about the item,

8  because I was hearing that there were problems.  In

9  fact, Jim had said earlier in the month, I don't

10  think it's going to go.

11                 So those words were still with me in

12  the month of June.  This is the month of June.  We

13  haven't even gotten to the middle of June.  The

14  first, second week of June, I had traveled to

15  Chicago I recall.  I had to talk about financing of

16  municipal jails.  We had financed a jail 20 years

17  earlier.  I was asked to speak about that.  So I

18  know in the first week of June, that kind of thing I

19  was doing, among the other big ticket item which was

20  the airport refinance of which the mayor was asking

21  for lots of explanations and answering questions.

22                 So I had a lot on my plate in terms

23  of what I was working on in addition to this

24  particular Muni Court item.  This was a big item.

25  That those things were big.  And this was between, I

Page 218

1   guess, the first week in August.  And I guess you

2   get to the third week, which is the third Tuesday --

3   I mean the third Wednesday, which is when the E&A

4   meeting occurred.

5            But prior to the regular E&A, the

6   mayor called for an E&A meeting on June 11, which we

7   previously talked about.  So I prepared for that

8   meeting.  And then chose not to go because of the

9   airline situation of which the airlines was

10  displeased with the mayor having stated that she

11  would have a special meeting to vote on the

12  refinancing.  They were very displeased.  So that

13  was also in play in that time period.

14            And as I was sitting with Jim on that

15  day, Jim never discussed with me any updates that he

16  would have had about the Muni Court project.  He had

17  all the opportunity in the world.  He had my full

18  attention on June 11 to talk to me about the Muni

19  project whether or not they had paid their taxes,

20  whether or not he thought the deal was going to go,

21  whether or not he wanted to put it on E&A.  He did

22  not ask me.  That was June 11.

23            And I'll finish so that you can

24  start.

25       Q.   You're saying he talked to you earlier in

1   the month.  And now you're saying way back on

2   June 11, he had an opportunity to talk to you.

3        A.   I said earlier in the month --

4        Q.   What date was that?

5        A.   That would have been the first week in

6   June.

7        Q.   Why do you think that he had new

8   information to give you as of June 11?

9        A.   I am saying that if he had information on

10  that date, I was available.

11       Q.   Okay.  But you don't know if he did or did

12  not?

13       A.   I stated I did not know anything.  What I

14  do know is he didn't talk to me about it.  I'm not

15  aware that he had information or that he did not

16  have information.  I am aware that I was available

17  and made myself available.  We were face-to-face.

18  And I'm aware that nothing from Jim about the Muni

19  Court project was talked to about on that day while

20  we were in a meeting.

21       Q.   Were you unavailable at other times in

22  that month?

23       A.   I was in Chicago at a conference that I

24  just spoke to you about.  That would have been the

25  first week -- between the first and second week of

Page 221

1    Q.   So this miscommunication here, which you

2    still got your answers the day before E&A as we've

3    testified, what policies does that violate in your

4    opinion?

5         MS. HAMILTON:  I would object that that

6         mischaracterizes the witness' testimony.

7         But to the extent you want to answer the

8         question, you can answer.

9         MR. NORWOOD:  I join in that objection and

10         also think it might call for a legal

11         conclusion, but subject to that.

12    A.   Well, as I understand the question, I

13    never told you that there was any violation.  And I

14    never told you there was a miscommunication.  I

15    never said that.  You're injecting that now.

16    Q.   (By Mr. Schmitz)  Do you consider it a

17    violation?

18    A.   And I never told you I consider it a

19    violation.  What I consider is insubordination for

20    an employee of mine who had direct instructions to

21    keep me in the loop as the deputy comptroller for

22    Finance & Development, and I was not kept in the

23    loop.

24         In addition, on the Tuesday, I

25    believe there was -- I was spoken to with

Page 222

1   misinformation.  That's different from

2   miscommunication.  I was directly communicated with,

3   with dishonesty.  I was told a lie on that phone.

4        Q.   You said you believe.  So why do you

5   believe that?

6        A.   Because his words were:  The mayor wants

7   to add the item to the agenda.  Do you want me to

8   send the documents to the mayor's office?  I had to

9   consider what I knew to be true versus what he was

10  saying to me on the phone.  They didn't connect.

11       Q.   What did you know to be true?

12       A.   What I knew to be true from Beverly was

13  that Jim was adding the item.  He's telling me that

14  the mayor's adding the item.  So I didn't know who

15  to believe.  Remember, this is at 9:00 something in

16  morning.

17       Q.   So you're saying --

18       A.   Later on in the day -- I'm answering the

19  question as fully as I can, because it does sound

20  strange here.  But these are the facts.

21                 I heard from Beverly.  Then I heard

22  from Jim.  Then I heard from Tyson Pruitt who's

23  telling me the mayor's posting.  So now what Jim is

24  saying at 9:00, I'm hearing from Tyson later in the

25  day, that there's this posting.

Page 223

1        Q.   Well, that tends to suggest that it's

2   true, does it not?

3        A.   It suggests in the moment that I'm hearing

4   from Jim, and he's not telling me anything at all

5   about him adding the project, he's telling me about

6   the mayor.  I hadn't heard from him about his

7   activities.  He's my employee.  I need to hear your

8   activities.  I don't want you to tell me about

9   somebody else that's not in our office.  You're on

10  our team.  What are you doing with regard to this

11  project?  Like I had heard in all the months in the

12  past.

13              Every single time prior to this time,

14  Jim had updated me properly.  And I had proper

15  information when this item -- this, as a matter of

16  fact, is probably the third extension.  The other

17  two extensions, I had no problems hearing from Jim

18  about why this project should go on the E&A or not.

19  Beverly never informed me about whether the project

20  should go on the agenda or not.  It was always Jim.

21              As a matter of fact, if you look at

22  the agendas, you will see that it's coming from

23  deputy director -- I mean deputy comptroller for

24  development, Finance & Development.  That's who

25  places it on the agenda.  And those discussions then

Page 224

1    have to be had between the supervisor, which is me,

2    Comptroller Green, and deputy comptroller, which is

3    Jim, had been had.  First time it was put on the

4    agenda.  Second time it was put on the agenda for

5    this.  And this third time, I don't know what

6    happened.

7         Q.   Again, the claim that the mayor -- you're

8    saying that that was a lie, that the mayor wanted to

9    put -- I'm not hearing any evidence.  Whether Jim

10   wanted to add it or not, how is that evidence that

11   the mayor's office didn't also want to add the item?

12        A.   It's evidence because -- or what I heard

13   in the early hour was contrary to what I knew at the

14   early hour.  Notwithstanding all of what Jim knew.

15        Q.   What did you know about the mayor's office

16   adding it to the agenda at that early hour?

17        A.   What Jim told me.

18        Q.   Okay.  Did you have anything that

19   suggested that that was false?

20        A.   Yes, I did.

21        Q.   And what is that?

22        A.   The knowledge from Beverly.

23        Q.   So Beverly had direct knowledge that the

24   mayor's office did not want to add it to the agenda?

25        A.   What she had was the knowledge that Jim

Page 238

1   And there would be others that a counselor or lawyer

2   would know that I would not know perhaps.

3       Q.   All right.

4               (Whereupon Exhibit S was marked

5               for identification.)

6       Q.   (By Mr. Schmitz)  So I have what's marked

7   Plaintiff's Exhibit S, which the first page is a

8   letter stating it's from you to Jim dated July 21,

9   2017.  Do you see that page?

10      A.   Yes.

11      Q.   All right.  Do you recall writing this

12  letter?

13      A.   Yes.

14      Q.   Okay.  Why did you write the letter?

15      A.   I wrote the letter to inform Jim that he

16  did not have and he was not authorized to sign

17  agreements on behalf of the City of St. Louis as

18  deputy comptroller for Finance & Development.  The

19  signature that he signed on an agreement with the

20  composting company were erroneous.  They were

21  extensions between the City of St. Louis and the

22  St. Louis composting company.  And it was a reminder

23  to Jim, because I had verbally told him one year

24  earlier that I recall when he asked if he has

25  signature authority, and I verbally told him he did

Page 239

1   not.

2                   And I recall that so clearly because

3   Tom Ray called me right after I had the discussion

4   with Jim about signature authority.  And at the

5   time, I thought since he was brand-new on the job,

6   that he maybe thought this came with the new job.  I

7   explained that it did not.  I explained Beverly

8   Fitzsimmons, who was the deputy comptroller, was the

9   only designated one besides myself that had the

10  authority to sign agreements on behalf of the City,

11  binding the City.  And that he did not have that

12  authority.

13                  So when I saw this signature wherein

14  Jim Garavaglia was crossing out my name and title on

15  a contract extension and replacing it with his name

16  and title and signing it in an attempt to inform the

17  contractor, as well as the Department where the

18  contractor was contracting with which was the

19  Forestry Department, that there was a new procedure

20  wherein his signature was good.

21                  I had to inform Jim that he was

22  incorrect.  And that I stated in this e-mail, as you

23  can see, I'm puzzled as to how this could happen.

24  This is an improper procedure.  And I asked Jim to

25  please work with Beverly Fitzsimmons so that

Page 240

1    Michelle Graham, who was in contract compliance

2    office, can process and provide a properly executed

3    extension.  Because what he had provided was not

4    properly executed.  And it would be putting the City

5    and the contractor at risk.

6        Q.   Did you ever have a discussion with Jim

7    about any opinions related by the City counselor's

8    office related to this?

9        A.   No.  Jim did not contact me after he went

10   to the City counselor's office seeking their advice.

11   Had he contacted me, then we could have had that

12   discussion.  But I was unaware that he was seeking

13   advice outside of the advice I had given him

14   directly as his supervisor.  Jim did not follow my

15   advice.

16             But I was fortunate that when he did

17   seek the advice of Tom Ray who was outside counsel,

18   Tom Ray e-mailed me to let me know that Jim asked

19   him about signing documents.  And that reminded me

20   that I had a verbal with Jim about signing

21   documents.  And Tom Ray then e-mailed me that

22   subsequent to my discussion with Jim that he asked

23   whether he had signatures authority obviously.  And

24   Tom Ray told him that he would contact me.

25             As a matter of fact, Jim is copied on

Page 241

1   Tom Ray's e-mail.  So that Tom Ray is letting Jim

2   know he is checking with the supervisor, which is

3   me, which is basically what Jim should have done.

4   In the cases where Jim sought other counsel, those

5   counselors did not e-mail me.  So I was not aware

6   and could not have ever been aware that Jim sought

7   advice to sign documents when his direct supervisor

8   had given him a direct order not to sign the

9   documents, which I did verbally as well as in

10  writing as you can see that's in this memorandum

11  today.

12        Q.   Did you do anything other than verbally

13  and in writing bring this to his attention?

14        A.   I did not.

15        Q.   Do you have any knowledge of this issue

16  with an unauthorized signature as you listed in the

17  title that occurred after July 21, 2017?

18        A.   I believe I -- I don't recall if the AT&T

19  invoice was 2017.  And I believe there may have been

20  another AT&T subsequent to that.  But I'm not sure.

21  I believe I saw one either in 2018 and/or in 2019.

22  There was multiple AT&T documents signed by Jim that

23  had multiple dates.  So I'm not sure if the

24  July 2017 was the last one, if that's what your

25  question is, if that's the last one or if there were

1       Q.   (By Mr. Schmitz)  I'm going to draw your

2    attention to what's now marked Plaintiff's Exhibit

3    T.  Do you recognize this document?

4       A.   Yes.

5       Q.   Okay.  What is this?

6       A.   It's internal audit document.

7       Q.   All right.  Do you see what's Bates

8    stamped, third page, GRN 000627?

9       A.   Yes.

10      Q.   All right.  That's a letter or a memo that

11   was written by Ishmael Ikpeama.  Do you know that

12   individual?

13      A.   Yes.

14      Q.   And who is he?

15      A.   He's an employee of the comptroller's

16   office.  I believe he's retired.

17      Q.   All right.  So was he an employee at the

18   time that this was written?

19      A.   Yes.

20      Q.   All right.  And did his position which is

21   listed here as internal audit supervisor fall under

22   the supervision of the deputy comptroller of Finance

23   & Development?

24      A.   Yes.  At that time.

25      Q.   All right.  Have you seen these documents

Page 246

1   in this exhibit?

2        A.   During this process, I have.

3        Q.   All right.  Are you aware of any e-mails

4   between Dr. Ikpeama and Jim and Sonia?

5        A.   During this process, I became aware of

6   some.

7        Q.   Would you say it's a responsibility of the

8   deputy comptroller for Finance & Development to

9   ensure that the findings of this audit are accurate?

10       A.   No.

11       Q.   Do you believe that getting this done

12  timely according to the timeline set out by

13  Dr. Ikpeama supercedes the need to get the

14  information accurate?

15       A.   You mean putting out a report versus --

16       Q.   Let me ask it differently.  What is more

17  important -- Jim, as the supervisor for Dr. Ikpeama,

18  what is more important that he follow Dr. Ikpeama's

19  self-created deadline or that Jim ensures that the

20  information is accurate?

21            MR. NORWOOD:  Let me object.  I think

22       that's a loaded question and assumes a lot of

23       facts that are not in evidence.

24            And subject to that, though, you can

25       answer the question.

Page 247

1           THE WITNESS:  I really don't understand.

2       It sounds like you're asking me who's more

3       important.

4       Q.  (By Mr. Schmitz)  No, I'm not asking you

5   who's more important at all.

6       A.   You're saying that Ishmael didn't have any

7   processes and procedures to follow.  You just said

8   self-imposed.  So you took me away when you said

9   that.  Because I thought it was apparent to me that

10  you are characterizing the two.  So please help me

11  understand what you really want to know.

12      Q.   Where does his deadline come from?

13      A.   His processes and procedures and his

14  supervisor.  He would have had someone supervising

15  him.  And in his profession as a CPA and an auditor,

16  internal audit, he would have understood his

17  processes and how long he should have to do a review

18  like this.

19      Q.   And that comes from his supervisor?

20      A.   Yes.

21      Q.   Okay.  And who did that supervisor --

22      A.   That would have been whoever at the time

23  was -- that would have been -- it would not have

24  been Jim Garavaglia in terms of deadlines, if that's

25  what you're asking.  Jim did not -- was not and is

1   not an auditor in the office.  He's a temporary --

2   had temporary oversight of the department but not

3   the function.  And that's a distinction.  This is an

4   audit function.  That Jim could not tell them how to

5   do their independent jobs.

6              These were professionals, and

7   licensed professionals to add to that.  These are

8   licensed professionals who could lose their license

9   if they were to do things outside of the accountancy

10  and audit and the audit rules.  So there are audit

11  rules that govern their job.

12       Q.   What rules are those?

13       A.   The audit rules that govern the auditor's

14  jobs are spelled out for auditors.  I'm not an

15  auditor.  So there are rules for auditors like there

16  are rules for lawyers and accountants.  So their

17  rules would have dictated what they would have had

18  to do with regard to this review in terms of setting

19  the processes in place to audit.

20       Q.   Do you believe -- I'm not trying to

21  characterize your testimony in any way.  I'm asking

22  this as a clarifying question that these audit

23  rules, as you refer to, are binding on him for an

24  internal audit done by the comptroller's office on

25  behalf of the comptroller's office, you know, and

Page 249

1    those are inflexible dates?

2        A.   You mean for Ishmael?

3        Q.   Uh-huh.

4        A.   I absolutely do.  Because they are

5    reviewed independently by other audit offices

6    similar to the audit office that exists in the

7    Office of the Comptroller.  For example, the audit

8    office in the County of St. Charles independently

9    comes in and audits.  And they have a process where

10   they audit in order to keep all of the internal

11   audit offices that exist up to standard.  And

12   they're very serious about their work.  That's what

13   I know about that.

14       Q.   Okay.  And what if the audit has errors in

15   it?  How is that corrected?

16       A.   The auditors would correct that and

17   reissue.

18       Q.   Okay.  So again, I'm not asking about

19   independent auditor rules.  I'm talking about your

20   rules as the comptroller for the comptroller's

21   office.  What is your expectation about getting the

22   information accurate during an audit?

23       A.   My expectation is that Ishmael and any of

24   the internal audit employees would perform in a

25   professional manner and adhere to the professional

Page 250

1    standards of their profession.  But I also would

2    expect my employee Jim Garavaglia as the deputy

3    comptroller to adhere to the professional standards

4    of the operations of the comptroller's office.  It's

5    an expectation that I believe I would -- it's a

6    reasonable expectation that they would be able to

7    perform their jobs in a professional manner.

8        Q.   Okay.  But that's -- I'm not sure the

9    question about professional manner came up.  But

10   those auditor rules do not apply to Jim, correct?

11       A.   That is correct.

12       Q.   All right.  And are there independent

13   separate policies within your office that inform

14   even a deputy comptroller, that they are subject to

15   those auditor rules in terms of their supervision of

16   somebody conducting an audit?

17       A.   The auditors are subject to the rules.

18   Those who they audit, which would have been in this

19   case, Jim Garavaglia.  As the supervisor at the time

20   of the audit, he was supervising Gateway

21   Transportation.  He would have been asked by Ishmael

22   to respond.  That's what he's after, a response.

23       Q.   Okay.  So my question was, are there any

24   rules that exist within your office directing -- or

25   policies, procedures, directing deputy comptrollers

Page 251

1    on the need to follow the auditor's rules --

2         A.   Okay.

3         Q.   -- as it pertains to the supervision?  So

4    I know they're not subject directly to the rules.

5    But as it pertains to the supervision of an auditor

6    conducting an audit?

7         A.   As I understand your question, that gets

8    back to me saying my expectation for the rules in my

9    office from the comptroller's standpoint is that the

10   behavior of the deputy comptroller for Finance &

11   Development would be to perform in a professional

12   manner.  That means timeliness.  That means honesty.

13   That means being able to act in a sense of urgency

14   when those things call for that.  That's -- and

15   perform the job, his job, in a professional manner.

16        Q.   Would that also be --

17        A.   So that would be to simply respond.

18        Q.   Would that include accuracy?

19        A.   From his position, of course.

20        Q.   Okay.  Due diligence?

21        A.   Due diligence, of course.  Because the

22   request from the internal auditor is for a response.

23   The internal auditor is not said to be always

24   accurate.  That's why you ask for the auditee's

25   response.  Because if, in fact, the auditee finds an

1          recall I had spoken to Lyda Krewson about a

2          year earlier about a deputy comptroller job.

3          She turned me down.  I was just thinking that

4          when you asked the question.  This was before

5          she became the mayor.

6          Q.  (By Mr. Schmitz)  Okay.  Well, this would

7    have been back when Jim was --

8          A.   This was before Jim.

9          Q.   Yeah.  I was specifically asking about

10   this go around.

11         A.   I understand, but I was still thinking.  I

12   was trying to make sure that I wouldn't leave

13   anybody out that I had considered for the position.

14   And Lyda Krewson was considered, because I asked her

15   directly.  We both sat at the airport commission

16   meeting.  There was one meeting.  And she looked at

17   me like I would get a look like -- I forget what she

18   told me.  But she told me -- oh, you said, I have a

19   job.  That's what she said.

20              MR. SCHMITZ:  Can you repeat that last

21         question?

22              THE COURT REPORTER:  Question:  If there

23         was a male and female candidate that you were

24         considering and all things were equal, do you

25         feel like it would be okay to select a

Page 260

1        candidate based on their gender at that point?

2        A.   I guess I don't look at gender in terms of

3   positions when I'm wanting to hire.  I never have

4   and I never will.  The gender has nothing to do with

5   the work qualifications for a job.  And so I would

6   say absolutely not.

7        Q.   (By Mr. Schmitz)  Have you ever considered

8   age before when considering somebody for a position?

9        A.   Absolutely not.  I never considered age,

10  gender, race.  Age, gender, race.  What's the other

11  thing?  Color, sex.  I don't consider those kinds of

12  things when I am looking for qualified professionals

13  to take a job in the Office of the Comptroller,

14  because those things are not important.  What is

15  important is the qualified individual willing and

16  able to take the job.  And they will come with the

17  qualifications to do the job.  And they live in the

18  City of St. Louis.

19       Q.   Do you consider factors related to age?

20  And this is specific to age, not the other items

21  that you mentioned.

22       A.   I never consider age.

23       Q.   If I could finish my question.  I was

24  going to ask something specific.

25                 Not age.  You already answered that

Page 261

1   question.  But likelihood of how long that

2   individual is going to work or --

3        A.   Absolutely not.  No.

4        Q.   Do you consider whether or not you think

5   that person's likely to stick around or move on to

6   another job?

7        A.   No, not at all.  If they're accepting a

8   position and the circumstance which has been

9   explained to them, living in the City of St. Louis,

10  that has been the most question when a person has

11  qualified, would come and accept the job.  If they

12  don't live in the City of St. Louis.  And I believe

13  the City of St. Louis gives you six months to move.

14  So of course I would have wanted to have the

15  employee in the position longer than six months.

16       Q.   Do you think that you have any right or

17  authority to consider any of those factors at all

18  before, age, gender, race, any of those factors at

19  all?

20       A.   I do not consider any of those factors at

21  all, whether I have the right or not.  Because that

22  is not in my character to do so and is not in the

23  best interest of hiring practices for myself or for

24  the City of St. Louis.  It's just not in the best

25  interest to be considering those factors.

Page 268

1      hypotheticals, but subject to that.

2      A.    I don't know.

3           MR. SCHMITZ:  I think that's all I have.

4           MR. NORWOOD:  Okay.  I've got some

5      follow-ups.  Let me dive right in.

6                     [EXAMINATION]

7  QUESTIONS BY MR. NORWOOD:

8      Q.    Counsel made a point about the fact that

9  when you talked to Jim that Tuesday before the E&A

10 meeting, that Jim made a reference to the mayor

11 wanting to place the item on the agenda.  Do you

12 recall that?

13     A.    Yes.

14     Q.    Was it your expectation that he would have

15 communicated to you that he had already made a

16 request for that to be placed on the agenda?

17     A.    I did, as well as I was very hopeful that

18 I would get a full update on the project from Jim.

19 I was stunned that I did not get a full update about

20 the particulars of the project, whether or not taxes

21 were paid, if that was an issue, whether it was

22 going to be in default, anything like that.  I was

23 stunned about what I heard instead of what I was

24 expecting to hear.

25     Q.    So just so we're clear on the record, it

Page 269

1  wasn't that the mayor was placing the item on the

2  agenda.  It was the fact that he hasn't communicated

3  to you that he made that request to place it on the

4  agenda on your behalf?

5      A.   On my behalf.  And he could have told me

6  the reasons for the request and the reasons why we

7  need to go ahead and put this on the agenda and on

8  and on and on.  And I would have supported Jim.

9  Because in times past, I would have supported him if

10  he had particular -- and I have to say I heard from

11  his deposition that he was knowledgeable and in

12  contact with the collector of revenue about the

13  taxes, but I didn't know about that until the

14  deposition.

15          Had I known about that with the

16  deposition, Jim and I could have had a more

17  intelligent conversation with information that he

18  knew.  I had no knowledge of his interactions with

19  the collector of revenue and attempting to get the

20  taxes and all of that.  Had I known that, that could

21  have been an item put on the agenda from the

22  comptroller's office as he had requested.  But

23  because I was kept out of the loop by Jim and made

24  to not have that knowledge, I couldn't work to help

25  Jim to support him to get the item on the agenda.

Page 270

1          So the fact that the mayor was

2  putting it on the agenda was not only confusing, but

3  as I said earlier, I had two different comments.

4  One made by Beverly and one made by him.  In that

5  split moment, I said, Jim, send the documents to me.

6  Then I had to do all the work at that time.  Then I

7  learned later there was an attempt to put the

8  documents on.

9          But the matter at 9:00 in the morning

10  that Jim had full control of could have been --

11  could have stopped not only the mayor but also his

12  first request if he had fully apprised me and told

13  me why he thought the item should go on the agenda.

14  Then I would have said, have you told Beverly this,

15  or are we all going to be on Team Comptroller to get

16  this item on the agenda?

17          I was not afforded that because the

18  behavior that I got from Jim was unbecoming of a

19  professional at his level to misinform me.  I was

20  misinformed on that call.  And I can't express that

21  enough, because I should have been well informed

22  instead of misinformed.  You gave me all the

23  information so I can make an intelligent decision.

24  But he didn't do that.  That's why we're here today,

25  I guess.

Page 271

1            If he had done that and done his job

2     in a professional manner, which I'm pretty sure that

3     I had a reasonable expectation of having him be

4     professional and doing his job at the level and

5     having a sense of urgency to make sure I'm apprised

6     of this issue so this item can move forward.  I

7     didn't get that from Jim on that day.

8         Q.   Okay.  Let's talk generally about why is

9     it important for your deputies to keep you -- you

10    referred to -- the term you used was in the loop.

11    Why is it important for your deputies to keep you in

12    the loop of what's happening with respect to

13    projects that impact your elected duties as the

14    comptroller?

15        A.   It's always important to keep me in the

16    loop as a deputy comptroller, because the deputy

17    comptrollers represent me to the public.  The deputy

18    comptrollers are my eyes and ears to those who are

19    developers, investment bankers, lawyers, and others

20    who are working projects.  They're speaking on

21    behalf of the comptroller in most cases.

22            And in some cases, the deputy

23    comptrollers can misrepresent.  And I believe in

24    this case, Jim misrepresented on my behalf.  It

25    appears from the e-mail trail, that it was told to

Page 272

1    Jim in some manner that I was not in favor of the

2    project.  And that never existed whatsoever.

3        Q.   Okay.  You also used the term "integrity"

4    of the office.  Could you explain a little bit more

5    about why that's important from the standpoint of

6    your elected duties as the comptroller?

7        A.   The integrity of the Office of the

8    Comptroller is really important to protect.  And you

9    protect it by behaving in a professional manner and

10   performing your job duties with honesty.  You

11   perform your job duties with professionalism.  And a

12   high level of sensitivity exists, because you're

13   talking about financial documents.

14              And so we want to have the integrity

15   of the Office of the Comptroller protected in the

16   manner with your behavior.  Your work behavior is

17   going to show in your manner of conduct that should

18   show that you're honest and that you have a sense of

19   professionalism that is deserving of being in the

20   Office of the Comptroller.

21       Q.   Now, has your office since you have been

22   in charge as the comptroller received awards for the

23   work that you have done in terms of keeping the

24   fiscal responsibilities, performance, and integrity

25   of the City?  What awards did you receive?

1        Q.    Just for the record, Chana is an African

2   American -- Chana Morton is an African American

3   female; is that correct?

4        A.    Yes.

5        Q.    And what about you mentioned Bev

6   Fitzsimmons, your deputy; did you do ratings for

7   her?

8        A.    No.

9        Q.    Except --

10       A.    Except for required ratings.

11       Q.    And she is -- just for the record, what is

12   her race?

13       A.    She's white.

14       Q.    What about Tyson Pruitt, did you do

15   ratings for him?

16       A.    No.

17       Q.    And what is his race?

18       A.    Except for the ones required.

19       Q.    Okay.  And what is his race, for the

20   record?

21       A.    He's white.

22       Q.    Okay.  Have you ever in all of your years

23   as deputy comptroller -- as comptroller for the City

24   of St. Louis, have you ever heard of a situation

25   where important time sensitive deal documents were

Page 277

1    placed in interoffice mail?

2        A.   Not ever in my whole 27 years as

3    comptroller of the City of St. Louis have I ever

4    heard of time sensitive documents being placed in

5    interoffice mail, not ever.  And also I have to add

6    to that neither has Tom Ray, who obviously knew that

7    he needed to alert the Office of the Comptroller

8    that this was happening at the time for these types

9    of time sensitive documents.

10       Q.   Okay.  Now, you were shown Exhibit S,

11   which is a memo you prepared to Jim regarding his

12   attempt to have a St. Louis composting contract

13   executed by Jim.  Do you recall that discussion?

14       A.   Yes.

15       Q.   Okay.  As you testified this wasn't the

16   first time you had discussions with Jim about

17   signature authority; is that correct?

18       A.   That is correct.

19       Q.   All right.  In fact, you identified a

20   situation that was at least a year prior where he

21   apparently went around you and went to Tom Ray to

22   get some advice about signing?

23       A.   After I had verbally admonished him about

24   signing.  And I said admonish.  It could be the same

25   to inform or counsel.  To let him know Beverly

Page 279

1           You wrote that to him, right?

2      A.   Yes, I did.

3      Q.   And when you said as you know, was that

4  based upon the fact that you had had these

5  discussions with him before?

6      A.   I had previous discussions with him.  So I

7  knew that he knew.

8      Q.   Did he ever come to you and say, no, I

9  didn't know?

10      A.   He never did.

11      Q.   And you go further and say:  As

12  comptroller, I am authorized and I have also

13  authorized Deputy Comptroller, Beverly Fitzsimmons.

14           Right?

15      A.   Yes.

16      Q.   All right.  And you had told him that

17  before, correct?

18      A.   Correct.

19      Q.   Years before?

20      A.   Correct.

21      Q.   All right.  When he received this memo,

22  after he received this memo, after July 21, 2017,

23  did Jim ever come to you and say, oh, by the way, I

24  have already signed off on contracts for AT&T and

25  for Waste Management?  Did he ever do that?

Page 280

1          A.    He never did.

2          Q.    Would it be your expectation that he would

3     come to you and tell you that?

4          A.    I would have expected that Jim would have

5     performed with the professional behavior and come to

6     me to tell me that he had signed other documents

7     after he had received this memo from me, but he did

8     not.

9          Q.    Okay.  At the time you wrote this memo,

10    did you know he had signed off on these other

11    contracts?

12         A.    I did not know that until he -- I did not

13    know at the time at all.  I did not know until a

14    year or two years later.

15         Q.    How did you find out about the fact that

16    there were these contracts out there and that he had

17    signed purportedly on behalf of the city?

18         A.    Once Jim decided to retire, other

19    employees took time to perform his duties.  And as

20    they were doing their regular duties, performing

21    their regular duties, they submitted a form.  They

22    submitted a voucher for payment for Waste Management

23    and it was rejected.  And it was rejected because

24    there was no current contract on file.

25                    And so there couldn't be, because

Page 281

1    they hadn't been being paid.  So then the Waste

2    Management company was contacted and they

3    immediately sent us a contract that had been signed

4    by Jim.  It was a three-year extension that was

5    signed by Jim.  And so we submitted it or at least I

6    was told that Judy Armstrong, not knowing any

7    better, submitted to the contract administrator who

8    knew better.  She said this can't be.  This is not

9    legitimate.

10        Q.   Okay.

11        A.   So then she moved to take steps to get a

12   legitimate three-month or four-month extension so

13   that the Waste Management people could continue to

14   be paid.

15        Q.   And this discovery happened during the

16   time he was on forced leave; is that right?

17        A.   Yes.  And this was within a few days.  He

18   was on forced leave as of July the 2nd.  This

19   discovery happened within less than seven days.

20        Q.   Okay.  Let me show you -- I want to go to

21   Exhibit O.  There was a reference to some letters

22   dated July 15, 2019.  So let's go to those.

23             Do you know if those letters were

24   actually submitted to Mr. Frank and to

25   Mr. Garavaglia on July 15, 2019?

Page 283

1  approval?

2      A.   It probably is Mr. Frank's approval.

3      Q.   Okay.  Let me close it out.  Do you know

4  if Judy Armstrong as the appointing authority would

5  have also consulted with Director of Personnel and

6  Linda Thomas in conjunction with the forced leave in

7  this case?

8      A.   Yes.

9      Q.   Okay.  Now, these deals that ultimately

10 were completed on time, were they completed on time

11 because there were guardrails in place in terms of

12 professionals, outside professionals, like Opinsky

13 and Tom Ray to make sure that they stayed on track?

14     A.   Absolutely.  That is correct.  Those

15 professionals, lawyers, bond lawyers, as well as

16 investment bankers were very aware of the timeline

17 and schedules.  And they were there to help to make

18 sure that these deals got done properly.  Even Tom

19 Ray would chime in, step in to make sure deals got

20 done without any delay.  That's how they got done

21 without delay.

22     Q.   When you found out about Tom Ray reaching

23 out to Chana to alert her of the problem with the

24 timing on getting these documents executed, did that

25 jump out to you as being unusual?

Page 284

1      A.    It was alarming to say the least.  That he

2   had to take the time.  Because in his e-mail, he's

3   also copying Jim.  But he's directed it to the

4   secretary of the comptroller letting us be alerted

5   that we're going to have a problem, because Jim is

6   basically not handling his job in a professional

7   manner to get the documents circulated in a timely

8   manner so there's a closing.

9            He lets us know there's a closing.

10  He lets us know documents are in interoffice mail,

11  which is a mistake.  He says to call him on the next

12  day so he can be of help.  Instead of calling him on

13  the next day, I chose to call him on the same day,

14  along with Jim, along with Sherry Wibbenmeyer in the

15  mayor's office, my secretary and myself, the five of

16  us was on that call.  And I asked him did he have a

17  plan for getting the documents executed in a timely

18  manner.

19     Q.    And he was going to be on vacation the

20  very following day; is that right?

21     A.    That is correct.  And that is why I chose

22  to call him that day, because I didn't know if I

23  would be able to get in touch with him the next day.

24  So if he had told me he had a plan in place to take

25  care of the execution, then I would have been secure

Page 285

1   in that.  He did say that his secretary, Sheila,

2   would be delivering the documents to my office the

3   next morning.

4                   That was after I asked him, could

5   he -- I asked him where were the documents at that

6   moment.  He told me they were in the mail.  My

7   question was a leading question.  And the leading

8   question was in an attempt to see if Jim was going

9   to offer to go get the documents out of the mail.

10  And he did not.

11       Q.   Are we talking about interoffice mail?

12       A.   I'm talking about interoffice mail before

13  the close of business at the City of St. Louis on

14  the day before he was going on vacation.

15       Q.   Okay.

16       A.   Jim showed no urgency to have the

17  documents ready for my signature in a timely manner.

18  But he did in his deposition talk about that the

19  documents needed review.  So when I heard the

20  deposition, I didn't understand how he was going to

21  be reviewing the documents that came out of the mail

22  on the day that he was driving out of town.  Those

23  things didn't register.

24       Q.   All right.

25       A.   He said that in his deposition.  He was

Page 286

1   going out of town on that call before the close of

2   business.  Before he left, those documents -- he

3   made no attempt to take them out of the mail for a

4   review that he talked about at his deposition.

5       Q.   Okay.  We talked about the Muni Court

6   project.

7           MR. BLANKE:  Let me interrupt you for a

8       second.  I want to object just for the record.

9       I think we're over the seven hours now in

10      total.

11          MR. NORWOOD:  You have a seven-hour limit.

12      I can use any of my seven hours.  I am going to

13      wrap it up.

14      Q.   (By Mr. Norwood)  But my question to you

15   is -- let's talk about the Muni Court project.  What

16   is that?  How many millions of dollars is involved

17   and what project are we talking about when you say

18   the Muni Court project?

19      A.   We're talking about a project where the

20   developers were going to redevelop the Muni Court

21   into a hotel.  And then that hotel would have also

22   be redeveled into a parking lot.  And that would

23   have took a building that is not in use right now

24   and pull it into full effect and use and would not

25   only create jobs, they were expecting there would be

Page 287

1    anywhere between 60 to 70 jobs created, along with

2    the revenues from the hotel taxes and sales taxes

3    for that particular location right now, which is

4    right now an unused building and boarded up.

5         Q.   Okay.  Let me close with this.  And I'll

6    ask you point blank.  Did Mr. Garavaglia's age,

7    race, or sex have anything to do with the steps you

8    took as it related to the first, the second forced

9    leave or pretermination?

10        A.   Absolutely not, no.  Absolutely not.  Not

11   at all.

12             MR. NORWOOD:  All right.  I have no

13        further questions.

14             MR. BLANKE:  Do you have anything else?

15             MR. SCHMITZ:  No.

16             MR. NORWOOD:  We'll read.

17                      (Whereupon signature was

18                      reserved.)

19                      (Off the record at 6:36 p.m.)

20

21

22

23

24

25