UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMES GARAVAGLIA,           )
                            )
    Plaintiff,              )
                            )
v.                          )   Case No. 4:20-CV-1681-CDP
                            )
CITY OF ST. LOUIS, et al.,  )
                            )
    Defendants.             )

## DECLARATION OF JAMES GARAVAGLIA

I, James Garavaglia, declare as follows:

1. I am over the age of eighteen.

2. I was an employee of the City of St. Louis, Comptroller's Office, for over 32 years, serving three different Comptrollers. and I have personal knowledge of the facts set forth below, and if called upon to testify concerning the same I would be able to competently do so.

3. Throughout my career, I routinely received service ratings exceeding standards until I became Deputy Comptroller. I never received a service rating while reporting directly to Comptroller Darlene Green. During the Virvus Jones administration, whenever he and his Deputy were out of town, he appointed me in charge of the office until his return.

4. During my time with the Comptroller's Office, I was promoted at least three times, with each promotion increasing my responsibilities and expanding the number of employees under my direction. My longest tenure in any position, close to twenty years, was as the City's Asset Manager, reporting to the then Deputy Comptroller for Finance

1



PLAINTIFF'S
EXHIBIT
KK

and Development, Ivy Neyland-Pinkston, an African American female. Ms. Pinkston and I had a great working relationship, and we worked together on many projects throughout her tenure as Deputy.

5. Unfortunately, Ms. Pinkston passed away in the fall of 2015. I applied for her position and went through the standard Department of Personnel ranking and hiring process. I found it strange that at the most important part of the hiring process, I was not interviewed by Comptroller Green. Instead, I was interviewed by Judy Armstrong, her executive assistant, who handled personnel matters for the office. Ms. Green was in her office at the time of my interview, adjacent to the conference room where my interview took place, but she never joined my interview. Through the ranking interview cycle, I was interviewed by the top financial manager at the Airport and by my peer Deputy Comptroller, Bev Fitzsimmons. I handled most of their questions adequately. One evaluator pointed out during the interview process that I struggled to answer questions about debt and financing. It is an area that while I had general knowledge of from assisting the previous deputy, I had never been responsible for on a daily basis. No one internal or external to the City could have answered the questions with a high degree of proficiency in that the questions could only be answered had the candidate worked in public finance for the City of St. Louis.

6. I was pleasantly surprised to be offered the position, which I accepted at the end of the interview cycle. I was elevated from a grade 19 position to a grade 21 position in the Civil Service system. While not formally spelled out in Civil Service regulations or in the current pay ordinance at the time, it was customary in the Comptroller's office to recommend to Personnel a 5% raise for each grade promoted. As a result, I received a

2

10% raise for my promotion of two grades, as was customary in the office. I ended up replacing a highly respected and well though-of African American female who had held the position for over twenty years. When I was offered the promotion to Deputy Comptroller, it changed the race of the two deputies from one white and one African American Deputy to two white Deputies, a situation which at the time I didn't realize was only meant to be temporary.

7. When I was offered the position of Deputy Comptroller for Finance and Development by Comptroller Darlene Green in May of 2016, I was 63-1/2 years old. The offer was made via telephone call, and at that time the Comptroller said she was glad I accepted the position because this would be a great way for me to round out and complete my career with the City as a Deputy. In fact, her exact words were, "You will be able in a couple of years to go out on top as a Deputy." At the time, I didn't fully understand the meaning of that comment, but she was clearly telling me that her plans for me were short-term, and that she expected me to retire when I reached full Social Security retirement age.

8. From my initial promotion to Deputy, while not immediately apparent, it became obvious that the role I was filling was to only be a temporary place-holder in her organization. I never really shared her total trust and complete confidence. I was never part of her inner circle of confidants and people that she felt comfortable around. It was obvious to me that she never felt comfortable around me. I can only count a few times that we ever met one-on-one, but other times when we met, there were always others in the room with whom she felt more comfortable interacting. As much as I tried, and as much as I attempted to be the best at my job and perform at the very highest level, it was

3

very hard for me to feel any sense of comfort or respect in her presence. I was simply being tolerated. I missed having that strong, close, personal working relationship that I had with my former bosses, Ms. Pinkston being the most recent. As Deputy Comptroller I was treated with a certain aloofness which let me know that I would never have that same working relationship with Ms. Green that I had with prior bosses.

9. As Deputy Comptroller, I supervised a number of mutually exclusive activities assigned to the Comptroller's Office. These activities included administration of all voice communication systems serving City departments, all real estate transactions involving City property, administration of the Gateway Transportation Center and administration of all public borrowings through bond issuance, bond refunding and lease purchase agreements. I also supervised an Internal Audit for a period of time as Deputy and served on various standing boards and committees. My day-to-day responsibilities with telecommunications were to supervise a staff of five employees that served as one stop solutions to all telecommunications issues. I supervised all moves, adds or changes to existing equipment, as well as repairs to existing systems. I also reviewed and negotiated custom tariffs for dial tone, truck charges, long distance and maintenance agreements. I also administered many leases of City properties to ensure leases were current and rent was collected. When appropriate, I handled both the sale and the purchase of property from the first meeting with the interested party through the writing of a sales contract and bond bill to accompany the contract through the legislative process. Through a staff person, I also administered both the Fire Insurance Program as well as two different home loan programs making use of Federal Block Grant money. These programs required the tracking of liens, subordinations and release of liens for over 4,000

forgivable loans. The Gateway Transportation Center is the City's Amtrak and Greyhound co-location facility. It is a 7 day a week, 24 hour operation administered by an on-side manager and around the clock City staff. I supervised the staff and administered contracts, janitorial services, trash removal, contracted repairs and other general maintenance. I also met regularly with local Greyhound and Amtrak representatives regarding any issues or compliance problems with their leases. Public Finance involved the issuance of debt, refunding/refinancing of existing debt and the negotiation of lease/purchases most often to buy equipment. These activities involved meeting with bankers, bond attorneys, rating agencies, financial advisors and City officials. I was the lead City representative in all of the transactions noted and was required to sign all bond issuance and bond refunding documents. When I assumed the role of Deputy Comptroller, I continued the successful procedures and processes that I followed as Asset Manager for the processing of contracts, leases, and board bills. There were also existing procedures and processes in place for the handling and routing of bond documents and lease purchase documents. I made sure staff incorporated these procedures into practice whenever these type of documents needed to be processed.

10. There were no problems with timely processing of any documents regardless of their nature. No formal due dates were missed; all bond issue documents, bond refunding documents and lease purchase transactions closed successfully on the appropriate closing dates. There was never any widespread mishandling of documents or significant delays in processing documents, and I never received any calls, emails, texts, or third-party communications from Comptroller Green regarding the Muni Courts Project and the handling of documents. There was only one conversation to which I was

a party when Comptroller Green counseled two employees, one of which worked for me, to work out a personal dispute, which led to a minor delay in signing one set of documents. I was not personally counseled about anything at this meeting. I never had any other conversation with the Comptroller, or received any correspondence from her, regarding the circulating of documents outside of the one described. Comptroller Green never spoke of, counseled, demanded, otherwise explained any "standard of professionalism" to me at any time.

11. Comptroller Green did have an inner circle of close confidants with whom she shared both a business, personal, and social relationship outside of the office. Among these were her secretary, Eunetter Steele, an African-American female, Chana Morton, an African American female, Judy Armstrong, her executive assistant, also an African American female, and LaTaunia Kenner, an accounting manager and also an African American female, who would later succeed me as Deputy Comptroller. To a lesser extent, Michelle Graham, a contract administrator and an African American female, was part of Comptroller Green's inner circle. Ms. Morton and Ms. Graham worked in close proximity to the Comptroller's Office. Ms. Armstrong was transferred to the building in which I worked at 1520 Market Street, prior to my promotion to Deputy Comptroller. Ms. Kenner was transferred to 1520 Market Street shortly after Ms. Armstrong, and was placed under my supervision, managing a home repair grant fund which would only be funded for approximately 18-24 months from the time she became my employee. On occasion, I would occasionally be invited to attend out-of-the-office formal events where I would help represent the Comptroller's Office as a deputy and other staff would also be invited; but I was never invited to purely social events that would be attended by her inner circle, for

example, Comptroller Green, Chana Morton and Judy Armstrong going to see the play "Hamilton" in Chicago.

12. Ms. Kenner had been in the Comptroller's Office for over twenty-five years and had been placed in a number of roles, from an assistant to Ms. Green, to accounting supervisor at the airport, to internal audit administrator, to special projects coordinator. She had never performed well or demonstrated any form of expertise in any position she had. In view of her limited success within the office, her one task when she reported to me was to manage a small residential home repair fund, with the help of a clerical assistant. With clerical assistance, she performed at an acceptable level, but one would have expected her, based on her previous job title and presumed experience, to be grossly overqualified for the work she did as my subordinate. To the best of my knowledge, Ms. Kenner never applied for the position of Deputy Comptroller, Finance & Development from the time of Ms. Pinkston's death through the date of my retirement. But as my subordinate, she was now set up in my report-to organization to ultimately be promoted to Deputy Comptroller, the position to which she was provisionally appointed within weeks of my being placed on forced leave.

13. In the March through June 2019 time period, there was a meeting in Ms. Green's office with the Comptroller, Deputy Comptroller, Bev Fitzsimmons (my counterpart), and myself, to discuss the upcoming FY 2020 budget for our office. Before we began to talk about the budget, Ms. Green announced that she was starting to look forward to and make plans to run for another term in April 2021. She looked at both Bev and I and asked if we would support her and would we be there for the following term. I said that I could commit to working full-time until at least the end of her current term, but

7

then I wanted to assess my health and talk to my family and commit to full-time employment on a year-to-year basis going forward. I told her I had no plans to retire, but that at some point I would like to continue in a part-time role with the Comptroller's Office. Upon hearing this, the Comptroller looked down, pursed her lips, and started making some notes. When asked the same question, Bev stated that she could not retire because she did not have the Rule of 85 and that she would be available for the entire next term. At that point the Comptroller looked at her, nodded approvingly, and gave a bit of a smile. I had worked for the Comptroller for a long time, and I knew well enough that when she heard what I was saying, her body language let me know that she was displeased by what I had told her. This conversation finalized in her mind the need for me to vacate my position so that she could promote a younger African American female, LaTaunia Kenner.

14. After I was placed on forced leave, I realized that my decisions, actions, and directions to my employees and others were being monitored and were being reported back to Comptroller Green on a regular basis. Observations of my decision-making, management, and overall activities were being made by LaTaunia Kenner, Judy Armstrong, and Chana Morton and were then conveyed to Comptroller Green. At least twice in the spring and early summer of 2019, Chana Morton, in a taunting but telling prediction, had said to me, "Yeah, there's going to be big changes around here next fiscal year" and it later became apparent that she was referring to me.

15. On July 2, 2019, at 7:00 a.m. I received a call from Chana Morton telling me to report to the Comptroller's Office for an important 7:30 a.m. meeting. Upon arrival to the Comptroller's conference room, I was informed by Judy Armstrong that I was being placed on forced leave and that I would be told why at some point in the future. I was then

8

asked to give up my employee ID and my keys to the office, and was then escorted out of City Hall by an armed Marshall who waited until I got into my car and drove off the parking lot.

16. The mishandling of the Muni Courts documents, initially by the developer's counsel, and then after approved by E&A, later mishandled in the signing phase by Chana Morton and the Comptroller's own staff, eventually became part of the pretextual basis for in putting me on forced leave. It is also important to note that the approval process was overshadowed by a disagreement between the Mayor and the Comptroller on the process of how to add an item to the E&A agenda.

17. While final E&A agenda items relating to the Comptroller's Office are approved by the Comptroller, it is routine to preliminarily submit items to Bev Fitzsimmons to be placed on a preliminary agenda, subject to final scrutiny and submission to the Comptroller for approval. The process often goes on for days prior to submission for the Comptroller's approval.

18. I was well aware of the municipal courts development project and had been involved in it since its inception.

19. My administrative assistant, Shiela Woods, as well as outside counsel, Tom Ray, were fully versed and prepared to handle the municipal courts documents through the signature process. They were well aware of the timeline within which the documents needed to be signed.

20. The City's interoffice mail was used to convey the municipal courts document to me from the Mayor's Office. This long-established system for moving all types of mail between city buildings and departments worked well, with pickups and drop-

9

offs occurring twice a day. I had no reason to suspect that I would not receive the municipal courts documents the same day that I asked them to be sent to me.

21. Once I was on forced leave, the office began an investigation of my work going back to 2009 while I was Asset Manager, predating my tenure as Deputy Comptroller by seven years. It became apparent that the acts of rescinding and reinstating forced leave were occurring each time my appeal of forced leave was coming up before a hearing officer for the Department of Personnel. The actions taken with rescinding and reinstating was clearly a result of having no substantial evidence to prevail before a hearing officer on my forced leave. Despite that, in August 2019, I received the pre-termination notice.

22. Immediately upon being placed on forced leave, I sought legal counsel and filed an appeal of the forced leave with the Civil Service Commission.

23. "Statements of Work" are documents acknowledging and accepting, on behalf of the Telecommunications Section that they agreed with the scope of work to be performed under the prior contract for AT&T's services.

24. I became aware of a billing error with AT&T and brought it to their attention. Resolution took in excess of two years as AT&T corporate refused to acknowledge the billing problem. However, the local AT&T office issued manual bills each month which were considerably less than the erroneous computer-generated bills. We timely paid the manual bills monthly. Despite that, the erroneous past-due balance grew. In the fall of 2018, AT&T offered the City a $200,000 settlement. I met with the Comptroller and we agreed to reject it for multiple reasons, among them being there was no documentation provided by AT&T to substantiate the $200,000 credit. Comptroller Green knew well in

advance of my being placed on forced leave that there was a billing issue with AT&T and that I was diligently working to resolve it.

25. I never failed to cooperate with an internal audit regarding the revenue review conducted by Dr. Ikpeama. Neither I nor the supervisor at the Gateway Center was able to access the data from the lessee in a time frame necessary to respond to Dr. Ikpeama on his own self-imposed schedule. Once the data became available, I performed a review and wrote an official response which we have requested in discovery but was never produced to me. This included my observations about certain errors in his computations, to which he never disputed. Had I not discovered these errors after taking the time to fully review his calculations, the lessee would have been improperly assessed rent and overcharged.

26. To go from being actively involved in the management of City government at a high level, to being told I no longer had a job without any specific reason given, was shocking and completely and totally devastating. Further, to be placed on forced leave with no explanation, and none that would be forthcoming for weeks, left me in a mental state of devastation and confusion that was worse than I had ever experienced in my life. The initial forced leave was imposed, then rescinded; then reinstated; then extended and then rescinded again; followed by the immediate issuance of a pre-termination hearing notice at which time I was finally made aware of what I had allegedly done to deserve intolerable harassment by the Comptroller.

27. By this point in time, my mental state of mind was hard to describe, but I was depressed and completely untrusting of Civil Service. My professional career and personal reputation had been completely destroyed, which greatly affected me. Even had

11

I prevailed before the Civil Service Commission in an appeal of my termination, I could no longer reasonably tolerate working for the city of St. Louis. So, after careful consideration, and despite the meritless actions taken against me, I felt that I had no choice but to retire.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 23rd day of June, 2022, in the State of Missouri.

*James Garavaglia* (signature)
James Garavaglia