**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

JAMES GARAVAGLIA,          )
                                     )
        Plaintiff,          )
                                     )
v.                               )     Case No. 4:20-CV-1681-CDP
                                     )
CITY OF ST. LOUIS, *et al.*,     )
                                     )
        Defendants.     )

**PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.**    **SUMMARY OF PLAINTIFF'S CLAIMS**

Plaintiff sues defendant City of St. Louis ("the City") and defendant Darlene Green ("defendant Green") in five counts. In Counts I, II, and V of his second amended complaint, plaintiff sues the City (only) for age, sex and race discrimination by wrongful constructive discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C.§§2000e et seq., as amended ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. §§621 et seq., as amended ("ADEA"); and the Missouri Human Rights Act, §213.055 & §213.111, RSMo. ("MHRA"). In Counts III and IV, plaintiff sues defendant Green <u>and</u> the City for age, sex and race discrimination by wrongful constructive discharge under the Civil Rights Act of 1866, 42 U.S.C. §§1983, et seq., as amended ("§1983"), for a violation of the Equal Protection clause of the 14th Amendment to the U.S. Constitution and for race discrimination by wrongful constructive discharge under the Civil Rights Act of 1991, 42 U.S.C.§§1981 et seq., as amended ("§1981").

## II. <u>STANDARD FOR SUMMARY JUDGMENT</u>

Defendants have summarized the standards correctly but leave out a few salient principles, as follows.

A moving party always bears the burden of <u>informing the Court of the basis of its motion for summary judgment</u> and showing that there is an absence of evidence on *identified* issues that justifies a judgment in its favor as a matter of law.  Only <u>after</u> the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to the genuine issues of material fact which the moving party specifically identified.  *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).  Defendants only make the following arguments and identify the following issues in moving for summary judgment: (a) defendants argue that the record does not show a genuine dispute of fact on plaintiff's claim that he was "constructively discharged"; and (b) defendants argue that the record does not show a genuine dispute of fact on plaintiff's claim that defendants were motivated to constructively discharge him because of race, sex, or age.  With regard to the latter issue, defendants argue that plaintiff cannot make a *prima facie* case of discrimination or show that defendants' articulated non-discriminatory reasons for plaintiff's constructive discharge were pretextual.  Defendants did *not* argue or identify any <u>other</u> elements of plaintiff's claims, or any affirmative defenses, upon which they rely in moving for summary judgment.  Plaintiff will accordingly limit his argument herein to the foregoing issues identified by defendants in support of their motion for summary judgment.

Also, in passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be

drawn in his favor. *Celotex Corp.*, *supra,* 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson*, *supra,* 477 U.S. at 249. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Torgerson v, City of Rochester*, 643 F.3d 1031,1042 (8th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

**III.    THERE ARE GENUINE DISPUTES OF MATERIAL FACT ON THE ISSUE OF PLAINTIFF'S CONSTRUCTIVE DISCHARGE AND DEFENDANTS ARE NOT THEREBY ENTITLED TO A JUDGMENT AS A MATTER OF LAW.**

A constructive discharge occurs when an employer deliberately renders an employee's working conditions intolerable, forcing him to quit his job. *Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Loc. No. 101,* 3 F.3d 281, 284 (8th Cir. 1993). A constructive discharge takes place, however, only when a reasonable person would find the working conditions intolerable. *Jackson v. Arkansas Dep't of Educ., Vocational & Tech. Educ. Div.,* 272 F.3d 1020, 1026 (8th Cir. 2001). And the employer's actions must have been intended to force the employee to quit, which is satisfied if the employee shows that his leaving his employment was a reasonably foreseeable consequence of the employer's discriminatory actions. *Hukkanen,* 3 F.3[rd] at 284-85. However:

> Our language in Bunny Bread does not mean constructive discharge plaintiffs must prove their employers ***consciously*** meant to force them to quit. See *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986); *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982); *Clark v. Marsh*, 665 F.2d 1168, 1175 n. 8 (D.C.Cir.1981). When an employer denies a conscious effort to force an employee to resign, as the Union and Long do in this case, the employer must necessarily be held to intend the reasonably foreseeable consequences of its actions. *Derr,* 796 F.2d at 344; *Held,* 684 F.2d at 432; *Clark,* 665 F.2d at 1175 n. 8.

3

*Id.* [emphasis added].   Moreover, an employee's choosing to retire early instead of continuing to work under intolerable working conditions may constitute a constructive discharge.   *Smith v. World Ins. Co.,* 38 F.3d 1456 (8th Cir. 1994).   And, "[j]ust like any other discharge, a constructive discharge *is* an adverse employment action."   *Thompson v. Bi-State Dev. Agency,* 463 F.3d 821, 825 (8th Cir. 2006) [emphasis added].

In this honorable Court's October 5, 2021 Memorandum and Order, the Court pronounced that plaintiff's Complaint adequately alleges facts stating a plausible claim of constructive discharge against Green, and supports an inference that a reasonable person would consider it intolerable to be repeatedly placed on forced leave without reason, especially when deprived of the opportunity to address that action to the Civil Service Commission.   Specifically, this Court ruled as follows:

> Garavaglia's allegations, as set forth above, are sufficient to proceed at this stage of the litigation. The complaint adequately alleges facts stating a plausible claim of constructive discharge against Green, including that she repeatedly suggested to Garavaglia that he retire, repeatedly stated to Garavaglia or in his presence that she preferred younger African-American female employees, twice placed Garavaglia on forced leave with no reason shortly after he stated his intention to remain in the office through April 2021, deprived him the opportunity to be heard before the Civil Service Commission on the forced leave issue, and soon thereafter scheduled him for pretermination hearing. These facts sufficiently support an inference that Green intended to force Garavaglia to end his employment, that Green's intention was motivated by discriminatory animus, and that it was a reasonably foreseeable consequence that Garavaglia would leave. The facts as pled also support an inference that a reasonable person would consider it intolerable to be repeatedly placed on forced leave without reason, especially when deprived of the opportunity to address the action to the Civil Service Commission. Being thereafter scheduled for a pretermination hearing could be considered the proverbial "straw that broke the camel's back."

{Dkt. #60, pp. 5, 6}.

The summary judgment record also contains sufficient *evidence* to demonstrate a genuine issue of material fact concerning the alleged constructive discharge such that

defendants are not entitled to judgment as a matter of law on this issue.  Competent and substantial evidence of record creates a genuine issue of fact as to whether defendant Green:

     *(a)* expected and wanted plaintiff to retire.  *See.*

*--Ex. GG, Garavaglia Deposition***:**  *p. 66, line 18 to p. 69, line 25; p. 102, line 4 to p.104, line 3; p. 106, line 12 to p. 107, line 13;*
*--Ex. EE, Fitzsimmons Deposition: p.34, line 5 to p.35. line 8;*
*--Ex. HH,Green Deposition:  p. 142, line 6 to p. 143, line 8;*
*--Ex. KK, Declaration of James Garavaglia, ¶¶ 7, 8, 13, 14, 26.*

     (b) twice placed plaintiff on forced leave for reasons she now articulates that are contradicted by the notices she provided to, and the communications she had with, the Director of the City Department of Personnel and to plaintiff.  *See:*

*-- Ex. FF, Richard Frank deposition, p. 38 line 23 to p.39, line 6; p. 111, lines 6-23; p.145, line 12 to p.147, line 3; p. 171, lines 14-22; p. 182, line 11 to p. 183, line 18; p. 190, line 10 to p.192, line 11;* **p. 223, line 6 to p. 224, line 16;**
*-- Ex. JJ, Linda Thomas deposition, p. 25, line 24 to p.26, line 23; p. 32, line 22 to p.34, line 23.*
*-- Ex. HH, Defendant Darlene Green deposition, p. 168, line 18 to 169, line 10; p. 180, lines 8-12.*
*-- Plaintiff's Exhibit O, pp. 3, 6, 22, 24, 26, & 32*

     (c) twice removed plaintiff from forced leave without any articulated justification or reason after he stated his intention to remain in his position as Deputy Director to the Comptroller through April 2021, thereby depriving him of the opportunity to be heard before the Civil Service Commission on the forced leave issue. *Id***.,** *see also*,

*-- Plaintiff's Exhibit O, pp. 22, 24, 51, & 52.*

     (d) soon thereafter scheduled him for a pretermination hearing**.**  *See,*

*-- Ex. GG, Garavaglia Deposition, p. 94, lines 16-24.*

     Defendants misconstrue the basis of plaintiff's constructive discharge by arguing that it is plaintiff's contention that "the very action of placing him on forced leave created

a hostile work environment and irretrievably rendered his working environment intolerable." {Defendants' Memo in Support, Dkt. #82, p. 17}.  To the contrary, plaintiff <u>contends</u> that defendant Green placed him on forced leave for alleged and unreasonably vague reasons (i.e., "serious fiscal issues") – when the true reason was that defendant Green preferred to have a younger African-American female occupy his position as Deputy Comptroller, finance and development -- followed by the withdrawal of that forced leave depriving plaintiff of his right to clear his name through a Civil Service Commission hearing, followed by an immediate restoration of forced leave, followed by the withdrawal of that second forced leave again depriving plaintiff of his right to clear his name through a Civil Service Commission hearing, followed by a pretermination notice – in combination with the failure of defendants to provide plaintiff with standard employment evaluations and ratings – all of which combined to create the intolerable hostile work environment.

Defendants also argue that plaintiff did not give defendants a chance to correct the alleged intolerable conditions before resigning. Yet, the peculiar circumstances of this case show that *defendant Green* consistently denied the City the opportunity to correct the intolerable work conditions that are tantamount to a constructive discharge by twice denying the Civil Service Commission the opportunity to rule on her decision to place plaintiff on forced leave. Tellingly, on the very same day she withdrew the first forced leave from the purview of the Commission, she reinstated the forced leave, also for alleged nebulous and groundless reasons.  Then she *again* denied the City its opportunity to have the Civil Service Commission rule on the second forced leave by withdrawing it for yet a second time.  Where the decision-maker herself – here, defendant Green – interferes with the employer's ability and opportunity to correct or reverse the harassment

6

she is imposing upon plaintiff, it should not, and cannot be the rule that the actions of such decision-maker are somehow imputed to the plaintiff, such that he is to deemed to be the person not affording the employer a chance to correct the intolerable conditions created by the Comptroller.

Defendants now argue that "the testimony of plaintiff and other City personnel firmly demonstrates that Plaintiff was placed on forced leave on July 2, 2019 for mishandling important closing documents for a multi-million City development project (the 'Muni Court Project')." They maintain that "[n]otably, the City's personnel director, Richard Frank, approved Green's recommendation to place Plaintiff on forced leave," and that thereafter, "City personnel discovered that Plaintiff had engaged in various other derelictions of duty and misconduct, the most significant of which included Plaintiff improperly signing multiple City contracts without authorization." [Defendants' memorandum in support, Dkt. #82, p.2; see also, p. 3].

Yet, the record demonstrates that all of this is the subject of genuine dispute. Personnel Director, Richard Frank, testified that he was *never* informed that *any* of plaintiff's forced leaves concerned the Muni Court Project or that defendant Green's subsequent investigation later unearthed allegations of improperly signing multiple City contracts without authorization. This was also confirmed by Mr. Frank's assistant, Linda Thomas. *See:*

**-- Ex. FF, Richard Frank deposition, p. 38 line 23 to p.39, line 6; p. 111, lines 6-23; p. 145, line 15 to p.147, line 3; p. 171, lines 14-22; p. 182, line 11 to p.183, line18; p. 190, line 10 to p.192, line 11; p. 223, line 6 to p.224, line 16; p. 227, lines 17-22; p. 232 line 19 to p.233, line 16.**
**-- Ex. JJ, Linda Thomas deposition, p. 25, line 24 to p. 26, line 23; p. 32, line 22 to p. 34, line 23.**
*See also:*
**-- Ex. HH, Defendant Darlene Green deposition, p. 168, line 18 to 169, line 10; p. 180, lines**

**8-12.**

To the contrary, Director Frank, affirmatively testified that he understood that the City Comptroller was placing plaintiff on forced leave (on both occasions) because of "serious *fiscal* issues"; and that further detail was unnecessary for him to approve the Comptroller's request.  **See, Ex. FF, Deposition of Richard Frank: p. 38, line 16 to p.39, line 6.; p.146, line16 to p.147, line3; p.232, line19 to 233, line16.** Moreover, the notices provided to plaintiff that he was being placed on forced leave also did not refer to the Muni Court Project in any way.  See, **Plaintiff's Exhibit O, pp. 3, 6, 22, 24, 26, & 32.**  Most tellingly, however, nowhere in the record did defendant Green or any other City employee attest to the reasons why defendant Green *withdrew* the first forced leave and the second forced leave, and thereby deprived plaintiff of his right to be heard before the City Civil Service Commission -- other than to state that they wanted to conduct an investigation to discover if plaintiff may have committed *additional* misconduct having nothing to do with the Muni Court Project. *See, Ex. GG, Garavaglia Deposition, p. 319, line 9 to p.322, line 17; p. 324, lines 11-17; see also, Depo Exhibit Y (STL 002172-002185).*

Defendants claim that plaintiff can make no showing that a reasonable person in his situation would find the working conditions intolerable. Yet, this Court has already ruled that the facts *as pled* support such an inference, especially if defendants deprived plaintiff the opportunity to address the propriety of the forced leaves with the City's Civil Service Commission; and that scheduling a pretermination hearing could fairly be considered as "the proverbial straw that 'broke the camel's back.'" And now, the summary judgment record adequately demonstrates that the facts pled are also adequately supported by sufficient evidence to afford a jury the opportunity of deciding whether a

reasonable person in plaintiff's situation would find defendants' conduct to constitute intolerable conditions making it reasonably foreseeable that plaintiff would leave his employment.

### IV. THE BURDEN-SHIFTING SCHEME OF *MCDONNELL DOUGLAS CORP. v. GREEN*

#### A. Plaintiff's *prima facie* case:

Under the burden-shifting analysis of *McDonnell Douglas Corp. v Green,* 411 U.S. 792 (1973), in the absence of direct evidence of intentional discrimination, the plaintiff has the initial burden of establishing a *prima facie* case.  "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). However, "[t]he burden of establishing a *prima facie* case of disparate treatment is not onerous."  *Id.* at 253.  For a <u>discharge case</u> that is not the result of a reduction in force, the elements of the plaintiff's *prima facie* case are as follows:  (1) plaintiff belongs to a protected group; (2) plaintiff was qualified for his former job; (3) plaintiff was discharged; and (4) the discharge occurred in circumstances that allow the court to infer unlawful discrimination – for instance, that the plaintiff was replaced by a person outside the protected group.[1]  Defendants have not identified or argued that plaintiff was not in a protected group or unqualified for his former job, so plaintiff will not address these elements.  *Celetox,* 477 U.S. at 323-25. Moreover, plaintiff has already addressed defendants' argument that he was not constructively discharged (*supra*).

---

[1]  In an age discrimination case, however, the fourth element becomes that "[t]he plaintiff was replaced by a younger person" (not a person "outside the protected group"; i.e., someone under age 40).  *Rothmeier v. Inv. Advisors, Inc.,* 85 F.3d 1328, 1333 n.7 (8th Cir. 1996); *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 312 (1996).

Instead, defendants argue that plaintiff's replacement by a younger, African-Amercian woman is insufficient to satisfy element (4). They cite *Main v. Ozark Health, Inc.,* 959 F.3d 319, 327-28 (8ᵗʰ Cir. 2020), *Nelson v. J.C. Penney Co., Inc.,* 75 F.3d 343, 346 (8ᵗʰ Cir. 1996), and a variety of district court decisions from other circuits.  Both *Main* and *Nelson, supra,* do <u>not</u> hold, however, that *prima facie* cases were not made in either case.  In *Main,* the court found that "[i]n its motion for summary judgment, Ozark conceded that Main sufficiently alleged a *prima facie* case of age and sex discrimination, and it does not argue otherwise on appeal.  Therefore, we assume without deciding that Main satisfied her burden at step one."  *Main,* 959 F. 3d at 324.  The court in *Main* then went on to explain that the fact that the employer replaced the plaintiff with a male employee who is twenty-two years her junior, <u>cannot by itself, create a triable issue of *pretext*</u>.  *Id.* at 327-28.  It can only serve to create a *prima facie* case.  Likewise, the court held in *Nelson* that "for the purposes of this appeal, we assume that Mr. Nelson established a *prima facie* case and thus created a presumption of unlawful age discrimination by Penney. [cite omitted] The existence of that presumption placed an obligation upon Penney to rebut it, if possible."  *Nelson,* 75 F.3d at 345.  And then, as in *Main,* the Court in *Nelson* went on to hold that such a fact, although consistent with age discrimination, is not alone sufficient to support a reasonable inference of it – *after* plaintiff's *prima facie* case is rebutted by the employer's articulated nondiscriminatory reason for plaintiff's discharge. The district court decisions from other circuits are all of the same ilk.  Plaintiff has satisfied element (4) of his *prima facie* case (and of course, that is not alone sufficient to satisfy plaintiff's argument as to pretext).  Defendants mischaracterize and exaggerate the holdings of the cases they are citing here.

Defendants also argue that "plaintiff's subjective belief of discrimination, without more, is insufficient" to support his *prima facie* case.  Defendants then suggest that plaintiff *admitted* in deposition testimony that he had no evidence of discrimination other than his subjective beliefs.  [Defendants' memorandum in support, pp. 8-9].  However, plaintiff's evidence is not limited to his own subjective belief regarding defendants' discriminatory conduct, nor did he admit in his deposition to "having no other evidence." Plaintiff merely testified that he could not "recall" such other evidence (at the time of his deposition) and *expressly* stated that "he could possibly recall something later." *Id.* at p. 9.  Essentially, defendants here are making the disingenuous argument that plaintiff must be readily capable of identifying all *the evidence* in the case when asked, from memory, or suffer summary judgment for his failure to remember, recall and verbalize such evidence on the spot.  Plaintiff's inability to recite the testimony of others not even yet deposed, and all of the documentary evidence adduced up to the time of his deposition, is not an "admission" that none exists or that none will later be adduced. Dispositively, however, plaintiff's Statement of Material Facts is replete with such evidence.

Defendants do not argue that plaintiff was not a member of a protected class, that he was unqualified for his position, or that he was not replaced by a younger, African-American female. They argue only that this is not a case of constructive discharge (discussed *supra*).  Plaintiff has made a *prima facie* case of invidious discrimination.[2]

---

[2] Also under the heading of whether plaintiff's make a *prima facie* case of discrimination, defendants argue that "plaintiff cannot rebut the same-actor inference," pointing out that defendant Green appointed plaintiff to his position of Deputy Comptroller, Finance and Development.  However, all the cases cited by defendants in support of this argument found that plaintiff *did* make a prima facie case and (yet again) analyzed the same-actor inference in the context of the plaintiffs' attempts to show that the reasons articulated by defendants for their respective adverse employment actions were *pretextual* for invidious discrimination. *See, Fitzgerald v. Action, Inc.,* 521 F.3d 867, 877 (8th Cir. 2008); *{continued next page}*

## B. Defendants' articulated non-discriminatory reasons for their constructive discharge of plaintiff.

Defendants now identify <u>one</u> major alleged nondiscriminatory reason for why Comptroller Green initially put plaintiff on forced leave:  the way he handled the Muni Courts Project.   They then allege that in the course of the subsequent "investigation" of plaintiff's conduct, including periods of time when he was Asset Manager of the Comptroller's Office (before his promotion to Deputy Comptroller), they discovered *additional* nondiscriminatory reasons for discharging him (and therefore issued a pretermination letter), to-wit:

> Comptroller Green discovered that Plaintiff had: (i) not properly managed payment on significant outstanding telecommunications bills which resulted, in part, in the City having a record of outstanding owed balances with one vendor of nearly $1.4 million dollars and receiving threats from that vendor of service interruption in its provision of critical services to the City (SUMF ¶¶99-110); (ii) signed multiple illegal contracts purportedly on behalf of the City without authorization contrary to Comptroller Green's repeated directives, the Charter and the Code of Conduct (SUMF ¶¶99-110, 121)4F 5 ; (iii) acted unprofessionally regarding an internal audit of the Gateway Transportation Center (SUMF ¶¶111-113); and (iv) engaged in other misconduct including making false representations to, and withholding critical information from, Comptroller Green and her staff, (SUMF ¶¶48-113.)

Defendants' Memorandum in Support {Dkt. #82, p. 23}.

## C.  There is ample and sufficient evidence of record creating a genuine dispute on the issue of PRETEXT.

In *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), a 57-year-old employee brought an age discrimination action after being terminated. The employer's stated reasons for terminating the plaintiff were that the

---

*Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 976 (8th Cir. 2006);  *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 174–75 (8th Cir. 1992); *Hayes v. Express Scripts*, 2021 WL 409840, at *5 (E.D. Mo. Feb. 5, 2021; *Kramer v. K&S Assocs.*, 942 F. Supp. 444, 448 (E.D. Mo. 1996).  Accordingly, plaintiff will discuss the same-actor inference below under his discussion of the *pretext* in this case.

plaintiff had failed to maintain accurate attendance records. However, at trial the employee presented evidence that the plaintiff had accurately and correctly performed such duties. Subsequently, a jury awarded damages to the plaintiff. On appeal, the 5th Circuit reversed, holding that the plaintiff never provided sufficient evidence of age discrimination. The Court acknowledged the fact that the plaintiff had discredited the employer's reasons for termination, and further concluded that plaintiff "very well may be correct" that "a reasonable jury could have found that [the employer's] explanation for its employment decision was pretextual." *Reeves*, 197 F.3d at 693. Nevertheless, the 5th Circuit held that this was insufficient evidence to sustain the jury's finding of unlawful discrimination.

A unanimous Supreme Court of the United States reversed the 5th Circuit. Writing the majority opinion in *Reeves,* Justice O'Conner explained that the plaintiff had made a *prima facie* case and produced a substantial showing that the employer's reason for termination — shoddy recordkeeping — was false and pretextual. Even the 5th Circuit Court of Appeals, recognized in its Opinion that the employer's reason was unworthy of credence because of a substantial showing that plaintiff had properly maintained the attendance records in question. *Reeves*, 197 F.3d at 693. The supreme court held that when a showing is made that the employer's proffered reason is unworthy of credence, no further evidence beyond what the plaintiff produced to make a *prima facie* case, is necessary to sustain a jury verdict for the plaintiff. The Court explained as follows:

> That is, the Court of Appeals proceeded from the assumption that a prima facie case of discrimination, combined with sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory reason for its decision, is insufficient as a matter of law to sustain a jury's finding of intentional discrimination. In so reasoning, the Court of Appeals misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through

indirect evidence.  This much is evident from our decision in *St. Mary's Honor Center*. There we held that the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff. 509 U.S. at 511. The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." *Id*. at 524. In other words, "it is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination. *Id*. at 519. **In reaching this conclusion, however, we reasoned that it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.**

*Reeves,* 530 U.S. at 147 [emphasis supplied].  Delving deeper, however, the *Reeves* court acknowledged that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* "Moreover once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. *Id. "Thus,* a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148 [emphasis supplied]. In *Reeves,* therefore, no further evidence of discriminatory intent was required to sustain a jury verdict than that necessary for the plaintiff to raise a rebuttable presumption by making his prima facie case and to make a submissible case on the issue of the falsity of the employer's articulate nondiscriminatory reason.

After *Reeves*, 8th Circuit decisions have occasionally seized upon its language in differentiating *two alternative means of proving pretext*, and in doing so, have carved out

an exception to the *Reeves* decision which precludes the use of a "pretext-plus" analysis for plaintiff to sustain his evidentiary burden. In *Wallace v. DTG Operations, Inc.,* 442 F.3d 1112 (8th Cir. 2006), *Togerson v. City of Rochester,* 605 F.3d 584 (8th Cir. 2010), and *Power v. Univ of N.D. Sch of Law,* 954 F.3d 1047, 1053 (8th Cir. 2020), the 8th Circuit refused to extend the *Reeves* holding abandoning a "pretext-plus" analysis to cases where pretext is *not* established with a sufficient showing that the defendants' articulated nondiscriminatory reason is unworthy of belief because it has no basis in fact. Instead, in cases where plaintiff cannot make <u>that</u> showing (such as *Wallace, Togerson, & Power, supra*), pretext may nevertheless be shown with enough *additional* evidence to create a genuine dispute (beyond that used to make a *prima facie* case) as to whether a prohibited reason — more than the proffered reason — likely motivated the employer.

In the case at bar, the summary judgment record establishes that the defendants' articulated nondiscriminatory reasons are unworthy of credence and belief because they have no basis in fact.  And in addition to that, there is a genuine dispute as to whether the prohibited reason (*viz.,* invidious discrimination), more than defendants' proffered reasons, likely motivated defendants in constructively discharging plaintiff.

First, as argued above, defendant Green's insistence that she initially put plaintiff on forced leave because of the Muni Court Project is genuinely disputed. The project was not mentioned in any of the requests to the Director of Personnel to place plaintiff on forced leave nor in any of defendant's Green notices to plaintiff as to *why* he was being placed on forced leave. See, **Plaintiff's Exhibit O, pp. 2, 3, 6, 21, 22, 23, 24, 26, 32, & 33**.  For this reason alone, the articulated reason proffered by defendants for harassing plaintiff with sequential forced leaves lacks credence and is unworthy of belief.  Second, and most

importantly, defendants' SUMF contains *numerous* paragraphs of allegations defendants make against plaintiff which defendants attempt to support with citations to the record which do not, in fact, support their allegations. Yet, to the extent that defendants' allegations of plaintiff's misconduct are at least in part supported by references to the record, there are also myriad references to the record cited by plaintiff in his Response which *clearly* demonstrate the existence of a genuine dispute regarding these very same allegations. It would serve no purpose and therefore should be unnecessary for plaintiff to regurgitate <u>all</u> of the genuine disputes highlighted by plaintiff in his SMF.  Yet, a cursory review -- *and even more so*, a careful and studied review of such evidence -- displays a clear and genuine dispute regarding whether plaintiff's handling of the Muni Courts Project constitutes a pretext for the real reasons and motivations for plaintiff's constructive discharge. Some of the more salient evidence demonstrating this genuine dispute are set forth in paragraphs **53** (showing that it was not the efforts of defendant Green that resulted in meeting the deadline for the Muni Courts Project)**; 57** (showing that plaintiff did not fail to communicate to defendant Green problems with the agenda)**; 58** (showing that plaintiff did not cause the vendors' delay in obtaining tax clearances)**; 61** (showing that plaintiff truthfully informed defendant Green that it was the mayor's office pushing to get this issue on the E&A agenda meeting of June 19, 2019)**; 63** (showing that the Comptroller instigated the discussion of how this issue got placed and removed from various versions of the agenda  at the E&A meeting where she alleges she was embarrassed by the mayor)**; 66** (showing that defendant Green approved plaintiff's vacation in advance and never asked him to postpone it)**; 67 & 68** (showing that Tom Ray's email to defendant Green's assistant, Chana Morton, had absolutely nothing to do with alleged impropriety

in using inter-office mail)**; 69** (showing that Ray's email to Chana Morton could not reasonably be interpreted as setting off "alarm bells" about *plaintiff's* alleged mismanagement of the project)**, 84** (showing that Chana Morton's handwritten notes did not contain *any* of the details she inserted in her trumped up memorandum to defendant Green), **& 85** (showing that there was no basis in fact for defendant Green to have considered plaintiff's conduct as exhibiting "lack of candor" or "insubordination").

The same can be said for the *additional* reasons articulated by defendants which were allegedly discovered *after* plaintiff was placed on forced leave. Plaintiff's statement of material facts displays a *plethora* of evidence demonstrating a genuine dispute as to these alleged nondiscriminatory reasons as proffered by defendants. Further, several of the new additional reasons allegedly "discovered" by defendant Green after plaintiff's initial forced leave were in fact known by defendant Green long before then, but resulted in no discipline being imposed upon plaintiff by defendant Green at the time. Moreover, several of these instances of alleged misconduct occurred *years* prior to plaintiff's promotion to Deputy Comptroller (when he was still Asset Manager).  Some of the more salient evidence demonstrating this genuine dispute are set forth in paragraphs **102** (showing that defendant Green based her opinion that plaintiff had improperly signed contracts on an erroneous characterization of the documents plaintiff signed); **103 & 105** (showing that the document plaintiff signed with AT&T was signed in 2009 when he was still Asset Manager and that plaintiff was not disciplined for doing this when defendant Green brought it to her attention at that time *and* that plaintiff signed the same at the direction of his boss, Ivy Pinkston, the then Deputy Comptroller for Finance and Development and by Jim Hartung, an attorney with the City Counselor's office); **110**

17

(showing that the AT&T "statements of work" plaintiff signed were not contracts but an acknowledgment of an already existing contract, as per the advice of an attorney in the City Counselor's office)**; 137** (showing that plaintiff signed a document exercising an option granted to the City under a prior existing lease contract, per the advice of an attorney in the City Counselor's office)**; 139-40** (showing that when defendant Green found out that plaintiff had signed the lease option acknowledgement, she told him not to do it again {but took no disciplinary action} without knowing that his action had been approved by the City Counselor's office)**; 141** (showing that defendant Green claimed that the *additional* "serious fiscal improprieties" she had informed Director Frank constituted the basis for her initial forced leave request were only later discovered *after* plaintiff had been placed on forced leave and that she never informed Director Frank about the Muni Corp Project she later insisted was the basis of her initial placement of plaintiff on forced leave)**, 143** (showing that the AT&T "statements of work" plaintiff signed in October 2018 were not contracts and that these documents were not referenced in any of the forced leave requests, the pretermination letter, or any other memoranda prepared during the so-called "investigation" into plaintiff after being placed on forced leave). The record is replete with evidence that creates a genuine dispute on the issue of *pretext* as it relates to virtually all of the charges brought against plaintiff, both before and after he was initially placed on forced leave.

There is also sufficient and substantial evidence in the record to rebut the same-actor inference, to show the background circumstances of reverse racism and/or sexism, *and* to further demonstrate, not only that the defendants' articulated and alleged nondiscriminatory reasons are false, but also that they are a pretext for the true reasons

for the actions taken by defendants which constitute constructive discharge, *viz.* discrimination based on age, race and/or sex.  Such evidence of defendants' invidious discrimination includes, *inter alia,* the following:

1. Following the death of Ivy Pinkston, Defendant Green did not want to promote plaintiff to the position of Deputy Comptroller for Finance and Development, and she did not consider plaintiff qualified for the position.  **(Ex. HH, Depo of Defendant Green, p. 115, line 14 to p. 117, line 9).**

2. Defendant Green preferred an African-American candidate from outside of the office, Ron Browning Smith, who was 70 years old at the time.  **(Ex. HH, Depo of Defendant Green, p. 114, line 10 to p. 115, line 11).**

3. Based on the age of the two candidates that were considered and the statement made by Defendant Green to plaintiff after she promoted plaintiff that he would retire on top in a couple of years, it is clear Defendant Green was looking for an older candidate that was near or at retirement age as a placeholder until her preferred candidate, a younger African-American female named LaTaunia Kenner, would be sufficiently trained and experienced to take over the position of Deputy Comptroller of Finance and Development.  **Ex. HH, Depo of Defendant Green, p. 114, line 10 to p. 115, line 11; p. 115, line 14 to p. 117, line 9; p. 142, line 18 to p. 143, line 8; Ex. GG, Garavaglia Depo. p. 33, lines 1-10; p, 66, line 18 to p. 67, line 18; See also Ex. KK, Declaration of James Garavaglia, ¶¶6, 7, 8, 12, 13).**

4. Defendant Green testified that she always tried to promote from within first; however, she first attempted to hire someone from outside the office before she decided to promote plaintiff.  **(Ex. HH, Depo of Defendant Green, p. 114, line 10 to p. 115, line 11; p. 140, lines 11-18).**

5. Lataunia Kenner, plaintiff's eventual replacement, did not apply for and was unqualified for the role of Deputy Comptroller in 2016 when plaintiff was first promoted, and was one of only two candidates considered at the time she was promoted in 2020.  **(Ex. GG, Garavaglia Depo. p. 86, lines 9-19; See also Ex. KK, Declaration of James Garavaglia, ¶12; Ex. V).**

6. After plaintiff was promoted, Defendant Green did not train plaintiff, coach plaintiff, give feedback related to performance to plaintiff (positive or negative), or complete service ratings for plaintiff during the entire time he was Deputy Comptroller for Finance and Development.  **(Ex. GG, Garavaglia Depo. p. 83, line 4 to p. 84, line 10; 87, line 10 to p. 88, line 15; p. 97, lines 6-12; Ex. HH, Depo of Defendant Green, p. 148, lines 13-16; See also Ex. KK, Declaration of James Garavaglia, ¶10).**

7. Defendant Green had an "inner circle" of close confidants, all younger African-American females, that she socialized with outside of the office, took trips with, and relied on to assist her in running the office, and all participated in some form in plaintiff's termination.  **(Ex. GG, Garavaglia Depo. p. 83, line 11 to p. 85, line 8; p. 87, line 10 to p. 88, line 15; p. 97, lines 6-12; Ex. DD, Deposition of Judy Armstrong, p. 157, line 5 to p. 159, line 12; p. 170, line 5 to p. 171, line 3; Ex. RR**

**(showing that plaintiff's duties were delegated to Eunetter Steele by Judy Armstrong); See also Ex. KK, Declaration of James Garavaglia, ¶11).**

8.  These individuals include plaintiff's replacement, LaTaunia Kenner, Defendant Green's executive secretary, Chana Morton, Defendant Green's Executive Assistant, Chana Morton, Secretary Eunetter Steele, and Contract Administrator Michele Graham. **(Ex. GG, Garavaglia Depo. p. 83, line 11 to p. 87, line 1; See also Ex. KK, Declaration of James Garavaglia, ¶11 ).**

9.  Following plaintiff's termination and their participation in the investigation of plaintiff's forced leave and pre-termination process, Chana Morton was promoted from Executive Secretary to the Comptroller to Executive Assistant to the Comptroller and Judy Armstrong was promoted from Executive Assistant to the Comptroller to Fiscal Operations Support Manager. **(Ex. DD, Deposition of Judy Armstrong, p. 19, lines 18-23; Ex. II, Deposition of Chana Morton, p. 14, lines 13-17; p. 15, lines 3-4).**

10. Despite all being in lower-level positions than plaintiff, Defendant used these confidants to surreptitiously securitize and spy on plaintiff and plaintiff's work and secretly report their observations back to Defendant Green. Defendant Green then relied entirely on those same individuals when explaining her pretextual reasons in support for why she placed plaintiff on forced leave and ultimately constructively terminated him. **(Ex. HH, Depo of Defendant Green, p. 118, line14 to p. 120, line 19; See also Ex. KK, Declaration of James Garavaglia, ¶¶ 11, 14).**

11. Sometime between March and June, 2019, Defendant Green met with plaintiff and Deputy Comptroller Beverly Fitzsimmons and discussed their intentions to stay on or retire, and after plaintiff responded he intended to stay in his position, Defendant Green was displeased.  **(Ex. GG, Garavaglia Depo., p. 102, line 4 to p.04, line 3; p. 106, line 12 to p. 107, line 13; Ex. EE, Deposition of Beverly Fitzsimmons, p. 34, line 5 to p. 35, line 8.)**

12. Immediately thereafter, in June, 2019, Defendant Green began taking steps to remove plaintiff from his position as Deputy Comptroller for Finance and Development by placing him on forced leave, and, on July 2, 2019, he was escorted out of his office and out of City Hall by a City Marshal without any knowledge of why he was being placed on forced leave**. (Plaintiff's Ex. O, pgs. 1-4; Ex. GG, Garavaglia Depo., p. 11, lines 7-25; p. 13- line 1 to p.131, line 1).**

13. July 2 is an important date because it was the beginning of the new fiscal year, and fit with the Comptroller's plan of having plaintiff replaced with Kenner as Deputy Comptroller for Finance and Development. **(Plaintiff's Ex. O, pgs. 1-4; Garavaglia Depo., p. 133, line 23 to p. 135, line 14).**

14. Defendant Green initially used allegations of "fiscal improprieties" such as claims that plaintiff signed unauthorized contracts or that there was unpaid and ignored overdue telecommunications bills, on Saturday June 28, 2019 when the Director of Personnel was told Defendant Green wanted to put plaintiff on forced leave on that basis**. (Ex. FF, deposition of Richard Frank, p. 38 line 23 to p. 39, line 6; p. 111, lines 6-23;  p. 145, lines 12-25;   p. 146, line 16 to p. 147, line 3; p. 171, lines 14-22; p. 183, lines 3-18; p. 190, line 10 to p. 192, line 11; p. 227,**

**line 25 to p.  228, line 7; Ex. JJ, Linda Thomas deposition, p. 25, line 24 to p. 26, line 23;  p.  32,  line  22  to  p.  34,  line  23.   Ex.  HH,  Defendant  Darlene  Green deposition, p. 168, line 18 to 169, line 10; p. 180, lines 8-12).**

15. Later, on July 12, with the assistance of Judy Armstrong, Defendant Green changed the initial reason for placing plaintiff on forced leave in an attempt to make it seem like the allegations surrounding the municipal court issue were the initial basis, and falsely alleged that after an investigation, and only after plaintiff was already on forced leave, it was newly discovered that plaintiff had signed unauthorized contracts and had improperly allowed telecommunications bills to remain unpaid**. (Ex. HH, Defendant Darlene Green deposition, p. 168, line 18 to 169, line 10; p. 180, lines 8-12; Ex. O, ps. 16-17, 43-44)**

16. Defendant  Green  had  been  aware  of  the  outstanding  telecommunications invoices the previous year, she refused an offer of settlement from AT&T at an amount that was less then what she later settled at, and she was aware plaintiff had been working diligently to resolve the outstanding invoice issue**.  (Ex. GG, Garavaglia Depo., p. 253, line 16 to p. 256 line 25; Ex. LL, Ex. MM, Ex. VV; See also Ex. KK, Declaration of James Garavaglia, ¶24).**

17. Once plaintiff was on forced leave Defendant Green attempted to conduct an "investigation" looking for additional pretext to support termination of plaintiff, and even attempted to bring in the State Auditor with the hope they would find additional pretext; however, the State Auditor did not find any evidence of any fiscal improprieties on the part of plaintiff.  **(Plaintiff's Ex. Y; Plaintiff's Ex. O, pgs. 32, 40-41, 53-54).**

## CONCLUSION

The summary judgment record demonstrates a genuine dispute of fact on plaintiff's claim that he was constructively discharged *and* that defendants were motivated to discharge him because of his race, sex or age.  With regard to the latter issue, plaintiff makes a *prima facie* case of discrimination and further demonstrates a genuine dispute regarding the falsity of defendants' articulated and alleged nondiscriminatory reasons *and* regarding whether their reasons were a pretext for the true reasons for their constructive discharge of plaintiff, *viz.,* race, sex and/or age discrimination.  Accordingly, defendants are not entitled to a judgment as a matter of law and their motion for summary judgment should be denied.

UTHOFF, GRAEBER, BOBINETTE & BLANKE
906 Olive Street, Ste. 300
St. Louis, Missouri  63101
Phone: (314) 621-9550
Fax: (314) 621-2697
*Attorneys for Plaintiff*
By:      /s/  Richard B. Blanke
         Richard B. Blanke, #28675MO
         E-Mail: rblanke@ugbblaw.com
By:      /s/  Paul L. Schmitz
         Paul L. Schmitz, #66885MO
         E-Mail: pschmitz@ugbblaw.com